ELECTRONICALLY FILED - 2025 Feb 07 2:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

GRAND STRAND WATER AND
SEWER AUTHORITY,

      Plaintiff,

v.

ALADDIN MANUFACTURING
CORPORATION; BURLINGTON
INDUSTRIES, INC.; DELTA MILLS,
INC., its predecessors, successors, assigns,
and/or responsible parties; DOMTAR
PAPER COMPANY, LLC; ELEVATE
TEXTILES, INC.; FIBER INDUSTRIES,
LLC; GFL ENVIRONMENTAL USA,
INC.; J.P. STEVENS & COMPANY, INC.,
its predecessors, successors, assigns,
and/or responsible parties; MOHAWK
INDUSTRIES, INC.; NAN YA PLASTICS
CORPORATION, AMERICA; PRET
ADVANCED MATERIALS, LLC; RED
ROCK DISPOSAL, LLC; SAMPSON
COUNTY DISPOSAL, LLC; and WASTE
INDUSTRIES, LLC,

      Defendants.

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT
C/A No. 2024-CP-26-05523

[PFAS Litigation Coordinated Docket]

**DOMTAR PAPER COMPANY, LLC'S
MOTION TO DISMISS**

NOW COMES Defendant Domtar Paper Company, LLC ("Domtar"), by and through the undersigned counsel, and hereby respectfully submits this Motion to Dismiss (this "Motion") the Second Amended Complaint pursuant to Rules 8(a), 12(b)(1) and Rule 12(b)(6) of the South Carolina Rules of Civil Procedure (SCRCP).[1]  Specifically, Domtar seeks dismissal of all causes of action pursuant to Rule 12(b)(1), SCRCP, because the claims are not ripe for adjudication.

---

[1] In filing this Motion, Domtar joins in all other pending motions to dismiss to the extent such motions seek dismissal of cause(s) of action based on arguments that apply to all defendants.

307813952v1

ELECTRONICALLY FILED - 2025 Feb 07 2:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Domtar further seeks dismissal of Plaintiffs' causes of action for nuisance, trespass, and negligence because the Second Amended Complaint fails to state a claim upon which relief can be granted. This Motion is based on the pleadings of record, a Memorandum in Support to be submitted in accordance with the briefing schedule entered by the Court on January 31, 2025, oral argument at the hearing scheduled for March 12, 2025, and any other materials properly before the Court.

WHEREFORE, Domtar respectfully requests that the Court enter an Order granting this Motion and dismissing the Second Amended Complaint. Domtar further seeks any additional relief deemed just and proper.

This the 7th day of February, 2025.

s/ William J. Farley III
William J. Farley III (S.C. Bar No. 101033)
TROUTMAN PEPPER LOCKE LLP
301 S. College Street, Suite 3400
Charlotte, North Carolina 28202
Telephone:  704.998.4099
Facsimile:  704.998.4051
Email:  will.farley@troutman.com

*Counsel for Domtar Paper Company, LLC*

307813952v1

ELECTRONICALLY FILED - 2025 Feb 14 3:45 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | | IN THE COURT OF COMMON PLEAS FIFTEENTH JUDICIAL CIRCUIT |
| COUNTY OF HORRY | | C/A No. 2024-CP-26-05523 |

GRAND STRAND WATER AND
SEWER AUTHORITY,

      Plaintiff,

v.

ALADDIN MANUFACTURING
CORPORATION; BURLINGTON
INDUSTRIES, INC.; DELTA MILLS,
INC., its predecessors, successors, assigns,
and/or responsible parties; DOMTAR
PAPER COMPANY, LLC; ELEVATE
TEXTILES, INC.; FIBER INDUSTRIES,
LLC; GFL ENVIRONMENTAL USA,
INC.; J.P. STEVENS & COMPANY, INC.,
its predecessors, successors, assigns,
and/or responsible parties; MOHAWK
INDUSTRIES, INC.; NAN YA PLASTICS
CORPORATION, AMERICA; PRET
ADVANCED MATERIALS, LLC; RED
ROCK DISPOSAL, LLC; SAMPSON
COUNTY DISPOSAL, LLC; and WASTE
INDUSTRIES, LLC,

      Defendants.

[PFAS Litigation Coordinated Docket]

**DOMTAR PAPER COMPANY, LLC'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

NOW COMES Defendant Domtar Paper Company, LLC ("Domtar"), by and through the undersigned counsel, and submits this Memorandum in Support of its Motion to Dismiss (this "Motion") the Second Amended Complaint filed by Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff"). For the reasons stated herein and in similar motions filed by other

1

ELECTRONICALLY FILED - 2025 Feb 14 3:45 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

defendants in this action, Domtar respectfully requests that the Court dismiss the Second Amended Complaint.[1]

## **BACKGROUND**

This lawsuit arises upon Plaintiff's allegation that Defendants contaminated the Pee Dee River Watershed, the Waccamaw River, and the Intracoastal Waterway with certain per- and polyfluoroalkyl substances ("PFAS") and other substances. *See* Second Am. Compl., ¶ 1. Plaintiff alleges that Defendants have "discharged and continue to discharge" such substances, resulting in high levels of PFAS that "cannot be removed by conventional wastewater treatment processes." *Id.*, ¶¶ 2, 5. Plaintiff, as a special purpose district that provides potable water to residents of various South Carolina counties, commenced this action seeking to recover certain alleged damages, as well as equitable and injunctive relief associated with its future acquisition, installation, and operation of "new water treatment technologies to remove, and provide water free from, Defendants' PFAS." *Id.*, ¶¶ 3, 6, 7.

Plaintiff's allegations specific to Domtar are limited. Plaintiff alleges that Domtar, as "part of its processes" at its Marlboro Mill, "directly discharges industrial wastewater contaminated with products that contain or degrade to these PFAS into the Great Pee Dee River upstream from Plaintiff's water intake on Bull Creek," and that these materials "flow downstream from the Great Pee Dee River and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs." *See* Second Am. Compl., ¶¶ 19, 52, 95, 98. Based on these allegations, the Second Amended Complaint asserts four causes of action against Domtar:

---

[1] In filing this Motion, Domtar joins in all other pending motions to dismiss and supporting memoranda to the extent they seek dismissal of cause(s) of action based on arguments that apply to all defendants. This memorandum borrows from the well-constructed arguments presented in other briefing.

ELECTRONICALLY FILED - 2025 Feb 14 3:45 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(1) private nuisance; (2) public nuisance; (3) trespass; and (4) negligence/gross negligence/recklessness.

As further detailed below, the Court should dismiss the Second Amended Complaint pursuant to Rule 12(b)(1), SCRCP, because none of the causes of action asserted therein are ripe for adjudication. Separately, the Court should also dismiss certain causes of action pursuant to Rule 12(b)(6), SCRCP, on the grounds that they fail to state a claim upon which relief can be granted.

## LEGAL STANDARD

Pursuant to Rule 12(b)(1), SCRCP, a court may dismiss an action for lack of subject matter jurisdiction. Subject matter jurisdiction is a "threshold inquiry for any court," which "requires a determination of justiciability, *i.e.*, whether the litigation presents an active case or controversy." *Holden v. Cribb*, 349 S.C. 132, 137 (2002) (internal citation omitted). Pursuant to Rule 12(b)(6), a "defendant may move to dismiss a complaint based on a failure to state facts sufficient to constitute a cause of action." *Spence v. Spence*, 368 S.C. 106, 116 (2006). A court may also dismiss a complaint based on a failure to state facts sufficient to constitute a cause of action. Rule 12(b)(6), SCRCP. If the facts and inferences drawn from the complaint, viewed in the light most favorable to the plaintiff, would not entitle the plaintiff to relief on any theory, then the grant of a motion to dismiss for failure to state a claim is proper. *Id.* (citing *Baird v. Charleston Cnty.*, 333 S.C. 519, 527 (2006)).

## ARGUMENT

### I.    Plaintiff's claims are not ripe for adjudication

To determine whether litigation constitutes an active case or controversy, a court must assess whether the plaintiff's claims are ripe for adjudication. *See James v. Anne's Inc.*, 390 S.C.

ELECTRONICALLY FILED - 2025 Feb 14 3:45 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

188, 193 (2010). If a claim presents only a "contingent, hypothetical or abstract dispute," the claim is not ripe for adjudication and must be dismissed. *See Pee Dee Elect. Co-op, Inc. v. Carolina Power & Light Co.*, 279 S.C. 64, 66 (1983); *see also Peoples Fed. Sav. & Loan Ass'n of S.C. v. Res. Plan. Corp.*, 358 S.C. 460, 477 (2004) (holding that a justiciable controversy is a real and substantial controversy which is ripe and appropriate for judicial determination, as distinguished from a contingent, hypothetical, or abstract dispute).

In this matter, the allegations in the Second Amended Complaint make clear that Plaintiff has not yet suffered—and may never suffer—any legally cognizable injury due to PFAS. Indeed, while the U.S. Environmental Protection Agency's PFAS water drinking standards ("maximum contaminant levels" or "MCLs") became final in April 2024, it has not been determined if or how the rule will impact Plaintiff. *See* Second Am. Compl., ¶ 45. This is true because the rule does not require that Plaintiff "begin conducting and reporting regular PFAS monitoring" until 2027, and does not require compliance with the MCLs until 2029. *Id.*, ¶ 47.

Moreover, the Second Amended Complaint offers no factual allegations to suggest that Plaintiff is doing anything other than waiting to see if and when it might have to incur costs or expenses associated with the MCLs scheduled to take effect in 2029. At present, any such costs or expenses cannot be quantified and are subject to a number of variables, all of which highlight the premature nature of this litigation. For example, there is pending litigation across the country challenging the EPA's rule. *See e.g., Am. Water Works Ass'n v. U.S. EPA*, Case No. 24-1188; *Nat'l Assoc. of Manufacturers, et al. v. U.S. EPA*, Case No. 24-1191; *The Chemours Company FC, LLC v. U.S. EPA*, Case No. 24-1192. Similarly, Plaintiff's future testing during the monitoring period may reveal that it is not required to make any capital investments to comply with the MCLs. The Second Amended Complaint acknowledges these variables insofar as Plaintiff seeks the award

ELECTRONICALLY FILED - 2025 Feb 14 3:45 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

of unspecified and speculative "future costs" it might incur to install water treatment technologies. *See e.g.,* Second Am. Compl., ¶ 110.   This is precisely the sort of "threat of injury" that is "too contingent or remote to support present adjudication." *Waters v. S.C. Land. Res. Conservation Comm'n*, 321 S.C. 219, 228 (1996) (internal citation omitted).   Accordingly, the Court should dismiss the Second Amended Complaint.

## II.     Plaintiff's claim for private nuisance fails

Plaintiff's claim for private nuisance should be dismissed because any alleged contamination of a public water body cannot form the basis of a claim for private nuisance.   In South Carolina, "a private nuisance affects only one person or a determinate number of persons," whereas a "nuisance is public because of the danger to the public which might have been created." *See Baltzeger v. Carolina Midland Ry. Co.*, 54 S.C. 242, 248 (1899); *Homes Sales Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 81 (Ct. App. 1989).  "If the only interest that is invaded is an interest shared equally by members of the public, then the alleged nuisance is public in nature." *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96-97 (4th Cir. 2011) (holding that an alleged interference with the public's access to clean drinking water and the presence of pollutants in the public water supply will not support a private nuisance claim).

Plaintiff's claim for private nuisance is based on alleged contamination of the Pee Dee River Watershed and other public bodies of water accessed by many other landowners with riparian rights and the public at large, and relied upon by "over 115,000 water customers in Horry County" for domestic water supply.  Second Am. Compl., ¶ 2.  Plaintiff's allegations, therefore, involve alleged harm that is fundamentally public in nature, which "will not support a private nuisance claim." *See Rhodes*, 636 F.3d at 96-97.  Accordingly, the Court should dismiss Plaintiff's cause of action for private nuisance.

### III.    Plaintiff's claim for trespass fails

#### A.    <u>Any alleged entry of PFAS onto Plaintiff's property cannot support a trespass claim</u>

Under South Carolina law, trespass is defined as "any intentional invasion of the plaintiff's interest in the exclusive possession of his property." *Hawkins v. City of Greenville*, 358 S.C. 280, 296 (Ct. App. 2004).  To constitute actionable trespass, however, there must be an affirmative act, invasion of land must be intentional, and harm caused must be the direct result of that invasion." *Id.*  "South Carolina adheres to the traditional rule requiring an invasion by a physical, tangible thing for a trespass to exist." *Babb v. Lee Cnty. Landfill S.C.,* 405 S.C. 129, 145 (2013).  In *Babb*, the Supreme Court of South Carolina specifically analyzed and rejected a broader rule recognizing trespass claims based on "intangible invasions" by "microscopic particulates." *Id*. at 150-52 (rejecting a trespass claim based on "microscopic and atomic" particles because such a claim would lead to public uncertainty as to what constitutes a trespass and would "transform trespass into nuisance" whereby a plaintiff could recover for "even the most ephemeral intrusion").

PFAS molecules, measured in the parts-per-trillion, fit squarely within the "microscopic particulate" category, which, in accordance with *Babb*, cannot form the basis of a trespass claim under South Carolina law.  Therefore, Plaintiffs' cause of action for trespass should be dismissed.

#### B.    <u>Plaintiff does not allege an intentional, unauthorized entry onto its property</u>

A trespass under South Carolina law requires an affirmative act that is "intentional" and "unauthorized." *Snow v. City of Columbia*, 305 S.C. 544, 553 (Ct. App. 1991); *Ravan v. Greenville Cnty.*, 315 S.C. 447, 464 (Ct. App. 1993).  Similarly, and pertinent to allegations in this case, multiple courts have recently found that a water treatment facility has no cause of action for trespass where the facility voluntarily draws allegedly contaminated water from a river. *See e.g.*, *Utilities Bd. Of Tuskegee v. 3M Co.*, *Inc.*, No. 2:22-cv-420-WKW, 2023 WL 1870912, at *16

6

ELECTRONICALLY FILED - 2025 Feb 14 3:45 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 14 3:45 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(M.D. Ala. Feb. 9, 2023) (rejecting a trespass claim based on similar allegations because, "unlike other indirect trespasses, Defendants' PFAS did not cross onto [plaintiff's] boundary line by a natural process").

The Second Amended Complaint is void of any allegation that Domtar, by intentionally discharging water in the Great Pee Dee River, intended to cause PFAS to enter Plaintiff's downstream water source. Notwithstanding this omission, the notion that Domtar acted with such intent strains credulity given that Domtar's Marlboro Mill is located approximately eighty (80) miles upstream. Moreover, it is impossible to square the concept that Domtar affirmatively, intentionally trespassed on Plaintiff's property with the fact that it is Plaintiff who affirmatively draws water from the public watershed into its facility by activating its pumps. *See* Second Am. Compl., ¶ 97. Stated differently, but for Plaintiff affirmatively taking water from the public watershed, there would never be an "invasion" of Plaintiff's property. This Court should follow the well-reasoned opinion in *Utilities Bd. Of Tuskegee*, and dismiss Plaintiff's claim for trespass.

C.   Plaintiff does not enjoy exclusive possession of the water from Bull Creek

Finally, the Supreme Court of South Carolina has previously held that trespass claims protect only the "right to exclusive possession" of property, as opposed to protecting against "merely interfer[ing] with the right to use and enjoyment." *Babb*, 405 S.C. at 150-51. It is also well-settled that while a riparian owner has "an equal right to use of the water which follows in the stream adjacent to his lands, … [h]e has no property in the water itself, but a simple usufruct." *White v. Whitney Mfg. Co.*, 60 S.C. 254, 265 (1904).

It follows that, to the extent Plaintiff seeks to recover on a trespass theory based on alleged PFAS contamination of the various waterways referenced in the Second Amended Complaint, such a claim fails because Plaintiff does not possess an exclusion right to the water. Rather,

7

ELECTRONICALLY FILED - 2025 Feb 14 3:45 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff has only a riparian right of reasonable use. Plaintiff admits as much, and specifically alleges that it "owns riparian land abutting Bull Creek and the Intracoastal Waterway, and Plaintiff has a property right in the reasonable use of the waters, including for the provision of water to its customers." *See* Second Am. Compl., ¶ 69. This is not—nor does allege it to be—exclusive possession of Bull Creek, which is fatal to Plaintiff's trespass claim. Accordingly, the Court should dismiss this cause of action.

### IV.    Plaintiff's claim for negligence fails

To prevail on a negligence cause of action under South Carolina law, it is well-established that a legally cognizable duty of care must flow between the plaintiff and the defendant; otherwise, the claim fails as a matter of law. *See e.g.*, *Huggins v. Citibank, N.A.*, 355 S.C. 329, 333 (2003) (holding that the parties must have a relationship recognized by law as providing the foundation for a duty to prevent an injury and that a court must not extend the concept of a legal duty of care in tort liability beyond reasonable limits); *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 136 (2006) (holding that an affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or some other special circumstance).

Here, the Second Amended Complaint is void of any allegation purporting to establish the existence of a duty of care flowing to Plaintiff from Domtar. Plaintiff does not allege the existence of a legal duty created by statute. Plaintiff does not allege the existence of a contractual relationship between Plaintiff and Domtar. Plaintiff does not allege a property interest involving Plaintiff or Domtar giving rise to a cognizable duty of care. There is likewise no other "status" or "special circumstance" alleged by Plaintiff as applicable to Domtar that might give rise to a cognizable duty of care.

ELECTRONICALLY FILED - 2025 Feb 14 3:45 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Instead, Plaintiff bases its negligence claim on the general notion that all Defendants "have a duty to use care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals." *See* Second Am. Compl., ¶ 103.  This broad, conclusory statement runs contrary to South Carolina law, which expressly guards against the extension of tort liability beyond reasonable limits.  *See e.g.*, *Huggins*, 355 S.C. at 333; *see also Miller v. City of Camden*, 329 S.C. 310, 314 (1997) (citation omitted) (holding that "one who has no control owes no duty").  Given the absence of a legal duty flowing between Plaintiff and Domtar, the Court should dismiss Plaintiff's cause of action for negligence.

## CONCLUSION

Based on the foregoing, Domtar respectfully requests that the Court enter an Order granting this Motion and dismissing the Second Amended Complaint.  Domtar further seeks any additional relief deemed just and proper.

This the 14th day of February, 2025.

s/ William J. Farley III
William J. Farley III (S.C. Bar No. 101033)
TROUTMAN PEPPER LOCKE LLP
301 S. College Street, Suite 3400
Charlotte, North Carolina 28202
Telephone:  704.998.4099
Facsimile:  704.998.4051
Email:  will.farley@troutman.com

*Counsel for Domtar Paper Company, LLC*

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| **STATE OF SOUTH CAROLINA**<br><br>**COUNTY OF HORRY**<br><br><br>Grand Strand Water and Sewer Authority,<br><br>Plaintiff,<br><br>v.<br><br>Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC, Elevate Textiles, Inc.; Fiber Industries, LLC; GFL Environmental USA, Inc.; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; and Waste Industries, LLC,<br><br>Defendants. | **IN THE COURT OF COMMON PLEAS FIFTEENTH JUDICIAL CIRCUIT**<br><br>**IN RE: PFAS LITIGATION COORDINATED DOCKET**<br><br>**C.A. No.: 2024-CP-26-05523**<br><br><br><br>**DEFENDANT PRET ADVANCED MATERIALS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT** |

Pursuant to Rules 8, 12(b)(1), and 12(b)(6) of the South Carolina Rules of Civil Procedure, and the Scheduling Order entered by the Court on January 31, 2025, Defendant PRET Advanced Materials, LLC ("PRET" or "Defendant") respectfully submits this Memorandum in Support of its Motion to Dismiss Plaintiff Grand Strand Water and Sewer Authority's ("GSWSA" or "Plaintiff") Second Amended Complaint (hereinafter the "SAC") as to PRET.

## INTRODUCTION

This action arises from the United States Environmental Protection Agency's ("EPA") recent regulation to modify the amount of per- and polyfluoroalkyl substances ("PFAS") chemicals in drinking water. The regulation is set to take effect in 2029. At the outset, Plaintiff's claims should be dismissed as the dispute is not ripe for adjudication, and therefore, this Court lacks

1

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

subject matter jurisdiction to hear this case. Because the basis of Plaintiff's SAC involves the EPA's PFAS regulation that has not even gone into effect, Plaintiff's claims are not ripe for adjudication. At this point, it is speculative as to whether the regulation will even be in effect in 2029, or if subsequent administrations or federal courts will overturn or alter the regulation. Moreover, assuming that the EPA's regulation does go into effect in 2029, the costs, if any, Plaintiff will ultimately have to undertake to comply with the EPA's regulation are theoretical. Plaintiff cannot recover for potential future expenses that it *might* incur in connection with its acquisition, installation, and operation of new water treatment technology in accordance with the EPA's regulation.

Second, the Court should dismiss Plaintiff's claims as the Court lacks subject matter jurisdiction under the theory of primary jurisdiction. Under the South Carolina State Safe Drinking Water Act, exclusive enforcement of the claims in the SAC rests with the South Carolina Department of Environmental Services ("SCDES"), formerly known as the South Carolina Department of Health and Environmental Control. This administrative agency is better able to address the issues in the SAC, not the Court.  Additionally, under the municipal cost recovery rule (also known as the "free public services doctrine"), a public governmental entity like Plaintiff cannot recover for expenditures in the performance of governmental functions, such as the alleged future expenditures in the SAC.

Notwithstanding the jurisdictional issues in the SAC, Plaintiff's claims against PRET for (1-2) private nuisance and public nuisance, (3) trespass, and (4) negligence should be dismissed because Plaintiff fails to state facts sufficient to support these claims. Both of Plaintiff's nuisance claims fail on account of Plaintiff's lack of exclusive ownership interest in the Pee Dee River Watershed, the Waccamaw River, and the Intercostal Waterway (hereinafter the "Public

2

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Waterbodies"), and its public nuisance claim specifically fails because Plaintiff is not the proper plaintiff to assert this claim absent any special injury. The SAC fails to allege any special injury.

Moreover, Plaintiff fails to allege the elements necessary to support a trespass claim. Plaintiff does not enjoy exclusive ownership of the Public Waterbodies. Additionally, the South Carolina Supreme Court has held that only invasions of physical tangible things may give rise to trespass, in contrast to the PFAS molecules which are intangible matter. Further, Plaintiff has not alleged a cognizable harm in trespass nor intentional invasion, as defined by South Carolina law.

Plaintiff's claim for negligence fails because PRET owes no affirmative duty to Plaintiff and because Plaintiff has not alleged any physical injury or property damage. As discussed in greater detail below, Plaintiff's claims against PRET fail as a matter of law and should be dismissed.

Plaintiff's claim for alleged future expenses concerning its Myrtle Beach Surface Water Treatment Plant ("Myrtle Beach SWTP") should be dismissed as to PRET because PRET's facility is not upstream from that plant and could not be the cause of any future expenses by Plaintiff with respect to that SWTP.

Plaintiff's claim for attorney's fees should be dismissed because Plaintiff has failed to allege a contractual, statutory, or other proper basis for such a claim in this case. In addition, Plaintiff's claim for prejudgment interest should be dismissed because its claim is not for a sum certain, but rather one for an unliquidated amount of damages.

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FACTUAL ALLEGATIONS[1]

Plaintiff is a special purpose district that operates the Bull Creek Surface Water Treatment Plant ("SWTP") and the Myrtle Beach SWTP (collectively, "Plaintiff's SWTPs") and owns certain land on Bull Creek in Bucksport, South Carolina and on the Intracoastal Waterway in Myrtle Beach. SAC ¶3. Plaintiff's SWTPs draw water from Bull Creek and the Intracoastal Waterway for treatment before distributing it to customers. *Id.*

Plaintiff's claims arise from the alleged discharge of PFAS into the Public Waterbodies. *Id.* at ¶¶ 1, 26, & 53. Plaintiff asserts the Defendants in this case own and/or operate industrial facilities upstream of Plaintiff's water intakes and allegedly used products that contain or degrade PFAS in their industrial processes. *Id.* at ¶4. Defendant then discharged wastewater with PFAS into the Public Waterbodies either directly or indirectly through certain wastewater treatment plants. *Id.* As a result, Plaintiff claims that it has incurred and will incur damages related to funding the acquisition, installation, and operation of water treatment technologies at Plaintiff's SWTPs to remove PFAS from drinking water. *Id.* at ¶7.

In the SAC, Plaintiff asserts the following four causes of action against PRET: (1 and 2) private and public nuisance, (3) trespass, and (4) negligence.[2] The basis of Plaintiff's claims against PRET is that PRET conveyed wastewater that allegedly contained PFAS to the Johnsonville Wastewater Treatment Plant ("Johnsonville WWTP"). SAC ¶¶ 1, 26, & 53. In turn, after further treatment, the Johnsonville WWTP discharged water containing PFAS that allegedly

---

[1] For purposes of this motion only, the allegations in the SAC are assumed to be true even though PRET expressly denies the allegations regarding its use and discharge of PFAS and other allegations in Plaintiff's SAC.

[2] Plaintiff's SAC asserts additional causes of action against Defendant Burlington Industries, Inc., but those claims do not state and do not purport to state claims against PRET.

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

came from PRET into the Lynches River at a location over 22 miles "as a crow flies" upstream from Plaintiff's plant on Bull Creek. *Id*. **Exhibit A.**[3] Plaintiff's Myrtle Beach SWTP on the Intracoastal Waterway is even farther away (over 32 miles) and **is not downstream** from the Johnsonville WWTP. **Exhibits B, C, D, and E.**[4] The relative locations of the Johnsonville WWTP and Plaintiff's Myrtle Beach SWTP, as well as the stream flow directions, are reproduced below.[5]

---

[3] Exhibit A is a Google Map of an area including Johnsonville, SC and Plaintiff's Bull Creek SWTP, https://www.google.com/maps (Last Visited: 12/4/2024).

[4] Exhibit B is a Google Map of an area including Johnsonville, SC and Plaintiff's Myrtle Beach SWTP, https://www.google.com/maps (Last Visited: 12/4/2024). Exhibits C, D, and E are United States Geological Survey maps showing that the Johnsonville WWTP is not upstream from Plaintiff's Myrtle Beach SWTP.

[5] This Court may take judicial notice of the location of PRET's facility and the Johnsonville WWTP in relation to Plaintiff's Myrtle Beach SWTP and the downstream flow of rivers. "Judicial notice may be taken at any stage of the proceeding." Rule 201(f), SCRE. "A judicially noticed fact must be one not subject to reasonable dispute that is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Id.* at (b); *S.C. Dep't of Soc. Servs. v. Janice C*., 383 S.C. 221, 227, 678 S.E.2d 463, 467 (Ct. App. 2009); *Bowers v. Bowers*, 349 S.C. 85, 94, 561 S.E.2d 610, 615 (Ct.App.2002). Where there is no South Carolina appellate court opinion on point, South Carolina courts are instructed to follow federal court decisions. *Gardner v. Newsome Chevrolet-Buick, Inc*., 304 S.C. 328, 404 S.E.2d 200 (1991). In particular, this Court should take judicial notice of the Google Earth maps and the location of PRET and the Johnsonville WWWTP in relation to Plaintiff's Myrtle Beach SWTP. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 711 n.5 (4th Cir. 2018) (taking judicial notice of facts, such as location, gleaned from internet mapping tools); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice of publicly available data from an official State website).

USGS Map displaying location of Johnsonville WWTP and Myrtle Beach SWTP

A. Johnsonville WWTP

B. Myrtle Beach SWTP



https://waterdata.usgs.gov/monitoring-location/02110755/#parameterCode=00010&period=P7D&showMedian=false

PRET is the current owner of a plant in Johnsonville, South Carolina where it recycles carpet. PRET has only owned the plant since 2015 when it purchased certain assets in connection with the bankruptcy of Wellman, Inc., which previously owned and operated the plant and recycled carpet at that location for several decades. PRET does not make, sell, or distribute PFAS or purchase PFAS for use in its carpet recycling, and Plaintiff does not allege that it does. In addition, PRET does not discharge its wastewater into a public waterway.  Rather, PRET discharges its wastewater to the Johnsonville WWTP. Further, PRET's operations and its discharges to the Johnsonville WWTP are regulated by governmental authorities, and Plaintiff does not allege that PRET or the Johnsonville WWTP have operated in violation of their permits.

An additional premise of Plaintiff's claims is that the EPA recently proposed a dramatic reduction in the allowable amount of certain PFAS in drinking water to 4 parts per *trillion.* SAC ¶¶ 41, 42, & 45. But that EPA regulation, which is being challenged in multiple lawsuits, does not

6

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

require compliance until **2029.** *Id.* at *¶* 47. Plaintiff alleges that it may be able to meet the potential future requirement by incurring unspecified and unknown expenses *See id.* at *¶¶* 78, 83 ("expenses associated with **future** acquisition ... of required treatment technologies"), 89 (seeking funding of "the acquisition ... of new water treatment technology"); 101, and 110.

## **LEGAL STANDARD**

South Carolina is a fact-pleading state that requires a plaintiff to plead the ultimate facts and a statement of facts constituting a cause of action. Rule 8(a), SCRCP. A complaint must contain factual allegations regarding each essential element of a viable cause of action, and failure to plead facts sufficient to constitute a cause of action warrants dismissal under Rule 12(b)(6), SCRCP. *See Doe v. Marion*, 361 S.C. 463, 470, 605 S.E.2d 556, 561 (Ct. App. 2004) (affirming dismissal under Rule 12(b)(6) where plaintiffs failed to allege sufficient facts to support their negligence claim).

Rule 12(b)(1), SCRCP, provides a case may be dismissed in full when the court lacks subject matter jurisdiction over the issues in the case. Subject matter jurisdiction cannot be conferred by consent of the parties and cannot be waived by the parties. *Atlanta Skin & Cancer Clinic, P.C. v. Hallmark Gen. Partners, Inc*., 320 S.C. 113, 121, 463 S.E.2d 600, 605 (1995). Further, a judgment of a court without subject matter jurisdiction is void. *Coon v. Coon*, 364 S.C. 563, 566, 614 S.E.2d 616, 617 (2005).

Under Rule 12(b)(6) of the South Carolina Rules of Civil Procedure, a party may move to dismiss a claim based on a failure to state facts sufficient to constitute a cause of action. *Spence v. Spence*, 368 S.C. 106, 116, 628 S.E.2d 869, 874 (2006). In considering a motion to dismiss, the court must base its ruling solely on allegations set forth in the operative pleading. *Id.* Based on the facts alleged, the "question is whether, in the light most favorable to the [nonmoving party],

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and with every doubt resolved in his behalf, the [pleading] states any valid claim for relief." *Doe*, 373 S.C. at 395, 645 S.E.2d at 247-48 (citation omitted).

## ARGUMENT

### I.     Plaintiff's Claims Are Not Ripe for Adjudication.

First and foremost, Plaintiff's claims in this lawsuit are not ripe for adjudication and, therefore, this Court does not have subject matter jurisdiction over the claims. "A threshold inquiry for any court is a determination of justiciability, i.e., whether the litigation presents an active case or controversy." *Lennon v. S.C. Coastal Council*, 330 S.C. 414, 415, 498 S.E.2d 906, 906 (Ct. App. 1998). This includes an inquiry into whether Plaintiff's claims are ripe for adjudication. *See James v. Anne's Inc.*, 390 S.C. 188, 193, 701 S.E.2d 730, 732 (2010). A claim is not ripe and should be dismissed when it presents "a contingent, hypothetical or abstract dispute." *Pee Dee Elec. Co-op., Inc. v. Carolina Power & Light Co.*, 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983).

The SAC confirms that Plaintiff has not yet suffered the injury for which it seeks recovery and therefore presents a hypothetical and abstract dispute. Although the EPA published PFAS drinking water standards in April, 2024, it has not yet been determined how, if at all, the rule will impact Plaintiff. SAC ¶ 45. The EPA regulation, which is being challenged in multiple lawsuits, does not require compliance until 2029. *Id.* at ¶ 47. In the SAC, Plaintiff argues that PRET should pay "expenses associated with future acquisition, installation, and operation of required treatment technologies." *Id.* at ¶ 83. Plaintiff thus implicitly admits that it is not currently required to—and has not—purchased treatment technologies to comply with the possible future regulation. Instead, Plaintiff seeks to recover damages for "the mere threat of potential injury," as the EPA regulation does not yet require compliance and is subject to change. *Waters v. S.C. Land Resources Comm.*, 321 S.C. 219, 228, 467 S.E.2d 913, 918 (1996). Since it is premature and entirely speculative what

measures, if any, Plaintiff may be required to take in the future, Plaintiff's claims are not ripe for adjudication and should be dismissed.

## II.      The Court Lacks Subject Matter Jurisdiction Over this Action Which May Only Be Heard by the South Carolina Department of Environmental Services.

The Court lacks subject matter jurisdiction over this action which may only be heard by SCDES on the basis of primary jurisdiction. "Primary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case, the judicial process is suspended pending referral of such issues to the administrative body for its view." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956) (internal quotation marks omitted).

The South Carolina State Safe Drinking Water Act (the "Act") reflects the regulatory framework under which the legislature entrusted SCDES with addressing the exact harm alleged here. *See* S.C. Code Ann. § 44-55-10, *et seq.* The Act prohibits any person from "render[ing] a public water system, or part or portion of a public water system, inoperable or unusable by means of contamination . . . ." *Id.* at § 44-55-80(B). The Act exclusively vests enforcement authority in SCDES and, if requested by SCDES, the Attorney General. *Id.* at §§ 44-55-60 through 44-55-100. Under the Act, violators are liable to the State, not the public water system, and damages are limited to actual damages sustained. *Id.* at § 44-5590(B)(1), 44-55-1520. Because the exclusive enforcement of these issues rests with SCDES, this Court should dismiss this case to allow SCDES to exercise primary jurisdiction.

## III.      Plaintiff Fails to Allege Facts Necessary to Support a Private Nuisance Claim.

Plaintiff's claim for private nuisance fails because it concerns the contamination of a public body of water and Plaintiff lacks any property interest in the public waterbody to which it alleges

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PRET discharged PFAS. "The traditional concept of a nuisance requires a landowner to demonstrate that the defendant unreasonably interfered with his ownership or possession of the land." *FOC Lawshe Ltd. P'ship v. Int'l Paper Co.*, 352 S.C. 408, 413, 574 S.E.2d 228, 231 (Ct. App. 2002) (quoting *Silvester v. Spring Valley Country Club*, 344 S.C. 280, 286, 543 S.E.2d 563, 566 (Ct. App. 2001)). A private nuisance "produces damage to but one or two persons, and cannot be said to be public." *Charleston Dev. Co., LLC v. Alami*, 433 S.C. 533, 548, 860 S.E.2d 687, 695 (Ct. App. 2021) (quoting *Deason v. S. Ry. Co.*, 142 S.C. 328, 334, 140 S.E.2d, 575, 577 (1927)); *see also Baltzeger v. Carolina Midland Ry. Co.*, 54 S.C. 242, 248, 32 S.E. 358, 360-61 (1899) ("A private nuisance affects only one person or a determinate number of persons." (quoting 16 Am. & Eng. Enc. Law, 926).

First, PRET did not unreasonably interfere with Plaintiff's ownership or possession of the waterways because PRET does not discharge any water into the Lynches River or any other waterway. Rather, as alleged, PRET conveys its wastewater to the Johnsonville WWTP, like other private citizens. SAC ¶ 26. Once PRET conveys its wastewater to the Johnsonville WWTP, it has no control over the treatment or filtration of the wastewater. Therefore, any interference with Plaintiff's property as a result of PFAS entering the watershed is not an interference caused by PRET.

In addition, Plaintiff cannot establish that PRET unreasonably interfered with any watershed from which Plaintiff's Myrtle Beach SWTP pulls. As neither PRET nor the Johnsonville WWTP are upstream from any watersheds feeding the Myrtle Beach SWTP, it does not withstand reason that PRET could have emitted PFAS into a waterway that then fed into the Myrtle Beach SWTP watershed. Therefore, PRET cannot be held responsible for any alleged damage to the Myrtle Beach SWTP as PRET was not the cause of the alleged interference.

Further, Plaintiff is just one of the many riparian landowners with property located along Black Creek, the Great Pee Dee River, and Bull Creek. Accordingly, Plaintiff cannot sustain its private nuisance claim as the alleged harm is inherently "public in nature," which cannot support a private nuisance claim. *See Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011).

### IV.    Plaintiff Fails to Allege Facts Necessary to Support a Public Nuisance Claim.

Plaintiff is not the proper plaintiff to bring a public nuisance claim. "While a public nuisance cause of action can be used to remedy harms suffered by the public generally, typically only the State may assert this cause of action." *Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*, 407 S.C. 67, 78, 753 S.E.2d 846, 852 (2014) (citing *Brown v. Hendricks*, 211 S.C. 395, 400, 45 S.E.2d 603, 605 (1947) ("a private action does not lie to abate a private nuisance.")). This power is generally reserved for the state Attorney General under the *parens patriae* authority. *See Condon v. State*, 354 S.C. 634, 641, 583 S.E.2d 430, 434 (2003) (stating Attorney General's "authority in his capacity as the chief legal officer of the State to institute actions involving the welfare of the State and its citizens, including vindication of wrongs committed collectively against the citizens of the State"); *Cnty. of Lexington v. City of Columbia*, 303 S.C. 300, 301, 400 S.E.2d 146, 147 (1991) (holding that "political subdivision[s] of the State," such as cities and counties, "lack[] the sovereignty to maintain such a suit under the doctrine of *parens patriae*" and therefore can only bring suit pursuant to an infringement of the local government's "own propriety interest or statutory rights").

Moreover, Plaintiff's public nuisance claim should be dismissed because Plaintiff does not allege a special injury to its real or personal property. *See* SAC ¶ 2. In South Carolina, a private party may only bring a private civil suit for a public nuisance "if he suffered special injury to his

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

real or personal property." *Carnival Corp.*, 407 S.C. at 78, 753 S.E.2d at 852. Courts have defined a special injury as an "individual or specific damage in addition to that suffered by the public" that must be "of a special character, distinct and different from the injuries suffered by the public generally." *Id.* (citations omitted); *see also Rhodes*, 636 F.3d at 96-98 (4th Cir. 2011) (rejecting public nuisance claim based on alleged PFAS contamination to municipal water supply where plaintiff failed to allege injury different from that "suffered by other members of the public").

Additionally, Plaintiff does not allege an injury to its own real or personal property. Plaintiff attempts to assert a "special injury" as to the "loss of use of its properties" under the EPA regulation. However, as discussed in more detail below, Plaintiff does not have any ownership interest in the waterways outside of its limited, reasonable, riparian use of the waterways. SAC ¶ 83 (arguing that Plaintiff's special injuries include "the inability to provide potable water to customers without concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals deemed unsafe by the EPA"); *id* at ¶16 ("Plaintiff operates the Bull Creek SWTP . . . [which] is riparian to, and draws water from, Bull Creek . . . The Myrtle Beach SWTP is riparian to, and draws water from, the Intracoastal Waterway."). As such, Plaintiff fails to allege that PRET caused any special injury to its real or personal property, and Plaintiff's claim for public nuisance fails as a matter of law. As Plaintiff has a riparian right of reasonable use in the waterways, "[h]e has no property in the water itself, but a simple usufruct." *White v. Whitney Mfg. Co.*, 60 S.C. 254, 38 S.E. 456 (1901); SAC ¶ 3.

Plaintiff's public nuisance claim should also be dismissed because, as discussed in Section II, *supra*, PRET does not discharge its wastewater into a public waterway, thus, it cannot be said that PRET unreasonably interfered with or caused special damage to Plaintiff's property. Accordingly, Plaintiff's claim for public nuisance fails as a matter of law and should be dismissed.

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**V.      Plaintiff Fails to Allege Facts Necessary to Support Trespass Claim.**

Plaintiff fails to state a claim for trespass. "Trespass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property . . . . To constitute actionable trespass, there must be an affirmative act, invasion of land must be intentional, and harm caused must be the direct result of that invasion." *Hawkins v. City of Greenville*, 358 S.C. 280, 296, 594 S.E.2d 557, 565-66 (Ct. App. 2004). In this case, Plaintiff fails to adequately allege invasion of Plaintiff's exclusive possession of property by a tangible matter or that the invasion onto its property was intentional and unauthorized. For these reasons, Plaintiff's trespass claim should be dismissed.

a.      <u>Plaintiff does not have exclusive possession over the waterways</u>.

Critically, Plaintiff's trespass claim should be dismissed because Plaintiff does not enjoy exclusive possession over the Public Waterbodies. South Carolina courts are clear that trespass *only* protects one's right to the exclusive possession of his property, and Plaintiff does not have exclusive possession over the Public Waterbodies at the center of its trespass claim. *Babb v. Lee County Landfill S.C.*, LLC, 405 S.C. 129, 139, 747 S.E.2d 468, 473 (2013). Under the common law, riparian property owners hold special rights allowing them to make 'reasonable use' of the water adjacent to their property." *Jowers v. S.C. Dep't of Health & Env't Control*, 423 S.C. 343, 355, 815 S.E.2d 446, 452 (2018). While it is well-settled in South Carolina that a riparian owner has "an equal right to the use of the water which flows in the stream adjacent to his lands . . . [h]e has no property *in the water itself*, but a simple usufruct." *White*, 60 S.C. at 254, 38 S.E. at 459 (emphasis added).

In its SAC, Plaintiff acknowledges that it "owns and occupies riparian lands in Horry County, both on Bull Creek in Bucksport, South Carolina, and on the Intracoastal Waterway in Myrtle Beach, South Carolina." SAC ¶ 3. Moreover, Plaintiff merely alleges that "Plaintiff has a

13

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

property right in the reasonable use of these waters, including for the provision of water to its customers." SAC ¶ 69. As Plaintiff does not enjoy any ownership interest in the water itself, but rather, only an equal right to use of that water, it is well-settled law in South Carolina that Plaintiff does not enjoy exclusive enjoyment of property to sustain a claim for trespass. *See White*, 60 S.C. 254, 38 S.E. at 456; *Jowers*, 423 S.C. at 355, 815 S.E.2d at 452.

      b.      <u>PFAS particles are intangible matter that cannot support a trespass claim.</u>

Even if Plaintiff had exclusive possession of the Public Waterbodies, Plaintiff's trespass claim fails because PFAS are intangible matter and any alleged contamination is not an invasion by a physical, tangible thing as required by South Carolina law. "South Carolina adheres to the traditional rule requiring an invasion by a physical, tangible thing for a trespass to exist." *Babb*, 405 S.C. at 145, 747 S.E.2d at 476. In *Babb*, the Court analyzed, and rejected, a line of trespass cases that would allow trespass claims based on intangible invasions. *Id.* 405 S.C. at 150-52, 747 S.E.2d at 480-81 (concluding that allowing trespass actions for "microscopic and atomic particles" would lead to public uncertainty as to what constitutes a trespass and "would transform trespass into nuisance" where plaintiffs could recover for "even the most ephemeral intrusion").

In *Babb*, the Court rejected alternatives to the traditional rule and recognized that the traditional rule remains "superior" as it promotes "clarity, ease of implementation, and ability to serve as a guide for future conduct" that will "yield a stable rule as to what rises to the level of a trespass." *Id.* 405 S.C. at 149-151, 747 S.E.2d 479-80 (*rejecting Martin v. Reynolds Metals Co.*, 221 Or. 86, 99-100, 32 P.2d 790 (Or. 1959) and *Borland v. Sanders Lead Co.*, 369 So. 523 (Ala. 1979) (holding "fluoride partials" and "sulfoxide emissions" were sufficient to constitute a trespass despite their intangible nature.)).

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

In following the traditional rule, the Court followed the Michigan Court of Appeals' decision in *Adams v. Cleveland-Cliffs Iron Co.* which concluded that dust is "not actionable in trespass" because "dust, along with other forms of airborne particulate, does not normally present itself as a significant physical intrusion," but rather "become[s] part of the ambient circumstances of th[e] space" on which it settles. *See Babb*, 405 S.C. at 149-50, 747 S.E.2d at 479; *see also* 237 Mich. App. 51, 67-70, 602 N.W. 2d 215, 222-24 (Mich. 1999). Further, the court emphasized that the traditional rule "preserves the distinction between trespass and nuisance," whereas "the divergent view would transform trespass into nuisance," thereby "leav[ing] property owners with less, rather than more, protection of their property rights." *See Babb*, 405 S.C. at 151, 747 S.E.2d at 480.

This case presents issues that are nearly identical to those in *Babb*. While, in *Babb*, the alleged trespass consisted of an "invisible odor," here, the PFAS particles are similarly microscopic and are "visibly undetectable and transient." *Babb*, 405 S.C. at 146, 747 S.E.2d at 477 (citation omitted); *see* SAC ¶ 36 (acknowledging that PFAS molecules are measured in parts per trillion). As a result, the PFAS particles are exactly the type of "intangible matter" that the South Carolina Supreme Court held is "insufficient to constitute a trespass" as the intrusion of particles does not interfere with the exclusive possession of land. *Babb*, 405 S.C. at 146, 747 S.E.2d at 477. For these reasons, Plaintiff's trespass claim should be dismissed because any alleged PFAS contamination cannot constitute a trespass under South Carolina law.

c.    Plaintiff fails to allege *any* affirmative act by PRET constituting an intentional and unauthorized entry upon Plaintiff's property.

Even if the Court finds that PFAS is tangible matter, Plaintiff's claim for trespass still fails because Plaintiff does not allege PRET's entry upon its property is intentional or unauthorized. Trespass under South Carolina law requires that a defendants' "affirmative act [and] invasion of

15

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the land must be intentional . . . ." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). South Carolina law is explicit that to be intentional, "[the trespasser] must intend [the] act which constitutes the unwarranted entry on another's land." *Id.* 305 S.C. at 553, 409 S.E.2d at 802. "Intent is proved by showing that the defendant acted voluntarily and that he knew or should have known the result would follow from his act." *Id.*

First, Plaintiff's SAC does not contain any allegation involving an affirmative act by PRET. In fact, PRET does not discharge wastewater into the Lynches River or any other waterway. As Plaintiff alleges, PRET conveys its wastewater to Johnsonville WWTP for treatment. SAC ¶ 26. PRET does not control the method or manner the Johnsonville WWTP uses to treat its wastewater. Because PRET does not discharge its wastewater into the Lynches River, or any other body of water, Plaintiff cannot establish that PRET affirmatively and intentionally discharged PFAS into the Public Waterbodies. Additionally, as it relates to Plaintiff's Myrtle Beach SWTP, neither PRET nor the Johnsonville WWTP are upstream from the Myrtle Beach SWTP. As a result, PRET could not have feasibly affirmatively or intentionally interfered with Plaintiff's Myrtle Beach SWTP and cannot be held responsible for any alleged damage related to this SWTP.

Second, Plaintiff concedes that PFAS contamination has only occurred as a result of Plaintiff's own actions in deliberately drawing the subject water into its facilities. *Id.* at ¶ 97. ("[E]ach separate invasion of PFAS-contaminated water constitutes a new trespass every time Plaintiff's water pumps are active."). As a result, it is not an alleged affirmative act by PRET that directly caused an invasion, but rather Plaintiff's intervening activation of its water pumps that brought the alleged PFAS molecules onto its property.

Moreover, Plaintiff fails to allege any plausible factual basis for a claim that PRET intended to cause or actually caused PFAS to enter Plaintiff's SWTP on Bull Creek, which is 22 miles from

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PRET's plant, and Plaintiff's SWTP in Myrtle Beach, which is over 32 miles from PRET's plant. Because Plaintiff cannot show that PRET directly caused an intentional invasion of Plaintiff's property, Plaintiff's trespass claim should be dismissed.

### VI.     Plaintiff Fails to State a Claim for Negligence Against PRET.

Plaintiff's negligence claim against PRET fails as well. To prevail in an action for negligence, a plaintiff must establish that: "(1) defendant owes a duty of care to the plaintiff, (2) defendant breached the duty by a negligent act or omission, (3) defendant's breach was the actual and proximate cause of the plaintiff's injury, and (4) plaintiff suffered an injury or damages." *Steinke v. S.C. Dep't of Labor, Licensing & Regulation,* 336 S.C. 373, 387, 520 S.E.2d 142, 149 (1999). "The absence of any one of these elements renders the cause of action insufficient." *Washington v. Lexington Cty. Jail,* 337 S.C. 400, 405, 523 S.E.2d 204, 206 (Ct.App.1999).

#### a.     PRET does not owe Plaintiff a duty of care.

It is well-settled under South Carolina law that "[a]n essential element in a cause of action for negligence is the existence of a legal duty of care owed by the defendant to the plaintiff." *Huggins v. Citibank, N.A.,* 355 S.C. 329, 332, 585 S.E.2d 275, 276 (2003). There can be no negligence liability unless the parties "have a relationship recognized by law as providing the foundation for a duty to prevent an injury." *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.,* 373 S.C. 43, 48, 644 S.E.2d 43, 46 (2007). Such a duty "may be created by statute, a contractual relationship, status, property interest, or some other special circumstance." *Madison ex rel. Bryant v. Babcock Ctr., Inc.,* 371 S.C. 123, 136, 638 S.E.2d 650, 656-57 (2006).

Furthermore, foreseeability of the alleged injury alone does not give rise to a duty absent such a relationship. *See Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.,* 355 S.C. 614, 618, 586 S.E.2d 586, 588 (2003). "Absent a legally recognized duty, the defendant in a

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

negligence action is entitled to a judgment as matter of law." *Wright v. S.C. Dep't of Transportation*, 437 S.C. 184, 191, 877 S.E.2d 788, 791 (Ct. App. 2022), *reh'g denied* (Sept. 23, 2022), *cert. denied* (May 24, 2023) (*citing Cole v. Boy Scouts of Am.*, 397 S.C. 247, 251, 725 S.E.2d 476, 478 (2011).

Plaintiff fails to plead any facts, or otherwise establish, a duty of care owed by PRET to Plaintiff. Plaintiff's conclusory allegation, that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others" is insufficient to support a negligence claim. SAC ¶ 103. Plaintiff's claim fails because Plaintiff does not identify any "statute, [] contractual relationship, status, property interest, or some other special circumstance" that would give rise to such duty of care. *See McCullough,* 373 S.C. at 47, 644 S.E.2d at 46.  Even if the EPA's recent regulation to modify the amount of PFAS in drinking water were the basis of Plaintiff's negligence claim, as explained above, the regulation might take effect in 2029 and therefore cannot, at this time, serve as a basis to establish that PRET owes a duty of care to Plaintiff.

Even if the hypothetical future expense of complying were foreseeable, South Carolina law holds that "foreseeability of injury, in and of itself, does not give rise to a duty." *Charleston Dry Cleaners* 355 S.C. at 618, 586 S.E.2d at 588 (*citing South Carolina State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 289 S.C. 373, 376, 346 S.E.2d 324, 325 (1986)). Because no duty exists between Plaintiff and PRET, Plaintiff's negligence claim fails as a matter of law.

      b.    <u>PRET is not the proximate cause of Defendant's alleged damages</u>.

Proximate cause requires proof of: (1) causation-in-fact, and (2) legal cause. J.*T. Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 369, 635 S.E.2d 97, 101 (2006) (*citing Bramlette v. Charter–Medical–Columbia*, 302 S.C. 68, 72, 393 S.E.2d 914, 916 (1990)). Causation-in-fact is proved by

18

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

establishing the injury would not have occurred "but for" the defendant's negligence, and legal cause is proved by establishing foreseeability. *Id.*

PRET does not discharge PFAS into the Lynches River—or any other body of water. As alleged by Plaintiff in the SAC, PRET conveys its wastewater to Johnsonville WWTP for treatment. SAC ¶ 26. PRET cannot, and does not, control how Johnsonville WWTP treats and filters its water any more than any other citizen who uses consumer products resulting in PFAS discharge into their wastewater can direct and control the activities of public utilities.

Because Johnsonville WWTP—not PRET— is responsible for filtering, treating, and discharging the water in accordance with SCDES, and other state and federal regulations, PRET cannot be the "but for" cause of PFAS entering any other, downstream, wastewater treatment plants as alleged by Plaintiff. *See S*.C. Code Ann. § 44-55-10, *et seq.* Therefore, Plaintiff does not establish the required element of causation to sustain its negligence claim against PRET.

Additionally, Plaintiff's claims against PRET in relation to Plaintiff's Myrtle Beach SWTP, must be dismissed because neither PRET nor the Johnsonville WWTP are upstream from the Myrtle Beach SWTP. As a result, there is no feasible way any PFAS allegedly emitted by PRET (which are none) could have flowed into the sources of water from which the Myrtle Beach SWTP pull. Therefore, PRET cannot be the proximate cause of any damage to Plaintiff's Myrtle Beach SWTP and cannot not be held responsible for any future damage to the Myrtle Beach SWTP on this basis.

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

c.    Plaintiff has not suffered an injury recoverable under a negligence claim.

Damages are a required element of a negligence claim. *Babb*, 405 S.C. at 153, 747 S.E.2d at 481. "Generally, under South Carolina law, the damages element requires a plaintiff to establish physical injury or property damage." *Id.*

Plaintiff fails to allege cognizable damages because Plaintiff has not yet (and may never) incur costs to comply with the EPA regulation. Other than the alleged future expenses to comply with the Rule, the Complaint asserts only conclusory allegations of harm. (*See, e.g.,* SAC ¶¶ 65, 86, 110, 120 (alleging unspecified "past, present, and future injury to property," and unnamed damages and "losses resulting from injury to its property")). These allegations are plainly insufficient to withstand a motion to dismiss. *Jones v. Gilstrap*, 288 S.C. 525, 528, 343 S.E.2d 646, 648 (Ct. App. 1986) (holding that, even under the liberal standard for a motion to dismiss, mere conclusory allegations, unsupported by allegations of fact, are insufficient). Consequently, Plaintiff's negligence claim should be dismissed on this basis as well.

## VII.    The Court Should Strike Plaintiff's Requests for Attorney's Fees and Prejudgment Interest.

a.    Plaintiff has not identified any applicable statute or contract providing for an award of attorney's fees.

Plaintiff is not entitled to attorneys' fees in this case. Under the "American Rule," the parties to a lawsuit generally bear the responsibility of paying their own attorneys' fees. *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 561, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). There are limited exceptions to the American Rule, such as when attorney's fees are authorized by contract or by statute. *Seabrook Island Prop. Owners' Ass'n v. Berger*, 365 S.C. 234, 238, 616 S.E.2d 431, 434 (Ct. App. 2005). "In South Carolina, the authority to award attorney's fees can come only from a statute or be provided for in the language of a

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

contract. There is no common law right to recover attorney's fees." *Harris–Jenkins v. Nissan Car Mart, Inc.*, 348 S.C. 171, 176, 557 S.E.2d 708, 710 (Ct. App. 2001) (citations omitted).

In this case, Plaintiff fails to plead any contract that permits the recovery of attorneys' fees as a separate element of damages. Therefore, Plaintiffs' prayer for relief for attorneys' fees should be dismissed.

     b  <u>Plaintiff's does not identify a statute or contract entitling it to prejudgment interest on an unliquidated claim.</u>

Plaintiff is not entitled to prejudgment interest in this case. "[South Carolina] law allows prejudgment interest on obligations to pay money from the time when, either by agreement or by operation of law, the payment is demandable, if the sum is certain or capable of being reduced to certainty, even if the parties do not agree on the amount of the obligation." *Brooklyn Bridge, Inc. v. S.C. Ins. Co.*, 420 S.E.2d 511, 513 (Ct. App. 1992) (citation omitted). "The proper test for determining whether prejudgment interest may be awarded is whether or not the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose." *Smith-Hunter Constr. Co., Inc. v. Hopson*, 365 S.C. 125, 129, 616 S.E.2d 419, 421 (2005) (citation omitted). (citation omitted). In terms of prejudgment interest, the general rule is that it is not recoverable on an unliquidated claim in the absence of agreement or statute. *QHG of Lake City, Inc. v. McCutcheon*, 360 S.C. 196, 205, 600 S.E.2d 105, 109 (Ct. App. 2004) (*citing Builders Transp., Inc. v. South Carolina Property & Cas. Ins. Guar. Ass'n*, 307 S.C. 398, 406, 415 S.E.2d 419, 424 (Ct. App. 1992)

Here, Plaintiff's claims are not a sum certain or capable of being reduced to any certainty. Because Plaintiff will not be required to comply with the EPA's regulation until 2029, any proposed amount of damages for future compliance with the EPA's regulation are speculative and cannot be fixed by conditions existing at the time the claim arose—especially seeing as Plaintiff's

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

claims cannot properly arise until 2029. Therefore, as Plaintiff does not identify any statute or agreement authorizing prejudgment interest as to its unliquidated amount of damages, Plaintiffs' prayer for relief for prejudgment interest should be dismissed.

### VIII. The Municipal Cost Recovery Rule (Also Known As The "Free Public Services Doctrine") Precludes The Speculative Damages Plaintiff Seeks In Its SAC.

Plaintiff is not entitled to recover costs incurred for its performance of its functions as a special purposed district. Under the municipal cost recovery rule, also known as the "free public service doctrine," public expenditures made in the performance of governmental functions are not recoverable in tort. *See United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 315-17 (1947) (holding that the "exercise of judicial power to establish [] new liability . . . would be intruding within a field properly within [the legislature's] control"). Attempts by governmental bodies to sue product manufacturers over response costs are an end run around the democratic process. *See Int'l Bhd. of Teamsters, Local 734 Health & Welfare Fund v. Philip Morris, Inc.*, 196 F.3d 818, 825 (7th Cir. 1999) ("[I]t is no part of the judicial function . . . to decree a sudden, *ex post* shift in the financial consequences of selling a consumer product by attaching what would amount to a regressive excise tax."); *Torres v. Putnam Cnty.*, 541 S.E.2d 133, 136 & n.4 (Ga. App. 2000) (allegation that defendant "caus[ed] the county to spend money enforcing its laws and protecting its citizens" failed to state a claim).

Plaintiff is a "special purpose district that provides potable water to residents of various counties in South Carolina, including Horry County." SAC ¶ 3. Under S.C. Code of Laws § 611-1610, a special purpose district is "a district created by an Act of the General Assembly or pursuant to general law and which provides any governmental power or function including, but not limited to, fire protection, sewerage treatment, water or natural gas distribution or recreation." S.C. Code Ann. § 6-11-1610. A special purpose district also means any rural community water district

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

authorized or created under the provisions of Chapter 13 of Title 6 of the S.C. Code of Laws. *See* S.C. Code Ann. § 6-13-10. As a public, governmental entity, Plaintiff cannot claim relief from the Court for alleged damages to its facilities. *See* SAC ¶ 7.

## CONCLUSION

For the foregoing reasons, PRET respectfully requests that the Court grant its motion to dismiss Plaintiff's Second Amended Complaint as to PRET.

February 14, 2025

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

By: _s/Robert Y. Knowlton_
Robert Y. Knowlton, S.C. Bar No. 3589
John P. Boyd, S.C. Bar No. 72412
1201 Main Street, 22nd Floor (29201)
Post Office Box 11889
Columbia, SC 29211-1889
(803) 779-3080
bknowlton@hsblawfirm.com
jboyd@hsblawfirm.com

Frank T. Davis, S.C. Bar No. 66291
Jonathan D. Klett, S.C. Bar No. 103208
One North Main, 2nd Floor
(864) 240-3211
fdavis@hsblawfirm.com
jklett@hsblawfirm.com

*Attorneys for Defendant PRET Advanced Materials, LLC*

23

*Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC, Elevate Textiles, Inc.; Fiber Industries, LLC; GFL Environmental USA, Inc.; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; and Waste Industries, LLC*
C.A. No.: 2024-CP-26-05523

# EXHIBIT A

Google Map showing distance between Johnsonville Wastewater Treatment Plant and Plaintiff Bull Creek Surface Water Treatment Plant

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Google Map measuring distance between Johnsonville WWTP and Bull Creek SWTP



Google (2024), Johnsonville WWTP to Bull Creek SWTP. Available at https://www.google.com/maps (Last Visited: 12/4/2024)

*Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC, Elevate Textiles, Inc.; Fiber Industries, LLC; GFL Environmental USA, Inc.; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; and Waste Industries, LLC*
C.A. No.: 2024-CP-26-05523

# EXHIBIT B

Google Map showing distance between Johnsonville Wastewater Treatment Plant and Plaintiff Myrtle Beach Surface Water Treatment Plant

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Google Map measuring distance between Johnsonville WWTP and Myrtle Beach SWTP



Google (2024), Johnsonville WWTP to Myrtle Beach SWTP. Available at https://www.google.com/maps (Last Visited: 12/4/2024)

*Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC, Elevate Textiles, Inc.; Fiber Industries, LLC; GFL Environmental USA, Inc.; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; and Waste Industries, LLC*
C.A. No.: 2024-CP-26-05523

# EXHIBIT C

USGS Map showing downstream flowline from Plaintiff Myrtle Beach WWTP to Winyah Bay

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## USGS Map showing downstream flowline from Myrtle Beach WWTP to Winyah Bay

A – Myrtle Beach SWTP
B – Winyah Bay



https://waterdata.usgs.gov/monitoring-location/02110755/#parameterCode=00010&period=P7D&showMedian=false

*Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC, Elevate Textiles, Inc.; Fiber Industries, LLC; GFL Environmental USA, Inc.; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; and Waste Industries, LLC*
C.A. No.: 2024-CP-26-05523

# EXHIBIT D

USGS Map displaying location of Johnsonville WWTP and Myrtle Beach SWTP

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## USGS Map displaying location of Johnsonville WWTP and Myrtle Beach SWTP

A - Johnsonville WWTP
B - Myrtle Beach SWTP



https://waterdata.usgs.gov/monitoring-location/02110755/#parameterCode=00010&period=P7D&showMedian=false

*Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC, Elevate Textiles, Inc.; Fiber Industries, LLC; GFL Environmental USA, Inc.; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; and Waste Industries, LLC*
C.A. No.: 2024-CP-26-05523

# EXHIBIT E

USGS Map annotated with locations of monitoring stations upstream and downstream of Plaintiff Myrtle Beach SWTP, all showing downstream flowline

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 14 4:10 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

USGS Map Annotated with locations of monitoring stations upstream and downstream of Plaintiff Myrtle Beach SWTP, all showing downstream flowline



https://waterdata.usgs.gov/monitoring-location/02110755/#parameterCode=00010&period=P7D&showMedian=false

ELECTRONICALLY FILED - 2025 Feb 28 1:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

IN RE: PFAS LITIGATION
COORDINATED DOCKET

_____

Grand Strand Water and Sewer Authority,

*Plaintiff,*

*v.*

Aladdin Manufacturing Corporation;
Burlington Industries, Inc.; Delta Mills,
Inc., its predecessors, successors, assigns,
and/or responsible parties; Domtar Paper
Company, LLC; Elevate Textiles, Inc.;
Fiber Industries, LLC; GFL Environmental
USA, Inc.; J.P. Stevens & Company, Inc.,
its predecessors, successors, assigns, and/or
responsible parties; Mohawk Industries,
Inc.; Nan Ya Plastics Corporation America;
PRET Advanced Materials, LLC; Red
Rock Disposal, LLC; Sampson County
Disposal, LLC, and Waste Industries, LLC,

*Defendants.*

IN THE COURT OF COMMON PLEAS

FIFTEENTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-26-05523

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER AND STAY OF DISCOVERY

Plaintiff, Grand Strand Water and Sewer Authority ("GSWSA"), by and through its

undersigned counsel, hereby submit this Response in Opposition to the pending motion for a

protective order to stay discovery filed by Defendant Elevate Textiles, Inc. ("Elevate"). For the

reasons set forth herein, the Court should deny Defendant's motion.

1

ELECTRONICALLY FILED - 2025 Feb 28 1:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## BACKGROUND

On November 4, 2024, Plaintiff served Defendant with its Second Amended Complaint ("Complaint").

On December 4, 2024, Defendant requested a 10-day extension to respond to Plaintiff's Complaint, which Plaintiff granted. On December 13, 2024, Defendant requested an additional one-week extension to respond, which Plaintiff, again, granted.

Then, on December 23, 2024, Defendant filed a motion to dismiss Plaintiff's Complaint. That same day, Defendant filed the current motion for a protective order to stay discovery.

To date, Plaintiff has not served any discovery requests upon Defendant.

## STANDARD OF REVIEW

Rule 26(c) allows the court to issue a protective order "for good cause shown" to protect a party from "annoyance, embarrassment, oppression, or undue burden or expense" of discovery. Rule 26(c), SCRCP. Under the Rules, "methods of discovery may be used in any sequence," and parties may commence discovery at any time after commencement and service of the action. Rule 26(d), SCRCP; Rule 30(a)(1), SCRCP; Rule 33(a), SCRCP; Rule 34(b), SCRCP. It is well established that the filing of a dispositive motion does not, by itself, warrant the issue of a stay of discovery. *Brown-Thomas v. Hynie*, No. 1:18-CV-02191-JMC, 2019 WL 1043724, at \*4 (D.S.C. Mar. 5, 2019). Instead, "a court may stay discovery during the pendency of a dispositive motion if there is good cause to do so." *Boudreaux Grp., Inc. v. Clark Nexsen, Owen, Barbieri, Gibson, P.C.*, No. 8:18-cv-1498-TMC, 2018 WL 9785308, at \*4 (D.S.C. Nov. 20, 2018). The burden of establishing good cause for a protective order and stay of discovery is on the party seeking the order. *See Martin v. Bimbo Foods Bakeries Distrib., LLC*, 313 F.R.D. 1 (E.D.N.C. 2016) (party

ELECTRONICALLY FILED - 2025 Feb 28 1:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

moving for protective order has burden of making particularized showing of why discovery should be denied, and conclusory or generalized statements in motion fail to meet this burden).

Furthermore, the moving party "may not rely upon 'stereotyped and conclusory statements,' to establish good cause"; rather, the moving party "must present a 'particular and specific demonstration of fact' as to why a protective order [staying discovery] should issue.'" *Wymes v. Lustbader*, No. CIV. WDQ-10-1629, 2012 WL 1819836, at \*3 (D. Md. May 16, 2012) (quoting *Baron Fin. Corp. v. Natanzon*, 240 F.R.D. 200, 202 (D. Md. 2006)). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." *Id*. (quoting *Merit Indus., Inc. v. Feuer*, 201 F.R.D. 382, 384–85 (E.D.Pa. 2001)). Moreover, "[t]he moving party must come forward with a specific factual showing that the interest of justice and considerations of prejudice and undue burden to the parties require a protective order and that the benefits of a stay outweigh the cost of delay.'" *Id.* (quoting *Kron Med. Corp. v. Groth*, 119 F.R.D. 636, 638 (M.D.N.C.1988)).

The decision to grant or deny a stay is within the Court's discretion. *See Midlands Util., Inc. v. S.C. Dep't of Health & Env't Control*, 287 S.C. 483, 487, 339 S.E.2d 862, 864 (1986). In determining whether a stay of discovery pending resolution of a motion to dismiss is appropriate, courts consider various factors "including the breadth of discovery and burden of responding to it, the risk of unfair prejudice to a party opposing the stay, the nature and complexity of the action, the posture or stage of the litigation, and any other relevant circumstances." *Herring v. Lapolla Indus., Inc.*, No. 2:12-CV-02705-RMG, 2013 WL 12148769, at \*1 (D.S.C. Aug. 30, 2013); *see also Nat'l Rifle Ass'n of Am. v. Cuomo*, No. 1:18-CV-566-TJMCFH, 2020 WL 7338588, at \*2 (N.D.N.Y. Dec. 14, 2020) ("[f]actors that courts have considered when determining whether or not a stay is appropriate include: (1) whether the defendant has made a strong showing that the

3

ELECTRONICALLY FILED - 2025 Feb 28 1:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

plaintiff's claim is unmeritorious; (2) the breadth of discovery and the burden of responding to it; and (3) the risk of unfair prejudice to the party opposing the stay. Courts also may take into consideration the nature and complexity of the action, whether some or all of the defendants have joined in the request for a stay, and the posture or stage of the litigation." (quoting *Chesney v. Valley Stream Union Free Sch. Dist. No. 24*, 236 F.R.D. 113, 115 (E.D.N.Y. 2006))). Furthermore, in deciding whether to stay discovery pending resolution of a pending motion, courts "balance the harm produced by a delay in discovery against the possibility that the motion will be granted and entirely eliminate the need for such discovery. This involves weighing the likely costs and burdens of proceeding with discovery." *Simpson v. Specialty Retail Concepts, Inc.*, 121 F.R.D. 261, 263 (M.D.N.C. 1988).

## ARGUMENT

While Rule 26(c), SCRCP, grants the Court broad discretion to issue protective orders for good cause, Defendant has failed to demonstrate the "good cause" requirement. Because a motion to stay discovery is "tantamount to a request for a protective order prohibiting or limiting discovery pursuant to Rule 26(c)," the movant must demonstrate "good cause" for the limitation on discovery. *Kron Med. Corp.*, 119 F.R.D at 637; *accord, Perry v. City of Pontiac*, 254 F.R.D. 309, 312 (E.D. Mich. 2008) ("court[s] may fashion a protective order to limit discovery" under Rule 26(c) "[u]pon good cause shown"). However, the moving party "may not rely upon 'stereotyped and conclusory statements,' to establish good cause"; rather, the moving party "must present a 'particular and specific demonstration of fact' as to why a protective order [staying discovery] should issue.'" *Wymes v. Lustbader*, No. CIV. WDQ-10-1629, 2012 WL 1819836, at *3 (D. Md. May 16, 2012) (quoting *Baron Fin. Corp.*, 240 F.R.D. at 202).

4

ELECTRONICALLY FILED - 2025 Feb 28 1:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Here, Defendant's assertion of undue burden is generic and conclusory and at best describes burdens that are routine and expected in the discovery process: "Absent a stay of discovery in this case, there is no dispute that Elevate will be required to devote substantial time and resources responding to any discovery requests served by Plaintiff in this action." Mot., at 4. Defendant fails to provide specific factual evidence showing that responding to Plaintiff's future discovery requests would somehow impose an undue burden or expense. Instead, Defendant's assertion of burden is entirely speculative and premature.

Simply filing a motion to dismiss does not excuse Defendant from its requirement to show particularized "good cause," because "a pending Motion to Dismiss is not ordinarily a situation that in and of itself would warrant a stay of discovery." *Turner Broad. Sys., Inc. v. Tracinda Corp.,* 175 F.R.D. 554, 556 (D. Nev. 1997). Furthermore, as demonstrated in Plaintiff's consolidated opposition to the motions to dismiss, Defendant's motion to dismiss is not well-founded and thus provides no basis for staying discovery, as Defendant fails to show that its motion to dismiss will likely succeed or fully dispose of the case. *See Simpson,* 121 F.R.D. at 263 (stating that when deciding whether to stay discovery pending resolution of a pending motion, courts "balance the harm produced by a delay in discovery against the possibility that the motion will be granted and entirely eliminate the need for such discovery") Instead, the only argument Defendant proffers is the mere general and conclusory assertion that, "*if* the Court ultimately grants Elevate's Motion to Dismiss, the time and resources expended by it to respond to discovery will have been unnecessary." Mot., at 4 (emphasis added; cleaned up). This fails to meet the required particularized showing of "good cause" requirement.

Furthermore, all of the factors relevant to whether the Court should stay discovery at this juncture weigh against the stay. *See Herring*, 2013 WL 12148769, at *1 ("breadth of discovery";

5

ELECTRONICALLY FILED - 2025 Feb 28 1:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

"burden of responding to it"; "risk of unfair prejudice" to the nonmovant; "the nature and complexity of the action"; "posture or stage of the litigation"). Plaintiff again emphasizes that no discovery has been served upon Defendant. There is zero burden upon Defendant from responding to nonexistent discovery requests. On the other hand, granting Defendant's preemptive request for a blanket discovery stay would unfairly prejudice Plaintiff by delaying its ability to gather evidence critical to proving its claims. *See generally Merritt Bros., Inc. v. Marine Midland Realty Credit Corp.*, 307 S.C. 213, 216, 414 S.E.2d 167, 169 (1992) ("An equitable stay may be invoked if justified by circumstances which outweigh any potential harm to the party against whom it is operative.").

Moreover, as the Court is well aware, this litigation is complex, and the Supreme Court assigned the Local PFAS Litigation to this Court to "promote the effective and expeditious disposition of this litigation." To stay discovery now, at the outset, would encourage Defendants to make further attempts to delay the litigation and stretch it out for many years before resolution. *See also Kron Med. Corp.,* 119 F.R.D. at 637–38 ("In considering [motions to stay discovery], the Court needs to remain mindful of its responsibility to expedite discovery and minimize delay. Disruption or prolongation of the discovery schedule is normally in no one's interest. A stay of discovery duplicates costs because counsel must reacquaint themselves with the case once the stay is lifted. Matters of importance may be mislaid or avenues unexplored. A case becomes more of a management problem to the Court when it leaves the normal track. While time may heal some disputes, in others it merely permits more opportunity for festering."); *Medlin v. Andrew*, 113 F.R.D. 650, 652 (M.D.N.C. 1987) (stating that protective orders "should be sparingly used and cautiously granted"). Doing so would not be consistent with "the effective and expeditious

ELECTRONICALLY FILED - 2025 Feb 28 1:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

disposition" of this case, nor would it "secure the just, speedy, and inexpensive determination" of this action. Rule 1, SCRCP.

Finally, because the Court is hearing Defendants' motion to stay discovery at the same time as the motions to dismiss, the motion to stay is very likely to be mooted by the Court's decision on the motions to dismiss.

## CONCLUSION

For the reasons set forth herein, Defendant has failed to meet its burden to demonstrate that it is entitled to the indeterminate protective order staying discovery that it seeks. Therefore, Plaintiff respectfully requests that the Court deny Defendant's motion.

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
JOHN B. WHITE, JR., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

February 28, 2025

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

Aladdin Manufacturing Corp. *et al.*,

*Defendants*.

C.A. No. 2024-CP-26-05523

## PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff, Grand Strand Water and Sewer Authority ("GSWSA" or "Plaintiff"), hereby responds to all pending motions filed by Defendants Domtar Paper Company, LLC ("Domtar"); Elevate Textiles, Inc. ("Elevate"); Fiber Industries, LLC ("Fiber"); GFL Environmental USA, Inc. ("GFL"); Mohawk Industries, Inc. and Aladdin Manufacturing Corporation (collectively "Mohawk"); Nan Ya Plastics Corporation, America ("Nan Ya"); PRET Advanced Materials, LLC ("PRET"); Red Rock Disposal, LLC ("RRD"); Sampson County Disposal, LLC ("SCD"); and Waste Industries, LLC ("Waste Industries").[1]

---

[1] Defendants filed separate memoranda in support of their motions to dismiss, which share uniform pagination for each's respective briefing in this case. In citations, Plaintiff abbreviates these memoranda to "MIS." Plaintiff references consolidated briefing filed by GFL and Waste Industries as "GFL MIS," and it references consolidated briefing filed by RRD and SCD as "RRD MIS."

i

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## TABLE OF CONTENTS

INDEX OF ACRONYMS ................................................................................................................... iv

I.     FACTUAL BACKGROUND ................................................................................. 1

II.    STANDARD OF REVIEW ................................................................................... 4

III.   ARGUMENT ......................................................................................................... 5

   A.   Plaintiff's claims for relief are justiciable. ..................................................... 5

      1.   Plaintiff clearly has standing to seek relief for past, present, and future property injuries. ..................................................................................................... 6

      2.   Defendants' position is self-defeating. ...................................................... 8

   B.   Plaintiff states actionable claims for trespass. ............................................. 10

      1.   The invasion of wastewater contaminated with Defendants' PFAS products constitute physical, tangible intrusions under South Carolina law. ........... 10

      2.   Defendants' discharges of PFAS-contaminated wastewater with knowledge that it would invade Plaintiff's properties constitute affirmative, intentional acts. ........... 12

   C.   Plaintiff states actionable claims for public and private nuisance. .............. 16

      1.   Plaintiff alleges that Defendants controlled their properties and products that cause the contamination of Plaintiff's properties and upstream surface waters. ............... 16

      2.   Plaintiff has suffered private property injuries that confer rights of action for both private and public nuisance. .................................................................... 19

   D.   Plaintiff states actionable claims for negligence. ......................................... 25

      1.   Defendants owed Plaintiff duties of care. ................................................ 25

      2.   Plaintiff sufficiently alleges that PRET and Nan Ya proximately caused Plaintiff's injuries. ..................................................................................................... 31

      3.   Plaintiff alleges actionable damages. ...................................................... 33

      4.   Plaintiff has not assumed the risk of PFAS contamination. ..................... 33

   E.   The "free public services doctrine" does not apply here, if it exists in South Carolina at all. ................................................................................................................. 35

   F.   The Safe Drinking Water Act does not preempt Plaintiff's claims. .............. 38

   G.   Defendants' causation arguments should be rejected. .................................. 40

      1.   Plaintiff sufficiently alleges that its injuries are fairly traceable to Elevate's and Nan Ya's conduct. ..................................................................................................... 40

      2.   PRET's causation arguments are also unavailing. ................................... 43

   H.   This Court has personal jurisdiction over RRD and SCD. ............................ 46

ii

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

1.      Because Plaintiff has voluntarily dismissed GFL and Waste Industries, the Court need not consider their motions. ................................................................. 47

2.      North Carolina law governs Plaintiff's claims against RRD and SCD. .................... 47

3.      This Court has personal jurisdiction over RRD and SCD. ...................................... 48

I.      Plaintiff properly seeks an award of attorney's fees and prejudgment interest. ........... 53

J.      This Court should not stay this case or decline jurisdiction. ...................................... 54

K.      The United States is not a necessary party. ................................................................. 57

IV.      CONCLUSION ............................................................................................................. 64

iii

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**INDEX OF ACRONYMS**

**Chemical Substances**

| | |
|---|---|
| **PFAS** | Perfluoroalkyl and polyfluoroalkyl substances. Refers to the entire body of synthetic chemicals known for their water-, grease- and stain-resistant properties. |
| **PFOS** | Perfluorooctane Sulfonate. One of the six PFAS regulated under the Safe Drinking Water Act. EPA states that there is no safe level for consuming PFOS. |
| **PFOA** | Perfluorooctanoic Acid. One of the six PFAS regulated under the Safe Drinking Water Act. EPA states that there is no safe level for consuming PFOA. |
| **PFNA** | Perfluorononanoic Acid. One of the six PFAS regulated under the Safe Drinking Water Act |
| **PFHxS** | Perfluorohexane Sulfonate. One of the six PFAS regulated under the Safe Drinking Water Act |
| **PFBS** | Perfluorobutanesulfonic Acid. One of the six PFAS regulated under the Safe Drinking Water Act |
| **HFPO-DA** | Hexafluoropropylene Oxide Dimer Acid. Also referred to as "GenX chemicals." <br><br> One of the six PFAS regulated under the Safe Drinking Water Act |
| **MCL PFAS** | Refers to all PFAS subject to maximum contaminant levels and maximum contaminant level goals under the Safe Drinking Water Act. Includes PFOA, PFOS, PFNA, PFHxS, PFBS, and HFPO-DA (aka "GenX chemicals") |

**Regulatory and Legal Terms**

| | |
|---|---|
| **DES** | South Carolina Department of Environmental Services, formerly known as the Department of Health and Environmental Control ("DHEC"). |
| **MCL** | Maximum Contaminant Level. Enacted and enforced pursuant to regulations passed under the Safe Drinking Water Act. Stands for the maximum allowable level of a contaminant that a public water system may deliver to a user. |
| **MCLG** | Maximum Contaminant Level Goal. Enacted pursuant to regulations passed under the Safe Drinking Water act. Stands for the maximum level of |

| | |
|---|---|
| | a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons will occur. |
| **SDWA** | Safe Drinking Water Act. The congressional legislation authorizing regulations that, among other things, set MCLs and MCLGs. |
| **SCSDWA** | South Carolina Safe Drinking Water Act. The state-level analogue to the SDWA. |
| **WWTP** | Wastewater Treatment Plant. A facility that receives wastewater from residential and/or industrial users. |
| **SWTP** | Surface Water Treatment Plant. A facility used by public water systems, like Plaintiff, that withdraws water from a water source, treats the water to make it fit for human consumption, and distributes the water to users. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## I.   FACTUAL BACKGROUND

For decades, Defendants have knowingly and recklessly poisoned the Pee Dee River Watershed,[2] the Waccamaw River, and the Intracoastal Waterway with toxic per- and polyfluoroalkyl substances ("PFAS"). Plaintiff relies on these vital water sources to supply potable drinking water to over 100,000 South Carolinians. Second Amended Complaint ("Complaint"), ¶¶ 1–3. Defendants, all operators of industrial facilities, have systematically discharged PFAS into these waters, causing pervasive and ongoing contamination that threatens the health of these residents and undermines Plaintiff's use of its properties, including its water treatment and distribution infrastructure. *Id.* at ¶¶ 4–6, 48–62. Defendants' pollution has rendered Plaintiff's water treatment systems incapable of producing water free from chemicals that the Environmental Protection Agency ("EPA") deems unsafe for consumption, or that even meets the basic safety standards set by EPA. *Id.* at ¶¶ 7, 63–66.

Plaintiff is a special purpose district responsible for supplying safe drinking water to over 115,000 residents in Horry County. *Id*. at ¶¶ 2–3, 15–17. Plaintiff operates two surface water treatment plants ("SWTPs"): the Bull Creek SWTP and the Myrtle Beach SWTP. *Id*. at ¶ 16. The Bull Creek SWTP draws water from Bull Creek, which branches off the main stem of the Great Pee Dee River just upstream from the SWTP's intake, whereas the Myrtle Beach SWTP draws water from the Intracoastal Waterway.

Upstream from Plaintiff, at various locations within the Pee Dee River Watershed, Defendants—companies currently and formerly engaged in textile and other manufacturing operations—have utilized products that contain or degrade to PFAS in their industrial processes and discharge the resulting PFAS-containing wastewater either directly to surface waters or to

---

[2] By "Pee Dee River Watershed," Plaintiff refers to the Great Pee Dee River, Little Pee Dee River, Lynches River, Lumber River, Lake Swamp, Black Creek, Bull Creek, and the tributaries thereof.

1

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

municipal wastewater treatment plants ("WWTPs"). *Id*. at ¶¶ 4–5, 18–26, 51. In addition, some Defendants are engaged in waste management operations that generate PFAS-containing leachate wastewater, which these Defendants haul to an upstream WWTP for disposal. *Id*. at ¶¶ 22, 54. The treatment works used by "direct" discharger Defendants and the WWTPs that receive wastewater from "indirect" discharger Defendants use conventional methods that are ineffective at treating PFAS. *Id*. at ¶¶ 5, 18–26, 62. Therefore, Defendants' PFAS-contaminated wastewater passes through the treatment works into the Pee Dee River Watershed unabated, flowing downstream to Bull Creek. *Id*. at ¶¶ 48–55.

Plaintiff's Bull Creek and Myrtle Beach SWTPs were never designed to, and in fact do not, remove PFAS. *Id*. at ¶¶ 6, 56, 61, 63–66. The same is true of the Bucksport Regional WWTP and Conway WWTP that Plaintiff also operates. *Id*. at ¶¶ 57–60. "Because the Bull Creek SWTP cannot remove Defendants' PFAS from the water Plaintiff draws from Bull Creek, the water that sewer customers send to the Bucksport and Conway WWTPs remains contaminated with Defendants' PFAS." *Id*. at ¶ 59. The Bucksport and Conway WWTPs discharge Defendants' PFAS to the Waccamaw River, which carries the pollutants downstream to the Intracoastal Waterway, where they contaminate the Myrtle Beach SWTP and the drinking water Plaintiff treats at this facility. *Id*. at ¶¶ 60–61.

Defendants knew, or at least should have known, that their discharges of PFAS-containing wastewater would endanger downstream communities like Plaintiff's. *Id*. at ¶¶ 62, 66. The chemicals are colloquially termed "forever chemicals" because of their extraordinary persistence and resistance to breakdown via environmental mechanisms as well as most treatment methods to purify wastewater and drinking water. *Id*. at ¶¶ 5–6, 27–28. Once released into water sources, PFAS remain indefinitely, migrating through surface water and groundwater

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and accumulating in human and animal tissues, which are the chemicals' ultimate environmental sink. *Id*. at ¶¶ 28, 30, 32. Nevertheless, the very persistence and chemical stability that make PFAS such an environmental menace also make them attractive for industrial applications like Defendants'. *Id*. at ¶¶ 27–28.

EPA and numerous scientific studies have linked exposure to PFAS to serious adverse human health effects, including kidney, testicular, and liver cancer; immune system suppression; thyroid disorders; liver damage; and reproductive and developmental harm, particularly in infants and pregnant women. *Id*. at ¶¶ 33, 38–40, 42. Guided by the evolving science, EPA issued health advisories for the two most studied PFAS compounds, perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), in 2009 and 2016. *Id*. at ¶¶ 36–38. In 2022, the agency dramatically reduced the health advisory levels for these compounds to near zero parts per trillion ("ppt"). *Id*. at ¶¶ 39–40. Finally, in April 2024, EPA issued its first ever binding regulatory limit for PFAS in drinking water—setting "maximum contaminant levels" ("MCLs") at 4 ppt for PFOA and PFOS and at 10 ppt for perfluorononanoic acid ("PFNA"), perfluorobutane sulfonate ("PFBS"), perfluorohexane sulfonate ("PFHxS"), and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals"), and using a "hazard index" approach to control mixtures of PFNA, PFBS, PFHxS, and GenX Chemicals. *Id*. at ¶¶ 45–46. EPA also set a purely health-based "maximum contaminant level goal" ("MCLG") for PFOA and PFOS at zero ppt—reflecting the fact that there is no safe level of exposure to these compounds. *Id*. at ¶¶ 41–42, 46. The MCLs compliance is due by April 2029. *Id*. at ¶ 47.

As a direct and foreseeable result of Defendants' improper, ongoing use and disposal of PFAS, Plaintiff's properties have been contaminated by Defendants' PFAS—including their land, SWTPs, and supporting infrastructures. *Id.* at ¶¶ 63–66. Worse, Plaintiff cannot currently provide

3

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

potable drinking water that is free of these toxic chemicals. *Id.* at ¶ 63. Plaintiff now suffers, and will continue to suffer, significant property injuries resulting in enormous operational and financial burdens. *Id.* at ¶ 65. Plaintiff seeks both monetary and equitable relief to remedy the past, present, and future PFAS contamination of its properties and protect its community from the consumption of Defendants' PFAS. *Id.* at ¶¶ 6–7, 74–77, 86–89, 99–101, 110, Prayer for Relief.

## II.  STANDARD OF REVIEW

"Under Rule 12(b)(6), SCRCP, a defendant may move to dismiss a complaint based on a failure to state facts sufficient to constitute a cause of action." *Spence v. Spence*, 368 S.C. 106, 116, 628 S.E.2d 869, 874 (2006). "In considering such a motion, the trial court must base its ruling solely on allegations set forth in the complaint." *Id.* "If the facts and inferences drawn from the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, would entitle the plaintiff to relief on any theory, then the grant of a motion to dismiss for failure to state a claim is improper." *Id.* "A motion to dismiss under Rule 12(b)(6) should not be granted if facts alleged and inferences reasonably deducible therefrom entitle the plaintiff to relief under any theory." *Id.* "When considering such motion, the court must regard all properly pleaded factual allegations as admitted." *Falk v. Sadler*, 341 S.C. 281, 286, 533 S.E.2d 350, 353 (Ct. App. 2000). "It is a well-settled principle that in resolving a Rule 12(b)(6) motion to dismiss, the court is limited to a consideration of the allegations contained within the four corners of the complaint." *Charleston Cnty. Sch. Dist. v. Harrell*, 393 S.C. 552, 559, 713 S.E.2d 604, 608 (2011).

Pleadings are to be liberally construed "to do substantial justice to all parties." *Quality Towing, Inc. v. City of Myrtle Beach*, 340 S.C. 29, 33, 530 S.E.2d 369, 371 (2000) (quoting Rule 8(f), SCRCP). "The purpose of pleadings is to place the adversary on notice as to what the issues

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are." *Langston v. Niles*, 265 S.C. 445, 455, 219 S.E.2d 829, 833 (1975). Rule 8, SCRCP, "requires a litigant to plead the ultimate facts which will be proved at trial, not the evidence which will be used to prove those facts." *Clark v. Clark*, 293 S.C. 415, 416, 361 S.E.2d 328, 328 (1987). "Ultimate facts fall somewhere between the verbosity of evidentiary facts and the sparsity of 'legal conclusions.'" *RoTec Servs., Inc. v. Encompass Servs., Inc.*, 359 S.C. 467, 473, 597 S.E.2d 881, 884 (Ct. App. 2004) (quoting *Watts v. Metro Sec. Agency*, 346 S.C. 235, 240, 550 S.E.2d 869, 871 (Ct. App. 2001)). A motion to dismiss should not be granted "if facts sufficient to constitute a cause of action can be fairly gathered from the complaint, however uncertain, defective, or imperfect the allegations of the complaint may be." *Riedman Corp. v. Jarosh*, 289 S.C. 191, 192, 345 S.E.2d 732, 733 (Ct. App. 1986). "Further, a judgment on the pleadings is considered to be a drastic procedure by our courts." *Russell v. City of Columbia*, 305 S.C. 86, 89, 406 S.E.2d 338, 339 (1991).

Rule 12(b)(6) permits the trial court to address the sufficiency of a pleading stating a claim, but it is not a vehicle for addressing the underlying merits of the claim. *Doe v. Oconee Mem. Hosp.*, 437 S.C. 574, 581, 878 S.E.2d 920, 925, (S.C. App. 2021).

### III. ARGUMENT

**A.     Plaintiff's claims for relief are justiciable.**

Defendants' primary grounds for dismissal are that Plaintiff's claims are not justiciable—reasoning that Plaintiff will suffer no injury until the compliance deadline for PFAS MCLs arrives. Domtar MIS, at 3–5; Elevate MIS, at 3–6; Fiber MIS, at 5–6; GFL MIS, at 8–10; Mohawk MIS, at 4–5; Nan Ya MIS, at 4–8; PRET MIS, at 8–9; RRD MIS, at 7–9. This argument is easily resolved, and its flaws immediately apparent:

    (1)   *It distorts Plaintiff's claims.* Defendants recast Plaintiff's case as fundamentally concerning regulatory compliance issues rather than what they actually are: straightforward state-law claims arising from past, present, and future property

injuries. South Carolina law unquestionably empowers Plaintiff to seek redress for them.

(2) *It is inherently self-contradictory.* Defendants assert that Plaintiff's only injuries are its need to comply with PFAS MCLs. But if the financial burdens of MCL compliance were Plaintiff's injuries—and they are not—Plaintiff would still have standing under Defendants' own premise.

**1.    Plaintiff clearly has standing to seek relief for past, present, and future property injuries.**

Defendants argue that because enforcement of PFAS MCLs will not begin until April 2029, Plaintiff's obligations to comply remain speculative. They also cite pending litigation in the D.C. Circuit[3] to suggest that the PFAS MCLs might change, further speculating that any injury Plaintiff faces is uncertain. Both contentions fail for the same reason: they assert, contrary to the pleadings, that Plaintiff's injuries arise from regulatory obligations rather than from Defendants' ongoing contamination of their properties.

Plaintiff's complaint speaks for itself. These are not regulatory compliance claims but straightforward state-law causes of action based on Defendants' ongoing contamination of its land, SWTP, infrastructure, and water sources with PFAS chemicals. *See* Complaint, ¶¶ 1–7, 67–111. According to the nation's leading authority on environmental science and public health, no level of these chemicals—PFOA and PFOS in particular—is safe for human consumption.[4] And

---

[3] *See Am. Water Works Ass'n v. Env't Prot. Agency*, No. 24-118 (D.C. Cir. Oct. 7, 2024).

[4] Notably, neither EPA's scientific findings concerning PFOA and PFOS, nor its MCL Goal of zero ppt for each chemical, is challenged in the D.C. Circuit litigation that Defendants emphasize. *See* **Ex. 1**, Opening Br. for Pet'rs, *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078734 (D.C. Cir. Oct. 7, 2024); **Ex. 2**, Br. for Pet'rs Nat'l Ass'n of Mfrs., Am. Chemistry Council, and The Chemours Co., *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078731 (D.C. Cir. Oct. 7, 2024). Instead, the parties challenge MCLs for mixtures PFHxA, PFNA, PFBS, and GenX Chemicals, and they complain that EPA's enforceable limits for PFOA and PFOS were too close to the MCL Goals to be economically feasible, posing risks to water affordability. *See id.*; *see also* **Ex. 3**, Resp't Proof Br., No. 24-1188, Doc. 2091318 (D.C. Cir. Dec. 23, 2024) (EPA brief, highlighting that "no Petitioner has

6

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

according to the operative pleadings, Defendants knew this well before EPA publicized it, and

they have in the past and continue to introduce them into Plaintiff's properties and water sources.

*See* Complaint, ¶¶ 63–66.

The injuries resulting from Defendants' contamination are not hypothetical—they are

real, present harms. Among other injuries, Plaintiff has:

- lost the ability to supply water free from unsafe concentrations of PFAS, *id.* at ¶ 83;

- incurred significant costs in investigating and identifying the sources of PFAS contamination, *id.*;

- suffered the presence of hazardous chemicals in its water treatment plants, supporting infrastructure, and water sources, which they have a legal right to use, *id.*; and

- experienced diminution in property value. *Id.*

Nothing about these injuries is "conjectural" or "contingent" on future events.[5] *See Jowers v.*

*S.C. Dep't of Health & Env't Servs.*, 423 S.C. 343, 353, 815 S.E.2d 446, 451 (2018). Courts

routinely recognize chemical contamination of private property as a property injury. *See infra* §§

B, C, D.

Ripeness and standing, though distinct, "boil down to the same question" here: whether

Plaintiff has already sustained an actual injury. *See Susan B. Anthony List v. Driehaus*, 573 U.S.

149, 158 n.5 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007))

---

articulated any challenge to EPA's regulatory determinations for PFOS and PFOA or its Goals for those contaminants").

[5] Several Defendants selectively isolate Plaintiff's allegations that it will incur "expenses associated with future acquisition, installation, and operation" of PFAS filtration for the dual propositions that (1) these are the only damages Plaintiff seeks and (2) these damages hinge on the need to comply with MCLs. *See, e.g.,* Fiber MIS, at 6; GFL MIS, at 9; Mohawk MIS, at 4–5. Both are plainly false. *See* Complaint, ¶ 72, 74, 83, 86, 101, 110. In reality, Plaintiff listed the expenses of installing treatment technologies to remove Defendants' PFAS as one of many "special injuries" it has incurred that are different "in kind" from the public's injury of being exposed to Defendants' PFAS in drinking water. *Id.* at ¶ 83.

(standing and ripeness can merge when the issue is whether an injury has occurred); *Crescent Homes SC, LLC v. CJN, LLC*, 2024 WL 4831180, at *7* (S.C. Nov. 20, 2024) (South Carolina justiciability principles align with federal "case or controversy" requirements). Under the operative pleadings and controlling law, the only answer is yes.

Defendants cannot rewrite Plaintiff's complaint to suit their motions. The allegations set forth ongoing and future property injuries from PFAS contamination—not injuries tied to the burdens of complying with a regulatory standard. Taking the pleadings as alleged, as the Court must, resolves the question of justiciability.

### 2. Defendants' position is self-defeating.

Defendants' arguments do not just mis-frame this case. Even taking their framework at face value, it collapses under its own contradictions. Their principal authority, *American Water Works Association*, involves associations representing water authorities—like Plaintiff— challenging the PFAS MCLs. But Defendants miss why those associations have standing to do so: ***their members face concrete, imminent financial harm due to compliance costs***. *See* **Ex. 1**, Opening Br. for Pet'rs, *Am. Water Works Ass'n v. U.S. Env't Prot. Agency*, No. 24-1188, Doc. 2078734, at 15–17 (D.C. Cir. Oct. 7, 2024);[6] *see also Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592–93 (D.C. Cir. 2023). Thus, even under Defendants' own framing—that Plaintiff's injuries stem only from MCL compliance—the very litigation they cite demonstrates why Plaintiff would have standing to act now. *See id.*

Defendants cannot have it both ways: Plaintiff's case cannot be unripe based on litigation acknowledging the present, *ripe* financial burdens imposed by MCL compliance. As that

---

[6] EPA has not challenged the associations' standing. *See* **Ex. 3**, Resp't Proof Br., *Am. Water Works Assoc.*, No. 24-118, Doc. 2091318.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

litigation shows, compliance is neither remote nor contingent. EPA itself recognizes that it demands significant, long-term capital improvements:

> For purposes of this [economic analysis], the EPA assumes that the [PFAS MCLs] will be promulgated in 2024. As the final rule will grant a 2-year nationwide extension date for MCL compliance, this analysis assumes that capital improvements *(i.e., installation of treatment technologies)* for systems taking action under the rule take effect five years after the date on which the regulations is promulgated, or in 2029.

**Ex. 4**, U.S. Env't Prot. Agency, *Econ. Analysis for the Final Per- and Polyfluoroalkyl Substances Nat'l Primary Drinking Water Regul.*, at 2–3 (2024), EPA Doc. No. EPA-815-R-24-001 (emphasis added) (hereafter "*Economic Analysis*"); *see also* U.S. Env't Prot. Agency, *PFAS Nat'l Primary Drinking Water Regul.*, 89 Fed. Reg. 32532, 32533 (2024) ("EPA is extending the compliance deadline for all systems nationwide to meet the MCL to allow additional time for capital improvements."). This process is extensive, costly, and time-consuming. Among other things, it requires pilot programs to test treatment methods, engineering analyses to evaluate and select the best treatment option, facility design, bidding and contract negotiations, material procurement, and full-scale construction. *See Econ. Analysis*, Table 5-11 (setting out cost elements for implementing water treatment upgrades). History teaches that this takes years.[7]

Defendants' notion that Plaintiff must wait until April 26, 2029 is belied by their own reasoning.

---

[7] For example, in the building phase alone, it took the West Morgan – East Lawrence Water & Sewer Authority over four years to complete its new reverse osmosis treatment facility designed to remove PFAS. *See* WHNT News 19, *Lawsuit funded water treatment plant being built in Lawrence County* (Feb. 17, 2020) (construction begins in Feb. 2020), *available at* https://whnt.com/news/lawsuit-funded-water-treatment-plant-being-built-in-lawrence-county; W. Morgan – E. Lawrence Water & Sewer Auth., *JD Sims – RM Hames Water Facility* (distribution of reverse osmosis-treated water begins May 1, 2024), *available at* https://dev.dv1ojdbghmtyn. amplifyapp.com/JDsimsRMHamesWaterFacility. And despite completing its pilot program in April of 2018, Brunswick County, North Carolina has still not completed construction of its reverse osmosis system. *See* Brunswick Cnty, N.C., *Gen-X / PFAS Information FAQs - What is Brunswick County doing to remove PFAS contaminates from drinking water?* (initiated pilot program to determine best method to remove PFAS from drinking water, choosing reverse osmosis), *available at* https://www.brunswickcountync.gov/ Faq.aspx?QID=447; Brunswick

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Defendants' true position is this: they speculate that Plaintiff's already-ripe case might become moot[8] if regulations change. That is not how justiciability works. Since *Marbury v. Madison*, 5 U.S. 137 (1803), courts adjudicate existing disputes like this one. The only "hypothetical" posed is a change in existing, legally binding law. Defendants' position turns Article III on its head.

## B.    Plaintiff states actionable claims for trespass.

### 1.    The invasion of wastewater contaminated with Defendants' PFAS products constitute physical, tangible intrusions under South Carolina law.

Defendants argue that Plaintiff alleges only invasions of intangible substances that do not amount to trespass under South Carolina law. *See* Domtar MIS, at 5–7; Elevate MIS, at 9–11; Fiber MIS, at 7–8; GFL MIS, at 12–13; Mohawk MIS, at 8–9; Nan Ya MIS, at 12–13; PRET MIS, at 14–15; RRD MIS, at 11–12. They rely on *Babb v. Lee Cnty. Landfill SC, LLC*, where the South Carolina Supreme Court answered various certified questions on property-related torts. 405 S.C. 129, 747 S.E.2d 468 (2013). As to trespass, the *Babb* court held that South Carolina law does not recognize a claim arising "solely from invisible odors" because the law requires "intrusions by physical, tangible things." *Id.* at 144-52, 747 S.E.2d at 476-80. Defendants maintain that "PFAS molecules" are intangible, "microscopic" particles that fall outside this threshold. *See, e.g.,* Mohawk MIS, at 9; RRD MIS, at 11.

---

Cnty., N.C., *Northwest Water Treatment Plant Expansion & Reverse Osmosis Treatment Upgrades* (reverse osmosis will be operational by spring 2025).

[8] Mootness is a third component of justiciability, where a case for which a plaintiff has standing at its outset becomes moot due to events that occur during the case's pendency. *See Sloan v. Greenville Cnty.*, 356 S.C. 531, 547, 552, 590 S.E.2d 338, 347, 349 (2003). By arguing that the MCLs might change in a way that affects Plaintiff's case, Defendants are masking mootness under the veil of ripeness.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

At least one South Carolina court has explicitly rejected Defendants' argument. In *State of South Carolina v. 3M Company*, the Richland County Court of Common Pleas distinguished *Babb* in this way:

> [The State]'s trespass claim does not stem from an invisible odor, but rather from identifiable and measurable amounts of PFAS product resulting in contamination that the State alleges, unlike a temporal disturbance of odor or quickly dissipating particulate, persists in the environment and contaminates the State natural resources and property "indefinitely."

**Ex. 5**, Order, *South Carolina v. 3M Co.*, No. 2023-CP-40-04111, at 6 (S.C. Ct. Comm. Pl. July 23, 2024).

The same holds true here, but these cases are even further removed from *Babb*. Defendants have discharged ***wastewater*** or ***leachate*** carrying ***PFAS products***—indisputably tangible substances—into Plaintiff's properties. *See* Complaint, ¶¶ 2–5, 18–26, 92–101. Before and after *Babb*, South Carolina courts have repeatedly held that chemical contamination via water is actionable trespass, even if individual contaminants are microscopic. *See, e.g.*, *Johnson v. Hoechst Celanese Corp.*, 317 S.C. 415, 423, 453 S.E.2d 908, 912 (1995) (noting that jury returned trespass verdict in favor of plaintiffs whose properties were either within plume of chemically-contaminated groundwater, or adjacent to contaminated creek); *Kelly v. Para-Chem S., Inc.,* 311 S.C. 223, 224-26, 428 S.E.2d 703, 704 (1993) (affirming jury verdict on trespass via groundwater contamination); *Weatherford v. E.I. du Pont & Co.*, 2023 WL 11015357, at \*5 (Sept. 27, 2023) (plaintiff stated claim for trespass under South Carolina law involving PFAS contamination via wastewater discharges to river and agricultural sludge); *Tillman v. Highland Indus., Inc.*, 486 F. Supp. 3d 1026, 1040–41 (D.S.C. 2020) (under South Carolina law, plaintiff stated trespass claim concerning PCB contamination of plaintiff's property via stormwater discharge pipe); *Shockley v. Hoechst Celanese Corp.*, 793 F. Supp. 670, 672–74 (D.S.C. 1992) (under South Carolina law, a jury can find a trespass where defendant's chemicals migrated to

11

plaintiff's land through groundwater), *aff'd*, 996 F.2d 1212 (4th Cir. 1993) (affirming plaintiff's verdict on trespass); *see also In re Wildewood Litig.*, 52 F.3d 499, 502 (4th Cir. 1995) (under South Carolina law, whether defendant trespassed onto Plaintiff's properties with TCE-contaminated groundwater submitted to jury); *c.f. Babb*, 405 S.C. at 143, 747 S.E.2d at 476 (labeling water a "physical invasion").

Defendants' misconstruction of *Babb* ignores decades of precedent recognizing that chemical contamination via water is a physical invasion sufficient for trespass. According to Plaintiff's allegations—which must be accepted as true at this stage—Defendants' products and wastewater physically invaded and altered Plaintiff's properties (and continue to do so). Complaint, ¶¶ 18–26, 51–64, 92–101. This is classic trespass under South Carolina law.

**2.    Defendants' discharges of PFAS-contaminated wastewater with knowledge that it would invade Plaintiff's properties constitute affirmative, intentional acts.**

Defendants also claim that Plaintiff's allegations foreclose any finding that they affirmatively or intentionally intruded onto Plaintiff's properties. Domtar MIS, at 7–8; Elevate MIS, at 12–13; Fiber MIS, at 8–10; GFL MIS, at 14–15; Mohawk MIS, at 9–10; Nan Ya MIS, at 14–16; PRET MIS, at 15–17; RRD MIS, at 13–14. They reason that intent is necessarily absent because their PFAS-contaminated wastewater first passes through WWTPs and into the Pee Dee River Watershed and Waccamaw River before Plaintiff "voluntarily" withdraws it. *See id.* Defendants are mistaken: intent exists where, as alleged, they know the consequences of their affirmative acts.

There is no dispute here that, for actionable trespass, "there must be an affirmative act, the invasion of the land must be intentional, and the harm caused must be the direct result of that invasion." *Snow v. City of Columbia*, 305 S.C. 544, 553, 409 S.E.2d 797, 802 (Ct. App. 1991). But a trespasser need only "intend the act which constitutes the unwarranted entry onto another's

12

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

land"—he "need not intend the damaging consequence of his entry." *Id.* Thus, Plaintiff have sufficiently alleged intent "by showing that [Defendants] acted voluntarily" in their discharges and "that [they] knew or should have known the result that would follow": the entry into and contamination of Plaintiff's properties.[9]

Plaintiff alleges just that. Its complaint explicitly states that Defendants conducted their discharges when they knew or should have known:

- that their respective WWTPs cannot remove PFAS from their wastewater before they pass through to the Pee Dee River Watershed and Waccamaw River, in the case of industrial users of the Lake City, Johnsonville, and Lumberton WWTPs;

- that their PFAS wastewater is discharged directly to the Great Pee Dee River or Black Creek, in the case of direct dischargers of wastewater;

- Plaintiff draws water from Bull Creek and the Intracoastal Waterway for the provision of potable water to its customers;

- the water Plaintiff draws from both sources is contaminated with PFAS Defendants discharged; and

- water contaminated with their PFAS products invades Plaintiff's properties.

Complaint, ¶¶ 51–62, 92–93. This is more than sufficient to allege affirmative, intentional acts under South Carolina law. Defendants' primary authority is easily distinguished on this very ground—where the plaintiff *admitted* that the defendant lacked the requisite intent. *See Snow*, 305 S.C. at 554, 409 S.E.2d at 802-03 ("Mr. Snow himself testified that the City did *not* intentionally allow the water to escape onto his property.").

---

[9] Most Defendants point out that Plaintiff lacks the right of exclusive possession of Bull Creek, the Intracoastal Waterway, and upstream surface waters. *See, e.g.,* Domtar MIS, at 6–7; Elevate MIS, at 11–12. This is true but irrelevant. Plaintiff never alleged a trespass of Bull Creek or the Intracoastal Waterway, but instead that Defendants trespassed "into Plaintiff's properties, including its land, SWTP, and related buildings, improvements, and equipment that make up its water distribution system." Complaint, ¶ 99.

The fact that some Defendants' contaminated wastewater first passes through their WWTPs—or that other Defendants' direct discharges take place many miles upstream—does not negate their intent. As numerous cases show, where a defendant knows or should know an invasion will occur as a result of its conduct, then the requisite intent is established—regardless of intervening events.[10] *See Weatherford*, 2023 WL 11015357, at *5 (where supplier of PFAS products knew of PFAS hazards and the textile processes used by their customers that results in their discharge to surface waters, continuing sale without warning and concealing the dangers was sufficiently affirmative and intentional for trespass); *Comm'rs of Pub. Works of Charleston v. Costco Wholesale Corp.*, 2021 WL 5908758, at *8 (D.S.C. Dec. 13, 2021) (defendants' sale of mislabeled flushable wipes are "affirmative or willful acts, even if the actual flushing of the wipes into the Plaintiff's sewer system is done by third parties"); *Shockley*, 793 F. Supp. at 673–74 (jury could find trespass where defendant intentionally delivered hazardous chemicals to independent chemical reclamation facility, from which defendant knew or should have known the chemicals invaded Plaintiff's properties). This case is no different: the controlling allegations state that Defendants knew their PFAS products passed through their applicable WWTPs and invaded Plaintiff's properties. Complaint, ¶¶ 51–62, 92–93.[11]

---

[10] This aligns with fundamental principles of causation. "An intervening force may be a superseding cause that relieves an actor from liability, but *for there to be relief from liability, the intervening cause must be one that could not have been reasonably foreseen or anticipated*" by the actor. *Glenn v. 3M Co.*, 440 S.C. 34, 74, 890 S.E.2d 569, 590 (2023) (quoting *Roddey v. Wal-Mart Stores E., LP*, 415 S.C. 580, 590, 784 S.E.2d 670, 676 (2016)).

[11] Defendants' appeal to Alabama trespass law also fails. Many cite *Utilities Bd. of Tuskegee v. 3M Co.*, 2023 WL 1870912, at *16 (M.D. Ala. 2023) for the proposition that trespass must occur by "natural process" instead of withdrawal from Bull Creek and the Intracoastal Waterway. Nothing in South Carolina law requires that trespass occur by "natural process"—a trespass occurs where a defendant affirmatively acts and knows or should know that an intrusion will occur. *See Snow*, 305 S.C. at 553, 409 S.E.2d at 802; *Weatherford*, 2023 WL 11015357, at *5; *Costco*, 2021 WL 5908758, at *8. Likewise, Alabama law allows consent to trespass even where obtained by fraud or mistake—precisely what 3M argued in *Tuskegee*. *See Tuskegee*, Def. 3M

14

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Several Defendants frame Plaintiff's water withdrawal as an issue of consent or authorization instead of intent, arguing that withdrawing water from Bull Creek and the Intracoastal Waterway *authorizes* the invasion of their PFAS-contaminated wastewater. *See* Mohawk MIS, at 9 ("Plaintiff *voluntarily* draws water into its facility by activating its pumps."). Defendants cite no authority for this radical proposition. By that logic, any water provider consents to chemical contamination simply by performing its essential function—even when that contamination directly compromises its purpose.

Even if Plaintiff implicitly authorized some water to enter its properties, that does not extend to the wrongful introduction of PFAS-contaminated wastewater. *See* Complaint, ¶ 148. On the contrary, consent is no defense when an entry abuses or exceeds the scope of authorization. *See Costco*, 2021 WL 5908758, at *8 (flushing mislabeled wipes into the plaintiff's sewer system not authorized and invited because "consent to enter property is not a defense to trespass 'if a wrongful act is done in excess of and in abuse of authorized entry'" (*quoting Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 517 (4th Cir. 1999) (applying South Carolina law)). Defendants identify nothing in the pleadings suggesting that Plaintiff knew of and consented to entry of harmful PFAS that their treatment systems cannot remove. In fact, the only pleadings on this issue are Plaintiff's *express disavowals* of consent. *See* Complaint, ¶ 148.

Plaintiff alleges all that is required to state a claim for trespass. Defendants affirmatively and intentionally discharged PFAS-contaminated wastewater, knowing it would ultimately

---

Co.'s Mot. to Dismiss, 2022 WL 18357105 (Oct. 3, 2022); *see also Evans v. Walter Indus., Inc.*, 579 F. Supp. 2d 1349, 1370 (N.D. Ala. 2008) ("The alleged contamination with hazardous substances, even if fraudulently concealed by Defendants, does not negate the Plaintiff's consent. Even consent procured by fraud will negate a trespass claim."). Not so in South Carolina. *See Costco*, 2021 WL 5908758, at *8.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

invade Plaintiff's properties. The paths their contaminated wastewater followed were known, predictable, and foreseeable; and the performance of Plaintiff's routine operations in no way authorizes the entry of hazardous chemicals.

**C.     Plaintiff states actionable claims for public and private nuisance.**

      **1.     Plaintiff alleges that Defendants controlled their properties and products that cause the contamination of Plaintiff's properties and upstream surface waters.**

Both operators of separate landfills, RRD and SCD argue that they lacked the requisite "control" over the source of the nuisance. RRD MIS, at 9–10. They emphasize that "nuisance law is a mechanism for resolving 'conflicting interests of *landowners*,'" RRD MIS, at 9, and since they send PFAS-contaminated leachate[12] to the Lumberton WWTP, they contend that they lack the requisite control. *Id.* Put plainly, Defendants disclaim control over their PFAS-contaminated leachate that they continually dispose of to maintain an ongoing PFAS contamination. The argument defeats itself: Defendants assert powerlessness over a problem they not only created but actively perpetuate.

RRD and SCD rest their argument on a flawed premise that they merely sent PFAS-contaminated leachate to the Lumberton WWTP, and the nuisance occurs only when the WWTP releases their PFAS. *Id.* at 9. This reduces to one misdirection: labelling the Lumberton WWTP's property as the source of the PFAS contamination instead of their own. *See* Complaint, ¶¶ 22, 54–62.  This deflection is an artificial attempt to sever control that, in reality, masks a misplaced causation argument.

---

[12] Leachate is the polluted wastewater that forms when rain or other liquids seep through landfilled wastes, carrying chemicals and other pollutants with it.
.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Defendants principally rely on *Clark v. Greenville County*, but *Clark* exposes their sleight-of-hand. There, plaintiffs asserted nuisance claims against corporate defendants that sent hazardous chemicals to a landfill, which contaminated the Plaintiff's nearby properties. 313 S.C. at 209, 437 S.E.2d at 119. The *Clark* court explained:

> Generally, a private nuisance is "that class of wrongs that arises from the unreasonable, unwarrantable, or unlawful use by a person *of his own property, personal or real.*" Nuisance law is based on the premise that "[e]very citizen holds his property subject to the implied obligation that he will use it in such a way as not to prevent others from enjoying the use of their property."

*Id.* (quoting *Peden v. Furman Univ.*, 155 S.C. 1, 16, 151 S.E. 907, 912 (1930)).

Upholding the trial court's summary judgment in the defendants' favor, the court reasoned that the plaintiffs "neither alleged nor produced any evidence [that] the [defendants] had control over the landfill or the hazardous waste once it was deposited at the landfill." *Id.* at 210, 437 S.E.2d at 119. Thus, the defendants "could not be liable for nuisance because they had no control over *the property allegedly used as a nuisance*." *Id.* (emphasis added).

*Clark*'s reasoning certainly applies, but not in the way that Defendants' claim. The "property allegedly used as a nuisance" here does not belong to the WWTPs, which received Defendants' contaminated leachate, but to Defendants themselves.[13] Here, Defendants *are the landfill*, and they control the PFAS-contaminated leachate that they send from their own properties to the Lumberton WWTP, aware that the PFAS passes through to Plaintiff's properties. Complaint, ¶¶ 22, 54. According to the operative pleadings, Defendants knowingly use their "own property, personal [and] real" in a way that "prevent[s Plaintiff] from enjoying the use of

---

[13] Defendants cannot unilaterally redefine the "property allegedly used as a nuisance" to be the Lumberton WWTP. *See Charleston Cnty. Sch. Dist. v. Harrell*, 393 S.C. 552, 557, 713 S.E.2d 604, 607 (2011) ("In considering a motion to dismiss pursuant to Rule 12(b)(6), SCRCP, the circuit court must base its ruling solely upon the allegations set forth on the face of the complaint.").

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

[its] property." *Clark*, 313 S.C. at 209, 437 S.E.2d at 119. Holding them responsible is not only consistent with *Clark*—it is precisely what *Clark* demands.

Defendants repeatedly send their own PFAS-contaminated leachate from their own landfills, fully aware that it bypasses the WWTPs ***unchanged*** and flows directly into surface waters and Plaintiff's properties. *See* Complaint, ¶¶ 22, 50, 54–62. Yet Defendants fragment their control into isolated snapshots—where it exists only at the moment of their custody and vanishes the moment it enters the WWTP. This strains credulity. The Lumberton WWTP does not add to, modify, or affect Defendants' PFAS in any way, and it merely passes through what Defendants introduce. Complaint, ¶ 22. Defendants' position would allow industrial polluters to endlessly discharge toxins to surface waters yet have "no control" because the current carries them downstream. *See infra* at 23 n.17 (compiling nuisance cases of downstream contamination). *Clark* does not support—let alone require—this absurd result.

In the end, Defendants' argument is not about control. They do not even dispute that they own the Red Rock Disposal and Sampson County Landfills or that they control the PFAS-contaminated leachate they send to the Lumberton WWTP. Shifting blame to the WWTP does nothing to extinguish their control over what Plaintiff alleges are the sources of the nuisance—it merely proposes that the WWTP is a superseding cause. But where Defendants knowingly send PFAS-contaminated leachate into a system they knew did not remove PFAS—as the controlling allegations say—this too fails as a matter of law. *See Glenn*, 440 S.C. at 74, 890 S.E.2d at 590, *supra* at 14 n.10; *Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 82, 382 S.E.2d 463, 469 (1989) ("In order to constitute an actionable nuisance, a wrongful act of the defendant must

18

be shown and the maintenance of the nuisance must be the natural and proximate cause of the injury suffered by the plaintiff." (citation omitted)).[14]

### 2. Plaintiff has suffered private property injuries that confer rights of action for both private and public nuisance.

Because the Pee Dee River Watershed, the Waccamaw River, and the Intracoastal Waterway are "public water bodies," Defendants also assert that Plaintiff suffers no private property injuries that could support either a public or private nuisance. Domtar MIS, at 5; Elevate MIS, at 7–8; Fiber MIS, at 10; GFL MIS, at 11–12; Mohawk MIS, at 6–7; Nan Ya MIS, at 9–10; PRET MIS, at 8–9; RRD MIS, at 10–11. Defendants ignore Plaintiff's allegations to manufacture grounds for dismissal. The pleadings clearly establish that Defendants' contamination directly injures Plaintiff's private properties—precisely the injuries required for both private and public nuisance. *See, e.g., Overcash v. S.C. Elec. and Gas Co.*, 364 S.C. 569, 573, 614 S.E.2d 619, 620-21 (2005).

The "well-beaten path" of South Carolina nuisance law provides a clear and consistent framework. *Id.* Like trespass, private nuisance protects property interests—but while trespass protects exclusive possession, nuisance law remedies interferences with use and enjoyment. *Babb*, 405 S.C. at 139, 747 S.E.2d at 473.

---

[14] PRET asserts a similar control argument without citation to authority. *See* PRET MIS, at 10. The same reasoning forecloses dismissal for PRET: it owns and controls the PFAS products and its facility from which it discharges those products, knowing that they bypass the Johnsonville WWTP and continually contaminate Plaintiff's properties adjacent to Bull Creek and its supporting infrastructure. Complaint, ¶ 26, 62, 65–66. PRET also states that it could not have interfered with Plaintiff's use of its property adjacent to the Intracoastal Waterway and its Myrtle Beach SWTP because the Johnsonville WWTP does not discharge upstream of either. PRET MIS, at 10. Plaintiff's complaint explains why this is incorrect. Complaint, ¶¶ 68–69. The same PFAS that bypass the Johnsonville WWTP and Plaintiff's Bull Creek SWTP, and ultimately flow to customers' taps, also flow in the sewer water received by Plaintiff's Bucksport and Conway WWTPs. *Id.* These WWTPs cannot remove PRET's PFAS any more than the Johnsonville WWTP, and they pass through to the Waccamaw River upstream of the Myrtle Beach SWTP. *Id.*

19

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Public nuisances are distinct from private nuisances, not in the nature of the wrongful act, but in the rights and number of people affected. *Overcash*, 364 S.C. at 573, 614 S.E.2d at 621–22.[15] Public nuisance protects *public* rights—such as public order, health, and morals. *Id.* As such, public nuisances are by default redressable only by public authorities. *See id.* at 573–74, 614 S.E.2d at 621; *Burrell v. Kirkland*, 242 S.C. 201, 204, 130 S.E.2d 470, 471 (1963); *Bowlin v. George*, 239 S.C. 429, 434, 123 S.E.2d 528, 530 (1962). But if a public nuisance also causes "special injury" to an individual, that person has standing to sue both for his private injury and to abate the entire public nuisance. *See id.*[16]

Courts have "encounter[ed] difficulty" in defining "special injury" in both private and public nuisance contexts, but a consistent principle emerges. *Bowlin*, 239 S.C. at 432, 123 S.E.2d at 530. A private nuisance is actionable if it interferes with a private property right—even if many others suffer similarly. *Id.* at 434, 123 S.E.2d at 530–31 ("[A]n injury to private property . . . is in its nature special and peculiar, and does not cause a damage which can properly be said to be common or public, however, numerous may be the cases of similar damage arising from the same cause." (quoting *Wesson v. Washburn Iron Co.*, 95 Mass. 95, 103–04 (1866)); *accord Brown v. Hendricks*, 211 S.C. 395, 401, 45 S.E.2d 603, 605–06. The key distinction is whether

---

[15] *See also Home Sales*, 299 S.C. at 81, 382 S.E.2d at 469 ("A nuisance is public because of the danger to the public which might have been created. It is private only because the individual as distinguished from the public has been or may be injured."); *State v. Turner*, 198 S.C. 487, 18 S.E.2d 372, 376 (1942) (a public nuisance "affects the surrounding community generally or the people of some local neighborhood; it is sufficient if it operates upon such members of the public as are brought into contact with the conditions that constitute the alleged nuisance"); *Morison v. Rawlinson*, 193 S.C. 25, 32, 7 S.E.2d 635, 638 (1940) ("A nuisance to be a public nuisance must be in a particular place or where the public frequently congregate, or where members of the public are likely to come within the range of its influence . . . .").

[16] This has been called a "mixed nuisance" because, "while producing injury to the public at large, [it] does some special damage to some individual or class of individuals." 23 S.C. Jur. Public Nuisance, § 4 (Feb. 2025) (citing *Deason v. S. Ry. Co.*, 142 S.C. 328, 338, 140 S.E.2d 575, 579 (1927)).

the nuisance affects a *public* right (shared by all) or a *private* right (tied to property). *See Bowlin*, 239 S.C. at 434, 123 S.E.2d at 530–31. Private property injuries are "special" because they involve specific, legal interests—not a general harm to the public. *Id.* at 435, 123 S.E.2d at 531 ("[Plaintiff] is not complaining of the violation of a right of a public nature or one held in common with the rest of the public. He alleges the invasion of a private right, namely, the interference with the reasonable enjoyment of his property and the depreciation in its value. We think it is quite clear that he is entitled to maintain this action.").

In the public nuisance context, courts ask whether the plaintiff's injury is "different in kind and not merely in degree from that suffered by the public at large." *Huggin v. Gaffney Dev.*, 229 S.C. 340, 344, 92 S.E.2d 883, 884–85 (1956). This aligns with private nuisance cases, highlighting the same "in kind" difference between public and private rights. *Id.* at 344–45, 92 S.E.2d at 884–85 (holding that a landowner adjacent to public road suffered an injury different in kind from the public because the obstruction of a public road deprived him of property access and economic value, whereas the public merely lost use of the road); *see also Jones v. Seaboard Air Line Ry. Co.*, 67 S.C. 181, 192, 45 S.E. 188, 192–93 (1903) (a landowner's rights to use riparian land undisturbed and to free access of the stream are different "in kind" from the public right to navigate the waterway). Indeed, the South Carolina Supreme Court recently reaffirmed that "special" injuries are those affecting real and personal property rights—not personal injury or public harms. *See Overcash*, 364 S.C. at 573–75, 364 S.E.2d at 620–22.

South Carolina law thus provides a firm foundation: a private property injury is inherently special because it implicates private property rights, not public ones. *See id.*; *Bowlin*, 239 S.C. at 432–34, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85. This means two things:

21

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(1)    A private nuisance claim concerning private property injury is not barred merely because others suffer similar harm; and

(2)    A plaintiff with a private property injury suffers a harm "different in kind" from a violation of a public right.

These principles apply squarely to Plaintiff's nuisance claims. As an authorized water provider and property owner, Plaintiff uses its properties *specifically* to provide clean water to customers. Complaint, ¶¶ 68, 80. By saturating the Pee Dee River Watershed, Bull Creek, the Waccamaw River, Intracoastal Waterway, and even Plaintiff's plants and infrastructures with chemicals that EPA deems unsafe for consumption, Defendants have not just *interfered with* Plaintiff's property use—they have damaged Plaintiff's properties directly and *fundamentally compromised* their use and Plaintiff's essential business. Complaint, ¶¶ 63–66, 71–74, 82–88. The resulting injuries are both undeniable and expressly detailed in the pleadings, including:

- Plaintiff's inability to use its properties to provide its customers with drinking water free from Defendants' chemicals;

- the costs of investigating the cause of the contamination and upgrading Plaintiff's facilities so that it can remove Defendants' chemicals; and

- diminution in property value.

*Id.* These are not "general public" harms; they are discrete, property-based injuries recognized under South Carolina law. *See Babb*, 405 S.C. at 129–144, 747 S.E.2d at 472–76; *Bowlin*, 239 S.C. at 434–35, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85.

In the face of these well-pleaded injuries, Defendants miss the point by focusing on the subject surface waters being "public waters." While the surface waters at issue may be "public," the property injuries alleged are *private*. And a century of South Carolina caselaw confirms that contaminating public waters still results in private injury when it interferes with private property rights. *See, e.g., Johnson*, 317 S.C. at 422, 453 S.E.2d at 912–13 (Defendants' chemicals migrated not only through groundwater, but also down creek and injured property of several

22

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

plaintiffs adjacent to creek); *Jones*, 67 S.C. at 191–202, 45 S.E. at 192–96 (holding that a riparian landowner adjacent to a navigable waterway suffered an injury different in kind from the public's lost navigational use, where obstructions altered the river's natural flow, causing direct harm to the landowner's property and agricultural use).[17]

Nor can Defendants equate Plaintiff's private injuries with the "injury allegedly suffered by the public at large." *See, e.g.,* Elevate MIS, at 9 (arguing Plaintiff's inability to supply PFAS-free water is the same as the public injury). The "injury allegedly suffered by the public at large" is community-wide exposure to PFAS-contaminated drinking water—a *public health* issue. Complaint, ¶¶ 81–82. *See Overcash*, 364 S.C. at 573, 614 S.E.2d at 621–22; *Home Sales*, 299 S.C. at 81, 382 S.E.2d at 469. Plaintiff is not suffering this injury to greater "degree" than the public, e.g., by exposure to more PFAS than others, or by suffering PFAS-related illness. Needless to say, Plaintiff does not consume water at all. Instead, its lands, SWTPs, and infrastructures are directly subjected to chemical contamination, undermining their essential use and causing substantial devaluation—private property injuries "different in kind" to the public

---

[17] *See also Bailey v. Lyman Printing & Finishing Co.*, 245 S.C. 13, 17–24, 138 S.E.2d 410, 415 (1964) (even non-riparian landowners stated nuisance claim where gases from waste discharged to Middle Tyger River interfered with Plaintiff's use and enjoyment of their homes); *Conestee Mills v. City of Greenville*, 160 S.C. 10, 13–14, 158 S.E. 113, 114–15 (1931) (sewage contamination of the Reedy River flowed downstream, interfering with the plaintiff's use of its property adjacent to the river); *Duncan v. Union-Buffalo Mills Co.*, 110 S.C. 302, 306, 96 S.E. 522, 523–24 (1918) (sewage discharged to Buffalo Creek interfered with use and enjoyment of downstream land owners adjacent to Buffalo Creek); *Lowe v. Ottaray Mills*, 93 S.C. 420, 424–26, 77 S.E. 135, 136–37 (1913) (cotton mill discharged sewage to creek upstream of plaintiff's property, which rendered his land unfit for use as dairy farm); *Williams v. Haile Gold Mining Co.*, 85 S.C. 1, 5–7, 66 S.E. 117, 118 (1909) (chemically-contaminated mine tailings discharged to stream, interfering with downstream owner's ability to farm his land).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

drinking water exposure. *See Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85; *Jones*, 67 S.C. at 191–202, 45 S.E. at 192–96.[18]

Defendants' own authorities underscore the flaw in their arguments. They lean on cases where municipal water ***customers*** asserted private nuisance claims based on the PFAS contamination of water they purchased from their utilities. *See, e.g.,* Mohawk MIS, at 7 (citing *Rhodes v. E.I. du Pont de Nemours and Co.*, 636 F.3d 88, 92–93, 96–97 (4th Cir. 2011); *Anderson v. W.R. Grace & Co.*, 628 F. Supp. 1219, 1233 (D. Mass. 1986)). Their holdings—that the interest in clean drinking water is only a public right—are both unremarkable and consistent with Plaintiff's own allegations. Plaintiff affirms that this as a public interest in its complaint— contrasting the public drinking water exposure from the direct contamination, devaluation, and interference with its own private properties and business operations. *Compare* Complaint, ¶¶ 81– 82, *with id.* at ¶ 83. Defendants can neither ignore the property injuries that Plaintiff expressly alleges nor conflate them with the public exposure to PFAS-contaminated drinking water.

Defendants have indeed created and continue to maintain a public health issue affecting over a hundred thousand people within Plaintiff's community. But Plaintiff alone bears the burden of commercially supplying clean water, while its private properties suffer direct PFAS

---

[18] Defendants identify nothing inside or outside the pleadings showing that ***any*** other persons (1) withdraw water from Bull Creek and the Intracoastal Waterway, much less for the purpose of selling drinking water; (2) suffer direct property contamination; or (3) have suffered any property injury as a result of the contamination. Even if such persons exist, Plaintiff's injuries would still be different in kind from the public exposed to Defendants' PFAS in drinking water. *See Jones*, 67 S.C. at 191–202, 45 S.E. at 192–93 (alleged right violated was "not the right of navigation, or any other right which [the plaintiffs] held in common with the public, but the right to the unimpaired use of their lands on the banks of the river" as riparians); *see also Overcash*, 364 S.C. at 573–75, 364 S.E.2d at 620–22; *Bowlin*, 239 S.C. at 434, 123 S.E.2d at 530–31; *Huggin*, 229 S.C. at 344–45, 92 S.E.2d at 884–85.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

contamination and interference with their essential functions. These are private, intimately unique, and "special" injuries that Defendants cannot ignore or circumvent.

## D.    Plaintiff states actionable claims for negligence.

### 1.    Defendants owed Plaintiff duties of care.

Many Defendants uniformly cite the same or similar case law stating that a duty of care may only be created "by statute, a contractual relationship, status, property interest, or some other special circumstance" to argue that they owe Plaintiff no duty with respect to their discharge of PFAS. PRET MIS, at 17; Elevate MIS, at 14; RRD MIS, at 14; Nan Ya MIS, at 16; Mohawk MIS, at 11; Fiber MIS, at 12; GFL MIS, at 15; Domtar MIS, at 8. In doing so, however, they conflate two fundamental tenets of South Carolina tort law: (1) while an *affirmative* duty to act may only be created in certain circumstances, (2) once a party voluntarily undertakes an act, it must exercise due care in doing so.

Defendants rely on the false presupposition that Defendants are innocent third parties whom Plaintiff haled into court for their failure to remedy PFAS pollution caused (or not remediated) by others. This is not so. Instead, by voluntarily engaging in their various industries, Defendants were required under South Carolina law to do so with due care. That is the duty underpinning Plaintiff's negligence claims, a duty long recognized in this State. *See Joyner v. S.C. Ry. Co.*, 26 S.C. 49, 51–52, 1 S.E. 52, 53 (1887) ("[T]he law has determined as a general rule . . . that the presence of due care negatives negligence, and that the absence of such care constitutes negligence."). This Court should not allow Defendants to obfuscate their roles in the pollution of South Carolina waters and attempt to escape liability through a distortion of South Carolina tort law.

A fair and complete statement of the law Defendants invoke is:

25

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

> An affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or some other special circumstance. Moreover, it has long been the law that one who assumes to act, even though under no obligation to do so, thereby becomes obligated to act with due care.

*Madison v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656-57 (2006) (citations omitted); *see also Byerly v. Connor*, 307 S.C. 441, 445, 415 S.E.2d 796, 799 (1992) ("At common law, where there is no duty to act, but an act is voluntarily undertaken, the actor assumes a duty to use due care."); *Rayfield v. S.C. Dep't of Corr.*, 297 S.C. 95, 100–01, 374 S.E.2d 910, 913 (Ct. App. 1988) ("Ordinarily, the common law imposes no duty on a person to act. An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance. It follows that a person usually incurs no liability for failure to take steps to benefit others or to protect them from harm *not created by his own wrongful act*. In other words, a person has no duty to protect another from harm *inflicted by a third person*." (emphases added)).

Plaintiff does not allege that Defendants owed it a duty of care to control others, ensure a third party (such as a WWTP) removed PFAS from South Carolina waters, or warn Plaintiff about PFAS discharged by others. Instead, Plaintiff alleges that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others." Complaint, ¶ 103. Importantly, Plaintiff does not invoke an affirmative duty disconnected from the conduct Defendants voluntarily performed at their industrial facilities— the law thus requires no contract, statute, special relationship between Plaintiff and Defendants, or other prerequisite to establish their duties. *See Edward's of Byrnes Downs v. Charleston Sheet*

26

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Metal Co.*, 253 S.C. 537, 542, 172 S.E.2d 120, 122 (1970) (recognizing there is a "common law duty to exercise due care to avoid injury or damage to others").[19]

Almost a century ago, the South Carolina Supreme Court approved the following jury instruction concerning the requirement to act with due care:

> Negligence is the failure to exercise due care. The law enjoins upon every individual, you and me and every individual each in our conduct with reference to anybody else, the duty of exercising due care under all of the circumstances attending our activities, and the failure to exercise that due care which the surrounding circumstances justly require is called negligence, and if one is injured by reason of that negligence, if that negligence itself, that failure to exercise due care under the circumstances is the direct cause of bringing about some injury or damage to the person of another, then that negligence we call actionable.

*Parker v. Simmons*, 163 S.C. 42, 54, 161 S.E. 169, 173 (1931). This duty remains to this day.

Additionally, Defendants owe Plaintiff a duty because, in discharging PFAS, they "created a situation that they knew or should have known posed a substantial risk of injury" to Plaintiff. *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 294, 688 S.E.2d 125, 130 (2010); *see also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.").[20]

---

[19] Many Defendants also argue they had no duty of care to Plaintiff because the PFAS they discharged passed through a WWTP before reaching Plaintiff's property and they therefore lacked "control" over it. This is a disingenuous argument that the Court should ignore. Although Defendants may have not had control over the PFAS after it left their facilities, or when it passed through the WWTPs, they certainly had control over the PFAS before discharging it into the environment, and that is the point in time out of which their duty to Plaintiff arises.

[20] The Restatement further supports the fact that Defendants misconstrue or misrepresent the duty they owe to Plaintiff, as is explained above. *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 cmt. l ("*Relationship with affirmative duties to act.* The general duty rule contained in this Section is conditioned on the actor's having engaged in conduct that creates a risk of physical harm. Section 37 states the obverse of this rule: In the absence of conduct creating a risk of harm to others, an actor ordinarily has no duty of care to another."); *id.* § 37 ("An actor whose conduct has not created a risk of physical or emotional

27

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

South Carolina courts have consistently recognized that parties who release pollution into the environment owed a duty to those exposed to the pollutants and were thus subject to negligence liability. For example, in *Chestnut v. AVX Corp.*, the plaintiff property owners brought suit against the defendant, a manufacturer of electronic components the production of which involved a degreasing chemical called trichloroethylene ("TCE"). 413 S.C. 224, 226, 776 S.E.2d 82, 83 (2015). The plaintiffs alleged that "TCE escaped respondent's plant and migrated beyond the boundaries of respondent's property, contaminating surrounding properties and groundwater." *Id.* In evaluating the Plaintiff's negligence claim on appeal, the Supreme Court found "the complaint sufficiently [pled] a negligence cause of action." *Id.* at 228, 776 S.E.2d at 84. The court explained,

> In *Babb v. Lee County Landfill S.C., LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013), we held a plaintiff could maintain an environmental negligence suit based upon offensive odors if the complaint alleged either "physical injury [to the plaintiff] or property damage." *Id.* at 153, 747 S.E.2d at 481. Here, appellants have pled all four elements of a negligence claim: *duty*, breach, proximate cause, and damages. In alleging damages, appellants contend that their property is "worthless," "damaged," and "devalued" by the "harmful" and "dangerous" chemicals on the real property that adjoins their properties.

*Id.* (emphasis added). If defendants can be held liable under a negligence theory for their discharge of TCE or "offensive odors" into the environment, so too can the defendants in this litigation be held liable for their discharge of PFAS.

Similarly, in *Ravan v. Greenville County*, several landowners sued Greenville County in its capacity as the operator of a landfill, along with several corporate entities that disposed of waste at the landfill, for damage to their properties. 315 S.C. 447, 452, 434 S.E.2d 296, 299 (Ct. App. 1993). Waste Management of South Carolina, Inc., as successor in interest to Spartan Waste

---

harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38-44 is applicable.").

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Control, was included as a defendant due to Spartan's disposal of toxic chemicals at the landfill on behalf of industrial plants, which later contaminated a plaintiff's property. *Id.* at 466–67, 434 S.E.2d 296, 308. On appeal, Waste Management argued it did not owe a duty of care to the affected plaintiff, and if a duty existed, it was limited to the safe transport of the waste to the landfill. *Id.* at 467, 434 S.E.2d at 308. The court agreed "that the duty of a mere hauler of hazardous waste extends only to the safe transport of the waste while it is in the hauler's possession and control," *id.* at 468, 434 S.E.2d at 309; however, because Waste Management, and not its customers, chose the location for disposal of the waste, its "role consisted of more than the mere hauling of waste to the landfill." *Id.* at 469, 434 S.E.2d at 309. "Thus, the facts of this case support the conclusion that a duty of care was owed by Spartan Waste to" the affected landowner. *Id.*

Here too, Defendants released PFAS into the environment, and it passed through a third party (in *Ravan*, a landfill, and here, the WWTPs) before reaching Plaintiff's property. As in *Ravan*, Defendants owe a duty of care to Plaintiff. *See also Conestee Mills v. Greenville*, 160 S.C. 10, 27, 158 S.E. 113, 119 (1931) (finding the City of Greenville, as the entity that built and constructed the city's sewer system, was liable to a downstream property owner for discharge of the sewage into the Reedy River, which then contaminated the plaintiff's property); *id.* at 26, 158 S.E. at 119 ("It is the duty of the commissioners of the sewer district to construct the sewer so that it will not become a nuisance to any neighborhood or to any particular inhabitant thereof; and it is the duty of the city, after the sewer has been turned over to it, to avoid the same result by properly maintaining and repairing the sewer after it is constructed." (quoting *Jones v. Sewer Improv. Dist.*, 177 S.W. 888, 889 (Ark. 1915))); *Johnston v. Anderson Reg'l Landfill, LLC*, 725 F. Supp. 3d 527, 540 (D.S.C. 2024) (finding the Plaintiff's allegations that the defendant landfill,

29

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

which allowed "'pollution, noxious fumes, odors, dust, gases including methane gas, particulate matter, and trash' to escape from their property and invade Plaintiff's properties," and that the defendant owed the plaintiffs a duty of reasonable care, were "sufficient to state a claim for negligence" and defeat the defendant's motion to dismiss).

Finally, other courts that recently considered this question in the context of PFAS contamination consistently rule that defendants such as those in this litigation owe a duty of care to those injured by the PFAS. *See, e.g.*, *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1324 (N.D. Ga. 2021) (finding the defendants "have a duty to exercise reasonable care in their use and disposal of unreasonably dangerous chemicals such as PFAS and/or products containing PFAS in operating their various . . . facilities to avoid pollution of the State's waterways and injury to members of the downstream public who consume the water as part of their public drinking water supply"); *Ryan v. Greif, Inc.*, 708 F. Supp. 3d 148, 164 (D. Mass. 2023) (agreeing with the magistrate judge's ruling that "facilities that use and dispose of PFAS-contaminated materials, knowing of risks associated with PFAS ingestion and the risks of environmental contamination following improper disposal, owe foreseeable victims of such contamination a duty of care"); *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1331 (N.D. Ga. 2022) (ruling a discharger of PFAS "has a duty to exercise reasonable care in its use and disposal of unreasonably dangerous chemicals such as PFAS to avoid pollution of state waterways and injury to downstream water users"); *Severa v. Solvay Specialty Polymers USA, LLC*, 524 F. Supp. 3d 381, 398 (D.N.J. 2021) (finding "Defendants had a duty of care with regard to the proper handling of PFAS"); *see also Peeler v. SRG Glob. Coatings, LLC*, C.A. No. 1:23-CV-23-SNLJ, 2024 WL 4625640, at *6-7 (E.D. Mo. Oct. 30, 2024); *Brown v. Corteva, Inc.*, C.A. No. 7:23-CV-1409-D, 2024 WL 4229937, at *4 (E.D.N.C. Sep. 18, 2024); *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021);

30

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Utils. Bd. of Tuskegee v. 3M Co.*, C.A. No. 2:22-CV-420-WKW, 2023 WL 1870912, at \*9-11 (M.D. Ala. Feb. 9, 2023).

> **2.    Plaintiff sufficiently alleges that PRET and Nan Ya proximately caused Plaintiff's injuries.**

PRET and Nan Ya argue that they could not have proximately caused Plaintiff's injuries as a matter of law. PRET MIS, at 18–19; Nan Ya MIS, at 4. This fails under straightforward principles.

"Proximate cause requires proof of both causation in fact and legal cause." *Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 88, 502 S.E.2d 78, 83 (1998). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence. Legal cause is proved by establishing foreseeability." *Id.* at 88–89, 502 S.E.2d at 83 (citation omitted). "Foreseeability is determined by looking to the natural and probable consequences of the complained of act." *Id.* at 89, 502 S.E.2d at 83. "The defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury." *Id.*

At this stage, Plaintiff must only plead—not *prove*—causation. *See Hurd v. Williamsburg Cnty.*, 353 S.C. 596, 613, 579 S.E.2d 136, 145 (Ct. App. 2003) ("Ordinarily, the question of proximate cause is one of fact for the jury . . . ." (quoting *McNair v. Rainsford*, 330 S.C. 332, 349, 499 S.E.2d 488, 497 (Ct. App. 1998))). It has done so.

As for causation in fact, Plaintiff alleges that PFAS are man-made chemicals that do not occur naturally in the environment, Defendants each discharged PFAS into a body of water upstream of Plaintiff's properties, PFAS does not naturally degrade in the environment, and the PFAS Defendants discharged flowed downstream onto Plaintiff's properties, thereby harming it. Complaint, ¶¶ 18–28. Although Plaintiff's properties have been contaminated by multiple

31

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

sources of PFAS, these allegations, along with the inferences reasonably deducible therefrom, are enough to sufficiently plead that Defendants are "but for" causes of their injuries.

"As to legal cause, 'foreseeability is considered "the touchstone . . . ," and it is determined by looking to the natural and probable consequences of the defendant's act or omission.' In most cases, foreseeability ends up being addressed as question of fact for the jury." *Wickersham v. Ford Motor Co.*, 432 S.C. 384, 390, 853 S.E.2d 329, 332 (2020) (quoting *Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 369, 635 S.E.2d 97, 101 (2006)). A plaintiff is not required to prove "the defendant should have foreseen the particular event which occurred but merely that the defendant should have foreseen his or her [wrongful conduct] would probably cause injury to someone." *Hurd*, 353 S.C. at 613, 579 S.E.2d at 145 (citing *Greenville Mem'l Auditorium v. Martin*, 301 S.C. 242, 245, 391 S.E.2d 546, 547–48 (1990)).

Here, Plaintiff's injuries were the "natural and probable consequences" of Defendants' wrongful conduct and were, therefore, foreseeable. Again, Plaintiff alleges that PFAS do not naturally degrade in the environment and Defendants knew that PFAS are hazardous to human health, Complaint, ¶¶ 27–28, 66; thus, it was entirely foreseeable to Defendants that the PFAS, once discharged from their facilities, would persist in South Carolina waters and invade the properties of downstream landowners. Moreover, the fact that Defendants' wastewater in some cases flowed through a WWTP before reaching Plaintiff's properties does not change this analysis, as Plaintiff also alleges that Defendants knew or should have known that the WWTPs were unable to remove Defendants' PFAS from the water they treated and discharged. Complaint, ¶ 62. *See Bishop*, 331 S.C. at 89, 502 S.E.2d at 83 ("The intervening negligence of a third person will not excuse the first wrongdoer if such intervention ought to have been foreseen

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

in the exercise of due care. In such case, the original negligence still remains active, and a contributing cause of the injury.")

### 3.     Plaintiff alleges actionable damages.

Several Defendants argue Plaintiff's negligence claim should be dismissed because it has not alleged physical injury or damage to their property. Fiber MIS, at 13; GFL MIS, at 16–17; Mohawk MIS, at 12–13; Nan Ya MIS, at 17–18; PRET MIS, at 20; RRD MIS, at 15–16. For reasons already discussed, *see supra* §§ B & C, this is baseless. The pleadings are replete with allegations that Defendants have contaminated and injured Plaintiff's *properties. See, e.g.,* Complaint, ¶¶ 1–7, 18–26, 55, 61, 63–65, 110. *See Chestnut v. AVX Corp.*, 413 S.C. 224, 228, 776 S.E.2d 82, 84 (2015) ("Here, appellants have pled all four elements of a negligence claim: duty, breach, proximate cause, and damages. In alleging damages, appellants contend that their property is 'worthless,' 'damaged,' and 'devalued' by the 'harmful' and 'dangerous' chemicals on the real property that adjoins their properties.").

Defendants label Plaintiff's damages allegations as "unexplained and conclusory," lacking "facts showing that anything other than water from a public waterway has or could have been damaged by PFAS." Nan Ya MIS, at 17; *see also* GFL MIS, at 16; Mohawk MIS, at 12; PRET MIS, at 20; RRD MIS, at 15. This simply ignores the pleadings: Defendants have put toxic and environmentally persistent chemicals that are unsafe to consume in drinking water into the lands, SWTPs, and infrastructure *of a water provider*. To the extent Plaintiff's allegations on the damage to its properties are concise, this merely reflects that its property injuries are obvious.

### 4.     Plaintiff has not assumed the risk of PFAS contamination.

T&S argues that by voluntarily assuming the role of a drinking water provider, which necessarily requires the intake of South Carolina's waters, Plaintiff has assumed the risk of PFAS exposure and contamination. T&S MIS, 19–20. This is incorrect.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

In South Carolina, assumption of risk can be either express or implied. *See Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*, 333 S.C. 71, 79, 508 S.E.2d 565, 569 (1998). "Implied assumption of risk is further divided into the categories of 'primary' and 'secondary' implied assumption of risk." *Id.* Here, T&S argues that Plaintiff's drinking water operations "constitute[] a primary implied assumption of the risk for any alleged injury [they] now complain[] of." T&S MIS, at 19.

"Primary implied assumption of risk arises when the plaintiff impliedly assumes those risks that are *inherent* in a particular activity." *Davenport*, 333 S.C. at 81, 508 S.E.2d at 570. "Primary implied assumption of risk is not a true affirmative defense, but instead goes to the initial determination of whether the defendant's legal duty encompasses the risk encountered by the plaintiff." *Id.* ("In its primary sense, implied assumption of risk focuses not on the plaintiff's conduct in assuming the risk, but on the defendant's general duty of care. . . . Clearly, primary implied assumption of risk is but another way of stating the conclusion that a plaintiff has failed to establish a prima facie case [of negligence] by failing to establish that a duty exists." (quoting *Perez v. McConkey*, 872 S.W.2d 897, 902 (Tenn. 1994))).

But as demonstrated above, T&S and other Defendants owed Plaintiff a duty "to use due care in the handling, use, and disposal of products containing or degrading to [PFAS] to avoid causing an unreasonable risk of harm to others." Complaint, ¶ 103. Plaintiff incorporates its arguments concerning the existence of Defendants' duty of care, which are dispositive here.

Regardless, PFAS contamination is not a risk inherent in the provision of potable water to Plaintiff's customers. *See Davenport*, 333 S.C. at 81, 508 S.E.2d at 570. As Plaintiff alleges, PFAS are "man-made chemicals that do not occur naturally in the environment." Complaint, ¶ 27. As a result, if it were not for Defendants' tortious conduct in discharging PFAS to the

34

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

environment, there would be no PFAS in Plaintiff's water supply. Neither T&S nor other Defendants should be allowed to create a hazard that did not previously exist, then attempt to escape liability by shielding itself behind the very same risk it created. T&S also argues Plaintiff "freely and voluntarily" exposed itself to PFAS, T&S MIS, 19–20, but this also misses the mark. Plaintiff is required to provide potable water to their customers, and it must intake and process water from Bull Creek and the Intracoastal Waterway, regardless of the contaminants in the water. It strains credulity to suggest that Plaintiff has freely and voluntarily exposed itself to Defendants' PFAS.

**E.      The "free public services doctrine" does not apply here, if it exists in South Carolina at all.**

Multiple Defendants argue that the free public services doctrine (also known as the municipal cost recovery rule) bars Plaintiff from recovering the costs it incurs from removing Defendants' PFAS from the drinking water they supply to their customers. *See* Elevate MIS, at 16; Fiber MIS, at 14; Nan Ya MIS, at 18; PRET MIS, at 22–23. The free public services doctrine is underdeveloped, if existing at all, in South Carolina jurisprudence.[21] Nevertheless, in certain jurisdictions it generally provides "that absent specific statutory authorization or damage to government-owned property, a county [or other governmental entity] cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." *Johnson v. 3M Co.*, 563 F. Supp. 3d 1253, 1311 (N.D. Ga. 2021) (emphasis removed) (quoting *Walker Cnty. v. Tri-State Crematory*, 642 S.E.2d 324, 327 (Ga. App. 2007)). Defendants' only

---

[21] Defendants cite no South Carolina cases in support of their arguments, and Plaintiff's Westlaw searches for "free public services doctrine" and "municipal cost recovery rule" returned no South Carolina cases addressing the doctrine. As a result, dismissal should not be granted on this basis. *See Madison v. Am. Home Prod. Corp.*, 358 S.C. 449, 451, 595 S.E.2d 493, 494 (2004) ("As a general rule, important questions of novel impression should not be decided on a motion to dismiss.").

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

real basis for applying the doctrine here is the fact that Plaintiff is a governmental entity. *See* Elevate MIS, at 16; Fiber MIS, at 14; Nan Ya MIS, at 18; PRET MIS, at 22–23.

The free public services doctrine rests on the premise that legislative authorities have the power to allocate the costs of providing "free" public services as they see fit, such as "spread[ing] [costs] by taxes," or by authorizing recovery "by statute or regulation." *City of Flagstaff v. Atchison, Topeka and Santa Fe Ry. Co.*, 719 F.2d 322, 323, 324 (9th Cir. 1983). By that rationale, courts should not intrude upon these legislative determinations about cost allocation by permitting tort recovery. *Id.* at 324 (citing *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 314–17 (1947)) ("If the government has chosen the bear the costs for reasons of economic efficiency, or even as a subsidy to the citizens and their businesses, the decision implicates fiscal policy; the legislature and its public deliberative processes, rather than the court, is the appropriate forum to address such fiscal concerns.").

Even if ultimately recognized in this jurisdiction, the free public services doctrine does not apply here for the simple reason that Plaintiff's provision of drinking water "to paying customers is neither free nor public as contemplated by the doctrine." *See Johnson*, 563 F. Supp. 3d at 1311. Rather, Plaintiff only provides drinking water to those customers who pay for the service. *See generally* Complaint (repeatedly stating that Plaintiff supplies drinking water to *customers*).

As *Flagstaff* clarifies, "it is the identity of the claimant and the nature of the cost that combine" under the doctrine "to deny recovery." 719 F.2d at 324. By focusing only on either Plaintiff's "identity" as a governmental entity to invoke the free public services doctrine, Defendants erroneously bypass "the nature of the cost" for which the doctrine precludes

36

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

recovery.[22] Here, the costs of the enhanced water treatment for which Plaintiff seeks relief are "not free for all the public" at the point of use. *Johnson*, 563 F. Supp. 3d at 1311; *see also* S.C. Code Ann. § 5-31-1150 (it is a misdemeanor for a person to use municipal water without a contract for water service). Unlike the costs of fire or police services, which are allocated across the public via taxes, the Legislature has authorized special purpose districts like Plaintiff to charge water and sewer users for these services. S.C. Code Ann. § 5-31-670. Indeed, it is telling that ***none*** of Defendants' authorities involve the free public services doctrine barring recovery by a water, sewer, or other public utility—or any service funded by billing customers.

In addition, the free public service doctrine recognizes exceptions for "where the acts of a private party create a public nuisance which the government seeks to abate" and "where the government incurs expenses to protect its own property." *Flagstaff*, 719 F.2d at 324; *see also Johnson*, 563 F. Supp. 3d at 1311 (indicating doctrine does not apply where recovery is sought for "damage to government-owned property"). Plaintiff plainly alleges both a public nuisance and damage to its properties. *See, e.g.*, Complaint, ¶¶ 1–3, 5–7, 16, 63, 65–66, 79-90.

Furthermore, in a case involving a challenge to the water rate set by the City of Conway—one of Plaintiff's wholesale customers—the Supreme Court recognized that a public water provider "has a proprietary interest" in the water it sells to its customers, "as evidenced by [its] unilateral ability to sell or lease it." *Sloan v. City of Conway*, 347 S.C. 324, 329, 555 S.E.2d 684, 686 (2001). It is such water (along with Plaintiff's other properties), in which Plaintiff has a

---

[22] T&S at least acknowledges that "the nature of the cost" is part of the analysis. Ultimately, however, T&S fails to properly apply this factor to "the services provided by Plaintiff[s]" by simply assuming that because they are generic "municipal services," the funding for Plaintiff's provision of drinking water has already been set in stone by the Legislature. T&S MIS, at 12. In so doing, T&S collapses "the nature of the cost" into Plaintiff's identities as governmental entities—really focusing only on this governmental status just as the other Defendants do.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

proprietary interest, that has been damaged by Defendants' tortious conduct. By stating the free public services doctrine applies to "public expenditures made in the performance of **_governmental functions_**" (emphasis added)—not proprietary functions, Defendants necessarily concede that the doctrine cannot apply here. Elevate MIS, at 16; Fiber MIS, at 14; Nan Ya MIS, at 18; PRET MIS, at 22.

**F.      The Safe Drinking Water Act does not preempt Plaintiff's claims.**

Elevate and Nan Ya present vague, unsupported, and conclusory arguments that Plaintiff's claims "*may . . .* intrude on regulatory territory reserved for federal oversight" and "should be decided under federal law"—namely, the Safe Drinking Water Act ("SDWA"). Elevate MIS, at 5–6; Nan Ya MIS, at 7–8. They cite a single case merely listing the three types of federal preemption (express, field, and conflict) but do not state which type supposedly applies to Plaintiff's state common law claims, and they cite no other authority suggesting that Plaintiff's claims are preempted. Defendants' failure to identify—much less articulate—a preemption theory underscores that this argument lacks both substance and merit. *See Normandy Corp. v. S.C. Dep't of Educ.*, 386 S.C. 393, 409, 688 S.E.2d 136, 144 (Ct. App. 2009) ("Courts should not lightly infer preemption."); *see also Eggleston v. UPS*, 428 S.C. 373, 381, 834 S.E.2d 713, 717 (Ct. App. 2019) ("[W]hen a plaintiff invokes traditional elements of tort law and the issue of preemption arises, 'the courts almost uniformly have resolved against federal preemption.'" (quoting *Jimenez-Ruiz v. Spirit Airlines, Inc.*, 794 F. Supp. 2d 344, 348 (D.P.R. 2011)); *Jamison v. Ford Motor Co.*, 373 S.C. 248, 265, 644 S.E.2d 755, 763-64 (Ct. App. 2007) ("[C]ommon law tort actions are historically within the scope of the States' police powers and are safe from preemption by a federal statute unless Congress reveals a clear and manifest purpose to preempt.").

By contrast, it is *unambiguous* that the SDWA imposes no preemption here.

38

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

First, Defendants identify no SDWA provision that imposes express preemption—because there is none. *See generally* 42 U.S.C. §§ 300f to 300j-27. In fact, the SDWA contains several "savings clauses" that communicate exactly the opposite: that Congress intended to establish "a joint federal-state system" "to assure that water supply systems serving the public meet minimum national standards for protection of public health." *Manufactured Hous. Inst. v. United States EPA*, 467 F.3d 391, 401 (4th Cir. 2006). *See* 42 U.S.C.S. § 300g-2 (providing that "a State has primary enforcement responsibility for public water systems" if it meets certain requirements); 42 U.S.C.S. § 300g-3(e) ("Nothing in this title shall diminish any authority of a State or political subdivision to adopt or enforce any law or regulation respecting drinking water regulations or public water systems, but no such law or regulation shall relieve any person of any requirement otherwise applicable under this title."); 42 U.S.C.S. § 300j-8(e) ("Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute *or common law* to seek enforcement of any requirement prescribed by or under this title *or to seek any other relief*." (emphases added)).

By allowing states to assume "primary enforcement responsibility for public water systems," § 300g-2, and "adopt or enforce any law or regulation respecting drinking water regulations or public water systems," § 300g-3(e), Congress also clearly did not attempt to "occup[y] the field" of water pollution regulation such that it "left no room for the states to supplement it" when it enacted the SDWA. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (observing that "[a]lthough Congress intended to dominate the field of pollution regulation" in enacting the Clean Water Act, the Act's "saving clause negates the inference that Congress 'left no room' for state causes of action"); *Perry v. Fleetwood Enters.*, C.A. No. 2:06-

39

cv-502-MEF (WO), 2007 WL 2893410, at *5 (M.D. Ala. Sep. 28, 2007) ("The presence of a saving clause suggests that Congress did not intend to occupy the field.").

Nor do Plaintiff's claims conflict with the SDWA, as to implicate conflict preemption. "Implied conflict preemption occurs in one of two ways—either where compliance with both federal and state regulations is physically impossible or where the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Priester v. Cromer*, 401 S.C. 38, 44, 736 S.E.2d 249, 252 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Here, Plaintiff's claims do not preclude Defendants from complying with the SDWA, nor do the claims otherwise hinder the SDWA in any way. In fact, the goals of the SDWA are advanced through this litigation.

Defendants' arguments have not succeeded elsewhere. *See, e.g., State v. Monarch Chems., Inc.*, 443 N.Y.S.2d 967, 969 (N.Y. Sup. Ct. 1981) (considering whether the SDWA, along with other federal statutes, preempted state law, and finding "this argument lacks merit"); *Russell v. Tyson Farms, Inc.*, 450 F. Supp. 3d 1266, 1273 (N.D. Ala. 2020) (ruling the plaintiffs' "state law causes of action . . . are not preempted by the SDWA"); *accord Batton v. Ga. Gulf*, 261 F. Supp. 2d 575, 697–98 (2003) (holding that the SDWA did not completely preempt plaintiff's claims). Nor should they here.

**G.    Defendants' causation arguments should be rejected.**

**1.    Plaintiff sufficiently alleges that its injuries are fairly traceable to Elevate's and Nan Ya's conduct.**

Defendants Elevate and Nan Ya both make the identical conclusory assertion that Plaintiff lacks standing because it "has failed to allege facts which show a causal connection between Plaintiff's alleged injury and Defendant's conduct." Elevate MIS, at 7; Nan Ya MIS, at 8. Neither Defendant provides any explanation or support for this assertion. As a result, the Court should

40

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

not consider it. *Cf. First Sav. Bank v. McClean*, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (S.C. 1994) (movant "deemed to have abandoned" issue on appeal where he "fails to provide arguments or supporting authority for his assertion").

Moreover, Plaintiff has pled more than enough facts to demonstrate that Elevate and Nan Ya's respective use and discharges of PFAS have caused injury to Plaintiff by contaminating its water sources and properties:

- Elevate and Nan Ya discharge wastewater contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals ("MCL PFAS") and/or their precursors directly to surface waters and indirectly to the Lake City WWTP, respectively, as a result of these Defendants' usage of products containing or degrading to these PFAS in their industrial processes. *See* Complaint, ¶¶ 20, 25; *see also id.* at ¶¶ 51–53.

- The treatment processes employed by Elevate's "Richmond Plant do[] not remove [its] PFAS," and those PFAS are discharged "into the Great Pee Dee River upstream of Plaintiff's Bull Creek intake." *Id.* at ¶ 20; *see also id.* at ¶ 52.

- Similarly, the treatment processes used by the Lake City WWTP, which receives Nan Ya's wastewater discharge, "cannot remove Nan Ya's PFAS, and the WWTP discharges water contaminated with Nan Ya's PFAS into Lake Swamp upstream of Bull Creek." *Id.* at ¶ 25; *see also id.* at ¶ 53.

- The Great Pee Dee River, which receives Elevate's PFAS-laden wastewater, flows downstream before branching off to Bull Creek, upon which Plaintiff's Bull Creek water intake is sited. *See id.* at ¶¶ 20, 48. Meanwhile, Lake Swamp, which receives Nan Ya's PFAS-laden wastewater, subsequently joins the Lynches River, then the Great Pee Dee River, and finally Bull Creek. *See id.* at ¶¶ 25, 48.

- "PFAS sampling of Bull Creek, the Great Pee Dee River, [and] Lynches River . . . confirms the presence of [MCL PFAS] throughout these bodies of water. These PFAS flow downstream and contaminate Plaintiff's water intake on Bull Creek at concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intakes confirm the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source." *Id.* at ¶ 50.

- Plaintiff's "Bull Creek SWTP utilizes conventional water treatment technologies" that are not capable of removing PFAS. *Id.* at ¶ 56.

- Finished drinking water treated by Plaintiff's Bull Creek SWTP (and contaminated with Defendants' PFAS) is distributed to customers that are served by Plaintiff's Bucksport Regional WWTP and Conway WWTP for their sewer services. Neither of these WWTPs serves industrial users. *Id.* at ¶¶ 57–59.

41

- Plaintiff's Bucksport Regional and Conway WWTPs "utilize conventional wastewater treatment methods," which also cannot remove PFAS. These WWTPs "both discharge to the Waccamaw River upstream of the Intracoastal Waterway," which is the source water for Plaintiff's Myrtle Beach SWTP. *Id.* at ¶¶ 60–61.

- Like the Bull Creek SWTP, Plaintiff's Myrtle Beach SWTP uses conventional water treatment methods that do not remove PFAS. Hence, Defendants' PFAS that pass through the Bull Creek SWTP, Plaintiff's water distribution system, and into the Waccamaw River via Bucksport Regional and Conway WWTPs, then flow downstream into the Intracoastal Waterway, where they contaminate the source water for Plaintiff's Myrtle Beach SWTP. *Id.* at ¶ 61.

- In order to provide drinking water that is free from Elevate, Nan Ya, and other Defendants' PFAS and which complies with EPA's MCLs, Plaintiff must therefore implement new treatment technologies that are capable of removing PFAS. *Id.* at ¶¶ 6, 63.

*See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161–62 (4th Cir. 2000) (indicating Article III's fairly traceable standard is more lenient than tort causation, and holding that allegations that defendant discharged chemicals in excess or its permit limits that were also present in a downstream water body satisfied this standard); *see also, e.g.*, Order on MTDs, *South Carolina v. 3M Co.*, No. 2023-CP-40-04111 (S.C. Ct. Comm. Pl. July 23, 2024) (attached as **Ex. 5**), at 4 (holding State's allegations that PFAS manufacturers produced PFAS and PFAS-containing products, "caused widespread contamination of the State's natural resources and property," and contaminated "identifie[d] areas in the State" "adequately pled causation"); *Weatherford v. E.I. du Pont de Nemours & Co.*, No. 4:22-cv-01427-RBH, 2023 WL 11015357, at *4–5 (D.S.C. Sept. 27, 2023) (holding that allegations of PFAS' persistence and tendency to leach from wastewater and biosolids, of defendants' knowledge about PFAS and their customer's manufacturing processes, and of defendants failure to provide proper disposal instructions to their customer sufficiently alleged proximate causation); *Braswell v. Colonial Pipeline Co.*, 395 F. Supp. 3d 641 (M.D.N.C. 2019) (holding allegations that plaintiffs "suffered 'a loss of use and enjoyment and property value as a direct and proximate cause result of

42

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

[Colonial's] conduct, actions and inactions,'" and that the properties were "directly affected by the ongoing releases" and "inside 'the contamination plume,'" sufficiently alleged causation (quoting complaint)).

### 2. PRET's causation arguments are also unavailing.

PRET broadly advances two causation arguments. First is that "PRET does not discharge PFAS into the Lynches River—or any other body of water," but rather "conveys its wastewater to Johnsonville WWTP," which then discharges the effluent into the Lynches River, upstream from Plaintiff. PRET MIS, at 19; *see also id.* at 10, 12. This is a mislabeled, and misplaced, contention that the Johnsonville WWTP is a superseding cause. Second, PRET contends that "Plaintiff's claims against PRET in relation to Plaintiff's Myrtle Beach SWTP, must be dismissed because neither PRET nor the Johnsonville WWTP are upstream from the Myrtle Beach SWTP." *Id.* at 19; *see also id.* at 5, 10, 16. Both arguments lack merit.

### a. The Johnsonville WWTP's receipt and discharge of PRET's contaminated wastewater is not a superseding cause.

"The touchstone of proximate cause in South Carolina is foreseeability," meaning that "the injury in question occurred as a natural and probable consequence of the defendant's act." *Small v. Pioneer Mach., Inc.*, 329 S.C. 448, 463, 494 S.E.2d 835, 842–43 (Ct. App. 1997). "For an intervening force to be a superseding cause that relieves an actor from liability, the intervening cause must be a cause that could not have been reasonably foreseen or anticipated." *Id.* at 467, 494 S.E.2d at 844.

The Johnsonville WWTP's actions here do not constitute a superseding cause. Plaintiff alleges that PRET "discharges industrial wastewater" that is contaminated "with products that contain or degrade to [MCL] PFAS to the Johnsonville WWTP," Complaint, ¶ 26, which "lack[s] filtration technologies to remove [PRET's] PFAS," *id.* at ¶ 53. As the complaint underscores,

43

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PFAS are "persisten[t] in the environment," *id.* at ¶ 27, "cannot be adequately removed by conventional wastewater treatment processes," *id.* at ¶ 5, and "are highly mobile and water soluble," *id.* at ¶ 32. PRET is alleged to have possessed actual or constructive knowledge "that conventional water treatment technologies used by . . . WWTPs cannot remove PFAS from wastewater," and further "that [its] treated wastewater contaminates surface waters and the water Plaintiff draws for its customers," *id.* at ¶ 62; *see also id.* at ¶ 93. Thus, the operative pleading plainly demonstrates that the Johnsonville WWTP was a foreseeable passive conduit for PRET's PFAS to enter the river system and contaminate Plaintiff's downstream water sources and facilities. *See, e.g.*, *Weatherford*, 2023 WL 11015357, at *4–5 (holding textile mill that used and discharged PFAS-containing products purchased from defendants did not constitute superseding cause); *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1332–33 (N.D. Ga. 2022) (same).

PRET, however, obfuscates the issue by arguing it does not "control how Johnsonville WWTP treats and filters its water," and that "PRET cannot be the 'but for' cause of PFAS entering" downstream water supplies "[b]ecause Johnsonville WWTP—not PRET—is responsible for filtering, treating, and discharging the water in accordance with SCDES, and other state and federal regulations." PRET MIS, at 19; *see id.* at 10, 12.

As to the first contention: foreseeability, not control, is the test for a superseding cause. Plaintiff has, moreover, already addressed Defendants' control-based arguments against their nuisance liability. *See supra* § III.C.1. In brief, PRET, like other Defendants that discharge to a WWTP, satisfies the control element for nuisance by controlling whether it sends toxic chemicals to the Johnsonville WWTP, via its sewer connection, which PRET knows or should know are resistant to conventional treatment methods.

As to the second contention: while but-for causation is indeed a prerequisite to proximate causation, the complaint leaves no doubt that PRET's discharges are a but-for cause of a portion of the PFAS impacting Plaintiff. *See Small*, 329 S.C. at 463, 494 S.E.2d at 842 ("Proximate cause requires proof of both causation in fact and legal cause."). Plaintiff alleges that PFAS are "man-made chemicals that do not occur naturally in the environment," Complaint, ¶ 27; that PRET uses PFAS "in the manufacture of plastics and resins,"[23] *id.* at ¶ 26; and that, "[a]s part of its processes," PRET discharges PFAS-contaminated wastewater to the Johnsonville WWTP, *id.* Notably absent from the pleading is any allegation that the Johnsonville WWTP adds any PFAS to the effluent stream that is discharged to the Lynches River. Rather, as stated earlier, the complaint demonstrates that the Johnsonville WWTP is merely a (foreseeable) passive conduit for the PFAS discharged by PRET.

### b.     PRET's extrinsic evidence concerns a disputed and, in any event, non-dispositive matter.

Plaintiff ably pleads that PFAS discharged by PRET as well as other Defendants on the Pee Dee Watershed upstream from Bull Creek contaminates not only Plaintiff's Bull Creek SWTP but also its Myrtle Beach SWTP, which draws water from the Intracoastal Waterway. *See supra* § III.G.1. However, PRET contends that it is not liable for any damages to the Myrtle Beach SWTP because this facility is not downstream from PRET's Johnsonville facility or the

---

[23] PRET asserts that its Johnsonville facility "recycles carpet." PRET MIS, at 6. The Court need not consider this statement for the purposes of deciding PRET's Motion to Dismiss. *See Johnson v. 3M Co.*, 563 F. Supp. 3d 1253, 1353–54 (N.D. Ga. 2021) (declining to consider defendant's argument that claims against it should be dismissed on the basis that the complaint mistakenly described its manufacturing activities). Nevertheless, Plaintiff notes that carpet recycling and "the manufacture of plastics and resins" are not necessarily mutually exclusive, and further that PFAS are known to have been extensively used in the manufacture of carpet and thus are present in post-consumer carpet. *See id.* at 1272 ("Due to their chemical stability and oil and water repellent properties, PFAS have been widely used in carpet and textile production to provide water and stain resistance."); *id.* at 1355–56 (denying motion to dismiss by carpet recycling facility).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Johnsonville WWTP. *See* PRET MIS, at 5, 10, 16, 19. In support, PRET submits extrinsic evidence that purports to show "Plaintiff's Myrtle Beach SWTP on the Intracoastal Waterway . . . *is not downstream* from the Johnsonville WWTP." *Id.* at 5 (emphasis in original); *see id.* at Exs. B, C, D, E.

PRET's attempt to bypass the pleadings is as misplaced as it is premature. *See Skydive Myrtle Beach, Inc. v. Horry Cnty.*, 426 S.C. 175, 180, 826 S.E.2d 585, 587 (2019) ("Rule 12(b)(6) . . . address[es] the sufficiency of a pleading stating a claim; it is not a vehicle for addressing the underlying merits of the claim."). Plaintiff's complaint expressly alleges that PFAS-contaminated water received by the Bull Creek SWTP also reaches the Myrtle Beach SWTP, in addition to explaining how. Complaint, ¶ 55–58. To wit, residential and industrial users of Bull Creek potable water send it via sewers to Plaintiff's WWTPs on the Waccamaw River, upstream of the Myrtle Beach SWTP. Since all plants involved utilize conventional treatment systems that do not remove Defendants' PFAS products, some of the PFAS that enter the Bull Creek SWTP also pass to the Myrtle Beach SWTP. *Id.* PRET's assertion that the Johnsonville WWTP is not upstream of the Myrtle Beach SWTP misses the point.

PRET's reliance on extrinsic evidence to dispute a complex hydrological and environmental fate issue—one that will be subject to expert discovery—only underscores why dismissal at this stage is improper. Moreover, PRET ignores additional environmental fate allegations that its evidence does not even address. Because Plaintiff's Complaint adequately pleads plausible causal pathways, and PRET's arguments rest on premature, contested, and irrelevant factual determinations, its motion should be denied.

**H.     This Court has personal jurisdiction over RRD and SCD.**

Defendants RRD and SCD contend that Plaintiff's claims against them should be decided under South Carolina law—not North Carolina law, as Plaintiff contends—and that the Court

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks personal jurisdiction over these claims. For the reasons that follow, RRD and SCD are wrong on both counts.

### 1.     Because Plaintiff has voluntarily dismissed GFL and Waste Industries, the Court need not consider their motions.

After discussions with counsel for GFL and Waste Industries, Plaintiff agreed to voluntarily dismiss its claims against them without prejudice. Plaintiff filed a notice of voluntary dismissal of these defendants on February 28, 2025 *See* **Ex. 6**. Accordingly, the Court need not consider these motions, as they became moot upon filing of the voluntary dismissal.

### 2.     North Carolina law governs Plaintiff's claims against RRD and SCD.

RRD and SCD argue that "under South Carolina choice-of-law rules," specifically *lex loci delicti*, "South Carolina law applies to Grand Stand's claims" against them. *See* RRD MIS, at 4. Defendants are incorrect for a straightforward reason: under the present circumstances, South Carolina law is preempted, and federal law compels the application of North Carolina law.

The U.S. Supreme Court's decision in *International Paper Co. v. Ouelette*, 479 U.S. 481 (1987) requires this result. There, Vermont property owners sued a polluter under Vermont law for discharges originating in New York. *Id.* at 483–84. But the Court held that under the federal Clean Water Act ("CWA"), an affected state's law is preempted and "inapplicable to" pollution originating from an out-of-state point source. *Id.* at 497.

This ruling applies with full force here. Because Defendants send their PFAS-containing leachate to a point source that discharges to surface waters in North Carolina, *see* Complaint, ¶¶ 22, 54, South Carolina law cannot govern the claims against it. *Ouelette*, 479 U.S. at 497.

*Ouelette* also confirms that the CWA's preemptive force extends beyond substantive law. Choice-of-law rules that require applying an affected state's law to an out-of-state point source

47

are likewise preempted. *Id.* at 499 n.20. Thus, both South Carolina's substantive law and its choice-of-law rules are preempted. *Id.*

But *Ouelette* makes clear that CWA preemption "does not leave [Plaintiff] without a remedy." *Id.* at 497. Instead, courts can and should apply the law of the source state—here, North Carolina. *Id.* Doing so "would not frustrate the goals of the CWA as would a suit governed by [South Carolina] law" and is exactly what *Ouelette* endorses. *See id.* at 498–99 (finding "no basis for holding that Vermont is an improper forum" for applying New York law); *id.* at 500 ("Nothing in the Act prevents a court sitting in an affected State from hearing a common-law nuisance suit, provided that jurisdiction otherwise is proper."). On remand, the federal district court followed the Supreme Court's directive and applied the substantive law of the source state. *See Ouelette v. Int'l Paper Co.*, 666 F. Supp. 58, 62 (D. Vt. 1987). *Ouelette* calls for the same result here.

### 3.      This Court has personal jurisdiction over RRD and SCD.

RRD and SCD dispute personal jurisdiction on the grounds that they lack sufficient minimum contacts to demonstrate that they have purposefully availed themselves of the privilege of conducting activities within South Carolina. *See* RRD MIS, at 4–7. Both state that they are "not residents of South Carolina." RRD MIS, at 4. Defendants further state that their "sole business is operating [their respective] solid waste landfill[s] in North Carolina," which "do not accept waste from South Carolina," and that "[n]either Defendant does business, is registered to do business, . . . solicits business in South Carolina," or "own[s] any property or ha[s] any employees in South Carolina." RRD MIS, at 4–5.

As will be explained in greater detail below, because the landfills directly operated by RRD and SCD purposefully and knowingly send their PFAS-contaminated wastewater to a WWTP that discharges to a river that flows into South Carolina, this Court can exercise personal

48

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

jurisdiction over these Defendants. Lacking physical presence or other business operations in South Carolina are simply irrelevant to this jurisdictional determination.

A court's exercise of personal jurisdiction over an out-of-state defendant must conform with both South Carolina's Long-Arm Statute, section 36-2-803 of the South Carolina Code, and the U.S. Constitution's Due Process Clause. *S. Plastics Co. v. S. Com. Bank*, 310 S.C. 256, 259, 423 S.E. 128, 130 (1992). Because the Long-Arm Statute has been interpreted to be coextensive with the limits of due process, however, analysis under the Long-Arm Statute is folded into "whether the exercise of personal jurisdiction would violate due process." *Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491, 611 S.E.2d 505, 508 (2005).

Due process requires "that the defendant possess sufficient minimum contacts with the forum state, so that he could reasonably anticipate being haled into court there." *Id.* at 491–92, 611 S.E.2d at 508. This determination is a "two-prong analysis." *Moosally v. W.W. Norton Co., Inc.*, 358 S.C. 320, 331, 594 S.E.2d 878, 884 (Ct. App. 2004). Under the first "power," or "purposeful availment," prong, the court must "find that the defendant directed its activities to residents of South Carolina and that the cause of action arises out of or relates to those activities." *Id.* at 331–32, 594 S.E. at 884. Under the second "fairness" prong, the court weighs factors including "the burden on the defendant, the extent of the plaintiff's interest, South Carolina's interest, efficiency of adjudication, and the several states' interest in substantive social policies." *Id.* at 332, 594 S.E.2d at 885. Finally, in making the foregoing determinations at the pre-trial stage, the court assesses the pleadings and also may consider extrinsic evidence. *Springmasters, Inc. v. D&M Mfg.*, 303 S.C. 528, 531–32, 402 S.E.2d 192, 193–94 (Ct. App. 1991).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Here, RRD and SCD have purposefully availed themselves to personal jurisdiction in South Carolina by collecting the PFAS-contaminated leachate generated by their respective landfills and transporting it to Lumberton, North Carolina's WWTP, where their PFAS predictably pass through the Lumberton WWTP's treatment processes, are discharged into the Lumber River, and flow downstream into South Carolina. Complaint, ¶¶ 20, 26, 46–48, 52–53, 60, 92. It is these very PFAS chemicals, which are traceable to Defendants' North Carolina landfill operations, that give rise to Plaintiff's claims. *Id*. SCD persists in this tortious course of conduct by continuing to haul leachate to Lumberton for disposal, whereas RRD ceased this practice only after these facilities were named in this lawsuit on August 16, 2024. *See* GFL MIS, Ex. A, at ¶¶ 5(b), (f) (providing that the RRD landfill ceased transporting leachate to the Lumberton WWTP as of December 10, 2024).

Moreover, Defendants have known since before this lawsuit was filed that PFAS are extremely persistent (and thus resistant to conventional wastewater treatment), mobile in the environment, and are often present in landfill leachate in high concentrations. *See* **Ex. 7** (May 7, 2024 CWA Notice of Intent Letter to SCD and other entities) at 6–19; *see also* Complaint, ¶¶ 28, 32, 62, 65–66, 94. In fact, in August 2024 (the same month they were named as Defendants in Plaintiff's lawsuit), SCD entered a proposed consent decree to address PFAS releases at the Sampson County Landfill. *See generally* **Ex. 8**.

This case is on all fours with decisions across the nation that have found an out-of-state defendant's discharges of substances that cross into the forum state establish minimum contacts. *See, e.g.*, *Ex parte Aladdin Mfg. Corp.*, 305 So.3d 214, 237–39 (Ala. 2019) (finding minimum contacts and personal jurisdiction where Georgia manufacturers knowingly discharged PFAS to the local WWTP, which passed through the WWTP and into the river, where the PFAS flowed

downstream to impact Alabama water utilities), *cert. denied,* 141 S. Ct. 1258 (2021); *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 577–78 (9th Cir. 2018) (finding purposeful availment and personal jurisdiction where Canadian smelter discharged wastes into the Columbia River that were transported downstream to Washington), *cert. denied*, 139 S. Ct. 2693 (2019); *Horne v. Mobile Area Water & Sewer Sys.*, 897 So.2d 972 (Miss. 2004) (finding minimum contacts and personal jurisdiction where Alabama utility knowingly released floodwaters that damaged downstream Mississippi property owners), *cert. denied*, 544 U.S. 922 (2005); *Triad Hunter, LLC v. Eagle Natrium, LLC*, 132 N.E.3d 1272, 1284–86 (Ohio Ct. App. 2019) (finding minimum contacts and personal jurisdiction where West Virginia mining operation injected brine solution that crossed into Ohio and disrupted Ohio drilling operation).

*Aladdin* is especially apposite: Like this case, *Aladdin* involved the contamination of a public water utility's property and water source with PFAS originating from out-of-state defendants' operations. 304 So. 3d at 222–23. Also like this case, the Georgia defendants argued that the actions of a third-party WWTP, which received their contaminated wastewater and discharged it to the river, insulated them from personal jurisdiction in Alabama. *Compare id.* ("The remaining defendants also argue that Dalton Utilities' treatment of the remaining defendants' wastewater, or its alleged failure to do so, is an intervening cause that breaks the chain of causation."), *with* RRD MIS, at 6 ("It is only Lumberton's unilateral actions in treating and discharging wastewater that allegedly connect Defendants' out-of-state contact with South Carolina, which cannot suffice."). The Alabama Supreme Court rejected this argument, holding that because the "defendants knew or should have known that the treatment processes could not and did not remove the [PFAS]-containing chemicals from the wastewater," the receiving WWTP's actions did not break the causal chain. *Ex parte Aladdin Mfg. Corp.*, 305 So.3d at 232–

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

33. The court emphasized that defendants' availment to the forum was based on more than mere foreseeability: by continuing to discharge contaminated wastewater, defendants engaged in a "purposeful direction of efforts towards" Alabama. *Id.* at 263–37 (quoting *Triad Hunter, LLC*, 132 N.E.3d at 1285).

By hauling their leachate dozens of miles across the State of North Carolina from their landfills to Lumberton's WWTP (which is far closer to South Carolina than the landfills themselves), RRD's and SCD's jurisdictional conduct is arguably more purposeful than the discharges in *Aladdin*. The fact that RRD has recently changed course, opting instead to discharge its leachate to the local sewer, only underscores that sending it to Lumberton was an elective choice. *Cf. Cockrell*, 363 S.C. at 494, 611 S.E.2d at 510 (no personal jurisdiction over defendants who certified baseball bat as meeting NCAA regulations where they "had no control over the distribution of the bats" in South Carolina).

Finally, due process fairness factors weigh heavily in favor of this Court's jurisdiction. South Carolina has a strong interest in adjudicating this dispute because it involves the contamination of waterways on which Plaintiff relies to provide drinking water to over 100,000 South Carolina residents. Resolving Plaintiff's claims in this Court in a single action is far more convenient and efficient than the alternative of bifurcating Plaintiff's claims via dual actions filed in separate states but for the same injuries. Defendants, which operate in North Carolina, will not suffer any unusual burden in having to litigate in the neighboring State of South Carolina. And although North Carolina also has an interest in this case, its interest is surely the same as South Carolina's in ensuring that landfills do not recklessly pollute public water supplies with toxic chemicals.

52

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**I.      Plaintiff properly seeks an award of attorney's fees and prejudgment interest.**

PRET uniquely argues that Plaintiff's "prayer for relief for attorneys' fees should be dismissed" because attorney's fees are only recoverable when "authorized by contract or by statute." PRET MIS, at 20–21. Also, it wildly seeks dismissal of Plaintiff's request for prejudgment interest. *See id.* Both arguments are procedurally improper and baseless.

As a threshold matter, Rule 12(b)(6) tests the legal sufficiency of a complaint to state a cause of action, and here, Plaintiff's requests for attorney's fees and interest are not causes of action. Because Rule 12(b)(6) applies to claims, not remedies, PRET's motion is procedurally improper.

Nevertheless, Plaintiff "seeks a declaratory judgment," among other relief, alleging Defendants' contamination constitutes an "irreparable injury for which there is no adequate remedy at law"; and it requests an "order and decree" requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety." Complaint, ¶¶ 2, 76, 88. If Plaintiff prevails and obtains the requested declaratory judgment, attorney's fees are clearly available.

Plaintiff's recovery of attorney fees is authorized by South Carolina's Uniform Declaratory Judgments Act, which provides that "[i]n any proceeding under this chapter the court may make such award of costs as may seem equitable and just."  S.C. Code Ann. § 15-53-100. Under this statute, courts have discretion to award attorney's fees and costs to a prevailing party. *See Greene-Mackey v. Bevins*, Op. No. 2021-UP-256, 2021 WL 2822419, at *1 (S.C. Ct. App. July 7, 2021); *cf. Marshall v. Ismie Mut. Ins. Co.*, 2:24-cv-00223-DCN, 2024 WL 4495355 *8 (D.S.C. Oct. 15, 2024) (insured entitled to costs and fees when prevailing against insurance company in declaratory judgment action); *Canopius U.S. Ins., Inc. v. Sloan*, 6:12-1919-TMC, 2013 WL 530318 (D.S.C. Feb. 11, 2013) (same); *Darden v. Witham*, 258 S.C. 380, 188 S.E.2d

53

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

776 (1972) (ex-husband in declaratory judgment ordered to pay attorney fees). *See generally Historic Charleston Holdings, LLC v. Mallon*, 381 S.C. 417, 436, 673 S.E.2d 448, 458 (2009) (observing that the decision to award statutory attorney's fees "rest[s] within the sound discretion of the trial court"). In any event, PRET's argument is premature. This Court can address whether Plaintiff should recover attorney's fees if and when Plaintiff prevails on its claims and petitions the Court for such an award.

PRET's aim at Plaintiff's prayer for relief for pre-judgment interest is even less defensible. It argues that, "[b]ecause Plaintiff will not be required to comply with the EPA's regulation until 2029," there is no "fixed condition" for determining interest. PRET MIS, at 21. This strawman—that Plaintiff's only injury is future regulatory enforcement—must fail here as it does elsewhere. As explained throughout this brief, PRET cannot rewrite Plaintiff's complaint to allege future "regulatory enforcement" injuries instead of the existing property injuries that are plainly set out in the operative pleadings.

## J.     This Court should not stay this case or decline jurisdiction.

Fiber and PRET ask the Court to stay or dismiss these cases so that they can be referred to the South Carolina Department of Environmental Services ("DES"). Fiber MIS, at 4, 15; PRET MIS, at 2, 9. They invoke the doctrine of primary jurisdiction as the basis for the stay or dismissal, vaguely contending that "the legislature [has] entrusted [DES] with addressing the exact harm alleged here" via the South Carolina State Safe Drinking Water Act ("SCSDWA"), S.C. Code Ann. §§ 44-55-10 to -120. Fiber MIS, at 15; PRET MIS, at 9.

This unjustified delay tactic falls well outside the scope of the primary jurisdiction doctrine. *See Local Union No. 189, Amalgamated Meat Cutters Etc. v. Jewel Tea Co., Inc.*, 381 U.S. 676, 686 (1965) (Frankfurter, J., dissenting) ("[T]he doctrine of primary jurisdiction is not a doctrine of futility; it does not require resort to 'an expensive and merely delaying administrative

54

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

proceeding when the case must eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency.'" (quoting *Fed. Maritime Bd. v. Isbrandtsen Co.*, 356 U.S. 481 (1958))).

Where a case or a factual issue therein is beyond "the conventional experience of judges" and "within the special competence" of an administrative agency, the primary jurisdiction doctrine provides courts discretion to stay a case or dismiss it without prejudice in order to refer the matter to the agency. *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996); *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64 (1956); *see also Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 449–50 (M.D.N.C. 2015). The doctrine is intended to promote "desirable uniformity" in regulation and leverage "the expert and specialized knowledge of the agenc[y] involved." *W. Pac. R.R. Co.*, 352 U.S. at 64.

This case involves only South Carolina common law claims, including claims of private and public nuisance, trespass, and negligence, gross negligence, and/or recklessness. These claims are firmly within this Court's conventional experience and competence. *See Nix v. The Chemours Company FC*, 2023 WL 6471690, at *6 (E.D.N.C. Oct. 4, 2023) (observing the Plaintiff's state law property claims "fit comfortably within" the court's expertise but not the state environmental agency's). Plaintiff asserts no claims under the SCSDWA, its federal analogue, or any other state or federal statute.

To invoke DES's purported exclusive authority to enforce the SCSDWA, Defendants suggest that the SCSDWA preempts cases such as this, involving common law claims against upstream polluters for contaminating a public water supply. *See* Fitesa MIS, at 4, 15; PRET MIS, at 2, 9. But nothing in the plain text of the act indicates a legislative desire to do so. Moreover, courts interpreting the federal SDWA have routinely held that the statute does not preempt state

55

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

common law claims. *See, e.g.*, *Russell v. Tyson Farms, Inc.*, 450 F. Supp. 3d 1266, 1271, 1273 (N.D. Ala. 2020); *Batton v. Ga. Gulf*, 261 F. Supp. 2d 575, 597–98 (M.D. La. 2003); *Hartwell Corp. v. Superior Court*, 38 P.3d 1098, 1107 (Cal. 2002). Defendants' notion that DES possesses some unique authority or expertise necessary to resolving this case is belied by the fact the PFAS MCLs were issued *by EPA*, not DES.

Plaintiff is also unaware of—and neither Fiber nor PRET identifies—any action by DES to control the PFAS discharges by either Defendant.[24] This reality reinforces the conclusion that a judgment for Plaintiff would not interfere with DES's regulation of PFAS. *See Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1313 (N.D. Ga. 2022) (emphasizing that the Georgia environmental agency "has not initiated a rulemaking or other administrative proceeding to regulate the discharge of PFAS from industrial sources in Georgia" and has not "taken enforcement action against [defendant]," in denying stay). And even if DES was currently taking action against Fiber's or PRET's PFAS discharges, that, too, would not necessarily require staying or dismissing this case under primary jurisdiction doctrine. *See, e.g.*, *Nix*, 2023 WL 6471690, at *5–6; *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 683 (W.D. Mich. 2021); *Cape Fear Pub. Util. Auth. v. The Chemours Company FC, LLC*, 2019 WL 13300188, at *10 (E.D.N.C. Apr. 19, 2019); *Dew v. E.I. du Pont de Nemours and Co.*, 2019 WL 13117100, at *10 (E.D.N.C. Apr. 17, 2019); *Yadkin Riverkeeper*, 141 F. Supp. 3d at 451.

Finally, Fiber and PRET Brass are not the first defendants in a PFAS contamination lawsuit to assert primary jurisdiction as grounds for a stay or dismissal. To date, most—and very likely *all*—of these attempts have been unsuccessful. *See, e.g.*, *Nix*, 2023 WL 6471690, at *5-6;

---

[24] To be clear, DES has recently begun to include monitoring requirements for PFAS when discharge permits come up for renewal. However, these monitoring requirements do not set limits for the amount of PFAS that permittees may release via their wastewater discharges.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Parris*, 595 F. Supp. 3d at 1312-13; *Zimmerman*, 542 F. Supp. 3d at 683; *Cape Fear Pub. Util. Auth.*, 2019 WL 13300188, at \*10; *Dew*, 2019 WL 13117100, at \*10. Defendants' attempt should meet the same result.

### K.      The United States is not a necessary party.

Nan Ya argues the United States is a necessary party under Rule 19(a), SCRCP, due to potential PFAS discharge from the site of a former Air Force base in Myrtle Beach (the "AFB"), and this action should be dismissed under Rules 19(b) and 12(b)(7), SCRCP, because the United States is indispensable but cannot be joined as a party. *See* Nan Ya Am. MIS. This argument is devoid of merit—the United States is not a necessary, indispensable, or even ***relevant*** party to this action.

The first of many flaws in Nan Ya's position is that it seeks to inject issues of aqueous film forming foam ("AFFF") contamination where Plaintiff expressly disclaims any damage from AFFF. Nan Ya's exhibits make clear that the potential PFAS being discharged from the AFB is from the use of AFFF at the site. *See, e.g.*, Nan Ya Am. MIS, Ex. 2, at 2 (stating the subject of the memorandum is "Final Site Inspection Report for *Aqueous Form Filming Foam* [sic] Areas at Former Myrtle Beach Air Force Base" (emphasis added)); *id.* at 3 ("The following subsections describe migration pathways and potential targets within the range of influence of the former Myrtle Beach AFB. Because of the nature of areas where *potential releases of AFFF may have occurred*, groundwater, surface water, soil, and sediment were sampled and their migration pathways evaluated in this SI report." (emphasis added)).

Plaintiff's complaint precludes any relevance of AFFF contamination at all, with the following disclaimer:

> Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, MilSpec, or other

57

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

Complaint, ¶ 8.

Such disclaimers are effectual. For example, in a case brought by the State of South Carolina against 3M Company and other defendants asserting PFAS-related claims similar to those brought by Plaintiff here, "South Carolina specifically disclaimed recovery for PFAS contamination from Aqueous Film Forming Foam, or AFFF." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, C.A. No. MDL No. 2:18-mn-2873-RMG, 2024 U.S. Dist. LEXIS 64206, at *14 (D.S.C. Feb. 29, 2024). 3M removed the action to federal court, "invoking federal officer removal under 28 U.S.C. § 1442(a)(1) and federal enclave jurisdiction under § 1441(a)," and it argued "federal officer removal [was] proper because some of the contamination at issue in this case overlaps with, or has commingled with, PFAS contamination from AFFF products that 3M supplied to the United States military per a military-created specification, referred to as MilSpec AFFF." *Id.* at *14–15. In its order granting remand, however, the district court found that the State's "disclaimers moot 3M's government contractor defense because, whether or not 3M meets the requirements for the defense, it cannot be held liable in this case for PFAS contamination originating from AFFF." *Id.* at *19.

Plaintiff's disclaimer must be given its full effect in this litigation and squarely precludes any notion that *any* AFFF discharger is a "necessary" or "indispensable" party. Needless to say, Plaintiff cannot sue for injuries that it has disclaimed. The United States is not a relevant party to this action, much less a necessary or indispensable one.

Even disregarding Plaintiff's AFFF disclaimer, the United States is not a necessary or indispensable party under Rule 19. The Rule provides:

58

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Rule 19(a), SCRCP.

The South Carolina Supreme Court "has interpreted Rule 19, SCRCP to require that a party be a 'necessary party' to be joined in an action pursuant to the rule." *Ex parte Gov't Emps. Ins. Co. v. Goethe*, 373 S.C. 132, 137, 644 S.E.2d 699, 701 (2007). "A necessary party is one whose rights must be ascertained and settled before the rights of the parties to the action can be determined." *Id.* (quoting *Slatton v. Slatton*, 289 S.C. 128, 130, 345 S.E.2d 248, 249 (1986)).

Here, no right of the United States "must be ascertained and settled" for the full adjudication of this action, and complete relief between Plaintiff and the existing defendants can be reached without the United States being made a party. Plaintiff seeks monetary damages from Defendants for property injures and the abatement of public and private nuisances through installation of upgraded water filtration technologies. Such relief "can[] be accorded among those already parties" to this action. Rule 19(a)(1); *see e.g.*, *Tinoco v. San Diego Gas & Elec. Co.*, 327 F.R.D. 651, 658 (S.D. Cal. 2018) ("Plaintiffs seek only monetary damages from [Defendant]. Should Plaintiffs prevail, they could recover damages from [Defendant] in the United States' absence. The requested relief does not require the United States to take action or change any policy."); *id.* at 659 ("Therefore, the Court is able to fashion meaningful relief between Plaintiffs and [Defendant] in the United States' absence. The Court finds the United States is not a necessary party under Rule 19(a)(1)(A).").

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Nan Ya argues there cannot be complete relief without the United States because (1) "[u]nless the United States is a party, it cannot be forced to provide documents (other than through the singularly imperfect use of a FOIA request) or witnesses" as part of discovery in this action, and (2) if any existing Defendant is found to be liable to Plaintiff, "there would have to be a determination of what percent of any damage suffered by plaintiff each defendant is responsible for. Inevitably, therefore, it must be determined what percentage of environmental contamination of the waters at each intake point is the result of discharge from the AFB site." Nan Ya Am. MIS, at 7–8. Neither of these is an appropriate ground for joinder.

First, Nan Ya's only claimed prejudice—its desire to serve discovery on the United States instead of seeking documents through FOIA requests—is immaterial to a Rule 19 analysis. *See S.C. Dep't of Health & Env't Control v. Fed-Serv Indus., Inc.*, 294 S.C. 33, 38, 362 S.E.2d 311, 314 (Ct. App. 1987) ("[G]eneral consideration of efficiency or convenience of the parties are not sufficient to require joinder . . . ."). Nan Ya cites no authority for the proposition that having to use FOIA instead of discovery tools moves the needle in any way, and courts that have considered the argument have rejected it. *See, e.g.*, *Hefley v. Textron, Inc.*, 713 F.2d 1487, 1498 (10th Cir. 1983) ("According to Textron, if the federal rules are read liberally in light of the goals they were intended to promote, rules 14, 19, and 20 allow the joinder of immune parties solely for the purposes of discovery and the assessment of comparative fault. We disagree."); *id.* ("We have found no cases which approve of the use of rule 19 simply to allow greater discovery, and we can discern no policy which such an expansion of the rule would promote.").[25]

---

[25] As Nan Ya stated in its Amended Memorandum, "Rule 19 is the same as the federal rule, so that decisions by federal courts on issues surrounding necessary and indispensable parties are important to consider." Nan Ya Am. MIS, at 5.

60

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Likewise, South Carolina law is clear that a party's status as a joint tortfeasor—who, if added as a defendant, would be subject to apportionment of liability under the South Carolina Uniform Contribution Among Tortfeasors Act ("UCATA")[26]—does not render it a necessary or indispensable party under Rule 19. "[A]dditional parties are not necessary to a complete determination of [a] controversy unless they have rights which must be ascertained and settled before the rights of the parties to the suit can be determined." *Smith v. Tiffany*, 419 S.C. 548, 562, 799 S.E.2d 479, 486 (2017) (quoting *Doctor v. Robert Lee, Inc.*, 215 S.C. 332, 335, 55 S.E.2d 68, 69 (1949)). "If the defendant and the parties sought to be brought in were joint tort-feasors, the decisions of this Court are clear to the effect that [the] defendant would have no right to bring in as an additional defendant a joint tortfeasor who was not made a party by the plaintiff." *Id.* at 562, 799 S.E.2d at 487. "Accordingly, mere joint tortfeasors are not necessary or indispensable parties to an action under Rule 19, SCRCP." *Id.* "To allow a defendant against the will of the plaintiff to bring in other joint tortfeasors as defendants would deny the plaintiff the right to name whom he should sue." *Id.* (quoting *Doctor*, 215 S.C. at 335, 55 S.E.2d at 69); *see also id.* at 564, 799 S.E.2d at 488 (recognizing "two centuries of common law establishing a plaintiff's right to choose which tortfeasors, if any, she will sue"); *Chester v. S.C. Dep't of Pub. Safety*, 388 S.C. 343, 345, 698 S.E.2d 559, 560 (2010) ("It is well-settled that a plaintiff has the sole right to determine which co-tortfeasor(s) she will sue."). As *Smith* makes evident, Nan Ya's desire to join the United States as a party for purposes of liability apportionment is contrary to South Carolina law.[27]

---

[26] S.C. Code Ann. §§ 15-38-10 to -70.

[27] In construing the UCATA, the *Smith* court recognized the act contemplates that not all tortfeasors may be defendants in an action and the courts do not have the authority to override that legislative determination. *See* 419 S.C. at 556–59, 799 S.E.2d at 483–85. However, Nan Ya does retain the right to argue the "empty chair" defense against the United States if it so chooses,

For its part, the United States has no—and indeed claims no—interest in Plaintiff's water supply, property, or water system, or any other interest "relating to the subject of th[is] action." Rule 19(a)(2). This Court should be skeptical of Nan Ya's attempt to achieve dismissal based on unarticulated, unclaimed, and unasserted rights of a non-party.

Nan Ya cites *Goddard v. Fairways Development General Partnership*, but this case is nothing like *Goddard*. Nan Ya Am. MIS, at 5. There, the plaintiffs sought the dissolution of a planned unit development ("PUD"), and the PUD's governing documents allowed dissolution only "with the consent of 100% of the [property] owners." 310 S.C. 408, 410, 426 S.E.2d 828, 830 (Ct. App. 1993). On appeal, the Court of Appeals found a property owner that had been dismissed from the action was an indispensable party because the relief sought in the action "affect[ed] her property interests." *Id.* at 412, 426 S.E.2d at 831.[28] Here, a judgment between Plaintiff and Defendants will not affect any property (or other) interest of the United States. *Cf. McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 951 (4th Cir. 2020) (recognizing that Fourth Circuit cases in which joinder was allowed "involve a situation where the contracts or obligations of the 'necessary' party were being interpreted or were otherwise directly at issue").

The fact that the United States, like Defendants, may have discharged PFAS into the environment does not create an interest in the United States related to this action. *See McKiver v.*

---

and it can seek contribution from the United States if it believes that is owed. *See* S.C. Code Ann. § 15-38-15(D) ("A defendant shall retain the right to assert that another potential tortfeasor, whether or not a party, contributed to the alleged injury or damages and/or may be liable for any or all of the damages alleged by any other party."); S.C. Code Ann. § 15-38-20(A) ("[W]here two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them.").

[28] The same is true of *EEE Minerals, LLC v. North Dakota*, which Nan Ya also cites. There, the court similarly found the United States was "a required party because it owns significant oil, gas, and other mineral interests in and under the lands that are the subject of this lawsuit." 318 F.R.D. 118, 125 (D.N.D. 2016).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Murphy-Brown, LLC*, 980 F.3d 937, 952 (4th Cir. 2020) ("'[E]ven if [an absent party] is alleged to have played a central role' in the action at issue, 'and even if resolution of the action will require the court to evaluate the absent party's conduct,' that party 'in many cases . . . will not have interests that warrant protection under Rule 19(a)(1)(B)(i).'" (quoting *Ward v. Apple Inc.*, 791 F.3d 1041, 1050 (9th Cir. 2015))); *see, e.g.*, *Goethe*, 373 S.C. at 136, 644 S.E.2d at 701 ("We find that although GEICO may be affected by the outcome of the family court action, its interest is insufficient to meet the requirements for joinder pursuant to Rule 19(a)(2)(i), SCRCP.").

Despite acknowledging that the United States "would not be bound by any judgment as to its potential causation of Plaintiff's damages," Nan Ya argues that it could be "subject to being forced to pay 'an equitable share' of the costs of correcting contamination for the release of these chemicals" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Nan Ya Am. MIS, at 7, 8. But any obligation under CERCLA for the United States to remedy PFAS pollution at the AFB exists independently of this action. Nan Ya does not, and cannot, show how Plaintiff's case could create any "inconsistent obligations" for the United States or itself. Again, Plaintiff has disclaimed causes of action and damages related to AFFF PFAS, so no judgment in this action will have any effect on the AFB cleanup or the United States' obligations under CERCLA.

Finally, even if the United States were a necessary party and unable to be joined, it is not indispensable such that dismissal of this action would be required.

> If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures,

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Rule 19(b), SCRCP.

As is shown above, a judgment in this action, even in the United States' absence, will adequately afford relief among the current parties and will not prejudice the United States or any current party as a result of the United States' nonjoinder. Nan Ya's desire to apportion liability to the United States and seek documents from the United States in discovery does not amount to prejudice under Rule 19. Moreover, Nan Ya's suggestion that Plaintiff has an adequate, alternative remedy against the United States is irrelevant, as Plaintiff is not seeking relief from the United States. Consequently, Rule 19(b)'s factors weigh heavily against finding the United States is an indispensable party.

In sum, the United States is not an indispensable, necessary, or even relevant party to this action. Thus, joinder under Rule 19(a) and dismissal under Rules 19(b) and 12(b)(7) would be inappropriate

## IV. CONCLUSION

Based on the foregoing, Plaintiff respectfully asks that this Court deny Defendants' motions in full and allow all of Plaintiff's claims to survive dismissal and proceed to discovery in this litigation.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Respectfully submitted,

 */s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

February 28, 2025

# Exhibit 1

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

No. 24-1188 (consolidated with Nos. 24-1191, 24-1192)

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN WATER WORKS ASSOCIATION, et al.,

*Petitioners,*

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents,*

CONCERNED CITIZENS OF WMEL WATER
AUTHORITY GRASSROOTS, et al.,

*Respondent-Intervenors.*

———————————

On Petition for Review of Final Action by the
United States Environmental Protection Agency —
89 Fed. Reg. 32,532 (April 26, 2024)

———————————

**OPENING BRIEF OF PETITIONERS AMERICAN WATER WORKS
ASSOCIATION AND ASSOCIATION OF METROPOLITAN WATER
AGENCIES**

———————————

(Names and addresses of counsel appear inside cover.)

Dated: October 7, 2024

Ronald J. Tenpas
Corinne V. Snow
Nathan Campbell
Vinson & Elkins LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Phone:  (202) 639-6622
Fax:  (917) 879-8998
Email: rtenpas@velaw.com
Email: csnow@velaw.com
Email: ncampbell@velaw.com

*Counsel for Petitioners American Water Works Association and Association of Metropolitan Water Agencies*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners American Water Works Association and Association of Metropolitan Water Agencies submit this certificate as to parties, rulings, and related cases.

### A.     PARTIES AND AMICI

The Petitioners are American Water Works Association and Association of Metropolitan Water Agencies (No. 24-1188); National Association of Manufacturers and American Chemistry Council (No. 24-1191); and The Chemours Company FC, LLC (No. 24-1192).

The Respondents are the United States Environmental Protection Agency and Michael S. Regan, Administrator of the United States Environmental Protection Agency.

The Intervenors are the Natural Resources Defense Council, Buxmont Coalition for Safe Water, Clean Cape Fear, Clean Haw River, Concerned Citizens of WMEL Water Authority Grassroots, Environmental Justice Task Force, Fight for Zero, Merrimack Citizens for Clean Water, and Newburgh Clean Water Project.

The State of Connecticut has notified the Court of its intention to participate as *amicus* curiae. At this time, counsel is unaware of any other party that has moved to participate as *amicus curiae*.

**B.    RULINGS UNDER REVIEW**

The consolidated petitions for review challenge the Environmental Protection Agency's final rule titled "PFAS National Primary Drinking Water Regulation," 89 Fed. Reg. 32,532 (April 26, 2024).

**C.    RELATED CASES**

This case has been consolidated with the following petitions for review of the same EPA final rule: *National Association of Manufacturers, et al. v. EPA, et al.* (No. 24-1191), and *The Chemours Company FC, LLC v. EPA, et al.* (No. 24-1192). At this time, counsel is unaware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Corinne V. Snow*
Corinne V. Snow

*Counsel for American Water Works Association and Association of Metropolitan Water Agencies*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners American Water Works Association and Association of Metropolitan Water Agencies, through undersigned counsel, certify as follows:

The American Water Works Association is a non-governmental corporation with no parent corporation and no publicly held company holding 10% or more of its stock. The American Water Works Association is a corporation organized and existing under the laws of the State of Illinois. The American Water Works Association is an international, nonprofit, scientific and educational society dedicated to assuring the effective management of water. Founded in 1881, the Association is the largest organization of water supply professionals in the world. The Association's membership includes more than 4,000 utilities that supply roughly 80 percent of the nation's drinking water and treat almost half of the nation's wastewater. The Association's 50,000-plus total membership represents the full spectrum of the water community: public water and wastewater systems, environmental advocates, scientists, academicians, and others who hold a genuine interest in water, our most important resource. The American Water Works Association unites the diverse water community to advance public health, safety, the economy, and the environment.

iii

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Association of Metropolitan Water Agencies is a non-governmental corporation with no parent corporation and no publicly held company holding 10% or more of its stock. The Association of Metropolitan Water Agencies is a corporation organized under the laws of the District of Columbia. The Association of Metropolitan Water Agencies is a nonprofit tax-exempt trade association representing approximately 180 of the largest publicly owned drinking water systems in the United States. The Association of Metropolitan Water Agencies' members provide more than 160 million people across the country with safe drinking water. The Association of Metropolitan Water Agencies' members include municipal agencies and special purpose districts and commissions serving customers on either a local or regional basis. Some are wholesalers providing water to other utilities, some serve end-use customers directly, and some do both. The Association's members are responsible for constructing and operating water treatment systems necessary to ensure compliance with National Primary Drinking Water Regulations promulgated pursuant to the Safe Drinking Water Act.

*/s/ Corinne V. Snow*
Corinne V. Snow

*Counsel for American Water Works Association and Association of Metropolitan Water Agencies*

iv

# TABLE OF CONTENTS

**Page**

Certificate as to Parties, Rulings, and Related Cases ...................................................i

Rule 26.1 Corporate Disclosure Statement............................................................ iii

Table of Contents...........................................................................................v

Table of Authorities ................................................................................ vii

Glossary ............................................................................................ xiii

Introduction.....................................................................................1

Jurisdictional Statement ........................................................................2

Statement of the Issues ........................................................................3

Statutes and Regulations......................................................................3

Statement of the Case .........................................................................3

     A.    PFAS........................................................................................3

     B.    Legal Background ...................................................................5

     C.    The Rulemaking .....................................................................10

     D.    The Rule ................................................................................13

Summary of Argument .........................................................................14

Standing ...........................................................................................15

Standard of Review.............................................................................17

Argument ..........................................................................................18

     I.    EPA Violated the Act by Issuing Proposed Regulations for Index PFAS Before Making Final Determinations to Regulate Those PFAS.......................................................................................18

         A.    Under the plain language of the Act, EPA may not issue a proposed rule before issuing a final Determination........................20

             1.    EPA must publish the Determination to Regulate before the proposed regulation. ..........................................22

         B.    EPA's new interpretation rests on an unreasoned and unacknowledged departure from decades of prior policy..............25

         C.    EPA's defense of its novel approach is unpersuasive..................28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

II.     EPA's Use of the Hazard Index as an Enforceable Level for Mixtures of Two or More Index PFAS Violated the Act and Was Arbitrary and Capricious. ................................................................33

        A.     The hazard index is not a Level. ...............................................34

        B.     The hazard index is not appropriate for regulating "mixtures" of Index PFAS. ......................................................................36

III.    EPA's Determinations to Regulate HFPO-DA, PFNA, and Mixtures of Two or More Index PFAS Were Unreasonable and Should Be Vacated. ...............................................................................40

        A.     EPA arbitrarily relied upon limited, piecemeal state-level occurrence information to reach Determinations to Regulate HFPO-DA, PFNA, and mixtures of two or more Index PFAS. ...................................................................................41

        B.     The available occurrence information did not demonstrate that HFPO-DA, PFNA, or mixtures of two or more Index PFAS have a substantial likelihood of occurring in public water systems with a frequency and at levels of public health concern. ...................................................................................44

               1.     HFPO-DA ................................................................46

               2.     PFNA .......................................................................48

               3.     Index PFAS .............................................................51

IV.     Based on a Fatally Flawed Cost Analysis, the Rule Arbitrarily Regulates at Levels that Impose Significant Additional Costs Without Commensurate Health Benefits and Are Not Feasible. .............53

        A.     The Rule should be remanded to EPA to cure the serious deficiencies in its cost analysis. ...............................................53

        B.     The incremental costs of the Rule's Levels are unsupported. ........55

Conclusion .......................................................................................57

Certificate of Compliance...................................................................59

Certificate of Service ........................................................................60

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
    41 F.4th 586 (D.C. Cir. 2022) ....................................................................... 15, 16

*Atlantic Cleaners & Dyers v. United States*,
    286 U.S. 427 (1932) ............................................................................................ 24

*BFP v. Resolution Tr. Corp.*,
    511 U.S. 531 (1994) ............................................................................................ 29

*Blackmon-Malloy v. U.S. Capitol Police Bd.*,
    575 F.3d 699 (D.C. Cir. 2009) ............................................................................ 45

*Bluewater Network v. EPA*,
    370 F.3d 1 (D.C. Cir. 2004) ........................................................................... 17, 45

*Chlorine Chemistry Council v. EPA*,
    206 F.3d 1286 (D.C. Cir. 2000) .......................................................................... 41

*City of Clarksville v. FERC*,
    888 F.3d 477 (D.C. Cir. 2018) ............................................................................ 20

*Committee for Effective Cellular Rules v. FCC*,
    53 F.3d 1309 (D.C. Cir. 1995) ............................................................................ 16

*Environmental Defense Fund v. FERC*,
    2 F.4th 953 (D.C. Cir. 2021) ............................................................................... 17

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................................ 26

*Int'l Union, United Mine Workers v. MSHA*,
    626 F.3d 84 (D.C. Cir. 2010) .............................................................................. 49

*Judge Rotenberg Educational Center, Inc. v. DEA*,
    3 F.4th 390 (D.C. Cir. 2021) ............................................................................... 24

*Leather Industries of America, Inc. v. EPA*,
    40 F.3d 392 (D.C. Cir. 1994)..................................................................................49

*Life Technologies Corp. v. Promega Corp.*,
    580 U.S. 140 (2017).............................................................................................45

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024).................................................................... 17, 30

*Maine Lobstermen's Ass'n v. National Marine Fisheries Serv.*,
    70 F.4th 582 (D.C. Cir. 2023)...........................................................................16

*Motor Vehicles Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983)...............................................................................................46

*Natural Resources Defense Council v. Regan*,
    67 F.4th 397 (D.C. Cir. 2023)..................................................... 10, 22, 25, 32

*Northpoint Technology, Ltd. v. FCC*,
    412 F.3d 145 (D.C. Cir. 2005)...........................................................................26

*Pacific Gas & Electric Co. v. FERC*,
    113 F.4th 943 (D.C. Cir. 2024).........................................................................17

*Romag Fasteners, Inc. v. Fossil, Inc.*,
    590 U.S. 212 (2020)............................................................................................24

*Salinas v. U.S. R.R. Ret. Bd.*,
    592 U.S. 188 (2021)............................................................................................24

*Sorenson Communications Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014)...........................................................................46

*United States Sugar Corp. v. EPA*,
    113 F.4th 984 (D.C. Cir. 2024).........................................................................17

*United States v. Bowser*,
    964 F.3d 26 (D.C. Cir. 2020)............................................................................24

**Statutes**

5 U.S.C. § 706(2)(A)...............................................................................................17

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

42 U.S.C. § 300g ............................................................................................5, 15

42 U.S.C. § 300g-1(a) .........................................................................................45

42 U.S.C. § 300g-1(b)(1)(A) .................................................................................8

42 U.S.C. § 300g-1(b)(1)(A)(i) ........................................................................7, 31

42 U.S.C. § 300g-1(b)(1)(A)(ii) ................................... 7, 15, 31, 40, 45, 48, 51

42 U.S.C. § 300g-1(b)(1)(A)(iii) .......................................................................7, 31

42 U.S.C. § 300g-1(b)(1)(B)(i) ..............................................................................6

42 U.S.C. § 300g-1(b)(1)(B)(i)(I) .....................................................................6, 18

42 U.S.C. § 300g-1(b)(1)(B)(ii)(I) ....................................... 6, 7, 18, 19, 20, 23, 31

42 U.S.C. § 300g-1(b)(1)(B)(ii)(II) .................................... 7, 24, 25, 31, 41, 49

42 U.S.C. § 300g-1(b)(1)(B)(ii)(III) .....................................................................24

42 U.S.C. § 300g-1(b)(1)(D) ................................................................................30

42 U.S.C. § 300g-1(b)(1)(E) ...................................... 8, 19, 21, 28, 30, 31, 33

42 U.S.C. § 300g-1(b)(3)(A) ..................................................................................8

42 U.S.C. § 300g-1(b)(3)(A), (C) (1986) .............................................................5

42 U.S.C. § 300g-1(b)(3)(C)(i) ..............................................................................8

42 U.S.C. § 300g-1(b)(3)(C)(i)(I) ..........................................................................8

42 U.S.C. § 300g-1(b)(3)(C)(i)(II) .........................................................................9

42 U.S.C. § 300g-1(b)(3)(C)(i)(III) ...................................................................9, 54

42 U.S.C. § 300g-1(b)(3)(C)(i)(IV) ........................................................................9

42 U.S.C. § 300g-1(b)(3)(C)(IV) ...........................................................................55

42 U.S.C. § 300g-1(b)(4)(A) ..................................................................................8

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

42 U.S.C. § 300g-1(b)(4)(C) ...................................................................... 9, 31, 53

42 U.S.C. § 300g-1(b)(4)(D) ................................................................................54

42 U.S.C. § 300g-1(b)(5)(B) ..................................................................................9

42 U.S.C. § 300g-1(b)(5)(B)(ii) ...........................................................................53

42 U.S.C. § 300g-1(b)(7)(A) ............................................................................8, 33

42 U.S.C. § 300j-4(a)(2) ..................................................................................7, 19

42 U.S.C. § 300j-4(g) ......................................................................................7, 19

42 U.S.C. § 300j-7(a) ...........................................................................................2

N.H. Code Admin. R. Env-Dw 705.06(b) .............................................................50

N.J. Admin. Code § 7:10-5.2(a)(5)(i) ...................................................................51

Vt. Code R. 12-037-001 n. (f), (g) ........................................................................51

## Regulations

40 C.F.R. § 141.61(a) ..........................................................................................41

40 C.F.R. § 141.61(c) ..........................................................................................41

40 C.F.R. § 141.66(b) ..........................................................................................41

40 C.F.R. § 141.66(c) ..........................................................................................41

## Administrative Materials

66 Fed. Reg. 6976 (Jan 22, 2021) ........................................................................68

68 Fed. Reg. 42,898 (July 18, 2003) .....................................................................51

73 Fed. Reg. 9628 (Feb. 21, 2008) .......................................................................22

74 Fed. Reg. 51,850 (Oct. 8, 2009) ................................................................. 13, 22

77 Fed. Reg. 26,072 (May 2, 2012) ......................................................... 13, 14, 24, 52

79 Fed. Reg. 62,716 (Oct. 20, 2014) .......................................................... 32, 38, 51

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

81 Fed. Reg. 13 (Jan. 4, 2016) .................................................................55

81 Fed. Reg. 81,099 (Nov. 17, 2016)................................................... 13, 22

85 Fed. Reg. 14,098 (Mar. 10, 2020).............................................. 13, 23, 51

86 Fed. Reg. 12,272 (Mar. 3, 2021)............................................. 13, 32, 55

86 Fed. Reg. 37,948 (July 19, 2021).....................................................22

86 Fed. Reg. 73,131 (Dec. 27, 2021) ............................................ 13, 14, 24

87 Fed. Reg. 68,060 (Nov. 14, 2022).....................................................22

88 Fed. Reg. 18,638 (Mar. 29, 2023)....................................... 14, 15, 23, 26, 40

89 Fed. Reg. 32,532 (April 26, 2024).. 2, 4, 5, 16, 17, 19, 20, 23, 24, 26, 27, 34, 35, 36, 37, 38, 40, 42, 43, 44, 45, 46, 48, 51, 52, 53, 54, 56, 57, 59, 60, 61, 62, 63, 64, 67

## Other Authorities

Anderson, J.K. et al., *Grouping of PFAS for Human Health Risk Assessment: Findings from an Independent Panel of Experts*, 134 Regulatory Toxicology and Pharmacology 105226 (Oct. 2022) ............................................45

*Black's Law Dictionary* (11th ed. 2019)..............................................27

EPA, *Discuss Potential Approaches to the Sixth Unregulated Contaminant Monitoring Rule (UCMR 6)* (2024) ........................................... 11, 33

EPA, *Economic Analysis for the Final Per- and Polyfluoroalkyl Substances National Primary Drinking Water Regulation* (2024) ............................... 19, 66

EPA, *Framework for Estimating Noncancer Health Risks Associated with Mixtures of Per- and Polyfluoroalkyl Substances (PFAS)* (2024)...................................46

EPA, *Guidelines for Health Risk Assessment of Chemical Mixtures* (1986) ... 44, 48

EPA, *How EPA Regulates Drinking Water Contaminants* (Nov. 2, 2023).............33

EPA, *Per- and Polyfluoroalkyl Substances (PFAS) Occurrence and Contaminant Background Support Document for the Final PFAS National Primary Drinking Water Regulation* (2024) ................................... 52, 56, 57, 60, 61, 63

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA, *Protocol for Regulatory Determination 3* (2014) ....................... 50, 51, 55, 63

EPA, *Responses to Public Comments on Per- and Polyfluoroalkyl Substances (PFAS) National Primary Drinking Water Regulation Rulemaking* (2024) ........................................................................ 42, 58, 65

EPA, *Risk Assessment Guidance for Superfund, Volume I, Human Health Evaluation Manual (Part A)* (1989) ...................................................44

EPA, SAB, *Review of EPA's Analyses to Support EPA's National Primary Drinking Water Rulemaking for PFAS, Final Report* (2022)..........................47

EPA, *Supplementary Guidance for Conducting Health Risk Assessment of Chemical Mixtures* (2000) .......................................................... 44, 46

EPA, *Understanding How EPA Develops New Drinking Water Regulations* (2024)....................................................................33

Forester, Eric & Bostardi, Christy, *PFAS Treatment: GAC vs. IX* (2019) ............65

H.R. Rep. No. 104-632 (1996)..................................................................6, 7

Kentucky Department for Environmental Protection, *Evaluation of Kentucky Community Drinking Water for Per- and Poly-Fluoroalkyl Substances* (2019) ...........................................................................57

Kentucky Energy and Environment Cabinet, Division of Water, *Drinking Water* (2024)....................................................................57

S. Rep. No. 104-169 (1995) ......................................................... 6, 41, 68

The American Heritage College Dictionary (3d ed. 1993).............................. 41, 53

U.S. Dep't of Health and Human Servs., *Toxicological Profile for Perfluoroalkyls* (2021)...........................................................................4

*Webster's New College Dictionary* (2d ed. 1995) ...................................27

*Webster's New International Dictionary* (3d ed. 1971) ...........................27

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## GLOSSARY

| | |
|---|---|
| **Act** | Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.* |
| **AMWA** | Association of Metropolitan Water Agencies |
| **AWWA** | American Water Works Association |
| **Board** | U.S. Environmental Protection Agency's Science Advisory Board |
| **Determination to Regulate** or **Determination** | A final determination to regulate a contaminant pursuant to 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I) |
| **EPA** or **the Agency** | U.S. Environmental Protection Agency |
| **Goal** | Maximum Contaminant Level Goal |
| **HFPO–DA** | Hexafluoropropylene oxide dimer acid |
| **Index PFAS** | PFHxS, PFNA, PFBS, and HFPO–DA |
| **Level** | Maximum Contaminant Level |
| **List** | Contaminant Candidate List |
| **ng/L** | Nanograms per liter |
| **PFAS** | Per- and polyfluoroalkyl substances |
| **PFBS** | Perfluorobutane sulfonic acid |
| **PFHxS** | Perfluorohexane sulfonic acid |
| **PFNA** | Perfluorononanoic acid |
| **PFOA** | Perfluorooctanoic acid |
| **PFOS** | Perfluorooctane sulfonic acid |
| **ppt** | Parts per trillion |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| **Preliminary Determination** | A preliminary determination to regulate a contaminant pursuant to 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I) |
| **UCMR** | Unregulated Contaminant Monitoring Rule |
| **UCMR 3** | Third Unregulated Contaminant Monitoring Rule |
| **UCMR 5** | Fifth Unregulated Contaminant Monitoring Rule |
| **Water Associations** | AMWA and AWWA |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**INTRODUCTION**

Respondent Environmental Protection Agency ("EPA" or the "Agency") finalized what promises to be the most expensive Safe Drinking Water Act ("Act") regulations ever visited on U.S. water systems in a single rulemaking that includes determinations to regulate and national primary drinking water regulations for six per- and polyfluoroalkyl substances ("PFAS"): perfluorooctanoic acid ("PFOA"); perfluorooctane sulfonic acid ("PFOS"); perfluorohexane sulfonic acid ("PFHxS"); perfluorononanoic acid ("PFNA"); perfluorobutane sulfonic acid ("PFBS"); and hexafluoropropylene oxide dimer acid ("HFPO–DA").

In doing so, EPA flouted the Act's carefully prescribed risk evaluation and standard setting process. EPA instead invented an unprecedented and atextual process designed with speed in mind. To hasten the timeline for PFHxS, PFNA, PFBS, and HFPO–DA (collectively the "Index PFAS"), EPA truncated the multistep process prescribed by Congress and pressed forward without nationally representative occurrence data, relying instead on piecemeal local data contrary to past practice.[1] Furthermore, EPA made novel use of a "hazard index" to regulate combinations of Index PFAS as a "mixture" based on a convoluted formula rather than individual limits for each contaminant.

---

[1] "Occurrence" refers to the detection of a contaminant above a certain minimum concentration.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Petitioners American Water Works Association ("AWWA") and Association of Metropolitan Water Agencies ("AMWA") (together, "Water Associations") support EPA's efforts to develop national primary drinking water regulations for PFOA and PFOS that cost-effectively protect public health. This rule, however, is neither feasible nor cost-effective, as required by the Act, and creates significant risks for water system compliance and water affordability.

The themes of EPA's rulemaking are apparent—hastiness, novelty, and inadequate data. In its rush to promulgate this rule, EPA violated the Act and the Administrative Procedure Act. While the substance of this rulemaking may be technical, the errors are abundant, clear, and grounded in statutory text. This Court should therefore vacate the rule and remand, so that EPA can undertake the data-driven and science-based regulatory process required by the Act.

## JURISDICTIONAL STATEMENT

Water Associations seek review of EPA's final action, "PFAS National Primary Drinking Water Regulation," 89 Fed. Reg. 32,532 (April 26, 2024) (the "Rule"). Joint Appendix ("JA") __-__. This Court has jurisdiction to review the challenged action. 42 U.S.C. § 300j-7(a) [42 U.S.C. § 300j-7, ADD-26-ADD-27]. Water Associations timely filed their petition on June 7, 2024—within 45 days of the Rule's publication in the *Federal Register*. *Id.*

2

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## STATEMENT OF THE ISSUES

Whether EPA violated the Act or Administrative Procedure Act by:

- Issuing proposed regulations for Index PFAS before making final determinations to regulate those PFAS;

- Using a "hazard index" as a national primary drinking water regulation for mixtures of two or more Index PFAS;

- Determining that inadequate occurrence data for Index PFAS demonstrated their occurrence (or substantial likelihood of occurrence) in drinking water with a frequency and at levels of public health concern to justify determinations to regulate HFPO-DA and PFNA, individually, and mixtures of two or more Index PFAS; and

- Promulgating regulations that are not cost-effective or feasible and based on a flawed cost benefit analysis.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in a separate addendum.

## STATEMENT OF THE CASE

### A.     PFAS

PFAS are a large and diverse class of thousands of synthetic chemicals that have been used in a wide range of products across a variety of consumer and industrial applications. Each PFAS chemical has distinct characteristics, including

3

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

different uses, levels of presence in the environment, and potential health impacts. Some, such as PFOA and PFOS, have been studied in greater depth than others, and their production has largely been phased out and replaced by other PFAS, such as PFHxS, HFPO-DA, and PFBS. *See* U.S. Dep't of Health and Human Servs., *Toxicological Profile for Perfluoroalkyls* at 3 (2021), EPA-HQ-OW-2022-0114-0066, JA__; 89 Fed. Reg. at 32,536, JA__. In 2021, EPA committed to an ambitious agenda to "immediately" address PFAS under multiple authorities, including the Act. 89 Fed. Reg. at 32,538, JA__.

The same characteristics that make PFAS desirable for many applications also presents a challenge for water systems to remove them from drinking water supplies, as water systems have only a limited set of treatment options available—e.g., granular activated carbon, anion exchange, reverse osmosis, and nanofiltration. *Id.* at 32,624-25, JA__-__. These technologies require significant capital, operating, and maintenance costs. They also pose risk trade-offs from downstream water quality, treatment byproducts, and environmental burdens. *See* AWWA Comment at 6-7, 29, EPA-HQ-OW-2022-0114-1759, JA__-__, __. Other alternatives can pose significant issues, and most systems will rely on installing new treatment facilities. *Id.* at 30-33, JA__-__. Importantly, because most water systems depend on revenue from water ratepayers, the costs of regulation are largely borne by the systems' customers.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**B.        Legal Background**

The Act applies generally to "each public water system in each State" and authorizes EPA to regulate certain contaminants in drinking water. 42 U.S.C. § 300g [42 U.S.C. § 300g, ADD-5-ADD-7]. The Act prescribes a unique regulatory process, mandating that EPA carefully consider the best available science; information on the occurrence of contaminants in drinking water; the feasibility of regulation; the costs of compliance; and the potential for meaningful health benefits. This multistep process allows for ample public engagement and minimizes the risk of "locking-in" regulations that are impractical for water systems, or pose excessive water affordability challenges for consumers. The Act also recognizes that not all contaminants pose a risk to public health at all occurrence levels, and that not all contaminants warrant national regulation at a particular stringency.

The current statutory structure results from Congressional dissatisfaction with the previous approach: Prior to 1996, the Act required EPA to set standards for 25 additional contaminants every 3 years. 42 U.S.C. § 300g-1(b)(3)(A), (C) (1986) [42 U.S.C. § 300g-1 (1986), ADD18-ADD-21]. That approach "provoked more critical comment than virtually any other element of environmental law," and led to "arbitrary Federal law imposing burdens on consumers and the taxpayers . . . with no rational relationship to the public benefits that might be realized" because some contaminants

5

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

occur so infrequently in public water systems that the costs of monitoring (for a substance not present) far outweigh any health benefit that could be realized at the few systems that may detect the contaminant. In other cases, the available science is so uncertain that standards incorporate extravagant margins of safety (30,000-fold for one contaminant) making it impossible to assert that expenditures to implement the regulation are a public health necessity.

S. Rep. No. 104-169, at 12-13 (1995); *see* H.R. Rep. No. 104-632, at 10 (1996) (approach "dilutes limited resources on lower priority contaminants, and as a consequence may hinder more rapid progress on high priority contaminants." (quoting EPA Assistant Administrator Robert Perciasepe)). The burdens of ill-advised regulation that "provide[d] only marginal increases in [public] health protection at significant costs," especially where there was "much uncertainty concerning both the occurrence and real threat to public health of many contaminants," ultimately fell to customers because compliance costs are directly passed on through rates. H.R. Rep. No. 104-632 at 9 (quoting Ronald Dungan, President of the National Association of Water Companies).

Congress responded with the current sequential, six-step regulatory process. *First*, EPA publishes a draft Contaminant Candidate List ("List") of unregulated contaminants that are known or anticipated to occur in public water systems every 5 years. 42 U.S.C. § 300g-1(b)(1)(B)(i) [42 U.S.C. § 300g-1, ADD-8-ADD-17]. *Second*, EPA finalizes the List after notice and comment. *Id.* § 300g-1(b)(1)(B)(i)(I).

6

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Third*, every 5 years EPA determines whether to regulate at least 5 contaminants identified on the List. *Id.* § 300g-1(b)(1)(B)(ii)(I). Importantly, EPA must initially publish a "notice of the ***preliminary determination***" of whether to regulate a contaminant, accompanied by an "opportunity for public comment." *Id.* (emphasis added). To support these efforts, every 5 years EPA issues a list of up to 30 unregulated contaminants for public water systems to monitor through an Unregulated Contaminant Monitoring Rule ("UCMR"), which creates a nationally representative dataset on the occurrence of unregulated contaminants in drinking water supplies. *See id.* §§ 300j-4(a)(2) [§ 300j-4, ADD-22-ADD-25], 300g-1(b)(1)(B)(ii)(II), 300j-4(g).

*Fourth,* EPA issues a **Determination to Regulate** (or "**Determination**") if three statutory criteria are met:

> (i) the contaminant may have an adverse effect on the health of persons;
>
> (ii) the contaminant is known to occur or there is a substantial likelihood that the contaminant will occur in public water systems with a frequency and at levels of public health concern; and
>
> (iii) in the sole judgment of the Administrator, regulation of such contaminant presents a meaningful opportunity for health risk reduction for persons served by public water systems.

*Id.* § 300g-1(b)(1)(A)(i)-iii; *id.* § 300g-1(b)(1)(B)(ii)(II). The Determination must also be based on "the best available public health information," including occurrence data of the contaminant in drinking water. *Id.* § 300g-1(b)(1)(B)(ii)(II).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Fifth*, if EPA issues a Determination to Regulate, the Agency shall publish a maximum contaminant level goal ("Goal")" for that contaminant. *Id.* § 300g-1(b)(1)(E); *see id.* § 300g-1(b)(1)(A). Goals are non-enforceable and identify the level of a contaminant at which point "no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." *Id.* § 300g-1(b)(4)(A). Along with a Goal, EPA must promulgate a "national primary drinking water regulation." *Id.* § 300g-1(b)(1)(E). This often takes the form of a maximum contaminant level ("Level"). The alternative is a "treatment technique," 42 U.S.C. § 300g-1(b)(7)(A), which is not at issue in this case. While the Goal is aspirational, the Level is legally enforceable. EPA must propose the Goal and Level "not later than 24 months after" the Determination to Regulate and may publish the proposed regulation concurrent with the Determination to Regulate. *Id.* § 300g-1(b)(1)(E). The final Goal and Level must come "within 18 months" of proposal, although EPA may extend that deadline. *Id.* EPA must base its actions on "the best available, peer-reviewed science and supporting studies conducted in accordance with sound and objective scientific practices," as well as "data collected by accepted methods or best available methods." *Id.* § 300g-1(b)(3)(A).

When proposing a Level, EPA must "publish, seek public comment on, and use" a Health Risk Reduction and Cost Analysis for the proposed Level and each alternative Level that EPA is considering. *Id.* § 300g-1(b)(3)(C)(i). This analysis

8

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

considers "[q]uantifiable and nonquantifiable health risk reduction benefits for which there is a factual basis in the rulemaking record." *Id.* § 300g-1(b)(3)(C)(i)(I)-(II). EPA must also consider "[q]uantifiable and nonquantifiable costs for which there is a factual basis in the rulemaking record to conclude that such costs are likely to occur solely as a result of compliance with the [Level]" (e.g., monitoring costs, treatment costs), as well as "[t]he incremental costs and benefits associated with each alternative maximum contaminant level considered." *Id.* § 300g-1(b)(3)(C)(i)(III)-(IV). EPA must also determine "whether the benefits of the [Level] justify, or do not justify, the costs." *Id.* § 300g-1(b)(4)(C). And a Level "shall not be more stringent than is feasible." *Id.* § 300g-1(b)(5)(B). *Sixth*, EPA issues a final regulation.

EPA has repeatedly used this graphic to describe the process:



EPA, *Discuss Potential Approaches to the Sixth Unregulated Contaminant Monitoring Rule* (UCMR 6) at 12 (2024) [hereinafter *EPA UCMR 6 Presentation*],

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

https://www.epa.gov/system/files/documents/2024-05/public-webinar-development-proposed-ucmr-6.pdf.

The Act's multistep process, and EPA's careful consideration of the best available science, data and costs, is essential because once issued, EPA cannot withdraw a Determination to Regulate. *See Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 401, 402 (D.C. Cir. 2023). And once promulgated, any future regulatory revisions must "maintain, or provide greater, protection of the health of persons." 42 U.S.C. § 300g-1(b)(9); *see Regan*, 67 F.4th at 399. The Act thus limits EPA's ability to revisit regulatory actions—e.g., Determinations to Regulate low-occurrence contaminants, or regulations that are too stringent and costly. In such instances, customers could bare rate increases disproportionate to potential public health benefits, while water systems could be prevented from better allocating resources towards activities that provide greater public health benefits.

## C.    The Rulemaking

EPA initially followed the Act's six-step process: EPA proposed and then included PFOA and PFOS in the third and fourth Lists (Steps 1-2). *See* 74 Fed. Reg. 51,850, 51,852 (Oct. 8, 2009), JA__; 81 Fed. Reg. 81,099, 81,107 (Nov. 17, 2016), JA__. EPA then collected nationally representative data on the occurrence of PFOA and PFOS, as well as PFHxS, PFNA, and PFBS, in drinking water as part of the third UCMR ("UCMR 3"). *See* 77 Fed. Reg. 26,072 (May 2, 2012), JA__. Next, EPA

10

issued Preliminary Determinations to regulate PFOA and PFOS (Step 3), *see* 85 Fed. Reg. 14,098 (Mar. 10, 2020), JA__, and after public comment, issued Determinations to Regulate (Step 4), *see* 86 Fed. Reg. 12,272, 12,275 (Mar. 3, 2021), JA__.

In 2021 EPA published the fifth UCMR ("UCMR 5") to collect nationally representative occurrence data, including for all 6 PFAS. *See* 86 Fed. Reg. 73,131, 73,148, 73,155-56 (Dec. 27, 2021), JA__, __-__. UCMR 5 is more representative of systems nationally than UCMR 3, with more than twice as many systems monitoring at lower reporting thresholds. *Compare* 77 Fed. Reg. at 26,090, 26,099, JA__, __ (Exhibit 9 and Table 1), *with* 86 Fed. Reg. at 73,148, 73,155-56, JA__, __-__ (Exhibit 6 and Table 1). UCMR 5 is scheduled for completion in December 2025 and EPA has already started to receive preliminary results.

In March 2023, EPA proposed the Rule (Step 5): For each of PFOA and PFOS, EPA proposed Goals of zero and enforceable Levels at 4.0 parts per trillion ("ppt").[2] 88 Fed. Reg. 18,638, 18,639, 18,666-68 (Mar. 29, 2023), JA__,___. 4.0 ppt is "the lowest concentration that [the two contaminants] can be reliably quantified within specific limits of precision and accuracy during routine laboratory operating

---

[2] For drinking water rulemakings, including the one here, ppt and nanograms per liter ("ng/L") are often used interchangeably.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

conditions." *Id.* at 18,666, JA __. EPA also requested comment on alternative Levels of 5.0 and 10.0 ppt. *Id.* at 18,670, JA__.

In the same proposal, EPA made stark departures from the Act's stepwise process and analytical requirements: EPA published Preliminary Determinations (Step 3) to regulate Index PFAS as individual contaminants, as well as mixtures of two or more of the four contaminants. *Id.* at 18,641, JA__. In support of those Preliminary Determinations, EPA relied upon occurrence data from UCMR 3, which did not include HFPO-DA, and non-targeted (i.e., not site-specific, or limited to areas of known or potential contamination) occurrence data from 11 states, which EPA acknowledged "var[ied] in terms of quantity and coverage." *Id.* at 18,648-49, JA__-__.

EPA concurrently proposed a novel use of a "hazard index," setting a value of 1.0 (unitless) as the Goal and Level for Index PFAS, individually and as mixtures of two or more contaminants (Step 5). *Id.* at 18,641-42, 18,663-66, JA __-__, __-__. EPA previously used the hazard index to investigate and compare the relative potential health risks of chemical mixtures at contaminated sites under the Superfund program. *Id.* at 18,669, JA__; *infra* Section II.B. As proposed by EPA in 2023, the hazard index is the sum of four "hazard quotients," which are ratios between the measured concentration of an Index PFAS in a water sample and its "health-based water concentration" (i.e., the level below which adverse health effects are not likely

12

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

to occur). *Id.* at 18,639, 18,665, JA__, __. EPA proposed health-based water concentrations for PFHxS (9.0 ppt), HFPO-DA (10 ppt), PFNA (10 ppt), and PFBS (2000 ppt). *Id.* at 18,641-42, JA__-__. Water Associations extensively commented that the proposal violated the Act. *See generally* AWWA Comment, JA__; AMWA Comment, EPA-HQ-OW-2022-0114-1738, JA__.

**D.     The Rule**

EPA issued the Rule (Step 6). For PFOA and PFOS, EPA finalized Goals of zero and Levels of 4.0 ppt—by far the most costly Level considered by EPA: At 4.0 ppt, EPA's expected annualized quantified costs (at a 2% discount rate) are about $1.537 billion . *See* 89 Fed. Reg. at 32,535, 32,710-12, JA__, __-__ (Tables 69, 70, and 71).

EPA also finalized Determinations to Regulate PFHxS, PFNA, and HFPO-DA individually. *Id.* at 32,535, JA__.[3] For each, EPA promulgated individual Goals and Levels of 10 ppt. *Id.* Additionally, EPA finalized a Determination to Regulate mixtures of any two or more Index PFAS, and promulgated a Goal and Level based on a hazard index value of 1 (unitless). *Id.*

---

[3] EPA deferred making a determination to regulate PFBS on an individual basis. 89 Fed. Reg. at 32,535, JA__. EPA's justification for deferral (insufficient occurrence information) would apply equally to HFPO-DA and PFNA.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

For Index PFAS, EPA relied on UCMR 3 occurrence data and piecemeal, non-targeted (i.e., not site-specific, or limited to areas of known or potential contamination) occurrence data from a limited number of states, having "supplemented the data" between the proposed and final Rule. *Id.* at 32,553-55, JA__-__. EPA asserted this was the "best available occurrence data" and declined to wait for nationally representative occurrence data from UCMR 5—while also noting that the individual states used reporting thresholds that were "not defined consistently across all states." *Id.* at 32,553, 32,554-55, JA__, __-__.

EPA also finalized monitoring, reporting, and public notification requirements, which will require public water systems to monitor for all six PFAS in perpetuity, even if none of the substances has ever been detected in a system's source water. *Id.* at 32,535, JA__.

## SUMMARY OF ARGUMENT

**I.**    EPA violated the Act by proposing regulations for Index PFAS **before** issuing a Determination to Regulate those PFAS. That action was contrary to the plain language of the Act and represents an unreasoned and unacknowledged departure from decades of prior policy.

**II.**    EPA's use of the "hazard index" value of 1 (unitless) as a Level for Index PFAS was arbitrary and contrary to the Act. A Level refers to a fixed, clearly defined threshold, not a convoluted equation where compliance hinges upon

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

fluctuations in the relative concentrations of four different contaminants. EPA's use of the hazard index is contrary to agency guidance and science, because its underlying inputs are based upon a mixture of chemicals with disparate adverse health effects.

**III.** EPA arbitrarily determined that HFPO-DA, PFNA, and Index PFAS (as mixtures) have a "substantial likelihood" of occurrence "in public water systems with a frequency and at levels of public health concern." 42 U.S.C. § 300g-1(b)(1)(A)(ii). EPA did not wait for nationally representative UCMR 5 data and instead relied upon a limited patchwork of state-level data. That data does not show those substances and mixtures occur at frequencies and levels of public health concern.

**IV.** EPA's defective analysis drastically underestimated the Rule's costs. Even EPA's own erroneous analysis demonstrates that it should have set the Levels for PFOA and PFOS at 10.0 ppt rather than 4.0 ppt.

## STANDING

Water Associations' standing is self-evident because their public water system members are "directly regulated by the rule and ha[ve]been injured by it." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022). Water Associations' public water system members are objects of the Rule, and subject to the Rule's requirements. *See* 89 Fed. Reg. at 32,534-35,

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

JA__-__; 42 U.S.C. § 300g (coverage of the Act); *e.g.*, Hedges Decl. ¶9, Standing Addendum ("SA") -64; Granger Decl. ¶10, SA-42-43; Gross Decl. ¶8, SA-57.

Water Associations' members satisfy the requirements for Article III standing. *See Advocs. for Highway and Auto Safety*, 41 F.4th at 593-94. The challenged actions give rise to "concrete, particularized pocketbook injur[ies]" for Water Associations' members. *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592 (D.C. Cir. 2023);*See* 89 Fed. Reg. at 32,653-63, JA__-__ (estimating costs); EPA, *Economic Analysis for the Final Per- and Polyfluoroalkyl Substances National Primary Drinking Water Regulation* at C-1 to C-33 (2024) [hereinafter *Economic Analysis*], EPA-HQ-OW-2022-0114-3084 and 2085, JA__-__. Even for systems that do not have any of the regulated PFAS above the applicable Levels, the Rule's initial and long-term compliance monitoring requirements will impose water sampling and lab testing costs. 89 Fed. Reg. at 32,660-63, JA__-__; Gross Decl. ¶¶9-12, SA-57-59; Rechtin Decl. ¶¶9-15, SA-73-76; Braker Decl. ¶¶12-18, SA-33-37. Members would not face some or all of those costs if the Rule is vacated in part or in full. *See* Granger Decl. ¶¶6, 12-13, SA-41, 43-44.

Water Associations' challenge is germane to their respective purposes, and there is no reason individual members must participate in it. *See Maine Lobersterman's Ass'n*, 70 F.4th at 593; *Comm. for Effective Cellular Rules v. FCC*,

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

53 F.3d 1309, 1315 (D.C. Cir. 1995). By challenging the Rule, Water Associations serve their organizational purposes of ensuring that drinking water regulations are feasible, cost-effective, and consistent with the Act. *See* Mehan Decl. ¶6, SA-3; Dobbins Decl. ¶4, SA-12.

### STANDARD OF REVIEW

This Court holds unlawful and sets aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), ADD-1. "[T]he overarching question" is whether the agency's "decisionmaking was reasoned, principled, and based upon the record," *Env't Def. Fund v. FERC*, 2 F.4th 953, 967-68 (D.C. Cir. 2021) (internal quotation marks omitted); *see Bluewater Network v. EPA*, 370 F.3d 1, 22 (D.C. Cir. 2004) (deference to agency findings "only if [the agency] has adequately explained the basis" for it).

On questions of statutory interpretation, EPA is no longer entitled to deference, and this Court "must apply what [it] regard[s] as the statute's 'best' reading." *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024) (citing *Loper Bright Enters. v. Raimondo,* 144 S. Ct. 2244, 2266 (2024)). The interpretive inquiry "begin[s] with the text," and focuses on "the ordinary meaning of [the statute's] key terms." *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 948 (D.C. Cir. 2024) (citations omitted).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## ARGUMENT

**I.    EPA Violated the Act by Issuing Proposed Regulations for Index PFAS Before Making Final Determinations to Regulate Those PFAS.**

The Act mandates a sequential, six-step process for regulation. For the first time ever, EPA departed from that process. EPA instead used a four-step process for regulating the Index PFAS based on its new interpretation of the term "determination to regulate." When mapped onto the statutory structure, EPA's actions look like this:

| | Step | Statutory Citation | PFAS Rulemaking |
|---|---|---|---|
| 1 | Draft List | 42 U.S.C. § 300g-1(b)(1)(B)(i)(I). | **PFOA/PFOS: 2008**. 73 Fed. Reg. 9628 (Feb. 21, 2008), JA__.<br><br>**Index PFAS: 2021**. 86 Fed. Reg. 37,948, 37,952 (July 19, 2021), JA__. |
| 2 | Final List | 42 U.S.C. § 300g-1(b)(1)(B)(i)(I). | **PFOA/PFOS: 2009/2016**. 74 Fed. Reg. 51,850, 51,852, JA__; 81 Fed. Reg. 81,099, 81,107, JA__.<br><br>**Index PFAS: 2022**. 87 Fed. Reg. 68,060, 68,062 (Nov. 14, 2022), JA__. |
| 3 | Preliminary Determination to Regulate | EPA makes a "preliminary determination . . . of whether or not to regulate such contaminants" subject to notice and comment<br><br>42 U.S.C. § 300g-1(b)(1)(B)(ii)(I). | **PFOA/PFOS: 2020**. 85 Fed. Reg. at 14,100, JA__.<br><br>**Index PFAS: 2023**. 88 Fed. Reg. at 18,641-42, JA__-__ (combined with Step 5). |

18

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| 4 | Determination to Regulate | After notice-and-comment on the Preliminary Determination, EPA "make[s] determinations of whether or not to regulate."<br><br>42 U.S.C. § 300g-1(b)(1)(B)(ii)(I). | **PFOA/PFOS: 2022**. 86 Fed. Reg. at 12,273, JA__.<br><br>**Index PFAS: 2024**. 89 Fed. Reg. at 32,535, JA__ (combined with Step 6). |
|---|---|---|---|
| 5 | Proposed Regulation | For each contaminant EPA determines to regulate, EPA shall propose the Goal and regulation not later than 24 months after the Determination to Regulate.<br><br>42 U.S.C. § 300g-1(b)(1)(E). | **All: 2023**. 88 Fed. Reg. at 18,641-42, JA__-__. |
| 6 | Final Regulation | EPA shall publish a Level, Goal, and promulgate a regulation within 18 months after the proposal<br><br>42 U.S.C. § 300g-1(b)(1)(E). | **All: 2024**. 89 Fed. Reg. at 32,535, JA__. |
| | UCMR data | 42 U.S.C. §§ 300g-1(b)(1)(B)(ii)(II), 300j-4(a)(2), 300j-4(g). | **UCMR 3: 2012** (PFOA, PFOS, PFHxS, PFNA, and PFBS). 77 Fed. Reg. at 26,075, JA__.<br><br>**UCMR 5: 2021** (All 6 PFAS). 86 Fed. Reg. at 73,148, 73,155-56, JA__, __-__. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The question here is whether it was lawful for EPA to issue proposed regulations for Index PFAS (Step 5) **before** it issued its Determinations to Regulate (Step 4). The answer is no: The best reading of the Act is that a proposed regulation may be issued either concurrently with or after the Determination to Regulate, but not before. EPA's current position, concocted for the one-off purpose of "accelerating" this rulemaking, departs from the Agency's prior interpretations without reasoned explanation or even acknowledgement. What few arguments offered in support of its novel approach are unpersuasive.

### A.    Under the plain language of the Act, EPA may not issue a proposed rule before issuing a final Determination.

"In addressing a question of statutory interpretation, we begin with the text." *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018). Here, the dispute turns largely on the meaning of Section 1412(b)(1)(E), reproduced below, broken out into its four key clauses:

> **[1]** For each contaminant that the Administrator determines to regulate under subparagraph (B),[4] the Administrator shall publish [Goals] and promulgate, by rule, national primary drinking water regulations under this subsection.

---

[4] "Subparagraph (B)" provides that EPA will "make determinations of whether or not to regulate" contaminants "after notice of the preliminary determination and opportunity for public comment." 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**[2]**  The Administrator shall propose the [ Goal] and national primary drinking water regulation for a contaminant not later than 24 months after the determination to regulate under subparagraph (B), and

**[3]**  may publish such proposed regulation concurrent with the determination to regulate.

**[4]**  The Administrator shall publish a [Goal] and promulgate a national primary drinking water regulation within 18 months after the proposal thereof.

42 U.S.C. § 300g-1(b)(1)(E).

EPA's theory hinges on a puzzling and ever-shifting interpretation of Clause 3. Before this rulemaking, EPA had always interpreted the phrase "determination to regulate" to be just that: the **final** Determination to Regulate (Step 4). *See infra* Section I.B. But here, EPA debuted the argument that "the reference to 'determination to regulate' in Section 1412(b)(1)(E) [is] referring to the **regulatory process** in 1412(b)(1)(B)(ii) that begins with a preliminary determination"—*i.e.*, that "determination to regulate" means the whole "rulemaking process[]" including both the Preliminary Determination and the final Determination. 88 Fed. Reg. at 18,644, JA__ (emphasis added). Then, EPA shifted its position again, and now "interpret[s] 'determination to regulate' in the phrase 'may publish such proposed regulation concurrent with the determination to regulation' in [Clause 3] to be a **preliminary determination**." 89 Fed. Reg. at 32,541, JA__ (emphasis added). In short, EPA first viewed the phrase "determination to regulate" to mean just that— the final Determination to Regulate, then said that phrase meant the whole

21

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

"regulatory process," and then said it meant the Preliminary Determination. Based on its third interpretation, EPA argued that Clause 3 authorizes EPA to issue a proposed regulation concurrently with a "determination to regulate" (in its view, a Preliminary Determination), which means that the proposed regulation (Step 5) can come before the Determination to Regulate (Step 4). *Id.* at 32,541-42, JA__-__. There is little to recommend EPA's view.

### 1. EPA must publish the Determination to Regulate before the proposed regulation.

Clause 1 provides that EPA "shall publish" a proposed regulation for contaminants that "the Administrator determines to regulate." The phrase "determines to regulate" must mean the final Determination to Regulate. The word "determination" itself means "a **final** decision by a court or administrative agency,"[5] The Determination to Regulate is the only Agency decision that is "final" or fixed. By contrast, a Preliminary Determination is non-final and can be withdrawn. *See Regan*, 67 F.4th at 398. Because the phrase "determines to regulate" in Clause 1 means the Determination to Regulate, and because Clause 1 provides that a proposed regulation shall be published only for those contaminants EPA has "determine[d] to

---

[5] *Black's Law Dictionary* 564 (11th ed. 2019) (emphasis added); *accord Webster's New International Dictionary* 616 (3d ed. 1971) ("determination" means "the settling and ending of a controversy" or "the act of deciding definitely and firmly"; "determine" means to "fix conclusively"); *Webster's New College Dictionary* 308 (2d ed. 1995) ("determine" means to "end or decide by final . . . action").

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

regulate," it follows that a proposed regulation *cannot* be issued before making a Determination to Regulate.

Moreover, interpreting the phrase "determines to regulate" in Clause 1 to mean the Preliminary Determination would create absurd results, as it would **obligate** EPA to issue a proposed regulation whenever it makes a Preliminary Determination. EPA plainly does not read the statute to create that obligation; indeed, in every past instance of regulation under the Act, EPA has **not** issued a proposed regulation together with its Preliminary Determination.

That reading is confirmed by Clauses 2 and 3. Clause 2 requires EPA to issue a proposed regulation "not later than 24 months **after the determination to regulate**." EPA appears to agree that this use of the term "determination to regulate" refers to the Determination to Regulate; no other reading is plausible, because no "determination to regulate" is made unless and until the final Determination is issued. Clause 3 then clarifies that EPA may issue a proposed regulation "concurrent with the determination to regulate." Thus, Clauses 2 and 3 work together to specify that the proposed regulation can be issued either "concurrent" with or "after" the Determination to Regulate—but not before.

EPA ignores that Congress elsewhere explicitly used "preliminary" when it meant to refer to a Preliminary Determination, and yet did not do so in Clause 3. *See* 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I) (EPA makes Determination to Regulate "after

23

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

notice of the **<u>preliminary determination</u>** and opportunity for public comment" (emphasis added)). Conversely, when Congress intended to refer to the final Determination to Regulate, it repeatedly used that exact phase. *See id.* § 300g-1(b)(1)(B)(ii)(II), (III). Indeed, EPA would have this Court believe that Congress intended the phrase "determination to regulate" in Clause 3 to mean the Preliminary Determination, even though Congress did not use the word "preliminary" in Clause 3 but did elsewhere in the same sub-section. That is not how statutory interpretation works. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020); *Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188, 196 (2021); *United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020).

EPA's theory would also require this Court to conclude that Congress meant the phrase "determination to regulate" to mean two different things in the same sentence of the same statute. EPA agrees that the phrase "determination to regulate" in Clause 2 means the final Determination. And rightly so: Read in context, that phrase could not possibly mean anything else. *See supra* note 5. *See Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932) (observing "natural presumption that identical words used in different parts of the same act are intended to have the same meaning"); *Judge Rotenberg Educ. Ctr., Inc. v. DEA*, 3 F.4th 390, 398 (D.C. Cir. 2021) (similar).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Were that not enough, this Court itself recently and repeatedly confirmed Water Associations' reading of the statute in its May 2023 opinion concerning regulation of perchlorate. *See Regan*, 67 F.4th at 402 ("[T]he preliminary determination precedes the notice and comment period. Once that period ends, the agency makes its regulatory determination, and that determination is final."); *see also id.* at 398, 399, 400, 403 (using "final determination" and "regulatory determination" interchangeably). More importantly, this Court held that the "**<u>final determination to regulate perchlorate . . . started a clock . . . to propose regulations</u>** within twenty-four months"—not the **<u>Preliminary</u>** Determination, as EPA contends here. *Id.* at 398. The opinion also clarified that EPA may only issue a proposed regulation "**<u>after</u>** determining the statutory criteria" in § 300g-1(b)(1)(A)(iii) "are met." *Id.* at 399 (emphasis added). That too confirms Water Associations' interpretation, because EPA does not determine whether the criteria of § 300g-1(b)(1)(A)(iii) "are met" until it makes the Determination—indeed, determining whether those criteria "are met" is the whole point of allowing comment on the Preliminary Determination. 42 U.S.C. § 300g-1(b)(1)(B)(ii)(II).

## B. EPA's new interpretation rests on an unreasoned and unacknowledged departure from decades of prior policy.

The Rule adopts several interpretations of the Act that contradict the Agency's public statements dating back more than a decade. That is a paradigmatic example

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

of arbitrary action. *See Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 156 (D.C. Cir. 2005); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

EPA has undertaken multiple processes to regulate contaminants since the Act was amended. Until this proceeding, it had **never** issued a proposed regulation before making a Determination to Regulate and had always regarded the Determination to Regulate as the trigger for the 24-month window to issue a proposed rule. The preambles to the rulemaking documents confirm that—before this case—EPA's view was that the Determination to Regulate must precede the proposed regulation. For example, the preamble to EPA's Final Determination 4 stated that, "[i]f **after** considering public comment on a preliminary determination, the Agency **makes a determination to regulate** a contaminant, EPA will **initiate** the process to propose and promulgate" a regulation. 86 Fed. Reg. at 12,273 (emphasis added). This confirms that EPA does not "make[] a determination to regulate" until "after" the comment period on the Preliminary Determination, and that EPA in turn does not "initiate" rulemaking until after the Determination to Regulate.

Similarly, the preamble to EPA's Preliminary Determination 3 described the regulatory process in this way:

> If after the public comment period [on the Preliminary Determination], the agency answers 'yes' to all three statutory criteria, the agency **then** makes a 'positive' final determination that regulation is necessary and

26

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**proceeds to develop** [a Goal] and [regulation] [i.e., a proposed regulation].

79 Fed. Reg. 62,716, 62,727 (Oct. 20, 2014). For more than a decade, EPA has thus understood that the Agency cannot "proceed to develop" a proposed regulation until after a "final determination" is made.

EPA has also issued numerous guidance documents which contravene its position in the Rule. EPA's website provides this summary:

> EPA first publishes a preliminary regulatory determination . . . and provides an opportunity for public comment. After review and consideration of public comment, EPA publishes a final [Federal Register] notice with the regulatory determination decisions. If EPA makes a decision to regulate a particular contaminant, the Agency **starts** the rulemaking process . . . .

EPA, *How EPA Regulates Drinking Water Contaminants* (Nov. 2, 2023), https://perma.cc/W7R3-FS2D (accessed Sept. 24, 2024) (emphasis added). Helpful graphics provided by the Agency reaffirm this process. *See, e.g.*, EPA, *Understanding How EPA Develops New Drinking Water Regulations*, https://www.epa.gov/system/files/images/2024-01/epa-regulate_drinking_water_contaminants-final-508.png; *EPA UCMR 6 Presentation*, *supra* p. 9. Outside the context of this litigation, EPA clearly believes the "regulatory determination decision[]" to be the Step 5 Determination to Regulate, and that EPA understands that Determination as being the event that "**starts** the rulemaking process."

27

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## C.     EPA's defense of its novel approach is unpersuasive.

EPA attempted to justify its novel reading of the Act by presenting four arguments. Each is confusing. None is persuasive.

*First*, EPA claimed that "Congress's use of the phrase 'determination to regulate' . . . in SDWA is not consistent." 89 Fed. Reg. at 32,541, JA__. But EPA has never identified any part of the Act that uses the phrase "determination to regulate" to mean anything **other than** the final Determination. EPA claims that the phrase "determination for a contaminant" as used in Section 1412(b)(1)(B)(iii) of the Act is supposedly a clear reference to a Preliminary Determination. *See id*. To state the obvious, the phrase "determination for a **contaminant**" is not the same as the phrase "determination to **regulate**." The former refers to the decision to list a contaminant from the List in the Preliminary Determination, whereas the latter refers to the agency's final decision on whether to pursue regulation.

*Second*, EPA advances a curious interpretation of Section 1412(b)(1)(E), which provides that EPA "shall propose the [proposed regulation] not later than 24 months after the determination to regulate." 42 U.S.C. § 300g-1(b)(1)(E). According to EPA, this language creates a deadline requiring EPA to issue a proposed regulation "not later" than two years after the final Determination, but does not "preclude the EPA from issuing a proposed rule at any time prior to the expiration of the 24 months after a final regulatory determination, including issuing the

28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

proposed rule on the same day as the preliminary regulatory determination." 89 Fed. Reg. at 32,541, JA__. This reading of the Act is the exact inverse of what EPA has previously told the public. *See supra* Section I.B. EPA's reading violates also the rule against superfluities: The phrase "determination to regulate" in Clause 3 must mean the final Determination. If that is so, then the phrase "not later than 24 months after the determination to regulate" as used in Clause 2 cannot mean that EPA may publish the proposed rule at any time before the date that is 24 months after the final Determination. Otherwise Clause 3 would be superfluous, because Clause 2 would already have authorized EPA to publish the proposed regulation contemporaneously with the final Determination. The better reading is that Clause 2 allows EPA to publish the proposed regulation "**after** the determination to regulate" (i.e., the Determination), and that Clause 2 allows EPA to publish the Proposed Regulation "concurrent with the determination to regulate" (again, the Determination).[6]

Moreover, EPA errs by reading Clause 2 in a vacuum. EPA ignores the first sentence of Clause 2, which states that "the Administrator shall publish" a proposed

---

[6] According to EPA, interpreting the phrase "concurrent with the determination to regulate" in Clause 3 to refer only to the Determination would render that phrase a "nullity," because Clause 2 already "expressly acknowledges that the EPA may issue a proposed rule concurrent with a final determination." 89 Fed. Reg. at 32,541, JA__. Not so. Clause 2 does not "expressly acknowledge" that the proposed regulation and Determination would be concurrent; only Clause 3 makes that clarification, and that is its independent utility. *See BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 543 n.7 (1994) ("It is no superfluity for Congress to clarify what had been at best unclear.").

regulation "**[f]or each contaminant that the Administrator determines to regulate**."    42  U.S.C.  § 300g-1(b)(1)(E)  (emphasis  added).  Because  the Administrator does not "determine[] to regulate" until a Determination to Regulate is issued, the proposed regulation cannot precede that Determination.

*Third*, EPA contends that requiring the Agency to issue a Determination to Regulate  before  a  proposed  regulation  would  "hinder  Congress's  goal"  of "accelerat[ing] EPA action under SDWA." 89 Fed. Reg. at 32,541, JA__. But this Court must credit the "enacted statutory text" EPA's "curated account[] of a law's purposes." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2291 n.6 (2024) (Gorsuch, J., concurring) (internal brackets and quotation marks omitted). Appeals to "statutory purpose" are no substitute for the standard "interpretive toolkit." *Id*. at 2271 (majority op.). And Congress specifically added mechanisms to the Act that allow EPA to regulate expeditiously on matters that presented "urgent threats to public health." 42 U.S.C. § 300g-1(b)(1)(D). EPA should not be permitted to invent a new, atextual process to "accelerate" a rule when the agency elected to ignore the separate, textual process for accelerated rulemaking that Congress actually crafted.

Indeed, as amended in 1996, the Act walked back Congress's prior approach of requiring EPA to move forward with regulation for 25 contaminants every 3 years, and replaced that system with the multistep process described on pages 5-12 above.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The amended statute evinces a methodical, deliberative approach from end-to-end—not an overriding concern with "acceleration."

*Fourth*, EPA argues that allowing "concurrent" comment on the Preliminary Determination and the proposed regulation, instead of two separate comment periods, somehow "enhances . . . the deliberative stepwise process provided in the statute." 89 Fed. Reg. at 32,541, JA___. But the fact of matter is that the Act prescribes two comment periods,[7] and gives no indication that they could be combined. Wedding the two comment periods into one had the practical effect of giving the public only 60 days to comment on two complex issues, instead of the two 60-day comment periods to which they were entitled.[8]

EPA contends that "it is not clear what further benefit would be provided by two separate public comment periods" given that the information provided in a separate comment period on a proposed rule "cannot be used to undo a final

---

[7] *Cf.* 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I); *id.* § 300g-1(b)(1)(E).

[8] In the Rule's preamble, EPA suggest that combining the comment periods meant that commenters had "more information to evaluate the preliminary regulatory determinations"—i.e., that they were able to review on the record for the Preliminary Determination, but also on the "full rulemaking record . . . that supports the proposed [regulation]." 89 Fed. Reg. at 32,542, JA___. That argument overlooks the fact that the decision of whether or not to regulate and the decision of how to shape a proposed regulation rest on very different criteria. *Compare* 42 U.S.C. §§ 300g-1(b)(1)(A)(i)-(iii), (B)(ii)(II), *with id.* § 300g-1(b)(4)(C). EPA itself has previously confirmed that the "regulatory determination process is distinct from the more detailed analyses needed to develop a national primary drinking water regulation." 79 Fed. Reg. at 62,727.

31

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

regulatory determination." 89 Fed. Reg. at 32,542, JA__. That argument is a straw man as there must be separate comment periods on the *Preliminary* Determination and the proposed regulation, not that there cannot be a combined comment period on the proposed regulation and the final Determination. In any case, the fact that a Determination to Regulate cannot be withdrawn strengthens Water Associations' argument. Congress knew that the Act contains two separate "points of no return": A Determination cannot be withdrawn once made (*see Regan*, 67 F.4th at 402), and a regulation cannot be weakened once promulgated (the "anti-backsliding" provision at 42 U.S.C. § 300g-1(b)(9)). That the Act includes these one-way ratchets makes it critical that EPA conduct a complete process **before** those points of no return are reached.

* * *

No matter the potential expediencies, EPA's approach of concurrently issuing Preliminary Determinations to regulate alongside proposed regulations for the Index PFAS was contrary to the language of the Act, EPA precedent, and the purpose of the overall statutory scheme. These portions of the Rule should therefore be vacated and remanded to EPA.

**II.    EPA's Use of the Hazard Index as an Enforceable Level for Mixtures of Two or More Index PFAS Violated the Act and Was Arbitrary and Capricious.**

For each regulated contaminant, the Act gives EPA only two options for the form of regulation: a Level or, if certain conditions are met, a treatment technique. *See* 42 U.S.C. § 300g-1(b)(1)(E), (b)(7)(A).

Here, EPA invented a third approach: For the first time ever, EPA promulgated a novel "hazard index" value of 1 (unitless) as the applicable "Level" for mixtures of two or more Index PFAS. 89 Fed. Reg. at 32,535, JA__. For the Rule, EPA derived a hazard index equation that sums together the "hazard quotients" (i.e., ratios meant to characterize a constituent chemical's relative potential health risk) for each of the four Index PFAS, according to their "health-based water concentrations" (i.e., the level below which adverse health effects are not likely to occur). *Id.* at 32,533, JA__. EPA conceded in the proposed Rule that "this is the first use of a[] [hazard index] approach for a [] National Primary Drinking Water Regulation." 88 Fed. Reg. at 18,669, JA__. EPA's novel use of the hazard index as a Level was inappropriate, because the hazard index is not a "Level" under the Act, and hazard indices are designed as risk screening/comparison tools, not the bases for regulation. The Index PFAS "Levels" should therefore be vacated.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## A.      The hazard index is not a Level.

A Level is "the maximum permissible **level of a contaminant** in water which is delivered to any user of a public water system." 42 U.S.C. § 300f(3) [42 U.S.C. § 300f, ADD-2-ADD-4] (emphasis added). "Level," as ordinarily understood, means "[r]elative position or rank on a scale" or "[a] **relative degree, as of** achievement, intensity, or **concentration**." The American Heritage College Dictionary 779 (3d ed. 1993) (emphasis added). In the context of the Act, "maximum . . . level of a contaminant" has long meant a fixed number, usually expressed in terms like ppt (or parts per billion, per million, etc.) or milligrams per liter (or ng/L, etc.). *See, e.g.*, 40 C.F.R. § 141.61(a), (c) [40 C.F.R. § 141.61, ADD-28-ADD-34] (expressing Levels for volatile organic contaminants and synthetic organic contaminants, except for PFAS, in terms of milligrams per liter); *see also* S. Rep. No. 104-169 at 3 ("Generally, the standards are stated as concentrations of particular contaminants in the water (in parts per million or parts per billion) as delivered to the tap of the consumer."). In total, there are 72 Levels that regulate contaminants in drinking water, and **all** are expressed and described as a concentration level. EPA has done so even when *combining* individual contaminants, like radionuclides. *See* 40 C.F.R. § 141.66(b), (c) [40 C.F.R. § 141.66, ADD-35-ADD-40] (Levels in terms of picocuries per liter). Levels, as long understood this way, make it relatively simple for a water system to maintain

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

compliance; the system only needs to monitor a contaminant's concentration in its water source against the contaminant's fixed concentration level in the regulation.

The hazard index is fundamentally different. The hazard index is the sum of four different ratios (called "hazard quotients") and depends on the relative occurrence of four different contaminants in a sample of drinking water. A sum of those calculations greater than 1 (unitless) constitutes an exceedance of the Level. The hazard-index equation, reproduced below, bears no resemblance to the concentration-based levels that EPA has, until now, used under the Act:

$$HI \; MCL = \left( \frac{[HFPO-DA_{water}ng/L]}{[10 \; ng/L]} \right) + \left( \frac{[PFBS_{water}ng/L]}{[2000 \; ng/L]} \right) + \left( \frac{[PFNA_{water}ng/L]}{[10 \; ng/L]} \right) +$$

$$\left( \frac{[PFHxS_{water}ng/L]}{[10 \; ng/L]} \right) = 1$$

89 Fed. Reg. at 32,533, JA__.

EPA thus impermissibly substituted a mathematical equation for a maximum contaminant *level*. EPA's principal justification for using the hazard index as a Level is that the Act does not "dictate that the [Level] take a particular form," so long as it "establishes a maximum permissible level of a contaminant in water" and is capable of being "validated." EPA, *Responses to Public Comments on Per- and Polyfluoroalkyl Substances (PFAS) National Primary Drinking Water Regulation Rulemaking* at 5-390 (2024) [hereinafter *Responses to Public Comments*], EPA-HQ-OW-2022-0114-3077, JA__; *see* 89 Fed. Reg. at 32,563, JA__. But this assertion of

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

virtually limitless flexibility proves too much. The hazard index-approach represents a series of ratios, not a "maximum level" for each constituent contaminant. Nor does it lend itself to easy validation, as a water system's compliance hinges upon fluctuations in the relative concentrations of four different contaminants. While EPA justifies using the hazard index to address the co-occurrence of Index PFAS and their "dose-additive" adverse health effects from co-exposure to those same PFAS, *see id.* at 32,539, 32,543, JA__, __, the structure of the hazard index means that for a particular sample, a violation of the Level could result if only *one* of the Index PFAS (i.e., PFHxS, PFNA, or HFPO-DA) is above its health-based water concentration, while the others are just above the detection limit. In that situation, a water system would be out of compliance with individual Level for that PFAS **and** the hazard index Level, despite the almost near absence of any theoretical "dose-additive" adverse health effects. That outcome is absurd.

**B.     The hazard index is not appropriate for regulating "mixtures" of Index PFAS.**

EPA's use of the hazard index as a Level is arbitrary and capricious, counter to sound scientific principles, and does not conform with EPA's longstanding risk assessment practices. EPA has previously used a "general hazard index" approach, as a preliminary *screening* tool to evaluate the potential comparative risk between Superfund sites. *See id.* at 32,550, 32,569, JA__, __. But EPA has also cautioned

36

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

against the use of the hazard index beyond such screening where, as here, the substances induce different adverse health effects and endpoints.[9]

Here, the hazard index relies upon "health-based water concentrations," which EPA identified as the levels below which lifetime adverse health effects are not expected and allow for a margin of safety. *Id.* at 32,544, JA__. Each Index PFAS's health-based water concentration is based on a different particular health effect and endpoint. For HFPO-DA, the value is based on liver effects in adult mice. *Id.* For PFHxS, the value is based on thyroid effects in adult rats. *Id.* For PFNA and PFBS, both values are based on effects on offspring of exposed mice, although looking at different endpoints—bodyweight for PFNA and thyroid hormone levels for PFBS. *Id.* at 32,544-45, JA__-__. EPA thus derived health-based water concentrations based on disparate responses and adverse health effects.

---

[9] *See* EPA, *Supplementary Guidance for Conducting Health Risk Assessment of Chemical Mixtures* at A-25 (2000) [hereinafter 2000 *Supplementary Guidance*], EPA-HQ-OW-2022-0114-0075, JA__ (cautioning that "the act of combining all compounds, even if they induce dissimilar effects, is a **screening procedure and not the preferred procedure in developing a hazard index**" (emphasis added)); EPA, *Guidelines for the Health Risk Assessment of Chemical Mixtures* at 26 (1986), EPA-HQ-OW-2022-0114-0068, JA__ (similar); EPA, *Risk Assessment Guidance for Superfund, Volume I, Human Health Evaluation Manual (Part A)* at 8-14 (1989), EPA-HQ-OW-2022-0114-0891, JA__ ("[A]pplication of the hazard index equation to a number of compounds that are not expected to induce the same type of effects or that do not act by the same mechanism could overestimate the potential for effects, **although such an approach is appropriate at a screening level**." (emphasis added)).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA's use of the general hazard index as an enforceable Level was therefore contrary to the prevailing view of a recently convened panel of independent experts, which explained that for purposes of assessing dose additivity, "PFAS groupings should be based only on common toxic [modes of action] and/or target organs," such that "[o]nly those PFAS that affect the same target organ/tissue/system should be grouped and assessed for dose additive or response additive approaches." J.K. Anderson et al., *Grouping of PFAS for Human Health Risk Assessment: Findings from an Independent Panel of Experts*, 134 Regulatory Toxicology and Pharmacology 105226, at 5 (Oct. 2022), https://tinyurl.com/35kb39cu.[10]

EPA asserted that the dose additivity assumptions underlying its hazard-index approach "can [] be based on 'toxicological similarity, but for specific conditions (endpoint, route, duration),'" and that it has "flexibility in the level of biological organization at which similarity among mixture components can be determined." 89 Fed. Reg. at 32,569, JA__ (quoting 2000 *Supplementary Guidance* at 29, JA__). But here there is **no** similar endpoint, target organ, and adverse health effects.

EPA's approach was also contrary to the recommendations of its Science Advisory Board ("Board"), which reviewed aspects of EPA's approach to PFAS mixtures as part of this rulemaking. *Id.* at 32,542, 32,568, JA__, __; EPA,

---

[10] *See* 3M Comment at 23, EPA-HQ-OW-2022-0114-1774, JA__; American Chemistry Council Comment at 36, EPA-HQ-OW-2022-0114-1841, JA__.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Framework for Estimating Noncancer Health Risks Associated with Mixtures of Per-
and Polyfluoroalkyl Substances (PFAS)* at 6-8 (2024) [hereinafter *Framework for
Estimating*], EPA-HQ-OW-2022-0114-3088, JA__-__. The Board explained that
where different effects and endpoints are being considered, the hazard index is most
appropriate for screening and identifying areas for further evaluation:

> In general, the screening level Hazard Index (HI) approach, in which
> Reference Values (RfVs) for the mixture components are used
> **regardless of the effect on which the RfVs are based**, is appropriate
> for **initial screening of whether exposure to a mixture of PFAS poses
> a potential risk that should be further evaluated**.

EPA, SAB, *Review of EPA's Analyses to Support EPA's National Primary
Drinking Water Rulemaking for PFAS, Final Report* at 91 (2022), EPA-HQ-OW-
2022-0114-3724, JA__ (emphases added). As the Board explained, EPA's hazard-
index approach, which the Agency finalized as Levels, is actually fit for "initial
screening" to determine whether there are potential risks that should be "further
evaluated."

Moreover, Index PFAS are not "mixtures" as the term is generally understood.
Here, EPA treats the mere fact that Index PFAS may co-occur as a justification to
treat them as mixtures. But this argument proves too much: a similar argument could
be made to justify any number of combinations of contaminants that happen to reside
in the same source water. Rather than making an individualized assessment of the
contaminant's health impacts, EPA could end-run the Act's statutory criteria by

39

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

using a hazard index to amalgamate the disparate health impacts of each substance to justify regulation. And common sense requires that a mixture must have "components and respective portions [that] exist in approximately the same pattern," 89 Fed. Reg. 32,542, JA__, whereas EPA's approach allows for infinite combinations of the Index PFAS. *Cf.* EPA, *Guidelines for Health Risk Assessment of Chemical Mixtures* (1986) https://www.epa.gov/sites/default/files/2014-11/documents/chem_mix_1986.pdf.

EPA failed to adequately justify its decision to use the hazard index as enforceable "Levels"; the hazard index Levels should be vacated.

## III. EPA's Determinations to Regulate HFPO-DA, PFNA, and Mixtures of Two or More Index PFAS Were Unreasonable and Should Be Vacated.

EPA cannot regulate a contaminant under the Act unless "the contaminant is known to occur or there is a substantial likelihood that the contaminant will occur in public water systems **with a frequency and at levels of public health concern**." 42 U.S.C. § 300g-1(b)(1)(A)(ii) (emphasis added). EPA concluded that this criterion was satisfied for HFPO-DA and PFNA, individually, and for mixtures of two or more Index PFAS based on its "evaluation of the best available occurrence information." 89 Fed. Reg. at 32,552, JA__. That "best available occurrence information," consisted of disparate occurrence data from a limited subset of states, rather than the nationally representative data upon which EPA typically relies. Worse, the occurrence information fails to justify EPA's determinations that HFPO-

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

DA, PFNA, or mixtures of two or more Index PFAS have a substantial likelihood of occurring in public water systems with a frequency and at levels of public health concern to warrant national regulation. Those determinations should be vacated.

**A. EPA arbitrarily relied upon limited, piecemeal state-level occurrence information to reach Determinations to Regulate HFPO-DA, PFNA, and mixtures of two or more Index PFAS.**

EPA's findings must "be based on the best available public health information, including the occurrence data base established under [Section 1445(g) of the Act]." 42 U.S.C. § 300g-1(b)(1)(B)(ii)(II); *cf. Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1290 (D.C. Cir. 2000) (finding similar "best available" requirement in the Act "unequivocal[]"). That "occurrence data base" refers to the UCMR program, *see supra* p. 7, which generates a nationally representative dataset of the occurrence of unregulated contaminants in drinking water.

"Nationally representative occurrence data are the primary source of the drinking water occurrence data" for the Act's principal standard-setting provision, ensuring that EPA does not prematurely move forward with **nationally applicable** regulation, when state regulations would be more appropriate to address localized problems. *See* EPA, *Protocol for Regulatory Determination 3* at 20 (2014), EPA-HQ-OW-2022-0114-3613, JA__. The Act created the UCMR program to gather this

41

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

national-level data according to uniform procedures and minimum reporting levels,[11] which produces more comparable data.

Indeed, EPA has previously determined *not* to regulate a contaminant (Acanthamoeba) where there was "no national monitoring data." *See* 68 Fed. Reg. 42,898, 42,903 (July 18, 2003). EPA has also declined to make a Determination (positive or negative) because of "[o]ccurence data gaps (no nationally representative finished water data or sufficient other finished water data)." 85 Fed. Reg. at 14,105, JA__; *accord* 79 Fed. Reg. at 62,725.

Here, there is the notable absence of decision-useful national occurrence data for Index PFAS. While UCMR 3 provided occurrence data for PFHxS, PFNA, and PFBS, the data were gathered using minimum reporting levels disconnected from (and often much higher than) the health reference levels[12] used for this Rule to gauge the effects of exposure to those contaminants. *Compare* 89 Fed. Reg. at 32,544-45, JA__ (health reference levels of 10ng/L for PFHxS and PFNA, and 2000 ng/L for PFBS), *with* 77 Fed. Reg. at 26,099, JA__ (minimum reporting levels of 30 ng/L for

---

[11] A minimum reporting level reflects the minimum quantitation level that a laboratory can consistently achieve. 89 Fed. Reg. at 32,574, JA__.

[12] A health reference level is "the level below which adverse health effects over a lifetime of exposure are not expected to occur, including for sensitive populations and life stages, and allows for an adequate margin of safety." 89 Fed. Reg. at 32,544, JA__.

PFHxS, 20 ng/L for PFNA, and 90 ng/L for PFBS). This necessarily limits the data's utility in evaluating whether these PFAS are occurring at a level of **public health concern**.

EPA has previously asserted that in the absence of "nationally representative occurrence data," "[s]tate-level finished water monitoring data" *may* be sufficient to evaluate the statutory criteria and support determinations to regulate. *See* EPA, *Protocol for Regulatory Determination 3* at 20-21. But while that may sometimes be the case, it was not true here due to the significant limitations in the state data. Specifically, EPA heavily relied upon "non-targeted" occurrence data (i.e., not site-specific, or limited to areas of known or potential contamination) from 19 states. 89 Fed. Reg. at 32,553, JA__. Nineteen states plainly do not present a national cross-section. Worse, the state-level data suffers from several flaws: the selected states used varying reporting levels to gather their data, while for some states, there was even variance *within* the reported data, attributable to the particular laboratory or laboratories analyzing the data. *See* EPA, *Per- and Polyfluoroalkyl Substances (PFAS) Occurrence and Contaminant Background Support Document for the Final PFAS National Primary Drinking Water Regulation* at 134, 168, 200 (2024) [hereinafter *Occurrence Support Document*], EPA-HQ-OW-2022-0114-3086, JA__, __, __.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

For HFPO-DA two states did not have publicly available reporting levels. Other states used extremely wide ranges of reporting levels that extended well beyond EPA's health reference level and the "practical quantitation level," meaning the lowest concentration that can be reliably measured in a laboratory. *See Occurrence Support Document* at 200, 202-03, JA__, __-__; *see* 89 Fed. Reg. at 32,555, JA__ (using occurrence data from those four states). Similar problems abound for the remaining Index PFAS. *See Occurrence Support Document* at 134-39, 168-73, A-10 to A-15, JA__-__, __-__, __-__.

In sum, the patchwork "best available" occurrence data that EPA compiled to assess the "substantial likelihood" criterion suffered from acute data quality problems, and could not form a reasoned basis for EPA's Determinations.

**B.    The available occurrence information did not demonstrate that HFPO-DA, PFNA, or mixtures of two or more Index PFAS have a substantial likelihood of occurring in public water systems with a frequency and at levels of public health concern.**

The "best available" occurrence information upon which EPA relies—again, neither nationally representative nor otherwise reliable—does *not* support the determinations that HFPO-DA, PFNA, or mixtures of two or more Index PFAS, have a substantial likelihood of occurring in public water systems with a frequency and at levels of public health concern.

At the outset, EPA asserts that there is not "a simple threshold of public health concern for all contaminants the agency considers for regulation under [the Act]."

44

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

89 Fed. Reg. at 32,552, JA__. But the statutory language "substantial likelihood" of occurrence, 42 U.S.C. § 300g-1(b)(1)(A)(ii), must provide some threshold standard for EPA to meet, and against which courts can review. *Cf. Bluewater Network*, 370 F.3d at 21 (agency must be able to explain "how it arrived at the specific standards adopted"). "Substantial," means "[c]onsiderable in importance, value, degree, amount, or extent." *Substantial*, The American Heritage College Dictionary 1354 (3d ed. 1993); *accord Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 146 (2017) ("substantial portion" may "refer to an important portion or to a large portion"). This ordinary meaning is supplemented by statutory context, *see Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 708 (D.C. Cir. 2009), which is chiefly aimed at determining whether "**national** primary drinking water regulations" are necessary. *See* 42 U.S.C. § 300g-1(a) (emphasis added). Thus, the likelihood of occurrence must be considerable in nature, and national in scope.

EPA has previously *declined* to regulate contaminants, including those with significant potential public health effects, occurring above their respective health reference levels (or above one half of those levels) in less than 0.1% of water systems.[13] This aligns with EPA protocol, which inquires into how many systems

---

[13] *See* 86 Fed. Reg. at 12,275 (declining to regulate nitrobenzene and RDX; each occurring above its cancer health reference level (or above one-half of the level) in only 0.05% and 0.07%, respectively, of public water systems); 81 Fed. Reg. 13, 16

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

have detections above the applicable health reference level (or above one half of that level). *See* EPA, *Protocol for Regulatory Determination 3* at 26-27, JA__-__. It is also important to ask whether occurrence is truly national, or reflective or regional patterns best addressed through state regulation.

As explained below, the occurrence information EPA relied on did not support Determinations to Regulate HFPO-DA, PFNA, and mixtures of two or more Index PFAS on a national level. *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (vacating action that relied on "unsubstantiated conclusion[s]"); *see also Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (action is arbitrary and capricious if agency "offered an explanation for its decision that runs counter to the evidence before the agency").

### 1.    HFPO-DA

While HFPO-DA was included in UCMR 5, those monitoring efforts are still ongoing and EPA declined to rely on the preliminary results. 89 Fed. Reg. at 32,557, JA__. Instead, EPA principally relied upon state-level occurrence data from 16 states. *Id.* Even assuming that this state-level occurrence data was an adequate substitute for national data, *see supra* Section III.A, the data does not come close to showing occurrence in water systems **with a frequency and at levels of public**

---

(Jan. 4, 2016) (same for terbufos sulfone, found to occur above its health reference level (or above one-half of the level) in only 0.02% of public water systems).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**health concern**: only 10 of the 16 states identified detections of HFPO-DA in their water systems. *Id.* And there were either no or very few detections exceeding the HFPO-DA health reference level identified by EPA (10 ng/L). *Id.* at 32,544, 32,557, JA__, __. Of the 10 states with detections, 7 states reported *no* water system as having a detection above 10 ng/L,[14] while 2 states reported very few—Michigan (3 of 2,508 systems monitored, or 0.12%) and Ohio (1 of 1,479 systems, or 0.07%). *See Occurrence Support Document* at 211-13, JA__-__. Most of the state-level occurrence data therefore does not indicate occurrence with a frequency and at levels of public health concern, relative to the applicable health reference level. In fact, the available data aligns more closely with those instances where EPA has declined to make a positive Determination to Regulate. *See supra* n.13.

For Kentucky, EPA reports that 2 of the 74 systems monitored (or 2.7%) had detections of HFPO-DA above the health reference level of 10 ng/L. *See Occurrence Support Document* at 211, JA__. But 74 systems represent only a fraction of Kentucky's 435 public water systems.[15] More importantly, 10 of the 11 Kentucky water systems with HFPO-DA detections draw water from the Ohio River; those

---

[14] For Alabama, EPA acknowledged that "only detections were reported and there was no information on the total number of samples collected to determine percent detection." 89 Fed. Reg. at 32,553, JA__.

[15] *See* Kentucky Energy and Environment Cabinet, Division of Water, *Drinking Water*, https://tinyurl.com/ykjpxvks (last visited Sept. 21, 2024).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

systems may have been impacted by discharges of HFPO-DA from the Washington Works PFAS manufacturing plant. *See* AWWA Comment at 15-16, JA__-__. Kentucky's Division of Water observed the same geographic concentration of systems. *See* Kentucky Dep't for Env't Prot., *Evaluation of Kentucky Community Drinking Water for Per- and Poly-Fluoroalkyl Substances* at 20 (2019), EPA-HQ-OW-2022-0114-0431, JA__ ("All of the detections [at water treatment plants using surface water] of [HFPO-DA] occurred at [plants] using the Ohio River and Ohio River Alluvium as sources."). EPA's response to this point is bare, citing only "disagree[ment]" with the argument that "the state monitoring results demonstrate this is a local or regional issue only, given the documented drinking water occurrence both for detections at any concentrations and at levels above the [health reference level] in 13 and 5 states, respectively." *Responses to Public Comments* at 3-42, JA__. But the limited state-level data does not demonstrate that the HFPO-DA occurs in drinking water with a frequency and at levels of public health concern at the **national** scale.

###         2.        PFNA

For PFNA, the problems are similar, and the available occurrence data does not support the finding that PFNA is known to occur (or has a substantial likelihood of occurring) in drinking water with a frequency and at levels of public health concern. 42 U.S.C. § 300g-1(b)(1)(A)(ii).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

UCMR 3 indicated that PFNA was detected in approximately 0.28% of water systems across only 7 states at a minimum reporting level of 20 ng/L, or twice the heath reference level of 10 ng/L used in the Rule. *See* 89 Fed. Reg. at 32,544, 32,556, JA__, __. The UCMR 3 data for PFNA thus tells little about the extent to which PFNA occurs with a frequency and **at levels of public health concern**. EPA acknowledged as much by asserting that it "expects there is even greater occurrence and exposed population in the range between 10 and 20 ng/L." *Id.* at 32,556, JA__. But EPA did not present additional nationally representative data to support that claim. The Act calls for the "best **available**" occurrence information. 42 U.S.C. § 300g-1(b)(1)(B)(ii)(II) (emphasis added). Rather than speculating, EPA could have used UCMR 5 information for PFNA (and the other regulated PFAS), which uses a lower reporting level of 4.0 ng/L. *See* 89 Fed. Reg. at 32,600, JA__. Instead, EPA decided to rush to regulate based, in part, on speculation. *See Int'l Union, United Mine Workers v. MSHA*, 626 F.3d 84, 93 (D.C. Cir. 2010) (rejecting a "conclusory statement" that was "unsupported by the rulemaking record"); *Leather Indus. of Am., Inc. v. EPA*, 40 F.3d 392, 403 (D.C. Cir. 1994) (similar).

As with HFPO-DA, EPA relied on limited state-level PFNA occurrence data—the sum of which does not support EPA's conclusion that PFNA warrants *national* regulation. Of the 16 states that EPA reported as having detections of PFNA, 8 states—Colorado (non-targeted data), Illinois, Indiana, Kentucky,

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Maryland, Massachusetts, South Carolina, and Wisconsin—reported **no** water system as having a detection above the health reference level of 10 ng/L. *Occurrence Support Document* at 180-83, JA__-__. Two states reported detections above 10 ng/L in less than 0.1% of systems: Michigan (1 of 2,508 monitored systems, or 0.04%) and Ohio (1 of 1,479 monitored systems, or 0.07%). *Id.* at 182, JA__.[16] Thus, for more than half of the already limited number of states comprising EPA's dataset, PFNA did not occur in water systems with a frequency and at levels of public health concern, relative to the applicable health reference level, and instead more closely aligns with those instances where EPA has declined to make a positive Determination to Regulate. *See supra* note 13. The information also undermines EPA's speculation that PFNA has some materially greater degree of occurrence at levels between 10 and 20 ng/L. *See* 89 Fed. Reg. at 32,556, JA__.

While the remaining states reported a relatively higher number of water systems with detections above 10 ng/L, *Occurrence Support Document* at 181-83, JA__-__, those datapoints actually evince a more regionalized concern in the northeastern United States, where many states have existing PFNA regulations. *See* N.H. Code Admin. R. Env-Dw 705.06(b), ADD-41 (11 ppt); N.J. Admin. Code

---

[16] Alabama had 1 water system with a detection of PFNA above 10 ng/L, *Occurrence Support Document* at 180, JA__, but the utility of Alabama's occurrence data is questionable, *see supra* n.14.

§ 7:10-5.2(a)(5)(i), ADD-44 (13 ppt); Vt. Code R. 12-037-001 n. (f), (g), ADD-81 (20 ppt, for combination of PFNA and other PFAS). Those datapoints should not form the basis for **national** regulation of PFNA.

Moreover, EPA acknowledges that PFNA "has generally been phased out in the U.S.," and that its use would likely only result from "legacy stocks" or imported products. 89 Fed. Reg. at 32,556, JA__. Those findings—in combination with the lack of occurrence data showing occurrence in public water systems with a frequency and at levels of public health concern—cannot support EPA's conclusion that "there is a substantial likelihood that environmental contamination of sources of drinking water will continue." *Id.* at 32,556, JA__.

### 3.    Index PFAS

For its Determination to Regulate mixtures of two or more Index PFAS, the key problem is that EPA relied on mere detections of Index PFAS (i.e., the reported absence or presence), irrespective of their concentrations. But without comparison to concentrations or the PFAS chemicals' health reference levels, mere detection tells very little about whether mixtures of two or more Index PFAS occur in public water systems with a frequency and **at levels of public health concern**, the necessary inquiry under the Act. *See* 42 U.S.C. § 300g-1(b)(1)(A)(ii).

EPA's rationale for regulating mixtures of two or more of Index PFAS is that "all available UCMR 3 and state occurrence data demonstrates that there is

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

substantial likelihood that combinations . . . co-occur or will co-occur at a frequency and level of public health concern." 89 Fed. Reg. at 32,557, JA__. To make that case, EPA goes through a complicated "groupwise and pairwise" statistical analysis of UCMR 3 and state-level detection information (from 18 states) for the Index PFAS. *Id.* at 32,558, 32,589-93, JA__, __-__. An underlying flaw, however, is that EPA used the mere detection (i.e., the reported presence or absence) of an Index PFAS in a water sample, without accounting for its concentration. This is apparent from EPA's supporting documentation, which explains that "the **reported absence or presence of chemicals** were used to conduct categorical analyses," and "continuous approaches relying on **relationships between chemical concentrations were not used**." *Occurrence Support Document* at 236, JA__ (emphases added). EPA thus largely evades the necessary inquiry of whether two or more Index PFAS co-occur in relation to their health reference levels. *See* EPA, *Protocol for Regulatory Determination 3* at 26-27, JA__-__. Instead, EPA treats occurrence at frequencies and levels of public health concern simply as a function of mere presence, which does not align with the statutory criteria. *See* 89 Fed. Reg. at 32,552-53, JA__-__.

EPA supplemented its approach by pointing to state-level occurrence data showing samples exceeding a hazard index value of 1 (unitless), which EPA interprets as "demonstrat[ing] [the] prevalence of [the Index PFAS] at levels of

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

concern." *Id.* at 32,594-96, JA__-__. But as explained above, *supra* Section II.B, the hazard index is ill-suited for regulatory purposes or to predict adverse health effects, as opposed to initial screening to set further evaluation goals. Exceedances of the hazard index therefore do not inform whether a particular mixture of PFAS occurs at a level of public health concern. EPA's justification in this respect does not advance the ball.

## IV. Based on a Fatally Flawed Cost Analysis, the Rule Arbitrarily Regulates at Levels that Impose Significant Additional Costs Without Commensurate Health Benefits and Are Not Feasible.

The Act recognizes that public health risk reductions in drinking water necessarily require consideration of costs and the downstream consequences on water affordability. This is because increased compliance costs for water systems are largely borne by water users, presenting very real health and economic concerns for lower income Americans.

### A. The Rule should be remanded to EPA to cure the serious deficiencies in its cost analysis.

The Act requires "a determination as to whether the benefits of the [Level] justify, or do not justify, the costs." 42 U.S.C. § 300g-1(b)(4)(C). And a Level "shall not be more stringent than is feasible." *Id.* § 300g-1(b)(5)(B)(ii). "[T]he term 'feasible' means feasible with the use of the best technology, treatment techniques and other means which the Administrator finds, after examination for efficacy under field conditions and not solely under laboratory conditions, are available (taking cost

53

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

into consideration)." *Id.* § 300g-1(b)(4)(D). Without a reliable assessment of both the costs and benefits of the Rule, EPA therefore could not appropriately set Levels as required by the Act.

EPA's cost estimates significantly underestimate the quantifiable costs of compliance "likely to occur solely as a result of compliance." 42 U.S.C. § 300g-1(b)(3)(C)(i)(III). AWWA provided EPA with a cost modeling report ("Black & Veatch Study"), which estimated the range of capital and operating costs attributable to PFOA and PFOS Levels and found that the national annualized costs would be $2.45 billion —**significantly** higher than EPA's initial costs estimate of $0.772 billion. *See* AWWA Comment at 24-35. JA__-__. AWWA also compiled more than 100 case studies of **actual** water systems that had detected and treated, or developed costs estimates to treat, PFAS contamination ("Case Study"). *See id.* at App. D, JA__-__. AWWA's comparison showed that EPA's modeling underestimated costs by a factor of 3.17 (based on the Black & Veatch Study) or 330% (based on the Case Study). *See id.* at 26, Table A-5, JA__-__. To the extent EPA considered any real-world data, it relied on older studies that do not account for inflation or the additional costs from simultaneous compliance by thousands of systems. *See Responses to Public Comments* at 3706 (citing Eric Forrester & Christy Bostardi, *PFAS Treatment: GAC vs. IX* (2019)), JA__. As a result, EPA's Health Risk Reduction

and Cost Analysis cannot provide an adequate basis to conclude that the Rule's benefits justify its costs. The Rule must therefore be vacated and remanded.

## B.    The incremental costs of the Rule's Levels are unsupported.

Even under EPA's flawed analysis, it cannot justify the incremental costs of the Rule's Levels. The Act requires EPA's Health Risk Reduction and Cost Analysis to analyze the incremental costs and benefits of each Level considered. *See* 42 U.S.C. § 300g-1(b)(3)(C)(IV). Here, EPA selected the most costly regulatory alternative for PFOA and PFOS (4.0 ppt) after considering Levels of 4.0, 5.0 ppt and 10.0 ppt. 89 Fed. Reg. at 32,634, JA__. By EPA's own estimates (assuming a 2% discount rate), the expected costs of implementation increase 208% when the Levels decrease from 10.0 ppt to 4.0 ppt, with an incremental **negative** benefit of $159.49 million annually. *See* 89 Fed. Reg. at 32,710-12, JA__-__; AWWA Comment at 42-43, JA__-__; *Economic Analysis* at 7-1 to 7-4 (Tables 7-1, 7-2, 7-3, 7-4), JA__-__.

This is because many systems would not be required to construct PFAS treatment facilities to comply with a 10.0 ppt Level, but will need to do so at a 4.0 ppt Level. AWWA Comment at 42, JA__. As Water Associations made clear, regulating PFOA and PFOS at 10.0 ppt would allow EPA to address the systems presenting the highest potential for health risk without incurring the same nationwide costs: EPA estimated that while 10.0 ppt Levels would cost $500 million annually, the annual public health benefits would exceed $665 million annually—a net benefit of $165

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

million annually (33% of the costs). By contrast, the annual costs for PFOA and PFOS Levels at 4.0 ppt were estimated to be $1.54 billion with only $5.7 million annual net benefit. *See* 89 Fed. Reg. at 32,710, 32,712, JA__, __. Regulating at 4.0 ppt thus reduce the annual net benefit by 96.% nationally, as it requires systems with Levels between 4.0 and 10.0 to install treatment facilities at a cost that exceeds potential health benefits, and increases the ongoing costs of treatment. *See* AMWA Comment at 23, JA__. Yet EPA somehow found it reasonable to ratchet up implementation costs (above anything seen before under the Act), even as the expected net benefits significantly decreased.

While the Act allows for the consideration of nonquantifiable benefits, here roughly 20% for 4.0 ppt PFOA/PFOS and more than 75% of the benefits for the Index PFAS would need to come from such nonquantifiable benefits to justify the costs. In addition, the analysis submitted by AWWA demonstrates that there are minimal incremental benefit to including regulation of the Index PFAS, *see* AWWA Comment at 42, JA__, while AMWA's analysis indicates that those same PFAS can drive significant compliance costs for some systems, *see* AMWA Comment at 36-38, JA__-__.

EPA selected the regulatory alternative that imposes the most costs and produces the least net benefits. That is not reasoned decision-making, nor in keeping with EPA past practice, where it has not set Levels below a point where there is

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

marginal benefit. *See, e.g.*, 66 Fed. Reg. 6976 (Jan 22, 2021). It is also counter to congressional intent, as the 1996 amendments sought to avoid precisely the type of regulations here—those that "impos[e] burdens on consumers and the taxpayers of other governments with no rational relationship to the public benefits that might be realized." S. Rep. No. 104-169, at 13. The outcome is particularly problematic because small systems serving less than 10,000 persons will face the most significant costs on a per-household basis. Water Associations' affordability analyses suggest that the costs to implement these treatment facilities will range from hundreds to thousands of dollars annually for individual households, significantly exceeding affordable margins for household expenditures for drinking water. *See* AWWA Comment at 41, 44, JA__, __; AMWA Comment at 32-34, JA__-__.

## CONCLUSION

For the foregoing reasons, the Court should grant the petition for review, vacate the Rule, and remand to EPA.

Date: October 7, 2024

Respectfully submitted,

/s/ *Corinne V. Snow*
Ronald J. Tenpas
Corinne V. Snow
Nathan Campbell
Vinson & Elkins LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Phone:  (202) 639-6622

Fax:  (917) 879-8998
Email: rtenpas@velaw.com
Email: csnow@velaw.com
Email: ncampbell@velaw.com

*Counsel for Petitioners American
Water Works Association and
Association of Metropolitan Water
Agencies*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## CERTIFICATE OF COMPLIANCE

1.      This Opening Brief of Petitioners American Water Works Association and Association of Metropolitan Water Agencies complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and the Court's order of September 3, 2024. It contains 12,906 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

2.      This Opening Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.


Date:  October 7, 2024          */s/ Corinne V. Snow*
                                Corinne V. Snow
                                VINSON & ELKINS LLP
                                2200 Pennsylvania Avenue NW
                                Suite 500 West
                                Washington, DC 20037
                                Phone: 202-639-6622
                                Email: csnow@velaw.com

                                *Counsel for Petitioners American Water*
                                *Works Association and Association of*
                                *Metropolitan Water Agencies*

59

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby

certify that, on October 7, 2024, I electronically filed the foregoing brief with the

Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit

by using the appellate CM/ECF system, and served copies of the foregoing via the

Court's CM/ECF system on all ECF-registered counsel.

Date:  October 7, 2024

*/s/ Corinne V. Snow*
Corinne V. Snow
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Phone: 202-639-6622
Email: csnow@velaw.com

*Counsel for Petitioners American Water
Works Association and Association of
Metropolitan Water Agencies*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

No. 24-1188 (consolidated with Nos. 24-1191, 24-1192)

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN WATER WORKS ASSOCIATION, et al.,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

———————————

On Petition for Review of Final Action by the
United States Environmental Protection Agency —
89 Fed. Reg. 32,532 (April 26, 2024)

———————————

**STANDING ADDENDUM OF PETITIONERS AMERICAN WATER
WORKS ASSOCIATION AND ASSOCIATION OF METROPOLITAN
WATER AGENCIES**

———————————

(Names and addresses of counsel appear inside cover.)

Dated: October 7, 2024

Ronald J. Tenpas
Corinne V. Snow
Nathan Campbell
Vinson & Elkins LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Phone:  (202) 639-6622
Fax:  (917) 879-8998
Email: rtenpas@velaw.com
Email: csnow@velaw.com
Email: ncampbell@velaw.com

*Counsel for Petitioners American Water Works Association and Association of Metropolitan Water Agencies*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**TABLE OF CONTENTS**

Declaration of G. Tracy Mehan, III ................................................................. SA-1

Declaration of Thomas Dobbins ...................................................................... SA-11

Declaration of Verna Arnette .......................................................................... SA-21

Declaration of Randal Braker ......................................................................... SA-29

Declaration of Paul Granger ........................................................................... SA-39

Declaration of Michael Grimm........................................................................ SA-47

Declaration of Liesel Gross ............................................................................ SA-54

Declaration of Jaime Bain Hedges.................................................................. SA-61

Declaration of Lindsey Rechtin ...................................................................... SA-70

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN WATER WORKS
ASSOCIATION and ASSOCIATION OF
METROPOLITAN WATER AGENCIES,

                *Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and MICHAEL
S. REGAN, in his official capacity as
Administrator, United States Environmental
Protection Agency,

                *Respondents.*

No. 24-1188 (lead; consolidated
with Nos. 24-1191, 24-1192)

**DECLARATION OF G. TRACY MEHAN, III**

I, G. Tracy Mehan, III, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this Declaration. All facts stated are within my personal knowledge and are true and correct.

1.      I am the Executive Director of Government Affairs for American Water Works Association ("AWWA") and have served in this role since August 1, 2015.

2.      Among other things, my responsibilities include helping to advance AWWA's organizational goals. Through my work as Executive Director of

1

SA-1

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Government Affairs for AWWA, I have become familiar with how government regulations affect AWWA's public water system members' business operations.

3.    AWWA is an international, nonprofit, scientific and educational society, and membership organization dedicated to providing solutions to ensure the effective management of water. Founded in 1881, AWWA is a 501(c)(3) organization that routinely supports the development of sound water policy for effective public health protection. AWWA is the largest water association in the United States. AWWA's membership includes more than 4,000 public water systems that supply roughly 80 percent of the nation's drinking water and treat almost half of the nation's wastewater. AWWA's 50,000-plus total members represent the full spectrum of the water community: public and private water and wastewater systems, environmental advocates, scientists, academicians, and others who hold a genuine interest in water, our most important resource. AWWA unites the diverse water community to advance public health, safety, the economy, and the environment.

4.    AWWA's membership includes 4,130 public water systems, which must comply with the United States Environmental Protection Agency's ("EPA") regulations promulgated pursuant to the Safe Drinking Water Act ("SDWA").

5.    AWWA was formed to promote public health, safety, and welfare through the improvement of the quality and quantity of water. AWWA routinely

SA-2

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

advocates for water policies at both the legislative and regulatory level. For example, AWWA was directly engaged in supporting the widely acclaimed 1996 amendments to the SDWA, which require EPA to use a risk and cost assessments and the best available, peer-reviewed science when developing regulatory standards, in order to focus attention on the most important health threats to drinking water.

6.     AWWA's government affairs mission is to: (1) advocate for effective laws, regulations, programs, and policies that ensure safe and affordable water for all Americans; (2) support effective measures that protect America's irreplaceable sources of drinking water; and (3) help water utilities function as high-performing and sustainable business enterprises (whether municipal or investor-owned) so they can provide excellent service to their customers, today and over the long run.

7.     I am familiar with the general history of EPA's consideration and development of drinking water regulations for certain perfluoroalkyl substances ("PFAS") under the SDWA, including EPA's March 29, 2023, proposal to establish national primary drinking water regulations for certain PFAS, as well as EPA's final regulations, published in the *Federal Register* on April 26, 2024, at 89 Fed. Reg. 32,532 and under the title "PFAS National Primary Drinking Water Regulation" ("PFAS Rule").

8.     The PFAS Rule, as I understand it, established maximum contaminant level goals ("MCLGs") and legally enforceable maximum contaminant levels

SA-3

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

("MCLs") for 6 PFAS chemicals: perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid ("HFPO-DA"), and perfluorobutane sulfonic acid ("PFBS"). For each of PFOA and PFOS, EPA established MCLGs of zero and MCLs of 4.0 parts per trillion ("ppt"). For each of PFHxS, PFNA, and HFPO-DA, EPA established individual MCLGs and MCLs of 10 ppt. And for mixtures of two or more of PFHxS, PFNA, HFPO-DA, and PFBS, EPA established an MCLG and MCL according to what EPA refers to as a "hazard index" value of 1, a unitless number.

9.      Moreover, the PFAS Rule, as I understand it, requires public water systems to monitor for the PFAS subject to the PFAS Rule, including specifically completing initial monitoring within 3 years of the rule's promulgation—by April 26, 2027—and followed by ongoing compliance monitoring.

10.     On May 30, 2023, AWWA submitted a comment to EPA regarding the proposed PFAS Rule. AWWA, following an extensive review of EPA's legal and policy justifications, health risk reduction and cost analysis, and associated materials, wrote to voice certain concerns, objections, and recommendations regarding EPA's proposed PFAS Rule. *See* Comments of AWWA on EPA's Proposed PFAS Rule (May 30, 2023), *available at* https://www.regulations.gov/comment/EPA-HQ-OW-2022-0114-1759.

SA-4

11.　　In the comment, AWWA voiced concern and objection with, among other things, EPA's decisions to issue preliminary determinations to regulate PFNA, HFPO-DA, and PFBS, and mixtures of two or more of PFNA, HFPO-DA, PFBS, and PFHxS; EPA's decision to propose regulation for a contaminant before reaching a final affirmative determination to regulate that same contaminant; and EPA's use of a "hazard index" as an MCL. AWWA also recommended that EPA withdraw and re-propose its drinking water standards for PFOA and PFOS, in light of concerns of flaws in EPA's health risk reduction and cost analysis, or, in the alternative, finalize standards for each of PFOA and PFOS at 10.0 ppt. In support of its comment, AWWA provided a cost modeling report by Black & Veatch; a compilation of case studies of water systems that had detected and treated, or developed cost estimates to treat, PFAS contamination; and an analysis of EPA's toxicology analyses by Ramboll.

12.　　AWWA's membership includes 4,130 public water systems, all of which are subject to EPA's PFAS Rule. In the preamble of the PFAS Rule, EPA noted that costs to water systems under the PFAS Rule would include capital and operational costs, monitoring costs, and administrative costs. A few specifics related to those costs, as I understand them, are summarized below.

13.　　EPA estimated that with respect to community water systems (i.e., those public water systems that have at least 15 service connections that serve year-

　　　　　　　　SA-5

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

round residents, or that regularly serve at least 25 year-round residents), a system would be expected, depending upon its ownership, size, and type of source water (ground or surface), to incur between $1,267 and about $2.1 million on a mean annualized basis as a result of the PFAS Rule. Moreover, if a community water system needs to treat or change a water source to maintain compliance with the PFAS Rule, EPA estimated that the cost range could increase to $18,234 to over $4 million. EPA also estimated that depending on the number of persons served, a water system needing to pursue treatment to comply with the PFAS Rule would need to spend between 3 and 42 hours to notify, consult, and submit a permit request for treatment installation.

14.    As I understand the matter, EPA's annualized cost estimates included (among other quantifiable inputs) sampling and monitoring costs, such as the labor hours and laboratory costs necessary to collect and analyze water samples. I also understand EPA's annualized cost estimates to have included, as necessary, treatment costs, such as engineering, installing, operating, and maintaining PFAS removal treatment technologies, and/or nontreatment actions, such as changing water sources.

15.    Some but not all of these costs are directly related to the level at which EPA set the MCLs for the regulated PFAS, with a lower MCL resulting in higher compliance costs. For instance, per EPA's estimates, the mean annualized costs for

SA-6

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

a community water system would have materially decreased if the MCLs for PFOA and PFOS were increased from 4.0 ppt to 5.0 ppt, and significantly so if the MCLs increased from 4.0 ppt to 10.0 ppt.

16.     As a result of the PFAS Rule, water systems will also incur sampling and monitoring costs for each regulated PFAS, regardless of the level that EPA selected for the applicable MCL and regardless of whether the PFAS chemical is detected at any particular level in a system's source waters.

17.     To satisfy initial monitoring requirements, the PFAS Rule, generally speaking, requires water systems serving 10,000 or fewer persons to collect 2 (semiannual) samples at each entry point during a consecutive 12-month period, with the samples collected 5 to 7 months apart. Water systems serving more than 10,000 persons will need to collect 4 (quarterly) samples at each entry point during a consecutive 12-month period, with the samples collected 2 to 4 months apart. The initial monitoring requirements must be completed within 3 years of the PFAS Rule's promulgation (i.e., by April 26, 2027). The PFAS Rule also requires ongoing compliance monitoring, after the completion of initial monitoring. Detection of any of the regulated PFAS above the applicable MCL will trigger more frequent monitoring requirements. Even if none of the regulated PFAS are detected above the applicable MCL, a water system would still be required to continue to monitor for the regulated PFAS triennially, and therefore incur additional costs.

SA-7

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

18.     With regard to sampling costs, EPA estimated that a public water system would need to spend at least 1 hour per sample to account for travel, collection, recordation of information, submission to a laboratory, and review of the results. EPA also estimated that for laboratory analysis, public water systems will incur between $273 and $309 per sample.

19.     Administrative costs to public water systems include one-time costs to understand and comply with the PFAS Rule and to provide training. In the PFAS Rule, EPA estimated that water systems would require at least 4 hours to read the rule and between 16 and 32 hours to attend trainings by primary agencies, depending on the number of persons that a system serves.

20.     In addition to EPA's cost analysis, AWWA performed an independent review and found that EPA likely underestimated the implementation and compliance costs associated with the PFAS Rule, indicating that costs that AWWA's public water system members will likely incur are greater than what EPA has asserted in the PFAS Rule and supporting documentation.

21.     AWWA's members—including the Duck River Utility Commission, Fairfax County Water Authority, Hicksville Water District, West Slope Water District, Lehigh Water Authority, and the Northern Kentucky Water District, all of which have submitted declarations—will not incur some or all of the above-described costs if EPA's PFAS Rule is vacated, in whole or in part.

8                                    SA-8

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

22.     I am familiar with the petition for review filed by AWWA and the Association of Metropolitan Water Agencies, No. 24-1188 (D.C. Cir. June 7, 2024), seeking to review and set aside EPA's PFAS Rule. Because the PFAS Rule, if allowed to stand, will impose capital, treatment, operational, and administrative costs to AWWA's public water system members and result in regulation that is not cost-effective for public water systems and America's water users, the petition for review is germane to AWWA's purpose.

23.     As noted in AWWA's comments, EPA did not follow the proper procedures for promulgating the PFAS Rule, including by failing to provide AWWA and its members with a stand-alone opportunity to comment on the preliminary determinations to regulate PFNA, HFPO-DA, PFBS, and PFHxS. EPA also relied on incomplete or problematic data and a faulty cost analysis. Ensuring that EPA follows the proper legal standards and that regulatory decisions are based on the best available science and data is an important part of AWWA's purpose; the petition for review is therefore germane to AWWA's purpose.

* * *

9                                                                              SA-9

24.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:   September 30, 2024          Respectfully submitted,

_____
G. Tracy Mehan III

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN WATER WORKS
ASSOCIATION and ASSOCIATION OF
METROPOLITAN WATER AGENCIES,

> *Petitioners,*

*v.*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and MICHAEL
S. REGAN, in his official capacity as
Administrator, United States Environmental
Protection Agency,

> *Respondents.*

No. 24-1188 (lead; consolidated
with Nos. 24-1191, 24-1192)

**<u>DECLARATION OF THOMAS DOBBINS</u>**

I, Thomas Dobbins, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this Declaration. All facts stated are within my personal knowledge and are true and correct.

1.    I am the Chief Executive Officer for the Association of Metropolitan Water Agencies ("AMWA") and have served in this role since June 15, 2022.

2.    My responsibilities include, among other things, helping to advance AMWA's organizational purposes. Through my work as Chief Executive Officer for

1

SA-11

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

AMWA, I have become familiar with how government regulations, including those promulgated by the U.S. Environmental Protection Agency ("EPA") pursuant to the Safe Drinking Water Act ("SDWA"), affect the business operations of AMWA's public water system members.

3.    Founded in 1981, AMWA is a non-profit trade association representing approximately 180 of the largest publicly owned drinking water systems in the United States. AMWA's members include municipal agencies, special purpose districts, and commissions serving customers on either a local or regional basis. Some members are wholesalers providing water to other utilities, some directly serve end-use customers, and some do both. AMWA's members provide safe drinking water to more than 160 million people across the country. AMWA's members are responsible for constructing and operating water treatment systems to ensure compliance with applicable regulations.

4.    AMWA is the only policy-making organization solely for metropolitan drinking water suppliers. Accordingly, AMWA routinely advocates for federal laws and regulations that are based on sound science and are cost-effective, protect the public health, and support the safety and security of drinking water. AMWA also provides programs, publications, and service to help water suppliers be more effective, efficient, and successful in their provision of drinking water.

SA-12

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

5.     I am generally familiar with the history of EPA's consideration, development, and promulgation of drinking water regulations for certain perfluoroalkyl substances ("PFAS") under the SDWA. More specifically, I am familiar with EPA's March 29, 2023, proposal to establish national primary drinking water regulations for certain PFAS, as well as EPA's April 26, 2024, final regulations published in the *Federal Register* at 89 Fed. Reg. 32,532, under the title "PFAS National Primary Drinking Water Regulation" ("PFAS Rule").

6.     As I understand the PFAS Rule, EPA has established maximum contaminant level goals ("MCLGs") and enforceable maximum contaminant levels ("MCLs") for 6 PFAS chemicals—perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid ("HFPO-DA"), and perfluorobutane sulfonic acid ("PFBS"). For each of PFOA and PFOS, EPA established MCLGs of zero and MCLs of 4.0 parts per trillion ("ppt"). For each of PFHxS, PFNA, and HFPO-DA, EPA issued determinations to regulate and promulgated individual MCLGs and MCLs of 10 ppt. Finally, for mixtures of two or more of PFHxS, PFNA, HFPO-DA, and PFBS, EPA issued a determination to regulate such mixtures and promulgated an MCLG and MCL according to what EPA refers to as a "hazard index" value of 1, a unitless number.

SA-13

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

7.    The PFAS Rule, moreover, requires public water systems to monitor for those PFAS subject to the PFAS Rule. As I understand it, the PFAS Rule requires regulated water systems to complete initial monitoring requirements within 3 years of the PFAS Rule's promulgation—by April 26, 2027. The initial monitoring will be followed by ongoing compliance monitoring requirements.

8.    On May 30, 2023, AMWA submitted a comment to EPA regarding the proposed version of the PFAS Rule. In preparation of that comment, AMWA reviewed EPA's legal and policy justifications, health risk reduction and cost analysis, and associated materials. The comment voiced targeted concerns, objections, and recommendations regarding EPA's proposed PFAS Rule. *See* Comments of AMWA on EPA's Proposed PFAS Rule (May 30, 2023), *available at* https://www.regulations.gov/comment/EPA-HQ-OW-2022-0114-1738.

9.    In its comment, AMWA raised concerns and objections regarding, among other things, the cost-effectiveness and feasibility of EPA's proposed MCLs for the regulated PFAS; the extent to which EPA's preliminary determinations to regulate PFNA, HFPO-DA, PFBS, and PFHxS—and mixtures of two or more of those PFAS—were supported by the available science and occurrence data; EPA's interpretation of the SDWA to allow it to propose a regulation for a contaminant before reaching a final affirmative determination to regulate that same contaminant; and EPA's use of a "hazard index" as an MCL. AMWA also raised specific concerns

SA-14

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

with EPA's cost analyses and feasibility determinations, such as the risk of insufficient laboratory capacity, sharp increases in treatment costs associated with a 4-ppt MCL for PFOA and PFOS and the "hazard index" MCL, and negative impacts on water affordability and smaller water systems. AMWA also echoed the cost-related concerns raised by American Water Works Association ("AWWA"), including reference to the cost modeling conducted by Black & Veatch.

10. AMWA's membership includes approximately 180 of the largest publicly owned drinking water systems in the United States, all of which are subject to the PFAS Rule. EPA noted that as a result of the PFAS Rule, public water systems would be expected to incur additional administrative costs, monitoring costs, and, in some instances, capital and operational costs. Specifics related to some of those costs, as I understand them, are summarized below.

11. Administrative costs to public water systems attributable to the PFAS Rule include one-time costs to understand and comply with the rule's requirements and to provide training. In the PFAS Rule, EPA estimated that water systems would require at least 4 hours to read the rule and between 16 and 32 hours to attend trainings by primary agencies, depending on the number of persons that a system serves.

12. I also understand the PFAS Rule to require water systems to incur sampling and monitoring costs for each of the regulated PFAS, regardless of the

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

level that EPA selected for the applicable MCL and regardless of whether the particular PFAS is actually detected in a system's source waters. To satisfy initial monitoring requirements, the PFAS Rule, generally speaking, requires water systems serving 10,000 or fewer persons to collect 2 (semiannual) samples at each entry point during a consecutive 12-month period, with the samples collected 5 to 7 months apart. Water systems serving more than 10,000 persons will need to collect 4 (quarterly) samples at each entry point during a consecutive 12-month period, with the samples collected 2 to 4 months apart. Water systems will need to complete initial monitoring within 3 years of the PFAS Rule's promulgation (i.e., by April 26, 2027). The PFAS Rule will also require water system to undertake ongoing compliance monitoring. Detection of any of the regulated PFAS above the applicable MCL will trigger more frequent monitoring. Even if none of the regulated PFAS are detected above the applicable MCL, a water system would still be required to continue to monitor for the regulated PFAS triennially, thus incurring additional costs even if no PFAS are detected above the applicable MCL.

13.    I understand that EPA estimated that a public water system would need to spend at least 1 hour per sample to account for travel, collection, recordation of information, submission to a laboratory, and review of the results. EPA estimated that water systems would incur between $273 and $309 per sample for laboratory costs.

6    SA-16

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

14.    I also understand that EPA provided estimates of the expected mean annualized costs for community water systems—public water systems that have at least 15 service connections that serve year-round residents, or that regularly serve at least 25 year-round residents—as a result of the PFAS Rule. Depending upon its size and type of source water (ground or surface), EPA expects a larger publicly owned community water system (i.e., one serving more than 10,000 persons) to incur between around $148,000 and about $1.5 million on a mean annualized basis as a result of the PFAS Rule. If a larger community water system needs to treat or change its water source(s) in order to maintain compliance with the PFAS Rule, EPA estimated that the cost range could increase to about $577,000 to almost $4 million. EPA also estimated that a water system needing to pursue treatment to comply with the PFAS Rule would likely need to spend between 3 and 42 hours to notify, consult, and submit a permit request for treatment installation, depending on the number of persons served by that system.

15.    I understand EPA's annualized cost estimates, referenced above, to have included (among other quantifiable cost inputs) sampling and monitoring costs, such as the labor hours and laboratory costs necessary to collect and analyze water samples. Additionally, I understand EPA's annualized cost estimates to have included, as necessary, treatment costs, such as the engineering, installation,

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

operation, and maintenance costs associated with PFAS removal treatment technologies or nontreatment actions.

16.    Importantly, some, but not all, of the costs attributable to the PFAS Rule are directly tied to the MCLs that EPA selected for the regulated PFAS. EPA's mean annualized costs estimates, and the overall costs figures provided in the preamble of the PFAS Rule, indicated that a lower MCL results in higher compliance costs. For example, and based on EPA's cost estimates, the mean annualized costs for a larger community water system would have materially decreased if the MCLs for PFOA and PFOS were increased from 4.0 ppt to 5.0 ppt, and even more so if the MCLs increased from 4.0 ppt to 10.0 ppt.

17.    In addition to EPA's cost analysis, I understand that AWWA performed an independent review and found that EPA likely underestimated the implementation and compliance costs associated with the PFAS Rule. This indicates that the costs of the PFAS Rule on AMWA's water system members will likely be greater than what EPA estimated in the PFAS Rule and supporting documentation.

18.    AMWA's members—including the Fairfax County Water Authority, Northern Kentucky Water District, and Beaufort-Jasper Water and Sewer Authority, each of which have submitted declarations—will not incur some or all of the above-described costs if EPA's PFAS Rule is vacated, in whole or in part.

SA-18

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

19.    I am familiar with the petition for review filed by AMWA and AWWA, No. 24-1188 (D.C. Cir. June 7, 2024), seeking to review and set aside EPA's PFAS Rule. The PFAS Rule, if allowed to stand, will impose capital, treatment, operational, and administrative costs to AMWA's public water system members and result in regulation that is not cost-effective for public water systems and their ratepayers. The petition for review is thus germane to AMWA's purpose.

20.    EPA did not follow the proper procedures for promulgating the PFAS Rule, including by failing to provide AMWA and its members with a stand-alone opportunity to comment on the preliminary determinations to regulate PFNA, HFPO-DA, PFBS, and PFHxS. EPA also relied on incomplete or problematic data and a faulty cost analysis. Ensuring that EPA follows the proper legal standards and that regulatory decisions are based on the best available science and data is an important part of AMWA's purpose; the petition for review is therefore germane to AMWA's purposes.

* * *

SA-19

21.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that

the foregoing is true and correct.


Dated:  <u>October 1, 2024</u>                    Respectfully submitted,

                                                        _____
                                                        Thomas Dobbins

SA-20

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN WATER WORKS
ASSOCIATION and ASSOCIATION
OF METROPOLITAN WATER
AGENCIES,

                           *Petitioners*,

v.

                  No. 24-1188 (lead; consolidated with No. 24-1191, 24-1192)

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY, and MICHAEL S. REGAN,
in his official capacity as
Administrator, United States
Environmental Protection Agency,

                         *Respondents*.

**DECLARATION OF VERNA ARNETTE ON BEHALF OF BEAUFORT-
JASPER WATER AND SEWER AUTHORITY**

I, Verna Arnette, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this Declaration. All facts stated are within my personal knowledge and are true and correct.

1.     I am currently the General Manager of the Beaufort-Jasper Water and Sewer Authority ("BJWSA"). I have served in this role since 2023. I have worked

1

SA-21

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

in the public water industry for over 22 years, having started my career at the Greater Cincinnati Water Works in 2001. BJWSA is a public water system that provides drinking water service to residents and businesses in Beaufort and Jasper Counties, South Carolina. In all, BJWSA serves approximately 173,000 residents.

2.      BJWSA is a Corporate Member of the Association of Metropolitan Water Agencies ("AMWA") and BJWSA supports my individual Membership with the American Water Works Association ("AWWA").

3.      This declaration is provided on behalf of BJWSA in its capacity as a Corporate Member of AMWA and on behalf of my individual membership in AWWA.

4.      Among many other things, BJWSA's responsibilities include overseeing the operation and management of two water treatment facilities with a combined capacity of 39 million gallons of water per day, the design and construction of capital improvements to the water system, and the finances for the water system. BJWSA's responsibilities also include ensuring compliance with the federal Safe Drinking Water Act ("SDWA"). Accordingly, we follow regulatory proposals and final regulations bearing on BJWSA's compliance obligations, such as new national primary drinking water regulations promulgated by the U.S. Environmental Protection Agency ("EPA").

SA-22

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

5.    BJWSA is familiar with the general history of EPA's development of the drinking water regulation for certain perfluoroalkyl substances ("PFAS") under the SDWA, including EPA's March 29, 2023, proposal to establish the national primary drinking water regulation ("NPDWR") for PFAS and EPA's April 26, 2024, final regulation under the SDWA, as published in the *Federal Register*, at 89 Fed. Reg. 32532 under the title "PFAS National Primary Drinking Water Regulation" ("Final PFAS NPDWR").

6.    As we understand the Final PFAS NPDWR, the EPA has established legally enforceable maximum contaminant levels ("MCLs") for six (6) PFAS: perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid ("HFPO-DA"), and perfluorobutane sulfonic acid ("PFBS"). For each of PFOA and PFOS, EPA established individual MCLs at 4.0 parts per trillion ("ppt"). For each of PFHxS, PFNA, and HFPO-DA, EPA established individual MCLs at 10 ppt. And for mixtures of two or more of PFHxS, PFNA, HFPO-DA, and PFBS, EPA established an MCL according to what EPA refers to as a "hazard index" of 1, a unitless number. We further understand the Final PFAS NPDWR to require public water systems to comply with the MCLs within five (5) years of the rule's promulgation—by April 26, 2029.

SA-23

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

7.    As we understand it, the Final PFAS NPDWR requires public water systems to actively monitor for the PFAS subject to the Final PFAS NPDWR, including specifically completing initial monitoring within three (3) years of the rule's promulgation—by April 26, 2027—followed by ongoing compliance monitoring.

8.    As a public water system, BJWSA is subject to EPA's Final PFAS NPDWR, and will be subject to any future regulation of PFAS that EPA promulgates under Section 1412 of the SDWA. Accordingly, BJWSA has a concrete interest in ensuring that its regulatory obligations are fair, effective, cost-efficient, and based on the best available science, as well as a concrete interest in ensuring that EPA adheres to the statutory requirements of the Safe Drinking Water Act.

9.    BJWSA has already incurred and anticipates incurring substantial costs with monitoring, legal advice, engineering assistance, public education, and other costs in relation to complying with the Final PFAS NPDWR promulgated under Section 1412 of the SDWA. BJWSA has also expended personnel time, and anticipates expending additional personnel time, to review and assess the new regulatory requirements of the Final PFAS NPDWR.

10.    BJWSA has incurred costs to conduct preliminary engineering evaluations of treatment alternatives for PFAS barrier technology at our water plants. BJWSA has incurred these costs because PFAS has been detected in our source

SA-24

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

water at levels exceeding EPA's MCLs for PFOA and PFOS and given the five-year compliance deadline in the rule, we needed to move immediately to evaluate alternatives, better define the potential capital and operating costs for PFAS treatment, and design and construct selected improvements in order to have any chance of meeting the compliance date for the Final PFAS NPDWR.

11.    BJWSA has been and will need to continue to devote resources to reviewing the Final PFAS NPDWR and associated guidance to determine what actions must be taken to comply, including initial monitoring to determine my utility's ongoing compliance monitoring schedule (*see* § 141.902(b) of the Final PFAS NPDWR), reporting initial monitoring results (*see* § 141.904(a)), conducting ongoing compliance monitoring (*see* § 141.902(a)(7)(v)) and reporting compliance monitoring observations (*see* § 141.902(b)).

12.    Based upon our preliminary engineering evaluations, we estimate that PFAS barrier technology could cost BJWSA upwards of $100 million in capital cost and several million dollars annually thereafter in operation and maintenance costs.

13.    Some, but not all, of these costs are directly related to the level at which EPA sets the MCL for a substance, with a lower MCL resulting in more facilities nationwide that must install and operate PFAS removal technology. Also, the lower the MCL, the higher the cost due to the increased cost of operation.

SA-25

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

14. Regulated systems like BJWSA will also incur sampling and monitoring costs for each regulated substance, regardless of the level that EPA selected for the MCL and regardless of whether the substance is present at any particular level in our system.

15. For example, BJWSA will incur additional sampling and monitoring costs related to each of the six (6) PFAS included in the Final PFAS NPDWR. The Final PFAS NPDWR requires systems like BJWSA to monitor for all six (6) PFAS. The Final PFAS NPDWR includes both initial monitoring by all affected systems to determine compliance with the MCL, as well as long-term monitoring. To satisfy initial monitoring requirements, BJWSA will have to collect four consecutive samples at each point of entry 2 to 4 months apart within a 12-month period (quarterly samples) for each regulated PFAS. We will have to conduct this sampling on fourteen points of entry. Our samples must be processed at a laboratory that has been certified by EPA or the State of South Carolina, and BJWSA will incur costs from the laboratory's services each time that it must submit a sample. Detection of any of the six (6) regulated PFAS above the MCL will trigger more frequent monitoring requirements. Even if none of the regulated PFAS are detected above the MCL trigger level, BJWSA will still be required to continue to monitor for all six (6) regulated PFAS triennially, and therefore incur additional costs.

SA-26

16.     On top of these prescribed monitoring events, BJWSA will actually have to perform extensive additional monitoring to better inform its selection of PFAS barrier technology for its water system.

17.     BJWSA would not incur some or all of the above-described costs if the Final PFAS NPDWR was not in effect.

18.     This rulemaking will impact the current management of BJWSA's raw water supplies and have implications for future water supply development and treatment options available to our utility.

* * *

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

7

SA-27

19.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September ___11___, 2024

*Rachael Ferrara*

RACHAEL FERRARA
Notary Public - State of South Carolina
My Commission Expires
August 07, 2033

Respectfully submitted,

/s/ *Verna Arnette*

Beaufort-Jasper Water and Sewer
Authority
Verna Arnette
General Manager

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

SA-28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN WATER WORKS
ASSOCIATION and ASSOCIATION OF
METROPOLITAN WATER AGENCIES,

                *Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and MICHAEL
S. REGAN, in his official capacity as
Administrator, United States Environmental
Protection Agency,

                *Respondents.*

No. 24-1188 (lead; consolidated
with Nos. 24-1191, 24-1192)

---

## DECLARATION OF RANDAL BRAKER

I, Randal Braker, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this Declaration. All facts stated are within my personal knowledge and are true and correct.

1. I am currently the General Manager of the Duck River Utility Commission, located in Tullahoma, Tennessee. I have served as General Manager since 1988. I am also a licensed professional engineer.

1

SA-29

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

2.      The Duck River Utility Commission, established in 1976, produces and supplies finished water to its wholesale water customers, who are public water systems in the cities of Tullahoma and Manchester, Tennessee, and surrounding communities. Those wholesale customers, in turn, serve approximately 70,000 residents. The water that the Duck River Utility Commission supplies to its wholesale customers is drawn from the Tennessee Valley Authority's Normandy Reservoir, which is located off the Duck River.

3.      The Duck River Utility Commission maintains quality control over the water its produces and supplies to its wholesale customers. To that end, the Duck River Utility Commission operates water treatment and pumping facilities on the Normandy Reservoir, treats the water it supplies to its wholesale customers, and conducts laboratory testing. The Duck River Utility Commission also helps local well owners and small utilities through free or low-cost water testing services and free technical assistance on water treatment questions or problems, as well as conducts water resources education and environmental awareness programs.

4.      The Duck River Utility Commission is a member of the American Water Works Association.

5.      In my role as General Manager, I am responsible for overseeing the Duck River Utility Commission's water production and treatment operations, including facility improvements, process control, and operations and maintenance.

SA-30

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

This responsibility necessarily includes ensuring continued compliance with the federal Safe Drinking Water Act ("SDWA"), and I follow regulatory proposals and final regulations bearing on the Duck River Utility Commission's compliance obligations under the SDWA, such as new national primary drinking water regulations promulgated by the U.S. Environmental Protection Agency ("EPA"). I also provide feedback to EPA and state and local regulators, including through the American Water Works Association, to ensure the Duck River Utility Commission's concerns are voiced and its interests protected.

6.      I am aware of and familiar with EPA's efforts to develop drinking water regulations for certain perfluoroalkyl substances ("PFAS") under the SDWA. I am also familiar with both EPA's proposed national primary drinking water regulation for PFAS, 88 Fed. Reg. 18,638 (March 29, 2023), and final national primary drinking water regulation for PFAS ("Final PFAS NPDWR"), 89 Fed. Reg. 32,532 (April 26, 2024).

7.      As I understand it, the Final PFAS NPDWR establishes legally enforceable maximum contaminant levels ("MCLs") for six (6) PFAS—specifically, perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid ("HFPO-DA"), and perfluorobutane sulfonic acid ("PFBS")—either as individual contaminants or as mixtures containing two or

SA-31

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

more of PFHxS, PFNA, HFPO-DA, and PFBS, based on what EPA refers to as a "hazard index." I also understand the Final PFAS NPDWR to have finalized maximum contaminant level goals ("MCLGs") for those same six (6) PFAS. And I further understand the Final PFAS NPDWR to require public water systems to comply with the MCLs by April 26, 2029—or five (5) years from the rule's promulgation.

8.    I also understand the Final PFAS NPDWR to require public water systems to monitor actively for the PFAS subject to the Final PFAS NPDWR, including specifically completing initial monitoring by April 26, 2027—or within three (3) years of the rule's promulgation—followed by ongoing compliance monitoring.

9.    As a public water system under EPA's SDWA implementing regulations, the Duck River Utility Commission is subject to EPA's Final PFAS NPDWR, as well as any future regulation of PFAS that EPA promulgates pursuant to Section 1412 of the SDWA. And as a regulated entity under the SDWA, the Duck River Utility Commission has a concrete interest in ensuring that regulatory obligations imposed on it are fair, effective, cost-efficient, and based on the best available science, as well as concrete interest in EPA adhering the requirements of the SDWA.

SA-32

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

10.    The Duck River Utility Commission expects to incur significant costs to comply with the Final PFAS NPDWR, including costs associated with monitoring and testing, public education, and (as necessary, based on the results of initial and subsequent monitoring requirements) new treatment facilities or processes or changes in water sources.

11.    Duck River Utility Commission performs the monitoring required under EPA's SDWA regulations for the water that it sells to our municipality customers and will be responsible for performing the monitoring required under the Final PFAS NPDWR.

12.    The Duck River Utility Commission has already incurred approximately $565,000 in 2024 to maintain and improve its granular activated carbon ("GAC") treatment processes. Such expenditures, however, have been aimed at determining the effectiveness of treating its water to meet the anticipated new regulation with GAC. While dependent upon the results of initial and periodic monitoring, the Duck River Utility Commission would expect to incur additional costs (on the magnitude of hundreds of thousands of dollars) in order to meet the Final PFAS NPDWR's lower than expected MCLs of 4 ppt for PFOA and PFOS, and potentially to meet the unitless, "hazard index" MCL for mixtures of two or more of PFHxS, PFNA, HFPO-DA, and PFBS. These additional costs could include

SA-33

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

additional GAC treatment processes, more frequent replacements of GAC filters, and upgrades to the Commission's existing water treatment facilities.

13.     Due to the planning and lead time needed to address certain capital and operational expenditures, the Duck River Utility Commission will need to begin incurring costs well before the Final PFAS NPDWR's compliance deadlines go into effect. In fact, the Duck River Utility Commission is already incurring costs to comply with the Final PFAS NPDWR through personnel time spent reviewing the new regulatory requirements and determining necessary steps to ensure compliance. The Duck River Utility Commission has also engaged engineering consultants to evaluate and design treatment modifications and upgrades. Preliminary engineering estimates to comply with the newly promulgated regulation project additional capital expenditures of at least $1 million as well as an annual operating costs of more than $500,000.

14.     As I understand it, EPA has estimated that the mean annualized cost of complying with the Final PFAS NPDWR that a public water system most comparable to the Duck River Utility Commission, based on total population served by the water we treat and sell wholesale, would incur is approximately $320,000. This mean annualized cost increases to almost $1.1 million if the Duck River Utility Commission finds it necessary to treat or change its water sources in order to comply with the Final PFAS NPDWR's MCLs or other provisions. And as I understand it,

SA-34

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA's annualized cost estimates include, among other quantifiable cost inputs, sampling and monitoring costs, such as the labor hours necessary to collect and analyze drinking water samples and the associated laboratory analysis costs. I also understand EPA's annualized cost estimates to include treatment costs, such as engineering, installing, operating, and maintaining PFAS removal treatment technologies, and/or nontreatment actions associated with changing water sources.

15.     While EPA's cost estimates may not perfectly align with and could underestimate the Duck River Utility Commission's actual incurred costs—and the relative recency of the Final PFAS NPDWR's promulgation means that the Commission's cost and compliance evaluations are still ongoing—the Duck River Utility Commission would reasonably expect to incur costs similar in type to those that EPA identifies and quantifies.

16.     Some, but not all, of EPA's estimated costs are directly related to the level at which EPA sets the MCL for a substance, with a lower MCL resulting in higher compliance costs. For example, EPA estimates that a public water system comparable to the Duck River Utility Commission would incur a mean annualized cost of compliance of approximately $319,000 if the PFOA and PFOS MCLs are set at 4.0 ppt, whereas the mean annualized cost of compliance that a public water system most comparable to the Duck River Utility Commission would incur is

SA-35

estimated by EPA to be about \$237,500 if the PFOA and PFOS MCLs are set at 5.0 ppt, and about \$79,500 if the PFOA and PFOS MCLs are set at 10.0 ppt.

17.    Regulated systems like the Duck River Utility Commission will also incur sampling and monitoring costs for each regulated substance, regardless of the level that EPA selected for the MCL and regardless of whether the substance is present at any particular level in our system.

18.    For example, the Duck River Utility Commission will incur additional sampling and monitoring costs related to each of the six (6) PFAS included in the Final PFAS NPDWR. The Final PFAS NPDWR requires systems like the Duck River Utility Commission to monitor for all six (6) PFAS. The Final PFAS NPDWR includes both initial monitoring by all affected systems to determine compliance with the MCL, as well as long-term monitoring. To satisfy initial monitoring requirements, the Duck River Utility Commission will have to collect four consecutive samples 2 to 4 months apart within a 12-month period (quarterly samples) for each regulated PFAS. Our samples must be processed at a laboratory that has been certified by EPA or the State of Tennessee, and the Duck River Utility Commission will incur costs from the laboratory's services each time that it must submit a sample. Detection of any of the six (6) regulated PFAS above the MCL will trigger more frequent monitoring requirements. Even if none of the regulated PFAS are detected above the MCL trigger level, the Duck River Utility Commission will

SA-36

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

still be required to continue to monitor for all six (6) regulated PFAS triennially, and therefore incur additional costs.

19.     The Duck River Utility Commission would not incur at least some of the above-described costs if EPA's Final PFAS NPDWR is found unlawful, in whole or in part, and set aside.

* * *

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

9                                                                SA-37

20.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 6/06/2024

Respectfully submitted,

/s/ _Randal J. Braker_

Randal J. Braker

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN WATER WORKS ASSOCIATION and ASSOCIATION OF METROPOLITAN WATER AGENCIES,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL S. REGAN, in his official capacity as Administrator, United States Environmental Protection Agency,

*Respondents.*

No. 24-1188 (lead; consolidated with Nos. 24-1191, 24-1192)

---

**<u>DECLARATION OF PAUL J. GRANGER</u>**

I, Paul J. Granger, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this Declaration. All facts stated are within my personal knowledge and are true and correct.

1.    I am currently the Superintendent of the Hicksville Water District, located in Hicksville, New York. I have served in this role since 2019. In total, I have over 36 years of experience with water supply systems. I am also a licensed professional engineer.

SA-39

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

2.      The Hicksville Water District, formed in 1921, is a community water system that provides drinking water services to residents and business throughout Hicksville, New York, as well as portions of the communities of Bethpage, East Meadow, Jericho, Levittown, Syosset and Westbury—all located in the State of New York. In all, the Hicksville Water District serves approximately 48,000 customers each year. The water that the Hicksville Water District supplies is pumped by fourteen wells from Long Island's Magothy Aquifer.

3.      The Hicksville Water District is a member of the American Water Works Association.

4.      As Superintendent, I am responsible for overseeing the day-to-day water production and water treatment operations of the Hicksville Water District. This includes, among other things, monitoring and assessing water quality and capacity, reviewing plans for capital projects, developing and administering public outreach and education programs, developing in-house engineering studies and work plans, and preparing budgetary and financial planning documents. My responsibilities also include ensuring compliance with the federal Safe Drinking Water Act, along with New York state law. Accordingly, I follow regulatory proposals and final regulations bearing on the Hicksville Water District's compliance obligations, such as new national primary drinking water regulations promulgated by the U.S. Environmental Protection Agency ("EPA"). I also provide

SA-40

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

feedback to EPA and New York regulators, including through the American Water Works Association, to ensure the Hicksville Water District's concerns are raised and its interests are protected.

5.      I also served on the New York State Drinking Water Quality Council from 2017 to 2022. The Council has the responsibility of advising the State of New York's Health Commissioner on issues pertaining to water quality, with a particular focus on recommending safe levels of currently unregulated contaminants in drinking water. During my tenure on the Council, I advised on the development of standards for three priority emerging contaminants: perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), and 1,4-dioxane.

6.      In 2020, the State of New York established drinking water standards for PFOA, PFOS, and 1,4-dioxane for public water systems. Those standards set maximum contaminant levels ("MCLs") for PFOA and PFOS at 10.0 parts per trillion ("ppt"), and for 1,4-dioxane at 1.0 part per billion. The Hicksville Water District is subject to these standards.

7.      I am familiar with the history of EPA's development of drinking water regulations for certain perfluoroalkyl substances ("PFAS") under the Safe Drinking Water Act. This includes EPA's March 29, 2023, proposal to establish a national primary drinking water regulation for PFAS, and EPA's final national primary drinking water regulation ("Final PFAS NPDWR"), as published in the *Federal*

SA-41

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Register* on April 26, 2024, at 89 Fed. Reg. 32,532 and under the title "PFAS National Primary Drinking Water Regulation."

8.    As I understand the Final PFAS NPDWR, the EPA has established legally enforceable MCLs for six PFAS contaminants: PFOA, PFOS, perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid ("HFPO-DA"), and perfluorobutane sulfonic acid ("PFBS"). For each of PFOA and PFOS, EPA established individual MCLs at 4.0 ppt. For each of PFHxS, PFNA, and HFPO-DA, EPA established individual MCLs at 10 ppt. And for mixtures of two or more of PFHxS, PFNA, HFPO-DA, and PFBS, EPA established an MCL according to what EPA refers to as a "hazard index" of 1.0, a unitless number. I further understand the Final PFAS NPDWR to require public water systems to comply with the MCLs within five years of the rule's promulgation—by April 26, 2029.

9.    As I understand it, the Final PFAS NPDWR requires public water systems to monitor actively for the PFAS subject to the Final PFAS NPDWR, including specifically completing initial monitoring within three years of the rule's promulgation—by April 26, 2027—followed by ongoing compliance monitoring.

10.    As a public water system under the Safe Drinking Water Act, the Hicksville Water District is subject to EPA's Final PFAS NPDWR, as well as any future regulation of PFAS that EPA promulgates pursuant to Section 1412 of the

SA-42

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Safe Drinking Water Act, 42 U.S.C. § 300g-1. As a regulated entity under the Safe Drinking Water Act, the Hicksville Water District has a concrete interest in ensuring that its regulatory obligations are fair, effective, cost-efficient, and based on the best available science, as well as a concrete interest in ensuring that EPA adheres to the statutory requirements of the Safe Drinking Water Act.

11.     The Hicksville Water District will incur (or could incur, depending on the results of initial monitoring) significant costs to comply with the Final PFAS NPDWR, such as costs associated with new drinking water treatment facilities and/or processes, monitoring and testing, public education.

12.     As noted previously, the District is subject to State of New York drinking water standards for PFOA and PFOS, which set MCLs at 10.0 ppt. To comply with these state PFOA and PFOS standards, the District's total capital investment, after completion of necessary build out by the end of 2025, is presently estimated at approximately $42 million, although inflation and other factors may increase that estimate. Additionally, the District already expects to incur about $1.5 million in annual operational costs, such as costs to replace granular activated carbon ("GAC") filters, to comply with New York's PFOA and PFOS standards.

13.     The Final PFAS NPDWR, however, lowers (relative to New York's standards) the MCLs for PFOA and PFOS from 10.0 ppt to 4.0 ppt and also sets individual and mixture-based MCLs for PFHxS, PFNA, HFPO-DA, and PFBS. This

SA-43

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lower standard means that the Hicksville Water District will need to replace its GAC filters on a more frequent basis, although the frequency would be variable based on factors such as annual water demand and weather conditions. The District's preliminary cost estimates indicate that compliance with the Final PFAS NPDWR would require the District to incur an additional $470,000 to $1.1 million in annual operational costs. The range reflects the potential frequencies with which the District will need to replace its GAC filters. For comparison, the Hicksville Water District presently operates on an approximately $14 million annual budget.

14.     Due to the planning and lead time necessary to address certain capital and operational expenditures, the Hicksville Water District will likely need to begin incurring costs well before the compliance deadlines for the Final PFAS NPDWR go into effect. In fact, the District is already incurring costs to comply with the Final PFAS NPDWR, including for personnel time spent reviewing and assessing the new regulatory requirements.

15.     Regulated systems like the Hicksville Water District will also incur sampling and monitoring costs for each regulated substance, regardless of whether the substance is present at any particular level in our system.

16.     For example, the Hicksville Water District will incur additional sampling and monitoring costs related to each of the six PFAS included in the Final PFAS NPDWR. The Final PFAS NPDWR requires systems like the Hicksville

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Water District to monitor for all six PFAS. The Final PFAS NPDWR includes both initial monitoring by all affected systems to determine compliance with the MCL, as well as long-term monitoring. To satisfy initial monitoring requirements, the Hicksville Water District will have to collect four consecutive samples 2 to 4 months apart within a 12-month period (quarterly samples) for each regulated PFAS. Our samples must be processed at a laboratory that has been certified by EPA or the State of New York, and the Hicksville Water District will incur costs from the laboratory's services each time that it must submit a sample. Detection of any of the six regulated PFAS above the MCL will trigger more frequent monitoring requirements. Even if none of the regulated PFAS are detected above the MCL trigger level, the Hicksville Water District will still be required to continue to monitor for all six regulated PFAS triennially, and therefore incur additional costs.

17.     The Hicksville Water District would not incur the above-described costs if EPA's Final PFAS NPDWR does not go into effect.

* * *

SA-45

18.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 5, 2024                    Respectfully submitted,

                                        /s/
                                        Paul J. Granger

8

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN WATER WORKS
ASSOCIATION and ASSOCIATION OF
METROPOLITAN WATER AGENCIES,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and MICHAEL
S. REGAN, in his official capacity as
Administrator, United States Environmental
Protection Agency,

*Respondents.*

No. 24-1188 (lead; consolidated
with Nos. 24-1191, 24-1192)

**DECLARATION OF MICHAEL W. GRIMM, P.E.**

I, Michael W. Grimm, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this Declaration. All facts stated are within my personal knowledge and are true and correct.

1.      I am currently the General Manager of West Slope Water District. I have served in this role since May 2015.

2.      West Slope Water District is a community water system that provides drinking water services to residents and businesses in the largely unincorporated area

1

SA-47

of eastern Washington County, Oregon, as well as to customers within the city limits of Beaverton, Oregon. In all, West Slope Water District serves about 10,900 residents, through approximately 3,250 customer accounts. The District purchases its water from the City of Portland, Oregon.

3.     West Slope Water District is a member of the American Water Works Association ("AWWA"). I am a 38-year individual member of AWWA.

4.     Among many other things, my responsibilities include overseeing the management of water production and water quality for West Slope Water District. My responsibilities also include ensuring compliance with the federal Safe Drinking Water Act ("SDWA"). Accordingly, I follow regulatory proposals and final regulations bearing on West Slope Water District's compliance obligations under the SDWA, such as new national primary drinking water regulations promulgated by the U.S. Environmental Protection Agency ("EPA").

5.     I am familiar with the general history of EPA's development of the drinking water regulation for certain perfluoroalkyl substances ("PFAS") under the SDWA, including EPA's March 29, 2023, proposal to establish the national primary drinking water regulation ("NPDWR") for PFAS and EPA's April 26, 2024, final regulation under the SDWA, as published in the *Federal Register*, at 89 Fed. Reg. 32,532 under the title "PFAS National Primary Drinking Water Regulation" ("Final PFAS NPDWR").

SA-48

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

6.    As I understand the Final PFAS NPDWR, the EPA has established legally enforceable maximum contaminant levels ("MCLs") for six (6) PFAS: perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid ("HFPO-DA"), and perfluorobutane sulfonic acid ("PFBS"). For each of PFOA and PFOS, EPA established individual MCLs at 4.0 parts per trillion ("ppt"). For each of PFHxS, PFNA, and HFPO-DA, EPA established individual MCLs at 10 ppt. And for mixtures of two or more of PFHxS, PFNA, HFPO-DA, and PFBS, EPA established an MCL according to what EPA refers to as a "hazard index" of 1.0, a unitless number. I further understand the Final PFAS NPDWR to require public water systems to comply with the MCLs within five (5) years of the rule's promulgation—by April 26, 2029.

7.    As I understand it, the Final PFAS NPDWR requires public water systems to monitor actively for the PFAS subject to the Final PFAS NPDWR, including specifically completing initial monitoring within three (3) years of the rule's promulgation—by April 26, 2027—followed by ongoing compliance monitoring.

8.    As a public water system, West Slope Water District will be subject to EPA's Final PFAS NPDWR, and will be subject to any future regulation of PFAS that EPA promulgates under Section 1412 of the SDWA. Accordingly, West Slope

3

SA-49

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Water District has a concrete interest in ensuring that its regulatory obligations are fair, effective, cost-efficient, and based on the best available science, as well as a concrete interest in ensuring that EPA adheres to the statutory requirements of the Safe Drinking Water Act.

9.     West Slope Water District has been devoting, and will need to continue to devote, resources and personnel time to reviewing the Final PFAS NPDWR and associated guidance to determine what actions must be taken to comply, including initial monitoring to determine my utility's ongoing compliance monitoring schedule (*see* § 141.902(b) of the Final PFAS NPDWR), reporting initial monitoring results (*see* § 141.904(a)), conducting ongoing compliance monitoring (*see* § 141.902(a)(7)(v)) and reporting compliance monitoring observations (*see* § 141.902(b)). As a result, West Slope Water District is already incurring costs and expending resources as a result of the Final PFAS NPDWR.

10.     West Slope Water District will incur, or anticipates incurring, costs associated with monitoring and testing, public education, and (as necessary, depending on the result of initial and periodic monitoring required by the Final PFAS NPDWR) new drinking water treatment facilities or processes. For example, West Slope Water District estimates that it will incur around $5,000 in costs for initial monitoring. West Slope Water District must begin incurring some of these costs prior to the rule's compliance dates in order to be prepared to comply with the rule.

4

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

11. The Final PFAS NPDWR will also impact the current management of the District's purchased water supplies and have implications for future water supply development and treatment options available to the District. For instance, some portion of any costs directly incurred by West Slope Water District's suppliers of purchased water in order to comply with the Final PFAS NPDWR would be expected to be passed along to the District through the price paid for the purchased water.

12. West Slope Water District will incur at least some costs regardless of whether PFAS is detected in our water. Specifically, West Slope Water District will incur sampling and monitoring costs related to each of the six (6) PFAS included in the Final PFAS NPDWR. The Final PFAS NPDWR requires systems like West Slope Water District to monitor for all six (6) PFAS. The Final PFAS NPDWR includes both initial monitoring by all affected systems to determine compliance with the MCL, as well as long-term monitoring. To satisfy initial monitoring requirements, the District will have to collect four consecutive samples 2 to 4 months apart within a 12-month period (quarterly samples) for each regulated PFAS. Our samples must be processed at a laboratory that has been certified by EPA or the State of Oregon, and West Slope Water District will incur costs from the laboratory's services each time that it must submit a sample. Initial monitoring costs for the District will exceed several thousands of dollars. Detection of any of the six (6)

SA-51

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

regulated PFAS above the MCL will trigger more frequent monitoring requirements. Even if none of the regulated PFAS are detected above the MCL trigger level, West Slope Water District will still be required to continue to monitor for all six (6) regulated PFAS triennially, and therefore incur additional costs.

13.     West Slope Water District would not incur some or all of the above-described costs if the Final PFAS NPDWR was not in effect.

* * *

SA-52

14.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated: May 31, 2024                    Respectfully submitted,

                                       Michael W. Grimm, P.E.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

SA-53

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| AMERICAN WATER WORKS ASSOCIATION and ASSOCIATION OF METROPOLITAN WATER AGENCIES,<br><br>*Petitioners*,<br><br>*v.*<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL S. REGAN, in his official capacity as Administrator, United States Environmental Protection Agency,<br><br>*Respondents.* | No. 24-1188 (lead; consolidated with Nos. 24-1191, 24-1192) |

**<u>DECLARATION OF LIESEL M. GROSS</u>**

I, Liesel M. Gross, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this Declaration. All facts stated are within my personal knowledge and are true and correct.

1.    I am currently the Chief Executive Officer of Lehigh County Authority, located in Allentown, Pennsylvania. I have served in this role since 2016. I am a 26-year veteran of Lehigh County Authority, having served in various capacities since 1998.

1

SA-54

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

2.     Lehigh County Authority is a community water system that provides drinking water services to residents and business throughout the County of Lehigh, including the City of Allentown and twelve surrounding townships, and that provides wholesale water service to four additional communities. In all, Lehigh County Authority serves about 270,000 residents, which is approximately seventy-two percent (72%) of Lehigh County's population.

3.     Lehigh County Authority is a member of the American Water Works Association.

4.     In my current position, I am responsible for overseeing the management of Lehigh County Authority's water production and water treatment, including ensuring compliance with the federal Safe Drinking Water Act and Pennsylvania state law. As a result, I follow regulatory proposals and final regulations affecting Lehigh County Authority's compliance obligations, such as new national primary drinking water regulations promulgated by the U.S. Environmental Protection Agency ("EPA"). I also provide feedback to EPA and Pennsylvania regulators, including through the American Water Works Association, to ensure Lehigh County Authority's concerns are raised and its interest are protected.

5.     I am familiar with the history of EPA's development of drinking water regulations for certain perfluoroalkyl substances ("PFAS") under the Safe Drinking Water Act. This includes EPA's March 29, 2023, proposal to establish a national

SA-55

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

primary drinking water regulation for PFAS, and EPA's April 26, 2024, final national primary drinking water regulation ("Final PFAS NPDWR"), as published in the *Federal Register* at 89 Fed. Reg. 32,532 under the title "PFAS National Primary Drinking Water Regulation."

6.     As I understand it, the Final PFAS NPDWR establishes legally enforceable maximum contaminant levels ("MCLs") for six (6) PFAS: perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid ("HFPO-DA"), and perfluorobutane sulfonic acid ("PFBS"). For each of PFOA and PFOS, EPA established individual MCLs at 4.0 parts per trillion ("ppt"). For each of PFHxS, PFNA, and HFPO-DA, EPA established individual MCLs at 10 ppt. And for mixtures of two or more of PFHxS, PFNA, HFPO-DA, and PFBS, EPA established an MCL according to what EPA refers to as a "hazard index" of 1.0, a unitless number. I further understand the Final PFAS NPDWR to require public water systems to comply with the MCLs within five (5) years of the rule's promulgation—by April 26, 2029.

7.     As I understand it, the Final PFAS NPDWR requires public water systems to monitor actively for the PFAS subject to the Final PFAS NPDWR, including specifically completing initial monitoring within three (3) years of the

3

rule's promulgation—by April 26, 2027—followed by ongoing compliance monitoring.

8. As a public water system under the Safe Drinking Water Act, Lehigh County Authority is subject to EPA's Final PFAS NPDWR, as well as any future regulation of PFAS that EPA promulgates pursuant to Section 1412 of the Safe Drinking Water Act, 42 U.S.C. § 300g-1. As a regulated entity under the Safe Drinking Water Act, Lehigh County Authority has a concrete interest in ensuring that regulatory obligations imposed on it are fair, effective, cost-efficient, and based on the best available science, as well as concrete interest in EPA adhering to statutory requirements.

9. Lehigh County Authority will incur significant costs to comply with the Final PFAS NPDWR, including costs associated with monitoring and testing, public education, and (as necessary, depending upon the results of initial and continual monitoring) new drinking water treatment facilities or processes or changes in water sources. Preliminary engineering costs estimates suggest that Lehigh County Authority will incur up to $118 million in additional capital and operating costs as a result of the Final PFAS NPDWR to address Lehigh County Authority's four (4) primary water supply sources that serve the City of Allentown and surrounding communities. An additional thirty-three (33) groundwater well sources and three (3) purchased water sources are still under evaluation, and increased capital and

SA-57

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

operating cost estimates are expected to be developed in the year ahead with respect to those facilities.

10. Due to the lead time needed to address certain capital expenditures, Lehigh County Authority must begin incurring costs well before the compliance deadlines for the Final PFAS NPDWR go into effect. In fact, Lehigh County Authority is already incurring costs to comply with the Final PFAS NPDWR, including for personnel time spent reviewing and assessing the requirements.

11. Regulated systems like Lehigh County Authority will also incur sampling and monitoring costs for each regulated substance, regardless of the level that EPA selected for the MCL and regardless of whether the substance is present at any particular level in our system.

12. For example, Lehigh County Authority will incur additional sampling and monitoring costs related to each of the six PFAS included in the Final PFAS NPDWR. The Final PFAS NPDWR requires systems like Lehigh County Authority to monitor for all six PFAS. The Final PFAS NPDWR includes both initial monitoring by all affected systems to determine compliance with the MCL, as well as long-term monitoring. To satisfy initial monitoring requirements, Lehigh County Authority will have to collect four consecutive samples 2 to 4 months apart within a 12-month period (quarterly samples) for each regulated PFAS. Our samples must be processed at a laboratory that has been certified by EPA or the Commonwealth of

SA-58

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Pennsylvania, and Lehigh County Authority will incur costs from the laboratory's services each time that it must submit a sample. Detection of any of the six (6) regulated PFAS above the MCL will trigger more frequent monitoring requirements. Even if none of the regulated PFAS are detected above the MCL trigger level, Lehigh County Authority will still be required to continue to monitor for all six (6) regulated PFAS triennially, and therefore incur additional costs.

13.     Lehigh County Authority would not incur the above-described costs if EPA's Final PFAS NPDWR does not go into effect.

* * *

SA-59

14.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 4, 2024                                    Respectfully submitted,

/s/   *Liesel M. Gross*
Liesel M. Gross

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

SA-60

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| AMERICAN WATER WORKS ASSOCIATION and ASSOCIATION OF METROPOLITAN WATER AGENCIES,<br><br>*Petitioners*,<br><br>*v.*<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL S. REGAN, in his official capacity as Administrator, United States Environmental Protection Agency,<br><br>*Respondents*. | No. 24-1188 (lead; consolidated with Nos. 24-1191, 24-1192) |

**<u>DECLARATION OF JAMIE BAIN HEDGES</u>**

I, Jamie Bain Hedges, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this Declaration. All facts stated are within my personal knowledge and are true and correct.

1.    I am currently the General Manager and Chief Executive Officer of the Fairfax County Water Authority (d.b.a. Fairfax Water). I have served in this role since 2021. I am a 35-year veteran of Fairfax Water, having started my career with the utility in 1989.

SA-61

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

2.     Fairfax Water is a public water system that provides drinking water service to residents and businesses in Fairfax County, Virginia, and the cities of Falls Church and Fairfax, Virginia. Fairfax Water also provides wholesale water service in Virginia to Loudoun County and Prince William County, the City of Alexandria, the towns of Herndon and Vienna, Fort Belvoir, and the Dulles International Airport. In all, Fairfax Water serves over two million residents, which is approximately 25% of the Commonwealth of Virginia's population.

3.     Fairfax Water is a member of the American Water Works Association ("AWWA").

4.     Fairfax Water is also a member of the Association of Metropolitan Water Agencies ("AMWA").

5.     Among many other things, my responsibilities include overseeing the operation and management of two water treatment facilities with a combined capacity of 345 million gallons of water per day, the design and construction of capital improvements to the water system, and the finances for the water system. My responsibilities also include ensuring compliance with the federal Safe Drinking Water Act ("SDWA"). Accordingly, I follow regulatory proposals and final regulations bearing on Fairfax Water's compliance obligations, such as new national primary drinking water regulations promulgated by the U.S. Environmental Protection Agency ("EPA").

SA-62

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

6.     I am familiar with the general history of EPA's development of the drinking water regulation for certain perfluoroalkyl substances ("PFAS") under the SDWA, including EPA's March 29, 2023, proposal to establish the national primary drinking water regulation ("NPDWR") for PFAS and EPA's April 26, 2024, final regulation under the SDWA, as published in the *Federal Register*, at 89 Fed. Reg. 32,532 under the title "PFAS National Primary Drinking Water Regulation" ("Final PFAS NPDWR").

7.     As I understand the Final PFAS NPDWR, the EPA has established legally enforceable maximum contaminant levels ("MCLs") for six (6) PFAS: perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid ("HFPO-DA"), and perfluorobutane sulfonic acid ("PFBS"). For each of PFOA and PFOS, EPA established individual MCLs at 4.0 parts per trillion ("ppt"). For each of PFHxS, PFNA, and HFPO-DA, EPA established individual MCLs at 10 ppt. And for mixtures of two or more of PFHxS, PFNA, HFPO-DA, and PFBS, EPA established an MCL according to what EPA refers to as a "hazard index" of 1, a unitless number. I further understand the Final PFAS NPDWR to require public water systems to comply with the MCLs within five (5) years of the rule's promulgation—by April 26, 2029.

SA-63

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

8. As I understand it, the Final PFAS NPDWR requires public water systems to actively monitor for the PFAS subject to the Final PFAS NPDWR, including specifically completing initial monitoring within three (3) years of the rule's promulgation—by April 26, 2027—followed by ongoing compliance monitoring.

9. As a public water system, Fairfax Water will be subject to EPA's Final PFAS NPDWR, and will be subject to any future regulation of PFAS that EPA promulgates under Section 1412 of the SDWA. Accordingly, Fairfax Water has a concrete interest in ensuring that its regulatory obligations are fair, effective, cost-efficient, and based on the best available science, as well as a concrete interest in ensuring that EPA adheres to the statutory requirements of the Safe Drinking Water Act.

10. Fairfax Water has already incurred and anticipates incurring substantial costs with monitoring, public education, and other provisions of the Final PFAS NPDWR promulgated under Section 1412 of the SDWA. Fairfax Water has also expended personnel time, and anticipates expending additional personnel time, to review and assess the new regulatory requirements of the Final PFAS NPDWR.

11. Fairfax Water has incurred costs to conduct a bench scale evaluation of treatment alternatives for PFAS for one of our raw water sources. Fairfax Water has incurred these costs because PFAS has been detected in our water and evaluation of

SA-64

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

treatment alternatives and the potential capital and operating costs for PFAS treatment must be understood well in advance of the compliance date for the Final PFAS NPDWR to provide sufficient time for design and construction of capital improvements.

12.    Fairfax Water has been and will need to continue to devote resources to reviewing the Final PFAS NPDWR and associated guidance to determine what actions must be taken to comply, including initial monitoring to determine my utility's ongoing compliance monitoring schedule (*see* § 141.902(b) of the Final PFAS NPDWR), reporting initial monitoring results (*see* § 141.904(a)), conducting ongoing compliance monitoring (*see* § 141.902(a)(7)(v)) and reporting compliance monitoring observations (*see* § 141.902(b)).

13.    As I understand it, EPA has estimated that the mean annualized cost of complying with the Final PFAS NPDWR that a public water system most comparable to Fairfax Water—although still much lesser in size, in terms of population served—would incur is almost $907,000. According to EPA's cost estimates, this mean annualized cost increases to more than $2.7 million if Fairfax Water finds it needs to treat or change its water sources in order to comply with the Final PFAS NPDWR. Whether Fairfax Water needs to treat or change its water sources is directly related to the level at which EPA sets the MCL for each of the six

SA-65

(6) PFAS substances, as well as EPA's decision to treat certain PFAS substances as a mixture.

14.    And as I understand it, EPA's annualized cost estimates include (among other quantifiable cost inputs) sampling and monitoring costs, such as the labor hours necessary to collect and analyze drinking water samples and the associated laboratory analysis costs. I also understand EPA's annualized cost estimates to include treatment costs, such as engineering, installing, operating, and maintaining PFAS removal treatment technologies, and/or nontreatment actions associated with changing water sources.

15.    Some, but not all, of these costs are directly related to the level at which EPA sets the MCL for a substance, with a lower MCL resulting in higher compliance costs. For example, EPA estimates that a public water system comparable to Fairfax Water would incur a mean annualized cost of compliance of almost $900,000 if the PFOA and PFOS MCLs are set at 4.0 ppt, whereas the mean annualized cost of compliance that a public water system most comparable to Fairfax Water would incur is estimated by EPA to be about $680,000 if the PFOA and PFOS MCLs are set at 5.0 ppt, and about $257,000 if the PFOA and PFOS MCLs are set at 10.0 ppt.

16.    Regulated systems like Fairfax Water will also incur sampling and monitoring costs for each regulated substance, regardless of the level that EPA

6    SA-66

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

selected for the MCL and regardless of whether the substance is present at any particular level in our system.

17.     For example, Fairfax Water will incur additional sampling and monitoring costs related to each of the six (6) PFAS included in the Final PFAS NPDWR. The Final PFAS NPDWR requires systems like Fairfax Water to monitor for all six (6) PFAS. The Final PFAS NPDWR includes both initial monitoring by all affected systems to determine compliance with the MCL, as well as long-term monitoring. To satisfy initial monitoring requirements, Fairfax Water will have to collect four consecutive samples at each point of entry 2 to 4 months apart within a 12-month period (quarterly samples) for each regulated PFAS. At a minimum, we will have to conduct this sampling on three points of entry. Our samples must be processed at a laboratory that has been certified by EPA or the Commonwealth of Virginia, and Fairfax Water will incur costs from the laboratory's services each time that it must submit a sample. Detection of any of the six (6) regulated PFAS above the MCL will trigger more frequent monitoring requirements. Even if none of the regulated PFAS are detected above the MCL trigger level, Fairfax Water will still be required to continue to monitor for all six (6) regulated PFAS triennially, and therefore incur additional costs.

18.     Fairfax Water would not incur some or all of the above-described costs if the Final PFAS NPDWR was not in effect.

SA-67

19.    This rulemaking will impact the current management of Fairfax Water's raw water supplies and have implications for future water supply development and treatment options available to my utility.

\* \* \*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

SA-68

20.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: _June 6, 2024_

Respectfully submitted,

/s/ _(signature)_
Jamie Bain Hedges

USCA Case #24-1188     Document #2078734     Filed: 10/07/2024     Page 148 of 157

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

9

SA-69

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| AMERICAN WATER WORKS ASSOCIATION and ASSOCIATION OF METROPOLITAN WATER AGENCIES, <br><br> *Petitioners*, <br><br> *v.* <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL S. REGAN, in his official capacity as Administrator, United States Environmental Protection Agency, <br><br> *Respondents*. | No. 24-1188 (lead; consolidated with Nos. 24-1191, 24-1192) |

**DECLARATION OF LINDSEY RECHTIN**

I, Lindsey Rechtin, hereby state that I am over the age of 18 and am in all respects competent and qualified to make this Declaration. All facts stated are within my personal knowledge and are true and correct.

1.    I am currently the President and Chief Executive Officer of the Northern Kentucky Water District ("NKWD"). I have served in this role since 2022. I have been employed with NKWD since 2013.

1

SA-70

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

2.    NKWD is a non-profit public water system organized under Chapter 74 of the Kentucky Revised Statutes that provides drinking water service to retail customers in Kenton, Boone, and Campbell Counties and sells water at wholesale to non-affiliated water distribution systems in Kenton, Boone, Pendleton, and Campbell Counties in Northern Kentucky. In all, NKWD serves approximately 300,000 people.

3.    NKWD is a member of both the American Water Works Association ("AWWA") and Association of Metropolitan Water Agencies ("AMWA").

4.    Among many other things, my responsibilities include overseeing the operation and management of three water treatment facilities with a combined capacity of 64 million gallons of water per day, the design and construction of capital improvements to the water system, and the finances for the water system. My responsibilities also include ensuring compliance with the federal Safe Drinking Water Act ("SDWA"). Accordingly, I follow regulatory proposals and final regulations bearing on NKWD's compliance obligations, such as new national primary drinking water regulations promulgated by the U.S. Environmental Protection Agency ("EPA").

5.    I am familiar with the general history of EPA's development of the drinking water regulation for certain perfluoroalkyl substances ("PFAS") under the SDWA, including EPA's March 29, 2023, proposal to establish the national primary

SA-71

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

drinking water regulation ("NPDWR") for PFAS and EPA's April 26, 2024, final regulation under the SDWA, as published in the *Federal Register*, at 89 Fed. Reg. 32532 under the title "PFAS National Primary Drinking Water Regulation" ("Final PFAS NPDWR").

6.    As I understand the Final PFAS NPDWR, the EPA has established legally enforceable maximum contaminant levels ("MCLs") for six (6) PFAS: perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid ("HFPO-DA"), and perfluorobutane sulfonic acid ("PFBS"). For each of PFOA and PFOS, EPA established individual MCLs at 4.0 parts per trillion ("ppt"). For each of PFHxS, PFNA, and HFPO-DA, EPA established individual MCLs at 10 ppt. And for mixtures of two or more of PFHxS, PFNA, HFPO-DA, and PFBS, EPA established an MCL according to what EPA refers to as a "hazard index" of 1, a unitless number. I further understand the Final PFAS NPDWR to require public water systems to comply with the MCLs within five (5) years of the rule's promulgation—by April 26, 2029.

7.    As I understand it, the Final PFAS NPDWR requires public water systems to actively monitor for the PFAS subject to the Final PFAS NPDWR, including specifically completing initial monitoring within three (3) years of the

SA-72

rule's promulgation—by April 26, 2027—followed by ongoing compliance monitoring.

8.      As a public water system, NKWD will be subject to EPA's Final PFAS NPDWR, and will be subject to any future regulation of PFAS that EPA promulgates under Section 1412 of the SDWA. Accordingly, NKWD has a concrete interest in ensuring that its regulatory obligations are fair, effective, cost-efficient, and based on the best available science, as well as a concrete interest in ensuring that EPA adheres to the statutory requirements of the Safe Drinking Water Act.

9.      NKWD has already incurred and anticipates incurring costs with monitoring, public education, and other provisions of the Final PFAS NPDWR promulgated under Section 1412 of the SDWA. NKWD has also expended personnel time, and anticipates expending additional personnel time, to review and assess the new regulatory requirements of the Final PFAS NPDWR.

10.     NKWD has been and will need to continue to devote resources to reviewing the Final PFAS NPDWR and associated guidance to determine what actions must be taken to comply, including initial monitoring to determine my utility's ongoing compliance monitoring schedule (*see* § 141.902(b) of the Final PFAS NPDWR), reporting initial monitoring results (*see* § 141.904(a)), conducting ongoing compliance monitoring (*see* § 141.902(a)(7)(v)) and reporting compliance monitoring observations (*see* § 141.902(b)).

SA-73

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

11.    As I understand it, EPA has estimated that the mean annualized cost of complying with the Final PFAS NPDWR that a public water system most comparable to NKWD would incur is almost $907,000. According to EPA's cost estimates, this mean annualized cost increases to more than $2.7 million if NKWD finds it needs to treat or change its water sources in order to comply with the Final PFAS NPDWR. Whether NKWD needs to treat or change its water sources is directly related to the level at which EPA sets the MCL for each of the six (6) PFAS substances, as well as EPA's decision to treat certain PFAS substances as a mixture.

12.    And as I understand it, EPA's annualized cost estimates include (among other quantifiable cost inputs) sampling and monitoring costs, such as the labor hours necessary to collect and analyze drinking water samples and the associated laboratory analysis costs. I also understand EPA's annualized cost estimates to include treatment costs, such as engineering, installing, operating, and maintaining PFAS removal treatment technologies, and/or nontreatment actions associated with changing water sources.

13.    Some, but not all, of EPA's estimated costs are directly related to the level at which EPA sets the MCL for a substance, with a lower MCL resulting in higher compliance costs. For example, EPA estimates that a public water system comparable to NKWD would incur a mean annualized cost of compliance of almost $900,000 if the PFOA and PFOS MCLs are set at 4.0 ppt, whereas the mean

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

annualized cost of compliance that a public water system most comparable to NKWD would incur is estimated by EPA to be about $680,000 if the PFOA and PFOS MCLs are set at 5.0 ppt, and about $257,000 if the PFOA and PFOS MCLs are set at 10.0 ppt.

14.　　As I understand it, if treatment is necessary to comply with the Final PFAS NPDWR, EPA expects that water systems could use granular activated carbon ("GAC") filters as one possible treatment technology. NKWD installed GAC systems at two of its three treatment facilities approximately fourteen (14) years ago, principally to comply with other federal SDWA regulations, such as those for disinfectants and disinfection byproducts. In NKWD's experience, one of the principal costs (both in terms of monetary costs and expense of personnel time) associated with GAC systems is the cost to reactivate (and, as necessary, supplement with virgin media) or replace GAC filters when a filter's adsorptive capacity has been exhausted. There are also costs associated with the addition of a "swing load" of GAC so that while reactivation occurs, the down time when water would have reduced contact with GAC would be substantially minimized.

15.　　From 2021 to 2023, NKWD observed increases in its annual GAC-related costs ranging from about $60,000 to about $792,000. Although I cannot make predictions, it is certainly possible that NKWD's GAC-related costs could further increase in the coming years, especially if the Final PFAS NPDWR prompts other

6

SA-75

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

water systems need to add, reactivate, or replace GAC filters at a greater rate than they are now. Moreover, based on preliminary estimates at this time, if NKWD needs to design and install a GAC system at its third treatment facility in order to ensure and maintain compliance with the Final PFAS NPDWR, the cost would likely be over $30 million.

16.    Regulated systems like NKWD will also incur sampling and monitoring costs for each regulated substance, regardless of the level that EPA selected for the MCL and regardless of whether the substance is present at any particular level in our system.

17.    For example, NKWD will incur additional sampling and monitoring costs related to each of the six (6) PFAS included in the Final PFAS NPDWR. The Final PFAS NPDWR requires systems like NKWD to monitor for all six (6) PFAS. The Final PFAS NPDWR includes both initial monitoring by all affected systems to determine compliance with the MCL, as well as long-term monitoring. To satisfy initial monitoring requirements, NKWD will have to collect four consecutive samples at each point of entry 2 to 4 months apart within a 12-month period (quarterly samples) for each regulated PFAS. At a minimum, we will have to conduct this sampling on three points of entry. Our samples must be processed at a laboratory that has been certified by EPA or the Commonwealth of Kentucky, and NKWD will incur costs from the laboratory's services each time that it must submit

SA-76

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

a sample. Presently, NKWD uses a contract lab for its PFAS testing. Detection of any of the six (6) regulated PFAS above the MCL will trigger more frequent monitoring requirements. Even if none of the regulated PFAS are detected above the MCL trigger level, NKWD will still be required to continue to monitor for all six (6) regulated PFAS triennially, and therefore incur additional costs.

18.    NKWD would not incur some or all of the above-described costs if the Final PFAS NPDWR was not in effect.

19.    This rulemaking will impact the current management of NKWD's raw water supplies and have implications for future water supply development and treatment options available to my utility.

* * *

SA-77

20.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated:   9/12/2024                              Respectfully submitted,

                                                _Lindsey Rechtin_____
                                                Lindsey Rechtin

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# Exhibit 2

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

**Nos. 24-1188 (lead), 24-1191, 24-1192**

# United States Court of Appeals
## District of Columbia Circuit

---

NATIONAL ASSOCIATION OF MANUFACTURERS &
AMERICAN CHEMISTRY COUNCIL, *petitioners*,

– v. –

U.S. ENVIRONMENTAL PROTECTION AGENCY *and* MICHAEL S. REGAN,
*in his official capacity as EPA Administrator*, *respondents*.

---

THE CHEMOURS COMPANY FC, LLC, *petitioner*,

– v. –

U.S. ENVIRONMENTAL PROTECTION AGENCY *and* MICHAEL S. REGAN,
*in his official capacity as EPA Administrator*, *respondents*.

---

On Petition for Review of a Final Rule of the Environmental Protection
Agency, 89 Fed. Reg. 32,532 (Apr. 26, 2024)

---

**BRIEF FOR PETITIONERS NATIONAL ASSOCIATION OF
MANUFACTURERS, AMERICAN CHEMISTRY COUNCIL,
AND THE CHEMOURS COMPANY FC, LLC**

---

ALLON KEDEM
JOEL M. GROSS
 *Arnold & Porter Kaye Scholer LLP*
 *601 Massachusetts Ave., NW*
 *Washington, DC 20001*
 *(202) 942-5000*

*Counsel for Petitioners*
*in No. 24-1192*

MICHAEL B. KIMBERLY
NICOLE E. WITTSTEIN
 *McDermott Will & Emery LLP*
 *500 N. Capitol Street NW*
 *Washington, DC 20001*
 *(202) 756-8000*

*Counsel for Petitioners*
*in No. 24-1191*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# TABLE OF CONTENTS

Introduction ................................................................................................1

Jurisdiction.................................................................................... 2

Issues Presented ......................................................................... 3

Statutes and Regulations............................................................ 3

Statement ..................................................................................... 3

    A.   Legal background............................................................... 3

    B.   Factual and rulemaking background.................................. 7

Summary of Argument ............................................................... 10

Standing..................................................................................... 12

Standard of Review ................................................................... 13

Argument.................................................................................... 14

I.   EPA did not adequately support the Levels selected .................... 14

    A.   The agency's cost-benefit determination is substantively
        unlawful and disregards important factors. ........................ 14

        1.   The Act does not permit EPA to combine the cost-benefit
            analyses for individual Levels into a group determination ........... 15

        2.   EPA's cost-benefit analysis failed to account for a number
            of costs brought to the agency's attention ................................. 18

        3.   EPA's consideration of "nonquantifiable" benefits
            spurned the statute's text and was arbitrary and capricious ....... 20

    B.   EPA failed adequately to consider important aspects of the
        Rule's feasibility ............................................................... 23

    C.   EPA failed to respond to significant public comments on
        regulatory alternatives ..................................................... 27

II.  The Hazard Index and individual Levels for the Index Substances
    are unlawful ............................................................................. 30

    A.   The Act does not authorize EPA to regulate mixtures through a
        "hazard index," which is a break from 50 years of practice ................ 31

    B.   The Hazard Index and individual Levels for Index Substances
        are procedurally defective ................................................. 34

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

1.  EPA may not announce a preliminary determination to regulate at the same time it proposes Goals and Levels .............. 34

2.  EPA unlawfully failed to consult the Science Advisory Board ................................................................................. 38

C.  The hazard index is not supported by substantial evidence ................ 39

1.  EPA did not demonstrate a substantial likelihood of co-occurrence among the Index Substances ................................... 40

2.  EPA did not demonstrate that combinations of Index Substances below the Levels adversely affect human health ................................................................................. 40

III. EPA's regulation of HFPO-DA is irreparably flawed ............................... 44

A.  EPA erred in concluding that HFPO-DA occurs in public water systems with a frequency and at levels of public health concern ........ 44

1.  EPA ignored UCMR data undermining its conclusions .............. 45

2.  Alternative federal and state data sources do not support EPA's determination to regulate HFPO-DA .............................. 49

B.  The Level for HFPO-DA is arbitrary and capricious ......................... 52

1.  EPA relied on uncertainty factors that deviate from its own standard methods and ignored relevant evidence ...................... 52

2.  The HFPO-DA Level relies on a flawed exposure assumption ................................................................................. 54

3.  The HFPO-DA Level relied upon toxicological effects on rodent livers that are irrelevant to humans................................ 57

4.  The HFPO-DA Level relies on a novel toxicological endpoint to generate an artificially low reference dose .............. 58

Conclusion .................................................................................................. 60

## CERTIFICATE AS TO THE PARTIES, RULINGS, AND RELATED CASES

**1.** Petitioners are American Water Works Association and Association of Metropolitan Water Agencies (No. 24-1188); National Association of Manufacturers and American Chemistry Council (No. 24-1191); and The Chemours Company FC, LLC (No. 24-1192). Respondents are the United States Environmental Protection Agency and Michael S. Regan. Intervenors are the Natural Resources Defense Council, the Buxmont Coalition for Safe Water, Clean Cape Fear, Clean Haw River, Concerned Citizens of WMEL Water Authority Grassroots, Environmental Justice Task Force, Fight for Zero, Merrimack Citizens for Clean Water, and Newburgh Clean Water Project.

**2.** The consolidated petitions for review challenge the Environmental Protection Agency's final rule titled *PFAS National Primary Drinking Water Regulation*, 89-FR-32,532 (April 26, 2024).

**3.** The case was not previously before this or any other Court.

## CORPORATE DISCLOSURE STATEMENT

The National Association of Manufacturers and American Chemistry Council both are nonprofit, tax-exempt advocacy and public policy organizations. Neither has a parent corporation or issues stock. The Chemours Company FC is a Delaware limited liability company wholly owned by The Chemours Company, a publicly traded corporation.

iii

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# TABLE OF AUTHORITIES[*]

**Cases**

*American Iron & Steel Institute v. OSHA*,
    939 F.2d 975 (D.C. Cir. 1991) ........................................................ 49

*American Radio Relay League, Inc. v. FCC*,
    524 F.3d 227 (D.C. Cir. 2008) .................................................. 53, 54

*American Waterways Operators v. Wheeler*,
    507 F. Supp. 3d 47 (D.D.C. 2020) ................................................. 27

*Bismullah v. Gates*,
    501 F.3d 178 (D.C. Cir. 2007) ....................................................... 52

*Butte County v. Hogen*,
    613 F.3d 190 (D.C. Cir. 2010) ................................................. 49, 59

*Chlorine Chemistry Council v. EPA*,
    206 F.3d 1286 (D.C. Cir. 2000) ......................................... 13, 20, 48

*Friends of Blackwater v. Salazar*,
    691 F.3d 428 (D.C. Cir. 2012). ...................................................... 38

*Gerber v. Norton*,
    294 F.3d 173 (D.C. Cir. 2002) ....................................................... 57

*International Fabricare Institute v. EPA*,
    972 F.2d 384 (D.C. Cir. 1992) ....................................................... 13

*Loper Bright Enterprises v. Raimondo*,
    144 S.Ct. 2244 (2024) .................................................................... 14

*Motor Vehicle Manufacturers Association v. State Farm
    Mutual Automobile Insurance*,
    463 U.S. 29 (1983) ........................................................... 28, 30, 54

*National Shooting Sports Foundation v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013) ....................................................... 28

*Ohio v. EPA*,
    144 S.Ct. 2040 (2024) ..................................................... 14, 25, 27, 28, 30

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Sierra Club v. FERC*,
    827 F.3d 59 (D.C. Cir. 2016) ........................................................12

*Sorenson Communications Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014)...................................................... 23

*Students for Fair Admissions, Inc. v. President & Fellows of
    Harvard College*,
    600 U.S. 181 (2023)...................................................................... 37

*SW General, Inc. v. NLRB*,
    796 F.3d 67 (D.C. Cir. 2015) ....................................................... 36

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
    566 U.S. 560 (2012) ......................................................................21

*U.S. Sugar Corp. v. EPA*,
    113 F.4th 984 (D.C. Cir. 2024) .................................................... 14

*UARG v. EPA*,
    573 U.S. 302 (2014)...................................................................... 44

*United States v. Hillie*,
    39 F.4th 674 (D.C. Cir. 2022)....................................................... 33

*United States v. Randall*,
    34 F.4th 867 (9th Cir. 2022) ........................................................ 32

*United Technicians v. U.S. Department of Defense*,
    601 F.3d 557 (D.C. Cir. 2010)...................................................... 23

*Wallaesa v. FAA*,
    824 F.3d 1071 (D.C. Cir. 2016)..................................................... 33

**Statutes and Regulations**

5 U.S.C.
    § 702 ............................................................................................... 2
    § 706 ............................................................................................... 14

42 U.S.C.

§ 300f(6) ............................................................................ 32

§ 300g–1(b)(1) ............................................................ 47, 48

§ 300g–1(b)(1)(A) ....................................................... 41, 44

§ 300g–1(b)(1)(B)(ii)(II) ................................................ 5, 46

§ 300g-1 ............................................................................. 2

§ 300g-1(b)(1) ................................................................. 49

*§ 300g-1(b)(1)(A), ............................... 31, 40, 41, 46, 50

§ 300g-1(b)(1)(A)(i) ...................................................... 43

*§ 300g–1(b)(1)(A)(ii) ............................................. 5, 45, 46

*§ 300g-1(b)(1)(B)(i)(I) ......................................... 3, 4, 34, 35

*§ 300g-1(b)(1)(B)(ii)(I) ....................................... 4, 5, 35, 36

§ 300g-1(b)(1)(B)(ii)(II) ............................................ 31, 45

§ 300g-1(b)(1)(B)(ii)(III) ................................................ 31

§ 300g-1(b)(1)(D) ........................................................... 37

*§ 300g-1(b)(1)(E) ................................. 5, 15, 31, 35, 36

§ 300g-1(b)(2)(C)(i) ........................................................ 21

§ 300g-1(b)(3)(A) ............................................................ 6

§ 300g-1(b)(3)(C) .......................................................... 16

§ 300g-1(b)(3)(C)(i) .................................................... 6, 28

§ 300g-1(b)(3)(C)(i)(IV) ................................................. 29

§ 300g-1(b)(4)(A) ............................................................. 5

§ 300g-1(b)(4)(B) ............................................................. 5

§ 300g-1(b)(4)(B) ............................................................. 6

*§ 300g-1(b)(4)(C) .................................................. 6, 14, 15

*§ 300g-1(b)(4)(D) ............................................. 7, 24, 25, 29

§ 300g-1(b)(4)(E)(i) ......................................................... 7

§ 300g-1(b)(4)(E)(ii) ........................................................ 7

§ 300g-1(b)(6)(A) ............................................................. 6

§ 300g-1(e) ............................................................... 38, 39

§ 300j-4(g)(1) ................................................................... 4

*§ 300j-4(g)(3) ...................................................... 46, 47, 48, 49

§ 300j-4(g)(5) ................................................................... 4

§ 300j-4(g)(7) ................................................................... 4

§ 300j-7(a)(1) ................................................................... 2

§ 9601(33) ...................................................................... 33

§ 9621(d)(2)(A) .............................................................. 13

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

45 U.S.C. § 300j-7(a)(2) ................................................................ 3

40 C.F.R. § 141.35 .......................................................................... 4

40 C.F.R. §§ 141.35, 141.40(a) ................................................ 19, 20

40 C.F.R. § 141.40(a)...................................................................... 4

77 Fed. Reg. 26,072 (May 2, 2012)............................................. 20

85 Fed. Reg. 14,098 (Mar. 10, 2020) ........................................... 7

86 Fed. Reg. 12,272 (Mar. 3, 2021) ............................................. 7

86 Fed. Reg. 73,131 (Dec. 27, 2021).......................................20, 46

*88 Fed. Reg. 18,638 (Mar. 29, 2023) ................... 8, 9, 30, 35, 38, 39

*89 Fed. Reg. 32,532 (Apr. 26, 2024) ........9, 15-19, 20, 22-27, 30-32,
                                              35, 37-39, 41-45, 49, 50-
                                              51, 53, 55, 59, 60

89 Fed. Reg. 39,124 (May 8, 2024) .........................................13

**Other authorities**

*Collins English Dictionary* (14th ed. 2023).......................16, 21, 32, 48

EPA, *Advances in Dose Addition for Chemical Mixtures* 2-
    26 (Dec. 2023) ...................................................................... 42

EPA, *The Fifth Unregulated Contaminant Monitoring Rule
    (UCMR 5) Data Summary* (July 2024)........................................ 47

EPA, *Guidelines for Developmental Toxicity Risk
    Assessment* (Dec. 5, 1991) ................................................. 54

EPA Office of Water, *Human Health Toxicity Assessments
    for GenX Chemicals* (Oct. 2021) ............................................. 58, 59

EPA Office of Water, *Methodology for Deriving Ambient
    Water Quality Criteria for the Protection of Human
    Health* (Oct. 2000) ................................................................. 56, 57

GAO, *Persistent Chemicals*, GAO-22-105135 (Sept. 2022) .............. 29

H.R. Rep. 93-1185 ...................................................................... 34

U.S. EPA, *Health Effects Test Guidelines OPPTS 870.3050
    Repeated Dose 28–Day Oral Toxicity Study in Rodents*
    (2000).......................................................................................... 28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Vishnu Renjith, et al., *Qualitative Methods in Health Care Research*, 12 International Journal of Preventive Medicine 1 (2021) ................................................................ 21, 22

*Websters Third New International Dictionary* (2002)............ 16, 32, 48

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| EPA (the agency) | Environmental Protection Agency |
| HFPO-DA | hexafluoropropylene oxide dimer acid |
| Index Substances | PFHxS, PFBA, PFNA, and HFPO-DA |
| MCL (a Level) | maximum contaminant level |
| MCLG (a Goal) | maximum contaminant level goal |
| NPDWR (a Regulation) | national public drinking water regulation |
| PFAS | per- and polyfluoroalkyl substances |
| PFBS | perfluorobutanosulfonic acid |
| PFHxS | perfluorohexanesulfonic acid |
| PFNA | perfluorononanoic acid |
| PFOA | perfluorooctanoic acid |
| PFOS | perfluorooctanesulfonic acid |
| ppt | parts per trillion & the equivalent of ng/L |
| SAB | Science Advisory Board |
| SDWA (the Act) | Safe Drinking Water Act |
| UCMR 3 | Third Unregulated Contaminant Monitoring Rule |
| UCMR 5 | Fifth Unregulated Contaminant Monitoring Rule |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**INTRODUCTION**

This case concerns new drinking water standards promulgated by the Environmental Protection Agency (EPA) under the Safe Drinking Water Act (the SDWA or Act). The final Rule establishes maximum contaminant level goals (MCLGs, or Goals) and maximum contaminant levels (MCLs, or Levels) for six substances within a broad family of chemicals known as PFAS. These are substances at the center of modern innovation and sustain many common technologies including semiconductors, telecommunications, defense systems, life-saving therapeutics, and renewable energy sources.

Petitioners support rational regulation of PFAS that allows manufacturers to continue supporting critical industries, while developing new chemistries and minimizing any potential environmental impacts. But that requires a measured and evidence-based approach that the Rule lacks.

Congress required as much when it enacted the SDWA. The Act requires EPA to follow strict, multi-step procedures and undertake detailed, multi-step analyses to justify regulation of any given substance. Recognizing that marginal benefits may impose prohibitive burdens for the public, the Act expressly requires the agency to weigh a proposed Level's foreseeable costs against its benefits. The Act also directs EPA to consider the feasibility of achieving any Level in light of costs and the limits of existing technologies, using the best available science. Here, EPA obscured the costs and benefits of each Level it

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

proposed by lumping them together, allowing the net positives of some to compensate for the net negatives of others. Beyond that, the agency failed to consider meaningful regulatory alternatives and refused to consider or respond to public comments that undercut its judgment.

Key aspects of the Rule exceed also EPA's statutory authority and flout the Act's express procedural requirements. The Rule purports to regulate undifferentiated *mixtures* of substances, using a "hazard index" approach that EPA has never before used in the Act's 50-year history and is not permitted by the statute's text. EPA also unlawfully collapsed two distinct rulemaking steps into a single step, forgoing Science Advisory Board review along the way. Congress baked those procedural safeguards into the Act not as mere formalities, but to discourage poor decision-making. This case proves the dangers of discarding them.

Finally, EPA's determination to regulate HFPO-DA was unsupported, as was the Level the agency selected for that substance. EPA lacked sufficient data to regulate HFPO-DA in the first place, and the Level it finalized was arbitrary and capricious several times over.

## JURISDICTION

EPA promulgated the Rule under the Act. 42 U.S.C. § 300g-1. This Court has jurisdiction to review EPA's final rule under 5 U.S.C. § 702 and 42 U.S.C. § 300j-7(a)(1). Petitioners filed timely petitions for review on June

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

10, 2024, which is within 45 days of the final Rule's April 26, 2024, publication date. *See* 45 U.S.C. § 300j-7(a)(2).

## ISSUES PRESENTED

**1.** Whether the Rule is unlawful or arbitrary and capricious for: (a) impermissibly combining multiple cost-benefit analyses into a single analysis; (b) failing to explain with evidence how the Rule's benefits justify its costs; (c) failing adequately to consider important factors bearing on the Rule's costs and feasibility; or (d) failing to consider reasonable regulatory alternatives and meaningfully respond to related comments.

**2.** Whether EPA's hazard index and Levels for three substances were statutorily authorized, procedurally unlawful, or arbitrary and capricious.

**3.** Whether EPA adequately supported its determination to regulate HFPO-DA at the selected Level.

## STATUTES AND REGULATIONS

Relevant provisions are set out in an addendum to this brief.

## STATEMENT

### A.    Legal background

**1.** The Act requires EPA to undertake a multi-step process for regulating previously unregulated contaminants. Every five years, EPA must publish a list of contaminants "which may require regulation." 42 U.S.C. § 300g-1(b)(1)(B)(i)(I). Listed contaminants are subject to reporting requirements

3

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

under the Unregulated Contaminant Monitoring Rule (UCMR), 40 C.F.R. §§ 141.35, 141.40(a). UCMR data must be maintained in a publicly available contaminant occurrence database. 42 U.S.C. § 300j-4(g)(1), (g)(5). The UCMR database must contain "monitoring information collected by [all] public water systems that serve a population of more than 10,000," as well as "from a representative sampling of public water systems that serve a population of 10,000 or fewer." *Id.* § 300j-4(g)(7)(A)-(B).

Every five years, EPA must evaluate whether to regulate at least five contaminants on the UCMR list. 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I). Before EPA may regulate any substance, it must first make a determination to regulate. "[A]fter consultation with the scientific community, including [EPA's] Science Advisory Board, after notice and opportunity for public comment, and after considering the occurrence data base," it must "publish a list of contaminants which . . . *may* require regulation." 42 U.S.C. § 300g-1(b)(1)(B)(i)(I) (emphasis added). The statute refers to this notice of intent to make a determination as a "preliminary determination." *Id.* § 300g-1(b)(1)(B)(ii)(I).

The Act requires the agency next to issue a final "determination to regulate," which is necessary for further regulatory steps. *Id.* § 300g-1(b)(1)(B)(ii)(I). The agency may regulate only where a contaminant 1) "may have an adverse effect on the health of persons," 2) "is known to occur or there is a substantial likelihood that the contaminant will occur in public

4

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

water systems with a frequency and at levels of public health concern," and 3) where regulation "presents a meaningful opportunity for health risk reduction." *Id.* § 300g–1(b)(1)(A)(ii). These findings "shall be based on the best available public health information, including the occurrence data base established under section 300j-4(g) of this title." *Id.* § 300g–1(b)(1)(B)(ii)(II).

The final determination to regulate must follow a separate "notice of the preliminary determination and opportunity for public comment" upon it. *Id.* § 300g-1(b)(1)(B)-(ii)(I). Only after (or with) a final determination to regulate may EPA proceed to propose regulatory standards for the identified contaminants. *Id.* § 300g-1(b)(1)(E).

For each contaminant EPA decides to regulate, the Act next requires it to set a "maximum contaminant level *goal*," or Goal, "at the level at which no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." *Id.* § 300g-1(b)(4)(A) (emphasis added). EPA then must promulgate a National Primary Drinking Water Regulation (Regulation) that, among other options, sets a "maximum contaminant *level*," or Level, "as close to the [Goal] as is feasible." *Id.* § 300g-1(b)(4)(B) (emphasis added).

**2.** The Act requires EPA to make two additional findings before finalizing any Regulation of a contaminant: that each proposed Level is justified by its benefits relative to its costs, and that the Level is feasible. The Act thus

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

requires EPA to analyze, publish, and seek comment on the "[q]uantifiable and nonquantifiable health risk reduction *benefits*" likely to result from compliance with a proposed Level, along with the "[q]uantifiable and nonquantifiable *costs*" of complying with the Level, "including monitoring, treatment, and other costs." *Id.* § 300g-1(b)(3)(C)(i)(I)-(III) (emphasis added). EPA also must address "[t]he incremental costs and benefits associated with each alternative [Level] considered." *Id.* § 300g-1(b)(3)(C)(i)(IV).

EPA must determine "whether the benefits of the [Level] justify, or do not justify, the costs" based on the analysis above. *Id.* § 300g-1(b)(4)(C). If anticipated costs *do* outweigh the benefits, "the Administrator may, after notice and opportunity for public comment, promulgate" an alternative Level "for the contaminant that maximizes health risk reduction benefits at a cost that is justified by the benefits" (*id.* § 300g-1(b)(6)(A)) or elect not to promulgate a regulation. The Act requires that EPA use "the best available, peer-reviewed science and supporting studies conducted in accordance with sound and objective scientific practices" when making any decisions regarding establishing Regulations. *Id.* § 300g-1(b)(3)(A).

The Act requires EPA to set a Level as close to the corresponding Goal "as is *feasible*." *Id.* § 300g-1(b)(4)(B) (emphasis added). Feasible is defined to mean "feasible with the use of the best technology, treatment techniques and other means which the Administrator finds, after examination for efficacy

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

under field conditions and not solely under laboratory conditions, are available (taking cost into consideration)." *Id.* § 300g-1(b)(4)(D).

EPA must "list the technology, treatment techniques, and other means" it "finds to be feasible" for achieving the Level. *Id.* § 300g-1(b)(4)(E)(i). And it must separately "list any technology, treatment technique, or other means that is affordable, as determined by the Administrator in consultation with the States, for small public water systems." *Id.* § 300g-1(b)(4)(E)(ii).

### B.     Factual and rulemaking background

**1.** PFAS are a class of synthetic compounds commonly used in consumer, commercial, and industrial products for their resistance to heat, water, and stains. There are thousands of different kinds of PFAS. For the present rulemaking, EPA first published a preliminary determination to regulate two PFAS substances: PFOA and PFOS. *See* 85-FR-14098, 14120 (Mar. 10, 2020). But it did not issue a preliminary determination to regulate any other PFAS substance at that time, stating it "plan[ned] to consider available human health toxicity and occurrence information for other PFAS as they become available." *Id.*

**2.** EPA issued a final determination to regulate PFOA and PFOS. *See* 86-FR-12272, 12276 (Mar. 3, 2021). It also confirmed its intent to "make regulatory determinations for additional PFAS" in the near term, for any compound "where sufficient information is available." 86-FR-12279.

EPA submitted its final determination to regulate PFOA and PFOS to its Science Advisory Board (SAB), which includes independent experts in the field. The SAB raised serious concerns with EPA's scientific analysis and conclusions. It "identified multiple inconsistencies and deficiencies in both the description and execution of the systematic review process utilized in the evaluation of both PFOA and PFOS" and raised "significant concerns that the reviews for PFOA and PFOS do not appear to have established a predefined protocol." SAB.Report 3 (JA__). It also took issue with the agency's substantive scientific analysis, calling it "unclear," "inconsistent," "confus[ing]," and in critical respects "unjustified," ultimately "recommend[ing] several changes" to the agency's work. SAB.Report 3-5 (JA__-__).

**3.** EPA issued a notice of proposed rulemaking for PFOA and PFOS two years after the final determination to regulate and approximately one year after the SAB's report was finalized. *See* 88-FR-18638 (Mar. 29, 2023). It did not meaningfully alter its analysis and proposed setting a Goal for both compounds at zero. It proposed setting Levels for both at 4.0 parts per trillion (ppt) as the lowest feasible level, considering costs. 88-FR-18638.

In the same regulatory action, EPA issued a "preliminary regulatory determination" to regulate four additional PFAS molecules: PFHxS, HFPO-DA, PFNA, and PFBS. *Id.* For simplicity's sake, we refer to these collectively as the Index Substances.

8

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Simultaneously with this "preliminary determination," EPA proposed a Goal and Level for mixtures of these four substances. But it did not propose Goals or Levels for any of the Index Substances *individually*. Unlike its approach to PFOA and PFOS—or, for that matter, to any other compound it has regulated under the Act—EPA instead proposed a combined Goal and Level "expressed as" a *hazard index*, with a unitless value of 1.0 for any mixture of two or more of the Index Substances. 88-FR-18668.

EPA has defined a hazard index as "the sum of [hazard quotients]" for a mixture of substances. *Id.* A hazard quotient is "the ratio of potential exposure to a substance and the level at which no health effects are expected." *Id.* In other words, a hazard index purports to define when a substance may be harmful only insofar as it appears with other substances. 88-FR-18639. EPA has used a hazard index approach in other contexts, including under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)—which, unlike the Act, expressly provides for regulation of mixtures. But it has never before used a hazard index for a Regulation under the Act.

EPA requested comments on whether to promulgate individual Goals and Levels for the four PFAS covered by the hazard index. *See* 88-FR-18671.

**4.** One year later, EPA published a final Rule, finding that the Rule's benefits justify its costs. 89-FR-32532 (Apr. 26, 2024). The agency finalized the proposed Goals and Levels for PFOA and PFOS without change. *Id.* at

9

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

32532. It also finalized a 1.0 hazard index for mixtures of two or more of the four Index Substances. And EPA both proposed and finalized Goals and Levels for three of the Index Substances (PFHxS, PFNA, and HFPO-DA) taken individually. *Id.*

## SUMMARY OF ARGUMENT

**I.** EPA's cost-benefit analysis was unlawful. The Act does not permit EPA to combine cost-benefit analyses for individual Levels into a group determination; to do so allows it to hide unjustified Levels behind other, more easily justified ones. Plus, EPA's cost-benefit analysis failed to account for a number of costs brought to the agency's attention, including costs of the hazard index and Levels for individual Index Substances. EPA's review of nonquantifiable benefits could not make up the difference. A nonquantifiable benefit is a qualitative one that can't be measured. EPA relies on quantifiable benefits lacking evidence; but these are not "nonquantifiable"—they are just unsupported.

EPA next failed adequately to consider important aspects of the Rule's feasibility. For instance, the agency ignored that there is insufficient laboratory capacity for all water systems to measure Rule compliance. Water systems also lack sufficient staff and facilities. Overcoming these problems is prohibitively expensive, but EPA did not consider them. It also declined to respond to public comments bearing on more reasonable Levels.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**II.** The hazard index and individual Levels for the Index Substances are unlawful. To start, the Act does not authorize EPA to regulate mixtures through a "hazard index," which is a break from 50 years of practice. The Act requires regulation of substances one at a time.

The hazard index and individual Levels for the Index Substances are also procedurally defective. EPA may not announce a preliminary determination to regulate at the same time it proposes Goals and Levels, and EPA did not consult the SAB, which the statute requires it to do. These procedural checks are not mere niceties, and EPA's failure to follow them dooms the Rule.

The hazard index is not supported by substantial evidence, either. EPA did not demonstrate a substantial likelihood of co-occurrence among the Index Substances, nor did it prove that combinations of Index Substances below the Levels adversely affect human health.

**III.** EPA's regulation of HFPO-DA, in particular, was unlawful. EPA first erred in concluding that HFPO-DA occurs in public water systems with a frequency and at levels of public health concern. The evidence does not bear out that finding, and EPA ignored UCMR data undermining its conclusions—despite two separate congressional instructions to consider such data. No alternative federal or state data sources support EPA's determination to regulate HFPO-DA. Beyond that, the Level for HFPO-DA is arbitrary and capricious because EPA relied on uncertainty factors that deviate from its own

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

standard methods and ignored relevant evidence. The HFPO-DA Level also relies on a flawed exposure assumption, toxicological effects on rodent livers that are irrelevant to humans, and a novel toxicological endpoint to generate an artificially low reference dose.

## STANDING

An association must demonstrate that its members would have standing to sue in their own right, that the interests advanced in the suit are germane to the organization's purpose, and the participation of individual members is not necessary. *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016).

Petitioners in No. 24-1191—the National Association of Manufacturers and American Chemistry Council—are trade associations that regularly represent the interests of their members in litigation challenging agency rulemakings. Their members manufacture PFAS, and use PFAS in manufacturing other substances and products, and face imminent risk of harm from the Rule. *See* Addendum B2-12.

Petitioner in No. 24-1192 is The Chemours Company, a chemical manufacturer and member of ACC. It manufactures and uses HFPO-DA, one of the PFAS at issue here. *See* Addendum B13-16.

The Rule causes concrete and immediate harm to current and former manufacturers and industrial users of the regulated PFAS.

12

First, state-court plaintiffs have relied on the Levels and Goals established by the Rule as a benchmark for liability under state law. *See* Addendum B4-5, 10. The Rule is already having an immediate impact on defendants in state-law suits, including petitioners' members, who face heightened risk of liability and greater financial exposure.

Second, the Rule bears on liability under CERCLA. *See* 89-FR-39124 (May 8, 2024) (designating PFOA and PFOS as "hazardous substance[s]" under CERCLA). Levels established by regulation under the Act generally provide "a relevant and appropriate standard" for determining liability for remedial action under CERCLA. 42 U.S.C. § 9621(d)(2)(A). Industrial users of PFOA and PFOS may face CERCLA liability where they have released or disposed of those substances. This Court has long recognized that exposure to CERCLA liability satisfies the injury-in-fact requirement to confer standing to challenge Regulations under the Act. *See Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1289-1290 (D.C. Cir. 2000); *International Fabricare Institute v. EPA*, 972 F.2d 384, 390 (D.C. Cir. 1992).

## STANDARD OF REVIEW

This Court must set aside agency regulations that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706. An action is arbitrary or capricious "if it is not 'reasonable and

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

reasonably explained.'" *Ohio v. EPA*, 144 S.Ct. 2040, 2053 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). The Court "must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made,'" and that it did not "ignore 'an important aspect of the problem.'" *Id.* (quoting *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance*, 463 U.S. 29, 43 (1983)).

On questions of statutory interpretation, the Court "must apply what [it] regard[s] as the statute's 'best' reading" without affording the agency's interpretation any special deference." *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024) (citing *Loper Bright Enterprises v. Raimondo,* 144 S.Ct. 2244, 2266 (2024)).

## ARGUMENT

### I.  EPA DID NOT ADEQUATELY SUPPORT THE LEVELS SELECTED

#### A.  The agency's cost-benefit determination is substantively unlawful and disregards important factors.

The Act specifies that EPA must determine "whether the benefits of" a proposed Level "justify, or do not justify, the costs" of compliance with the Level. 42 U.S.C. § 300g-1(b)(4)(C). In this case, EPA's reported cost-benefit analysis favored the Rule by an economic hair—just $760,000 annually, or about $2,080 daily. 89-FR-32709, Table 68. For a sector of the economy that

14

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

moves hundreds of *billions* of gallons of water each day at a daily cost of more than *$1 billion*, a $2,080 daily national benefit is less than a rounding error; it's essentially zero. And with a margin that thin, virtually any cost that EPA failed to consider is likely to tip the scale against the Rule. There were many such costs. In fact, the agency's cost-benefit analysis is pervaded by legal errors and shoddy empirical work. That alone calls for vacatur of the entire Rule.

### 1.   *The Act does not permit EPA to combine the cost-benefit analyses for individual Levels into a group determination*

**a.** EPA first departed from the statutory text by lumping substances together into a single cost-benefit analysis. The Act directs EPA to consider each proposed Level taken alone and thus calls for individual, substance-by-substance analyses.

The text makes this clear. Paragraph (b)(4)(C) uses the singular when directing EPA to conduct an analysis of "whether the benefits of *the* maximum contaminant level justify, or do not justify, the costs" of *the* Level. 42 U.S.C. § 300g-1(b)(4)(C) (emphasis added). Likewise using the singular, the statute directs that "[f]or *each* contaminant that [EPA] determines to regulate," it "shall publish *a* maximum contaminant level goal and promulgate *a* national primary drinking water regulation." *Id*. § 300g-1(b)(1)(E). And it specifies further that, "[w]hen proposing any national primary drinking water regulation that includes *a* maximum contaminant level, the Administrator shall, with

15

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

respect to *a* maximum contaminant level that is being considered," address certain factors. 42 U.S.C. § 300g-1(b)(3)(C) (emphasis added). The word "each" means "every (one) of two or more considered individually." *Collins English Dictionary* 621 (14th ed. 2023) (hereinafter, *Collins*); *accord Websters Third New International Dictionary* 713 (2002) (hereinafter, *Websters*) ("one of two or more distinct individuals having a similar relation" and "considered one by one").

Use of the singular, together with the word "each," indicates that EPA must conduct a cost-benefit analysis for every Level it proposes, taken alone. The language does not permit the agency to combine the costs and benefits of Levels for multiple substances into a single analysis, allowing the net positive effect of some to offset the net negative effects of others.

**b.** EPA undertook no such substance-by-substance analysis here. Instead, the agency "determined" with respect to the proposed Levels as an undifferentiated group that "the benefits justify the costs for [Levels] set as close as feasible to the [Goals]." 89-FR-32651. Throughout its cost-benefit analysis, it thus combined the costs and benefits for all five individually regulated substances and the hazard index, taken together. *E.g.*, 89-FR-32691 (Table 58); 32709 (Table 68); EA Appendices Table C-5 (JA___). Elsewhere, it provided cost and benefit estimates for PFOA and PFOS taken together, while omitting the hazard index and Index Substances. *E.g.*, 89-FR-32707, 32710;

16

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EA Appendices Table C-6 (JA__). But nowhere in either the notice or the pre-amble to the final Rule did the agency undertake cost-benefit analyses individ-ually for each substance.

This case readily demonstrates the problem with that approach. The preamble shows that the expected total net benefits from just the "PFOA and PFOS MCLs," taken together, was $5.67 million annually. 89-FR-32710 (Table 69). But it also shows that adding the hazard index and individual Index Substance Levels *reduces* the total net benefits from $5.67 million to just $760,000. 89-FR-32709 (Table 68). By implication, the net benefit from regulating the Index Substances is *negative* $4.9 million annually—meaning that they are not justified, even as a group.

Along similar lines, analyzing PFOA and PFOS together overstates the benefits of regulating PFOS. For example, a major element of EPA's benefit analysis for PFOA and PFOS is alleged cardiovascular disease reduction. Cardiovascular disease reduction depends on EPA's calculation of the impact of reduction of total cholesterol. Even assuming EPA's analysis on this score is accurate, which petitioners dispute, the impact on total cholesterol from reducing PFOS is nearly two orders of magnitude *less* than the same reduction EPA calculated for PFOA. *See* 89-FR-32683. By considering the cost-benefit of PFOA and PFOS together rather than individually, EPA obscures these variable costs and benefits of regulating individual substances.

17

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

At bottom, EPA's analysis does not reveal the expected quantifiable net benefit for any one substance taken alone. It is commonsense that each Level for each substance will have its own cost-benefit profile. That is why Section 300g-1(b) expressly requires EPA to undertake individual cost-benefit analyses for "each" Level, in the singular. Combining analyses (as EPA has done here) is too simple an expedient to promulgate a manifestly unjustified Level, obscuring net negative effects using the net positive effects of the other Levels proposed in the same rule.

### 2. EPA's cost-benefit analysis failed to account for a number of costs brought to the agency's attention

Even supposing the Act permits EPA to combine its cost-benefit analyses (it does not), its analyses are arbitrary and capricious on their own terms.

**a. Treatment costs for HFPO-DA, PFNA, and PFBS.** EPA calculated yet expressly omitted treatment costs for PFNA, HFPO-DA, and PFBS. When these costs are properly considered, the Rule's net benefits no longer exceed its costs, as the agency reported. *See* 89-FR-32709 (Table 68).

EPA employed a different method to calculate treatment costs for HFPO-DA, PFNA, and PFBS than for the other substances. It asserted that it "had insufficient nationally representative data to precisely characterize [their] occurrence," so it instead conducted a "sensitivity analysis" to approximate treatment costs for those three substances and the hazard index. 89-FR-

18

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

32533; *see also* EA App. N-4 thru N-5 (JA__-__). Based on that analysis, EPA concluded that treatment costs for these compounds would likely enlarge the Rule's annually recurring costs by around $82 million. *See* 89-FR-32650, 32713; EA App. N-5 thru N-6 (JA__-__).

EPA omitted these results from the Rule's total quantified cost calculation. Its only explanation was to insist that its calculations omitting them were only "marginally underestimated," and if the added costs were considered, it would not change the cost-benefit outcome. *See* 89-FR-32650; EA Appendices N-6 (JA__). That makes no sense. An $82 million cost, compared with a $760,000 benefit, can hardly be dismissed as marginal. Including that cost made the Rule's overall net benefit substantially negative. That is arbitrary and capricious decision-making in its clearest form.

**b. Underinclusive data.** EPA's "primary dataset" to estimate the number of systems that will be affected by the Rule (and thus incur compliance costs) was collected through the agency's Third Unregulated Contaminant Monitoring Rule (UCMR 3). *See* EA 4-25 (JA__). "The UCMR is a national drinking water monitoring program administered by the EPA." *Id.* at 4-21. Many PFAS are subject to UCMR reporting requirements. 40 C.F.R. §§ 141.35, 141.40(a).

Based primarily on the data water systems reported through UCMR 3, EPA estimated that approximately 7.7% of water systems would incur

19

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

compliance costs under the Rule. *Id.* But UCMR 3's reporting thresholds (between 20 and 90 ppt) are far higher than the compliance levels in the Rule. *See* 77-FR-26072, 26099 (Table 1) (May 2, 2012). UCMR 3 would not have captured water systems with PFAS occurrences below the higher UCMR 3 levels, leading EPA to underestimate the number of systems impacted by the Rule within the range with the least benefits and highest costs.

The monitoring levels for the Fifth UCMR (UCMR 5), which has a study period of 2023-2025, more closely match the Rule's Levels. *See* 86-FR-73131, 73156 Table 1 (Dec. 27, 2021). EPA analyzed the UCMR 5 data available to date, which confirms that the number of systems that will incur major costs is higher than the number that EPA took into account in its economic analysis. Indeed, sample-level analysis of UCMR 5 data suggested that 15.8% of systems saw PFAS at levels between UCMR 3 and the Rule—the range in which costs of compliance are greatest and benefits are least. 89-FR-32601. EPA was obligated to use "the best available evidence at the time of the rulemaking" (*Chlorine Chemical Council*, 206 F.3d at 1291), but it did not do so.

### 3. *EPA's consideration of "nonquantifiable" benefits spurned the statute's text and was arbitrary and capricious*

EPA will say that our challenge to its cost-benefit analysis disregards the Rule's nonquantifiable benefits. And true, the Act directs EPA to consider both "[q]uantifiable and nonquantifiable health risk reduction benefits." 42

20

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

U.S.C. § 300g-1(b)(2)(C)(i). But EPA has misconstrued what Congress meant by "nonquantifiable" benefits. The term means benefits that by their nature cannot be measured. It does not mean benefits that *can* be measured but as to which the agency lacks sufficient evidence or data to make an adequately supported measurement.

**a.** The dictionary definition of "nonquantifiable" bears this out. *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning," principally by reference to "dictionaries."). Something is nonquantifiable when it is "not capable of being quantified." *Collins* 1353.

A factor incapable of being measured turns on behaviors and lived experience, not numeric measurement. These factors are addressed by qualitative research, which is common in the healthcare context and "involves broadly stated questions about human experiences and realities" using "descriptive data [to] help . . . understand those individual[s'] experiences." Vishnu Renjith, et al., *Qualitative Methods in Health Care Research*, 12 International Journal of Preventive Medicine 1, 1 (2021). It "is widely used to understand patterns of health behaviors, describe lived experiences, develop behavioral theories, explore healthcare needs, and design interventions." *Id.*

The beneficial role of qualitative research in a cost-benefit analysis under the Act is easy to see. Using qualitative data, EPA might give greater

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

weight in its cost-benefit analysis to avoiding incidents of Effect 1 rather than Effect 2 if the evidence shows that living with Effect 1 is painful or uncomfortable, whereas living with Effect 2 is not. Reducing the risk of Effect 1 thus would produce greater *nonquantifiable* benefits than reducing the risk of Effect 2, even if it would not also increase the *quantifiable* economic benefits. EPA might therefore use this nonquantifiable benefit to justify incurring greater costs to avoid Effect 1 rather than Effect 2.

**b.** In EPA's view, a benefit is "nonquantifiable" when it *is* capable of being quantified, but the agency "lack[s] the economic or other information needed for a quantitative analysis." EA 1-3 (JA__). It thus purported here to "evaluat[e] nonquantifiable costs" by engaging in a supposedly "qualitative discussion" of factors for which its data did not allow for reliable quantification. 89-FR-32649-32650.

There are two problems with this approach. First, a factor is not "unquantifiable" simply because the agency lacks the empirical evidence needed to make a reliable measurement. A quantifiable factor as to which there is "inadequate data" (89-FR-32638) is simply *unsupported*—meaning that to rely on it would be arbitrary and capricious. The solution is simply to get adequate data.

That leads to the second problem: EPA took Congress's direction to consider "nonquantifiable" benefits as an invitation to engage in pure guesswork.

22

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

It was candid about this: Throughout its "nonquantifiable" effects analysis—which lacked any discussion of qualitative effects—EPA explained that the studies it reviewed concerned "nonquantifiable" effects *because* the evidence painted an "inconsistent," "limited," "mixed," and "indeterminate" picture of any correlations between PFAS exposure and the effects hypothesized. *See* 89-FR-32697-32698, 32700.

On the back of that equivocal and unreliable evidence, the agency then engaged in admitted speculation. It simply assumed that the benefits the agency *could* support with evidence are "likely" understated in light of the benefits it could *not* support with evidence. 89-FR-32651.

Neither the Act nor the APA permits "it must be so" reasoning like this. Agencies must base their rulemaking decisions on "logic and evidence, not sheer speculation." *Sorenson Communications Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). And a reviewing court may not "defer to the agency's conclusory or unsupported suppositions." *United Technicians v. U.S. Department of Defense*, 601 F.3d 557, 562 (D.C. Cir. 2010)). That is all EPA offers with its "nonquantifiable" factors analysis.

## B.　EPA failed adequately to consider important aspects of the Rule's feasibility

EPA's assessment of the Rule's feasibility also was woefully incomplete. Feasibility here is a defined term: It "means feasible with the use of the

23

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

best technology, treatment techniques and other means" that are actually "available (taking cost into consideration)." 42 U.S.C. § 300g-1(b)(4)(D). As a matter of both plain text and common usage, the feasibility analysis requires the agency to consider all factors affecting water systems' practical ability to implement a Regulation.

EPA acknowledged as much. It expressly recognized in the preamble that its statutory obligation is "to ensure that any public water system nation-wide can monitor, determine compliance, and deliver water that does not ex-ceed the maximum permissible level of a contaminant in water to any of its consumers." 89-FR-32573.

But the agency artificially limited its feasibility inquiry to two sub-is-sues only. It addressed, first, whether "analytical methods" are available "to reliably quantify levels of the contaminants in drinking water" with sufficient "precision and accuracy" to reach compliance with the new Levels. *Id.* It ad-dressed, second, whether the "costs of treatment technologies that have been demonstrated under field conditions to be effective at removing PFOA and PFOS and determined that the costs of complying with" the Levels "are rea-sonable for large metropolitan water systems." *Id.*

The question whether "public water system[s] nationwide can monitor, determine compliance, and deliver water" in compliance with the Rule (89-FR-32573) turns on far more than that. Feasibility is an inquiry about practical

24

realities—about the rubber hitting the road. For instance, it includes whether there is sufficient laboratory and supply-chain capacity *in the real world* to measure and treat the regulated PFAS at the Levels set by the Rule, and whether there are sufficient field facilities and water-system personnel *in the real world* to implement cleanup technologies. These are "important aspect[s] of the problem before [EPA]." *Ohio*, 144 S.Ct. at 2054.

A Level is not "feasible" if only a small subset of water systems can actually access the technologies and facilities necessary for compliance. And if compliance requires opening new laboratories and building new on-site facilities, those (enormous) added costs must be factored into the agency's determination of whether the new Levels are "feasible . . . *taking cost into consideration.*" 42 U.S.C. § 300g-1(b)(4)(D) (emphasis added).

Commenters raised these issues with respect to the Levels set for PFOA and PFOS. Several expressed concerns that the materials and skilled personnel required to build and operate treatment technologies will be in short supply. *E.g.*, SBA.Comment (JA\_\_); NRWA.Comment (JA\_\_). Others stressed that existing laboratory capacity is insufficient to ensure that all water systems are able to comply. *E.g.*, 3M.Comment (JA\_\_); TCEQ.Comment (JA\_\_-\_\_); A.O. Smith.Comment (JA\_\_-\_\_). Specifically, commenters expressed concern that few laboratories nationwide are approved to analyze systems for PFAS to the level the Rule requires. *See* 3M.Comment (JA\_\_-\_\_).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA did not substantively address these issues. It simply assumed without explanation that these problems would simply resolve themselves at no cost to anyone. For instance, with respect to testing technology and personnel, the agency speculated that "structural demand increase is expected to lead to supply increases as well as innovation such as proposed technologies which were not designated as [best available technologies]." 89-FR-32624. Shortfalls in testing materials and personnel, EPA surmised, will work themselves out at some point in the future, ensuring the Rule's *present* feasibility.

The agency took the same approach to laboratory capacity. It assumed without meaningful support that "the 53 laboratories for PFAS methods" participating in EPA's UCMR 5 monitoring program will have sufficient capacity to handle the Rule's implementation. 89-FR-32575. But that was a bare assertion at odds with evidence-based comments to the contrary. In fact, UCMR 5 requires monitoring of large systems and only a sample of 800 small water systems. *Id.* EPA did not explain how existing testing capacity—even if sufficient for limited monitoring requirements—will necessarily offer adequate support for the thousands of additional water systems, which will require more extensive and frequent testing under the Rule. *See* EA Appendices 4-28.

Nor did EPA respond to specific concerns about laboratory testing for *commercial* water samples. Accreditation data narrows that number even further, to 38 that are certified to perform approved EPA methods of PFAS

26

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

testing. 3M.Comment (JA__-__). Although the "53 labs" currently testing for PFAS have "demonstrated sufficient capacity for current UCMR 5 monitoring" (89-FR-32575), that is a non sequitur with respect to the objections raised concerning capacity to meet Rule compliance.

Congress's requirement to ensure that Levels under the Act are *feasible* requires the agency to stick to what is possible in the real world. By failing to analyze or reasonably respond to key problems bearing on the Rule's feasibility, EPA made unsupported assumptions and unlawfully "ignore[d] 'an important aspect of the problem.'" *Ohio*, 144 S.Ct. at 2053.

### C.    EPA failed to respond to significant public comments on regulatory alternatives

"[A]n agency must 'respond to relevant and significant public comments'" when those comments "disclose the factual or policy basis on which they rest." *American Waterways Operators v. Wheeler*, 507 F. Supp. 3d 47, 68 (D.D.C. 2020). Critically, it is not enough for an agency to demonstrate "awareness" of an objection and then "sidestep it." *Ohio*, 144 S.Ct. at 2054-2055. It must engage the substance of the comment. *Id*. But here, EPA simply declined to consider alternative Levels commenters proposed.

The Act expressly envisions that EPA will consider alternative Levels at the same time it evaluates the justification and feasibility of its main proposal. *See* 42 U.S.C. § 300g-1(b)(3)(C)(i)(III)-(IV). Beyond that specific require-

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ment, an agency's obligation to make rational choices requires it to identify and consider "alternative way[s] of achieving the objectives" it pursues and provide "adequate reasons" for rejecting those alternatives. *State Farm*, 463 U.S. at 48-49. An agency need not anticipate every possible policy choice, but it must consider "significant and viable" or "obvious" alternatives, including those identified in comments. *National Shooting Sports Foundation v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013).

Commenters identified reasonable, alternative Levels of 20 ppt and 40 ppt, but EPA refused without response to consider them. *See* ACC.Comment 53 & n.203 (JA__-__); Chamber.Comment 43 (JA__). EPA's own scientific guidance supported including an obvious alternative no less than 40 ppt, an order of magnitude more than 4.0 ppt. *See* U.S. EPA, *Health Effects Test Guidelines OPPTS 870.3050 Repeated Dose 28–Day Oral Toxicity Study in Rodents* 1, 5 (2000), https://perma.cc/77JA-TR5W (describing dosing guidance). Presented with reasonable alternatives to its Rule, EPA had the burden to reasonably explain why it declined to adopt them—a burden it did not satisfy here.

EPA asserted that considering higher alternatives would be contrary to its mandate "to establish MCLs as close to the MCLGs as feasible, taking cost into consideration." EPA Response 13-524 (JA____). But as EPA's response acknowledges, feasibility is, by statute, a function of cost. It is required to set

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the Level as close to the Goal (here, 0) as feasible *taking cost into considera-tion.* 42 U.S.C. § 300g-1(b)(4)(D). And when EPA takes the costs of a particular Level into consideration, it must "use" its determination of the "incremental costs . . . associated with each alternative [Level]." *Id.* § 300g-1(b)(3)(C)(i)(IV). It did not do so.

It is no answer that EPA considered alternatives of 5.0 ppt and 10 ppt. The difference between 4.0 ppt and 5.0 ppt is within the margin of measurement error, meaning there is no appreciable toxicological difference between those two Levels—and EPA has explained none. *See* EPA Response at 5-193 (JA___). For context, 4.0 ppt is about the equivalent of one drop in five Olympic-sized swimming pools. *See* GAO, *Persistent Chemicals* 4 n.12, GAO-22-105135 (Sept. 2022). EPA cannot seriously mean that 1.25 drops (5.0 ppt) is a meaningful alternative to 1.0 drop (4.0 ppt)—or, at least, if that is its position, it must explain why. The same is true for 10 ppt, which offers no more meaningful a variation.

EPA provided no real explanation for its choice of 5.0 ppt. EPA stated that it chose this option only because 5.0 is "25 percent above" 4.0. 88-FR-18670. That purely arithmetic observation fails to "examine the relevant data and articulate a satisfactory explanation," (*State Farm*, 463 U.S. at 43), of how the differences between 4.0 and 5.0 were meaningful and why it would not have been more appropriate to consider 20 or 40. This response, if that is

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

what it is, "did not address the [stated] concern so much as sidestep it." *Ohio*, 144 S.Ct. at 2055.

The same goes for the 10 ppt alternative, as to which the agency's reasoning was self-contradictory. EPA noted that New York had already adopted a threshold of 10 ppt "for certain PFAS." 88-FR-18670. That ignores that every other state had selected a higher threshold for PFOS. *See* EA 4-26 (JA__). And at any rate, EPA elsewhere rejected the suggestion that state standards should influence its evaluation. *See* 89-FR-32577. The agency also asserted that raising the threshold to 10 ppt would reduce the number of utilities required to take remedial actions. 88-FR-18670. But EPA acknowledged that it lacked reliable data on how many utilities currently exceed the 10 ppt threshold, so the number of affected water systems did not provide "a basis for informing the agency's decisions." 89-FR-32601.

Commenters explained the scientific and economic problems with selecting 5.0 ppt and 10 ppt as alternatives, rather than more meaningful upper bounds. *See* 3M.Comment 62-68 (JA__-__); ACC.Comment 52 (JA__). EPA again failed to provide a reasoned response.

## II. THE HAZARD INDEX AND INDIVIDUAL LEVELS FOR THE INDEX SUBSTANCES ARE UNLAWFUL

The opening brief for petitioners in No. 24-1188, at pages 21-46, explains well the legal deficiencies inherent in EPA's use of a hazard index and

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

its promulgation of individual Levels for three of the Index Substances. Petitioners in Nos. 24-1191 and 24-1192 incorporate and adopt that reasoning in full and offer the following additional explanation.

## A.     The Act does not authorize EPA to regulate mixtures through a "hazard index," which is a break from 50 years of practice

**1.** The Rule's hazard index purports to regulate the Index Substances as mixtures "where they co-occur in drinking water." 89-FR-32535. But the Act authorizes EPA to regulate levels of individual contaminants only, not mixtures of them.

The Act states that a Goal and Level may regulate only one "contaminant" at a time. It refers to "a" or "the" contaminant in the singular throughout. *See* 42 U.S.C. §§ 300g-1(b)(1)(A), (B)(ii)(II)-(III). And it requires EPA to publish a Goal and Level "[f]or *each* contaminant" that it decides to regulate. *Id.* § 300g-1(b)(1)(E) (emphasis added). With these words, there is no avoiding the call for singular, contaminant-by-contaminant regulation. Again, the word "each" means "every (one) of two or more considered individually." *Collins* 621. And use of the singular "tells us that each [contaminant] requires a separate assessment." *Cf. United States v. Randall*, 34 F.4th 867, 876 (9th Cir. 2022) (the "phrasing 'an offense'" using the singular "tells us that each 'offense' requires a separate assessment").

31

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA does not directly disagree. Instead, it takes the position that a single "contaminant" is best read to include "mixtures" of contaminants. *See* 89-FR-32542. But Congress defined "contaminant" in the Act, again using the singular, as "any physical chemical, biological, or radiological substance or matter in water." 42 U.S.C. § 300f(6). Meanwhile, the dictionary defines a "mixture" as "matter consisting of two or more components" or "a product of mixing." *Websters* 1449; *accord Collins* 1263 ("two or more substances mixed together"). These definitions suggest that a mixture is *multiple* substances combined together, distinct from a single chemical taken alone.

EPA focused in the preamble on the word "matter" rather than "substance," insisting that "matter, . . . by definition, is comprised of either pure substances or mixtures of substances." 89-FR-32542. But "matter," taken literally in that way, means anything with a physical manifestation, as distinct from something that is only "mental, spiritual, etc." *Collins* 1213. Such a broad reading would make the rest of the clause superfluous—Congress could just as well have authorized EPA to regulate "any matter in water."

That is not what Congress said, and under the doctrine of *noscitur a sociis*, "a word is given more precise content by the neighboring words with which it is associated." *United States v. Hillie*, 39 F.4th 674, 685 (D.C. Cir. 2022) (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)). Here, that suggests that Congress had in mind for EPA to regulate *singular* chemical

32

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

substances, and not open-ended mixtures or combinations of them. EPA's contrary reading is owed no deference.

**2.** Other factors confirm this conclusion. First, when Congress means to authorize EPA to regulate mixtures, it says so expressly. In CERCLA, for example, Congress authorized regulation of a "pollutant or contaminant," which it expressly defined to include "any element, substance, compound, *or mixture.*" 42 U.S.C. § 9601(33) (emphasis added). If the word "contaminant" already included "mixture" by definition, Congress would have had no need to state so expressly. Moreover, if Congress had intended the word contaminant in the SDWA to include mixtures, "it knew how to say so." *See Wallaesa v. FAA*, 824 F.3d 1071, 1083 (D.C. Cir. 2016). It did not.

Second, the legislative history suggests the same. Although the House committee responsible for the Act "anticipat[ed] that the Administrator will establish primary drinking water regulations for some groups of contaminants" in a single Regulation, it also was clear that a Level must be "specifie[d] for *each* such contaminant," not for the group as an indeterminate mixture. *See* H.R. Rep. 93-1185, 1974 U.S.C.C.A.N. at 6463-6464; *see also id.* ("Once the Administrator specifies contaminants, including groups and subgroups thereof . . . he must prescribe for each contaminant a maximum contaminant level."). The Hazard Index is thus unlawful.

### B. The Hazard Index and individual Levels for Index Substances are procedurally defective

The Hazard Index suffers from procedural defects, as well. First, in promulgating the Rule, EPA disregarded the Act's multistep process for issuing a Regulation. Second, it failed to consult its Science Advisory Board before proposing drinking water standards for the Index Substances.

### 1. *EPA may not announce a preliminary determination to regulate at the same time it proposes Goals and Levels*

**a.** EPA did not follow the Act's express procedure for proposing to regulate the Index Substances. EPA announced its preliminary determination to regulate these substances simultaneously with issuing the proposed hazard index itself, against the statute's mandate.

The Act provides for a multistep rulemaking process between EPA's decision to regulate a substance, on the one hand; and its decision to set a Goal and Level, on the other hand. Section 300g-1(b)(1)(B) is unequivocal: EPA must issue a "preliminary determination" to regulate a substance. 42 U.S.C. § 300g-1(b)(1)(B)(i)(I). This determination must follow "consultation with the scientific community, including the Science Advisory Board," "notice and opportunity for public comment," and "consider[ation of] the occurrence data base." *Id.* "*After* notice of the preliminary determination and opportunity for public comment," the agency may issue a final determination "of whether or not to regulate such contaminants." *Id.* § 300g-1(b)(1)(B)(ii)(I) (emphasis

34

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

added). And after "determin[ing] to regulate [a contaminant]" or concurrently with its determination, EPA must publish a Goal and Level. *Id.* § 300g-1(b)(1)(E). EPA may, however, publish its proposed Goals and Levels "concurrent with the determination to regulate." *Id.*

Despite the Act's clear regulatory sequence, EPA published a proposed hazard index for mixtures of the Index Substances concurrently with its *preliminary* determination to regulate them. In the notice of proposed rulemaking, EPA stated that it was "requesting comment on a preliminary determination to regulate additional PFAS" and "[c]oncurrent[ly] . . . proposing an HI of 1.0 as the [Goal] and enforceable [Level]." 88-FR-18641. This was a clear-cut procedural error.

**b.** EPA's contrary position requires giving the phrase "determination to regulate" varied meanings across different paragraphs of the same statutory provision. *See* 89-FR-32541 (asserting that "Congress did not use the term 'determination to regulate' consistently"). That is not defensible.

Paragraph (b)(1)(E) permits EPA to propose Goals and Levels simultaneously only with a "determination to regulate under subparagraph (B)." As EPA sees it, this provision authorizes it to propose Goals and Levels alongside *either* a final determination *or* a preliminary determination—both, in its view, are "determinations to regulate." But EPA fails to account for the fact that paragraph (b)(1)(B) expressly defines "determination to regulate" as the

decision made "*after* the preliminary determination and opportunity for public comment." 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I) (emphasis added). Congress's choice to distinguish the "preliminary determination" from "the determination to regulate" thus indicates that "the determination to regulate" is the *final* determination following the preliminary one.

From that angle, EPA's argument fails. EPA would give "determination to regulate" one meaning in paragraph (b)(1)(B) (a final determination only) and a different meaning a few lines down the page, in paragraph (b)(1)(E) (a final or preliminary determination). That flouts the "well-established rule of statutory construction, that a word is presumed to have the same meaning in all subsections of the same statute." *SW General, Inc. v. NLRB*, 796 F.3d 67, 75 (D.C. Cir. 2015). Even that aside, paragraph (b)(1)(E) refers not to just any "determination to regulate," but specifically to a "determination to regulate *under subparagraph (B)*." 42 U.S.C. § 300g-1(b)(1)(E) (emphasis added). There is no plausible basis for concluding that Congress meant in paragraph (b)(1)(E) something different from what it meant in (b)(1)(B).

EPA invokes notions of congressional purpose and the importance of ex-peditious decision-making. *See* 89-FR-32541-32542. But Congress allowed EPA to shortcut the normal process when "urgent threats to public health" justify doing so (42 U.S.C. § 300g-1(b)(1)(D)), and it has not asserted such urgency here. Courts may not "disregard the plain terms of a valid

36

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

congressional enactment based on surmise about unenacted legislative intentions." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 309 (2023) (Gorsuch, J., concurring).

**c.** There is also good reason that Congress would not have intended to collapse the preliminary determination to regulate with a proposed Regulation establishing drinking water Goals and Levels for that contaminant.

As the Rule here demonstrates, the factual considerations underpinning *both* the decision to regulate *and* the appropriate regulatory standard are complex and highly technical. Bifurcated rulemaking allows the interested public an opportunity to meaningfully comment on each proposal. Congress reasonably determined that EPA would be more likely to give genuine consideration to alternative ideas (*e.g.*, that it should *not* regulate a contaminant), before it has already devoted considerable resources to determining what Goals and Levels would be appropriate.

EPA complains that bifurcated rulemaking would be inefficient and unnecessary here. *See* 89-FR-32542. But that view "is irrelevant, for '[w]hen a statute commands an agency without qualification to carry out a particular program in a particular way, the agency's duty is clear; if it believes the statute untoward in some respect, then it should take its concerns to Congress, for in the meantime it must obey [the statute] as written.'" *Friends of Blackwater v. Salazar*, 691 F.3d 428, 447 (D.C. Cir. 2012).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 2.    *EPA unlawfully failed to consult the Science Advisory Board*

EPA also violated the requirement that it "shall request comments from the Science Advisory Board . . . prior to proposal of a maximum contaminant level goal and national primary drinking water regulation." 42 U.S.C. § 300g-1(e). EPA sought comments from the SAB only with respect to Levels for PFOA and PFOS. It did not consult the SAB on Goals or Levels for the individual Index Substances or the hazard index itself. EPA acknowledged as much in the NPRM. *See* 88-FR-18736. It developed the hazard index—and the individual Goals and Levels for PFHxS, PFNA, and HFPO-DA—only after SAB's review was complete.

The agency submitted detailed proposals for deriving Goals for PFOA and PFOS, with targeted charge questions related to "developing Goals based on the best available health effects information for PFOA and PFOS." 88-FR-18736; *see* EPA 2021e (JA__); EPA 2021f (JA__). For the hazard index, it consulted SAB only as to whether an index is an appropriate tool for regulating PFAS mixtures in the abstract. *See* 88-FR-18736. EPA's failure to adequately consult the SAB on the hazard index is all the more concerning given the Board's sharp criticisms of the agency's PFOA and PFOS proposals. *See* SAB.Report 3-5 (JA__-__).

EPA argues it had no obligation to consult the SAB on anything other than PFOA and PFOS, contending it satisfied its obligation by submitting "a

38

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

question specifically focused on the utility and scientific defensibility of the Hazard Index approach in the context of mixtures risk assessment in drinking water." 89-FR-32568. But that inquiry, as EPA's phrasing suggests, focused on the propriety of the hazard index *methodology*—not a proposal for Goals or Levels for an actual group of PFAS substances.

Confronted on this point, EPA simply "disagree[d] with commenters who contend[ed] that [it] must seek advice from the SAB on all aspects of the [Regulation]." 89-FR-32569. In its view, the Act "does not dictate on which scientific issues the EPA must request comment from the SAB." *Id.* That is wrong. The statute is clear that EPA "shall request comments from the Science Advisory Board prior to proposal of *a* [Goal] and [Level]." 42 U.S.C. § 300g-1(e). There, again, Congress used the singular, suggesting that Congress wanted SAB review for each Goal and each Level. It hardly could be otherwise—paragraph (e) would mean next to nothing if all the agency had to do is promulgate multiple Goals and Levels at once and seek SAB review only on one of them. EPA's failure to consult the SAB is another basis for vacating the Rule.

## C.    The hazard index is not supported by substantial evidence

Even supposing EPA could regulate mixtures using a "hazard index" rather than setting an actual level—and it assuredly cannot—the hazard index must be vacated because it is not supported by substantial evidence. EPA must

39

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

demonstrate (a) that each possible combination of substances is substantially likely to occur with a frequency and at levels of public health concern; and (b) that the likely combinations have adverse effects on human health. 42 U.S.C. § 300g-1(b)(1)(A).  EPA demonstrated neither.

**1.    *EPA did not demonstrate a substantial likelihood of co-occurrence among the Index Substances***

EPA has not identified a single sample containing detectable levels of all four Index Substances occurring together. PFAS Occurrence Ex. 11-6 thru 11-7 (JA__-__).  Co-occurrence of even three of the Index Substances is extremely rare, at 0.1% of over 16,000 samples. *Id.* And for HFPO-DA and PFNA, the agency did not identify a single sample where those two compounds co-occur in *any* combination. *Id.* at Ex. 11-9. EPA admits that odds of co-occurrence for this mixture are 0.0%. *Id.*

Unable to establish a "substantial likelihood" for these mixtures, (42 U.S.C. § 300g–1(b)(1)(A)), EPA attempts a broad expansion of its authority: As long as enough compounds are added to the hazard index, EPA (under its preferred interpretation) can always claim the occurrence criterion is met. That would render the statutory criteria meaningless.

**2.    *EPA did not demonstrate that combinations of Index Substances below the Levels adversely affect human health***

EPA similarly failed to demonstrate that any combination of Index Substances "may have an adverse effect on the health of persons." 42 U.S.C.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

§ 300g–1(b)(1)(A). Central to EPA's hazard-index grouping is the assumption that the compounds are "dose additive," meaning that "when two or more of the component chemicals exist in one mixture, the risk of adverse health effects following exposure to the mixture is equal to the sum of the individual doses or concentrations scaled for potency." 89-FR-32550 (parenthetical omitted). This assumption is flawed in multiple respects.

**a.** The SAB advises that dose additivity assumptions can be appropriate for "initial screening" of whether a mixture "should be further evaluated," but cannot sanction regulation. SAB.Report 90-91 (JA__-__). EPA attempts to prop up its dose-additivity assumption with studies evaluating other PFAS. 89-FR-32550. But the category of PFAS is extraordinarily broad and heterogenous—numbering in the thousands—and none of the relied-upon studies evaluates the specific mixtures regulated by EPA's hazard index here. Reliance on default assumptions and analogies to other compounds is insufficient to meet EPA's burden of demonstrating that a specific contaminant has sufficient risk of adverse health effects to justify regulation.

**b.** Even insofar as a "default" dose-additivity assumption is ever permissible, it requires proof of an overlap of critical effects. The SAB thus endorsed dose additivity "based on a common outcome" when evaluating PFAS mixtures "that have similar effects." 89-FR-32551; SAB.Report 90-91 (JA__-__). EPA has acknowledged that the hazard index approach "could

41

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

overestimate the hazard when . . . the critical effects . . . across mixture chemicals differ." EPA, *Advances in Dose Addition for Chemical Mixtures* 2-26 (Dec. 2023), https://perma.cc/2SGZ-ZXY9. That is the case here: EPA's own risk assessments for the Index Substances each identify a different critical effect. 89-FR-32546–32549.

That lack of similar critical effects is dispositive. A critical effect is the first relevant health effect to appear as dosage of a contaminant is increased, which in turn is used to set the reference dose at the maximum exposure that does not cause "an appreciable risk of deleterious effects during a lifetime." MCLG 1-18 (JA__-__). At concentrations below the reference dose, therefore, a compound does not show any appreciable risk of relevant adverse health effects, because even the most sensitive organ system is not yet harmed. Yet by grouping compounds with different critical effects, EPA's hazard index would regulate mixtures at concentrations far below where an appreciable risk arises for any identifiable adverse effect. As a result, countless permutations of the hazard-index mixtures may exceed the level set by the Rule despite having no possibility of causing any "adverse effect on the health of persons." 42 U.S.C. § 300g-1(b)(1)(A)(i).

An example illustrates the point. According to EPA, 10 ppt is the lowest concentration at which HFPO-DA could produce adverse health effects in the liver; and 10 ppt is the lowest concentration at which PFHxS could produce

42

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

adverse health effects on the thyroid. But *no* data—literally none—supports the conclusion that a mixture of 5 ppt HFPO-DA and 5 ppt PFHxS will trigger adverse health effects on either the liver or the thyroid.

Unable to show overlapping critical effects, EPA purports to show overlapping "health endpoints." 89-FR-32551. But that novel approach warps the available toxicity data. Any compound—even water itself—can be toxic at a high enough dosage. But it does not follow that, for example, if 2,000 ml of water and 0.0002 ml of cadmium can each cause kidney failure, those compounds would be "toxicologically similar." Indeed, some of the health outcomes EPA relies upon to show "similar toxicological effects" were only observed at doses over 300 million times higher than the reference dose for the Index Substances. MCLG Table 1-3 (JA__).

**c.** EPA's hazard-index approach also relies on such a broad interpretation of "toxicological similarity" that thousands of separate substances (PFAS or not) could be collectively regulated by the agency in a single rule. There are thousands of substances, and essentially infinite combinations, that could cause some overlapping health effects at high enough doses. *Id.*

Indeed, grouping these particular substances together makes especially little sense. The Index Substances have no overlapping critical effects, and EPA has not identified a single sample containing the four compounds together. One of the compounds (PFBS) is not even regulated by an individual

43

Level or Goal. *See* 89-FR-32533. Yet EPA has claimed near-unfettered authority to add any collection of compounds together in order to satisfy the SDWA regulatory criteria. The agency's broad interpretation of "toxicological similarity" would lift all limits to its authority. Such previously unheralded power is inherently suspect (*UARG v. EPA*, 573 U.S. 302, 324 (2014)), and illustrates how far EPA has strayed from its statutory authority to promulgate regulations of "a contaminant." 42 U.S.C. § 300g-1(b)(1)(A).

## III.    EPA'S REGULATION OF HFPO-DA IS IRREPARABLY FLAWED

EPA's regulation of HFPO-DA is a matter of particular importance to petitioner Chemours Company, as this compound is most closely associated with its manufacturing operations.

### A.    EPA erred in concluding that HFPO-DA occurs in public water systems with a frequency and at levels of public health concern.

The Act establishes a data-driven process for determining to regulate, and then regulating, contaminants. Central to this process are data about the prevalence of a contaminant in public water systems. Congress authorized EPA to regulate a contaminant only when the "best available" evidence shows it will occur "with a frequency" and at levels of public concern. 42 U.S.C. § 300g–1(b)(1)(A)(ii), (b)(1)(B)(ii)(II).

Here, UCMR data showed overwhelmingly that HFPO-DA does not frequently occur in public water systems, but EPA disregarded it—despite rely-

44

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ing on that same data when it supported EPA's conclusions for other compounds.

Other data the agency cites *confirmed* HFPO-DA's non-occurrence in all states' samples other than North Carolina, where Chemours's Fayetteville Works facility is located. But as EPA admitted, even the occurrence data from North Carolina was tainted by failures to report complete information, making it impossible to know the proportion of samples where HFPO-DA was detected. The set also only included data more "likely to potentially over-represent concentrations at locations of known or suspected contamination." 89-FR-32553. That is arbitrary agency action at its worst.

### 1.     *EPA ignored UCMR data undermining its conclusions*

**a.** The agency may regulate a contaminant only where it "is known to occur or there is a substantial likelihood that the contaminant will occur in public water systems with a frequency and at levels of public health concern." 42 U.S.C. § 300g–1(b)(1)(A)(ii). Critically, this finding "shall be based on the best available public health information, including the occurrence data" in the UCMR database. *Id.* § 300g–1(b)(1)(B)(ii)(II). A separate provision similarly instructs EPA that "[t]he [UCMR] data shall be used by the Administrator in making determinations under section 300g–1(b)(1) of this title with respect to the occurrence of a contaminant in drinking water at a level of public health concern." *Id.* § 300j–4(g)(3).

45

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

In 2021, at Congress' direction, EPA promulgated regulations adding HFPO-DA to UCMR 5, with a study period of 2023-2025. 86-FR-73131. EPA then rushed to issue the Rule in April 2024, months before the study period was to conclude.

**b.** The UCMR 5 data available to EPA at the time of regulation overwhelmingly demonstrates that HFPO-DA does *not* "occur in public water systems with a frequency and at levels of public health concern." 42 U.S.C. § 300g–1(b)(1)(A). Such data, covering all 50 states, showed only a single sampling location out of 6,946 that detected HFPO-DA at levels greater than 10 ppt—an occurrence rate of 0.01%. And currently, the UCMR database shows one sampling location out of 8,893:

| Regulated PFAS | MCL (µg/L)[1] | Total number of locations with a full set of results[2] | Number of locations with an average greater than MCL | % of locations with an average greater than MCL | Total number of PWSs with location(s) with a full set of results | Number of PWSs with average(s) greater than MCL | % of PWSs with average(s) greater than MCL |
|---|---|---|---|---|---|---|---|
| PFOS | 0.0040 | 8,887 | 524 | 5.9% | 3,459 | 316 | 9.1% |
| PFOA | 0.0040 | 8,888 | 445 | 5.0% | 3,460 | 246 | 7.1% |
| HFPO-DA (GenX chemicals) | 0.01 | 8,893 | 1 | 0.0% | 3,462 | 1 | 0.0% |

EPA, *The Fifth Unregulated Contaminant Monitoring Rule (UCMR 5) Data Summary*, at 11, table 4 (July 2024), https://perma.cc/3XTG-UFJX (yellow highlights added).

EPA has never imposed a Level for any other contaminant so infrequently detected at levels of concern. And its refusal to use accessible UCMR 5 data on this point was plainly unlawful.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**c.** Given Congress's express instructions that "[t]he data shall be used by the Administrator in making [regulation] determinations . . . with respect to the occurrence of a contaminant" (42 U.S.C. § 300j–4(g)(3)), and that MCLs "shall be based on . . . the occurrence data base" (*id.* § 300g–1(b)(1)), EPA's refusal to consider information from the database is unlawful per se.

EPA rejoins that, since the UCMR 5 dataset was not "complete" when it promulgated the Rule, *none* of the UCMR data was "available." EPA-Response 6-68 (JA___). In the agency's view, it was "not required under the statute to wait for another round of UCMR data to be collected before proposing or finalizing a regulation." *Id.* Nor was it under any "legal obligation to consider the preliminary, partial UCMR 5 dataset prior to rule promulgation." EPA-Response 6-69 (JA___).

That position is untenable. EPA's argument is based on Section 300g-1(b)(1)'s instruction to treat the UCMR data as containing "the best available information," ignoring Congress's separate command that "[t]he data shall be used by the Administrator in making [regulatory] determinations." *Id.* § 300j-4(g)(3). The latter instruction does not contain the word "available."

In any event, UCMR occurrence data *was* "available" to EPA. Three rounds of UCMR-5 data were released and analyzed before EPA finalized the Rule. Data is "available" if it is "accessible" or "capable of being made use of." *Collins* 137; *accord Webster's* 150. Nothing in the Act suggests that data

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

is unavailable until the dataset of which it is a part is fully complete. *See Chlorine Chemical Council*, 206 F.3d at 1290-91 ("EPA cannot reject the 'best available' evidence simply because of the possibility of contradiction in the future by evidence unavailable at the time of action"). The Act instructs that "information from the data base shall be *available* to the public in readily accessible form." 42 U.S.C. § 300j–4(g)(3) (emphasis added). That requires the data to be open to and able to be used by the public, *not* that it must be complete. And EPA has in fact made the database publicly accessible, without waiting for the data-collection cycle to conclude.

EPA's opposite position is contradicted by its reliance on other incomplete occurrence datasets. As explained more fully below, EPA relied on admittedly incomplete data from the states—but because it confirmed what EPA wanted to see, it insisted that those partial data should be "extrapolated to the nation." 89-FR-32557.

Likewise, EPA selectively relied on UCMR 5 data where it "confirm[ed] the EPA's conclusions" about the general prevalence of PFAS in public water systems. 89-FR-32526 (emphasis added); *see* EPA-Response 6-69–70 (JA__-__) ("[e]xtrapolat[ing]" from "preliminary UCMR 5 dataset" to assess prevalence of any contaminant combination "exceeding a PFAS MCL"). An agency errs when it includes incomplete data in support of a rule but excludes

48

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

similarly incomplete data in opposition to that rule. *See American Iron & Steel Institute v. OSHA*, 939 F.2d 975, 1009 (D.C. Cir. 1991).

At bottom, EPA's "refusal to consider evidence bearing on the issue before it" renders the Levels arbitrary and capricious. *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). Indeed, given Congress's express—and repeated—instructions to rely on UCMR data (42 U.S.C. §§ 300g-1(b)(1), 300j-4(g)(3)), EPA's refusal to consider information from the database is unlawful per se.

### 2.    *Alternative federal and state data sources do not support EPA's determination to regulate HFPO-DA*

Ignoring UCMR 5 data, EPA "extrapolate[d]" from a collection of alternative federal and state occurrence data sources. 89-FR-32577. But those sources also fail to demonstrate a "substantial likelihood" that HFPO-DA occurs at a frequency and level that support nationwide regulation. 42 U.S.C. § 300g–1(b)(1)(A). Indeed, they show the opposite.

First, EPA relied on additional federal datasets (PFAS Occur. at 7.2.2 (JA__)), which confirm the UCMR 5 data that HFPO-DA does not occur frequently in public water systems. Department of Defense data showed *zero* reported detections of HFPO-DA at or above 10 ppt out of 1,178 samples. *Id.* at Ex.7-12; Ex.5-16. And for ambient water—based on National Water Information System and EPA Storage and Retrieval data from "monitoring

49

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

locations in all 50 states"—there were, again, *zero* such detections. *Id.* at Ex.7-13, -14.

Second, EPA relied on State monitoring data. *Id.* at 7.2.1.1. But just 25 States participated, only 19 of which used non-targeted analyses (as necessary to avoid selection bias); and most sampled only a small fraction of public water systems within the State. *Id.* at Ex.7-7. Indeed, the data's incompleteness is precisely why EPA insists it should be "extrapolated." 89-FR-32577.

EPA admits that even the selected sources contain numerous deficiencies. States used "various reporting thresholds" that were "not defined consistently"; some states had no "clearly defined reporting limits" at all; others used reporting thresholds that "varied" even within the state; still other data varied according to "the laboratory analyzing the data"; and some states reported finding HFPO-DA at levels lower than what "can be reliably measured based on precision and accuracy acceptance criteria" (PFAS Occurrence 21 (JA__)), rendering their results suspect. Some States failed to report samples when HFPO-DA was *not* detected. 89-FR-32554, 32557, 32583. UCMR data, by contrast, has none of these flaws.

Still, even the spotty, incomplete state dataset showed that detection of HFPO-DA above the Level is exceedingly rare. Excluding North Carolina, HFPO-DA was detected above the Level in only seven out of 35,755 total samples—a rate of less than 0.02%. PFAS Occurrence Ex. 7-8 (JA__). EPA

50

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

attempts to obscure this fact, stating that "HFPO-DA was reported in approximately 0.48 percent of monitored *systems*." 89-FR-32577 (emphasis added). But that is the percentage who reported the substance in *any* amount, not at levels above 10 ppt.

In North Carolina, there were 430 detections at six water treatment plants along the Cape Fear River, but that is also not a basis for an occurrence finding: The majority of sampling in North Carolina—representing 428 of the 430 detections at levels above the Level—did not report the total number of samples taken (*i.e.*, the denominator), making it impossible to know the relevant proportion of samples. Without a denominator, the data is unusable for establishing frequency. *See Bismullah v. Gates*, 501 F.3d 178, 186 (D.C. Cir. 2007) (noting the impossibility of "tell[ing] whether a fraction is more or less than one half by looking only at the numerator and not at the denominator"). And even if this denominator-free data could establish that HFPO-DA occurs frequently at levels of concern *in North Carolina* (it cannot), that would not by itself establish a frequency of public health concern for issuing national regulations.

Thus, the state data, incomplete and flawed as they are, confirm the UCMR dataset—like the other federal datasets—showing that HFPO-DA does not occur frequently at levels of public health concern.

51

**B.     The Level for HFPO-DA is arbitrary and capricious**

Even if EPA's decision to regulate HFPO-DA were defensible, the Level it selected is not. The Level for HFPO-DA relies on several arbitrary and capricious assumptions: EPA used significantly inflated "uncertainty factors" to calculate its reference dose; applied a default relative source contribution, despite having access to concrete data about HFPO-DA's actual presence in the environment; relied on a toxicological effect irrelevant to humans, ignoring contrary evidence; and invented a new toxicological concept ("constellation of effects") with no valid basis. The Level for HFPO-DA must be vacated.

### 1.     *EPA relied on uncertainty factors that deviate from its own standard methods and ignored relevant evidence*

EPA applied a 3000-fold uncertainty factor—the most-stringent value it could possibly have used. 89-FR-32546. That uncertainty factor is an order of magnitude greater than the one EPA had applied in its draft Toxicity Assessment. Yet EPA provided no reasoned explanation for increasing the uncertainty factor in this way. Chemours raised the contradiction in a request for correction (Chemours RFC 25-26 (JA__-__)) and again in regulatory comments (Chemours.Comment Ex. 1 at 11-12 (JA__-__)), but EPA ignored the point both times.

Insofar as EPA attempted to justify this factor at all, it relied on new studies that actually *reduced* uncertainty regarding toxicity. Chemours RFC

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

26-27 (JA__-__); Ex. 3.6 (JA__). "[T]he absence of any evidentiary basis" for the database uncertainty factor is thus especially glaring, given contrary "empirical evidence supporting a lower [uncertainty] factor." *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 233 (D.C. Cir. 2008). EPA's purported "complete discussion" of the uncertainty factors (89-FR-32546) contains no reasoned explanation. It simply parrots the database uncertainty factor and lists the studies consulted. MCLG 2-1 - 2, A-9-11 (JA__-__).

The higher database factor is also inconsistent with EPA's own guidance: Where a reference dose is "based on animal data, a factor of 3 is often applied if either a prenatal toxicity study or a two-generation reproduction study is missing, or a factor of 10 may be applied if both are missing." EPA, *Guidelines for Developmental Toxicity Risk Assessment*, 45 (Dec. 5, 1991), https://perma.cc/N7DG-GG3V (*Guidelines*) (emphasis added). Here, EPA had multiple prenatal toxicity studies available. EPA's failure to confront relevant data and its own guidance provides no "assurance that the [agency] considered the relevant factors" *American Radio*, 524 F.3d at 241.

There was similarly no valid basis for increasing the duration uncertainty factor from 3 in the draft assessment to 10 in the final assessment. Both assessments relied on the same study, yet EPA failed to "provide a scientific basis for increasing that factor." Chemours RFC 28-29 (JA__-__); Chemours.Comment Ex. 1, at 11 (JA__). While an agency may reevaluate

53

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

existing data, "an agency changing its course must supply a reasoned analysis" for doing so. *State Farm*, 463 U.S. at 57 (citation omitted). Moreover, where, as here, relevant data fail to show substantial "progression of" the observed effects "with longer exposure duration," (Chemours RFC 28 (JA__)), EPA guidance instructs that "an uncertainty factor is not applied to account for duration of exposure" at all. *Guidelines* 42.

EPA emphasizes that it sought "external peer review of the toxicity assessment twice," (89-FR-32548), but seeking peer review does not validate an agency's conclusions when it ignores the feedback it receives.

EPA's choice of uncertainty factors also reflects an improperly frozen-in-time understanding of HFPO-DA. Chemours pointed EPA to extensive new data in the years since the 2021 Toxicity Assessment, all of which further reduced any database uncertainty. EPA's uncertainty factors are therefore even less appropriate now than they were in 2021.

### 2.   *The HFPO-DA Level relies on a flawed exposure assumption*

Yet another error dramatically reduced the Level's tolerance metric: EPA applied a relative source contribution (RSC) factor of 0.2. RSC "represents the proportion of an individual's total exposure to a contaminant that is attributed to drinking water ingestion . . . relative to other exposure pathways." 89-FR-32546. The 0.2 RSC assumes that drinking water accounts for only 20% of a person's exposure to the chemical, thus assuming that 80% of a

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

person's exposure will come from other sources, such as air, food, dust, and soil. 89-FR-32544. This assumption renders the Rule five times less tolerant of HFPO-DA in drinking water.

The agency based its exposure assumption on guidance that cabins the range of possible RSC values from 20% to 80%. EPA Office of Water, *Methodology for Deriving Ambient Water Quality Criteria for the Protection of Human Health*, 4.4-8 (Oct. 2000), https://perma.cc/X6YS-LAMC (*Methodology*). Although the guidance allows the 20% minimum as a "default" assumption "when adequate exposure data do not exist," (*id.* at 4.1-7, 4-6), it strongly cautions against using the default when information is "available" that "more accurately reflects exposures." *Id.* at 4.4-6. The guidance thus underscores several times that the default will be appropriate only "infrequently," since information necessary to calculate the relative source contribution "should be available in most cases." *Id.* at 4.4-12.

Here, EPA had ample information to calculate a more-accurate RSC. EPA claims that "commenters did not offer a suggested alternative RSC." 89-FR-32456. That was not commenters' responsibility. But the claim is also false: Chemours commented that "the data support the use of an RSC value of at least 80%," and provided 22 independent studies for support. Chemours.Comment 22 (JA__).

55

These data uniformly showed that "the only relevant exposure pathway for HFPO is drinking water," and exposure from non-drinking-water pathways "is either non-existent or extremely minimal." Chemours.Comment at 14, n14 (JA__). Multiple studies showed no significant exposure levels through other pathways. Chemours.Comment at 13-14 & nn.5-16 (JA__). EPA simply disregarded them.

EPA also ignored data confirming these studies. The Agency for Toxic Substances and Disease Registry monitored HFPO-DA at eight separate "Exposure Assessment sites," but found none in "urine or dust samples." CA3JA1380. Though one EPA official observed that "[t]he lack of detects in dust etc will be interesting when considering a RSC," CA3JA1380, the agency failed to mention these data.

Instead, EPA asserted (without explanation) that it had "assessed the available scientific literature on potential sources of human exposure [to HFPO-DA] other than drinking water." 89-FR-32546. Curiously, although EPA claimed the data were "insufficient to allow for quantitative characterization of the different exposure sources" (89-FR-32546), it relied on the same studies to proclaim that "there are significant known or potential uses/sources of HFPO-DA other than drinking water." MCLG A-15 (JA__). EPA then summarily concluded that the default RSC of 0.2 was appropriate. *Methodology* 4.4-12. This "mere[] assert[ion], without elaboration," is "insuf-

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ficient to sustain the agency's decision." *Gerber v. Norton*, 294 F.3d 173, 183 (D.C. Cir. 2002).

### 3.    *The HFPO-DA Level relied upon toxicological effects on rodent livers that are irrelevant to humans*

The reference dose underlying the Level is based on studies showing liver effects in rodents through a mode of action (PPAR-alpha) irrelevant to humans. In the Toxicity Assessment, EPA admitted that the PPAR-alpha mode of action "could be more relevant to rodents than humans." EPA Office of Water, *Human Health Toxicity Assessments for GenX Chemicals*, 29 (Oct. 2021) (*Assessments*). But the agency then speculated—without basis—that "other" modes of action for the observed liver effects might exist. *Assessments* 86. As Chemours explained to EPA, there is no "explanation, evidence, or analysis to support its hypotheses, and in some instances the citations relied upon by EPA are directly contrary to its theory." Chemours RFC 20 (JA__). EPA asserted that the studies it had examined supported the opposite conclusion. 89-FR-32548. That unsupported speculation cannot withstand scrutiny.

First, EPA has stated that Chemours's research focused on only one type of liver effect (apoptosis), while "the critical study selected by the EPA, and indeed other studies as well reported not only apoptosis but also other liver effects such as necrosis," and those other liver effects "are not associated with" the PPAR-alpha mode of action. 89-FR-32548. But Chemours's argu-

57

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ment has never been limited to apoptosis: All rodent liver effects underpinning the MCL—including necrosis and enzyme concentrations—are related to the PPAR-alpha mode of action. Chemours RFC 18-22; Chemours.Comment 19-20 (JA__-__); Ex. 1, at 10-11 (JA__-__). Chemours supported this with substantial data. *See* Chemours RFC 22-23 (JA__-__); Ex. 2, at 6 (JA__); 9-11 (JA__-__) (necrosis); Ex. 2 at 17-18 (JA__-__); Ex. 3 at 11 (JA__) (enzymes). EPA again ignored it.

Second, EPA dismissed the peer-reviewed Chappell study, which found that the rodent liver effects underpinning the Toxicity Assessment "are PPAR-alpha effects." Chemours RFC 18 (JA__); Chemours.Comment 18 (JA__). EPA discounted the study on grounds that it "specifically assessed evidence for PPARα-driven apoptosis and did not investigate other potential modes of action or types of cell death." 89-FR-32548. That is also is incorrect: The Chappell study explicitly states that "other transcriptional targets and/or mechanisms related to liver toxicity were also investigated." CA3JA1082. Again, EPA simply "ignore[d] evidence contradicting its position." *Butte County*, 613 F.3d at 194.

### 4.    *The HFPO-DA Level relies on a novel toxicological endpoint to generate an artificially low reference dose*

EPA's toxicity assessment is based on the National Toxicology Program Pathology Working Group, which reinterpreted a prior study in which liver

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

effects were observed in mice that were orally exposed to HFPO-DA. *Assessments* 41-44, 51-52, App. D (JA__-__); 89-FR-32548. In the draft toxicity assessment, consistent with standard practice, EPA relied on a single "toxicological endpoint." *Draft Assessments* vii-viii, 23 (JA__-__).

In the final Toxicity Assessment, however, EPA combined four different effects, thereby producing a so-called "constellation of liver effects." [Tox.Assessment.52; MCL.32544]. As Chemours explained, "[n]ot only is EPA's 'constellation of liver effects' unprecedented and a significant deviation from its standard toxicity assessment methods, but it is also erroneous and at odds with the science." Chemours RFC 24 (JA__); *see* Chemours.Comment 18 (JA__); Ex. 1 at 9-10 (JA__).

EPA again relied on the supposed "constellation of liver effects." 89-FR-32544. And again, the agency failed to acknowledge (much less rebut) contrary evidence. EPA seeks to defend its invented concept by emphasizing that the agency "engaged a pathology working group within the [National Toxicology Program] at the National Institutes of Health to perform an independent analysis of the liver tissue slides." 89-FR-32548. But, notably, the Pathology Working Group never claimed that rodent-study findings were indicative of effects in humans, much less "agreed with the selection of the constellation of liver lesions as the critical effect." 89-FR-32548. The Group in

fact distinguished between separate effects. It was EPA that (improperly) combined them into a single dataset.

## CONCLUSION

The Court should vacate the Rule in its entirety.

Respectfully submitted October 7, 2024,

/s/ *Allon Kedem*                                   /s/ *Michael B. Kimberly*

ALLON KEDEM                                     MICHAEL B. KIMBERLY
JOEL M. GROSS                                   NICOLE E. WITTSTEIN
  *Arnold & Porter Kaye Scholer LLP*              *McDermott Will & Emery LLP*
  *601 Massachusetts Ave., NW*                    *500 N. Capitol Street NW*
  *Washington, DC 20001*                          *Washington, DC 20001*
  *(202) 942-5000*                                *(202) 756-8000*

*Counsel for Petitioners*                         *Counsel for Petitioners*
*in No. 24-1192*                                  *in No. 24-1191*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(g), I certify that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7) because it contains 12,994 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(e)(1); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is typeset in Century Supra in font size 14.

Dated: October 7, 2024                    /s/ *Michael B. Kimberly*

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 7, 2024, I electronically filed the foregoing brief with the Clerk of the Court using the appellate CM/ECF system, which served copies of the brief via on all ECF-registered counsel.

Dated: October 7, 2024                    /s/ *Michael B. Kimberly*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ADDENDUM A**

**ADDENDUM A**
**TABLE OF CONTENTS**

**42 U.S.C. § 300g-1(b)(1)**
  Identification of contaminants for listing.. ................................... Add. A2

**42 U.S.C. § 300g-1(b)(2)**
  Schedules and deadlines........................................................... Add. A5

**42 U.S.C. § 300g-1(b)(3)**
  Risk assessment, management, and communication. .................... Add. A6

**42 U.S.C. § 300g-1(b)(4)**
  Goals and standards. ................................................................ Add. A9

**42 U.S.C. § 300g-1(b)(6)**
  Additional health risk reduction and cost considerations. ........... Add. A12

**42 U.S.C. § 300g-1(e)**
  Science Advisory Board comments. ........................................... Add. A13

**42 U.S.C. § 300j-4(g)**
  Occurrence data base ............................................................... Add. A14

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**42 U.S.C. § 300g-1(b)(1) provides:**

**(1) Identification of contaminants for listing.—**

**(A)** General authority.—The Administrator shall, in accordance with the procedures established by this subsection, publish a maximum contaminant level goal and promulgate a national primary drinking water regulation for a contaminant (other than a contaminant referred to in paragraph (2) for which a national primary drinking water regulation has been promulgated as of August 6, 1996) if the Administrator determines that—

**(i)** the contaminant may have an adverse effect on the health of persons;

**(ii)** the contaminant is known to occur or there is a substantial likelihood that the contaminant will occur in public water systems with a frequency and at levels of public health concern; and

**(iii)** in the sole judgment of the Administrator, regulation of such contaminant presents a meaningful opportunity for health risk reduction for persons served by public water systems.

**(B)** Regulation of unregulated contaminants.—

**(i)** Listing of contaminants for consideration.—

**(I)** Not later than 18 months after August 6, 1996, and every 5 years thereafter, the Administrator, after consultation with the scientific community, including the Science Advisory Board, after notice and opportunity for public comment, and after considering the occurrence data base established under section 300j–4(g) of this title, shall publish a list of contaminants which, at the time of publication, are not subject to any proposed or promulgated national primary drinking water regulation, which are known or anticipated to occur in public water systems, and which may require regulation under this subchapter.

**(II)** The unregulated contaminants considered under subclause (I) shall include, but not be limited to, substances referred to in

Add. A2

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

section 9601(14) of this title, and substances registered as pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act [7 U.S.C. 136 et seq.].

**(III)** The Administrator's decision whether or not to select an unregulated contaminant for a list under this clause shall not be subject to judicial review.

**(ii)** Determination to regulate.—

**(I)** Not later than 5 years after August 6, 1996, and every 5 years thereafter, the Administrator shall, after notice of the preliminary determination and opportunity for public comment, for not fewer than 5 contaminants included on the list published under clause (i), make determinations of whether or not to regulate such contaminants.

**(II)** A determination to regulate a contaminant shall be based on findings that the criteria of clauses (i), (ii), and (iii) of subparagraph (A) are satisfied. Such findings shall be based on the best available public health information, including the occurrence data base established under section 300j–4(g) of this title.

**(III)** The Administrator may make a determination to regulate a contaminant that does not appear on a list under clause (i) if the determination to regulate is made pursuant to subclause (II).

**(IV)** A determination under this clause not to regulate a contaminant shall be considered final agency action and subject to judicial review.

**(iii)** Review.—

Each document setting forth the determination for a contaminant under clause (ii) shall be available for public comment at such time as the determination is published.

Add. A3

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**(C)** Priorities.—

In selecting unregulated contaminants for consideration under subparagraph (B), the Administrator shall select contaminants that present the greatest public health concern. The Administrator, in making such selection, shall take into consideration, among other factors of public health concern, the effect of such contaminants upon subgroups that comprise a meaningful portion of the general population (such as infants, children, pregnant women, the elderly, individuals with a history of serious illness, or other subpopulations) that are identifiable as being at greater risk of adverse health effects due to exposure to contaminants in drinking water than the general population.

**(D)** Urgent threats to public health.—

The Administrator may promulgate an interim national primary drinking water regulation for a contaminant without making a determination for the contaminant under paragraph (4)(C), or completing the analysis under paragraph (3)(C), to address an urgent threat to public health as determined by the Administrator after consultation with and written response to any comments provided by the Secretary of Health and Human Services, acting through the director of the Centers for Disease Control and Prevention or the director of the National Institutes of Health. A determination for any contaminant in accordance with paragraph (4)(C) subject to an interim regulation under this subparagraph shall be issued, and a completed analysis meeting the requirements of paragraph (3)(C) shall be published, not later than 3 years after the date on which the regulation is promulgated and the regulation shall be repromulgated, or revised if appropriate, not later than 5 years after that date.

**(E)** Regulation.—

For each contaminant that the Administrator determines to regulate under subparagraph (B), the Administrator shall publish maximum contaminant level goals and promulgate, by rule, national primary drinking water regulations under this subsection. The Administrator shall propose the maximum contaminant level goal and national primary drinking water regulation for a contaminant not later than 24 months after

Add. A4

the determination to regulate under subparagraph (B), and may publish such proposed regulation concurrent with the determination to regulate. The Administrator shall publish a maximum contaminant level goal and promulgate a national primary drinking water regulation within 18 months after the proposal thereof. The Administrator, by notice in the Federal Register, may extend the deadline for such promulgation for up to 9 months.

**(F)** Health advisories and other actions.—

The Administrator may publish health advisories (which are not regulations) or take other appropriate actions for contaminants not subject to any national primary drinking water regulation.

**42 U.S.C. § 300g-1(b)(2) provides:**

**(2) Schedules and deadlines.—**

**(A)** In general.—In the case of the contaminants listed in the Advance Notice of Proposed Rulemaking published in volume 47, Federal Register, page 9352, and in volume 48, Federal Register, page 45502, the Administrator shall publish maximum contaminant level goals and promulgate national primary drinking water regulations—

**(i)** not later than 1 year after June 19, 1986, for not fewer than 9 of the listed contaminants;

**(ii)** not later than 2 years after June 19, 1986, for not fewer than 40 of the listed contaminants; and

**(iii)** not later than 3 years after June 19, 1986, for the remainder of the listed contaminants.

**(B)** Substitution of contaminants.—

If the Administrator identifies a drinking water contaminant the regulation of which, in the judgment of the Administrator, is more likely to be protective of public health (taking into account the schedule for regulation under subparagraph (A)) than a contaminant referred to in subparagraph (A), the Administrator may publish a maximum contaminant

Add. A5

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

level goal and promulgate a national primary drinking water regulation for the identified contaminant in lieu of regulating the contaminant referred to in subparagraph (A). Substitutions may be made for not more than 7 contaminants referred to in subparagraph (A). Regulation of a contaminant identified under this subparagraph shall be in accordance with the schedule applicable to the contaminant for which the substitution is made.

**(C)** Disinfectants and disinfection byproducts.—

The Administrator shall promulgate an Interim Enhanced Surface Water Treatment Rule, a Final Enhanced Surface Water Treatment Rule, a Stage I Disinfectants and Disinfection Byproducts Rule, and a Stage II Disinfectants and Disinfection Byproducts Rule in accordance with the schedule published in volume 59, Federal Register, page 6361 (February 10, 1994), in table III.13 of the proposed Information Collection Rule. If a delay occurs with respect to the promulgation of any rule in the schedule referred to in this subparagraph, all subsequent rules shall be completed as expeditiously as practicable but no later than a revised date that reflects the interval or intervals for the rules in the schedule.

**42 U.S.C. § 300g-1(b)(3) provides:**

**(3) Risk assessment, management, and communication.—**

**(A)** Use of science in decisionmaking.—In carrying out this section, and, to the degree that an Agency action is based on science, the Administrator shall use—

**(i)** the best available, peer-reviewed science and supporting studies conducted in accordance with sound and objective scientific practices; and

**(ii)** data collected by accepted methods or best available methods (if the reliability of the method and the nature of the decision justifies use of the data).

**(B)** Public information.—In carrying out this section, the Administrator shall ensure that the presentation of information on public health effects

Add. A6

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

is comprehensive, informative, and understandable. The Administrator shall, in a document made available to the public in support of a regulation promulgated under this section, specify, to the extent practicable—

**(i)** each population addressed by any estimate of public health effects;

**(ii)** the expected risk or central estimate of risk for the specific populations;

**(iii)** each appropriate upper-bound or lower-bound estimate of risk;

**(iv)** each significant uncertainty identified in the process of the assessment of public health effects and studies that would assist in resolving the uncertainty; and

**(v)** peer-reviewed studies known to the Administrator that support, are directly relevant to, or fail to support any estimate of public health effects and the methodology used to reconcile inconsistencies in the scientific data.

**(C)** Health risk reduction and cost analysis.—

**(i)** Maximum contaminant levels.—When proposing any national primary drinking water regulation that includes a maximum contaminant level, the Administrator shall, with respect to a maximum contaminant level that is being considered in accordance with paragraph (4) and each alternative maximum contaminant level that is being considered pursuant to paragraph (5) or (6)(A), publish, seek public comment on, and use for the purposes of paragraphs (4), (5), and (6) an analysis of each of the following:

**(I)** Quantifiable and nonquantifiable health risk reduction benefits for which there is a factual basis in the rulemaking record to conclude that such benefits are likely to occur as the result of treatment to comply with each level.

**(II)** Quantifiable and nonquantifiable health risk reduction benefits for which there is a factual basis in the rulemaking record to conclude that such benefits are likely to occur from reductions in

Add. A7

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

co-occurring contaminants that may be attributed solely to compliance with the maximum contaminant level, excluding benefits resulting from compliance with other proposed or promulgated regulations.

**(III)** Quantifiable and nonquantifiable costs for which there is a factual basis in the rulemaking record to conclude that such costs are likely to occur solely as a result of compliance with the maximum contaminant level, including monitoring, treatment, and other costs and excluding costs resulting from compliance with other proposed or promulgated regulations.

**(IV)** The incremental costs and benefits associated with each alternative maximum contaminant level considered.

**(V)** The effects of the contaminant on the general population and on groups within the general population such as infants, children, pregnant women, the elderly, individuals with a history of serious illness, or other subpopulations that are identified as likely to be at greater risk of adverse health effects due to exposure to contaminants in drinking water than the general population.

**(VI)** Any increased health risk that may occur as the result of compliance, including risks associated with co-occurring contaminants.

**(VII)** Other relevant factors, including the quality and extent of the information, the uncertainties in the analysis supporting subclauses (I) through (VI), and factors with respect to the degree and nature of the risk.

**(ii)** Treatment techniques.—

When proposing a national primary drinking water regulation that includes a treatment technique in accordance with paragraph (7)(A), the Administrator shall publish and seek public comment on an analysis of the health risk reduction benefits and costs likely to be experienced as the result of compliance with the treatment technique and

Add. A8

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

alternative treatment techniques that are being considered, taking into account, as appropriate, the factors described in clause (i).

**(iii)** Approaches to measure and value benefits.—

The Administrator may identify valid approaches for the measurement and valuation of benefits under this subparagraph, including approaches to identify consumer willingness to pay for reductions in health risks from drinking water contaminants.

**(iv)** Authorization.—

There are authorized to be appropriated to the Administrator, acting through the Office of Ground Water and Drinking Water, to conduct studies, assessments, and analyses in support of regulations or the development of methods, $35,000,000 for each of fiscal years 1996 through 2003.

**42 U.S.C. § 300g-1(b)(4) provides:**

**(4) Goals and standards.—**

**(A)** Maximum contaminant level goals.—

Each maximum contaminant level goal established under this subsection shall be set at the level at which no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety.

**(B)** Maximum contaminant levels.—

Except as provided in paragraphs (5) and (6), each national primary drinking water regulation for a contaminant for which a maximum contaminant level goal is established under this subsection shall specify a maximum contaminant level for such contaminant which is as close to the maximum contaminant level goal as is feasible.

**(C)** Determination.—

At the time the Administrator proposes a national primary drinking water regulation under this paragraph, the Administrator shall publish a

Add. A9

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

determination as to whether the benefits of the maximum contaminant level justify, or do not justify, the costs based on the analysis conducted under paragraph (3)(C).

**(D)** Definition of feasible.—

For the purposes of this subsection, the term "feasible" means feasible with the use of the best technology, treatment techniques and other means which the Administrator finds, after examination for efficacy under field conditions and not solely under laboratory conditions, are available (taking cost into consideration). For the purpose of this paragraph, granular activated carbon is feasible for the control of synthetic organic chemicals, and any technology, treatment technique, or other means found to be the best available for the control of synthetic organic chemicals must be at least as effective in controlling synthetic organic chemicals as granular activated carbon.

**(E)** Feasible technologies.—

**(i)** In general.—

Each national primary drinking water regulation which establishes a maximum contaminant level shall list the technology, treatment techniques, and other means which the Administrator finds to be feasible for purposes of meeting such maximum contaminant level, but a regulation under this subsection shall not require that any specified technology, treatment technique, or other means be used for purposes of meeting such maximum contaminant level.

**(ii)** List of technologies for small systems.—The Administrator shall include in the list any technology, treatment technique, or other means that is affordable, as determined by the Administrator in consultation with the States, for small public water systems serving—

**(I)** a population of 10,000 or fewer but more than 3,300;

**(II)** a population of 3,300 or fewer but more than 500; and

**(III)** a population of 500 or fewer but more than 25;

Add. A10

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and that achieves compliance with the maximum contaminant level or treatment technique, including packaged or modular systems and point-of-entry or point-of-use treatment units. Point-of-entry and point-of-use treatment units shall be owned, controlled and maintained by the public water system or by a person under contract with the public water system to ensure proper operation and maintenance and compliance with the maximum contaminant level or treatment technique and equipped with mechanical warnings to ensure that customers are automatically notified of operational problems. The Administrator shall not include in the list any point-of-use treatment technology, treatment technique, or other means to achieve compliance with a maximum contaminant level or treatment technique requirement for a microbial contaminant (or an indicator of a microbial contaminant). If the American National Standards Institute has issued product standards applicable to a specific type of point-of-entry or point-of-use treatment unit, individual units of that type shall not be accepted for compliance with a maximum contaminant level or treatment technique requirement unless they are independently certified in accordance with such standards. In listing any technology, treatment technique, or other means pursuant to this clause, the Administrator shall consider the quality of the source water to be treated.

**(iii)** List of technologies that achieve compliance.—

Except as provided in clause (v), not later than 2 years after August 6, 1996, and after consultation with the States, the Administrator shall issue a list of technologies that achieve compliance with the maximum contaminant level or treatment technique for each category of public water systems described in subclauses (I), (II), and (III) of clause (ii) for each national primary drinking water regulation promulgated prior to June 19, 1986.

**(iv)** Additional technologies.—

The Administrator may, at any time after a national primary drinking water regulation has been promulgated, supplement the list of technologies describing additional or new or innovative treatment

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

technologies that meet the requirements of this paragraph for categories of small public water systems described in subclauses (I), (II), and (III) of clause (ii) that are subject to the regulation.

**(v)** Technologies that meet surface water treatment rule.—

Within one year after August 6, 1996, the Administrator shall list technologies that meet the Surface Water Treatment Rule for each category of public water systems described in subclauses (I), (II), and (III) of clause (ii).

**42 U.S.C. § 300g-1(b)(6) provides:**

**(6) Additional health risk reduction and cost considerations.—**

**(A)** In general.—

Notwithstanding paragraph (4), if the Administrator determines based on an analysis conducted under paragraph (3)(C) that the benefits of a maximum contaminant level promulgated in accordance with paragraph (4) would not justify the costs of complying with the level, the Administrator may, after notice and opportunity for public comment, promulgate a maximum contaminant level for the contaminant that maximizes health risk reduction benefits at a cost that is justified by the benefits.

**(B)** Exception.—The Administrator shall not use the authority of this paragraph to promulgate a maximum contaminant level for a contaminant, if the benefits of compliance with a national primary drinking water regulation for the contaminant that would be promulgated in accordance with paragraph (4) experienced by—

**(i)** persons served by large public water systems; and

**(ii)** persons served by such other systems as are unlikely, based on information provided by the States, to receive a variance under section 300g–4(e) of this title (relating to small system variances);

would justify the costs to the systems of complying with the regulation. This subparagraph shall not apply if the contaminant is found almost

Add. A12

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

exclusively in small systems eligible under section 300g–4(e) of this title for a small system variance.

**(C)** Disinfectants and disinfection byproducts.—

The Administrator may not use the authority of this paragraph to establish a maximum contaminant level in a Stage I or Stage II national primary drinking water regulation (as described in paragraph (2)(C)) for contaminants that are disinfectants or disinfection byproducts, or to establish a maximum contaminant level or treatment technique requirement for the control of cryptosporidium. The authority of this paragraph may be used to establish regulations for the use of disinfection by systems relying on ground water sources as required by paragraph (8).

**(D)** Judicial review.—

A determination by the Administrator that the benefits of a maximum contaminant level or treatment requirement justify or do not justify the costs of complying with the level shall be reviewed by the court pursuant to section 300j–7 of this title only as part of a review of a final national primary drinking water regulation that has been promulgated based on the determination and shall not be set aside by the court under that section unless the court finds that the determination is arbitrary and capricious.

**42 U.S.C. § 300g-1(e) provides:**

**(e) Science Advisory Board comments**

The Administrator shall request comments from the Science Advisory Board (established under the Environmental Research, Development, and Demonstration Act of 1978) prior to proposal of a maximum contaminant level goal and national primary drinking water regulation. The Board shall respond, as it deems appropriate, within the time period applicable for promulgation of the national primary drinking water standard concerned. This subsection shall, under no circumstances, be used to delay final promulgation of any national primary drinking water standard.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**42 U.S.C. § 300j-4(g)**

**(g) Occurrence data base**

**(1)** In general

Not later than 3 years after August 6, 1996, the Administrator shall assemble and maintain a national drinking water contaminant occurrence data base, using information on the occurrence of both regulated and unregulated contaminants in public water systems obtained under subsection (a)(1)(A) or subsection (a)(2) and reliable information from other public and private sources.

**(2)** Public input

In establishing the occurrence data base, the Administrator shall solicit recommendations from the Science Advisory Board, the States, and other interested parties concerning the development and maintenance of a national drinking water contaminant occurrence data base, including such issues as the structure and design of the data base, data input parameters and requirements, and the use and interpretation of data.

**(3)** Use

The data shall be used by the Administrator in making determinations under section 300g–1(b)(1) of this title with respect to the occurrence of a contaminant in drinking water at a level of public health concern.

**(4)** Public recommendations

The Administrator shall periodically solicit recommendations from the appropriate officials of the National Academy of Sciences and the States, and any person may submit recommendations to the Administrator, with respect to contaminants that should be included in the national drinking water contaminant occurrence data base, including recommendations with respect to additional unregulated contaminants that should be listed under subsection (a)(2). Any recommendation submitted under this clause shall be accompanied by reasonable documentation that—

    **(A)** the contaminant occurs or is likely to occur in drinking water; and

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**(B)** the contaminant poses a risk to public health.

**(5)** Public availability

The information from the data base shall be available to the public in readily accessible form.

**(6)** Regulated contaminants

With respect to each contaminant for which a national primary drinking water regulation has been established, the data base shall include information on the detection of the contaminant at a quantifiable level in public water systems (including detection of the contaminant at levels not constituting a violation of the maximum contaminant level for the contaminant).

**(7)** Unregulated contaminants

With respect to contaminants for which a national primary drinking water regulation has not been established, the data base shall include—

**(A)** monitoring information collected by public water systems that serve a population of more than 10,000, as required by the Administrator under subsection (a);

**(B)** monitoring information collected from a representative sampling of public water systems that serve a population of 10,000 or fewer;

**(C)** if applicable, monitoring information collected by public water systems pursuant to subsection (j) that is not duplicative of monitoring information included in the data base under subparagraph (B) or (D); and

**(D)** other reliable and appropriate monitoring information on the occurrence of the contaminants in public water systems that is available to the Administrator.

Add. A15

**ADDENDUM B**

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ADDENDUM B**
**TABLE OF CONTENTS**

**Declaration of Christopher Netram**
    Declaration for the National Association of Manufacturers........... Add. B2

**Declaration of Robert J. Simon**
    Declaration for the American Chemistry Council ......................... Add. B7

**Declaration of Todd A. Coomes**
    Declaration for The Chemours Company......................................Add. B13

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

No. 24-1191

# United States Court of Appeals
## District of Columbia Circuit

National Association of Manufacturers *and*
American Chemistry Council,

*Petitioners,*

— v. —

United States Environmental Protection Agency *and*
Michael S. Regan, *in his official capacity as EPA Administrator,*

*Respondents.*

**DECLARATION OF CHRISTOPHER NETRAM
IN SUPPORT OF PETITIONERS**

I, Christopher Netram, hereby declare as follows:

1.      I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.      I am the Managing Vice President of Policy at the National Association of Manufacturers (NAM). I am authorized to make this declaration on the NAM's behalf. The NAM's headquarters are located at 733 10th St NW, Suite 700, Washington, D.C., 20001.

3.      The NAM advocates for the nearly 13 million people who make things in America. Founded in 1895, the NAM is the nation's largest manufacturing industrial trade association. Its 14,000 member companies range from small businesses to multinational firms operating in all 50

Add. B2

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

states. Its members are engaged in every manufacturing sector, from energy to healthcare to national defense.

4.    The NAM advances its members' interests by interfacing directly with law and policymakers on every facet of manufacturing policy. Its work includes litigation to protect and advance its members interests, as well as education and advocacy work.

5.    Several NAM members have manufactured perfluoroalkyl and polyfluoroalkyl substances (PFAS) for use in their operations and products. And many more have used or relied on PFAS in their supply chain. PFAS have played a critical role in developing the products that have sustained modern America, such as medical technologies, semiconductors, batteries, phones, cars, and airplanes. For many of the NAM's members, the unique properties of PFAS have been indispensable.

6.    In recent years, the NAM's members have begun innovating new chemicals that might replace PFAS throughout America's critical industries, and several have begun phasing certain PFAS compounds out of their manufacturing. But despite these efforts, the NAM's members remain under persistent threat of legal action, including from state water systems and private parties. *See* Hiroko Tabuchi, *Lawyers to Plastics Makers: Prepare for 'Astronomical' PFAS Lawsuits*, New York Times (May 28, 2024), https://nyti.ms/4glJWEm; Jeffrey Kluger, *'Forever Chemical' Lawsuits Could Ultimately Eclipse the Big Tobacco Settlement*, TIME (July 12, 2023), https://bit.ly/3Xmy2B8.

7.    I have reviewed and am familiar with the petition for review and opening brief filed in this case. I understand that the lawsuit challenges EPA's final rule, *PFAS National Primary Drinking Water Regulation*, 89 Fed. Reg. 32532 (Apr. 26, 2024) (the Rule). I further understand

2

Add. B3

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

that the Rule establishes National Primary Drinking Water Regulations (NPDWR) for six PFAS substances: PFOA, perfluoro-octane sulfonic acid (PFOS), perfluorohexane sulfonic acid (PFHxS), perfluorononanoic acid (PFNA), hexafluoropropylene oxide dimer acid (HFPO-DA), and perfluorobutane sulfonic acid (PFBS). The Rule establishes maximum contaminant level goals (MCLGs) of 0 ng/L and enforceable maximum contaminant levels (MCLs) of 4 ng/L, for PFOA and PFOS. It also establishes MCLGs and MCLs of 10 ng/L for PFHxS, PFNA, and HFPO-DA, as well as a Hazard Index of 1.0 for a mixture of two or more of PFHxS, PFNA, HFPO-DA, or PFBS.

8.      Compliance with the Rule's MCLs will generate enormous costs, much borne by the NAM's members. EPA estimates the Rule's total annualized cost will be over $1.5 billion. 89 Fed. Reg. at 32665-32666.

9.      Advocating for a Rule that complies with the requirements of the Safe Drinking Water Act and the Administrative Procedure Act and challenging the Rule as arbitrary and capricious and beyond the Agency's authority falls within the NAM's mission to advance its members' longstanding interests. The NAM commented on the proposed rule before it was finalized. Comment by the National Association of Manufacturers on EPA PFAS National Primary Drinking Water Regulation Rulemaking Preliminary Regulatory Determination and Proposed Rule, Docket No. EPA-HQ-OW-2022-0114 (May 30, 2023).

10.     The NAM also assists its members and the manufacturing industry more broadly by educating its members and the public. The NAM has expended resources to educate its members on the complexities and uncertainties of the Rule.

11.     The immediate harm the NAM's members face from PFAS-related litigation includes the risks associated with lawsuits filed by municipal water systems and others required

Add. B4

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

to comply with the Rule, including the costs of defending against such suits. Indeed, these are costs manufacturers have already begun to bear. *See, e.g.*, Clark Mindock, *New PFAS Lawsuit Cites EPA's 'Forever Chemicals' Drinking Water Rules*, Reuters (Apr. 15, 2024), https://www.reuters.com/legal/litigation/new-pfas-lawsuit-cites-epas-forever-chemicals-drinking-water-rules-2024-04-15/ (discussing PFAS remediation suit filed against PFAS manufacturers). Several states and municipalities have recently filed lawsuits across the country seeking to hold manufacturers, including several NAM members, liable for the cleanup costs they stand to incur to come into compliance. *See, e.g.*, Compl. ¶¶ 115-120, 130-138, *City of Columbia v. 3M et al*, 24-CP-40-03392 (June 4, 2024). The Columbia, South Carolina suit relies on the Rule to provide the standard for liability, meaning that the Rule is directly increasing the liability risk that the NAM's members are facing in pending litigation.

12.    The Rule's immediate impact on the NAM's members stems also from the contemporaneous promulgation of the final rule, *Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances*, 89 Fed. Reg. 39124 (May 8, 2024). This rule designates two PFAS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). This designation confers EPA with cleanup and enforcement authority to require regulated entities, including NAM members, to pay cleanup costs for PFAS contamination under certain circumstances.

13.    MCLs under the SDWA can provide "a relevant and appropriate standard" for determining remedial action under CERCLA. *See* 42 U.S.C. § 9621(d)(2)(A). The collective impact of the CERCLA rule and the Rule's MCLs create a risk of CERCLA liability and litigation defense costs where MCLs are allegedly exceeded. EPA has stated expressly that it plans to subject PFAS

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

manufacturers to such liability, recently announcing in a guidance memorandum that the agency will "focus on holding accountable those parties that have played a significant role in releasing or exacerbating the spread of PFAS into the environment, such as those who have manufactured PFAS or used PFAS in the manufacturing process." *PFAS Enforcement Discretion and Settlement Policy Under CERCLA*, EPA (Apr. 19, 2024), https://perma.cc/P9NP-5GUR. This threat of imminent enforcement impacts not only NAM members who have manufactured PFAS themselves, but its many members who have used PFAS in producing myriad medical devices, automobiles, airplanes, consumer goods, defense systems, and more.

14.     In sum, the NAM's members face immediate and ongoing risk of enormous economic harm stemming directly from the Rule and its new MCLs for several PFAS compounds. An order from the Court vacating the Rule would redress these harms.

I declare under penalty of perjury that the foregoing is true and correct.

Signed: _____

Name & Title: __Christyln Netram, Managing VP, Policy__

Date: __10/7/2024__

5

Add. B6

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**No. 24-1191**

_____

# United States Court of Appeals
## District of Columbia Circuit

_____

National Association of Manufacturers *and*
American Chemistry Council,

*Petitioners*,

– v. –

United States Environmental Protection Agency *and*
Michael S. Regan, *in his official capacity as EPA Administrator*,

*Respondents*.

_____

**DECLARATION OF ROBERT J. SIMON IN SUPPORT OF PETITIONERS**

_____

I, Robert J. Simon, hereby declare as follows:

1.     I am over the age of eighteen. If called as a witness in this action, I could testify to the facts stated herein.

2.     I am the Vice President, Chemical Products & Technology Division, at the American Chemistry Council (ACC). I am authorized to make this declaration on the ACC's behalf. ACC's headquarters are located at 700 2nd St NE, Washington, DC 20002.

3.     The ACC represents more than 190 companies engaged in the business of chemistry—an innovative, economic growth engine that is helping to solve the biggest challenges facing the nation and the world. Its members are the leading companies engaged in all aspects of the business of chemistry, from large corporations to small businesses. ACC's members'

Add. B7

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

groundbreaking innovations improve the world around us by making it healthier, safer, more sustainable, and more productive. The industry's products make it possible to sustain a growing world population, including by protecting food, air, and water supply, supplying affordable energy sources, and delivering new medical treatments.

4.      ACC's core vision is to protect the chemistry industry's unique role in facilitating the growth and global leadership of American industry. Its member-driven philosophy makes ACC the leading, collective voice of the chemistry business. It advocates a science-based public policy agenda to create jobs, spur economic growth, and enhance public and environmental health and safety. This work includes participating in litigation on its members' behalf to promote or combat policies affecting their interests where warranted.

5.      ACC's members have manufactured and still manufacture a multitude of chemistries that may be defined as perfluoroalkyl and polyfluoroalkyl substances (PFAS) for use in their operations and as their products, as well as for use throughout industrial manufacturing and other value chains.  PFAS have played a critical role in developing the products that have sustained modern America, such as medical technologies, semiconductors, batteries, phones, cars, and airplanes. For ACC members developing products in, for example, the national security aerospace, medical and renewable energy industries, the unique properties of PFAS have been indispensable.

6.      The Chemours Company, a co-petitioner here, is an ACC member.

7.      In recent years, a number of federal and state legislative and regulatory actions have been undertaken to regulate PFAS compounds, including the action challenged in this case. ACC's members also remain under persistent threat of legal action, including from state water

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

systems and private parties. *See* Hiroko Tabuchi, *Lawyers to Plastics Makers: Prepare for 'Astronomical' PFAS Lawsuits*, New York Times (May 28, 2024), https://nyti.ms/4glJWEm; Jeffrey Kluger, *'Forever Chemical' Lawsuits Could Ultimately Eclipse the Big Tobacco Settlement,* TIME (July 12.2023), http://bit.ly/3Xmy2B8.

8.     I have reviewed and am familiar with the petition for review and opening brief filed in this case. I understand that the lawsuit challenges EPA's final rule, *PFAS National Primary Drinking Water Regulation*, 89 Fed. Reg. 32532 (Apr. 26, 2024) (the Rule). I further understand that the Rule establishes National Primary Drinking Water Regulations (NPDWR) for six PFAS substances: perfluorooctanoic acid (PFOA), perfluoro-octane sulfonic acid (PFOS), per-fluorohexane sulfonic acid (PFHxS), perfluorononanoic acid (PFNA), hexafluoropropylene oxide dimer acid (HFPO-DA), and perfluorobutane sulfonic acid (PFBS). The Rule establishes maximum contaminant level goals (MCLGs) of 0 ng/L and enforceable maximum contaminant levels (MCLs) of 4 ng/L, for PFOA and PFOS. It also establishes MCLGs and MCLs of 10 ng/L for PFHxS, PFNA, and HFPO-DA, as well as a Hazard Index of 1.0 for a mixture of two or more of PFHxS, PFNA, HFPO-DA, or PFBS.

9.     Compliance with the Rule's MCLs will cost more than $1.5 billion annually according to EPA's own estimates (89 Fed. Reg. at 32665-32666).

10.    Advocating for a Rule that complies with the requirements of the Safe Drinking Water Act and the Administrative Procedure Act and challenging the Rule as beyond the Agency's authority and arbitrary and capricious falls within the ACC's mission to advance its members' longstanding interests. ACC filed a comment letter on the proposed rule before it was finalized.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*See* Comments of the American Chemistry Council on Proposed National Primary Drinking Water Regulation for PFAS, Docket No. EPA-HQ-OW-2022-0114 (June 5, 2023).

11.    ACC also assists its members and the chemistry industry more broadly by educating its members and the public. It has expended resources to educate its members on the complexities and uncertainties of the Rule.

12.    The immediate harm ACC's members face from PFAS-related litigation includes the risks associated with lawsuits filed by water providers and others required to comply with the Rule, including the costs of defending against such suits. Indeed, these are costs ACC's members and similarly situated companies have already begun to bear. *See, e.g.,* Clark Mindock, *New PFAS Lawsuit Cites EPA's 'Forever Chemicals' Drinking Water Rules,* Reuters (Apr. 15, 2024), https://www.reuters.com/legal/litigation/new-pfas-lawsuit-cites-epas-forever-chemicals-drinking-water-rules-2024-04-15/ (discussing PFAS remediation suit filed against PFAS manufacturers). Several states and municipalities have recently filed lawsuits across the country seeking to hold manufacturers, including Chemours and other ACC members, liable for the cleanup costs they stand to incur to come into compliance. For example, a lawsuit brought by the City of Columbia, South Carolina suit relies on the Rule to provide the standard for liability, meaning that the Rule is directly increasing the liability risk that the ACC's members are facing pending litigation. *See* Compl. ¶¶ 115-120, 130-138, *City of Columbia v. 3M et al.,* 24-CP-40-03392 (June 4, 2024).

13.    The Rule's immediate impact on ACC's members stems also from the contemporaneous promulgation of the final rule, *Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances*, 89 Fed. Reg. 39124 (May

Add. B10

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

8, 2024). This rule designates two PFAS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). This designation confers EPA with cleanup and enforcement authority to require regulated entities, including ACC members, to pay cleanup costs for PFAS contamination under certain circumstances.

14.     MCLs under the SDWA can provide "a relevant and appropriate standard" for determining remedial action under CERCLA. *See* 42 U.S.C. § 9621(d)(2)(A). The collective impact of the CERCLA rule and the Rule's MCLs create a risk of CERCLA liability and litigation defense costs where MCLs are allegedly exceeded. EPA has stated expressly that it plans to subject PFAS manufacturers and other companies that have used PFAS in manufacturing to such liability, recently announcing in a guidance memorandum that the agency will "focus on holding accountable those parties that have played a significant role in releasing or exacerbating the spread of PFAS into the environment, such as those who have manufactured PFAS or used PFAS in the manufacturing process." *PFAS Enforcement Discretion and Settlement Policy Under CERCLA*, EPA (Apr. 19, 2024), https://perma.cc/P9NP-5GUR.

15.     In sum, ACC members face an immediate and ongoing risk of enormous economic harm, including the cost of more frequent litigation and higher liability risks, stemming directly from the Rule and its new MCLs for several PFAS compounds. An order from the Court vacating the Rule would redress these harms.

I declare under penalty of perjury that the foregoing is true and correct.

Add. B11

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Signed:    _____

Name & Title:   Robert J Simon, Vice President Chemical Products and Technology

Date:        October 7, 2024

Add. B12

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

THE CHEMOURS COMPANY FC, LLC, )
 )
   *Petitioner*, )
 )
  v. )  No. 24-1192
 )
UNITED STATES ENVIRONMENTAL )
PROTECTION AGENCY and MICHAEL S. )
REGAN, in his official capacity as )
Administrator of the United States )
Environmental Protection Agency, )
 )
   *Respondents*.

<u>**DECLARATION OF TODD A. COOMES**</u>

I, Todd A. Coomes, state as follows:

1. I am the Deputy General Counsel at The Chemours Company FC, LLC (Chemours).

2. I am over 18 years of age and am competent to testify to the matters stated in this declaration.

3. Chemours is a chemistry company that manufactures and uses hexafluoropropylene oxide dimer acid and its ammonium salt (collectively, "HFPO-DA") as a component of a patented technology platform used as a polymerization aid in the manufacture of fluoropolymers. Fluoropolymers—extremely stable molecules composed of multiple carbon-fluorine bonds—

Add. B13

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are essential to a variety of key industries, including the medical, transportation, semiconductor, electronic/communications, and green energy industries.

4.     The technology platform in which Chemours uses HFPO-DA is sometimes referred to as HFPO-DA or by the trade name "GenX."

5.     Chemours manufactures HFPO-DA at its Fayetteville Works facility in North Carolina. Chemours uses HFPO-DA in manufacturing processes at its Washington Works facility in West Virginia and at its Chambers Works facility in New Jersey. HFPO-DA is also formed or may be present as an unintended byproduct or impurity from other manufacturing processes at the Fayetteville Works facility and, to a lesser degree, at Chemours's Chambers Works and Parlin facilities in New Jersey.

6.     On April 26, 2024, the U.S. Environmental Protection Agency issued a Final Drinking Water Health Advisory entitled *PFAS National Primary Drinking Water Regulation,* 89 Fed. Reg. 32,532 (April 26, 2024) (the Rule). The Maximum Contaminant Levels (MCLs) set forth in that rule have concrete effects on Chemours.

7.     North Carolina must issue its Groundwater Quality Standards at levels at least as stringent as the MCL. 15A N.C. Admin. Code 02L .0202. Indeed, North Carolina has proposed such Standards for HFPO-DA at the MCL concentration and has indicated the Standards will be finalized in October 2024. *See*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Public Notice on PFAS Groundwater IMACs (Sep. 4, 2024), https://www.deq.nc.gov/public-notice-imacs-eight-pfas-september-4-2024/download?attachment.

8.    The 2019 Consent Order with the North Carolina Department of Environmental Quality (NCDEQ) and Cape Fear River Watch concerning the Fayetteville Works facility and its surrounding areas, which was approved and entered by the North Carolina Superior Court, incorporates requirements "for the remediation of groundwater to the standards set forth in 15A N.C. Admin. Code 02L .0202" (referencing the Groundwater Quality Standards). *See* Consent Order, *North Carolina v. The Chemours Co. FC, LLC* (N.C. Super. Ct., Feb. 25, 2019), https://deq.nc.gov/media/12453/download.

9.    A North Carolina statute also authorizes NCDEQ to require the provision of replacement drinking water to parties with private drinking water wells with concentrations of HFPO-DA above the Groundwater Quality Standards. *See* N.C. Gen. Stat. § 143-215.2A.

10.    Additionally, Chemours has operations throughout the country, including its facilities in West Virginia and New Jersey. Chemours's operations between its facilities are interconnected, such that an impact on the manufacture of HFPO-DA at Chemours's Fayetteville Works facility in North Carolina may affect its operations at Chemours's facilities in other states.

Add. B15

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

11.     Chemours' immediate harm from the Rule also includes the threat of lawsuits or use in current lawsuits for those required to comply with the Rule or its incorporation into other regulatory programs, including the costs and other burdens of defending against such suits.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 7, 2024.

/s/ Todd A. Coomes

Todd. A. Coomes
Deputy General Counsel
The Chemours Company FC,
LLC

Add. B16

# Exhibit 3

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ORAL ARGUMENT NOT YET SCHEDULED**

Case No. 24-1188

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN WATER WORKS ASSOCIATION, et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

---

On Petition for Review

---

**RESPONDENTS' PROOF BRIEF**

---

Dated: December 23, 2024

TODD KIM
    *Assistant Attorney General*

*Of Counsel*:
HEIDI NALVEN
    U.S. Environmental Protection
    Agency
    Office of General Counsel

KIMERE J. KIMBALL
ANDREW D. KNUDSEN
    U.S. Department of Justice
    Env't & Natural Resources Div.
    P.O. Box 7611
    Washington, DC 20044
    (202) 514-2285 (Kimball)
    (202) 353-7466 (Knudsen)
    Kimere.Kimball@usdoj.gov
    Andrew.Knudsen@usdoj.gov

*Counsel for Respondents*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**RESPONDENTS' CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), counsel for Respondents United States

Environmental Protection Agency ("EPA") and EPA Administrator Michael S.

Regan submit this certificate as to parties, rulings, and related cases.

**A.     Parties and Amici**

The petitioners, respondents, and intervenors in these consolidated cases are

set forth in the brief of American Water Works Association and Association of

Metropolitan Water Agencies ("Utility Petitioners") (ECF 2078734, "Utility Br."),

and in the brief of National Association of Manufacturers, American Chemistry

Council, and the Chemours Company FC, LLC ("Industry Petitioners") (ECF

2078734, "Industry Br.").

In addition to those parties listed in Petitioners' briefs, Chamber of

Commerce of the United States of America is participating as Amicus Curiae for

Petitioners.  Additionally, the State of Connecticut, Cape Fear River Watch, Center

for Environmental Health, Harper Peterson, Toxic Free North Carolina, and

Michael Watters are participating as Amici Curiae for Respondents.  In addition,

an unidentified "group of interested scientists" is seeking to participate as Amici

Curiae for Respondents.  (ECF 2089133).

**B.    Rulings Under Review**

The agency action under review is EPA's rule entitled "PFAS National

Primary Drinking Water Regulation," 89 Fed. Reg. 32532 (April 26, 2024).

**C.    Related Cases**

The above-captioned case (No. 24-1188) has been consolidated with two

additional petitions for review, *National Ass'n of Manufacturers, et al. v. EPA, et*

*al.* (No. 24-1191) and *The Chemours Co. FC, LLC v. EPA, et al.* (No. 24-1192).

Respondents are not aware of any other related cases within the meaning of Circuit

Rule 28(a)(1)(C).


<span style="padding-left:50%">/s/ *Kimere J. Kimball*<br>KIMERE J. KIMBALL</span>

<span style="padding-left:50%">Counsel for Respondent</span>

ii

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# TABLE OF CONTENTS

Respondents' Certificate as to Parties, Rulings, and Related Cases ......................... i

Table of Contents ...................................................................................................... iii

Table of Authorities ................................................................................................. vii

Glossary ................................................................................................................... xiii

Introduction ................................................................................................................. 1

Statement of Jurisdiction ............................................................................................. 3

Statement of the Issues ................................................................................................ 3

Pertinent Statutes and Regulations ............................................................................. 4

Statement of the Case .................................................................................................. 4

    I.  The Safe Drinking Water Act ............................................................................. 4

    II.  The Regulated PFAS ......................................................................................... 8

        A. HFPO-DA ....................................................................................................... 9

            1.  Health Effects ........................................................................................... 9

            2.  Occurrence ................................................................................................ 9

            3.  Non-Drinking Water Exposure ............................................................... 10

        B. PFNA ............................................................................................................ 11

            1.  Health Effects ......................................................................................... 11

            2.  Occurrence .............................................................................................. 11

        C.  Index PFAS Mixtures .................................................................................. 12

            1.  Health Effects ......................................................................................... 12

            2.  Occurrence .............................................................................................. 13

    III. EPA's PFAS Drinking Water Regulation ......................................................... 14

        A.  Regulatory Determinations for PFOA and PFOS ...................................... 14

        B.  Science Advisory Board ............................................................................. 14

        C.  Preliminary Regulatory Determinations for Index PFAS and Proposed
            Goals and Standards for PFOA, PFOS, and Index PFAS ......................... 16

        D.  The Final Rule ............................................................................................ 18

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Summary of Argument ..............................................................20

Standard of Review..................................................................23

Argument.................................................................................24

   I.  The Regulatory Determinations for the Index PFAS Are Lawful and
       Followed Proper Procedure..............................................24

      A. EPA Has Authority to Regulate Mixtures of Contaminants.......................25

      B. The Act Allows EPA to Propose and Finalize a Standard in Parallel
         with a Regulatory Determination..................................29

   II. The Record Supports EPA's Determination to Regulate HFPO-DA and
       PFNA Individually and the Index PFAS Collectively. ..................38

      A. The Record Supports EPA's Occurrence Analyses..................38

        1. EPA Properly Considered State Monitoring Data.................41

        2. EPA Reasonably Determined There Is a Substantial Likelihood
           HFPO-DA Will Occur at Frequencies and Levels of Public Health
           Concern..............................................................45

           a. Substantial Evidence Supports EPA's HFPO-DA Occurrence
             Determination. ................................................ 45

           b. EPA Properly Limited Its Consideration of the Partial UCMR5
             Data.............................................................. 48

        3. EPA Reasonably Determined There Is a Substantial Likelihood
           PFNA Will Occur at Frequencies and Levels of Public Health
           Concern..............................................................54

        4. EPA Reasonably Determined There Is a Substantial Likelihood
           Mixtures of the Index PFAS Will Occur at Frequencies and Levels
           of Public Health Concern. .........................................56

           a. EPA Properly Considered Reported Co-Occurrences of
             Index PFAS. ..................................................... 57

           b. EPA Reasonably Statistically Analyzed Index PFAS
             Co-Occurrence.................................................. 58

      B. The Record Supports EPA's Determination that the Index PFAS May
         Have an Adverse Effect on the Health of Persons....................61

   III.The Rule's Standards Are Lawful, Reasonable, and Supported by the
       Record......................................................................65

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

A. EPA Set the Standards for PFOS and PFOA at the Level That Is as Close to the Goals as Feasible. ...................................................................66

B. EPA Adequately Considered Alternative Standards. ................................72

C. EPA Has Authority to Promulgate Standards in the Form of a Hazard Index....................................................................................................74

D. The Index PFAS Standard Appropriately Regulates Mixtures of Index PFAS. ...........................................................................................78

E. The HFPO-DA Individual Standard Is Reasonable and Supported by the Record. ...........................................................................................81

   1. EPA Reasonably Considered Non-Drinking Water Exposure to HFPO-DA................................................................................................81

   2. EPA Reasonably Relied on Rodent Studies Showing HFPO-DA Elicits a Constellation of Adverse Liver Effects Relevant to Humans....84

   3. EPA Reasonably Applied Both Subchronic-to-Chronic and Database Uncertainty Factors of 10. ....................................................................89

F. EPA Satisfied Its Procedural Requirements for Consultation with the Science Advisory Board. .........................................................................92

IV. EPA Appropriately Considered Costs and Benefits in Promulgating the Rule.................................................................................................95

A. EPA's Selection of "Feasible" Standards Does Not Depend on Comparison of Costs and Benefits..........................................................95

B. The Act Precludes Judicial Review of EPA's Finding That the Rule's Benefits Justify Its Costs.......................................................................99

C. EPA Reasonably Determined that the Rule's Benefits Justify Its Costs.....................................................................................................103

   1. To the Extent the Court May Review EPA's Assessment of Costs and Benefits, The Scope Is Limited to Arbitrary-and-Capricious Review. ..................................................................................................103

   2. EPA Properly Based Its Determination on Both the Quantified and Nonquantifiable Costs and Benefits. .....................................................105

   3. EPA Was Not Required to Conduct a Stand-Alone Economic Analysis for Each Individual Standard in the Rule. ............................110

   4. EPA Addressed Petitioners' Specific Concerns with the Economic Analysis in the Record........................................................................114

V. None of Petitioners' Arguments Warrant Vacatur of the Entire Rule...........120

Conclusion ...................................................................................................122

Certificates of Compliance and Service.............................................................123

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# TABLE OF AUTHORITIES

## CASES

*Abbott v. United States*,
  562 U.S. 8 (2010)...................................................................................41

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993).............................................................122

*Am. Mining Congress v. EPA*,
  907 F.2d 1179 (D.C. Cir. 1990)........................................................23, 24

*Am. Textile Mfrs. Inst. v. Donovan*,
  452 U.S. 490 (1981)...............................................................................67

*Appalachian Power Co. v. EPA*,
  251 F.3d 1026 (D.C. Cir. 2001)...........................................................107

*Bluewater Network v. EPA*,
  370 F.3d 1 (D.C. Cir. 2004)..................................................................39

*City of Portland v. EPA*,
  507 F.3d 706 (D.C. Cir. 2007)...................................... 66, 67, 74, 96, 98

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 2003)........................... 23, 36, 37, 76, 94, 113

*Coal. for Renewable Nat. Gas v. EPA*,
  108 F.4th 846 (D.C. Cir. 2024)........................................................39, 41

*Consol. Edison Co. of New York, Inc. v. FERC*,
  347 F.3d 964 (D.C. Cir. 2003)..............................................................65

*Corley v. United States*,
  556 U.S. 303 (2009)...............................................................................26

*Del. Dep't Nat. Res. & Env't Control v. EPA*,
  895 F.3d 90 (D.C. Cir. 2018)................................................................26

*Duncan v. Walker*,
  533 U.S. 167 (2001)...............................................................................26

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Fed. Trade Comm'n v. Morton Salt Co.*,
   334 U.S. 37 (1948)................................................................................61

*Huntsman Petrochemical LLC v. EPA*,
   114 F.4th 727 (D.C. Cir. 2024).....................................................23, 88

*Int'l Fabricare Inst. v. EPA*,
   972 F.2d 384 (D.C. Cir. 1992)...................................... 23, 67, 68, 105

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024)........................................ 24, 25, 28, 39, 74

*Michigan v. EPA*,
   576 U.S. 743 (2015)..........................................................................104

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)............................................ 23, 90, 104, 105

*Nat'l Ass'n for Surface Finishing v. EPA*,
   795 F.3d 1 (D.C. Cir. 2015)....................................................109, 110

*NRDC v. EPA*,
   529 F.3d 1077 (D.C. Cir. 2008)..............................................52, 109

*NRDC v. Regan*
   67 F.4th 397 (D.C. Cir. 2023)............................................................32

*NYC C.L.A.S.H., Inc. v. Fudge*,
   47 F.4th 757 (D.C. Cir. 2022)....................................................82, 85

*Sinclar Wyo. Refin. Co. v. EPA*,
   101 F.4th 871 (D.C. Cir. 2024)............................................23, 84, 92

*U.S. Sugar Corp. v. EPA*,
   113 F.4th 984 (D.C. Cir. 2024)........................................................23

*UARG v. EPA*,
   573 U.S. 302 (2014).........................................................................65

*United States v. Am. Trucking Ass'ns*,
   310 U.S. 534 (1940).........................................................................28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*West Virginia v. EPA*,
   597 U.S. 697 (2022).............................................................................65

**STATUTES**

5 U.S.C. § 706.....................................................................................36

5 U.S.C. § 706(2)(A)............................................................................23

42 U.S.C. § 300f(1)........................................................................6, 113

42 U.S.C. § 300f(3)..........................................................................6, 75

42 U.S.C. § 300f(6).......................................................................25, 26

42 U.S.C. § 300g-1.............................................................................50

42 U.S.C. § 300g-1(a)(3) ......................................................................6

42 U.S.C. § 300g-1(b)(1) .......................................................35, 38, 121

42 U.S.C. § 300g-1(b)(1)(A)-(B)........................................................45

42 U.S.C. § 300g-1(b)(1)(A).......................................................5, 6, 50

42 U.S.C. § 300g-1(b)(1)(A)(i)..................................................61, 63, 64

42 U.S.C. § 300g-1(b)(1)(A)(ii).......................................39, 40, 41, 47, 48

42 U.S.C. § 300g-1(b)(1)(B)..............................................................30

42 U.S.C. § 300g-1(b)(1)(B)(i) .......................................................5, 35

42 U.S.C. § 300g-1(b)(1)(B)(ii)(I)........................................................5

42 U.S.C. § 300g-1(b)(1)(B)(ii)(II)..........................5, 38, 39, 44, 48, 49, 50, 51

42 U.S.C. § 300g-1(b)(1)(B)(iii)...........................................5, 30, 31, 34

42 U.S.C. § 300g-1(b)(1)(B)(ii)(III) ......................................5, 33, 34, 35

42 U.S.C. § 300g-1(b)(1)(E) ...........................................14, 29, 30, 32

42 U.S.C. § 300g-1(b)(3)(A)..........................................................73, 109

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

42 U.S.C. § 300g-1(b)(3)(C)........................................................... 7, 73, 112, 113

42 U.S.C. § 300g-1(b)(3)(C)(i)(I)-(II) ..................................................114

42 U.S.C. § 300g-1(b)(3)(C)(i)(I)-(III) ................................... 105, 108, 109

42 U.S.C. § 300g-1(b)(3)(C)(i) ..........................................................113

42 U.S.C. § 300g-1(b)(3)(C)(i)(I) ......................................................110

42 U.S.C. § 300g-1(b)(3)(C)(i)(III) .....................................................72

42 U.S.C. § 300g-1(b)(3)(C)(i)(VII).....................................................109

42 U.S.C. § 300g-1(b)(4) ........................................................74, 81, 93

42 U.S.C. § 300g-1(b)(4)(A)....................................................6, 74, 104

42 U.S.C. § 300g-1(b)(4)(B) .......................................... 6, 66, 73, 74, 96, 101

42 U.S.C. § 300g-1(b)(4)(C).................................... 6, 24, 73, 96, 97, 101, 113

42 U.S.C. § 300g-1(b)(4)(D)...................................... 66, 67, 69, 96

42 U.S.C. § 300g-1(b)(6) .......................................................97, 121

42 U.S.C. § 300g-1(b)(6)(A)...................................... 7, 97, 100, 101

42 U.S.C. § 300g-1(b)(6)(D)...................................... 24, 100, 103

42 U.S.C. § 300g-1(b)(7) ..............................................................6

42 U.S.C. § 300g-1(d)...................................................................6

42 U.S.C. § 300g-1(e) ...........................................................92, 95

42 U.S.C. § 300i(a) .....................................................................27

42 U.S.C. § 300j-4(g).........................................................5, 44, 48, 49

42 U.S.C. § 300j-4(g)(1) .........................................................6, 49

42 U.S.C. § 300j-4(g)(3) .............................................................5

42 U.S.C. § 300j-4(g)(5) ............................................................49

x

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

42 U.S.C. § 300j-4(g)(7)(A)-(B) ............................................................52

42 U.S.C. § 300j-7 ............................................................100

42 U.S.C. § 300j-7(a) ............................................................32

42 U.S.C. § 300j-7(a)(1) ............................................................3

42 U.S.C. § 4365(a) ............................................................93

Pub. L. No. 115-270 § 2021 (2018), 132 Stat 3765 ............................................................52

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 141.23 ............................................................78

40 C.F.R. § 141.24 ............................................................78

40 C.F.R. § 141.26 ............................................................78

40 C.F.R. § 141.64(b) ............................................................77

40 C.F.R. § 141.66 ............................................................77

40 C.F.R. § 141.66(b) ............................................................76

40 C.F.R. § 141.66(c) ............................................................76

40 C.F.R. § 141.66(d) ............................................................76

40 C.F.R. § 141.133 ............................................................78

**FEDERAL REGISTER**

44 Fed. Reg. 68624 (Nov. 29, 1979) ............................................................29

51 Fed. Reg. 34836 (Sept. 30, 1986) ............................................................76

56 Fed. Reg. 3526 (Jan. 30, 1991) ............................................................29

63 Fed. Reg. 69390 (Dec. 16, 1998) ............................................................29

65 Fed. Reg. 76708 (Dec. 7, 2000) ............................................................ 29, 77

66 Fed. Reg. 45676 (Aug. 29, 2001) ............................................................93

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

67 Fed. Reg. 38222 (June 3, 2002) ..................................................45

68 Fed. Reg. 42898 (July 18, 2003) ................................................45

71 Fed. Reg. 388 (Jan. 4, 2006) .....................................................29

74 Fed. Reg. 51850 (Oct. 8, 2009) .................................................14

77 Fed. Reg. 26072 (May 2, 2012) .................................................29

78 Fed. Reg. 10270 (Feb. 13, 2013) ...............................................93

85 Fed. Reg. 14098 (Mar. 10, 2020) ..............................................14

86 Fed. Reg. 4198 (Jan. 15, 2021) ................................................93

86 Fed. Reg. 12272 (Mar. 3, 2021) ...............................................14

## LEGISLATIVE HISTORY

H.R. Rep. No. 93-1185 (1974),
    |*as reprinted in* 1974 U.S.C.C.A.N. 6454 ..............................27, 28, 67

S. Rep. No. 104-169 (1995) ........................................ 67, 99, 101, 102, 104

H.R. Rep. No. 104-632 (1996)......................................................99

## OTHER AUTHORITIES

RANDOM HOUSE COLLEGE DICTIONARY
    (Laurence Urdang et al. eds., 1973).......................................25, 75, 80

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# GLOSSARY

| | |
|---|---|
| Board | Science Advisory Board |
| EPA | U.S. Environmental Protection Agency |
| Goal | Maximum Contaminant Level Goal |
| HFPO-DA | Hexafluoropropylene oxide dimer acid |
| Index PFAS | HFPO-DA, PFBS, PFHxS, and PFNA |
| PFAS | Per- and Polyfluoroalkyl Substances |
| PFBS | Perfluorobutane Sulfonic Acid |
| PFHxS | Perfluorohexane Sulfonic Acid |
| PFNA | Perfluorononanoic Acid |
| PFOA | Perfluorooctanoic Acid |
| PFOS | Perfluorooctane Sulfonic Acid |
| Standard | Maximum Contaminant Level |
| SDWA | Safe Drinking Water Act |
| UCMR | Unregulated Contaminant Monitoring Rule |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**INTRODUCTION**

In the rule challenged here, the U.S. Environmental Protection Agency ("EPA") took action to safeguard the nation's drinking water from a class of chemicals so long-lived and persistent in the environment that they are colloquially known as "forever chemicals."  Many of these chemicals, known as per- and polyfluoroalkyl substances ("PFAS"), are known to be dangerous to humans (including children and fetuses); do not break down to become less dangerous over human lifespans; and have widely contaminated the nation's drinking water supplies.  EPA's action here under the Safe Drinking Water Act ("SDWA" or "Act") provides much-needed protection from the public health risks of these chemicals.

PFAS persist and accumulate in the environment, meaning that once released, they will remain for decades or even millennia.  A large and robust body of scientific evidence indicates PFAS exposure can result in cancer and a broad range of other adverse health effects, including developmental, cardiovascular, liver, kidney, immune, endocrine, metabolic, reproductive, and musculoskeletal effects.  Many PFAS have been shown to have the same or similar dose-additive health effects, such that exposure to multiple PFAS together compounds the risk presented.  And the best available data demonstrates that these chemicals are

1

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

present in many geographically dispersed public water systems at levels of public health concern.

To address the associated public health risks, in this rulemaking EPA has promulgated drinking water standards under the Act applicable to six PFAS.[1]  JA-[FR_EPA-HQ-OW-2022-0114-3076_32532] (the "Rule").  The Rule culminates a coordinated years-long research and regulatory process across multiple administrations.  It establishes enforceable standards that are estimated to prevent thousands of deaths and reduce tens of thousands of serious PFAS-attributable illnesses.  And the Rule does so at a cost that is lower than its quantified benefits, even before accounting for its substantial nonquantifiable health benefits.  JA-[FR_32708].

Petitioners' arguments challenging the Rule lack merit.[2]  In many of their arguments, Petitioners advance interpretations of EPA's statutory authority or the role of costs in the Act's regulatory process that are inconsistent with the statute and with this Court's precedent.  In others, Petitioners second-guess EPA's

---

[1] The Rule applies to six PFAS: perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid ("HFPO-DA," commonly known as GenX Chemicals), and perfluorobutane sulfonic acid ("PFBS").  JA-[FR_32532].

[2] Petitioners in case number 24-1188 ("Utility Petitioners") filed one brief, while Petitioners in case numbers 24-1191 and 24-1192 ("Industry Petitioners") filed a separate brief.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

conclusions on scientific issues while misinterpreting or entirely ignoring relevant evidence and explanation in the record. And in still others, Petitioners misstate EPA's past practices under the Act. For all the reasons discussed below, the Court should reject Petitioners' arguments and deny the petitions for review.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over the petitions for review under 42 U.S.C. § 300j-7(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the Rule's regulatory determinations for PFHxS, PFNA, HFPO-DA, and PFBS (together, the "Index PFAS") are permissible exercises of EPA's statutory authority for which EPA followed the required procedure.

2. Whether the Rule's determinations to regulate the Index PFAS, individually and collectively, are reasonable where:

   a. EPA considered the best available information on occurrence of these contaminants; and

   b. EPA supported its findings on the adverse health effects of mixtures of Index PFAS based on the best available, peer-reviewed science.

3. Whether the Rule's national primary drinking water regulations are reasonable where:

3

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

a.  EPA addressed Petitioners' comments regarding feasibility of the PFOS and PFOA standards and adequately considered alternatives;

b.  EPA regulated mixtures of Index PFAS through a hazard index that meets SDWA's definition of a "maximum contaminant level" and appropriately addresses those contaminants' dose-additive effects;

c.  EPA adequately supported its determination of the safe drinking water level of the Index PFAS collectively and HFPO-DA individually; and

d.  EPA consulted with its Science Advisory Board on the scientific questions most critical to EPA's proposed Rule.

4.  Whether the Court may review EPA's analysis of the Rule's costs and benefits and, if so, whether EPA's determination that the Rule's benefits justify its costs was reasonable.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations not provided in the addendum to Utility Petitioners' Opening Brief are provided in the addendum accompanying this brief.

## STATEMENT OF THE CASE

### I.  The Safe Drinking Water Act

The Safe Drinking Water Act authorizes EPA to promulgate national primary drinking water regulations, which specify enforceable standards limiting contaminants in public water systems.

4

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

SDWA provides two processes by which EPA can determine to regulate new contaminants.  First, the Act requires EPA to maintain and periodically update a list of contaminants that are candidates for regulation.  *Id.* § 300g-1(b)(1)(B)(i).  Every five years, EPA must make a determination of whether or not to regulate at least five contaminants on this list.  *Id.* § 300g-1(b)(1)(B)(ii)(I).  Second, EPA may also make a regulatory determination at any time outside of the candidate listing process.  *Id.* § 300g-1(b)(ii)(III).  For either approach, EPA must publish a preliminary determination and provide an opportunity for public comment before making its determination.  *Id.* § 300g-1(b)(1)(B)(ii)(I), (b)(1)(B)(iii).

EPA determines to regulate a contaminant if three criteria are satisfied:

1. the contaminant may have an adverse effect on the health of persons;

2. the contaminant is known to occur or there is a substantial likelihood that the contaminant will occur in public water systems with a frequency and at levels of public health concern; and

3. in the sole judgment of the Administrator, regulation of such contaminant presents a meaningful opportunity for health risk reduction for persons served by public water systems.

*Id.* § 300g-1(b)(1)(A).  EPA must make these findings "based on the best available public health information, including the occurrence database established under section 300j-4(g)" of SDWA.  *Id.* § 300g-1(b)(1)(B)(ii)(II); *see also id.* § 300j-4(g)(3).  The occurrence database consists of "information on the occurrence of

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

both regulated and unregulated contaminants in public water systems…and reliable information from other public and private sources." *Id*. § 300j-4(g)(1).

For each contaminant EPA decides to regulate, the agency must publish a maximum contaminant level goal ("Goal") and promulgate a national primary drinking water regulation for that contaminant through notice-and-comment rulemaking. *Id*. § 300g-1(a)(3), (b)(1)(A), (d). The Goals are non-enforceable public health goals and are set at the level of a contaminant in drinking water below which "no known or anticipated adverse effects on the health of persons occur and which allow[] an adequate margin of safety." *Id*. § 300g-1(b)(4)(A). The drinking water regulation is enforceable and typically takes the form of a maximum contaminant level ("Standard") setting the "maximum permissible level of a contaminant in water which is delivered to any user of a public water system."[3] *Id*. § 300f(1), (3). EPA generally must set the Standard "as close to the [Goal] as is feasible." *Id*. § 300g-1(b)(4)(B). The statute defines "feasible" as "feasible with the use of the best technology, treatment techniques and other means which the Administrator finds…are available (taking cost into consideration)." *Id*. § 300g-1(b)(4)(D).

---

[3] Regulations may also take the form of treatment technique requirements. 42 U.S.C. § 300g-1(b)(7). Because the Rule does not include such requirements, this brief focuses only on "Standards."

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

At proposal, EPA must publish a determination as to "whether the benefits of the [Standard] justify, or do not justify, the costs." *Id.* § 300g-1(b)(4)(C). To inform this determination, SDWA requires EPA to publish a health risk reduction and cost analysis ("Economic Analysis") along with the proposal setting forth the benefits, costs, and other impacts of the proposed Standards. *Id.* § 300g-1(b)(3)(C). EPA must analyze:

1.  quantifiable and nonquantifiable health risk reduction benefits likely to occur from treatment to comply with the Standard;

2.  quantifiable and nonquantifiable health risk reduction benefits likely to occur from reductions of co-occurring contaminants attributable solely to compliance with the Standard;

3.  quantifiable and nonquantifiable costs likely to occur solely as a result of compliance with the Standard;

4.  incremental costs and benefits associated with any alternative Standards EPA considers;

5.  the effects of the contaminant on the general population and more sensitive subgroups within the population;

6.  any increased health risk that may occur as a result of compliance; and

7.  other "relevant factors," including the quality and extent of information, uncertainties in the analysis, and the degree and nature of the risk.

*Id.* § 300g-1(b)(3)(C).

If EPA determines that the benefits of a Standard set as close to the relevant Goal as feasible "would not justify the costs of complying with the [Standard]," it may (at the Administrator's discretion) adopt a less stringent Standard set at a level

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

that "maximizes health risk reduction benefits at a cost that is justified by the benefits." *Id*. § 300g-1(b)(6)(A).

## II.    The Regulated PFAS

PFAS are a large class of chemically and structurally similar synthetic chemicals, exposure to which can result in a number of significant health effects, including heart attacks, strokes, and cancers. JA-[FR_32536]. Exposure to several different PFAS elicit many of the same harmful health effects, including effects on the liver, hormone levels, kidneys, development and growth, and the immune, nervous, and reproductive systems. JA-[FR_32537]. These chemicals are used across a variety of products for their ability to withstand heat and to repel water and stains, and break down extremely slowly in the environment. JA-[FR_32536].

The Rule individually regulates five PFAS—PFOS, PFOA, PFNA, PFHxS, and HFPO-DA—in drinking water. JA-[FR_32533]. Additionally, because these chemicals occur together (*i.e.*, "co-occur") and have the same or similar health effects, their individual effects on certain biological systems can add to each other's health impact (referred to as "dose-additivity"). JA-[FR_32532]. The Rule thus regulates mixtures containing two or more of HFPO-DA, PFNA, PFHxS, and PFBS (collectively, the "Index PFAS"). JA-[FR_32533].

Before issuing the Rule, EPA studied for years the health effects and occurrence of these chemicals in drinking water and in the environment, as well as

8

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

technology to remove these chemicals from drinking water.  The following summarizes the portion of EPA's extensive research relevant here.

### A. HFPO-DA

#### 1. Health Effects

The available scientific HFPO-DA health effects literature demonstrates that exposure elicits adverse health effects on development, the liver and kidney, and the reproductive, immune, and hematological systems.  JA-[FR_32544]; JA-[MCLG_EPA-HQ-OW-2022-0114-3078_2-1_to_2-2].  EPA submitted critical components of its analysis of HFPO-DA's health effects for independent peer review three times over six years before setting the Standard; all three panels agreed with EPA's assessments.  *See* JA-[HFPO-DA_1st_Peer_Review_USEPA_2018b]; JA-[HFPO-DA_2nd_Peer_Review_EPA-HQ-OW-2022-0114-3618]; JA-[HFPO-DA_TA_EPA-HQ-OW-2022-0114-0102_Appx_D].

#### 2. Occurrence

EPA considered data from 25 state water monitoring programs that monitored for HFPO-DA, and from the Department of Defense and the National Water Information System.  JA-[Occurrence_Support_EPA-HQ-OW-2022-0114-3086_205-216].  EPA analyzed the state data both for overall detections and for detections above the health reference level (the concentration below which adverse

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

health effects are not likely to occur), which EPA has calculated as 10 ng/L for HFPO-DA. JA-[MCLG_2-1]. This data demonstrated that HFPO-DA currently occurs in concentrations above the health reference level in public water systems in five geographically diverse states, and that it is currently detected at lower levels in systems in an additional eight states. JA-[Occurrence_Support_205-216].

HFPO-DA continues to be both produced and used in the United States and is chemically stable and resistant to degradation. JA-[Occurrence_Support_198]; JA-[FR_32557]. EPA thus anticipates that contamination will continue, and may increase, in the future. JA-[FR_32557]. Accordingly, EPA found that there is a substantial likelihood HFPO-DA will occur at frequencies and levels of public health concern. JA-[FR_32557].

### 3. Non-Drinking Water Exposure

To set a health-protective concentration of HFPO-DA in drinking water, EPA also considered the extent of HFPO-DA exposure that occurs through non-drinking water sources. JA-[MCLG_2-3]. EPA conducted a thorough review of the available scientific studies and data on HFPO-DA exposure from other exposure routes, which demonstrated HFPO-DA's presence in certain foods, soil, sewage sludge, air emissions, rainwater, and indoor dust. JA-[MCLG_A-11_to_A-15]. Because these studies did not allow calculation of the specific amount of HFPO-DA exposure from drinking water versus other media, EPA followed its

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

standard protocol of attributing 20% of exposure to drinking water and 80% to other sources.  JA-[MCLG_2-3, A-15]; JA-[RSC_Guide_EPA-HQ-OW-2022-0114-0882_1-7].

### B. PFNA

#### 1. Health Effects

Scientific evidence demonstrates that PFNA exposure, like HFPO-DA exposure, elicits adverse effects on development, reproduction, immune function, and the liver.  JA-[FR_32544]; JA-[MCLG_1-7_to_1-10, 2-8].

#### 2. Occurrence

EPA considered a variety of national and state data regarding PFNA in public water systems.  JA-[Occurrence_Support_163-93].  EPA analyzed the data both for overall occurrences and for occurrences above the health reference level, which EPA has calculated as 10 ng/L.  JA-[MCLG_2-7_to_2-10].

Data from EPA's third cycle of unregulated contaminant monitoring ("UCMR3") reported detections of PFNA at concentrations of 20 ng/L or higher – twice the health reference level.  *Id*.  Fourteen public water systems across seven states detected PFNA at levels at least twice the health reference level.  *Id*.; JA-[FR_32556].  Additionally, data collected from 30 state monitoring programs demonstrate public water systems in 12 states in geographically dispersed areas detected PFNA above the health reference level, and systems in an additional

11

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

seven states detected concentrations at lower levels. JA-[Occurrence_Support_180-83]. EPA also considered Department of Defense and National Water Information System testing, which demonstrated, *inter alia*, detections above the health reference level at military bases in South Dakota and Texas. JA-[Occurrence_Support_189-90].

Finally, EPA considered that PFNA is chemically stable and resistant to degradation, making it likely to persist in the environment. JA-[Occurrence_Support_163]. Additionally, although PFNA has largely been phased out of production in the United States, legacy stocks still remain in the United States and may be used in products, and both PFNA and products containing PFNA may to be produced internationally and imported into the United States. JA-[FR_32556]. EPA thus determined that there is a substantial likelihood PFNA will occur at frequencies and levels of public health concern. JA-[FR_32556].

## C. Index PFAS Mixtures

### 1. Health Effects

Scientific evidence demonstrates that exposure to Index PFAS elicit many of the same or similar health effects, including effects on the liver, the kidney, cholesterol, and development, and on the immune, endocrine, and hematologic systems. JA-[FR_32545, 32552]; JA-[MCLG_1-5_to_1-11]; JA-[Framework_ EPA-HQ-OW-2022-0114-3088_33-38]. These chemicals are "toxicologically

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

similar," meaning that they "elicit the same or similar adverse health effects (but with differing potencies for effect(s))...." JA-[MCLG_1-7]. This toxicological similarity means that the chemicals are expected to act "dose-additively." JA-[MCLG_1-7]. This means that "individual PFAS, each at doses that are not anticipated to result in adverse health effects, when combined in a mixture may result in adverse health effects." JA-[MCLG_1-11].

## 2. Occurrence

EPA analyzed state monitoring data, which demonstrates that two or more Index PFAS occur together at levels above the health reference level in public water systems in at least 21 states. JA-[Occurrence_Support_220-51].

EPA also evaluated state data for co-occurrence using groupwise (comparing PFOA and PFOS with Index PFAS) and pairwise (comparing unique pairs of PFAS) statistical analyses. JA-[Occurrence_Support_220-46]; JA-[FR_32589-596]. The groupwise analysis demonstrated that Index PFAS were more likely to occur when PFOA and/or PFOS were present and also that when Index PFAS were present it was more likely that there would be multiple Index PFAS rather than a single Index PFAS. JA-[Occurrence_Support_240]. The pairwise analysis demonstrated how much more likely one Index PFAS was to occur if a second Index PFAS were present. JA-[Occurrence_Support_242-44]. The odds of detecting one Index PFAS if another was present were between 5.2 and 66.0 times

13

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

higher than if the other Index PFAS was not present. JA-[Occurrence_Support_242-44]. EPA thus determined that there is a substantial likelihood the Index PFAS will co-occur at frequencies and levels of public health concern. JA-[FR_32552-53].

## III.    EPA's PFAS Drinking Water Regulation

### A. Regulatory Determinations for PFOA and PFOS

EPA added PFOA and PFOS to its list of candidate contaminants for regulation in 2009. 74 Fed. Reg. 51850 (Oct. 8, 2009). In 2020, EPA published a preliminary determination to regulate these contaminants and solicited public comment. 85 Fed. Reg. 14098 (Mar. 10, 2020). In March 2021, EPA made a final determination to regulate PFOA and PFOS, finding that all three statutory criteria were met for each contaminant. 86 Fed. Reg. 12272 (Mar. 3, 2021). This determination triggered a 24-month deadline for EPA to propose Goals and Standards for PFOS and PFOA. 42 U.S.C. § 300g-1(b)(1)(E).

### B. Science Advisory Board

Beginning in December 2021, EPA sought review from its Science Advisory Board ("Board") on four draft documents presenting key scientific issues related to its forthcoming proposed Goals and Standards for PFOS, PFOA, and Index PFAS. JA-[SAB_Report_EPA-HQ-OW-2022-0114-3107_1]. These documents included EPA's proposed framework for estimating noncancer health risks associated with

14

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

mixtures of PFAS. JA-[Peer_Review_Draft_Mixture_Framework_EPA-HQ-OW-2022-0114-3619].

With respect to PFAS mixtures, EPA asked the Board for feedback on PFAS dose-additivity. EPA provided an in-depth overview of the scientific literature regarding dose-additivity generally and of PFAS specifically. JA-[Peer_Review_Draft_Mixture_Framework_at_16-26]. EPA sought the Board's input on a tiered process for evaluating PFAS mixtures' health risks whereby PFAS mixtures would first be evaluated using one of several approaches, including a hazard index, and, if risk was indicated, more data-intensive approaches would be followed. JA-[Peer_Review_Draft_Mixture_Framework_at_26-29]. The hazard index approach is "EPA's most commonly used component-based mixture risk assessment method," in which EPA divides the concentration of each contaminant by the contaminant's health reference level, then sums the fractional results and compares that sum to the hazard index health reference level of 1. JA-[Framework_57]; JA-[Occurrence_Support_220].

The Board agreed that many PFAS have common health outcomes and are expected to act dose-additively when present together. JA-[SAB_Report_87, 90]. They noted that PFAS "elicit effects…that have common adverse outcomes in several biological systems (e.g., hepatic, thyroid, lipid synthesis and metabolism, developmental and immune toxicities)." JA-[SAB_Report_87, 90]. The Board

15

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

supported EPA's use of a hazard index to evaluate PFAS mixtures, but recommended against the tiered approach.  JA-[SAB_Report_91-94].

EPA responded to the Board's recommendations in March 2023 and published a draft framework for public comment along with the proposed Rule. JA-[SAB_Response_EPA-HQ-OW-2022-0114-0043]; JA-[Framework_Public_Comment_Draft_EPA-HQ-OW-2022-0114-0030].  EPA published a finalized framework document along with the final Rule in April 2024. JA-[Framework].

### C. Preliminary Regulatory Determinations for Index PFAS and Proposed Goals and Standards for PFOA, PFOS, and Index PFAS

In March 2023, EPA proposed the Rule challenged here.  JA-[NPRM_EPA-HQ-OW-2022-0114-0027_18638] ("Proposal").  The Proposal included three primary components: (1) proposed Goals and Standards for PFOA and PFOS; (2) a preliminary determination to regulate the four Index PFAS individually and as a mixture; and (3) a proposed Goal and Standard applicable to the Index PFAS individually and as a mixture.  *Id.*

First, for PFOA and PFOS, EPA found that these contaminants are likely human carcinogens and (consistent with its historic practice for such contaminants) proposed to set their Goals at zero.  [NPRM_18660, 18663].  EPA proposed to set the Standards at 4.0 ng/L, the lowest concentration at which these contaminants can be reliably quantified, known as the practical-quantitation level.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

[NPRM_18666].  EPA identified numerous treatment technologies that are both available and have reliably demonstrated ability to achieve concentrations below the proposed Standards.  [NPRM_18668].

Second, EPA made a preliminary determination to regulate the four Index PFAS individually and collectively as a mixture.  [NPRM_18645].  Based on the best available public health information, including the information discussed in Pt.II, *supra*, EPA proposed to find that PFHxS, HFPO-DA, PFNA, and PFBS (individually and together in mixtures) satisfied the Act's criteria for regulation. [NPRM_18645-52].

Third, EPA proposed a Goal and Standard for the Index PFAS.  EPA proposed to regulate these contaminants in the form of a hazard index to protect against dose-additive risk from combinations of these PFAS.  [NPRM_18664]. To account for differences in toxicity among the four Index PFAS, the hazard index approach weights each mixture component using a chemical-specific "health-based water concentration" reflecting the level that is protective of health effects over a lifetime of exposure.[4]  *Id.*  Compliance with the hazard index is calculated by dividing each Index PFAS contaminant's measured concentration by its health-based water concentration, then adding the results for the four Index

---

[4] EPA proposed health-based water concentrations for PFHxS, HFPO-DA, PFNA, and PFBS of 9.0, 10.0, 10.0, and 2,000.0 ng/L, respectively.  [NPRM_18641].

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PFAS together.  *Id.* at 18665.  EPA proposed to set the Goal at 1.0 and to set the Standard at the same level because treatment to the level of the Goal is feasible. [NPRM_18665, 18669].  The Proposal defined a mixture as containing "one or more" of the four Index PFAS, and thus would also regulate each Index PFAS individually if it occurred alone above its health-based water concentration. [NPRM_18638-39].  EPA also solicited comment on whether to promulgate stand-alone Goals and Standards for each of the four Index PFAS individually. [NPRM_18730].

### D. The Final Rule

After considering extensive public comments, EPA published the final Rule in April 2024.  JA-[FR_32532].  For PFOA and PFOS, the Rule retained the Proposal's Goals and Standards of zero and 4.0 ng/L, respectively.  JA-[FR_32567, 32577].  For the Index PFAS, EPA finalized its preliminary regulatory determinations for PFHxS, HFPO-DA, and PFNA as individual contaminants.  JA-[FR_32563].  EPA deferred a final determination for PFBS to continue evaluating it against the criteria for regulation, particularly whether the occurrence information supports regulation of that contaminant individually.  JA-[FR_32552].  However, EPA found that there is a substantial likelihood of PFBS co-occurrence in mixtures with the other three Index PFAS with a frequency and at levels of public health concern.  Accordingly, EPA finalized its regulatory

18

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

determination for mixtures containing two or more Index PFAS (including PFBS). JA-[FR_32557-58].

EPA largely retained the proposed Goal and Standard for mixtures of Index PFAS, but revised the number of significant digits (*i.e.*, from 1.0 to 1) and corrected an error in the health-based water concentration for PFHxS. JA-[FR_32571-72]. EPA promulgated individual Goals and Standards for PFHxS, HFPO-DA, and PFNA that are equivalent to their health-based water concentrations. JA-[FR_32573].

EPA included a revised Economic Analysis in its final Rule that updated the Economic Analysis from its Proposal. JA-[FR_32633-32719]. EPA developed quantified estimates for a limited set of the Rule's health benefits, including reduced birth weight effects, cardiovascular effects and renal cell carcinoma from PFOS and PFOA exposure, as well as health benefits from co-removal of other contaminants. JA-[FR_32715]. Weighing these quantified benefits against costs of compliance associated with PFOS, PFOA, and PFHxS, EPA found net positive national-level benefits of $760,000 annually. JA-[FR_32708]. Data limitations prevented EPA from quantifying national-level costs of compliance associated with PFNA, HFPO-DA, or PFBS with the same degree of certainty as PFOA, PFOS, and PFHxS. JA-[FR_32713]. But EPA performed a quantitative sensitivity analysis to estimate their cost impact, which indicated that the costs of

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

treating these contaminants would likely increase the national compliance costs by $82.4 million, or approximately 5 percent of the Rule's overall quantified costs. JA-[FR_32672]. As required by the Act, EPA also considered the many substantial, nonquantifiable health benefits that are expected to result from compliance with the Rule, including reduced health effects from exposure to PFOS, PFOA, Index PFAS, and other PFAS. JA-[FR_32696-702]. Based on all of the information in its Economic Analysis, EPA reaffirmed its determination made in the Proposal that the benefits of the Rule justify the costs. JA-[FR_32716].

## SUMMARY OF ARGUMENT

EPA's regulatory determinations for the Index PFAS (individually and as a mixture) are lawful and were issued in accordance with the statute's procedures. The Act authorizes EPA to regulate "contaminants," a broad term that Congress itself has recognized encompasses groups or mixtures of individual substances. Likewise, the Act permits EPA to propose and finalize the Goal and Standard for a contaminant in parallel with the regulatory determination process, rather than waiting for a final determination. EPA's interpretation is the best reading of the Act because it gives effect to all portions of the statutory text and is consistent with Congressional intent.

20

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA's regulatory determinations for the Index PFAS are also reasonable and supported by the administrative record.  EPA appropriately relied on occurrence data from robust state datasets, the UCMR3 monitoring cycle (where available), and additional national occurrence database information, which together represent the best available public health information on these contaminants.  This data demonstrates that there is a substantial likelihood that HFPO-DA and PFNA will occur both individually and collectively with other Index PFAS at frequencies and levels of public health concern.  Moreover, EPA was not required to consider partial data submitted in its ongoing fifth cycle of unregulated contaminant monitoring ("UCMR5") or wait for that monitoring effort to be completed before proceeding, and the preliminary data confirmed EPA's findings of occurrence of these chemicals.

Petitioners' various challenges to the Rule's Standards also lack merit.  First, as to PFOS and PFOA, EPA demonstrated in the record that its Standards meet the Act's requirement that they be as close to the Goals as feasible, and Petitioners fail to acknowledge EPA's responses to their narrow objections.  EPA also provided a reasoned justification for rejecting Petitioners' suggested alternative Standards.  Second, with respect to mixtures of Index PFAS, the Act authorizes EPA to adopt a Standard in the form of a hazard index.  The hazard index meets the Act's definition of a "maximum contaminant level," and EPA adequately supported its

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

decision to use this approach to address the dose-additive effects of Index PFAS. Third, with respect to HFPO-DA individually and the Index PFAS collectively, the Court should reject Petitioners' attempt to second-guess EPA's scientific determinations within its expertise. EPA considered and reasonably addressed each of Petitioners' objections to the scientific inputs of the Index PFAS Standard and the HFPO-DA Standard, and EPA's analyses and conclusions are well-supported by the record.

The Court should also reject Petitioners' challenges to EPA's consideration of costs and benefits in the Rule. The Act and this Court's case law clearly provide that EPA's identification of a Standard at the "feasible" level does not depend on a comparison of costs and benefits. Moreover, the Act does not permit judicial review of EPA's determination as to whether the Rule's benefits justify its costs. To the extent judicial review is available here, EPA reasonably considered all of the relevant factors and responded to Petitioners' comments on the analysis of costs and benefits.

Finally, to the extent the Court finds any of Petitioners' arguments has merit, they cannot justify vacatur of the entire Rule. The Rule's provisions for each contaminant are severable, as are EPA's actions at each step of the regulatory process for each contaminant. Petitioners have not articulated any challenge that would invalidate the Rule in its entirety.

22

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## STANDARD OF REVIEW

In reviewing EPA's actions under the Act, this Court follows the Administrative Procedure Act's standard of review. *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003). Under that standard, the Court evaluates whether EPA's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) (quoting 5 U.S.C. § 706(2)(A)).

The Court reviews questions of statutory interpretation *de novo*. *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024). On all other questions, the Court applies a deferential standard of review that assesses whether the agency "entirely failed to consider an important aspect of the problem," "offered an explanation for its decision that runs counter to the evidence before the agency," or failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Huntsman Petrochemical LLC v. EPA*, 114 F.4th 727, 735 (D.C. Cir. 2024) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court accords particular deference to EPA's "evaluation of scientific data within its area of expertise." *Id.*; *see also Sinclair Wyo. Refin. Co. v. EPA*, 101 F.4th 871, 883 (D.C. Cir. 2024) (affording particular deference to "matters implicating predictive judgments"); *Am. Mining Congress v. EPA*, 907

23

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

F.2d 1179, 1187 (D.C. Cir. 1990) (affording particular deference to "the scientific judgments of the EPA") (internal citation omitted).

The Act contains special language governing judicial review of EPA's determination under Section 300g-1(b)(4)(C) as to whether the benefits of a Standard justify or do not justify its costs.  42 U.S.C. § 300g-1(b)(6)(D).  Such determinations are reviewable only "as part of a review of a final national primary drinking water regulation that has been promulgated based on the determination." *Id.*  Where such review is available, the scope is limited to arbitrary-and-capricious review.  *Id.*

**ARGUMENT**

## I.    The Regulatory Determinations for the Index PFAS Are Lawful and Followed Proper Procedure.

Petitioners challenge EPA's regulatory determinations for the Index PFAS (individually and in a mixture) on both legal and procedural grounds, arguing that the Act does not permit regulation of mixtures and that EPA must finalize the regulatory determination for a contaminant *before* proposing a Goal and Standard. Both arguments lack merit.  The Act's definition of "contaminant" is broad, and the "best reading" of the statute is that it permits EPA to regulate contaminants in a group or mixture.  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024).  Likewise, EPA's interpretation permitting concurrent publication of a

24

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

preliminary determination and proposed regulation is the only reading that gives effect to all parts of the Act and to Congress's goals.

### A. EPA Has Authority to Regulate Mixtures of Contaminants.

EPA's determination to regulate mixtures of the Index PFAS is consistent with its longstanding interpretation of "contaminant" as including mixtures or groups of individual substances. JA-[FR_32571]. Nothing in the Act confines EPA to "regulat[ing] levels of individual contaminants only, not mixtures of them." *Contra* Industry Br. 31. EPA's interpretation of "contaminant" is the best reading "after applying all relevant interpretive tools," *Loper*, 144 S. Ct. at 2266, including review of the term itself, the statutory context, the legislative history, and EPA's consistent use of its authority to regulate contaminants both individually and collectively.

Congress defined "contaminant" broadly to include "*any* physical, chemical, biological, or radiological substance *or matter* in water." 42 U.S.C. § 300f(6) (emphases added). "Matter" is a broad term that encompasses both pure substances and mixtures or groups of those substances. JA-[FR_32542]; *see* RANDOM HOUSE COLLEGE DICTIONARY 825 (Laurence Urdang et al. eds., 1973) (defining "matter" as "the substance *or substances* of which any physical object consists or is composed" or "a particular *kind* of substance") (emphases added). Industry Petitioners' own brief concedes that a mixture by definition is "*matter*

25

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

consisting of two or more components." Industry Br. 32 (emphasis added). Thus, the mixture of Index PFAS that EPA determined to regulate in this Rule is "matter" that falls within the Act's definition of "contaminant."

EPA's interpretation is the only interpretation that gives the statutory definition's component terms "substance" and "matter" independent meaning. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (stating courts must "give effect, if possible, to every clause and word of a statute") (cleaned up). Petitioners' cramped interpretation would render part of the statute "superfluous" by reading out the term "matter" entirely. Industry Br. 32. If "matter" truly encompassed only "*singular* chemical substances," *id.* at 32-33, then that term would be redundant because it would add nothing to the definition of "contaminant" not covered by "substance." 42 U.S.C. § 300f(6); *see Del. Dep't Nat. Res. & Env't Control v. EPA*, 895 F.3d 90, 99 (D.C. Cir. 2018) (stating Court "strive[s] to construe statutes 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant'") (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

EPA's interpretation also comports with the rest of the statute, which likewise supports reading "contaminant" to include mixtures or groups of individual substances. JA-[FR_32542]. For example, SDWA's "emergency powers" provision grants EPA residual authority to take action as necessary

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

wherever it finds that "*a contaminant* which is present in or is likely to enter a public water system or an underground source of drinking water…may present an imminent and substantial endangerment" to health.  42 U.S.C. § 300i(a) (emphasis added).  In enacting this provision, Congress intended to provide EPA with "broad administrative authority" that would be construed "so as to give paramount importance to the objective or protection of the public health."  H.R. Rep. No. 93-1185, at 35 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6454, 6487-88.  EPA's responses under this authority are often not limited to individual contaminants and must address a mixture, such as a plume of contaminants in groundwater threatening a drinking water intake.  Under Petitioners' reading of "contaminant," EPA could not invoke this authority where a mixture or group of substances is endangering public health, so long as no individual substance alone presents such endangerment.  By contrast, EPA's reading effectuates Congressional intent by authorizing action under Section 300i wherever a mixture of substances collectively presents imminent and substantial endangerment.

EPA's interpretation also aligns with the Act's legislative history, which demonstrates that since the Act's adoption in 1974, Congress has recognized that EPA may regulate contaminants as groups.  *See* JA-[FR_32542].  Noting the tens of thousands of chemical compounds in use, the responsible House Committee acknowledged it would be "impossible for EPA to regulate each of these

27

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

contaminants which may be harmful to health on a contaminant-by-contaminant basis." H.R. Rep. No. 93-1185, at 10, 1974 U.S.C.C.A.N. 6454, 6463. As a result, the Committee anticipated that EPA would "establish primary drinking water regulations for some groups of contaminants," while also establishing regulations for individual contaminants within those groups as appropriate. *Id.* at 6463-64. By allowing for regulation of contaminants as groups, Congress gave EPA leeway to "assure that the public health will be protected from currently undiscovered, unidentified or under-researched subgroups or specific contaminants within the group." *Id.* at 6463.

Finally, EPA has consistently used this authority to promulgate Standards that regulate multiple substances collectively. JA-[FR_32543]; *see Loper*, 144 S. Ct. at 2262 ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning.") (citing *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 549 (1940)). For example, EPA has adopted Standards collectively regulating such groups as: disinfection byproducts (with subgroups including total trihalomethanes and haloacetic acids); radionuclides (with subgroups including alpha emitters, beta/photon emitters, and combined radium-226 and -228);

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

polychlorinated biphenyls; and asbestos.[5]  EPA's regulation of mixtures of Index

PFAS fits within this longstanding interpretation of the statute.

## B. The Act Allows EPA to Propose and Finalize a Standard in Parallel with a Regulatory Determination.

EPA complied with the Act's procedural requirements when it proposed and

finalized its regulatory determinations for the Index PFAS concurrently with its

Standards and Goals for those contaminants.  And even if this Court agrees with

Petitioners' contrary interpretation, any error here was harmless, as Petitioners did

not suffer any prejudice from EPA's approach.

The Act provides that EPA

> [1] shall propose the [Goal] and [Standard] for a contaminant not later
> than 24 months after the determination to regulate under subparagraph
> (B), and [2] may publish such proposed regulation *concurrent with the
> determination to regulate*.

42 U.S.C. § 300g-1(b)(1)(E) (emphasis added).  The best reading of this provision

is that "determination to regulate" in the second clause refers to EPA's *preliminary*

determination, such that EPA may concurrently proceed with a preliminary

determination and proposed regulation rather than waiting for a *final* regulatory

determination before proposing a Goal and Standard.  JA-[FR_32541].  This

reading best fits SDWA's text and structure and effectuates Congress's intent to

---

[5] 44 Fed. Reg. 68624 (Nov. 29, 1979); 56 Fed. Reg. 3526 (Jan. 30, 1991); 63 Fed. Reg. 69390 (Dec. 16, 1998); 65 Fed. Reg. 76708 (Dec. 7, 2000); 71 Fed. Reg. 388 (Jan. 4, 2006).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

propel regulation forward where EPA has evidence that a contaminant warrants regulation.

Although the second clause does not explicitly use the phrase "preliminary determination," Congress generally used the term "determination to regulate" or simply "determination" in subparagraph (b)(1)(B) without distinguishing between preliminary and final—even where the text demonstrably refers to a preliminary determination. JA-[RTC_EPA-HQ-OW-2022-0114-3077_3-109]. Most notably, subparagraph (b)(1)(B)(iii)—which requires EPA to provide for public comment on "the determination for a contaminant"—uses the term "determination" despite the fact that it plainly refers to comment on a *preliminary* determination to regulate. *Id.* § 300g-1(b)(1)(B)(iii).

Because Congress was inconsistent in its terminology, the meaning of "determination" in any particular part of the Act must be inferred from the surrounding context. Here, the relevant context of subparagraph (b)(1)(E) supports reading SDWA to permit EPA to propose a contaminant's Goal and Standard concurrently with the *preliminary* determination. Although this reading admittedly results in "determination to regulate" taking a different meaning in the first clause (addressing the *latest* point at which EPA may propose the Goal and Standard) and second clause (addressing the *earliest* point at which EPA may propose them) of this sentence, that result best comports with the Act's structure and goals.

30

For one, the rest of the text in this clause indicates Congress intended to allow EPA to align the proposed Goal and Standard with the *public comment process* on a preliminary determination. SDWA's use of the term "publish" is informative: it identifies the specific action (publication) that EPA may take "concurrent[ly]" for both the regulatory determination and Standard-setting processes. The only other place in the Act where Congress refers to publication of a regulatory determination is in subparagraph (b)(1)(B)(iii), where it clearly refers to publication of a *preliminary* regulatory determination for public comment. 42 U.S.C. § 300g-1(b)(1)(B)(iii). No provision of SDWA refers to publication of a *final* regulatory determination. Thus, Congress must have meant that EPA may "publish" its proposed regulation at the same time that it "publish[es]" a preliminary determination to regulate.

Moreover, EPA's interpretation is the only one that gives the second clause of this sentence independent meaning. Reading this provision to only allow publication of proposed Goals and Standards alongside a *final* regulatory determination would render it superfluous, because there is nothing else in SDWA or administrative law generally that suggests EPA would otherwise be precluded from doing so. JA-[RTC_3-110]. There is certainly nothing in subparagraph (b)(1)(E)'s deadline provisions implying such a limitation. In particular, SDWA's requirement to propose regulations "not later than 24 months after" a final

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

regulatory determination simply establishes when EPA's deadline begins to run; it does not suggest that EPA may only propose them after that deadline is triggered. 42 U.S.C. § 300g-1(b)(1)(E); JA-[RTC_3-108]. If Congress had wanted to create an exclusive window defining the start and end date for EPA's proposal of a Goal and Standard, it would have specified that EPA must do so "within" 24 months, as it did for other deadlines in this same section and elsewhere in the Act. JA-[RTC_3-108]; *see* 42 U.S.C. § 300g-1(b)(1)(E) (requiring EPA to promulgate final Goal and Standard "within 18 months after the proposal thereof"); *id.* § 300j-7(a) (requiring petitions for review to be filed "within the 45-day period beginning on the date of the promulgation of the regulation …").

This Court's decision in *NRDC v. Regan* is not to the contrary. Utility Br. 25 (citing 67 F.4th 397 (D.C. Cir. 2023)). The language Petitioners cite from that case only addresses what obligations are triggered once EPA makes a final regulatory determination for a contaminant.[6] *Id.* *NRDC* never addressed (and had no need to address) at what point EPA may first propose the Goal and Standard for a contaminant.

---

[6] *NRDC* did not hold that EPA "may only issue a proposed regulation '**after** determining the statutory criteria'" are met. *Contra* Utility Br. 25 (citing *NRDC*, 67 F.4th at 399) (emphasis in original). The Court simply observed that EPA *must* promulgate a *final* Goal and Standard after making that determination. *NRDC*, 67 F.4th at 399.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Additionally, EPA's reading of subparagraph (b)(1)(E) best reflects Congress's goal of accelerating the regulatory process for contaminants that present meaningful public health risks, which is the evident purpose of its allowance for "concurrent" processes.  SDWA's 1996 amendments eliminated a previous requirement that EPA regulate 25 additional contaminants every three years, replacing it with the current regulatory determination process.  This change reflected Congress's desire for EPA to expeditiously address contaminants that truly warrant regulation, without becoming bogged down in arbitrary quotas and procedural requirements.  Moreover, Congress included an explicit provision allowing EPA to initiate regulatory determinations whenever necessary for any contaminant outside of the five-year cycle for its candidate contaminant list, recognizing that EPA may need to act expeditiously to address public health concerns between its periodically scheduled reviews.  42 U.S.C. § 300g-1(b)(1)(B)(ii)(III); JA-[RTC_3-110].  EPA's reading effectuates Congress's intent by allowing the agency to move forward in a "concurrent" manner on both a regulatory determination and a proposed regulation where appropriate.  Petitioners' contrary reading transforms this provision into a limit rather than an authorization and would unnecessarily delay EPA's efforts to address public health threats in drinking water, with no apparent benefit.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Petitioners insist that "determination to regulate" must take the same meaning wherever it appears. Industry Br. 35-36; Utility Br. 22-25. But as noted above, Congress itself demonstrably used the shorthand "determination" in reference to both preliminary and final determinations. *See* 42 U.S.C. § 300g-1(b)(1)(B)(iii). Petitioners do not meaningfully engage with this inconsistency; they simply deny it exists.

In particular, Petitioners assert the phrase "determination" in clause (b)(1)(B)(iii) must mean something other than a determination to regulate. Utility Br. 28. But their alternative reading—that it refers to publication of a "decision to list a contaminant from the List in the Preliminary Determination"—makes no sense. Nothing in the Act suggests that EPA's selection of which candidate contaminants to consider for regulation constitutes a distinct "determination" with its own public comment requirement separate from the preliminary determination to regulate. Moreover, clause (b)(1)(B)(iii) cannot be limited to EPA's selection of contaminants from its candidate list because it refers to any "determination for a contaminant under clause (ii)," which includes determinations for contaminants *not included* on that list. *See* 42 U.S.C. § 300g-1(b)(1)(B)(ii)(III).

Petitioners cast SDWA's regulatory process as a set of rigid, stepwise procedures. Utility Br. 6-10, 18-19. But they misstate the statutory requirements: SDWA does not "mandate[] a sequential, six-step process for regulation," Utility

34

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Br. 18; in fact, the statute clearly provides that the first two "steps" that Petitioners describe are not mandatory. While EPA *may* choose to consider a contaminant for regulation through the candidate listing process in subparagraph (b)(1)(B)(i), the Act also permits EPA at any time to "make a determination to regulate a contaminant that does not appear on" the candidate contaminant list, as it did for the Index PFAS here. 42 U.S.C. § 300g-1(b)(1)(B)(ii)(III); *see also* Industry Br. 34 (describing consultation requirements that apply to development of candidate list, not to regulatory determinations). Petitioners' mistakes reflect their fundamental misunderstanding of the Congressional goals—namely, a desire to proceed expeditiously toward regulation of contaminants with public health risks— that support EPA's interpretation.

Petitioners also make much of EPA's supposed break from "decades of prior policy," emphasizing that before this Rule EPA "had **never** issued a proposed regulation before making a [final] Determination to Regulate." Utility Br. 25-26 (emphasis in original). That is true, but EPA has never issued a Goal or Standard for a newly listed contaminant *after* finalizing a determination to regulate either. This Rule is the first time that EPA has promulgated regulations for a new contaminant since enactment of the 1996 amendments creating the regulatory determination process in Section 300g-1(b)(1). Thus, there is no prior rulemaking establishing precedent on this issue from which EPA departs. The agency

35

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

statements that Petitioners rely on consist of simplified informational graphics or high-level summaries of the Act's regulatory process that do not purport to represent EPA's definitive interpretation of any sequencing requirement in the relevant statutory language.[7]

To the extent this Court agrees with Petitioners' interpretation of the Act, any procedural violation here was harmless error.  Subparagraph (b)(1)(E) governs the *timing* of EPA's proposed regulations for a contaminant, not its *authority* to propose them.  To merit relief from this Court, Petitioners must "show prejudice from an agency procedural violation."  *City of Waukesha*, 320 F.3d at 246 (citing 5 U.S.C. § 706).

Petitioners have failed to establish any harm they suffered from EPA's decision to propose the Index PFAS Goals and Standards concurrently with the regulatory determination process.  At most, Petitioners suggest that they would have benefitted from a longer time to comment on these actions.  Utility Br. 31; Industry Br. 37; *see* JA-[NPRM_18638] (providing 60 days for public comment).  As an initial matter, Petitioners were not "entitled" to "two 60-day comment periods," or to a comment period of *any* specific length.  Utility Br. 31.  The Act does not specify how long EPA must provide for public comments on either a

---

[7] Moreover, none of these sources actually states that a final determination "must precede" a proposed regulation.  Utility Br. 26.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

preliminary regulatory determination or a proposed Goal or Standard.  In any event, Petitioners fail to demonstrate that if EPA had proceeded through a bifurcated rulemaking process, they "would have submitted additional, different comments that could have invalidated the rationale for" any portion of the Rule. *City of Waukesha*, 320 F.3d at 246.  Petitioners had adequate time to prepare detailed comments with supporting studies addressing all aspects of the Rule, including the regulatory determinations, the proposed Goals and Standards for all of the regulated PFAS, and EPA's Economic Analysis.

If anything, EPA's decision to concurrently publish its preliminary regulatory determinations and its proposed regulations for the Index PFAS *promoted* meaningful public comment on those actions by providing Petitioners with much more information to evaluate them.  JA-[RTC_3-110].  As a result of this approach, EPA was required to simultaneously publish its Economic Analysis and other record materials supporting the proposed Goals and Standards, including information on risk, cost, occurrence, and benefits that otherwise would not have been available as part of the record for the regulatory determinations.  *Id.*  Indeed, in this litigation Petitioners are relying on record materials developed for the Goals and Standards to support their challenges to the regulatory determinations.  *See* Industry Br. 40.

Accordingly, the Court should reject Petitioners' procedural challenge to the Rule.

## II.    The Record Supports EPA's Determination to Regulate HFPO-DA and PFNA Individually and the Index PFAS Collectively.

EPA may regulate drinking water contaminants if it determines (1) "there is a substantial *likelihood* that the contaminant *will* occur in public water systems with a frequency and at levels of public health concern" either now or in the future; (2) "the contaminant *may* have an adverse effect on the health of persons;" and (3) "in the sole judgment of [EPA], regulation of such contaminant presents a meaningful opportunity for health risk reduction for persons served by public water systems." 42 U.S.C. § 300g-1(b)(1)(A) (emphases added). In keeping with the health protective nature of the Act, these first two criteria are not onerous. Moreover, in all of these determinations, EPA is to use "the best *available* public health information," underscoring the importance of EPA acting expeditiously to protect human health. *Id*. § 300g-1(b)(1)(B)(ii)(II) (emphasis added).

Here, EPA considered extensive scientific literature, water monitoring data, and statistical analyses to determine to regulate HFPO-DA and PFNA individually, as well as the Index PFAS as a group.

### A.    The Record Supports EPA's Occurrence Analyses.

EPA used the "best available" data, both national and state, when determining that "there is a substantial likelihood" that PFNA and HFPO-DA

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

individually[8] and all Index PFAS collectively "will occur in public water systems at a frequency and at levels of public health concern." 42 U.S.C. § 300g-1(b)(1)(A)(ii), (B)(ii)(II); JA-[Occurrence_Support_160-258]. The statute mandates only two criteria to find sufficient current or substantially likely future occurrence: (1) a "frequency...of public health concern" and (2) "levels of public health concern." 42 U.S.C. § 300g-1(b)(1)(A)(ii). The statute has no geographic mandate. Thus, the "best" reading of the "plain text" of the statute is that EPA has discretion to regulate a contaminant anywhere in the United States if the contaminant either does or likely will occur at both frequencies and levels of public health concern. *Loper*, 144 S. Ct. at 2266; *Coal. for Renewable Nat. Gas v. EPA*, 108 F.4th 846, 852-53 (D.C. Cir. 2024).

Guided by this standard, EPA fully explained "how it arrived at" its assessments of public health concern by providing "a reasonable explanation of the specific analysis and evidence upon which the Agency relied...." *Bluewater Network v. EPA*, 370 F.3d 1, 21 (D.C. Cir. 2004); *contra* Utility Br. 45. Pursuant to its longstanding practice, EPA considers several factors when assessing occurrence, including (1) comparing the available occurrence data to the health reference level; (2) the frequency with which the contaminant is found both alone

---

[8] Although EPA also fully supported its determination to individually regulate PFOA, PFOS, and PFHxS, no petitioner challenges these determinations. Accordingly, EPA does not discuss them here.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and co-occurring with other contaminants; (3) whether there is a "sustained upward trend" in occurrence; (4) "the geographic distribution (national, regional, or local occurrence)"; (5) the "impacted population, health effect(s), the potency of the contaminant, other possible sources of exposure, and potential impacts on sensitive populations or lifestages"; and (6) "production and use trends and environmental fate and transport parameters which may indicate that the contaminant would persist and/or would be mobile in water." JA-[RTC_3-29_to_3-30]; JA-[Reg_Det_Protocol_EPA-HQ-OW-2022-0114-3613_30-31]. EPA provided extensive analysis of these factors for the Index PFAS, both individually and collectively, to determine that the contaminants warrant regulation. JA-[Occurrence_Support_126-258, A-1_to_A-32].

Based solely on the Act's titling of drinking-water regulations as "national primary drinking water regulations," Petitioners attempt to rewrite the criteria of a "substantial likelihood that the contaminant will occur in public water systems with a frequency…of public health concern" to add a "national in scope" requirement. 42 U.S.C. § 300g-1(b)(1)(A)(ii); Utility Br. 44-45. Asserting that "considerable" is a synonym, for "substantial," Petitioners urge that "the likelihood of occurrence must be considerable in nature, and national in scope." Utility Br. 45. But this strained reading improperly both adds new terms and rearranges the statute's syntax to create an entirely *different* standard with a nonsensical requirement that

40

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the "likelihood" have a "national scope." Utility Br. 44-45; *Abbott v. United States*, 562 U.S. 8, 25 (2010) (interpreting statutes to "make[] sense as a matter of syntax"). Because the statutory text imposes no geographic requirement for occurrence, the Court should not accept Petitioners' atextual interpretation. 42 U.S.C. § 300g-1(b)(1)(A)(ii); *Coal. for Renewable Nat. Gas*,108 F.4th at 852-53.

**1.     EPA Properly Considered State Monitoring Data.**

When making its regulatory determinations, EPA reasonably relied on a "very large dataset consisting of tens of thousands of samples" from 32 state monitoring programs, "represent[ing] one of the most robust occurrence datasets ever used to inform the development of drinking water regulation of a previously unregulated contaminant." JA-[FR_32559]. Petitioners fail in their attempts to discount this data based on states' differing testing criteria and reporting levels and Petitioners' belief the data was not sufficiently "nationwide." Utility Br. 43-44; Industry Br. 50-51.

*a.*     With respect to states' different testing methodologies, EPA carefully assessed the quality of the state data and fully explained the quality-control measures it undertook. JA-[RTC_6-10_to_6-19]; JA-[Occurrence_Support_23-29]. Specifically, EPA ensured that only finished drinking water (i.e., treated drinking water ready to be delivered to consumers) data was used and removed data not representing single types of PFAS. JA-[Occurrence_Support_23-29].

41

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA then separated states' data into non-targeted statewide data and data collected from targeted areas where PFAS contamination was expected to have occurred and analyzed these datasets separately to ensure accurate characterization of the data. JA-[Occurrence_Support_23].

Petitioners argue that states' targeted data should be disregarded as "tainted," Industry Br. 45, 51, but there is nothing inappropriate about this data and ignoring it would arbitrarily exclude relevant information and known exposures to the contaminant. Although testing *only* where a state believes contamination exists may not reveal the full breadth of contamination within a state, it does provide critical information regarding the number of locations with known contamination, the number of people affected, whether the contamination is localized or geographically dispersed, and the levels of contamination in certain areas. This information is highly relevant, and EPA properly considered it.

Additionally, although different states reported occurrences at different thresholds, Utility Br. 43-44; Industry Br. 50, EPA accounted for the specific reporting thresholds of each state's data by analyzing both reported detections and detections above the health reference level. JA-[FR_32554-57]; JA-[Occurrence_Support_200]. While some states' higher reporting thresholds likely undercount the total number of detections in those states, this data still provides useful information on the scale and geographic dispersal of detections. Moreover,

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

by standardizing analysis through comparison to the health reference level, EPA further ensured that detections monitored at very low thresholds were not given undue weight.

Finally, Petitioners erroneously assert that, because some states reported HFPO-DA levels below the "practical quantitation level" set for this rule (*see* Pt.III.C), those states monitored at levels laboratories cannot accurately test. Utility Br. 44; Industry Br. 50.  But the practical-quantitation level is not an assessment of a minimum accurate detection limit; it is a quantitation level that EPA believes can be achieved by "a broad spectrum of capable laboratories across the nation."  JA-[Occurrence_Support_21]; *see also* JA-[RTC_6-13].  In fact, practical-quantitation levels are generally set "*above* the limit of detection," and for PFAS specifically, all the practical-quantitation levels were set "*well above their limits of detection*."  JA-[FR_32574] (emphasis added).  The fact that a state monitoring program used a lower reporting threshold than required in EPA's nationwide reporting thus does not call any reporting data into question. JA-[RTC_6-13].

*b.*      Petitioners' concerns that the state data are not part of a nationwide monitoring program are similarly misplaced.  Utility Br. 43.  SDWA specifically contemplates EPA may consider data sources other than its own nationwide monitoring data.  It requires only that EPA must consider "the best available public

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

health information, *including*"—but not limited to—"[EPA's nationwide] occurrence database established under 300j-4(g)" of the statute.  42 U.S.C. § 300g-1(b)(1)(B)(ii)(II) (emphasis added).

Here, the state data EPA considered was the "best available public health information" and fully demonstrated that HFPO-DA and PFNA individually and the Index PFAS collectively are present at levels of public health concern across disparate sections of the country.  JA-[Occurrence_Support_126-251]; *contra* Utility Br. 43; Industry Br. 50.  EPA considered data from 32 states, of which 30 states had data for PFNA and 25 states had data for HFPO-DA.  JA-[FR_32554-55]; JA-[Occurrence_Support_23-29, 201-16].  This data came from geographically dispersed states and from both states with concentrated population centers and states that are predominantly rural.  JA-[Occurrence_Support_23-29, 201-16].  Although it did not come from every single state, the data was sufficiently robust and representative to warrant EPA's consideration and reliance.  *Id.*; JA-[FR_32553-32560, 32583, 32594-96]; JA-[RTC_6-10].

Additionally, although Petitioners assert that EPA previously declined to regulate a contaminant (acanthamoeba) as a drinking water contaminant based on the lack of nationwide data, Utility Br. 42, this is incorrect.  EPA declined to regulate acanthamoeba through SDWA because the available public health data demonstrated that adverse health effects were not caused by contaminated drinking

44

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

water, but instead by "poor hygiene practices among contact lens wearers." 67 Fed. Reg. 38222, 38232 (June 3, 2002); JA-[RTC_3-38_to_3-39]. EPA's decision to issue a guidance document on acanthamoeba for contact lens wearers rather than issuing drinking water regulations, thus is entirely distinct from the circumstance presented here. 68 Fed. Reg. 42898, 42903 (July 18, 2003); https://www.epa.gov/sdwa/danger-using-tap-water-contact-lenses. Here, EPA reasonably relied on "one of the most robust occurrence datasets ever used to inform development of a drinking water regulation of a previously unregulated contaminant," JA-[FR_32559], to determine to regulate the Index PFAS.

> **2.     EPA Reasonably Determined There Is a Substantial Likelihood HFPO-DA Will Occur at Frequencies and Levels of Public Health Concern.**

EPA properly considered the "best available public health information, including [EPA's national] occurrence database" to find a substantial likelihood HFPO-DA will occur at frequencies and levels of public health concern. 42 U.S.C. § 300g-1(b)(1)(A)-(B). Additionally, when UCMR5 data became available after the preliminary regulatory determination and was raised in public comments, EPA properly considered the data and determined it confirmed EPA's prior analysis.

> **a. Substantial Evidence Supports EPA's HFPO-DA Occurrence Determination.**

To determine that HFPO-DA occurs with a frequency and at levels of public health concern warranting regulation, EPA considered extensive data from 25 state

45

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

drinking water monitoring programs and data in its occurrence database from the Department of Defense and National Water Information System. JA-[Occurrence_Support_194-219, 252-58]. This data demonstrates that HFPO-DA currently occurs in concentrations above the health reference level in public water systems in at least five geographically diverse states and is currently detected in eight additional states. JA-[FR_32557]; JA-[Occurrence_Support_205-216]. Additionally, EPA found that, due to the environmental persistence of HFPO-DA, its "continued and increasing presence in consumer products and use," and the experience gleaned from the extraordinary persistence of other PFAS in the environment, "there is a substantial likelihood HFPO-DA will occur at a frequency and level of public health concern." JA-[FR_32557]. Despite this evidence, Petitioners incorrectly assert EPA had insufficient data to regulate HFPO-DA.

Industry Petitioners erroneously assert that, if the Court simply disregards the HFPO-DA contamination Petitioner Chemours caused in North Carolina, HFPO-DA rarely occurred elsewhere in the United States. Industry Br. 45, 50-51. Similarly, Utility Petitioners attempt to diminish the significance of HFPO-DA contamination in Kentucky by noting that that contamination *also* may have been caused by Petitioner Chemours's Washington Works HFPO-DA plant across the state border in West Virginia. Utility Br. 47-48; Industry Br. Add. B14. But neither set of petitioners explains why either EPA or this Court should disregard

46

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

significant occurrences of drinking water contamination at levels of public health concern in these states simply because Petitioner Chemours—which still manufactures HFPO-DA at both plants, Industry Br. Add. B14—may have caused the contamination.

Moreover, North Carolina and Kentucky were not the only states with drinking water contaminated by HFPO-DA. JA-[Occurrence_Support_206-213]. Michigan, Ohio, and Virginia also reported public water systems with HFPO-DA contamination above the health reference level; and public water systems in eight additional states, including Vermont, Alabama, and Colorado, detected HFPO-DA at lower levels. JA-[Occurrence_Support_211-213].

Not only do these disparate locations demonstrate HFPO-DA contamination is not limited to a single locality or region, *contra* Utility Br. 48, but Petitioner Chemours does not appear to have facilities in many of these states. *See* https://www.chemours.com/en/about-chemours/global-reach. This suggests that contamination comes from more than just Petitioner Chemours's HFPO-DA production facilities, and potentially comes from consumer products containing HFPO-DA. JA-[Occurrence_Support_194]. EPA rested its regulatory determination not only on data demonstrating HFPO-DA's current occurrence, but also on the "substantial likelihood" that the contaminant "*will* occur in public water systems with a frequency and at levels of public health concern" in the future. 42

47

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

U.S.C. § 300g-1(b)(1)(A)(ii) (emphasis added).  EPA explained that, because HFPO-DA continues to be produced domestically and has a "continued and possibly increasing presence in consumer products and use," and because it is "very stable chemically" and resistant to degradation, it will continue be present in the environment in increasing amounts.  JA-[FR_32557]; JA-[Occurrence_Support_198].

Notably, neither set of Petitioners disputes HFPO-DA's persistence and accumulation in the environment, or that HFPO-DA continues to enter the environment through both production of the chemical and consumer products containing the chemical.  Because the current data demonstrates occurrence at a frequency and level of public health concern, and because the current data represents the nadir of HFPO-DA occurrence, EPA reasonably determined there is a "substantial likelihood [HFPO-DA] *will* occur…at a frequency and at levels of public health concern" in the future.  42 U.S.C. § 300g-1(b)(1)(A)(ii) (emphasis added); JA-[FR_32557].

**b.  EPA Properly Limited Its Consideration of the Partial UCMR5 Data.**

Petitioners incorrectly assert EPA was required to rely on UCMR5 data in making its regulatory determination for HFPO-DA.  Industry Br. 44-50.  But SDWA requires only that EPA consider the "best available public health information, including the occurrence database established under section 300j-

48

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

4(g)....” 42 U.S.C. § 300g-1(b)(1)(B)(ii)(II).  Because the UCMR5 data was not "available" data, much less the "best available" data, the Act did not mandate reliance on it.  *Id*.

*i.*       At the outset, Petitioners erroneously equate EPA's "occurrence database" referenced in SDWA with UCMR data.  *Compare* Industry Br. 45; Utility Br. 41 *with* 42 U.S.C. § 300j-4(g)(1).  The occurrence database is broader than UCMR data; it also includes, for example, Department of Defense and National Water Information System data that EPA explicitly analyzed as part of this rulemaking.  *Compare* https://www.epa.gov/sdwa/national-contaminant-occurrence-database-ncod; *with* JA-[Occurrence_Support_217-19].

Moreover, at the time of EPA's preliminary regulatory determination, no UCMR5 data existed, and thus *no* data was "available."  JA-[NPRM_18638]; JA-[Occurrence_Support_252].  Petitioners argue that an entirely different provision of the statute requiring occurrence-database information be made "available to the public in readily accessible form," 42 U.S.C. § 300j-4(g)(5), transforms the Act's requirement that EPA use the "best available" data into a requirement to *wait* specifically for UCMR data.  Industry Br. 48.  But this is inconsistent with the plain text of the statute.

Nothing in the statute requires EPA to include a contaminant in UCMR monitoring prior to regulation, or to await nationally representative UCMR results

49

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

for a contaminant before beginning the regulatory process.  JA-[RTC_6-68]; 42

U.S.C. § 300g-1.  The Act simply states that EPA must consider "the best

*available* public health information, *including* the occurrence database...."  42

U.S.C. § 300g-1(b)(1)(B)(ii)(II) (emphases added).  Industry Petitioner's attempt to

rewrite the statute to require that EPA consider "the best available...information,

including [*UCMR data for the specific contaminant, which must exist in*] the

occurrence database" strains the text too far.  That no UCMR data for HFPO-DA

was present in the database at the time of the proposed regulatory determination

does not preclude EPA from evaluating other occurrence information to assess the

"substantial likelihood" that a contaminant "will occur…with a frequency and at

levels of public health concern."  *Id*. § 300g-1(b)(1)(A).

Consistent with its statutory obligation, EPA considered "the best available

public health information, including"—but not limited to—"the occurrence

database."  42 U.S.C. § 300g-1(b)(1)(B)(ii)(II).  EPA thus properly considered

HFPO-DA data available in the occurrence database—Department of Defense data

and National Water Information System data—as well as data from 25 state

monitoring programs.  JA-[Occurrence_Support_199-219].

*ii.*    Petitioners incorrectly assert EPA should have relied exclusively on

the partial UCMR5 data showing very little detection of HFPO-DA in the small

number of samples EPA had received by the date of the rulemaking, *instead of* the

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

substantially more robust state monitoring data that demonstrated HFPO-DA

contamination above the health reference level in five states ranging from

Michigan to Virginia, and detections as far west as Colorado.  Industry Br. 50; JA-

[Occurrence_Support_206-210].  Petitioners argue the state monitoring data should

be ignored in favor of the partial UCMR5 data because they erroneously claim the

state data had fewer samples from fewer public water systems.  Industry Br. 50.

But the state monitoring data produced over twice as many samples as the partial

UCMR5 data had reported—over 35,000 state samples, compared to 16,777

UCMR5 samples available at the time of the final regulatory determination.  JA-

[Occurrence_Support_205-07, 211-13, 252].  Moreover, the state data monitored

nearly three times as many water systems as had been reported in the partial

UCMR5 data—over 10,000 water systems in the state monitoring compared to

3,722 reported in the partial UCMR5 data.  JA-[Occurrence_Support_205-07, 211-

13, 252].  The state data thus was the "best available" data.  42 U.S.C. § 300g-

1(b)(1)(B)(ii)(II).

*iii.*    Although Petitioners argue that HFPO-DA should not be regulated

because it is largely not present in most of the limited set of UCMR5 samples

available, Industry Br. 46, this partial data provides no conclusion regarding the

potential occurrence or lack thereof of HFPO-DA nationwide.  The partial UCMR5

data is not reflective of all systems for populations over 3,300 or a "representative

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

sampling" of nationwide systems serving 3,300 or fewer people, as required by the statute. 42 U.S.C. § 300j-4(g)(7)(A)-(B) *as amended by* Pub. L. 115-270, § 2021 (2018), 132 Stat. 3765, 3861.  As of the time of the rulemaking, only approximately *one-third* of systems had reported collection of even *one* sample. JA-[FR_32601].

This partial UCMR5 data cannot support a determination that HFPO-DA does *not* occur frequently, particularly in light of the state data.  As EPA explained, "[i]t is difficult to determine that a contaminant is *not* occurring or *not* likely to occur based on non-national data because the data are limited in scope and the contaminant could be occurring in other parts of the country that have not been monitored."  JA-[Reg_Det_Protocol_21] (emphasis added).  In contrast, "a compilation of non-national data sources *can* support a determination that there *is* a substantial likelihood that the contaminant will occur in [public water systems] with a frequency and at levels of public health concern."  JA-[Reg_Det_Protocol_21] (emphasis added; quotations omitted); *see NRDC v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008) (affording EPA "wide latitude in determining the extent of data-gathering necessary to solve a problem" and "defer[ring] to an agency's decision to proceed on the basis of imperfect scientific information" (internal quotations omitted)).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The partial UCMR5 data demonstrates neither the existence nor absence of occurrence of HFPO-DA at frequencies and levels of public health concern because there simply is not a representative enough sample to draw conclusions. In contrast, the state data definitively demonstrates that HFPO-DA is currently present in at least 13 states and is currently present at levels of public health concern in at least 5 states. JA-[Occurrence_Support_205-216]. EPA cannot reasonably ignore valid and complete data demonstrating that HFPO-DA *does* occur in five geographically dispersed states at levels of public health concern.

*iv.* Similarly, Petitioners incorrectly assert that the Department of Defense and National Drinking Water Information System data in the occurrence database "confirm the UCMR5 data that HFPO-DA does not occur frequently in public water systems." Industry Br. 49. But this non-state data simply shows that HFPO-DA did not occur at those particular test sites. JA-[Occurrence_Support_216-19]. This data does not negate state data demonstrating other sites where contamination is known to occur.

*v.* Finally, contrary to Petitioners' assertion, EPA did not "refus[e] to consider" the UCMR5 data. Industry Br. 47. Although not required to do so, EPA fully considered the available data as well as its limitations. JA-[FR_32557, 32559, 32601-05]; JA-[Occurrence_Support_252-58]; JA-[RTC_6-68_to_6-101]. EPA explained that, although the UCMR5 data was "not available for this rule's

53

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

proposal, [was] not complete, and [was] not a basis for informing the agency's decisions for the final rule," the data "generally confirm[ed] the extensive occurrence analyses the agency has conducted:  namely, that all six regulated PFAS occur in finished drinking water and that the six regulated PFAS co-occur with one another."  JA-[FR_32601].  For HFPO-DA specifically, although less than one-quarter of UCMR5 data was available, the data showed 17 water systems reporting HFPO-DA detections, with one water system exceeding the level of public health concern, thus confirming its occurrence. JA-[Occurrence_Support_252-53]; JA-[RTC_6-69].  Because this data was insufficiently comprehensive to demonstrate the presence or absence of occurrence *anywhere* in the country and does not represent the "best available public health information," and because extensive state data demonstrates HFPO-DA occurrence in geographically dispersed areas of the country, EPA reasonably determined there is a substantial likelihood HFPO-DA will occur at frequencies and levels of public health concern.

3. **EPA Reasonably Determined There Is a Substantial Likelihood PFNA Will Occur at Frequencies and Levels of Public Health Concern.**

EPA considered the "best available" data from UCMR3, state monitoring, Department of Defense monitoring, and National Water Information System data when determining to regulate PFNA.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*a.*     Petitioners argue EPA erred in relying on UCMR3 data because that data was reported at minimum levels *higher* than the health reference levels at issue in this rulemaking.  Utility Br. 42-43.  But this simply means that the UCMR3 likely *underreported* the frequency of occurrence of the Index PFAS, and PFNA specifically.  Public water systems in seven states reported detections of PFNA over 20 ng/L—twice the 10 ng/L health reference level in EPA's regulatory determination.  JA-[FR_32556].  Thus, based solely on the UCMR3 data, PFNA occurs in public drinking water at a minimum of *double* the concentration EPA deems the "level of public health concern" at systems in at least those seven states.  JA-[FR_32556].

*b.*     Extensive state monitoring data at reporting thresholds lower than the UCMR3 further demonstrates that PFNA occurs at a frequency and levels of public health concern well beyond a single region of the country; it has been detected in 19 states and detected at levels above the health reference level in 12 states.  JA-[Occurrence_Support_174-87]; *contra* Utility Br. 49-50.  The 12 states with concentrations above the health reference level are geographically diverse, ranging from Maine to Alabama.  JA-[Occurrence_Support_174-187].  Similarly, Department of Defense data identified eleven military bases in which PFNA was detected in water samples, two of which—in South Dakota and in Texas—had detections above the health reference level.  JA-[Occurrence_Support_189-90].  In

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

short, ample evidence demonstrates PFNA currently occurs, and there is a substantial likelihood it will occur, at a frequency and level of public health concern throughout the United States.

*c.*     Finally, although eight PFNA manufacturers committed to cease PFNA production in the United States by 2015, legacy stock may still be used domestically, products manufactured prior to 2015 may still contain PFNA, and products made with PFNA may be manufactured abroad and imported into the United States. JA-[FR_32556]; JA-[Occurrence_Support_160]. Additionally, other chemicals break down into PFNA. JA-[FR_32536]. And PFNA is "very stable chemically" with a "resistance to essentially all forms of degradation other than atmospheric processes." JA-[Occurrence_Support_162-63]. PFNA thus is very persistent in the environment. Accordingly, "there is a substantial likelihood that environmental contamination of sources of drinking water [with PFNA] will continue." JA-[FR_32556]. Given these factors, EPA reasonably found there is a substantial likelihood that PFNA will occur at a frequency and levels of public health concern. JA-[FR_32556-57].

### 4. EPA Reasonably Determined There Is a Substantial Likelihood Mixtures of the Index PFAS Will Occur at Frequencies and Levels of Public Health Concern.

EPA analyzed state monitoring data and determined there is a substantial likelihood that mixtures of the Index PFAS will co-occur at frequencies and levels

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

of public health concern.  JA-[Occurrence_Support_220-46]; JA-[FR_32590-600].

EPA considered the frequency with which two or more PFAS are detected together

and detected together above the health reference level in reported data.  JA-

[Occurrence_Support_220-35].  EPA then also conducted a statistical analysis of

the data that further demonstrates the odds of finding one Index PFAS increase

substantially when a second Index PFAS is present.  JA-

[Occurrence_Support_238-46].

### a.    EPA Properly Considered Reported Co-Occurrences of Index PFAS.

Twenty-one of 27 states reported combinations of two or more Index PFAS

occurring above the health reference level.  JA-[Occurrence_Support_220-35];

*contra* Utility Br. 51-52 (asserting EPA only considered "mere

detections…irrespective of their concentrations").  Petitioners incorrectly argue

that co-occurrence should only matter if the individual contaminants co-occur at

levels at which *each* contaminant exceeds its individual health reference level.

Utility Br. 51-53.  But this misunderstands the purpose of regulation of the

chemicals as a hazard index as opposed to individually.  As explained in Pt.II.B,

*infra*, because these chemicals all elicit the same or similar health effects,

combinations of even very low doses of these chemicals can result in more harmful

effects than if the chemicals occurred alone.  JA-[RTC_4-368_to_4-371, 4-

418_to_4-419].  Regulation via a hazard index is thus necessary to protect against

the health effects of exposure to combinations of the Index PFAS.  JA-[RTC_4-424_to_4-425].

### b.        EPA Reasonably Statistically Analyzed Index PFAS Co-Occurrence.

EPA conducted extensive statistical analysis of the occurrence of the Index PFAS and found the Index PFAS are likely to co-occur.  EPA calculated the odds ratio[9] for every pair of Index PFAS using the non-targeted state data, which demonstrates the Index PFAS are between 5.2 and 66.0 times more likely to occur in mixtures of two or more Index PFAS than they are to occur alone.  JA-[Occurrence_Support_243-44].

Petitioners ignore the entirety of EPA's statistical analysis of state monitoring data and focus exclusively on perceived lack of occurrences in EPA's purely illustrative analysis of the partial UCMR5 data.  Industry Br. 40.  At the

---

[9] Odds ratios "represent the change in the odds of observing a first chemical given that a second chemical is known to be present relative to the odds of observing the first chemical given that the second chemical is not present."  JA-[Occurrence_Support_242].  This is different than calculating the probability of occurrence (or "odds").  *Contra* Industry Br. 40.  Odds ratios greater than 1 indicate increasingly higher likelihoods of finding the first chemical if the second chemical is present than if it were not present.  An odds ratio of 1 indicates that there is the exact same likelihood of finding the first chemical if the second chemical is present as if it were not present (i.e., there is no relationship between the odds of finding the two chemicals).  Odds ratios between 0 and 1 indicate a greater likelihood of *not* finding the first chemical if the second chemical is present.  And an odds ratio of 0 indicates missing data in the formula such that there is a null set.  JA-[Occurrence_Support_242].

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

outset, EPA's regulatory determination is based on its analysis of state data, not UCMR5 data, for the reasons outlined in Pt.II.A.2.b *supra*. JA-[Occurrence_Support_252] ("Since the UCMR5 dataset is currently incomplete, it does not serve as the basis for informing the agency's decisions for the regulatory determinations and [regulations]."). Nevertheless, because EPA received comments on the preliminary UCMR5 data that had begun to be reported between the preliminary and final regulatory determinations, EPA conducted a purely illustrative analysis of the UCMR5 data. JA-[Occurrence_Support_252-58]. Because this data did not form the basis of EPA's determination, Petitioners' arguments are irrelevant. Moreover, Petitioners misstate the data in a number of respects.

First, by focusing on instances where all Index PFAS are present, Petitioners misunderstand the hazard index. Industry Br. 40. As EPA explained, the hazard-index approach addresses the fact that "where drinking water contains any combination of *two or more* of the four PFAS that are the subject of this action—PFHxS, PFNA, HFPO-DA, and PFBS—the hazard associated with each PFAS in the mixture must be added together to determine whether the mixture exceeds a level of public health concern." JA-[RTC_4-418] (emphasis added).

Second, Petitioners are wrong that "[c]o-occurrence of even three of the Index [PFAS] is extremely rare" and "EPA has not identified a single sample

59

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

containing detectable levels of all four Index Substances occurring together."

Industry Br. 40.  The state data identifies 31 samples across 20 systems (1% of

systems) in which all four Index PFAS were present, and an additional 1,919

samples across 362 systems (25.9% of systems) in which three Index PFAS were

present.  JA-[Occurrence_Support_240].  Moreover, given that only approximately

one-third of systems had reported *any* UCMR5 data, it is not surprising or relevant

that the mere 24 samples containing HFPO-DA in that data did not happen to

contain *all* other Index PFAS.  JA-[Occurrence_Support_252]; JA-[FR_32601].

Third, Petitioners' assertion that "EPA admits that odds of co-occurrence of

[HFPO-DA and PFNA] are 0.0%," with a citation to odds *ratios* at JA-

[Occurrence_Support_256] both misstates the data and fundamentally

misunderstands the difference between "odds" and an "odds ratio."  Industry Br.

40.  As explained in n.9 *supra*, these are different concepts, and the odds ratio

cannot be expressed as a percentage.  An odds ratio of 0 demonstrates a null

dataset, not a lack of probability of co-occurrence.  *See* n.9.  Moreover, EPA's

analysis of the state data demonstrates an odds ratio of 15.9 for these two

chemicals, meaning that it is 15.9 times more likely that PFNA will be present if

HFPO-DA is present.  JA-[Occurrence_Support_243].

Finally, EPA did not dilute the "substantial likelihood" standard by adding

in "enough compounds to the hazard index" to "always claim the occurrence

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

criterion is met." *Id.* As fully explained in Pt.II.B, *infra*, EPA carefully considered inclusion of these specific Index PFAS to ensure sufficient similarity in the systems and tissues affected by the chemicals, and EPA's extensive co-occurrence analyses here demonstrate the high likelihood that at least two of these chemicals will co-occur at frequencies and levels of public health concern. EPA thus fully supported its determination to regulate the Index PFAS as mixtures.

### B. The Record Supports EPA's Determination that the Index PFAS May Have an Adverse Effect on the Health of Persons.

The record fully supports EPA's determination that combinations of two or more Index PFAS "*may* have an adverse effect on the health of persons." 42 U.S.C. § 300g-1(b)(1)(A)(i) (emphasis added). In keeping with SDWA's health-protective focus, this threshold is not onerous; it does not require definitive proof, but rather a reasonable *possibility* of adverse health effects. *Fed. Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37, 46 (1948) (interpreting statute's use of "may" to require "only that there is a reasonable possibility that they 'may' have had such an effect"). The record evidence here easily meets this standard by demonstrating that the four Index PFAS have the same or similar health effects.

EPA explained that each of the four Index PFAS "can disrupt signaling of multiple biological pathways, resulting in a shared set of adverse effects...." JA-[FR_34545]. Exposure to each of these chemicals elicit many adverse health effects, including effects on development, the liver and kidney, and endocrine,

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

respiratory, and reproductive systems. JA-[MCLG_1-8]; JA-[FR_32552]; JA-[RTC_4-373_to_4-375, 4-428]. Although each chemical's individual health reference level is set based on its most sensitive health effect (its "critical effect"), exposure to each of these chemicals causes many of the same adverse health outcomes. JA-[MCLG_1-8_to_1-10, 2-1_to_2-5, 2-8, 2-11]. For example, exposure to each of the four PFAS leads to endocrine, liver, and kidney toxicity. JA-[MCLG_1-8_to_1-10]. EPA thus reasonably determined that these chemicals are dose-additive. JA-[Framework_33-34] ("[I]t is considered a health-protective conclusion that PFAS that can be demonstrated to share one or more...adverse health outcomes will produce dose-additive effects from co-exposure."). Petitioners assert three challenges to this framework, none of which is availing.

1.      Petitioners misstate both the Science Advisory Board's recommendations and the science underlying EPA's dose-additivity analysis. Petitioners incorrectly assert that the Board advised that EPA's "dose[-]additivity assumptions...cannot sanction regulation." Industry Br. 41. In fact, the Board explicitly supported consideration of PFAS dose-additivity. JA-[SAB-Report_90] (The Board PFAS Review Panel "supports dose[-]additivity based on a common outcome, instead of a common mode of action as a health protective default assumption and does not propose another default approach."). The Board *never*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

suggested that the Index PFAS dose-additivity "cannot sanction regulation." *Id*; *contra* Industry Br. 41.

Petitioners further misstate the science supporting EPA's dose-additivity analysis by asserting that EPA relied exclusively on studies of PFAS that did not include the Index PFAS and that "none of the relied-upon studies evaluates the specific mixtures regulated by EPA's hazard index here." Industry Br. 41. At the outset, the hazard-index approach does not regulate only when all four Index PFAS are present; it regulates mixtures of two or more Index PFAS. JA-[RTC_4-418]. And EPA detailed numerous studies of various mixtures of the Index PFAS. JA-[Framework_33-37]; JA-[RTC_4-368_to_4-371]. Based on both studies of the individual Index PFAS and their various mixtures, EPA determined the Index PFAS likely are dose-additive. JA-[Framework_38] ("PFAS data reported in the literature support an assumption of similarity in toxicity profiles for several health effect domains.").

2.    Petitioners next erroneously assert that dose-additivity pertain *only* when there is "an overlap of critical effects." Industry Br. 41-42. But the sole document Petitioners cite for this position explicitly endorses use of the hazard index with substances with *different* critical effects, explaining an index in these circumstances is "health-protective" because it "increases the confidence of a minimal hazard...." JA-[Adv_Dose_Add_EPA-HQ-OW-2022-0114-3122_2-26].

63

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Importantly, EPA need only establish the contaminant "*may* have an adverse effect on the health of persons." 42 U.S.C. § 300g-1(b)(1)(A)(i) (emphasis added).

A "critical effect" in the context of developing a reference dose is the effect "typically observed at the lowest tested dose among the available data." JA-[FR_32547]; *contra* Industry Br. The critical effect is not the *only* effect of the chemical, or even the only effect at low levels. For example, EPA selected liver effects as the critical effect for HFPO-DA, but exposure to HFPO-DA also elicits many additional adverse health effects, including increased kidney weight. JA-[MCLG_1-8_to_1-10, 2-1_to_2-2]; *see also* Pt.III.E, *infra*. Similarly, EPA selected the thyroid as the most critical effect for PFBS, but PFBS exposure also elicits many other adverse effects, including increased kidney weight. JA-[MCLG_1-8_to_1-10, 2-4_to_2-5]. Because *both* these chemicals affect the kidney, exposure even at levels that individually would not likely result in adverse effects, may result in adverse kidney effects when exposure to both chemicals occurs simultaneously. JA-[RTC_4-368_to_4-378, 4-497_to_4-498]. EPA cites a multitude of studies demonstrating this. JA-[RTC_4-368_to_4-378]; JA-[Framework_33-37]. Notably, Petitioners cite no scientific evidence disproving the dose-additivity of these chemicals.

3.     Finally, Petitioners assert that the Index approach is "novel" and overly broad. Industry Br. 43-44. To the extent Petitioners intend these vague

64

criticisms, combined with a single case citation, to invoke the major questions doctrine, Petitioners have failed to preserve this argument. Industry Br. 44 (citing *UARG v. EPA*, 573 U.S. 302, 324 (2014)); *Consol. Edison Co. of New York, Inc. v. FERC*, 347 F.3d 964, 970 (D.C. Cir. 2003) (argument only "hint[ed] at" in the opening brief deemed waived). Moreover, as fully explained in Pt.I.A, *supra*, far from an "extraordinary case" departing from longstanding practice, EPA's use of the hazard index here is in line with its longstanding "history" of regulating contaminants in groups and is not a new grant of authority of "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Moreover, the PFAS combined here are not an "overly broad" assertion of authority. The Index PFAS are chemically and structurally similar compounds that affect the same health endpoints and have been shown to co-occur in drinking water with considerable frequency. JA-[FR_32552, 32592-93]; JA-[NPRM_18642-43]. They thus are amenable to regulation via a hazard index, and their regulation falls within the heartland of EPA's regulatory authority.

III. **The Rule's Standards Are Lawful, Reasonable, and Supported by the Record.**

Each of Petitioners' myriad challenges to the Rule's Standards fail. As to PFOS and PFOA, the record demonstrates that these Standards meet the Act's requirement to be as close to the Goals as "feasible," and that EPA addressed Petitioners' comments regarding regulatory alternatives. As to Index PFAS

65

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

mixtures, the Act authorizes EPA to promulgate Standards in the form of a hazard index, and EPA supported its selection of this Standard as an appropriate tool to address the dose-additive effects of these four PFAS. As to HFPO-DA, EPA considered and reasonably rejected each of Petitioners' objections, and EPA's conclusions on these scientific issues merit deference. Finally, EPA adequately consulted its Science Advisory Board before proposing the Standards.

## A. EPA Set the Standards for PFOS and PFOA at the Level That Is as Close to the Goals as Feasible.

While no Petitioner challenges the Goals EPA set for PFOS and PFOA, Industry Petitioners dispute whether EPA set the final Standards closer to those Goals than "feasible."[10] Industry Br. 23-27. EPA's feasibility determination for the final Standards of 4.0 ng/L was reasonable, and the record demonstrates that EPA considered and addressed the very concerns Industry Petitioners raise here.

EPA must set the Standard for a contaminant "as close to the [Goal] as is feasible." 42 U.S.C. § 300g-1(b)(4)(B). For purposes of this analysis, "feasible" means:

---

[10] Notably, Utility Petitioners—whose members include the public water systems that actually have to implement the Rule—do not challenge whether the PFOS and PFOA Standards are feasible within the meaning of SDWA. While their brief includes a throwaway reference to feasibility, Utility Br. 53-54, their arguments only concern EPA's finding that the Rule's benefits justify its costs, which is distinct from the feasibility determination under 42 U.S.C. § 300g-1(b)(4)(B). *See infra* Pt.IV.A; *City of Portland v. EPA*, 507 F.3d 706, 712 (D.C. Cir. 2007).

> feasible with the use of the best technology, treatment techniques and other means which the Administrator finds, after examination for efficacy under field conditions and not solely under laboratory conditions, are available (taking cost into consideration).

*Id.* § 300g-1(b)(4)(D). In other words, "feasible" means "technically possible and affordable." *City of Portland*, 507 F.3d at 712 (citing *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 509-512 (1981)). While this analysis does not entail balancing costs against benefits, pursuant to Congress's express guidance, EPA considers cost in this analysis by considering whether the costs of compliance are affordable for large public water systems. *Id.*; *see also* H.R. Rep. No. 93-1185, at 18, 1974 U.S.C.C.A.N. 6454, 6470-71 (stating Committee's intent that feasibility determinations are "to be based on what may reasonably be afforded by large metropolitan or regional public water systems").

In addition to evaluating the feasibility of *treatment* to the level of the Standard, EPA also considers "the *analytical limits* of [the] best available treatment and testing technology." JA-[FR_32573] (emphasis added) (quoting S. Rep. No. 104-169, at 3 (1995)); *see Int'l Fabricare*, 972 F.2d at 399 ("Before the EPA can set the enforceable limit…it first must ascertain how low a concentration of that chemical reliably can be measured[.]"). By considering these analytical limitations, EPA "ensure[s] that any public water system nationwide can monitor, determine compliance, and deliver water that does not exceed" the Standard. JA-[FR_32573].

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA supported its Standards for PFOS and PFOA through a robust feasibility analysis. *See generally* JA-[FR_32573-78]; JA-[RTC_5-44_to_5-50, 5-164_to_5-165, 5-316_to_5-317]. Far from limiting its analysis to the "two sub-issues" Petitioners identify, Industry Br. 24, EPA considered all aspects relevant to determining what level is as close as feasible to each contaminant's Goal. First, EPA identified the lowest levels at which PFOA and PFOS can be "reliably quantified within specific limits of precision and accuracy during routine laboratory operating conditions" using EPA-approved methods, known as the practical-quantitation level. JA-[FR_32573]. For contaminants with a Goal of zero (like PFOS and PFOA), EPA commonly sets the Standard at the contaminant's practical-quantitation level so long as treatment to that level is otherwise feasible. *Id.*; *see Int'l Fabricare*, 972 F.2d at 398-400 (upholding Standard based on this methodology). Here, EPA considered laboratories' current technical capabilities and found that they can reliably detect and quantify PFOS and PFOA at a level of 4.0 parts per trillion. JA-[FR_32574-76]; JA-[RTC_5-44_to_5-46]. Petitioners do not challenge EPA's identification of the practical-quantitation level.

Second, EPA evaluated the best available technologies for removing PFOS and PFOA from drinking water and concluded that several technologies, including granular activated carbon, are available and effective under field conditions for

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

treating these contaminants to levels below the Standards. JA-[FR_32577, 32622-24]; JA-[RTC_5-316_to_5-317]; JA-[Best_Available_Tech_EPA-HQ-OW-2022-0114-3087]. EPA concluded that the costs of these technologies are reasonable at a system and national level. JA-[FR_32575]; JA-[RTC_5-164_to_5-165]. And in any event, the Act provides that use of granular activated carbon is *per se* "feasible" for the control of synthetic organic chemicals, which include PFAS. 42 U.S.C. § 300g-1(b)(4)(D); JA-[FR_32575]. Petitioners do not challenge EPA's identification of the best available technologies or its conclusion that these technologies are affordable for public water systems.

Third, EPA evaluated numerous other practical concerns regarding the Standards' implementation, including available laboratory capacity for sample analysis and disposal costs associated with treatment technologies. *See* JA-[FR_32575-77]. EPA considered each of these issues and explained why they did not alter its conclusion that the Standards are feasible.

Industry Petitioners claim that EPA failed to adequately respond to two of these practical concerns: the supply of materials and personnel to build and operate treatment technologies, and the sufficiency of laboratory capacity to analyze systems' compliance with the Standards. Industry Br. 25-27. EPA considered and responded to both these concerns. Regarding the supply of treatment materials and personnel, EPA acknowledged the possibility of short-term issues but did not

69

merely "assume[] without explanation that these problems would simply resolve themselves."[11]  Industry Br. 26.  Instead, EPA relied on record evidence— including comments from treatment-system suppliers—showing excess capacity and investment in expanded production.  JA-[FR_32623]; JA-[RTC_10-201_to_10-202, 10-209].  EPA also noted the availability of federal funding to support operator training and certification programs.  JA-[RTC_12-15].

While EPA *also* projected that increased demand for treatment will lead to supply increases and innovation, that was not the only factor supporting its decision, and it was based on EPA's experience with multiple rulemakings rather than mere speculation.  JA-[RTC_10-202].  And in any event, the Act does not preclude EPA from relying on reasonable projections of technology availability.  Indeed, Congress in 1986 removed the Act's previous requirement that Standards reflect "generally available" technology, indicating that EPA may base Standards on technology that is not currently in widespread use.  *Id.*

Regarding available lab capacity, EPA reasonably explained its conclusion that adequate capacity exists to support implementation of the Standards.  First, EPA noted that 53 labs spread throughout the country are already accredited for use of EPA's PFAS testing methods as part of the UCMR5 sampling program.  JA-

---

[11] EPA extended the Standards' compliance deadline by two years to mitigate any potential supply chain issues and spread out peak demand for capital improvements.  *See* JA-[FR_32632-33].

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

[RTC_5-47]. Those 53 labs have sufficiently accommodated the testing needs of UCMR5, which requires quarterly or semi-annual sampling by *every* medium and large system in the United States and by 800 smaller systems. *Id.* Second, apart from the labs approved to participate in UCMR5, EPA identified an additional 25 labs accredited for use of the relevant test methods. JA-[RTC_5-48]. Third, EPA noted that unlike the more frequent sampling required in UCMR5, many systems will qualify for reduced monitoring under this Rule and will only need to submit samples for analysis annually or triennially, easing the burden on laboratory capacity. *Id.* Fourth, EPA projected that laboratory capacity will grow in response to the Rule and state monitoring efforts. *Id.* And fifth, the final Rule allows systems to submit previously collected data to meet their initial monitoring requirements, potentially easing the Rule's testing burden by tens of thousands of samples. *See* JA-[FR_32616]. EPA's conclusions were corroborated by the commercial environmental testing community, which represented that laboratory capacity is not expected to be an "ongoing concern." *Id.*

Finally, EPA responded to commenters claiming it had overestimated the number of commercial labs accepting samples for analysis. Industry Br. 26-27. In particular, EPA noted that the database on which commenters relied excludes laboratories in some states and likely underestimates the actual number of accredited or certified commercial labs. JA-[RTC_5-47].

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Accordingly, EPA addressed all of Industry Petitioners' concerns and reasonably concluded that the Standards for PFOS and PFOA are feasible.

**B. EPA Adequately Considered Alternative Standards.**

EPA also addressed Industry Petitioners' comments suggesting that EPA consider specific alternative Standards for PFOS and PFOA. Industry Br. 27-30. At the outset, the Act does not require EPA to consider any particular number or range of alternatives to the Standards it proposes. It simply provides that *if* EPA elects to consider alternatives as part of its rulemaking, it must analyze the incremental costs and benefits of those alternatives in the Economic Analysis required under Section 300g-1(b)(3)(C). 42 U.S.C. § 300g-1(b)(3)(C)(i)(III). Petitioners do not dispute that EPA satisfied that requirement for the alternatives it considered of 5.0 and 10.0 parts per trillion, *see* JA-[FR_32634], and their objections to how EPA selected those alternatives over other potential alternatives are legally irrelevant. *See* Industry Br. 29-30.

At bottom, Industry Petitioners simply complain that EPA did not sufficiently consider their preferred regulatory alternatives of 20 and 40 ng/L for PFOA and PFOS, respectively. Industry Br. 28. But EPA met its burden to respond to these public comments and provided a reasoned explanation for rejecting these alternative Standards. Industry Petitioners suggested these levels because they reflected the minimum reporting levels for PFOS and PFOA adopted

72

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

in 2012 for the UCMR3 sampling program.[12]  *See* JA-[ACC_Comments_EPA-HQ-OW-2022-0114-1841_at_53]; 77 Fed. Reg. 26072 (May 2, 2012).  EPA explained that in the 12 years that had elapsed since 2012, analytical accuracy and precision had improved such that 20 and 40 ng/L no longer represented the analytical limits of the best available technology.  JA-[RTC_5-198]; *see also* JA-[RTC_13-524]; JA-[FR_32574] (noting use of 4.0 ng/L as minimum reporting levels for more recent UCMR5).  Given the Act's command to set the Standards "as close to the [Goals] as is feasible," EPA reasonably decided not to consider alternative Standards based on outdated analytical limits.  42 U.S.C. § 300g-1(b)(3)(A), (b)(4)(B).

Industry Petitioners suggest that EPA nonetheless should have considered their preferred alternatives because EPA could have selected them as the closest "feasible" levels to the Goals based on their "incremental costs" compared to the final Rule's Standards.  Industry Br. 28-29.  But Petitioners appear to be conflating the "feasibility" analysis required by Section 300g-1(b)(4)(B) with EPA's separate requirement to conduct an Economic Analysis and determine whether a Standard's benefits justify its costs under Section 300g-1(b)(3)(C) and (b)(4)(C).  As

---

[12] In their brief, Industry Petitioners also argue (apparently for the first time) that an EPA guidance document supports their preferred alternative Standards. Industry Br. 28.  Petitioners do not explain how their cited guidance—which addresses how to conduct animal toxicity studies for purposes of a different statute—is relevant to setting Standards under the Act.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

discussed in Pt.IV.A, *infra*, these are two distinct requirements, and feasibility under the Act does not depend on the incremental costs or benefits of one alternative Standard compared to another. As this Court recognized in *City of Portland*, "[n]othing in Section 300g-1(b)(4)…allows EPA to choose a [Standard] other than the most stringent feasible." 507 F.3d at 712 (holding "feasible" simply means "technically possible and affordable"). Accordingly, there is no conflict between EPA's decision not to consider these alternatives and its obligation to determine what Standard is feasible.

## C. EPA Has Authority to Promulgate Standards in the Form of a Hazard Index.

For mixtures containing two or more of the Index PFAS, EPA promulgated a Goal and Standard in the form of a hazard index. JA-[FR_32571, 32580]. No Petitioner challenges whether the Standard selected is "as close to the [Goal] as feasible." 42 U.S.C. § 300g-1(4)(A), (B). Instead, they simply challenge the *form* of the Standard. Utility Br. 34-36. Contrary to their arguments, the best reading of the statutory term "maximum contaminant level" clearly authorizes EPA's selection of a hazard index as the Standard, and the hazard index approach is consistent with Standards EPA has promulgated for other contaminants. *Loper*, 144 S. Ct. at 2266.

Nothing in the Act requires a Standard to take any particular form. JA-[RTC_5-386]. Instead, a Standard that sets a "maximum contaminant level"

74

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

simply must state "the maximum permissible level of a contaminant in water which is delivered to any user of a public water system." 42 U.S.C. § 300f(3). To meet this definition, a Standard must specify a "level" for the relevant contaminant. JA-[RTC_5-386]. And for practical purposes, it must be capable of being validated to assess a system's compliance. *Id.* The hazard index in the final Rule satisfies these requirements. It establishes the level that the relevant contaminant—here, any mixture of two or more Index PFAS—may not exceed in drinking water. And it can be validated because regulated systems use their monitoring results as inputs to determine whether their water contains a mixture of Index PFAS exceeding that level. *Id.*

Petitioners fail to explain how a Standard based on a hazard index does not establish a "level." They claim that a "level" must be expressed as the "concentration" of an individual substance in water. Utility Br. 34. But their own brief concedes that "level" has a broader meaning that includes any measure of "relative position or rank on a scale" or a "relative degree…[of] intensity." *Id.*; *accord* RANDOM HOUSE COLLEGE DICTIONARY 770 (Laurence Urdang et al. eds., 1973) (defining "level" as "a position in a graded scale of values; status; rank"). The hazard index is a scale measuring the relative intensity of the hazard presented, with a value above 1 representing amounts of the mixture at which there are known or anticipated adverse health effects and values at or below 1

75

representing amounts at which no such effects are expected. JA-[RTC_4-418_to_4-419].

Petitioners are wrong that all of EPA's other Standards are "expressed and described as a concentration level"; in fact, the example they cite disproves their argument. Utility Br. 34 (discussing Standards for radionuclides). The Standards for combined radium and for gross alpha particle radioactivity are each expressed in picocuries per liter. 40 C.F.R. § 141.66(b), (c). These units do not represent the *concentration* of any particular radionuclides in water, but rather the *intensity of radioactivity* in the water, measured via the rate of radioactive decay. *City of Waukesha*, 320 F.3d at 232 n.1; *see also* 51 Fed. Reg. 34836, 34850 (Sept. 30, 1986) (providing background on radionuclides and their measurement in advance notice of proposed rulemaking). Likewise, the Standard for beta particle and photon radioactivity is expressed in millirems per year, which measures the dose of radiation received over a set time period and accounts for both the quantity and energy of radiation present. 40 C.F.R. § 141.66(d); *City of Waukesha*, 320 F.3d at 232 n.2.

Like the hazard index, each of these Standards uses a metric other than the concentration of a contaminant in water to set the maximum permissible "level." Notably, EPA's reason for taking this approach with radionuclides is directly analogous to its reason for using a hazard index here: the need to "account for the

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

different potencies of the mixture components." JA-[RTC_4-429]; *see* 65 Fed. Reg. 76708, 76720 (Dec. 7, 2000) (explaining factors affecting hazards of various radionuclides). Because the mixture components are not equally hazardous and may occur in different proportions at different times and locations, a Standard set in the form of a total concentration of these components would not adequately protect against adverse health effects and would be over-protective in some cases and under-protective in others. JA-[RTC_4-430]. Petitioners' narrow reading of "level" would hamstring EPA's ability to address these kinds of mixtures.

Likewise, there is nothing "fundamentally different" about a Standard that "depends on the relative occurrence of four different contaminants in a sample of drinking water." Utility Br. 35. The same is true of *any* Standard that limits a contaminant as a group, like EPA's Standards for disinfection byproducts or radionuclides. 40 C.F.R. §§ 141.64(b), 141.66. For example, a system's compliance with the Standard for haloacetic acids will depend on "fluctuations in the relative concentrations of" the five acids collectively regulated by that Standard, Utility Br. 36, just as a system's compliance with the hazard index in this Rule will depend on the measured concentrations of different Index PFAS in its water. The only distinction here is that the concentrations of Index PFAS are given different weights before adding them together to reflect the lower potency of one component (PFBS) compared to the other Index PFAS. *See* JA-[RTC_4-368]

77

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(noting for contaminants with dose-additive effects, overall risk depends on sum of individual contaminant concentrations "scaled for potency").

Nor is the hazard index made "fundamentally different" by use of a "mathematical equation" to determine compliance with the Standard.  Utility Br. 35.  Again, the mathematical steps involved in calculating the hazard index (division and addition of individual contaminant concentrations) are no different or more complex than the steps required for the many Standards for which compliance is based on a running annual average of quarterly sampling results. JA-[RTC_5-391]; *see* 40 C.F.R. §§ 141.23, 141.24, 141.26, 141.133.  Thus, a Standard expressed as a hazard index is consistent with the Act and with EPA's past practice.

### D. The Index PFAS Standard Appropriately Regulates Mixtures of Index PFAS.

Petitioners largely repackage arguments regarding the regulatory determination of the Index PFAS as arguments that the Standard is arbitrary and capricious.  *Compare* Industry Br. 40-44 *with* Utility Br. 36-40; Pt.II.A.3.  These arguments are no more availing regarding the Standard.

First, Petitioners assert the Index PFAS have different health effects.  Utility Br. 36-38.  As explained in Pt.II.A.3, *supra*, this is incorrect.  Exposure to different Index PFAS elicit many similar adverse health effects, including effects on development, the liver, and kidney, and endocrine, respiratory, and reproductive

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

systems.  JA-[FR_32552]; JA-[RTC_4-373_to_4-375, 4-424_to_4-429]; JA-[MCLG_1-7_to_1-10].

Second, Petitioners misstate the Board's recommendations regarding use of a hazard index.  Contrary to Petitioners' assertion, Utility Br. 38-39, the Board never stated that a hazard index is "most appropriate" as a screening tool.  JA-[SAB_Report].  EPA sought the Board's input on its original proposal to use a tiered approach to evaluate noncancer health risks associated with PFAS mixtures in which the hazard index could be used as the first tier before more data-intensive steps were taken.  JA-[RTC_4-423_to_4-426].  The Board agreed that the hazard index was "a reasonable approach" for regulating PFAS mixtures because of their dose-additivity, but specifically recommended that EPA remove additional tiers of evaluation and use a simplified structure like the hazard index.  JA-[SAB_Report_91, 110]; JA-[RTC_4-424].  Thus, far from criticizing this approach, the Board endorsed it.

Finally, Petitioners misrepresent the EPA guidance document they claim requires consistent proportions.  Utility Br. 39-40.  Petitioners conflate the concept of a mixture generally with a specific type of mixture *analysis* called the "whole-mixture" approach.  JA-[Chem_Mix_Guidance_EPA-HQ-OW-2022-0114-0075_3].  As the guidance document explains, there are different methods of analyzing mixtures that include both "whole-mixture" approaches and component-

based approaches (like a hazard index).  JA-[Chem_Mix_Guidance_3].  The references to similarities in proportions and components that Petitioners cite relate to one particular type of analysis under the "whole-mixture" approach, *not* a hazard-index approach.  JA-[Chem_Mix_Guidance_10, 37-38].  Indeed, EPA explained that the variability of proportions of individual PFAS within the mixtures of the Index PFAS was the very reason it is using the hazard-index approach.  JA-[Chem_Mix_Guidance_79-80]; JA-[RTC_4-420_to_4-421].  And although Petitioners quibble with EPA's use of the term "mixture" to describe combinations of Index PFAS because they claim the "common sense" definition of "mixture" requires "components and respective portions [that] exist in approximately the same pattern," Utility Br. 40, the longstanding definition of a mixture in chemistry is "an aggregate of two or more substances that are not chemically united and that exist *in no fixed proportion to each other*."  *Mixture*, DICTIONARY.COM, *available at* https://www.dictionary.com/browse/mixture (emphasis added); *Mixture*, RANDOM HOUSE COLLEGE DICTIONARY 865 (Laurence Urdang et al. eds. 1973) (same).

Accordingly, EPA's decision to regulate the Index PFAS using a hazard-index methodology is reasonable and supported by record evidence.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**E. The HFPO-DA Individual Standard Is Reasonable and Supported by the Record.**

EPA thoroughly reviewed the scientific data to develop the HFPO-DA Goal and Standard. Petitioners challenge two inputs into the Goal: EPA's consideration of non-drinking water exposure to HFPO-DA (the "relative source contribution") and various aspects of the Toxicity Assessment. Neither of these arguments is availing.

**1. EPA Reasonably Considered Non-Drinking Water Exposure to HFPO-DA.**

To set a Goal at the level of HFPO-DA in drinking water at which "no known or adverse effects on the health of persons occur and which allows an adequate margin of safety," EPA must consider not only human exposure to HFPO-DA through drinking water, but also non-drinking water HFPO-DA exposure. JA-[MCLG_2-3, A-8_to_A-15]; JA-[RSC_Guide_EPA-HQ-OW-2022-0114-0882_1-5_to_1-8]. EPA does this through assessment of the "relative source contribution." 42 U.S.C. § 300g-1(b)(4); JA-[MCLG_2-3]; JA-[RSC_Guide_1-7_to_1-8]. EPA takes "a conservative approach to public health" by assuming 20% of exposure is from drinking water and 80% from other exposure sources "when adequate exposure data do not exist…." JA-[RSC_Guide_1-7]. Here, EPA fully evaluated the available peer-reviewed scientific studies and determined that inadequate data existed to calculate the specific amount of exposure to HFPO-DA

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

an individual would likely receive from each media.  JA-[MCLG_2-3, A-8_to_A-15].  Thus, pursuant to EPA's longstanding methodology, EPA determined that a relative source contribution of 20% was appropriate.  The Court affords EPA particular deference for its evaluation of this type of scientific data within its "technical expertise."  *NYC C.L.A.S.H., Inc. v. Fudge*, 47 F.4th 757, 763 (D.C. Cir. 2022).

EPA thoroughly explained its consideration of peer-reviewed scientific studies—including all articles Petitioner Chemours provided—to determine whether HFPO-DA exposure may occur from non-drinking water sources.  JA-[MCLG_A-8_to_A-15]; JA-[RTC_4-587_to_4-590]; *contra* Industry Br. 55.  At the outset, much of what Petitioner Chemours provided was not valid scientific data or peer reviewed studies (*e.g.*, internal PowerPoint slides and public-service announcements) or failed to even reference HFPO-DA.  JA-[RTC_4-587_to_4-590].  Nevertheless, EPA included a table in its response to comments specifically addressing each document submitted, confirming EPA considered the valid scientific studies therein, and explaining why each document that was not considered failed to meet the statutory standard for consideration.  JA-[RTC_4-587_to_4-590].  Notably, Petitioners do not disagree with EPA's assessment of any of these documents.  Industry Br. 54.

82

Contrary to Petitioners assertion, Industry Br. 56, EPA did not disregard data showing a lack of non-drinking water exposure routes. EPA fully discussed both studies that demonstrated HFPO-DA presence and studies that did not. JA-[MCLG_A-11_to_A-15]. Collectively, the studies demonstrated the presence of HFPO-DA in certain foods, but not in others. JA-[MCLG_A-11_to_A-12]. Studies also detected HFPO-DA in soil and sewage sludge, air emissions, rainwater, and indoor dust. JA-[MCLG_A-12_to_A-15]. EPA thus concluded that several studies showed people may be exposed to HFPO-DA through non-drinking water exposure routes. JA-[MCLG_A-11_to_A-15]. Critically, Petitioners identify no error in EPA's reliance on *any* of these studies. Industry Br. 55-56. And although Petitioners cite to an extra-record email regarding preliminary data on PFAS in dust that Petitioners claim EPA failed to consider, Industry Br. 56, the final results of that study merely document that, at the ten specific military bases studied, HFPO-DA overwhelmingly was not present in *any* form. *See* ATSDR Report at 57, https://www.atsdr.cdc.gov/pfas/docs/PFAS-EA-Final-Report-508.pdf. EPA thus reasonably concluded exposure may occur through non-drinking water sources.

EPA then explained that, because "the available information [on HFPO-DA exposure] is limited" and "does not allow for the quantitative characterization of the relative levels of exposure among these difference sources," EPA would follow

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

its standard methodology of applying a relative source contribution of 20%. JA-[MCLG_2-3, A-15]. EPA's protocol does not "strongly caution[] against" using a 20% value. *Contra* Industry Br. 55. It states that "[w]hen other sources or routes of exposure are anticipated but data are not adequate" to quantify the precise amount of exposure from drinking water versus other media, "there is an even greater need to make sure that public health protection is achieved," and "the 20 percent default will still generally be used." JA-[RSC_Guide_4-6]. Petitioners do not identify a single peer-reviewed scientific study that quantifies HFPO-DA exposure through drinking water as compared to other exposure media, nor do Petitioners offer any evidence to *specifically calculate* a relative source contribution value EPA should have used. *See generally* Industry Br. 54-57.

EPA's extensive discussion of the scientific literature of HFPO-DA exposure surpasses its obligation to consider all relevant factors and demonstrate a reasonable connection between the record facts and policy choice. *Sinclair Wyo.*, 101 F.4th at 882.

## 2. EPA Reasonably Relied on Rodent Studies Showing HFPO-DA Elicits a Constellation of Adverse Liver Effects Relevant to Humans.

EPA thoroughly analyzed the available scientific literature before relying on rodent studies to determine that a constellation of adverse liver effects is the most critical effect observed after HFPO-DA exposure to derive a Goal at "the level at

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

which no known or anticipated adverse effects on the health of persons occur and which allows an adequate margin of safety." JA-[MCLG_1-1, 2-1]. Although Petitioners disagree with EPA's reliance on these studies and conclusions, the record—including *multiple* rounds of independent expert peer reviews—overwhelmingly supports EPA's conclusions. JA-[HFPO-DA_TA_Appx_D]; JA-[HFPO-DA_1st_Peer_Review_13-31]; JA-[HFPO-DA_2nd_Peer_Review_10-15]. These factual findings are entitled to an "extreme degree of deference." *NYC C.L.A.S.H., Inc.* 47 F.4th at 763.

*a.* Petitioners incorrectly assert that *no* liver effects in rodents are relevant to humans. Industry Br. 57-60. But EPA's analysis is supported by peer-reviewed scientific literature and was affirmed by multiple rounds of external peer review by independent human health scientists.

Petitioners incorrectly assert all liver effects observed in rodents result from a toxicity pathway (or "mode of action") called PPAR-alpha, which they claim is not relevant to humans. Industry Br. 57-58. But there are multiple modes of action for liver effects in rodents other than PPAR-alpha, including the cytotoxic mode of action. JA-[RTC_4-517_to_4-520]. EPA identified scientific literature demonstrating that only a *decrease* in one type of liver cell death (apoptosis) is associated with PPAR-alpha, whereas other modes of action relevant to humans are associated with the specific liver effects at issue here—*increases* in apoptosis,

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

various types of necrosis, and increased serum liver enzyme concentrations, *i.e.*, a "constellation of liver effects"). JA-[RTC_4-516_to_4-521]; JA-[HFPO-DA_TA_29, 42-45, 51-54, 72-77, 82-90, Appx_D]; JA-[HFPO-DA_1st_Peer_Review_13-21]; JA-[Draft_HFPO-DA_TA_RTC_EPA-HQ-OW-2022-0114-3616_12-15, 34-35]; JA-[Resp_Chem_IQA_EPA-HQ-OW-2022-0114-3629_7-14]. Petitioners ignore EPA's cited studies, and instead erroneously assert EPA's analysis was based on "specula[tion]." Industry Br. 57.

Notably, EPA *twice* sought external peer review regarding whether the specific rodent studies relied upon were relevant to humans, and both panels unanimously agreed they were. JA-[HFPO-DA_1st_Peer_Review_17-21, 25-31]; JA-[HFPO-DA_2nd_Peer_Review_10-15]. And, when Petitioner Chemours previously challenged a specific type of liver cell death reported in studies EPA considered when determining HFPO-DA's toxicity to humans, EPA even convened a *third* group of independent experts, the Pathology Working Group at the National Institutes of Health, to conduct an independent analysis of the pathology slides from the studies. JA-[Draft_HFPO-DA_TA_RTC_11-15]; JA-[HFPO-DA_TA_Appx_D]. The Group generally supported the original study's findings, concluding that the pathology slide evaluations demonstrated a range of adverse liver effects, including increased single-cell necrosis, cytoplasmic alteration, focal necrosis, and apoptosis—collectively, a "constellation of

lesions"—that it identified as adverse effects observed after exposure to HFPO-DA.  JA-[HFPO-DA_TA_D-22].

Although Petitioners now complain that the Group did not make any specific findings regarding the relevance of the constellation of lesions to humans, Industry Br. 59-60, Petitioners misunderstand the Group's role.  The Group was asked to diagnose the liver effects using a particular type of liver diagnostic criteria (the "Elmore" criteria.  JA-[HFPO-DA_TA_D-22].  Evaluation of whether a particular rodent effect can be extrapolated to humans follows an analysis of "the Hall criteria," which is conducted *after* identification of the specific liver effect.  JA-[RTC_4-517]; JA-[FR_32548-49].  Two panels of experts also unanimously affirmed EPA's "Hall criteria" analysis.  JA-[HFPO-DA_1st_Peer_Review_17-21, 25-31]; JA-[HFPO-DA_2nd_Peer_Review_10-15].

Thus, although Petitioners may disagree with EPA's scientific assessment, EPA's analysis and conclusions are supported by ample evidence in the record and are well-explained.

**b.**      The record demonstrates that EPA appropriately considered the Chappell article Petitioner Chemours identified in its comments.  Industry Br. 58; JA-[RTC_4-517_to_4-520].

First, EPA considered the Chappell article in conjunction with the other available scientific studies on this issue.  JA-[HFPO-DA_TA_76-77].  EPA

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

determined, in its technical expertise, that the weight of evidence supported the human relevance of the liver effects resulting from HFPO-DA exposure. JA-[HFPO-DA_TA_76-77]; JA-[RTC_4-517_to_4-520]; JA-[Resp_Chem_IQA_8]. For example, although the Chappell study did not find necrosis in the slides studied, the seven pathologists in the Pathology Working Group analyzed the same slides and found necrosis in addition to apoptosis. JA-[HFPO-DA_TA_D-20_to_D-21_Tbl._1]. Although Petitioners may disagree with EPA's weighing of this evidence, this Court affords EPA's evaluation of within its technical expertise particular deference. *Huntsman Petrochem.*, 114 F.4th at 735.

Second, Petitioners are incorrect that the Chappell study concluded that *no* modes of action other than PPAR-alpha are at issue in *any* liver effects resulting from HFPO-DA exposure. Industry Br. 58. The article did not address all other potential modes of action, including the cytotoxic mode of action, and thus cannot refute the potential applicability of other modes of action. JA-[Chappell_study_EPA-HQ-OW-2022-0114-3431_505-06]; JA-[RTC_4-518_4-519].

Finally, EPA explained that Chappell's finding of apoptosis is consistent with other studies that demonstrate that apoptosis is part of the constellation of liver effects seen in response to HFPO-DA exposure. JA-[RTC_4-519_to_4-520]. EPA thus fully considered the Chappell study.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### 3. EPA Reasonably Applied Both Subchronic-to-Chronic and Database Uncertainty Factors of 10.

When deriving a Goal and Standard, EPA must first determine the reference dose (an estimate of daily oral exposure that is "likely to be without an appreciable risk of deleterious effects during a lifetime") by analyzing the scientific literature and applying certain "uncertainty factors."  JA-[Reference_Dose_Protocol_EPA-HQ-OW-2022-0114-0100_G-7, 4-40_to_4-41].  Uncertainty factors are numerical values of 1, 3, or 10 that account for gaps or uncertainties in the available scientific data for the chemical.  JA-[Reference_Dose_Protocol_4-40_to_4-41].  Because of gaps in the scientific studies conducted on HFPO-DA at the time of the rulemaking, EPA reasonably set both the subchronic-to-chronic and database uncertainty factors in its derivation of the HFPO-DA chronic reference dose at 10.

*First*, EPA's guidance regarding application of uncertainty factors to chronic reference doses explains that a "default value of 10 for [the subchronic-to-chronic uncertainty factor] is applied…on the assumption that effects from a given compound in a subchronic study occur at a 10-fold higher concentration than in a corresponding (but absent) chronic study."  JA-[Reference_Dose_Protocol_4-45_to_4-46].  Although EPA originally set this value at 3 when drafting its initial toxicity assessment in 2018, additional studies became available that indicated studies of longer duration were needed.  JA-[HFPO-DA_TA_92-93].  Contrary to

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Petitioners' assertion, Industry Br. 53-54,[13] EPA fully explained the reasons for this increase. JA-[HFPO-DA_TA_41-45, 92-93]; JA-[HFPO-DA_2nd_Peer_Review_10]. Specifically, based on the Pathology Working Group's reanalysis of pathology slides, EPA revised its assessment of the most sensitive population from parental males to lactating females. JA-[HFPO-DA_TA_41-45, 92-93]; JA-[HFPO-DA_2nd_Peer_Review_10]; JA-[HFPO-DA_Draft_TA_EPA-HQ-OW-2022-0114-0521_60]. EPA explained that female test subjects had been exposed to HFPO-DA for a shorter duration than the exposure duration for males, thus requiring an increase in the subchronic-to-chronic uncertainty factor. JA-[HFPO-DA_TA_92-93]; JA-[HFPO-DA_2nd_Peer_Review_20]. Additionally, because the available studies demonstrated female rodents had progressing liver effects over longer durations of exposure to HFPO-DA, EPA explained it was "critical to have a 2-year chronic study in the mouse to understand the progression of these liver effects," but no such studies existed. JA-[HFPO-DA_TA_93].

---

[13] EPA had no heightened burden to "supply a reasoned analysis," Industry Br. 54 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 57 (1983)), for revising this uncertainty factor between the draft and final toxicity assessment in response to public comment and updated scientific studies. *State Farm* refers to an agency "changing its course" by revising a final regulation, not a draft scientific assessment. *State Farm*, 463 U.S. at 57.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Second,* Petitioners question why EPA increased its database uncertainty factor from 3 to 10 in response to additional studies and findings. Industry Br. 52-53. But EPA explained that scientific papers published after the draft assessment identified new health effects needing more study—specifically, reproductive, developmental, and neurotoxic effects. JA-[HFPO-DA_TA_93-96]; JA-[HFPO-DA_2nd_Peer_Review_15]; JA-[Draft_HFPO-DA_TA_RTC_23-24]. For example, one study observed placental lesions in pregnant mice following exposure to higher doses of HFPO-DA, and EPA explained that additional studies were needed both at lower doses and to determine how those lesions "might impact reproductive and developmental outcomes." JA-[HFPO-DA_TA_94]. Similarly, three studies published after the draft toxicity assessment showed alterations in thyroid hormones in pregnant subjects after gestational exposure to HFPO-DA, but EPA explained the potential neurodevelopmental effects that might result from the thyroid hormone effects required additional investigation at lower doses. JA-[HFPO-DA_TA_96]. Thus, contrary to Petitioners' assertion, Industry Br. 52-53, EPA specifically identified the critical data gaps it had discovered between the draft and final toxicity assessments. JA-[HFPO-DA_TA_93-96].

*Third*, EPA's proposal to increase both the subchronic-to-chronic and database uncertainty factors from 3 to 10 was supported by a panel of independent experts. JA-[HFPO-DA_2nd_Peer_Review_15-24].

91

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Accordingly, EPA considered the "relevant factors" and articulated a "reasonable connection" between the facts found and the choice made. *Sinclair Wyo.*, 101 F.4th at 882.

### F. EPA Satisfied Its Procedural Requirements for Consultation with the Science Advisory Board.

EPA sought the Board's comments on the key scientific issues involved in its regulations for these contaminants and addressed the Board's recommendations in its proposed and final Rule. JA-[FR_32729-31]. The Act does not require more. And ultimately, any procedural deficiencies in EPA's consultation with the Board would constitute harmless error that does not warrant any remedy— certainly not "vacating the Rule" in its entirety. Industry Br. 39.

The Act requires EPA to "request comments from the Science Advisory Board…prior to proposal of a [Goal] and [Standard]." 42 U.S.C. § 300g-1(e). Other than specifying when EPA must solicit comment, this broad language leaves EPA significant discretion regarding how and on what issues to seek the Board's input prior to proposal. Contrary to Petitioners' suggestion, SDWA does not require EPA to submit the specific Goals and Standards it proposes for the Board's

92

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

review.[14]  Industry Br. 39.  If Congress had intended to require as much, it would have done so explicitly.

That it did not is unsurprising.  The Board exists only to provide "scientific advice" to EPA.  42 U.S.C. § 4365(a).  EPA's selection of a specific Goal and Standard for a contaminant involves policy questions (including what constitutes an "adequate margin of safety" and what level is "feasible") that the Board is neither authorized nor qualified to address.  *See id.* § 300g-1(b)(4).  Moreover, requiring EPA to solicit the Board's comment on the specific Goal and Standard it proposes would be impractical, as it could trap EPA in a feedback loop of continuous consultation.  EPA would have to go back to the Board for further comment each time it changes its proposed rules, even if it were changing the proposal in response to the Board's feedback.  JA-[RTC_4-427].

In practice, EPA considers hundreds of scientific issues for any given regulation under the Act, and EPA must focus its consultation with the Board on the most important or novel issues.[15]  *Id.*  Here, EPA identified the most critical

---

[14] Petitioners appear to recognize as much: they do not challenge EPA's consultation with the Board regarding PFOS or PFOA, notwithstanding that EPA also did not solicit the Board's comments on those specific Goals or Standards. Industry Br. 38.

[15] *See, e.g.*, 86 Fed. Reg. 4198, 4276 (Jan. 15, 2021) (describing issues for which EPA sought Board comment on lead and copper Standards); 78 Fed. Reg. 10270, 10341 (Feb. 13, 2013) (total coliform Standard); 66 Fed. Reg. 45676 (Aug. 29, 2001) (Standards for microbial pathogens, disinfectants, and disinfection byproducts).

scientific issues to its forthcoming proposals that had not yet undergone peer review, where Board commentary would be most valuable. *Id.* EPA submitted questions to the Board on these issues, including dose-additivity and the reasonableness of using a hazard index or other methods for assessing risks of PFAS mixtures. *Id.*; *see* JA-[Response_to_Final_SAB_Recommendations_EPA-HQ-OW-2022-0114-0043_at_46-71]. The Board met on four occasions to deliberate on these charge questions and others EPA submitted for this rulemaking; published a draft report; considered oral and written public comments; and provided numerous recommendations to EPA. JA-[RTC_4-426]. EPA considered these recommendations and included its responses to the Board in its proposed and final Rule. *Id.* The Act does not require more.

Finally, even if the Court agrees with Petitioners, any procedural violation was harmless error. *See City of Waukesha*, 320 F.3d at 246. Petitioners do not claim to have suffered any prejudice from EPA's alleged failure to consult with the Board and do not show further consultation would have altered or improved anything about the Rule—particularly given that EPA accepted all of the Board's recommendations with respect to PFAS mixtures. JA-[Response_to_Final_SAB_Recommendations_at_12, 46-71]. Moreover, while Congress may have considered Board consultation a worthwhile effort, it clearly did not intend this requirement to be essential. The Act does not even require the

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Board to respond to EPA's solicitation, and it prohibits EPA from delaying final promulgation of a Standard to allow for Board consultation.  42 U.S.C. § 300g-1(e).

## IV.     EPA Appropriately Considered Costs and Benefits in Promulgating the Rule.

Petitioners' challenges to EPA's consideration of costs and benefits in the Rule fail for numerous reasons.  First, Petitioners' assertion that what is "feasible" under SDWA depends on a balance of costs and benefits is wrong as a matter of law.  Second, the Act does not permit judicial review of EPA's separate determination that the Rule's benefits justify its costs.  Third, to the extent it is reviewable here, EPA's determination was reasonable because it properly considered the Rule's substantial nonquantifiable benefits, considered certain Standards' impacts collectively to accurately account for their overlapping costs and benefits, and addressed each of Petitioners' objections on the record.  Finally, if the Court agrees with Petitioners on any issue, vacatur of the Rule is inappropriate.

### A. EPA's Selection of "Feasible" Standards Does Not Depend on Comparison of Costs and Benefits.

Petitioners' arguments challenging the Standards based on purported deficiencies in the Economic Analysis rely on a fundamentally mistaken proposition:  that in order to set a Standard that is as close to the Goal as

95

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

"feasible," EPA must strike some particular balance between the Standard's benefits and costs. *See* Utility Br. 2, 53-57; Industry Br. 6, 14-23. Petitioners improperly conflate EPA's analysis of what Standard is "feasible" under subparagraph (b)(4)(B) with its separate determination of whether such a Standard's benefits justify its costs under subparagraph (b)(4)(C). As this Court already held in *City of Portland*, SDWA's text, structure, and legislative history confirm that these analyses are distinct and that whether a Standard is "feasible" does not turn on its relative benefits and costs. 507 F.3d at 712.

The text and structure of the Act make clear that subparagraphs (b)(4)(B) and (b)(4)(C) involve different analyses based on different factors. Subparagraph (b)(4)(B) directs EPA to set a contaminant's Standard as close as "feasible" to its health-protective Goal. 42 U.S.C. § 300g-1(b)(4)(B). This analysis focuses on the availability and performance of the best available technology for treating a contaminant. JA-[FR_32573]. Although EPA's evaluation of what is "feasible" also involves some "consideration" of cost, *see* 42 U.S.C. § 300g-1(b)(4)(D), that consideration is limited to whether the costs of compliance are *affordable* for large public water systems and does not seek to balance costs against benefits. *City of Portland*, 507 F.3d at 712; JA-[FR_32573].

By contrast, subparagraph (b)(4)(C) explicitly directs EPA to determine whether the benefits of a Standard set pursuant to (b)(4)(B) justify its costs based

96

on the results of an Economic Analysis conducted specifically for that purpose. 42 U.S.C. § 300g-1(b)(4)(C). EPA's determination under subparagraph (b)(4)(C) does not alter or influence its determination of what Standard is as close to the Goal as feasible under (b)(4)(B). Instead, it is the first step in a separate process through which EPA "may" decide (in its discretion) to promulgate a Standard that is *not* as close to the Goal as feasible. *See* 42 U.S.C. § 300g-1(b)(6).

Specifically, if EPA finds the benefits of a Standard set pursuant to subparagraph (b)(4)(B) justify the costs, then it cannot depart from that process, even if a Standard set at a different level might have greater net benefits. But if EPA determines the benefits do not justify the costs, it "may" promulgate a less stringent Standard at a level that "maximizes health risk reduction benefits at a cost that is justified by the benefits." *Id.* § 300g-1(b)(6)(A). This is the only circumstance in which SDWA authorizes EPA to set a contaminant's Standard based on its evaluation of the relative costs and benefits.

EPA's interpretation that "feasible" does not require comparing costs and benefits is not only the best reading of the Act, it is the *only* reading that is consistent with this statutory framework. Paragraph (b)(6) offers a discretionary release valve allowing EPA to depart from the Act's normal Standard-setting requirements where they result in Standards that are not justified by their benefits. If determining "feasibility" already required balancing costs and benefits, this

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

release valve would be unnecessary: any Standard for which benefits did not justify costs would by definition be infeasible and would have to be adjusted upward under subparagraph (b)(4)(B) until the benefits justified the costs, without any need to resort to the provisions of paragraph (b)(6). Thus, Petitioners' interpretation would read paragraph (b)(6)—one of the most prominent changes included in Congress's 1996 amendments to SDWA—out of the statute.

This Court has already squarely rejected Petitioners' reading of the feasibility requirement for precisely these reasons. In *City of Portland*, petitioners claimed that alleged errors in EPA's Economic Analysis under subparagraph (b)(3)(C) undermined EPA's determination that the challenged Standard was feasible. 507 F.3d at 712. The petitioners argued that a Standard "is only 'feasible' if its benefits outweigh its costs." *Id.* This Court disagreed, noting that "when Congress wanted EPA to undertake cost-benefit analysis, it said so expressly." *Id.* Likewise, if "feasible meant that the [Standard's] benefits justified its costs," then the release valve offered by paragraph (b)(6) "would be surplusage." *Id.* The Court concluded that feasibility does not require balancing costs against benefits and simply means "technically possible and affordable." *Id.*

Finally, the legislative history confirms this Court's and EPA's reading of the statute. The Senate Committee's report discussed feasibility as a separate concept from comparison of costs and benefits, noting that paragraph (b)(6) would

98

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

give EPA "discretionary authority to establish less stringent standards (than *feasible*), when the Administrator determines that the benefits of a [Standard] set at the *feasible level* would not justify the costs …." S. Rep. 104-169, at 31 (emphases added). That report also emphasized that EPA could still choose to set the Standard for a contaminant as close to its Goal as feasible, "even if the Administrator determines that the benefits of the [Standard] at this level do not justify the costs"—a choice that would be impossible if determining feasibility itself required a finding that benefits justify costs. *Id.* at 33. And the House Committee's report noted that the 1996 amendments would "retain[] the basic standard setting process" from earlier iterations of the Act, indicating that neither the cost-justification determination in subparagraph (b)(4)(C) nor the requirement to conduct an Economic Analysis in subparagraph (b)(3)(C) were intended to change how EPA determined feasibility under subparagraph (b)(4)(B). H.R. Rep. No. 104-632, at 27 (1996).

Petitioners' interpretation of the feasibility requirement is incompatible with the statute and foreclosed by *City of Portland*. Accordingly, the Court should reject their arguments.

## B. The Act Precludes Judicial Review of EPA's Finding That the Rule's Benefits Justify Its Costs.

Because feasibility under SDWA does not involve comparison of a Standard's costs and benefits, Petitioners' challenges to the Economic Analysis can

99

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

only be relevant to the merits of EPA's separate determination under Section 300g-1(b)(4)(C).  But the Act does not permit judicial review of that determination where, as here, EPA sets the Standard for a contaminant as close to its Goal as feasible.  Instead, judicial review is only available where EPA exercises its discretion to adopt an alternative Standard that is less stringent than otherwise required.

SDWA separately addresses judicial review of EPA's cost-justification determinations.  It states that EPA's determination as to whether the benefits of a Standard justify its costs "shall be reviewed by the court pursuant to section 300j-7...*only* as part of a review of a final [Standard] that has been promulgated *based on the determination*."  42 U.S.C. § 300g-1(b)(6)(D) (emphases added).  Those circumstances are not presented here.

The only Standards that are "promulgated based on" such a determination are those set under subparagraph (b)(6)(A) at a level less stringent than what is feasible.  Standards under subparagraph (b)(6)(A) are "based on" EPA's determination regarding costs and benefits because in order to promulgate such Standards, EPA must first determine that the benefits of a Standard at the feasible level "would not justify" the costs.  42 U.S.C. § 300g-1(b)(6)(A).  And in order to select the appropriate alternative Standard under this provision, EPA must also

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

affirmatively determine whether the benefits of its chosen alternative *do* justify the costs. *Id.*

By contrast, a Standard that is set pursuant to subparagraph (b)(4)(B) (*i.e.*, as close to the Goal as feasible) is not one that has been promulgated "based on the determination" of whether its benefits justify the costs. This is evident from the fact that under SDWA's plain text, EPA may set the Standard as close to the Goal as feasible *regardless of the outcome* of its assessment of benefits and costs under subparagraph (b)(4)(C). If EPA finds the benefits of a Standard at the feasible level justify the costs, it must proceed to set the Standard as close to the Goal as feasible. But even if it finds the benefits *do not* justify the costs, the statutory text leaves EPA with discretion to set the Standard at the feasible level. 42 U.S.C. § 300g-1(b)(6)(A) (stating EPA "may" promulgate alternative Standard if benefits do not justify costs); *see also* S. Rep. No. 104-169, at 33 (stating EPA "is not precluded from using the authority of section 1412(b)(4)" to set Standard at the feasible level, "even if the Administrator determines that the benefits of the [Standard] at this level do not justify the costs"). Either way, EPA's choice of the Standard under subparagraph (b)(4)(B) is not and cannot be "based on" its determination whether benefits justify costs.

EPA's interpretation represents the best reading of the statute. It is supported by the text discussed above and the statutory framework, which notably

101

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

situates this provision addressing judicial review of EPA's cost-benefit determination within the provisions granting EPA limited discretionary authority to promulgate alternative Standards based on that determination. In fact, the existence of this provision alone is telling: if Congress had meant to authorize judicial review of *every* cost-benefit determination EPA makes in promulgating a Standard, it would not have needed to insert a special judicial-review provision specifying when such review is available at all.

EPA's interpretation is also consistent with the legislative history of SDWA's 1996 amendments, which demonstrates that Congress intended EPA's choice of whether to exercise its authority under paragraph (b)(6) to be "entirely discretionary." S. Rep. No. 104-169, at 35. The Senate Committee's report emphasized that even where EPA finds the benefits of a Standard at the feasible level do not justify the costs, "[n]o court may compel the Administrator to set a standard using the authority of" paragraph (b)(6). *Id.* Allowing judicial review of EPA's cost-benefit determination for every rulemaking under the Act would undermine Congress's grant of broad discretion to EPA to adopt a Standard that is as close to the corresponding Goal as feasible regardless of whether the benefits justify the costs.

Accordingly, Section 300g-1(b)(6)(D) precludes this Court from reviewing EPA's determination that the benefits of this Rule's Standards justify their costs.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## C. EPA Reasonably Determined that the Rule's Benefits Justify Its Costs.

To the extent judicial review is permitted here, EPA's determination that the benefits of the Standards justify their costs is not arbitrary or capricious. As indicated by the term "justify," SDWA grants EPA significant discretion regarding how to make such a determination for a Standard, and this Court's review is limited to examining whether EPA failed to consider a relevant factor. EPA properly considered the quantifiable and nonquantifiable costs and benefits of the Standards, supported its determination in the record with a robust Economic Analysis, and adequately responded to each of the objections Petitioners raise below.

### 1. To the Extent the Court May Review EPA's Assessment of Costs and Benefits, The Scope Is Limited to Arbitrary-and-Capricious Review.

If the Court concludes it may review EPA's cost-justification determination under subparagraph (b)(4)(C), it may not set aside EPA's determination "unless the court finds that the determination is arbitrary and capricious." 42 U.S.C. § 300g-1(b)(6)(D). This standard of review is highly deferential and focuses on whether EPA "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

SDWA does not require EPA to use any particular metric for determining whether a Standard's benefits "justify" its costs, such as evaluating whether the benefits "outweigh" the costs or whether less stringent Standards would yield higher net benefits. *Contra* Industry Br. 6, 17; Utility Br. 56. To the contrary, Congress understood that the term "justify" does not mean "exceed" or "outweigh," and nothing in the Act requires EPA to "demonstrate that the dollar value of the benefits are greater (or lesser) than the dollar value of the costs." S. Rep. No. 104-169, at 33. Even where EPA exercises its discretion under paragraph (b)(6) to promulgate less stringent Standards, the Act still does not require EPA to set those Standards at a level that provides greater benefits than costs or otherwise maximizes net benefits. *See* 42 U.S.C. § 300g-1(b)(6)(A) (stating alternative Standard must "maximize[] health risk reduction benefits at a cost that is justified by the benefits").

In the absence of specific instructions from Congress, EPA has discretion regarding how to determine whether a Standard's benefits justify its costs. *See Michigan v. EPA*, 576 U.S. 743, 759 (2015) (stating that where statute requires consideration of cost, it is "up to the Agency to decide (as always, within the limits of reasonable interpretation) *how* to account for cost") (emphasis added). Where

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(as here) the Court reviews EPA's cost-benefit determination for arbitrariness, the Court may not "substitute its judgment for that of the agency" and must cabin its review to whether EPA "examined the relevant data and has articulated an adequate explanation for its action." *State Farm*, 463 U.S. at 43; *Int'l Fabricare*, 972 F.2d at 389.

### 2. EPA Properly Based Its Determination on Both the Quantified and Nonquantifiable Costs and Benefits.

In preparing its Economic Analysis under Section 300g-1(b)(3)(C), EPA must consider all the "quantifiable and nonquantifiable" health risk-reduction benefits and costs of its Standards for which there is a "factual basis in the rulemaking record to conclude that such [benefits and costs] are likely to occur." 42 U.S.C. § 300g-1(b)(3)(C)(i)(I)-(III). Here, EPA developed a robust, well-supported Economic Analysis that assessed these factors, along with all of the other factors required under subparagraph (b)(3)(C), and determined that the benefits of the Rule's Standards justify their costs. *See* JA-[FR_32633-718].

EPA concluded that the Rule's quantified benefits alone not only justified its costs, but slightly *exceeded* them. *See* JA-[FR_32709_Tbl.68] (identifying expected total net benefits of $760,000 annually). But as the Act requires, EPA proceeded to also consider the Rule's nonquantifiable benefits and costs. *See* JA-[FR_32715_Tbl.73] (summarizing costs and benefits EPA considered and whether each was quantified or nonquantifiable).

105

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA described the nonquantifiable health benefits that were expected to result from reductions in PFOS and PFOA exposure and the record evidence supporting EPA's conclusion that they are likely to occur, including benefits associated with reductions in developmental, cardiovascular, liver, immune, endocrine, metabolic, reproductive, musculoskeletal, and carcinogenic effects. JA-[FR_32696-700]; *see also* JA-[FR_32543-52] (describing evidence of adverse health effects from regulated PFAS). EPA also described the nonquantifiable health benefits it expected from the Rule's reductions in Index PFAS (as well as other unregulated PFAS that would be captured by treatment technologies through co-removal), including reductions in many of the same health effects. JA-[FR_32700-02]. EPA summarized additional nonquantifiable costs associated with the Rule. JA-[FR_32713]. Finally, EPA explained how each category of nonquantifiable costs or benefits was likely to impact the Rule's overall costs and benefits. JA-[FR_32714_Tbl.72].

Notably, EPA found based on the evidence available that "the nonquantifiable human health benefits associated with reductions in drinking water PFAS exposure are substantial and may reasonably exceed the benefits the agency was able to quantify for this final rule." JA-[Economic_Analysis_EPA-HQ-OW-2022-0114-3084_1-3]. Based on this analysis, along with EPA's consideration of costs (both quantified and nonquantifiable) and quantified benefits, EPA

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

reaffirmed its determination from the proposed rule that the benefits of the Rule justify its costs.  JA-[FR_32716].

While Petitioners dispute several aspects of EPA's determination, many of their arguments are premised on discounting or completely ignoring the Rule's significant nonquantifiable benefits.  *See, e.g.*, Industry Br. 17 (claiming Standards for Index PFAS are "not justified" based solely on net quantified benefits of those Standards).  Petitioners do not dispute that EPA must account for nonquantifiable benefits in its Economic Analysis under subparagraph (b)(3)(C).  *Id.* at 20.  Instead, they argue that EPA was not allowed to consider any of the benefits it relied on because the term "nonquantifiable" does not include benefits that "*can* be measured but as to which the agency lacks sufficient evidence or data to make an adequately supported measurement."  *Id.* at 21.

This argument fails for several reasons.  As a threshold matter, Petitioners have waived this issue because they did not raise it in their comments on the proposed Rule.  "It is black-letter administrative law that absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue."  *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) (cleaned up).  By failing to raise this issue during the comment period, Petitioners denied EPA the opportunity to articulate its response in the final Rule, including by explaining in the record how a

107

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

finding that these benefits are not truly "nonquantifiable" would impact EPA's determination of whether the Rule's benefits justify its costs. Accordingly, Petitioners are precluded from advancing this argument here.

In any event, EPA did not err by treating benefits it was unable to quantify due to data limitations as "nonquantifiable" benefits. Petitioners' sole support for their cramped statutory interpretation is to point out that the dictionary defines "nonquantifiable" as "not capable of being quantified." Industry Br. 21. Even taken at face value, this argument gets Petitioners nowhere. Both the cited definition and the Act are agnostic as to the *reasons why* a "nonquantifiable" benefit might not be "capable of being quantified." Some benefits or costs may be nonquantifiable because they "by their nature cannot be measured," *id.*; others are not "capable of being quantified" because the information necessary to accurately quantify them simply does not exist, is inaccessible to EPA, or would be impractical to develop.

Petitioners' definition of "nonquantifiable" costs and benefits is also inconsistent with the rest of the Act. The Economic Analysis provision requires EPA to consider all benefits and costs "for which there is a factual basis in the rulemaking record to conclude that [they] are likely to occur." 42 U.S.C. § 300g-1(b)(3)(C)(i)(I)-(III). Many rulemakings involve benefits and costs that are expected to occur (or in some cases, are *certain* to occur), and that might

108

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

conceivably be measurable, but for which the data necessary to quantify their impacts is unavailable.  Petitioners' reading of the Act would place EPA in an impossible position: it would have to either exclude these impacts from its Economic Analysis, violating its duty to consider all costs and benefits "for which there is a factual basis in the rulemaking record," *id.*; or else devote extensive time and resources to developing the information necessary to quantify these impacts, needlessly delaying its efforts to protect public health.

Congress did not require EPA to wait until it has perfect information before acting to address contaminants in drinking water.  Indeed, the Act's provisions governing the Economic Analysis explicitly recognize that gaps may exist in EPA's knowledge and direct EPA to account for those gaps by considering "the quality and extent of the information" available and "the uncertainties in the analysis."  42 U.S.C. § 300g-1(b)(3)(C)(i)(VII).  Likewise, the Act requires EPA to carry out its Standard-setting functions using "the best *available*, peer-reviewed science and supporting studies," not to affirmatively develop new information that is not already available.  *Id.* § 300g-1(b)(3)(A) (emphasis added).  This Court has generally recognized that agencies have "wide latitude in determining the extent of data-gathering necessary to solve a problem."  *NRDC v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008); *see Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 12-13 (D.C. Cir. 2015) (finding EPA did not act arbitrarily by proceeding with the best

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

data available to it).  Consistent with that precedent, the Court should not adopt an interpretation of "nonquantifiable" that would effectively freeze EPA by bogging it down in an endless cycle of data-gathering and read the term "nonquantifiable" out of the Act.

Industry Petitioners also question whether the nonquantifiable benefits EPA relied on will materialize, cherry-picking various phrases from the Rule and presenting them out of context to suggest that these benefits reflect "pure guesswork."  Industry Br. 22-23.  But Petitioners do not address the extensive supporting evidence EPA gathered in the record substantiating these benefits.  EPA conducted a systematic review of the scientific literature regarding the health effects of PFAS, which provided evidence linking exposure to these contaminants with a broad range of adverse health outcomes.  *See* JA-[FR_32696-702] (summarizing results of literature review).  This effort more than satisfied EPA's requirement to support any nonquantifiable benefits with "a factual basis in the rulemaking record to conclude that such benefits are likely to occur."  42 U.S.C. § 300g-1(b)(3)(C)(i)(I).

### 3.  EPA Was Not Required to Conduct a Stand-Alone Economic Analysis for Each Individual Standard in the Rule.

EPA did not err by considering the impacts of some portions of the Rule together with one another.  Industry Br. 15-18.  The benefits and costs of the

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Rule's various Standards are highly interrelated, and the best interpretation of the Act is one that authorizes EPA to meaningfully analyze them.

As an initial matter, EPA did not "lump[] substances together into a single cost-benefit analysis." Industry Br. 15. EPA used contaminant-specific information to analyze the Rule's costs and benefits, permitting comparison of some Standards' incremental costs and benefits on a more granular level than for the entire Rule. For example, while EPA did not *individually* assess the costs and benefits of the Rule's Standards for PFOS and PFOA, EPA did evaluate the costs and benefits of promulgating those two Standards without the Rule's other Standards, and EPA found that their benefits justify the costs. JA-[RTC_13-513_to_13-514]; *see* JA-[FR_32710_Tbl.69] (summarizing costs and benefits of PFOS/PFOA Standards alone). EPA also evaluated the costs and benefits of adopting the PFHxS Standard on top of the PFOS and PFOA Standards, and determined that the benefits of this grouping justified the costs as well. JA-[RTC_13-514]. Finally, EPA considered the incremental impact on costs and benefits from adopting each of the other Index PFAS Standards (for PFNA, HFPO-DA, and mixtures of Index PFAS) and again found that the benefits justify costs for any grouping of these Standards and the PFOS/PFOA Standards.[16] *Id.*

---

[16] While Petitioners cite the Index PFAS Standards to illustrate how EPA's approach purportedly "obscur[ed]" some unjustified requirements, it is their own

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA also explained in the record its reasons for evaluating the costs and benefits of the Rule's various Standards in this manner. Specifically, many characteristics of the regulated PFAS make it difficult to accurately evaluate the costs and benefits of regulating one contaminant in isolation from the others, including their tendency to co-occur, the dose-additivity of the Index PFAS, and the shared health impacts of many of these PFAS. JA-[RTC_13-513]. Notably, Standard-specific analyses would significantly overestimate the treatment costs of each Standard because they would fail to account for the cost efficiencies afforded by co-removal of the other regulated PFAS. *Id.* Finally, EPA explained that because it had already finalized a regulatory determination for PFOS and PFOA prior to this Rule, it was already obligated to promulgate Standards for those contaminants and any regulatory scenario considered in the Economic Analysis would need to account for the existence of Standards for both. *See* JA-[RTC_13-352, 13-513].

EPA's approach to evaluating the costs and benefits of the Standards promulgated in this Rule is permitted under SDWA. Nothing in the statute requires EPA to conduct a separate analysis for each individual Standard. Both subparagraph (b)(3)(C) (regarding the Economic Analysis) and subparagraph

---

analysis that "obscures" the true benefits of these Standards by failing to account for any nonquantifiable benefits. Industry Br. 17.

112

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(b)(4)(C) (regarding EPA's determination of whether benefits justify costs) speak in terms of what EPA must do when proposing a "national primary drinking water regulation." SDWA itself recognizes that a single national primary drinking water regulation may specify Standards for multiple contaminants simultaneously. 42 U.S.C. § 300f(1) (defining term as a regulation that "specifies *contaminants which*" may have adverse health effects and specifies a Standard for "*each* such contaminant") (emphasis added); *see* JA-[RTC_13-352] (noting PFOS/PFOA Standards are "not two 'separate regulations'" but "two [Standards] included in one regulation").

While subparagraphs (b)(3)(C) and (b)(4)(C) spell out the analyses EPA must conduct for "each" Standard that is contained within a national primary drinking water regulation, neither provision requires that EPA conduct those analyses in isolation for each Standard.[17] Instead, EPA may "publish, seek public comment on, and use" a single Economic Analysis so long as it analyzes all seven of the statutory factors for each Standard contained within the rule. 42 U.S.C. § 300g-1(b)(3)(C)(i).

Petitioners' alternative reading would unnecessarily constrain EPA's discretion over how to analyze the costs and benefits of its regulations without

---

[17] This Court has previously declined to read SDWA strictly as requiring EPA to analyze the costs and benefits of "each" Standard included in a rule. *See City of Waukesha*, 320 F.3d at 245.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

promoting the Act's overall goals. For regulations like this one, in which the contaminants involved have strong co-occurrence, co-removal, dose-additivity, and shared health effects, disentangling the costs and benefits of one contaminant's Standard from another would be impractical. Moreover, it would likely yield misleading results. For example, analyzing one of the Rule's Standards in isolation would necessarily overestimate its treatment costs because it would fail to account for the sunk costs and economies of scale associated with co-treatment of that contaminant at systems that are already required to install treatment systems to address other PFAS. *See* JA-[RTC_13-513]. And because the regulated PFAS are co-removed by treatment processes, assessing benefits for each Standard separately would likely either overestimate the expected benefits (by double-counting them as attributable to each Standard) or underestimate them (by excluding benefits from co-removal), either of which would be inconsistent with Congress's desire for an accurate accounting of the Standards' benefits. *See* 42 U.S.C. § 300g-1(b)(3)(C)(i)(I)-(II). Considering the Rule's impacts in a holistic manner allows EPA to more accurately evaluate the costs and benefits to make an informed determination on whether they are justified.

> ### 4. EPA Addressed Petitioners' Specific Concerns with the Economic Analysis in the Record.

Petitioners claim that EPA failed to respond to various objections that they raised regarding the Rule's Economic Analysis. To the contrary, EPA considered

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

each of Petitioners' concerns and addressed each of them in the administrative record. Because EPA adequately responded to these comments, its Economic Analysis was not arbitrary or capricious.

First, EPA responded to Petitioners' comments asserting it had underestimated the costs of compliance with the Standards based on a cost modeling report (the "Black & Veatch Study"), case studies, and other information they submitted to EPA. Utility Br. 54. Regarding the use of "older studies that do not account for inflation," Utility Br. 54, EPA responded to Petitioners' comments by adjusting its cost inputs to reflect the most recent data. EPA updated its equipment costs to 2022 dollars, collected new price quotes from vendors for cost driver equipment components, and made other adjustments to its cost model. JA-[FR_32645]; JA-[RTC_13-117, 13-217].

With respect to the Black & Veatch Study, EPA provided a detailed explanation of its areas of disagreement on the methodologies and assumptions used to develop that study's cost model. JA-[FR_32642-47_Tbls._24-26]; JA-[RTC_13-119_to_13-123]. EPA identified numerous assumptions in that report regarding the systems expected to require treatment, the capital costs of treatment technology, and operation and maintenance costs that compounded to significantly overestimate the compliance costs of this Rule's Standards. Notably, when applied to the case studies submitted with Utility Petitioners' comments, the Black &

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Veatch Study's model overestimated the costs 88 percent of the time. *See* JA-[FR_32645]. By contrast, when EPA compared its own cost model's results to the costs of treatment technology packages supplied by a vendor of these systems, its results generally fell within 10 percent of the vendor costs. *Id.* Petitioners fail to address any of the responses EPA provided to this study.

With respect to the case studies submitted, EPA explained that commenters did not provide sufficient information to meaningfully compare the costs in these case studies with EPA's peer-reviewed cost models. JA-[RTC_13-217]. For example, the report provided only minimal information about the systems involved and did not state which cost figures were estimates versus as-built costs; whether all of the case study costs were directly associated with PFAS treatment as opposed to other improvements; or whether the design parameters would be similar to the values used in EPA's models. *Id.*

And regarding possible increases in cost related to higher demand, Utility Br. 54, EPA responded that treatment costs are unlikely to significantly increase as a result of compliance with the Rule. JA-[RTC_13-117]. EPA explained that the Rule's two-year compliance extension, together with the availability of multiple available treatment technologies and non-treatment options for compliance, were expected to alleviate price pressure on treatment systems. *Id.*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Second, Petitioners suggest that EPA underestimated the number of systems that would be impacted by the Rule by relying solely on sampling data from the UCMR3 program, in which the reporting thresholds for PFAS were higher than the Rule's Standards. Industry Br. 19-20. But this argument is misplaced because EPA's occurrence estimates did not simply rely on UCMR3 data alone. Rather, EPA used data from UCMR3 to inform a statistically robust, peer-reviewed occurrence model, together with more recently collected data from state datasets using lower reporting thresholds. JA-[FR_32597-98]. EPA's use of this model allowed it to generate reasonable estimates of occurrence for the PFAS contaminants regulated in this Rule, including at levels below the UCMR3 reporting thresholds. *Id.*

Moreover, the preliminary results available from UCMR5 did not undermine EPA's occurrence estimates. EPA was not "obligated to use" its preliminary data gathered pursuant to UCMR5, Industry Br. 20, because that data did not represent the "best *available* public health information," JA-[FR_32601]. Indeed, the UCMR5 data was not actually "available" for use in the rulemaking at all. At the time of the Rule's promulgation, EPA had only received approximately 24 percent of the total data expected to be submitted under UCMR5, with the participating systems having varying degrees of completeness in their sample collection. *Id.*

117

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

While this preliminary data did not form the basis of this rulemaking, EPA did consider the results it had received, which confirmed EPA's conclusions based on the extensive UCMR3 and state data utilized in its occurrence modeling analyses. *Id.* The preliminary results did not suggest that EPA underestimated the number of systems that would incur compliance costs. *Contra* Industry Br. 20. While the preliminary results showed that 15.8 percent of systems reported at least one sample above the level of the Standards, these results do not represent *exceedances* of the Standards, since compliance is determined based on a running annual average. JA-[FR_32601]. Although the preliminary UCMR5 data was insufficient to actually calculate such averages, EPA observed that 9.4 percent of systems reported mean concentrations above the level of the Standards, consistent with the 6.2-10.1 percent range predicted by EPA's occurrence model. JA-[FR_32602, 32605]. And even this figure likely overestimates occurrence, since the UCMR5 results overrepresent large systems. *See* JA-[FR_32605] (estimating only 7.8 percent of systems would have mean concentrations exceeding a Standard after weighting for system size).

Third, Petitioners argue that EPA failed to account for the costs of treating HFPO-DA, PFNA, and PFBS to comply with the Standards. Industry Br. 18-19. But far from omitting these costs, EPA went out of its way to account for them in its Economic Analysis. EPA explained that it lacked sufficient nationally

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

representative data to precisely estimate the occurrence of these three contaminants and, thus, to estimate the number of systems that would incur costs to comply with the Standards applicable to them. *See* JA-[FR_32533]. Nevertheless, EPA accounted for the costs of treating HFPO-DA, PFNA, and PFBS as nonquantifiable costs in its Economic Analysis, as required by Section 300g-1(b)(3)(C)(i)(III). JA-[FR_32671-72]. And to better understand the potential impact of these costs, EPA performed a quantitative sensitivity analysis to estimate the impact that treating these contaminants might have on the Rule's overall costs. JA-[FR_32533]; JA-[Economic_Analysis_App'x_EPA-HQ-OW-2022-0114-3085_N.3-N.4]. This sensitivity analysis indicated that the costs of treating these contaminants would likely increase the national cost impacts by $82.4 million, or approximately 5 percent of the Rule's overall quantified costs. JA-[FR_32672].

Petitioners appear to believe that EPA cannot possibly have considered these costs because if it had, EPA would have had to reject the Standards applicable to these contaminants as unjustified. But Petitioners yet again fail to consider the significant nonquantifiable benefits associated with reductions in HFPO-DA, PFNA, and PFBS, which SDWA requires EPA to account for in its Economic Analysis. *See* JA-[FR_32700] (summarizing nonquantifiable benefits).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## V.  None of Petitioners' Arguments Warrant Vacatur of the Entire Rule.

Setting aside the substantive and procedural defects in Petitioners' arguments, the relief they request—vacatur of the Rule in its entirety—far exceeds the scope of any argument they present.  Utility Br. 57; Industry Br. 60.  In the event that the Court concludes any of Petitioners' arguments have merit, any relief should be limited to the specific provisions of the Rule for which the Court finds error.

EPA finalized several distinct actions in this Rule, including: a regulatory determination for mixtures of Index PFAS; individual regulatory determinations for three of those Index PFAS (PFHxS, PFNA, and HFPO-DA); Goals for PFOS, PFOA, PFHxS, PFNA, HFPO-DA, and mixtures of the Index PFAS; and Standards for those same contaminants.  JA-[FR_32532].  EPA's actions for each contaminant are independent of one another and can be implemented on their own.  JA-[FR_32731-32].  Accordingly, a finding that EPA erred in addressing one of these contaminants cannot support vacatur of EPA's actions for the other contaminants.  Likewise, EPA's actions at the various steps of the regulatory process are severable.  For example, a finding that EPA erred in setting the Standard for a contaminant (*e.g.*, by selecting a level that is not feasible) cannot justify vacatur of the Goal or the regulatory determination for that contaminant.  JA-[FR_31732].

120

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Each of Petitioners' arguments focuses on individual provisions of the Rule; nowhere in their briefs do Petitioners raise any global issue that might affect the validity of the Rule as a whole. Indeed, no Petitioner has articulated any challenge to EPA's regulatory determinations for PFOS and PFOA or its Goals for those contaminants. Thus, Petitioners cannot justify vacatur of the entire Rule.

Petitioners' arguments regarding the Rule's analysis of costs and benefits are no exception. *See* Industry Br. 15. Even if the Court finds EPA's Economic Analysis was arbitrary and capricious, any error in that analysis cannot possibly justify vacatur of those portions of the Rule that, under the statutory text, are not based on consideration of cost. In particular, because the Economic Analysis under Section 300g-1(b)(3)(C) plays no role in the regulatory determination or the Goal for a contaminant, any defects in that analysis would not provide grounds for the Court to vacate *those* portions of the Rule. *See* 42 U.S.C. § 300g-1(b)(1).

And in any event, even where the benefits of a Standard set at the feasible level do not justify its costs, the Act grants EPA *discretionary* authority either to promulgate a less stringent alternative Standard or proceed with setting a Standard at the feasible level. *Id.* § 300g-1(b)(6). Thus, on remand from a decision of this Court reversing EPA's determination that the Rule's benefits justify its costs, EPA could simply decide in its discretion to retain some or all of the Rule's Standards at their current levels. Given that reasonable possibility, it would be unnecessarily

121

disruptive to vacate those Standards in the interim. *See Allied-Signal, Inc. v. U.S.*

*Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

**CONCLUSION**

The Court should deny the petitions for review.


Respectfully submitted,

Dated:  December 23, 2024                TODD KIM
                                         *Assistant Attorney General*


                                          /s/ Kimere J. Kimball
*Of Counsel*:                            KIMERE J. KIMBALL
HEIDI NALVEN                             ANDREW D. KNUDSEN
   U.S. Environmental Protection            U.S. Department of Justice
   Agency                                   Env't & Natural Resources Div.
   Office of General Counsel                P.O. Box 7611
                                            Washington, DC 20044
                                            (202) 514-2285 (Kimball)
                                            (202) 353-7466 (Knudsen)
                                            Kimere.Kimball@usdoj.gov
                                            Andrew.Knudsen@usdoj.gov

                                         *Counsel for Respondents*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## CERTIFICATES OF COMPLIANCE AND SERVICE

I certify that this document complies with Fed. R. App. P. 32(a)(5) and (6) because it uses 14-point Times New Roman, a proportionally spaced font, with 1-inch margins.

I also certify that this document complies with Fed. R. App. P. 32(a)(7)(B)(i) and the Court's Briefing Order (ECF No. 2072754) because according to Microsoft Word's count, it has 25,699 words, excluding the parts of exempted under Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

Finally, I certify that on December 23, 2024, I electronically filed this document with the Court's CM/ECF system, which will serve each party's counsel of record.

_/s/ Kimere J. Kimball_____
KIMERE J. KIMBALL

# Exhibit 4

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



EPA Document No.

EPA-815-R-24-001

# Economic Analysis for the Final Per- and Polyfluoroalkyl Substances National Primary Drinking Water Regulation

FINAL RULE

APRIL 2024

# Economic Analysis for the Final Per- and Polyfluoroalkyl Substances National Primary Drinking Water Regulation

Prepared by:

U.S. Environmental Protection Agency

Office of Water

Office of Ground Water and Drinking Water

Standards and Risk Management Division

Washington, DC 20460

EPA Document Number: EPA-815-R-24-001

APRIL 2024

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# Disclaimer

This document has been reviewed in accordance with EPA policy and approved for publication. Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# Authors, Contributors, and Reviewers

This document was prepared by the Office of Water (OW) of the U.S. Environmental Protection Agency (EPA). The agency gratefully acknowledges the valuable contributions of the EPA scientists and economists from the OW's Standards and Risk Management Division, Water Economics Center, Office of Science and Technology, and the Office of Policy's National Center for Environmental Economics. This document was prepared by Katherine Foreman, Rachel Gonsenhauser, Austin Heinrich, Erik Helm, Kirsten Studer, and Morgan Webster. The EPA scientists and economists who provided valuable contributions to the development of the document include Lena Abu-Ali, Carlye Austin, Wes Austin, Keelan Baldwin, Elizabeth Berg, Adam Cadwallader, Stanley Gorzelnik, Ashley Greene, Hannah Holsinger, Won Hyung Lee, Brittany Jacobs, Rajiv Khera, Alexis Lan, Casey Lindberg, Gregory Miller, Michael Trombley, and Holly Young. The agency gratefully acknowledges the valuable technical reviews by Chris Dockins and Ruth Etzel and the executive direction from Ryan Albert and Eric Burneson.

This document was prepared in collaboration with ICF under the U.S. EPA Contracts EP-C-16-011 and 68HE0C18D0001. This document was prepared by Anna Belova, Elena Besedin, Sorina Eftim, Brad Firlie, Andre Kiesel, Kate Munson, and Jerry Stedge.

This document was prepared in collaboration with Abt Associates under the BPA Number 68HERC21A0011. Contributors from Abt Associates include Holly Bender, Emma Glidden-Lyon, Claire Lay, Shannon Ragland and Patrick Ransom.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# Contents

**1     Executive Summary** ................................................................................................. **1-1**

**2     Introduction** .......................................................................................................... **2-1**

2.1   Summary of the Final PFAS Rule and Regulatory Alternatives ................................... 2-2

2.2   Economic Analysis Assumptions ............................................................................... 2-3

    2.2.1   Compliance Schedule and Period of Analysis for Final Rule............................. 2-3

    2.2.2   Dollar Year and Discount Rates ...................................................................... 2-3

    2.2.3   Annualization................................................................................................. 2-4

    2.2.4   Population ...................................................................................................... 2-4

    2.2.5   Valuation........................................................................................................ 2-4

2.3   Document Organization ............................................................................................. 2-5

2.4   Supporting Documentation ........................................................................................ 2-6

**3     Need for the Rule** .................................................................................................. **3-1**

3.1   Previous EPA Nonregulatory and Regulatory Actions Potentially Affecting PFAS
    Drinking Water Management ...................................................................................... 3-1

    3.1.1   PFAS Council and PFAS Strategic Roadmap .................................................. 3-1

    3.1.2   Final Regulatory Determinations on the Fourth Drinking Water Contaminant
Candidate List.......................................................................................................... 3-1

    3.1.3   Proposed PFAS National Primary Drinking Water Rule and Regulatory
Determinations for PFHxS, PFNA, HFPO-DA, PFBS, and their Mixtures..................... 3-2

    3.1.4   Unregulated Contaminant Monitoring Rule ..................................................... 3-2

3.2   Statutory Authority for Promulgating the Rule .......................................................... 3-3

3.3   Economic Rationale ................................................................................................... 3-4

**4     Baseline Drinking Water System Conditions** ....................................................... **4-1**

4.1   Introduction............................................................................................................... 4-1

4.2   Data Sources ............................................................................................................. 4-1

    4.2.1   SDWIS/Fed 2021 ........................................................................................... 4-2

    4.2.2   Unregulated Contaminant Monitoring Rule ..................................................... 4-5

    4.2.3   Independent State Sampling Programs ............................................................ 4-5

    4.2.4   Six-Year Review Data .................................................................................... 4-5

    4.2.5   Geometries and Characteristics of Public Water Systems (2000) ..................... 4-6

    4.2.6   Community Water System Survey (2006)......................................................... 4-6

4.3   Drinking Water System Baseline/Industry Profile ...................................................... 4-7

    4.3.1   Water System Inventory ................................................................................. 4-7

    4.3.2   Population and Households Served ................................................................. 4-10

    4.3.3   Treatment Plant Characterization/Production Profile ...................................... 4-13

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

4.3.4   Public Water System Labor Rates ................................................................ 4-17
4.3.5   Cost of Capital .............................................................................................. 4-19
4.4   Occurrence of PFAS ................................................................................................ 4-21
4.4.1   Overview of UCMR 3 Data .......................................................................... 4-21
4.4.2   Overview of State PFAS Data ...................................................................... 4-21
4.4.3   Overview of PFAS Co-Occurrence .............................................................. 4-24
4.4.4   Summary of PFAS Occurrence Data Analysis ............................................. 4-25
4.4.5   Summary of National PFAS Occurrence ...................................................... 4-27
4.5   Uncertainties in the Baseline and Compliance Characteristics of Systems ............. 4-43
**5   Cost Analysis** ...........................................................................................................**5-1**
5.1   Introduction ............................................................................................................... 5-1
5.1.1   Chapter Overview .......................................................................................... 5-1
5.1.2   Uncertainty Characterization ......................................................................... 5-1
5.1.3   Summary of Quantified National Cost Estimates of the Final Rule .................. 5-2
5.2   Overview of SafeWater Multi-Contaminant Benefit Cost Model (MCBC) .................. 5-7
5.2.1   Modeling PWS Variability in SafeWater MCBC ............................................ 5-8
5.3   Estimating Public Water System Costs ...................................................................... 5-10
5.3.1   PWS Treatment Costs .................................................................................... 5-10
5.3.2   Estimating PWS Administrative and Monitoring Costs ................................. 5-29
5.4   Estimating Primacy Agency Costs ............................................................................. 5-36
5.5   PWS-Level Cost Estimates ........................................................................................ 5-38
5.6   Household-Level Cost Estimates ................................................................................ 5-39
5.7   Discussion of Data Limitations and Uncertainty ....................................................... 5-39
**6   Benefits Analysis** ....................................................................................................**6-1**
6.1   Introduction ............................................................................................................... 6-1
6.1.1   Chapter Overview .......................................................................................... 6-2
6.1.2   Uncertainty Characterization ......................................................................... 6-2
6.1.3   Summary of Quantified National Benefits Estimates of the Final Rule .............. 6-3
6.1.4   Life Table Modeling Background ................................................................... 6-6
6.2   Overview of Benefit Categories ................................................................................. 6-7
6.2.1   Availability of Pharmacokinetic (PK) Models ............................................... 6-14
6.2.2   Benefits of PFOA and PFOS Exposure Reduction ......................................... 6-14
6.2.3   Summary of Health Information Considered in the Economic Analysis .......... 6-25
6.2.4   Nonquantifiable Benefits of PFAS in Final Rule and PFAS Expected to be
Co-Removed .............................................................................................................. 6-25
6.2.5   Sensitive Populations ..................................................................................... 6-31
6.2.6   Co-Removal of Additional Contaminants ...................................................... 6-32
6.3   Blood Serum Concentration Modeling for PFAS ....................................................... 6-33
6.3.1   Introduction ................................................................................................... 6-33
6.3.2   Application of PK Models to Benefits Analyses ............................................ 6-33
6.3.3   Contributions from Other Sources ................................................................. 6-35

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

6.4   Developmental Effects ........................................................................... 6-35
   6.4.1  Overview of the Birth Weight Risk Reduction Analysis ................................ 6-36
   6.4.2  Estimation of Birth Weight Changes Between Baseline and Regulatory
Alternatives ........................................................................................................ 6-38
   6.4.3  Estimation of Birth Weight Impacts ........................................................... 6-41
   6.4.4  Valuation of Reduced Birth Weight Impacts ............................................. 6-50
   6.4.5  Results ........................................................................................................ 6-54
6.5   Cardiovascular Disease ......................................................................... 6-55
   6.5.1  Overview of the Cardiovascular Disease Risk Analysis .............................. 6-55
   6.5.2  Cardiovascular Disease Exposure-Response Analyses ............................... 6-58
   6.5.3  Estimation of Cardiovascular Disease Risk Reductions ............................. 6-61
   6.5.4  Valuation of Cardiovascular Disease Risk Reductions ............................... 6-71
   6.5.5  Results ........................................................................................................ 6-73
6.6   Renal Cell Carcinoma ........................................................................... 6-74
   6.6.1  Overview of the RCC Risk Reduction Analysis .......................................... 6-74
   6.6.2  RCC Exposure-Response Modeling ............................................................ 6-77
   6.6.3  Estimation of RCC Risk Reductions ........................................................... 6-78
   6.6.4  Valuation of RCC Risk Reductions ............................................................ 6-79
   6.6.5  Results ........................................................................................................ 6-81
6.7   Benefits from Co-Removal of Disinfection Byproducts ........................ 6-83
   6.7.1  Overview of Reduced Disinfection Byproduct Formation .......................... 6-84
   6.7.2  Estimation of Bladder Cancer Risk Reductions .......................................... 6-105
   6.7.3  Results ........................................................................................................ 6-112
6.8   Limitations and Uncertainties of the Benefits Analysis ......................... 6-113
**7    Comparison of Costs to Benefits ........................................................ 7-1**
**8    Environmental Justice Analysis ........................................................ 8-11**
8.1   Introduction ........................................................................................... 8-11
8.2   Literature Review .................................................................................. 8-12
   8.2.1  Methods ...................................................................................................... 8-12
   8.2.2  Findings ...................................................................................................... 8-12
   8.2.3  Discussion and Limitations ......................................................................... 8-17
8.3   EJ PFAS Exposure Analysis .................................................................. 8-17
   8.3.1  Data Sources and Approach ....................................................................... 8-18
   8.3.2  EJ Exposure Analysis Results ..................................................................... 8-27
8.4   SafeWater EJ Analysis of Final Rule and Regulatory Alternatives ........ 8-64
   8.4.1  Methodology .............................................................................................. 8-64
   8.4.2  SafeWater EJ Analysis Results ................................................................... 8-66
8.5   Conclusions ........................................................................................... 8-80
   8.5.1  EJ PFAS Exposure Analysis ........................................................................ 8-80
   8.5.2  SafeWater EJ Analysis of Regulatory Options ........................................... 8-81
   8.5.3  Overall Environmental Justice Conclusion .................................................. 8-82

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                         APRIL 2024

**9    Statutory and Administrative Requirements ..................................................................... 9-1**

    9.1    Executive Order 12866: Regulatory Planning and Review and Executive Order
        14094: Modernizing Regulatory Review ................................................................ 9-1

    9.2    Additional Analysis Pursuant to EO 12866 ......................................................... 9-2

    9.3    Paperwork Reduction Act ..................................................................................... 9-12

        9.3.1    Primacy Agency Activities .................................................................... 9-12

        9.3.2    Public Water System Activities ............................................................. 9-13

    9.4    The Final Regulatory Flexibility Analysis ............................................................ 9-14

        9.4.1    Need for, Objectives, and Legal Basis of the Rule ............................... 9-15

        9.4.2    Summary of the SBAR Comments and Recommendations .................... 9-16

        9.4.3    Summary of the Final Rule and Public Comments on the Impacts to Small
    Entities 9-18

        9.4.4    Number and Description of Small Entities Affected .............................. 9-19

        9.4.5    Description of Compliance Requirements of the Final Rule ................... 9-20

        9.4.6    Analysis of Impact of Regulatory Options on Small System Costs ......... 9-21

        9.4.7    The EPA's Steps to Minimize the Significant Economic Impact of the Final
    Rule on Small Systems ........................................................................................... 9-23

    9.5    Unfunded Mandates Reform Act ......................................................................... 9-26

    9.6    Executive Order 13132: Federalism .................................................................... 9-28

    9.7    Executive Order 13175: Consultation and Coordination with Indian Tribal
        Governments ........................................................................................................ 9-29

    9.8    Executive Order 13045: Protection of Children from Environmental Health and
        Safety Risks ......................................................................................................... 9-30

    9.9    Executive Order 13211: Actions That Significantly Affect Energy Supply,
        Distribution, or Use ............................................................................................. 9-31

        9.9.1    Energy Supply ....................................................................................... 9-31

        9.9.2    Energy Distribution ............................................................................... 9-31

        9.9.3    Energy Use ............................................................................................ 9-31

    9.10    National Technology Transfer and Advancement Act ......................................... 9-32

    9.11    Executive Order 12898: Federal Actions to Address Environmental Justice in
        Minority Populations and Low-Income Populations, Executive Order 14096:
        Revitalizing our Nation's Commitment to Environmental Justice for All ................... 9-32

    9.12    Consultations with the Science Advisory Board, National Drinking Water Council,
        and the Secretary of Health and Human Services ............................................... 9-33

        9.12.1 Science Advisory Board ........................................................................ 9-33

        9.12.2 National Drinking Water Advisory Council .......................................... 9-33

        9.12.3 Secretary of Health and Human Services .............................................. 9-34

    9.13    Affordability Analyses ......................................................................................... 9-34

        9.13.1 National Small System Affordability Determination ........................... 9-35

        9.13.2 Supplemental Affordability Analyses ................................................... 9-38

**10    References ...................................................................................................................... 10-1**

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# Tables

Table 4-1: Data Sources Used to Develop the Water System Characteristics ........................... 4-2

Table 4-2: Inventory of CWSs ................................................................................................ 4-8

Table 4-3: Inventory of NTNCWSs ......................................................................................... 4-9

Table 4-4: Population and Number of Households Served by CWSs ..................................... 4-11

Table 4-5: Population Served by NTNCWSs ......................................................................... 4-12

Table 4-6: Frequency Distribution of EP Inputs for CWSs ................................................... 4-15

Table 4-7: Frequency Distribution of EP Inputs for NTNCWSs ........................................... 4-15

Table 4-8: Functions for Design and Average Daily Flow by System Types ......................... 4-16

Table 4-9: Design and Average Daily Flow for CWSs .......................................................... 4-17

Table 4-10: Design and Average Daily Flow for NTNCWSs ................................................. 4-17

Table 4-11: Hourly Wage Rates Based on CWSS Data ($2007) ............................................ 4-18

Table 4-12: Hourly Labor Costs Including Wages Plus Benefits ($2007) .............................. 4-18

Table 4-13: Hourly Labor Costs Escalated to $2022 ............................................................. 4-19

Table 4-14: Weighted Average Cost of Capital by PWS Ownership and Size Category ......... 4-20

Table 4-15: Non-Targeted State PFAS Finished Water Data – Summary of Samples with
            Detections of PFAS Included in Final Regulation ................................................. 4-23

Table 4-16: Non-Targeted State PFAS Finished Water Data – Summary of Systems with
            Detections of Select PFAS .................................................................................. 4-24

Table 4-17: State PFAS Regulations ...................................................................................... 4-26

Table 4-18: Total Systems Impacted, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each,
            PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1) .............................. 4-28

Table 4-19: Total Systems Impacted, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) ............ 4-29

Table 4-20: Total Systems Impacted, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) ............ 4-30

Table 4-21: Total Systems Impacted, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) ........... 4-31

Table 4-22: Total Entry Points Impacted, Final Rule (PFOA and PFOS MCLs of 4.0 ppt
            each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1) ..................... 4-32

Table 4-23: Total Entry Points Impacted, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) ...... 4-33

Table 4-24: Total Entry Points Impacted, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) ...... 4-34

Table 4-25: Total Entry Points Impacted, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) .... 4-35

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Table 4-26: Total Population at PWSs Impacted, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1)............... 4-36

Table 4-27: Total Population at PWSs Impacted, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) .................................................................................................................... 4-37

Table 4-28: Total Population at PWSs Impacted, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) .................................................................................................................... 4-38

Table 4-29: Total Population at PWSs Impacted, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) .................................................................................................................. 4-39

Table 4-30: Total Population at Entry Points Impacted, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1) .... 4-40

Table 4-31: Total Population at Entry Points Impacted, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) ................................................................................................................ 4-41

Table 4-32: Total Population at Entry Points Impacted, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) ................................................................................................................ 4-42

Table 4-33: Total Population at Entry Points Impacted, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) .............................................................................................................. 4-43

Table 4-34: Limitations and Uncertainties that Apply to the Baseline Characteristics of Systems for the Final PFAS Rule........................................................................ 4-44

Table 5-1: Quantified Sources of Uncertainty in Cost Estimates ............................................. 5-2

Table 5-2: National Annualized Costs, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1) (Million $2022) ..... 5-4

Table 5-3: National Annualized Costs, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) (Million $2022) .................................................................................................... 5-5

Table 5-4: National Annualized Costs, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) (Million $2022) .................................................................................................... 5-6

Table 5-5: National Annualized Costs, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) (Million $2022) .................................................................................................... 5-7

Table 5-6: Model PWS Variability Characteristics and Data Sources ...................................... 5-9

Table 5-7: Frequency Distribution to Estimate Influent TOC in mg/L ................................... 5-13

Table 5-8: Initial Compliance Forecast Including POU RO..................................................... 5-14

Table 5-9: Initial Compliance Forecast Excluding POU Devices ............................................ 5-15

Table 5-10: Estimated Parameter Values for Technology-Specific Bed Life Equations .......... 5-16

Table 5-11: Cost Elements Included in All WBS Models........................................................ 5-21

Table 5-12: Technology-Specific Cost Elements Included in the GAC Model ........................ 5-23

Table 5-13: Technology-Specific Cost Elements Included in the PFAS-Selective IX Model .. 5-25

Table 5-14: Technology-Specific Cost Elements Included in the Nontreatment Model ........... 5-26

Table 5-15: Implementation Administration Startup Costs ($2022) ......................................... 5-30

Table 5-16: Modeled Initial and Long-Term Sampling Frequencies Per System Entry Point .. 5-32

Table 5-17: Sampling Costs ($2022) ....................................................................................... 5-33

Table 5-18: Treatment Administration Costs ($2022) ............................................................. 5-35

Table 5-19: Public Notification Burden Estimate .................................................................... 5-36

Table 5-20: Primacy Agency Costs ($2022) ........................................................................... 5-37

Table 5-21: Limitations that Apply to the Cost Analysis for the Final PFAS Rule ................. 5-39

Table 6-1: Quantified Sources of Uncertainty in Benefits Estimates ...................................... 6-3

Table 6-2: National Annualized Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt
          each, PFHxS, PFNA, and HFPO-DA MCLs of 10 ppt each and HI of 1)
          (Million $2022) ..................................................................................................... 6-4

Table 6-3: National Annualized Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt)
          (Million $2022) ..................................................................................................... 6-5

Table 6-4: National Annualized Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt)
          (Million $2022) ..................................................................................................... 6-5

Table 6-5: National Annualized Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt)
          (Million $2022) ..................................................................................................... 6-6

Table 6-6: Overview of Health Benefits Categories Considered in the Analysis of Changes
          in PFAS Drinking Water Levels ............................................................................ 6-9

Table 6-7: Overview of Epidemiology and Toxicology Evidence of PFAS Effects on
          Health Outcomes .................................................................................................. 6-12

Table 6-8: Summary of Studies Relating PFOA or PFOS to Birth Weight ............................. 6-39

Table 6-9: Serum Exposure-Birth Weight Response Estimates ............................................... 6-40

Table 6-10: Race/Ethnicity- and Gestational Age-Specific Birth Weight Marginal Effects
           and Odds Ratios from the Mortality Regression Models ...................................... 6-45

Table 6-11: Simulated Cost Changes for Birth Weight Increases ($2022) (Based on Klein
           and Lynch, 2018 Table 8) .................................................................................... 6-52

Table 6-12: National Birth Weight Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt
           each, PFHxS, PFNA, and HFPO-DA MCLs of 10 ppt each and HI of 1)
           (Million $2022) ................................................................................................... 6-54

Table 6-13: National Birth Weight Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt)
           (Million $2022) ................................................................................................... 6-54

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Table 6-14: National Birth Weight Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) (Million $2022) ............................................................................... 6-55

Table 6-15: National Birth Weight Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) (Million $2022)................................................................................ 6-55

Table 6-16: Studies Selected for Inclusion in the Meta-Analyses ............................................. 6-59

Table 6-17: Estimated Shares of Fatal and Non-Fatal First Hard CVD Events Based on MEPS and HCUP Data ............................................................................... 6-68

Table 6-18: Estimated Risk of Post-Acute CVD Mortality Following the First Non-Fatal Hard CVD Event ...................................................................................... 6-71

Table 6-19: Cost of Illness of Non-Fatal First CVD Event Used in Modeling ......................... 6-72

Table 6-20: National CVD Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, and HFPO-DA MCLs of 10 ppt each and HI of 1) (Million $2022) .............................................................................................................. 6-73

Table 6-21: National CVD Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt)............. 6-73

Table 6-22: National CVD Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) ............ 6-74

Table 6-23: National CVD Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt)........... 6-74

Table 6-24: RCC Morbidity Valuation ..................................................................................... 6-81

Table 6-25: National RCC Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, and HFPO-DA MCLs of 10 ppt each and HI of 1) (Million $2022) .............................................................................................................. 6-82

Table 6-26: National RCC Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) ............. 6-82

Table 6-27: National RCC Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt)............. 6-83

Table 6-28: National RCC Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) ........... 6-83

Table 6-29: Data Sources and How the Information Derived from each Source is Used in the DBP Co-Removal Analysis................................................................... 6-85

Table 6-30: DBP ICR (1998), SYR3 ICR (2011), and SYR4 ICR (2019) – Summary of Raw Water TOC Annual System Means for Ground Water Systems ................... 6-89

Table 6-31: DBP ICR (1998), SYR3 ICR (2011), and SYR4 ICR (2019) – Summary of Raw Water TOC Annual System Means for Surface Water Systems .................. 6-89

Table 6-32: SYR3 ICR (2011) and SYR4 ICR (2019) – Summary of Finished Water TOC Annual System Means for Ground Water Systems.............................................. 6-90

Table 6-33: SYR3 ICR (2011) and SYR4 ICR (2019) – Summary of Finished Water TOC Annual System Means for Surface Water Systems.............................................. 6-90

Table 6-34: DBP ICR (Aux 1; 1998), SYR3 ICR (2011), and SYR4 ICR (2019) – Finished Water Annual System Mean TOC; Common Surface Water Systems ................. 6-91

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Table 6-35: Summary of THM4 Baseline Comparing DBP ICR and SYR4 ICR...................... 6-92

Table 6-36: DBP ICR (Aux 1) Summary of THM4 Concentrations Based on Disinfectant and Source Water Type ......................................................................... 6-93

Table 6-37: TOC Reduction for All Waters (Both Surface Water and Ground Water) with GAC EBCT of 20 Min and a 2-year Replacement Time ....................................... 6-98

Table 6-38: Estimation of ΔTHM4 in Surface Water with a 20 Min EBCT, and a 2-year GAC Replacement Time ............................................................................. 6-99

Table 6-39: Estimation of ΔTHM4 in Ground Water with a 20 Min EBCT, and a 2-year GAC Replacement Time ............................................................................. 6-99

Table 6-40: Selected Distribution Systems from SYR4 Based on Outlined Criteria .............. 6-101

Table 6-41: Information on Selected Distribution System and Corresponding ΔTHM4 Values............................................................................................. 6-103

Table 6-42: Comparison Between ICR TSD Conservative ΔTHM4 and SYR4 ΔTHM4 for Surface Water Systems ............................................................................. 6-104

Table 6-43: Bladder Cancer Morbidity Valuation .................................................. 6-111

Table 6-44: National Bladder Cancer Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, and HFPO-DA MCLs of 10 ppt each and HI of 1) (Million $2022) ...................................................................................... 6-112

Table 6-45: National Bladder Cancer Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) ............................................................................................... 6-112

Table 6-46: National Bladder Cancer Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) ............................................................................................... 6-113

Table 6-47: National Bladder Cancer Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) ............................................................................................... 6-113

Table 6-48: Limitations and Uncertainties that Apply to Benefits Analyses Considered for the Final PFAS Rule ................................................................................ 6-114

Table 6-49: Limitations and Uncertainties in the PK Model Application .............................. 6-118

Table 6-50: Limitations and Uncertainties in the Analysis of Birth Weight Benefits Under the Final Rule ......................................................................................... 6-119

Table 6-51: Limitations and Uncertainties in the Analysis of CVD Benefits Under the Final Rule ................................................................................................... 6-122

Table 6-52: Limitations and Uncertainties in the Analysis of RCC Benefits Under the Final Rule ................................................................................................... 6-127

Table 6-53: Limitations and Uncertainties in the Analysis of DBP Quantified Benefits Under the Final Rule ................................................................................ 6-129

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Table 7-1: Annualized Quantified National Costs and Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each, and HI of 1) (Million $2022) ................................................................................ 7-2

Table 7-2: Annualized Quantified National Costs and Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) (Million $2022) ................................................................. 7-3

Table 7-3: Annualized Quantified National Costs and Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) (Million $2022) ................................................................. 7-3

Table 7-4: Annualized Quantified National Costs and Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) (Million $2022) ............................................................... 7-4

Table 7-5: Summary of Quantified and Nonquantified Benefits and Costs in the National Analysis ............................................................................................................. 7-6

Table 7-6: Potential Impact of Nonquantifiable Benefits and Costs ......................................... 7-7

Table 8-1: Categorizing of PWSs Based on Data Availability for PFAS Occurrence and PWS Service Area Boundaries ..................................................................................... 8-19

Table 8-2: Data Sources for Predelineated PWS Service Areas ................................................ 8-22

Table 8-3: Number of Category 1 and 2 PWSs and Populations Served by Size and State ...... 8-29

Table 8-4: Population Served by Category 1 and 2 PWSs Compared to Percent of U.S. Population by Demographic Group ........................................................................ 8-31

Table 8-5: Baseline Scenario: Population Served by Category 1 and 2 PWS Service Areas Above Baseline Thresholds and as a Percent of Total Population Served.............. 8-35

Table 8-6: Modeled Average PFAS Concentrations (ppt) by Demographic Group in the Baseline, Category 1 and 2 PWS Service Areas .................................................... 8-36

Table 8-7: Hypothetical Regulatory Scenario #1: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above UCMR 5 MRLs and as a Percent of Total Population Served .................................................................. 8-39

Table 8-8: Reductions in Average PFAS Concentrations (ppt) by Demographic Group in a Hypothetical Regulatory Scenario with Maximum Contaminant Level at the UCMR 5 MRLs, Category 1 and 2 PWS Service Areas ...................................... 8-40

Table 8-9: Hypothetical Regulatory Scenario #2: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above 10.0 ppt and as a Percent of Total Population Served .................................................................... 8-43

Table 8-10: Reductions in Average PFAS Concentrations (ppt) by Demographic Group in a Hypothetical Regulatory Scenario with Maximum Contaminant Level at 10.0 ppt, Category 1 and 2 PWS Service Areas ............................................................ 8-44

Table 8-11: Population Served by Category 1 and 2 PWSs and Percent of U.S. Population by Demographic Group, Large Systems ................................................................ 8-46

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

Table 8-12: Population Served by Category 1 and 2 PWSs and Percent of U.S. Population by Demographic Group, Small Systems ................................................................ 8-47

Table 8-13: Baseline Scenario: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above Baseline Thresholds and as a Percent of Total Population Served, Large Systems ................................................................ 8-50

Table 8-14: Baseline Scenario: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above Baseline Thresholds and as a Percent of Total Population Served, Small Systems ................................................................ 8-51

Table 8-15: Modeled Average PFAS Concentrations (ppt) by Demographic Group and System Size in the Baseline, Category 1 and 2 PWS Service Areas ...................... 8-52

Table 8-16: Hypothetical Regulatory Scenario #1: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above UCMR 5 MRLs and as a Percent of Total Population Served, Large Systems ........................................... 8-56

Table 8-17: Hypothetical Regulatory Scenario #1: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above UCMR 5 MRLs and as a Percent of Total Population Served, Small Systems ........................................... 8-57

Table 8-18: Reductions in Average PFAS Concentrations (ppt) by Demographic Group in a Hypothetical Regulatory Scenario with Maximum Contaminant Levels at the UCMR 5 MRLs, Category 1 and 2 PWS Service Areas ........................................ 8-58

Table 8-19: Hypothetical Regulatory Scenario #2: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above 10.0 ppt and as a Percent of Total Population Served, Large Systems ............................................... 8-61

Table 8-20: Hypothetical Regulatory Scenario #2: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above 10.0 ppt and as a Percent of Total Population Served, Small Systems ............................................... 8-62

Table 8-21: Reductions in Average PFAS Concentrations (ppt) by Demographic Group in a Hypothetical Regulatory Scenario with Maximum Contaminant Levels at 10.0 ppt, Category 1 and 2 PWS Service Areas ........................................................ 8-63

Table 8-22: Annualized Cases Avoided per 100,000 People by Race/Ethnicity and Income Group, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1) ................................................... 8-69

Table 8-23: Annualized Cases Avoided per 100,000 People by Race/Ethnicity and Income Group, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) ........................................ 8-70

Table 8-24: Annualized Cases Avoided per 100,000 People by Race/Ethnicity and Income Group, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) ........................................ 8-71

Table 8-25: Annualized Cases Avoided per 100,000 People by Race/Ethnicity and Income Group, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) ...................................... 8-71

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Table 8-26: Annualized Population Weighted Household Cost by PWS Size Category and Race/Ethnicity Group ($2022) ...................................................................... 8-75

Table 8-27: Annualized Population Weighted Household Cost by PWS Size Category and Income Level ($2022) ............................................................................................ 8-76

Table 8-28: Annualized Population-Weighted Household Cost for Treating PWSs by Size Category and Race/Ethnicity Group ........................................................................ 8-79

Table 8-29: Annualized Population Weighted Household Cost for Treating PWSs by PWS Size Category and Income Level ($2022).................................................................. 8-80

Table 9-1: Estimates of the Social Cost of $CO_2$, 2020-2080 (2020$ per metric ton $CO_2$) .......... 9-5

Table 9-2: Entry Point Level Electricity Consumption Range by System Size and Technology (MWh/year).................................................................................... 9-7

Table 9-3: National Electricity Use (MWh/year) by Technology and System Size.................... 9-8

Table 9-4: $CO_2$ Emissions per MWh Calculated from Post-IRA 2022 IPM Reference Case ... 9-10

Table 9-5: $CO_2$ emissions per Year from Operating Treatment Technologies to Comply with the PFAS NPDWR .................................................................................. 9-11

Table 9-6: Annualized Monetized Climate Disbenefits Associated with Operating Treatment Technologies to Comply with the Final PFAS NPDWR ($2022)......... 9-12

Table 9-7: Average Annual Burden, Costs, and Responses for the Final Rule Information Collection Request ...................................................................................... 9-13

Table 9-8: Total Burden, Costs, and Responses for Each Required Activity .......................... 9-14

Table 9-9: Inventory of Small CWSs.................................................................................. 9-20

Table 9-10: Inventory of Small NTNCWSs ........................................................................ 9-20

Table 9-11: Cost-Revenue Ratio for Small CWSs, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1) (Commercial Cost of Capital) ...................................................................... 9-23

Table 9-12: Annual Costs by PWS Size and Ownership, Final Rule (Million $2022) (Commercial Cost of Capital) ...................................................................... 9-28

Table 9-13: SSCT Affordability Analysis Results – Technologies that Meet Effectiveness Criterion ...................................................................................................... 9-36

Table 9-14: Expenditure Margins for SSCT Affordability Analysis........................................ 9-37

Table 9-15: Total Annual Cost per Household for Candidate Technologies............................. 9-37

Table 9-16: Total Annual Cost per Household Assuming Hazardous Waste Disposal.............. 9-38

Table 9-17: Potential Annual Expenditure Margins for SSCT Affordability Analysis............. 9-40

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Table 9-18: Affordability Analysis Results Using a 1.0% of Annual Median Household Income Expenditure Margin ................................................................................ 9-40

Table 9-19: Affordability Analysis Results Using a 2.5% of Lowest Quintile of Annual Household Income Expenditure Margin ................................................................ 9-41

Table 9-20: Annual Cost per Household for Candidate Technologies Assuming 100% Financial Assistance for Technology Capital Costs ................................................ 9-44

Table 9-21: Affordability Analysis Results Using a 2.5% of Annual Median Household Income Minus the Baseline Median Annual Drinking Water Cost Expenditure Margin and Assuming 100% Financial Assistance for Technology Capital Costs. 9-45

Table 9-22: Affordability Analysis Results Using a 1.0% of Annual Median Household Income Expenditure Margin and Assuming 100% Financial Assistance for Technology Capital Costs ........................................................................................ 9-46

Table 9-23: Affordability Analysis Results Using a 2.5% of Lowest Quintile of Annual Household Income Expenditure Margin and Assuming 100% Financial Assistance for Technology Capital Costs ................................................................ 9-46

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# Figures

Figure 5-1: Approach Used by SafeWater MCBC to Model PWS Variability ........................ 5-10

Figure 6-1: Overview of Analysis of Birth Weight-Related Benefits ..................................... 6-38

Figure 6-2: Comparison of Change in Incidence of Infant Death per 1 g Increase in Birth
Weight by Gestational Age Category and Race/Ethnicity (Deaths per 1,000
Births)............................................................................................................... 6-44

Figure 6-3: Weighted Mortality Odds Ratios Based on Populations of Infants Falling into
100 g Birth Weight Increments and Four Gestational Age Categories.................. 6-47

Figure 6-4: Piecewise Medical Cost Function Calculated by Klein and Lynch (2018) for
Three Increments in Increased Birth Weight (18 g, 50 g, and 100 g).................... 6-51

Figure 6-5. Interpolated Cost of Illness at Baseline Average Birth Weights, by Estimated
Change in Birth Weight Under the Final Rule...................................................... 6-53

Figure 6-6: Overview of the CVD Risk Model ........................................................ 6-57

Figure 6-7: Overview of Life Table Calculations in the CVD Model..................................... 6-63

Figure 6-8: CVD Model Calculations for Ages 40+ Tracking CVD....................................... 6-65

Figure 6-9: Overview of Analysis of Reduced RCC Risk........................................................ 6-76

Figure 6-10: Overview of Analysis of Co-Removal Benefits ................................................. 6-87

Figure 6-11: Estimated TOC Percent Removal in Ground Water Using GAC Based on
Logistic Equation Model.................................................................................. 6-96

Figure 6-12: Estimated TOC Percent Removal in Surface Water Using GAC Based on
Logistic Equation Model.................................................................................. 6-97

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

# Acronyms and Abbreviations

| | |
|---|---|
| ACS | American Community Survey |
| AFFF | Aqueous Film Forming Foam |
| AIX | Anion Exchange |
| ANSI | American National Standards Institute |
| AOC | Assimilable Organic Carbon |
| ARIC | Atherosclerosis Risk in Communities |
| ATSDR | Agency for Toxic Substances and Disease Registry |
| AWWA | American Water Works Association |
| BAT | Best Available Technology |
| BIL | Bipartisan Infrastructure Law |
| BLS | Bureau of Labor Statistics |
| BP | Blood Pressure |
| BV | Bed Volumes |
| CARDIA | Coronary Artery Risk Development in Young Adults |
| CBX | SafeWater Cost Benefit Model |
| CCL | Contaminant Candidate List |
| CCR | Consumer Confidence Report |
| CDC | Centers for Disease Control and Prevention |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| CHMS | Canadian Health Measures Survey |
| COI | Cost of Illness |
| CPI | Consumer Price Index |
| CVD | Cardiovascular Disease |
| CWSs | Community Water Systems |
| CWSS | Community Water System Survey |
| DBP | Disinfection Byproduct |
| DHS | Department of Homeland Security |
| DWSRF | Drinking Water State Revolving Fund |
| EA | Economic Analysis |
| EBCT | Empty Bed Contact Time |
| ECEC | Employer Cost for Employee Compensation |
| ECI | Employment Cost Index |
| ECTT | Error Code Tracking Tool |
| EC-SDC | Emerging Contaminants in Small or Disadvantaged Communities |
| EJ | Environmental Justice |
| EP | Entry Point |
| EPA | U.S. Environmental Protection Agency |
| FR | Federal Register |
| GAC | Granular Activated Carbon |
| GDP | Gross Domestic Product |
| GHG | Greenhouse Gas |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                          APRIL 2024

| gpm | Gallons per Minute |
| GWUDI | Ground Water Under the Direct Influence |
| HDLC | High-Density Lipoprotein Cholesterol |
| HESD | Health Effects Support Document |
| HFPO-DA | Hexafluoropropylene Oxide Dimer Acid |
| HHS | Department of Health and Human Services |
| HI | Hazard Index |
| HRRCA | Health Risk Reduction and Cost Analysis |
| HTN | Hypertension |
| HUC | Hydraulic Unit Code |
| ICR | Information Collection Request |
| ICR TSD | Information Collection Rule Treatment Study Database |
| IHS | Indian Health Service |
| IPM | Integrated Planning Model |
| IRA | Inflation Reduction Act |
| IRFA | Initial Regulatory Flexibility Analysis |
| IS | Ischemic Stroke |
| IWG | Interagency Working Group |
| IX | Ion Exchange |
| LBW | Low Birth Weight |
| LDLC | Low-Density Lipoprotein Cholesterol |
| LRAA | Locational Running Annual Average |
| MCBC | Multi-Contaminant Benefit-Cost Model |
| MCLGs | Maximum Contaminant Level Goals |
| MCLs | Maximum Contaminant Levels |
| MCMC | Markov Chain Monte Carlo |
| MGD | Million Gallons Per Day |
| MHI | Median Household Income |
| MI | Myocardial Infarction |
| MRL | Minimum Reporting Level |
| NCHS | National Center for Health Statistics |
| NCWSs | Non-Community Water Systems |
| NDWAC | National Drinking Water Advisory Council |
| NF | Nanofiltration |
| NHANES | National Health and Nutrition Examination Survey |
| NOM | Natural Organic Matter |
| NPDWR | National Primary Drinking Water Regulation |
| NSF | National Sanitation Foundation |
| NTNCWSs | Non-Transient Non-Community Water Systems |
| NTTAA | National Technology Transfer and Advancement Act |
| O&M | Operation and Maintenance |
| OEHHA | California Environmental Protection Agency's Office of Environmental Health Hazard Assessment |
| OES | Occupational Employment Survey |
| OIRA | Office of Information and Regulatory Affairs |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

| | |
|---|---|
| OMB | Office of Management and Budget |
| ORD | Office of Research and Development |
| OSHA | Occupational Safety and Health Administration |
| PAF | Population Attributable Fraction |
| PBPK | Physiological-Based Pharmacokinetic |
| PFAA | Perfluorinated Alkyl Acids |
| PFAS | Per- And Polyfluoroalkyl Substances |
| PFBS | Perfluorobutanesulfonic Acid |
| PFHpA | Perfluoroheptanoic Acid |
| PFHxS | Perfluorohexanesulfonic Acid |
| PFNA | Perfluorononanoic Acid |
| PFOA | Perfluorooctanoic Acid |
| PFOS | Perfluorooctane Sulfonatic Acid |
| PK | Pharmacokinetic |
| POU | Point-of-Use |
| POU RO | Point-of-Use Reverse Osmosis |
| PRA | Paperwork Reduction Act |
| PWS | Public Water System |
| PWSID | Public Water System Identifier |
| PWSS | Public Water System Supervision |
| Q | Design Flow |
| RCC | Renal Cell Carcinoma |
| RCRA | Resource Conservation and Recovery Act |
| RFA | Regulatory Flexibility Act |
| RIA | Regulatory Impact Analysis |
| RO | Reverse Osmosis |
| RO/NF | Reverse Osmosis/Nanofiltration |
| RSSCT | Rapid Small-Scale Column Test |
| SAB | Science Advisory Board |
| SBA | Small Business Administration |
| SBAR | Small Business Advocacy Review |
| SBREFA | Small Business Regulatory Enforcement Fairness Act |
| SDWA | Safe Drinking Water Act |
| SDWIS | Safe Drinking Water Information System |
| SEER | Surveillance, Epidemiology, And End Results |
| SER | Small Entity Representatives |
| SGA | Small for Gestational Age |
| SISNOSE | Significant Economic Impact on a Substantial Number of Small Entities |
| SOC | Synthetic Organic Compounds |
| SSCTs | Small System Compliance Technologies |
| T&C | Technologies and Costs |
| T3 | Triiodothyronine |
| T4 | Thyroxine |
| TC | Total Cholesterol |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

| | |
|---|---|
| TDP | Technology Design Panel |
| THM4 | Four Regulated Trihalomethanes |
| TNCWSs | Transient Non-Community Water Systems |
| TOC | Total Organic Carbon |
| TRI | Toxics Release Inventory |
| TSH | Thyroid Stimulating Hormone |
| UCMR | Unregulated Contaminant Monitoring Rule |
| UCMR 3 | Third Unregulated Contaminant Monitoring Rule |
| UCMR 4 | Fourth Unregulated Contaminant Monitoring Rule |
| UMRA | Unfunded Mandates Reform Act |
| VOCs | Volatile Organic Compounds |
| VSL | Value of a Statistical Life |
| WBS | Work Breakdown Structure |
| WIFIA | Water Infrastructure Finance and Innovation |
| WIIN | Water Infrastructure Improvements for the Nation Act |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                                          APRIL 2024

# 1  Executive Summary

Under the Safe Drinking Water Act (SDWA), the U.S. Environmental Protection Agency (EPA or "the agency") has the authority to set enforceable National Primary Drinking Water Regulations (NPDWRs) for drinking water contaminants and require monitoring of public water supplies. The EPA is finalizing a NPDWR for per-and polyfluoroalkyl substances (PFAS) (EPA-HQ-OW-2022-0114). The agency initiated the process for developing a NPDWR for PFAS compounds in March 2021, when the EPA published the fourth regulatory determination for contaminants on the fourth Contaminant Candidate List (CCL), which included a final determination to regulate perfluorooctanoic acid (PFOA) and perfluorooctane sulfonic acid (PFOS) in drinking water. Additionally, in the EPA's final regulatory determination for PFOA and PFOS, as well as its PFAS Strategic Roadmap, the agency committed to evaluating additional PFAS beyond PFOA and PFOS and considering actions to address groups of PFAS (86 FR 12272) (U.S. EPA, 2021b; U.S. EPA, 2021e). In March of 2023, the EPA made a preliminary regulatory determination for four additional PFAS and their mixtures: perfluorononanoic acid (PFNA), hexafluoropropylene oxide dimer acid (HFPO-DA) and its ammonium salt (also known as GenX chemicals)[1], perfluorohexanesulfonic acid (PFHxS), and perfluorobutanesulfonic acid (PFBS). Additionally, the EPA proposed a NPDWR and health-based Maximum Contaminant Level Goals (MCLGs) for PFOA, PFOS and these four additional PFAS and their mixtures (88 FR 18638). The final NPDWR is one of several actions consistent with the agency's commitment to address these long-lasting "forever chemicals" that occur in drinking water supplies and impact communities across the U.S.

The final PFAS NPDWR is a significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review. An economic analysis (EA) is required for all significant rules under Executive Order (EO) 12866 (Regulatory Planning and Review). In addition, Section 1412(b)(3)(C) of the 1996 Amendments to the SDWA requires the EPA to prepare a Health Risk Reduction and Cost Analysis (HRRCA) in support of any NPDWRs that include a maximum containment level (MCL). This EA addresses these and other regulatory reporting requirements, including those that direct the EPA to conduct distributional and environmental justice analysis. With respect to the SDWA HRRCA requirements, this document provides the following:

- Quantifiable and nonquantifiable health risk reduction benefits for which there is a factual basis in the rulemaking record to conclude that such benefits are likely to occur as the result of compliance with each level of treatment (Chapter 6);

- Quantifiable and nonquantifiable health risk reduction benefits for which there is a factual basis in the rulemaking record to conclude that such benefits are likely to occur from reductions in co-occurring contaminants that may be attributed solely to compliance with the final MCL, excluding benefits resulting from compliance with other proposed or promulgated regulations (Chapter 6);

---

[1] The EPA notes that the chemical HFPO-DA is used in a processing aid technology developed by DuPont to make fluoropolymers without using PFOA. The chemicals associated with this process are commonly known as GenX Chemicals and the term is often used interchangeably for HFPO-DA along with its ammonium salt.

---

*Final PFAS Rule Economic Analysis*                             1-1                             *April 2024*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- Quantifiable and nonquantifiable costs for which there is a factual basis in the rulemaking record to conclude that such costs are likely to occur solely as a result of compliance with the final MCL, including monitoring, treatment, and other costs, and excluding costs resulting from compliance with other proposed or promulgated regulations (Chapter 2);

- Incremental costs and benefits associated with each alternative MCL considered (Chapter 7);

- Effects of the contaminant on the general population and on groups within the general population, such as sub-populations identified as likely to be at greater risk of adverse health effects due to exposure to contaminants in drinking water than the general population (Chapters 6 and 8);

- Any increased health risk that may occur as the result of compliance, including risks associated with co-occurring contaminants (Chapter 6); and

- Other relevant factors, including the quality and extent of the information, uncertainties in the analysis, and factors related to the degree and nature of the risk (Chapters 5–7).

The final NPDWR will reduce PFAS concentrations in the drinking water distributed by public water systems (PWSs) from the current baseline to drinking water concentrations that are in compliance with MCLs of 4.0 parts per trillion (ppt; also expressed as ng/L) for PFOA, 4.0 ppt for PFOS, and a unitless hazard index (HI) of 1 for the group including PFNA, HFPO-DA, PFHxS, PFBS. Additionally, the EPA is finalizing individual MCLs for HFPO-DA, PFHxS, and PFNA at 10 ppt each. See Sections III and V of the PFAS NPDWR for further discussion (U.S. EPA, 2024h). These impacts are assessed in comparison to the baseline scenario, which reflects the PFAS occurrence and exposure conditions expected in the absence of finalizing a PFAS drinking water regulation. This EA presents the incremental costs and benefits associated with the final rule (PFOA, PFOS, HI, PFHxS, PFNA, and HFPO-DA MCLs) and three regulatory alternatives that only include MCLs for PFOA and PFOS. The regulatory alternative MCLs are referred to as Option 1a (MCL of 4.0 ppt for PFOA and 4.0 ppt for PFOS), Option 1b (MCL of 5.0 ppt for PFOA and 5.0 ppt for PFOS), and Option 1c (MCL of 10.0 ppt for PFOA and 10.0 ppt for PFOS). The regulatory alternative MCLs for PFOA and PFOS (Options 1a, 1b, and 1c) do not directly regulate additional PFAS, thereby limiting public health protection and benefits relative to the final rule.

In this EA, the EPA presents the quantified and nonquantifiable health benefits expected from reductions in PFAS exposures resulting from the final rule. Quantified benefits are assessed as avoided cases of illness and deaths (or morbidity and mortality, respectively) associated with exposure to PFAS contaminants. Adverse human health outcomes associated with PFAS exposure that cannot be quantified and monetized are assessed as nonquantifiable benefits. Additionally, this EA presents the costs associated with the final NPDWR. Costs presented include those expenses incurred by PWSs to (1) monitor for PFAS, (2) inform consumers, (3) install and operate treatment technologies, and (4) perform record-keeping and reporting to comply with the PFAS NPDWR; and the costs incurred by primacy agencies (typically states) with authority to implement and enforce SDWA regulations. The EPA presents annualized quantified benefits and costs discounted at a 2 percent discount rate, consistent with OMB guidance (OMB Circular A-4, 2023).

Quantified economic benefits analyses consider the strength of evidence for associations between PFAS exposure and each adverse health effect and the availability of data to quantify the morbidity and mortality impacts associated with that adverse health effect. To identify health effects that are associated with PFAS exposure, the EPA relied on the assessment of adverse health effects associated with PFOA and PFOS exposure in the final human health toxicity assessments for PFOA and PFOS (U.S. EPA, 2024f; U.S. EPA, 2024e). The EPA provides a national-level quantitative estimate of avoided morbidity and mortality related to cardiovascular disease (CVD; both PFOA and PFOS), low birth weight (both PFOA and PFOS), and renal cell carcinoma (RCC; PFOA only) associated with reductions in PFAS consistent with the final rule. Additional quantified benefits estimates for low birth weight (PFNA) and liver cancer (PFOS) are presented in sensitivity analyses in Appendix K and Appendix O, respectively.

As required by SDWA, the EPA also provides a qualitative assessment of potential benefits for adverse health effects that are associated with PFAS exposure but lack the economic or other information needed for a quantitative analysis. In this EA, a qualitative discussion is provided for other adverse health effects and potential avoided diseases associated with PFOA, PFOS, and the four PFAS compounds included in the HI group (PFHxS, PFNA, PFBS, and HFPO-DA). The agency anticipates that the nonquantifiable human health benefits associated with reductions in drinking water PFAS exposure are substantial and may reasonably exceed the benefits the agency was able to quantify for this final rule.

As part of its HRRCA, the EPA is directed by SDWA to evaluate quantifiable and nonquantifiable health risk reduction benefits for which there is a factual basis in the rulemaking record to conclude that such benefits are likely to occur from reductions in co-occurring contaminants that may be attributed solely to compliance with the final MCL (SDWA 1412(b)(3)(C)(II)). These co-occurring contaminants are expected to include additional PFAS contaminants not directly regulated by the final PFAS NPDWR, co-occurring chemical contaminants such as other synthetic organic compounds (SOCs), volatile organic compounds (VOCs), and disinfection byproduct (DBP) precursors. The EPA has quantified costs associated with reduction in DBP precursors, and has considered health risk reduction benefits for other PFAS, SOCs, and VOCs qualitatively.

The agency anticipates that because of the PFAS NPDWR, some community water systems (CWSs) and non-transient non-community water systems (NTNCWSs) will need to reduce their PFAS concentrations to comply with the rule. This EA describes the costs associated with activities PWSs are expected to undertake to comply with the final rule (e.g., installation of treatment technologies to remove PFAS), and the costs associated with primacy agency implementation and administration of the final rule. National quantified cost estimates are provided for PFOA, PFOS, and PFHxS treatment. In the national cost analysis, the EPA quantified the national treatment and monitoring costs for PFHxS individual MCL exceedances and HI MCL exceedances where PFHxS is present above its HBWC while one or more other HI PFAS is also present in that same mixture. In instances where concentrations of PFNA, PFBS, and HFPO-DA are high enough to cause or contribute to a HI exceedance when the concentrations of PFOA, PFOS, and PFHxS would not have already otherwise triggered treatment, the national quantified costs may be underestimated; however, these costs are considered quantitatively in a sensitivity analysis. Additional discussion of the methodology and results of this analysis can be found in Chapter 5, Section 5.3.1.4, and Appendix N.3. See section

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                            APRIL 2024

XII.A.4 of the final rule preamble for more information about how EPA considered HI, PFNA, and HFPO-DA MCL costs.

The EPA identified effective treatment technologies as part of the NPDWR, and consistent with SDWA requirements found in Section 1412(b)(3)(C)(II) to consider benefits likely to occur from reductions in co-occurring compounds, the EPA estimated expected benefits from reductions in co-occurring compounds as a result of PFAS treatment. Moreover, the EPA developed a quantitative analysis for reductions in bladder cancer morbidity and mortality that stem from removal of DBP precursors. DBPs, specifically trihalomethanes, are formed when disinfectants interact with organic material in drinking water distribution systems. Since PFAS treatment has been demonstrated to remove DBP precursors, the agency anticipates that DBPs, including trihalomethanes, will be reduced with PFAS treatment. The EPA provides a qualitative discussion of benefits for other potential water quality improvements that stem from PFAS treatment, including those benefits associated with reductions in other co-occurring contaminants besides DBPs.

The tables below present quantified benefits and costs of the final NPDWR ("final rule") and alternative MCLs considered. Compared to the economic analysis for the proposed PFAS NPDWR, which presented costs in 2021 dollars, the EPA presents costs for the final rule in 2022 dollars. Table ES-1 presents the total estimated national annualized benefits associated with the final rule and regulatory alternatives considered. Table ES-2 presents the total estimated national annualized costs associated with the final rule and regulatory alternatives considered. Quantitative estimates are presented using a 2 percent discount rate. Throughout this EA, benefits and costs are presented using mean (or "expected value"), 5th, and 95th percentile results to characterize key sources of uncertainty, including but not limited to PFAS baseline occurrence and health effect slope factor uncertainty, which is consistent with OMB and EPA guidance (OMB Circular A-4, 2003; U.S. EPA, 2010a). All significant limitations and uncertainties of this economic analysis are described in the pages that follow.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                      APRIL 2024

**Table ES-1: Quantified Total National Annualized Benefits, All Options (Million $2022)**

| Option | 2% Discount Rate[a] | | |
|---|---|---|---|
| | 5th Percentile[b] | Expected Value | 95th Percentile[b] |
| Final rule[c] | $920.91 | $1,549.40 | $2,293.80 |
| Option 1a[d] | $913.05 | $1,542.74 | $2,280.10 |
| Option 1b[e] | $768.55 | $1,296.84 | $1,919.30 |
| Option 1c[f] | $397.28 | $664.45 | $970.70 |

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates. Quantified total national annualized benefits do not include quantified sensitivity analysis results for PFNA effects on birth weight and PFOS effects on liver cancer, and as such, the quantified total national annualized benefits may be underestimated. See appendices K and O for PFNA birth weight and PFOS liver cancer sensitivity analysis results, respectively.
[a]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.
[b]The 5th and 95th percentile range is based on modeled variability and uncertainty described in Section 6.1.2 and Table 6-1 for benefits. This range does not include the uncertainty described in Table 6-48 for benefits.
[c]The final rule sets PFOA and PFOS MCLs of 4.0 ppt each, an HI of 1, and MCLs for HFPO-DA, PFNA, and PFHxS of 10 ppt each.
[d]Option 1a sets PFOA and PFOS MCLs only, at 4.0 ppt each.
[e]Option 1b sets PFOA and PFOS MCLs only, at 5.0 ppt each.
[f]Option 1c sets PFOA and PFOS MCLs only, at 10.0 ppt each.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

**Table ES-2: Quantified Total National Annualized Costs, All Options (Million $2022)**

| Option | 2% Discount Rate[a,b] | | |
|---|---|---|---|
| | 5th Percentile[c] | Mean | 95th Percentile[c] |
| Final rule[d,e] | $1,435.70 | $1,548.64 | $1,672.10 |
| Option 1a[f] | $1,423.60 | $1,537.07 | $1,660.30 |
| Option 1b[g] | $1,102.60 | $1,192.13 | $1,291.40 |
| Option 1c[h] | $462.87 | $499.29 | $540.68 |

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.

[a]See Table 7-6 for a list of the nonquantifiable costs, and the potential direction of impact these costs would have on the estimated monetized total annualized costs in this table.

[b]PFAS-contaminated wastes are not considered regulatory under the Resource Conservation and Recovery Act (RCRA) or characteristic hazardous wastes at this time and therefore total costs reported in this table do not include costs associated with hazardous waste disposal of spent filtration materials. To address stakeholder concerns about potential costs for disposing PFAS-contaminated wastes as hazardous should they be regulated as such in the future, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. See Appendix N, Section N.2 for additional detail.

[c]The 5th and 95th percentile range is based on modeled variability and uncertainty described in Section 5.1.2 and Table 5-1 for costs. This range does not include the uncertainty described in Table 5-21 for costs.

[d]Quantified national costs do not include quantified sensitivity analysis results for PFNA, PFBS, and HFPO-DA. Including the costs of treating for these compounds increases total annualized cost of the final rule to $1,631.05 million. These benefits and costs are considered quantitatively in the sensitivity analysis. See Appendix N.3 for more information.

[e]The final rule sets PFOA and PFOS MCLs of 4.0 ppt each, an HI of 1 and MCLs for HFPO-DA, PFNA, and PFHxS of 10 ppt each.

[f]Option 1a sets PFOA and PFOS MCLs of 4.0 ppt each.

[g]Option 1b sets PFOA and PFOS MCLs of 5.0 ppt each.

[h]Option 1c sets PFOA and PFOS MCLs of 10.0 ppt each.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# 2 Introduction

PFAS are a class of synthetic chemicals that have been manufactured and in use since the 1940s (AAAS, 2020; U.S. EPA, 2022h). PFAS are or were most commonly used to make products resistant to water, heat, and stains and are consequently found in industrial and consumer products like clothing, food packaging, cookware, cosmetics, carpeting, and fire-fighting foam (AAAS, 2020). PFAS manufacturing and processing facilities, facilities using PFAS in the production of other products, airports, and military installations have been associated with PFAS releases into the air, soil, and water (U.S. EPA, 2016b; U.S. EPA, 2016c). People may be exposed to PFAS by using certain consumer products, through occupational exposure, and/or through consuming contaminated food or contaminated drinking water (Domingo & Nadal, 2019; Fromme et al., 2009).

PFOS and PFOA are part of a subset of PFAS referred to as perfluorinated alkyl acids (PFAA) and are two of the most widely studied and longest-used PFAS. Due to their widespread use and persistence in the environment, most people have been exposed to PFAS, including PFOA and PFOS (U.S. EPA, 2016b; U.S. EPA, 2016c). PFOA and PFOS have been detected in up to 98 percent of blood serum samples taken in biomonitoring studies that are representative of the U.S. general population (CDC, 2019). Following the voluntary phase-out of PFOA by eight major chemical manufacturers and processors in the U.S. under the EPA's 2010/2015 PFOA Stewardship Program and reduced manufacturing of PFOS (last reported in 2002 under Chemical Data Reporting), serum concentrations have been declining. The National Health and Nutrition Examination Survey (NHANES) data exhibited that 95th-percentile serum PFOS concentrations have decreased over 75 percent, from 75.7 µg/L in the 1999-2000 cycle to 18.3 µg/L in the 2015-2016 cycle (CDC, 2019; Jain, 2018; Calafat et al., 2007; Calafat et al., 2019).

Despite voluntary phase-outs and reduced exposure to some PFAS chemicals, PFAS are still used in a wide range of consumer products and industrial applications. The EPA's analysis of drinking water monitoring data shows widespread occurrence of PFAS compounds in multiple geographic locations. Most known exposures are relatively low, but some can be high, particularly when people are exposed to a concentrated source over long periods of time. Studies indicate that PFAS exposure above certain levels may result in adverse health effects, including developmental effects to fetuses during pregnancy or to breast-fed infants, cancer, and other immunologic-related effects.

Under SDWA, the EPA is regulating PFAS in drinking water distributed by all CWSs[2] and NTNCWSs. In 2021, the EPA determined that a NPDWR for PFAS would result in a meaningful opportunity to reduce health risks (U.S. EPA, 2021b). In March of 2023, the EPA proposed a NPDWR with health-based MCLGs and enforceable MCLs for PFOA, PFOS and four PFAS and their mixtures. Section 2.1 provides further detail on the final NPDWR for PFAS.

---

[2] Systems that supply water to the same population year-round.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 2.1 Summary of the Final PFAS Rule and Regulatory Alternatives

The EPA is regulating six PFAS in finished drinking water: (1) PFOS, (2) PFOA, (3) PFNA, (4) HFPO-DA and its ammonium salt (also known as GenX chemicals), (5) PFHxS, and (6) PFBS. The final regulation utilizes compound-specific MCLs for PFOA, PFOS, PFNA, HFPO-DA, and PFHxS and a group MCL based on a HI for PFNA, HFPO-DA, PFHxS, and PFBS. This regulatory approach utilizes the mixtures framework peer reviewed by the EPA's Science Advisory Board (SAB; U.S. EPA, 2022i) and builds a framework for inclusion of additional PFAS through future rulemaking as new data become available (U.S. EPA, 2024d). For more information on the HI approach, see the EPA's Framework for Estimating Noncancer Health Risks Associated with Mixtures of PFAS (U.S. EPA, 2024d).

Based on the best available scientific information on the health effects, the EPA is finalizing MCLGs of 0 ppt for PFOA and PFOS each, an MCLG of 1 for the HI, and MCLGs of 10 ppt for HFPO-DA, PFHxS, and PFNA each. The EPA has determined that it is feasible to set enforceable MCLs for PFOA and PFOS at 4.0 ppt each and MCLs for HFPO-DA, PFHxS, and PFNA at 10 ppt each. Additionally, the EPA has determined it is feasible to set an MCL for four PFAS with a HI limit of 1. As such, the EPA is finalizing enforceable MCLs of 4.0 ppt for PFOA, 4.0 ppt for PFOS, 10 ppt for HFPO-DA, 10 ppt for PFHxS, and 10 ppt for PFNA and a unitless HI of 1 for the group including PFNA, HFPO-DA, PFHxS, and PFBS. For additional details about the MCLGs and MCLs in the final rule, see the Federal Register Notice for this rulemaking.

Additionally, in this EA, the EPA presents benefits and costs for the final rule as well as three regulatory alternatives. For the proposed rule, the agency received comments on whether establishing traditional MCLGs and MCLs for PFHxS, HFPO-DA, PFNA, and PFBS instead of or in addition to the HI approach would change public health protection, improve clarity for the rule, or change costs. See Section V of the Federal Register Notice for further discussion of why the EPA added individual MCLs for HFPO-DA, PFHxS, and PFNA. For the final rule, the EPA has also included estimates of the marginal costs for the individual PFHxS, PFNA, and HFPO-DA MCLs in the absence of the HI (See Section 5.1.3 and Appendix N.4 for details). This analysis confirms that the treatment burden from the individual MCLs is fully considered in the HI cost estimates in Appendix N.3 (and as discussed above, the individual PFHxS, PFNA, and HFPO-DA MCL marginal costs are lower in the absence of the HI MCL).

The regulatory alternatives that the EPA evaluated present individual MCLG and enforceable MCL values for PFOA and PFOS. MCL values for PFOA and PFOS vary for each alternative considered: 4.0 ppt in Option 1a, 5.0 ppt in Option 1b, and 10.0 ppt in Option 1c. The EPA evaluated benefits and costs for Option 1a to determine the difference in costs between alternatives for PFOA and PFOS MCLs only versus MCLs for PFOA and PFOS and an HI for four additional PFAS. The EPA considered benefits and costs under Option 1b—MCLs of 5.0 ppt for PFOA and PFOS—because it is 25 percent above the compliance quantitation limit of 4.0 ppt established for the final rule. Lastly, the EPA considered benefits and costs of Option 1c— MCLs of 10.0 ppt for PFOA and PFOS—to provide information on whether the agency should consider utilizing its authority under Section 1412(b)(6) to set an alternative MCL at the level at which the benefits would justify the costs.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 2.2 Economic Analysis Assumptions

### 2.2.1 Compliance Schedule and Period of Analysis for Final Rule

For purposes of this EA, the EPA assumes that the NPDWR will be promulgated in 2024. As the final rule will grant a 2-year nationwide extension of the date for MCL compliance, this analysis assumes that capital improvements (i.e., installation of treatment technologies) for systems taking action under the rule take effect five years after the date on which the regulation is promulgated, or in 2029. All other requirements, including initial monitoring, are assumed to be completed within three years of rule promulgation. In addition to this initial time window, the EPA's period of analysis includes the 80 years following the assumed compliance date.[3] This time span is based on an assumed median human lifespan of 80 years. In this EA, the EPA evaluates costs and benefits under the final rule for the period of analysis from 2024 through 2105. The EPA selected this period of analysis to estimate human health risk reduction to capture health effects from chronic illnesses that are typically experienced later in life (i.e., cardiovascular disease and cancer). Capital costs for installation of treatment technologies are spread over the useful life of the technologies. The EPA does not capture effects of compliance with the final rule beyond the year 2105.

### 2.2.2 Dollar Year and Discount Rates

The EPA presents estimated costs and benefits under the final rule in 2022 U.S. dollars. Appendix J provides additional details on the price indices used for inflation adjustments.

The final rule analysis estimates the annualized value of future benefits and costs using a 2 percent discount rate. The U.S. White House and OMB recently finalized and re-issued the A-4 and A-94 benefit-cost analysis guidance (see OMB Circular A-4, 2023), and the update includes new guidance to use a social discount rate of 2 percent. The updated OMB Circular A-4 states that the discount rate should equal the real (inflation-adjusted) rate of return on long-term U.S. government debt, which provides an approximation of the social rate of time preference. This rate for the past 30 years has averaged around 2.0 percent per year in real terms on a pre-tax basis. OMB arrived at the 2 percent discount rate figure by considering the 30-year average of the yield on 10-year Treasury marketable securities, and the approach taken by OMB produces a real rate of 1.7 percent per year, to which OMB added a 0.3 percent per-year rate to reflect inflation as measured by the personal consumption expenditure (PCE) inflation index. The OMB guidance states that Agencies must begin using the 2 percent discount rate for draft final rules that are formally submitted to the Office of Information and Regulatory Affairs (OIRA) after December 31, 2024. The updated OMB Circular A-4 guidance further states that "to the extent feasible and appropriate, as determined in consultation with OMB, agencies should follow this Circular's guidance earlier than these effective dates." Given the updated default social discount rate prescribed in the OMB Circular A-4 and also public input received on the discount rates considered by the EPA in the proposed NPDWR for this final rule (see response to comment

---

[3] When calculating the present value of costs over the 82-year period of analysis, the EPA uses the useful life of the technology to determine when the capital components will need to be replaced. So, for example, if a PWS installs a technology in year 7 of the analysis that has an average useful life of 18 years, and costs $1M, the PWS accrues capital costs of $1M in each of the following years: 7, 25, 43, 61, and 79. It also accrues O&M costs every year of the analysis beginning in year 7.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

document Section 13.2), the EPA estimated national benefits and costs at the 2 percent discount rate for the final rule and incorporated those results into the final economic analysis. Since the EPA proposed this NPDWR with the 3 and 7 percent discount rates based on guidance in the previous version of OMB Circular A-4, the EPA has kept the presentation of results using these discount rates in Appendix P. The Administrator reaffirms his determination that the benefits of the rule justify the costs. The EPA's determination is based on its analysis under in SDWA section 1412(b)(3)(C) of the quantifiable benefits and costs at the 2 percent discount rate, in addition to at the 3 and 7 percent discount rate, as well as the nonquantifiable benefits and costs. The EPA found that significant nonquantifiable benefits are likely to occur from the final PFAS NPDWR.

The same discount rate is used for both benefits and costs. All future cost and benefit values are discounted back to the initial year of the analysis, 2024, providing the present value of the cost or benefit.

## 2.2.3 Annualization

Consistent with the timing of the final rule and associated reductions in PFAS levels, the EPA uses the following equation to annualize the future costs and benefits:

Equation 1:

$$AV = \frac{r(PV)}{(1+r)[1-(1+r)^{-n}]}$$

Where $AV$ is the annualized value, $PV$ is the present value,[4] $r$ is the discount rate (2%), and $n$ is the number of years (82 years).

## 2.2.4 Population

To determine the number of people expected to benefit from actions under the final rule, the EPA uses population data from the Safe Drinking Water Information System Federal version (SDWIS/Fed) 2021 Quarter 4 (Q4) database (U.S. EPA, 2021h). The SDWIS/Fed data provide the population served by each PWS in the U.S. For analyses that rely on age-, sex-, and race/ethnicity-specific populations, the EPA uses county-level population proportions based on 2021 estimates from the U.S. Census Bureau (2020a). The EPA does not consider population growth during the period of analysis (2024–2105). For more information on the SDWIS/Fed and U.S. Census Bureau (2020a) data, see Appendix B.

## 2.2.5 Valuation

To estimate the economic value of avoided premature deaths, the EPA uses Value of Statistical Life estimates. The EPA follows *Guidelines for Preparing Economic Analyses* (U.S. EPA, 2010a) and approximates Value of Statistical Life growth using a compound annual growth rate of projected Value of Statistical Life values to obtain a Value of Statistical Life suitable for

---

[4] The present value is the current value of a future sum of benefits given a specified discount rate. The present value represents the expected value of benefits determined at the date of valuation.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

valuation of mortality risk reductions during the period of analysis, 2024-2105. As the base value, the EPA used the Value of Statistical Life estimate of $4.8 million ($1990, 1990 income year), which is the central tendency of the Value of Statistical Life distribution recommended for use in the EPA's regulatory impact analyses (U.S. EPA, 2010a). The base Value of Statistical Life estimate is adjusted for inflation and income growth as described in Appendix J. The Value of Statistical Life estimates employed in the EPA's analysis range from $11.6 million ($2022) in 2024 to $19.1 million ($2022) in 2105.[5]

To estimate the economic value of avoided morbidity (i.e., non-fatal heart attacks and ischemic strokes, birth weight decrements, and cancers), the EPA used the cost of illness (COI) valuation approach. The COI-based values used in this analysis reflect medical care expenditures and opportunity costs associated with managing/treating the condition. The health endpoint-specific morbidity valuation details are provided in Sections 6.4.4, 6.5.4, 6.6.4, and 6.7.2.5. The EPA received public comments on the proposed rule that recommended the EPA incorporate willingness to pay metrics in addition to COI in its final estimates of non-fatal health effects associated with reduced PFAS exposure. To address these comments, the EPA developed a sensitivity analysis in Appendix O to illustrate the impact to benefits results when using available willingness to pay information to monetize cancer morbidity.

## 2.3 Document Organization

The remainder of this EA is organized into the following chapters:

- Chapter 2: Introduction summarizes the final PFAS rule and regulatory alternatives, including the economic assumptions made in developing the rule.

- Chapter 3: Need for the Rule summarizes the statutory requirements, regulatory actions, and national EPA initiatives affecting PFAS in drinking water. It also explains the contributors to the PFAS rule, statutory authority, and the economic rationale for the regulatory approach.

- Chapter 4: Baseline Drinking Water System Conditions describes the systems subject to the final PFAS rule, PFAS water concentration levels, and data sources used to characterize the baseline before the EPA models estimated changes that result from complying with the final PFAS requirements.

- Chapter 5: Estimating Public Water System Costs provides a description of the estimated costs for the final regulatory changes affecting systems and Primary Agencies.

- Chapter 6: Benefits Analysis provides an estimate of the potential health benefits of the final PFAS rule and regulatory alternatives relative to the baseline, including quantification and monetization where possible.

---

[5] Income growth projections from the U.S. Energy Information Administration (2021) are available through 2050. The EPA uses these projections to calculate annual VSL values in $2022 from years 2024 to 2050 as described in Equation J-1 in Appendix J. The EPA uses these calculated VSL values to estimate a compound annual growth rate (see Equation J-2 in Appendix J) and applies this growth rate to estimate annual VSL values beyond year 2050 (see Equation J-3 in Appendix J).

- Chapter 7: Comparison of Costs to Benefits provides a summary of costs and benefits associated with the provisions of the final PFAS rule.

- Chapter 8: Environmental Justice Analysis provides a description of how the final PFAS rule addresses Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations.

- Chapter 9: Statutory and Administrative Requirements discusses analyses performed to evaluate the effects of the final PFAS rule and regulatory alternatives on different segments of the population in accordance with 12 federal mandates and statutory reviews, including but not limited to the Final Regulatory Flexibility Analysis/Small Business Regulatory Enforcement Fairness Act (RFA/SBREFA), Unfunded Mandates Reform Act (UMRA), and Executive Order 14008: Tackling the Climate Crisis at Home and Abroad.

- Chapter 10: References includes a list of references cited throughout the final PFAS rule economic analysis.

## 2.4 Supporting Documentation

This EA involves numerous detailed and complex analyses, and the following appendices are provided to help the reader understand how those analyses were conducted and their underlying data and assumptions:

- Appendix A: Framework of Bayesian Hierarchical Markov Chain Monte Carlo Occurrence Model

- Appendix B: Affected Population

- Appendix C: Cost Analysis Results

- Appendix D: PFOA and PFOS Serum Concentration-Birth Weight Relationship

- Appendix E: Effects of Reduced Birth Weight on Infant Mortality

- Appendix F: Serum Cholesterol Dose-Response Functions

- Appendix G: CVD Benefits Model Details and Input Data

- Appendix H: Cancer Benefits Model Details and Input Data

- Appendix I: Trihalomethane Co-Removal Model Details and Analysis

- Appendix J: Value of a Statistical Life Updating

- Appendix K: Benefits Sensitivity Analyses

- Appendix L: Uncertainty Characterization Details and Input Data

- Appendix M: Environmental Justice

- Appendix N: Supplemental Cost Analyses

- Appendix O: Supplemental Benefits Analyses

- Appendix P: Additional Model Outputs

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- Appendix Q: Appendix References

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# 3  Need for the Rule

This section provides the statutory and economic rationales for choosing a regulatory approach to address the public health consequences of PFAS contamination in drinking water. The EPA's statutory requirements, regulatory actions, and agency initiatives impacting PFAS in drinking water are discussed.

## 3.1 Previous EPA Nonregulatory and Regulatory Actions Potentially Affecting PFAS Drinking Water Management

This section provides a summary of actions and initiatives affecting PFAS in drinking water prior to the publication of the final NPDWR for PFAS. Additionally, states have begun proposing and promulgating their own regulatory and non-regulatory standards for PFAS in drinking water. For more information on these state actions, see the Environmental Council of the States' Processes & Considerations for Setting State PFAS Standards (ECOS, 2022).

### 3.1.1 PFAS Council and PFAS Strategic Roadmap

EPA Administrator Michael Regan established the EPA Council on PFAS in April 2021 and charged it to develop a bold, strategic, whole-of-EPA strategy to protect public health and the environment from the impacts of PFAS. The Council comprises senior technical and policy leaders from across EPA program offices and regions and is chaired by Assistant Administrator for Water Radhika Fox and Acting Region 1 Administrator Deb Szaro (U.S. EPA, 2021e).

On October 18, 2021, Administrator Regan announced the agency's PFAS Strategic Roadmap, developed by the PFAS Council to lay out the EPA's whole-of-agency approach to tackling PFAS. The PFAS Strategic Roadmap sets timelines by which the EPA plans to take specific actions and commits to bolder new policies to safeguard public health, protect the environment, and hold polluters accountable. Described in the Roadmap are key commitments the agency made toward addressing these contaminants in the environment. With this final rule, the EPA is delivering on a key commitment in the Roadmap to "establish a National Primary Drinking Water Regulation" (U.S. EPA, 2021e).

### 3.1.2 Final Regulatory Determinations on the Fourth Drinking Water Contaminant Candidate List

Section 1412(b)(1)(B)(i) of SDWA requires the EPA to publish the CCL every five years after public notice and an opportunity to comment. The CCL is a list of contaminants which are not subject to any final or promulgated NPDWRs but are known or anticipated to occur in PWSs and may require regulation under SDWA. SDWA Section 1412(b)(1)(B)(ii) directs the EPA to determine, after public notice and an opportunity to comment, whether to regulate at least five contaminants from the CCL every five years.

Under Section 1412(b)(1)(A) of SDWA, the EPA will regulate a contaminant in drinking water if the EPA Administrator determines that:

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

a)   The contaminant may have an adverse effect on the health of persons;

b)   The contaminant is known to occur or there is a substantial likelihood that the contaminant will occur in PWSs with a frequency and at levels of public health concern; and

c)   In the sole judgment of the Administrator, regulation of such contaminant presents a meaningful opportunity for health risk reduction for persons served by PWSs.

If after considering public comment on a preliminary determination, the EPA decides to regulate a contaminant, the EPA will initiate the process to propose and promulgate a NPDWR. In that case, the statutory time frame provides for agency proposal of a regulation within 24 months and action on a final regulation within 18 months of proposal.

On March 10, 2020, the EPA published preliminary positive regulatory determinations for PFOS and PFOA (85 FR 14098) (U.S. EPA, 2020a). On March 3, 2021, the EPA published final regulatory determinations for PFOS and PFOA (86 FR 12272) (U.S. EPA, 2021b). In doing so, the EPA also committed to evaluating a broader range of PFAS, including new monitoring and occurrence data, and other information being developed by the EPA, other federal agencies, state governments, international organizations, industry groups, and other stakeholders (U.S. EPA, 2021b).

### 3.1.3 Proposed PFAS National Primary Drinking Water Rule and Regulatory Determinations for PFHxS, PFNA, HFPO-DA, PFBS, and their Mixtures.

On March 14th, 2023, the EPA announced the PFAS NPDWR and requested comments on all aspects of the proposed rule. This action included determinations to regulate PFHxS, HFPO-DA and its ammonium salt (also known as a GenX chemicals), PFNA, and PFBS, and mixtures of these PFAS as contaminants. A summary of major public comments and agency responses to those comments are presented in the preamble for the final rule (U.S. EPA, 2024h). The agency's detailed response to the comments received are presented in the document "Response to Comments on the EPA's Proposed PFAS NPDWR" which is available in the public docket for this rule. The EPA received approximately 122,000 comments on these regulatory determinations and proposed NPDWR and considered commenter input in finalizing the rule and this economic analysis.

### 3.1.4 Unregulated Contaminant Monitoring Rule

As part of its responsibilities under the SDWA, the EPA implements Section 1445(a)(2), Monitoring Program for Unregulated Contaminants. This section requires that once every five years, the EPA issues a list of no more than 30 unregulated contaminants to be monitored by PWSs. This monitoring is implemented through the Unregulated Contaminant Monitoring Rule (UCMR), which collects data from community water systems and NTNCWS. For each UCMR cycle, the EPA establishes a new list of contaminants for monitoring, specifies which systems are required to monitor, identifies the sampling locations, and defines the analytical methods to be used.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                      APRIL 2024

The third Unregulated Contaminant Monitoring Rule (UCMR 3) was published on May 2, 2012. UCMR 3 required monitoring for six PFAS: PFOA, PFOS, PFNA, PFHxS, PFBS, and perfluoroheptanoic acid (PFHpA). UCMR 3 data were used in the development of this economic analysis. See Sections 4.2.2 and 4.4 for further discussion of these data.

On December 17, 2021, the EPA Administrator Michael Regan signed the final Revisions to the Unregulated Contaminant Monitoring Rule (UCMR 5) for Public Water Systems, and the rule was subsequently published in the Federal Register on December 27, 2021 (86 FR 73131). The five-year UCMR 5 cycle spans from 2022 to 2026, with preparations in 2022, sample collection from 2023 to 2025, and completion of data reporting in 2026. UCMR 5 includes all 29 PFAS that are within the scope of EPA Methods 533 and 537.1 (U.S. EPA, 2021b). Initial sampling results for UCMR 5 are available at: https://www.epa.gov/dwucmr/occurrence-data-unregulated-contaminant-monitoring-rule#5 and discussed in *PFAS Occurrence & Contaminant Background Support Document* (U.S. EPA, 2024g). In addition to information on occurrence data from previous rounds of UCMR sampling, when completed, permanent results for UCMR 5 will be available at: https://www.epa.gov/dwucmr/occurrence-data-unregulated-contaminant-monitoring-rule.

## 3.2 Statutory Authority for Promulgating the Rule

Section 1412(b)(1)(A) of SDWA authorizes the EPA to establish NPDWRs for contaminants that may have an adverse public health effect, that are known to occur or that present a substantial likelihood of occurring in PWSs at a frequency and level of public health concern, and that present a meaningful opportunity for health risk reduction for persons served by PWSs.

Section 1445(a) of SDWA authorizes the EPA Administrator to establish monitoring, recordkeeping, and reporting regulations that the Administrator can use to establish regulations under the SDWA, determine compliance with SDWA, and advise the public of the risks of unregulated contaminants (42 U.S.C. § 300j-4(a)). In requiring a PWS to monitor under Section 1445(a), the Administrator may take into consideration the water system size and the contaminants likely to be found in the system's drinking water (42 U.S.C. § 300j-4(a)). Section 1445(a)(1)(C) of the SDWA provides that "every person who is subject to a national primary drinking water regulation" under Section 1412 must provide such information as the Administrator may reasonably require to assist the Administrator in establishing regulations under Section 1412 (42 U.S.C § 300j-4(a)(1)(C)).

Section 1413(a)(1) of the SDWA allows the EPA to grant a state primary enforcement responsibility ("primacy") for NPDWRs when the EPA has determined that the state has, among other things, adopted regulations that are no less stringent than the EPA's (42 U.S.C. § 300g-2(a)(1)). To obtain primacy for this rule, states must adopt comparable regulations within two years of the EPA's promulgation of the final rule, unless the EPA grants the state a two-year extension (40 CFR 142.12(b)). State primacy requires, among other things, adequate enforcement (including monitoring and inspections) and reporting. The EPA must approve or deny state primacy applications within 90 days of submission to the EPA (42 U.S.C. § 300g-2(b)(2)). In some cases, a state submitting revisions to adopt a NPDWR has interim primary enforcement authority for the new regulation while the EPA's decision on the revision is pending (42 U.S.C. § 300g-2(c)).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Section 1450 of the SDWA authorizes the Administrator to prescribe such regulations as are necessary or appropriate to carry out his or her functions under the Act (42 U.S.C § 300j-9).

## 3.3 Economic Rationale

Section 1(b) of Executive Order 12866, "The Principles of Regulation," provides that each agency, as applicable and permitted by law: "shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new agency action) as well as assess the significance of that problem." This section describes the types of market failures that NPDWRs address.

In a perfectly competitive market, market forces guide buyers and sellers to attain the most efficient social outcome. A perfectly competitive market occurs when both buyers and sellers are price takers, usually when there are many producers and buyers of a product and both producers and buyers have complete knowledge about that product. Also, there must not be any barriers to entry into the industry, and existing producers in the industry must not have any advantage over potential new producers. Several factors in the public water supply industry preclude it from being a perfectly competitive market and lead to market failures that may require regulation.

First, it is not economically efficient to have multiple suppliers who would, for example, compete by building multiple systems of pipelines, reservoirs, wells, and other facilities. Instead, economic efficiency leads to a single firm or government entity performing these functions generally under public control. Under these monopoly conditions, consumers are provided only one level of service with respect to drinking water quality. If consumers do not believe that the quality of tap water is adequate, they cannot simply switch to another water utility. Consumers may purchase bottled water, but this option can be much more expensive due to the inefficiencies of bottling and transporting bottled water. Consumers may also install and operate home treatment systems, but this can also be considerably more expensive without the economies of scale of large, centralized water systems. Additionally, home treatment systems potentially can lead to increased health risks when not regularly maintained by the consumer.

Second, high information and transaction costs impede the public's understanding of health and safety issues concerning drinking water quality. The health risks potentially posed by trace quantities of drinking water contaminants requires the EPA to analyze and distill complex toxicological and health sciences data. The EPA promulgated the Consumer Confidence Report (CCR) rule to make water quality information more easily available to consumers. The CCR rule requires CWSs to mail their customers an annual report on local drinking water quality.

The report provides customers with information on levels of detected contaminants in their drinking water, limited health risk information associated with contaminant exposure when levels exceed MCLs, and utility contact information. Even if informed consumers can engage utilities regarding these health issues, the costs of such engagement, known as "transaction costs" (in this case measured in personal time and commitment), can be a barrier to efficient market outcomes.

SDWA regulations are intended to provide a level of protection from exposure to drinking water contaminants that would not otherwise occur in the existing market environment of public water supply. The regulations set minimum performance requirements for all public water supplies to

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

reduce the risk confronted by all consumers from exposure to drinking water contaminants. SDWA regulations are not intended to restructure market mechanisms or establish competition in supply; rather, SDWA standards establish the level of service needed to better reflect the public's preference for safety. Federal regulations remove the high information and transaction costs by acting on behalf of all consumers in balancing the risk reduction and social costs of achieving this reduction.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# 4  Baseline Drinking Water System Conditions

## 4.1 Introduction

In its *Guidelines for Preparing Economic Analyses*, the EPA characterizes the baseline as a reference point that reflects the world without the regulation (U.S. EPA, 2010a); this baseline is the starting point for estimating the potential benefits and costs of the final PFAS NPDWR.

This chapter presents a characterization of PWSs and their current operations (i.e., the baseline) before changes are made to meet the final PFAS NPDWR. Section 4.2 identifies each major data source used to develop the baseline. Section 4.3 explains the derivation of each baseline characteristic and presents results in detailed tables. Section 4.4 describes the Bayesian model developed to estimate national PFAS occurrence in drinking water supplies. Section 4.5 summarizes limitations of the major data sources and uncertainties in the baseline characterization (both quantified and nonquantifiable) in table format.

## 4.2 Data Sources

The EPA used a variety of data sources to develop the baseline. Section 4.2.1 explains the relevant information provided in the federal version of the SDWIS/Fed and measures the EPA took to verify the data. Section 4.2.2 describes the purpose of UCMR 3 data. Section 4.2.3 describes the independent state sampling program data. Sections 4.2.4 and 4.2.5 describe two data sources used to develop key characteristics of system treatment plants. Section 4.2.6 explains the purpose of the 2006 Community Water System Survey (CWSS) and the representativeness of the data. Table 4-1 identifies each major data source and the baseline data element(s) derived from them.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

**Table 4-1: Data Sources Used to Develop the Water System Characteristics**

| Data Source | Baseline Data Derived from the Source |
|---|---|
| SDWIS/Fed fourth quarter 2021 Q4 "frozen" dataset[a] | • Water System Inventory (Section 4.3.1): PWS inventory, including system unique identifier, population served, number of service connections, source water type, and system type.<br>• Population and Households Served (Section 4.3.2): PWS population served.<br>• Treatment Plant Characterization (Section 4.3.3.1): Number of unique treatment plant facilities per system, which are used as a proxy for entry points (EPs) when UCMR 3 sampling site data are not available. |
| UCMR 3 (U.S. EPA, 2017) | • Treatment Plant Characterization (Section 4.3.3): Number of unique EP sampling sites, which are used as a proxy for EPs.<br>• Treatment Plant Characterization (Section 4.3.3): PFAS concentration data collected as part of UCMR 3. |
| Independent state sampling programs | • Treatment Plant Characterization (Section 4.3.3): PFAS concentration data collected by states. These data supplemented the occurrence modeling for systems included in UCMR 3. |
| SYR4 ICR Occurrence Dataset (2012-2019) | • Treatment Plant Characterization (Section 4.3.3): TOC. |
| Geometries and Characteristics of PWSs (U.S. EPA, 2000) | • Treatment Plant Characterization (Section 4.3.3): Design and average daily flow per system. |
| 2006 CWSS (U.S. EPA, 2009) | • PWS Labor Rates (Section 4.3.4): PWS labor rates. |

Abbreviations: CWSS – Community Water System Survey; ICR – Information Collection Request; PFAS – per- and polyfluoroalkyl substances; PWS – public water system; SDWIS/Fed – Safe Drinking Water Information System/federal version; SYR – Six-Year Review; TOC – total organic carbon; UCMR 3 – Third Unregulated Contaminant Monitoring Rule.
Note:
[a]Contains information extracted on January 14, 2022.

## 4.2.1 SDWIS/Fed 2021

SDWIS/Fed (U.S. EPA, 2021h) is the EPA's national regulatory compliance database for the drinking water program. It contains system inventory, treatment facility, violation, and enforcement information for PWSs as reported by primacy agencies, EPA regions, and EPA headquarters personnel. Primacy agencies report data quarterly to the EPA. The information presented in the EA is based on the fourth quarter 2021 "frozen" dataset that was extracted on January 14, 2022.

SDWIS/Fed contains information to characterize the inventory of PWSs, namely: system name and location; retail population served, source water type, and PWS type.

### 4.2.1.1 PWS Type

The EPA defines a PWS as a system that provides water for human consumption through pipes or other constructed conveyances to at least 15 service connections or regularly serves an average of at least 25 individuals per day for at least 60 days per year (U.S. EPA, 2021h). Systems are categorized as follows:

- CWSs are systems that supply water to the same population year-round.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- Non-community water systems (NCWSs) are systems that supply water to a varying population or one that is served less than year-round; these are sub-categorized as:
  - o Non-transient non-community water systems (NTNCWSs) are systems that are not CWSs and that regularly supply water to at least 25 of the same people at least six months per year (e.g., schools).
  - o Transient non-community water systems (TNCWSs) are NCWSs that do not meet the non-transient criterion; they provide water in places such as gas stations or seasonal campgrounds where people do not remain for long periods of time.

A final rule to limit PFAS in drinking water would not apply to TNCWSs. Therefore, system inventories in this analysis are classified into two categories: CWSs and NTNCWSs.

### 4.2.1.1.1 Population Served

Systems are also categorized by the number of people they serve.[6] The following nine categories of populations served by systems are used throughout this EA:

- $\leq 100$
- 101–500
- 501–1,000
- 1,001–3,300
- 3,301–10,000
- 10,001–50,000
- 50,001–100,000
- 100,001–1,000,000 (1M)
- >1M

The EPA uses these system size categories based on distinctions in the way systems operate as the amount of water supplied and number of service connections increases. Systems within each size category can be expected to face similar implementation and cost challenges when complying with the new regulatory requirements for this final rule.

### 4.2.1.1.2 Source Water Type

SDWIS/Fed classifies system by source water using the following six categories:

- Ground water
- Ground water purchased

---

[6] SDWIS/Fed classifies systems according to "retail" population that does not include the population served by other systems that purchase water from them.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- Ground water under the direct influence (GWUDI)[7]

- Ground water under the direct influence purchased (purchased GWUDI)

- Surface water

- Surface water purchased

For this analysis, the EPA broadly categorized systems as surface water if any of their sources are surface water, surface water purchased, GWUDI, or purchased GWUDI. Systems are classified as ground water if they exclusively used ground water or purchased ground water.[8]

### 4.2.1.1.3 Facilities

SDWIS/Fed provides additional information on system facilities, including the type of facility, its activity status, and a unique facility identification number.

## 4.2.1.2 Verification of SDWIS/Fed Data

The EPA routinely conducts program reviews to verify whether information in the primacy agencies' databases and files, such as inventory and violations for all regulations are correctly represented in SDWIS/Fed. Between 2006 and 2016, the EPA recorded the findings from these reviews in the national Error Code Tracking Tool (ECTT) (U.S. EPA, 2007b). The ECTT contains, as individual records, all actions assessed during each program review. The EPA identifies records as confirmed actions (correct compliance determinations and correct reporting to SDWIS/Fed), compliance determination discrepancies (incorrect compliance determinations), or data flow discrepancies (correct compliance determination but incorrect reporting). This section presents data from the ECTT from program reviews conducted from 2006 to 2016 related to system inventory.

It is important to note that treatment data (objective codes and process codes for plants in SDWIS/Fed) are not evaluated during program reviews and therefore have more uncertainty associated with the data as compared to inventory and compliance data.

### 4.2.1.2.1 System Inventory

From 2006 to 2016 the EPA evaluated inventory data for a total of 2,180 systems. Prior to August 2007, the program reviews evaluated eight inventory fields: system type, system status, activity status, source type, population, service connection, administrative contact, and administrative address. After August 2007, the reviews did not include administrative contact or address. In addition, in August 2007, the review policy changed so that discrepancies for

---

[7] 40 CFR Section 141.2 defines ground water under the direct influence of surface water as "any water beneath the surface of the ground with significant occurrence of insects or other macroorganisms, algae, or large-diameter pathogens such as Giardia lamblia or Cryptosporidium, or significant and relatively rapid shifts in water characteristics such as turbidity, temperature, conductivity, or pH which closely correlate to climatological or surface water conditions."

[8] 23 CWS and 11 NTNCWS have an unknown primary water source. For purposes of this analysis, the EPA assigned these systems to the source type ground water.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

inventory were only identified if they affected monitoring requirements (e.g., a change in population that would increase or decrease the minimum number of required samples).

Of the inventory fields evaluated from 2006 to 2016, only 82 (<1%) inventory discrepancies were identified. Furthermore, some of these discrepancies, such as those related to administrative contact and address, may not impact the PWS baseline characterization. The inventory data in ECTT indicate a high degree of completeness and accuracy in SDWIS/Fed as of 2016, and the EPA expects that the information is largely representative of the regulated PWS.

## 4.2.2 Unregulated Contaminant Monitoring Rule

Every five years, the EPA issues a new list of no more than 30 unregulated contaminants to be monitored by PWSs. UCMR 3 was published in 2012 and required monitoring for six PFAS from 2013-2015: PFOA, PFOS, PFBS, PFNA, PFHxS, and PFHpA. The final UCMR 3 dataset of analytical results was released in January 2017.

Under UCMR 3, all CWSs and NTNCWSs with more than 10,000 retail customers and a representative sample of 800 systems serving 10,000 or fewer retail customers were required to conduct assessment monitoring to collect occurrence data for the listed contaminants suspected to be present in drinking water but that do not have health-based standards set under the SDWA.

Systems conducted assessment monitoring over one consecutive 12-month period between January 2013 and December 2015. Ground water systems were required to monitor twice during that period, with sampling events occurring five to seven months apart. Surface water systems were required to monitor in four consecutive quarters, with sampling events occurring three months apart. For the PFAS compounds, sampling was conducted at the entry point (EP) to the distribution system post treatment.

The fifth UCMR (UCMR 5), published December 2021, requires sample collection and analysis for 29 PFAS to occur between January 2023 and December 2025 using analytical methods developed by the EPA and consensus organizations. In the Federal Register Notice for this rulemaking, the EPA describes the small subset (7%) of data released as of August 2023, the limitations with considering an incomplete dataset, and that findings from analyses of these data are generally confirmatory of the EPA's other occurrence analyses. Because of the partial nature of this dataset, the EPA has not used it to characterize baseline occurrence in this EA.

## 4.2.3 Independent State Sampling Programs

The EPA used state monitoring data from 20 states (Alabama, Colorado, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, North Dakota, Ohio, South Carolina, Tennessee, Vermont, and Wisconsin). These states conducted non-targeted monitoring (i.e., random sampling) of finished drinking water for one or more of the four PFAS in this analysis.

## 4.2.4 Six-Year Review Data

The EPA used information from the fourth Six-Year Review Information Collection Request (ICR) Dataset ("SYR4 ICR dataset") to characterize the total organic carbon (TOC) level for

individual systems. The SYR4 ICR dataset is the most comprehensive and current national drinking water occurrence dataset, containing millions of records of water system compliance monitoring data and treatment technique information for regulated chemical, radiological, and microbiological contaminants collected from 2012 through 2019. The portion of the dataset containing the TOC information was made publicly available in August 2022.[9]

## 4.2.5 Geometries and Characteristics of Public Water Systems (2000)

An important factor in determining costs of treatment is average daily flow and design flow, measured in gallons per day or million gallons per day (MGD), at a treatment plant. The EPA estimated the average daily flow and design flow for each EP in the system based on the relationship between retail population and flow as derived in the EPA's *Geometries and Characteristics of Public Water Systems* report (U.S. EPA, 2000).

Utilizing data from the 1995 CWSS, the EPA conducted an extensive data-cleaning process[10] to develop a dataset of 1,734 records with paired responses for population and total average daily flow. These data were then weighted to account for non-responses to individual questions from the CWSS. The EPA used this dataset to develop regression equations that predict average daily flow based on retail population served (for both publicly-owned and privately-owned systems). The data show a strong correlation as indicated by a high R-squared value of 0.90. Additional information and background data are provided in Chapter 4 of the *Geometries and Characteristics of Public Water Systems* report (U.S. EPA, 2000).

## 4.2.6 Community Water System Survey (2006)

The EPA periodically conducts the CWSS to obtain data to support the agency's development and evaluation of drinking water regulations. The 2006 CWSS is the most recent survey. For this EA, the EPA relied on the national average estimates of unit labor from the 2006 CWSS to derive the unit labor rates.

The EPA selected the CWSS as a data source because it is based on a nationally representative sample of CWSs. The sample was drawn from SDWIS/Fed, which includes approximately 50,000 systems in the 50 states and the District of Columbia. The survey used a stratified random sample design to ensure the sample was representative. The EPA selected a survey sample of 2,210 systems, including all systems serving populations of 100,000 or more. In the 2006 CWSS, the agency took additional steps to improve response rates, ensure accurate responses, and reduce the burden of the survey on systems, especially systems serving 3,300 or fewer persons. The EPA sent water system experts to collect data from systems serving 3,300 or fewer persons. For systems serving more than 3,300 people, the agency mailed the survey, made available a spreadsheet and Web-based version of the questionnaire, and provided extensive assistance through e-mail and a toll-free telephone hotline. The survey was designed to collect data for the

---

[9] Available at: https://www.epa.gov/dwsixyearreview/microbial-and-disinfection-byproduct-data-files-2012-2019-epas-fourth-six-year
[10] The EPA adjusted the dataset to remove non-zero values; adjusted flow if needed to represent retail flow only removing wholesale water flow; and adjusted for reporting discrepancies in population, flow, or service connections.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

year 2006. Full-scale data collection occurred from June to December 2007. The overall response rate was 59 percent with a total of 1,314 systems responding; 95 percent of selected systems serving 3,300 or fewer persons (representing 571 of 600 systems sampled) participated in the survey (U.S. EPA, 2009).

## 4.3 Drinking Water System Baseline/Industry Profile

This section presents the following baseline characterizations for the purposes of estimating costs and benefits for the final rule. Section 4.3.1 provides a characterization of the inventory of systems subject to the final rule (CWSs and NTNCWSs). Section 4.3.2 includes the population served by CWSs and NTNCWSs and the number of households served by CWSs. Section 4.3.3 provides treatment plant characteristics used to determine treatment costs. Section 4.3.4 describes the derivation of PWS labor rates. Finally, Section 4.3.5 describes the cost of capital rates used to estimate household-level costs. Each section includes a characterization of the baseline for CWSs, followed by NTNCWSs, if applicable, and a characterization of data limitations and uncertainty. TNCWSs are not subject to the final rule.

### 4.3.1 Water System Inventory

A key component of the baseline is the inventory of systems—both CWSs and NTNCWSs— subject to the final rule. As shown in Table 4-2, approximately 81 percent of all CWSs serve 3,300 or fewer people (39,746 of the total systems), and those serving 500 or fewer account for about 54 percent of all CWSs (26,742 of the total systems). CWSs serving 3,301–50,000 people represent about 17 percent of all CWSs (8,422 of the total systems), and those serving more than 50,000 people account for only about 2 percent (1,025 of the total systems). Most CWSs (about 77 percent or 37,733 systems) use ground water as their primary source. Most systems serving more than 10,000 people, however, are classified as surface water systems (about 63 percent or 2,817 systems).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                APRIL 2024

**Table 4-2: Inventory of CWSs**

| System Size (Population Served) | CWSs[a] | | |
| | Ground Water | Surface Water | Total |
| | A | B | C = A + B |
|---|---|---|---|
| ≤ 100 | 10,654 | 739 | 11,393 |
| 101–500 | 13,037 | 2,042 | 15,079 |
| 501–1,000 | 4,132 | 1,179 | 5,311 |
| 1,001–3,300 | 5,503 | 2,460 | 7,963 |
| 3,301–10,000 | 2,784 | 2,223 | 5,007 |
| 10,001–50,000 | 1,385 | 2,030 | 3,415 |
| 50,001–100,000 | 162 | 417 | 579 |
| 100,001–1M | 74 | 347 | 421 |
| > 1M | 2 | 23 | 25 |
| TOTAL | 37,733 | 11,460 | 49,193 |

Abbreviations:  CWS – community water systems.
Note:
[a]Includes 23 CWSs serving 10,000 or fewer people for which no primary source water type was reported to SDWIS/Fed. The EPA assigned these systems to the source type of ground water.
*Source: SDWIS/Fed fourth quarter 2021 "frozen" dataset that contains information reported through January 14, 2022. Includes all active CWSs.*

As shown in Table 4-3, approximately 99 percent of all NTNCWSs serve 3,300 or fewer people (17,135 of the total). NTNCWSs serving 3,301 – 50,000 people account for about 1 percent of all NTNCWSs (200 of the total). Only two NTNCWSs serve more than 50,000 people, and none serve more than 1 million people. Most NTNCWSs (about 95 percent or 16,531 systems) use ground water as their primary source. Approximately 51 percent (21 systems) of those serving 10,001–100,000 people use surface water versus ground water and the one system serving 100,001–1 million people is classified as a surface water system.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                        APRIL 2024

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 4-3: Inventory of NTNCWSs**

| System Size (Population Served) | NTNCWSs[a] | | |
| --- | --- | --- | --- |
| | Ground Water | Surface Water | Total |
| | A | B | C=A+B |
| ≤ 100 | 8,084 | 252 | 8,336 |
| 101–500 | 6,111 | 257 | 6,368 |
| 501–1,000 | 1,476 | 91 | 1,567 |
| 1,001–3,300 | 743 | 121 | 864 |
| 3,301–10,000 | 97 | 63 | 160 |
| 10,001–50,000 | 20 | 20 | 40 |
| 50,001–100,000 | 0 | 1 | 1 |
| 100,001–1M | 0 | 1 | 1 |
| > 1M | 0 | 0 | 0 |
| TOTAL | 16,531 | 806 | 17,337 |

Abbreviations:  NTNCWS – non-transient non-community water systems.
Notes:
[a]Includes 11 NTNCWSs serving 3,300 or fewer people for which no primary source type was reported to SDWIS/Fed. The EPA assigned these systems to the source water type of ground water.
*Source: SDWIS/Fed fourth quarter 2021 "frozen" dataset that contains information reported through January 14, 2022. Includes all active NTNCWSs.*

FINAL RULE                                                                    APRIL 2024

There is uncertainty in the approach used to assign source water type to the 23 CWSs and 11 NTNCWSs where no primary source type was reported to SDWIS/Fed. This analysis assumes that these systems have ground water as their primary source based on the preponderance of ground water systems in the inventory. This could result in an under- or overestimate of costs in those instances where the cost model inputs vary by source type (e.g., number of EPs per system); however, the EPA expects the impact to be low because the systems without a source type in SDWIS/Fed represent a small proportion of systems subject to the rule (23 of the total 49,193 CWSs and 11 of the total 17,337 NTNCWSs or 0.05 percent of all systems subject to the rule) and all serve fewer than 10,000 people.

## 4.3.2 Population and Households Served

It is necessary to have an accurate characterization of population served by water systems when assessing the potential benefits of a final regulation. Population is also an input for estimating treated water volumes and associated granular activated carbon (GAC) or ion exchange (IX) costs.

SDWIS/Fed tracks "retail" population served, meaning that it counts only the population that purchases water directly from the water system, not the population of a system's wholesale customers. The systems that purchase water appear in SDWIS/Fed as a separate system with a unique PWS identification (PWSID) number.

Table 4-4 and Table 4-5 show the total population served and average population served per system by size category for CWSs and NTNCWSs, respectively. Each exhibit is organized by source water type (surface water or ground water) and is based on the SDWIS/Fed fourth quarter 2021 "frozen" dataset that contains information reported by primacy agencies through January 14, 2022.

Because systems often pass some or all of their costs onto customers in the form of rate increases, the final rule cost analysis also includes analyses to assess the impact of the rule requirements on annual household expenditures. The EPA estimated the number of households served by affected CWSs by dividing the population for each system size category by the average number of people per household. For CWSs, the EPA assumed an average of 2.53 persons per household based on 2020 U.S. Census data (U.S. Census Bureau, 2020b). This information is also included in Table 4-4 by system size and source type. NTNCWSs do not serve households, thus, this information is not included in Table 4-5.

As shown in Table 4-4, although CWSs serving 3,300 or fewer people account for approximately 81 percent of all CWSs, they serve fewer than 8 percent of the population and households that receive their water from a CWS. Although CWSs serving more than 50,000 people account for only 2 percent of all CWSs, they serve more than half (59 percent) of the population and households that receive their water from a CWS.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 4-4: Population and Number of Households Served by CWSs**

| System Size (Population Served) | Ground Water[c] | | | Surface Water | | | TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|
| | Population Served | Average Population Per System | Number of Households Served | Population Served | Average Population Per System | Number of Households Served | Population Served | Average Population Per System | Number of Households Served |
| | A | B[a] | $C = A/2.53^b$ | D | E[a] | $F = D/2.53^b$ | G | H[a] | $I = G/2.53^b$ |
| ≤ 100[d] | 652,335 | 61 | 257,840 | 45,231 | 61 | 17,878 | 697,566 | 61 | 275,718 |
| 101–500 | 3,254,293 | 250 | 1,286,282 | 576,601 | 282 | 227,906 | 3,830,894 | 254 | 1,514,187 |
| 501–1,000 | 3,032,366 | 734 | 1,198,564 | 883,656 | 749 | 349,271 | 3,916,022 | 737 | 1,547,835 |
| 1,001–3,300 | 10,264,020 | 1,865 | 4,056,925 | 4,935,965 | 2,006 | 1,950,974 | 15,199,985 | 1,909 | 6,007,899 |
| 3,301–10,000 | 15,794,291 | 5,673 | 6,242,803 | 13,633,206 | 6,133 | 5,388,619 | 29,427,497 | 5,877 | 11,631,422 |
| 10,001–50,000 | 28,665,202 | 20,697 | 11,330,119 | 46,262,480 | 22,789 | 18,285,565 | 74,927,682 | 21,941 | 29,615,685 |
| 50,001–100,000 | 10,889,918 | 67,222 | 4,304,315 | 29,350,794 | 70,386 | 11,601,104 | 40,240,712 | 69,500 | 15,905,420 |
| 100,001–1M | 15,082,760 | 203,821 | 5,961,565 | 84,675,709 | 244,022 | 33,468,660 | 99,758,469 | 236,956 | 39,430,225 |
| > 1M | 3,400,000 | 1,700,000 | 1,343,874 | 44,266,001 | 1,924,609 | 17,496,443 | 47,666,001 | 1,906,640 | 18,840,317 |
| TOTAL[e] | 91,035,185 | 2,413 | 35,982,287 | 224,629,643 | 19,601 | 88,786,420 | 315,664,828 | 6,417 | 124,768,707 |

Abbreviations: CWS – community water systems.
Notes:
[a] B, E, and H: Derived by dividing the population served by the number of systems presented in Table 4-2.
[b] C, F, and I: The average of 2.53 persons per household is from 2020 U.S. Census data (Table AVG1. Average Number of People per Household, by Race and Hispanic Origin/1, Marital Status, Age, and Education of Householder: 2020).
[c] CWSs with unreported primary source were assumed to be ground water systems. Thus, the ground water column reflects an additional 23 CWSs with unreported primary source type.
[d] The EPA removed any CWS wholesaler serving less than 25 people from the analysis and assumed that any remaining CWS had a minimum possible population of 25.
[e] Numbers may not sum to total because of rounding.
*Source for A, D, and G: SDWIS/Fed fourth quarter 2021 "frozen" dataset that contains information reported through January 14, 2022.*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                                      APRIL 2024

As previously discussed, NTNCWSs serving 3,300 or fewer people account for approximately 99 percent of all NTNCWSs. As shown in Table 4-5, these systems serve approximately 70 percent of the population that receives their water from an NTNCWS. Those serving 3,301–50,000 people and more than 50,000 people serve approximately 26 percent and 4 percent of the population that receives water from an NTNCWS, respectively.

### Table 4-5: Population Served by NTNCWSs

| System Size (Population Served) | Ground Water[b] | | Surface Water | | TOTAL | |
|---|---|---|---|---|---|---|
| | Population Served | Average Population Per System | Population Served | Average Population Per System | Population Served | Average Population Per System |
| | A | B[a] | D | E[a] | F | G[a] |
| ≤ 100[c] | 452,516 | 56 | 12,534 | 50 | 465,050 | 56 |
| 101–500 | 1,513,562 | 248 | 69,046 | 269 | 1,582,608 | 249 |
| 501–1,000 | 1,049,638 | 711 | 68,235 | 750 | 1,117,873 | 713 |
| 1,001–3,300 | 1,241,973 | 1,672 | 239,516 | 1,979 | 1,481,489 | 1,715 |
| 3,301–10,000 | 511,494 | 5,273 | 377,219 | 5,988 | 888,713 | 5,554 |
| 10,001–50,000 | 397,246 | 19,862 | 414,099 | 20,705 | 811,345 | 20,284 |
| 50,001–100,000 | 0 | 0 | 71,963 | 71,963 | 71,963 | 71,963 |
| 100,001–1M | 0 | 0 | 203,375 | 203,375 | 203,375 | 203,375 |
| > 1M | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL[d] | 5,166,429 | 313 | 1,455,987 | 1,806 | 6,622,416 | 382 |

Abbreviations:  NTNCWS – non-transient non-community water systems.
Notes:
[a]B, E, and G: Derived by dividing the population served by the number of systems presented in Table 4-3.
[b]NTCWSs with unreported primary source were assumed to be ground water systems. Thus, the "Ground Water" column reflects an additional 11 NTCWSs with unreported primary source type.
[c]The EPA assumed any non-wholesale NTNCWS had a minimum possible population of 25.
[d]Numbers may not sum to total because of rounding.
Source for A, D, and F: SDWIS/Fed fourth quarter 2021 "frozen" dataset that contains information reported through January 14, 2022.

As noted previously, the EPA consistently classifies systems in SDWIS/Fed according to the retail population served by the system and does not include the population served by wholesale customers. Wholesale customers who purchase water from another system and meet the PWS definition have their own unique PWSID, retail population, and associated regulatory requirements under SDWA. The EPA uses retail population to estimate design and average daily flow parameters, which are then used to estimate treatment costs associated with the rule. Use of retail population may overestimate aggregate costs by assuming that each system will have an individual treatment plant instead of the more common scenario of the seller having one large plant and selling treated water to their wholesale customers. Because of returns to scale in treatment capital costs, the cost of a single large plant will be less than the sum of the costs across several small plants treating the same aggregate flow.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

In addition, given that some of the reported population values would create inconsistencies in the analysis, the EPA removed any CWS wholesaler serving less than 25 people from its analysis and assumed that any remaining CWS had a minimum possible population of 25. The EPA assumed any non-wholesale NTNCWS had a minimum possible population of 25.

## 4.3.3 Treatment Plant Characterization/Production Profile

This section explains the baseline inputs for the following treatment-related PWS characteristics. Section 4.3.3.1 discusses the EPs per system characterization. Section 4.3.3.2 discusses the EPA's TOC baseline assumptions and Section 4.3.3.3 presents the estimation method and the computed average daily flows and design flows by system type and size.

### 4.3.3.1 Entry Points Per System

EPs are the point of compliance for the final rule and systems can have multiple EPs. The EPA developed estimates of EPs per system using UCMR 3 unique sampling points, SDWIS/Fed facility data, and a modeled frequency distribution.

UCMR 3 required a subset of CWSs and NTNCWSs to conduct assessment monitoring for six PFAS compounds.[11] The data record a unique identifying number for the EP sample location(s) for each system. Given the information provided, the EPA assumes that the number of unique sample point IDs per system approximates the total number of EPs per system.

For systems without UCMR 3 occurrence data, the EPA developed estimates based on SDWIS/Fed facilities data. The SDWIS/Fed data include unique identification numbers for system facilities, as well as facility type and activity status. This analysis relies on active facilities identified as treatment plants. Using the assumption that treatment plants are associated with one EP, the SDWIS/Fed facility data provide an approximation for the number of EPs per system when a system does not have UCMR 3 occurrence data. The EPA considers the UCMR 3 sampling point data to be of higher quality than the SDWIS/Fed treatment facility data. If the SDWIS/Fed treatment facility data value for a system exceeded the maximum number found for the equivalent system size and source water combination in the UCMR 3 data, the EPA limited the system EP value to the UCMR3 maximum number of EPs.

For systems without UCMR 3 occurrence data or SDWIS/Fed facility data, the EPA relies on an estimate of the number of EPs. The estimated value for each system with missing EP count data was imputed from known EP counts for stratified SDWIS/Fed data. Within each stratum, defined by a combination of system size and source water, the EPA sampled from systems with known EP counts. Sampling was done with replacement after truncating the EP counts to the maximum recorded in UCMR 3. For reproducibility, the EPA performed this sample-based imputation in R using the 'base::sample' function (R Core Team, 2021).

---

[11] UCMR 3 required all systems serving more than 10,000 people to collect and analyze samples for PFOA, PFOS, PFNA, PFHxS, PFBS, and PFHpA at each distribution system entry point. The EPA also identified a stratified random sample of 800 small systems serving up to 10,000 people to collect samples for these six PFAS.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Following this process, the EPA relies on sample point values recorded in UCMR 3 for 5,419 systems, SDWIS/Fed facility data for 43,563 systems, and imputed EP values for 17,523 systems. All systems have at least one EP. Among CWSs, the maximum number of EPs is 202, and the mean is 1.80. Among NTNCWSs, the maximum number of EPs is 22, and the mean is 1.31.

Table 4-6 summarizes the final frequency distribution of EP input ranges for each CWS stratum of size and source water combination. Table 4-7 summarizes the final frequency distribution of EP input ranges for each NTNCW stratum of size and source water combination. These distributions are used to proportionally assign numbers of EPs to systems in each system size and type category.[12]

---

[12] The SDWIS/Fed data provide information on the PWS characteristics that typically define PWS categories, or strata, for which the EPA develops costs in rulemakings. These characteristics include system type (CWS, NTNCWS), number of people served by the PWS, PWS's primary raw water source (ground water or surface water), PWS's ownership type (public or private), and PWS state. For more information on the use of baseline and compliance characteristics to define model systems in the EPA's cost analysis, please see Section 5.2.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                APRIL 2024

**Table 4-6: Frequency Distribution of EP Inputs for CWSs**

| System Size | Ground Water | | | | | | | Surface Water | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 EP | 2–5 EP | 6–10 EP | 11–15 EP | 16–20 EP | 21–100 EP | > 100 EP | 1 EP | 2–5 EP | 6–10 EP | 11–15 EP | 16–20 EP | 21–100 EP | > 100 EP |
| ≤ 100 | 90% | 10% | 0.1% | 0 | 0 | 0 | 0 | 87% | 13% | 0 | 0 | 0 | 0 | 0 |
| 101–500 | 76% | 24% | 0 | 0 | 0 | 0 | 0 | 84% | 16% | 0 | 0 | 0 | 0 | 0 |
| 501–1,000 | 62% | 38% | 0.5% | 0 | 0 | 0 | 0 | 76% | 23% | 0.8% | 0 | 0 | 0 | 0 |
| 1,001–3,300 | 48% | 50% | 1% | 0 | 0 | 0 | 0 | 70% | 30% | 0.7% | 0 | 0 | 0 | 0 |
| 3,301–10,000 | 32% | 59% | 8% | 0.9% | 0.1% | 0 | 0 | 54% | 43% | 3% | 0.5% | 0.04% | 0 | 0 |
| 10,001–50,000 | 3% | 58% | 28% | 7% | 3% | 1% | 0.07% | 3% | 82% | 10% | 2% | 1% | 0.6% | 0 |
| 50,001–100,000 | 0 | 51% | 25% | 8% | 8% | 9% | 0 | 0.2% | 74% | 13% | 6% | 2% | 4% | 0 |
| 100,001–1M | 0 | 34% | 22% | 11% | 8% | 24% | 1% | 0.3% | 67% | 13% | 4% | 9% | 6% | 0.3% |

Abbreviations:  CWS – community water systems; EP – entry point.

**Table 4-7: Frequency Distribution of EP Inputs for NTNCWSs**

| System Size | Ground Water | | | | | Surface Water | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 EP | 2–5 EP | 6–10 EP | 11–20 EP | > 20 EP | 1 EP | 2–5 EP | 6–10 EP | 11–20 EP | > 20 EP |
| ≤ 100 | 84% | 16% | 0.4% | 0 | 0 | 82% | 18% | 0 | 0 | 0 |
| 101–500 | 81% | 19% | 0 | 0 | 0 | 74% | 26% | 0 | 0 | 0 |
| 501–1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1,001–3,300 | 68% | 30% | 2% | 0 | 0 | 61% | 31% | 8% | 0 | 0 |
| 3,301–10,000 | 53% | 44% | 2% | 1% | 0 | 35% | 44% | 14% | 6% | 0 |
| 10,001–50,000 | 10% | 80% | 0 | 10% | 0 | 30% | 40% | 5% | 20% | 5% |
| 50,001–100,000 | 0 | 0 | 0 | 0 | 0 | 0 | 100% | 0 | 0 | 0 |
| 100,001–1M | 0 | 0 | 0 | 0 | 0 | 0 | 100% | 0 | 0 | 0 |

Abbreviations: NTNCWS – non-transient non-community water systems; EP – entry point.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 4.3.3.2 Total Organic Carbon

The effectiveness of the GAC treatment process varies with the level of TOC in the influent water. There is no national dataset containing TOC values for every CWS or NTNCWS. Therefore, the EPA randomly assigned a TOC level to each system based on two distributions of TOC in 'finished' water. The agency developed distributions using TOC data voluntarily submitted by states in response to the SYR4 ICR drinking water regulations. Because TOC levels in ground water are lower on average than TOC levels in surface water, the EPA separated the data by system primary source water. TOC levels can also vary throughout a system. Source water TOC measurements can be higher than finished water estimates if a treatment process removes TOC. For each system, the EPA identified TOC measurements that best represented finished water quality. Using the resulting distribution of ground water or surface water estimates, the EPA identified decile midpoint values to randomly assign to each system.

## 4.3.3.3 Average Daily Production Flow and Design Flow

Average daily production flow and design flow per system are based on regression equations from the EPA's *Geometries and Characteristics of Public Water Supplies* report (U.S. EPA, 2000). The average daily flow and design flow are functions of the population served, with different equations for source water type (surface water or ground water). Table 4-8 presents these flow equations. The flow was then divided by the number of EPs to calculate the flow per treatment plant for the system (assuming each EP has one treatment plant). The EPA does not have comparable flow-population regression equations for NTNCWSs and, therefore, used the CWS relationships to estimate flow for NTNCWSs.

**Table 4-8: Functions for Design and Average Daily Flow by System Types**

| **Design Flow Functions (kgal)** | |
|---|---|
| Surface water system | Design Flow $= 0.59028 \times$ Population$^{0.94573}$ (or 2 x Average Flow, whichever is greater) |
| Ground water system | Design Flow $= 0.54992 \times$ Population$^{0.95538}$ (or 2 x Average Flow, whichever is greater) |
| **Average Daily Flow Functions (kgal)** | |
| Surface water system | Average Flow $= 0.14004 \times$ Population$^{0.99703}$ |
| Ground water system | Average Flow $= 0.08575 \times$ Population$^{1.05839}$ |

Abbreviations: kgal – 1000 gallons.

As an example, Table 4-9 shows the design flow and average daily flow results when applying the regression equations to the average population per system for each CWS system stratum. The results for NTNCWSs are in Table 4-10. Note that these results are examples only. In practice, the EPA applied the regression equations to the population served of individual systems, instead of the stratum average population. In addition, for systems serving more than 1 million people, the EPA obtained publicly available system-specific information on the average daily flow and design flow for each EP whenever possible (e.g., annual Consumer Confidence Reports).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                      APRIL 2024

**Table 4-9: Design and Average Daily Flow for CWSs**

| System Size | Ground Water | | | Surface Water | | |
|---|---|---|---|---|---|---|
| | Average Population | Design Flow (MGD) | Average Flow (MGD) | Average Population | Design Flow (MGD) | Average Flow (MGD) |
| ≤ 100 | 61 | 0.028 | 0.007 | 61 | 0.029 | 0.008 |
| 101–500 | 250 | 0.107 | 0.030 | 282 | 0.123 | 0.039 |
| 501–1,000 | 734 | 0.301 | 0.093 | 749 | 0.309 | 0.103 |
| 1,001–3,300 | 1,865 | 0.733 | 0.248 | 2,006 | 0.784 | 0.275 |
| 3,301–10,000 | 5,673 | 2.121 | 0.806 | 6,133 | 2.255 | 0.837 |
| 10,001–50,000 | 20,697 | 7.305 | 3.171 | 22,789 | 7.804 | 3.098 |
| 50,001–100,000 | 67,222 | 22.512 | 11.031 | 70,386 | 22.671 | 9.535 |
| 100,001–1M | 203,821 | 71.371 | 35.685 | 244,022 | 73.470 | 32.937 |

Abbreviations: CWS – community water systems; MGD – million gallons per day.

**Table 4-10: Design and Average Daily Flow for NTNCWSs**

| System Size | Ground Water | | | Surface Water | | |
|---|---|---|---|---|---|---|
| | Average Population | Design Flow (MGD) | Average Flow (MGD) | Average Population | Design Flow (MGD) | Average Flow (MGD) |
| ≤ 100 | 56 | 0.026 | 0.006 | 50 | 0.024 | 0.007 |
| 101–500 | 248 | 0.107 | 0.029 | 269 | 0.117 | 0.037 |
| 501–1,000 | 711 | 0.292 | 0.089 | 750 | 0.309 | 0.103 |
| 1,001–3,300 | 1,672 | 0.660 | 0.221 | 1,979 | 0.774 | 0.271 |
| 3,301–10,000 | 5,273 | 1.978 | 0.746 | 5,988 | 2.205 | 0.817 |
| 10,001–50,000 | 19,862 | 7.023 | 3.035 | 20,705 | 7.127 | 2.815 |
| 50,001–100,000 | Not applicable | Not applicable | Not applicable | 71,963 | 23.151 | 9.748 |
| 100,001–1M | Not applicable | Not applicable | Not applicable | 203,375 | 61.841 | 27.465 |

Abbreviations: NTNCWS – non-transient non-community water systems; MGD – million gallons per day.

## 4.3.4 Public Water System Labor Rates

The EPA recognizes that there may be variation in labor rates across all systems. However, for purposes of this EA, the EPA used national average estimates of unit labor from the 2006 CWSS, with a few modifications described below. Prior labor unit costs for managerial, technical, and clerical labor in the EPA's work breakdown structure[13] (WBS) were based on a review of data from three sources:

- The Occupational Employment Survey (OES), a semi-annual Bureau of Labor Statistics (BLS) survey that provides hourly wage estimates by occupation and industry (BLS, 2022b).

---

[13] To estimate treatment costs, the EPA uses several engineering models using a bottom-up approach known as work breakdown structure (WBS). The WBS models derive system-level costs and provide the EPA with comprehensive, flexible and transparent tools to help estimate treatment costs.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- The Water Utility Compensation Survey, an annual American Water Works Association (AWWA) survey that provides hourly wage estimates for the water and wastewater industry by occupation. Data are in 2008 dollars.

- The 2006 CWSS, a periodic EPA survey that obtains employment information from a sample of CWSs.

There are more recent wage data from the OES and AWWA surveys, but there has not been a CWSS since 2006. A 2020 review of the WBS labor rates found that the WBS wage rates in 2019 dollars overstate labor costs for clerical labor hours as well as potentially overstate labor costs for technical labor hours (Abt Associates, 2020). Following these findings, the EPA adjusted the labor costs used in the WBS to reflect occupation-specific escalation factors rather than the seasonally adjusted employment cost index (ECI) for all civilian employees. The WBS labor costs for managerial hours were not clearly over- or understated compared to OES data but were consistently lower than the AWWA wage estimates (Abt Associates, 2020).

Table 4-11 presents the labor rate estimates used in the WBS in 2007 dollars. Labor rates were calculated for three occupation categories: technical, managerial, and clerical. The rates do not include benefits.

**Table 4-11: Hourly Wage Rates Based on CWSS Data ($2007)**

| Occupation | ≤ 500 | 501–3,300 | 3,301–10,000 | 10,001–50,000 | 50,001–100,000 | > 100,000 |
|---|---|---|---|---|---|---|
| Technical | $16.97 | $16.97 | $18.10 | $19.11 | $19.95 | $23.32 |
| Managerial | $24.06 | $24.06 | $27.52 | $30.65 | $35.76 | $38.21 |
| Clerical | $16.21 | $16.21 | $16.21 | $20.93 | $20.93 | $20.93 |

Abbreviations: CWSS – Community Water System Survey.
*Source: Abt Associates, 2020*

A review of updated BLS Employer Cost for Employee Compensation (ECEC) data indicated that benefits account for a higher proportion of total compensation today than they did at the end of 2006 (Abt Associates, 2020). The WBS assumes a benefit multiplier of 1.45, which is the 2020 multiplier for all civilians working in service-producing industries (Abt Associates, 2020). The benefit-loaded wage rates are shown in Table 4-12.

**Table 4-12: Hourly Labor Costs Including Wages Plus Benefits ($2007)**

| Occupation | ≤ 500 | 501–3,300 | 3,301–10,000 | 10,001–50,000 | 50,001–100,000 | > 100,000 |
|---|---|---|---|---|---|---|
| Technical | $24.61 | $24.61 | $26.25 | $27.71 | $28.93 | $33.81 |
| Managerial | $34.89 | $34.89 | $39.90 | $44.44 | $51.85 | $55.40 |
| Clerical | $23.50 | $23.50 | $23.50 | $30.35 | $30.35 | $30.35 |

*Source: Abt Associates, 2020*

Because the WBS relies on 2020 dollar values, the EPA escalated the CWSS values using the OES occupation-specific change in mean wage rate from 2007 to 2020 instead of the general civilian ECI escalation rate. The escalation for the technical rate is 35.2 percent and the escalation for the clerical rate is 36.3 percent. The WBS managerial wage rates are consistent with OES rates, but slightly lower than AWWA rates (Abt Associates, 2020). At the time of the analysis in 2020, the OES occupation-specific wage escalation rate for the managerial rate was

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

comparable to the ECI rate (Abt Associates, 2020). Therefore, the WBS retains the ECI escalated managerial labor rates, which for 2020 is 41.4 percent. The national cost-benefit analysis method described in Section 5.2 presents all values in 2022 dollars. The method uses the gross domestic product (GDP) implicit price deflator to adjust values in other dollar years to 2022 dollars. Therefore, the labor costs including wages and benefits in 2022 dollars shown in Table 4-13 reflect an additional adjustment for dollar year. The EPA applied the same system labor rates to both CWSs and NTNCWSs.

**Table 4-13: Hourly Labor Costs Escalated to $2022**

| Occupation | ≤ 500 | 501–3,300 | 3,301–10,000 | 10,001–50,000 | 50,001–100,000 | > 100,000 |
|---|---|---|---|---|---|---|
| Technical | 35.48 | 35.48 | 37.84 | 39.94 | 41.70 | 48.74 |
| Managerial | 52.60 | 52.60 | 60.16 | 67.02 | 78.19 | 83.55 |
| Clerical | 34.17 | 34.17 | 34.17 | 44.12 | 44.12 | 44.12 |

There is uncertainty in the derivation of labor rates that could result in an over- or underestimate of national costs of the final rule. The mean labor rate is based on findings of the 2006 CWSS. The labor rate mix may have changed since the time of the survey. The EPA accounted for general changes in cost of labor by adjusting 2007 values to 2020 using occupation-specific escalators and the ECI where appropriate. There is also uncertainty in assuming a 1.45 benefits multiplier; this may cause an under- or overestimation of cost of the final rule.

## 4.3.5 Cost of Capital

For the social cost-benefit analysis, the EPA uses a social discount rate of 2 percent to discount future values and annualize discounted present value over the period of analysis. This rates is in accordance with OMB Circular A-4 (OMB, 2023).

When evaluating the economic impacts on PWSs and households, however, the EPA uses estimated cost of capital to discount future costs and annualize the discounted present value over the analysis period. This rate best represents the actual costs of compliance that systems will incur over time. To estimate PWS cost of capital, the EPA used data from the 2006 CWSS. The CWSS defined the following categories of funding sources:

- Current revenue;
- Equity or other funds from private investors;
- Department of Homeland Security (DHS) grant;
- Other government grants;
- Drinking Water State Revolving Fund (DWSRF), including loans and Principal Repayment Forgiveness;
- Other borrowing from public sector sources; and
- Borrowing from private sectors sources.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The EPA calculated the overall weighted average cost of capital (across all funding sources and loan periods) for each size/ownership category, weighted by the percentage of funding from each source.[14] Table 4-14 shows the cost of capital for each CWS size category and ownership type. Similar cost of capital information is not available for NTNCWS. Therefore, the EPA used the CWS cost of capital when calculating the annualized cost per NTNCWS.

**Table 4-14: Weighted Average Cost of Capital by PWS Ownership and Size Category**

| Size Category | Publicly Owned CWS | Privately Owned CWS |
|---|---|---|
| ≤100 | 3.8% | 7.8% |
| 101–500 | 5.5% | 8.2% |
| 501–1,000 | 4.0% | 8.6% |
| 1,001–3,300 | 4.7% | 7.1% |
| 3,301–10,000 | 5.8% | 7.0% |
| 10,001–50,000 | 6.1% | 7.0% |
| 50,001–100,000 | 4.9% | 6.9% |
| 100,001–500,000 | 4.7% | 3.9% |
| Over 500,000 | 3.7% | 7.8% |

Abbreviations: PWS – public water system; CWS – community water system.

Since the CWSS data collection, Congress established new programs and expanded funding for existing programs. These funding sources allow PWSs to lower their cost of capital. These include the DWSRF, the Water Infrastructure Finance and Innovation (WIFIA) program, the Water Infrastructure Improvements for the Nation Act of 2016 (WIIN Act), and the Bipartisan Infrastructure Law of 2021 (BIL).

Through the DWSRF Program, the EPA allocates annual capitalization grants to states. The grants, along with state matching monies, support a dedicated loan fund to finance eligible water system infrastructure improvement projects. States are permitted to use funding from their DWSRF to help PWS finance water treatment through low-interest loans. These loans range from zero percent to market rate. The weighted average interest rate across all signed DWSRF loans in the past ten fiscal years (2013 through 2023) has been below 2% each year, with the weighted average for the 2023 state fiscal year of 1.6%. EPA notes these weighted averages reflect the rates signed into final loans, not the range of possible rates offered during those years. The WIFIA program provides creditworthy PWSs access to low-interest direct federal loans for water treatment investment. The WIIN Act established a grant program to help small, underserved, and disadvantaged communities achieve compliance with drinking water standards. Additionally, the BIL (P.L. 117-58) authorizes $5 billion as part of the Emerging Contaminants in Small or Disadvantaged Communities (EC-SDC) grants program that can be used to reduce PFAS in drinking water in communities facing disproportionate impacts. BIL funds will be provided as grants and loan forgiveness associated with PFAS drinking water treatment capital expenditures. Overall, the actual cost of capital faced by some PWSs may be lower than those used in this analysis.

---

[14] See "Cost of Capital Approach.doc" in the docket for details of how the cost of capital estimates were developed.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 4.4 Occurrence of PFAS

The EPA's *PFAS Occurrence & Contaminant Background Support Document* provides estimates of the baseline PFAS occurrence in PWSs (U.S. EPA, 2024g). After reviewing the available data on PFAS in drinking water, the EPA determined that the data from the UCMR 3 are the best available nationally representative data to characterize the occurrence of multiple PFAS in drinking water. Consistent with the agency's commitment in the final regulatory determination for PFOA and PFOS and the EPA's PFAS Strategic Roadmap to present the best available occurrence information, the agency supplemented the UCMR 3 data with data collected by states that have made their data publicly available (U.S. EPA, 2021b; U.S. EPA, 2021e).

This section summarizes the EPA's PFAS occurrence analysis (U.S. EPA, 2024g). Section 4.4.1 provides an overview of UCMR 3 and its PFAS occurrence data. Section 4.4.2 provides an overview of state PFAS monitoring data. Section 4.4.4 summarizes the EPA's analysis of PFAS drinking water occurrence data. Section 4.4.5 summarizes the national PFAS occurrence estimates used in the cost and benefit analyses.

### 4.4.1 Overview of UCMR 3 Data

The UCMR is a national drinking water monitoring program administered by the EPA. The UCMR 3 monitoring cycle included a census of all large CWSs and NTNCWSs (i.e., those serving more than 10,000 people) and a statistical sample of 800 small CWSs and NTNCWSs (i.e., those serving 10,000 people or fewer). Monitoring under UCMR 3 occurred from 2013 to 2015. More information on the UCMR 3 study design and data analysis can be found in U.S. EPA (2012) and U.S. EPA (2019c).

The EPA collected the UCMR 3 data from PWSs in all 50 states and seven additional primacy agencies. UCMR 3 monitoring occurrence data are available for six PFAS: PFOS, PFOA, PFNA, PFHxS, PFHpA, and PFBS. For the individual PFAS contaminants, the EPA collected nearly 37,000 finished water samples from 4,920 PWSs.

Systems collected PFAS samples at each EP to their customer distribution system. EPs are the point of compliance for the final rule, and systems can have multiple EPs. The sampling frequency varied by source water: four quarterly samples in a one-year period for surface water systems, and two samples at least six months apart for ground water systems.

The EPA's *PFAS Occurrence & Contaminant Background Support Document* (U.S. EPA, 2024g) describes the data and analyses that the EPA used to develop national estimates of PFAS occurrence in public drinking water systems using UCMR 3 data.

### 4.4.2 Overview of State PFAS Data

Outside of the UCMR 3 data collection, many states have undertaken individual efforts to monitor for PFAS in both source and finished drinking water. The EPA collected data from 32 states that have made their data available and represents sampling conducted on or before May 2023. The EPA notes that this data collection cutoff was made to allow sufficient time for the agency to conduct analyses on the state information for the final NPDWR. Due to the limitations in representation and reporting of some of the available data, the EPA conducted technical

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

analyses using a subset of the available state data from 20 states. These more recent state data, collected using improved analytical methods that have lower reporting limits than under UCMR 3, show widespread occurrence of PFOA, PFOS, PFNA, and PFHxS and co-occurrence of these four PFAS and PFBS in multiple geographic locations. These data also show that these PFAS occur with substantial frequency at lower concentrations than were analyzed under UCMR 3, as demonstrated within the EPA's *PFAS Occurrence & Contaminant Background Support Document* (U.S. EPA, 2024g). Furthermore, these state data include results for more PFAS than were included in the UCMR 3, including HFPO-DA. Please see Sections III and VI of the Federal Register Notice for discussion about how these data enhanced and supported the EPA's occurrence analyses and were confirmatory of the EPA's findings and conclusions in the proposed PFAS NPDWR.

The EPA's analysis of state PFAS data shows occurrence in multiple geographic locations consistent with what was observed during UCMR 3 monitoring. The agency notes that the data vary in terms of quantity and coverage; for example, some of these available data are from targeted sampling efforts (i.e., monitoring in areas of known or potential contamination) and thus may not be representative of levels found in all PWSs within the state. Summaries on the non-targeted state PFAS finished water data are available in Table 4-15 and Table 4-16. Specifically, a summary on the percent of samples in state datasets that were above reporting thresholds for select PFAS is provided in Table 4-15, and a summary on the number of systems in state datasets that had detections for select PFAS is available in Table 4-16. Comprehensive summaries of state data are available within the EPA's *PFAS Occurrence & Contaminant Background Support Document* (U.S. EPA, 2024g).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                                          APRIL 2024

**Table 4-15: Non-Targeted State PFAS Finished Water Data – Summary of Samples with Detections of PFAS Included in Final Regulation**

| State | PFHxS[a] | PFNA[a] | PFBS[a] | HFPO-DA[a,b] |
|-------|----------|---------|---------|--------------|
| Colorado | 10.8% | 0.9% | 11.0% | 0.2% |
| Illinois | 13.4% | 0.6% | 17.6% | 0.0% |
| Indiana | 1.5% | 0.2% | 5.6% | 0.0% |
| Kentucky | 8.6% | 2.5% | 12.3% | 13.6% |
| Maine | 3.0% | 3.5% | 10.1% | N/A |
| Maryland | 18.2% | 2.3% | 19.3% | 0.0% |
| Massachusetts | 23.6% | 2.9% | 39.8% | 0.1% |
| Michigan | 4.3% | 0.6% | 7.5% | 0.1% |
| Missouri | 3.3% | 0.0% | 6.1% | 0.0% |
| New Hampshire | 16.8% | 3.3% | 32.1% | 3.8% |
| New Jersey | 26.2% | 7.7% | 28.1% | N/A |
| New York | 21.6% | 8.6% | 28.8% | 0.7% |
| North Dakota | 5.3% | 0.0% | 8.8% | 0.0% |
| Ohio | 6.6% | 0.3% | 5.0% | 0.1% |
| South Carolina | 8.1% | 0.1% | 13.7% | 1.3% |
| Tennessee | 0.0% | 0.0% | 0.0% | N/A |
| Vermont | 4.2% | 2.5% | 7.1% | 0.2% |
| Wisconsin | 27.2% | 2.2% | 28.0% | 0.0% |

Abbreviations: PFAS – per- and polyfluoroalkyl substances.

Note:

[a]0.0 % indicates that monitoring data were available for the compound/state but there were no detections above minimum reporting limits. Detections are determined by individual state reporting limits which are not defined consistently across all states.

[b]N/A indicates that no data are available.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                          APRIL 2024

**Table 4-16: Non-Targeted State PFAS Finished Water Data – Summary of Systems with Detections of Select PFAS**

| State | PFHxS[a] | PFNA[a] | PFBS[a] | HFPO-DA[a,b] |
|---|---|---|---|---|
| Colorado | 13.4% | 1.0% | 13.4% | 0.3% |
| Illinois | 4.6% | 0.5% | 8.0% | 0.0% |
| Indiana | 1.3% | 0.3% | 6.5% | 0.0% |
| Kentucky | 9.5% | 2.7% | 13.5% | 12.2% |
| Maine | 2.8% | 3.9% | 10.3% | N/A |
| Maryland | 12.7% | 3.2% | 12.7% | 0.0% |
| Massachusetts | 18.1% | 4.4% | 27.8% | 0.3% |
| Michigan | 4.1% | 0.6% | 7.9% | 0.3% |
| Missouri | 2.7% | 0.0% | 6.2% | 0.0% |
| New Hampshire | 22.5% | 5.5% | 38.1% | 5.1% |
| New Jersey | 32.9% | 16.5% | 35.2% | N/A |
| New York | 25.0% | 9.7% | 36.7% | 1.1% |
| North Dakota | 5.4% | 0.0% | 9.0% | 0.0% |
| Ohio | 2.2% | 0.3% | 2.4% | 0.1% |
| South Carolina | 13.7% | 0.3% | 22.1% | 2.0% |
| Tennessee | 0.0% | 0.0% | 0.0% | N/A |
| Vermont | 2.7% | 0.9% | 6.0% | 0.5% |
| Wisconsin | 31.8% | 3.9% | 33.9% | 0.0% |

Abbreviations: PFAS – per-and polyfluoroalkyl substances.

Note:

[a]0.0 % indicates that monitoring data were available for the compound/state but there were no detections above minimum reporting limits. Detections are determined by individual state reporting limits which are not defined consistently across all states.

[b]N/A indicates that no data are available.

## 4.4.3 Overview of PFAS Co-Occurrence

Co-occurrence of multiple PFAS has been reported in drinking water, ambient surface waters, aquatic organisms, biosolids (sewage sludge), and other environmental media. PFOA and PFOS have historically been target analytes, which has partly contributed to their prevalence in environmental monitoring studies, although some recent monitoring studies have begun to focus on additional PFAS via advanced analytical instruments/methods and non-targeted analysis (McCord & Strynar, 2019; McCord et al., 2020).

The EPA's analysis on PFAS co-occurrence using UCMR 3 data found that 4 percent of PWSs reported results for which one or more of the six UCMR 3 PFAS were measured at or above their respective UCMR 3 minimum reporting levels (MRL). Additionally, several studies have demonstrated PFAS co-occurrence in finished drinking water (Adamson et al., 2017; Cadwallader et al., 2022; Guelfo & Adamson, 2018; Smalling et al., 2023). One study in particular used UCMR 3 data to demonstrate that two or more of the six PFAS monitored under UCMR 3 co-occurred in 48 percent (285/598) of sampling events with PFAS detected, and PFOA and PFOS co-occurred in 27 percent (164/598) of sampling events with two or more PFAS detected (Guelfo & Adamson, 2018).

For additional discussion and analysis on PFAS co-occurrence, reference the EPA's *PFAS Occurrence & Contaminant Background Support Document* (U.S. EPA, 2024g).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 4.4.4 Summary of PFAS Occurrence Data Analysis

Identifying the systems and population exposed to PFAS exceeding the limits under the final rule and the three regulatory alternatives is a key step to estimating benefits and costs of the final NPDWR. The EPA used a Bayesian hierarchical Markov chain Monte Carlo (MCMC) occurrence model to estimate national PFAS occurrence in PWSs. The EPA used the MCMC occurrence model output to estimate the PWSs and EPs with PFAS occurrence exceeding the limits under the final rule and regulatory alternatives. The EPA assumed that the populations served by these PWSs were exposed to the PFAS concentration estimates generated by the MCMC occurrence model.

This section summarizes the occurrence model and the EPA's use of the model to identify the systems and EPs with PFAS occurrence exceeding the regulatory alternatives considered within the EA, as well as the corresponding populations exposed. Further details on the MCMC model are available in Appendix A, Cadwallader et al. (2022), and U.S. EPA (2024g).

Data collected under UCMR 3 served as the primary dataset for the MCMC occurrence model due to its nationally representative design. Additionally, the EPA incorporated state PFAS monitoring datasets to supplement UCMR 3 data in the occurrence model. These state datasets, for which the monitoring has been conducted more recently than UCMR 3, generally have lower reporting limits because the analytical methods have improved over the last 10 years, allowing laboratories to reliably measure PFAS at concentrations approximately 5 to 20 times lower than for UCMR 3. Thus, state datasets with lower reporting limits than those in UCMR 3 helped inform the model by enabling observation of PFAS occurrence at lower concentrations. State datasets also consist of more recent samples than UCMR 3, which broadened the temporal range of data used to fit the model. The supplemental state data were limited to samples collected from systems that were also in UCMR 3 to prevent biasing the dataset toward states for which the data from additional PWSs were available as well as maintain the nationally representative set of systems selected for UCMR 3. Using these criteria, 28 states were identified as having some state monitoring data to be included in fitting the national occurrence model.

The dataset used to fit the model included all data available in the final UCMR 3 dataset for PFOS, PFOA, PFHpA, and PFHxS. This amounted to 36,972 samples each for PFOS, PFOA, and PFHpA, and 36,971 samples for PFHxS. Of these four PFAS, 1,114 samples had results reported at or above the UCMR 3 MRLs. The additional state datasets included to supplement the UCMR 3 data contained 18,091 PFOS samples, 18,082 PFOA samples, 14,458 PFHpA samples, and 14,906 PFHxS samples collected at systems that were included in UCMR 3. Of these samples, 7,156 (40%) were reported values for PFOS, 8,257 (46%) were reported values for PFOA, 4,496 (31%) were reported values for PFHpA, and 5,041 (34%) were reported values for PFHxS. The remainder were listed as being below their respective reporting limits. A summary of the state data used in the occurrence model, including system and sample counts, is available in Appendix A.

Some states have promulgated drinking water standards for PFAS since the UCMR 3 monitoring. The EPA reviewed state websites and identified states with enacted standards for the PFAS compounds considered within the regulatory alternatives discussed in the EA. Table 4-17 summarizes state regulations on PFAS in drinking water, which are current as of May 2023. The

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

APRIL 2024

state PFAS regulation summary in Table 4-17 is reflective of only those states that have promulgated PFAS drinking water regulations and does not include information from states that have proposed PFAS drinking water regulations or issued guidance for PWSs.

**Table 4-17: State PFAS Regulations**

| State | Regulated PFAS Levels (ppt) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PFOA | PFOS | PFBS | PFHpA | PFHxA | PFHxS | PFNA | PFDA | HFPO-DA | Sum |
| New Jersey | 14 | 13 | | | | | 13 | | | |
| Vermont[a] | * | * | | * | | * | * | | | 20 |
| New Hampshire | 12 | 15 | | | | 18 | 11 | | | |
| Massachusetts[a] | * | * | | * | | * | * | * | | 20 |
| Michigan | 8 | 16 | 420 | | 400,000 | 51 | 6 | | 370 | |
| New York | 10 | 10 | | | | | | | | |
| Pennsylvania | 14 | 18 | | | | | | | | |
| Wisconsin | 70 | 70 | | | | | | | | |
| Rhode Island[a] | * | * | | | * | | * | * | * | 20 |

Abbreviations: PFAS – per-and polyfluoroalkyl substances.
Notes:
[a]Asterisks (*) indicate states that regulate PFAS compounds at an overall threshold value, as indicated in the Sum column.
*Sources: State websites are as follows – New Jersey (https://www.nj.gov/health/ceohs/documents/pfas_drinking%20water.pdf), Vermont (https://dec.vermont.gov/water/drinking-water/water-quality-monitoring/pfas), New Hampshire (https://www.nhwwa.org/wp-content/uploads/NHWWA-Water-is-Essential-Seminar-Oct-20-2020-PFAS-Arsenic-Rule-Updates.pdf), Massachusetts (https://www.mass.gov/lists/development-of-a-pfas-drinking-water-standard-mcl#final-pfas-mcl-regulations-), Michigan (https://www.michigan.gov/pfasresponse/drinking-water/mcl), New York (https://www.health.ny.gov/environmental/water/drinking/docs/water_supplier_fact_sheet_new_mcls.pdf).*

To estimate the costs and benefits of the final rule, the EPA assumed that all MCMC occurrence model estimates exceeding state limits are equivalent to the state-enacted limit. For these states, the EPA assumed that the state MCL is the maximum baseline PFAS occurrence value for all EPs in the state. This adjustment was made to the MCMC occurrence model PFAS estimates for PFOA, PFOS, and PFHxS in this EA. In the three states where PFAS is regulated at a combined threshold level (Vermont, Massachusetts, and Rhode Island), the EPA did not make any adjustment to the estimated PFAS occurrence values from the MCMC model. Since the final rule standards are more stringent than current state drinking water standards, systems in states with PFAS regulations are still expected to incur incremental costs to comply with the final rule, although the estimated compliance costs will be less compared to costs that do not adjust the MCMC occurrence data to reflect the state MCLs. Similarly, populations served by PWSs in the states with PFAS regulations are expected to benefit from further reductions in PFAS exposures, although the incremental benefits for these populations will be less compared to benefits that do not adjust the MCMC occurrence data to reflect the state MCLs.

The EPA used system-level distributions, as described in Cadwallader et al. (2022), to simulate EP concentrations and estimate PFAS occurrence relative to the regulatory alternatives and final rule limits. The EPA assumed EP concentrations were constant. Simulated sample data are composed of a set of 4,000 iterations with the number of simulated samples per system within each iteration equal to the number of EPs. The EPA estimated within system variation from all available samples within each system as part of the model fitting process. Although the data used

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

to fit the model may have included multiple samples over time or EPs, this simulation strategy assumes that all within-system variability is across EPs.

For 4,920 systems with means fitted by the model (i.e., systems with PFAS data in UCMR 3), the EPA simulated system-specific samples based on the best-fit model. The EPA simulated from the high level multivariate normal distribution to produce means for each chemical at each non-UCMR system and then used those distributions to simulate system-specific samples. The agency then generated random samples from the multivariate distribution and the value of the fixed parameters for each iteration. The exception to this approach was systems serving more than 1 million people. For these systems, the EPA used UCMR 3 and more recent monitoring data to identify the EPs that might require PFAS removal. These relatively few very large systems have the potential to affect aggregate costs and, therefore, require more precision in baseline occurrence estimates.

## 4.4.5 Summary of National PFAS Occurrence

Using the MCMC occurrence model, the EPA estimated baseline occurrence to understand changes in occurrence and exposure for the final rule and the regulatory alternative MCLs under Options 1a – 1c. These estimates vary across the 4,000 MCMC occurrence model iterations, thereby characterizing baseline occurrence uncertainty. In addition, for PWSs in states with existing MCLs for PFOA, PFOS, and PFHxS, the EPA capped contaminant concentrations at the state MCLs. The EPA notes that the baseline occurrence estimates presented herein differ from those presented under the proposed rule, which is due to the EPA's incorporation of additional state data for the final rule. Additionally, the final rule requirements for the number of significant digits used to assess compliance also impacts the baseline occurrence estimates.

The estimated number of PWSs with at least one EP above the PFHxS MCL and, by definition the PFHxS HBWC are provided in Table 4-18 through Table 4-21, while the total estimated number of EPs above the MCLs are provided in Table 4-22 through Table 4-25. In Table 4-26 through Table 4-29, the EPA provides the population served by PWSs with at least one EP above the MCLs. The population served by EPs above the MCLs are provided in Table 4-30 through Table 4-33. Each table provides expected value estimates as well as 5th percentile and 95th percentile estimates that characterize the uncertainty of baseline PFAS occurrence.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                    APRIL 2024

**Table 4-18: Total Systems Impacted, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Number of PWSs | 62,048 | 62,048 | 62,048 |
| PWSs With PFOS Exceedance | 1,929 | 2,854 | 3,942 |
| PWSs With PFOA Exceedance | 1,903 | 2,759 | 3,791 |
| PWSs With PFHxS MCL and/or PFHxS HBWC Exceedance[a,b] | 51 | 110 | 194 |
| PWSs That Exceed One or More MCLs | 2,797 | 3,872 | 5,217 |
| **Large Systems** | | | |
| Total Number of PWSs | 4,482 | 4,482 | 4,482 |
| PWSs With PFOS Exceedance | 912 | 969 | 1,025 |
| PWSs With PFOA Exceedance | 992 | 1,049 | 1,107 |
| PWSs With PFHxS MCL and/or PFHxS HBWC Exceedance [a,b] | 92 | 105 | 120 |
| PWSs That Exceed One or More MCLs | 1,207 | 1,266 | 1,328 |
| **All Systems** | | | |
| Total Number of PWSs | 66,530 | 66,530 | 66,530 |
| PWSs With PFOS Exceedance | 2,874 | 3,823 | 4,958 |
| PWSs With PFOA Exceedance | 2,924 | 3,808 | 4,825 |
| PWSs With PFHxS MCL and/or PFHxS HBWC Exceedance [a,b] | 154 | 215 | 297 |
| PWSs That Exceed One or More Limits | 4,023 | 5,139 | 6,427 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level; PFHxS - perfluorohexane sulfonate; HI – hazard index; HBWC - Health Based Water Concentration.

Note: Detail may not add exactly to total due to independent rounding.

[a]The national level exceedance estimates for PFHxS are reflective of both the total national PFHxS individual MCL exceedances and HI MCL exceedances where PFHxS is present above its HBWC while one or more other HI PFAS is also present in that same mixture. Total national exceedance values do not include the exceedances associated with the co-occurrence of HFPO-DA, PFBS, and PFNA. EPA has considered the additional HI and individual MCLs for PFNA and HFPO-DA exceedances associated with occurrence of HFPO-DA, PFBS, and PFNA in a quantified sensitivity analysis; see Appendix N, Section N.3 for the analysis and Section XII.A.4 of the final rule preamble for more information about how the EPA considered HI, PFNA, and HFPO-DA MCL costs.

[b]Exceedance of both the PFHxS MCL as well as the PFHxS HBWC is triggered by PFHxS occurrence estimates above 10 ppt from the MCMC occurrence model.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 4-19: Total Systems Impacted, Option 1a (PFOA and PFOS MCLs of 4.0 ppt)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Number of PWSs | 62,048 | 62,048 | 62,048 |
| PWSs With PFOS Exceedance | 1,935 | 2,854 | 3,972 |
| PWSs With PFOA Exceedance | 1,903 | 2,759 | 3,800 |
| PWSs That Exceed One or More MCLs | 2,795 | 3,870 | 5,097 |
| **Large Systems** | | | |
| Total Number of PWSs | 4,482 | 4,482 | 4,482 |
| PWSs With PFOS Exceedance | 916 | 969 | 1,026 |
| PWSs With PFOA Exceedance | 987 | 1,049 | 1,109 |
| PWSs That Exceed One or More MCLs | 1,203 | 1,266 | 1,328 |
| **All Systems** | | | |
| Total Number of PWSs | 66,530 | 66,530 | 66,530 |
| PWSs With PFOS Exceedance | 2,875 | 3,823 | 4,952 |
| PWSs With PFOA Exceedance | 2,930 | 3,808 | 4,828 |
| PWSs That Exceed One or More MCLs | 4,018 | 5,136 | 6,441 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

**Table 4-20: Total Systems Impacted, Option 1b (PFOA and PFOS MCLs of 5.0 ppt)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Number of PWSs | 62,048 | 62,048 | 62,048 |
| PWSs With PFOS Exceedance | 1,336 | 2,075 | 2,932 |
| PWSs With PFOA Exceedance | 1,217 | 1,867 | 2,636 |
| PWSs That Exceed One or More MCLs | 1,936 | 2,768 | 3,733 |
| **Large Systems** | | | |
| Total Number of PWSs | 4,482 | 4,482 | 4,482 |
| PWSs With PFOS Exceedance | 741 | 791 | 841 |
| PWSs With PFOA Exceedance | 779 | 827 | 877 |
| PWSs That Exceed One or More MCLs | 981 | 1,033 | 1,084 |
| **All Systems** | | | |
| Total Number of PWSs | 66,530 | 66,530 | 66,530 |
| PWSs With PFOS Exceedance | 2,142 | 2,865 | 3,753 |
| PWSs With PFOA Exceedance | 2,058 | 2,693 | 3,443 |
| PWSs That Exceed One or More MCLs | 2,945 | 3,801 | 4,809 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

**Table 4-21: Total Systems Impacted, Option 1c (PFOA and PFOS MCLs of 10.0 ppt)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Number of PWSs | 62,048 | 62,048 | 62,048 |
| PWSs With PFOS Exceedance | 391 | 648 | 987 |
| PWSs With PFOA Exceedance | 250 | 421 | 645 |
| PWSs That Exceed One or More MCLs | 505 | 806 | 1,188 |
| **Large Systems** | | | |
| Total Number of PWSs | 4,482 | 4,482 | 4,482 |
| PWSs With PFOS Exceedance | 338 | 366 | 395 |
| PWSs With PFOA Exceedance | 300 | 323 | 347 |
| PWSs That Exceed One or More MCLs | 444 | 473 | 503 |
| **All Systems** | | | |
| Total Number of PWSs | 66,530 | 66,530 | 66,530 |
| PWSs With PFOS Exceedance | 750 | 1,014 | 1,348 |
| PWSs With PFOA Exceedance | 570 | 744 | 958 |
| PWSs That Exceed One or More MCLs | 977 | 1,279 | 1,658 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 4-22: Total Entry Points Impacted, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Number of Entry Points | 88,938 | 88,938 | 88,938 |
| Entry Points With PFOS Exceedance | 2,455 | 3,623 | 5,006 |
| Entry Points With PFOA Exceedance | 2,368 | 3,448 | 4,706 |
| Entry Points With PFHxS MCL and/or PFHxS HBWC exceedance[a,b] | 59 | 126 | 219 |
| Entry Points That Exceed One or More MCLs | 3,672 | 5,122 | 6,884 |
| **Large Systems** | | | |
| Total Number of Entry Points | 23,264 | 23,264 | 23,264 |
| Entry Points With PFOS Exceedance | 2,306 | 2,438 | 2,572 |
| Entry Points With PFOA Exceedance | 2,388 | 2,518 | 2,651 |
| Entry Points With PFHxS MCL and/or PFHxS HBWC exceedance[a,b] | 273 | 298 | 327 |
| Entry Points That Exceed One or More MCLs | 3,742 | 3,921 | 4,086 |
| **All Systems** | | | |
| Total Number of Entry Points | 112,202 | 112,202 | 112,202 |
| Entry Points With PFOS Exceedance | 4,852 | 6,061 | 7,520 |
| Entry Points With PFOA Exceedance | 4,856 | 5,966 | 7,248 |
| Entry Points With PFHxS MCL and/or PFHxS HBWC exceedance[a,b] | 349 | 425 | 524 |
| Entry Points That Exceed One or More MCLs | 7,546 | 9,043 | 10,759 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level; PFHxS - perfluorohexane sulfonate; HI – hazard index; HBWC - health based water concentration.

Note: Detail may not add exactly to total due to independent rounding.

[a]The national level exceedance estimates for PFHxS are reflective of both the total national PFHxS individual MCL exceedances and HI MCL exceedances where PFHxS is present above its HBWC while one or more other HI PFAS is also present in that same mixture. Total national exceedance values do not include the exceedances associated with the co-occurrence of HFPO-DA, PFBS, and PFNA. EPA has considered the additional HI and individual MCLs for PFNA and HFPO-DA exceedances associated with occurrence of HFPO-DA, PFBS, and PFNA in a quantified sensitivity analysis; see Appendix N, Section N.3 for the analysis and Section XII.A.4 of the final rule preamble for more information about how the EPA considered HI, PFNA, and HFPO-DA MCL costs.

[b]Exceedance of both the PFHxS MCL as well as the HBWC is triggered by PFHxS occurrence estimates above 10 ppt from the MCMC occurrence model.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                  APRIL 2024

**Table 4-23: Total Entry Points Impacted, Option 1a (PFOA and PFOS MCLs of 4.0 ppt)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Number of Entry Points | 88,938 | 88,938 | 88,938 |
| Entry Points With PFOS Exceedance | 2,456 | 3,623 | 5,007 |
| Entry Points With PFOA Exceedance | 2,368 | 3,448 | 4,709 |
| Entry Points That Exceed One or More MCLs | 3,666 | 5,115 | 6,858 |
| **Large Systems** | | | |
| Total Number of Entry Points | 23,264 | 23,264 | 23,264 |
| Entry Points With PFOS Exceedance | 2,305 | 2,438 | 2,572 |
| Entry Points With PFOA Exceedance | 2,386 | 2,518 | 2,651 |
| Entry Points That Exceed One or More MCLs | 3,701 | 3,878 | 4,056 |
| **All Systems** | | | |
| Total Number of Entry Points | 112,202 | 112,202 | 112,202 |
| Entry Points With PFOS Exceedance | 4,853 | 6,061 | 7,511 |
| Entry Points With PFOA Exceedance | 4,862 | 5,966 | 7,247 |
| Entry Points That Exceed One or More MCLs | 7,497 | 8,993 | 10,711 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                      APRIL 2024

**Table 4-24: Total Entry Points Impacted, Option 1b (PFOA and PFOS MCLs of 5.0 ppt)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Number of Entry Points | 88,938 | 88,938 | 88,938 |
| Entry Points With PFOS Exceedance | 1,735 | 2,620 | 3,794 |
| Entry Points With PFOA Exceedance | 1,532 | 2,321 | 3,234 |
| Entry Points That Exceed One or More MCLs | 2,567 | 3,643 | 4,967 |
| **Large Systems** | | | |
| Total Number of Entry Points | 23,264 | 23,264 | 23,264 |
| Entry Points With PFOS Exceedance | 1,821 | 1,928 | 2,043 |
| Entry Points With PFOA Exceedance | 1,784 | 1,884 | 1,982 |
| Entry Points That Exceed One or More MCLs | 2,900 | 3,038 | 3,185 |
| **All Systems** | | | |
| Total Number of Entry Points | 112,202 | 112,202 | 112,202 |
| Entry Points With PFOS Exceedance | 3,627 | 4,548 | 5,661 |
| Entry Points With PFOA Exceedance | 3,399 | 4,204 | 5,135 |
| Entry Points That Exceed One or More MCLs | 5,550 | 6,682 | 8,007 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                          APRIL 2024

**Table 4-25: Total Entry Points Impacted, Option 1c (PFOA and PFOS MCLs of 10.0 ppt)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Number of Entry Points | 88,938 | 88,938 | 88,938 |
| Entry Points With PFOS Exceedance | 475 | 809 | 1,221 |
| Entry Points With PFOA Exceedance | 308 | 520 | 780 |
| Entry Points That Exceed One or More MCLs | 676 | 1,051 | 1,547 |
| **Large Systems** | | | |
| Total Number of Entry Points | 23,264 | 23,264 | 23,264 |
| Entry Points With PFOS Exceedance | 787 | 842 | 903 |
| Entry Points With PFOA Exceedance | 609 | 649 | 693 |
| Entry Points That Exceed One or More MCLs | 1,177 | 1,244 | 1,312 |
| **All Systems** | | | |
| Total Number of Entry Points | 112,202 | 112,202 | 112,202 |
| Entry Points With PFOS Exceedance | 1,320 | 1,651 | 2,069 |
| Entry Points With PFOA Exceedance | 955 | 1,170 | 1,435 |
| Entry Points That Exceed One or More MCLs | 1,900 | 2,295 | 2,780 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

**Table 4-26: Total Population at PWSs Impacted, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Population | 58,607,697 | 58,607,697 | 58,607,697 |
| Population Impacted by PFOS Exceedance | 2,240,600 | 3,286,600 | 4,520,200 |
| Population Impacted by PFOA Exceedance | 2,362,000 | 3,309,200 | 4,393,900 |
| Population Impacted by PFHxS MCL and/or PFHxS HBWC Exceedance[a,b] | 83,044 | 177,250 | 296,240 |
| Population Impacted by One or More MCL Exceedances | 3,314,000 | 4,494,200 | 5,848,200 |
| **Large Systems** | | | |
| Total Population | 263,679,547 | 263,679,547 | 263,679,547 |
| Population Impacted by PFOS Exceedance | 51,819,000 | 56,096,000 | 60,482,000 |
| Population Impacted by PFOA Exceedance | 55,099,000 | 59,554,000 | 64,109,000 |
| Population Impacted by PFHxS MCL and/or PFHxS HBWC Exceedance [a,b] | 6,372,000 | 7,499,900 | 8,864,500 |
| Population Impacted by One or More MCL Exceedances | 67,160,000 | 71,789,000 | 76,869,000 |
| **All Systems** | | | |
| Total Population | 322,287,244 | 322,287,244 | 322,287,244 |
| Population Impacted by PFOS Exceedance | 54,945,000 | 59,383,000 | 64,025,000 |
| Population Impacted by PFOA Exceedance | 58,326,000 | 62,863,000 | 67,423,000 |
| Population Impacted by PFHxS MCL and/or PFHxS HBWC Exceedance [a,b] | 6,508,600 | 7,677,100 | 9,025,300 |
| Population Impacted by One or More MCL Exceedances | 71,354,000 | 76,283,000 | 81,397,000 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level; PFHxS - perfluorohexane sulfonate; HI – hazard index; HBWC - Heath Based Water Concentration.

Notes: Detail may not add exactly to total due to independent rounding.

[a]The national level exceedance estimates for PFHxS are reflective of both the total national PFHxS individual MCL exceedances and HI MCL exceedances where PFHxS is present above its HBWC while one or more other HI PFAS is also present in that same mixture. Total national exceedance values do not include the exceedances associated with the co-occurrence of HFPO-DA, PFBS, and PFNA. EPA has considered the additional HI and individual MCLs for PFNA and HFPO-DA exceedances associated with occurrence of HFPO-DA, PFBS, and PFNA in a quantified sensitivity analysis; see Appendix N, Section N.3 for the analysis and Section XII.A.4 of the final rule preamble for more information about how the EPA considered HI, PFNA, and HFPO-DA MCL costs.

[b]Exceedance of both the PFHxS MCL as well as the HI is triggered by PFHxS occurrence estimates above 10 ppt from MCMC occurrence model.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 4-27: Total Population at PWSs Impacted, Option 1a (PFOA and PFOS MCLs of 4.0 ppt)**

| | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Population | 58,607,697 | 58,607,697 | 58,607,697 |
| Population Impacted by PFOS Exceedance | 2,268,500 | 3,286,700 | 4,520,100 |
| Population Impacted by PFOA Exceedance | 2,342,800 | 3,309,200 | 4,372,800 |
| Population Impacted by One or More MCL Exceedances | 3,176,300 | 4,489,900 | 5,816,300 |
| **Large Systems** | | | |
| Total Population | 263,679,547 | 263,679,547 | 263,679,547 |
| Population Impacted by PFOS Exceedance | 51,819,000 | 56,098,000 | 60,417,000 |
| Population Impacted by PFOA Exceedance | 55,205,000 | 59,554,000 | 64,109,000 |
| Population Impacted by One or More MCL Exceedances | 66,940,000 | 71,747,000 | 76,805,000 |
| **All Systems** | | | |
| Total Population | 322,287,244 | 322,287,244 | 322,287,244 |
| Population Impacted by PFOS Exceedance | 54,951,000 | 59,385,000 | 63,997,000 |
| Population Impacted by PFOA Exceedance | 58,313,000 | 62,863,000 | 67,420,000 |
| Population Impacted by One or More MCL Exceedances | 71,316,000 | 76,237,000 | 81,338,000 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

APRIL 2024

**Table 4-28: Total Population at PWSs Impacted, Option 1b (PFOA and PFOS MCLs of 5.0 ppt)**

| | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Population | 58,607,697 | 58,607,697 | 58,607,697 |
| Population Impacted by PFOS Exceedance | 1,616,400 | 2,422,200 | 3,346,900 |
| Population Impacted by PFOA Exceedance | 1,557,200 | 2,294,100 | 3,119,500 |
| Population Impacted by One or More MCL Exceedances | 2,360,900 | 3,270,600 | 4,284,100 |
| **Large Systems** | | | |
| Total Population | 263,679,547 | 263,679,547 | 263,679,547 |
| Population Impacted by PFOS Exceedance | 42,546,000 | 46,436,000 | 50,371,000 |
| Population Impacted by PFOA Exceedance | 44,201,000 | 47,952,000 | 51,786,000 |
| Population Impacted by One or More MCL Exceedances | 55,498,000 | 59,542,000 | 64,103,000 |
| **All Systems** | | | |
| Total Population | 322,287,244 | 322,287,244 | 322,287,244 |
| Population Impacted by PFOS Exceedance | 44,997,000 | 48,858,000 | 52,916,000 |
| Population Impacted by PFOA Exceedance | 46,406,000 | 50,246,000 | 54,145,000 |
| Population Impacted by One or More MCL Exceedances | 58,436,000 | 62,812,000 | 67,277,000 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 4-29: Total Population at PWSs Impacted, Option 1c (PFOA and PFOS MCLs of 10.0 ppt)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Population | 58,607,697 | 58,607,697 | 58,607,697 |
| Population Impacted by PFOS Exceedance | 494,310 | 792,790 | 1,154,300 |
| Population Impacted by PFOA Exceedance | 345,510 | 566,290 | 841,210 |
| Population Impacted by One or More MCL Exceedances | 663,970 | 1,009,300 | 1,428,300 |
| **Large Systems** | | | |
| Total Population | 263,679,547 | 263,679,547 | 263,679,547 |
| Population Impacted by PFOS Exceedance | 19,723,000 | 22,216,000 | 24,811,000 |
| Population Impacted by PFOA Exceedance | 18,531,000 | 20,713,000 | 23,109,000 |
| Population Impacted by One or More MCL Exceedances | 26,477,000 | 29,287,000 | 32,179,000 |
| **All Systems** | | | |
| Total Population | 322,287,244 | 322,287,244 | 322,287,244 |
| Population Impacted by PFOS Exceedance | 20,510,000 | 23,009,000 | 25,642,000 |
| Population Impacted by PFOA Exceedance | 19,034,000 | 21,280,000 | 23,717,000 |
| Population Impacted by One or More MCL Exceedances | 27,545,000 | 30,296,000 | 33,118,000 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

**Table 4-30: Total Population at Entry Points Impacted, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1)**

| | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Population | 58,607,697 | 58,607,697 | 58,607,697 |
| Population Impacted by PFOS Exceedance | 1,592,500 | 2,389,900 | 3,324,700 |
| Population Impacted by PFOA Exceedance | 1,553,100 | 2,282,900 | 3,157,000 |
| Population Impacted by PFHxS MCL and/or Hazard Index Exceedance[a] | 34,900 | 80,968 | 143,530 |
| Population Impacted by One or More MCL Exceedances | 2,423,800 | 3,394,500 | 4,582,500 |
| **Large Systems** | | | |
| Total Population | 263,679,547 | 263,679,547 | 263,679,547 |
| Population Impacted by PFOS Exceedance | 22,266,000 | 23,923,000 | 25,634,000 |
| Population Impacted by PFOA Exceedance | 24,109,000 | 25,766,000 | 27,448,000 |
| Population Impacted by PFHxS MCL and/or Hazard Index Exceedance[a] | 1,641,800 | 1,953,000 | 2,316,400 |
| Population Impacted by One or More MCL Exceedances | 35,505,000 | 37,817,000 | 40,155,000 |
| **All Systems** | | | |
| Total Population | 322,287,244 | 322,287,244 | 322,287,244 |
| Population Impacted by PFOS Exceedance | 24,476,000 | 26,313,000 | 28,238,000 |
| Population Impacted by PFOA Exceedance | 26,227,000 | 28,049,000 | 29,959,000 |
| Population Impacted by PFHxS MCL and/or Hazard Index Exceedance[a] | 1,723,000 | 2,034,000 | 2,388,100 |
| Population Impacted by One or More MCL Exceedances | 38,658,000 | 41,212,000 | 43,817,000 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; MCL – maximum contaminant level; PFHxS - perfluorohexane sulfonate; HI – hazard index.

Notes: Detail may not add exactly to total due to independent rounding.

[a]Exceedance of both the PFHxS MCL as well as the HI is triggered by PFHxS occurrence estimates above 10 ppt from the MCMC occurrence model.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 4-31: Total Population at Entry Points Impacted, Option 1a (PFOA and PFOS MCLs of 4.0 ppt)**

| | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Population | 58,607,697 | 58,607,697 | 58,607,697 |
| Population Impacted by PFOS Exceedance | 1,595,900 | 2,390,000 | 3,320,100 |
| Population Impacted by PFOA Exceedance | 1,553,000 | 2,282,900 | 3,157,400 |
| Population Impacted by One or More MCL Exceedances | 2,422,500 | 3,389,700 | 4,576,500 |
| **Large Systems** | | | |
| Total Population | 263,679,547 | 263,679,547 | 263,679,547 |
| Population Impacted by PFOS Exceedance | 22,295,000 | 23,923,000 | 25,634,000 |
| Population Impacted by PFOA Exceedance | 24,014,000 | 25,765,000 | 27,504,000 |
| Population Impacted by One or More MCL Exceedances | 35,131,000 | 37,547,000 | 39,930,000 |
| **All Systems** | | | |
| Total Population | 322,287,244 | 322,287,244 | 322,287,244 |
| Population Impacted by PFOS Exceedance | 24,482,000 | 26,313,000 | 28,242,000 |
| Population Impacted by PFOA Exceedance | 26,221,000 | 28,048,000 | 29,959,000 |
| Population Impacted by One or More MCL Exceedances | 38,390,000 | 40,937,000 | 43,524,000 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 4-32: Total Population at Entry Points Impacted, Option 1b (PFOA and PFOS MCLs of 5.0 ppt)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Population | 58,607,697 | 58,607,697 | 58,607,697 |
| Population Impacted by PFOS Exceedance | 1,128,900 | 1,725,500 | 2,455,000 |
| Population Impacted by PFOA Exceedance | 1,006,000 | 1,534,300 | 2,154,900 |
| Population Impacted by One or More MCL Exceedances | 1,661,300 | 2,411,500 | 3,279,500 |
| **Large Systems** | | | |
| Total Population | 263,679,547 | 263,679,547 | 263,679,547 |
| Population Impacted by PFOS Exceedance | 17,664,000 | 19,054,000 | 20,404,000 |
| Population Impacted by PFOA Exceedance | 17,229,000 | 18,563,000 | 19,877,000 |
| Population Impacted by One or More MCL Exceedances | 27,557,000 | 29,479,000 | 31,476,000 |
| **All Systems** | | | |
| Total Population | 322,287,244 | 322,287,244 | 322,287,244 |
| Population Impacted by PFOS Exceedance | 19,282,000 | 20,780,000 | 22,362,000 |
| Population Impacted by PFOA Exceedance | 18,650,000 | 20,097,000 | 21,605,000 |
| Population Impacted by One or More MCL Exceedances | 29,830,000 | 31,890,000 | 34,032,000 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 4-33: Total Population at Entry Points Impacted, Option 1c (PFOA and PFOS MCLs of 10.0 ppt)**

|  | 5th Percentile | Mean | 95th Percentile |
|---|---|---|---|
| **Small Systems** | | | |
| Total Population | 58,607,697 | 58,607,697 | 58,607,697 |
| Population Impacted by PFOS Exceedance | 315,170 | 531,480 | 797,030 |
| Population Impacted by PFOA Exceedance | 195,280 | 341,450 | 528,460 |
| Population Impacted by One or More MCL Exceedances | 434,870 | 691,810 | 1,007,800 |
| **Large Systems** | | | |
| Total Population | 263,679,547 | 263,679,547 | 263,679,547 |
| Population Impacted by PFOS Exceedance | 8,341,500 | 9,048,100 | 9,820,200 |
| Population Impacted by PFOA Exceedance | 5,758,200 | 6,399,500 | 7,097,400 |
| Population Impacted by One or More MCL Exceedances | 11,901,000 | 12,819,000 | 13,810,000 |
| **All Systems** | | | |
| Total Population | 322,287,244 | 322,287,244 | 322,287,244 |
| Population Impacted by PFOS Exceedance | 8,850,300 | 9,579,600 | 10,391,000 |
| Population Impacted by PFOA Exceedance | 6,089,500 | 6,741,000 | 7,435,600 |
| Population Impacted by One or More MCL Exceedances | 12,555,000 | 13,511,000 | 14,539,000 |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; PWS – public water system; MCL – maximum contaminant level.
Note: Detail may not add exactly to total due to independent rounding.

## 4.5 Uncertainties in the Baseline and Compliance Characteristics of Systems

This section summarizes limitations and uncertainties of the baseline analysis. In the chapter, the EPA described how the quantitative analysis incorporates some sources of uncertainty. The agency also noted data limitations that introduce uncertainty because information is not available for the baseline analysis. Table 4-34 provides a summary of sources that have quantifiable uncertainty and data limitations.

The EPA notes that in most cases it is not possible to determine the extent to which a particular limitation or uncertainty can affect the magnitude of the baseline conditions. The EPA notes the potential direction of the impact on baseline inputs to the costs and/or benefits analysis when possible, but the agency does not prioritize the entries with respect to the impact magnitude.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

## Table 4-34: Limitations and Uncertainties that Apply to the Baseline Characteristics of Systems for the Final PFAS Rule

| Uncertainty/ Assumption | Effect on Quantitative Analysis | Notes |
|---|---|---|
| The agency assigned ground water as the source to systems missing source water information. | Underestimate costs | The design and average flow equations for ground water systems result in lower flow estimates than the equations for surface water systems. If any of the systems assigned ground water source are in fact surface water systems, then the flow estimates used in the cost analysis will be underestimated. In addition, initial monitoring costs will be underestimated for small surface water systems that are assigned as a ground water source. |
| SDWIS/Fed retail populations used for baseline analysis | Overestimate costs | The EPA did not reallocate populations for purchased water systems to the wholesale suppliers. All systems are in the inventory with their respective retail populations. In general, this will result in extra systems with small populations in the analysis and smaller populations at the wholesale systems. Both results will tend to increase cost estimate because the cost curves reflect economies of scale. |
| SDWIS/Fed data quality | Uncertain impact on baseline number of systems and EPs | The EPA periodically reviews inventory information in SDWIS/Fed (U.S. EPA, 2021h) and has generally found a high level of completeness and accuracy. There is uncertainty, however, in some of the population and facility data reported per system. To address this, the EPA removed any CWS wholesaler serving fewer than 25 people from the analysis and assumed any remaining CWSs had a minimum possible population of 25. The EPA also assumed any non-wholesale NTNCWSs had a minimum possible population of 25. The maximum number of EPs per system was limited to the maximum number found for the equivalent system size and source water combination in the UCMR 3 data. |
| Flow relationships for CWS | Uncertain impact on flow inputs to cost analysis | The equations used to estimate design and average daily flow based on service population may over- or underestimate actual system flows. In general, average per capita household water consumption has declined since the source data were collected because of increased water efficiency.[a] The change in nonresidential consumption is unknown. |
| CWS flow curves applied to NTNCWS | Uncertain impact on flow inputs to cost analysis | The EPA applied the CWS population-flow equations to NTNCWSs. This approach may result in an over- or underestimate of flow, and therefore cost for NTNCWSs. |
| Uniform EP population distribution | Uncertain impact on flow inputs to cost analysis and population inputs to benefits analysis | The EPA assumed a uniform distribution of system population across system EPs. Actual EP population may be greater or lower than the modeled estimates. |
| System wage rates are based on old survey data | Uncertain impact on cost analysis | National average wage rates are based on CWSS data finalized in 2006. The EPA escalated the values to $2022 to reflect current national industry averages, but actual wage rates at affected systems may be greater or less than national averages. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 4-34: Limitations and Uncertainties that Apply to the Baseline Characteristics of Systems for the Final PFAS Rule**

| Uncertainty/ Assumption | Effect on Quantitative Analysis | Notes |
|---|---|---|
| Baseline occurrence based on MCMC occurrence model outputs | Uncertain effect on occurrence and exposure | The iterative MCMC approach (4,000 iterations) probabilistically estimates parameters for system-level distributions to capture uncertainty. The simulated EP concentrations then reflect the system-level distribution from which they are drawn across 4,000 iterations. Further details on the MCMC model are available in Cadwallader et al. (2022). |
| UCMR 3 data for PFBS and PFNA and no UCMR 3 data for HFPO-DA were available to incorporate into the Bayesian hierarchical occurrence model | Underestimate occurrence and exposure | Excluding occurrence estimates for PFNA, HFPO-DA, and PFBS underestimates the number of systems that would exceed the MCLs based on occurrence of these three compounds. Due to occurrence data limitations, cost estimates for PFNA, PFBS, and HFPO-DA are less precise relative to those for PFOA, PFOS, and PFHxS compounds, and as such, the EPA performed a quantitative sensitivity analysis of the national cost impacts associated with exceedances resulting from PFNA, PFBS, and HFPO-DA in Appendix N.3 to consider the potential magnitude of costs associated with treating these regulated PFAS. |

Abbreviations: CWS – community water systems; CWSS– community water system survey; HI– hazard index; MCMC – Markov chain Monte Carlo; NTNCWS – non-transient, non-community water systems; PFAS – per- and polyfluoroalkyl substances; PFOA– perfluorooctanoic acid; PFOS– perfluorooctane sulfonate; SDWIS/Fed– safe drinking water information system federal version.

Note:

[a]There is uncertainty in using the equations from the EPA's *Geometries and Characteristics of Public Water Systems* report (U.S. EPA, 2000) to predict future average daily and design flow based on a system's retail population. Water use efficiency has increased substantially since the 1980s, with a major improvement between 2005 and 2010 (Rockaway et al., 2011). A 2016 Water Research Foundation study reported a 22 percent decline in indoor water use (Water Research Foundation, 2016). Several factors have contributed to increases in water efficiency. Technological changes, supported by policy, increased the efficiency of water use. For example, the Energy Policy Act of 1992 required water efficiency standards for fixtures, including shower heads, toilets, and washing machines. Water recycling and increased efficiency of power generation also reduces freshwater use. The economic downturn of 2008 contributed to the drop in water use and the increase in use of water-efficient fixtures and xeriscaping. Other demand-side management measures contributed to reduction in per capita use as well. The trend of lower residential water use could result in lower flow per population and lower treatment costs as compared to predicted values in this EA.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# 5 Cost Analysis

## 5.1 Introduction

In this chapter, the EPA presents its cost analysis for the final PFAS NPDWR (the final rule) and other alternative rule options considered by the agency as part of the rulemaking process (Options 1a through 1c). The contents include the national cost estimates for the final rule as well as options and the approach the EPA used to derive those estimates. The estimates include the cost that PWSs, households, and primacy agencies may incur in response to the final rule requirements.

### 5.1.1 Chapter Overview

This chapter has seven main sections including this introductory section. Section 5.2 provides an overview of the EPA's approach to estimate the cost of the final rule and options. In Section 5.3, the EPA provides the data and algorithms used to calculate the cost of activities PWSs will undertake to comply with the final rule. Section 5.4 provides the data and assumptions used to calculate the cost of activities primacy agencies will undertake to implement and administer the final rule. Sections 5.1.3, 5.5, and 5.6 provide the cost estimates at the national, PWS, and household level, respectively. As indicated below, some additional details on the approach and data used to calculate the costs of the final rule are in Appendix C.

### 5.1.2 Uncertainty Characterization

Many of the input values used to calculate the costs of drinking water regulations are not known with certainty. For example, estimated technology unit costs and contaminant occurrence values are uncertain to some degree given imperfect information. The EPA determined it does have enough information about the level or distribution of uncertainty to conduct a full Monte-Carlo based uncertainty analysis as part of the SafeWater Multi-Contaminant Benefit-Cost Model (MCBC). With respect to the cost analysis, the EPA modeled the sources of uncertainty summarized in Table 5-1.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 5-1: Quantified Sources of Uncertainty in Cost Estimates**

| Source | Description of Uncertainty |
|---|---|
| EP concentration of PFAS compounds | The concentration and co-occurrence at each PWS EP of each modeled compound is unknown. The cost analysis uses EP concentrations simulated with system level distributions produced by the Bayesian hierarchical MCMC occurrence model. The iterative MCMC approach (4,000 iterations) probabilistically estimates parameters for system-level distributions to capture uncertainty. The simulated EP concentrations then reflect the system-level distribution from which they are drawn across 4,000 iterations. Further details on the MCMC model are available in Cadwallader et al. (2022). For more information on the application of the model in this analysis, see Section 4.4 and Appendix A. For more information on the data and analyses that the EPA used to develop national estimates of PFAS occurrence in public drinking water systems see U.S. EPA (2024g). |
| TOC concentration | The TOC value assigned to each system is from a distribution derived from the fourth Six-Year Review Information Collection Request database (see Section 5.3.1.1) |
| Compliance technology unit cost curve selection | Cost curve selection varies with baseline PFAS concentrations and also includes a random selection from a distribution across feasible technologies (see Section 5.3.1.1), and a random selection from a triangular distribution of low-, mid-, and high-cost equipment (25%, 50%, and 25%, respectively). |

Abbreviations: MCBC – Multi-Contaminant Benefit-Cost Model; PFAS – per- and polyfluoroalkyl substances; TOC – total organic carbon.

For each iteration, SafeWater MCBC assigned new values to the three sources of modeled uncertainty as described in Table 5-1, and then calculated costs for each of the model PWSs. This was repeated 4,000 times to reach an effective sample size for each parameter. At the end of the 4,000 iterations, SafeWater MCBC outputs the expected value as well as the 90 percent confidence interval for each cost metric (i.e., bounded by the 5th and 95th percentile estimates for each cost component). Detailed information on the data used to model uncertainty is provided in Appendix A and Appendix L.

## 5.1.3 Summary of Quantified National Cost Estimates of the Final Rule

In Table 5-2, the EPA summarizes the total annualized cost of the final rule at a 2 percent discount rate. The first three rows show the annualized PWS sampling costs, the annualized PWS implementation and administrative costs, and the annualized PWS treatment costs. The fourth row shows the sum of the annualized PWS costs. Expected annualized PWS costs are $1.54 billion. The quantified uncertainty range for annualized PWS costs is $1.43 billion to $1.67 billion. Finally, annualized primacy agency implementation and administrative costs are added to the annualized PWS costs to calculate the total annualized cost of the final rule. Expected total annualized cost of the final rule is $1.55 billion with an uncertainty range of $1.44 billion to $1.67 billion.

The difference in the costs between the final rule and Option 1a provides the marginal cost of the PFHxS standards. As shown in Table 4-18 and 4-22, the EPA estimates that 215 water systems (425 EPs) will exceed the PFHxS MCL of 10 ppt and by definition the HBWC of 10 ppt for the

HI.[15] Of the water systems estimated to exceed the PFHxS regulatory thresholds, many are also anticipated to exceed the PFOA and PFOS MCLs. The EPA estimates that 3 water systems with 50 EPs will be triggered into corrective action for PFHxS alone while 212 systems (375 EPs) will treat for PFHxS in addition to PFOA and/or PFOS, and the national annualized marginal costs of all PFHxS exceedances, including at systems with and without PFOA/PFOS exceedances, is $11.57 million dollars. This is the estimated contribution of costs from PFHxS to the overall costs of the rule, not in addition to the costs presented in Table 5-2. As discussed in U.S. EPA (2024g), PFHxS is observed to strongly cooccur with PFOA and PFOS; therefore, there are significantly more systems with PFHxS, PFOA, and PFOS present with two or more of these PFAS above their respective MCLs than systems with PFHxS above the MCL alone. Furthermore, this pattern is accentuated because the PFHxS MCL of 10 ppt is 2.5 times higher than either the PFOA or PFOS MCLs of 4.0 ppt. Additionally, since the PFHxS MCL is one significant figure, whereas PFOA and PFOS are two significant figures, for purposes of estimating compliance, PFHxS would not be deemed to be in exceedance until above 15 ppt. All told, this means that the PFHxS MCL (and its contributions to the HI) adds important public health protection for a modest additional cost.

---

[15] Note that results above a single HBWC for a single PFAS does not constitute an HI exceedance (see Section V.B.III of the preamble for the final rule for more information).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 5-2: National Annualized Costs, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1) (Million $2022)**

| | 2% Discount Rate | | |
| --- | --- | --- | --- |
| | **5th Percentile[a]** | **Expected Value** | **95th Percentile[a]** |
| Annualized PWS Sampling Costs | $33.63 | $36.23 | $39.03 |
| Annualized PWS Implementation and Administration Costs | $1.33 | $1.33 | $1.33 |
| Annualized PWS Treatment Costs | $1,395.23 | $1,506.44 | $1,627.65 |
| **Total Annualized PWS Costs** | **$1,431.00** | **$1,544.00** | **$1,667.10** |
| Primacy Agency Rule Implementation and Administration Cost | $4.35 | $4.65 | $4.97 |
| **Total Annualized Rule Costs[b,c,d]** | **$1,435.70** | **$1,548.64** | **$1,672.10** |

Abbreviations: PWS – public water system.

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P, Section P.2 for results presented at 3 and 7 percent discount rates. 5th and 95th percentile values for total rule costs are not additive across cost category as the categories are not completely correlated.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty described in Section 5.1.2 and Table 5-1. This range does not include the uncertainty described in Table 5-21.

[b]See Table 7-6 for a list of the nonquantifiable costs, and the potential direction of impact these costs would have on the estimated monetized total annualized costs in this table.

[c]The national level cost estimates for PFHxS are reflective of both the total national cost for PFHxS individual MCL exceedances, and HI MCL exceedances where PFHxS is present above its HBWC while one or more other HI PFAS is also present in that same mixture. Total quantified national cost values do not include the incremental treatment costs associated with the co-occurrence of HFPO-DA, PFBS, and PFNA. EPA has considered the additional national costs of the HI and individual MCLs associated with HFPO-DA, PFNA, and PFBS occurrence in a quantified sensitivity analysis; See Appendix N, Section N.3 for the analysis and more information.

[d]PFAS-contaminated wastes are not considered RCRA regulatory or characteristic hazardous wastes at this time and therefore total costs reported in this table do not include costs associated with hazardous waste disposal of spent filtration materials. To address stakeholder concerns about potential costs for disposing PFAS-contaminated wastes as hazardous should they be regulated as such in the future, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. See Appendix N, Section N.2 for additional detail.

In Table 5-3, Table 5-4, and Table 5-5 the EPA summarizes the total annualized cost of Options 1a, 1b, and 1c, respectively.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 5-3: National Annualized Costs, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) (Million $2022)**

|  | 2% Discount Rate | | |
|---|---|---|---|
|  | **5th Percentile[a]** | **Expected Value** | **95th Percentile[a]** |
| Annualized PWS Sampling Costs | $33.37 | $35.98 | $38.77 |
| Annualized PWS Implementation and Administration Costs | $1.33 | $1.33 | $1.33 |
| Annualized PWS Treatment Costs | $1,383.33 | $1,495.14 | $1,616.15 |
| **Total Annualized PWS Costs** | **$1,419.20** | **$1,532.44** | **$1,654.80** |
| Primacy Agency Rule Implementation and Administration Cost | $4.34 | $4.63 | $4.95 |
| **Total Annualized Rule Costs[b,c]** | **$1,423.60** | **$1,537.07** | **$1,660.30** |

Abbreviations: PWS – public water system.

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P, Section P.2 for results presented at 3 and 7 percent discount rates. 5th and 95th percentile values for total rule costs are not additive across cost category as the categories are not completely correlated.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty described in Section 5.1.2 and Table 5-1. This range does not include the uncertainty described in Table 5-21.

[b]See Table 7-6 for a list of the nonquantifiable costs, and the potential direction of impact these costs would have on the estimated monetized total annualized costs in this table.

[c]PFAS-contaminated wastes are not considered RCRA regulatory or characteristic hazardous wastes at this time and therefore total costs reported in this table do not include costs associated with hazardous waste disposal of spent filtration materials. To address stakeholder concerns about potential costs for disposing PFAS-contaminated wastes as hazardous should they be regulated as such in the future, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. See Appendix N, Section N.2 for additional detail.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                          APRIL 2024

**Table 5-4: National Annualized Costs, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) (Million $2022)**

|  | 2% Discount Rate | | |
| --- | --- | --- | --- |
|  | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Annualized PWS Sampling Costs | $31.07 | $33.29 | $35.71 |
| Annualized PWS Implementation and Administration Costs | $1.33 | $1.33 | $1.33 |
| Annualized PWS Treatment Costs | $1,065.30 | $1,153.31 | $1,250.22 |
| **Total Annualized PWS Costs** | **$1,098.40** | **$1,187.92** | **$1,286.50** |
| Primacy Agency Rule Implementation and Administration Cost | $3.98 | $4.21 | $4.47 |
| **Total Annualized Rule Costs[b,c]** | **$1,102.60** | **$1,192.13** | **$1,291.40** |

Abbreviations: PWS – public water system.

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P, Section P.2 for results presented at 3 and 7 percent discount rates. 5th and 95th percentile values for total rule costs are not additive across cost category as the categories are not completely correlated.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty described in Section 5.1.2 and Table 5-1. This range does not include the uncertainty described in Table 5-21.

[b]See Table 7-6 for a list of the nonquantifiable costs, and the potential direction of impact these costs would have on the estimated monetized total annualized costs in this table.

[c]PFAS-contaminated wastes are not considered RCRA regulatory or characteristic hazardous wastes at this time and therefore total costs reported in this table do not include costs associated with hazardous waste disposal of spent filtration materials. To address stakeholder concerns about potential costs for disposing PFAS-contaminated wastes as hazardous should they be regulated as such in the future, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. See Appendix N, Section N.2 for additional detail.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

APRIL 2024

**Table 5-5: National Annualized Costs, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) (Million $2022)**

|  | 2% Discount Rate | | |
|---|---|---|---|
|  | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Annualized PWS Sampling Costs | $26.11 | $27.48 | $28.97 |
| Annualized PWS Implementation and Administration Costs | $1.33 | $1.33 | $1.33 |
| Annualized PWS Treatment Costs | $431.37 | $467.12 | $507.50 |
| **Total Annualized PWS Costs** | **$459.50** | **$495.93** | **$537.21** |
| Primacy Agency Rule Implementation and Administration Cost | $3.27 | $3.37 | $3.48 |
| **Total Annualized Rule Costs[b,c]** | **$462.87** | **$499.29** | **$540.68** |

Abbreviations: PWS – public water system.

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P, Section P.2 for results presented at 3 and 7 percent discount rates. 5th and 95th percentile values for total rule costs are not additive across cost category as the categories are not completely correlated.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty described in Section 5.1.2 and Table 5-1. This range does not include the uncertainty described in Table 5-21.

[b]See Table 7-6 for a list of the nonquantifiable costs, and the potential direction of impact these costs would have on the estimated monetized total annualized costs in this table.

[c]PFAS-contaminated wastes are not considered RCRA regulatory or characteristic hazardous wastes at this time and therefore total costs reported in this table do not include costs associated with hazardous waste disposal of spent filtration materials. To address stakeholder concerns about potential costs for disposing PFAS-contaminated wastes as hazardous should they be regulated as such in the future, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. See Appendix N, Section N.2 for additional detail.

# 5.2 Overview of SafeWater Multi-Contaminant Benefit Cost Model (MCBC)

The SafeWater Cost Benefit Model (SafeWater CBX) was designed to calculate the costs and benefits associated with setting a new or revised MCL. Since the final PFAS rule simultaneously regulates multiple PFAS contaminants, the EPA developed a new model version called the SafeWater MCBC to estimate the costs and benefits associated with regulating more than one contaminant. The following modifications were made to the SafeWater CBX model to create the SafeWater MCBC model:

1. Instead of tracking a single contaminant's level and comparing that to the MCL options to determine if the PWS must take compliance actions, SafeWater MCBC tracks each PWS's level of multiple PFAS contaminants and compares them against MCL options for each contaminant (or group of contaminants). The PWS will need to take corrective action if any of its EP's contaminant levels are above any of the MCLs. In this case the EP will incur treatment costs and will accrue health benefits.
2. The structure of the occurrence data input to the model was updated to not only handle multiple contaminants, but to incorporate all information from the PFAS occurrence model on the predicted co-occurrence of contaminants.
3. The model structure was also adjusted to allow for assignment of one or more compliance technologies that achieve all regulatory requirements and estimates costs and benefits

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

associated with multiple PFAS contaminant reductions and calculates before and after treatment concentrations of each contaminant for use in the estimation of benefits.

## 5.2.1 Modeling PWS Variability in SafeWater MCBC

The costs incurred by a PWS depend on water system characteristics. The data describing some of these characteristics for PWSs are in SDWIS/Fed. The SDWIS/Fed data provide information on the PWS characteristics that typically define PWS categories, or strata, for which the EPA develops costs in rulemakings:

- System type (CWS, NTNCWS);
- Number of people served by the PWS;
- PWS's primary raw water source (ground water or surface water);
- PWS's ownership type (public or private); and
- State in which PWS is located.

Because the EPA does not have complete PWS-specific data across the 49,193 CWSs and 17,337 NTNCWS in SDWIS/Fed for many of the baseline and compliance characteristics necessary to estimate costs and benefits, such as design and average daily flow rates, water quality characteristics, treatment in-place, and labor rates, the EPA adopted a "model PWS" approach. SafeWater MCBC creates model PWSs by combining the PWS-specific data available in SDWIS/Fed with data on baseline and compliance characteristics available at the PWS category level. In some cases, the categorical data are simple point estimates. In this case, every model PWS in a category is assigned the same value. In other cases, where more robust data representing system variability are available, the category-level data include a distribution of potential values. In the case of distributional information, SafeWater MCBC assigns each model PWS a value sampled from the distribution. These distributions are assumed to be independent. Table 5-6 provides a list of all the PWS characteristics that impact model PWS compliance costs. These data include inventory data specific to each system and categorical data for which randomly assigned values are based on distributions that vary by category (e.g., ground water and surface water TOC distributions or compliance forecast distributions that vary by system size category).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 5-6: Model PWS Variability Characteristics and Data Sources**

| PWS Characteristic | Data Type and Description |
|---|---|
| System Type | Known SDWIS/Fed Inventory |
| Primary Source Water | Known: SDWIS/Fed Inventory |
| Ownership | Known: SDWIS/Fed Inventory |
| Population Served | Known: SDWIS/Fed Inventory |
| Number of EPs | Known: UCMR 3, SDWIS/Fed Inventory, and modeled from SDWIS/Fed Inventory distribution (see Section 4.3.3.1) |
| PFAS Contaminant Concentration at each EP | Sampled from EPA Occurrence Model (see Section 4.3.3.2) |
| Influent TOC Level | Assigned from distribution derived from fourth Six-Year Review Information Collection Request database (see Section 5.3.1.1) |
| Compliance Technology Forecast at each EP | Assigned from distribution derived from full-scale compliance actions analyzed by the EPA (see Section 5.3.1.1) |

Abbreviations: EPA – U.S. Environmental Protection Agency; PFAS – per-and polyfluoroalkyl substances; SDWIS/Fed – Safe Drinking Water Information System/Federal version; TOC – total organic carbon; UCMR 4 – Fourth Unregulated Contaminant Monitoring Rule.

As illustrated in Figure 5-1, once all the model PWSs are created and assigned baseline and compliance characteristics, SafeWater MCBC estimates the quantified costs and benefits of compliance for each model PWS under the final rule. Because of this model PWS approach, SafeWater MCBC does not output any results at the PWS-level. Instead, the outputs are cost and benefit estimates for 36 PWS categories, or strata. Each PWS category is defined by the system type (CWS and NTNCWS), primary water source (ground or surface), and size category (there are nine). Note the EPA does not report state specific strata although state location is utilized in the SafeWater MCBC model (e.g., current state level regulatory limits on PFAS in drinking water).

For each PWS category, the model then calculates summary statistics that describe the costs and quantified benefits associated with the final rule compliance. These summary statistics include total quantified costs of the final regulatory requirements, total quantified benefits of the final regulatory requirements, the variability in PWS-level costs (i.e., 10th, 25th, 50th, 75th and 90th percentile system costs), and the variability in household-level costs (i.e., 10th, 25th, 50th, 75th and 90th percentile household costs). In addition, SafeWater MCBC characterizes the uncertainty in the estimated costs and benefits by calculating the expected value and 90th percentile confidence interval (5th and 95th percentile values) for each output metric.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



**Figure 5-1: Approach Used by SafeWater MCBC to Model PWS Variability**

# 5.3 Estimating Public Water System Costs

The EPA estimated PWS compliance activities that result in treatment costs and administrative and monitoring costs associated with the final rule. Each major regulatory component consists of required activities, which the EPA details here. The EPA presents the costs associated with treatment addition and nontreatment actions that could be taken in lieu of treatment in Section 5.3.1. The EPA presents the costs associated with the administrative and monitoring requirements of the final rule in Section 5.3.2.

## *5.3.1 PWS Treatment Costs*

This section describes how the EPA estimated costs associated with:

- Engineering, installing, operating, and maintaining PFAS removal treatment technologies, including treatment media replacement and spent media destruction or disposal; and

- Nontreatment actions that some PWSs might take in lieu of treatment, such as constructing new wells in an uncontaminated aquifer or interconnecting with and purchasing water from a neighboring PWS.

The EPA used SafeWater MCBC to apply costs for one of these treatment technologies or nontreatment alternatives at each EP in a PWS estimated to be out of compliance with the regulatory option under consideration. First, for each affected EP, SafeWater MCBC selected

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

from among the compliance alternatives using the decision tree procedure described in Section 5.3.1.1. Next, SafeWater MCBC estimated the cost of the chosen compliance alternative using inputs from the EPA's WBS cost estimating models. Specifically, SafeWater MCBC used cost equations generated from the following models:[16]

- The GAC WBS model;
- The PFAS-selective IX WBS model; and
- The nontreatment WBS model.

The national cost analysis reflects that PFAS-contaminated wastes are not considered Resource Conservation and Recovery Act (RCRA) regulatory or characteristic hazardous wastes. Additionally, this PFAS NPDWR does not require drinking water treatment residuals to be managed in any specific way. The EPA understands that the current practice for drinking water systems to manage their spent treatment media is generally to reactivate GAC and to dispose of ion exchange treatment residuals as non-hazardous waste. As shown below in Table 5-9, the EPA estimates that 52-89% of systems will use GAC and 11-48% of systems will use IX, depending on system size and water quality. The national cost analysis assumes the spent GAC media is reactivated off-site under current RCRA non-hazardous waste regulations. The WBS model uses a unit cost for reactivation that includes transportation to the reactivation facility and back to the treatment plant. To account for losses in the reactivation and replacement process, it also adds the cost of replacing 30 percent of the spent GAC with virgin media. The national cost analysis assumes the spent IX resin is incinerated off-site under current RCRA non-hazardous waste regulations. The WBS model uses a unit cost for non-hazardous incineration that includes transportation to the incineration facility. For purposes of the cost analysis, EPA does not assume any facilities will utilize Subtitle D Landfills. EPA notes that if the agency were to assume some or all facilities would utilize Subtitle D landfills to dispose of spent IX resin, estimated spent resin treatment residual disposal costs attributable to the PFAS NDPWR would have been lower. For more information on GAC and IX residuals management unit cost estimates for PFAS see Section 7.2 and 7.3 of the Technologies and Costs (T&C) document (U.S. EPA, 2024i).

The EPA proposed PFOA and PFOS be designated as Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) hazardous substances to require reporting of PFOA and PFOS releases, enhance the availability of data, and ensure agencies can recover cleanup costs (U.S. EPA, 2022). Stakeholders have expressed concern to the EPA that a hazardous substance designation for certain PFAS may limit their disposal options for drinking water treatment residuals (e.g., spent media, concentrated waste streams) and/or potentially increase costs. Designation of PFOA and PFOS as CERCLA hazardous substances would not require waste (e.g., biosolids, treatment residuals, etc.) to be treated in any particular fashion, nor disposed of at any specific particular type of landfill. The designation also would not restrict, change, or recommend any specific activity or type of waste at landfills. Although designating

---

[16] At this time, the EPA is not including point-of-use (POU) devices in the national cost estimates because the final rule requires treatment to concentrations below the current NSF/ANSI certification standard for POU devices. However, POU treatment is reasonably anticipated to become a compliance option for small systems in the future if NSF/ANSI or other independent third-party certification organizations develop a new certification standard that mirrors the EPA's final regulatory standard. In the event POU treatment becomes a valid compliance option, national costs could be lower than estimated in this application of the SafeWater MCBC.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

chemicals as hazardous substances under CERCLA would not result in new requirements for disposal of PFAS drinking water treatment residuals, to address stakeholder concerns, including those raised during the SBREFA process, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. The EPA acknowledges that if in the future PFAS-contaminated wastes are required to be handled as hazardous wastes, the residuals management costs are expected to be higher. For a discussion of the findings from this sensitivity analysis, see Appendix N, Section N.2.

Section 5.3.1.2 describes the WBS models. Section 5.3.1.2.2 describes the form of the resulting cost equations and their application in SafeWater MCBC. The T&C document (U.S. EPA, 2024i) provides a comprehensive discussion of each of the treatment technologies, their effectiveness, and the WBS cost models. It also presents the cost equations themselves in tabular form. These models are available on the EPA's website at https://www.epa.gov/sdwa/drinking-water-treatment-technology-unit-cost-models as well as in the docket for this rulemaking.

## 5.3.1.1 Decision Tree for Technology Selection

For EPs at which baseline PFAS concentrations exceed regulatory thresholds, SafeWater MCBC selects a treatment technology or nontreatment alternative using a two-step process that:

1. Determines whether to include or exclude each alternative from consideration given the EP's characteristics and the regulatory option selected; and
2. Selects from among the alternatives that remain viable based on percentage distributions derived, in part, from data on recent PWS actions in response to PFAS contamination.

Inputs to SafeWater MCBC used in the Step 1 include the following:

- Influent concentrations of individual PFAS contaminants in ppt (ng/L);
- EP design flow in MGD; and
- TOC influent to the new treatment process in mg/L.

Section 4.4 describes the EPA's method for estimating PFAS influent concentrations and Section 4.3.3.3 describes how the EPA derived EP flow estimates. SafeWater MCBC selects influent TOC using the distribution shown in Table 5-7.

FINAL RULE                                                                                      APRIL 2024

**Table 5-7: Frequency Distribution to Estimate Influent TOC in mg/L**

| Percentile | Surface Water | Ground Water |
|---|---|---|
| 0.05 | 0.65 | 0.35 |
| 0.15 | 1.1 | 0.48 |
| 0.25 | 1.38 | 0.5 |
| 0.35 | 1.6 | 0.5 |
| 0.45 | 1.85 | 0.58 |
| 0.5 | 1.97 | 0.69 |
| 0.55 | 2.14 | 0.75 |
| 0.65 | 2.54 | 1 |
| 0.75 | 3.04 | 1.39 |
| 0.85 | 3.63 | 2.01 |
| 0.95 | 4.81 | 3.8 |

Abbreviations: TOC – total organic carbon.
*Source: The EPA's analysis of total organic carbon concentrations in the fourth Six-Year Review Information Collection Request database.*

In Step 1, SafeWater MCBC uses these inputs to determine whether to include or exclude each treatment alternative from consideration in the compliance forecast. For the treatment technologies (GAC and IX), this determination is based on estimates of each technology's performance given available data about influent water quality and the regulatory option under consideration. Section 5.3.1.1.1 describes this process for GAC and IX.

The EPA assumes a small number of PWSs may be able to take nontreatment actions in lieu of treatment. The viability of nontreatment actions (interconnection with neighboring system or new wells) is likely to depend on the quantity of water being replaced. Therefore, SafeWater MCBC considers nontreatment only for EPs with design flows less than or equal to 3.536 MGD.

In Step 2, SafeWater MCBC selects a compliance alternative for each EP from among the alternatives that remain in consideration after Step 1. Table 5-8 shows the initial compliance forecast that is the starting point for this step. The percentages in Table 5-8 consider data presented in the T&C document (U.S. EPA, 2024i) on actions PWSs have taken in response to PFAS contamination.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 5-8: Initial Compliance Forecast Including POU RO**

| Compliance Alternative | Design Flow Less than 1 MGD | | Design Flow 1 to Less than 10 MGD | | Design Flow Greater than or Equal to 10 MGD | |
|---|---|---|---|---|---|---|
| | TOC Less than or Equal to 1.5 mg/L | TOC Greater than 1.5 mg/L | TOC Less than or Equal to 1.5 mg/L | TOC Greater than 1.5 mg/L | TOC Less than or Equal to 1.5 mg/L | TOC Greater than 1.5 mg/L |
| GAC | 68% | 53% | 81% | 52% | 89% | 52% |
| PFAS-selective IX | 11% | 26% | 11% | 40% | 11% | 48% |
| Central RO/NF | 0% | 0% | 0% | 0% | 0% | 0% |
| POU devices | 13% | 13% | 0% | 0% | 0% | 0% |
| Interconnection | 6% | 6% | 6% | 6% | 0% | 0% |
| New Wells | 2% | 2% | 2% | 2% | 0% | 0% |

Abbreviations: GAC – granular activated carbon; PFAS – per-and polyfluoroalkyl substances; MGD – million gallons per day; IX – ion exchange; RO/NF – reverse osmosis/nanofiltration; POU – point-of-use; TOC – total organic carbon.
*Source: The EPA's analysis of total organic carbon concentrations in the fourth Six-Year Review Information Collection Request database.*

To date, the majority of PWSs for which data are available have installed GAC (U.S. EPA, 2024i). U.S. EPA (2024i) includes data for 52 systems, 34 of which (65%) have installed GAC. The first full-scale system treating drinking water using PFAS-selective IX began operation in 2017 (WWSD, 2018). The data in the T&C document (U.S. EPA, 2024i) also suggest that an increasing share of PWSs have selected IX in response to PFAS since that first installation. Specifically, for systems installed prior to 2017, 78% used GAC. The EPA expects this trend to continue, so the initial percentages include adjustments to account for this expectation. In addition, as discussed in Section 5.3.1.1.1, the performance of GAC is affected by the presence of TOC. Accordingly, the table includes adjusted distributions for systems with higher influent TOC.

While central reverse osmosis/nanofiltration (RO/NF) remains a best available technology (BAT) for the final rule, the EPA does not anticipate water systems will select this technology to comply with the rule, largely due to the challenges presented by managing the treatment residuals from this process.

The initial percentages in Table 5-8 reflect the fact that some small systems could choose point-of-use reverse osmosis (POU RO) as a compliance alternative. At this time, the EPA is not including POU devices in the national cost estimates because the regulatory options under consideration require treatment to concentrations below 70 ppt PFOA and PFOS summed, the current certification standard for POU devices.[17] Therefore, SafeWater MCBC excludes POU devices from consideration and proportionally redistributes the percentages among the other alternatives. Table 5-9 shows the final compliance forecast after this redistribution.

---

[17] POU treatment might become a compliance option for small systems in the future if independent third-party certification organizations, such as NSF or ANSI develop a new certification standard that mirrors the EPA's proposed regulatory standard. In the event POU treatment becomes a valid compliance option, national costs could be lower than estimated here.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 5-9: Initial Compliance Forecast Excluding POU Devices**

| Compliance Alternative | Design Flow Less than 1 MGD | | Design Flow 1 to Less than 10 MGD | | Design Flow Greater than or Equal to 10 MGD | |
|---|---|---|---|---|---|---|
| | TOC Less than or Equal to 1.5 mg/L | TOC Greater than 1.5 mg/L | TOC Less than or Equal to 1.5 mg/L | TOC Greater than 1.5 mg/L | TOC Less than or Equal to 1.5 mg/L | TOC Greater than 1.5 mg/L |
| GAC | 79% | 62% | 81% | 52% | 89% | 52% |
| PFAS-selective IX | 12% | 29% | 11% | 40% | 11% | 48% |
| Central RO/NF | 0% | 0% | 0% | 0% | 0% | 0% |
| Interconnection | 7% | 7% | 6% | 6% | 0% | 0% |
| New Wells | 2% | 2% | 2% | 2% | 0% | 0% |

Abbreviations: GAC – granular activated carbon; PFAS – per-and polyfluoroalkyl substances; MGD – million gallons per day; IX – ion exchange; RO/NF – reverse osmosis/nanofiltration; POU – point-of-use; TOC – total organic carbon.

If all the compliance alternatives (other than POU devices and Centralized RO) remain in consideration after Step 1, the decision tree uses the forecast shown in Table 5-9. If GAC or IX is not viable for a particular EP due to performance limitations (see Section 5.3.1.1.1), SafeWater MCBC proportionally redistributes the percentages among the remaining alternatives and uses the redistributed percentages.

## 5.3.1.1.1 Estimating GAC and IX Performance

The viability of GAC and IX depends on bed life, which is the length of time the technology can maintain a target removal percentage (e.g., 80 percent, 95 percent). Bed life can vary depending on factors including type of media used (GAC or IX), specific PFAS contaminants targeted, influent water quality, and removal performance required to meet regulatory option thresholds. Bed life determines media replacement frequency and, therefore, affects both the practicality and operation and maintenance (O&M) cost of these technologies. This analysis estimates bed life in bed volumes (BV), which is a measure of throughput: the volume of water treated during the bed life divided by the volume of the media bed.

The bed life estimates use linear equations derived as described in the T&C document (U.S. EPA, 2024i). The EPA estimated the equations based on pooled data from several studies of GAC as well as IX performance and reflect central tendency results under varying water quality conditions. As such, the EPA believes they represent the best approach currently available for use in a national cost estimation. However, they should not be used in lieu of site-specific engineering analyses or pilot studies to guide the design or operation of specific treatment systems.

The bed life equations are technology-specific and shown below:

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Equation 2:

$$BV_{contam,GAC} = A_{TOC} \times TOC + A_{R,GAC} \times \%R_{contam} + B_{contam,GAC}$$

$$BV_{contam,IX} = A_{PFAS} \times PFAS_{total} + A_{R,IX} \times \%R_{contam} + B_{contam,IX}$$

Where:

$BV_{contam,tech}$ = bed life of the given technology for a given PFAS contaminant in BV; tech = GAC or IX

$TOC$ = TOC influent to the new treatment process in mg/L

$PFAS_{total}$ = total influent concentration of all PFAS contaminants (regulated or unregulated) in ppt

$\%R_{contam}$ = target percent removal of a given PFAS as a decimal (e.g., 0.8, 0.95)

$B_{contam,tech}$ = constant; tech = GAC or IX

Table 5-10 shows the estimated values of the parameter coefficients $A_{TOC}$, $A_{PFAS}$, $A_{R,tech}$, and intercepts $BV_{contam,tech}$.

**Table 5-10: Estimated Parameter Values for Technology-Specific Bed Life Equations**

| Parameter | GAC Model Value | IX Model Value |
|---|---|---|
| $A_{TOC}$ | -37,932 | Not applicable[a] |
| $A_{PFAS}$ | Not applicable[a] | -6.04 |
| $A_R$ | -36,309 | -198,242 |
| $B_{HFPO-DA}$ | 113,034 | Data not available |
| $B_{PFHxA}$ | 113,967 | 212,867 |
| $B_{PFBS}$ | 129,357 | 439,515 |
| $B_{PFHpA}$ | 129,357 | 319,511 |
| $B_{PFHxS}$ | 129,357 | 439,515 |
| $B_{PFOA}$ | 139,862 | 390,787 |
| $B_{PFOS}$ | 143,731 | 439,515 |

Note:
[a]Total PFAS is not a significant parameter in GAC performance; TOC is not a significant parameter in IX performance.
*Source: Technical Support Document - Technologies and Cost for Removing Per- and Polyfluoroalkyl Substances (PFAS) from Drinking Water (U.S. EPA, 2024i)*

The bed life equations are only applicable over a specific range of water quality conditions (TOC up to 3.2 mg/L for GAC; total PFAS up to 7,044 ppt for IX). Data are not available to estimate performance beyond these limits. Therefore, SafeWater MCBC excludes GAC from consideration if an EP's influent TOC concentration is greater than 3.2 mg/L. It excludes IX if total influent PFAS is greater than 7,044 ppt. No PWS meets both of these exclusionary conditions.

FINAL RULE                                                                 APRIL 2024

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

If GAC and/or IX remain in consideration, SafeWater MCBC calculates the percent removal required for the regulatory option under consideration and uses the linear equations above to estimate bed life. These calculations vary depending on the regulatory option. Section 5.3.1.1.1.1 describes the calculations for PFOA and PFOS. Section 5.3.1.1.1.2 describes the calculations under the final rule (individual MCLs for PFOS, PFOA, PFNA, PFHxS, and HFPO-DA plus the group HI MCL).

Based on data presented in the T&C document (U.S. EPA, 2024i), specifically the maximum removal effectiveness values reported in EPA's Drinking Water Treatability Database plus the full set of removal data used to develop the bed life equations presented in Table 5-10, the EPA assumes the maximum PFAS removal achievable by GAC or IX is 99.5% percent. Therefore, if the relevant regulatory option requires removal at an EP greater than this maximum, SafeWater MCBC removes GAC and IX from consideration, as described in the sections below. Additionally, the EPA assumes that bed lives less than 5,000 BV for GAC and less than 20,000 BV for IX are impractical. These bed lives correspond to media replacement frequencies of two to five months depending on the average flow of the EP. If the relevant regulatory option results in a final operating bed life below these limits, SafeWater MCBC removes the corresponding technology from consideration. Finally, the EPA assumes that the maximum bed life for GAC is 75,000 BV and the maximum bed life for IX is 260,000 BV. While some water systems treating for PFAS may have performance that exceeds these values, the EPA included this assumption to more conservatively estimate operational costs. If the calculated bed life is greater than 75,000 BV for GAC or greater than 260,000 BV for IX, then SafeWater MCBC sets the bed life at 75,000 BV for GAC and 260,000 BV for IX. For EPs that ultimately select GAC or IX, the final operating bed life is also an input to the cost estimates (see Section 5.3.1.3) and the calculation of post-treatment PFAS concentrations used to estimate reduction in health risks).[18]

### 5.3.1.1.1.1 Bed Life for PFOA and PFOS

Under Options 1a-c, PWSs must meet individual MCLs for PFOS and PFOA. For these options, SafeWater MCBC calculates the percent removal required to meet each individual MCL in the following equation:

Equation 3:

$$\%R_{contam} = \frac{C_{0,contam} - MCL_{contam} \times SF}{C_{0,contam}}$$

Where:

$\%R_{contam}$ = target percent removal of a given PFAS as a decimal (e.g., 0.8, 0.95)

$C_{0,contam}$ = influent concentration of the given PFAS in ppt

$MCL_{contam}$ = MCL for the given PFAS in ppt

---

[18] As shown in Equation 2, bed life and percent removal are directly related. SafeWater uses the same equation to back-calculate final percent removal for each PFAS compound from final operating bed life. It then uses the final removal efficiency to calculate post-treatment concentrations.

FINAL RULE               APRIL 2024

$SF = 0.8$, a safety factor that assumes PWSs will design and operate treatment processes to achieve 80 percent of the MCL (i.e. to 20 percent below the MCL value).

SafeWater MCBC performs this calculation for each contaminant that occurs at an EP and has an MCL in the regulatory option, even if the contaminant occurs at a concentration below the MCL. Including contaminants that are below their respective MCLs helps to account for chromatographic peaking;[19] which is a concern in GAC along with IX and is discussed in greater detail in the T&C document (U.S. EPA, 2024i). The calculations here are designed to account for and avoid it.

If the percent removal required for any contaminant ($\%R_{contam}$) is greater than 0.99 (99 percent), SafeWater MCBC removes GAC and IX from consideration. If the technologies remain in consideration, SafeWater MCBC estimates the bed life for each contaminant using the linear equations presented in Section 5.3.1.1.1. The final operating bed life is the minimum of the individual contaminant-specific bed life estimates. If this final operating bed life is less than 5,000 BV for GAC or less than 20,000 BV for IX, SafeWater MCBC removes the corresponding technology from consideration.

### 5.3.1.1.1.2 Bed Life Under the Final Rule

The final rule utilizes compound-specific MCLs for PFOA, PFOS, PFNA, HFPO-DA, and PFHxS and an HI MCL for mixtures containing at least two or more of PFNA, HFPO-DA, PFHxS, and PFBS. Due to limitations in occurrence data, the national cost estimates summate costs only for the occurrence of PFOA, PFOS and PFHxS. The EPA notes that the costs for the HI MCL and the individual MCLs for PFNA and HFPO-DA, are included and considered in the Appendix N, Section N.3 sensitivity analysis. Therefore, for this option, SafeWater MCBC calculates the percent removal required to meet the individual health benchmark for PFHxS using the following equation:

Equation 4:

$$\%R_{PFHxS} = \frac{C_{0,PFHxS} - HB_{PFHxS} \times SF}{C_{0,PFHxS}}$$

Where:

$\%R_{PFHxS}$= target percent removal of PFHxS as a decimal (e.g., 0.8, 0.95)

$C_{0,PFHxS}$ = influent concentration of PFHxS in ppt

$HB_{PFHxS}$ = heath benchmark for PFHxS in ppt

$SF = 0.8$, a safety factor that assumes PWSs will design and operate treatment processes to achieve 80 percent of the health benchmark.

---

[19] Chromatographic peaking is a phenomenon in which less strongly sorbed contaminants are detached from sorbents by more strongly bound sorbents and the less tightly bound sorbent re-enters drinking water. Direct competition with stronger sorbing constituents can lead to effluent PFAS concentrations temporarily exceeding influent concentrations. Some PFAS species sorb more strongly than other PFAS species which can cause more weakly sorbed species to re-enter drinking water.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

SafeWater MCBC performs this calculation even when PFHxS occurs at a concentration below its health benchmark. Including contaminants that are below their respective MCLs prevents the subsequent bed life calculations from selecting a bed life that results in a preferred PFAS displacing a less preferred PFAS from the treatment media to the extent that the less preferred PFAS periodically exceeds its MCL. This phenomenon is sometimes a concern in GAC as well as IX design and operation and is discussed in greater detail in the T&C document (U.S. EPA, 2024i). The calculations here are designed to account for and avoid it.

If the percent removal required to meet the MCL and health benchmark for PFHxS is greater than 0.99 (99 percent), SafeWater MCBC removes GAC and IX from consideration. If the technologies remain in consideration, SafeWater MCBC estimates the bed life for PFHxS using the linear equations presented in Section 5.3.1.1.1. It also calculates the bed lives necessary to meet the individual MCLs for PFOS and PFOA, as described in Section 5.3.1.1.1.1. The final operating bed life is the minimum of all the bed life estimates resulting from the calculations for all three contaminants (PFOS, PFOA, and PFHxS). If this final operating bed life is less than 5,000 BV for GAC or less than 20,000 BV for IX, SafeWater MCBC removes the corresponding technology from consideration. Finally, if the calculated bed life is greater than 75,000 for GAC, or greater than 260,000 for IX, then SafeWater MCBC sets the bed life at 75,000 for GAC and 260,000 for IX.

## 5.3.1.2 WBS Models

The WBS models are spreadsheet-based engineering models for individual treatment technologies, linked to a central database of component unit costs. The EPA developed the WBS model approach as part of an effort to address recommendations made by the Technology Design Panel (TDP), which convened in 1997 to review the agency's methods for estimating drinking water compliance costs (U.S. EPA, 1997). The TDP consisted of nationally recognized drinking water experts from the EPA, water treatment consulting companies, public as well as private water utilities along with suppliers, equipment vendors, and Federal along with State regulators in addition to cost estimating professionals.

In general, the WBS approach involves breaking a process down into discrete components for the purpose of estimating unit costs. The WBS models represent improvements over past cost estimating methods. By adopting a WBS-based approach to identify the components that should be included in a cost analysis, the models produce a more comprehensive, flexible, and transparent assessment of the capital and operating requirements for a treatment system.

Section 5.3.1.2.1 is a brief overview of the common elements of all the WBS models. Section 5.3.1.2.2 provides information on the anticipated accuracy of the models. Sections 5.3.1.2.3 through 5.3.1.2.5 identify technology-specific cost elements included in each model and discuss key inputs. The documentation for the individual WBS models (U.S. EPA, 2023i; U.S. EPA, 2023k; U.S. EPA, 2023j), provides more complete details on the structure, content, and use of each model.

### 5.3.1.2.1 Common Model Components and Inputs

Each WBS model contains the work breakdown for a particular treatment process and preprogrammed engineering criteria and equations that estimate equipment requirements for

user-specified design requirements (e.g., system size and influent water quality). Each model also provides unit and total cost information by component (e.g., individual items of capital equipment) and totals the individual component costs to obtain a direct capital cost. Additionally, the models estimate add-on costs (e.g., permits and land acquisition), indirect capital costs, and annual O&M costs, thereby producing EPA's best estimates of complete compliance cost.

Primary inputs common to all the WBS models include design flow and average daily flow in MGD. Each WBS model has default designs (input sets) that correspond to specified categories of flow, but the models can generate designs for many other combinations of flows. To estimate costs for PFAS compliance, the EPA fit cost curves to the WBS estimates across a range of flow rates, as described in Section 5.3.1.3.

Another input common to all the WBS models is "component level" or "cost level." This input drives the selection of materials for items of equipment that can be constructed of different materials. For example, a low-cost system might include fiberglass pressure vessels and polyvinyl chloride (PVC) piping. A high-cost system might include stainless steel pressure vessels and stainless-steel piping. The component level input also drives other model assumptions that can affect the total cost of the system, such as building quality and heating and cooling. The component level input has three possible values: low cost, mid cost, and high cost. To estimate costs for PFAS treatment, the EPA generated separate cost equations for each of the three component levels, thus creating a range of cost estimates for use in national compliance cost estimates.

The third input common to all the WBS models is system automation, which allows the design of treatment systems that are operated manually or with varying degrees of automation (i.e., with control systems that reduce the need for operator intervention). The cost equations described in Section 5.3.1.3 are for systems that are fully automated, minimizing the need for operator intervention and reducing operator labor costs.

The WBS models generate cost estimates that include a consistent set of capital, add-on, indirect, and O&M costs. Table 5-11 identifies these cost elements, which are common to all the WBS models and included in the cost estimates below. Sections 5.3.1.2.3 through 5.3.1.2.5 identify the technology-specific cost elements included in each model. The documentation for the WBS models (U.S. EPA, 2023i; U.S. EPA, 2023k; U.S. EPA, 2023l; U.S. EPA, 2023j) provide more information on the methods and assumptions used in the WBS models to estimate the costs for both the technology-specific and common cost elements.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## Table 5-11: Cost Elements Included in All WBS Models

| Cost Category | Components Included |
|---|---|
| Direct Capital Costs | • Technology-specific equipment (e.g., vessels, basins, pumps, treatment media, piping, valves)<br>• Instrumentation and system controls<br>• Buildings<br>• Residuals management equipment |
| Add-on Costs | • Land<br>• Permits<br>• Pilot testing |
| Indirect Capital Costs | • Mobilization and demobilization<br>• Architectural fees for treatment building<br>• Equipment delivery, installation, and contractor's overhead and profit<br>• Sitework<br>• Yard piping<br>• Geotechnical<br>• Standby power<br>• Electrical infrastructure<br>• Process engineering<br>• Contingency<br>• Miscellaneous allowance<br>• Legal, fiscal, and administrative<br>• Sales tax<br>• Financing during construction<br>• Construction management |
| O&M Costs: Technology-specific | • Operator labor for technology-specific tasks (e.g., managing backwash and media replacement)<br>• Materials for O&M of technology-specific equipment<br>• Technology-specific chemical usage<br>• Replacement of technology-specific equipment that occurs on an annual basis (e.g., treatment media)<br>• Energy for operation of technology-specific equipment (e.g., mixers) |
| O&M Costs: Labor | • Operator labor for O&M of process equipment<br>• Operator labor for building maintenance<br>• Managerial and clerical labor |
| O&M Costs: Materials | • Materials for maintenance of booster or influent pumps<br>• Materials for building maintenance |
| O&M Costs: Energy | • Energy for operation of booster or influent pumps<br>• Energy for lighting, ventilation, cooling, and heating |
| O&M Costs: Residuals | • Residuals management operator labor, materials, and energy<br>• Residuals disposal and discharge costs |

Abbreviations: O&M – operation & maintenance; WBS – work breakdown structure.

### 5.3.1.2.2 WBS Model Accuracy

Costs for a given system can vary depending on site-specific conditions (e.g., raw water quality, climate, local labor rates, and location relative to equipment suppliers). The costs presented here are based on national average assumptions and include a range (represented by low-, mid-, and high-cost equations) intended to encompass the variation in costs that systems would incur to remove PFAS. To validate the engineering design methods used by the WBS models and increase the accuracy of the resulting cost estimates, the EPA has subjected the individual models to a process of external peer review by nationally recognized technology experts.

The GAC model underwent peer review in 2006. Two of the three reviewers expressed the opinion that resulting cost estimates would be in the range of budget estimates (+30 to -15 percent). The other reviewer did not provide a precise estimate of the model's accuracy range but commented that the resulting cost estimates were reasonable. The EPA made substantial revisions to the GAC model in response to the peer review.

The IX model underwent peer review in 2005, during an early stage of its development. One peer reviewer responded that resulting cost estimates were in the range of budget estimates (+30 to -15 percent). The other two reviewers thought the estimates were order of magnitude estimates (+50 to -30 percent), with an emphasis on the estimates being high. The IX model has since undergone extensive revision, both in response to the peer review and to adapt it for PFAS treatment using selective resin.

The EPA received peer review comments on the nontreatment model in May 2012. The first reviewer responded that cost estimates resulting from the nontreatment model were in the range of budget estimates (+30 to -15 percent). The second reviewer thought the cost estimates were order of magnitude estimates (+50 to -30 percent). The third reviewer felt the cost estimates were definitive (+15 to -5 percent), except for land costs, which were difficult to assess due to regional variations. The EPA revised the nontreatment model in response to the peer review recommendations.

### 5.3.1.2.3 GAC Model

Work Breakdown Structure-Based Cost Model for Granular Activated Carbon Drinking Water Treatment provides a complete description of the engineering design process used by the WBS model for GAC (U.S. EPA, 2023i). The model can generate costs for two types of design:

- Pressure designs where the GAC bed is contained in stainless steel, carbon steel, or fiberglass pressure vessel; and

- Gravity designs where the GAC bed is contained in open concrete basins.

Table 5-12 shows the technology-specific capital equipment and O&M requirements included in the GAC model. These items are in addition to the common WBS cost elements listed in Table 5-11.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 5-12: Technology-Specific Cost Elements Included in the GAC Model**

| Cost Category | Major Components Included |
|---|---|
| Direct Capital Costs | • Booster pumps for influent water<br>• Contactors (either pressure vessels or concrete basins) that contain the GAC bed<br>• Tanks and pumps for backwashing the contactors<br>• GAC transfer and storage equipment<br>• Spent GAC reactivation facilities (if on-site reactivation is selected)<br>• Associated piping, valves and instrumentation |
| O&M Costs: Labor | • Operator labor for contactor maintenance (for gravity GAC designs)<br>• Operator labor for managing backwash events<br>• Operator labor for backwash pump maintenance (if backwash occurs weekly or more frequently)<br>• Operator labor for GAC transfer and replacement |
| O&M Costs: Materials | • Materials for contactor maintenance (accounts for vessel relining in pressure designs, because GAC can be corrosive, and for concrete and underdrain maintenance in gravity designs)<br>• Materials for backwash pump maintenance (if backwash occurs weekly or more frequently)<br>• Replacement virgin GAC (loss replacement only if reactivation is selected) |
| O&M Costs: Energy | • Operating energy for backwash pumps |
| O&M Costs: Residuals | • Discharge fees for spent backwash<br>• Fees for reactivating spent GAC (if off-site reactivation is selected)<br>• Labor, materials, energy, and natural gas for regeneration facility (if on-site reactivation is selected)<br>• Disposal of spent GAC (if disposal is selected) |

Abbreviations: GAC – granular activated carbon; O&M – operation & maintenance; WBS – work breakdown structure.

For small systems (less than 1 MGD) using pressure designs, the GAC model assumes the use of package treatment systems that are pre-assembled in a factory, mounted on a skid, and transported to the site. These assumptions are based on common vendor practice for these technologies, for example, see Khera et al. (2013), which says "...small systems are often built as packaged, pre-engineered, or skid-mounted systems." The model estimates costs for package systems by costing all individual equipment line items (e.g., vessels, interconnecting piping and valves, instrumentation, and system controls) in the same manner as custom-engineered systems. This approach is based on vendor practices of partially engineering these types of package plants for specific systems (e.g., selecting vessel size to meet flow and treatment criteria). The model applies a variant set of design inputs and assumptions that are intended to simulate the use of a package plant and that reduce the size and cost of the treatment system. U.S. EPA (2023i) provides complete details on the variant design assumptions used for package plants.

To generate the cost equations discussed in Section 5.3.1.3, the EPA used the following key inputs in the GAC model:

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- For pressure designs, two vessels in series with a minimum total empty bed contact time (EBCT) of 20 minutes;

- For gravity designs, contactors in parallel with a minimum total EBCT of 20 minutes; and

- Bed life varying over a range from 5,000 to 75,000 BV, estimated as discussed in Section 5.3.1.1.1.

The EPA generated separate cost equations for two spent GAC management scenarios:

- Off-site reactivation under current RCRA non-hazardous waste regulations; and

- Off-site disposal as a hazardous waste and replacement with virgin GAC (i.e., single use operation).

The T&C document (U.S. EPA, 2024i) provides a comprehensive discussion of these and other key inputs and assumptions.

### 5.3.1.2.4 PFAS-selective IX Model

Work Breakdown Structure-Based Cost Model for Ion Exchange Treatment of Per- and Polyfluoroalkyl Substances (PFAS) in Drinking Water provides a complete description of the engineering design process used by the WBS model for PFAS-selective IX (U.S. EPA, 2023j). Table 5-13 shows the technology-specific capital equipment and O&M requirements included in the model. These items are in addition to the common WBS cost elements listed in Table 5-11.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 5-13: Technology-Specific Cost Elements Included in the PFAS-Selective IX Model**

| Cost Category | Major Components Included |
|---|---|
| Direct Capital Costs | • Booster pumps for influent water<br>• Pre-treatment cartridge filters<br>• Pressure vessels that contain the resin bed<br>• Tanks and pumps for initial rinse and (optionally) backwash of the resin bed<br>• Tanks (with secondary containment), pumps and mixers for delivering sodium hydroxide for use in post-treatment corrosion control (optional)<br>• Associated piping, valves, and instrumentation |
| O&M Costs: Labor | • Operator labor for pre-treatment filters<br>• Operator labor for managing backwash/rinse events<br>• Operator labor for backwash pump maintenance (only if backwash occurs weekly or more frequently)<br>• Operator labor for resin replacement |
| O&M Costs: Materials | • Replacement cartridges for pre-treatment filters<br>• Materials for backwash pump maintenance (only if backwash occurs weekly or more frequently)<br>• Chemical usage (if post-treatment corrosion control is selected)<br>• Replacement virgin PFAS-selective resin |
| O&M Costs: Energy | • Operating energy for backwash/rinse pumps |
| O&M Costs: Residuals | • Disposal of spent cartridge filters<br>• Discharge fees for spent backwash/rinse<br>• Disposal of spent resin |

Abbreviations: IX – ion exchange; O&M – operation & maintenance; PFAS – per-and polyfluoroalkyl substances.

For small systems (less than 1 MGD), the PFAS-selective IX model assumes the use of package treatment systems that are pre-assembled in a factory, mounted on a skid, and transported to the site. The IX model estimates costs for package systems using an approach similar to that described for the GAC model, applying a variant set of inputs and assumptions that reduce the size and cost of the treatment system (see Section 5.3.1.2.3). U.S. EPA (2023j) provides complete details on the variant design assumptions used for IX package plants.

To generate the cost equations discussed in Section 5.3.1.3, the EPA used the following key inputs in the PFAS-selective IX model:

• Two vessels in series with a minimum total EBCT of 6 minutes; and

• Bed life varying over a range from 20,000 to 260,000 BV, estimated as discussed in Section 5.3.1.1.

The EPA generated separate cost equations for two spent resin management scenarios:

• Spent resin managed as non-hazardous and sent off-site for incineration; and

- Spent resin managed as hazardous and sent off-site for incineration.

The T&C document (U.S. EPA, 2024i) provides a comprehensive discussion of these and other key inputs and assumptions.

### 5.3.1.2.5 Nontreatment Model

Work Breakdown Structure-Based Cost Model for Nontreatment Options for Drinking Water Compliance provides a complete description of the engineering design process used by the WBS model for nontreatment actions (U.S. EPA, 2023k). The model can estimate costs for two nontreatment alternatives: interconnection with another system and drilling new wells to replace a contaminated source. Table 5-14 shows the technology-specific capital equipment and O&M requirements included in the model for each alternative. The interconnection alternative does not include any buildings. It includes all the indirect capital costs shown in Table 5-14 except for yard piping, site work, and architectural fees. The new well alternative includes a small shed or other low-cost building at the well site along with materials and labor for maintenance of this building. It includes all the indirect capital costs shown in Table 5-14 except for yard piping.

**Table 5-14: Technology-Specific Cost Elements Included in the Nontreatment Model**

| Cost Category | Major Components Included for Interconnection | Major Components Included for New Wells |
|---|---|---|
| Direct Capital Costs | <ul><li>Booster pumps or pressure reducing valves (depending on pressure at supply source)</li><li>Concrete vaults (buried) for booster pumps or pressure reducing valves</li><li>Interconnecting piping (buried) and valves</li></ul> | <ul><li>Well casing, screens, and plugs</li><li>Well installation costs including drilling, development, gravel pack, and surface seals</li><li>Well pumps</li><li>Piping (buried) and valves to connect the new well to the system</li></ul> |
| O&M Costs: Labor | <ul><li>Operator labor for O&M of booster pumps or pressure reducing valves (depending on pressure at supply source) and interconnecting valves</li></ul> | <ul><li>Operator labor for operating and maintaining well pumps and valves</li></ul> |
| O&M Costs: Materials | <ul><li>Cost of purchased water</li><li>Materials for maintaining booster pumps (if required by pressure at supply source)</li></ul> | <ul><li>Materials for maintaining well pumps</li></ul> |
| O&M Costs: Energy | <ul><li>Energy for operating booster pumps (if required by pressure at supply source)</li></ul> | <ul><li>Energy for operating well pumps</li></ul> |

Abbreviations: O&M – operation & maintenance.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

To generate the cost equations discussed in Section 5.3.1.3, the EPA used the following key inputs in the nontreatment model for interconnection:

- An interconnection distance of 10,000 feet;

- Includes booster pumps designed to account for friction loss in interconnecting piping; and

- An average cost of purchased water of $3.35 per thousand gallons in 2022 dollars.

For new wells, the EPA used the following key inputs:

- A maximum well capacity of 500 gallons per minute (gpm), such that one new well is installed per 500 gpm of water production capacity required;

- A well depth of 250 feet; and

- 500 feet of distance between the new wells and the distribution system.

The T&C document (U.S. EPA, 2024i) provides a comprehensive discussion of these and other key inputs and assumptions.

## 5.3.1.3 WBS Cost Equations

The EPA developed the cost estimates for PFAS treatment using outputs from the WBS models. Outputs from these models are point estimates of total capital and O&M cost that correspond to a given set of inputs that include design flow and average daily flow in MGD. Separately for total capital and annual O&M cost, the EPA fit cost equations to the WBS outputs for up to 49 different flow rates. The EPA choose from among several possible equation forms: linear, quadratic, cubic, power, exponential, and logarithmic. For each equation, the EPA selected the form that resulted in the best correlation coefficient ($R^2$), subject to the requirement that the equation must be monotonically increasing over the appropriate range of flow rates (i.e., within the flow rate category, the equation must always result in higher estimated costs for higher flow systems than for lower flow systems). The resulting cost equations take one of the following forms, identified by which coefficients (C1 through C10) are nonzero:

Equation 5:

$$\text{Cost} = C1\ Q^{C2}$$

$$\text{or} \quad = C3\ Ln(Q) + C4$$

$$\text{or} \quad = C5\ e^{(C6\ Q)}$$

$$\text{or} \quad = C7\ Q3 + C8\ Q2 + C9\ Q + C10$$

In each case, Q is design flow in MGD for total capital costs, or average flow in MGD for annual O&M costs. The resulting costs are in 2022 dollars.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The equations are categorized by water source (surface water or ground water) and component level (low, mid, or high cost). The EPA developed separate equations for small, medium, or large systems. These equations apply as follows:

- Small system equations apply where design flow (Q) is less than 1 MGD;

- Medium system equations apply where design flow (Q) is 1 MGD or greater, but less than 10 MGD; and

- Large system equations apply where design flow (Q) is 10 MGD or greater.

SafeWater MCBC selects from among the small, medium, and large equations and applies the equations using the treated flow of the EP. For GAC, IX, and nontreatment alternatives, the treated flow is the entire flow of the EP.

For GAC and IX, the EPA developed separate equations that vary according to the estimated bed life. These equations are in increments of 5,000 BV for GAC and 20,000 BV for IX. Each bed life increment corresponds to a change in media replacement frequency of two to five months, depending on the average flow of the EP. For EPs using GAC or IX, SafeWater MCBC selects from among these equations based on the final operating bed life calculated as described in Section 5.3.1.1.1, rounded down to the nearest increment of 5,000 BV for GAC and 20,000 BV for IX.

For GAC, there are separate equations for pressure designs and gravity designs. For ground water EPs using GAC, the EPA assumed PWSs would always use pressure designs to maintain their existing pressure head. For surface water EPs using GAC, the EPA assumed PWSs would choose between pressure and gravity based on the design that results in the lower annualized cost.

In total, there are more than 2,600 individual cost equations across the categories of capital and O&M cost, water source, component level, flow, bed life (for GAC and IX), residuals management scenario (for GAC and IX), and design type (for GAC). The T&C document (U.S. EPA, 2024i) presents the equations in tabular form.

## 5.3.1.4 Incremental Treatment Costs of PFNA, PFBS, and HFPO-DA

The EPA has estimated the national level costs of the final rule associated with PFOA, PFOS and PFHxS. As discussed in Chapter 4 and detailed in the Technical Support Document for PFAS Occurrence and Contaminant Background Chapter 10.1 and 10.3, there are limitations with nationally representative occurrence information for the other compounds in the final rule (PFNA, HFPO-DA, and PFBS; U.S. EPA, 2024g). Specifically, HFPO-DA does not currently have a completed nationally representative dataset while PFNA and PFBS were not included in the national occurrence model because of limited results reported above the minimum reporting levels in UCMR 3. As described in the Technical Support Document for PFAS Occurrence and Contaminant Background Chapter 10.3 non-targeted state monitoring datasets were used for extrapolation of PFNA, HFPO-DA, and PFBS in lieu of a nationally representative dataset (U.S. EPA, 2024g). EPA used conservative assumptions in this extrapolation to generate conservative cost estimates. As demonstrated in this analysis, the HI, PFNA, and HFPO-DA MCLs meaningfully increase public health protection at modest additional costs.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                          APRIL 2024

Because of the increased uncertainty associated with PFNA, HFPO-DA and PFBS, the additional treatment cost from co-occurrence of PFNA, HFPO-DA, PFBS at systems already required to treat because of PFOA, PFOS, or PFHxS MCL and HI exceedances are not quantitatively assessed in the national cost estimates. These HI treatment costs are summarized here in this section and detailed in Appendix N, Section N.3. Likewise, treatment costs for systems that exceed the HI based on the combined occurrence of PFNA, HFPO-DA, PFBS, and PFHxS (where PFHxS itself does not exceed its HBWC of 10 ppt) are not included in the national monetized cost estimates and are also summarized in this section and detailed in Appendix N, Section N.3.

In the EA for the proposed PFAS NPDWR, the EPA used a model system approach to illustrate the potential incremental costs for removing PFAS not included in the national economic model. After considering public comments on the incremental cost analysis, the EPA decided to further explore the incremental costs associated with the HI and MCLs with a national level sensitivity analysis in the final rule.

When the modeled occurrence data for PFNA, HFPO-DA, PFBS is incorporated into the SafeWater MCBC model, the estimated number of EPs exceeding one or more MCLs, and therefore required to treat or use a different water source, increases to 9,471 from 9,043. This results in an increase in the expected national costs. Under the primary analyses, the expected total national cost is $1,549 million over EPA's period of analysis (2024-2105) for the PFOA, PFOS and PFHxS MCLs (which as discussed in Section XII.A.4 of the preamble for today's rule, accounts for a portion of the HI costs). When considering the additional incremental national cost impacts of the HI MCL based on occurrence of PFNA, HFPO-DA, and PFBS and individual MCLs for PFNA and HFPO-DA based on their individual occurrence the expected national costs of the final rule increase to $1,631 million, or approximately a 5 percent national cost increase.

For further detail on the assumptions and findings of the EPA's analysis of incremental costs of other PFAS, see Appendix N, Section N.3.

## 5.3.2 Estimating PWS Administrative and Monitoring Costs

This section details how the EPA estimated the costs of compliance with system administrative and sampling activities associated with the final rule. In section 5.3.2, the EPA organizes and presents the cost information based on the series of activities that are required to comply with the final PFAS NPDWR, with tables for each data element used to calculate the final rule component costs. These tables include the data element name and a description of the data variable, as well as any relevant sources for the data. The EPA presents the costs categorized as follows:

- Administrative costs associated with implementation (Section 5.3.2.1)
- Sampling costs (Section 5.3.2.2)
- Administrative costs associated with treatment (Section 5.3.2.3)

Consistent with standard agency practice, the EPA assumes compliance with the rule throughout the economic analysis, and as a result, SafeWater MCBC does not accrue costs to any system for the Tier 2 and 3 public notifications. Nevertheless, the EPA presents a qualitative discussion of the public notification costs potentially associated with the final rule in Section 5.3.2.4.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 5.3.2.1 Implementation Administration Costs

Systems conduct the following one-time actions to begin implementation of the rule:

- Reading and understanding the rule; and

- Attending training provided by primacy agencies.

The average unit costs for PWSs are based on the following burden assumptions: 1) The EPA anticipates that the majority of water systems will likely not read the entirety of the rule preamble (as they are not required to do so) but focus their time and attention on understanding the regulatory requirements through the Code of Federal Regulations (CFR) regulatory text, relevant portions of the preamble, the EPA provided fact sheets and small system guidance documents, and state provided summaries documents; 2) Additionally, the EPA anticipates that system staff will attend primacy agency PFAS rule trainings to reenforce the systems' understanding of the final rule. The EPA assumes that systems will conduct these activities during years one through three of the period of analysis. Table 5-15 lists the data elements and provides descriptions, values, and sources for these costs. The cost per system for each activity is the product of the hourly labor cost (labor_sys_rate) and the hours (hrs_sys_adopt_rule and hrs_sys_initial_ta), which vary by system size. The total cost is the sum of per-system costs.

**Table 5-15: Implementation Administration Startup Costs ($2022)**

| Data Element Name | Data Element Description | Data Element Value | Data Element Source |
|---|---|---|---|
| labor_sys_rate | The labor rate per hour for systems | $36.43 (systems ≤3,300) $38.84 (systems 3,301-10,000) $41.00 (systems 10,001-50,000) $42.81 (systems 50,001-100,000) $50.03 (systems >100,000) | WBS Technical Labor Cost |
| hrs_sys_adopt_rule | The average hours per system to read and adopt the rule | 4 hours per system | Arsenic in Drinking Water Rule Economic Analysis (EPA 815-R-00-026) |
| hrs_sys_initial_ta | The average hours per system to attend one-time training provided by primacy agencies | 16 hours per system (systems ≤3,300) 32 hours per system (systems >3,300) | Arsenic in Drinking Water Rule Economic Analysis (EPA 815-R-00-026) |

Abbreviation: WBS – work breakdown structure.

FINAL RULE                                                                        APRIL 2024

## 5.3.2.2 Sampling Costs

The final rule requires initial and long-term monitoring. As Table 5-16 shows, surface and ground water systems serving greater than 10,000 people will collect one sample each quarter, at each EP, during the initial 12-month monitoring period. Surface water systems serving 10,000 or fewer people are also required to collect a quarterly sample at each EP during the initial 12-month period. Ground water systems that serve 10,000 or fewer people will be required to sample once at each EP on a semi-annual basis for the first 12-month monitoring period.

Long-term monitoring schedules are based on specific EP sampling results (i.e., water systems can have different EPs within the system on different monitoring schedules). Long-term monitoring requirements differ based on whether a system can demonstrate during the initial monitoring period or once conducting long-term monitoring that an EP is below the trigger levels for regulated PFAS. The trigger levels are set as one-half each of the MCLs: 2.0 ppt for PFOA and PFOS 5 ppt for PFHxS, HFPO-DA, and PFNA and 0.5 for the HI. EPs below the trigger level values during the initial 12-month monitoring period and in future long-term monitoring periods may conduct triennial monitoring and collect one triennial sample at that EP. For EPs with concentration values at or above a trigger level, a quarterly sample must be taken at that EP following initial monitoring. EPs that demonstrate they are "reliably and consistently"[20] below the MCLs following four consecutive quarterly samples are eligible to conduct annual monitoring. After three annual samples at that EP showing no results at or above a trigger level, the location can further reduce to triennial monitoring.

For any samples that have a detection, the system will analyze the field reagent blank samples collected at the same time as the monitoring sample. Systems that have an MCL exceedance will collect one additional sample from the relevant EP to confirm the results (i.e., a confirmation sample) (U.S. EPA, 2004).

---

[20] The definition of reliably and consistently below the MCL means that each of the samples contains regulated PFAS concentrations below the applicable MCLs. For the PFAS NPDWR, this demonstration of reliably and consistently below the MCL would include consideration of at least four quarterly samples at an EP below the MCL, but states will make their own determination as to whether the detected concentrations are reliably and consistently below the MCL.

FINAL RULE                                                                                         APRIL 2024

**Table 5-16: Modeled Initial and Long-Term Sampling Frequencies Per System Entry Point**

| System Size Category | Sample Number and Frequency | PFAS Detection ≥ MCLs | PFAS Detection ≥ Trigger Levels and < MCLs[b] | PFAS Detection < Trigger Levels |
|---|---|---|---|---|
| | **Initial Monitoring** | | **Long Term Monitoring[a]** | |
| ≤ 10,000 | Surface water: 1 sample every quarter Ground water: 1 sample every 6-month period | 1 sample every quarter | 1 sample every year (following four consecutive quarterly samples reliably and consistently below the MCL) | 1 triennial sample |
| >10,000 | Surface water and Ground water: 1 sample every quarter | 1 sample every quarter | 1 sample every year (following four consecutive quarterly samples reliably and consistently below the MCL) | 1 triennial sample |

Abbreviations: MCL– maximum contaminant level; PFAS – per-and polyfluoroalkyl substances.
Note:
[a]The EPA used the following thresholds to distinguish whether PFAS concentrations are reliably and consistently below the MCL: If after four consecutive quarterly samples, a system is below the MCLs (PFOA and PFOS – 4.0 ppt, PFHxS, HFPO-DA, PFNA – 10 ppt, HI – 1).
[b]Systems are not eligible for annual monitoring until after four consecutive quarterly samples are collected following initial monitoring.

For the national cost analysis, the EPA assumes that systems with either UCMR 5 data or monitoring data in the State PFAS Database will not conduct the initial year of monitoring (See Section 3.1.4). As a simplifying assumption for the cost analysis, the EPA assumes all systems serving a population of greater than 3,300 have UCMR 5 data and those with 3,300 or less do not. For the State PFAS Database, the EPA relied on the PWSIDs stored in the database and exempted those systems from the first year of monitoring in the cost analysis.

The EPA assumes that systems with an MCL exceedance will implement actions to comply with the MCL by the compliance date. As indicated in Section 5.3.1, the EPA assumes a treatment target, for systems required to treat for PFAS, that includes a margin of safety so finished water PFAS levels at these systems are 80 percent of the MCLs and HI. In the final rule, in order to reduce burden associated with monitoring, the EPA is adding an annual tier of sampling for any system with concentrations reliably and consistently below the MCL but not consistently below the trigger level. The EPA believes this tier would likely apply to most systems treating their water for regulated PFAS, at least for the first three years of treatment. Therefore, in the model, the EPA assumes EPs that have installed treatment will take one year of quarterly samples, then continue to sample on an annual basis after that. The final rule allows EPs showing no results at or above a trigger level after three annual samples to further reduce to triennial monitoring. In the national cost analysis, the EPA does not model this possibility nor does the EPA model instances where water systems are triggered back into quarterly monitoring after installing treatment.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

For all systems, the activities associated with the sample collection in the initial 12-month monitoring period are the labor burden and cost for the sample collection and analysis, as well as a review of the sample results. Table 5-17 presents the data needs associated with the implementation monitoring period. The cost per EP for each sampling activity is the product of the hourly labor cost and the hours plus the laboratory analysis cost. The laboratory analysis cost will include the additional field blank cost when occurrence values exceed method detection limits. The total cost is the sum of per-EP costs.

**Table 5-17: Sampling Costs ($2022)**

| Data Element Name | Data Element Description | Data Element Value | Data Element Source |
|---|---|---|---|
| labor_sys_rate | The labor rate per hour for systems | $36.43 (systems ≤3,300)<br>$38.84 (systems 3,301-10,000)<br>$41.00 (systems 10,001-50,000)<br>$42.81 (systems 50,001-100,000)<br>$50.03 (systems >100,000) | WBS Technical Labor Cost |
| numb_initial_samples | The number of samples per EP per monitoring round for the initial monitoring in Year 1 | 4 samples per system[a]<br>2 samples (ground water systems ≤ 10,000) | Final rule |
| numb_quarterly_samples | The number of samples per EP per long-term monitoring year for EPs with finished water concentrations > MCLs (i.e., Systems not reliably and consistently below the MCLs) | 4 samples per year | Final rule |
| numb annual samples | The number of samples per EP per long-term monitoring year for EPs with finished water concentrations ≤ MCLs but ≥ the trigger levels for four consecutive quarterly samples | 1 sample per year | |
| numb_trienniall_samples | The number of samples per EP per long-term monitoring round for EPs with finished water concentrations < the trigger levels | 1 sample every 3 years | Final rule |
| hrs_samp | The hours per sample to travel to sampling locations, collect samples, record any additional information, submit samples to a laboratory, and review results | 1 hour | UCMR5 ICR (EPA-HQ-OW-2020-0530-00141) |
| EPA537_cost | The laboratory analysis cost per sample for EPA Method 537.1[b] | $309 | UCMR5 ICR (EPA-HQ-OW-2020-0530-0141) |

FINAL RULE                                                                    APRIL 2024

**Table 5-17: Sampling Costs ($2022)**

| Data Element Name | Data Element Description | Data Element Value | Data Element Source |
|---|---|---|---|
| EPA537_fieldblank_cost | The laboratory analysis cost per sample for the field reagent blank under EPA Method 537.1 | $273[c] | |

Abbreviations: EPA – U.S. Environmental Protection Agency; ICR – Information Collection Request; UCMR – Unregulated Contaminant Monitoring Rule; WBS – work breakdown structure.
Notes:
[a]Systems greater than 3,300 will rely on UCMR 5 data and a subset of other systems will rely on data in the State PFAS Monitoring Database.
[b]The EPA assumes that while both methods provide the required data to demonstrate compliance, water systems will select the least costly analytical method (which is Method 537.1).
[c]This incremental sample cost applies to all samples that exceed the method detection limit.

## 5.3.2.3 Treatment Administration Costs

As described in Section 5.3.1, any system with an MCL exceedance adopts either a treatment or nontreatment alternative to comply with final rule. The majority of systems are anticipated to install treatment technologies while a subset, described in Section 5.3.1.1, will choose alternative methods. The EPA assumes that systems will have administrative costs associated with obtaining permits for either the treatment or nontreatment methods. The costs vary depending on whether the system installs treatment or selects a nontreatment method. For the economic analysis, the EPA assumes that systems install treatment in the fifth year of the period of analysis. In addition, after installation of treatment, the EPA assumes that systems will spend an additional 2 hours per treating EP compiling data for and reviewing treatment efficacy with their primacy agency during their triennial sanitary survey.

Table 5-18 presents the data elements and sources for these costs. The cost per EP requiring treatment or changing water source is the product of the hourly labor cost and the hours per the relevant permit request and sanitary survey review. The total cost is the sum of per-EP costs.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                 APRIL 2024

**Table 5-18: Treatment Administration Costs ($2022)**

| Data Element Name | Data Element Description | Data Element Value | Data Element Source |
|---|---|---|---|
| labor_sys_rate | The labor rate per hour for systems | $36.43 (systems ≤3,300) $38.84 (systems 3,301-10,000) $41.00 (systems 10,001-50,000) $42.81 (systems 50,001-100,000) $50.03 (systems >100,000) | WBS Technical Labor Cost |
| hrs_sys_treat | The hours per EP for a system to notify, consult, and submit a permit request for treatment installation[a] | 3 hours (systems ≤100) 5 hours (systems 101-500) 7 hours (systems 501-1,000) 12 hours (systems 1,001 - 3,300) 22 hours (systems 3,301-50,000) 42 hours (systems >= 50,001) | Lead and Copper Rule Revisions Support Material (EPA-HQ-OW-2017-0300-1701) |
| hrs_ss_increment | The additional hours per EP the system will spend every 3 years after PFAS-related treatment is installed during a sanitary survey. | 2 hours per EP that installs treatment every 3 years post-installation | Lead and Copper Rule Revisions Support Material (EPA-HQ-OW-2017-0300-1701) |
| hrs_sys_source | The hours per EP for a system to notify, consult, and submit a permit request for source water change or alternative method[a] | 6 hours | Lead and Copper Rule Revisions Support Material (EPA-HQ-OW-2017-0300-1700) |

Abbreviations: WBS – work breakdown structure.
Note:
[a]The Lead and Copper Rule Revisions presents this burden per system, but the EPA applied the cost per EP for this economic analysis because the notification, consultation, and permitting process occurs for individual EPs.

## 5.3.2.4 Public Notification Costs

While the EPA assumes full compliance with the rule and does not include public notification costs in the cost estimates, there are public notification requirements in the final rule for systems with certain violations. The final rule designates MCL violations for PFAS as Tier 2, which requires systems to provide public notification as soon as practical, but no later than 30 days after the system learns of the violation. The system must repeat notice every three months if the violation or situation persists unless the primacy agency determines otherwise. At a minimum, systems must give repeat notice at least once per year.

The final rule designates monitoring and testing procedure violations as Tier 3, which requires systems to provide public notice not later than one year after the system learns of the violation.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The system must repeat the notice annually for as long as the violation persists. Community water systems may deliver Tier 3 PNs in their CCR if the timing, content, and delivery requirements are met according to 40 CFR 141.204(d). Using the CCR to deliver Tier 3 PNs can minimize the burden on systems by reducing delivery costs.

To provide an approximate estimate of the burden associated with the Tier 2 and 3 violations, the EPA reviewed the ICR for the Public Water System Supervision (PWSS) Program (U.S. EPA, 2011), which includes Tier 2 and 3 notifications. Table 5-19 presents the PWSS Program ICR burdens for the preparation and delivery of the Tier 2 and 3 public notifications.

**Table 5-19: Public Notification Burden Estimate**

| Data Element[a] | Data Element Value | Data Element Source |
|---|---|---|
| Preparation of initial Tier 2 notices | 3.5 hours | PWSS Program ICR (EPA-HQ-OW-2011-0433-0003) |
| Preparation of initial Tier 3 notices | 3 hours (CWS)<br>3.5 hours (NTNCWS) | PWSS Program ICR (EPA-HQ-OW-2011-0433-0003) |
| Delivery of initial Tier 2 notices | 9 hours (CWS ≤500)<br>30 hours (CWS >500)<br>9 hours (NTNCWS) | PWSS Program ICR (EPA-HQ-OW-2011-0433-0003) |
| Development and delivery of repeated Tier 2 and 3 notices | 3 hours | PWSS Program ICR (EPA-HQ-OW-2011-0433-0003) |

Abbreviations: CWS – community water systems; NTNCWS – non-transient non-community water systems; PWSS – public water systems supervision; ICR – information collection request.
Note:
[a]Delivery of Tier 3 notices must occur not later than one year after the system learns of the violation. The EPA assumes systems will include this notice with the Consumer Confidence Reports sent to all customers annually, therefore Tier 3 delivery costs are assumed to be zero.

## 5.4 Estimating Primacy Agency Costs

In addition to the PWS costs associated with the rule implementation, the EPA assumes primacy agencies will have upfront implementation costs as well as ongoing administrative costs and costs associated with the system actions related to sampling and treatment. The activities associated with primacy agencies under the final rule include:

- Reading and understanding the rule, providing internal primacy agency officials training for the rule implementation, updating sanitary survey standard operating procedures,

- Primacy package application, including making state regulatory changes to the federal rule where applicable

- Providing systems with training and technical assistance during the rule implementation;

- Reporting to the EPA on an ongoing basis any PFAS-specific information under 40 CFR 142.15 regarding violations as well as enforcement actions and general operations of public water supply programs;

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                      APRIL 2024

- Performing inspection of PFAS related treatment during sanitary surveys every three years[21]

- Reviewing the sample results during the initial monitoring period and the long-term monitoring period; and

- Reviewing and consulting with systems on the installation of treatment technology or alternative methods, including source water change.

For the last three activities listed above, primacy agency burdens are incurred in response to an action taken by a system. For example, the cost to primacy agencies of reviewing any sample result depends on the number of samples taken at each EP by each system under the jurisdiction of the primacy agency. Table 5-20 presents the data elements and sources for all primacy agency costs. The data element descriptions indicate whether the cost is per primacy agency, per sample, per system, or per EP. In each instance, the primacy agency labor rate is multiplied by the number of relevant hours and the activity frequency.

### Table 5-20: Primacy Agency Costs ($2022)

| Data Element Name | Data Element Description | Data Element Value | Data Element Source |
|---|---|---|---|
| labor_pa_rate | The labor rate per hour for primacy agencies | $59.69 | Loaded labor rate (including the cost of benefits) derived from the Bureau of Labor Statistics[a] |
| hrs_pa_adopt_rule | The average hours per primacy agency to read and understand the rule, update sanitary survey standard operating procedures, and train internal staff. | 4,020 hours per primacy agency | ASDWA, 2023 |
| hrs_pa_write_reg | The average hours for a primacy agency to develop state-level regulations | 300 hours per primacy agency | ASDWA, 2023 |
| hrs_pa_initial_ta | The average hours per primacy agency to provide initial training and technical assistance to systems | 1,500 hours per primacy agency | ASDWA, 2023 |
| hrs_sdwis | The average hours per primacy agency to report annually to the EPA information under 40 CFR 142.15 regarding violations, variances and exemptions, enforcement actions and general operations of State public water supply programs | 0 | The EPA assumes that the final PFAS rule will have no discernable incremental burden for quarterly or annual reports to SDWIS/Fed |

---

[21] Sanitary surveys are required for CWS every three years, except for CWS with outstanding performance based on prior sanitary surveys for which they are required every 5 years. Sanitary surveys are required for NCWS at least every 5 years. As a simplifying assumption in the national cost analysis, the EPA set the sanitary survey frequency to three years for all systems expected to install treatment to comply with the PFAS rule.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                          APRIL 2024

**Table 5-20: Primacy Agency Costs ($2022)**

| Data Element Name | Data Element Description | Data Element Value | Data Element Source |
|---|---|---|---|
| hrs_pa_report_ep | The hours per sample for a primacy agency to review sample results | 1 hour | Arsenic in Drinking Water Rule Economic Analysis (EPA 815-R-00-026) |
| hrs_pa_treat | The hours per EP for a primacy agency to review and consult on installation of a treatment technique[b] | 80 hours (systems ≤3,300) 70 hours (systems serving 3,301 - 50,000) 50 hours (systems serving > 50,000) | ASDWA, 2023 |
| hrs_pa_ss_increment | The additional hours per EP the primacy agency will spend every 3 years after PFAS-related treatment is installed during a sanitary survey. | 2 hours per EP that installs treatment every 3 years post-installation. | Lead and Copper Rule Revisions Support Material (EPA-HQ-OW-2017-0300-1701) |
| hrs_pa_source | The hours per EP for a primacy agency to review and consult on a source water change[b] | 4 hours | Lead and Copper Rule Revisions Support Material (EPA-HQ-OW-2017-0300-1700) |

Abbreviations: PFAS – per-and polyfluoroalkyl substances; SDWIS/Fed – Safe Drinking Water Information System Federal Version; ASDWA – Association of State Drinking Water Administrators.
Notes:
[a]State employee wage rate of $33.91 from National Occupational Employment and Wage Estimates, United States, BLS SOC Code 19-2041, "State Government, excluding schools and hospitals - Environmental Scientists and Specialists, Including Health," hourly mean wage rate. May 2020 data (published in March 2021): https://www.bls.gov/oes/current/oes192041.htm. Wages are loaded using a factor of 62.2 from the BLS Employer Costs for Employee Compensation report, Table 3, March 2020. Percent of total compensation - Wages and Salaries - All Workers - State and Local Government Workers (https://www.bls.gov/news.release/archives/ecec_06182020.pdf). See worksheet BLS Table 3. The final loaded wage is adjusted for inflation.
[b]The Lead and Copper Rule Revisions present this burden per system, but the EPA has applied the cost per EP for this economic analysis because the notification, consultation, and permitting process occurs for individual EPs.

In addition to the costs described above, a primacy agency may also have to review the certification of any Tier 2 or 3 public notifications sent out by systems. The EPA assumes full compliance with the final rule but provides a brief discussion of the possible system costs associated with this component in Section 5.3.2.4. The public notification burden associated with primacy agencies is between 0.33 and 0.5 hours per system to review the system certification of the public notification. The burden is derived from the Lead and Copper Rule Revisions estimates for a similar activity.

## 5.5 PWS-Level Cost Estimates

PWS-level cost estimates for the final rule and other regulatory options are provided in Appendix C. PWS-level cost are provided for all PWSs by PWS-type, size category, primary source water

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

type, and ownership. In addition, a second set of PWS-level costs are provided for PWSs that must take action to comply with the rule (treat or change water source).

## 5.6 Household-Level Cost Estimates

Household-level cost estimates for the final rule and other regulatory options are provided in Appendix C. Household-level cost are provided for all CWSs by size category, primary source water type, and ownership. In addition, a second set of household-level costs are provided for households served by CWSs that must take an action to comply with the rule (treat or change water source).[22]

## 5.7 Discussion of Data Limitations and Uncertainty

The preceding sections identify the nonquantifiable costs and the uncertainty information incorporated in the quantitative cost analysis. There are also data limitations that could not be incorporated in this analysis. Chapter 7 and Table 7-6 outline the nonquantifiable costs associated with the regulatory requirements of the final rule as well as Options 1a-c. Table 5-21 lists the data limitations and characterizes the impact on the quantitative cost analysis. The EPA notes that in most cases it is not possible to judge the extent to which a particular limitation or uncertainty could affect the cost analysis. The EPA provides the potential direction of the impact on the cost estimates when possible but does not prioritize the entries with respect to the impact magnitude.

**Table 5-21: Limitations that Apply to the Cost Analysis for the Final PFAS Rule**

| Uncertainty/ Assumption | Effect on Quantitative Analysis | Notes |
|---|---|---|
| WBS engineering cost model assumptions and component costs | Uncertain | The WBS engineering cost models require many design and operating assumptions to estimate treatment process equipment and operating needs. Section 5.3.1 addressed the bed life assumption. The Technologies and Costs document (U.S. EPA, 2024i) and individual WBS models in the rule docket provide additional information. The component-level costs approximate national average costs, which can over- or under-estimate costs at systems affected by the final rule. |
| Compliance forecast | Uncertain | The forecast probabilities are based on historical full-scale compliance actions. Site-specific water quality conditions, changes in technology, and changes in market conditions can result in future technology selections that differ from the compliance forecast. |

---

[22] Note that the EPA does compute per household technology cost values in the separate national small system affordability determination analysis. These household values are distinct from the values generated in the national cost estimates as they include only small system compliance technology cost. For three small system size categories (systems serving 25-500, 501-3,300, and 3,301-10,000) The EPA estimates a per household treatment technology cost range including the minimum and maximum cost values. These cost estimates are based on system characteristics, contaminant reduction requirements, and technology efficacy, across the set of small system compliance technology options. See Chapter 9.12 for additional information on the national small system affordability determination.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 5-21: Limitations that Apply to the Cost Analysis for the Final PFAS Rule**

| Uncertainty/ Assumption | Effect on Quantitative Analysis | Notes |
|---|---|---|
| TOC concentration | Uncertain | The randomly assigned values from the two national distributions are based on a limited dataset. Actual TOC concentrations at systems affected by the final rule can be higher or lower than the assigned values. |
| Insufficient UCMR 3 data for PFBS and PFNA and no UCMR 3 data for HFPO-DA were available to incorporate into the Bayesian hierarchical occurrence model | Underestimate | The final rule regulates PFBS, PFNA, and HFPO-DA in addition to the PFAS modeled in the primary analysis (PFOA, PFOS and PFHxS). In instances when concentrations of PFBS, PFNA, and/or HFPO-DA are high enough to cause or contribute to HI exceedances or PFNA and/or HFPO-DA are high enough to cause individual MCL exceedances, the modeled costs in the primary analysis may be underestimated. If these PFAS occur in isolation at levels that affect treatment decisions, or if they occur in sufficient concentration to result in an exceedance when the concentration of PFHxS alone would be below the HBWC, then costs would be underestimated. Note that the EPA has conducted an analysis of and considered the potential changes in national level treatment cost associated with the occurrence of PFBS, PFNA, and HFPO-DA, which is discussed in detail in Appendix N, Section N.3. |
| POU not included in compliance forecast | Overestimate | If POU devices can be certified to meet concentrations that satisfy the final rule, then small systems may be able to reduce costs by using a POU compliance option instead of centralized treatment or source water changes. |
| Process wastes not classified as hazardous | Underestimate | The national cost analysis reflects the assumption that PFAS-contaminated wastes are not considered RCRA regulatory or characteristic hazardous wastes. To address stakeholder concerns, including those raised during the SBREFA process, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. As part of this analysis, the EPA generated a second full set of unit cost curves that are identical to the curves used for the national cost analysis with the exception that spent GAC and spent IX resin are considered hazardous. The EPA acknowledges that if in the future PFAS-contaminated wastes require handling as hazardous wastes, the residuals management costs in the WBS treatment cost models are expected to be higher. See Appendix N, Section N.2 for a sensitivity analysis describing the potential increase in costs associated with hazardous waste disposal at 100 percent of systems treating for PFAS. The costs estimated in Appendix N, Section N.2 are consistent with EPA OLEM's "Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances" (U.S. EPA, 2020b). |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 5-21: Limitations that Apply to the Cost Analysis for the Final PFAS Rule**

| Uncertainty/ Assumption | Effect on Quantitative Analysis | Notes |
|---|---|---|
| Population served held constant over time | Uncertain | All PWS populations served were held constant over the period of analysis as not all locations have reliable information on population changes over time. If population served by affected PWSs increases (or decreases), then the estimated costs are likely underestimated (or overestimated). |

Abbreviations: WBS – work breakdown structure; TOC – total organic carbon; HFPO-DA – hexafluoropropylene oxide dimer acid; PFAS – per and polyfluoroalkyl substances; PFBS – perfluorobutanesulfonic acid; PFNA – perfluorononanoic acid; PFHxS – perfluorohexanesulfonic acid; MCL – maximum contaminant level; HI – hazard index; HBWC- health based water concentration; POU – point-of-use; RCRA – Resource Conservation and Recovery Act; SBREFA  – Small Business Regulatory Enforcement Fairness Act; GAC –  granulated activated carbon; IX – ion exchange; OLEM – Office of Land Energy and Management.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# 6  Benefits Analysis

## 6.1 Introduction

This chapter discusses the potential quantified and nonquantifiable[23] benefits to human health resulting from changes in PFAS levels in drinking water due to implementation of the final rule, as well as several regulatory alternatives. The EPA's quantification of health benefits resulting from reduced PFAS exposure in drinking water was driven by PFAS occurrence estimates, pharmacokinetic (PK) model availability, information on exposure-response relationships, and economic data to monetize the impacts. The EPA either quantitatively assesses or qualitatively discusses health endpoints associated with exposure to PFAS. The EPA assesses potential benefits quantitatively if there is evidence of an association between PFAS exposure and health effects if it is possible to link the outcome to risk of a health effect, and if there is no overlap in effect with another quantified endpoint in the same outcome group. Only a subset of the avoided morbidity and mortality stemming from reduced PFAS levels in drinking water can be quantified and monetized. The monetized benefits evaluated in the economic analysis for the final rule include changes in human health risks associated with CVD and infant birth weight from reduced exposure to PFOA and PFOS in drinking water and RCC from reduced exposure to PFOA.[24] The EPA also quantified benefits from reducing bladder cancer risk due to the co-removal of non-PFAS pollutants via the installation of drinking water treatment, discussed in greater detail in Section 6.7. The EPA was not able to quantify or monetize other benefits, including those related to possible immune, hepatic, endocrine, metabolic, reproductive, musculoskeletal, or other outcomes. The EPA discusses these benefits qualitatively in more detail below in Section 6.2 of the economic analysis.

The EPA analyzes the quantified costs and benefits of the final rule MCLs of 4.0 ppt for PFOA, 4.0 ppt for PFOS, and a unitless HI of 1 for the group including PFNA, HFPO-DA, PFHxS, and PFBS. The analysis of costs and benefits associated with the HI also express the costs and benefits of the individual MCLs for PFNA, HFPO-DA, and PFHxS. Additionally, the EPA presents the incremental costs and benefits associated with three regulatory alternative MCLs for PFOA and PFOS at 4.0 ppt, 5.0 ppt, and 10.0 ppt, referred to as Options 1a through 1c respectively. As discussed in Section 2.1, the regulatory options include treatment thresholds that would reduce PFAS levels in finished drinking water by various amounts. The change in PFAS levels at a particular water system depends on baseline PFAS levels estimated using the occurrence model (Section 4.4) and the PFAS treatment threshold specified under each regulatory alternative.

The EPA notes that the quantified benefits alone of this analysis are a significant underestimate of the total benefits expected to result from this rule because the EPA was not able to quantitatively monetize all benefits. Hence, as mandated by SDWA Section 1412(b)(3)(C), the

---

[23] Nonquantifiable benefits are discussed qualitatively.

[24] Benefits to human health in terms of reduced liver cancer incidence are described in Appendix O. This analysis is presented as a supplemental analysis for the final rule in response to public comments received on the proposed rule requesting that the EPA quantify additional health benefits.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA has considered both quantifiable and nonquantifiable benefits in informing its decision making that the costs of this rule are clearly justified by the benefits.

## 6.1.1 Chapter Overview

Section 6.2 provides an overview of the health benefit categories considered in the analysis of reductions of PFAS in drinking water. In addition to describing the benefits that the EPA is able to quantify, this section includes a robust qualitative discussion of nonquantifiable benefits. Because of the broad adverse health impacts of PFAS on many endpoints, the nonquantifiable benefits of this final rule are likely substantial. Section 6.3 describes the application of the EPA's PK models for PFAS to estimate changes in blood serum concentrations under each regulatory alternative. Section 6.4 presents the methodology and results of the impacts of the PFAS regulatory alternatives on a subset of developmental outcomes, namely infant birth weight. Section 6.5 presents the methodology and results of the impacts of the PFAS regulatory alternatives on CVD incidence. Section 6.6 presents the methodology and results of the impacts of the PFAS regulatory alternatives on the incidence of RCC, one of the cancers associated with PFOA exposure. Section 6.7 presents the methodology and results of the impacts of the PFAS regulatory alternatives on DBP formation and the associated incidence of bladder cancer. Finally, Section 6.8 describes limitations and uncertainties of the benefits analyses.

## 6.1.2 Uncertainty Characterization

The EPA characterizes sources of uncertainty in its analysis of potential quantified benefits resulting from changes in PFAS levels in drinking water. The analysis reports uncertainty bounds for benefits estimated in each health endpoint category modeled for the final rule. Each lower (upper) bound value is the 5th (95th) percentile of the category-specific benefits estimate distribution represented by 4,000 Monte Carlo draws. Table 6-1 provides an overview of the specific sources of uncertainty that the EPA quantified in this benefits analysis. In addition to these sources of uncertainty, reported uncertainty bounds also reflect the following upstream sources of uncertainty: baseline PFAS occurrence (Section 4.4), affected population size and demographic composition (Section 4.3), and the magnitude of PFAS concentration reductions (Section 4.4). These analysis-specific sources of uncertainty are further described in Appendix L.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-1: Quantified Sources of Uncertainty in Benefits Estimates**

| Source | Description of Uncertainty |
|---|---|
| Health effect slope factors | The slope factors that express the effects of serum PFOA, serum PFOS, and THM4 on health outcomes (birth weight, CVD,[a] RCC, and bladder cancer) are based either on the EPA meta-analyses or medium- or high-confidence studies that provide a central estimate and a confidence interval. To characterize uncertainty, the EPA assumed that these slope factors have a normal distribution with a mean set at the central estimate and the standard deviation set at the estimated standard error. |
| RCC risk reduction cap | The EPA implemented a cap on the cumulative RCC risk reductions due to reductions in serum PFOA based on the population attributable fraction (PAF) estimates for a range of cancers and environmental contaminants. This parameter is treated as uncertain; its uncertainty is characterized by a log-uniform distribution with a minimum set at the smallest PAF estimate identified in the literature and a maximum set at the largest PAF estimate identified in the literature. The central estimate for the PAF is the mean of this log-uniform distribution. |

Abbreviations: PFAS – per- and polyfluoroalkyl substances; PFOA – perfluorooctanoic acid; PFOS – perfluorooctane sulfonic acid; RCC – renal cell carcinoma; PAF – population attributable fraction, THM4 – four regulated trihalomethanes.
Note:
[a] The slope factors contributing to the CVD benefits analysis include the relationship between total cholesterol and PFOA and PFOS, and the relationship between blood pressure and PFOS.

The EPA did not characterize the following sources of potentially quantifiable uncertainty in the national-level quantified benefits analysis: U.S. population life tables (see Section 6.1.4), annual all-cause and health outcome-specific incidence and mortality rates, coefficients of the CVD risk model linking total cholesterol (TC), high-density lipoprotein cholesterol (HDLC), and blood pressure (BP) to cardiovascular event incidence (Goff et al., 2014), CVD risk model predictors (e.g., share of smokers) estimated from health survey data, prevalence of CVD event history in the U.S. population, distribution of CVD events by type, the estimated infant mortality-birth weight slope factor (See Section 6.4.3.1), state-level distributions of infant births and infant deaths over discrete birth weight ranges, the 200-g cap on birth weight changes estimated under the rule, cost of illness estimates for all modeled non-fatal health outcomes, the Value of Statistical Life reference value, the Value of Statistical Life income elasticity value used to approximate the Value of Statistical Life income growth adjustment, and the gross domestic product per capita projection used for the Value of Statistical Life income growth adjustment (see Appendix J). The EPA expects that the sources listed in Table 6-1, in addition to uncertainty surrounding the estimates of PFAS occurrence, affected population size, and the magnitude of PFAS reduction, account for a substantial portion of the uncertainty in the benefits analysis.

## 6.1.3 Summary of Quantified National Benefits Estimates of the Final Rule

This section provides summary outputs for the benefits analysis of the final rule as well as Options 1a-c. Total annual benefits include human health risk reduction benefits for the health outcomes listed in Section 6.1.1. The EPA annualized benefit values for each endpoint at a 2 percent discount rate. Both the expected value and the 90% confidence interval (CI) are provided.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

As discussed in Section 2.1, for purposes of this analysis, the EPA is considering the benefits analysis to be representative of the final rule utilizing individual MCLs for PFOA, PFOS, PFNA, HFPO-DA, and PFHxS and a group MCL based on a HI for PFNA, HFPO-DA, PFHxS, and PFBS.

**Table 6-2: National Annualized Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, and HFPO-DA MCLs of 10 ppt each and HI of 1) (Million $2022)**

|  | 2% Discount Rate | | |
|---|---|---|---|
|  | **5th Percentile[a]** | **Expected Value** | **95th Percentile[a]** |
| Annualized CVD Benefits | $140.66 | $606.09 | $1,069.40 |
| Annualized Birth Weight Benefits | $124.85 | $209.00 | $292.78 |
| Annualized RCC Benefits | $61.33 | $353.90 | $883.55 |
| Annualized Bladder Cancer Benefits | $300.64 | $380.41 | $463.74 |
| **Total Annualized Rule Benefits[b]** | **$920.91** | **$1,549.40** | **$2,293.80** |

Abbreviations: CVD – cardiovascular disease; HI – hazard index; RCC – renal cell carcinoma.
Note: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates. 5th and 95th percentile values for total rule benefits are not additive across benefit category as the categories are not completely correlated. Quantifiable benefits are increased under final rule table results relative to the other options presented because of modeled PFHxS occurrence, which results in additional quantified benefits from co-removed PFOA and PFOS.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

When using willingness to pay instead of cost of illness values to monetize cancer morbidity impacts, annualized RCC benefits are $360.97 million, whereas annualized bladder cancer benefits are $456.28 million (see Appendix O). If used in the national benefits analysis, these willingness to pay estimates would result in approximately 83 million dollars additional quantified benefits from those presented in Table 6-2, resulting in an increase in quantified benefits of approximately 5.4%.

Additionally, in Appendix O, the EPA presents several sensitivity analyses, including an analysis evaluating liver cancer benefits. Quantified benefits associated with reduction of liver cancer from PFOS could increase total benefits from $1,549.40 million to $1,554.19 million (see Appendix O).

FINAL RULE                                                                                         APRIL 2024

**Table 6-3: National Annualized Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) (Million $2022)**

|  | 2% Discount Rate | | |
| --- | --- | --- | --- |
|  | **5th Percentile[a]** | **Expected Value** | **95th Percentile[a]** |
| Annualized CVD Benefits | $140.12 | $602.72 | $1,059.60 |
| Annualized Birth Weight Benefits | $124.82 | $207.82 | $291.00 |
| Annualized RCC Benefits | $60.90 | $351.79 | $877.47 |
| Annualized Bladder Cancer Benefits | $301.06 | $380.41 | $462.73 |
| **Total Annualized Rule Benefits[b]** | **$913.05** | **$1,542.74** | **$2,280.10** |

Abbreviations: CVD – cardiovascular disease; RCC – renal cell carcinoma.
Note: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates. 5th and 95th percentile values for total rule benefits are not additive across benefit category as the categories are not completely correlated.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

**Table 6-4: National Annualized Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) (Million $2022)**

|  | 2% Discount Rate | | |
| --- | --- | --- | --- |
|  | **5th Percentile[a]** | **Expected Value** | **95th Percentile[a]** |
| Annualized CVD Benefits | $119.18 | $513.27 | $900.13 |
| Annualized Birth Weight Benefits | $107.34 | $178.97 | $250.00 |
| Annualized RCC Benefits | $48.41 | $290.72 | $730.99 |
| Annualized Bladder Cancer Benefits | $246.48 | $313.88 | $383.32 |
| **Total Annualized Rule Benefits[b]** | **$768.55** | **$1,296.84** | **$1,919.30** |

Abbreviations: CVD – cardiovascular disease; RCC – renal cell carcinoma.
Note: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates. 5th and 95th percentile values for total rule benefits are not additive across benefit category as the categories are not completely correlated.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-5: National Annualized Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) (Million $2022)**

| | 2% Discount Rate | | |
|---|---|---|---|
| | **5th Percentile[a]** | **Expected Value** | **95th Percentile[a]** |
| Annualized CVD Benefits | $66.97 | $267.56 | $469.05 |
| Annualized Birth Weight Benefits | $60.24 | $98.97 | $137.75 |
| Annualized RCC Benefits | $21.20 | $137.30 | $352.07 |
| Annualized Bladder Cancer Benefits | $120.97 | $160.62 | $202.14 |
| **Total Annualized Rule Benefits[b]** | **$397.28** | **$664.45** | **$970.70** |

Abbreviations: CVD – cardiovascular disease; RCC – renal cell carcinoma.

Note: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates. 5th and 95th percentile values for total rule benefits are not additive across benefit category as the categories are not completely correlated.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.

[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

## 6.1.4 Life Table Modeling Background

The EPA uses a life table modeling approach to evaluate reductions in CVD and cancer risk. This approach allows for internally consistent estimation of the path-dependent health effects for regulatory alternatives, including annual incidence of CVD events or cancers among those without prior history of these conditions, which is dependent on the population prevalence of these chronic conditions and survival over time.

The life table is a statistical tool used to analyze the mortality experience of a population over time. Specifically, using data on the age-specific probability of death and the initial population size (e.g., 100,000 persons), the life table computes the number of persons surviving to a specific age, the number of deaths occurring at a given age, the number of person-years lived at a given age, the number of person-years lived beyond a given age, and age-specific life expectancy. The details of standard life table calculations can be found in Anderson (1999).

The life table modeling approach extends the standard life table calculations to characterize populations with respect to their chronic condition status and estimate transitions into the subpopulation affected by the chronic condition.[25] The EPA has previously used life table approaches in regulatory analyses, including the analysis of lead-associated health effects in the 2015 *Benefit and Cost Analysis for the Effluent Limitations Guidelines, Standards for the Steam*

---

[25] For example, a benefits model that evaluates the impact of contaminant exposure on incidence of cancer—a chronic condition—would need to estimate the number of persons who are cancer free and, therefore, are eligible for the estimation of new cancer risk (i.e., the risk of transition into the subpopulation affected by the chronic condition).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Electric Power Generating Point Source Category* (U.S. EPA, 2015), and PM$_{2.5}$-related health effects in revisions to the National Ambient Air Quality Standards for ground-level ozone (U.S. EPA, 2008). Other examples of the use of a life table approach among federal agencies include the EPA's analysis of Benefits and Costs of the Clean Air Act from 1990 to 2020 (U.S. EPA, 2011a) and the Occupational Safety and Health Administration (OSHA) assessment of lifetime excess lung cancer, nonmalignant respiratory disease mortality, and silicosis risks from exposure to respirable crystalline silica (OSHA, 2010; OSHA, 2016). Additionally, the agency sought advice from the EPA SAB on the use of the life table in this application and they supported this approach (U.S. EPA, 2022i). See Appendix G for details on application of the life table for the CVD benefits analysis. See Appendix H for details on application of the life table for cancer benefits analyses.

## 6.2 Overview of Benefit Categories

The EPA's decision to quantify health benefits resulting from reduced PFAS exposure in drinking water is driven by the availability of PFAS-related occurrence estimates, PK models, and information on exposure-response relationships. In this benefits analysis, the EPA either quantitatively assesses or qualitatively discusses the health endpoints associated with exposure to PFAS; the EPA assesses potential benefits quantitatively if (1) there is indicative evidence of a relationship between exposure and a health effect response, (2) it is possible to link the health outcome (e.g., CVD) to risk of a health effect (e.g., increased total cholesterol), and (3) there is no overlap in effect with another quantified endpoint in the same outcome group.

The EPA describes occurrence modeling information in Section 4.4. Table 6-6 presents an overview of the categories of health benefits expected to result from the implementation of treatment that reduces PFAS levels in drinking water. The PFAS compounds that the EPA identified as having indicative evidence linking exposure to a particular health endpoint, as well as compounds having reliable PK models estimating the distribution to PFAS compounds throughout the body, include PFOA, PFOS, and PFNA.[26]

As seen in Table 6-6, only a small subset of the potential health effects of reduced PFAS levels in drinking water can be quantified and monetized. The monetized benefits evaluated in the national-level quantified analysis for the final rulemaking include CVD, infant birth weight, and RCC. The EPA also quantified benefits from reducing bladder cancer risk due to the reduction of DBP formation as a result of the co-removal of organic carbon via the installation of additional treatment for PFAS (Cantor et al., 1998; Crittenden et al., 1993; Regli et al., 2015; Weisman et al., 2022). The EPA also quantified benefits associated with PFOS effects on liver cancer and PFNA effects on birth weight in sensitivity analyses, available in appendices O and K, respectively. The EPA notes that the agency anticipates additional benefits resulting from installing drinking water treatment for PFAS chemicals and the subsequent removal of co-occurring non-PFAS contaminants, including source water metals (e.g., chromium (VI)), organic regulated and unregulated contaminants, (e.g., cyanotoxins (Foreman et al., 2021)), and certain pesticides. The EPA was not able to quantify or monetize other benefits, including those related to possible immune, hepatic, endocrine, metabolic, reproductive, musculoskeletal, many cancers,

---

[26] The EPA relies on the serum PFNA calculator from Lu and Bartell (2020). PFNA effects are described as part of a sensitivity analysis for birth weight-related benefits in Appendix K.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

or other outcomes discussed in Section 6.1.2. The EPA discusses these benefits qualitatively in Sections 6.2.2.2 and 6.2.4.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-6: Overview of Health Benefits Categories Considered in the Analysis of Changes in PFAS Drinking Water Levels**

| | Health Outcome | PFAS Compound[a,b,d] | | Benefits Analysis | |
|---|---|---|---|---|---|
| Category | Endpoint | PFOA | PFOS | Discussed Quantitatively | Discussed Qualitatively |
| Lipids | Total cholesterol (TC) | X | X | X | |
| | High-density lipoprotein cholesterol (HDLC) | X[c] | X[c] | X | |
| | Low-density lipoprotein cholesterol (LDLC) | X | X | | X |
| CVD | Blood pressure (BP) | | X | X | |
| Developmental | Birth weight | X | X | X | |
| | Small for gestational age (SGA), non-birth weight developmental | X | | | X |
| Hepatic | Alanine transaminase (ALT) | X | X | | X |
| Immune | Antibody response (tetanus, diphtheria) | X | X | | X |
| Metabolic | Leptin | X | | | X |
| Musculoskeletal | Osteoarthritis, bone mineral density | X | | | X |
| Cancer | Renal Cell Carcinoma (RCC) | X | | X | |
| | Liver | | X | X[e] | |
| | Testicular | X | | | X |

Abbreviations: PFAS – per- and polyfluoroalkyl substances; PFOA – perfluorooctanoic acid; PFOS – perfluorooctane sulfonic acid
Notes:
[a]Fields marked with "X" indicate the PFAS compound for which there is evidence of an association with a given health outcome in humans.
[b]Outcomes with indicative evidence of an association between a PFAS compound and a health outcome are assessed quantitatively unless (1) there is an overlap within the same outcome group (e.g., low density lipoprotein cholesterol overlaps with total cholesterol and small for gestational age overlaps with low birth weight), or (2) it is not possible to link the outcome to the risk of the health effect (e.g., evidence is inconclusive regarding the relationship between PFOS exposure, leptin levels and associated health outcomes). Such health outcomes are discussed qualitatively.
[c]Although evidence of associations between HDLC and PFOA and PFOS was mixed, certain individual studies reported robust associations in general adult populations (See Section 6.2.2.1.2 on Cardiovascular Effects). Based on comments and recommendations from the EPA SAB (U.S. EPA, 2022i), the EPA assessed HDLC in a sensitivity analysis (see Appendix K).
[d]Note that only PFOA and PFOS effects were modeled in the assessment of benefits under the final rule. For another PFAS in the rule, PFNA, the best available finalized analysis is based on studies published before 2018 (ATSDR, 2021). The EPA notes that new evidence since the release of the current, best available peer reviewed scientific assessment for PFNA (ATSDR, 2021) provides further justification for the EPA's analysis of potential economic benefits of PFNA exposure reduction and avoided birth weight effects. More recent epidemiological studies that evaluated PFNA and birth weight, including key studies modeled for PFOA and PFOS (Sagiv et al., 2018; Wikström et al., 2020), as well as a recently published meta-analysis of mean birth weight that indicates the birth weight results for PFNA are robust and consistent, even if associations in some studies may be small in magnitude (Wright et al., 2023). PFNA was modeled in a sensitivity analyses of birth weight benefits. This modeling relied on epidemiological studies published before 2018, representing the best available finalized human health analysis of PFNA (ATSDR, 2021) and the approach by Lu and Bartell (2020) was used for estimating PFNA blood serum levels resulting from PFNA exposures in drinking water (see Appendix K).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-6: Overview of Health Benefits Categories Considered in the Analysis of Changes in PFAS Drinking Water Levels**

| Health Outcome | | PFAS Compound[a,b,d] | | Benefits Analysis | |
|---|---|---|---|---|---|
| Category | Endpoint | PFOA | PFOS | Discussed Quantitatively | Discussed Qualitatively |

[e]Liver cancer benefits are not included in the national-level quantified benefits analysis. See Appendix O for the liver cancer benefits analysis results.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

In Table 6-7, the EPA presents an overview of the epidemiology and toxicology evidence regarding the effects of exposure to PFAS compounds on health outcomes that were examined in various EPA and Agency for Toxic Substances and Disease Registry's (ATSDR) assessments. Health outcomes are classified as having:

- No evidence of an association[27] (signified with a dot in the table);

- Evidence of an association noted as suggestive or slight (signified with an X in the table); or

- Indicative evidence of an association (signified with a green-highlighted X in the table).

Health outcomes that have indicative (likely) associations and that are quantified in the benefits analysis for the final rule are signified with X*. The EPA further describes the associations, and supporting evidence of associations, in Section 6.2.2 for PFOA and PFOS and in Section 6.2.4 for additional PFAS compounds.

---

[27] No evidence of an association is listed in instances where an absence of evidence precludes definitive conclusions about the relationship between exposure and a given health effect or when there is evidence demonstrating that exposure does not result in a given health effect.

## Table 6-7: Overview of Epidemiology and Toxicology Evidence of PFAS Effects on Health Outcomes

| PFAS | Evidence Type | Lipids TC | Lipids HDLC | Lipids LDLC | CVD: BP (human)/Heart histopathology (animal) | Developmental: Birth weight | Developmental: SGA, non-birth weight | Hepatic: ALT (human)/Organ weight, cell death (animal) | Immune: AbR (human)/Various endpoints (animal) | Endocrine: Thyroid hormone disruption | Metabolic: Leptin, body weight (human)/Body fat, body weight (animal) | Renal: Uric acid (human)/Organ weight (animal) | Reproductive: Gestational hypertension/pre-eclampsia (human)/Various endpoints (animal) | Musculoskeletal: Osteoarthritis, bone mineral density | Hematologic: Vitamin D, hemoglobin, albumin levels | Other non-cancer | Cancer: RCC[a] | Cancer: Testicular | Cancer: Liver | Cancer: Other | Data Source(s) | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PFOA | Epi | X* | • | X | X | X* | X | X | X | X | X | • | X | X | • | • | X* | X[b] | • | X | U.S. EPA 2024b, 2024d; ATSDR 2021; NASEM, 2022 | Other non-cancer: neurological effects, respiratory effects, gastrointestinal |
| PFOA | Tox | X | X | X | • | X* | X | X | X | X | • | • | X | X | • | X | • | • | X | • | U.S. EPA 2024b, 2024d; ATSDR 2021 | Other non-cancer: neurological effects, respiratory effects, gastrointestinal |
| PFOS | Epi | X* | • | X | X | X*[c] | • | X | X | X | • | • | X[d] | • | • | • | X | • | X | X | U.S. EPA 2024a, 2024c; ATSDR 2021; NASEM, 2022 | Other non-cancer: neurological effects, gastrointestinal |
| PFOS | Tox | • | • | • | • | X | X | X | X | X | • | • | X | • | • | X | • | • | X | X | U.S. EPA 2024a, 2024c; ATSDR 2021 | Other non-cancer: neurological effects, gastrointestinal |
| PFBA | Epi | • | • | • | • | • | • | • |  | • |  | • | • |  |  |  |  |  |  |  | IRIS Assessment 2022; ATSDR 2021; NASEM, 2022 | No associations in humans |
| PFBA | Tox | • |  |  | • |  | X | X | • |  | X |  | • | • | • |  |  |  |  |  | IRIS Assessment 2022; ATSDR 2021 | Other non-cancer: ocular, respiratory (ATSDR) |
| PFNA | Epi | X | • | X | • | X[e] | • | • | • | • | • | • | • |  |  | • |  |  |  |  | ATSDR 2021; NASEM, 2022 | Other non-cancer: respiratory effects |
| PFNA | Tox | X | • | • | • | X | X | X | X | • | • | • | • | X | • |  |  |  |  |  | ATSDR 2021 | Other non-cancer: general toxicity |
| PFDA | Epi | X | • | X | • | X | X | X | X | • | X | • | • | • |  | X |  |  | • |  | ATSDR 2021; NASEM, 2022 |  |
| PFDA | Tox | • | • | • | • | X | X | X | X | • | • | • | X |  | X |  | • | • | • | • | ATSDR 2021 |  |
| PFHxS | Epi | • | • | • | • | X | • | • | X | • | • | • | • | • | • |  | • |  |  |  | ATSDR 2021; NASEM, 2022 |  |
| PFHxS | Tox | X | • | • | X | • | X | • | X | • | • | • | • | X | • | • |  |  |  |  | ATSDR 2021 | Other non-cancer: respiratory effects |
| PFHxA | Epi |  |  |  | • |  |  |  | • | • | • | • |  |  |  | • |  |  |  | • | IRIS Assessment 2023; ATSDR 2021; NASEM, 2022 | No associations in humans |
| PFHxA | Tox | • | • | • | • | X | • | X | • | X | • | • | • | • | X | • | • |  |  |  | IRIS Assessment 2023; ATSDR 2021 | Other non-cancer: nervous (IRIS, ATSDR), respiratory (ATSDR) |
| PFBS | Epi | • | • | • | • |  |  |  |  |  | • | • | • |  |  |  |  |  |  |  | EPA Human Health Toxicity Study 2021; ATSDR 2021; NASEM, 2022 | No associations in humans |
| PFBS | Tox | X | • | • | • | • | X | • | X | X | • | X | • | • | X | • |  |  |  |  | EPA Human Health Toxicity Study 2021; ATSDR 2021 | Other non-cancer: respiratory effects (ATSDR) |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| PFAS | Evidence Type | Lipids | | | CVD | | Developmental | | Hepatic | Immune | Endocrine | Metabolic | Renal | Reproductive | Musculoskeletal | Hematologic | Other non-cancer | Cancer | | | | Data Source(s) | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | TC | HDLC | LDLC | BP[a] (human) | Heart histopathology (animal) | Birth weight | SGA, non-birth weight developmental | ALT (human) Organ weight, cell death (animal) | AbR[a] (tetanus, diphtheria) (human) Various endpoints (animal) | Thyroid hormone disruption | Leptin, body weight (human) Body fat, body weight (animal) | Uric acid (human) Organ weight (animal) | Gestational hypertension/pre-eclampsia (human) Various endpoints (animal) | Osteoarthritis, bone mineral density | Vitamin D levels, hemoglobin levels, albumin levels | Other non-cancer | RCC[a] | Testicular | Liver | Other | | |
| PFHpA | Epi | • | • | • | • | | • | • | • | • | | | | | • | • | | | | | • | ATSDR 2021; NASEM, 2022 | No associations in humans |
| | Tox | | | | | | | | | | | | | | | | | | | | | ATSDR 2021 | |
| PFUnA | Epi | • | • | • | • | | X | • | • | • | • | • | | • | | • | | | | | • | ATSDR 2021; NASEM, 2022 | |
| | Tox | | | | | | X | | | • | | | • | | | • | | | | | | ATSDR 2021 | |
| PFDoDA | Epi | • | • | • | • | | • | • | • | • | • | • | • | • | | • | | | | | • | ATSDR 2021; NASEM, 2022 | |
| | Tox | • | | | | | • | • | • | | | • | • | • | | • | | | | | | ATSDR 2021 | |
| FOSA | Epi | | | | | • | • | • | | • | | • | | • | | | • | • | | | • | ATSDR 2021; NASEM, 2022 | |
| | Tox | | | | | | | | | • | | • | | | | | | | | | | ATSDR 2021 | |
| HFPO-DA[f] | Epi | | | | | | | | | | | | | | | | | | | | | EPA HFPO-DA 2021 final toxicity assessment | No data from epidemiology studies |
| | Tox | X | | • | X | | | | X | X | X | • | X | | | X | | | | X | | EPA HFPO-DA 2021 final toxicity assessment | |

Notes:

| | |
|---|---|
| • | Health outcomes examined, no evidence of associations (also noted as inadequate, or equivocal evidence). |
| X | Health outcomes examined, slight or suggestive evidence of associations. |
| X | Health outcomes examined, moderate or indicative evidence of associations (also noted as supports a hazard in IRIS assessments, evidence indicates, or evidence demonstrates). |
| X* | Health outcomes quantified in benefits analyses, indicative evidence of associations. |
| [Blank cell] | Health outcome was not examined. |
| [a] | AbR: antibody response; BP: blood pressure; Epi: epidemiology; Tox: toxicology; RCC: renal cell carcinoma. |
| [b] | Supported based on PFOA HESD (2016) and Bartell et al. (2021) meta-analysis. |
| [c] | Supported by Dzierlenga et al. (2020) meta-analysis. |
| [d] | Also supported by recent meta-analysis from Gao et al. (2021) (PFOS and preeclampsia risk). |
| [e] | Also supported by recent meta-analysis from Wright et al. (2023) (PFNA and birth weight). |

## 6.2.1 Availability of Pharmacokinetic (PK) Models

PK models are tools for quantifying the relationship between external measures of exposure and internal measures of dose. The EPA evaluated existing PFOA and PFOS PK models for their utility in predicting internal doses for use in both cancer and non-cancer dose-response assessments (U.S. EPA, 2024e; U.S. EPA, 2024f). PFOA and PFOS PK models typically take one of three forms:

- **Classical compartment models**, where modelers define the body as a one- or two-compartment system with volumes and intercompartmental transfer fit specifically to the PFAS PK dataset. The most common approach for prediction of serum PFAS levels is to apply a simple single-compartment model.

- **Modified compartment models**, where modelers attempt to characterize absorption, distribution, metabolism, and/or excretion through protein-binding, cardiac output, and known renal elimination. These models also rely on fitting PFAS data to non-physiological parameters.

- **Physiological-based pharmacokinetic (PBPK) models**, where tissues and organs of the body are described as physiological-based compartments. In these models, transport between compartments is informed by measures of blood flow and tissue perfusion. These models are fit to time-course concentration data.

The EPA's *Final Human Health Toxicity Assessment for PFOA* (U.S. EPA, 2024f) and *Final Human Health Toxicity Assessment for PFOS* (U.S. EPA, 2024e)[28] describe existing PFOA and PFOS PK models and modifications made to existing PK models to derive points of departure in the assessments. Briefly, the EPA updated a modified single-compartment PK model for adult males and females to estimate blood serum PFOA and PFOS concentrations. These models are described in Section 4.1.3.2 of U.S. EPA (2024e; 2024f), and the application of these models in health risk benefits modeling is described in Section 6.3.

## 6.2.2 Benefits of PFOA and PFOS Exposure Reduction

This section provides an overview of the potential health benefits of reduced exposure to PFOA and PFOS in drinking water. These benefits are expected to be realized as avoided adverse health effects as a result of the final NPDWR, in addition to the benefits that the EPA has quantified. The EPA identified a wide range of potential health effects associated with exposure to PFOA and PFOS using five comprehensive federal government health effects assessments that summarize the recent literature on PFAS (mainly PFOA and PFOS, although many of the same health effects have been observed for the other PFAS in this rule) exposure and its health impacts: the EPA's Health Effects Support Document for PFOA and Health Effects Support Document for PFOS, hereafter referred to as the EPA HESDs (U.S. EPA, 2016e; U.S. EPA, 2016f); the EPA's Final Human Health Toxicity Assessments for PFOA and PFOS (U.S. EPA, 2024e; U.S. EPA, 2024f); and the U.S. Department of Health and Human Services ATSDR

---

[28] For brevity, these documents are described throughout as the EPA's Final Human Health Toxicity Assessments for PFOA and PFOS.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Toxicological Profile for Perfluoroalkyls (ATSDR, 2021). Each source presents comprehensive literature reviews on adverse health effects associated with PFOA and PFOS.

The most recent literature reviews on PFAS exposures and health impacts, which are included in the EPA's Final Human Health Toxicity Assessments for PFOA and PFOS, describe the weight of evidence supporting PFOA and PFOS associations with health outcomes as either demonstrative, indicative (likely), suggestive, inadequate, or strong evidence supportive of no effect according to the evidence integration judgments outlined in the Office of Research and Development (ORD) Staff Handbook for Developing IRIS Assessments (U.S. EPA, 2022g; U.S. EPA, 2024e; U.S. EPA, 2024f). For the purposes of the reviews conducted to develop the Final Human Health Toxicity Assessments for PFOA and PFOS, an association is deemed demonstrative when there is a strong evidence base demonstrating that the chemical exposure causes a health effect in humans. The association is deemed indicative (likely) when the evidence base indicates that the chemical exposure likely causes a health effect in humans, although there might be outstanding questions or limitations that remain, and the evidence is insufficient for the higher conclusion level. The association is suggestive if the evidence base suggests that the chemical exposure might cause a health effect in humans, but there are very few studies that contributed to the evaluation, the evidence is very weak or conflicting, or the methodological conduct of the studies is poor. The association is inadequate if there is a lack of information or an inability to interpret the available evidence (e.g., findings across studies). The association supports no effect when extensive evidence across a range of populations and exposure levels has identified no effects/associations. Note that the EPA considered information available as of September 2023 for the analyses presented herein. Section 6.2.2.1 discusses PFOA and PFOS-related health effects that were considered quantitatively (modeled and monetized) in the benefits analysis, while Section 6.2.2.2 discusses PFOA and PFOS-related health effects that were considered only qualitatively in the benefits analysis. These sections specify whether evidence is based on animal (toxicology) or human (epidemiology) studies, or both.

## 6.2.2.1 Quantitative Benefits of PFOA and PFOS Exposure Reduction

In this section, the EPA discusses some of the health benefits expected to result from reduced exposure to PFOA and PFOS in drinking water. These benefits are expected to be realized as avoided adverse health effects as a result of the final NPDWR and are quantified in Sections 6.4, 6.5, and 6.6 respectively.

### 6.2.2.1.1 Developmental Effects

Exposure to PFOA and PFOS is linked to developmental effects such as decreased infant birth weight, birth length, head circumference at birth, and other effects (Steenland et al., 2018; Dzierlenga et al., 2020; Verner et al., 2015; U.S. EPA, 2016e; U.S. EPA, 2016f; Negri et al., 2017; Waterfield et al., 2020; U.S. EPA, 2024e; U.S. EPA, 2024f). Low birth weight (LBW) is an important health outcome because it is a significant factor in survival rates and medical care costs among infants (ATSDR, 2021). Infants are exposed prenatally to PFOA and PFOS through maternal serum via the placenta (U.S. EPA, 2024e, U.S. EPA, 2024f).

Because data on the cost of incremental changes in birth weight are available from Klein and Lynch (2018), the EPA selected decreased birth weight as a key developmental health effect when assessing the economic impacts of reduced PFOA and PFOS exposures. Epidemiology studies on PFOA were associated with an increased risk of decreased BW in infants with PFOA exposures (U.S. EPA, 2024f). Similarly, epidemiology studies on PFOS were associated with an increased risk of decreased BW in infants with increasing PFOS exposures (U.S. EPA, 2024e). As described in the toxicity assessments for PFOA and PFOS (see Section 3.4.4.1.4 of the final toxicity assessments; U.S. EPA, 2024e; U.S. EPA, 2024f), many epidemiology studies evaluating the association between maternal serum PFOA/PFOS and birth weight reported inverse associations (i.e., increased exposure is associated with decreased birth weight) (Darrow et al., 2013; Verner et al., 2015; Govarts et al., 2016; Negri et al., 2017; Starling et al., 2017; Sagiv et al., 2018; Chu et al., 2020; Dzierlenga et al., 2020; Wikström et al., 2020; Yao et al., 2021).[29] Toxicology studies on PFOA further supported an association between decreased offspring weight and PFOA exposure; several studies conducted on rodents showed decreased fetal and pup weight with gestational PFOA exposure (U.S. EPA, 2024f). Toxicology studies also reported that increased exposure to PFOS was associated with decreased body weight in rodent fetuses and pups (U.S. EPA, 2024e). For additional details on developmental effects studies and their individual outcomes, see Chapter 3.4.4 (Developmental) in U.S. EPA (2024e) and U.S. EPA (2024f). See Section 6.4 for the EPA's analysis of avoided infant birth weight impacts estimated as attributable to reduced PFOA and PFOS exposure from the final rule.

## 6.2.2.1.2 Cardiovascular Effects

CVD is one of the leading causes of premature mortality in the U.S. (D'Agostino et al., 2008; Goff et al., 2014; Lloyd-Jones et al., 2017). As discussed in the EPA's Final Human Health Toxicity Assessments for PFOA and PFOS, exposure to PFOA and PFOS through drinking water contributes to increased serum PFOA and PFOS concentrations and elevated levels of TC, as well as suggestive changes in levels of HDLC and elevated levels of systolic BP (U.S. EPA, 2024e; U.S. EPA, 2024f). Changes in TC, HDLC, and BP are associated with changes in incidence of CVD events such as myocardial infarction (MI, i.e., heart attack), ischemic stroke (IS), and cardiovascular mortality occurring in populations without prior CVD event experience (D'Agostino et al., 2008; Goff et al., 2014; Lloyd-Jones et al., 2017).

Overall, epidemiology evidence indicated a positive association between PFOS/PFOA exposure and TC levels (i.e., increased exposure is associated with increased TC levels) (ATSDR, 2021; U.S. EPA, 2024e; U.S. EPA, 2024f). Epidemiology studies observed relatively consistent positive associations between PFOA and LDLC (U.S. EPA, 2024f). Most epidemiology studies on PFOS exposure reported a positive association between exposure and TC levels in the general population (ATSDR, 2021; U.S. EPA, 2024e). There was also some evidence of this association in children and pregnant women (U.S. EPA, 2024e). Consistent positive associations were also observed between PFOS and LDLC in general population adults. Toxicology studies often reported decreases in serum lipids from oral exposure to PFOA and PFOS (U.S. EPA, 2024e; U.S. EPA, 2024f). Although the biological significance of the decrease in various serum lipid

---

[29] Recent evidence indicates that relationships between maternal serum PFOA/PFOS and birth weight may be impacted by changes in pregnancy hemodynamics, however exact patterns are not completely understood (Sagiv et al., 2018; Steenland et al., 2018).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

levels observed in animal models regardless of species, sex, or exposure paradigm is unclear, these effects do indicate a disruption in lipid metabolism, which is consistent with effects observed in humans. For additional details on the TC studies and their individual outcomes, see Chapter 3.4.3 (Cardiovascular) in U.S. EPA (2024e) and U.S. EPA (2024f).

Existing epidemiology and toxicology studies provided inconsistent evidence of associations between PFOA and PFOS exposures and HDLC levels, with a mix of positive and some inverse associations in adult populations (ATSDR, 2021; U.S. EPA, 2024e; U.S. EPA, 2024f). Two studies reported a positive association between PFOA and HDLC in pregnant women (Starling et al., 2017; Dalla Zuanna et al., 2021). In children, prenatal exposure to PFOA was associated with lower HDLC in some studies, especially in boys, whereas childhood exposure was not consistently associated with higher HDLC (ATSDR, 2021; U.S. EPA, 2024f). Similarly, studies did not report consistent associations between PFOS and HDLC levels (ATSDR, 2021; U.S. EPA, 2024e). Most of the evidence in adults involved cross-sectional assessments, although associations between PFOS and lower HDLC were also observed in the cohort study by Lin et al. (2019). Studies examining PFOS and HDLC in pregnant women provided mixed evidence (U.S. EPA, 2024e). Although evidence of associations between PFOA and PFOS exposures and HDLC is mixed, certain individual studies reported robust associations in general adult populations. Based on comments and recommendations from the EPA SAB on the EPA's analysis of CVD risk reductions resulting from changes in PFOA/PFOS exposures (U.S. EPA, 2021a), the EPA assessed HDLC in a sensitivity analysis (see Appendix K). For additional details on the HDLC studies and their individual outcomes, see Chapter 3.4.3 (Cardiovascular) of U.S. EPA (2024e) and U.S. EPA (2024f).

Epidemiology studies observed inconsistent associations between PFOA exposure and BP (ATSDR, 2021; U.S. EPA, 2024f). In adults, some epidemiology studies reported positive associations between PFOA exposure and changes in BP or risk of hypertension (defined as elevated BP) (U.S. EPA, 2024f). Studies in children, adolescents, and pregnant women suggested no association between PFOA exposure and elevated BP (U.S. EPA, 2024f). In adults, there was consistent evidence of positive associations between PFOS exposure and BP, although the results were not always consistent between systolic BP and diastolic BP, and one study reported an inverse association (U.S. EPA, 2024e). However, there was overall consistent evidence of an association between PFOS and BP in studies conducted in general adult populations (U.S. EPA, 2024e). Evidence for associations between PFOS exposure and BP in children and adolescents was limited and did not suggest an association with elevated BP (U.S. EPA, 2024e). However, exposure duration was a limitation in these studies, and evidence of an association between PFOS and increased risk of hypertension, specifically, was limited and inconsistent (U.S. EPA, 2024e). Evidence of associations between BP and PFOS in animal toxicological studies was mixed (U.S. EPA, 2024e). For additional details on the BP studies and their individual outcomes, see Chapter 3.4.3 (Cardiovascular) in U.S. EPA (2024e) and U.S. EPA (2024f).

Given the breadth of evidence linking PFOA and PFOS exposure to effects on TC and BP in general adult populations, the EPA quantified public health impacts of changes in these well-established CVD risk biomarkers (D'Agostino et al., 2008; Goff et al., 2014; Lloyd-Jones et al., 2017) by estimating changes in incidence of several CVD events. Specifically, the EPA assumed that PFOA/PFOS-related changes in TC and BP had the same effect on the CVD risk as the changes unrelated to chemical exposure and used the Pooled Cohort Atherosclerotic

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Cardiovascular Disease (ASCVD) model (Goff et al., 2014) to evaluate their impacts on the incidence of MI, IS, and cardiovascular mortality occurring in populations without prior CVD event experience (see Section 6.5). The EPA observed that the direct evidence of associations between PFOA/PFOS exposure and CVD risk was limited (U.S. EPA, 2024e; U.S. EPA, 2024f), with mixed findings reported by one high-quality longitudinal epidemiology study (Mattsson et al., 2015) and four medium-quality cross-sectional epidemiology studies (Huang et al., 2018; Shankar et al., 2012; Hutcheson et al., 2019; Fry & Power, 2017). However, inconclusive evidence of the direct association between PFOA/PFOS exposure and CVD effects from a limited collection of studies does not imply the absence of such an association. Future analyses of CVD effects using large longitudinal studies, such as the ones used to develop the ASCVD model (Goff et al., 2014), could help elucidate whether there is a consistent direct association between PFOA/PFOS and CVD risk. The EPA notes that the SAB review also supported this approach in consideration of impact of PFAS on CVD risk (U.S. EPA, 2022i). See Section 6.5 for EPA's analysis of reduced CVD impacts as a result of reduced PFOA and PFOS exposure from the final rule.

### 6.2.2.1.3 Cancer Effects

Data on the association between PFOA exposure and kidney cancer (i.e., RCC), particularly from epidemiological studies, indicate a positive association between exposure and increased risk of RCC (CalEPA, 2021; U.S. EPA, 2016f; ATSDR, 2021; U.S. EPA, 2024f). PFOA exposure effects on RCC were shown in two occupational population studies (Raleigh et al., 2014; Steenland & Woskie, 2012) and two high-exposure community studies (Vieira et al., 2013; Barry et al., 2013). A recent study of the relationship between PFOA and RCC in the U.S. general population found strong evidence of a positive association between exposure to PFOA and RCC in humans (Shearer et al., 2021). A meta-analysis of epidemiological literature also concluded that there was an increased risk of kidney cancer associated with increased PFOA serum concentrations (Bartell & Vieira, 2021). In the EPA's Final Human Health Toxicity Assessment for PFOA, the agency reviewed the weight of the evidence and determined that PFOA is Likely to Be Carcinogenic to Humans, as "the evidence is adequate to demonstrate carcinogenic potential to humans but does not reach the weight of evidence for the descriptor Carcinogenic to Humans" (U.S. EPA, 2005c; U.S. EPA, 2024f).[30] This determination is based on the evidence of kidney and testicular cancer in humans and Leydig cell tumors (LCTs), pancreatic acinar cell tumors (PACTs), and hepatocellular tumors in rats (U.S. EPA, 2024f). See Section 6.6 for the EPA's analysis of the benefits of reduced RCC as a result of reduced PFOA exposures from the final rule.

Evidence of the association between PFOS exposure and kidney cancer was inconclusive; the small number and limited scope of studies were inadequate to make definitive conclusions (U.S. EPA, 2016e; U.S. EPA, 2024e). One recent study observed an association between PFOS and an increased risk of RCC in the highest exposed quartile and per doubling of PFOS concentration (Shearer et al., 2021; U.S. EPA, 2024e). However, the association was no longer statistically

---

[30] This determination is comparable to the International Agency for Research on Cancer (IARC) determination, which classified PFOA as "carcinogenic to humans" based on "sufficient" evidence for cancer in the toxicology literature and "strong" mechanistic evidence in the epidemiology literature. The IARC also determined that PFOS was classified as "possibly carcinogenic to humans" based on "strong" mechanistic evidence (Zahm et al., 2024).

significant after adjusting for other PFAS (Shearer et al., 2021). The EPA did not report any PFOA or PFOS toxicology studies specifically relating to RCC, although there was evidence of other cancer types in rodent models treated with PFOA or PFOS (U.S. EPA, 2024e; U.S. EPA, 2024f). The EPA did not quantify benefits associated with PFOS and RCC and the agency notes that the national quantifiable benefits analysis includes results for PFOA effects on RCC only. The EPA's benefits analysis for avoided RCC cases from reduced PFOA exposure is detailed in Section 6.6.

The EPA found evidence of a positive association between PFOS exposure and hepatocellular tumors in animal studies. Butenhoff et al. (2012)/Thomford (2002) reported a statistically significant increase in combined hepatocellular adenomas and carcinomas tumor incidence in female Sprague-Dawley rats exposed to PFOS. There was also a statistically significant increase in hepatocellular adenomas in males from the highest dose group. The study reported a statistically significant trend of increased incidence with increasing PFOS concentrations across dose groups in both sexes. Additionally, recently published studies reporting associations between PFOS exposure and hepatocellular carcinoma in humans (Goodrich et al., 2022; Cao et al., 2022) further strengthen these findings in rats and support the cancer classification of Likely to be Carcinogenic to Humans for PFOS (U.S. EPA, 2024e). Thomford (2002) also reported a statistically significant trend of increased incidence of pancreatic islet cell carcinomas with increasing PFOS doses. The EPA reviewed the weight of the evidence and determined that PFOS Is Likely to Be Carcinogenic to Humans, as "the evidence is adequate to demonstrate carcinogenic potential to humans but does not reach the weight of evidence for the descriptor Carcinogenic to Humans" (U.S. EPA, 2005c; U.S. EPA, 2024e). The EPA evaluated the effects of the final rule on liver cancer using relationships between PFOS exposure and liver cancer in female rats in Appendix O.

For additional details on cancer studies and their individual outcomes, see Chapter 3.5 (Cancer) in U.S. EPA (2024e) and U.S. EPA (2024f).

## 6.2.2.2 Nonquantifiable Benefits of PFOA and PFOS Exposure Reduction

In this section, the EPA qualitatively discusses the potential health benefits resulting from reduced exposure to PFOA and PFOS in drinking water. These nonquantifiable benefits are expected to be realized as avoided adverse health effects as a result of the final NPDWR, in addition to the benefits that the EPA has quantified. The EPA anticipates additional benefits associated with developmental, cardiovascular, liver, immune, endocrine, metabolic, reproductive, musculoskeletal, and carcinogenic effects beyond those benefits that the EPA has quantified. The evidence for these adverse health effects is briefly summarized below.

### 6.2.2.2.1 Developmental Effects

In addition to the infant birth weight impacts that the EPA has quantified (see Section 6.4), small for gestational age (SGA) is a developmental health outcome of interest when studying potential effects of PFOA/PFOS exposure, because infants who are SGA face increased health risks during pregnancy and delivery as well as post-delivery (Osuchukwu & Reed, 2022). The majority of epidemiology studies indicated increased risk of SGA with PFOA/PFOS exposure, although some studies reported null results (U.S. EPA, 2024e; U.S. EPA, 2024f). For instance,

some studies suggested a potentially positive association between PFOA exposure and SGA (Govarts et al., 2018; Lauritzen et al., 2017; Y. Wang et al., 2016; Souza et al., 2020; Wikström et al., 2020; Chang et al., 2022; U.S. EPA, 2024f). In addition to decreases in offspring weight, toxicology studies on PFOA and PFOS exposures in rodents demonstrated relationships with multiple other developmental endpoints including increased offspring mortality, decreased maternal body weight and body weight change, skeletal and soft tissue effects, and delayed eye-opening (U.S. EPA, 2024e; U.S. EPA, 2024f). For additional details on developmental studies and their individual outcomes, see Chapter 3.4.4 (Developmental) in U.S. EPA (2024e) and U.S. EPA (2024f).

### 6.2.2.2.2 Cardiovascular Effects

In addition to the CVD effects that the EPA quantified associated with changes in TC and BP from exposure to PFOA and PFOS (see Section 6.5), available evidence suggests an association between exposure to PFOA and PFOS and increased LDLC (ATSDR, 2021; U.S. EPA, 2024e; U.S. EPA, 2024f). High levels of LDLC are known as the "bad" cholesterol because it can lead to the buildup of cholesterol in the arteries, which can raise the risk of heart disease and stroke. Epidemiology studies showed a positive association between PFOA and PFOS exposure and LDLC levels in adults and children (U.S. EPA, 2024e; U.S. EPA, 2024f). In particular, the evidence suggested positive associations between serum PFOA and PFOS levels and LDLC levels in adolescents ages 12–18, while positive associations between serum levels and LDLC levels in younger children were observed only for PFOA (ATSDR, 2021). Additionally, available evidence supports a relatively consistent positive association between PFOA or PFOS and LDLC in adults, especially those who are obese or prediabetic. Associations with other lipoprotein cholesterol known to increase cardiovascular risks were also positive, which increased confidence in the findings for LDLC. Available evidence regarding the impact of PFOA and PFOS exposure on pregnant women was too limited for the EPA to determine an association (U.S. EPA, 2024e; U.S. EPA, 2024f). Toxicology studies generally reported alterations in serum lipid levels in mice and rats following oral exposure to PFOA (U.S. EPA, 2024f) or PFOS (U.S. EPA, 2024e), indicating a disruption in lipid metabolism, which is coherent with effects observed in humans. For additional details on LDLC studies and their individual outcomes, see Chapter 3.4.3 (Cardiovascular) in U.S. EPA (2024e) and U.S. EPA (2024f).

### 6.2.2.2.3 Hepatic Effects

Several biomarkers can be used clinically to diagnose liver diseases, including alanine aminotransferase (ALT). Serum ALT measures are considered a reliable indicator of impaired liver function because increased serum ALT is indicative of leakage of ALT from damaged hepatocytes (Boone et al., 2005; Z. Liu et al., 2014; U.S. EPA, 2002). Additionally, evidence from both human epidemiological and animal toxicological studies indicates that increased serum ALT is associated with liver disease (Ioannou, Boyko, & Lee, 2006; Ioannou, Weiss, et al., 2006; Kwo et al., 2017; Roth et al., 2021). Human epidemiological studies have demonstrated that even low magnitude increases in serum ALT can be clinically significant (Mathiesen et al., 1999; J. H. Park et al., 2019). Additionally, numerous studies have demonstrated an association between elevated ALT and liver-related mortality (reviewed by Kwo et al., 2017). Furthermore, the American Association for the Study of Liver Diseases

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(AASLD) recognizes serum ALT as an indicator of overall human health and mortality (W. R. Kim et al., 2008). Epidemiology data provides consistent evidence of a positive association between PFOS/PFOA exposure and ALT levels in adults (ATSDR, 2021; U.S. EPA, 2024e; U.S. EPA, 2024f). Studies of adults showed consistent evidence of a positive association between PFOA exposure and elevated ALT levels at both high exposure levels and exposure levels typical of the general population (U.S. EPA, 2024f). There is also consistent epidemiology evidence of associations between PFOS and elevated ALT levels. A limited number of studies reported inconsistent evidence on whether PFOA/PFOS exposure is associated with increased risk of liver disease (U.S. EPA, 2024e). It is also important to note that while evaluation of direct liver damage is possible in animal studies, it is difficult to obtain biopsy-confirmed histological data in humans. Therefore, liver injury is typically assessed using serum biomarkers of hepatotoxicity (Costello et al., 2022). Associations between PFOS/PFOA exposure and ALT levels in children were less consistent than in adults (U.S. EPA, 2024e; U.S. EPA, 2024f).

PFOA toxicology studies showed increases in ALT and other serum liver enzymes across multiple species, sexes, and exposure paradigms (U.S. EPA, 2024f). Toxicology studies on the impact of PFOS exposure on ALT also reported increases in ALT and other serum liver enzyme levels in rodents (U.S. EPA, 2024e). Several studies in animals also reported increases in the incidence of liver lesions or cellular alterations, such as hepatocellular cell death (U.S. EPA, 2024e; U.S. EPA, 2024f). For additional details on the ALT studies and their individual outcomes, see Chapter 3.4.1 (Hepatic) in U.S. EPA (2024e) and U.S. EPA (2024f).

## 6.2.2.2.4 Immune Effects

Proper antibody response helps maintain the immune system by recognizing and responding to antigens. The available evidence indicates a relationship between PFOA exposure and immunosuppression; epidemiology studies showed suppression of at least one measure of the antibody response for tetanus and diphtheria among people with higher prenatal and childhood serum concentrations of PFOA (ATSDR, 2021; U.S. EPA, 2024f). Data reporting on associations between PFOA exposure and antibody response to vaccinations other than tetanus and diphtheria (i.e., rubella and hand, foot, and mouth disease) are limited but supportive of associations between PFOA and decreased immune response in children (U.S. EPA, 2024f). Available studies supported an association between PFOS exposure and immunosuppression in children, where increased PFOS serum levels were associated with decreased antibody production in response to tetanus, diphtheria, and rubella vaccinations (U.S. EPA, 2024e). Studies reporting associations between PFOA or PFOS and immunosuppression in adults are less consistent, though this may be due to a lack of high confidence data (U.S. EPA, 2024e; U.S. EPA, 2024f). Toxicology evidence suggested that PFOA and PFOS exposure results in effects similarly indicating immune suppression, such as reduced response of immune cells to challenges (e.g., reduced natural killer cell activity and immunoglobulin production) (U.S. EPA, 2024e; U.S. EPA, 2024f). For additional details on immune studies and their individual outcomes, see Chapter 3.4.2 (Immune) in U.S. EPA (2024e) and U.S. EPA (2024f).

Because evidence indicates that PFOA or PFOS exposure results in immune effects, the EPA expects those effects to potentially impact immune response to other diseases. For instance, the coronavirus disease 2019 (COVID-19) caused by the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) rapidly evolved into a global pandemic after its first report in

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                  APRIL 2024

Wuhan, China, in December 2019. A few recent studies have considered the association between PFOA and PFOS exposure and COVID-19 infection, severity, or mortality (Catelan et al., 2021; Grandjean et al., 2020; Ji et al., 2021).

A case-control study in China (Ji et al., 2021) showed increased risks for COVID-19 infection with high urinary PFOS, PFOA, and total PFASs after adjusting for potential confounding factors including age, gender, diabetes, cardiovascular disease, and urine albumin-to-creatinine ratio. Adjusted odds ratios (ORs) were 1.94 (95% CI: 1.39, 2.96) for PFOS and 2.73 (95% CI: 1.71, 4.55) for PFOA. Using metabolome-wide association analysis, Ji et al. (2021) found that PFOA and PFOS exposure in COVID-19 patients was associated with metabolic disturbances in biochemical pathways involved in mitochondria stress signaling and the regulation of immune function, including fatty acid oxidation, tricarboxylic acid cycle, eicosanoid, and kynurenine pathways. One cross-sectional study in Denmark (Grandjean et al., 2020) observed no association between PFOA or PFOS concentrations and severity of COVID-19 development.[31] In a spatial ecological analysis, Catelan et al. (2021) showed higher mortality risk for COVID-19 in a population heavily exposed to PFAS (including PFOA, PFOS, PFHxS, PFBS, PFBA, PFPeA, PFHxA, and PFHpA) via drinking water in Veneto, Italy.

Although these studies provide a suggestion of possible associations, the body of evidence does not permit any conclusions about the relationship between COVID-19 and exposures to PFAS.

### 6.2.2.2.5 Endocrine Effects

Elevated circulating thyroid hormone levels can accelerate metabolism and cause irregular heartbeat; low levels of thyroid hormones can cause neurodevelopmental effects, tiredness, weight gain, and increased susceptibility to the common cold. There is suggestive evidence of a positive association between PFOA/PFOS exposure and thyroid hormone disruption (ATSDR, 2021; U.S. EPA, 2024e; U.S. EPA, 2024f). Epidemiology studies reported inconsistent evidence regarding associations between PFOA and PFOS exposure and general endocrine outcomes, such as thyroid disease, hypothyroidism, and hypothyroxinemia (U.S. EPA, 2024e; U.S. EPA, 2024f). However, for PFOA, epidemiological studies reported suggestive evidence of positive associations for serum levels of thyroid stimulating hormone (TSH) and the thyroid hormone triiodothyronine (T3) in adults, and the thyroid hormone thyroxine (T4) in children (U.S. EPA, 2024e; U.S. EPA, 2024f). For PFOS, epidemiological studies reported suggestive evidence of positive associations for TSH in adults, positive associations for T3 in children, and inverse associations for T4 in children (U.S. EPA, 2024e). Toxicology studies indicated that PFOA and PFOS exposure leads to decreases in serum thyroid hormone levels[32] and adverse effects to the endocrine system (ATSDR, 2021; U.S. EPA, 2024b; U.S. EPA, 2024e; U.S. EPA, 2024f). Overall, changes in serum thyroid hormone levels in animals indicate PFOS and PFOA toxicity potentially relevant to humans (U.S. EPA, 2024e; U.S. EPA, 2024f). For additional details on endocrine effects studies and their individual outcomes, see Appendix C.2 (Endocrine) in U.S. EPA (2024a) and U.S. EPA (2024b).

---

[31] Note that the authors found that PFBA exposure was associated with increasing severity of COVID-19.

[32] Decreased thyroid hormone levels are associated with effects such as changes in thyroid and adrenal gland weight, hormone fluctuations, and organ histopathology, as well as adverse neurodevelopmental outcomes (ATSDR, 2021; U.S. EPA, 2024e).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### 6.2.2.2.6 Metabolic Effects

Leptin is a hormone that, along with adiponectin, can be a marker of adipose tissue dysfunction. Chronic high levels of leptin lead to leptin resistance that mirrors many of the characteristics associated with diet-induced obesity, including reduced leptin receptors and diminished signaling. Therefore, high leptin levels are associated with higher body fat mass, a larger size of individual fat cells, overeating, and inflammation (e.g., of adipose tissue, the hypothalamus, blood vessels, and other areas). Evidence suggests an association between PFOA exposure and leptin levels in the general adult population (ATSDR, 2021; U.S. EPA, 2024f). Based on a review of human epidemiology studies, evidence of associations between PFOS and metabolic outcomes appears inconsistent, but in some studies, positive associations were observed between PFOS exposure and leptin levels (U.S. EPA, 2024e). Studies examining newborn leptin levels did not find associations with maternal PFOA levels (ATSDR, 2021). Maternal PFOS levels were also not associated with alterations in leptin levels (ATSDR, 2021). For additional details on metabolic effect studies and their individual outcomes, see Appendix C.3 (Metabolic/Systemic) in U.S. EPA (2024a) and U.S. EPA (2024b).

### 6.2.2.2.7 Reproductive Effects

Studies of the reproductive effects from PFOA/PFOS exposure have focused on associations between exposure to these contaminants and increased risk of gestational hypertension and preeclampsia in pregnant women (ATSDR, 2021; U.S. EPA, 2024e; U.S. EPA, 2024f). Gestational hypertension (high BP during pregnancy) can lead to fetal problems such as poor growth and stillbirth. Preeclampsia—instances of gestational hypertension where the mother also has increased levels of protein in her urine—can similarly pose significant risks to both the fetus and mother. Risks to the fetus include impaired fetal growth due to the lack of oxygen and nutrients, stillbirth, preterm birth, and infant death (National Institutes of Health, 2017). Even if born full term, the infant may be at risk for later problems such as diabetes, high blood pressure, and congestive heart failure. Effects of preeclampsia on the mother may include kidney and liver damage, blood clotting problems, brain injury, fluid on the lungs, seizures, and mortality (National Institutes of Health, 2018). The epidemiology evidence yields mixed (positive and null) associations, with some suggestive evidence supporting positive associations between PFOA/PFOS exposure and both preeclampsia and gestational hypertension (ATSDR, 2021; U.S. EPA, 2024e; U.S. EPA, 2024f). For additional details on reproductive effects studies and their individual outcomes, see Appendix C.1 (Reproductive) in U.S. EPA (2024a) and U.S. EPA (2024b).

### 6.2.2.2.8 Musculoskeletal Effects

Adverse musculoskeletal effects such as osteoarthritis and decreased bone mineral density impact bone integrity and cause bones to become brittle and more prone to fracture. The available epidemiology evidence suggests that PFOA exposure may be linked to decreased bone mineral density, bone mineral density relative to bone area, height in adolescence, osteoporosis, and osteoarthritis (ATSDR, 2021; U.S. EPA, 2024f). Some studies found that PFOA/PFOS exposure was linked to osteoarthritis, in particular among women under 50 years of age (ATSDR, 2021). There is limited evidence from studies pointing to effects of PFOS on skeletal size (height), lean body mass, and osteoarthritis (U.S. EPA, 2024e). Evidence from some studies

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

suggests that PFOS exposure has a harmful effect on bone health, particularly measures of bone mineral density, with more statistically significant effects occurring among females (U.S. EPA, 2024e). However, other reviews reported mixed findings on the effects of PFOS exposure including decreased risk of osteoarthritis, increased risk for some demographic subgroups, or no association (ATSDR, 2021). For additional details on musculoskeletal effects studies and their individual outcomes, see Appendix C.8 (Musculoskeletal) in U.S. EPA (2024a) and U.S. EPA (2024b).

### 6.2.2.2.9 Cancer Effects

In the EPA's Final Human Health Toxicity Assessment for PFOA (U.S. EPA, 2024d), the agency evaluates the evidence for carcinogenicity of PFOA that has been documented in both epidemiological and animal toxicity studies. The evidence in epidemiological studies is primarily based on the incidence of kidney and testicular cancer, as well as potential incidence of breast cancer in genetically susceptible subpopulations or for particular breast cancer types. Other cancer types have been observed in humans, although the evidence for these is generally limited to low confidence studies. The evidence of carcinogenicity in animal models is provided in three chronic oral animal bioassays in Sprague-Dawley rats which identified neoplastic lesions of the liver, pancreas, and testes (U.S. EPA, 2024f). For more information on the EPA's cancer determination for PFOA, see Section 6.2.2.1.3.

In the EPA's Final Human Health Toxicity Assessment for PFOS (U.S. EPA, 2024e), the agency evaluates the evidence for carcinogenicity of PFOS and found that several epidemiological studies and a chronic cancer bioassay comprise the evidence database for the carcinogenicity of PFOS (U.S. EPA, 2024e). The available epidemiology studies report elevated risk of liver cancer, consistent with increased incidence of liver tumors reported in male and female rats. There is also mixed but plausible evidence of bladder, prostate, kidney, and breast cancers in humans. The animal chronic cancer bioassay study also provides evidence of increased incidence of pancreatic islet cell tumors in male rats. For more information on the EPA's cancer determination for PFOS, see Section 6.2.2.1.3.

The EPA anticipates there are additional nonquantifiable benefits related to potential testicular, bladder, prostate, and breast cancer effects summarized above. Benefits associated with avoiding cancer cases not quantified in the EPA's analysis could be substantial. For example, a study by Obsekov et al. (2023) reports the number of breast cancer cases attributable to PFAS exposure ranges from 421 to 3,095 annually, with an estimated direct cost of 6-month treatment ranging from $27.1 to $198.4 million per year ($2022). This study also finds that approximately 5 (0.076%) annual testicular cancer cases are attributable to PFOA exposure with an estimated direct cost of treatment of $173,450 per year ($2022). Although the methods used by Obsekov et al. (2023) differ from those used to support the national quantified benefits of the rule, the information provided in the study is helpful in portraying the costs of cancers that are associated with PFAS exposures. For additional details on cancer studies and their individual outcomes, see Chapter 3.5 (Cancer) in U.S. EPA (2024e) and U.S. EPA (2024f).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 6.2.3 Summary of Health Information Considered in the Economic Analysis

After assessing available health and economic information, the EPA was unable to quantify the benefits of avoided health effects discussed in Section 6.2.2.2 above. The agency prioritized health endpoints with the strongest weight of evidence conclusions and readily available data for monetization, namely cardiovascular effects, developmental effects, and carcinogenic effects. Several other health endpoints that had indicative or suggestive evidence of associations with exposure to PFOA and PFOS have not been selected for the economic analysis:

- While immune effects had indicative evidence of associations with exposure to PFOA and PFOS, the EPA did not identify the necessary information to connect the measured biomarker responses (i.e., decrease in antibodies) to a disease that could be valued in the economic analysis;

- Evidence indicates associations between PFOA and PFOS exposure and hepatic effects, such as increases in ALT. While increased ALT is considered an adverse effect, ALT can be one of several contributors to a variety of diseases, including liver disease, and it is difficult to therefore quantify the relationship between this biomarker and a disease that can be monetized. Similar challenges with the biomarkers representing metabolic effects (i.e., leptin) and musculoskeletal effects (i.e., bone density) prevented economic analysis of these endpoints;

- There is evidence of association between exposure to PFOA and testicular cancer in human and animal studies; however, the available slope factor in rats implied small changes in the risk of this endpoint. Because testicular cancer is rarely fatal and the Value of Statistical Life is the driver of economic benefits evaluated in the EA, the benefit of decreased testicular cancer expected with this rule was smaller in comparison and not quantified;

- There is evidence of association between exposure to PFOS and hepatic carcinogenicity in human and animal studies. The EPA quantified benefits associated with reduced liver cancer cases and deaths as part of a sensitivity analysis for the final rule in response to public comments received on the proposed rule requesting that the EPA quantify additional health benefits (see Appendix O);

- Finally, other health endpoints, such as small for gestational age and LDLC effects, were not modeled in the EA because they overlap with effects that the EPA did model. More specifically, SGA infants are often born with decreased birth weight or receive similar care to infants born with decreased birth weight. LDLC is a component of total cholesterol and could not be modeled separately as the EPA used total cholesterol as an input to the ASCVD model to estimate CVD outcomes.

## 6.2.4 Nonquantifiable Benefits of PFAS in Final Rule and PFAS Expected to be Co-Removed

The EPA also qualitatively summarized the potential health benefits resulting from reduced exposure to PFAS other than PFOA and PFOS in drinking water. The final rule and all

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                              APRIL 2024

regulatory alternatives are expected to result in additional benefits that have not been quantified. The final rule will reduce exposure to PFHxS, HFPO-DA, and PFNA to below their individual MCLs. It will also reduce exposure to mixtures of two or more of PFHxS, PFNA, HFPO-DA, and PFBS to below the HI MCLG and MCL of 1. Benefits from avoided cases of the adverse health effects discussed below are expected from the final rule due to co-occurrence of these contaminants in source waters containing PFOA and/or PFOS, as documented in detail in the *Per- and Polyfluoroalkyl Substances (PFAS) Occurrence & Contaminant Background Support Document* (U.S. EPA, 2024g). In addition, PFAS, including PFHxS, HFPO-DA, PFNA, and PFBS and their mixtures affect common target organs, tissues, or systems to produce dose-additive effects from their co-exposures with each other, as well as PFOA and PFOS (U.S. EPA, 2024d). The EPA expects that compliance actions taken under the final rule will remove additional unregulated co-occurring PFAS contaminants where present because the best available technologies have been demonstrated to co-remove additional PFAS. Treatment responses implemented to reduce PFOA and PFOS exposure under the final rule and Options 1a-c are likely to remove some amount of additional PFAS contaminants where they co-occur.

IX and GAC are effective at removing PFAS; there is generally a linear relationship between PFAS chain length and removal efficiency, shifted by functional group (McCleaf et al., 2017; Sörengård, 2020). Perfluoroalkyl sulfonates (PFSAs), such as PFOS, are removed with greater efficiency than corresponding perfluoroalkyl carboxylates (PFCAs), such as PFOA, of the same carbon backbone length (Appleman et al., 2014; Du, 2014; Eschauzier et al., 2012; Ochoa-Herrera & Sierra-Alvarez, 2008; Zaggia et al., 2016). Generally, for a given water type and concentration, PFSAs are removed approximately as effectively as PFCAs, which have two additional fully perfluorinated carbons in the carbon backbone. For example, PFHxS (i.e., sulfonic acid with a six-carbon backbone) is removed approximately as well as PFOA (i.e., carboxylic acid with an eight-carbon backbone) and PFHxA (i.e., carboxylic acid with a six-carbon backbone) is removed approximately as well as PFBS (i.e., sulfonic acid with a four-carbon backbone). Further, PFAS compounds with longer carbon chains display lower percentage decreases in average removal efficiency over time (McCleaf et al., 2017).

In cases where the six PFAS included in the final rule occur at concentrations above their respective regulatory standards, there is also an increased probability of co-occurrence of additional unregulated PFAS. Further, as the same technologies also remove other long-chain and higher carbon/higher molecular weight PFAS, the EPA expects that treatment will provide additional public health protection and benefits due to co-removal of unregulated PFAS that may have adverse health effects. While the EPA has not quantified these additional benefits, the agency expects that these important co-removal benefits will further enhance public health protection.

The EPA identified a wide range of potential health effects associated with exposure to PFAS other than PFOA and PFOS using documents that summarize the recent literature on exposure and associated health impacts: the ATSDR's Toxicological Profile for Perfluoroalkyls (ATSDR, 2021); the EPA's toxicity assessment of HFPO-DA (U.S. EPA, 2021c); publicly available IRIS assessments for PFBA and PFHxA (U.S. EPA, 2022e; U.S. EPA, 2023d); EPA's toxicity assessment of PFBS (U.S. EPA, 2021d); and the recent National Academies of Sciences, Engineering, and Medicine Guidance on PFAS Exposure, Testing, and Clinical Follow-up

(NASEM, 2022). Note that the determinations of associations between PFAS and associated health effects are based on information available as of September 2023.

**Developmental effects:** Toxicology and/or epidemiology studies observed evidence of associations between birth weight and/or other developmental effects and exposure to PFBA, PFDA, PFHxS, PFHxA, HFPO-DA, PFNA, PFUnA, and PFBS. Specifically, data from toxicology studies support this association for PFBS, PFBA, PFHxA, and HFPO-DA, while both toxicology and epidemiology studies support this association for PFHxS, PFDA, PFUnA, and PFNA (ATSDR, 2021; U.S. EPA, 2021c; U.S. EPA, 2022e; Wright et al., 2023). In general, epidemiological studies did not find associations between exposure and adverse pregnancy outcomes (miscarriage, preterm birth, or gestational age) for PFNA, PFUnA, and PFHxS (ATSDR, 2021; NASEM, 2022). Epidemiological studies support an association between PFNA, PFHxS or PFDA exposure and developmental effects such as decreases in infant birth weight and birth length, small for gestational age and increased risk of low birth weight (Valvi et al., 2017; C.C. Bach et al., 2016; Louis et al., 2018; Wright et al., 2023; Manzano-Salgado et al., 2017; Starling et al., 2017). Few epidemiologic studies also indicate that PFDA exposure is associated with developmental effects (Wikström et al., 2020; Valvi et al., 2017; Luo et al., 2021; Yao et al., 2021). The EPA has determined that evidence indicates that exposure to PFBA or PFHxA likely causes developmental effects, based on moderate evidence from animal studies and indeterminate evidence from human studies (U.S. EPA, 2022e; U.S. EPA, 2023d).

**Cardiovascular effects:** Epidemiology and/or toxicology studies observed evidence of associations between PFNA, PFDA, and PFHxS exposures and effects on total cholesterol, LDLC, and HDLC. Epidemiological studies report consistent associations between PFHxS and total cholesterol in adults (Cakmak et al., 2022; Dunder et al., 2022; Canova et al., 2020; Lin et al., 2019; G. Liu et al., 2020; Fisher et al., 2013). In an analysis based on studies published before 2018, evidence for associations between PFNA exposure and serum lipid levels in epidemiology studies was mixed; associations have been observed between serum PFNA levels and total cholesterol in general populations of adults but not in pregnant women, and evidence in children is inconsistent (ATSDR, 2021). Most epidemiology studies did not observe associations between PFNA and LDLC or HDLC. Epidemiological studies report consistent associations between PFDA and effects on total cholesterol in adults (Cakmak et al., 2022; Dunder et al., 2022; G. Liu et al., 2020; Dong et al., 2019). Positive associations between PFDA and other serum lipids, adiposity, cardiovascular disease, and atherosclerosis were observed in some epidemiology studies, but findings were inconsistent (Huang et al., 2018; Mattsson et al., 2015; Christensen et al., 2016). A single animal study observed decreases in cholesterol and triglyceride levels in rats at PFDA doses above 1.25 mg/kg/d for 28 days (National Toxicology Program, 2018b). There was no association between PFBA and serum lipids in a single epidemiology study and no animal studies on PFBA evaluated cardiovascular endpoints (U.S. EPA, 2022e). Other PFAS for which lipid outcomes were examined in toxicology or epidemiology studies showed limited to no evidence of associations. Studies have examined possible associations between various PFAS and blood pressure in humans or heart histopathology in animals. Epidemiological studies report positive associations between PFHxS and hypertension in adolescents and young adults (Averina et al., 2021; N. Li et al., 2021; Pitter et al., 2020), but not in other adults (P.-I. D. Lin et al., 2020; A. Chen et al., 2019; Christensen et al., 2018; G. Liu et al., 2018; Bao et al., 2017 ; Christensen et al., 2016) or children (Papadopoulou et al., 2021; Khalil et al., 2018; Manzano-Salgado et al., 2017). No evidence was

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                                    APRIL 2024

observed of associations between PFHxS and cardiovascular diseases (Huang et al., 2018; Mattsson et al., 2015). Overall, studies did not find likely evidence of cardiovascular effects for other PFAS except for PFOS and PFOA (U.S. EPA, 2024e; U.S. EPA, 2024f).

**Hepatic effects:** Toxicology and/or epidemiology studies have reported associations between exposure to PFAS (PFBA, PFDA, PFUnA, PFDoDA, PFHxA, PFHxS, HFPO-DA, and PFBS) and hepatotoxicity. The results of the animal toxicology studies provide strong evidence that the liver is a sensitive target of PFHxS, PFNA, PFDA, PFUnA, PFBS, PFBA, PFDoDA, HFPO-DA and PFHxA toxicity. Observed effects in rodents include increases in liver weight, hepatocellular hypertrophy, hyperplasia, and necrosis (ATSDR, 2021; U.S. EPA, 2021c; U.S. EPA, 2022e; U.S. EPA, 2023d). Increases in serum enzymes (such as ALT) and decreases in serum bilirubin were observed in several epidemiological studies of PFNA and PFDA (Nian et al., 2019; Jain & Ducatman, 2019b; J.-J. Liu et al., 2022; Cakmak et al., 2022). Associations between exposure to PFHxS and effects on serum hepatic enzymes are less consistent (Cakmak et al., 2022; J.-J. Liu et al., 2022; Jain & Ducatman, 2019b; Salihovic et al., 2018; Gleason et al., 2015 ). Mixed effects were observed for serum liver enzymes in epidemiological studies for PFNA (ATSDR, 2021).

**Immune effects:** Epidemiology studies have reported evidence of associations between PFDA or PFHxS exposure and antibody response to tetanus or diphtheria (Grandjean et al., 2012; Grandjean, Heilmann, Nielsen, et al., 2017; Grandjean, Heilmann, Weihe, et al., 2017; Budtz-Jørgensen & Grandjean, 2018). There is also some limited evidence for decreased antibody response for PFNA, PFUnA, and PFDoDA, although there were notable inconsistencies across studies examining associations for these compounds (ATSDR, 2021). There is limited evidence for associations between PFHxS, PFNA, PFDA, PFBS, and PFDoDA and increased risk of asthma due to the small number of studies evaluating the outcome and/or inconsistent study results (ATSDR, 2021). The small number of studies investigating immunotoxicity in humans following exposure to PFHpA and PFHxA did not find associations (ATSDR, 2021; U.S. EPA, 2023d, NASEM, 2022). Toxicology studies have reported evidence of associations between HFPO-DA exposure and effects on various immune-related endpoints in animals (ATSDR, 2021; U.S. EPA, 2021c). No laboratory animal studies were identified for PFUnA, PFHpA, PFDoDA, or FOSA. A small number of toxicology studies evaluated the immunotoxicity of other perfluoroalkyls and most did not evaluate immune function. No alterations in spleen or thymus organ weights or morphology were observed in studies on PFHxS and PFBA. A study on PFNA found decreases in spleen and thymus weights and alterations in splenic lymphocyte phenotypes (ATSDR, 2021). Changes in spleen and thymus weights were reported in female mice and male/female rats in two 28-day gavage studies of PFDA, although the direction and dose-dependency of these changes in rats was inconsistent across studies (Frawley et al., 2018 ; National Toxicology Program, 2018b).

**COVID-19:** A cross-sectional study in Denmark (Grandjean et al., 2020) showed that PFBA exposure was associated with increasing severity of COVID-19, with an OR of 1.77 (95% CI: 1.09, 2.87) after adjustment for age, sex, sampling site, and interval between blood sampling and diagnosis. A case-control study showed increased risk of COVID-19 infection with high urinary PFAS (including PFOA, PFOS, PFHxA, PFHpA, PFHxS, PFNA, PFBS, PFDA, PFUnA, PFDoA, PFTrDA, PFTeDA) levels (Ji et al., 2021). Adjusted odds ratios were 1.94 (95% CI: 1.39, 2.96) for PFOS, 2.73 (95% CI: 1.71, 4.55) for PFOA, and 2.82 (95% CI: 1.97–3.51) for

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

total PFAS (sum of 12 PFAS), while other PFAS were not significantly associated with COVID-19 susceptibility after adjusting for confounders. In a spatial ecological analysis, Catelan et al. (2021) showed higher mortality risk for COVID-19 in a population heavily exposed to PFAS (including PFOA, PFOS, PFHxS, PFBS, PFBA, PFPeA, PFHxA, and PFHpA) via drinking water. Overall, results suggested a general immunosuppressive effect of PFAS and/or increased COVID-19 respiratory toxicity due to a concentration of PFBA in the lungs. Although these studies provide a suggestion of possible associations, the body of evidence does not permit conclusions about the relationship between COVID-19 infection, severity, or mortality, and exposures to PFAS. In addition to the adverse health effects listed above, there was little or no evidence that exposure to the various PFAS is associated with the additional health effects summarized below.

**Endocrine effects:** Epidemiology studies have observed associations between serum PFHxS, PFNA, PFDA, and PFUnA and effects on thyroid stimulating hormone (TSH), triiodothyronine (T3), or thyroxine (T4) levels in serum or thyroid disease; however, there are notable inconsistencies across the studies identified in the available reports (ATSDR, 2021; NASEM, 2022). Toxicology studies have reported consistent associations between exposure to PFHxS, PFBA, PFHxA, and PFBS and effects on thyroid hormones, thyroid organ weight, and thyroid histopathology in animals; the endocrine system was a notable target of PFBS and PFHxS toxicity (ATSDR, 2021; U.S. EPA, 2021d; U.S. EPA, 2022e; U.S. EPA, 2023d; National Toxicology Program, 2018a; Ramhøj et al., 2018; Ramhøj et al., 2020; Butenhoff et al., 2009).

**Metabolic effects:** Epidemiology and toxicology studies have examined possible associations between various PFAS and metabolic effects, including leptin, body weight, or body fat in humans or animals (ATSDR, 2021). Exposure to PFDA has been associated with an increase in adiposity in adults (Blake et al., 2018; Christensen et al., 2018; G. Liu et al., 2018). However, evidence of associations was not suggestive or likely for any PFAS in this summary except for PFOA and PFOS (U.S. EPA, 2024a; U.S. EPA, 2024b; U.S. EPA, 2024e; U.S. EPA, 2024f). Evidence for changes such as maternal body weight gain, pup body weight, or other developmentally focused weight outcomes is strong but is considered under the Developmental effects category (ATSDR, 2021; NASEM, 2022).

**Renal effects:** A small number of epidemiology studies with inconsistent results evaluated possible associations between PFHxS, PFNA, PFDA, PFBS, PFDoDA, or PFHxA and renal function (including estimated glomerular filtration rate and increases in uric acid levels) (ATSDR, 2021; NASEM, 2022; U.S. EPA, 2023d). Toxicology studies have not observed impaired renal function or morphological damage following exposure to PFHxS, PFDA, PFUnA, PFBS, PFBA, PFDoDA, or PFHxA (ATSDR, 2021). Associations with kidney weight in animals were observed for PFBS and HFPO-DA and was a notable target for PFBS toxicity (ATSDR, 2021; U.S. EPA, 2021c; U.S. EPA, 2021d).

**Reproductive effects:** A small number of epidemiology studies with inconsistent results evaluated possible associations between reproductive hormone levels and PFHxS, PFNA, PFDA, PFUnA, PFDoDA, or PFHxA. Some associations between PFAS (PFHxS, PFHxA, PFNA, PFDA) exposures and sperm parameters have been observed, but often only one sperm parameter was altered. While there is suggestive evidence of an association between PFHxS or PFNA exposure and an increased risk of early menopause, this may be due to reverse causation since an earlier onset of menopause would result in a decrease in the removal of PFAS in

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

menstrual blood. Epidemiological studies provide mixed evidence of impaired fertility (increased risks of longer time to pregnancy and infertility), with some evidence for PFHxS, PFNA, PFHpA, and PFBS but the results are inconsistent across studies or were only based on one study (ATSDR, 2021; Carlsen Bach et al., 2018; Vélez et al., 2015). Toxicology studies have evaluated the potential histological alterations in reproductive tissues, alterations in reproductive hormones, and impaired reproductive functions. No effect on fertility was observed for PFBS and PFDoDA, and no histological alterations were observed for PFBS and PFBA. One study found alterations in sperm parameters and decreases in fertility in mice exposed to PFNA, and one study for PFDoDA observed ultrastructural alterations in the testes (ATSDR, 2021). Decreased uterine weights, changes in hormone levels, and increased time spent in diestrus were observed in studies of PFDA or PFHxS exposures (National Toxicology Program, 2018b; Yin et al., 2021).

**Musculoskeletal effects:** Epidemiology studies observed evidence of associations between PFNA and PFHxS and musculoskeletal effects including osteoarthritis and bone mineral density, but data are limited to two studies (ATSDR, 2021; Khalil et al., 2016; Khalil et al., 2018). Toxicology studies reported no morphological alterations in bone or skeletal muscle in animals exposed to PFBA, PFDA, PFHxA, PFHxS, or PFBS, but evidence is based on a very small number of studies (NTP, 2018; ATSDR, 2021; U.S. EPA, 2022e; U.S. EPA, 2023d).

**Hematological effects:** A single uninformative epidemiological study reported on blood counts in pregnant women exposed to PFHxA (U.S. EPA, 2024e). Epidemiological data were not identified for the other PFAS (ATSDR, 2021). A limited number of toxicology studies observed alterations in hematological indices following exposure to relatively high doses of PFHxS, PFDA, PFUnA, PFBS, PFBA, or PFDoDA (ATSDR, 2021; U.S. EPA, 2022e; National Toxicology Program, 2018b; 3M Company, 2000; Frawley et al., 2018). Toxicology studies observed robust evidence of association between PFHxA or HFPO-DA exposure and hematological effects, including decreases in red blood cell (RBC) number, hemoglobin, and percentage of RBCs in the blood (U.S. EPA, 2021c; U.S. EPA, 2023d). A small number of toxicology studies observed slight evidence of associations between exposure to PFHxS, PFDA, or PFBA and decreases in multiple red blood cell parameters and in prothrombin time; however, effects were not consistent (U.S. EPA, 2022e; Butenhoff et al., 2009).

**Other non-cancer effects:** A limited number of epidemiology and toxicology studies have examined possible associations between various PFAS and dermal, ocular, and other non-cancer effects. However, the evidence does not support associations for any PFAS in this summary except for PFOA and PFOS (ATSDR, 2021; U.S. EPA, 2021d; U.S. EPA, 2022e; U.S. EPA, 2023d).

**Cancer effects:** A small number of epidemiology studies reported limited associations between multiple PFAS (i.e., PFHxS, PFDA, PFUnA, and FOSA) and cancer effects. No consistent associations were observed for breast cancer risk for PFHxS, PFHxA, PFNA, PFHpA, or PFDoDA; increased breast cancer risks were observed for PFDA and FOSA, but this was based on a single study (Bonefeld-Jorgensen et al., 2014), and one study observed non-significant increased risk for breast cancer risk and PFDA (Tsai et al., 2020). Exposure to PFHxS was associated with increased breast cancer risk in one study and with decreased breast cancer risk in two related studies (Bonefeld-Jorgensen et al., 2014; Ghisari et al., 2017; Tsai et al., 2020). No associations between PFHxS, PFNA, PFDA, or PFUnA and prostate cancer risk were observed. However, among men with a first-degree relative with prostate cancer, associations were

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

observed for PFHxS, PFDA (Hardell et al., 2014), and PFUnA, but not for PFNA (ATSDR, 2021; U.S. EPA, 2022e; U.S. EPA, 2023d). A decreased risk of thyroid cancer was associated with exposure to PFHxS and PFDA in a single study (M. Liu et al., 2021). Epidemiological studies examining potential cancer effects were not identified for PFBS or PFBA (ATSDR, 2021; U.S. EPA, 2022e). No animal studies examined carcinogenicity of PFHxS or PFBA. Aside from a study that suggested an increased incidence of liver tumors in rats exposed to high doses of HFPO-DA, the limited number of available toxicology studies reported no evidence of associations between exposure to other PFAS (i.e., PFDA and PFHxA) and risk of cancer (ATSDR, 2021; U.S. EPA, 2021c; U.S. EPA, 2023d). At this time, there is inadequate information to assess carcinogenic potential for PFAS other than PFOA, PFOS, and HFPO-DA.

## 6.2.5 Sensitive Populations

SDWA Section 1412(b)(3)(C) establishes requirements for the EPA to develop a HRRCA that presents both quantifiable and nonquantifiable benefits and costs likely to occur as a result of compliance with the NPDWR. In developing this HRRCA, the EPA considered adverse health effects to sensitive populations and subpopulations.

Adverse health effects of PFAS such as cancer, developmental, hepatic, immune, and serum lipid effects (see Sections 6.2.2 and 6.2.4) have been observed in the general population, including women of reproductive age. Effects have been observed in vulnerable populations of groups who have relatively high exposures, for example workers and their families who worked at and/or lived near facilities that used PFOA (such as the C8 Health Project[33] populations). However, data for the elucidation of differential susceptibility dependent on life stage (e.g., developing embryo/fetus, or pregnant women) are very limited or not available. Children are frequently more vulnerable to contaminants than the average adult because of the differences in their behaviors and biology. These differences can result in greater exposure and/or unique windows of developmental susceptibility during the prenatal and postnatal periods for both the pregnant mother and the developing fetus.

When evaluating NPDWRs for any unregulated contaminant, the EPA considers the adverse health risks to infants/children, pregnant women, the elderly, individuals with a history of serious illness, and any subpopulation that are identifiable as being at greater risk due to exposure to contaminants in drinking water than the general population to ensure that the most sensitive population groups are protected. SDWA Section 1412(b)(3)(C)(i)(V). In conducting risk analyses and assessments, the EPA and other agencies and organizations consider subpopulations that may be sensitive to PFAS exposure to be pregnant women, infants/children, individuals who are immunologically compromised, and the elderly (U.S. EPA, 2024e; U.S. EPA, 2024f; ATSDR, 2021; CalEPA, 2021; Minnesota Pollution Control Agency, 2021). CalEPA (2021) and the Minnesota Pollution Control Agency (2021) also identify the timing of exposure to PFAS to be critical in the development of adverse health effects. There is evidence of associations with birth weight effects and exposure to PFDA, PFHxS, PFNA, PFOA, PFOS, or PFUnA (see Sections 6.2.2 and 6.2.4). There is some sex-specific variation in the toxicokinetics of PFOA in

---

[33] The C8 Health Project studied over 60,000 individuals who had lived, worked, or attended school for more than one year in one of six water districts contaminated by PFOA between 1950 and 2004 (Frisbee et al., 2010).

humans and rodents, with females generally excreting PFOA faster than males (U.S. EPA, 2024f).

Overall, given that evidence of exposure and adverse health effects of PFAS is mostly reported in studies of the general population, not all potentially sensitive populations are quantified in developing this HRRCA. However, the modeled endpoints, including decreases in infant birth weight (Section 6.4), CVD (Section 6.5), and RCC (Section 6.6), are prevalent in sensitive populations (i.e., infants and the elderly).

## 6.2.6 Co-Removal of Additional Contaminants

Additional co-removal benefits can occur with the advanced treatment options for PFAS removal. Advanced treatment technologies including GAC, IX, as well as high-pressure membranes such as nanofiltration (NF) and reverse osmosis (RO) can remove many contaminants in addition to those specifically targeted by the final PFAS rule, including other contaminants that the EPA may regulate in the future (Chowdhury et al., 2013; de Abreu Domingos & da Fonseca, 2018; McNamara et al., 2018; Pramanik et al., 2015; Yu et al., 2012). For example, membrane technology (depending on pore size) can be used to lower DBP formation by the removal of organic carbon, and can also remove many microbial contaminants (e.g., bacteria and protozoans) of public health concern (S. K. Park et al., 2019).

Organic matter can also be removed by IX and GAC (Crittenden et al., 1993; W. H. Kim et al., 1997; Yapsakli & Çeçen, 2010; Dickenson & Higgins, 2016; Yuan et al., 2022). Removing TOC, which functions as a DBP precursor, may also help address DBP issues, including regulated and nonregulated DBPs. Epidemiological studies have shown that increased exposure to chlorinated DBPs is associated with higher risk of bladder cancer and other adverse health outcomes (Cantor et al., 1998; Freeman et al., 2017). Weisman et al. (2022) found that approximately 8,000 of the 79,000 annual bladder cancer cases in the U.S. were potentially attributable to chlorinated DBPs in drinking water systems.

In addition, TOC removal lowers disinfectant demand and could lower disinfectant dose requirements (Hooper & Allgeier, 2002). Membrane technology, IX, and GAC lower nutrient availability for bacterial growth, produce a more biologically stable finished water, and facilitate management of water quality in the distribution system. Lower organic matter concentration is also associated with lower assimilable organic carbon (AOC) and nutrient availability for biofilm growth, helping to maintain disinfectant residual in the distribution system and to reduce microbial risk (U.S. EPA, 2005b).

A major concern for drinking water systems is biofilm control in reducing microbial risk. One opportunistic pathogen of concern is Legionella, which can grow and multiply in amoeba that live in biofilms and sediments (National Academies of Sciences, 2020). Certain conditions in the distribution and plumbing systems can also support its proliferation, including low disinfectant residual (U.S. EPA, 2016i; LeChevallier, 2020). Legionella exposure can lead to legionellosis, Pontiac fever, or a form of pneumonia called Legionnaires' disease (National Academies of Sciences, 2020). Collier et al. (2021) estimated that in 2014 there were 11,000 cases of Legionnaires' disease due to waterborne exposure in the U.S., with an estimated one in 10 cases leading to death.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Since membrane technology and GAC also remove SOCs, these advanced treatment options provide additional protection from exposure to chemicals associated with accidental spills or environmental runoff. The EPA has previously used the term SOC to include volatile organic carbons, herbicides, pesticides, and other anthropogenic organic compounds (U.S. EPA, 1998d). One example of a volatile organic carbon that can be co-removed by GAC is dichloromethane (also known as methylene chloride), which has been linked to liver, neurological, and blood cell damage in addition to various cancers (U.S. EPA, 2014). The EPA also identified alachlor as a herbicide that can be removed by GAC and has been linked to liver, kidneys, and spleen damage (U.S. EPA, 1998a). Another SOC example that can be removed by GAC treatment is atrazine, a pesticide that targets the endocrine system and has been associated with adverse developmental reproductive effects (U.S. EPA, 2007a). Removal of any contaminants that may face current and/or future regulation could result in additional public health protection and cost savings to a water system. As public water systems move to advanced treatment, other non-health benefits are also anticipated including better-tasting and smelling water.

## 6.3 Blood Serum Concentration Modeling for PFAS

### 6.3.1 Introduction

The U.S. EPA implemented PK models to evaluate blood serum PFOA and PFOS levels in adults resulting from exposure to PFAS via drinking water. This section discusses the application of the PFOA and PFOS PK models in the context of the benefits analysis.

### 6.3.2 Application of PK Models to Benefits Analyses

The EPA used baseline and regulatory alternative PFOA/PFOS drinking water concentrations as inputs to its PK models to estimate blood serum PFOA/PFOS concentrations for adult males and females. In this analysis, the agency implemented the final PFOA/PFOS PK model version in SafeWater MCBC.[34] See the EPA's Final Human Health Toxicity Assessments for PFOA and PFOS for further information on the model (U.S. EPA, 2024e; U.S. EPA, 2024f) and EPA's Github repository for pharmacokinetic modeling.[35] The PK models require total PFOA/PFOS dose in mg/kg of body weight per day to be provided as an input. The EPA multiplied PFOA/PFOS drinking water concentrations in mg/L by a water intake of 0.013 L/kg of body weight per day based on the EPA's Exposure Factors Handbook (U.S. EPA, 2011b) in order to compute the PFOA/PFOS dose from drinking water sources.

The EPA acknowledges that sources or pathways of exposure other than drinking water consumption may contribute to an individual's total PFOA/PFOS exposure (see Section 6.3.3 for discussion of contributions from other sources). However, the assumed baseline exposure from drinking water sources does not affect the estimated changes in serum PFOA/PFOS, which is the key quantity of interest to the benefits estimation. For the PK model in humans, the EPA selected a "linear" approach in which the rates in the model are all proportional to concentration. In this

---

[34] SafeWater MCBC was programmed for maximal computational efficiency. The implementation is mathematically consistent with what is described in the SAB documentation and associated R code, however, SafeWater performs a series of pre-calculations to reduce model runtime.
[35] https://github.com/USEPA/OW-PFOS-PFOA-MCLG-support-PK-models

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

type of model, predicted serum concentration is proportional to the dose, with a proportionality constant that is dependent on time, but not dose. Given the same model parameters, such as sampling age and exposure duration, doubling the dose will double the predicted serum concentration. Note that each simulation models an individual from birth through to the sampling age, with a default exposure scenario of constant lifetime exposure beginning at birth.[36] This implies that the change in predicted serum concentration is dependent only on the change in drinking water dose and independent of the dose from non-drinking water sources. The EPA additionally assumed that non-drinking water exposure is independent of the drinking water PFOA/PFOS concentration and estimated the total regulatory alternative dose as the sum of the baseline non-drinking water dose and the regulatory alternative drinking water dose.[37]

The EPA used the PK models to evaluate the following PWS EP-specific exposure scenarios in male and female subpopulations:

- **Lifetime baseline exposure scenario:** Lifetime exposure to baseline PFOA/PFOS drinking-water dose for cohorts of all ages alive at the start of the evaluation period in 2024 and cohorts born after 2024;

- **Lifetime regulatory alternative exposure scenario:** Lifetime exposure to regulatory alternative PFOA/PFOS drinking-water dose for cohorts born during or after 2029 (i.e., the year of full regulatory alternative implementation);

- **Partial lifetime treatment exposure scenario:** Exposure to baseline PFOA/PFOS drinking-water dose until age A–1 years and regulatory alternative PFOA/PFOS dose thereafter for cohorts aged A > 0 years in 2029.

The EPA selected the annual midpoint (the value on June 1 of each year) of the PK-modeled serum PFOA/PFOS concentration time series to represent the annual average serum PFOA/PFOS concentrations under the baseline and regulatory options. The EPA estimated changes in annual average serum PFOA/PFOS concentrations under the regulatory alternatives by subtracting baseline cohort-specific serum PFOA/PFOS concentrations from either full or partial lifetime cohort-specific serum PFOA/PFOS concentrations (as appropriate) under the regulatory alternatives. The EPA applied the PFOA/PFOS blood serum concentration time series estimated using the PK models to all benefits analyses that considered changes in PFOA/PFOS drinking water concentrations.

---

[36] Specifically, let $C = \alpha \cdot D_t$, where $C$ is serum concentration, $\alpha$ is a proportionality constant, and $D_t$ is the total dose. This can be expanded to $C = \alpha \cdot D_t = \alpha \cdot (D_{dw} + D_o)$, where the total dose is the sum of the dose from drinking water, $D_{dw}$, and from other sources, $D_o$. The change in concentration due to a change in dose from drinking water is then $\Delta C = \alpha \cdot \Delta D_{dw} + \alpha \cdot \Delta D_o = \alpha \cdot \Delta D_{dw}$, given that the dose from other sources is constant, $\Delta D_o = 0$.

[37] The EPA used the fraction of exposure from drinking water under baseline conditions to estimate the total daily dose of PFOA/PFOS and the exposure from sources other than drinking water, which did not change upon implementation of the treatment scenario. While the total change in exposure is independent of the amount of exposure from other sources, the relative change in exposure does depend on the relative amount of exposure from non-drinking water sources. A greater fraction of exposure from drinking water sources will result in a greater relative change in total exposure upon implementation of the treatment scenario. The EPA also notes that, in reality, some portion of the non-drinking water exposure will be related to drinking water concentration (e.g., water used for cooking). This portion is difficult to estimate, and, depending on the relationship, there may be a time lag between the decrease in drinking water concentration and the decrease in the non-drinking water exposure.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The birth weight analysis focuses only on women of childbearing age defined by the Centers for Disease Control and Prevention (CDC) as those aged 15 to 44 (Ellington et al., 2020) and thus considers only maternal serum PFOA/PFOS levels. As described above, the PK models provide estimates of changes in serum PFOA/PFOS levels by PWS EP, age, and sex for each year during the period of analysis (2024 to 2105). The birth weight analysis requires a single estimate of change in maternal serum levels for each PFAS compound per year and location to evaluate potential changes in birth weight resulting from the regulatory alternatives. Therefore, the EPA used the race/ethnicity-specific distribution of populations of women of childbearing age during the period of analysis to estimate average annual race/ethnicity-specific change in PFOA/PFOS levels at each PWS EP and for each year. The EPA relied on the average age of race/ethnicity-specific women of childbearing age when determining PFOA/PFOS serum levels to reflect differences in maternal age across these groups. The population of women of childbearing age per PWS, race/ethnicity, age, and sex are based on population estimates for women aged 15 to 44 using county-level data from the U.S. Census (U.S. Census Bureau, 2020a; see Appendix B).[38]

## 6.3.3 Contributions from Other Sources

The regulatory alternatives considered in this economic analysis are based on potential reductions in PFOA/PFOS levels in drinking water. However, human exposures to PFOA and PFOS may also result from sources other than drinking water, including diet, ambient and indoor air, incidental soil/dust ingestion, consumer products, and others (U.S. EPA, 2024a; U.S. EPA, 2024b).

Following a systematic review of the PFOA and PFOS source contribution literature, the EPA identified ingestion of food as the dominant source of both PFOA and PFOS exposures in adults from the general population (U.S. EPA, 2024a; U.S. EPA, 2024b). This pathway is particularly dominant due to bioaccumulation of PFOA and PFOS in food from environmental emissions, large amounts of foods being consumed, and high gastrointestinal uptake. PFOA and PFOS may be present in food due to contact with non-stick cookware or grease-proofing agents in food packaging. PFOA and PFOS have also been shown to bioaccumulate in fish and shellfish. Consumer products, including certain cosmetics, textiles, and other household goods, are also a source of PFOA and PFOS exposure. While PFAS have been detected in ambient air globally, concentrations vary widely depending on location. PFAS have been detected in soils and dust from carpets and upholstered furniture. Incidental exposures from soils and dust are particularly important exposure routes for small children, who have a higher level of hand-to-mouth behavior compared to adults. PFAS levels in soils and surface water can also impact PFAS levels found in air particulates, fish, dairy products, meat/poultry, and produce (ATSDR, 2021; U.S. EPA, 2024a; U.S. EPA, 2024b).

## 6.4 Developmental Effects

Exposure to PFOA and PFOS is linked to developmental effects, including decreased infant birth weight (Steenland et al., 2018; Dzierlenga et al., 2020; Verner et al., 2015; Negri et al., 2017; ATSDR, 2018; ATSDR, 2021; Waterfield et al., 2020; U.S. EPA, 2016e; U.S. EPA, 2016f; U.S.

---

[38] County-level population estimates are linked to PWSs based on the "counties served" field provided by the SDWIS/Fed 2021 Q4 database.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                   APRIL 2024

EPA, 2024e; U.S. EPA, 2024f). The route through which infants are exposed prenatally to PFOA and PFOS is maternal blood via the placenta. Most studies of the association between maternal serum PFOA/PFOS and birth weight report inverse relationships (Verner et al., 2015; Negri et al., 2017; Steenland et al., 2018; Dzierlenga et al., 2020).[39] This chapter outlines the overall methodology, assumptions, and data used for estimating changes in birth weight among infants whose mothers were exposed to PFOA and PFOS in drinking water during or prior to pregnancy.[40]

The EPA also considered the potential benefits from reduced exposure to PFNA that may be realized as a direct result of the final rule. The agency explored the birth weight impacts of PFNA in a sensitivity analysis based on epidemiological studies published before 2018 cited in the best available final human health analysis of PFNA (ATSDR, 2021), as well as a recently published meta-analysis of mean birth weight that indicates the birth weight results for PFNA are robust and consistent, even if associations in some studies may be small in magnitude (Wright et al., 2023). The EPA used a unit PFNA reduction scenario (i.e., 1 ppt change) and the PFAS serum calculator developed by Lu and Bartell (2020) to estimate PFNA blood serum levels resulting from PFNA exposures in drinking water. To estimate blood serum PFNA based on its drinking water concentration, the EPA used a first-order single-compartment model whose behavior was previously demonstrated to be consistent with PFOA pharmacokinetics in humans (Bartell et al., 2010). In addition to the PFOA-birth weight and PFOS-birth weight effects analyzed in the EA, the EPA examined the effect of inclusion of PFNA-birth weight effects using estimates from two studies (Lenters et al., 2016; Valvi et al., 2017). The EPA found that inclusion of a 1 ppt PFNA reduction could increase annualized birth weight benefits by a factor of 5.6 to 7.8, relative to the scenario that quantifies a 1 ppt reduction in PFOA and a 1 ppt reduction in PFOS only. The range of estimated PFNA-related increases in benefits is driven by the exposure-response, with smaller estimates produced using the slope factors from Lenters et al. (2016), followed by Valvi et al. (2017). The EPA notes that the PFNA slope factor estimates are orders of magnitude larger than the slope factor estimates used to evaluate the impacts of PFOA/PFOS reductions. The EPA also notes that the PFNA slope factor estimates in this analysis are not precise, with 95 percent CIs covering wide ranges that include zero (i.e., serum PFNA slope factor estimates are not statistically significant at 5 percent level). Caution should be exercised in making judgements about the potential magnitude of change in the national benefits estimates based on the results of these sensitivity analyses, although conclusions about the directionality of these effects can be inferred. The EPA did not include PFNA effects in the national benefits estimates for the final rulemaking because there was insufficient data above the UCMR 3 MRL to reasonably fit model parameters for PFNA (U.S. EPA, 2024g). For the EPA's PFNA sensitivity analysis, see Appendix K.

## 6.4.1 Overview of the Birth Weight Risk Reduction Analysis

Figure 6-1 provides an overview of the approach used to quantify and value the changes in birth weight-related risks associated with reductions in exposure to PFOA and PFOS via drinking water. Section 4.4 and Section 6.3 detail the PWS EP-specific PFOA/PFOS drinking water

---

[39] Note that recent evidence indicates that relationships between maternal serum PFOA/PFOS and birth weight may be impacted by changes in pregnancy hemodynamics (Sagiv et al., 2018; Steenland et al., 2018).
[40] The PK model assumes that mothers were exposed to PFOA/PFOS from birth to the year in which pregnancy occurred.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

occurrence estimation and modeling of serum PFOA/PFOS concentrations, respectively. EP-specific time series of the differences between serum PFOA/PFOS concentrations under baseline and regulatory alternatives are inputs into this analysis. For each EP, evaluation of the changes in birth weight impacts involves the following key steps:

1. Estimating the changes in birth weight based on modeled changes in serum PFOA/PFOS levels and exposure-response functions for the effect of serum PFOA/PFOS on birth weight;
2. Estimating the difference in infant mortality probability between the baseline[41] and regulatory alternatives based on changes in birth weight under the regulatory alternatives and the association between birth weight and mortality;
3. Identifying the infant population affected by reduced exposure to PFOA/PFOS in drinking water under the regulatory alternatives;
4. Estimating the changes in the expected number of infant deaths under the regulatory alternatives based on the difference in infant mortality rates and the population of surviving infants affected by increases in birth weight due to reduced PFOA/PFOS exposure; and
5. Estimating the economic value of reducing infant mortality based on the Value of Statistical Life and infant morbidity based on reductions in medical costs associated with changes in birth weight for the surviving infants based on the cost of illness.

Section 6.4.2 discusses the exposure-response modeling for birth weight. Section 6.4.3 describes estimation of birth weight-related mortality and morbidity impacts in the affected population. Section 6.4.4 discusses the EPA's valuation methodology for reductions in birth weight-related mortality and morbidity. Section 6.4.5 presents the results of the analysis.

---

[41] Based on mortality rates per state and 500 g birth weight increment from the Centers for Disease Control and Prevention (CDC) from 2012 to 2018.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



Notes:

SDWIS – Safe drinking water information system, CDC – Centers for Disease Control, BW – birth weight

[a]Includes baseline state-level birth rate and average BW (varies by 100-gm BW increment) and infant mortality rate (varies by 500-gm BW increment) data distributed based on national-level race/ethnicity-specific data. Baseline infant mortality rates, along with the BW-infant mortality relationship, are used to determine the change in infant mortality rate between the baseline and policy scenario. Birth rate and average BW data describe the affected population of infants.

[b]Includes both large and small surface water and ground water systems.

[c]Morbidity cases refer to the total affected population minus infant mortality cases under the regulatory alternatives.

**Figure 6-1: Overview of Analysis of Birth Weight-Related Benefits**

## 6.4.2 Estimation of Birth Weight Changes Between Baseline and Regulatory Alternatives

To estimate changes in birth weight resulting from reduced exposure to PFOA and PFOS under the regulatory alternatives, the EPA relied on the estimated time series of changes in serum

PFOA/PFOS concentrations specific to women of childbearing age and serum-birth weight exposure-response functions provided in recently published meta-analyses. The estimation of the time series of changes in serum PFOA/PFOS concentrations is explained in Section 6.3.2. The EPA reviewed five recent meta-analyses of PFAS-birth weight relationships in detail. As described in Table 6-8, two of the analyses used well-documented systematic review and risk of bias procedures to identify relevant studies in the literature (Johnson et al., 2014; Negri et al., 2017). The three other studies did not document risk of bias protocols and study quality evaluation criteria, however, the EPA evaluated most of the studies used in these meta-analyses for study quality (Verner et al., 2015; Dzierlenga et al., 2020; Steenland et al., 2018; U.S. EPA, 2024e; U.S. EPA, 2024f). As discussed below, there was extensive overlap in the studies used in the various meta-analyses. Two of the meta-analyses included exposure-response modeling for both PFOS and PFOA (Verner et al., 2015; Negri et al., 2017), while one addressed only PFOS (Dzierlenga et al., 2020) and the remaining two addressed only PFOA (Johnson et al., 2014; Steenland et al., 2018).

**Table 6-8: Summary of Studies Relating PFOA or PFOS to Birth Weight**

| Author | PFOA | PFOS | Documented Risk of Bias Protocols |
|---|---|---|---|
| Johnson et al. (2014) | X | | X |
| Verner et al. (2015) | X | X | |
| Negri et al. (2017) | X | X | X |
| Steenland et al. (2018) | X | | |
| Dzierlenga et al. (2020) | | X | |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctane sulfonic acid.

The EPA evaluated the applicability of these studies for use in the evaluation of birth weight changes resulting from reduced PFOS and PFOA exposure based on the following criteria: number of studies, homogeneity among studies, and sensitivity analyses. Based on these considerations, the agency selected results from Steenland et al. (2018) as the birth weight exposure-response function for PFOA and results from Dzierlenga et al. (2020) as the birth weight exposure-response function for PFOS.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Steenland et al. (2018) conducted a random effects meta-analysis based on 24 studies. The authors estimated a slope of −10.5 g birth weight per ng PFOA/mL with significant heterogeneity ($I^2 = 63\%$)[42] (p-value for heterogeneity <0.0001). The agency chose the results from this study for use in the risk assessment from exposure to PFOA and benefits analysis of reducing PFOA in drinking water because it is the most recent meta-analysis on PFOA-birth weight, and it included a large number of studies.

Dzierlenga et al. (2020) conducted a random effects meta-analysis based on 32 results from 29 studies. An EPA reanalysis of this study[43] estimated a slope of −3.0 g birth weight per ng PFOS/mL with significant heterogeneity ($I^2 = 58\%$) (p-value for heterogeneity <0.001). The agency chose the results from this study for use in the risk assessment from exposure to PFOS and benefits analysis of reducing PFOS in drinking water because it is the most recent meta-analysis on PFOS-birth weight and includes a large number of the most recent studies. While sensitivity analyses suggested that results may be sensitive to the timing of blood draw, the authors observed consistent inverse associations with birth weight among those with blood measurements in early pregnancy and in later pregnancy.

Changes in serum PFOA and PFOS concentrations are calculated for each PWS EP during each year in the analysis period. The EPA assumes that, given the long half-lives of PFOS and PFOA (with median half-lives of 2.7 and 3.5 years, respectively; Y. Li et al., 2018), any one-time measurement during or near pregnancy is reflective of a critical exposure window and not subject to considerable error. In other words, blood serum concentrations in a single year are expected to correlate with past exposures and are reflective of maternal exposures regardless of the timing of pregnancy. The mean change in birth weight per increment in long-term PFOA and PFOS exposure is calculated by multiplying each annual change in PFOA and PFOS serum concentration (ng/mL serum) by the PFOA and PFOS serum-birth weight exposure-response slope factors (g birth weight per ng/mL serum) provided in Table 6-9, respectively. The mean annual change in birth weight attributable to changes in both PFOA and PFOS exposure is the sum of the annual PFOA- and PFOS-birth weight change estimates. Appendix D provides additional details on the derivation of the exposure-response functions. Appendix K presents an analysis of birth weight risk reduction considering slope factors specific to the first trimester.

**Table 6-9: Serum Exposure-Birth Weight Response Estimates**

| Compound | g Birth Weight/ng/mL Serum (95% CI) |
|---|---|
| PFOA[a] | −10.5 (−16.7, −4.4) |
| PFOS[b] | −3.0 (−4.9, −1.1) |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctane sulfonic acid; g – gram.
Notes:
[a]The serum-birth weight slope factor for PFOA is based on the main random effects estimate from Steenland et al. (2018).
[b]The serum-birth weight slope factor for PFOS is based on an EPA reanalysis of Dzierlenga et al. (2020).

The EPA places a cap on estimated birth weight changes in excess of 200 g based on existing studies that found that changes to environmental exposures result in relatively modest birth

---

[42] $I^2$ represents the proportion of total variance in the estimated model due to inter-study variation.
[43] In the original Dzierlenga et al. (2020) estimate, the authors duplicated an estimate from M. H. Chen et al. (2017) in the pooled estimate. The EPA reran the analysis excluding the duplicated estimate.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

weight changes (Windham & Fenster, 2008; Klein & Lynch, 2018; Kamai et al., 2019).[44,45] Modest changes in birth weight even as a result of large changes in PFOA/PFOS serum concentrations may be due to potential bias from studies only including live births (Liew et al., 2015). Additionally, the magnitude of birth weight changes may be correlated with other developmental outcomes such as preterm birth, gestational duration, fetal loss, birth defects, and developmental delays. As described in Section 6.2, these developmental outcomes have limited epidemiology evidence showing associations with PFOA/PFOS exposure and due to this uncertainty, these outcomes were not further assessed.

## 6.4.3 Estimation of Birth Weight Impacts

LBW is linked to a number of health effects that may be a source of economic burden to society in the form of medical costs, infant mortality, parental and caregiver costs, labor market productivity loss, and education costs (Chaikind & Corman, 1991; J. R. Behrman & Rosenzweig, 2004; R. E. Behrman & Butler, 2007; Joyce et al., 2012; Kowlessar et al., 2013; Colaizy et al., 2016; Nicoletti et al., 2018; Klein & Lynch, 2018). Recent literature also linked LBW to educational attainment and required remediation to improve student outcomes, childhood disability, and future earnings (Jelenkovic et al., 2018; Temple et al., 2010; Elder et al., 2020; Hines et al., 2020; Chatterji et al., 2014; Dobson et al., 2018). The EPA's analysis focuses on two categories of birth weight impacts that are amenable to monetization associated with incremental changes in birth weight: (1) medical costs associated with changes in infant birth weight and (2) the value of avoiding infant mortality at various birth weights.

The birth weight literature related to other sources of economic burden to society (e.g., parental and caregiver costs and productivity losses) is limited in geographic coverage, population size, and range of birth weights evaluated and therefore cannot be used in the economic analysis of birth weight effects from exposure to PFOA/PFOS in drinking water (ICF, 2021). The following sections summarize the relationship between infant mortality and birth weight as well as methods used to estimate changes in the number of infant deaths and the number of surviving infants whose birth weight is affected by reduced PFOA/PFOS exposures.

### 6.4.3.1 Impacts of Birth Weight on Infant Mortality

Infant mortality is defined as the deaths among infants who were delivered alive but passed before their first birthday. Birth weight is a significant factor in infant survival (Jacob, 2016). Epidemiology studies in the U.S. have reported relationships between birth weight and mortality. Most of these studies typically evaluate relationships between infant mortality and birth weight above or below various birth weight thresholds (e.g., McIntire et al., 1999; Lau et al., 2013). However, even small changes in birth weight could result in substantial avoided mortality benefits.

---

[44] Klein et al. (2018) indicate that birth weight changes in response to reduced environmental exposures are likely to be small and simulated changes in birth weight up to 100 g. Kamai et al. (2019) found maximum changes in birth weight in response to reduced exposures to cigarette smoke of 150 g, while Windham et al. (2008) found a maximum decrement in mean birth weight of 200 g for infants of smokers.
[45] Under the final rule, the EPA estimates that the 200 g birth weight cap is triggered in 0.01 percent of affected infants.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Two studies showed statistically significant relationships between incremental changes in birth weight and infant mortality: Almond et al. (2005) and Ma and Finch (2010). Ma and Finch (2010) used 2001 National Center for Health Statistics (NCHS) linked birth/infant death data for singleton and multiple birth infants among subpopulations defined by sex and race/ethnicity to estimate a regression model assessing the associations between 14 key birth outcome measures, including birth weight, and infant mortality. They found notable variation in the relationship between birth weight and mortality across race/ethnicity subpopulations, with odds ratios for best-fit birth weight-mortality models ranging from 0.8-1 (per 100 g birth weight change). Almond et al. (2005) used 1989-1991 NCHS linked birth/infant death data for multiple birth infants to analyze relationships between birth weight and infant mortality within birth weight increment ranges. For their preferred model, they reported coefficients in deaths per 1,000 births per 1 g increase in birth weight that range from −0.420 to −0.002. However, the data used in these studies (Almond et al., 2005 and Ma & Finch, 2010) are outdated (1989-1991 and 2001, respectively). Given the significant decline in infant mortality over the last 30 years (ICF, 2020) and other maternal and birth characteristics that are likely to influence infant mortality (e.g., average maternal age and rates of maternal smoking), the birth weight-mortality relationship estimates from Almond et al. (2005) and Ma and Finch (2010) are likely to overestimate the benefits of birth weight changes.

Considering the discernible changes in infant mortality over the last 30 years, the EPA developed a regression analysis to estimate the relationship between birth weight and infant mortality using the Period/Cohort Linked Birth-Infant Death Data Files published by NCHS from the 2017 period/2016 cohort and the 2018 period/2017 cohort (CDC, 2017, 2018). These data provide information on infants who are delivered alive and receive a birth certificate.[46] The EPA selected variables of interest for the regression analysis, including maternal demographic and socioeconomic characteristics, maternal risk and risk mitigation factors (e.g., number of prenatal care visits, smoker status), and infant birth characteristics. The EPA included several variables used in Ma and Finch (2010) (maternal age, maternal education, marital status, and others – see Appendix E for the complete list) as well as additional variables to augment the set of covariates included in the analyses. In addition, the EPA developed separate models for different race/ethnicity categories (non-Hispanic Black, non-Hispanic White, and Hispanic) and interacted birth weight with categories of gestational age, similar to Ma and Finch (2010).[47] Appendix E provides details on model development and regression results.

Table 6-10 presents the resulting odds ratios and marginal effects (in terms of deaths per 1,000 births for every 1 g increase in birth weight) estimated for changes in birth weight among different gestational age categories in the mortality regression models for non-Hispanic Black, non-Hispanic White, and Hispanic race/ethnicity subpopulations. Marginal effects for birth weight among different gestational age categories indicate the change in the incidence of infant

---

[46] These data do not include information on miscarriages or stillbirths.

[47] Note that Ma and Finch (2010) developed a model for infants with Mexican heritage, rather than the Hispanic population, and interacted birth weight with gestational age as a continuous interaction variable, rather than developing different birth weight variables per gestational age category. Ma and Finch (2010) did not consider the Hispanic paradox, a term for the epidemiological finding that Hispanic and Latino Americans often have lower risk of poor health outcomes compared to race/ethnicity groups with higher income and education levels..

mortality per 1 g increase in birth weight.[48] Marginal effects for birth weight among gestational age categories vary across different race/ethnicity subpopulations. As shown in Figure 6-2, the marginal effects for birth weight among different gestational age categories are higher in the non-Hispanic Black model than in the non-Hispanic White and Hispanic models, particularly for extremely and very preterm infants, indicating that LBW increases the probability of mortality within the first year more so among non-Hispanic Black infants than among non-Hispanic White and Hispanic infants.

The EPA relies on odds ratios estimated using the birth weight-mortality regression model to assess mortality outcomes of reduced exposures to PFOA/PFOS in drinking water under the regulatory alternatives. To obtain odds ratios specific to each race/ethnicity and 100 g birth weight increment considered in the birth weight benefits model,[49] the EPA averaged the estimated odds ratios for 1 g increase in birth weight over the gestational age categories using the number of infants (both singleton and multiple birth) that fall into each gestational age category as weights. Separate gestational age category weights were computed for each 100 g birth weight increment and race/ethnicity subpopulation within the 2017 period/2016 cohort and 2018 period/2017 cohort Linked Birth-Infant Death Data Files. The weighted birth weight odds ratios are then used in conjunction with the estimated change in birth weight and baseline infant mortality rates to determine the probability of infant death under the regulatory alternatives, as described further in Section 6.4.3.1.

---

[48] All marginal effect values for birth weight among different gestational age categories are negative and decrease in magnitude with each higher gestational age category, indicating that the probability of mortality decreases as gestational age and birth weight increase. For example, using marginal effects from the non-Hispanic Black model, for extremely preterm infants a 100 g birth weight increase on average would translate to 20 fewer infant deaths per 1,000 births in this gestational age category or a 2% decrease in the probability of mortality within one year of birth. The same birth weight increase at a higher gestational age would still decrease mortality risk but to a lesser extent.

[49] The birth weight risk reduction model evaluates changes in birth weight in response to PFOA/PFOS drinking water level reductions for infants who fall into 100 g birth weight increments (e.g., birth weight 0-99 g, 100-199 g, 200-299 g… 8,000-8,099 g, 8,100-8,165 g).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



**Figure 6-2: Comparison of Change in Incidence of Infant Death per 1 g Increase in Birth Weight by Gestational Age Category and Race/Ethnicity (Deaths per 1,000 Births)**

Notes: Gestational age categories defined as extremely preterm (<=28 weeks), very preterm (>28 weeks and <=32 weeks), moderately preterm (>32 weeks and <=37 weeks), and term (>37 weeks). Data based on the 2016/17 and 2017/18 CDC Period Cohort Linked Birth-Infant Death Data Files obtained from NCHS/NVSS. Marginal effects and odds ratios are estimated using a regression model that also includes covariates representative of infant birth characteristics in addition to birth weight, maternal demographic characteristics, and maternal risk factors. Details are included in Appendix E.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

**Table 6-10: Race/Ethnicity- and Gestational Age-Specific Birth Weight Marginal Effects and Odds Ratios from the Mortality Regression Models**

| Race | Gestational Age Category[b] | Marginal Effect per 1,000 births (95% CI) | Odds Ratio (95% CI) |
|------|------|------|------|
| Non-Hispanic Black | Extremely Preterm | -0.20400 (-0.21910, -0.18890) | 0.99817 (0.99802, 0.99832) |
| | Very Preterm | -0.04580 (-0.04820, -0.04340) | 0.99816 (0.99804, 0.99827) |
| | Moderately Preterm | -0.01030 (-0.01080, -0.009850) | 0.99852 (0.99846, 0.99857) |
| | Term | -0.00453 (-0.00472, -0.00434) | 0.99856 (0.99851, 0.9986) |
| Non-Hispanic White | Extremely Preterm | -0.12160 (-0.13080, -0.11240) | 0.99866 (0.99855, 0.99878) |
| | Very Preterm | -0.03290 (-0.03430, -0.03140) | 0.9985 (0.99842, 0.99858) |
| | Moderately Preterm | -0.00677 (-0.00702, -0.00652) | 0.99867 (0.99863, 0.99872) |
| | Term | -0.00228 (-0.00236, -0.00221) | 0.99865 (0.99861, 0.99868) |
| Hispanic | Extremely Preterm | -0.15260 (-0.16770, -0.13750) | 0.99835 (0.99817, 0.99853) |
| | Very Preterm | -0.03290 (-0.03510, -0.03070) | 0.99846 (0.99835, 0.99858) |
| | Moderately Preterm | -0.00626 (-0.00659, -0.00592) | 0.99856 (0.99849, 0.99862) |
| | Term | -0.00219 (-0.00229, -0.00208) | 0.99849 (0.99844, 0.99855) |

Notes:
[a]Data based on the 2016/17 and 2017/18 CDC Period Cohort Linked Birth-Infant Death Data Files obtained from NCHS/NVSS. Marginal effects and odds ratios are estimated using a regression model that also includes covariates representative of infant birth characteristics in addition to birth weight, maternal demographic characteristics, and maternal risk factors. All effects were statistically significant at the 5% level. Additional details are included in Appendix E.
[b]Gestational age categories defined as extremely preterm (<=28 weeks), very preterm (>28 weeks and <=32 weeks), moderately preterm (>32 weeks and <=37 weeks), and term (>37 weeks).

The EPA weighted the race/ethnicity-specific mortality odds ratios in Table 6-10 by the proportions of the infant populations who fell into each gestational age within a 100 g birth weight increment, based on the 2016/17 and 2017/18 period cohort data, to obtain a weighted

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

mortality odds ratio estimate for each modeled race/ethnicity subpopulation and 100 g birth weight increment. The weighted mortality odds ratios are shown in Figure 6-3.[50]

---

[50] Note that weighted mortality odds ratios for the Hispanic population at larger birth weight increments fluctuate between 0.99849 and 0.99856. Due to the small sample size of the Hispanic infant population within these birth weight increments, 100 percent of infants in a specific birth weight increment is associated with either moderately preterm or term gestational age categories. For instance, all Hispanic infants included in the analysis who were between 7,800 and 7,899 g were full-term, while all Hispanic infants who were between 7,900 and 7,999 g were moderately preterm. Therefore, the weighted mortality odds ratio for Hispanic infants between 7,800 and 7,899 g is equal to the full-term mortality odds ratio estimated for the Hispanic infant population, while the weighted mortality odds ratio for Hispanic infants between 7,900 and 7,999 g is equal to the moderately preterm mortality odds ratio estimated for the Hispanic infant population.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                                APRIL 2024

**Figure 6-3: Weighted Mortality Odds Ratios Based on Populations of Infants Falling into 100 g Birth Weight Increments and Four Gestational Age Categories**

Note: Weighted mortality odds ratios refer to the exponentiation of the sum of odds ratios estimated for each gestational age category and race/ethnicity-specific infant population multiplied by the proportions of the infant populations who fell into each gestational age within a 100 g birth weight increment, based on the 2016/17 and 2017/18 CDC Period Cohort Linked Birth-Infant Death Data Files obtained from NCHS/NVSS, to obtain a weighted odds ratio estimate for each modeled race/ethnicity and 100 g birth weight increment. The EPA applies the weighted mortality odds ratios estimated for the non-Hispanic White subpopulation to the "other" race/ethnicity subpopulation because of similarities in infant death rates from 2016 to 2018 among non-Hispanic White infants (4.75 deaths per 1,000) and non-Hispanic other infants (4.45 deaths per 1,000).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Note that the EPA did not model the relationship between birth weight and infant mortality for other race/ethnicity subpopulations because doing so for each individual race/ethnicity or combination of all "other" races/ethnicities is precluded by very low sample sizes (i.e., imprecise coefficients and imprecise marginal effects). The EPA applies the weighted mortality odds ratios estimated for the non-Hispanic White subpopulation to the "other" race/ethnicity subpopulation because of similarities in infant death rates from 2016 to 2018 among non-Hispanic White infants (4.75 deaths per 1,000) and non-Hispanic other infants (4.45 deaths per 1,000).

## 6.4.3.2 Estimating the Number of Infants Affected by Birth Weight Changes and Changes in Infant Mortality

Based on reduced serum PFOA/PFOS exposures under the regulatory alternatives and the estimated relationship between birth weight and infant mortality, the EPA estimates the subsequent change in birth weight for those infants affected by decreases in PFOA/PFOS and changes in the number of infant deaths. The EPA evaluates these changes at each PWS EP affected by the regulatory alternatives and the calculations are performed for each race/ethnicity group, 100 g birth weight category, and year of the analysis.

### 6.4.3.2.1 Changes in Birth Weight

The EPA combined estimated average annual changes in PFOA and PFOS serum levels for women of childbearing age (15 to 44 years old) by analysis year, race/ethnicity group, and PWS EP (see Section 6.3.2) with the serum PFOA/PFOS-birth weight exposure-response slope factors (see Table 6-9) to compute average annual changes in birth weight per newborn as follows:

Equation 6:

$$\Delta BW_{y,r,p} = \max\left(CAP, SF_{BW,PFOA} \cdot \Delta PFOA\_Serum_{y,r,p} + SF_{BW,PFOS} \cdot \Delta PFOS_{Serum_{y,r,p}}\right)$$

Where $\Delta BW$ is the change in birth weight under the regulatory alternatives, $y$ is the analysis year, $r$ is the race/ethnicity group, $p$ is the PWS EP analyzed; $\Delta PFOA\_Serum$ is the change in PFOA serum for women of childbearing age under the regulatory alternatives; $\Delta PFOS\_Serum$ is the change in PFOS serum for women of childbearing age under the regulatory alternatives; $SF_{BW,PFOA}$ and $SF_{BW,PFOS}$ are the serum-birth weight exposure-response slope factors for PFOA and PFOS, respectively; and $CAP$ is the 200 g cap placed on the birth weight changes.

### 6.4.3.2.2 Changes in Infant Death Rate

The EPA used average annual changes in birth weight under the regulatory alternatives (Equation 6) to estimate the associated infant mortality odds ratios, $OR_{y,i,r,p}$:

Equation 7:

$$OR_{y,i,r,p} = \exp\left(\Delta BW_{y,r,p} \cdot \ln(OR_{i,r})\right)$$

Where $y$ is the analysis year, $i$ is the 100 g birth weight increment, $r$ is the race/ethnicity group, $p$ is the PWS EP analyzed, and $OR_{i,r}$ is the weighted odds ratio for a 1 g birth weight increase

---

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

associated with each 100 g birth weight increment for a given race/ethnicity category (see Section 6.4.3).

The EPA combined the result of Equation 7 with the baseline infant death rate to estimate the infant death rate under the regulatory alternatives, $DR_{Regulatory\ Alternative,y,i,r,p}$:

Equation 8:

$$DR_{Regulatory\ Alternative,y,i,r,p} = \frac{OR_{y,i,r,p} \cdot DR_{Baseline,y,i,r,p}}{1 + OR_{y,i,r,p} \cdot DR_{Baseline,y,i,r,p}}$$

Where $DR_{Baseline,y,i,r,p}$ is the baseline death rate per birth computed from 2012-2018 death rates per 500 g birth weight increment (CDC, 2020a),[51] $y$ is the analysis year, $i$ is 100 g birth weight increment, $r$ is the race/ethnicity group, $p$ is the PWS EP analyzed, and $OR_{y,i,r,p}$ is the mortality odds ratio associated with the annual change in birth weight under the regulatory alternatives.

### 6.4.3.2.3 Affected Infant Population Size

The annual race/ethnicity- and PWS EP-specific number of infants affected by changes in PFOA/PFOS drinking water levels is based on the 2021 retail population served at each PWS from the SDWIS/Fed and 2021 race/ethnicity-specific population estimates from the U.S. Census (U.S. Census Bureau, 2020a; see Appendix B). Because birth rates per race/ethnicity group and 100 g birth weight increment are often suppressed due to lack of data, the EPA multiplied state-level birth rates per race/ethnicity group from the Centers for Disease Control and Prevention (CDC) Linked Birth/Infant Death records from 2012 to 2018 (CDC, 2020a) by the ratio of infants falling within each 100 g birth weight increment per state (not specific to race/ethnicity) to the total number of infants per state to distribute the number of affected infants in each state. The EPA imputed state-level data that was missing from the 2012-2018 CDC Linked Birth/Infant Death records with data at the census region level. The EPA used the same approach to assign average birth weights per race/ethnicity group over the 100 g birth weight increments for use in COI data matching (See Section 6.4.4). Using the 2012-2018 imputed state-level birth rate data, the EPA computed the share of births that correspond to each 100 g birth weight increment ($i$), race/ethnicity ($r$), and PWS EP ($p$) as the ratio of race/ethnicity- and state-specific ($s$) birth rates[52] in a particular birth weight increment to the sum of birth rates associated with all birth weight increments:

Equation 9:

$$Share\ of\ Births_{i,r,p} = \frac{\left(BR_{2012-2018,i,r,s}\right)}{sum\left(BR_{2012-2018,i,r,s}\right)}$$

Next, the EPA assumed that the share of births within each 100 g birth weight increment (from Equation 9) would remain constant throughout the period of analysis and estimated the annual

---

[51] The EPA assumed that the same death rate applies to infants in all 100 g birth weight increments falling in the 500 g birth weight range.
[52] In this analysis, the EPA applies state-specific birth rates that correspond to the state for which each PWS EP is located.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

affected infant population size for each future analysis year ($y$), 100 g birth weight increment ($i$), race/ethnicity group ($r$), and PWS EP ($p$), $Births_{y,i,r,p}$ as follows:

Equation 10:

$$Births_{y,i,r,p} = Births_{y,r,p} \cdot Share\ of\ Births_{i,r,p}$$

### 6.4.3.2.4 Infant Deaths Avoided and the Number of Surviving Infants

The EPA used the estimated annual infant population size, $Births_{y,i,r,p}$, along with infant death rates, $DR_{Baseline,y,i,r,p}$ and $DR_{Regulatory\ Alternative,y,i,r,p}$, to compute the annual number of deaths expected at baseline (Equation 11) and the annual number of deaths expected under the regulatory alternatives (Equation 12):

Equation 11:

$$Deaths_{Baseline,y,i,r,p} = Births_{y,i,r,p} \cdot DR_{Baseline,y,i,r,p}$$

Equation 12:

$$Deaths_{Regulatory\ Alternative,y,i,r,p} = Births_{y,i,r,p} \cdot DR_{Regulatory\ Alternative,y,i,r,p}$$

The EPA estimated the annual number of avoided infant deaths, $Avoided\ Deaths_{y,i,r,p}$, as:

Equation 13:

$$Avoided\ Deaths_{y,i,r,p} = Deaths_{Baseline,y,i,r,p} - Deaths_{Regulatory\ Alternative,y,i,r,p}$$

The EPA computed the population of surviving infants whose birth weight would be affected by changes in PFOA/PFOS exposure ($Survivors_{Regulatory\ Alternative,y,i,r,p}$) as the number of births less the number of deaths under the regulatory alternatives. The EPA estimated the annual number of avoided infant deaths, $Avoided\ Deaths_{y,i,r,p}$, as:

Equation 14:

$$Survivors_{Regulatory\ Alternative,y,i,r,p} = Births_{y,i,r,p} \cdot (1 - DR_{Regulatory\ Alternative,y,i,r,p})$$

## 6.4.4 Valuation of Reduced Birth Weight Impacts

The EPA uses the Value of Statistical Life to estimate the benefits of reducing infant mortality and COI to estimate the economic value of increasing birth weight in the population of surviving infants born to mothers exposed to PFOA and PFOS in drinking water. Value of Statistical Life updating information is provided in Section 2.2.

The EPA's approach to monetizing benefits associated with incremental increases in birth weight resulting from reductions in drinking water PFOA/PFOS levels relies on avoided medical costs associated with various ranges of birth weight. Although the economic burden of treating infants

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

at various birth weights also includes non-medical costs, very few studies to date have quantified such costs (Klein & Lynch, 2018; ICF, 2021). The EPA selected the medical cost function from Klein and Lynch (2018) to monetize benefits associated with the estimated changes in infant birth weight resulting from reduced maternal exposure to PFOA/PFOS.[53] The EPA selected the cost function from Klein and Lynch (2018) because it is based on recent data on birth weight, healthcare utilization, and healthcare costs that encompass a longer time period and a larger population than data used in other studies (e.g., Almond et al., 2005). Additional studies that the EPA reviewed provided only an incremental cost for LBW infants compared to normal birth weight infants (greater or equal to 2,500 g; e.g., Almond et al., 2010 and Malits et al., 2018). Klein and Lynch (2018), on the other hand, estimated incremental medical costs as a function of birth weight over the range from 900 to 4,500 g and used a continuous spline function (Figure 6-4), rather than allowing for a discontinuity at the very low birth weight level (i.e., < 1,500 grams). Table 6-11 summarizes the incremental cost changes associated with birth weight increases from Klein and Lynch (2018).



**Figure 6-4: Piecewise Medical Cost Function Calculated by Klein and Lynch (2018) for Three Increments in Increased Birth Weight (18 g, 50 g, and 100 g)**

---

[53] The Klein and Lynch (2018) report was externally peer reviewed by three experts with qualifications in economics and public health sciences. The EPA's charge questions to the peer reviewers sought input on the methodology for developing medical cost estimates associated with changes in birth weight. The agency's charge questions and peer reviewer responses are available in the docket (see No. EPA-HQ-OW-2022-0114 at https://www.regulations.gov/docket/EPA-HQ-OW-2022-0114).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                           APRIL 2024

**Table 6-11: Simulated Cost Changes for Birth Weight Increases ($2022) (Based on Klein and Lynch, 2018 Table 8)**

| Birth Weight[a] | Simulated Cost Changes for Birth Weight Increases, Dollars per Gram ($2022)[b] | | |
|---|---|---|---|
| | +0.04 lb (+18 g) | +0.11 lb (+50 g) | +0.22 lb (+100 g) |
| 2 lb (907 g) | -$131.66 | -$117.44 | -$113.82 |
| 2.5 lb (1,134 g) | -$98.72 | -$88.07 | -$85.35 |
| 3 lb (1,361 g) | -$74.03 | -$66.04 | -$64.00 |
| 3.3 lb (1,497 g) | -$62.29 | -$55.56 | -$53.85 |
| 4 lb (1,814 g) | -$41.63 | -$37.13 | -$35.99 |
| 4.5 lb (2,041 g) | -$31.21 | -$27.84 | -$26.98 |
| 5 lb (2,268 g) | -$23.41 | -$20.88 | -$20.23 |
| 5.5 lb (2,495 g) | -$0.97 | -$0.88 | -$0.87 |
| 6 lb (2,722 g) | -$0.95 | -$0.86 | -$0.86 |
| 7 lb (3,175 g) | -$0.92 | -$0.83 | -$0.83 |
| 8 lb (3,629 g) | -$0.89 | -$0.81 | -$0.80 |
| 9 lb (4,082 g) | $3.28 | $2.99 | $3.01 |
| 10 lb (4,536 g) | $3.69 | $3.37 | $3.39 |

Notes:

[a]Note that simulated medical costs increase, rather than decrease, in response to increased birth weight changes among high birth weight infants (those greater than 8 lb). Among high birth weight infants, there is a higher risk of birth trauma, metabolic issues, and other health problems (Klein & Lynch, 2018).

[b]Values scaled from $2010 to $2022 using the medical care Consumer Price Index (U.S. Bureau of Labor Statistics, 2022a).

Using the incremental cost changes from Klein and Lynch (2018), the EPA calculates the change in medical costs resulting from changes in birth weight among infants in the affected population who survived the first year following birth. To do so, the EPA linearly interpolates between the birth weight and cost values presented in Klein and Lynch (2018) to obtain a cost value for every 1 g birth weight increment, as shown in Figure 6-5. The EPA then matches this interpolated birth weight value to the nearest baseline average birth weight value in each 100 g birth weight increment to obtain the simulated cost change for birth weight increases that are estimated to be between zero and 18 g, between 19 and 50 g, and between 51 and 100 g or more.[54]

---

[54] Note that the EPA caps birth weight changes at 200 g, as described in earlier sections. The EPA assumes that the cost of illness estimates for birth weight increases between 51 and 100 g apply to birth weight increases greater than 100 g.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



**Figure 6-5. Interpolated Cost of Illness at Baseline Average Birth Weights, by Estimated Change in Birth Weight Under the Final Rule**

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 6.4.5 Results

Table 6-12 to Table 6-15 provide the health effects avoided and valuation associated with birth weight impacts.

**Table 6-12: National Birth Weight Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, and HFPO-DA MCLs of 10 ppt each and HI of 1) (Million $2022)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Increase in Birth Weight (millions of grams) | 129.6 | 216.8 | 304.1 |
| Number of Birth Weight-Related Deaths Avoided | 781.9 | 1,301.7 | 1,823.6 |
| **Total Annualized Birth Weight Benefits (Million $2022)[b]** | **$124.85** | **$209.00** | **$292.78** |

Note: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates. Quantifiable benefits are increased under final rule table results relative to the other options presented because of modeled PFHxS occurrence, which results in additional quantified benefits from co-removed PFOA and PFOS.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

**Table 6-13: National Birth Weight Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) (Million $2022)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Increase in Birth Weight (millions of grams) | 128.8 | 215.6 | 302.1 |
| Number of Birth Weight-Related Deaths Avoided | 777.4 | 1,294.4 | 1,812.9 |
| **Total Annualized Birth Weight Benefits (Million $2022)[b]** | **$124.82** | **$207.82** | **$291.00** |

Note: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 6-14: National Birth Weight Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) (Million $2022)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Increase in Birth Weight (millions of grams) | 111.3 | 185.6 | 260.3 |
| Number of Birth Weight-Related Deaths Avoided | 668.9 | 1,114.7 | 1,561.2 |
| **Total Annualized Birth Weight Benefits (Million $2022)[b]** | **$107.34** | **$178.97** | **$250.00** |

Note: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.

[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

**Table 6-15: National Birth Weight Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) (Million $2022)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Increase in Birth Weight (millions of grams) | 62.1 | 102.0 | 142.4 |
| Number of Birth Weight-Related Deaths Avoided | 375.8 | 616.6 | 859.1 |
| **Total Annualized Birth Weight Benefits (Million $2022)[b]** | **$60.24** | **$98.97** | **$137.75** |

Note: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.

[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

## 6.5 Cardiovascular Disease

### 6.5.1 Overview of the Cardiovascular Disease Risk Analysis

Figure 6-6 provides an overview of the approach used to quantify and value the changes in CVD risk associated with reductions in exposure to PFOA and PFOS via drinking water. Section 4.4 details the PWS EP-specific PFOA/PFOS drinking water occurrence estimation and Section 6.3 describes modeling of serum PFOA/PFOS concentrations. EP-specific time series of the differences between serum PFOA/PFOS concentrations under baseline and regulatory

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                      APRIL 2024

alternatives are inputs into this analysis. For each EP, evaluation of the changes in CVD risk involves the following key steps:

1. Estimation of annual changes in TC[55] and BP levels using exposure-response functions for the potential effects of serum PFOA/PFOS on these biomarkers;

2. Estimation of the annual incidence of fatal and non-fatal first hard CVD events,[56] defined as fatal and non-fatal myocardial infarction (MI; i.e., heart attack), fatal and non-fatal IS, or other coronary heart disease (CHD) death occurring in populations without prior CVD event experience (D'Agostino et al., 2008; Goff et al., 2014; Lloyd-Jones et al., 2017), and post-acute CVD mortality corresponding to baseline and regulatory alternative TC and BP levels in all populations alive during or born after the start of the evaluation period; and

3. Estimation of the economic value of reducing CVD mortality and morbidity from baseline to regulatory alternative levels, using the Value of Statistical Life and COI measures, respectively.

Section 6.5.2 discusses the exposure-response models for TC and BP. Section 6.5.3 details the estimated CVD risk reductions using the Pooled Cohort ASCVD risk model (Goff et al., 2014) and the life table approach. Section 6.5.4 discusses the EPA's valuation methodology for fatal and non-fatal CVD events. Section 6.5.5 presents the results of the analysis.

---

[55] The EPA discusses the relationship between PFOA/PFOS exposure and other forms of cholesterol in Appendix F.

[56] Hard CVD events include fatal and non-fatal myocardial infarction, fatal and non-fatal stroke, and other coronary heart disease mortality.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024



Abbreviations: PFOA – perfluorooctanoic acid, PFOS – perfluorooctanesulfonic acid, TC – total cholesterol, BP – blood pressure, CVD – cardiovascular disease, ASCVD – atherosclerotic cardiovascular disease, MI – myocardial infarction, IS – ischemic stroke, CHD – coronary heart disease
Notes:
[a]Data from the Centers for Disease Control (CDC) and Prevention.
[b]Non-fatal CVD includes non-fatal first MI and non-fatal first IS.
[c]Fatal CVD includes fatal first MI, fatal first IS, other fatal first CHD events, and post acute CVD mortality among survivors of the first MI and the first IS.

**Figure 6-6: Overview of the CVD Risk Model**

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

## 6.5.2 Cardiovascular Disease Exposure-Response Analyses
### 6.5.2.1 Estimation of Cholesterol Changes

The ASCVD model includes TC as a predictor of first hard CVD events. The EPA did not identify any readily available relationships for PFOA or PFOS and TC that were specifically relevant to the age group of interest (40-89 years, the years for which the ASCVD model estimates the probability of a first hard CVD event). Therefore, the agency developed a meta-analysis of studies reporting associations between serum PFOA or PFOS and TC in general populations (e.g., populations that are not a subset of workers or pregnant women). Statistical analyses that combine the results of multiple studies, such as meta-analyses, are widely applied to investigate the associations between contaminant levels and associated health effects. Such analyses are suitable for economic assessments because they can improve precision and statistical power (Engels et al., 2000; Deeks, 2002; Rücker et al., 2009). Appendix F provides details on the studies selection criteria, meta-data development, meta-analysis results, and discussion of the uncertainty and limitations inherent in the EPA's exposure-response analysis.

The EPA identified studies for inclusion in the meta-analysis using data from literature reviews, including those performed by the ATSDR in the development of their Toxicological Review Public Comment Draft (ATSDR, 2018), which included literature through mid-2017, and those performed for developing the EPA's Final Human Health Toxicity Assessment for PFOA and PFOS (U.S. EPA, 2024e; U.S. EPA, 2024f), which included studies published from 2016 through September 2020. The EPA included studies in the meta-analysis if they reported quantitative estimates (e.g., regression coefficients) and measures of uncertainty (e.g., standard errors, confidence intervals) of associations between serum PFOA or PFOS and TC or HDLC in general population adults aged 20 years and older. The EPA included a total of 14 studies in the meta-analysis. Of these, 12 studies were used to develop exposure-response relationships for serum PFOA or PFOS and TC (i.e., not all relevant studies report the effects for both PFOA and PFOS). The unit in the meta-analysis was the change in TC (or HDLC) in mg/dL per increases in serum PFOA or PFOS.

Table 6-16 summarizes the 14 studies that the EPA identified from literature reviews and used to derive slope estimates for PFOA and PFOS associations with serum TC levels.[57] Six of the studies that the EPA retained for use in the meta-analysis were based on serum PFAS and serum TC measurements from the U.S. general population (National Health and Nutrition Examination Survey [NHANES]) (Dong et al., 2019; Fan et al., 2020; He et al., 2018; Jain & Ducatman, 2019a; H.-S. Liu et al., 2018; Nelson et al., 2010); there were also general population studies from Canada (Fisher et al., 2013), Sweden (Y. Li et al., 2020), Taiwan (Yang et al., 2018; C. Y. Lin et al., 2020), and Henan Province, China (Fu et al., 2014). Château-Degat et al. (2010) reported on the association between PFOS and TC in a Canadian Inuit population. The EPA also retained the results from a study of a highly exposed population in the U.S. (the C8 cohort) (Steenland et al., 2009) and from a study using participants in a U.S. diabetes prevention program (Lin et al., 2019). The EPA retained results from Steenland et al. (2009) because serum levels in the examined cohort were only modestly elevated compared to less exposed populations (e.g., the median serum PFOA concentration in this cohort was 27 ng/mL, with an interquartile

---

[57] For this effort, the EPA focused on PFOA and PFOS, since these are by far the most well-studied perfluorinated compounds.

FINAL RULE                                                                          APRIL 2024

range of 13.1 to 67 ng/mL). The EPA retained results from Lin et al. (2019) because the examined cohort included pre-diabetic adults enrolled in a diabetes prevention program; thus, this cohort was representative of a large portion of the U.S. adult population.

**Table 6-16: Studies Selected for Inclusion in the Meta-Analyses**

| Author and Year | Title | TC and Serum PFAS Relationship Evaluated in Study | |
|---|---|---|---|
| | | PFOA | PFOS |
| Steenland et al., 2009[a,d] | Association of Perfluorooctanoic Acid and Perfluorooctane Sulfonate With Serum Lipids Among Adults Living Near a Chemical Plant | X | X |
| Château-Degat et al., 2010[a,d] | Effects of Perfluorooctanesulfonate Exposure on Plasma Lipid Levels in the Inuit Population of Nunavik (Northern Quebec) | | X |
| Nelson et al., 2010[a,d] | Exposure to Polyfluoroalkyl Chemicals and Cholesterol, Body Weight, and Insulin Resistance in the General U.S. Population | X | X |
| Fisher et al., 2013[a,d] | Do Perfluoroalkyl Substances Affect Metabolic Function and Plasma Lipids? —Analysis of the 2007–2009, Canadian Health Measures Survey (CHMS) Cycle 1 | X | X |
| Fu et al., 2014[a,d] | Associations Between Serum Concentrations of Perfluoroalkyl Acids and Serum Lipid Levels in a Chinese Population | X | X |
| He et al., 2018[c] | PFOA is Associated with Diabetes and Metabolic Alteration in US Men: National Health and Nutrition Examination Survey 2003-2012 | X | X |
| Liu et al., 2018[c] | Association Among Total Serum Isomers of Perfluorinated Chemicals, Glucose Homeostasis, Lipid Profiles, Serum Protein and Metabolic Syndrome in Adults: NHANES, 2013–2014 | X | X |
| Dong et al., 2019[b] | Using 2003–2014 U.S. NHANES Data to Determine the Associations Between Per- and Polyfluoroalkyl Substances and Cholesterol: Trend and Implications | X | X |
| Jain et al., 2019[b] | Roles of Gender and Obesity in Defining Correlations Between Perfluoroalkyl Substances and Lipid/Lipoproteins | X | X |
| P.-I. D. Lin et al., 2019[b] | Per- and Polyfluoroalkyl Substances and Blood Lipid Levels in Pre-Diabetic Adults—Longitudinal Analysis of the Diabetes Prevention Program Outcomes Study | X | X |
| Fan et al., 2020[b] | Serum Albumin Mediates the Effect of Multiple Per- and Polyfluoroalkyl Substances on Serum Lipid Levels | X | X |
| Y. Li et al., 2020[b] | Associations Between Perfluoroalkyl Substances and Serum Lipids in a Swedish Adult Population With Contaminated Drinking Water | X | X |

Abbreviations: TC – total cholesterol; PFOS – perfluorooctane sulfonic acid; PFOA – perfluorooctanoic acid; PFAS – per-and polyfluoroalkyl substances.
Notes:
[a]Studies identified based on ATSDR literature review.
[b]Studies identified based on the EPA's literature review.
[c]Studies available in both assessments.
[d]Studies available in PFOA and/or PFOS health effects support documents (U.S. EPA, 2016e; U.S. EPA, 2016f).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The EPA developed exposure-response relationships between serum PFOA/PFOS and TC for use in the CVD analysis using the meta-analyses restricted to studies of adults in the general population reporting similar models. The EPA used untransformed serum PFOA/PFOS to reduce bias due to back-transformations of effect estimates. For studies that provided results only for log-transformed serum PFOA/PFOS (five studies) or log-transformed outcomes (two studies), or both log-transformed serum PFOA/PFOS and outcomes (two studies), the EPA approximated the results for an untransformed analysis using the approach outlined by Rodríguez-Barranco et al. (2017) and Dzierlenga et al. (2020). When using studies reporting linear associations between TC and serum PFOA or PFOS, the EPA estimated a positive increase in TC of 1.57 (95% CI: 0.02, 3.13) mg/dL per ng/mL serum PFOA (p-value = 0.048), and of 0.08 (95% CI: -0.01, 0.16) mg/dL per ng/mL serum PFOS (p-value = 0.064). The EPA selected the pooled slope estimate based on the studies using linear models to ease interpretability and to reduce bias due to back-transformations of effect estimates with log-transformed outcomes or exposures (see Appendix F for details). While the association for PFOS and TC is not significant at the 0.05 confidence level, it is significant at the 0.10 confidence level (p-value = 0.064). Furthermore, the literature provides sufficient support of a positive association (e.g., Château-Degat et al., 2010; Dong et al., 2019; U.S. EPA, 2024e; U.S. EPA, 2024f). The studies are large with more than 700 and 8,900 participants, respectively (Château-Degat et al., 2010; Dong et al., 2019) and have low risk of bias. In addition, the estimated values are supported by sensitivity analyses and by the estimates from potential candidate studies from exposure-response modeling for ongoing agency efforts (Dong et al., 2019). Based on the systematic literature review of epidemiologic studies published through February 2023 for developing the EPA's Final Human Health Toxicity Assessments for PFOA and PFOS, the available evidence supports a positive association between PFOS and TC in the general population (U.S. EPA, 2024e; U.S. EPA, 2024f). For more information on the systematic review and results, see the EPA's Final Human Health Toxicity Assessments for PFOA and PFOS (U.S. EPA, 2024e; U.S. EPA, 2024f).

Note that the EPA sought comments from the EPA SAB on the cardiovascular disease exposure-response approach (U.S. EPA, 2022i). The SAB recommended that the EPA evaluate how the inclusion of HDLC effects would influence results. The EPA evaluated the inclusion of HDLC effects in a sensitivity analysis, described in Appendix K.

## 6.5.2.2 Estimation of BP Changes

PFOS exposure has been linked to other cardiovascular outcomes, such as systolic BP and hypertension (Liao et al., 2020; U.S. EPA, 2024e). Because systolic BP is another predictor used by the ASCVD model, the EPA included the estimated changes in BP from reduced exposure to PFOS in the CVD analysis. The EPA selected the slope from the Liao et al. (2020) study — a high confidence study conducted based on U.S. general population data from NHANES cycles 2003-2012. Liao et al. (2020) estimated an increase of 1.35 (95% CI: 0.18, 2.53) in mmHg systolic BP per log10(ng/mL) PFOS among those not using antihypertensive medications. For the purposes of this analysis, the EPA converted this slope to 0.044 (95% CI: 0.006, 0.083) mmHg per ng/mL. The evidence on the associations between PFOA and BP is not as consistent as for PFOS (see Section 6.2.2.1.2). Therefore, the EPA is not including effect estimates for the serum PFOA-BP associations in the CVD analysis.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 6.5.3 Estimation of Cardiovascular Disease Risk Reductions

The EPA relies on the life table-based approach to estimate CVD risk reductions because (1) changes in serum PFOA/PFOS in response to changes in drinking water PFOA/PFOS occur over multiple years, (2) CVD risk, relying on the ASCVD model, can be modeled only for those older than 40 years without prior CVD history, and (3) individuals who have experienced non-fatal CVD events have elevated mortality implications immediately and within at least five years of the first occurrence.[58] Recurrent life table calculations are used to estimate a PWS EP-specific annual time series of CVD event incidence for a population cohort characterized by sex, race/ethnicity, birth year, age at the start of the PFOA/PFOS evaluation period (i.e., 2024), and age- and sex-specific time series of changes in TC and BP levels obtained by combining serum PFOA/PFOS concentration time series (Section 6.3) with exposure-response information (Section 6.5.3). Baseline and regulatory alternatives are evaluated separately, with regulatory alternative TC and BP levels estimated using baseline information on these biomarkers from external statistical data sources and modeled changes in TC and BP due to conditions under the regulatory alternatives (see Appendix G for detailed information on data sources used in CVD modeling).

The EPA estimated the incidence of first hard CVD events based on TC serum and BP levels using the ASCVD model (Goff et al., 2014), which predicts the 10-year probability of a hard CVD event to be experienced by a person without a prior CVD history (see Section 6.5.3.2).[59] The EPA adjusted the modeled population cohort to exclude individuals with pre-existing conditions, as the ASCVD risk model does not apply to these individuals. For BP effects estimation, the EPA further restricts the modeled population to those not using antihypertensive medications for consistency with the exposure-response relationship (see Section 6.5.3.2 for detail). Modeled first hard CVD events include fatal and non-fatal MI, fatal and non-fatal IS, and other CHD mortality. The EPA has also estimated the incidence of post-acute CVD mortality among survivors of the first MI or IS within 6 years of the initial event (Section 6.5.3.3).

The estimated CVD risk reduction resulting from reducing serum PFOA and serum PFOS concentrations is the difference in annual incidence of CVD events (i.e., mortality and morbidity associated with first-time CVD events and post-acute CVD mortality) under the baseline and regulatory alternatives. Appendix G provides detailed information on all CVD model components, computations, and sources of data used in modeling.

### 6.5.3.1 Life Table Calculations

The CVD model integrates the ASCVD model predictions and post-acute CVD mortality rates in the series of recurrent calculations that produce a life table estimate for the affected population cohort (e.g., non-Hispanic White females aged 70 years at the beginning of the evaluation period). For each PWS EP, the EPA evaluates population cohorts defined by a combination of birth year, age, sex (males and females), and race/ethnicity (non-Hispanic White, non-Hispanic

---

[58] The EPA notes that elevated mortality for hard CVD event survivors may persist beyond five years of the initial event. However, the EPA did not identify U.S. based studies with sufficiently long follow-up to quantify mortality impacts beyond five years of the initial event.

[59] The EPA did not identify studies that found statistically significant associations between the modeled biomarkers (TC, BP) and CVD events in populations with prior CVD history. Discussion of the relevant literature is provided in Appendix G.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                      APRIL 2024

Black, Hispanic, Other). In addition to the key standard life table components (i.e., the number of persons surviving to a specific age and the number of all-cause deaths occurring at a given age) for ages 40 years or older, the CVD model estimates the number of surviving persons with and without a history of hard CVD events, the number of persons experiencing hard CVD events at a given age, and the deaths from CVD and non-CVD causes at a given age.

Figure 6-7 summarizes the CVD model calculations for a population cohort age 0 at the start of the evaluation period.[60] The CVD model calculations are identical across race/ethnicity and sex demographic subgroups but use subgroup-specific parameters.[61] For cohorts born prior to or in 2024, the CVD model is initialized using the PWS-specific number of persons estimated to be alive at the beginning of 2024. For cohorts born after 2024 (i.e., 2025–2105), the CVD model is initialized using the PWS EP-, race/ethnicity-, sex, and scenario-specific number of persons who died in the previous calendar year of the analysis, thereby ensuring that the size of the modeled population remains constant throughout the analysis period. Additional PWS EP- and sex, race/ethnicity, and age-specific population estimation assumptions are provided in Section 2.2; additional details are included in Appendix B.

Once the model is initialized, the following types of calculations occur for each year within the simulation period:[62]

- Recurrent standard life table calculations that rely on the all-cause, age-specific annual mortality rates to evaluate the number of deaths among persons of a specific integer age and the number of survivors to the beginning of the next integer age.[63] These calculations are executed whenever the current cohort age is in the 0–39 range. They are represented by the navy-blue segment of the timeline shown in Figure 6-7.

- Recurrent life table calculations that separately track subpopulations with and without a history of hard CVD events, including estimation of the number of annual CVD and non-CVD deaths (in either subpopulation), as well as the number of annual post-acute CVD deaths experienced by survivors of the first hard CVD events that occurred, at most, 5 years ago. These calculations are executed whenever the current cohort age is 40 years or older.[64] These calculations are represented by the blue segment of the timeline. Figure 6-7 and Figure 6-8 further illustrates the year-specific calculations required for explicit tracking of subpopulations with and without a hard CVD event history.

---

[60] This initial population cohort age is chosen because it allows for illustration of the full set of calculation types used in the CVD model.

[61] There are different ASCVD model coefficients for non-Hispanic White and non-Hispanic Black males and females. The figure shows the generalized approach of the CVD model.

[62] The EPA notes that the simulation period is the lifespan of individuals relevant to the analysis. The simulation period is distinct from the period of analysis in that some parts of the simulation period may fall outside the period of analysis. For example, for a person aged 40 years at the start of the analysis period, the period of analysis will not capture the first 40 years of simulation results.

[63] Life table calculations are based on the present-day information about life expectancy, disease, environmental exposure, and other factors.

[64] People 85 years or older, are treated as a single cohort in the model. The mortality rate for this cohort is assumed to be the average mortality rate for those age 85-100 years. This cohort also used serum PFOA/PFOS values at age 85.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



**Figure 6-7: Overview of Life Table Calculations in the CVD Model**

Note: The figure illustrates the model for population cohort age 0 years at the beginning of the evaluation period (i.e., calendar year 2024). The model is initialized using the age 0 PWS EP-specific population (see Appendix B for PWS population estimation details).

Figure 6-8 provides additional information on the post-acute CVD mortality estimation. Each person included in the surviving current age-specific incident CVD subpopulation[65] (corresponding to the group F result in Figure 6-8) is tracked for 5 additional years to estimate the number of CVD deaths occurring in that timeframe. The recurrent estimates rely on age-specific non-CVD mortality rates, estimated based on the CDC's life table data and annual CVD mortality rates, and on post-acute CVD mortality rates, estimated based on Thom et al. (2001) and S. Li et al. (2019).

Further details of the life table calculations are provided in Appendix G. The outputs of the life table calculations and application of the ASCVD model are the PWS EP-specific estimates of the annual number of persons experiencing their first non-fatal MI or IS event and the number of deaths among those who have experienced their first hard CVD event, at most, 6 years ago. Note that the ASCVD model does not predict risks separately by type of first hard CVD event (i.e., non-fatal MI, non-fatal IS, and fatal CVD). The distribution of these events by type is estimated using data publicly available on CVD prevalence, incidence, and hospital mortality statistics as described in Section 6.5.3.2 and integrated into the overall CVD impacts modeling.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

---

[65] For example, persons who experienced their first non-fatal MI or IS at age 70 and survived through the first post-event year.



**Figure 6-8: CVD Model Calculations for Ages 40+ Tracking CVD**

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 6.5.3.2 Risk and Distribution of First Hard Cardiovascular Disease Event

The first hard CVD event incidence estimates are generated by the Pooled Cohort ASCVD model (Goff et al., 2014). The ASCVD model is commonly used in clinical practice to estimate CVD risk for those between ages 40 and 80, as well as for overall population risk management (Lloyd-Jones et al., 2017). The ASCVD model predicts the 10-year probability of a hard CVD event—fatal and non-fatal MI, fatal and non-fatal IS, or CHD death—to be experienced by a person without a prior history of MI, IS, congestive heart failure, percutaneous coronary intervention, coronary bypass surgery, or atrial fibrillation. The ASCVD model is a survival model that links predictor levels at the start of the 10-year follow-up period to the first hard CVD event incidence during the follow-up period; the modeling does not account for changes in CVD risk predictors over time.

Four large longitudinal community-based epidemiologic cohort studies were combined to develop a geographically and racially diverse dataset used for the ASCVD model estimation.[66] The predictors of the ASCVD model include age, TC and HDLC concentrations, systolic BP, current smoking, diagnosed diabetes, and whether the participant is undergoing treatment for high BP. The model was fit separately to four population subgroups: non-Hispanic White females, non-Hispanic Black females, non-Hispanic White males, and non-Hispanic Black males.

Several studies assessed predictive performance of the ASCVD risk model in racial and ethnic groups other than other non-Hispanic White and non-Hispanic Black populations, as well as in various sociodemographic subgroups in the U.S. Two studies concluded that the ASCVD risk model overestimated CVD risk among Asian and Hispanic groups, while noting that these groups were not included in the development and validation of the ASCVD model (Mongraw-Chaffin et al., 2018; Rodriguez et al., 2019). Five studies acknowledged limitations for the ASCVD risk model in terms of performance among individuals with high levels of CVD risk, diabetes, older adults with frailty and multimorbidity, smokers, and women (Muntner et al., 2014; Leigh et al., 2019; Mora et al., 2018; Q. D. Nguyen et al., 2020; Raghavan et al., 2020). Overall, the literature across different sociodemographic subgroups concluded that the ASCVD risk model tended to overestimate risk but suggested the model may improve through additional input variables and recalibration given contemporary ASCVD prevalence, especially if the prevalence differs significantly across geographic locations to which the model is applied (Mora et al., 2018; (Muntner et al., 2014). Extended discussion of ASCVD risk model performance and availability of alternative CVD risk prediction models for national analysis is provided in ICF (2022a).

In light of these findings, the EPA does not follow the Goff et al. (2014) recommendation that the ASVCD risk model for non-Hispanic White populations be used for other race/ethnicity groups. In the development and parameterization of the CVD model for Hispanic, Asian American, and American Indian/Alaska Native populations, the EPA applies the model for non-Hispanic Black populations based on the ASCVD model validation relative to reported CVD

---

[66] These studies include the Atherosclerosis Risk in Communities (ARIC) study (Williams, 1989) and the Cardiovascular Health Study (Fried et al., 1991), along with applicable data from the Coronary Artery Risk Development in Young Adults (CARDIA) study (Friedman et al., 1988) and the Framingham Original and Offspring cohort data (D'Agostino et al., 2008).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                        APRIL 2024

prevalence and mortality statistics (the EPA analysis based on Medical Expenditure Panel Surveys from 2010–2017), as described in Appendix G. The results of this validation exercise showed that the ASCVD model coefficients for the non-Hispanic Black model are more consistent with data on CVD prevalence and mortality for Hispanic and non-Hispanic other race subpopulations than the ASCVD model coefficients for the non-Hispanic White model. The all-cause and CVD mortality was obtained from CDC's National Vital Statistics System, whereas CVD prevalence was estimated using agency for Healthcare Research and Quality survey data (see Appendix G for details). As explained in Appendix G, race/ethnicity and sex-specific CVD incidence consistent with these reported statistics was compared with the incidence estimated using the ASCVD model, where the baseline race/ethnicity- and sex-specific values for the ASCVD model predictors were obtained from CDC's public health surveys (see Appendix G for details).

The ASCVD model generates predictions of the 10-year probability of the first hard CVD event without differentiation across CVD event types. The specifics of annual first hard CVD event probability derivation, which is needed for the life table calculations in Section 6.5.3.1, are provided in Appendix G. As is also detailed in Appendix G, the EPA combined the Medical Expenditure Panel Survey (MEPS) 2010–2017 data and the Healthcare Cost and Utilization Project (HCUP) 2017 data to derive the ASCVD event distribution over the following event types: non-fatal MI, non-fatal IS, and fatal CVD events. The fatal CVD events include fatal MI, fatal IS, and other fatal CHD events. The EPA used the MEPS data to identify the subpopulation of persons without a prior CVD event history and estimate the rate of new CVD events by type (i.e., MI, IS, and other CHD) in this subpopulation. The probabilities of in-hospital death for MI, IS, and other CHD were obtained from HCUP.

Table 6-17 shows the derived race/ethnicity-, sex-, and age group-specific shares of first hard CVD events for the following event types: non-fatal MI, fatal MI, non-fatal IS, fatal IS, other non-fatal CHD, and other fatal CHD. For males, looking across race/ethnicity and age categories, the share of non-fatal MI events is 4.9 percent to 28 percent, the share of non-fatal IS events is 9.4 percent to 38 percent, and the share of other non-fatal CHD events is 44 percent to 78 percent. For females, across race/ethnicity and age categories, the share of non-fatal MI events is 6.4 percent to 19 percent, the share of non-fatal IS events is 8.7 percent to 29 percent, and the share of other non-fatal CHD events is 51 percent to 76 percent. For both sexes, shares of all fatal events increase with age. The share of fatal CVD events is largest for Hispanic and non-Hispanic other race subpopulations of both sexes. Table 6-17 also shows derived race/ethnicity-, sex-, and age group-specific shares of first hard CVD events over ASCVD event types (i.e., non-fatal MI, non-fatal IS, and fatal CVD). Note that these shares were re-normalized to sum to 100 percent after exclusion of other non-fatal CHD not predicted by the ASCVD model. The CVD model relies on the re-normalized shares to allocate the total number of first hard CVD events predicted by the ASCVD model.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE

APRIL 2024

**Table 6-17: Estimated Shares of Fatal and Non-Fatal First Hard CVD Events Based on MEPS and HCUP Data**

| Sex | Age (in years) | Race/ Ethnicity | Non-Fatal CVD (%) | | | Fatal CVD (%) | | |
|---|---|---|---|---|---|---|---|---|
| | | | Non-Fatal MI (%) | Non-Fatal IS (%) | Other Non-Fatal CHD (%) | Fatal MI (%) | Fatal IS (%) | Other Fatal CHD (%) |
| **Shares of First Hard CVD Events** | | | | | | | | |
| Males | 18–44 | NH White | 14 | 9.4 | 77 | 0.19 | 0.17 | 0 |
| | 45–64 | NH White | 16 | 15 | 69 | 0.39 | 0.34 | 0.44 |
| | 65–84 | NH White | 13 | 20 | 64 | 0.71 | 0.75 | 0.76 |
| | 85 or older | NH White | 13 | 20 | 63 | 1.3 | 1.4 | 1.9 |
| | 18–44 | NH Black | 4.9 | 17 | 78 | 0.067 | 0.31 | 0 |
| | 45–64 | NH Black | 11 | 38 | 50 | 0.28 | 0.88 | 0.32 |
| | 65–84 | NH Black | 8.9 | 22 | 67 | 0.48 | 0.8 | 0.79 |
| | 85 or older | NH Black | 8.5 | 21 | 66 | 0.87 | 1.5 | 2 |
| | 18–44 | Hispanic | 23 | 17 | 59 | 0.31 | 0.31 | 0 |
| | 45–64 | Hispanic | 19 | 29 | 51 | 0.48 | 0.67 | 0.32 |
| | 65–84 | Hispanic | 20 | 17 | 60 | 1.1 | 0.65 | 0.71 |
| | 85 or older | Hispanic | 19 | 17 | 59 | 2 | 1.2 | 1.8 |
| | 18–44 | NH Other | 26 | 30 | 44 | 0.35 | 0.54 | 0 |
| | 45–64 | NH Other | 28 | 19 | 52 | 0.71 | 0.43 | 0.33 |
| | 65–84 | NH Other | 13 | 25 | 60 | 0.71 | 0.92 | 0.71 |
| | 85 or older | NH Other | 12 | 24 | 59 | 1.3 | 1.7 | 1.8 |
| Females | 18–44 | NH White | 8.1 | 19 | 72 | 0.13 | 0.41 | 0 |
| | 45–64 | NH White | 6.9 | 20 | 72 | 0.2 | 0.55 | 0.54 |
| | 65–84 | NH White | 11 | 28 | 58 | 0.68 | 1.2 | 0.82 |
| | 85 or older | NH White | 10 | 27 | 57 | 1.2 | 2.3 | 2.1 |
| | 18–44 | NH Black | 15 | 8.7 | 76 | 0.23 | 0.18 | 0 |
| | 45–64 | NH Black | 10 | 27 | 61 | 0.29 | 0.74 | 0.46 |
| | 65–84 | NH Black | 6.7 | 29 | 62 | 0.42 | 1.2 | 0.87 |
| | 85 or older | NH Black | 6.4 | 28 | 61 | 0.76 | 2.3 | 2.2 |
| | 18–44 | Hispanic | 8.8 | 18 | 73 | 0.14 | 0.38 | 0 |
| | 45–64 | Hispanic | 13 | 27 | 59 | 0.37 | 0.73 | 0.45 |
| | 65–84 | Hispanic | 19 | 26 | 52 | 1.2 | 1.1 | 0.73 |
| | 85 or older | Hispanic | 18 | 25 | 51 | 2.1 | 2.1 | 1.9 |
| | 18–44 | NH Other | 11 | 13 | 75 | 0.17 | 0.27 | 0 |
| | 45–64 | NH Other | 14 | 29 | 55 | 0.42 | 0.78 | 0.42 |
| | 65–84 | NH Other | 12 | 28 | 58 | 0.74 | 1.2 | 0.81 |
| | 85 or older | NH Other | 11 | 27 | 56 | 1.3 | 2.3 | 2.1 |
| **Shares of First Hard CVD Event Categories Predicted by the ASCVD Model[a]** | | | | | | | | |
| Males | 18–44 | NH White | 58 | 40 | – | 1.5 | | |
| | 45–64 | NH White | 50 | 47 | – | 3.7 | | |
| | 65–84 | NH White | 37 | 57 | – | 6.2 | | |
| | 85 or older | NH White | 34 | 53 | – | 13 | | |
| | 18–44 | NH Black | 22 | 77 | – | 1.7 | | |
| | 45–64 | NH Black | 22 | 75 | – | 2.9 | | |
| | 65–84 | NH Black | 27 | 66 | – | 6.4 | | |
| | 85 or older | NH Black | 25 | 62 | – | 13 | | |
| | 18–44 | Hispanic | 56 | 42 | – | 1.5 | | |
| | 45–64 | Hispanic | 38 | 59 | – | 3.0 | | |

FINAL RULE                                                                          APRIL 2024

**Table 6-17: Estimated Shares of Fatal and Non-Fatal First Hard CVD Events Based on MEPS and HCUP Data**

| Sex | Age (in years) | Race/ Ethnicity | Non-Fatal CVD (%) | | | Fatal CVD (%) | | |
|---|---|---|---|---|---|---|---|---|
| | | | Non-Fatal MI (%) | Non-Fatal IS (%) | Other Non-Fatal CHD (%) | Fatal MI (%) | Fatal IS (%) | Other Fatal CHD (%) |
| Females | 65–84 | Hispanic | 50 | 44 | – | | 6.1 | |
| | 85 or older | Hispanic | 47 | 41 | – | | 12 | |
| | 18–44 | NH Other | 46 | 53 | – | | 1.6 | |
| | 45–64 | NH Other | 58 | 39 | – | | 3.1 | |
| | 65–84 | NH Other | 33 | 62 | – | | 5.8 | |
| | 85 or older | NH Other | 30 | 58 | – | | 12 | |
| | 18–44 | NH White | 29 | 69 | – | | 1.9 | |
| | 45–64 | NH White | 24 | 71 | – | | 4.6 | |
| | 65–84 | NH White | 26 | 67 | – | | 6.5 | |
| | 85 or older | NH White | 24 | 63 | – | | 13 | |
| | 18–44 | NH Black | 62 | 36 | – | | 1.7 | |
| | 45–64 | NH Black | 26 | 70 | – | | 3.9 | |
| | 65–84 | NH Black | 18 | 76 | – | | 6.7 | |
| | 85 or older | NH Black | 16 | 70 | – | | 14 | |
| | 18–44 | Hispanic | 32 | 66 | – | | 1.9 | |
| | 45–64 | Hispanic | 31 | 65 | – | | 3.8 | |
| | 65–84 | Hispanic | 40 | 54 | – | | 6.4 | |
| | 85 or older | Hispanic | 37 | 51 | – | | 12 | |
| | 18–44 | NH Other | 45 | 53 | – | | 1.8 | |
| | 45–64 | NH Other | 32 | 64 | – | | 3.6 | |
| | 65–84 | NH Other | 28 | 66 | – | | 6.5 | |
| | 85 or older | NH Other | 26 | 61 | – | | 13 | |

Abbreviations: CVD – cardiovascular disease; CHD – coronary heart disease; fatal CVD – includes fatal MI, fatal IS, and fatal other coronary heart disease events; HCUP – Healthcare Cost and Utilization Project; IS – ischemic stroke; MEPS – Medical Expenditure Panel Survey; MI – myocardial infarction; NH – non-Hispanic.
Note:
[a]The distribution is derived by (1) excluding the other non-fatal CHD category; (2) aggregating fatal MI, fatal IS, and other fatal CHD categories into the fatal CVD category; and (3) re-normalizing the data to sum to 100%.

## 6.5.3.3 Risk of Post-Acute Cardiovascular Disease Mortality

Persons who have experienced non-fatal MI and non-fatal IS have an elevated risk of post-acute CVD mortality and morbidity (Roger et al., 2012). Studies focusing on secondary hard CVD events point to an elevated risk of these events among survivors of the first hard CVD event (e.g., Beatty et al., 2015; S. Li et al., 2019; Thom et al., 2001), but do not support the link between these risks and TC/BP levels (Beatty et al., 2015). (See Appendix G for details.) Therefore, the CVD model evaluates post-acute CVD mortality among survivors of the initial MI/IS event under baseline and regulatory alternatives using the baseline post-acute mortality rates that do not depend on the levels of modeled biomarkers. The CVD model does not explicitly evaluate secondary CVD morbidity because available first non-fatal MI/IS valuation measures (e.g., O'Sullivan et al., 2011) incorporate incidence of these secondary events.

For survivors of the first hard CVD event at ages 40–65, the EPA uses estimates of sex- and race/ethnicity-specific all-cause post-acute mortality for MI survivors at 1- and 5-year follow-up from Thom et al. (2001). Because Thom et al. (2001) reports all-cause post-acute mortality rates,

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the EPA adjusted these rates to exclude deaths from non-CVD causes. To this end, the EPA used general population integer age- and sex-specific all-cause mortality from U.S. Life Tables, 2017 (Arias & Xu, 2019), U.S. CVD mortality rates (CDC, 2020b), and U.S. Life Tables Eliminating Certain Causes of Death, 1999–2000 (Arias et al., 2013). Appendix G provides additional estimation details. Although the EPA was unable to identify comparable post-acute mortality statistics for non-fatal IS, an analysis of the Medicare population by S. Li et al. (2019) suggests that post-acute MI mortality is a reasonable approximation for post-acute IS mortality.[67] Table 6-18 shows estimated post-acute CVD mortality rates for survivors of the first MI or IS at ages 40–65 that are used to parameterize the CVD model.

For survivors of the first hard CVD event at ages 66 or older, the EPA uses the results from S. Li et al. (2019) to estimate the number of post-acute CVD deaths within 6 years of the initial event. Because S. Li et al. (2019) reports only all-cause post-acute mortality rates, the EPA adjusted these rates to exclude deaths from non-CVD causes. Integer age- and sex-specific probability of death from non-CVD causes was derived from U.S. Life Tables, 2017 (Arias & Xu, 2019), U.S. CVD mortality rates (CDC, 2020b), and U.S. Life Tables Eliminating Certain Causes of Death, 1999–2000 (Arias et al., 2013). The sex-specific probabilities of death from non-CVD causes were average using the demographic information for the cohorts analyzed by S. Li et al. (2019). See Appendix G for additional estimation details. Table 6-18 shows estimated post-acute CVD mortality rates for survivors of the first MI and survivors of the first IS at ages 66 years or older that are used to parameterize the CVD model.[68]

---

[67] For those age 65 or older, S. Li et al. (2019) have estimated the probability of death within 1 year after non-fatal IS to be 32.07 percent and the probability of death within 1 year after non-fatal MI to be 32.09 percent.
[68] These rates are applied to all those aged 66 or older in the SafeWater MCBC implementation of the model.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

**Table 6-18: Estimated Risk of Post-Acute CVD Mortality Following the First Non-Fatal Hard CVD Event**

| Type of First Non-Fatal Hard CVD Event | Demographic Group | Post-Acute CVD Mortality Rate per 100,000 by Integer Year Since the First Non-Fatal Hard CVD Event | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0 | 1 | 2 | 3 | 4 | 5 |
| | **Source: Thom et al. (2001)** | | | | | | |
| MI, IS[a] | Non-Hispanic White[b] males aged 45–65 years | 4,500 | 910 | 860 | 820 | 760 | – |
| | Non-Hispanic Black males aged 45–65 years | 12,000 | 1,200 | 1,100 | 1,100 | 1,000 | – |
| | Non-Hispanic White[b] females aged 45–65 years | 8,600 | 1,900 | 1,900 | 1,900 | 1,800 | – |
| | Non-Hispanic Black females aged 45–65 years | 7,700 | 4,300 | 4,200 | 4,100 | 4,100 | – |
| | **Source: S. Li et al. (2019)** | | | | | | |
| MI | Persons aged 66 years or older | 27,000 | 11,000 | 9,600 | 9,040 | 8,600 | 8,040 |
| IS | Persons aged 66 years or older | 28,000 | 9,900 | 10,000 | 9,800 | 8,900 | 8,030 |

Abbreviations: CVD – cardiovascular disease; IS – ischemic stroke (International Classification of Disease Ninth Revision [ICD9] = 433, 434; International Classification of Disease Tenth Revision [ICD10] = I63), MI – myocardial infarction (ICD9 = 410; ICD10 = 121).
Notes:
[a]Thom et al. (2001) reported data for the first MI survivors only for aged 45–64 years. The CVD model applies these rates to both the first MI and first IS survivors.
[b]Estimates for non-Hispanic White populations are applied to other race/ethnicity-specific populations.

## 6.5.4 Valuation of Cardiovascular Disease Risk Reductions

The EPA uses the Value of Statistical Life to estimate the benefits of reducing mortality associated with hard CVD events in the population exposed to PFOA and PFOS in drinking water. Value of Statistical Life updating information is provided in Section 2.2. The EPA relies on COI-based valuation that represents the medical costs of treating or mitigating non-fatal first hard CVD events (MI, IS) during the three years following an event among those without prior CVD history, adjusted for post-acute mortality.

The annual medical expenditure estimates for MI and IS are based on O'Sullivan et al. (2011). The estimated expenditures do not include long-term institutional and home health care. For non-fatal MI, O'Sullivan et al. (2011) estimated medical expenditures are $53,246 ($2022)[69] for the initial event and then $33,162, $14,635, $13,078 annually within 1, 2, and 3 years after the initial event, respectively. For non-fatal IS, O'Sullivan et al. (2011) estimated medical expenditures are $16,503 ($2022) for the initial event and then $11,988, $788, $1,868 annually within 1, 2, and 3 years after the initial event, respectively. Annual estimates within 1, 2, and 3 years after the initial event include the incidence of secondary CVD events among survivors of first MI and IS events.

To estimate the present discounted value of medical expenditures within 3 years of the initial non-fatal MI, the EPA combined O'Sullivan et al. (2011) MI-specific estimates with post-acute

---

[69] Original values from the source were inflated to $2022 using the medical care Consumer Price Index (U.S. Bureau of Labor Statistics, 2021).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

survival probabilities based on Thom et al. (2001) (for MI survivors aged 40-64) and S. Li et al. (2019) (for MI survivors aged 65 or older). To estimate the present discounted value of medical expenditures within 3 years of the initial non-fatal IS, the EPA combined O'Sullivan et al. (2011) IS-specific estimates with post-acute survival probabilities based on Thom et al. (2001) (for IS survivors aged 40-64, assuming post-acute MI survival probabilities reasonably approximate post-acute IS survival probabilities) and S. Li et al. (2019) (for IS survivors aged 65 or older). The EPA did not identify post-acute IS mortality information in this age group, but instead applied post-acute MI mortality estimates for IS valuation.[70] Table 6-19 presents the resulting MI and IS unit values.

**Table 6-19: Cost of Illness of Non-Fatal First CVD Event Used in Modeling**

| Type of First Non-fatal Hard CVD Event | Age Group | Present Discounted Value of 3-Year Medical Expenditures ($2022, 2% Discount Rate)[a,b] Adjusted for Post-Acute Mortality[c] |
|---|---|---|
| MI | 40-64 years | $110,040 |
|  | 65 years or older | $96,626 |
| IS | 40-64 years | $30,373 |
|  | 65 years or older | $27,954 |

Abbreviations: CVD – cardiovascular disease; MI – myocardial infarction (ICD9 = 410; ICD10 = 121, IS – ischemic stroke (ICD9 = 433, 434; ICD10 = I63).

Notes:

[a]Estimates of annual medical expenditures are from O'Sullivan et al. (2011).

[b]Original values from O'Sullivan et al. (2011) were inflated to $2022 using the medical care Consumer Price Index (U.S. Bureau of Labor Statistics, 2022a).

[c]Post-acute MI mortality data for those aged 40-64 years is from Thom et al. (2001); probabilities to survive 1 year, 2 years, and 3 years after the initial event are 0.93, 0.92, and 0.90, respectively. The EPA applies these mortality values to derive the IS value in this age group. Post-acute MI mortality data and post-acute IS mortality data for persons aged 65 years and older are from S. Li et al. (2019). For MI, probabilities to survive 1 year, 2 years, and 3 years after the initial event are 0.68, 0.57, and 0.49, respectively. For IS, probabilities to survive 1 year, 2 years, and 3 years after the initial event are 0.67, 0.57, and 0.48, respectively.

---

[70] Post-acute mortality estimates for IS and MI were very close in the Medicare population (S. Li et al., 2019). For those ages 65 years or older, S. Li et al. (2019) have estimated probability of death within 1 year after non-fatal IS to be 32.07 percent and probability of death within 1 year after non-fatal MI to be 32.09 percent. Therefore, reliance on the post-acute mortality for MI to approximate the same for stroke is reasonable.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                APRIL 2024

## 6.5.5 Results

Table 6-20 to Table 6-23 provide the health effects avoided and valuation associated with cardiovascular disease.

**Table 6-20: National CVD Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, and HFPO-DA MCLs of 10 ppt each and HI of 1) (Million $2022)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal MI Cases Avoided | 1,407.7 | 6,333.1 | 11,189.0 |
| Number of Non-Fatal IS Cases Avoided | 2,074.8 | 9,247.6 | 16,279.0 |
| Number of CVD Deaths Avoided | 845.5 | 3,715.8 | 6,555.6 |
| **Total Annualized CVD Benefits (Million $2022)[b]** | **$140.66** | **$606.09** | **$1,069.40** |

Abbreviations: CVD – cardiovascular disease, MI – myocardial infarction, IS – Ischemic Stroke.
Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates. Quantifiable benefits are increased under final rule table results relative to the other options presented because of modeled PFHxS occurrence, which results in additional quantified benefits from co-removed PFOA and PFOS.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

**Table 6-21: National CVD Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal MI Cases Avoided | 1,400.8 | 6,296.0 | 11,115.0 |
| Number of Non-Fatal IS Cases Avoided | 2,065.0 | 9,194.8 | 16,203.0 |
| Number of CVD Deaths Avoided | 839.9 | 3,695.1 | 6,484.4 |
| **Total Annualized CVD Benefits (Million $2022)[b]** | **$140.12** | **$602.72** | **$1,059.60** |

Abbreviations: CVD – cardiovascular disease, MI – myocardial infarction, IS – Ischemic Stroke.
Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                          APRIL 2024

**Table 6-22: National CVD Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal MI Cases Avoided | 1,209.2 | 5,352.0 | 9,417.5 |
| Number of Non-Fatal IS Cases Avoided | 1,778.3 | 7,826.9 | 13,778.0 |
| Number of CVD Deaths Avoided | 733.1 | 3,146.8 | 5,518.0 |
| **Total Annualized CVD Benefits (Million $2022)[b]** | **$119.18** | **$513.27** | **$900.13** |

Abbreviations: CVD – cardiovascular disease, MI – myocardial infarction, IS – Ischemic Stroke.
Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable costs, and the potential direction of impact these costs would have on the estimated monetized total annualized costs in this table.

**Table 6-23: National CVD Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal MI Cases Avoided | 673.7 | 2,776.5 | 4,872.8 |
| Number of Non-Fatal IS Cases Avoided | 987.0 | 4,079.2 | 7,145.6 |
| Number of CVD Deaths Avoided | 411.6 | 1,640.9 | 2,878.1 |
| **Total Annualized CVD Benefits (Million $2022)[b]** | **$66.97** | **$267.56** | **$469.05** |

Abbreviations: CVD – cardiovascular disease, MI – myocardial infarction, IS – Ischemic Stroke.
Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

## 6.6 Renal Cell Carcinoma

### 6.6.1 Overview of the RCC Risk Reduction Analysis

Figure 6-9 illustrates the approach used to quantify and value the changes in RCC risk associated with lowered serum PFOA levels from reductions in drinking water PFOA concentrations under the regulatory alternatives. Section 4.4 and Section 6.3 detail the PWS EP-specific PFOA

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

drinking water occurrence estimation and modeling of serum PFOA concentrations, respectively. PWS EP-specific time series of the differences between serum PFOA concentrations under baseline and regulatory alternatives are inputs into this analysis. For each PWS EP, evaluation of the changes in RCC impacts involves the following key steps:

1. Estimating the changes in RCC risk based on modeled changes in serum PFOA levels and the exposure-response function for the effect of serum PFOA on RCC;
2. Estimating the annual incidence of RCC cases and excess mortality among those with RCC in all populations corresponding to baseline and regulatory alternative RCC risk levels, as well as estimating the regulatory alternative-specific reduction in cases relative to the baseline; and
3. Estimating the economic value of reducing RCC mortality from baseline to regulatory alternative levels, using the Value of Statistical Life and COI measures, respectively.

Section 6.6.2 discusses the exposure-response modeling for RCC. Section 6.6.3 summarizes the life table-based approach for estimation of RCC risk reductions. Section 6.6.4 discusses the EPA's valuation methodology for RCC mortality and morbidity. Section 6.6.5 presents the results of the analysis.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Legend:**
- Result of upstream analysis
- Data/Inputs
- Model
- # Analysis step

Abbreviations:
PFOA – perfluorooctanoic acid, RCC – renal cell carcinoma, SEER - Surveillance, Epidemiology, and End Results program
Notes:
(a) Data from the Centers for Disease Control (CDC) and Prevention.

**Figure 6-9: Overview of Analysis of Reduced RCC Risk**

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

## 6.6.2 RCC Exposure-Response Modeling

To identify an exposure-response function, the EPA reviewed studies highlighted in the HESD for PFOA (U.S. EPA, 2016f) and a recent study discussed in both the California Environmental Protection Agency's Office of Environmental Health Hazard Assessment (OEHHA) PFOA Public Health Goals report (CalEPA, 2021) and the EPA's Final Human Health Toxicity Assessment for PFOA (U.S. EPA, 2024f). Steenland and Woskie (2012) observed an increase in kidney cancer deaths among workers with high exposures to PFOA. Vieira et al. (2013) found that kidney cancer was positively associated with "high" and "very high" PFOA exposures. Barry et al. (2013) found a slight trend in cumulative PFOA serum exposures and kidney cancer among the C8 Health Project population.[71] In a large case-control general population study of the relationship between PFOA and kidney cancer in 10 locations across the U.S., Shearer et al. (2021) found evidence that exposure to PFOA is associated with RCC, the most common form of kidney cancer, in humans.

To evaluate changes between baseline and regulatory alternative RCC risk resulting from reduced exposure to PFOA, the EPA relied on the estimated time series of changes in serum PFOA concentrations (Section 6.3) and the serum-RCC exposure-response function provided by Shearer et al. (2021): 0.00178 (95% CI: 0.00005, 0.00352) per ng/mL. The analysis reported in Shearer et al. (2021) was designed as a case-control study with population controls based on 10 sites within the U.S. population. Shearer et al. (2021) accounted for age, sex, race, ethnicity, study center, year of blood draw, smoking, and hypertension in modeling the association between PFOA and RCC. Results showed a strong and statistically significant association between PFOA and RCC. The EPA selected the exposure-response relationship from Shearer et al. (2021) because it included exposure levels typical in the general population and the study was found to have a low risk of bias when assessed in the EPA's *Final Human Health Toxicity Assessment for PFOA* (U.S. EPA, 2024f).

The linear slope factor developed by the agency (see Section 4.2 of U.S. EPA, 2024f) based on Shearer et al. (2021) enables estimation of the changes in the lifetime RCC risk associated with reduced lifetime serum PFOA levels:

Equation 15:

$$LR(x) = LR(z) + 0.00178 \cdot (x - z)$$

Where $LR(x)$ is the probability of lifetime RCC incidence for an individual exposed to a lifetime average serum PFOA concentration of $x$ ng/mL, and $LR(z)$ is the probability of lifetime RCC at the baseline lifetime average serum PFOA concentration of $z$ ng/mL.

Because baseline RCC incidence statistics are not readily available from the National Cancer Institute public use data, the EPA used kidney cancer statistics in conjunction with an assumption that RCC comprises 90 percent of all kidney cancer cases to estimate baseline lifetime probability of RCC (U.S. EPA, 2024f; American Cancer Society, 2020). The EPA estimated the baseline lifetime RCC incidence for males at 1.89 percent and the baseline lifetime

---

[71] The C8 Health Project collected data to ascertain the amount of C8 (otherwise known as PFOA) in blood among Mid-Ohio Valley communities from 2005-2013. Mean PFOA at enrollment was 24 ng/mL.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

RCC incidence for females at 1.05 percent. Details of these calculations are provided in Appendix H. Because the Shearer et al. (2021) slope factor is not sex-specific, the EPA averaged sex-specific baseline lifetime RCC estimates to obtain $LR(z) = 0.0147$ for use in the estimation of annual RCC risk changes.

To enable annual RCC risk estimation, the EPA further assumed that the relative risk relationship implied by Equation 15, i.e., $RR(x,z) = LR(x)/LR(z) = 1 + 0.00178 \cdot (x - z)/LR(z) = 1 + 0.00178 \cdot (x - z)/0.0147$, also holds for the cumulative RCC risk and cumulative average exposure to serum PFOA from birth to a specific age.

A person's cumulative serum PFOA exposure by age $a$—denoted by $x_a$—is defined as:

Equation 16:

$$x_a = \frac{1}{a}\sum_{i=0}^{a-1} serum\ PFOA_i\, , x_0 = 0$$

The EPA estimated the relative risk of RCC by a particular age from a change in average serum PFOA experienced by this age as follows:

Equation 17:

$$RR(x_a, z_a) = max\left(1 - PAF, 1 + \frac{0.00178 \cdot (x_a - z_a)}{0.0147}\right)$$

Where $RR(x_a, z_a)$ is the relative cumulative risk of RCC by age $a$ associated with a change from baseline cumulative exposure $z_a$ to treatment cumulative exposure $x_a$ and $PAF$ is the environmental exposure-related population attributable fraction of RCC incidence set at 0.0394. As such, this equation implies that the EPA caps the magnitude of PFOA-related cumulative RCC risk reduction at the $PAF$ of 3.94 percent to ensure plausibility of the estimated RCC benefits size. The EPA developed this $PAF$ estimate based on its review of literature on environmental contaminant-attributable risk estimates for cancers (ICF, 2022b). In calculations of the annual RCC risk changes, the EPA continued to assume that RCC comprises 90 percent of annual kidney cancer incidence.

## 6.6.3 Estimation of RCC Risk Reductions

The EPA relies on the life table approach to estimate RCC risk reductions because:

- Changes in serum PFOA in response to changes in drinking water PFOA occur over multiple years;
- Annual risk of new RCC should be quantified only among those not already experiencing this chronic condition;
- RCC has elevated mortality implications.

The EPA used recurrent life table calculations to estimate PWS EP-specific time series of RCC incidence for a population cohort characterized by sex, race/ethnicity, birth year, and age at the

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

beginning of the evaluation period (i.e., 2024) under the baseline scenario and the regulatory alternatives. The life table analysis accounts for the gradual changes in lifetime exposures to PFOA following implementation of treatment under the regulatory alternatives compared to the baseline.[72] Details of the life table calculations are provided in Appendix H. The outputs of the life table calculations are the PWS EP-specific estimates of the annual change in the number of RCC cases and the annual change in RCC population mortality.

Although the change in PFOA exposure likely affects the risk of developing RCC beyond the end of the analysis period (the majority of RCC cases manifest during the latter half of the average individual lifespan; see Appendix H), the EPA does not capture effects after the end of the period of analysis, 2105. Individuals alive after the end of the period of analysis likely benefit from lower lifetime exposure to PFOA. Lifetime health risk model data sources include SDWIS/Fed; age-, sex-, and race/ethnicity-specific population estimates from the U.S. Census Bureau (U.S. Census Bureau, 2020a); the Surveillance, Epidemiology, and End Results (SEER) program database (National Cancer Institute),[73] and the CDC NCHS.[74] Appendix H provides additional detail on the data sources and information used in this analysis as well as baseline kidney cancer statistics. Appendix B describes estimation of the affected population.

## 6.6.4 Valuation of RCC Risk Reductions

The EPA uses the Value of Statistical Life to estimate the benefits of reducing mortality associated with RCC in the population exposed to PFOA in drinking water. Section 2.2 provides information on updating Value of Statistical Life for inflation and income growth. The EPA uses the COI-based valuation to estimate the benefits of reducing morbidity associated with RCC.

The EPA used the medical cost information from a recent RCC cost-effectiveness study by Ambavane et al. (2020) to develop COI estimates for RCC morbidity. Ambavane et al. (2020) used a discrete event simulation model to estimate the lifetime treatment costs of several RCC treatment sequences, which included first and second line treatment[75] medication costs, medication administration costs, adverse effect management costs, and disease management costs on- and off-treatment. To this end, the authors combined RCC cohort data from a CheckMate 214 clinical trial and recent US-based healthcare cost information assembled from multiple sources (see supplementary information from Ambavane et al. (2020)).

The EPA received public comments on the economic analysis for the proposed rule related to the EPA's use of cost of illness information for morbidity valuation. Specifically, some commenters recommended that the EPA use willingness to pay information (instead of cost of illness information) when valuing the costs associated with non-fatal illnesses, stating that willingness to pay information better accounts for lost opportunity costs (e.g., lost productivity and pain and suffering) associated with non-fatal illnesses. To better account for these opportunity costs, the

---

[72] As described above, the EPA models PFAS changes under the regulatory alternatives as being in effect for the years 2024 through 2105, with nonzero PFAS changes first occurring in 2029, the year when all PWSs are assumed to comply with PFAS treatment requirements.

[73] For cancer incidence and stage distribution data, the EPA relies on SEER 21 (2009-2018); for cancer survival data, the EPA relies on SEER 18 (2000-2017).

[74] CDC WONDER data on 1999-2019 all-cause and kidney cancer mortality by age and sex.

[75] Second line cancer treatment is a treatment implemented after the failure of the initial treatment (i.e., first line treatment). The first line treatment may fail because it stops working or has side effects that are not tolerated.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA used recently available willingness to pay values in a sensitivity analysis for morbidity associated with RCC. The sensitivity analysis results show that when willingness to pay values are used in RCC benefits analysis, morbidity benefits are increased by 2.0 percent. See Appendix O for full details and results on the willingness to pay sensitivity analyses.

Table 6-24 summarizes RCC morbidity COI estimates derived by the EPA using Ambavane et al. (2020)-reported disease management costs on- and off-treatment along with medication, administration, and adverse effect management costs for the first line treatment that initiated the most cost-effective treatment sequences as identified by Ambavane et al. (2020), i.e., the nivolumab and ipilimumab drug combination. This is a forward-looking valuation approach in that it assumes that the clinical practice would follow the treatment recommendations in Ambavane et al. (2020) and other recent studies cited therein. The EPA notes that the second line treatment costs are not reflected in the EPA's COI estimates, because Ambavane et al. (2020) did not report information on the expected durations of the treatment-free interval (between the first line treatment discontinuation and the second line treatment initiation) and the second line treatment phase, conditional on survival beyond discontinuation of the second line treatment. As such, the EPA valued RCC morbidity at $261,175 ($2022) during year 1 of the diagnosis, $198,705 ($2022) during year 2 of the diagnosis, and $1,661 ($2022) starting from year 3 of the diagnosis. Additionally, the EPA assumed that for individuals with RCC who die during the specific year, the entire year-specific cancer treatment regimen is applied prior to the death event. This may overestimate benefits if a person does not survive the entire year.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                          APRIL 2024

**Table 6-24: RCC Morbidity Valuation**

| Time Interval | First Line Medication ($2018)[a] | First Line Administration ($2018)[a] | First Line Adverse Effect Management ($2018)[a,c] | Disease Management ($2018)[a] | Total ($2018) | Total ($2022)[d] |
|---|---|---|---|---|---|---|
| Monthly cost, month 1-3 from diagnosis[a,e] | 32,485 | 516 | 78 | 73 | 33,152 | 37,382 |
| Monthly cost, month 4-24 from diagnosis[b,f] | 13,887 | 647 | 78 | 73 | 14,685 | 16,559 |
| Monthly cost, month 25+ from diagnosis[g] | - | - | - | 123 | 123 | 139 |
| Annual cost, year 1 from diagnosis | 222,438 | 7,371 | 934 | 878 | 231,621 | 261,175 |
| Annual cost, year 2 from diagnosis | 166,644 | 7,764 | 934 | 878 | 176,220 | 198,705 |
| Annual cost, year 3+ from diagnosis | - | - | - | 1,473 | 1,473 | 1,661 |

Abbreviations: RCC – renal cell carcinoma.
Notes:
[a]Ambavane et al. (2020) Table 1;
[b]Ambavane et al. (2020) p. 41, a maximum treatment duration assumption of 2 years;
[c]The adverse effect management costs of $1,868 in Ambavane et al. (2020) Table 1 were reported for the treatment duration. The EPA used the treatment duration of 24 months (i.e., 2 years) to derive monthly costs of $77.83.
[d]To adjust for inflation, the EPA used U.S. Bureau of Labor Statistics Consumer Price Index for All Urban Consumers: Medical Care Services in U.S. (City Average).
[e]First line treatment induction
[f]First line treatment maintenance
[g]Treatment-free interval

## 6.6.5 Results

Table 6-25 to Table 6-28 provide the health effects avoided and valuation associated with renal cell carcinoma.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-25: National RCC Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, and HFPO-DA MCLs of 10 ppt each and HI of 1) (Million $2022)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal RCC Cases Avoided | 1,091.5 | 6,964.2 | 17,937.0 |
| Number of RCC-Related Deaths Avoided | 320.4 | 2,028.8 | 5,206.5 |
| **Total Annualized RCC Benefits (Million $2022)[b,c]** | **$61.33** | **$353.90** | **$883.55** |

Abbreviations: RCC – renal cell carcinoma.
Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates. Quantifiable benefits are increased under final rule table results relative to the other options presented because of modeled PFHxS occurrence, which results in additional quantified benefits from co-removed PFOA and PFOS.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.
[c]When using willingness to pay metrics to monetize morbidity benefits, total annualized RCC benefits are increased by $7.1 million (see Appendix O).

**Table 6-26: National RCC Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal RCC Cases Avoided | 1,082.0 | 6,922.4 | 17,870.0 |
| Number of RCC-Related Deaths Avoided | 319.1 | 2,016.7 | 5,190.9 |
| **Total Annualized RCC Benefits (Million $2022)[b]** | **$60.90** | **$351.79** | **$877.47** |

Abbreviations: RCC – renal cell carcinoma.
Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-27: National RCC Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal RCC Cases Avoided | 851.9 | 5,696.1 | 14,906.0 |
| Number of RCC-Related Deaths Avoided | 251.6 | 1,663.8 | 4,328.4 |
| **Total Annualized RCC Benefits (Million $2022)[b]** | **$48.41** | **$290.72** | **$730.99** |

Abbreviations: RCC – renal cell carcinoma.

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.

[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

**Table 6-28: National RCC Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal RCC Cases Avoided | 372.1 | 2,648.1 | 6,967.4 |
| Number of RCC-Related Deaths Avoided | 111.5 | 782.8 | 2,057.3 |
| **Total Annualized RCC Benefits (Million $2022)[b]** | **$21.20** | **$137.30** | **$352.07** |

Abbreviations: RCC – renal cell carcinoma.

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.

[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

# 6.7 Benefits from Co-Removal of Disinfection Byproducts

As part of its health risk reduction and cost analysis, the EPA is directed by SDWA to evaluate quantifiable and nonquantifiable health risk reduction benefits for which there is a factual basis in the rulemaking record to conclude that such benefits are likely to occur from reductions in co-occurring contaminants that may be attributed solely to compliance with the maximum contaminant level (SDWA 1412(b)(3)(C)(II)). These co-occurring contaminants are expected to include additional PFAS contaminants not directly regulated by the final PFAS NPDWR, co-occurring chemical contaminants such as SOCs, VOCs, and DBP precursors. In this section, the

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EPA presents a quantified estimate of the reductions in DBP formation potential that are likely to occur as a result of compliance with the final PFAS NPDWR.[76]

## 6.7.1 Overview of Reduced Disinfection Byproduct Formation

DBPs are formed when disinfectants react with naturally occurring materials in water. Under the Stage 2 Disinfectants and Disinfection Byproducts Rule (Stage 2 DBP Rule, U.S. EPA, 2006b), the EPA regulates 11 individual DBPs from three subgroups: four trihalomethanes, five haloacetic acids, and two inorganic compounds (bromate and chlorite). Under the Stage 2 DBP Rule, compliance is based on a locational running annual average (LRAA) calculation, where the annual average at each sampling location in the distribution system is used to determine compliance with the MCL of 0.08 mg/L for THM4 (regulated as TTHM, bromodichloromethane, bromoform, chloroform, and dibromochloromethane). There is a substantial body of literature on DBP precursor occurrence and THM4 formation mechanisms in drinking water treatment. The formation of THM4 in a particular drinking water treatment plant is a function of several factors including disinfectant type, disinfectant dose, bromide concentration, organic material type and concentration, temperature, pH, and system residence times. Epidemiology studies have shown that THM4 exposure, a surrogate for chlorinated drinking water, is associated with an increased risk of bladder cancer, among other diseases (Cantor et al., 1998; Cantor et al., 2010; Costet et al., 2011; Freeman et al., 2017; King & Marrett, 1996; Regli et al., 2015; Villanueva et al., 2004; Villanueva et al., 2006; U.S. EPA, 2019d). These studies considered THM4 as surrogate measures for DBPs formed from the use of chlorination that may co-occur. Reductions in exposure to THM4 is expected to yield significant public health benefits (Regli et al., 2015). In what Richardson (2022) describes as the "largest risk assessment of DBPs in the U.S. to date, focusing on bladder cancer cases associated with chlorinated drinking water", Weisman et al. (2022) estimated that 8,000 of 79,000 national cases of bladder cancer are attributable to DBPs in drinking water.

The EPA used the following data sources for the DBP co-removal analysis (see Table 6-29).

---

[76] The methodology detailed in Section 6.7.1 on estimated DBP reductions was externally peer reviewed by three experts in GAC treatment for PFAS removal and DBP formation potential. The external peer reviewers supported the EPA's approach and edits based on their recommendations for clarity and completeness are reflected in the following analysis and discussion. Please see "Response to Letter of Peer Review for Disinfectant Byproduct Reduction " (U.S. EPA, 2023b) for discussion of the peer review and the EPA's responses to peer reviewed comments.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-29: Data Sources and How the Information Derived from each Source is Used in the DBP Co-Removal Analysis**

| Data Source | Acronym | How Specific Data were Used in Analysis |
|---|---|---|
| Consumer Confidence Reports | CCR | • Identify GAC treatment start date/year.<br>• Identify intended purpose for GAC treatment.<br>• Estimate baseline THM4 (four regulated trihalomethanes) concentrations at systems when SYR4 data were unavailable.<br>• Calculate THM4 reduction at systems when SYR4 data were unavailable. |
| DBP Information Collection Rule Treatment Study Database | DBP ICR TSD | • Estimate changes in THM4 levels based on implementing GAC treatment. |
| DBP ICR Aux 1 (1998) | Aux 1 | • Evaluate changes in DBP precursor occurrence over time by comparing TOC data to SYR3 TOC data. |
| Six-Year Review 3, Information Collection Rule (2011) | SYR3 ICR | • Evaluate raw water TOC data. |
| Six-Year Review 4, Information Collection Rule (2019) | SYR4 ICR | • Evaluate raw water TOC data.<br>• Estimate baseline THM4 concentrations.<br>• Calculate THM4 reductions. |
| Unregulated Contaminant Monitoring Rule 3 | UCMR 3 | • Inform a Bayesian occurrence model to identify PWSs expected to implement treatment under the NPDWR.<br>• Identify PWSIDs that had a detectable level of PFOA and/or PFOS to identify systems used in trihalomethane reduction comparison. |
| Unregulated Contaminant Monitoring Rule 4 | UCMR 4 | • Identify plants that indicated GAC treatment.<br>• Inform disinfectant type. |

Abbreviations: THM4 – four regulated trihalomethanes; DBP – disinfection byproduct; NPDWR – National Primary Drinking Water Regulation; PWS – public water system; PWSID – public water system identifier; SYR – Six-Year Review; GAC – granular activated carbon; TOC – total organic carbon; PFOS – perfluorooctane sulfonic acid; PFOA – perfluorooctanoic acid.

## 6.7.1.1 Overview of PFAS Treatment with Disinfection Byproduct Reduction

GAC adsorption has been used to remove synthetic organic chemicals, taste and odor compounds, and natural organic matter (NOM) during drinking water treatment (Chowdhury et al., 2013). Recently, many water utilities have installed or are considering installing GAC and/or other advanced technologies as a protective or mitigation measure to remove various contaminants of emerging concern, such as PFAS (Dickenson & Higgins, 2016). Because NOM often exists in a much higher concentration (in mg/L) than trace organics (in µg/L or ng/L) in water, NOM, often measured as TOC, can interfere with the adsorption of trace organics by

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

outcompeting the contaminants for adsorption sites and by general fouling (blockage of adsorption pores) of the GAC.

NOM and inorganic matter are precursors for the formation of THMs and other DBPs when water is disinfected using chlorine and other disinfectants to control microbial contaminants in finished drinking water. Removal of DBP precursors through adsorption onto GAC has been included as a treatment technology for compliance with the existing DBP Rules and is a BAT for the Stage 2 DBP Rule. Dissolved organic matter can be removed by GAC through adsorption and biodegradation (Crittenden et al., 1993; W. H. Kim et al., 1997; Yapsakli & Çeçen, 2010). Upon startup, the initial removal is via adsorption of the DBP precursors; GAC is well-established for removal of THM and HAA precursors (Dastgheib et al., 2004; Cheng et al., 2005; Iriarte-Velasco et al., 2008; Summers et al., 2013; Cuthbertson et al., 2019; L. Wang et al., 2019). However, biodegradation becomes the predominant mechanism over time as adsorption capacity is exhausted and microbial growth within the GAC column establishes itself (Speitel Jr et al., 1989; Velten et al., 2007). In addition to removal of organic DBPs, GAC also exhibits some capacity for removal of inorganic DBPs such as bromate and chlorite (Kirisits et al., 2000; Sorlini & Collivignarelli, 2005) and removal of preformed organic DBPs via adsorption and biodegradation (Jiang et al., 2017; Terry & R.S., 2018). Further, GAC may offer limited removal of dissolved organic nitrogen (Chili et al., 2012).

Based on an extensive review of published literature in sampling studies where both contaminant groups (PFAS and DBPs) were sampled, there is limited information about PFAS removal and co-occurring reductions in DBPs, specifically THMs. To help inform its economic analysis, the EPA relied on the DBP Information Collection Rule Treatment Study Database and DBP formation studies to estimate reductions in THM4 ($\Delta$THM4) that may occur when GAC is used to remove PFAS. Subsequently, these results were compared to THM4 data from PWSs that have detected PFAS and have indicated use of GAC.

The objective of the co-removal benefits analysis is to determine the reduction in bladder cancer cases associated with the decrease of regulated THM4 in treatment plants due to the installation of GAC for PFAS removal. Figure 6-10 illustrates the EPA's approach for quantifying the human health benefits of reducing THM4 levels in drinking water. The analysis entails:

1. Estimating the number of systems expected to install GAC treatment in compliance with the final PFAS NPDWR and affected population size;
2. Estimating changes in THM4 levels that may occur when GAC is installed for PFAS removal based on influent TOC levels;
3. Estimating changes in the cumulative risk of bladder cancer using an exposure-response function linking lifetime risk of bladder cancer to THM4 concentrations in residential water supply (Regli et al., 2015);
4. Estimating annual changes in the number of bladder cancer cases and mortality in the bladder cancer population corresponding to changes in THM4 levels under the final rule and regulatory alternatives in all populations alive during or born after the start of the evaluation period;
5. Estimating the economic value of reducing bladder cancer morbidity and mortality from baseline to the final rule and regulatory alternative levels, using COI measures and the Value of Statistical Life, respectively.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                        APRIL 2024



Figure 6-10: Overview of Analysis of Co-Removal Benefits

Abbreviations: THM4 = Four Regulated Species of Trihalomethanes; SEER = Surveillance, Epidemiology, and End Results; TOC = Total Organic Carbon

Notes:

[a]Systems expected to be triggered into PFAS treatment using either granular activated carbon (GAC) or ion exchange (IX) treatment technologies.

[b]Based on median raw water TOC annual system-means for non-purchased water systems.

[c]Based on THM4 reductions due to GAC installation from the disinfection byproduct (DBP) information collection rule (ICR) treatment studies. Reductions dependent on empty bed contact time (EBCT) and source water type (surface water or groundwater).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 6.7.1.2 Baseline Information on DBP Precursors and Trihalomethane Formation

DBP precursors are the chemical constituents that are reactants or intermediates in the formation of DBPs. Precursors can be characterized by their origin and the nature of their chemistry (inorganic vs. organic). Precursors include NOM and anthropogenic organic matter (i.e., wastewater) from watersheds, organic matter contaminants within treatment processes, and biofilm growth within the distribution system. Additional precursors include inorganic matter present in source water from anthropogenic and natural sources, or chemical additives introduced during treatment. The presence of DBP precursors is site-specific and dependent on many factors such as, but not limited to, environment, location, watershed, and treatment.

The EPA evaluated raw water TOC data included in the SYR3 and SYR4 ICR datasets (U.S. EPA, 2016j; U.S. EPA, 2022f). The fourth Unregulated Contaminant Monitoring Rule (UCMR 4) TOC data were not used since that dataset did not include THM4 information. In addition, the EPA compared the DBP ICR Aux 1 TOC data (pre-Stage 1 DBP Rule[77]) to the SYR3 ICR TOC data to evaluate changes in DBP precursor occurrence over time. PWSs (specifically subpart H systems[78]) are required to achieve a certain percentage of TOC removal; occurrence estimates for TOC are typically evaluated at the plant-level. The SYR3 ICR dataset contains TOC data for 33 states and systems of all sizes. The SYR4 ICR dataset contains TOC data for 49 states/tribes and systems of all sizes. To be consistent with SYR3 and SYR4 data management protocols, non-detections of TOC were assigned a value of 0.0 mg/L for all plant-mean calculations (U.S. EPA, 2016a).

In U.S. EPA (2005b), the EPA reviewed the raw water TOC levels for ground water plants included in the DBP ICR Aux 1 data. The results shown in Table 6-30 represent the distribution of ground water plant-mean data as calculated using ICR Aux 1 monthly data from the year 1998. Only plants with reported data for at least 9 of the 12 months are included in this summary table. Note that the table does not include results for blended, mixed, or purchased water plants. Table 6-31 shows the distribution of plant-mean TOC concentrations in raw water for non-purchased surface water plants. Segmenting the plants with raw water TOC means provides some indication of the percentage of plants that would be within each THM4 reduction category outlined in Section 6.7.1.3. The levels in ground water plants tended to be lower compared to concentrations in surface water plants (Table 6-30 and Table 6-32 compared to Table 6-31 and Table 6-33). As mentioned above, TOC non-detections were assumed to be zero for plant-mean calculations.

---

[77] Stage 1 Disinfectants and Disinfection Byproducts Rule was promulgated by the EPA in December 1998 (U.S. EPA, 1998e).
[78] Subpart H systems are defined as public water systems using surface water or ground water under the direct influence of surface water as a source that are subject to the requirements of subpart H of the National Primary Drinking Water Regulations (U.S. EPA, 2006a).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                                APRIL 2024

**Table 6-30: DBP ICR (1998), SYR3 ICR (2011), and SYR4 ICR (2019) – Summary of Raw Water TOC Annual System Means for Ground Water Systems**

| Data Source (Year)[a] | Source Water Type | Count of Systems | Median (mg/L) | Mean (mg/L) | 90th Percentile (mg/L) | Range of System-Means[b] |
|---|---|---|---|---|---|---|
| DBP ICR (1998) | Ground Water | 103 | 0.19 | 1.46 | 3.36 | 0.0 - 16.1 |
| SYR3 ICR (2011) | Ground Water | 68 | 2.19 | 3.33 | 5.85 | 0.42 – 17.0 |
| SYR4 ICR (2019) | Ground Water | 80 | 1.50 | 2.54 | 7.11 | 0.0 – 15.73 |

Notes:
Abbreviations: DBP – disinfection byproduct; ICR – information collection rule; SYR – Six-Year Review; TOC – total organic carbon.
[a]Using SYR3 cutoff values, values > 100 mg/L were excluded from calculations.
[b]Values below the MRL were converted to 0.0 mg/L to calculate system-means.
*Source: ICR AUX1 database; table extracted from Exhibit 3.6 of U.S. EPA (2005b).*

**Table 6-31: DBP ICR (1998), SYR3 ICR (2011), and SYR4 ICR (2019) – Summary of Raw Water TOC Annual System Means for Surface Water Systems**

| Data Source (Year)[a] | Source Water Type | Count of Systems | Median (mg/L) | Mean (mg/L) | 90th Percentile (mg/L) | Range of System-Means[b] |
|---|---|---|---|---|---|---|
| DBP ICR (1998) | Surface Water | 307 | 2.71 | 3.14 | 5.29 | 0.0 – 21.4 |
| SYR3 ICR (2011) | Surface Water | 756 | 2.89 | 3.45 | 6.45 | 0.0 – 29.3 |
| SYR4 ICR (2019) | Surface Water | 802 | 3.29 | 3.88 | 6.93 | 0.0 – 38.9 |

Abbreviations: ICR – information collection rule; SYR – Six-Year Review; TOC – total organic carbon.
Notes:
[a]Using SYR3 cutoff values, values > 100 mg/L were excluded from calculations.
[b]Values below the MRL were converted to 0.0 mg/L to calculate system-means.

The EPA reviewed the finished water TOC levels included in SYR3 ICR and SYR4 ICR data. The results shown in Table 6-32 represent the distribution of TOC concentrations for ground water plants. Note that ground water plants are not federally required to report finished water TOC data. In addition, the EPA reviewed finished water TOC levels for surface water plants included in SYR3 and SYR4 ICR data. Table 6-33 displays the distribution of TOC levels in finished water for surface water plants. Similar to the raw water comparison, TOC levels tended to be higher among surface water plants compared to ground water plants.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                          APRIL 2024

**Table 6-32: SYR3 ICR (2011) and SYR4 ICR (2019) – Summary of Finished Water TOC Annual System Means for Ground Water Systems**

| Data Source (Year)[a] | Source Water Type | Count of Systems | Median (mg/L) | Mean (mg/L) | 90th Percentile (mg/L) | Range of System-Means[b] |
|---|---|---|---|---|---|---|
| SYR3 ICR (2011) | Ground Water | 78 | 1.86 | 2.30 | 4.53 | 0.0 – 11.4 |
| SYR4 ICR (2019) | Ground Water | 113 | 0.73 | 2.77 | 3.63 | 0.0 – 93.0 |

Abbreviations: ICR – information collection rule; SYR – Six-Year Review; TOC – total organic carbon.
Notes:
[a]Using SYR3 cutoff values, values > 100 mg/L were excluded from calculations.
[b]Values below the MRL were converted to 0.0 mg/L to calculate system-means.

**Table 6-33: SYR3 ICR (2011) and SYR4 ICR (2019) – Summary of Finished Water TOC Annual System Means for Surface Water Systems**

| Data Source (Year)[a] | Source Water Type | Count of Systems | Median (mg/L) | Mean (mg/L) | 90th Percentile (mg/L) | Range of System-Means[b] |
|---|---|---|---|---|---|---|
| SYR3 ICR (2011) | Surface Water | 756 | 1.93 | 2.32 | 3.99 | 0.0 – 25.1 |
| SYR4 ICR (2019) | Surface Water | 802 | 1.89 | 2.24 | 3.90 | 0.0 – 74.4 |

Abbreviations: ICR – information collection rule; SYR – Six-Year Review; TOC – total organic carbon.
Notes:
[a]Using SYR3 cutoff values, values > 100 mg/L were excluded from calculations.
[b]Values below the MRL were converted to 0.0 mg/L to calculate system-means.

The EPA compared the levels of raw water TOC between the DBP ICR and SYR3 ICR to evaluate the changes in TOC occurrence over time (U.S. EPA, 2016g). The EPA used 1998 data from the DBP ICR Aux 1 database and 2011 data from the SYR3 ICR dataset and included only the data from systems that were found in both datasets (referred to as "common systems"). The evaluation of TOC changes over time was limited to large surface water systems (≥100,000 population served) because the DBP ICR only covered large systems.

Table 6-34 below presents plant-level summary statistics for finished water TOC from common systems in the Aux 1 database and SYR3 ICR. The common systems were distributed across 14 states (Alabama, Alaska, Illinois, Indiana, Iowa, Kentucky, Nevada, New Jersey, North Carolina, Oklahoma, Pennsylvania, South Carolina, Virginia, and West Virginia). The comparison of data for large surface water supplies between 1998 and 2011 shows a small decrease in treated water TOC levels. The median finished water TOC concentrations at large systems were 1.76, 1.75, and 1.51 mg/L in the Aux 1 database, SYR3 ICR dataset, and SYR4 ICR dataset, respectively.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-34: DBP ICR (Aux 1; 1998), SYR3 ICR (2011), and SYR4 ICR (2019) – Finished Water Annual System Mean TOC; Common Surface Water Systems**

| Data Source (Year) | Count of Systems[a] | Median (mg/L) | Mean (mg/L) | 90th Percentile (mg/L) | 95th Percentile (mg/L) | % Means > 2 mg/L | % Means > 3 mg/L |
|---|---|---|---|---|---|---|---|
| DBP ICR (1998) | | 1.76 | 1.77 | 2.90 | 3.23 | 34% | 8% |
| SYR3 ICR (2011) | 80 | 1.75 | 1.74 | 2.78 | 3.24 | 30% | 8% |
| SYR4 ICR (2019) | 80 | 1.51 | 1.49 | 2.44 | 2.81 | 21% | 5% |

Abbreviations: DBP – disinfection byproduct; ICR – information collection rule; SYR – Six-Year Review; TOC – total organic carbon.
Note:
[a]Some systems included data for multiple plants.
*Source: Table extracted from Exhibit 6.11 of U.S. EPA (2016g)*

Table 6-35 summarizes THM4 baselines under DBP ICR, which represents pre-Stage 1 and Stage 2 DBP Rules. Prior to evaluating the SYR4 ICR THM4 data, the EPA removed values greater than 10 times the MCL (800 µg/L) due to potential data entry errors. Additionally, the EPA converted values below the MRL (10 µg/L) to 0 µg/L, which is consistent with previous SYR data analysis (U.S. EPA, 2016a). Average THM4 values were higher for surface water plants compared to ground water plants across the two datasets. Within the DBP ICR dataset, representing PWSs serving populations ≥100,000, 82 ground water plants had a median THM4 concentration of 6.8 µg/L with a range of 0-123 µg/L. For the 213 surface water plants in the DBP ICR, the median THM4 concentration was 40 µg/L with a range of 0 to 117 µg/L. In comparison, post-Stage 1 and 2 DBP Rules SYR4 ICR data show median THM4 concentrations of 5.0 µg/L and 41.4 µg/L and mean THM4 concentrations of 13.4 µg/L and 41.1 µg/L in ground water and surface water, respectively. Plant means ranged from 0 to 371.4 µg/L and from 0 to 263.8 µg/L for ground water and surface water, respectively. Note that the SYR4 dataset was from voluntary submissions and includes data from systems of all sizes. The SYR4 ICR reduced dataset, limited to PWSs serving populations ≥100,000, shows median THM4 concentrations of 24.4 and 36.1 µg/L and mean THM4 concentrations of 25.0 and 35.1 µg/L for ground water and surface water, respectively. Plant means ranged from 0 to 66.6 µg/L and from 0 to 62.0 µg/L for ground water and surface water, respectively.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-35: Summary of THM4 Baseline Comparing DBP ICR and SYR4 ICR**

| Data Source | Source Water Type | Count of Systems[c] | THM4 Median (µg/L) | THM4 Mean (µg/L) | 90th Percentile (µg/L) | Range of System-Means[d] |
|---|---|---|---|---|---|---|
| DBP ICR (1998)[a] | Ground Water | 82 | 6.8 | 15.4 | 37 | 0–123 |
| DBP ICR (1998)[a] | Surface Water | 213 | 40 | 42 | 70 | 0–117 |
| SYR4 ICR Reduced (2012-2019)[b,e,f] | Ground Water | 84 | 24.4 | 25.0 | 53.1 | 0–66.6 |
| SYR4 ICR Reduced (2012-2019)[b,e,f] | Surface Water | 291 | 36.1 | 35.1 | 50.2 | 0–62.0 |
| SYR4 ICR (2012-2019)[b,e] | Ground Water | 26,243 | 5.0 | 13.4 | 38.5 | 0–371.4 |
| SYR4 ICR (2012-2019)[b,e] | Surface Water | 9,618 | 41.4 | 41.1 | 64.1 | 0–263.8 |

Abbreviations: DBP – disinfection byproduct; ICR – information collection rule; SYR – Six-Year Review; THM4 – four regulated trihalomethanes.

Notes:

[a]Stage 2 DBP Rule Economic Analysis (U.S. EPA, 2005b), screened data from Exhibit 3.15 and 3.20

[b]Using SYR3 cutoff values, values > 10 times the MCL were excluded from calculations.

[c]NA values and blanks were removed prior to calculations.

[d]Values below the MRL were converted to 0.0 µg/L to calculate system-means.

[e]SYR4 data collected from 2012 to 2019. All years were included in calculations.

[f]SYR4 reduced dataset included only PWSs serving populations ≥100,000

In the Economic Analysis for the Stage 2 DBP Rule, the EPA estimated a combined average THM4 reduction for all systems of 7.8 percent, with surface water systems ranging from 9.2 percent (systems serving ≥10,000) to 7.2 percent (systems serving <10,000), and ground water systems ranging from 1.4 percent (systems serving ≥10,000) to 2.0 percent (systems serving <10,000) (U.S. EPA, 2005b). Comparisons of the DBP ICR THM4 baseline data and the SYR4 data that reflects Stage 1 and Stage 2 DBP Rule changes indicate that the Stage 2 EA slightly overestimated the ΔTHM4 for surface water systems (40 to 41.4 µg/L, 3.5% increase) and underestimated the ΔTHM4 for ground water systems (6.8 to 5.0 µg/L, 26.5% reduction). Comparing all systems (surface water and ground water) serving ≥100,000, no statistically significant difference (p-value = 0.2) was observed between the DBP ICR and SYR4 dataset means. Comparing ground water systems in the DBP ICR dataset to those in the reduced SYR4 dataset showed a statistically significant difference (p-value = 0.0003) in THM4 means, with THM4 increasing in the more recent years (SYR4). Comparing surface water systems in the DBP ICR dataset to those in the reduced SYR4 dataset showed no statistically significant difference (p-value = 0.3) in THM4 means. The lack of statistically significant differences in THM4 means between the DBP ICR and SYR4 datasets for surface water systems indicates that TOC and THM4 trends support the use of the DBP ICR dataset to predict ΔTHM4 resulting from GAC treatment. For large ground water systems (populations ≥100,000), reductions in THM4 mean concentrations may be underestimated due to the increase in THM4 baseline concentrations observed from data reported in the DBP ICR to the SYR4 ICR. Based on the TOC and THM4 trends over time and the percent differences observed between the DBP ICR and SYR4 dataset means, the EPA determined that using the DBP ICR Treatment Study Database results for ΔTHM4 to predict future ΔTHM4 resulting from GAC treatment was

justified and reasonable. Additionally, with this focus on GAC treatment and the reduction of THM4, it is important to note that the DBP ICR treatment study required systems to conduct DBP precursor removal studies (Treatment Study Database), which contains the most extensive amount of data on GAC treatment and DBP formation potentials (U.S. EPA, 1996; L. Wang et al., 2019).

Larger datasets, such as SYR ICRs, do not include data on both disinfectant type and DBP formation. The DBP ICR collected this information in addition to other source and water quality parameters. Table 6-36 shows mean THM4 concentrations in the DBP ICR per disinfectant type and source water type.

**Table 6-36: DBP ICR (Aux 1) Summary of THM4 Concentrations Based on Disinfectant and Source Water Type**

| Disinfectant Type | Source Water Type | Count of Plants / Facilities | Mean THM4 concentration (µg/L) |
|---|---|---|---|
| Chloramine | Ground Water | 15 | 29.2 |
| | Surface Water | 77 | 43.2 |
| Free Chlorine | Ground Water | 34 | 21.3 |
| | Surface Water | 164 | 45.0 |
| Free Chlorine + Chloramine (DS) | Ground Water | 1 | 18.7 |
| | Surface Water | 20 | 53.2 |

Abbreviations: DBP – disinfection byproduct; THM4 – four regulated trihalomethanes; DS – distribution system.

Despite the significant public health improvements provided by the EPA's Stage 2 DBP Rule, DBPs are still estimated to cause approximately 8,000 cases of drinking water-attributable bladder cancer cases every year (Weisman et al., 2022). Hence, there are still public health benefits to be realized when DBPs are reduced when feasible. Where systems install activated carbon, the PFAS rule will, for many systems, further reduce DBP concentrations because of precursor removal. While the Stage 1 and Stage 2 DBP Rules were effective at reducing THM4, there are remaining risks associated with DBP exposure that could be further reduced as shown in the baseline analysis above. The Stage 2 DBP Rule was promulgated in 2006 and since the rule implementation there have been numerous peer-reviewed studies that have shown an increased weight of evidence supporting an association between chlorination DBPs and bladder cancer with updated estimates on attributable cases (Weisman et al., 2022; Regli et al., 2015). Additionally, there is an increased understanding of the role of genetically susceptible populations and exposure routes for THMs (i.e., oral, inhalation, and dermal) that impact risk assessments. This comparison between the SYR4 ICR (2019) and DBP ICR (1998) showed that the DBP ICR THM4 data were still relevant for the post Stage 2 DBP Rule baselines for both TOC (i.e., DBP precursors) and THM4. Because the baseline was pre-Stage 1 (DBP ICR), the EPA took the low-end estimate for THM4 reduction to reduce possible overestimation. Further reduction in TOC concentrations in finished water could be achieved if additional treatment is added (i.e., PFAS removal using GAC treatment).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                      APRIL 2024

### 6.7.1.3 Estimation of Trihalomethane Reduction using Treatment Models

#### 6.7.1.3.1 DBP Information Collection Rule Treatment Study Database

The Information Collection Rule Treatment Study Database (ICR TSD) contains results of the most extensive GAC study conducted on a national scale. The ICR TSD contains treatment study data submitted by systems required to conduct DBP precursor removal studies under the DBP ICR (U.S. EPA, 1996). The systems included in the ICR TSD were considered "challenged" in their ability to achieve compliance with potential Stage 2 DBP rule revision MCLs. The participating systems included surface water systems (and ground water systems under the direct influence of surface water) serving 100,000 or more people and having ≥ 4 mg/L of TOC in source water, and ground water systems serving 50,000 or more people and having ≥ 2 mg/L of TOC in finished water. Both free chlorine and chloramine systems were included in the treatment study (U.S. EPA, 1996; L. Wang et al., 2019).

Data from the ICR TSD study from these "challenged systems" can be used to identify conservative estimates of TOC reduction and associated ΔTHM4. Due to upstream pollution, drought, and/or climate change, individual drinking water sources may be as challenged as when the ICR TSD data were collected (Hashempour et al., 2020; McDonough et al., 2020). While the GAC treatment dataset dates are from 1998, the physical/chemical relationships observed have only improved with the current application of GAC being at least as effective for THM4 as was observed in the ICR TSD (Yuan et al., 2022). While source water parameters and treatments at individual plants have changed over time, as seen in the baseline characterization in Section 6.7.1.2, the EPA determined the ICR TSD was still appropriate to inform estimates of ΔTHM4 formation potential given the lack of available data to directly inform ΔTHM4 from PFAS adsorption studies and the low percent difference in TOC changes on a national scale between the DBP ICR and SYR4 collection efforts.

From the 63 GAC systems included in the ICR TSD, a total of 182 pilot/rapid small-scale column test (RSSCT) studies were conducted to develop breakthrough curves of TOC and DBP formation changes. Two EBCTs, 10 and 20 min, were evaluated for treated water that had passed through any full-scale treatment processes previously in place at each drinking water treatment plant to remove precursors (i.e., coagulation/flocculation, sedimentation, filtration) but before any disinfectant was added. To determine the effect of GAC treatment on DBP formation, these studies evaluated TOC removal and THM4 formation potential for the treated water before and after GAC treatment. Uniform formation condition procedures were standardized across each study, with a reaction time of 24 ± 1 hours, temperature of 20.0 ± 1.0ºC, buffered pH at 8.0 ± 0.2, and 24-hr chlorine residual of 1.0 ± 0.4 mg/L as Cl2 (U.S. EPA, 1996; Summers et al., 1996).

The pilot/RSSCT studies were timed to account for seasonal changes and an "averaging" approach was used to remove temporal variations. This approach was consistent with analysis used to characterize different GAC options for compliance with the MCLs under the Stage 2 DBP Rule (Hooper & Allgeier, 2002). Additional details on the GAC study design specifications under the ICR TSD are available in the "ICR Manual for Bench and Pilot Scale Treatment Studies" (U.S. EPA, 1996).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

For drinking water systems in the ICR TSD that used chloramines (n = 123 pilots/RSSCTs) in their distribution system, free chlorine was still used in the DBP formation tests, therefore the pilot and RSSCT systems were not compared based on disinfectant type used by the individual treatment system. For reference, a summary of the THM4 estimates by disinfectant type is provided in Appendix I Table I-1. Additionally, if the comparison categories were further parsed by source water type, disinfectant type, and TOC concentrations, then the number of systems in each bin would not provide sufficient studies to compare the ΔTHM4 estimates. Therefore, the EPA analyzed the THM4 reductions based on raw-water TOC.

The TOC and THM4 formation potential reductions data from the ICR TSD were modeled with a logistic equation using results from 182 pilot plant/RSSCT studies. The EPA fit the logistic function parameters for each EBCT and did not consider feed water quality parameters. Results were categorized by TOC level and source water type. Further subdivision of these or additional categories would have resulted in very small numbers of systems in bins and some bins not being filled (see Appendix I Table I-1 for example of "disinfection type" added as a category). The model calculated individual system TOC removal for the EBCT and results were averaged for each subset of systems for the GAC replacement interval. The model was not intended to simulate the dynamics of TOC removal by GAC or the formation of THM4, but it simulated the TOC ranges within the pilot/RSSCT studies and the changes in THM4 due to the reduction in TOC observed in the ICR TSD. The EPA used Python to individually fit data from each pilot or RSSCT study in the ICR TSD to a logistic equation and the performance was then averaged. Additional details on the data model are included in Appendix I.

To conservatively estimate national scale THM4 reduction due to GAC treatment to reduce levels of PFAS compounds, the EPA chose a 2-year GAC replacement time. The EPA assumes that this is the longest amount of time before replacement would be required and percent removals are approximately at their long-term removal level with minimal further changes. The PFAS NPDWR will likely result in some systems replacing GAC media more frequently than 2 years, which the EPA expects would result in a greater average TOC reduction since TOC removal decreases over time with GAC treatment (see Figure 6-11 and Figure 6-12 for ground water and surface water respectively). The overall trends seen in Figure 6-11 and Figure 6-12 show greatest TOC removal in the first 200 days of use, after which the predicted TOC removal becomes consistent for ground water with 26.9 percent (EBCT 20 min) and surface water with 37.5 percent (EBCT 20 min).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



Abbreviations: TOC – total organic carbon; GAC – granular activated carbon; EBCT – empty bed contact times.
Notes:
Pink shaded area represents ±1 standard deviation for ground water TOC with a GAC EBCT of 10 min
Gray shaded area represents ±1 standard deviation for ground water TOC with a GAC EBCT of 20 min

**Figure 6-11: Estimated TOC Percent Removal in Ground Water Using GAC Based on Logistic Equation Model**

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                          APRIL 2024



Abbreviations: TOC – total organic carbon; GAC – granular activated carbon; EBCT – empty bed contact time.
Notes:
Pink shaded area represents ±1 standard deviation for surface water TOC with a GAC EBCT of 10 min
Gray shaded area represents ±1 standard deviation for surface water TOC with a GAC EBCT of 20 min

**Figure 6-12: Estimated TOC Percent Removal in Surface Water Using GAC Based on Logistic Equation Model**

To estimate the TOC reduction, the ICR TSD pilot/RSSCT studies (n = 182) were partitioned into five potential bins based on TOC concentrations in raw water (Very Low ≤1 mg/L, Low >1 to ≤2 mg/L TOC, Mid >2 to ≤3.5mg/L, High-Mid >3.5 to ≤5mg/L, High TOC >5mg/L TOC). There were no systems in the ICR TSD that fell into very low TOC bin. Based on the logistic equation for TOC reduction, higher raw water TOC concentrations yield greater TOC reductions (in absolute value) following GAC treatment. Table 6-37 shows the TOC reduction for all waters (both ground water and surface water) for a 20 min EBCT.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

**Table 6-37: TOC Reduction for All Waters (Both Surface Water and Ground Water) with GAC EBCT of 20 Min and a 2-year Replacement Time**

| TOC Bin | Number of Studies in GAC Treatment Dataset | TOC Reduction ± 1-Standard Deviation (%) | TOC Reduction (mg/L) |
|---|---|---|---|
| TOC 1–2 mg/L | 20 | 41.9 ± 23.2 | 0.75 ± 0.39 |
| TOC 2–3.5 mg/L | 103 | 37.1 ± 11.6 | 1.06 ± 0.36 |
| TOC 3.5–5 mg/L | 44 | 32.0 ± 9.6 | 1.31 ± 0.39 |
| TOC above 5mg/L | 15 | 26.3 ± 14.2 | 1.83 ± 0.91 |

Abbreviations: TOC – total organic carbon; GAC – granular activated carbon; EBCT – empty bed contact time.
Note: The model calculated individual system TOC removal and results were averaged for each influent TOC bin for a two-year GAC replacement interval and the standard deviation was calculated for each subset average.

Using the same raw water TOC bins, the EPA estimated national scale ΔTHM4 values resulting from GAC treatment. The selected ΔTHM4 estimate was based on a conservative approach (mean concentration minus one standard deviation), since the DBP ICR systems included in the treatment studies were "challenged systems" (i.e., systems that had difficulty meeting regulatory compliance requirements) that may experience increased TOC reduction due to GAC installation.

The analysis here assumes operation of GAC with a replacement interval of 730 days (2 years). Although some systems will operate with longer replacement intervals, after 730 days, the modeled TOC reduction due to GAC shows consistent removal when further extending the replacement interval (Figure 6-11 and Figure 6-12). While systems may replace GAC at shorter time intervals, the 2-year replacement assumption also approximates blended systems (i.e., multiple GAC treatment trains in parallel with varying replacement intervals) and TOC long term removal by adsorption since GAC treatment for PFAS uses adsorption rather than biodegradation (Kempisty et al., 2022). Therefore, the estimated TOC reduction at 730 days should also be representative for systems with longer replacement intervals or systems with intermittent use. If GAC replacement occurred more frequently due to PFAS treatment needs, higher average TOC removal would occur, resulting in greater THM4 reduction as shown in the 6-month GAC replacement time-steps (1/2, 1, 1 ½, and 2 years) shown in Appendix I (Tables I-2, I-3, I-4, and I-5). Using the longer replacement time of 2 years is consistent with the EPA's conservative approach to estimating ΔTHM4 even when the presence of PFAS compounds and other source water conditions may affect GAC replacement frequency.

Based on common treatment designs, the EPA expects GAC treatment parameters for PFAS removal to be 20 min EBCTs (U.S. EPA, 2024i). Table 6-38 and Table 6-39 provide estimates of THM4 reductions in the modeled 182 pilot/RSSCT systems considering a 20 min EBCT broken out by surface water versus ground water. The number of GAC systems included in each TOC bin is provided along with the average ΔTHM4 and the "conservative" ΔTHM4 (defined as average ΔTHM4 minus 1-standard deviation) with a GAC replacement time of 2 years.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-38: Estimation of ΔTHM4 in Surface Water with a 20 Min EBCT, and a 2-year GAC Replacement Time**

| Raw Water TOC Bin | Number of Studies in GAC Treatment Dataset | Average ΔTHM4 ± 1-Standard Deviation (μg/L) | Conservative ΔTHM4 (μg/L) |
|---|---|---|---|
| TOC 1–2 mg/L | 12 | 14.23 ± 7.34 | 6.9 |
| TOC 2–3.5 mg/L | 89 | 31.54 ± 24.02 | 7.5 |
| TOC 3.5–5 mg/L | 37 | 48.55 ± 31.81 | 16.7 |
| TOC above 5mg/L | 7 | 67.2 ± 18.3 | 48.9 |

Abbreviations: EBCT – empty bed contact time; TOC – total organic carbon; THM4 – four regulated trihalomethanes; GAC – granular activated carbon.

**Table 6-39: Estimation of ΔTHM4 in Ground Water with a 20 Min EBCT, and a 2-year GAC Replacement Time**

| Raw Water TOC Bin | Number of Studies in GAC Treatment Dataset | Average ΔTHM4 ± 1-Standard Deviation (μg/L) | Conservative ΔTHM4 (μg/L) |
|---|---|---|---|
| TOC 1–2 mg/L | 8 | 15.14 ± 8.98 | 6.2 |
| TOC 2–3.5 mg/L | 14 | 22.02 ± 17.48 | 4.5 |
| TOC 3.5–5 mg/L | 7 | 27.46 ± 8.33 | 19.1 |
| TOC above 5 mg/L | 8 | 56.66 ± 38.69 | 18.0 |

Abbreviations: EBCT – empty bed contact time; TOC – total organic carbon; THM4 – four regulated trihalomethanes; GAC – granular activated carbon.

For the Low (1–2 mg/L), Mid (2–3.5 mg/L), and High-Mid (3.5–5 mg/L) TOC bins, the conservative ΔTHM4 estimates were reasonable compared to the mean concentrations reported into the SYR4 baseline occurrence data. Conservative ΔTHM4 estimates in the High TOC bin (>5 mg/L) were higher due to the greater reduction in TOC. For the THM4 reduction observed in the High TOC bin (>5 mg/L), the conservative THM4 reduction estimates were higher due to the greater reduction in TOC and may not be plausible based on the baseline occurrence information and if it is assumed that all systems are currently in compliance (THM4 <80 μg/L). However, based on SDWIS/Fed violations, not all systems are currently in compliance with the Stage 2 DBP Rule. The EPA assumes that these larger ΔTHM4 estimates would be observed only in the 90th percentile of TOC data. Ground water systems in the High TOC bin may also be mischaracterized during the ICR TSD and should be more accurately described as GWUDI of surface water (Brunke & Gonser, 1997; Chin & Qi, 2000). The GWUDI provisions of the 1989 Surface Water Treatment Rule instituted the concept of ground water that is so closely connected to surface water that public water supply wells should be regulated as surface water rather than as ground water (U.S. EPA, 1989). If one or more ground water systems were mischaracterized, then this could overestimate the ΔTHM4 estimate since these systems make act more like a surface water system in terms of TOC removal.

Since these conservative ΔTHM4 estimates were based on the longest assumed time period for GAC use (i.e., GAC replacement time) in the current regulatory options, the EPA assumes that the estimated ΔTHM4 values are conservative, considering that shorter replacement times would increase the average TOC removal during that operation time.

Since these surface water and ground water systems have already been identified as "challenged" in the ICR TSD (pre-Stage 1 and Stage 2 DBP Rules), this indicates the specific advantages of using GAC to reduce THM4 precursors in comparison to conventional treatment (i.e., coagulation/flocculation followed by sedimentation and filtration). When GAC treatment is used for additional contaminant removal such as PFAS, TOC reduction benefits will also be observed. Since there is a lack of PFAS and TOC co-removal data, the ICR TSD can provide the largest dataset on TOC reduction and THM4 formation changes in drinking water to provide a national estimate of ΔTHM4.

The limitations and uncertainties for using this method to quantify ΔTHM4 due to GAC treatment for PFAS are listed in Section 6.8. One major limitation of using the ICR TSD was that this dataset only used chlorine as a disinfectant and does not capture THM reduction in chloraminating systems. This limitation may lead to an overestimate of THMs formed in systems that used chloramines in the distribution system since THM4 can continue to form within the distribution system and formation tends to be lower when chloramines are used in comparison to free chlorine (Hua & Reckhow, 2008). Most chlorinating systems use free chlorine as a primary disinfectant followed by the addition of ammonia to form chloramines for the secondary disinfectant. Of the 9,838 ground water EPs to distribution systems included in UCMR 3, chlorine disinfection was used 8.8 times more often than chloramine (n = 7,881 for chlorine exclusively and n = 896 for chloramines or both chlorine and chloramines) (U.S. EPA, 2016g). For the 3,179 surface water EPs to distribution systems in UCMR 3, chlorine was used 1.9 times more than chloramine (n = 1,648 for chlorine exclusively and n = 879 for chloramines or both chlorine and chloramines) (U.S. EPA, 2016g).

By assuming the use of free chlorine only, the estimates of ΔTHM4 from pilot/RSSCTs studies may provide an overestimation when factoring in use of both free chlorine and chloramines. Thus, using the conservative free chlorine THM4 formation potential (average ΔTHM4 minus 1-standard deviation) rather than the average ΔTHM4, the EPA attempted to address the overestimation and provide a reasonable national estimate of ΔTHM4.

In a separate DBP formation study under the ICR TSD, individual DBP formation conditions were selected to represent simulated distribution systems for each individual plant that accounted for the disinfectant differences (i.e., chlorine versus chloramine) by using only chlorine as the disinfectant and varying the reaction times. The simulated distribution system studies were not included in the estimated ΔTHM4 provided in this document since including them would have further increased the uncertainty error for systems using chloramine due to the longer reaction times.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 6.7.1.3.2 Trihalomethane Reduction Comparison to Fourth Six-Year Review PFAS Plants with GAC Treatment

The EPA compared ΔTHM4 estimates from the ICR TSD to the SYR4 data for PFAS-associated plants that have installed GAC. The objective of this analysis was to compare the ICR TSD modeled predictions of ΔTHM4 to the observed ΔTHM4 concentrations from PWSs that installed GAC for PFAS treatment.

The EPA identified systems that had detectable levels of PFOA and/or PFOS in UCMR 3. Subsequently, the EPA used UCMR 4 data to identify which systems indicated use of GAC treatment. Finally, the EPA used CCRs for all systems that detected PFAS and specified GAC treatment for PFAS to approximate the year that GAC treatment was installed and the purpose for installation. While this approach limited the number of systems available for comparison (n = 7), it allowed the EPA to pinpoint, approximately, which samples were taken before and after GAC installation. The EPA obtained THM4 compliance monitoring data through the SYR4 ICR, based on data collected between 2012 and 2019. The EPA calculated the ΔTHM4 values based on observed THM4 levels before and after GAC installation.

The EPA identified plants using the following criteria (see Table 6-40):

1. Detectable level of PFAS in UCMR 3 (i.e., detections of PFOA and/or PFOS above their respective MRL values).
2. GAC installed as indicated in UCMR 4 and confirmed for PFAS treatment by using CCR information.
3. Ability to identify the year GAC was installed using CCR information.
4. THM4 data available from SYR4 (CCR THM4 data were used as an alternative when SYR4 data were unavailable).

**Table 6-40: Selected Distribution Systems from SYR4 Based on Outlined Criteria**

| PWSID | Source Water Type | Disinfectant Type | Year GAC Began |
|---|---|---|---|
| AL0000577 | Surface Water | Free Chlorine[a] | 2018 |
| AL0001092 | Surface Water | Free Chlorine, Chlorine Dioxide | 2016 |
| AZ0407046 | Ground Water | Free Chlorine | 2017 |
| MI0005370 | Surface Water | Free Chlorine | 2018 |
| NY3503549 | Surface Water | Free Chlorine | 2018 |
| OH2903412 | Ground Water | Free Chlorine | 2017 |
| PA1090069 | Ground Water | Free Chlorine | 2017 |

Abbreviations: PWSID – public water system identifier; SYR – Six-Year Review; GAC – granular activated carbon.
Note:
[a]Free chlorine includes gaseous chlorine, offsite generated hypochlorite, or onsite generated hypochlorite.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The EPA chose sampling years to represent conditions before and after GAC treatment based on the following criteria:

- If source water type was surface water, used one year before and one year after the year in which GAC treatment began.

- If source water type was ground water, used two years before and two years after the year in which GAC treatment began. Since ground water plants have fewer samples, this was done to offset the lower sample number. (Note that ground water quality typically has fewer fluctuations than surface water quality, so the EPA expects fewer changes in year-to-year data for ground water systems.)

The EPA extracted and matched sampling point IDs for the years that represent before and after GAC treatment (see Appendix I). Only sampling point IDs with the same number of samples for before and after GAC treatment were used to determine THM4 averages. The seasonality and quantity of samples were considered, and the EPA found that samples were taken consistently and remained at the same frequency throughout the years selected to represent before and after GAC treatment.

The EPA calculated ΔTHM4 concentrations for each system at matched sampling point locations using THM4 data collected before and after GAC installation. The EPA also estimated ΔTHM4 concentrations at the broader plant level by aggregating all THM4 locational sampling data collected before and after GAC installation (see Table 6-41).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

**Table 6-41: Information on Selected Distribution System and Corresponding ΔTHM4 Values**

| PWSID | Source Water Type | Disinfectant Type | Sampling Point ID[a] | Average THM4 (Before) (µg/L) | Average THM4 (After) (µg/L) | ΔTHM4 (µg/L)[b] | Average ΔTHM4 (µg/L)[c] |
|---|---|---|---|---|---|---|---|
| AL0000577 | Surface Water | Free Chlorine | 12975 | 16.5 | 10.9 | 5.7 | 9.8 |
| AL0001092 | Surface Water | Free Chlorine, Chlorine Dioxide | 23592 | 16.6 | 6.4 | 10.2 | 15.7 |
| AZ0407046 | Ground Water | Free Chlorine | 33997 | 28.8 | 21.6 | 7.3 | 4.8 |
| MI0005370 | Surface Water | Free Chlorine | CCR | 84.9 | 66.4 | 18.5 | 18.5 |
| NY3503549 | Surface Water | Free Chlorine | 334940 | 39.1 | 7.6 | 31.5 | 31.5 |
| OH2903412 | Ground Water | Free Chlorine | 541452 | 8.9 | 7.0 | 1.9 | -4.1 |
| PA1090069 | Ground Water | Free Chlorine | 892902 | 21.0 | 21.3 | -0.3 | -10.7 |

Abbreviations: THM4 – four regulated trihalomethanes.
Notes:
[a]Sampling point IDs that have a sampling point type of EP were used when available. When unavailable, the first listed sampling point ID was used.
[b]ΔTHM4 = THM4 Average (Before) – THM4 Average (After).
[c]Average delta of pairwise changes in THM4 for each location in the entire distribution system.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Based on available data, the EBCT for the seven plants from SYR4 is unknown. The EPA used TOC values from SYR4 when available and used CCR TOC data as an alternative when TOC data were missing from SYR4. TOC values for SYR4 ground water plants were missing from the SYR4 dataset and corresponding CCRs, and due to this limitation, the EPA did not use raw water TOC bins, but instead used a range of ΔTHM4 values for comparison between SYR4 and ICR TSD.

The EPA compared ΔTHM4 values from the SYR4 to the ICR TSD dataset conservative approach (see Table 6-42). Among SYR4 ground water plants, ΔTHM4 values ranged from -10.7 µg/L to 4.8 µg/L. ICR TSD ground water ΔTHM4 values ranged from 3.5 µg/L to 67.2 µg/L. SYR4 ground water averages were between -7.2 µg/L to 62.4 µg/L lower than ICR TSD surface water averages.

**Table 6-42: Comparison Between ICR TSD Conservative ΔTHM4 and SYR4 ΔTHM4 for Surface Water Systems**

| Raw Water TOC Bin[a] | Surface Water | | |
|---|---|---|---|
| | ICR TSD Conservative ΔTHM4 (µg/L) | PWSID | SYR4 ΔTHM4 (µg/L)[b] |
| TOC 0-1 mg/L | No available data | AL0000577, AL0001092 | 5.7, 15.7 |
| TOC 1-2 mg/L | 6.9 | NY3503549 | 31.5 |
| TOC 2-3.5 mg/L | 7.5 | MI0005370 | 18.5 |
| TOC 3.5-5 mg/L | 16.7 | No available data | No available data |
| TOC >5 mg/L | 48.9 | No available data | No available data |

Abbreviations: TOC – total organic carbon; THM4 – four regulated trihalomethanes; ICR – information collection rule; TSD – treatment study database.
Notes:
[a]Three of the seven surface water PWSs had no TOC measurements.[b]20 min EBCT was used to determine best-case and conservative ΔTHM4 values.

Two of the three ground water systems showed increased THM4 formation after the installation of GAC. Possible reasons for increased formation may include source water changes (i.e., increased sediment runoff or spore concentration fluctuations in ground water), operational challenges of the GAC treatment, changes to other treatments within the PWS, or changes in retention time within the distribution system. The four surface water systems had ΔTHM4 values ranging from 5.7 to 31.5 µg/L.

Three out of the seven plants had no available TOC data in SYR4 or CCRs. TOC data for the SYR4 THM4 analysis were only available for surface water plants. SYR4 surface water plants with influent TOC concentrations between 1–2 mg/L had an average ΔTHM4 of 31.5 µg/L compared to the ICR TSD conservative ΔTHM4 estimate of 6.9 µg/L. For SYR4 surface water plants with influent TOC concentrations between 2–3.5 mg/L, the EPA observed an average ΔTHM4 of 18.5 µg/L compared to the ICR TSD conservative ΔTHM4 estimate of 7.5 µg/L. Both comparisons of TOC bins for surface water show that the conservative estimates for THM4 reduction are plausible. Note that this finding is based on a small subset of systems (n = 4) and may not be representative of systems nationally.

Due to lack of TOC data for SYR4 ground water plants, the EPA compared ground water plants to the lowest TOC bin (1–2 mg/L) with ICR TSD data available. SYR4 ground water plants had an average ΔTHM4 between ICR TSD ground water plants with influent TOC concentrations between 1–2 mg/L had an average change in THM4 between -10.7 µg/L to 4.8 µg/L compared to the ICR TSD conservative THM4 reduction estimate of 4.5 µg/L. Limitations on the comparison between the ICR TSD ΔTHM4 estimates and the SYR4 THM changes are described in Section 6.8.

## 6.7.2 Estimation of Bladder Cancer Risk Reductions

Evaluation of the expected reductions in bladder cancer risk resulting from treatment of PFAS in drinking water involves five steps listed in Section 6.7.1.1. Section 6.7.1.3.2 provides details on the estimation of changes in THM4, while Section 6.7.2.1 provides details on selecting the changes in THM4 specific to the modeled scenarios.[79]

### 6.7.2.1 Application of Changes in THM4 to PFAS PWSs

The EPA expects PWSs that exceed the PFAS regulatory threshold to consider both treatment and nontreatment options to achieve compliance with the drinking water standard. The EPA assumes that the populations served by systems with EPs expected to install GAC based on the compliance forecast detailed in Section 5.3 will receive the DBP exposure reduction benefits. The EPA notes that other compliance actions included in the compliance forecast could result in DBP exposure reductions, including installation of RO. However, these compliance actions are not included in the DBP benefits analysis because this DBP exposure reduction function is specific to GAC. Switching water sources may or may not result in DBP exposure reductions, therefore the EPA assumed no additional DBP benefits for an estimated percentage of systems that elect this compliance option. Also, the EPA assumed no change in DBP exposure at water systems that install IX, as that treatment technology is not expected to remove a substantial amount of DBP precursors. Finally, the EPA also assumed that PWSs included in this analysis use chlorine only for disinfection and have conventional treatment in place prior to GAC installation.

As described in Section 6.7.1.3, the EPA used the relationship between median raw water TOC levels and changes in THM4 levels estimated in the 1998 DBP ICR to estimate changes in THM4 concentrations in the finished water of PWSs fitted with GAC treatment. The EPA applied changes in THM4 levels to PWS treating for PFAS using the following steps:

1. Identifying the PWSs expected to be triggered into PFAS treatment under various thresholds and the associated PWS populations served by source water type: surface water and ground water;

---

[79] The benefits analyses described herein relied on methodology implemented in R software (R Core Team, 2021) and differ slightly from SafeWater MCBC methods. Specifically, SafeWater performs a set of pre-calculations to maximize computational efficiency and, as such, the order of analytical steps across R and SafeWater models differs. However, results across models are mathematically consistent.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                     APRIL 2024

2. Estimating the TOC levels associated with each source water type, based on median raw water TOC data collected among non-purchased surface water and ground water systems from the 2019 SYR4 dataset; and

3. Identifying the associated THM4 reduction value based on relationships between raw water TOC levels and changes in THM4 levels estimated in the 1998 DBP ICR.

As shown in the Section 6.7.1.3 tables, the EPA estimated changes in THM4 levels that vary based on the following characteristics:

- **Replacement time:** Assumed to be 730 days;

- **EBCT:** 20 min;

- **Source water type**: Surface Water, Ground Water;

- **THM4 change scenario:** Conservative (mean DBP ICR THM4 reduction minus one standard deviation per TOC bin).

For the DBP risk reduction modeling, the EPA focused on the following treatment scenario (See Table 6-38 and Table 6-39):

- **PWS treatment threshold:** PFOA or PFOS mean concentration exceeds threshold defined by regulatory alternatives;

- **EBCT:** 20 min;

- **Source water type:** Surface Water, Ground Water;

- **THM4 change scenario:** Conservative.

As described in Section 2.2.4, the EPA models a scenario where reduced exposures to THM4 begin in 2029. Therefore, the EPA assumed that the population affected by reduced THM4 levels resulting from implementation of GAC treatment is exposed to baseline THM4 levels prior to actions to comply with the rule (i.e., prior to 2029) and to reduced THM4 levels from 2029 through 2105.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 6.7.2.2 Affected Population

Information on PWS attributes required for estimating changes in population-level bladder cancer is obtained from the EPA's 2021 Q4 SDWIS/Fed database (U.S. EPA, 2021h). This information includes data on PWS primary sources of water (e.g., whether a PWS relies primarily on ground water or surface water for their source water), operational status, and population served. Some PWSs have multiple EPs delivering drinking water to the distribution network. As discussed in Section 6.7.2.1, the analysis assumes that PWSs will reduce PFAS levels by fitting individual EPs for either GAC or IX treatment and therefore changes in NOM and THM4 will also be specific to EPs.

Rather than modeling individual locations (e.g., PWS), the EPA evaluates changes in bladder cancer cases among the aggregate population per treatment scenario and source water type that is expected to install GAC treatment to reduce PFAS levels. Because of this aggregate modeling approach, the EPA used national-level population estimates to distribute the SDWIS/Fed populations based on single-year age and sex and to extrapolate the age- and sex-specific populations to future years. Section 5.3 describes the decision tree for GAC technology selection. Appendix B provides additional details on estimation of the affected population.

## 6.7.2.3 Bladder Cancer Exposure-Response Modeling

The relationship between exposure to DBPs, specifically trihalomethanes and other halogenated compounds resulting from water chlorination, and bladder cancer has been the subject of multiple epidemiology studies (Cantor et al., 2010; U.S. EPA, 2016g; NTP, 2018c), meta-analyses (Villanueva et al., 2003; Costet et al., 2011), and a pooled analysis (Villanueva et al., 2004). The EPA used the relationship between THM4 levels and bladder cancer in the Villanueva et al. (2004) study to support the benefits analysis for the Stage 2 DBP Rule[80] which specifically aimed to reduce the potential health risks from DBPs (U.S. EPA, 2005b).

Regli et al. (2015) analyzed the potential lifetime bladder cancer risks associated with increased bromide levels in surface source water resulting in increased THM4 levels in finished water.[81] To account for variable levels of uncertainty across the range of THM4 exposures from the pooled analysis of Villanueva et al. (2004), they derived a weighted mean slope factor from the odds ratios reported in Villanueva et al. (2004). They showed that, while the original analysis deviated from linearity, particularly at low concentrations, the overall pooled exposure-response relationship for THM4 could be well-approximated by a linear slope factor that predicted an incremental lifetime cancer risk of 1 in ten thousand exposed individuals ($10^{-4}$) per 1 µg/L increase in THM4. The linear slope factor developed by Regli et al. (2015) is 0.00427 per 1 µg/L. Using a fixed effects meta-analysis model assumed by Regli et al. (2015), the EPA estimated a 95% confidence interval for the estimated slope of 0.00331–0.00522 per 1 µg/L. This

---

[80] See DBP Rule documentation at https://www.epa.gov/dwreginfo/stage-1-and-stage-2-disinfectants-and-disinfection-byproducts-rules

[81] The Regli et al. (2015) slope factor was utilized in the recently peer-reviewed Weisman et al. (2022) study, which estimates that 8,000 of 79,000 US bladder cancer cases are attributable to bladder cancer. Among other things, the authors found that there is a stronger weight of evidence linking DBPs and bladder cancer since the promulgation of the 2006 Stage 2 DBP regulations and even since publication of Regli et al. (2015).

FINAL RULE                                                       APRIL 2024

slope enables estimation of the changes in the lifetime bladder cancer risk associated with lifetime exposures to reduced THM4 levels:

Equation 18:

$$Odds(x) = Odds(0) \cdot exp(0.00427 * x)$$

Where $Odds(x)$ are the odds of lifetime bladder cancer incidence for an individual exposed to a lifetime average THM4 concentration in residential water supply of $x$ µg/L and $Odds(0)$ are the odds of lifetime bladder cancer in the absence of exposure to THM4 in residential water supply. The relationship (Equation 18) has the advantage of being independent from the baseline THM4 exposure level, which is highly uncertain for most affected individuals due to lack of historical data.

To enable annual bladder cancer risk estimation, the EPA assumed that the relationship (Equation 18) also holds for the cumulative bladder cancer risk and cumulative average exposure to residential water THM4 from birth to a specific age. A person's cumulative THM4 exposure from drinking water by age $a$—denoted by $x_a$—is defined as:

Equation 19:

$$x_a = \frac{1}{a} \sum_{i=0}^{a-1} THM4_i \, , x_0 = 0$$

The EPA estimated the relative risk of bladder cancer by a particular age from a change in average THM4 experienced by this age as follows:

Equation 20:

$$RR(x_a, z_a) = \frac{exp(0.00427 * [x_a - z_a])}{exp(0.00427 * [x_a - z_a]) * LR(z_a) + 1 - LR(z_a)}$$

Where $RR(x_a, z_a)$ is the relative cumulative risk of bladder cancer associated with a change from baseline cumulative exposure $z_a$ to treatment cumulative exposure $x_a$. This calculation requires an estimate of baseline cumulative bladder cancer risk $LR(z_a)$ which is described in Appendix H.

## 6.7.2.4 Estimation of Bladder Cancer Risk Reductions

The EPA estimated changes in annual bladder cancer cases and annual mortality in the bladder cancer population due to estimated reductions in lifetime THM4 exposure using a life table-based approach. This approach was used because (1) annual risk of new bladder cancer should be quantified only among those not already experiencing this chronic condition, and (2) bladder cancer has elevated mortality implications.

The EPA used recurrent life table calculations to estimate a water source type-specific time series of bladder cancer incidence for a population cohort characterized by sex, birth year, and age at the beginning of the PFOA/PFOS evaluation period under the baseline scenario and the GAC regulatory alternative described in Section 6.7.2.1. The estimated risk reduction from lower

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

exposure to DBPs in drinking water is calculated based on changes in THM4 levels used as inputs to the Regli et al. (2015)-based health impact function, as shown in Section 6.7.2.3. The life table analysis accounts for the gradual changes in lifetime exposures to THM4 following implementation of GAC treatment under the regulatory alternative compared to the baseline.[82] Details of the life table calculations are provided in Appendix H. The outputs of the life table calculations are the water source type-specific estimates of the annual change in the number of bladder cancer cases and the annual change in bladder cancer population mortality.

Although the change in THM4 exposure likely affects the risk of developing bladder cancer beyond the end of the analysis period (the majority of cancer cases manifest during the latter half of the average individual life span; Hrudey et al., 2015), the EPA does not capture effects after the end of the period of analysis, 2105. Individuals alive after the end of the period of analysis likely benefit from lower lifetime exposure to THM4. Lifetime health risk model data sources include; the SDWIS/Fed; age- and sex-specific population estimates from the U.S. Census Bureau (U.S. Census Bureau, 2020a); the SEER program database (National Cancer Institute),[83] and the CDC National Center for Health Statistics.[84] Appendix H provides additional detail on the data sources and information used in this analysis as well as baseline bladder cancer statistics. Appendix B provides additional details on the estimation of the affected population.

## 6.7.2.5 Valuation of Bladder Cancer Risk Reductions

The EPA uses the Value of Statistical Life to estimate the benefits of reducing mortality associated with bladder cancer in the affected population. Section 2.2 provides information on updating Value of Statistical Life for inflation and income growth. The EPA uses COI-based valuation to estimate the benefits of reducing morbidity associated with bladder cancer. Specifically, the EPA used bladder cancer treatment-related medical care and opportunity cost[85] estimates from Greco et al. (2019). Table 6-43 shows the original COI estimates from Greco et al. (2019) which were reported in $2010, along with the values updated to $2022 used in this analysis. The EPA further notes that the estimates for non-invasive bladder cancer subtype were used to value local, regional, and unstaged bladder cancer morbidity reductions, while the estimates for the invasive bladder cancer subtype were used to value distant bladder cancer morbidity reductions.[86]

The EPA received public comments on the economic analysis for the proposed rule related to the EPA's use of cost of illness information for morbidity valuation. Specifically, a couple commenters recommended that the EPA use willingness to pay information (instead of cost of illness information) when valuing the costs associated with non-fatal illnesses, stating that

---

[82] As described above, the EPA models THM4 changes under the treatment scenario as being in effect for the years 2024 through 2105, with nonzero THM4 changes first occurring in 2029, the year when all PWS are assumed to comply with PFAS treatment requirements.
[83] For cancer incidence and stage distribution data, the EPA relies on SEER 21 (2009-2018); for cancer survival data, the EPA relies on SEER 18 (2000-2017).
[84] CDC Wonder data on 1999-2019 all-cause and bladder cancer mortality by age and sex.
[85] Opportunity (or indirect) costs modeled by this study were represented by the value of time needed to undergo the cancer treatment, which could otherwise have been dedicated to work or leisure activities.
[86] Local cancer is a malignant cancer confined entirely to the organ where the cancer began. Remote cancer refers to cancer that has grown beyond the original (primary) tumor to nearby lymph nodes or organs and tissues. Distant cancer refers to cancer that has spread from the original (primary) tumor to distant organs or distant lymph nodes; it is also called a distant metastasis. Unstaged cancer is a cancer whose subtype is unknown.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

willingness to pay information better accounts for lost opportunity costs (e.g., lost productivity and pain and suffering) associated with non-fatal illnesses. To better account for these opportunity costs, the EPA used recently available willingness to pay values in a sensitivity analysis for morbidity associated with bladder cancer. The sensitivity analysis results show that when willingness to pay values are used in bladder cancer benefits analysis, morbidity benefits are increased by 19.9 percent. See Appendix O for full details and results on the willingness to pay sensitivity analyses.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                        APRIL 2024

**Table 6-43: Bladder Cancer Morbidity Valuation**

| Bladder Cancer Subtype[a] | Type of Cost | Cost in First Year ($2010)[b] | Cost in Subsequent Years ($2010)[b] | Cost in First Year ($2022)[c] | Cost in Subsequent Years ($2022)[c] |
|---|---|---|---|---|---|
| Non-invasive | Medical care | $9,133 | $916 | $12,851 | $1,289 |
| | Opportunity cost | $4,572 | $24 | $6,212 | $33 |
| | Total cost | $13,705 | $941 | $19,062 | $1,321 |
| Invasive | Medical care | $26,951 | $2,455 | $37,922 | $3,454 |
| | Opportunity cost | $10,513 | $77 | $14,283 | $105 |
| | Total cost | $37,463 | $2,532 | $52,205 | $3,559 |

Notes:

[a]The estimates for non-invasive bladder cancer subtype were used to value local, regional, and unstaged bladder cancer morbidity reductions, while the estimates for the invasive bladder cancer subtype were used to value distant bladder cancer morbidity reductions.

[b]The estimates come from Greco et al. (2019).

[c]To adjust for inflation, the EPA used the U.S. Bureau of Labor Statistics Consumer Price Index for All Urban Consumers: Medical Care Services in U.S. (City Average).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 6.7.3 Results

Table 6-44 to Table 6-47 provide the health effects avoided and valuation associated with bladder cancer.

**Table 6-44: National Bladder Cancer Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, and HFPO-DA MCLs of 10 ppt each and HI of 1) (Million $2022)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal Bladder Cancer Cases Avoided | 5,781.0 | 7,313.0 | 8,912.7 |
| Number of Bladder Cancer-Related Deaths Avoided | 2,029.6 | 2,567.8 | 3,129.9 |
| **Total Annualized Bladder Cancer Benefits (Million $2022)[b,c]** | **$300.64** | **$380.41** | **$463.74** |

Notes: See Appendix P for results presented at 3 and 7 percent discount rates. Quantifiable benefits are increased under final rule table results relative to the other options presented because of modeled PFHxS occurrence, which results in additional quantified benefits from co-removed PFOA and PFOS.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.
[c]When using willingness to pay metrics to monetize morbidity benefits, total annualized bladder cancer benefits are increased by $75.87 million (see Appendix O).

**Table 6-45: National Bladder Cancer Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal Bladder Cancer Cases Avoided | 5,789.3 | 7,312.9 | 8,896.0 |
| Number of Bladder Cancer-Related Deaths Avoided | 2,032.5 | 2,567.8 | 3,123.2 |
| **Total Annualized Bladder Cancer Benefits (Million $2022)[b]** | **$301.06** | **$380.41** | **$462.73** |

Notes: See Appendix P for results presented at 3 and 7 percent discount rates.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-46: National Bladder Cancer Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal Bladder Cancer Cases Avoided | 4,739.4 | 6,034.0 | 7,367.1 |
| Number of Bladder Cancer-Related Deaths Avoided | 1,664.0 | 2,118.7 | 2,587.1 |
| **Total Annualized Bladder Cancer Benefits (Million $2022)[b]** | **$246.48** | **$313.88** | **$383.32** |

Notes: See Appendix P for results presented at 3 and 7 percent discount rates.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized benefits in this table.


**Table 6-47: National Bladder Cancer Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt)**

| Benefits Category | 2% Discount Rate | | |
|---|---|---|---|
| | 5th Percentile[a] | Expected Value | 95th Percentile[a] |
| Number of Non-Fatal Bladder Cancer Cases Avoided | 2,326.9 | 3,087.9 | 3,885.3 |
| Number of Bladder Cancer-Related Deaths Avoided | 816.8 | 1,084.3 | 1,364.3 |
| **Total Annualized Bladder Cancer Benefits (Million $2022)[b]** | **$120.97** | **$160.62** | **$202.14** |

Notes: See Appendix P for results presented at 3 and 7 percent discount rates.
[a]The 5th and 95th percentile range is based on modeled variability and uncertainty. This range does not include the uncertainty described in Table 6-48.
[b]See Table 7-6 for a list of the nonquantifiable benefits, and the potential direction of impact these benefits would have on the estimated monetized total annualized costs in this table.

## 6.8 Limitations and Uncertainties of the Benefits Analysis

This section describes limitations of the quantified benefits analysis, along with uncertainties that could not be modeled quantitatively as part of the national benefits analysis. The sources of uncertainty characterized quantitatively are presented in Section 6.1.2. In the tables below, the EPA summarizes limitations and uncertainties that apply to:

- All quantitative benefits analyses implemented for the final PFAS rule (Table 6-48);

- Application of PK models for blood serum PFAS concentration estimation (Table 6-49);

- Developmental effects (i.e., infant birth weight) modeling (Table 6-50);

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- CVD impacts modeling (Table 6-51);

- RCC impacts modeling (Table 6-52); and

- Modeling of bladder cancer impacts from GAC treatment related THM4 reductions (Table 6-53).

The EPA notes that in most cases it is not possible to judge the extent to which a particular limitation or uncertainty could affect the magnitude of the estimated benefits. Therefore, in each table below, the EPA notes the potential direction of the impact on the quantified benefits (e.g., a source of uncertainty that tends to underestimate quantified benefits indicates expectation for larger quantified benefits) but does not prioritize the entries with respect to the impact magnitude.

**Table 6-48: Limitations and Uncertainties that Apply to Benefits Analyses Considered for the Final PFAS Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| The EPA has quantified benefits for three health endpoints for PFOA (birth weight, CVD, and RCC) and two health endpoints for PFOS (birth weight and CVD). | Underestimate | For various reasons, the EPA has not quantified the benefit of removing PFOA and PFOS from drinking water for most of the health endpoints PFOA and PFOS are expected to impact. See discussion in Section 6.2.2 for more information about these nonquantifiable benefits. |
| The EPA has quantified benefits for one co-removed contaminant group (THM4). | Underestimate | Treatment technologies that remove PFAS can also remove numerous other contaminants, including some other PFAS compounds, additional regulated and unregulated DBPs, heavy metals, organic contaminants, pesticides, among others. These co-removal benefits may be significant, depending on co-occurrence, how many facilities install treatment and which treatment option they select. |
| The EPA has not quantified national benefits for any health endpoint for the PFAS that make up the Hazard Index (PFHxS, PFNA, PFBS, and HFPO-DA). | Underestimate | PFHxS, PFNA, PFBS, and HFPO-DA each have substantial health impacts on multiple health endpoints. However, the effects of PFNA on birth weight are evaluated as part of a sensitivity analysis in Appendix K. |
| The analysis does not explicitly consider changes in PFOA/PFOS and THM4 concentrations for systems that purchase their drinking water from other PWSs. | Uncertain | Many PWSs purchase their primary source water from PWSs that are likely to implement treatment under the rule. The SDWIS/Fed inventory of PWSs includes these systems with their retail populations instead of allocating those populations to the wholesale systems. The MCMC occurrence analysis outputs for the wholesale system and purchasing system may vary from one another, resulting in either an under- or over-estimate of affected population in any iteration. The net effect on total benefits is uncertain. |
| The analysis does not account for populations that consume bottled water as their primary drinking water source. | Uncertain | Studies indicate that between 13 percent and 33 percent of the U.S. population consumes bottled water as their primary drinking water source (Z. Hu et al., 2011; Rosinger et al., 2018; Vieux et al., 2020). The benefits models do not consider these populations. This could result |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE

APRIL 2024

**Table 6-48: Limitations and Uncertainties that Apply to Benefits Analyses Considered for the Final PFAS Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| | | in an overestimate of avoided cases of health effects and associated benefits. However, bottled water consumers can also be CWS customers and may still be exposed to PFAS by using water for cooking etc., and therefore, would benefit from PFAS removal. (U.S. FDA, 2022; Aquafina, 2022). Finally, the benefits may also be underestimated because those using bottled water as a primary drinking water source may switch to CWS supply as a result of the final NPDWR; the EPA did not model this behavioral response and hence the benefits do not account for the potential cost savings to those consuming bottled water at baseline. |
| The analysis considers PFOA/PFOS concentrations from NTNCWSs. | Overestimate | SDWIS/Fed population served estimates for NTNCWSs represent both the population that has regular exposure to the NTNCWS' drinking water (e.g., the employees at a location) and the peak day transient population (e.g., customers) who have infrequent exposure to the NTNCWS' drinking water. Estimating the demographic distribution and the share of daily drinking water consumption for these two types of NTNCWS populations would be difficult across many of the industries which operate NTNCWSs. The inclusion of NTNCWS results is an overestimate of benefits because daily drinking water consumption for these populations is also modeled at their residential CWS. |
| The EPA assumes that the effects of PFOA and PFOS exposures are independent. | Uncertain | The exposure-response functions used in benefits analyses assume that the effects of serum PFOA/PFOS on the health outcomes considered are independent and therefore additive. This assumption is consistent with the *Framework for Estimating Noncancer Health Risks Associated with Mixtures of Per- and Polyfluoroalkyl Substances (PFAS)* (U.S. EPA, 2024d). Due to limited evidence, the EPA does not consider synergies or antagonisms in PFOA/PFOS exposure-response. |
| The derivation of PFOA/PFOS exposure-response functions for the relationship between PFOA/PFOS serum and associated health outcomes assumes that there are no threshold serum concentrations below which effects do not occur. | Overestimate | The EPA's *Final Human Health Toxicity Assessments* indicate that the levels at which adverse health effects could occur are much lower than previously understood when the EPA issued the 2016 health advisories for PFOA and PFOS (70 ppt) – including near zero for certain health effects. Therefore, the exposure-response functions used in benefits analyses assume that there are no threshold serum concentrations below which effects do not occur. This could result in a slight overestimate of benefits for noncancer health endpoints. |
| Causality is assumed for all health effects for which exposure-response functions are used to estimate risk. | Overestimate | Analyses evaluating the evidence on the associations between PFAS exposure and health outcomes are ongoing and the EPA has not conclusively determined causality. As described in Section 6.2, the EPA modeled health risks from PFOA/PFOS exposure for endpoints for which the evidence of association was found to be likely. These |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-48: Limitations and Uncertainties that Apply to Benefits Analyses Considered for the Final PFAS Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| | | endpoints include birth weight, TC, and RCC. While the evidence supporting causality between DBP exposure and bladder cancer has increased since the EPA's Stage 2 DBP Rule (NTP, 2021; Weisman et al., 2022), causality has not yet been conclusively determined (Regli et al., 2015). |
| The analysis assumes that quantified benefits categories are additive. | Uncertain | The EPA did not model birth weight, CVD, RCC, and bladder cancer benefits jointly, in a competing risk framework. Therefore, reductions in health risk in a specific benefits category do not influence health risk reductions in another benefits category. For example, lower risk of CVD and associated mortality implies a larger population that could benefit from cancer risk reductions, because cancer incidence grows considerably later in life (see Tables G-3 through G-6 in Appendix G). |
| The scope of the analysis does not include intra- or international migration throughout the evaluation period. | Uncertain | Throughout the analysis period people may migrate from one place to another. If persons migrate to locations with larger decreases in PFOA/PFOS under the regulatory alternative, the EPA would be underestimating the impacts. The opposite is true if persons migrate to locations with smaller decreases in PFOA/PFOS under the regulatory alternative. |
| The analysis does not take into account population growth and other changes in long-term trends. | Underestimate | The benefits analysis does not reflect the effects of growing population that may benefit from reduction in PFOA/PFOS exposure, which is expected to result in underestimated benefits. The EPA uses present-day information on life expectancy, disease, environmental exposure, and other factors, which are likely to change in the future. |
| The analysis does not include the impacts of COVID-19 on future population health and economic growth. | Uncertain | Impacts of the COVID-19 pandemic have had resulting effects on conception, pregnancy, and birth rates (Aassve et al., 2021; McLaren Jr et al., 2021; Ullah et al., 2020). Some studies suggest that the economic recession caused by the COVID-19 pandemic may impose long-term impacts on fertility rates (McLaren Jr et al., 2021; Ullah et al., 2020). Such impacts are not accounted for in this benefits analysis. |
| For PWSs with multiple EPs, the analysis assumes a uniform population distribution across the EPs. | Uncertain | Data on the populations served by each EP are not available and the EPA therefore uniformly distributes system population across EPs. Effects of the regulatory alternative may be greater or smaller than estimated, depending on actual populations served by affected EPs. For one large system serving more than one million customers the EPA has sufficient data on EP flow to proportionally assign effected populations. |
| Valuation of mortality risk reductions assumes that per capita income will grow at the constant rate. | Uncertain | The EPA uses Value of Statistical Life adjusted for income growth to estimate economic value of the premature mortality avoided in the future. Per capita income growth projections were available through 2050. The EPA estimated the compound annual growth rate in per capita |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-48: Limitations and Uncertainties that Apply to Benefits Analyses Considered for the Final PFAS Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| | | income during 2023-2050 and applied it to project Value of Statistical Life over the analysis period 2024-2105. |
| The EPA does not characterize uncertainty associated with the Value of Statistical Life reference value or Value of Statistical Life elasticity. | Uncertain | The EPA did not quantitatively characterize the uncertainty for the Value of Statistical Life reference value and income elasticity. Because the economic value of avoided premature mortality comprises the majority of the overall benefits estimate, not considering uncertainty surrounding the Value of Statistical Life is a limitation. |
| Process wastes are not classified as hazardous. | Underestimate | The national economic analysis reflects the assumption that PFAS-contaminated wastes are not considered RCRA regulatory or characteristic hazardous wastes. The EPA acknowledges that if Federal authorities later determine that PFAS-contaminated wastes require handling as hazardous wastes, there will be additional benefits to public health and the environment from reduced exposures to PFAS that have not been quantified as part of this analysis. |

Abbreviations: COVID-19 – coronavirus disease 2019; CVD – cardiovascular disease; CWS – community water system; DBP – disinfection byproduct; MCLG - maximum contaminant level goal; PFOA – perfluorooctanoic acid; PFOS – perfluorooctane sulfonic acid; PWS – public water system; RCC – renal cell carcinoma; RO – reverse osmosis; UCMR – unregulated contaminant monitoring rule.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

**Table 6-49: Limitations and Uncertainties in the PK Model Application**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| The benefits analysis assumes that there are no reductions in PFOA/PFOS exposure from other sources associated with treatment-related reductions in PFOA/PFOS drinking water concentrations. | Underestimate | Some portion of the non-drinking water PFOA/PFOS exposure could be related to drinking water concentration (e.g., food affected by water contamination). This portion is difficult to estimate, and, depending on the relationship, there may be a time lag between the decrease in drinking water concentration and the decrease in the non-drinking water exposure. |
| The birth weight analysis uses the adult PK model to estimate changes in female serum PFOA/PFOS from changes in drinking water PFOA/PFOS. | Overestimate | Evidence from epidemiology studies connects birth weight to serum PFOA/PFOS levels throughout pregnancy: The serum PFOS-birth weight slope factor in the birth weight benefits module comes from the meta-analysis of 29 studies by Dzierlenga et al. (2020). Table 1 in Dzierlenga et al. (2020) summarizes the timing of the serum samples for the contributing studies, including pre-pregnancy (2 studies), first trimester (6 studies), second trimester (5 studies), third trimester (5 studies), and cord blood samples/delivery (11 studies).[a] The serum PFOA-birth weight slope factor comes from the meta-analysis of 24 studies by Steenland et al. (2018). Steenland et al. (2018) summarizes the timing of the serum samples for the contributing studies, including pre-pregnancy (2 studies), first trimester (4 studies), straddling first and second trimester (1 study), second trimester (2 studies), straddling second and third trimester (2 studies), third trimester (4 studies), and cord blood samples/delivery (9 studies).[b] Because the slope factors included epidemiological evidence throughout pregnancy, a developmental version of the PK model may be a more appropriate choice. A developmental PK model would allow the observed decrease in serum levels that occurs during pregnancy to be captured by accounting for maternal physiological changes. For example, Glynn et al. (2012) found a mean decrease of 16 percent for PFOA and 11 percent for PFOS between serial measurements taken in the 1st trimester and 3rd trimester of pregnancy. This decrease is associated with increases in maternal plasma volume and transfer of the chemicals to the placenta and fetus. The EPA expects that the use of the adult PK model overestimates the additive difference in serum concentrations between baseline and regulatory alternative (and, therefore, the birth weight benefits of the regulatory alternative) because of the expected larger volume of distribution for pregnant females and, therefore, proportionally lower serum concentrations. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctane sulfonic acid; PK – pharmacokinetic.
Notes:
[a]For PFOS, the EPA used 4 high confidence studies (Chu et al., 2020; Sagiv et al., 2018; Starling et al., 2017; and Wikström et al., 2019) with a variety of PFOS exposure measures across the fetal and neonatal window. Sagiv et al. (2018) collected maternal samples in trimester 1, while Wikström et al. (2020) collected them in trimesters 1 and 2. The samples from Starling et al. (2017) were from trimesters 2 and 3, while Chu et al. (2020) collected exclusively in trimester 3. Of these studies, only Sagiv et al. (2018) and Starling et al. (2017) were part of the Dzierlenga et al. (2020) meta-analysis.
[b]For PFOA, the EPA used 5 high confidence studies (Chu et al., 2020; Govarts et al., 2016; Sagiv et al., 2018; Starling et al., 2017; and Wikström et al., 2020) with a variety of PFOA exposure measures across the fetal and neonatal window. Sagiv et al. (2018) collected maternal samples in trimester 1, while Wikström et al. (2020) collected them in trimesters 1 and 2. The samples from Starling et al. (2017) were from trimesters 2 and 3, while Chu et al. (2020) collected exclusively in trimester 3. The samples in the Govarts et al. (2016) study were collected from umbilical cords. None of these studies were part of the Negri et al. (2017) meta-analysis.

**Table 6-50: Limitations and Uncertainties in the Analysis of Birth Weight Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| **Characterizing the Exposed Population** | | |
| The analysis does not consider the effects of PFOA/PFOS exposure on fertility rates. | Uncertain | Studies have shown that exposure to PFAS may lead to reduced fertility rates among women (Fei et al., 2009; Waterfield et al., 2020), while the evidence supporting PFAS effects on the male reproductive system is inconclusive (Cathrine Carlsen Bach et al., 2016; U.S. EPA, 2024e; U.S. EPA, 2024f). The birth weight risk reduction analysis does not account for any potential differences in birth rates among the baseline and treatment scenario due to PFAS-related changes in fertility. |
| The EPA uses state-specific birth rate data, distributed based on census region-level race/ethnicity-specific birth rates, to determine the share of infants born to women of childbearing age at each PWS and within each 100 g birth weight increment. | Uncertain | County-level birth rates from CDC by 100 g birth weight increment are often tagged as "unreliable" by CDC in cases where there are low infant counts per birth weight increment. State-specific 100 g increment-specific birth rates may not reflect the number of infants born in each 100 g birth weight increment in PWS service area that is affected by PFOA/PFOS through the pregnant mother's ingestion of drinking water. Using state-specific birth rates may over- or underestimate the number of infants falling into each 100 g birth weight increment born to mothers who experience PWS specific changes in drinking water PFOA/PFOS levels. This in turn may over- or underestimate benefits associated with changes in PFOA/PFOS levels. |
| The EPA uses state-specific death rate data, distributed based on national-level race/ethnicity-specific infant mortality rates, as the baseline infant mortality rate (i.e., number of deaths per 1,000 births) | Uncertain | State-specific death rates may not reflect the baseline number of infants who die in each PWS that is affected by PFOA/PFOS in mother's drinking water. Using state-specific baseline death rates may over- or underestimate the post-regulation death rates determined using the birth weight-mortality relationship and changes in birth weight, and result in an over- or underestimate of benefits associated with changes in PFOA/PFOS levels. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                      APRIL 2024

**Table 6-50: Limitations and Uncertainties in the Analysis of Birth Weight Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| of infants born to women of childbearing age at each PWS. | | |
| Baseline infant death rates per location are held constant throughout the years of the analysis. | Uncertain | Although changes in infant death rates may not be consistent across race/ethnicity and location in the US, medical advances in infant care will likely reduce infant mortality in future years. |
| The EPA uses county-specific percentages of the population that fall within four race/ethnicity categories (non-Hispanic White, non-Hispanic Black, Hispanic, and other) to separate total PWS-specific populations into race categories for application of the birth weight-mortality marginal effects estimates. | Uncertain | County-specific population percentages may not accurately represent the race/ethnicity makeup of PWS-level populations served. PWS populations served may span multiple counties or may represent a portion of a single county. |
| **Modeling Changes in Health Risks** | | |
| The analysis does not model variability in pregnancy stage-specific serum PFOA/PFOS concentrations and exposure-response relationships. | Overestimate | The studies estimating the link between maternal serum PFOA/PFOS and infant birth weight use serum PFOA/PFOS measurements from various stages of pregnancy. The EPA used a constant, adult PK model-based estimate of serum PFOA/PFOS concentration to represent exposure during pregnancy, which is more consistent with early pregnancy exposures and likely overestimates the reduction in serum PFOA/PFOS exposure later in pregnancy. In a sensitivity analysis (Appendix K), the EPA estimated birth weight benefits using exposure-response functions that evaluated the association between early pregnancy serum PFOA/PFOS and birth weight. The EPA found that using an early pregnancy-based exposure-response function would result in approximately a 60 percent reduction in birth weight benefits. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 6-50: Limitations and Uncertainties in the Analysis of Birth Weight Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| The analysis assumes that birth weight changes resulting from changes in PFAS serum levels will not exceed 200 g. | Underestimate | The EPA places a cap on estimated birth weight changes in excess of 200 g based on existing studies that found that changes to environmental exposures result in relatively modest birth weight changes (Windham & Fenster, 2008; Klein & Lynch, 2018; Kamai et al., 2019). Under the final rule, this birth weight threshold is exceeded in only 0.01 percent of affected infants. |
| **Economic Valuation of Changes in Health Risk** | | |
| Some possible benefits from increased birth weight in infants are omitted from the analysis. | Underestimate | Omitted benefit categories include reduction in IQ loss, special education costs, early intervention costs, and labor market productivity losses associated with specific developmental diseases, among others (National Academies of Sciences, 2023). The EPA's analysis omitted these categories because the available studies documenting relationships between birth weight and non-medical effects either did not identify methods for determining the associated economic burden of such effects or had other limitations such as older (pre-2000s) data, limited geographical coverage, small sample sizes, small ranges of birth weight evaluated, performed outside of the U.S., or lack of statistical significance. See ICF (2021) for additional details. |
| The analysis does not monetize medical treatment costs for infants who die within 1 year of birth. | Underestimate | This limitation likely results in an underestimate of total benefits. The magnitude of this underestimate is likely to be small because the number of infants who do not survive represent a small percentage of the total number of LBW infants. In addition, the medical cost function is based on estimated treatment expenses over a two-year period after birth and thus the EPA would have to scale down medical costs to account for the distribution of infant death timing within 1-year (e.g., within 28 days of birth or 3 months). Based on the 2016-2018 NCHS/NVSS data, approximately 50 percent of LBW infant deaths occur within the first 28 days of birth. Thus, it is likely that only a small portion of medical costs from Klein et al. (2018) is applicable to infants who die within 1 year of birth. |
| Simulated medical cost changes from Klein and Lynch (2018) do not reflect | Uncertain | Preliminary modeling indicates that reductions in PFOA/PFOS concentrations based on the regulatory alternatives may lead to birth weight changes greater |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                 APRIL 2024

**Table 6-50: Limitations and Uncertainties in the Analysis of Birth Weight Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| birth weight changes greater than 100 g. | | than 100 g. Although the EPA caps birth weight change estimates at 200 g, the EPA uses the COI estimates associated with a 100 g change in birth weight for all birth weight changes between 100 and 200 g to avoid extrapolation outside of the data range. |

Abbreviations: CDC – Centers for Disease Control and Prevention; COI – cost of illness; g – gram; LBW – low birth weight; NCHS – National Center for Health Statistics; NTNCWS - non-transient non-community water system; NVSS – National Vital Statistics System; PFAS – per-and polyfluoroalkyl substances; PFOA – perfluorooctanoic acid; PFOS – perfluorooctane sulfonic acid; PWS – public water system; SDWIS/Fed - Safe Drinking Water Information System Federal Version.

**Table 6-51: Limitations and Uncertainties in the Analysis of CVD Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| **Characterizing the Exposed Population** | | |
| The analysis uses national-level estimates of CVD prevalence and incidence rates, life tables, and ASCVD model inputs (e.g., prevalence of treated and untreated hypertension, diabetes, smoking). | Uncertain | Using national-level baseline health data may over- or underestimate the effects of regulatory alternatives on CVD morbidity and mortality overall and in specific PWSs. |
| The effects of statin use on changes in CVD risk were not modeled in this analysis. | Uncertain | Because statin medications lower LDLC, statin use may impact the relationship between serum PFOA/PFOS levels and TC and, ultimately, the estimated changes in CVD risk. The EPA did not model population variability with respect to this factor for two reasons. First, as described in Appendix F, not all studies modeling serum PFOA/PFOS levels and TC consider and/or control for statin use. Exclusion of persons who rely on statins for LDLC control from the modeled population would underestimate CVD benefits if serum PFOA/PFOS-TC effect represents an average across statin user and non-user groups. Second, there are challenges in estimating statin use prevalence. Depending on age, sex, race/ethnicity, and disease status, approximately 20 percent-40 percent of the U.S. population relies on statins (Robinson & Booth, 2010). Factors such as overt CVD, healthcare, and demographics are significantly associated with statin use (Leino et al., 2020; Electricwala et al., 2020). While statin therapy is intended to be permanent, many individuals who are prescribed statins take them irregularly (Colantonio, 2019; Lewey et al., 2013; Ellis et al., 2004; Goldstein et al., 2016; Toth et al., 2019); Toth |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 6-51: Limitations and Uncertainties in the Analysis of CVD Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| | | et al. (2019) found a <25 percent rate of adherence 5 years after initiation of therapy. |
| **Modeling Changes in Health Risks** | | |
| The analysis assumes that there is no lag between changes in serum PFOA/PFOS concentrations and changes in TC and BP. Likewise, the analysis assumes that there is no lag between changes in TC/BP and changes in CVD risk. | Overestimate | The studies estimating the link between serum PFOA/PFOS and TC/BP and the ASCVD model are not dynamic, and hence do not provide insights into whether TC/BP may respond gradually to changes in serum PFOA/PFOS and/or if CVD risk may respond gradually to changes in TC/BP. The analysis assumes immediate adjustment, which may overestimate impacts to the exposed population. Note, however, that reductions in TC/BP and CVD risk do not instantaneously follow the reductions in PFOA/PFOS drinking water concentrations, because the reductions in serum PFOA/PFOS are gradual, as predicted by the PK model. |
| The derivation of PFOA/PFOS exposure-response functions for the relationship between PFOA/PFOS serum and TC levels assumes that the studies used in the meta-analysis represent the PFOA/PFOS effects on serum TC levels in general population adults. | Uncertain | The exposure-response function was developed based on six general population studies reporting linear serum PFAS-TC level associations. Four of these studies were high quality as reflected by the lower risk of bias evaluations. These studies may not capture all possible relationships between PFOA/PFOS and serum TC levels. |
| The analysis excludes exposure-response relationships between serum PFOA/PFOS and HDLC. | Uncertain | The relationship between serum PFOA/PFOS and HDLC is uncertain. As shown in Section 6.5.2 and Appendix F, the meta-analysis-based estimate of the effect of serum PFOA/PFOS on HDLC concentration is positive but not statistically significant. Single-study analyses of this relationship have generated both positive (Dong et al. (2019) serum PFOS-HDLC relationship) and inverse (Dong et al. (2019) serum PFOA-HDLC relationship, Lin et al. (2019) serum PFOA-HDLC and serum PFOS-HDLC relationship) effect estimates that were not statistically significant. To better understand the impact of incorporating HDLC in the CVD risk model, the EPA has implemented a sensitivity analysis (see details in Appendix K). The EPA found that, using the meta-analysis results, inclusion of HDLC would decrease benefits by approximately 23-25%. |
| The analysis assumes that the CVD risk impact of changes in TC/BP from reductions in serum PFOA/PFOS is the same as the CVD risk impact of changes in these | Uncertain | While the CVD risk impacts of changes in TC/BP from behavioral and medical interventions is well documented (Lloyd-Jones et al., 2017), there is no information on whether changes in serum PFOS/PFOA leading to changes in these biomarkers would result in similar outcomes. |

FINAL RULE                                                                                    APRIL 2024

**Table 6-51: Limitations and Uncertainties in the Analysis of CVD Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| biomarkers due to other reasons such as behavioral changes or medication. | | |
| The CVD risk analysis assumes that person's TC/BP level history does not have an impact on changes in CVD risk due to changes in the levels of these biomarkers. | Uncertain | The ASCVD model links TC/BP levels at the start of the 10-year follow-up period to first hard CVD event incidence during the follow-up period. The modeling does not account for TC/BP changes over time, which could have an impact on the CVD event risk. |
| The ASCVD model was not recalibrated for the contemporary CVD incidence and prevalence. | Overestimate | Assessments of ASCVD risk model performance across different sociodemographic subgroups (Asian populations, Hispanic populations, persons with high levels of CVD risk, diabetes, older adults with frailty and multimorbidity, smokers, and women) indicated that the model tended to overestimate risk but suggested that the model may improve through additional input variables and recalibration given contemporary CVD incidence and prevalence (Mora et al., 2018; Muntner et al., 2014). |
| The analysis uses the ASCVD model developed for non-Hispanic Black populations to assess potential CVD risks for race/ethnicity groups other than non-Hispanic Black and non-Hispanic White populations. | Uncertain | The ASCVD model documentation encourages the use of equations for non-Hispanic White populations for other race/ethnicity categories, specifying that estimated risks may be biased upward, especially for Hispanic and Asian American populations. The EPA's model validation analysis detailed in Appendix G shows that the non-Hispanic Black model is a better fit for these race/ethnicity groups. However, the ultimate impact of this assumption is uncertain. |
| The EPA uses the fraction of the population who smokes and has diabetes as inputs into the ASCVD model. | Underestimate | The ASCVD model uses binary values to indicate whether a person is a current smoker or has diabetes. The EPA simplifies calculations by using the fraction of the population who smokes and has diabetes as inputs to the ASCVD model. The EPA has implemented a targeted evaluation of the effect of this assumption and confirmed that this simplification likely underestimates impacts by approximately 5 percent to 10 percent, depending on the age group, due to the non-linearity of the estimated model. |
| The analysis assumes that the threshold for high BP is a systolic/diastolic measurement of 140/90. | Underestimate | In November 2017, the threshold defined for high BP was reduced to 130/80 (Whelton et al., 2018). The analysis relies on high BP prevalence data and treated, untreated, and normal BP measurements that are based on NHANES surveys from 2011 to 2016. Therefore, the EPA adheres to the pre-2017 threshold. Furthermore, the ASCVD model was developed prior to the change in high BP definition. Adhering to the pre-2017 threshold may affect the number of people sorted into the high BP population category, potentially underestimating CVD risk. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                          APRIL 2024

**Table 6-51: Limitations and Uncertainties in the Analysis of CVD Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| The analysis assumes independence among the prevalence of high BP, smoking, and diabetes. | Overestimate | Smoking and high BP are often related, and smoking is a risk factor for Type 2 diabetes. Assuming independence among the prevalence of high BP, smoking, and diabetes may result in overestimated CVD risk impacts. |
| The analysis assumes that deaths from causes other than hard CVD events occur first. | Underestimate | By assuming that deaths from causes other than hard CVD events occur first, the EPA underestimates the eligible population (e.g., population without CVD history) evaluated for the first hard CVD event estimation. |
| The analysis does not account for survivors of first hard CVD events that are neither MI nor IS. The analysis does not account for persons who were younger than 40 years at the time of their first hard CVD event. | Underestimate | The ASCVD model captures risk of non-fatal MI, non-fatal IS, and fatal CVD; however, it does not capture other non-fatal CHD. The ASCVD model can be used to predict the annual probability of a first hard CVD event for persons aged 40–89 years; the EPA applied this model to populations aged 40 years and older. The prevalence of CVD history before age 40 is low (<7% based on estimates from the Medical Expenditure Panel Survey) and likely includes persons whose CVD arises from genetic factors (Zhang et al., 2019). Early life PFAS exposures and TC are inconclusively associated for PFOA and positively associated for PFOS (U.S. EPA, 2024e; U.S. EPA, 2024f). TC later in life is highly positively correlated with early TC as seen in Pletcher et al. (2016) and Zhang et al. (2019). This analysis does not directly capture effects of early life increases in TC due to PFAS exposures. The analysis does capture the effects of early life TC indirectly to the extent that early and later in life TC levels are correlated. |
| The analysis does not capture post-acute CVD mortality beyond 5 years of the first MI or IS for those ages 40–65 at the time of the initial event nor does it capture post-acute CVD mortality beyond 6 years of the first MI or IS for those ages 66–89 at the time of the initial event. | Underestimate | The risk of post-acute CVD mortality was estimated based on Thom et al. (2001) for those aged 40–65 years and on S. Li et al. (2019) for those older than 65 years. Neither study reported post-acute mortality information for a longer follow-up period. The reported information does not support complete post-acute mortality risk elimination beyond the longest follow-up period. The EPA did not identify U.S. population-based MI/IS survivor studies that had a longer follow-up time and, thus, has no reliable quantitative basis to estimate post-acute mortality impacts beyond 6 years of the initial event. |
| The analysis assumes that post-acute CVD mortality for survivors of IS at ages 40–65 is the same as post-acute CVD mortality for survivors of MI at ages 40–65. | Uncertain | Post-acute mortality estimates for IS and MI were very close in the Medicare population (S. Li et al., 2019). For those aged 65 years or older, S. Li et al. (2019) have estimated the probability of death within 1 year after non-fatal IS to be 32.07 percent and the probability of death within 1 year after non-fatal MI to be 32.09 percent. Therefore, reliance on the post-acute mortality for MI to approximate the same for stroke is reasonable. |
| The analysis models the 85 year or older group jointly | Uncertain | The effect of this modeling approximation on the CVD benefits is not certain because the integer age-specific |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-51: Limitations and Uncertainties in the Analysis of CVD Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| and applies average mortality rate for those aged 85 or older in this age group. | | mortality rates may be above or below the average mortality rate. |
| The analysis models the 85 year or older group jointly and uses serum PFOA/PFOS estimates for age 85 in initiate calculations in this age group. | Underestimate | Because the impacts of changes in PFOA/PFOS drinking water concentrations on serum PFOA/PFOS levels increase over time, the use of serum PFOA/PFOS concentrations at 85 years to model the 85 or older age group will underestimate the CVD risk impacts in this group. |
| The analysis applies the ASCVD model to those older than 80 years. | Overestimate | The ASCVD model evaluates first hard CVD event risk for adults aged 40-80. Applying the predicted hard CVD event risk for those aged 80 years or older results in an overestimate of benefits. |
| The EPA does not characterize uncertainty associated with ASCVD model parameters. | Uncertain | The EPA treats the coefficients of the ASCVD risk model as certain. However, uncertainty surrounding race/ethnicity- and sex-specific ASCVD model parameters could be characterized by multivariate normal distribution using the ASCVD model coefficient estimates, and the variance-covariance matrix shared by the ASCVD model authors. Assuming that ASCVD model parameters are certain is a limitation of this analysis. |
| **Economic Valuation of Changes in Health Risk** | | |
| The analysis monetized changes in non-fatal first MI/IS risk using medical expenditures that do not cover long-term institutional or at-home care. Furthermore, the COI estimates do not include lost productivity. Finally, the COI-based approach does not account for the pain and suffering associated with non-fatal CVD events. | Underestimate | This analysis likely understates morbidity benefits since hard CVD events, particularly IS, require a longer rehabilitation period. According to HCUP 2017 data, 65 percent of IS survivors and 33 percent of MI survivors are discharged to a long-term care facility or to a home healthcare setting. Lost productivity impacts are also likely (Cropper & Krupnick, 2000; Skolarus et al., 2014). MI/IS survivors also experience significant reductions in the health-related quality of life (Bach et al., 2011; Kirchberger et al., 2020; Martino Cinnera et al., 2020; Mollon & Bhattacharjee, 2017). |

Abbreviations: ASCVD – Atherosclerotic cardiovascular disease; BP – blood pressure; CVD – cardiovascular disease; HDLC – high-density lipoprotein; IS – ischemic stroke (ICD9 = 433, 434; ICD10 = I63); MI – myocardial infarction (ICD9 = 410; ICD10 = 121); NHANES – National Health and Nutrition Examination Survey; PFOA – perfluorooctanoic acid; PFOS – perfluorooctane sulfonic acid; TC – total cholesterol.

**Table 6-52: Limitations and Uncertainties in the Analysis of RCC Benefits Under the Final Rule**

| Uncertainty/Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| **Characterizing the Exposed Population** | | |
| The analysis uses national-level estimates of kidney cancer incidence, prevalence, stage distribution, and relative survival data, as well as national-level life tables. | Uncertain | Using national-level baseline health data may over- or underestimate the effects of regulatory alternatives on RCC morbidity and mortality in specific PWSs and well as overall. |
| The EPA assumed that RCC comprises 90 percent of kidney cancer incidence. | Uncertain | Because baseline RCC incidence statistics are not readily available from the National Cancer Institute public use data, the EPA used kidney cancer statistics in conjunction with an assumption that RCC comprises 90 percent of all kidney cancer cases to estimate baseline lifetime probability of RCC. This assumption was used in RCC exposure-response modeling by U.S. EPA (2024f). |
| RCC risks are estimated for populations for which reductions in PFOA exposures relative to baseline exposures start at different ages, including children. | Uncertain | The relative cancer potency of PFOA in children is unknown, which may bias benefits estimates either upward or downward. Because RCC incidence in children is very small, we assess any bias to be negligible. |
| **Modeling Changes in Health Risks** | | |
| The analysis assumes that the magnitude of RCC risk reductions resulting from reductions in serum PFOA levels will not exceed a PAF of 3.94 percent. | Uncertain | The EPA placed a cap of 3.94 percent on the magnitude of the estimated cumulative RCC risk reduction resulting from reductions in serum PFOA levels, based on its analysis of PAF values found in the literature on environmental contaminants and cancers (ICF, 2022b). This review found that changes in environmental exposures result in relatively modest PAFs (between 0.2 percent and 17.9%); however, few of the studies provided PAFs related specifically to RCC or kidney cancer. The EPA characterized the uncertainty surrounding this parameter using a log-uniform distribution with a minimum of 0.2 percent and a maximum of 17.9 percent. For the central estimate of RCC benefits, the EPA used a PAF of 3.94 percent, which is the mean of the PAF uncertainty distribution. As such, the EPA assumed that RCC risk reduction estimates in excess of the PAF are unreasonable even as a result of large changes in serum PFOA concentrations. Because this PAF cap is not based on RCC studies specifically, it is uncertain whether the RCC impacts are under- or overestimated. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-52: Limitations and Uncertainties in the Analysis of RCC Benefits Under the Final Rule**

| Uncertainty/Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| The analysis assumes that there is no lag between changes in serum PFOA concentrations and changes in RCC incidence. | Overestimate | The studies estimating the link between serum PFOA and RCC are not dynamic, and hence do not provide insights into whether RCC incidence may respond gradually to changes in serum PFOA. The PK model estimates daily serum levels, which are averaged annually for the purposes of modeling gradual serum changes for the RCC risk reduction analysis. The RCC risk reduction analysis assumes immediate RCC incidence adjustment within each year, which may overestimate impacts to the exposed population. |
| The analysis relies on public-access SEER 18 10-year relative kidney cancer survival data to model mortality patterns in the kidney cancer population. | Uncertain | Reliance on these data generates both a downward and an upward bias. The downward bias is due to the short, 10-year excess mortality follow-up window. Survival rates beyond 10 years following the initial diagnosis are likely to be lower. The upward bias comes from the inability to determine how many of the excess deaths were deaths from kidney cancer. |
| The analysis assumes that RCC incidence patterns and survival are reasonably approximated by the kidney cancer statistics. | Uncertain | The exposure-response function provides information on changes in RCC risk, while detailed race/ethnicity-, sex-, and age-specific cancer incidence, stage, and survival information is available for kidney cancer only. For consistency with the RCC exposure-response modeling (U.S. EPA, 2024f), the EPA assumed that RCC comprises 90 percent of kidney cancer cases. In absence of RCC-specific detailed information, the model relies on patterns based on kidney cancer statistics. |
| The analysis models the 85 years or older group jointly and applies the average mortality rate for those aged 85 or older in this age group. | Uncertain | The effect of this modeling approximation on the RCC benefits is not certain because integer age-specific mortality rates may be above or below the average mortality rate. |
| The analysis models the 85 years or older group jointly and uses serum PFOA estimates for those aged 85 to initiate calculations in this age group. | Underestimate | Because the impacts of changes in PFOA drinking water concentrations on serum PFOA levels increase over time, the use of serum PFOA concentrations at 85 years to model the 85 or older age group will underestimate the RCC risk impacts in this group. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

**Table 6-52: Limitations and Uncertainties in the Analysis of RCC Benefits Under the Final Rule**

| Uncertainty/Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| **Economic Valuation of Changes in Health Risk** | | |
| RCC morbidity valuation is based on medical costs associated with the first line treatment that resulted in the most cost-effective treatment sequences, as reported in Ambavane et al. (2020). | Uncertain | The valuation is biased downward because it does not account for (1) the second line treatments that may also be applied; (2) lost productivity by the person experiencing RCC and family caregivers; and (3) the pain and suffering associated with experiencing RCC and/or adverse effects of RCC treatment. The valuation is biased upward because (1) the full year-specific cancer treatment is assumed to occur prior to the year-specific cancer population death; and (2) the first line treatment may be discontinued prior to the assumed maximum treatment duration of 2 years. The effect of using costs associated with the most cost-effective treatment from Ambavane et al. (2020) rather than costs for treatments currently prevalent in clinical practice is uncertain. The EPA could not assess the impact of this assumption because the EPA is not aware of publicly available information on the frequency of various kidney cancer treatments in the U.S. population. To assess the impact of using a willingness to pay based valuation approach, the EPA performed a sensitivity analysis using willingness to pay values for non-fatal unspecified cancer to value reductions in risk of RCC morbidity (See Appendix O). |

Abbreviations: PFOA – perfluorooctanoic acid; PFOS – perfluorooctane sulfonic acid; PK – pharmacokinetic; RCC – renal cell carcinoma.

**Table 6-53: Limitations and Uncertainties in the Analysis of DBP Quantified Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| **Modeling Reduced THM4 in PWSs** | | |
| Reductions in THM4 formation depend only on the relationship between raw water TOC levels and THM4 levels as estimated in the 1998 DBP ICR. Other source water quality parameters were not modeled. | Uncertain | The EPA assumes that PWSs affected by implementation of PFAS treatment technologies have similar characteristics as those evaluated in the 1998 DBP ICR. Source water parameters and treatments at individual plants may have changed over time. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-53: Limitations and Uncertainties in the Analysis of DBP Quantified Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| The EPA uses available TOC data to estimate reduced THM4 concentration. | Uncertain | Due to the lack of site-specific information on factors affecting THM4 formation at each potentially affected drinking water treatment plant, the EPA uses relationships between TOC levels and changes in THM4 levels among GAC-treating systems from the 1998 DBP ICR and median raw water TOC levels for each source water type from the 2019 SYR4 dataset. Actual changes in THM4 concentrations for a given change in treatment at any specific PWS could be higher or lower than that estimated using the EPA's approach. |
| The EPA assigned TOC values at the system level based on ground water or surface water distributions. | Uncertain | Because the TOC levels for all systems are not available, the EPA used TOC data provided by states in response to the fourth Six-Year Review to derive TOC probability distributions for influent into a PFAS treatment process; one distribution for ground water systems and another for surface water systems. The EPA randomly assigned values from these distributions to each ground water or surface water system, respectively. The actual TOC values may be higher or lower than the assigned values. For systems using GAC for PFAS removal, the corresponding impact would be under-stating or over-stating costs. |
| The EPA estimates THM4 reduction based on free chlorine formation potential but does not estimate the reduction based on chloramine use. | Overestimate | The 1998 DBP ICR TSD provided information for systems that only used free chlorine as a disinfectant and did not capture THM4 reduction in chloraminating systems. This limitation likely leads to an overestimate of THM4 formed in systems that used chloramines in the distribution system because THM4 formation within the distribution system is lower when chloramines are used, compared to when free chlorine is used (Hua & Reckhow, 2008). Based on SYR3 data, 36 percent of surface water systems and 4 percent of ground water systems use chloramination (U.S. EPA, 2016j). Chloramines may produce greater amounts of genotoxic and carcinogenic DBPs, but a reduction in the TOC prior to disinfection will also yield a reduction in DBP formation (Cuthbertson et al., 2019). |

**Table 6-53: Limitations and Uncertainties in the Analysis of DBP Quantified Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| THM4 is assumed to be a surrogate for other chlorination DBPs, some of which are more genotoxic and cytotoxic than THMs. | Uncertain | The EPA's analysis relies on the slope factor from Regli et al. (2015), which links lifetime risk of bladder cancer to THM4 concentrations in finished water. Regli et al. (2015) did not explicitly account for brominated or nitrogenous DBPs, but instead used THM4 as a surrogate for the broad suite of chlorination DBPs. This is consistent with the approach used in numerous epidemiolocal studies (Costet et al., 2011; Freeman et al., 2017) since insufficient data are available to estimate the co-occurrence and co-removal of specific genotoxic or cytotoxic DBPs. |
| The EPA estimates THM4 reduction based on GAC use but does not estimate the reduction in individual THM4 species. | Uncertain | GAC has been shown to shift the speciation among THM4 and can result in a relatively larger fraction of brominated species (THM3) compared to chloroform. However, studies show that even as speciation shifts, the absolute concentrations of each species are reduced (Cuthbertson et al., 2019; L. Wang et al., 2019). |
| The EPA assumed a GAC replacement frequency. | Underestimate | A GAC replacement frequency of 730 days was assumed based on the estimated percent removal of TOC curves (see Figures 6-11 and 6-12). After 730 days of GAC use the modeled TOC removal remained consistent for both ground water and surface water models. If the GAC was replaced more frequently based on PFAS removal needs, then increased average TOC removal would be observed further reducing DBP precursors. |
| The logistic model uses pilot/RSSCT results to predict ΔTHM4. | Overestimate | RSSCTs may overpredict full-scale adsorption capacity of GAC (Kempisty et al., 2022; Zachman & Summers, 2010) |
| **SYR4 Comparison** | | |
| Estimates of reductions in THM4 formation assume that GAC treatment is the only treatment change in a distribution system. | Uncertain | Uncertainty exists if other changes (i.e., new source water, chemical dosing, other treatments added such as pre-chlorination, existing treatments changed such as new filter media) that could have been made in public water systems beyond GAC treatment could potentially over- or underestimate THM4 reduction. |
| The EPA analyzed only systems that were sampled under UCMR 3 and indicated GAC treatment under UCMR 4. | Uncertain | Assessing only UCMR GAC systems limited the sample to PWS serving ≥ 10,000 people. Therefore, the EPA was unable to compare THM4 reduction estimates to measured data for small systems. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-53: Limitations and Uncertainties in the Analysis of DBP Quantified Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| The EPA relied on available CCRs to estimate the GAC treatment start date to determine before and after treatment years. | Uncertain | Available CCRs were used to inform the GAC start date. When CCRs were unavailable, the EPA searched the web to identify information about the timeline of treatment for individual PWSs. While installation dates were found, the exact date for when the GAC systems went into full-scale use was not always specified. |
| The EPA obtained THM4 values from multiple data sources. | Uncertain | For PWSs that met criteria outlined in Section 6.7.1.3.2 but had no THM4 data available in SYR4, the EPA relied on CCR THM4 data. Reporting on THM4 levels is inconsistent across CCRs. If a CCR listed "Amount Detected" instead of the THM4 average, then the EPA used the "Amount Detected" value to represent the THM4 average. |
| **Characterizing the Exposed Population** | | |
| Analysis assumes that systems implementing IX do not accrue benefits associated with bladder cancer risk reductions. | Underestimate | Systems using IX for PFAS removal will also benefit from some TOC removal, but the removal will be limited in comparison to GAC treatment because PFAS-selective IX can show preferential removal of PFAS over organic matter (de Abreu Domingos & da Fonseca, 2018). |
| The analysis does not model location-specific demographics. | Uncertain | Because the EPA models impacts to aggregate populations based on systems triggered into treatment under various scenarios, the EPA relies on national-level demographic and bladder cancer data. The impact of this limitation is uncertain. For instance, populations with a large portion of elderly or male individuals will be more sensitive to changes in THM4 levels due to the high baseline bladder cancer incidence among elderly and male populations, compared to younger and female populations. |
| The analysis does not model variability by race/ethnicity. | Uncertain | Because the EPA models impacts based on a national-level distribution of finished water TOC levels, specific TOC levels at actual PWSs are not available. Therefore, these impacts were not included in the EPA's DBP analysis. Accordingly, the EPA did not pursue race/ethnicity-specific modeling of health risk because it would not provide meaningful insight into distributional effects. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

**Table 6-53: Limitations and Uncertainties in the Analysis of DBP Quantified Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| Bladder cancer risks are estimated for populations for which reductions in THM4 exposures relative to baseline exposures start at different ages, including children. | Uncertain | The relative cancer potency of THM4 in children is unknown, which may bias estimates either upward or downward. Past reviews found no clear evidence that children are at greater risk of adverse effects from bromoform or dibromochloromethane exposure (U.S. EPA, 2005a), although certain modes of action and health effects may be associated with exposure to THM4 during childhood (U.S. EPA, 2016g). Because bladder cancer incidence in children is very small, the EPA assesses any bias to be negligible. |
| **Modeling Changes in Health Risks** | | |
| Analysis assumes an immediate and full reduction in bladder cancer risk following THM4 exposure reduction. | Overestimate | The EPA did not model the transitional dynamics in relative annual risk of bladder cancer following the THM4 exposure reduction. The EPA considered age-specific cohort cumulative exposures to THM4. Therefore, while drinking water concentrations are assumed to be reduced upon compliance with the rulemaking, the changes in cumulative average exposure are much more gradual. The EPA has not identified any studies on bladder cancer-specific risk cessation lag. Regli et al. (2015) do not provide pertinent information; as such, this is a cross-sectional analysis quantifying the relationship between lifetime cancer risk and lifetime average exposure. Existing cancer risk cessation lag studies focused on smoking and arsenic exposure (e.g., Hrubec & McLaughlin, 1997, Hartge et al., 1987, and C. W. Chen & Gibb, 2003); show that, annual cancer risk drops within the first 25 years after exposure cessation, yet it may never reach the annual cancer risk of persons who were always exposed to the treatment contaminant levels. In the EPA's modeling this issue pertains to those alive at the start of the evaluation period who have been exposed to the pre-treatment THM4 levels for a considerable amount of time, such as persons older than 60 years at the start of the evaluation period. This subpopulation comprises approximately 20 percent of the affected population alive in 2023. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                                          APRIL 2024

**Table 6-53: Limitations and Uncertainties in the Analysis of DBP Quantified Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| The analysis relies on public-access SEER 18 10-year relative bladder cancer survival data to model mortality patterns in the bladder cancer population. | Uncertain | Reliance on these data generates both a downward and an upward bias. The downward bias is due to the short, 10-year excess mortality follow-up window. Survival rates beyond 10 years following the initial diagnosis are likely to be lower. The upward bias comes from the inability to determine how many of the excess deaths were deaths from bladder cancer. |
| The relationship from Regli et al. (2015) is a linear approximation of the odds ratios reported in Villanueva et al. (2004). | Uncertain | Given the uncertainty about the historical, location-specific THM4 baselines, Regli et al. (2015) provides a reasonable approximation of the risk. However, depending on the baseline THM4 exposure level, the impact computed based on Regli et al. (2015) may be larger or smaller than the impact computed using the Villanueva et al. (2004)-reported odds ratios directly. |
| The analysis assumes that the magnitude of DBP risk reductions resulting from reductions in serum PFOA levels will not exceed a PAF of 3.94 percent. | Uncertain | The EPA placed a cap of 3.94 percent on the magnitude of the estimated cumulative bladder cancer risk reduction resulting from reductions in THM4 levels, based on its analysis of PAF values found in the literature on environmental contaminants and cancers (ICF, 2022b). This review found that changes in environmental exposures result in relatively modest PAFs (between 0.2 and 17.9 percent); however, few of the studies provided PAFs related specifically to bladder cancer. For the estimate of bladder cancer benefits, the EPA used a PAF of 3.94 percent, which is the mean of the PAF uncertainty distribution. As such, the EPA did not quantify bladder cancer risk reduction estimates in excess of the PAF that are predicted to occur as a result of changes in THM4 concentrations. Because this PAF cap is not based on bladder cancer studies specifically, it is uncertain whether the bladder cancer impacts are under- or overestimated. Because the PAF is rarely binding in the bladder cancer analysis, the influence of PAF uncertainty on the analysis is likely negligible. |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 6-53: Limitations and Uncertainties in the Analysis of DBP Quantified Benefits Under the Final Rule**

| Uncertainty/ Assumption | Effect on Benefits Estimate | Notes |
|---|---|---|
| **Economic Valuation of Changes in Health Risk** | | |
| Bladder cancer morbidity valuation is based on medical costs and indirect/time costs (by cancer stage), as reported in Greco et al. (2019). | Uncertain | The valuation is biased downward because it does not account for (1) lost productivity by the family caregivers and volunteers; (2) broader labor market participation effects for those experiencing bladder cancer and/or providing care; and (3) the pain and suffering associated with experiencing bladder cancer and/or adverse effects of bladder cancer treatment. The valuation is biased upward because (1) the full year-specific cancer treatment is assumed to occur prior to the year-specific cancer population death; and (2) the treatment may be discontinued if it is no longer effective. To assess the impact of using a willingness to pay based valuation approach, the EPA performed a sensitivity analysis using willingness to pay values for non-fatal bladder cancer to value reductions in risk of bladder cancer morbidity (See Appendix O). |

Abbreviations: CCR – consumer confidence reports; DBP – disinfection byproduct; GAC – granular activated carbon; ICR – information collection request; PFAS – per-and polyfluoroalkyl substances; PFOA – perfluorooctanoic acid; PFOS – perfluorooctane sulfonic acid; PWS – public water system; SYR – Six-Year Review; THM4 – four regulated trihalomethanes; TOC – total organic carbon; TSD – treatment study database; UCMR – Unregulated Contaminant Monitoring Rule, PAF – population attributable fraction.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                          APRIL 2024

# 7 Comparison of Costs to Benefits

This chapter provides a comparison of the incremental costs and benefits of the final rule, as described in Chapter 5 and Chapter 6.[87] The incremental cost is the difference between costs that will be incurred if the final rule is enacted over current baseline conditions. Incremental benefits reflect the avoided future adverse health outcomes attributable to PFAS reductions and co-removal of additional contaminants due to actions undertaken to comply with the final rule. This chapter also provides benefits and costs for the alternatives to the final rule that the EPA considered. Results for the final rule precede estimates for the alternatives. The EPA notes that under SDWA, the EPA must consider whether the costs of the rule are justified by the benefits based on all statutorily-prescribed costs and benefits, not just the quantified costs and benefits (see SDWA 1412(b)(3)(c)(i)).

Table 7-1 provides the incremental quantified costs and benefits of the final rule at a 2 percent discount rate in 2022 dollars. The top row shows total monetized annualized costs including total PWS costs and primacy agency costs. The second row shows total monetized annualized benefits including all endpoints that could be quantified and valued. For both, the estimates are the expected (mean) values and the 5th percentile and 95th percentile quantified estimates from the uncertainty distribution. These percentile estimates come from the distributions of annualized quantified costs and annualized quantified benefits generated by the 4,000 iterations of SafeWater MCBC, as described in Sections 5.1.2 and 6.1.2. Therefore, these distributions reflect the joint effect of the multiple sources of variability and uncertainty for quantified costs identified in Section 5.1.2 and for quantified benefits identified in Section 6.1.2 as well as the baseline uncertainties discussed throughout Chapter 4 such as baseline PFAS occurrence. The third row shows net quantified benefits (benefits minus costs). The net annual quantified incremental benefits are $760,000. Because of the variation associated with the use of statistical models such as SafeWater MCBC, the modeled quantified net benefits are nearly at parity. The uncertainty range for net quantified benefits is negative $622 million to $725 million. Additional uncertainties are presented in Table 7-6.

---

[87] The cost-benefit analysis results for each option reflect the variability and uncertainties that could be quantified given the best available scientific data. There are many factors that the EPA could not quantify because of data limitations. For example, benefits will be underestimated if the PFOA and PFOS reductions result in avoided adverse health outcomes that cannot be quantified and valued. Chapters 0 and 0 identify these limitations and the potential effect on the cost or benefit estimates, respectively.

---

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 7-1: Annualized Quantified National Costs and Benefits, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each, and HI of 1) (Million $2022)**

|  | 2% Discount Rate | | |
|---|---|---|---|
|  | **5th Percentile[a]** | **Mean** | **95th Percentile[a]** |
| Total Annualized Rule Costs | $1,435.70 | $1,548.64 | $1,672.10 |
| Total Annualized Rule Benefits | $920.91 | $1,549.40 | $2,293.80 |
| **Total Net Benefits[b,c,d]** | **-$621.99** | **$0.76** | **$725.07** |

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates. Quantifiable benefits are increased under final rule table results relative to the other options presented because of modeled PFHxS occurrence, which results in additional quantified benefits from co-removed PFOA and PFOS.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty described in Section 5.1.2 and Table 5-1 for costs and Section 6.1.2 and Table 6-1 for benefits. This range does not include the uncertainty described in Table 5-21 for costs and Table 6-48 for benefits.

[b]See Table 7-6 for a list of the nonquantifiable benefits and costs, and the potential direction of impact these benefits and costs would have on the estimated monetized total annualized benefits and costs in this table.

[c]The national level cost estimates for PFHxS are reflective of both the total national cost for PFHxS individual MCL exceedances, and HI MCL exceedances where PFHxS is present above its HBWC while one or more other HI PFAS is also present in that same mixture. Total quantified national cost values do not include the incremental treatment costs associated with the co-occurrence of HFPO-DA, PFBS, and PFNA. EPA has considered the additional national costs of the HI and individual MCLs associated with HFPO-DA, PFNA, and PFBS occurrence in a quantified sensitivity analysis; see Appendix N, Section N.3 for the analysis and more information.

[d]PFAS-contaminated wastes are not considered RCRA regulatory or characteristic hazardous wastes at this time and therefore total costs reported in this table do not include costs associated with hazardous waste disposal of spent filtration materials. To address stakeholder concerns about potential costs for disposing PFAS-contaminated wastes as hazardous should they be regulated as such in the future, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. See Appendix N, Section N.2 for additional detail.

Table 7-2 to Table 7-4 summarize the monetized total annualized costs and benefits for Options 1a, 1b, and 1c, respectively.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 7-2: Annualized Quantified National Costs and Benefits, Option 1a (PFOA and PFOS MCLs of 4.0 ppt) (Million $2022)**

| | 2% Discount Rate | | |
| --- | --- | --- | --- |
| | 5th Percentile[a] | Mean | 95th Percentile[a] |
| Total Annualized Rule Costs | $1,423.60 | $1,537.07 | $1,660.30 |
| Total Annualized Rule Benefits | $913.05 | $1,542.74 | $2,280.10 |
| **Total Net Benefits[b,c]** | **-$613.79** | **$5.67** | **$722.09** |

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty described in Section 5.1.2 and Table 5-1 for costs and Section 6.1.2 and Table 6-1 for benefits. This range does not include the uncertainty described in Table 5-21 for costs and Table 6-48 for benefits.

[b]See Table 7-6 for a list of the nonquantifiable benefits and costs, and the potential direction of impact these benefits and costs would have on the estimated monetized total annualized benefits and costs in this table.

[c]PFAS-contaminated wastes are not considered RCRA regulatory or characteristic hazardous wastes at this time and therefore total costs reported in this table do not include costs associated with hazardous waste disposal of spent filtration materials. To address stakeholder concerns about potential costs for disposing PFAS-contaminated wastes as hazardous should they be regulated as such in the future, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. See Appendix N, Section N.2 for additional detail.

**Table 7-3: Annualized Quantified National Costs and Benefits, Option 1b (PFOA and PFOS MCLs of 5.0 ppt) (Million $2022)**

| | 2% Discount Rate | | |
| --- | --- | --- | --- |
| | 5th Percentile[a] | Mean | 95th Percentile[a] |
| Total Annualized Rule Costs | $1,102.60 | $1,192.13 | $1,291.40 |
| Total Annualized Rule Benefits | $768.55 | $1,296.84 | $1,919.30 |
| **Total Net Benefits[b,c]** | **-$414.34** | **$104.71** | **$710.38** |

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty described in Section 5.1.2 and Table 5-1 for costs and Section 6.1.2 and Table 6-1 for benefits. This range does not include the uncertainty described in Table 5-21 for costs and Table 6-48 for benefits.

[b]See Table 7-6 for a list of the nonquantifiable benefits and costs, and the potential direction of impact these benefits and costs would have on the estimated monetized total annualized benefits and costs in this table.

[c]PFAS-contaminated wastes are not considered RCRA regulatory or characteristic hazardous wastes at this time and therefore total costs reported in this table do not include costs associated with hazardous waste disposal of spent filtration materials. To address stakeholder concerns about potential costs for disposing PFAS-contaminated wastes as hazardous should they be regulated as such in the future, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. See Appendix N, Section N.2 for additional detail.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 7-4: Annualized Quantified National Costs and Benefits, Option 1c (PFOA and PFOS MCLs of 10.0 ppt) (Million $2022)**

| | 2% Discount Rate | | |
| --- | --- | --- | --- |
| | **5th Percentile[a]** | **Mean** | **95th Percentile[a]** |
| Total Annualized Rule Costs | $462.87 | $499.29 | $540.68 |
| Total Annualized Rule Benefits | $397.28 | $664.45 | $970.70 |
| **Total Net Benefits[b,c]** | **-$96.42** | **$165.16** | **$468.54** |

Notes: Detail may not add exactly to total due to independent rounding. See Appendix P for results presented at 3 and 7 percent discount rates.

[a]The 5th and 95th percentile range is based on modeled variability and uncertainty described in Section 5.1.2 and Table 5-1 for costs and Section 6.1.2 and Table 6-1 for benefits. This range does not include the uncertainty described in Table 5-21 for costs and Table 6-48 for benefits.

[b]See Table 7-6 for a list of the nonquantifiable benefits and costs, and the potential direction of impact these benefits and costs would have on the estimated monetized total annualized benefits and costs in this table.

[c]PFAS-contaminated wastes are not considered RCRA regulatory or characteristic hazardous wastes at this time and therefore total costs reported in this table do not include costs associated with hazardous waste disposal of spent filtration materials. To address stakeholder concerns about potential costs for disposing PFAS-contaminated wastes as hazardous should they be regulated as such in the future, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. See Appendix N, Section N.2 for additional detail.

The EPA notes that these quantified benefits are estimated using a COI approach (see Chapter 6 for further discussion). In the sensitivity analysis, the EPA also calculated quantified benefits using a willingness to pay approach instead of COI information, for non-fatal RCC and bladder cancer illnesses. In this case, the estimated expected quantified annualized costs are $1,548.64 million and the estimated expected quantified annualized benefits increase to $1,632.34 million (see Appendix O), resulting in $83.7 million in expected annualized net benefits.

The EPA further notes that the quantified benefit-cost results above are not representative of all benefits and costs anticipated under the final NPDWR. Due to occurrence, health, and economic data limitations, there are several adverse health effects associated with PFAS exposure and costs associated with treatment that the EPA could not estimate quantitatively.

PFAS exposure is associated with a wide range of adverse health effects, including reproductive effects such as decreased fertility; increased high blood pressure in pregnant women; developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes; increased risk of some cancers, including prostate, kidney, and testicular cancers; reduced ability of the body's immune system to fight infections, including reduced vaccine response; interference with the body's natural hormones; and increased cholesterol levels and/or risk of obesity. Based on the available data at rule proposal and submitted by public commenters, the EPA is only able to quantify three PFOA- and PFOS-related health endpoints (i.e., changes in birth weight, CVD, and RCC) in the national analysis.

The EPA also evaluated the impacts of PFNA on birth weight and PFOS on liver cancer in quantitative sensitivity analyses (see Appendix K and Appendix O, respectively). Those analyses demonstrate that there are potentially significant other quantified benefits not included in the national quantified benefits above. For example, the EPA's quantitative sensitivity analysis for PFNA (Appendix K) found that inclusion of a 1 ppt PFNA reduction could increase annualized birth weight benefits 5.6-7.8-fold in a model system serving 100,000 people, relative to a

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                      APRIL 2024

scenario that quantifies a 1 ppt reduction in PFOA and a 1 ppt reduction in PFOS only. In the case of PFOS impacts on liver cancer, the EPA has estimated additional benefits of up to $4.79 million via the reduction in liver cancer cases anticipated to be realized by the final rule. All regulatory alternatives are expected to produce substantial additional benefits from all the other adverse health effects avoided, but that cannot be quantified at this time. Treatment responses implemented to remove PFOA and PFOS under Options 1a-c are likely to remove some amount of additional PFAS contaminants where they co-occur. Co-occurrence among PFAS compounds has been observed frequently as discussed in the PFAS Occurrence & Contaminant Background Support Document (U.S. EPA, 2024g). The final rule is expected to produce the greatest reduction in exposure to PFAS compounds as compared to the three regulatory alternative MCLs because it includes PFHxS, HFPO-DA, PFNA, and PFBS in the regulation. Inclusion of the HI will trigger more systems to treat (as shown in Section 4.4.4) and provides enhanced public health protection by ensuring reductions of these additional compounds when present above the HI of 1. For further discussion of the quantitative and qualitative benefits associated with the final rule, see Section 6.2.

The EPA also expects that the final rule will result in additional nonquantifiable costs. As noted above, the HI and individual MCLs are expected to trigger more systems into more frequent monitoring and treatment. In the national cost analysis, the EPA quantified the national treatment and monitoring costs associated with the PFHxS individual MCL and the HI associated costs based on PFHxS occurrence only. Due to occurrence data limitations, cost estimates for PFNA, PFBS, and HFPO-DA are less precise relative to those for PFOA, PFOS, and PFHxS compounds, and as such, the EPA performed a quantitative sensitivity analysis of the national cost impacts associated with HI exceedances resulting from PFNA, PFBS, and HFPO-DA and the PFNA and HFPO-DA MCLs to understand and consider the potential magnitude of costs associated with treating these three PFAS. The EPA found that in addition to the costs associated with PFHxS exceedances, which are included in the national cost estimate, the HI and individual MCLs for PFNA and HFPO-DA could cost an additional $82.4 million per year. In cases where these compounds co-occur at locations where PFAS treatment is implemented because of nationally modeled PFOA, PFOS, and PFHxS occurrence, treatment costs are likely to be marginally higher as treatment media estimated bed-life is shortened. In instances where concentrations of HFPO-DA, PFNA, and PFBS are high enough to cause or contribute to an HI exceedance when the concentrations of PFOA, PFOS, and PFHxS would not have already otherwise triggered treatment, the national modeled costs may be underestimated. If these PFAS occur in isolation at levels that affect treatment decisions, or if these PFAS occur in combination with PFHxS when PFHxS concentrations were otherwise below the its respective HBWC in isolation (i.e., less than 10 ppt) then the quantified costs underestimate the impacts of the final rule. See Appendix N.3 for a sensitivity analysis of additional treatment costs at systems with HI exceedances. See Appendix N.4 for a sensitivity analysis of the marginal costs of HFPO-DA and PFNA MCLs. For further discussion of how EPA considered the costs of the five individual MCLs and the HI MCL, see Section XII.A.4 of the preamble for the final rule.

The EPA has proposed designating PFOA and PFOS as CERCLA hazardous substances (U.S. EPA, 2022b). Stakeholders have expressed concern to the EPA that a hazardous substance designation for certain PFAS may limit their disposal options for drinking water treatment residuals (e.g., spent media, concentrated waste streams) and/or potentially increase costs. Designation of PFOA and PFOS as CERCLA hazardous substances would not require waste

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(e.g., biosolids, treatment residuals, etc.) to be treated in any particular fashion, nor disposed of at any specific particular type of landfill. The designation also would not restrict, change, or recommend any specific activity or type of waste at landfills. In its estimated national costs, the EPA has maintained the assumption that disposal does not have to occur in accordance with hazardous waste standards thus national costs may be underestimated. The EPA has conducted a sensitivity analysis that assumes hazardous waste disposal at all systems treating for PFAS to assess the potential increase in costs (see Appendix N). Table 7-5 summarizes the benefits and costs that are quantified and nonquantified under the final NPDWR.

**Table 7-5: Summary of Quantified and Nonquantified Benefits and Costs in the National Analysis**

| Category | Quantified | Non-quantified | Methods (Report Section where Analysis is Detailed) |
|---|:---:|:---:|---|
| **Costs** | | | |
| PWS treatment costs[a] | ✓ | | Section 5.3.1 |
| PWS sampling costs | ✓ | | Section 5.3.2.2 |
| PWS implementation and administration costs | ✓ | | Section 5.3.2.1 |
| Primacy agency rule implementation and administration costs | ✓ | | Section 5.3.2 |
| Hazardous waste disposal for treatment media | | ✓ | Section 5.6 |
| POU not in compliance forecast | | ✓ | Section 5.6 |
| **Benefits** | | | |
| PFOA and PFOS birth weight effects | ✓ | | Section 6.4 |
| PFOA and PFOS cardiovascular effects | ✓ | | Section 6.5 |
| PFOA and PFOS renal cell carcinoma | ✓ | | Section 6.6 |
| Health effects associated with disinfection byproducts, specifically bladder cancer | ✓ | | Section 6.7 |
| Other PFOA and PFOS health effects[b] | | ✓ | Section 6.2.2.2 |
| Health effects associated with HI compounds HFPO-DA, PFNA, PFBS, and PFHxS | | ✓ | Section 6.2 |
| Health effects associated with other PFAS | | ✓ | Section 6.2 |

Abbreviations: HFPO-DA – hexafluoropropylene oxide dimer acid; PFAS – per and polyfluoroalkyl substances; PFBS – perfluorobutanesulfonic acid; PFHxS – perfluorohexane sulfonate; PFNA – perfluorononanoic acid; PFOA – Perfluorooctanoic Acid; PFOS– Perfluorooctane Sulfonate; POU – point-of-use; PWS– public water system
Notes:
[a]The national level cost estimates for PFHxS are reflective of both the total national cost for PFHxS individual MCL exceedances, and HI MCL exceedances where PFHxS is present above its HBWC while one or more other HI PFAS is also present in that same mixture. Total quantified national cost values do not include the incremental treatment costs associated with the co-occurrence of HFPO-DA, PFBS, and PFNA. EPA has considered the additional national costs of the HI and individual MCLs associated with HFPO-DA, PFNA, and PFBS occurrence in a quantified sensitivity analysis; see Appendix N, Section N.3 for the analysis and more information.
[b]Effects of PFOS on liver cancer are summarized as a national-level sensitivity analysis in Appendix O.

Table 7-6 provides a summary of the likely impact of nonquantifiable benefit-cost categories. In each case, the EPA notes the potential direction of the impact on costs and/or benefits. For

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

example, benefits are underestimated if the PFOA and PFOS reductions result in avoided adverse health outcomes that cannot be quantified and valued. Sections 5.7 and 6.8 identify the key methodological limitations and the potential effect on the cost or benefit estimates, respectively.

**Table 7-6: Potential Impact of Nonquantifiable Benefits and Costs**

| Source | Final Rule | Option 1a | Option 1b | Option 1c |
|---|---|---|---|---|
| Nonquantifiable PFOA and PFOS health endpoints | B: underestimate | B: underestimate | B: underestimate | B: underestimate |
| Limitations with nationally representative HFPO-DA, PFNA, and PFBS occurrence data | B&C: underestimate | N/A | N/A | N/A |
| Nonquantifiable HFPO-DA, PFNA, PFHxS, and PFBS health endpoints | B: underestimate | N/A | N/A | N/A |
| Limitations with nationally representative occurrence data for additional PFAS compounds | B&C: underestimate | B&C: underestimate | B&C: underestimate | B&C: underestimate |
| Removal of co-occurring non-PFAS contaminants | B&C: underestimate | B&C: underestimate | B&C: underestimate | B&C: underestimate |
| POU not in compliance forecast | C: overestimate | C: overestimate | C: overestimate | C: overestimate |
| Unknown future hazardous waste management requirements for PFAS | B&C: underestimate | B&C: underestimate | B&C: underestimate | B&C: underestimate |

Abbreviations: B – benefits; C – costs; POU – point-of-use; PFAS – per-and polyfluoroalkyl substances.

Table 7-1 through Table 7-6 summarize the results of this final rule analysis. As indicated in Section 2.2.2 of this EA, the EPA discounted the estimated monetized cost and benefit values using a 2 percent discount rate, consistent with OMB Circular A-4 (OMB, 2003; OMB, 2023) guidance. The U.S. White House and OMB recently finalized and re-issued the A-4 and A-94 benefit-cost analysis guidance (see OMB Circular A-4, 2023), and the update includes new guidance to use a social discount rate of 2 percent. The updated OMB Circular A-4 states that the discount rate should equal the real (inflation-adjusted) rate of return on long-term U.S. government debt, which provides an approximation of the social rate of time preference. This rate for the past 30 years has averaged around 2.0 percent per year in real terms on a pre-tax basis. OMB arrived at the 2 percent discount rate figure by considering the 30-year average of the yield on 10-year Treasury marketable securities, and the approach taken by OMB produces a real rate of 1.7 percent per year, to which OMB added a 0.3 percent per-year rate to reflect inflation as measured by the personal consumption expenditure (PCE) inflation index. The OMB guidance states that Agencies must begin using the 2 percent discount rate for draft final rules that are formally submitted to OIRA after December 31, 2024. The updated OMB Circular A-4 guidance further states that "to the extent feasible and appropriate, as determined in consultation

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

with OMB, agencies should follow this Circular's guidance earlier than these effective dates."
Given the updated default social discount rate prescribed in the OMB Circular A-4 and also
public input received on the discount rates considered by the EPA in the proposed NPDWR, for
this final rule, the EPA estimated national benefits and costs at the 2 percent discount rate for the
final rule and incorporated those results into the final economic analysis. Since the EPA
proposed this NPDWR with the 3 and 7 percent discount rates based on guidance in the previous
version of OMB Circular A-4, the EPA has kept the presentation of results using these discount
rates in Appendix P. The Administrator reaffirms his determination that the benefits of the rule
justify the costs. The EPA's determination is based on its analysis under in SDWA section
1412(b)(3)(C) of the quantifiable benefits and costs at the 2 percent discount rate, in addition to
at the 3 and 7 percent discount rate, as well as the nonquantifiable benefits and costs. The EPA
found that significant nonquantifiable benefits are likely to occur from the final PFAS NPDWR.

The quantified analysis is limited in its characterization of uncertainty. In Table 7-1, the EPA
provides 5th and 95th percentile values for net benefits. These values represent the quantified, or
modeled, potential range in the expected net benefit values associated with the uncertainty
resulting from the following variables: the baseline PFAS occurrence; the affected population
size; the compliance technology unit cost curves, which are selected as a function of baseline
PFAS concentrations and population size, the distribution of feasible treatment technologies, and
the three alternative levels of treatment capital costs; the concentration of total organic carbon in
a system's source water (which impacts GAC O&M costs); the demographic composition of the
system's population; the magnitude of PFAS concentration reductions; the health effect-serum
PFOA and PFOS slope factors that quantify the relationship between changes in PFAS serum
level and health outcomes for birth weight, CVD, and renal cell carcinoma; and the cap placed
on the cumulative renal cell carcinoma risk reductions due to reductions in serum PFOA. These
modeled sources of uncertainty are discussed in more detail in Sections 5.1.2 and 6.1.2. The
quantified 5th and 95th percentile values do not include a number of factors that impact both
costs and benefits but for which the agency did not have sufficient data to include in the
quantification of uncertainty. The factors influencing the final rule cost estimates that are not
quantified in the uncertainty analysis are detailed in Table 5-21. These uncertainty sources
include: the specific design and operating assumptions used in developing treatment unit cost;
the use of national average costs that may differ from the geographic distribution of affected
systems; the possible future deviation from the compliance technology forecast; and the degree
to which actual TOC source water values differ from the EPA's estimated distribution. The EPA
has no information to indicate a directional influence of the estimated costs with regard to these
uncertainty sources. To the degree that uncertainty exists across the remaining factors, it would
most likely influence the estimated 5th and 95th percentile range and not significantly impact the
expected value estimate of costs.

Table 6-48 discusses the sources of uncertainty affecting the estimated benefits not captured in
the estimated 5th and 95th reported values. The modeled values do not capture the uncertainty in:
the exposure that results from daily population changes at NTNCWSs or routine population
shifting between PWSs, for example spending working hours at a NTNCWS or CWS and home
hours at a different CWS; the exposure-response functions used in the benefits analyses assume
that the effects of serum PFOA/PFOS on the health outcomes considered are independent,
additive, and that there are no threshold serum concentrations below which effects
(cardiovascular, developmental, and renal cell carcinoma) do not occur; the distribution of

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

population by size and demographics across EPs within modeled systems and future population size and demographic changes, and the Value of Statistical Life reference value or income elasticity used to update the VSL. Given information available to the agency, four of the listed uncertainty sources would not affect the benefits expected value but the dispersion around that estimate. They are the unmodeled movements of populations between PWSs with potentially differing PFAS concentrations; the independence and additivity assumptions with regard to the effects of serum PFOA/PFOS on the health outcomes; the uncertainty in the population and demographic distributions among EPs within individual systems; and the VSL value and the income elasticity measures. Two of the areas of uncertainty not captured in the analysis would tend to indicate that the quantified benefits numbers are overestimates. First, the data available to the EPA with regard to population size at NTNCWSs, while likely capturing peaks in populations utilizing the systems, does not account for the variation in use and population and would tend to overestimate the exposed population. The second source of uncertainty, which definitionally would indicate overestimates in the quantified benefits values, is the assumption that there are no threshold serum concentrations below which health effects (cardiovascular, developmental, and renal cell carcinoma) do not occur. One source of possible underestimation of benefits not accounted for in the quantified analysis is the impact of general population growth over the extended period of analysis.

In addition to the quantified cost and benefit expected values, the modeled uncertainty associated within the 5th and 95th percentile values, and the un-modeled uncertainty associated with a number of factors listed above, there are also significant nonquantifiable costs and benefits, which are important to the overall weighing of costs and benefits. Table 7-6 provides a summary of these nonquantifiable cost and benefit categories along with an indication of the directional impact each category would have on total costs and benefit. Table 5-21 and Table 6-48 also provide additional information on a number of these nonquantifiable categories.

For the nonquantifiable costs, the EPA had insufficient nationally representative data to precisely characterize occurrence of HFPO-DA, PFNA, and PFBS at the national level and therefore could not include complete treatment costs associated with: the co-occurrence of these PFAS at systems already required to treat as a result of estimated PFOA, PFOS, or PFHxS levels, which would shorten the filtration media life and therefore increase operation costs; and the occurrence of HFPO-DA, PFNA, and/or PFBS at levels high enough to cause systems to exceed the individual MCLs for PFNA and HFPO-DA or the HI and have to install PFAS treatment. The EPA expects that the quantified national costs, which do not include HFPO-DA, PFNA, and PFBS treatment costs are marginally underestimated (on the order of 5%) as a result of this lack of sufficient nationally representative occurrence data. In an effort to better understand and consider the costs associated with treatment of the PFNA and HFPO-DA MCLs and potentially co-occurring HFPO-DA, PFNA, and PFBS at systems both with and without PFOA, PFOS and PFHxS occurrence in exceedance of the MCLs the EPA performed a quantitative sensitivity analysis of the national cost impacts associated with HI MCL exceedances resulting from HFPO-DA, PFNA, and PFBS and/or individual MCL exceedances of PFNA and HFPO-DA. The analysis is discussed in Section 5.3.1.4 and Appendix N.3. Two additional nonquantifiable cost impacts stemming from insufficient co-occurrence data could also potentially shorten filtration media life and increase operation costs. The co-occurrence of other PFAS and other non-PFAS contaminants not regulated in the final rule could both increase costs to the extent that they reduce media life. The EPA did not include POU treatment in the compliance technology

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

forecast because current POU units are not certified to remove PFAS to the standards required in the final rule. Once certified, this technology may be a low-cost treatment alternative for some subset of small systems. Not including POU treatment in this analysis has resulted in a likely overestimate of costs.

Appendix N.2 contains a sensitivity analysis that estimates possible additional national annualized costs of $99 million, which would accrue to systems if the waste filtration media from GAC and IX were handled as RCRA regulatory or characteristic hazardous waste. This sensitivity analysis includes only disposal costs and does not consider other potential environmental benefits and costs associated with the disposal of the waste filtration media.

There are significant nonquantifiable sources of benefits that were not captured in the quantified benefits estimated for the proposed rule. While the EPA was able to monetize some of the PFOA and PFOS benefits related to cardiovascular disease, infant birth weight, and renal cell carcinoma effects, the agency was unable to quantify additional reductions in negative health impacts in the national quantitative analysis. In addition to the national analysis for the final rule, the agency developed a sensitivity analysis assessing liver cancer impacts, which is detailed in Appendix O. The EPA did not quantify PFOA and PFOS benefits related to health endpoints including developmental, cardiovascular, hepatic, immune, endocrine, metabolic, reproductive, musculoskeletal, and other types of carcinogenic effects. Section 6.2.2 provides additional information on the nonquantifiable impacts of PFOA and PFOS. Further, the agency did not quantify any health endpoint benefits associated with the potential reductions in HI PFAS, which include PFHxS, HFPO-DA, PFNA, and PFBS, or other co-occurring non-regulated PFAS which would be removed due to the installation of required filtration technology at those systems that exceed the final MCLs. The nonquantifiable benefits impact categories associated with PFHxS, HFPO-DA, PFNA, and PFBS include developmental, cardiovascular, immune, hepatic, endocrine, metabolic, reproductive, musculoskeletal, and carcinogenic effects. In addition, the EPA did not quantify the potential developmental, cardiovascular, immune, hepatic, endocrine, metabolic, reproductive, musculoskeletal, and carcinogenic impacts related to the removal of other co-occurring non-regulated PFAS. See Section 6.2.4 for additional information on the nonquantifiable impacts of PFHxS, HFPO-DA, PFNA, and PFBS, and other non-regulated co-occurring PFAS.

The treatment technologies installed to remove PFAS can also remove numerous other non-PFAS drinking water contaminants which have negative health impacts including additional regulated and unregulated DBPs (the quantified benefits assessment does estimate benefits associated with THM4), heavy metals, organic contaminants, and pesticides, among others. The removal of these co-occurring non-PFAS contaminants could have additional positive health benefits. In total these nonquantifiable benefits are anticipated to be significant and are discussed qualitatively in Section 6.2.

To fully weigh the costs and benefits of the action, the agency considered the totality of the monetized values, the potential impacts of the nonquantifiable uncertainties described above, the nonquantifiable costs and benefits, and public comments received by the agency related to the quantification and qualitative assessment of the costs and benefits. In the final rule, the EPA is reaffirming the Administrator's determination made at proposal that the quantified and nonquantifiable benefits of the rule justify its quantified and nonquantifiable costs (88 FR 18638).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# 8 Environmental Justice Analysis

## 8.1 Introduction

The EPA defines environmental justice (EJ) as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies" (U.S. EPA, 2016h). The concept of fair treatment includes not just the distribution of burdens across populations but also the distribution of risk reduction from the EPA's actions. The EPA reviews potential EJ concerns regarding minority populations, low-income populations, and/or indigenous peoples (U.S. EPA, 2016h).

The framework used to evaluate the anticipated EJ impacts of the final rule for per– and polyfluoroalkyl substances (PFAS) comes from the Technical Guidance for Assessing Environmental Justice in Regulatory Analysis (U.S. EPA, 2016h), which provides the following guiding questions:

- Are there potential EJ concerns associated with environmental stressors affected by the regulatory action for population groups of concern in the baseline?

- Are there potential EJ concerns associated with environmental stressors affected by the regulatory action for population groups of concern for the regulatory options under consideration?

- For the regulatory options under consideration, are potential EJ concerns created or mitigated compared to the baseline?

Contextualizing these questions for the final PFAS rule, the EPA evaluated the following questions:

- Are population groups of concern (i.e., people of color and low-income populations) disproportionately exposed to PFAS compounds in drinking water delivered by PWSs?

- Are population groups of concern disproportionately affected by the final rule and regulatory alternatives under consideration for the final PFAS NPDWR?

- If any disproportionate impacts are identified, do they create or mitigate baseline EJ concerns?

As part of the proposal process for the PFAS NPDWR, the EPA conducted the EJ analyses in this chapter to assess the demographic distribution of baseline PFAS drinking water exposure and impacts that are anticipated to result from the final rule. The EPA conducted two separate analyses to address the research questions presented above. To inform the first question, the EPA conducted an analysis using the agency's EJSCREENbatch R package, which utilizes data from EJScreen, the agency's Environmental Justice Screening and Mapping Tool and from the U.S. Census Bureau's American Community Survey (ACS) 2015–2019 five-year sample (U.S. EPA, 2019a). To inform the second and third questions above, the EPA conducted an EJ analysis of the EPA's final regulatory option and regulatory alternatives using SafeWater MCBC.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

Section 8.2 provides an overview of the EPA's EJ literature review. Sections 8.3 and 8.4 describe the EJ analyses the EPA conducted. Section 8.5 presents the conclusions from the EPA's EJ analyses.

## 8.2 Literature Review

The EPA conducted a literature review to develop a broad understanding of current research at the intersection of drinking water quality, PFAS exposure, and communities with related EJ concerns. The literature covered a range of specific topics including the likelihood of exposure based on proximity to sites of contamination, sociodemographic characteristics of communities exposed to PFAS in region-specific studies and understanding the sociodemographic distribution of health outcomes associated with exposure to PFAS. The EPA's literature review also examined the relationship between PFAS exposure via drinking water in overburdened communities and a range of health outcomes.

### 8.2.1 Methods

The EPA conducted its literature review to evaluate and synthesize findings from studies that explored associations between PFAS exposure via drinking water in overburdened communities and associated health outcomes, including those health endpoints the EPA quantified as part of its benefits analysis: changes in infant birth weight, CVD, and kidney cancer.

The EPA applied a variety of search terms for the literature review, including: CVD; disparities; disproportionate exposure; disproportionate impact; drinking water quality/contamination; environmental justice; equity; forever chemicals; inequity; infant birth weight; kidney cancer; low-income; minority; over-burdened; people of color; PFAS; PFAS interactions; PFC(s); PFOA; PFOS; race differences in health effects after PFAS exposure; race disparities in health effects, immune effects, and PFAS exposure; race ethnicity and health effects of PFAS exposure and interactions; sociodemographic differences in health effects after PFAS exposure; social justice; and tribal.

From the literature review, the EPA found that there are a limited number of studies that focus on the association between disproportionate exposure to PFAS via drinking water and health outcomes for overburdened communities on a national level. The agency excluded studies that examined exposure routes apart from drinking water and/or did not evaluate race/ethnicity within their participant demographics. Of the studies that the EPA identified as part of its literature review, all but two studies were published in peer reviewed journals (with the remaining two studies appearing in gray literature).

### 8.2.2 Findings

To contextualize its analysis of EJ impacts related to PFAS in drinking water, the EPA reviewed studies that evaluate overall EJ concerns related to environmental contamination. In 1987, the EPA reported in a nationwide study that roughly twice as many people of color resided in proximity to a commercial hazardous waste facility compared to communities without a facility (U.S. EPA, 1994). Later research indicated that communities of low socioeconomic status are more likely to reside in proximity to environmental hazardous facilities, thereby potentially

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

facing a disproportionate impact of exposure to toxic chemicals than communities of higher socioeconomic status (Brown, 1995; Brulle & Pellow, 2006). A 2010 study showed 63 percent of large polluters in a North Carolina county were operating in census tracts with per capita income below $21,000, as identified in the EPA's Toxics Release Inventory (TRI) (Banzhaf et al., 2019).

When specifically examining studies related to PFAS in drinking water, available literature showed associations between PFAS contamination in drinking water and proximity to sites including those critical for transportation infrastructure, industry, and national defense (Black et al., 2021; X. C. Hu et al., 2016; Johnston & Cushing, 2020; Sunderland et al., 2019). Researchers noted that identifiable sources of PFAS are often prevalent at aforementioned locations and are more frequently located in overburdened communities (Black et al., 2021; X. C. Hu et al., 2016; Stoiber et al., 2020).

The characteristics of PFAS, such as high aqueous solubility and persistence within the environment, allow them to travel readily between ecological zones (ATSDR, 2021; X. C. Hu et al., 2016; Kotlarz et al., 2020). As such, PFAS contamination can negatively impact drinking water sources downstream from an original contamination site, putting residents in communities surrounding known sources of PFAS at a disproportionate risk of exposure. A 2019 study in Michigan by Desikan et al. (2019) evaluated the proportion of low-income households and households with people of color in communities within five miles of PFAS-contaminated sites compared to census projections for those areas. The study found that 38,962 more low-income households and 294,591 more households with people of color reside within five miles of a site contaminated with PFAS than expected, based on U.S. Census data.

In California, Lee et al. (2021) demonstrated that overburdened communities are more likely to be served by PWSs with higher levels of PFAS. PFAS data were integrated with results from CalEnviroScreen 3.0, a statewide EJ screening tool (OEHHA, 2016). Of the 7,896 PWSs in the state, about 3 percent (n = 248) had been monitored for PFAS, serving 42 percent of California's total population. Results from the study showed that PFAS was detected in 160 of 248 PWSs, or roughly 65 percent of systems monitored. Lee, Kar, and Reade (2021) overlaid the upper 25 percent of disadvantaged communities as identified by CalEnviroScreen 3.0 with water systems experiencing the highest levels of PFAS contamination. Among the communities in the top quartile for people of color and low-income demographic groups, 69 percent had PFAS detected in their water system. Further, PWSs in 20 percent of overburdened communities with PFAS contamination fell within the highest quartile of PFAS concentration levels in the state of California, suggesting that PFAS occurrence is disproportionately higher in drinking water serving already overburdened communities. Only 2 of the 10 water systems with the highest PFAS concentrations fell below the state average for all relevant demographic indicators included in the study (people of color, education level, unemployment, poverty, and housing burden).

A 2023 study by Liddie, Schaider, and Sunderland examined sociodemographic disparities in exposures to PFAS via drinking water based on potential exposure source. Community water systems were geocoded within 8-digit hydrologic codes where the exact coordinates of water source regions were unavailable, and the study refers to these areas as watersheds or CWS watersheds. In examining data from 18 states with the most robust PFAS monitoring and reporting infrastructure, Liddie et al. (2023) found that watersheds with higher concentrations of PFAS also had higher concentrations of the potential PFAS exposure sources that the researchers

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

examined. Sources of potential exposure (based on correlation of proximity) included industrial sites, wastewater treatment plants, municipal solid waste landfills, military fire training areas, and civilian airports. Additionally, watersheds that served Hispanic/Latino communities and non-Hispanic Black communities were found to have significantly greater odds of containing PFAS sources. Further, CWS watersheds with PFAS concentrations above 5 ppt or above the lowest state-level MCL served communities with greater proportions of Hispanic/Latino and non-Hispanic Black populations than CWS watersheds with concentrations below these limits (Liddie et al., 2023).

At least two studies identified the use of aqueous film forming foam (AFFF) as a predictor of PFAS concentrations in U.S. drinking water (Johnston & Cushing, 2020; Sunderland et al., 2019). Using nationally representative PFAS occurrence data from UCMR 3, a study from X. C. Hu et al. (2016) found that the presence of a military fire training area using AFFF within a watershed's eight-digit hydraulic unit code (HUC) increased the frequency of exposure to at least one PFAS analyte in drinking water from 10.4 percent to 28.2 percent . For each additional military site within a HUC, drinking water samples with detectable levels of PFAS found a 20 percent increase in PFHxS, a 10 percent increase in both PFHpA and PFOA, and a 35 percent increase in PFOS.

The EPA also sought to characterize literature that discusses potential pathways of PFAS exposure for communities in proximity to waste disposal and destruction sites. The EPA is unaware of any literature which specifically discusses PFAS exposure for communities with potential environmental justice concerns due to disposal of PFAS-contaminated drinking water treatment residuals. Therefore, the EPA has reviewed literature which discusses the siting of waste facilities in general as well as the pathways of exposure for other contaminants. It is also important to note that there are uncertainties associated with the potential pathways of exposure for communities with potential environmental justice concerns regarding the destruction and disposal of PFAS in drinking water. For information related to the destruction and disposal of PFAS, please see the EPA's Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances, version 2 (U.S. EPA, 2020c.

Waste facilities are often disproportionately located near communities with potential environmental justice concerns (Martuzzi et al., 2010). Additionally, in a national-level study of the demographic characteristics of communities collocated with waste management facilities, racial composition was found to be an independent predictor of waste management facility siting, controlling for other socioeconomic variables (Mohai & Saha, 2015). As such, communities with potential EJ concerns may experience adverse health effects that result from these disproportionate exposures to PFAS due to proximity to waste sites if PFAS are released from these sites (Desikan et al., 2019).

Martin et al. (2023) found that communities with hazardous waste incinerators that regularly receive PFAS shipments have demographic characteristics that indicate that potential exposures, if any, that result from incineration may affect individuals that reside in communities with lower incomes and less education than the US average. However, there is uncertainty regarding exposures from PFAS destruction at these hazardous waste incinerators. PFAS residuals from drinking water are likely carbon, which is likely to be reactivated. As described in the EPA's Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances, version 2 (U.S. EPA, 2020c), carbon reactivation systems have the potential to remove PFAS from the reactivated carbon and destroy PFAS. Additionally, Distefano et al. (2022) showed >99.99 percent destruction of measured PFAS at a full-scale commercial reactivation facility. The EPA believes when proper guidance, such as that from the EPA's Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances, is followed, the destruction and disposal of drinking water treatment residuals can be suitably managed in a way which can minimize risk.

For more information and further discussion on this topic, please see Section 4 (Considerations for Potentially Vulnerable Populations Living Near Likely Destruction or Disposal Sites) in *Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances*, version 2 (U.S. EPA, 2020c).

To remain consistent with the health endpoints associated with PFAS exposure that are monetized as part of the final PFAS NPDWR's benefits analysis, the health outcomes of focus in this literature review included CVD, kidney cancer, and impacts on infant birth weight. For more information on the EPA's quantified benefits analysis, see Chapter 60.

Literature showed that overburdened communities experience relatively higher adverse health outcomes compared to communities with fewer people of color (Driscoll & Gregory, 2021; Fryar et al., 2017; Pinheiro et al., 2021). Literature also showed that risk of CVD, kidney cancer, and changes in infant birth weight are associated with PFAS exposure (Almond et al., 2005; Barry et al., 2013; Goff et al., 2014; Ma & Finch, 2010; Raleigh et al., 2014; Steenland & Woskie, 2012; Vieira et al., 2013; U.S. EPA, 2016d; U.S. EPA, 2016h; U.S. EPA, 2021a; U.S. EPA, 2024e; U.S. EPA, 2024f), discussed in more detail in Chapter 60.

The Centers for Disease Control and Prevention (CDC) identified hypertension (HTN) as a substantial risk factor for CVD (Fryar et al., 2017). Using the 140/90 mmHg threshold for HTN diagnosis, the CDC reported that African American adults reported a higher burden of HTN (40.3%) compared to White (27.8%), Asian (25.0%), or Hispanic (27.8%) adults (Fryar et al., 2017). Additionally, a comprehensive narrative literature review by Graham (2015) found disproportionate rates of CVD among minority subpopulations in the U.S., particularly the African American population. African American subpopulations were found to have higher incidence of myocardial infarction, heart failure, stroke, among other cardiovascular events and experience the highest overall death rate from CVD among various minority population groups.

With regards to cancer, a study by Uche et al. (2021) showed statistically significantly greater cumulative cancer risk was identified in communities in which small and large CWSs serve higher proportions of Hispanic/Latino and Black/African American residents in Texas and California.[88] In Texas, greater cumulative cancer risk was statistically significantly greater for small and medium CWSs serving relatively higher proportions of Hispanic/Latino community members. Additionally, small CWSs serving relatively higher proportions of Black/African

---

[88] A CWS was defined as small if it served 501-3,300 people, medium if it served 3,301-10,000 people, large if it served 10,001-100,000 people, and very large if it served more than 100,000 people.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                              APRIL 2024

American residents had statistically significantly greater cumulative cancer risk. In California, cumulative cancer risk was statistically significantly greater for very large CWSs serving relatively higher proportions of Black/African American community members, followed by small CWSs serving relatively higher proportions of Hispanic/Latino residents.

Pinheiro et al. (2021) studied kidney cancer rates in White, Black, Asian/Pacific Islander (API), American Indian, all non-Hispanic, and Hispanic populations of any race by using reported cancer deaths in California and Florida (2008–2018) and New York (2008–2017). This study's methodology directly compared results for specific race/ethnicity groups to White populations. Results indicated that American Indian individuals experience the highest mortality (54%), and mortality is 53 percent higher for men and women when compared to mortality among White participants (Pinheiro et al., 2021). Conversely, API populations showed significantly lower mortality than White populations, with 45 percent lower mortality among males and 43 percent lower mortality among females. Kidney cancer mortality among Black populations and all-combined Hispanic populations (i.e., Cuban, Puerto Rican, and Mexican) was also significantly lower than among White populations, but by smaller margins: mortality was 12 percent and 16 percent lower for Black males and females and 11 percent and 8 percent lower for Hispanic males and females, respectively.

Additionally, the CDC's National Vital Statistics Reports used the 2020 birth file from the National Vital Statistic System to display distributions in prepregnancy body mass index (BMI), including three classes of obesity, by maternal race and Hispanic origin for women who gave birth in 2020 (Driscoll & Gregory, 2021). Infants born to non-Hispanic Black women had the highest rate of low birth weight (14.19%), followed by infants of Hispanic women (7.40%). Infants of non-Hispanic White women had the lowest rate of low birth weight (6.84%) (Driscoll & Gregory, 2021).

Furthermore, the EPA reviewed studies that examine blood serum levels of PFAS across various demographic groups. Studies analyzing biomarker data indicate some demographic disparities that exist in blood serum levels across certain PFAS analytes (Boronow et al., 2019; Calafat et al., 2007; Eick et al., 2021; C. Y. Lin et al., 2020; Nelson et al., 2012; V. K. Nguyen et al., 2020; S. K. Park et al., 2019). Specifically, blood serum levels of PFNA and PFOS were found to be elevated in Black adults (Boronow et al., 2019; Calafat et al., 2007; Eick et al., 2021; C. Y. Lin et al., 2020; Nelson et al., 2012; S. K. Park et al., 2019). PFNA was also found to be elevated in Asian American mothers, when compared to all other races (Eick et al., 2021). Additionally, PFDA was found to be elevated in Asian American women, when compared to non-Hispanic White populations (V. K. Nguyen et al., 2020). Finally, Me-FOSAA was found to be elevated in Black women at some but not all study sites analyzed (S. K. Park et al., 2019).

However, many studies indicate lower average blood serum PFAS levels among people of color. Three studies in particular demonstrated that non-Hispanic White populations had the highest concentrations of PFAS across all analytes (Barton et al., 2020; Kato et al., 2014; Kingsley et al., 2018). It should be noted, however, that the study design for Barton et al. (2020), Kato et al. (2014), and Kingsley et al. (2018) each had majority non-Hispanic White participant demographics of 75 percent, 63 percent, and 61 percent of study participants, respectively. The literature also indicates that higher socioeconomic status (e.g., income) is associated with higher PFAS blood serum levels (Buekers et al., 2018).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## *8.2.3 Discussion and Limitations*

The EPA's purpose in conducting its literature review was to examine the relationship between PFAS exposure via drinking water in overburdened communities and health outcomes related to CVD, changes in infant birth weight, and kidney cancer. Presented studies indicate that higher percentages of low-income and minority communities reside near a range of PFAS-contaminated sites. Such contamination is also shown to occur at higher levels in low-income and minority communities. Further, the EPA's literature review analysis indicates that PFAS contamination occurs more often and/or at higher levels in overburdened communities.

It should be noted there are substantial gaps in current literature on PFAS exposure and health outcomes in overburdened communities. One substantial gap in the available literature is a dearth of studies that examine differential impacts of health outcomes associated with PFAS exposure, as reported by race or ethnicity. Potential gaps in understanding also relate to determining whether the rate of developed risk for one or more of the aforementioned health endpoints is related to exposure to PFAS contamination in drinking water rather than other exposure pathways.

The blood serum PFAS studies evaluated as part of this literature review have their limitations in extrapolating to the potential disproportionate impacts of PFAS drinking water exposure given their focus on overall PFAS exposure across many exposure routes rather than drinking water-specific exposures. Wilder et al. (2017) note that national average PFAS blood serum levels are influenced by a variety of major exposure pathways, including diet and consumer products in addition to exposure via drinking water. As such, this limits conclusions that can be drawn about the demographic breakdown of PFAS blood serum levels due to drinking water exposure alone. Additional information on exposure via drinking water alone is necessary to better understand the impacts of PFAS drinking water contamination on PFAS blood serum levels within overburdened communities.

Another limitation of these blood serum-based studies is their inequitable representation of study participants by race. The participant demographic makeup of three published studies that examined PFAS blood serum levels was highly biased toward the non-Hispanic White population, resulting in an incomplete understanding of people of color's exposure to PFAS. Statisticians can adjust the results if certain participant demographic groups are disproportionately represented. However, these adjustments are based on assumptions about the underlying demographic makeup of the study population.

## 8.3 EJ PFAS Exposure Analysis

This section describes the data sources and approach the EPA used to characterize the demographic distribution of PFAS exposure in drinking water. This analysis is designed to answer the question posed in the beginning of the chapter: Are population groups of concern (i.e., people of color and low-income populations) disproportionately exposed to PFAS compounds in drinking water delivered by PWSs? This analysis estimates anticipated exposure rates above various PFAS concentrations for four PFAS analytes, where occurrence of these is used as a proxy for co-occurrence of many other PFAS compounds. In some cases, the thresholds that the EPA uses in this analysis overlap with regulatory alternatives considered by

FINAL RULE                                                                 APRIL 2024

the EPA in the final regulatory action. This analysis does not evaluate the anticipated costs and benefits of the final rule and regulatory alternatives. The EPA's analysis of the anticipated demographic distribution of costs and benefits of the final rule and regulatory alternatives can be found in Section 8.4.

The EPA estimated the sociodemographic characteristics of populations that the EPA anticipates are exposed to levels higher than various threshold concentrations of four PFAS analytes (PFOA, PFOS, PFHxS, and PFHpA). For this analysis, the EPA had sufficient information on PFAS occurrence and PWS service area boundaries in the sample population, which was a subset of PWSs.[89] PWSs were first categorized by available data (Section 8.3.1), using availability of UCMR 3 sampling data, state sampling data, and availability of service area boundary information (Table 8-1).

The EPA used PWS service area data in conjunction with the EJSCREENbatch R package to obtain sociodemographic characteristics of the populations served by PWSs (U.S. EPA, 2022a). The EJSCREENbatch R package allows analysts to conduct EJ screening analyses for multiple geographies using environmental and sociodemographic data from EJScreen and the American Community Survey. The EPA estimated the rate of exposure to PFAS across demographic groups using PFAS occurrence data and the sociodemographic characteristics of populations served with designated service area boundaries. The EPA conducted this analysis using several thresholds: hypothetical trigger levels set above Method 537.1 detection limits and intended to reflect a water system's margin of safety below the MCL values (also referred to as baseline occurrence level for this analysis), UCMR 5 MRLs, and 10.0 ppt. This analysis serves as an estimate of possible exposure to PFAS levels over these thresholds, as the EPA cannot confirm that these populations consumed the water at the time of elevated PFAS occurrence at each PWS.

## 8.3.1 Data Sources and Approach

### 8.3.1.1 Categorization of Public Water Systems

The EPA designated distinct categories for PWSs based on data availability for PFAS occurrence and estimated PWS service area boundaries. The agency used two types of PFAS occurrence data sources in this analysis: (1) simulated PFAS occurrence data for PWSs with sampled PFAS occurrence data under UCMR 3; and (2) state-collected PFAS occurrence data for PWSs not sampled under UCMR 3 (U.S. EPA, 2017). PWS service area boundary data are distinguished by three types: (1) those with predelineated PWS service area boundaries, (2) those where zip codes served by PWSs were used as a proxy to approximate and delineate PWS service area boundaries, and (3) those with no available PWS service area boundary information. Table 8-1 describes the characteristics of each of the six distinct PWS categories examined in this analysis.

For the EJ exposure analysis, the EPA focused on reporting results for PWSs in categories 1 and 2, which were sampled for PFAS under UCMR 3. The PWSs in categories 4 and 5 include systems with state PFAS occurrence data, and the EPA has summarized the results for these categories in Appendix M. The EPA used data from EJScreen (U.S. EPA, 2022a) and the

---

[89] PWS service area boundaries are defined as the spatial extent of the geographic area served by a PWS.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                      APRIL 2024

American Community Survey along with PWS service area boundary data to characterize the sociodemographic characteristics of PWSs.

PWSs in categories 1 and 2 account for 252.2 million people served (n = 4,743 PWSs), and PWSs in categories 4 and 5 account for approximately 2 million people served (n = 736 PWSs). PWSs in categories 3 and 6 were not included in the EJ exposure analysis, as PWS service area boundaries or zip codes served by the PWS were unavailable.

**Table 8-1: Categorizing of PWSs Based on Data Availability for PFAS Occurrence and PWS Service Area Boundaries**

|  | PWS Included in UCMR 3 | PWS State PFAS Occurrence Data Available and Not Included in UCMR 3 |
|---|---|---|
| PWS Service Areas Available | Category 1 | Category 4 |
| PWS Service Area Boundary Estimates from Zip Codes | Category 2 | Category 5 |
| No PWS Service Area Information Available | Category 3 | Category 6 |
| Abbreviations: PWS – public water system; UCMR – Unregulated Contaminant Monitoring Rule. | | |

## 8.3.1.2 Data Sources

### 8.3.1.2.1 PFAS Occurrence

The two data source categories used to derive PFAS occurrence estimates for this analysis are described in more detail below. All PFAS occurrence data are presented in parts per trillion (ppt).

Generally, if a system was sampled for PFAS under UCMR 3, the EPA used simulated occurrence data that were based on system-specific results. For PWSs in categories 1 and 2 (n = 4,743 PWSs), the EPA simulated PFAS occurrence data using a hierarchical Bayesian model that was optimized with PFAS occurrence data from UCMR 3 and, where available, state data (see Cadwallader et al., 2022, and Section 4.44.4 for further description). The EPA calculated the system-level geometric mean occurrence value for each PWS from the simulated water sample concentrations. All simulated values (i.e., simulated samples for PWSs in categories 1 and 2) were above zero because the occurrence model assumes a log-normal distribution for water concentration. The system-level geometric mean occurrence values for the category 1 and 2 PWSs ranged from 0.01 to 254.65 ppt.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

For other systems, the EPA used state sampling data. The EPA used state monitoring data from 12 states[90], which generally conducted nontargeted monitoring (i.e., random sampling) of finished drinking water for one or more of the four PFAS in this analysis. PWSs that had state sampling data but were not sampled under UCMR 3 fell into categories 4 and 5 (n = 736). The EPA calculated the system-level geometric means of measured PFAS water sample concentrations to characterize PFAS occurrence for each PWS. For this dataset, the agency did not pursue Bayesian estimation of non-detection concentrations due to a limited sample size and non-standardized sampling regime. Instead, for these data, the EPA set non-detections to a small constant, 10 percent of the lowest analyte sample value (i.e., 0.02 ppt for each analyte), before calculating the system-level geometric mean.[91]

Among the 12 state occurrence datasets used in this analysis to characterize PFAS occurrence for category 4 and 5 PWS service areas, the EPA noted that different states utilized various reporting, quantification, and/or detection limits when analyzing and presenting data, and for some states, no clearly defined limits were publicly provided as part of the dataset. Further, the limits often varied within the data for each state depending on the specific PFAS analyte. In some cases, states reported detection, quantification, or reporting limits and/or presented data at concentrations below the EPA's final rule detection limits and/or practical quantitation limits provided in the Federal Register Notice for this final regulatory action. In addition to variable reporting limits and PFAS analytes evaluated, sample collection routines across state datasets also lacked uniformity. For more information on the collection and analysis of occurrence data, see U.S. EPA (2024g).

For both simulated occurrence data and state-sampled occurrence data, system-level geometric means were calculated to represent a typical concentration of a single sample for each PFAS analyte in a system. The concentrations of samples are log-normally distributed for all four PFAS analytes (PFOA, PFOS, PFHxS, PFHpA), meaning that while most samples have low concentrations, some may have much higher concentrations.

## 8.3.1.2.2 PWS Service Area Boundaries

For CWSs and NTNCWSs that had PFAS occurrence data sampled under UCMR 3 or PFAS occurrence data collected by states, the EPA acquired or estimated service area boundaries. Since TNCWSs have changing populations throughout the year, they were not included in this analysis. Data were categorized by the availability of PWS service areas, those with predelineated PWS service areas (categories 1 and 4), and those where zip codes served by PWSs were used to approximate PWS service area boundaries (categories 2 and 5). When available, predelineated PWS service areas were prioritized over zip code-approximated PWS service area boundaries. The EPA used the federal version of the SDWIS/Fed to inform the type of water system (e.g., CWS, NTNCWS), population served, identify Native American-owned

---

[90] States include: Alabama, Colorado, Illinois, Kentucky, Massachusetts, Michigan, New Hampshire, New Jersey, North Dakota, Ohio, South Carolina, and Vermont.
[91] The EPA evaluated the difference between using 10 percent (0.02 ppt) and 50 percent (1 ppt) of the minimum reported sample concentration for all analytes. The difference in population estimates from this change was less than 0.5 percent for all analytes. 10 percent of the minimum reported value was used in the analysis (0.02 ppt).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PWSs, and determine activity status for PWSs included in the analysis. Only active systems, as identified in SDWIS/Fed fourth quarter 2021, were included.

For predelineated PWS service area boundaries, the EPA aggregated spatial data from a variety of sources spanning multiple file formats into one ESRI file geodatabase.[92] Data sources are provided in Table 8-2.

---

[92] File formats included: ESRI ArcGIS Online (AGOL) layers, shapefiles, and GeoJSON.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                      APRIL 2024

**Table 8-2: Data Sources for Predelineated PWS Service Areas**

| Accessed Through State Sources or EPA Correspondence | | | |
|---|---|---|---|
| **State** | **Source Name** | **Link** | **Date** |
| CO | State of Colorado – Water District Boundaries | https://data.colorado.gov/Water/Water-District-Boundaries/82ke-q8t2 | Accessed 1/26/2022 |
| CA | State of California – Division of Drinking Water, California Water Resources Control Board | https://gispublic.waterboards.ca.gov/portal/home/item.html?id=fbba842bf134497c9d611ad506ec48cc | Accessed 1/31/2022 |
| NJ | EPA correspondence | EPA Office of Ground Water and Drinking Water | Accessed 1/31/2022 |
| NM | State of New Mexico – water data | https://catalog.newmexicowaterdata.org/dataset/5d069bbb-1bfe-4c83-bbf7-3582a42fce6e/resource/037d915d-4a28-4c39-9922-3556ec492698/download/nm_pws_areas.zip | Accessed 1/26/2022 |
| NY | State of New York – Department of Health | https://water.ny.gov/doh2/applinks/waterqual/assets/PWS_GeoJson3.json | Accessed 1/31/2022 |
| OK | State of Oklahoma – Water Resources Board | https://www.owrb.ok.gov/maps/data/layers/Water%20Supply/ws_system_service_areas.htm; https://owrb.maps.arcgis.com/apps/webappviewer/index.html?id=68c5f3fd492a43ee8386f39a80f88afb | Accessed 1/26/2022 |
| PA | State of Pennsylvania – Department of Environmental Protection | https://newdata-padep-1.opendata.arcgis.com/datasets/public-water-systems-public-water-supplier-service-areas/explore?location=40.917958%2C-77.621150%2C8.24 | Accessed 1/12/2022 |
| RI | EPA correspondence | EPA Office of Ground Water and Drinking Water | Accessed 1/31/2022 |
| Accessed through EPA ArcGIS Online Portal | | | |
| **State** | **Source** | **Link** | **Date** |
| AR | EPA ArcGIS – Portal | | |
| AZ | EPA ArcGIS – Portal | | |
| CT | EPA ArcGIS – Portal | | |
| KS | EPA ArcGIS – Portal | https://epa.maps.arcgis.com/home/item.html?id=59eb7810caa044678f1e26e637b4fa79 | Accessed 12/7/2021 |
| MO | EPA ArcGIS – Portal | | |
| MS | EPA ArcGIS – Portal | | |
| TX | EPA ArcGIS – Portal | | |
| UT | EPA ArcGIS – Portal | | |
| NC | EPA ArcGIS – Portal | https://www.nconemap.gov/search?groupIds=9eb59a7bdc8e4bdf8cbe2488c8584552 | Accessed 1/10/2021 |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Under UCMR 3 and 4, PWSs sampled were asked to report U.S. Postal Service zip code(s) for all areas being served water by a PWS. As such, when pre-delineated PWS service area boundaries were unavailable, the EPA used zip codes served by PWSs to delineate approximated boundaries using the following steps:

- The EPA joined zip codes served—as specified for PWSs in UCMR 3 (U.S. EPA, 2017) and UCMR 4 (U.S. EPA, 2022c)—to a zip code polygon layer that represented postal service delivery areas.

- The EPA projected zip codes served by PWSs.

- In cases where zip codes did not have polygons (i.e., zip codes for post offices and large volume mail customers), to map these zip codes as approximate service areas, the EPA selected and overlaid zip code points for each service area with zip code polygons to select the polygon at that location. Then, the EPA merged and dissolved all zip codes (both point- and polygon-based) to map each service area.

- The EPA aggregated all zip code polygons served by each PWS into one boundary representative of PWS service area boundaries.

- In instances where one zip code was served by multiple PWSs, the EPA included the zip code boundary in all corresponding PWS service area boundaries. For example, if one zip code was served by two PWSs, both PWS service area boundaries would contain the same zip code region represented in their boundaries. In some cases, this resulted in the EPA referencing the same population demographic composition for multiple systems; however, the populations were not double-counted because population-served data were obtained from SDWIS/Fed and were unique to each PWS.

PWSs with pre-delineated PWS service areas (categories 1 and 4), account for 38.4 percent of all PWSs included in the analysis. PWSs with zip code delineated boundaries (categories 2 and 5), account for 61.6 percent of all PWSs included in the analysis.

Because there is greater accuracy with the predelineated PWS service areas, and to reduce double-counting of affected populations, the EPA removed the portion of the zip code boundaries that were already accounted for within the predelineated PWS service area boundaries.

For example, in rural areas, the zip code boundaries can be relatively large and therefore overlap with predelineated PWS service area boundaries. To avoid redundancy and reduce bias from potentially counting populations outside a service area in the demographic composition of a system, the EPA used the following approach:

- The EPA used predelineated PWS service area boundaries (including overlap[93]) when available.

---

[93] For PWSs with predelineated PWS service area boundaries, the EPA conducted a sensitivity analysis of the results of the EPA's EJ exposure analysis to evaluate the impact of retaining PWS boundaries including overlapping areas versus removing overlapping boundaries. The impact on the results of the EPA's EJ exposure analysis showed very few differences across the two approaches. As such, the EPA used service area boundaries with overlapping areas included.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- If predelineated PWS service areas were not available, the EPA used zip code-approximated PWS service area boundaries (as provided in UCMR 3 and UCMR 4).

The EPA carved out or removed predelineated PWS service area boundaries from the zip code-approximated PWS service area boundaries to reduce the risk of double-counting the demographic composition of the populations served.

The EPA used predelineated PWS service area boundaries and zip code-approximated PWS service area boundaries as inputs to the EJSCREENbatch R package to estimate the sociodemographic characteristics of PWS service areas included in the analysis (see Section 8.3.1.2.3 for more detail on this process) (U.S. EPA, 2022a). The population served counts were obtained from SDWIS/Fed for each PWS. Further description of the population-served data and sociodemographic characteristics of the population served by PWS service areas is provided in Section 8.3.2.1 and in Appendix M.

### 8.3.1.2.2.1 Categories 1 and 2

Categories 1 and 2 contained PWSs that had sampled PFAS occurrence data from UCMR 3. Category 1 (n = 1,707 PWSs) comprised PWSs that had predelineated PWS service area boundaries, whereas category 2 (n = 3,036 PWSs) comprised PWSs that had zip code-approximated PWS service area boundaries.

The exposure analysis included service areas for 1,707 category 1 PWSs and 3,036 category 2 PWSs, for a total of 4,743 PWSs. There were 4,920 PWSs that conducted PFAS sampling under UCMR 3, and categories 1 and 2 PWSs accounted for approximately 96 percent of all PWSs that participated in UCMR 3. Of the 4,920 PWSs that participated in UCMR 3, 10 PWSs did not have predelineated PWS service area boundaries or zip code-served data available to approximate PWS service area boundaries. Systems were excluded from the analysis if they were classified as "inactive" in SDWIS/Fed (67 PWSs). Additionally, PWSs could not be evaluated if there were errors processing the EJSCREENbatch R package (100 PWSs). The majority of these systems are located in US territories.[94] In such instances, the EJSCREENbatch R package did not provide sociodemographic characteristics for a given PWS service area.

Category 1 and 2 PWSs account for 252.2 million people served, or approximately 76 percent of the U.S. population. However, the subset of category 1 and 2 PWSs captured in the analysis represented roughly 3 percent of active PWSs.[95]

### 8.3.1.2.2.2 Categories 4 and 5

The EPA used state PFAS occurrence data for PWSs in categories 4 and 5 because these systems did not monitor for PFAS under UCMR 3. Category 4 (n = 440 PWSs) included PWSs that had predelineated PWS service areas, whereas category 5 (n = 296 PWSs) included PWSs that had zip code-approximated PWS service area boundaries.

---

[94] These included 69 PWSs in Puerto Rico, 3 PWSs in the Virgin Islands, 2 PWSs in Guam, 1 PWS in American Samoa, and 1 system in the Northern Mariana Islands.
[95] The number of active public water systems was retrieved from SDWIS/Fed fourth quarter 2021.

FINAL RULE                                                                                                                      APRIL 2024

The EJ exposure analysis includes PWS service areas for 440 category 4 PWSs and 296 category 5 PWSs. Category 4 and 5 PWSs account for approximately 5 percent of all PWSs with state PFAS sample occurrence data. 1,143 PWSs with state PFAS occurrence data have PFAS occurrence data available in UCMR 3, and therefore are included in the analysis under categories 1 and 2. In addition, the EPA included PWSs with state PFAS occurrence data in the analysis only if finished water samples were available for at least one of the four PFAS analytes. The agency could not include many of the PWSs with state PFAS occurrence data because predelineated PWS service areas or zip code approximated PWS service area boundaries were not available.

Category 4 and 5 PWSs account for 2 million people served, or approximately 0.6 percent of the U.S. population. The EPA summarized the results for these PWSs in Appendix M.

### 8.3.1.2.2.3 Categories 3 and 6

The EPA did not include category 3 and 6 PWSs in the EJ exposure analysis because predelineated PWS service areas and information containing zip codes served by PWSs were both unavailable.

### 8.3.1.2.3 Sociodemographic Data

The EPA used version 2.0.1 of the agency's EJSCREENbatch R package to characterize the sociodemographic makeup of populations living in PWS service areas, as described in Section 8.3.1.2.2 (U.S. EPA, 2022a). The EJSCREENbatch R package offers functions to extract and process Census block group EJScreen data within user-provided geographies. This analysis relies on 2021 EJScreen data, which corresponds to  demographic estimates from the U.S. Census Bureau's ACS 2015–2019 five-year sample (U.S. EPA, 2022a). EJScreen data are input into a function that spatially apportions (i.e., using areal apportionment) data to service areas using a 1 km resolution raster population dataset from NASA's Socioeconomic Data and Applications Center.

The EPA used the following data outputted from the EJSCREENbatch package on the race, ethnicity, and poverty status of populations served by the PWSs:

- Race: Percent non-Hispanic American Indian or Alaska Native; percent non-Hispanic Asian; percent non-Hispanic Black or African American; percent non-Hispanic White, and percent non-Hispanic Pacific Islander.[96]

- Ethnicity: Percent Hispanic.

- Income: Percent of the population below twice the Federal poverty level; percent of the population above twice the Federal poverty level.

In addition, the agency identified PWSs that are Native American-owned and within the EPA's tribal primacy program using SDWIS/Fed data (U.S. EPA, 2021h).

---

[96] In an effort to avoid double counting populations, race/ethnicity categories reported here do not account for people who selected "some other race alone" or "two or more races" in the ACS.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                          APRIL 2024

Note that sociodemographic information used for the EPA's EJ exposure analysis includes additional demographic groups from those used in the EPA's benefits analysis, which relies on SDWIS/Fed and race/ethnicity-specific population estimates from the U.S. Census Bureau (2020a). Population estimates from the U.S. Census Bureau are available at the county level, but more granular location-specific population and demographic information was needed for the EPA's EJ exposure analysis. In particular, this analysis presents non-Hispanic American Indian or Alaska Native, non-Hispanic Asian, and non-Hispanic Pacific Islander instead of the Other demographic category employed in Section 8.4. Both analyses include the demographic categories non-Hispanic Black, Hispanic, and non-Hispanic White. For further information on the use of U.S. Census Bureau population proportions in the EPA's benefits analysis, see Appendix B.

Based on public comment provided on this proposed rule, the EPA has disaggregated the Asian and Pacific Islander demographic group into two separate categories for the final rule analysis; one representing Asian populations and the other Pacific Islander populations. The EPA disaggregated these demographic groups to ensure the prior aggregated category for Asian and Pacific Islander populations would not mask exposures and impacts specific to various ethnic subpopulations that fall under the broader Asian and Pacific Islander designation. These subpopulations vary in language, culture, and historic, social, economic, and environmental experiences; these differences contribute to unique social determinants of health, which could lead to disparate environmental exposures, impacts, and health outcomes (Look et al, 2020; Bhakta 2022). An aggregate Asian and Pacific Islander demographic group that encapsulates these various subpopulations may obscure possible disparities that exist across subpopulations (Quint et al, 2021). For the final rule analysis, the EPA disaggregated this group to investigate such possible disparities among the diverse subpopulations.

### 8.3.1.3 EJ Exposure Analytic Approach

The EPA conducted a baseline analysis of populations served by PWS service areas in categories 1 and 2 to evaluate the demographic characteristics of systems exposed to PFAS concentrations above a baseline set of thresholds and two hypothetical regulatory thresholds.

For purposes of this baseline analysis, the EPA assumed the following baseline thresholds are intended to reflect trigger levels of one-half of the MCL values for PFOA, and PFOS. For consistency, the EPA also applied these baseline thresholds for PFHxS and PFHpA. Note that the following values are slightly higher than Method 537.1 detection limits (U.S. EPA, 2018):[97,98,99]

---

[97] There are no detection limits reported for Method 533 (U.S. EPA, 2019b).

[98] The EPA used these detection limits solely as baseline thresholds for purposes of its EJ analysis. The EPA has defined the Rule Detection Limit for purposes of consideration of monitoring data to determine monitoring schedules as 1/2 the MCL for PFOA and PFOS, or 1.3 ppt. Refer to Sections VI, VIII, and IX of the federal register notice for this proposed regulatory action for further discussion on the EPA's analytical methods and the determination of practical quantitation limits (PQLs).

[99] As noted in Section 8.3.1.2.1, different states utilized various reporting, quantification, and/or detection limits when analyzing and presenting data, and for some states, no clearly defined limits were publicly provided as part of the dataset. Further, the limits often varied within the data for each state depending on the specific PFAS analyte. In some cases, states reported detection, quantification, or reporting limits and/or presented data at concentrations below the EPA's proposed rule detection limits and/or practical quantitation limits provided in the federal register notice for this proposed regulatory action. For more information on the collection and analysis of occurrence data, see U.S. EPA (2022h).

---

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- PFHpA: 2 ppt
- PFHxS: 2 ppt
- PFOS: 2 ppt
- PFOA: 2 ppt

The EPA also evaluated the rate of exposure using two hypothetical regulatory thresholds: (1) the UCMR 5 MRL values for each PFAS analyte, and (2) 10.0 ppt. For the purpose of this analysis, these values are assumed to be individual regulatory thresholds for each contaminant. The EPA notes that while these thresholds are not exactly set at the final or regulatory alternative MCL values, the EPA began this analysis prior to refinement of those regulatory options. This analysis is not intended to determine the demographic breakdown of costs and benefits expected to result from the final rule and alternatives; rather, this analysis determines whether overburdened communities are disproportionately exposed to PFAS over baseline conditions and these hypothetical thresholds. The UCMR 5 MRL values for PFOA, PFOS, PFHpA, and PFHxS are as follows:

- PFHpA: 3 ppt
- PFHxS: 3 ppt
- PFOS: 4 ppt
- PFOA: 4 ppt

The EPA compared the estimated population served in each demographic group anticipated to experience reductions in PFAS exposure under each hypothetical regulatory threshold to the total population served across all demographic groups. This analysis seeks to answer the following question: When PFAS occurs in drinking water over a certain threshold, will overburdened communities be disproportionately exposed to PFAS compared to the total population that is exposed to PFAS over the same threshold?

As described above, the EPA's EJ exposure analysis for the final rule uses data from EJScreen and the American Community Survey to examine anticipated exposure above set baseline and theoretical regulatory thresholds using system-level mean occurrence data. As the literature shows, the degree to which a community experiences PFAS exposure above a specific threshold can vary. As such, the EPA also characterized population-weighted mean concentrations of PFAS to evaluate the extent to which the levels of potential exposure correlate with community characteristics.

## 8.3.2 EJ Exposure Analysis Results

This section describes the demographic characterization of category 1 and 2 PWS service areas in the baseline as well as the results of the analysis exploring the EJ implications of two hypothetical regulatory thresholds. The EPA focused on category 1 and 2 PWS service areas due to the availability of spatial boundaries (from both predelineated PWS service area boundaries and zip code-approximated PWS service area boundaries) and PFAS occurrence data from UCMR 3. Results from categories 4 and 5 are reported in Appendix M.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 8.3.2.1 Demographic Profile of PWS Service Areas

Table 8-3 summarizes the breakdown of category 1 and 2 PWS service areas by state and by size, where small systems are those serving fewer than or equal to 10,000 people. In total, these PWSs account for roughly 252 million people served, or approximately 76 percent of the U.S. population. Category 1 and 2 PWSs span all states in the continental U.S. Category 1 and 2 PWSs included in this analysis capture roughly 3 percent of active PWSs. Among the 3 percent of active PWSs captured by the EPA's analysis (i.e., category 1 and 2 PWSs), there are 26 PWSs within the EPA's tribal primacy program, serving a population of approximately 306,000 people. Additionally, approximately 17 percent of the systems are defined as small (serving fewer than 10,000 people), accounting for 1.3 percent of the total population served.

Table 8-4 summarizes the demographic profile for category 1 and 2 PWS service areas and compares it to the demographic characteristics of the overall U.S. population. There are slight differences in the demographic characteristics of the population served by PWS service areas included in the EPA's analysis compared to the overall U.S. population, with percent differences all being less than +/- 4.1 percent. The population served by these PWSs has slightly higher percentages of Asian (+0.8%) and Black (+1.5%) populations compared to the overall U.S. population. The percentage of American Indian or Alaska Native and Pacific Islander populations is consistent with the percent of these populations across the U.S. The Hispanic population served by category 1 and 2 PWSs is slightly higher (+2.3%) and the non-Hispanic White population is lower (-4.1%) than that of the overall U.S. population. When examining income demographics, Table 8-4 shows that category 1 and 2 PWSs have a slightly higher percentage of populations with income below twice the Federal poverty level (+1.4%) and a slightly lower percentage of population with income above twice the Federal poverty level (-1.4%) compared to the overall U.S. population.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 8-3: Number of Category 1 and 2 PWSs and Populations Served by Size and State**

| State | Number of Total Service Areas | Number of Small Service Areas | Total Population Served[a] | Population Served in Small Systems[a] | Population Served in Medium and Large Systems |
|---|---|---|---|---|---|
| Tribal Service Areas | 26 | 12 | 305,846 | 36,235 | 269,611 |
| Alabama | 124 | 19 | 4,488,042 | 86,106 | 4,401,936 |
| Arizona | 75 | 14 | 5,897,987 | 52,559 | 5,845,428 |
| Arkansas | 63 | 18 | 1,786,895 | 81,217 | 1,705,678 |
| California | 451 | 38 | 36,995,867 | 149,032 | 36,846,835 |
| Colorado | 81 | 13 | 5,298,922 | 54,590 | 5,244,332 |
| Connecticut | 42 | 6 | 2,457,248 | 13,799 | 2,443,449 |
| Delaware | 13 | 3 | 642,261 | 13,535 | 628,726 |
| District of Columbia | 3 | 0 | 676,068 | 0 | 676,068 |
| Florida | 259 | 28 | 19,366,933 | 111,293 | 19,255,640 |
| Georgia | 124 | 20 | 8,752,508 | 77,382 | 8,675,126 |
| Idaho | 26 | 6 | 991,096 | 16,854 | 974,242 |
| Illinois | 252 | 32 | 9,702,346 | 120,173 | 9,582,173 |
| Indiana | 101 | 20 | 3,792,604 | 63,428 | 3,729,176 |
| Iowa | 57 | 15 | 1,810,021 | 52,241 | 1,757,780 |
| Kansas | 45 | 14 | 1,999,477 | 50,363 | 1,949,114 |
| Kentucky | 119 | 26 | 3,599,670 | 172,624 | 3,427,046 |
| Louisiana | 88 | 24 | 3,363,018 | 84,804 | 3,278,214 |
| Maine | 16 | 3 | 411,385 | 16,456 | 394,929 |
| Maryland | 39 | 8 | 4,980,513 | 20,084 | 4,960,429 |
| Massachusetts | 171 | 15 | 6,236,022 | 74,117 | 6,161,905 |
| Michigan | 158 | 25 | 5,895,618 | 122,403 | 5,773,215 |
| Minnesota | 98 | 14 | 3,478,561 | 40,952 | 3,437,609 |
| Mississippi | 77 | 24 | 1,399,379 | 86,698 | 1,312,681 |
| Missouri | 86 | 21 | 3,879,698 | 87,393 | 3,792,305 |
| Montana | 15 | 6 | 416,576 | 10,070 | 406,506 |
| Nebraska | 21 | 7 | 1,136,091 | 12,642 | 1,123,449 |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

**Table 8-3: Number of Category 1 and 2 PWSs and Populations Served by Size and State**

| State | Number of Total Service Areas | Number of Small Service Areas | Total Population Served[a] | Population Served in Small Systems[a] | Population Served in Medium and Large Systems |
|---|---|---|---|---|---|
| Nevada | 16 | 4 | 2,826,471 | 10,200 | 2,816,271 |
| New Hampshire | 23 | 5 | 570,449 | 10,907 | 559,542 |
| New Jersey | 173 | 17 | 8,123,044 | 54,089 | 8,068,955 |
| New Mexico | 28 | 5 | 1,442,144 | 7,457 | 1,434,687 |
| New York | 169 | 32 | 15,965,142 | 98,790 | 15,866,352 |
| North Carolina | 147 | 21 | 7,307,497 | 82,447 | 7,225,050 |
| North Dakota | 12 | 3 | 425,637 | 4,903 | 420,734 |
| Ohio | 184 | 28 | 8,971,538 | 113,929 | 8,857,609 |
| Oklahoma | 66 | 16 | 2,533,092 | 57,411 | 2,475,681 |
| Oregon | 65 | 11 | 2,875,275 | 33,730 | 2,841,545 |
| Pennsylvania | 174 | 34 | 9,402,219 | 130,731 | 9,271,488 |
| Rhode Island | 17 | 2 | 934,307 | 12,485 | 921,822 |
| South Carolina | 80 | 9 | 3,475,385 | 46,773 | 3,428,612 |
| South Dakota | 18 | 5 | 458,464 | 17,065 | 441,399 |
| Tennessee | 137 | 16 | 6,143,130 | 86,951 | 6,056,179 |
| Texas | 383 | 92 | 21,617,805 | 370,158 | 21,247,647 |
| Utah | 62 | 8 | 2,595,756 | 32,847 | 2,562,909 |
| Vermont | 12 | 6 | 142,888 | 23,438 | 119,450 |
| Virginia | 80 | 13 | 6,263,605 | 48,692 | 6,214,913 |
| Washington | 132 | 20 | 6,304,525 | 70,712 | 6,233,813 |
| West Virginia | 32 | 8 | 844,387 | 30,705 | 813,682 |
| Wisconsin | 92 | 18 | 2,920,851 | 82,496 | 2,838,355 |
| Wyoming | 11 | 2 | 268,828 | 3,341 | 265,487 |
| TOTAL | 4,743 | 806 | 252,173,091 | 3,137,307 | 249,035,784 |

Abbreviations: PWS – public water system.
Note:
[a]Population served by PWSs was obtained from SDWIS/Fed fourth quarter 2021. Small systems include those serving fewer than or equal to 10,000 people. Medium and large systems serve populations more than 10,000 people.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 8-4: Population Served by Category 1 and 2 PWSs Compared to Percent of U.S. Population by Demographic Group**

| | Race/Ethnicity | | | | | | Income | | Total Population Served |
|---|---|---|---|---|---|---|---|---|---|
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | |
| Population Served | 1,140,247 | 16,168,317 | 34,581,847 | 366,278 | 51,710,333 | 141,147,967 | 78,625,592 | 173,547,499 | 252,173,091 |
| Percent of Total Population Served | 0.5% | 6.4% | 13.7% | 0.10% | 20.50% | 56.00% | 31.2% | 68.8% | 100.0% |
| U.S. Population Percent by Demographic Group[a] | 0.6% | 5.6% | 12.2% | 0.20% | 18.20% | 60.10% | 29.8% | 70.2% | - |
| Percent Difference Between Population Served and U.S. Population | -0.1% | 0.8% | 1.5% | -0.10% | 2.30% | -4.10% | 1.4% | -1.4% | - |

Note:
[a] U.S. population estimates were obtained from the U.S. Census Bureau's American Community Survey 2016–2020 five-year estimates.

## 8.3.2.2 Exposure Analysis Results

### 8.3.2.2.1 Baseline Scenario

To evaluate impacts of the final rule on population groups of concern, the percent of a specific demographic group with modeled PFAS above baseline thresholds needs to be presented in relation to another group, typically referred to as a comparison group. The way in which the comparison group is defined can have important implications for identifying differences in potential exposure across population groups of concern in an EJ analysis. The agency's *Technical Guidance for Assessing Environmental Justice in Regulatory Analysis* notes that the comparison group can be defined as individuals with similar socioeconomic characteristics across different areas in the state, region or nation (i.e., within-group comparison) or as affected individuals with different socioeconomic characteristics (i.e., across-group comparison) (U.S. EPA, 2016h).

For this final regulatory action, the EPA examines individuals served by PWSs with modeled PFAS occurrence above the baseline concentration threshold or a specific hypothetical alternative policy threshold. The EPA presents the total affected population as a possible metric of comparison, noting however that each affected demographic group is reflected also within the total affected population. It is possible that the EPA understates the magnitude of disproportionate baseline exposure to PFAS for populations of concern by using the total affected population as the basis of comparison. For this reason, the EPA also makes comparisons between affected population groups of concern and the mutually exclusive affected non-Hispanic White population or the affected population with income above twice the Federal poverty level.

As currently defined, race and ethnicity classifications are presented in a disaggregated form such that racial categories include individuals who identify as non-Hispanic, while the Hispanic category includes individuals of any race who identify with Hispanic ethnicity. In aggregate, those who identify (1) as a race other than White and/or (2) identify with Hispanic ethnicity are considered "people of color" when considering potential EJ concerns. The EPA has therefore included the category non-Hispanic White in the analysis, as this category does not include individuals who identify as a race or ethnicity included within "people of color".

The results of the EPA's analysis of baseline exposure are shown in Table 8-5 and Table 8-6. Table 8-5 summarizes the population served by category 1 and 2 PWSs with modeled PFAS occurrence above baseline thresholds based on a trigger level of 2 ppt for each PFAS analyte, which is slightly above the Method 537.1 detection limits. The second set of rows in Table 8-5 summarizes the percentage of each demographic group with modeled PFAS occurrence above these baseline thresholds. Table 8-6 shows average population-weighted PFAS concentrations across demographic groups. In Table 8-5, percentages are bolded and italicized when the percentage of the population in a specific demographic group with modeled PFAS above the baseline threshold is greater than the percentage of the total population across all demographic groups exposed to modeled PFAS above this threshold (right-hand column). In, the highlighted numbers represent where percentages of the population served in a particular demographic group are more than 1 percentage point greater than percentages of the total population. In Table 8-6, highlighted cells represent whether the average concentration for a given demographic group is higher than the average for the total population served across all demographic groups (right-hand column). Higher percentages or concentrations indicate higher PFAS exposure for a given

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

demographic group compared to the percentage of the population served across all demographic groups. Between 4.7 percent and 10.8 percent of the total population served by category 1 and 2 PWS service areas, depending on the analyte, are exposed to modeled PFAS occurrence above baseline thresholds based on a trigger level of 2 ppt for each PFAS analyte.

The following are findings from the EPA's baseline EJ exposure analysis:[100]

- The percentage of Hispanic populations served with exposure to PFAS above baseline thresholds is higher across all four PFAS analytes compared to the percentage of the total population served across all demographic groups with anticipated PFAS exposure above baseline thresholds. All percentages are more than 1 percentage point greater than percentages exposed across the total population, ranging from 1.3 - 2.6 percentage points higher. These percentages are also higher than those of non-Hispanic White populations by 2.1 - 3.5 percentage points.

- The percentage of non-Hispanic Black populations served with exposure to PFAS above baseline thresholds is higher across all four PFAS analytes compared to the percentage of the total population served across all demographic groups. Exposure is at least one percentage point greater for PFOA and PFOS and less than 1 percentage point greater for PFHxS and PFHpA, with a range of 0.3 - 1.6 percentage points difference. The percentage of non-Hispanic Black populations exposed is also greater than the percentage of non-Hispanic White populations for all four PFAS analytes. The difference in percentage exposed between Black and non-Hispanic White populations ranges from 0.9 - 2.4 percentage points.

- The percentage of non-Hispanic American Indian or Alaska Native populations served have greater PFHxS exposure above its baseline threshold compared to the total population served across all demographic groups, and exposures to PFOS, PFHpA, and PFOA are similar to or less than the percentages exposed across all demographic groups. Exposure to PFHxS, PFHpA, and PFOA exposure above the baseline thresholds is higher for non-Hispanic American Indian or Alaska Native populations in comparison to the non-Hispanic White population by 0.3 to 1.8 percentage points.

- The percentage of non-Hispanic Asian populations served with exposure above baseline thresholds is comparable or less than the percentages of the population served across all demographic groups. When compared to non-Hispanic White populations, the percentage of non-Hispanic Asian populations served with exposure above baseline thresholds is 1 percentage point higher for PFOS but less than the exposure for non-Hispanic White populations for PFHxS, PFHpA, and PFOA.

- Other demographic groups, including non-Hispanic Pacific Islanders and those representing relative income status, are anticipated to experience percentages of PFAS occurrence above baseline thresholds similar to (within 0.5%) or less than the percentage of the population served across all demographic groups facing exposure above baseline thresholds.

---

[100] Although differences in anticipated exposure between a particular demographic group and the entire sample population are <5%, all results are reported in the EPA's summary of results regardless of magnitude.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

Table 8-6 characterizes population-weighted mean concentrations of PFAS by demographic group. In addition to having a higher percentage of populations served by PWSs with concentrations of PFAS above baseline thresholds, Hispanic and non-Hispanic Black populations are also exposed to higher mean concentrations than is typical for the total population served and average population-weighted exposures for non-Hispanic White populations. On average, Hispanic populations are exposed to 0.1-0.2 ppt more of each of the four PFAS analytes examined than non-Hispanic White populations served. Differences in average exposure between non-Hispanic Black populations and non-Hispanic White populations are close to or less than 0.1 ppt.

The results also suggest that non-Hispanic American Indian and Alaska Native as well as non-Hispanic Pacific Islander populations have greater exposure to PFHxS and PFOA in comparison to the total population served and the non-Hispanic White population. Non-Hispanic Pacific Islander populations have the highest average exposures to PFHxS and PFOA of any demographic group, while Hispanic populations are the most highly exposed to PFOS and PFHpA. The findings of differential population-weighted average exposure for non-Hispanic American Indian or Alaska Native as well as Pacific Islander populations was not observed in Table 8-5 except with respect to PFHxS for non-Hispanic American Indian or Alaska Native populations; this difference in results suggests that these populations may be exposed to higher average PFHxS and PFOA concentrations when exposure does occur, however these populations are not always more likely to be served by public water systems with above baseline concentrations of PFAS.

In addition, low-income populations are exposed to higher average concentrations of PFHxS, PFHpA, and PFOA in comparison to the total population served and to populations with income above twice the Federal poverty level, although differences are all less than 0.1 ppt.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                            APRIL 2024

**Table 8-5: Baseline Scenario: Population Served by Category 1 and 2 PWS Service Areas Above Baseline Thresholds and as a Percent of Total Population Served**

| PFAS | Race/Ethnicity | | | | | | Income | | Total Population Served |
|---|---|---|---|---|---|---|---|---|---|
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | |
| **Population Served Above Baseline Threshold** | | | | | | | | | |
| PFOS | 96,464 | 1,761,960 | 4,130,816 | 25,193 | 6,263,677 | 14,156,536 | 8,035,262 | 19,075,300 | 27,110,562 |
| PFHxS | 79,130 | 802,126 | 2,303,033 | 20,823 | 4,458,586 | 7,184,715 | 5,095,233 | 10,132,796 | 15,228,029 |
| PFHpA | 52,579 | 602,837 | 1,732,707 | 12,312 | 3,459,309 | 5,729,697 | 3,670,395 | 8,188,555 | 11,858,950 |
| PFOA | 88,674 | 1,069,233 | 3,423,882 | 19,851 | 5,202,088 | 10,561,078 | 6,651,205 | 14,211,140 | 20,862,345 |
| **Population Served Above Baseline Threshold as a Percent of Total Population Served** | | | | | | | | | |
| PFOS | 8.5% | *10.9%* | *11.9%* | 6.9% | *12.1%* | 10.0% | 10.2% | *11.0%* | 10.8% |
| PFHxS | *6.9%* | 5.0% | *6.7%* | 5.7% | *8.6%* | 5.1% | *6.5%* | 5.8% | 6.0% |
| PFHpA | 4.6% | 3.7% | *5.0%* | 3.4% | *6.7%* | 4.1% | 4.7% | 4.7% | 4.7% |
| PFOA | 7.8% | 6.6% | *9.9%* | 5.4% | *10.1%* | 7.5% | *8.5%* | 8.2% | 8.3% |

Abbreviations: PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                              APRIL 2024

**Table 8-6: Modeled Average PFAS Concentrations (ppt) by Demographic Group in the Baseline, Category 1 and 2 PWS Service Areas**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served |
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| PFOS | 0.97 | 1.01 | 1.05 | 0.90 | 1.15 | 0.96 | 1.01 | 1.02 | 1.01 |
| PFHxS | 0.81 | 0.58 | 0.64 | 0.86 | 0.75 | 0.59 | 0.64 | 0.62 | 0.63 |
| PFHpA | 0.53 | 0.50 | 0.55 | 0.51 | 0.64 | 0.50 | 0.54 | 0.53 | 0.53 |
| PFOA | 1.05 | 0.85 | 1.03 | 1.14 | 1.11 | 0.89 | 0.99 | 0.94 | 0.96 |

Abbreviations: PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                          APRIL 2024

## 8.3.2.2.2 Hypothetical Regulatory Scenario #1: UCMR 5 MRLs

Table 8-7 and Table 8-8 summarize the results for population served by category 1 and 2 PWSs with PFAS occurrence above UCMR 5 MRL values. For this hypothetical regulatory scenario, the EPA assumed that PWSs with PFAS system-level means above the MRL value will reduce PFAS levels to comply with the final rule. The first set of rows in Table 8-7 summarizes populations served by category 1 and 2 PWS service areas with modeled PFAS occurrence above the UCMR 5 MRLs. The second set of rows provides these estimates as a percentage of the total population served by PWSs included in the EPA's analysis. Table 8-8 summarizes the population-weighted average reductions in PFAS assuming all PWSs reduce their concentrations to UCMR 5 MRL levels.

In Table 8-7, percentages are bolded and italicized when the percentage of the population in a specific demographic group with PFAS occurrence above the MRL value is greater than the percentage of the total population across all demographic groups with PFAS occurrence above the MRL (right-hand column). In Table 8-7, the highlighted numbers represent where percentages of the population served in a particular demographic group are more than 1 percent greater than percentages of the total population. In Table 8-8, highlighted cells represent whether the average reduction in PFAS concentrations for a given demographic group is higher than the average for the total populations served across all demographic groups (right-hand column). The percentages that are bolded, italicized, or highlighted indicate higher PFAS exposure above the MRL for a given demographic group; the EPA anticipates that relatively higher reductions in PFAS exposure will accrue to these demographic groups under this hypothetical regulatory scenario compared to the percentage of the population across all demographic groups. The EPA provides additional details on anticipated exposure above UCMR 5 MRL values in Appendix M.

Between 3 percent and 5.4 percent of the population served by category 1 and 2 PWS service areas, depending on the PFAS analyte, are exposed to modeled PFAS concentrations above the UCMR 5 MRL values for PFOS, PFOA, PFHpA, and PFHxS. Under this hypothetical regulatory scenario, where MCLs are assumed to be equal to UCMR 5 MRL values, the EPA expects these populations to experience reductions in PFAS exposure to below the hypothetical regulatory thresholds. The EPA's analysis of the demographic distribution of anticipated health benefits and household costs due to reductions in PFAS exposure resulting from the final PFAS rule and regulatory alternatives is discussed in Section 8.4.2.

Based on this analysis, non-Hispanic American Indian or Alaska Native, non-Hispanic Black, Hispanic, and low-income populations are estimated to face higher rates of system-level mean PFAS exposure above UCMR 5 MRL values compared to rates of exposure over these thresholds for the total population served across all demographic groups. The differences are even greater when compared to the rates of exposure over these thresholds for non-Hispanic White populations. Specifically, non-Hispanic American Indian or Alaska Native populations served have higher exposure above the UCMR 5 MRL values for PFOA, PFHxS, and PFHpA compared to the percent of the population served across all demographic groups by 0.5 to 1.1 percentage points. These differences in exposure are 1.1 to 2.1 percentage points greater when compared to non-Hispanic White populations. Non-Hispanic Black populations served have higher exposure above the UCMR 5 MRL values for all four PFAS analytes compared to the percent of the total population served across all demographic groups, although these differences

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are all less than 0.5 percentage points. In comparison to the non-Hispanic White population, non-Hispanic Black populations have higher exposure above the UCMR 5 MRLs for all PFAS analytes examined, with a range of 0.7 to 1.2 percentage points greater exposure. Hispanic populations served have higher exposure above the UCMR 5 MRL values across all four PFAS analytes compared to the percent of the total population served across all demographic groups. The percent of Hispanic populations served with exposure above the UCMR 5 MRL values is at least double the percent of non-Hispanic White populations with exposure above the UCMR 5 MRL values for PFHxS and PFHpA and at least 2 percentage points greater for all PFAS analytes. This is the most notable difference in exposure for a single demographic group. The percent differences observed suggest that, in this analysis, Hispanic populations are estimated to face the highest baseline levels of exposure to all four PFAS analytes compared to the entire sample population across all demographic groups. As such, these Hispanic populations could also be expected to experience the greatest reductions in PFAS exposure under this hypothetical regulatory scenario. Populations served with income less than twice the Federal poverty level have higher rates of PFAS exposure above the UCMR 5 MRL values across all four PFAS analytes compared to the percent of the population served across all demographic groups. Exposure percentages for populations served with income less than twice the Federal poverty level are also higher than exposure for populations with income above twice the Federal poverty level for all four PFAS analytes, however differences are generally relatively small at between 0.2 - 0.6 percentage points.

Table 8-8 displays population-weighted reductions in PFAS exposure in a hypothetical regulatory scenario where system-level means are reduced to UCMR 5 MRLs to comply with the final rule. Hispanic populations see the greatest reductions in concentrations for PFOS and PFHpA in this hypothetical regulatory scenario, which is consistent with higher levels of exposure for this group observed in Table 8-7. However, despite having a lower percentage of populations affected than Hispanic populations, non-Hispanic Pacific Islander populations see the greatest reduction in PFOA and PFHxS of any demographic group in this hypothetical regulatory scenario. Similarly, non-Hispanic American Indian or Alaska Native populations see relatively large reductions in PFHxS and PFOA in comparison to both the total population served and non-Hispanic White populations. Non-Hispanic Black populations see higher reductions in PFOA and PFHpA than the average across the total population served, which is consistent with the percentage of non-Hispanic Black individuals with exposure above UCMR 5 MRLs being slightly higher than percentage of the total population served across all demographic groups as observed in Table 8-7.

FINAL RULE                                                                     APRIL 2024

**Table 8-7: Hypothetical Regulatory Scenario #1: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above UCMR 5 MRLs and as a Percent of Total Population Served**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served |
|---|---|---|---|---|---|---|---|---|---|
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | |
| **Population Served Above UCMR5 MRL** | | | | | | | | | |
| PFOS | 49,319 | 688,558 | 1,795,216 | 11,297 | 3,575,722 | 5,792,353 | 3,911,510 | 8,272,754 | 12,184,264 |
| PFHxS | 62,140 | 515,410 | 1,544,025 | 14,361 | 3,706,494 | 4,703,878 | 3,667,141 | 7,131,026 | 10,798,167 |
| PFHpA | 39,582 | 371,042 | 1,083,498 | 7,783 | 2,656,914 | 3,326,278 | 2,587,679 | 5,071,760 | 7,659,439 |
| PFOA | 67,366 | 706,541 | 2,026,879 | 11,952 | 3,925,638 | 6,642,157 | 4,409,705 | 9,273,284 | 13,682,989 |
| **Population Served Above UCMR 5 MRL as a Percent of Total Population Served** | | | | | | | | | |
| PFOS | 4.3% | 4.3% | **5.2%** | 3.1% | **6.9%** | 4.1% | **5.0%** | 4.8% | 4.8% |
| PFHxS | **5.4%** | 3.2% | **4.5%** | 3.9% | **7.2%** | 3.3% | **4.7%** | 4.1% | 4.3% |
| PFHpA | **3.5%** | 2.3% | **3.1%** | 2.1% | **5.1%** | 2.4% | **3.3%** | 2.9% | 3.0% |
| PFOA | **5.9%** | 4.4% | **5.9%** | 3.3% | **7.6%** | 4.7% | **5.6%** | 5.3% | 5.4% |

Abbreviations: MRL – minimum reporting level; PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; UCMR – Unregulated Contaminant Monitoring Rule.

FINAL RULE                                                                APRIL 2024

**Table 8-8: Reductions in Average PFAS Concentrations (ppt) by Demographic Group in a Hypothetical Regulatory Scenario with Maximum Contaminant Level at the UCMR 5 MRLs, Category 1 and 2 PWS Service Areas**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served |
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | |
|---|---|---|---|---|---|---|---|---|---|
| PFOS | 0.18 | 0.17 | 0.19 | 0.16 | 0.26 | 0.18 | 0.19 | 0.19 | 0.19 |
| PFHxS | 0.29 | 0.10 | 0.13 | 0.37 | 0.15 | 0.14 | 0.15 | 0.14 | 0.14 |
| PFHpA | 0.03 | 0.02 | 0.06 | 0.05 | 0.06 | 0.04 | 0.05 | 0.04 | 0.04 |
| PFOA | 0.43 | 0.22 | 0.35 | 0.58 | 0.40 | 0.29 | 0.35 | 0.30 | 0.32 |

Abbreviations: PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                      APRIL 2024

### 8.3.2.2.3 Hypothetical Regulatory Scenario #2: 10.0 ppt

Table 8-9 and Table 8-10 summarize the results of the population served by category 1 and 2 PWS service areas with modeled PFAS occurrence above 10.0 ppt. The first set of rows in Table 8-9 summarizes populations served by PWSs with PFAS occurrence above 10.0 ppt. The second set of rows displays these estimates as a percent of the total population served for PWSs included in the EPA's analysis. Table 8-10 shows the population-weighted average reduction in PFAS concentrations assuming all PWSs reduce their concentrations to 10.0 ppt.

In Table 8-9, percentages are bolded and italicized when the percentage of the population in a specific demographic group with PFAS occurrence above 10.0 ppt is greater than the percentage of the total population served across all demographic groups with PFAS occurrence above 10.0 ppt (right-hand column). In Table 8-10, highlighted cells represent whether the average reduction in PFAS concentrations for a given demographic group is higher than the average for the total populations served across all demographic groups (right-hand column). The percentages that are bolded, italicized, or highlighted indicate greater PFAS exposure above 10.0 ppt for a given demographic group compared to the total population served across all demographic groups; the EPA anticipates potentially relatively higher reductions in PFAS exposure to accrue to these demographic groups under this hypothetical regulatory scenario compared to the percentage of population across all demographic groups. Unlike the results from the EPA's exposure analysis where UCMR 5 MRLs are used as hypothetical MCL values, percentages in particular demographic groups are less than 1 percent greater than percentages across the total population. Between 0.1 percent and 1.3 percent of the population served by category 1 and 2 PWS service areas, depending on the PFAS analyte, is exposed to PFAS occurrence above 10.0 ppt.

The following are findings from the EJ exposure analysis for PFAS occurrence above 10.0 ppt:

- Non-Hispanic American Indian or Alaska Native, non-Hispanic Asian, non-Hispanic Black, and low-income populations have slightly higher PFAS exposure above 10.0 ppt for some PFAS analytes compared to the population served across all demographic groups. These results are essentially unchanged when comparing exposures above 10.0 ppt to non-Hispanic White populations.

- The most notable difference is for PFOA and PFHxS exposure for non-Hispanic American Indian or Alaska Native populations served. PFOA and PFHxS population exposure percentages are 2.5 and 1.3 percent, respectively, for non-Hispanic American Indian or Alaska Native populations served compared to 1.3 and 0.6 percent of the total population served across all demographic groups.

- Non-Hispanic Asian populations also have elevated exposure to PFOS over 10.0 ppt at 1.3 percent, whereas the percent of the total population served with PFOS above 10.0 ppt is 0.9 percent.

Table 8-10 characterizes population-weighted average reductions of PFAS by demographic group in a hypothetical regulatory scenario where system-level means are reduced to 10.0 ppt. This analysis provides similar evidence with respect to PFOA and PFHxS exposures above 10.0 ppt for non-Hispanic American Indian or Alaska Native populations as was summarized in Table 8-9. Similarly, reductions in PFOA exposure for non-Hispanic Black populations are greater than

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

for the total population served. Notably, we observe that non-Hispanic Pacific Islander populations see greater reductions than the total population served for all PFAS analytes despite having similar percentages of the population exposed above 10.0 ppt. Reductions of PFHxS and PFOA for non-Hispanic Pacific Islander populations are at least three times greater than reductions in these PFAS for both the total population served and non-Hispanic White populations. Low-income populations see slightly greater reductions in PFOA in comparison to the total population served as well as those with income above twice the Federal poverty level.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                          APRIL 2024

**Table 8-9: Hypothetical Regulatory Scenario #2: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above 10.0 ppt and as a Percent of Total Population Served**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served |
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | |
|---|---|---|---|---|---|---|---|---|---|
| **Population Served Above 10.0 ppt** | | | | | | | | | |
| PFOS | 6,398 | 202,496 | 223,186 | 2,212 | 504,833 | 1,379,440 | 666,066 | 1,703,438 | 2,369,504 |
| PFHxS | 14,318 | 77,674 | 204,849 | 2,500 | 237,828 | 1,041,439 | 493,350 | 1,136,891 | 1,630,241 |
| PFHpA | 1,674 | 11,466 | 74,657 | 722 | 52,522 | 218,417 | 119,836 | 251,455 | 371,291 |
| PFOA | 28,563 | 178,353 | 535,779 | 5,607 | 716,412 | 1,775,254 | 1,143,134 | 2,185,557 | 3,328,691 |
| **Population Served Above 10.0 ppt as a Percent of Total Population Served** | | | | | | | | | |
| PFOS | 0.6% | **1.3%** | 0.6% | 0.6% | **1.0%** | **1.0%** | 0.8% | **1.0%** | 0.9% |
| PFHxS | **1.3%** | 0.5% | 0.6% | **0.7%** | 0.5% | **0.7%** | 0.6% | **0.7%** | 0.6% |
| PFHpA | 0.1% | 0.1% | **0.2%** | **0.2%** | 0.1% | 0.2% | **0.2%** | 0.1% | 0.1% |
| PFOA | **2.5%** | 1.1% | **1.5%** | **1.5%** | **1.4%** | 1.3% | **1.5%** | 1.3% | 1.3% |

Abbreviations: PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; ppt – parts per trillion.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                 APRIL 2024

**Table 8-10: Reductions in Average PFAS Concentrations (ppt) by Demographic Group in a Hypothetical Regulatory Scenario with Maximum Contaminant Level at 10.0 ppt, Category 1 and 2 PWS Service Areas**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served |
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| PFOS | 0.04 | 0.03 | 0.04 | 0.07 | 0.03 | 0.05 | 0.04 | 0.04 | 0.04 |
| PFHxS | 0.09 | 0.04 | 0.05 | 0.30 | 0.06 | 0.07 | 0.06 | 0.06 | 0.06 |
| PFHpA | 0.01 | 0.00 | 0.01 | 0.03 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 |
| PFOA | 0.20 | 0.09 | 0.16 | 0.45 | 0.13 | 0.15 | 0.16 | 0.14 | 0.14 |

Abbreviations: PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 8.3.2.3 Comparison of Results by PWS Size

### 8.3.2.3.1 Demographic Profile of PWS Service Areas

Table 8-11 and Table 8-12 summarize the demographic profile for category 1 and 2 PWS service areas by system size for large and small PWS service areas, respectively. Small systems are defined as systems serving fewer than or equal to 10,000 people while large systems serve more than 10,000 people. Table 8-11 and Table 8-12 also provide a comparison to the demographic characteristics of the overall U.S. population.

Table 8-11 shows that the population served by large category 1 and 2 PWS service areas has slight differences in demographic characteristics compared to the overall U.S. population, with percent differences all being less than +/- 4.3 percent. The population served by large category 1 and 2 PWS service areas has lower percentages of non-Hispanic White (-4.3%) populations and populations with income above twice the Federal poverty level (-1.4%) compared to the overall U.S. population. Additionally, the population served by large category 1 and 2 PWS service areas have higher percentages of non-Hispanic Black (+1.6%), Hispanic (+2.4%), and non-Hispanic Asian populations (+0.9%) populations and populations with income below twice the Federal poverty level (+1.4%) compared to the overall U.S. population. The percentage of non-Hispanic American Indian or Alaska Native populations and non-Hispanic Pacific Islander populations is relatively consistent with the percent of these populations across the U.S.

Table 8-12 shows that the population served by small category 1 and 2 PWS service areas has greater differences in the demographic characteristics of the population served compared to the overall U.S. population, with percent differences being generally greater than +/- 2 percent, and the greatest difference being +12.2 percent. The population served by small category 1 and 2 PWS service areas has lower percentages of non-Hispanic Asian (-3.62%), non-Hispanic Black (-2.13%), and Hispanic (-6.58%) populations and populations with income above twice the Federal poverty level (-4.02%) compared to the overall U.S. population. Additionally, the population served by small category 1 and 2 PWS service areas has higher percentages of non-Hispanic American Indian or Alaska Native (+1%), non-Hispanic White (+12.23%) populations, and populations with income below twice the Federal poverty level (+4.02%) compared to the overall U.S. population.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                      APRIL 2024

**Table 8-11: Population Served by Category 1 and 2 PWSs and Percent of U.S. Population by Demographic Group, Large Systems**

| | Race and Ethnicity | | | | | | Income | | Total Population Served |
|---|---|---|---|---|---|---|---|---|---|
| | **Non-Hispanic American Indian or Alaska Native** | **Non-Hispanic Asian** | **Non-Hispanic Black** | **Non-Hispanic Pacific Islander** | **Hispanic** | **Non-Hispanic White** | **Below Twice the Poverty Level** | **Above Twice the Poverty Level** | |
| Population Served | 1,089,683 | 16,106,131 | 34,265,828 | 363,866 | 51,345,649 | 138,878,798 | 77,564,529 | 171,471,255 | 249,035,784 |
| Percent of Total Population Served | 0.44% | 6.47% | 13.76% | 0.15% | 20.62% | 55.77% | 31.15% | 68.85% | 100.00% |
| U.S. Population Percent | 0.6% | 5.6% | 12.2% | 0.2% | 18.2% | 60.1% | 29.8% | 70.2% | |
| Percent Difference Between Population Served Percent and U.S. Percent | -0.16% | 0.87% | 1.56% | -0.05% | 2.42% | -4.33% | 1.35% | -1.35% | |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

**Table 8-12: Population Served by Category 1 and 2 PWSs and Percent of U.S. Population by Demographic Group, Small Systems**

| | Race and Ethnicity | | | | | | Income | | Total Population Served |
|---|---|---|---|---|---|---|---|---|---|
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | |
| Population Served | 50,564 | 62,185 | 316,020 | 2,412 | 364,684 | 2,269,169 | 1,061,063 | 2,076,244 | 3,137,307 |
| Percent of Total Population Served | 1.61% | 1.98% | 10.07% | 0.08% | 11.62% | 72.33% | 33.82% | 66.18% | 100.00% |
| U.S. Population Percent | 0.6% | 5.6% | 12.2% | 0.2% | 18.2% | 60.1% | 29.8% | 70.2% | |
| Percent Difference between Population Served Percent and U.S. Percent | 1.01% | -3.62% | -2.13% | -0.12% | -6.58% | 12.23% | 4.02% | -4.02% | |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 8.3.2.3.2 Baseline Scenario

Table 8-13 and Table 8-14 summarize the populations served by large and small category 1 and 2 PWS service areas with modeled PFAS occurrence above baseline thresholds based on a trigger level of 2 ppt for each PFAS analyte, which is slightly above the Method 537.1 detection limits for each PFAS analyte. The second set of rows in Table 8-13 and Table 8-14 summarize the percentage of the total population served by demographic group with modeled PFAS occurrence above baseline thresholds. Percentages are bolded and italicized when the percentage of the population in a specific demographic group with modeled PFAS above baseline thresholds is greater than the percentage of the total population across all demographic groups exposed to modeled PFAS above the baseline thresholds. Additionally, percentages are highlighted when the percentage of the population in a specific demographic group with modeled PFAS above the baseline threshold represents greater than a 1 percentage point difference compared to the total population across all demographic groups. Table 8-15 characterizes population-weighted average PFAS concentrations across demographic groups in large and small category 1 and 2 PWSs. Highlighted cells represent whether the average concentration for a given demographic group is higher than the average concentration for the total population served across all demographic groups (right-hand column).

Depending on the PFAS analyte, between 4.8 percent and 10.8 percent of the total population served by large category 1 and 2 PWS service areas are exposed to modeled PFAS occurrence above baseline thresholds based on a trigger level of 2 ppt. Depending on the PFAS analyte, between 0.5 percent and 3.7 percent of the total population served by small category 1 and 2 PWS service areas is exposed to modeled PFAS occurrence above baseline thresholds based on baseline thresholds of 2 ppt.

For large systems, the percentage of Hispanic populations served by category 1 and 2 PWS service areas is higher across all four PFAS analytes compared to the percentage of the total population served across all demographic groups with anticipated PFAS exposure above baseline thresholds. Depending on the PFAS analyte, the percentage of Hispanic populations served by large systems with exposure above baseline thresholds is 1.3 percent to 2.6 percentage points higher than percentages of the total population served across all demographic groups, or 2.6 to 3.5 percentage points higher than for non-Hispanic White populations. Non-Hispanic Black populations are also exposed to all PFAS analytes above baseline levels to a greater extent than the total population served, with 1.6 and 1.2 percentage point higher exposure levels to PFOA and PFOS, respectively. In comparison to non-Hispanic White populations, non-Hispanic Black populations have 1 to 2.4 percentage points greater exposure depending on the PFAS analyte. The percent of non-Hispanic American Indian or Alaska Native populations served with exposure above baseline thresholds to PFHxS is 1.2 percentage points greater than the share of the total population served, or 2.1 percentage points higher than the percent of non-Hispanic White populations exposed. For large systems, significant differences in exposure to any PFAS for non-Hispanic Asian, non-Hispanic Pacific Islander, or low-income populations were not observed.

For small systems, the percent of non-Hispanic Asian populations served by category 1 and 2 PWS service areas with PFAS above baseline thresholds is higher for PFOA and PFOS in comparison to the total population served, with a range of 1.5 to 2.2 percentage points more of

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the population served. The percentage of non-Hispanic Black populations served by category 1 and 2 PWS service areas with PFAS above baseline thresholds is 0.8 percentage points higher for PFHxS compared to the percentage of the total population served across all demographic groups with anticipated PFAS exposure above baseline thresholds. The EPA also observed that non-Hispanic White populations and those with income above twice the Federal poverty level have slightly higher percentages of the population exposed across all PFAS analytes examined. Given the data gaps in occurrence information among small systems, extrapolating these results to small systems across the country is not possible. For example, the EPA observed only 2,400 individuals who identify as non-Hispanic Pacific Islander.

Table 8-15 provides detail on average concentrations across these demographic groups for large and small water systems, respectively. The first panel of Table 8-15 supports the previous findings in Table 8-13 that, for large PWSs, non-Hispanic American Indian or Alaska Native, non-Hispanic Black, and Hispanic populations served have greater exposure across at least two PFAS analytes in comparison to exposure for the total population served across all demographic groups. Hispanic and non-Hispanic Black populations served have greater exposure to all four PFAS in comparison to the total population served.

In addition, Table 8-15 demonstrates that non-Hispanic Pacific Islander populations are served by water systems with higher average concentrations of PFHxS and PFOA in comparison to average concentrations of these PFAS analytes for the total population served by large PWSs, even though non-Hispanic Pacific Islander populations have similar or even lower share of the population exposed in comparison to the total population served, as shown in Table 8-13. Non-Hispanic White and non-Hispanic Asian populations generally have lower average concentrations, on average, across all four PFAS analytes in comparison to the total population served. Further, populations with income less than twice the Federal poverty level are on average served by large PWSs with higher concentrations of three PFAS analytes in comparison to populations with income above twice the Federal poverty level or the total population served across all large PWSs.

The second panel of Table 8-15 shows that non-Hispanic Asian, non-Hispanic Black, and non-Hispanic White populations have greater potential exposure to specific PFAS analytes in comparison to the total population served across all demographic groups served by small PWSs. Non-Hispanic Asian populations served by small PWSs have elevated concentrations of PFOS and PFHpA in comparison to the total population served by small PWSs. Non-Hispanic Black populations served by small PWSs have greater exposure to PFOS, PFHxS, and PFOA in comparison to the total population served by small PWSs. Non-Hispanic White populations also see greater exposure to PFHpA in comparison to the total population served in small PWSs, although this difference is small (0.01 ppt).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                                APRIL 2024

**Table 8-13: Baseline Scenario: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above Baseline Thresholds and as a Percent of Total Population Served, Large Systems**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served | System Count |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | | |
| **Population Served Above Baseline Threshold** | | | | | | | | | | |
| PFOS | 96,211 | 1,758,287 | 4,120,087 | 25,192 | 6,253,084 | 14,069,015 | 8,013,031 | 18,982,735 | 26,995,766 | 339 |
| PFHxS | 79,002 | 802,016 | 2,296,946 | 20,822 | 4,457,379 | 7,156,640 | 5,083,638 | 10,107,999 | 15,191,637 | 186 |
| PFHpA | 52,475 | 602,507 | 1,732,401 | 12,295 | 3,458,779 | 5,714,325 | 3,666,804 | 8,175,133 | 11,841,937 | 143 |
| PFOA | 88,407 | 1,066,286 | 3,413,512 | 19,849 | 5,195,766 | 10,480,694 | 6,630,748 | 14,129,410 | 20,760,158 | 296 |
| **Population Served Above Baseline Threshold as a Percentage of Total Population Served** | | | | | | | | | | |
| PFOS | 8.83% | *10.92%* | *12.02%* | 6.92% | *12.18%* | 10.13% | 10.33% | *11.07%* | 10.84% | - |
| PFHxS | *7.25%* | 4.98% | *6.70%* | 5.72% | *8.68%* | 5.15% | *6.55%* | 5.89% | 6.10% | - |
| PFHpA | *4.82%* | 3.74% | *5.06%* | 3.38% | *6.74%* | 4.11% | 4.73% | *4.77%* | 4.76% | - |
| PFOA | 8.11% | 6.62% | *9.96%* | 5.46% | *10.12%* | 7.55% | *8.55%* | 8.24% | 8.34% | - |
| **Total Population Served in Sampled Population** | | | | | | | | | | |
| | 1,089,683 | 16,106,131 | 34,265,828 | 51,345,649 | 138,878,798 | 363,866 | 77,564,529 | 171,471,255 | 249,035,784 | - |

Abbreviations: PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 8-14: Baseline Scenario: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above Baseline Thresholds and as a Percent of Total Population Served, Small Systems**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served | System Count |
|------|---|---|---|---|---|---|---|---|---|---|
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | | |
| **Population Served Above Baseline Threshold** | | | | | | | | | | |
| PFOS | 253 | 3,672 | 10,730 | 1 | 10,593 | 87,520 | 22,231 | 92,565 | 114,796 | 22 |
| PFHxS | 128 | 111 | 6,087 | 1 | 1,207 | 28,075 | 11,595 | 24,797 | 36,392 | 9 |
| PFHpA | 104 | 330 | 306 | 17 | 530 | 15,372 | 3,591 | 13,422 | 17,013 | 4 |
| PFOA | 267 | 2,947 | 10,369 | 1 | 6,322 | 80,383 | 20,456 | 81,731 | 102,187 | 20 |
| **Population Served Above Baseline Threshold as a Percentage of Total Population Served** | | | | | | | | | | |
| PFOS | 0.50% | *5.90%* | 3.40% | 0.04% | 2.90% | *3.86%* | 2.10% | *4.46%* | 3.66% | - |
| PFHxS | 0.25% | 0.18% | *1.93%* | 0.04% | 0.33% | *1.24%* | 1.09% | *1.19%* | 1.16% | - |
| PFHpA | 0.21% | 0.53% | 0.10% | *0.70%* | 0.15% | *0.68%* | 0.34% | *0.65%* | 0.54% | - |
| PFOA | 0.53% | *4.74%* | *3.28%* | 0.04% | 1.73% | *3.54%* | 1.93% | *3.94%* | 3.26% | - |
| **Total Population Served in Sampled Population** | | | | | | | | | | |
| | 50,564 | 62,185 | 316,020 | 364,684 | 2,269,169 | 2,412 | 1,061,063 | 2,076,244 | 3,137,307 | - |

Abbreviations: PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                          APRIL 2024

**Table 8-15: Modeled Average PFAS Concentrations (ppt) by Demographic Group and System Size in the Baseline, Category 1 and 2 PWS Service Areas**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served |
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | |
|---|---|---|---|---|---|---|---|---|---|
| **Large Systems** | | | | | | | | | |
| PFOS | 0.99 | 1.02 | 1.05 | 0.90 | 1.16 | 0.96 | 1.02 | 1.02 | 1.02 |
| PFHxS | 0.84 | 0.58 | 0.64 | 0.86 | 0.75 | 0.59 | 0.65 | 0.63 | 0.63 |
| PFHpA | 0.54 | 0.50 | 0.55 | 0.51 | 0.64 | 0.50 | 0.55 | 0.53 | 0.54 |
| PFOA | 1.09 | 0.85 | 1.04 | 1.14 | 1.12 | 0.90 | 0.99 | 0.95 | 0.96 |
| **Small Systems** | | | | | | | | | |
| PFOS | 0.46 | 0.68 | 0.59 | 0.44 | 0.54 | 0.57 | 0.50 | 0.60 | 0.57 |
| PFHxS | 0.20 | 0.24 | 0.26 | 0.19 | 0.23 | 0.23 | 0.23 | 0.24 | 0.24 |
| PFHpA | 0.22 | 0.26 | 0.24 | 0.24 | 0.23 | 0.25 | 0.23 | 0.25 | 0.24 |
| PFOA | 0.32 | 0.45 | 0.57 | 0.29 | 0.38 | 0.46 | 0.42 | 0.48 | 0.46 |

Abbreviations: PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                    APRIL 2024

### 8.3.2.3.3 Hypothetical Regulatory Scenario #1: UCMR 5 MRLs

Table 8-16, Table 8-17, and Table 8-18 summarize the results for populations served by large and small category 1 and 2 PWS service areas with PFAS occurrence above UCMR 5 MRL values, respectively. The EPA assumed that PWS service areas with PFAS system-level means above the UCMR 5 MRL value will reduce PFAS levels to comply with the final rule.

The first set of rows in Table 8-16 and Table 8-17 summarize populations served by large and small category 1 and 2 PWSs with modeled PFAS occurrence above the UCMR 5 MRLs, respectively. The second set of rows provides these estimates as a percentage of the total population served by PWS service areas included in the EPA's analysis. In Table 8-16 and Table 8-17, percentages are bolded and italicized when the percentage of the population in a specific demographic group with PFAS occurrence above the MRL value is greater than the percentage of the total population across all demographic groups with PFAS occurrence above the MRL. Additionally, percentages are highlighted when the percentage of the population in a specific demographic group with modeled PFAS above the MRL represents greater than a 1 percentage point difference compared to the total population across all demographic groups exposed to modeled PFAS above the MRL value. Table 8-17 characterizes population-weighted average reductions in PFAS concentrations across demographic groups in large and small category 1 and 2 PWSs. Highlighted cells represent whether the average reduction for a given demographic group is higher than the average reduction for the total population served across all demographic groups (right-hand column). The percentages that are bolded, italicized, or highlighted indicate more PFAS exposure above the MRL for a given demographic group; the EPA anticipates relatively higher reductions in PFAS exposure will accrue to these demographic groups under this hypothetical regulatory scenario compared to the percentage of the population across all demographic groups.

Depending on the PFAS analyte, between 3.1 percent and 5.5 percent of the total population served by large category 1 and 2 PWS service areas are exposed to at least one of the modeled four PFAS occurrences above UCMR 5 MRL values. For small category 1 and 2 PWS service areas, depending on the PFAS analyte, between 0.3 percent and 1.9 percent of the total population served is exposed to modeled PFAS occurrence above UCMR 5 MRL values.

Findings for large systems are as follows:

- Non-Hispanic American Indian or Alaska Native populations served have higher exposure above UCMR 5 MRL values for PFOA, PFHpA, and PFHxS compared to the percent of the population served across all demographic groups. Non-Hispanic American Indian or Alaska Native populations also have higher exposure than the non-Hispanic White population across all PFAS analytes. The differences in percent of non-Hispanic American Indian or Alaska Native populations exposed range from 0.6 - 1.4 percentage points in comparison to the total population served across all demographic groups.

- Non-Hispanic Black populations served have higher exposure above the UCMR 5 MRL for all PFAS analytes compared to the percent of the total population served across all demographic groups, however the differences are all relatively small in magnitude (<0.5 percentage points). Exposure to PFOA, PFOS, and PFHxS for non-Hispanic Black

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

populations is at least 1 percentage point higher than percent of the non-Hispanic White population exposed to these PFAS analytes.

- Hispanic populations served by large PWSs have higher exposure above the UCMR 5 MRL values for all four PFAS analytes compared to the percent of the total population served across all demographic groups. Differences in percent of Hispanic populations exposed are consistently at least 2 percentage points higher in comparison to the total population served across all demographic groups. Hispanic populations have at least double the exposure above UCMR 5 MRL values in comparison to non-Hispanic White populations for PFHxS and PFHpA.

- Non-Hispanic Asian and non-Hispanic Pacific Islander populations served have comparable or lower levels of exposure above UCMR 5 MRL values for all PFAS analytes compared to both the percent of the total population served across all demographic groups and the non-Hispanic White population.

- Low-income populations have higher PFAS exposure above UCMR 5 MRL values for all PFAS analytes compared to the total population served across all demographic groups. These differences are all relatively small at less than 0.4 percentage points, but disparate exposures are larger for each PFAS analyte when compared to populations with income above twice the Federal poverty level.

Findings for small systems are as follows:

- Non-Hispanic Asian populations served have higher exposure above UCMR 5 MRL values for PFOS and PFHpA compared to the percent of the total population served across all demographic groups, with PFOS exposure 1 percentage point higher than the percent of the total population or non-Hispanic White population served that is exposed to PFOS.

- Non-Hispanic Black populations served have higher exposure above the UCMR 5 MRL values for PFOS, PFHxS, and PFOA compared to the percent of the total population served across all demographic groups, with PFOA exposure over 1 percentage point higher than the percent of the total population or non-Hispanic White population served. The differences in population exposed range from 0.9 - 1.3 percentage points when comparing exposure for non-Hispanic Black populations to the total population served.

- Non-Hispanic White populations served experience slightly higher exposure above the UCMR 5 MRL value for PFHpA compared to the percent of the total population served across all demographic groups.

- Populations with income above twice the Federal poverty level have higher exposure above the UCMR 5 MRL values across all PFAS analytes compared to the percent of the total population served across all demographic groups.

Table 8-18 characterizes population-weighted average reductions in PFAS exposures anticipated to occur for large and small PWSs in a hypothetical regulatory scenario where system-level means are reduced to UCMR 5 MRL values. For large systems, as in Table 8-16, Hispanic populations have higher exposures above UCMR 5 MRL values for all PFAS analytes in comparison to the total population served among large PWSs. The results also show that non-

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                          APRIL 2024

Hispanic Black populations have higher average exposures to PFHpA and PFOA than the total population served across all demographic groups in large PWSs. On average, non-Hispanic American Indian or Alaska Native populations also see large reductions in PFHxS and PFOA in comparison to the total population served, which is consistent with elevated percentages of the population exposed as shown in Table 8-16. Non-Hispanic Pacific Islander populations served by large systems see the greatest reductions in PFHxS and PFOA of any demographic group for large systems, with reductions of each that are roughly twice the average reduction observed for the total population served by large systems. In large systems, the EPA also observed elevated population-weighted concentrations of all PFAS analytes for low-income populations in comparison to the total population served, and low-income populations are also more exposed to all PFAS analytes in comparison to populations with income above twice the Federal poverty level. For small systems, non-Hispanic Asian, non-Hispanic Black, and Hispanic populations have larger reductions in particular PFAS than the total population served across all demographic groups. In general, however, differences in PFAS reductions across demographic groups are slight for small systems.

It should be noted that the sample size of small PWS service areas included in categories 1 and 2 with PFAS exposure above UCMR 5 MRL values is limited and could meaningfully impact the results presented in this analysis. The population served by small category 1 and 2 PWS service areas included in this analysis captures roughly 1 percent of the total U.S. population. Given that approximately 20 percent of the U.S. population is served by small systems, this subset of systems may not be representative of small systems across the U.S. As such, results from this analysis cannot be extrapolated to be representative of small systems nationwide. Additionally, the population served by the subset of small systems in categories 1 and 2 is disproportionately non-Hispanic White, with 12.2 higher percentage point representation compared to the overall U.S. population. The population served is also less Hispanic, with representation of this group being 6.58 percentage points lower than the overall U.S. population. Further evaluation is needed to demonstrate whether the sample population served by small category 1 and 2 PWS service areas is representative of the demographic breakdown of all small systems nationwide.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                      APRIL 2024

**Table 8-16: Hypothetical Regulatory Scenario #1: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above UCMR 5 MRLs and as a Percent of Total Population Served, Large Systems**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served | System Count |
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Population Served Above UCMR 5 MRL** | | | | | | | | | | |
| PFOS | 49,110 | 686,780 | 1,786,279 | 11,297 | 3,571,565 | 5,750,090 | 3,898,651 | 8,227,263 | 12,125,914 | 190 |
| PFHxS | 62,128 | 515,390 | 1,539,938 | 14,361 | 3,706,392 | 4,695,697 | 3,663,223 | 7,122,201 | 10,785,424 | 111 |
| PFHpA | 39,572 | 370,784 | 1,083,401 | 7,783 | 2,656,626 | 3,318,167 | 2,586,693 | 5,063,861 | 7,650,554 | 81 |
| PFOA | 67,138 | 705,879 | 2,017,982 | 11,950 | 3,922,241 | 6,608,160 | 4,397,699 | 9,237,285 | 13,634,984 | 175 |
| **Population Served Above UCMR 5 MRL as a Percentage of Total Population Served** | | | | | | | | | | |
| PFOS | 4.51% | 4.26% | *5.21%* | 3.10% | *6.96%* | 4.14% | *5.03%* | 4.80% | 4.87% | - |
| PFHxS | *5.70%* | 3.20% | *4.49%* | 3.95% | *7.22%* | 3.38% | *4.72%* | 4.15% | 4.33% | - |
| PFHpA | *3.63%* | 2.30% | *3.16%* | 2.14% | *5.17%* | 2.39% | *3.33%* | 2.95% | 3.07% | - |
| PFOA | *6.16%* | 4.38% | *5.89%* | 3.28% | *7.64%* | 4.76% | *5.67%* | 5.39% | 5.48% | - |
| **Total Population Served in Sampled Population** | | | | | | | | | | |
| | 1,089,683 | 16,106,131 | 34,265,828 | 51,345,649 | 138,878,798 | 363,866 | 77,564,529 | 171,471,255 | 249,035,784 | - |

Abbreviations: MRL – minimum reporting level; PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; UCMR – Unregulated Contaminant Monitoring Rule.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

**Table 8-17: Hypothetical Regulatory Scenario #1: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above UCMR 5 MRLs and as a Percent of Total Population Served, Small Systems**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served | System Count |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | | |
| **Population Served Above UCMR 5 MRL** | | | | | | | | | | |
| PFOS | 209 | 1,778 | 8,937 | 0 | 4,157 | 42,263 | 12,859 | 45,491 | 58,350 | 13 |
| PFHxS | 12 | 21 | 4,087 | 0 | 103 | 8,181 | 3,918 | 8,825 | 12,743 | 4 |
| PFHpA | 9 | 258 | 97 | 0 | 287 | 8,111 | 986 | 7,899 | 8,885 | 2 |
| PFOA | 228 | 663 | 8,897 | 1 | 3,397 | 33,997 | 12,006 | 35,999 | 48,005 | 10 |
| **Population Served Above UCMR 5 MRL as a Percentage of Total Population Served** | | | | | | | | | | |
| PFOS | 0.41% | 2.86% | 2.83% | 0.00% | 1.14% | 1.86% | 1.21% | 2.19% | 1.86% | - |
| PFHxS | 0.02% | 0.03% | 1.29% | 0.00% | 0.03% | 0.36% | 0.37% | 0.43% | 0.41% | - |
| PFHpA | 0.02% | 0.41% | 0.03% | 0.00% | 0.08% | 0.36% | 0.09% | 0.38% | 0.28% | - |
| PFOA | 0.45% | 1.07% | 2.82% | 0.04% | 0.93% | 1.50% | 1.13% | 1.73% | 1.53% | - |
| **Total Population Served in Sampled Population** | | | | | | | | | | |
| | 50,564 | 62,185 | 316,020 | 364,684 | 2,269,169 | 2,412 | 1,061,063 | 2,076,244 | 3,137,307 | - |

Abbreviations: MRL – minimum reporting level; PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; UCMR – Unregulated Contaminant Monitoring Rule.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                        APRIL 2024

**Table 8-18: Reductions in Average PFAS Concentrations (ppt) by Demographic Group in a Hypothetical Regulatory Scenario with Maximum Contaminant Levels at the UCMR 5 MRLs, Category 1 and 2 PWS Service Areas**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served |
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | |
|---|---|---|---|---|---|---|---|---|---|
| **Large Systems** | | | | | | | | | |
| PFOS | 0.19 | 0.17 | 0.19 | 0.16 | 0.26 | 0.18 | 0.20 | 0.19 | 0.19 |
| PFHxS | 0.31 | 0.10 | 0.14 | 0.38 | 0.16 | 0.15 | 0.15 | 0.14 | 0.15 |
| PFHpA | 0.04 | 0.02 | 0.06 | 0.05 | 0.06 | 0.04 | 0.05 | 0.04 | 0.04 |
| PFOA | 0.44 | 0.22 | 0.36 | 0.58 | 0.41 | 0.29 | 0.35 | 0.31 | 0.32 |
| **Small Systems** | | | | | | | | | |
| PFOS | 0.01 | 0.09 | 0.05 | 0.00 | 0.03 | 0.06 | 0.03 | 0.07 | 0.06 |
| PFHxS | 0.00 | 0.02 | 0.01 | 0.00 | 0.03 | 0.02 | 0.02 | 0.02 | 0.02 |
| PFHpA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PFOA | 0.02 | 0.05 | 0.17 | 0.00 | 0.05 | 0.10 | 0.09 | 0.10 | 0.10 |

Abbreviations: PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid.
Note:
[a] The demographic group people of color includes individuals who identify as Hispanic and/or a race other than White. It is calculated from EJScreen's percent minority indicator and is non-duplicative across race and ethnicity categories.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                          APRIL 2024

## 8.3.2.3.4 Hypothetical Regulatory Scenario #2: 10.0 ppt

Table 8-19 summarizes results for populations served by large category 1 and 2 PWS service areas with PFAS occurrence above 10.0 ppt. Table 8-20 summarizes results for populations served by small category 1 and 2 PWS service areas with PFAS occurrence above 10.0 ppt. Table 8-21 characterizes population-weighted average reductions in PFAS exposures anticipated to occur for large and small PWSs in a hypothetical regulatory scenario where system-level means are reduced to 10.0 ppt. The first set of rows in Table 8-19 and Table 8-20 summarizes populations served by large and small category 1 and 2 PWSs with modeled PFAS occurrence above the 10.0 ppt, respectively. The second set of rows provides these estimates as a percentage of the total population served by these PWS service areas.

In Table 8-19 and Table 8-20, percentages are bolded and italicized when the percent of the population in a specific demographic group with PFAS occurrence above 10.0 ppt is greater than the percentage of the total population across all demographic groups with PFAS occurrence above 10.0 ppt. In Table 8-21, highlighted cells represent whether the average reduction for a given demographic group is higher than the reductions for the total population served across all demographic groups in large and small PWSs (right-hand column). The percentages that are bolded, italicized, or highlighted indicate more PFAS exposure above 10.0 ppt for a given demographic group; the EPA anticipates relatively higher reductions in PFAS exposure will accrue to these demographic groups under this hypothetical regulatory scenario compared to the percentage of the population across all demographic groups.

For large systems, a greater percent of non-Hispanic American Indian or Alaska Native populations experience exposure to PFHxS and PFOA in comparison to the total population served, with differences ranging from 0.7 to 1.3 percentage points. Non-Hispanic Asian populations are exposed to PFOS to a greater extent than the total population served, with a difference of 0.3 percentage points. The percent of the non-Hispanic Black population with PFHpA and PFOA above 10.0 ppt is also elevated, although differences are relatively small in comparison to both the total population served or non-Hispanic White populations (<0.2 percentage points). Non-Hispanic Pacific Islander populations served by large systems have elevated exposure above 10.0 ppt for PFHpA, PFOA and PFHxS compared to the total population served across all demographic groups, although differences are again relatively small (<0.2 percentage points). Hispanic populations are slightly more likely to be served by large PWSs with PFOA and PFOS concentrations above 10.0 ppt (<0.1 percentage points). Populations with income below twice the Federal poverty level are also slightly more likely to have PFOS and PFHxS above 10.0 ppt in comparison to the total population served.

For small systems, non-Hispanic Asian populations are slightly more likely to be served by PWSs with PFOS above 10.0 ppt than the total population served by small systems. Non-Hispanic Black populations are more likely to be served by small systems with PFOA above 10.0 ppt, with a difference in percent of the population exposed of 0.9 percentage points in comparison to the total population served or non-Hispanic White populations. Non-Hispanic White populations have slightly elevated exposure above 10.0 ppt for PFOS compared to the population served across all demographic groups. The average reductions by demographic group, shown in Table 8-21, largely confirm the findings of Table 8-19 and Table 8-20, with greater

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

average reductions generally accruing to populations with a higher percentage of potentially exposed individuals for large and small PWSs.

As previously noted, the sample size of small PWS service areas included in categories 1 and 2 is limited, with population served capturing roughly 1 percent of the total U.S. population. Additionally, the population served by the subset of small systems in categories 1 and 2 is disproportionately White and non-Hispanic compared to the overall U.S. population, as previously discussed. Further evaluation is needed to demonstrate whether the sample population served by small category 1 and 2 PWS service areas is representative of the demographic breakdown of all small systems nationwide.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE

APRIL 2024

**Table 8-19: Hypothetical Regulatory Scenario #2: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above 10.0 ppt and as a Percent of Total Population Served, Large Systems**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served | System Count |
|---|---|---|---|---|---|---|---|---|---|---|
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | | |
| **Population Served Above 10.0 ppt** | | | | | | | | | | |
| PFOS | 6,388 | 202,238 | 223,089 | 2,212 | 504,545 | 1,371,329 | 665,080 | 1,695,539 | 2,360,619 | 48 |
| PFHxS | 14,317 | 77,668 | 204,840 | 2,500 | 237,779 | 1,041,289 | 493,256 | 1,136,755 | 1,630,011 | 32 |
| PFHpA | 1,673 | 11,460 | 74,648 | 722 | 52,474 | 218,268 | 119,742 | 251,319 | 371,061 | 8 |
| PFOA | 28,551 | 178,333 | 531,691 | 5,607 | 716,309 | 1,767,073 | 1,139,216 | 2,176,732 | 3,315,948 | 62 |
| **Population Served Above 10.0 ppt as a Percentage of Total Population Served** | | | | | | | | | | |
| PFOS | 0.59% | *1.26%* | 0.65% | 0.61% | *0.98%* | *0.99%* | 0.86% | *0.99%* | 0.95% | - |
| PFHxS | *1.31%* | 0.48% | 0.60% | *0.69%* | 0.46% | *0.75%* | 0.64% | *0.66%* | 0.65% | - |
| PFHpA | 0.15% | 0.07% | *0.22%* | *0.20%* | 0.10% | *0.16%* | 0.15% | 0.15% | 0.15% | - |
| PFOA | *2.62%* | 1.11% | *1.55%* | *1.54%* | *1.40%* | 1.27% | *1.47%* | 1.27% | 1.33% | - |
| **Total Population Served in Sampled Population** | | | | | | | | | | |
| | 1,089,683 | 16,106,131 | 34,265,828 | 51,345,649 | 138,878,798 | 363,866 | 77,564,529 | 171,471,255 | 249,035,784 | - |

Abbreviations: MRL – minimum reporting level; PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; UCMR – Unregulated Contaminant Monitoring Rule.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                                      APRIL 2024

**Table 8-20: Hypothetical Regulatory Scenario #2: Demographic Breakdown of Population Served by Category 1 and 2 PWS Service Areas Above 10.0 ppt and as a Percent of Total Population Served, Small Systems**

| | Race and Ethnicity | | | | | | Income | | Total Population Served | System Count |
|---|---|---|---|---|---|---|---|---|---|---|
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | | |
| **Population Served Above 10.0 ppt** | | | | | | | | | | |
| PFOS | 9 | 258 | 97 | 0 | 287 | 8111 | 986 | 7899 | 8,885 | 2 |
| PFHxS | 1 | 7 | 9 | 0 | 48 | 149 | 94 | 136 | 230 | 1 |
| PFHpA | 1 | 7 | 9 | 0 | 48 | 149 | 94 | 136 | 230 | 1 |
| PFOA | 12 | 21 | 4087 | 0 | 103 | 8181 | 3918 | 8825 | 12,743 | 3 |
| **Population Served Above 10.0 ppt as a Percentage of Total Population Served** | | | | | | | | | | |
| PFOS | 0.02% | *0.41%* | 0.03% | 0.00% | 0.08% | *0.36%* | 0.09% | *0.38%* | 0.28% | - |
| PFHxS | 0.00% | *0.01%* | 0.00% | 0.00% | *0.01%* | 0.01% | 0.01% | 0.01% | 0.01% | - |
| PFHpA | 0.00% | *0.01%* | 0.00% | 0.00% | *0.01%* | 0.01% | 0.01% | 0.01% | 0.01% | - |
| PFOA | 0.02% | 0.03% | *1.29%* | 0.00% | 0.03% | 0.36% | 0.37% | *0.43%* | 0.41% | - |
| **Total Population Served in Sampled Population** | | | | | | | | | | |
| | 50,564 | 62,185 | 316,020 | 364,684 | 2,269,169 | 2,412 | 1,061,063 | 2,076,244 | 3,137,307 | - |

Abbreviations: PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid; ppt – parts per trillion.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                              APRIL 2024

**Table 8-21: Reductions in Average PFAS Concentrations (ppt) by Demographic Group in a Hypothetical Regulatory Scenario with Maximum Contaminant Levels at 10.0 ppt, Category 1 and 2 PWS Service Areas**

| PFAS | Race and Ethnicity | | | | | | Income | | Total Population Served |
|---|---|---|---|---|---|---|---|---|---|
| | Non-Hispanic American Indian or Alaska Native | Non-Hispanic Asian | Non-Hispanic Black | Non-Hispanic Pacific Islander | Hispanic | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level | |
| **Large Systems** | | | | | | | | | |
| PFOS | 0.04 | 0.03 | 0.04 | 0.07 | 0.03 | 0.05 | 0.04 | 0.04 | 0.04 |
| PFHxS | 0.10 | 0.04 | 0.05 | 0.30 | 0.06 | 0.07 | 0.06 | 0.06 | 0.06 |
| PFHpA | 0.01 | 0.00 | 0.01 | 0.03 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 |
| PFOA | 0.21 | 0.09 | 0.16 | 0.45 | 0.13 | 0.15 | 0.16 | 0.14 | 0.15 |
| **Small Systems** | | | | | | | | | |
| PFOS | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 | 0.01 | 0.00 | 0.01 | 0.01 |
| PFHxS | 0.00 | 0.02 | 0.01 | 0.00 | 0.03 | 0.01 | 0.02 | 0.01 | 0.02 |
| PFHpA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PFOA | 0.01 | 0.03 | 0.06 | 0.00 | 0.03 | 0.05 | 0.05 | 0.05 | 0.05 |

Abbreviations: PFHpA – perfluoroheptanoic acid; PFHxS – perfluorohexanesulfonic acid; PFOA – perfluorooctanoic acid; PFOS – perfluorooctanesulfonic acid.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 8.4 SafeWater EJ Analysis of Final Rule and Regulatory Alternatives

### 8.4.1 Methodology

In addition to analyzing EJ exposure using the EJSCREENbatch R package, the EPA also conducted an EJ analysis of the final rule and regulatory alternatives using the SafeWater MCBC. The EPA's final rule sets MCLs of 4.0 ppt for PFOA and PFOS each, MCLs of 10 ppt each for PFHxS, PFNA, and HFPO-DA and an HI of 1.0 for PFNA, HFPO-DA, PFHxS, and PFBS. Options 1a, 1b, and 1c set MCL values for PFOA and PFOS at 4.0 ppt, 5.0 ppt, and 10.0 ppt, respectively.

SafeWater MCBC was used to analyze the distribution of anticipated health benefits and household costs associated with the final PFAS NPDWR across race/ethnicity groups and income level. For more information on SafeWater MCMC and its application in the EPA's analysis of national quantified benefits and costs associated with the final PFAS NPDWR, see Section 5.2.

Using SafeWater MCBC, the EPA estimated the quantified health benefits and household costs expected to accrue to specific race/ethnicity and income level groups for category 1 and 2 PWS service areas. As previously described in Section 8.3.1, category 1 and 2 PWS service areas include systems that have sampled PFAS occurrence data from UCMR 3 and have predelineated service area boundaries or those estimated using zip code served information (n = 4,723). The subset of category 1 and 2 PWSs captured in the analysis represents roughly 3 percent of active PWSs.[101]

Results are presented across four race/ethnicity groups, consistent with the subpopulation definitions used to estimate the national quantified benefits for the final PFAS NPDWR (see Section 8.1). These race/ethnicity groups include: non-Hispanic Black, Hispanic, non-Hispanic White, and Other.[102] Race/ethnicity categories examined in the EPA's analysis using SafeWater MCBC differ from the demographic groups presented in the exposure analysis discussed previously in this chapter due to the availability of demographic information utilized in the EPA's quantified benefits analysis. For more information on the selection of data inputs to the EPA's benefit analysis, see Chapter 6.

The total sample population captured by the EPA's analysis using SafeWater MCBC is roughly 196 million people, with a breakdown by race/ethnicity and income group as follows:

- Non-Hispanic Black: 25.1 million (~13%)

- Hispanic: 32.6 million (~17%)

- Other: 12.2 million (~6%)

---

[101] The number of active PWSs was retrieved from SDWIS/Fed fourth quarter 2021.

[102] The "Other" race/ethnicity category includes any race/ethnicity populations that are not non-Hispanic Black, Hispanic, or non-Hispanic White.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- Non-Hispanic White: 125.9 million (~64%)
- Income below twice the poverty level: 61.6 million (~32%)
- Income above twice the poverty level: 133.9 million (~68%)

When compared to the breakdown of the total U.S. population by these same race/ethnicity groups, the makeup of the sample population in the EPA's analysis is generally representative of the overall U.S. population. Non-Hispanic Black, Hispanic, and Other race/ethnicity groups (making up ~13 percent, ~19 percent, and ~8 percent of the U.S. population, respectively) are slightly underrepresented, while the non-Hispanic White race/ethnicity group (making up ~60% of the U.S. population) is slightly overrepresented in the EPA's analysis (U.S. Census Bureau, 2020a).

Because demographic proportion information utilized in the EPA's benefits analysis was available at the county level, the EPA utilized the following step-by-step approach to identify the number of people in each race/ethnicity and income group within a given PWS service area. Specifically, in this order, the EPA utilized the following stepwise approach:

1. Overlayed census block groups with PWS service area boundaries;
2. Calculated the area of each census block group and PWS service area boundary;
3. Calculated the percent of each census block group overlapping each PWS service area boundary;
4. Multiplied the population of the census block group by the percent of each census block overlapping each PWS service area boundary;
5. Summed across census block groups to calculate the population in each PWS service area boundary that lives in each county;
6. Calculated the percent of the population in each county (PWS_county_weight) for each PWS; and
7. Estimated the number of people served by a PWS for each subpopulation as follows:

Equation 21:

$$SubPop = \sum_c PWS\_county\_weight_c \; x \; PWS\_Pop \; x \; Subpop\_share_c$$

Where:

$SubPop$ = number of people in each subpopulation served by a PWS

$PWS\_County\_weight_c$ = the percentage of the PWS population in each county (c)

$PWS\_Pop$ = Number of people served by PWS from SDWIS/Fed inventory

$Subpop\_share_c$ = The share of county (c) population consisting of the subpopulation from the U.S. Census

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

As part of its national analysis of quantified benefits and costs using SafeWater MCBC, the EPA accounted for states that have enacted enforceable MCLs for PFAS contaminants. For these states, the EPA assumed that the state MCL is the maximum baseline PFAS occurrence value for all EPs in the state. For more information on this assumption and on state-enacted MCLs, see Section 4. The EPA has applied this assumption as part of its EJ analysis conducted in SafeWater MCBC.

## 8.4.2 SafeWater EJ Analysis Results

### 8.4.2.1 Health Benefits

To determine if there are disproportionate health impacts borne by any race/ethnicity subpopulation or income group under the final rule or regulatory alternatives, the EPA estimated the annual avoided cases of mortality and morbidity per 100,000 people, as shown in Table 8-22 through Table 8-25.

For the analysis conducted in SafeWater MCBC, the EPA reports the estimated avoided cases of mortality and morbidity by race/ethnicity and income groups for the following health endpoints:

- CVD: Non-fatal MI, non-fatal IS, CVD deaths

- RCC: Non-fatal RCC cases avoided, fatal RCC cases avoided

- Birth weight: Birth weight gain (total grams), birth weight-related deaths avoided

Baseline incidence associated with these health endpoints varies by demographic group, and disparities in underlying incidence by demographic group likely influence the distribution of quantified health benefits expected under the final PFAS NPDWR. For example, non-fatal MI incidence is generally most prevalent among non-Hispanic White males, while non-fatal IS incidence is generally most prevalent among non-Hispanic Black males. Additionally, low income and poverty are linked to higher cancer mortality rates. Survival after a cancer diagnosis is shorter for people of all races who have a lower socio-economic status (National Cancer Institute, 2020). The demographic distribution of quantified health benefits presented here incorporates differing incidence in baseline health outcomes by race/ethnicity. However, the demographic distribution of quantified health benefits that the EPA reports here have not been adjusted for income. For a detailed breakdown of incidence associated with the effects of reduced birth weight on infant mortality, CVD events, and RCC by race/ethnicity, see Appendices E, G, and H, respectively.

The EPA did not analyze the demographic breakdown of bladder cancer cases avoided that are expected to result from the co-removal of PFAS and DBP precursors (discussed in Section 6.7). The EPA models bladder cancer impacts based on a national-level distribution of finished water TOC levels; because specific TOC levels at actual PWSs are not available, the EPA did not include these impacts in the portion of its EJ analysis conducted in SafeWater MCBC.

Table 8-22 summarizes the number of avoided cases of morbidity and mortality per 100,000 people per year for all health endpoints evaluated under the EPA's final regulatory option. Table 8-23 through Table 8-25 summarize the number of avoided cases of morbidity and mortality per

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

100,000 people per year for all health endpoints evaluated under the EPA's regulatory alternatives.

For the final rule and all regulatory alternatives, benefits are anticipated to be realized across all health endpoints and demographic groups (i.e., race/ethnicity and income) evaluated. A summary of benefits anticipated for each health endpoint is included below. In general, when comparing benefits under the final rule to those across regulatory alternatives, the distribution of quantified health benefits for a given demographic group is relatively similar. Variation exists between the final rule and regulatory alternatives with respect to the total amount of health benefits anticipated. Additionally, across all health endpoints evaluated and across all race/ethnicity groups, the greatest benefits are anticipated under the final rule.

Below is a summary of quantified health benefits categorized by endpoint, with results presented across the final rule and regulatory alternatives and across demographic groups.

*Cardiovascular Disease*

*Non-Fatal MI Cases Avoided* – Under the final rule and all alternatives and across all race/ethnicity and income groups, values range from 1.07 to 3.78 cases avoided per 100,000 people per year. Under the final rule and all alternatives, the EPA anticipates the greatest benefit to accrue to the Hispanic race/ethnicity group and the lowest benefit to accrue to the non-Hispanic Black race/ethnicity group. The number of MI cases avoided per 100,000 people per year is similar across income groups (e.g., for the final rule, 3.09 cases avoided per 100,000 people for populations with income below twice the poverty level vs. 2.99 cases avoided per 100,000 people for populations with income above twice the poverty level).

*Non-Fatal IS Cases Avoided* – Under the final rule and all alternatives and across all race/ethnicity and income groups, values range from 1.58 to 7.48 cases avoided per 100,000 people per year. Under the final rule and all alternatives, the EPA anticipates the greatest benefit to accrue to the non-Hispanic Black race/ethnicity group. Under the final rule, the EPA anticipates the lowest benefit to accrue to the non-Hispanic White race/ethnicity group, though this is not the case across all regulatory alternatives evaluated.[103] The number of IS cases avoided per 100,000 people per year is similar across income groups (e.g., for the final rule, 4.68 cases avoided per 100,000 people for populations with income below twice the poverty level vs. 4.45 cases avoided per 100,000 people for populations with income above twice the poverty level).

*CVD Deaths Avoided* – Under the final rule and all alternatives and across all race/ethnicity and income groups, values range from 0.53 to 3.90 deaths avoided per 100,000 people per year. Under the final rule and all alternatives, the EPA anticipates the greatest benefit to accrue to the non-Hispanic Black race/ethnicity group. The lowest benefit is anticipated to accrue to the non-Hispanic White race/ethnicity group under the final rule and Options 1a and 1b, whereas the Other race/ethnicity group is anticipated to experience the lowest benefit under Option 1c. The number of deaths avoided per 100,000 people per year is similar across income groups (e.g., for the final rule, 1.72 deaths avoided per 100,000 people for populations with income below twice

---

[103] The non-Hispanic White race/ethnicity group is anticipated to experience the lowest benefit related to non-fatal IS cases avoided under the final rule and under Options 1a and 1b. Under Option 1c, the Other race/ethnicity group is anticipated to experience the lowest benefit for non-fatal IS cases avoided, (i.e., 1.58 cases avoided per 100,000 people).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the poverty level vs. 1.62 deaths avoided per 100,000 people for populations with income above twice the poverty level).

*Renal Cell Carcinoma*

*Non-Fatal RCC Cases Avoided* – Under the final rule and all alternatives and across all race/ethnicity and income groups, values range from 0.98 to 4.04 cases avoided per 100,000 people per year. Under the final rule and all alternatives, the EPA anticipates the greatest benefit to accrue to Hispanic race/ethnicity groups and the lowest benefit to accrue to the non-Hispanic White race/ethnicity group. The number of cases avoided per 100,000 people per year is similar across income groups (e.g., for the final rule, 3.09 cases avoided per 100,000 people for populations with income below twice the poverty level vs. 3.02 cases avoided per 100,000 people for populations with income above twice the poverty level).

*Fatal RCC Cases Avoided* – Under the final rule and all alternatives and across all race/ethnicity and income groups, values range from 0.26 to 1.44 deaths avoided per 100,000 people per year. Under the final rule and all alternatives, the EPA expects the greatest benefit to accrue to the Hispanic race/ethnicity group and the lowest benefit to accrue to the non-Hispanic White race/ethnicity group. The number of deaths avoided per 100,000 people per year is similar across income groups (e.g., for the final rule, 0.91 deaths avoided per 100,000 people for populations with income below twice the poverty level vs. 0.88 deaths avoided per 100,000 people for populations with income above twice the poverty level).

*Birth Weight*

*Birth Weight Gain (total grams)* – Under the final rule and all alternatives and across all race/ethnicity and income groups, values range from 32,431 grams to 167,846 grams of birth weight gain per 100,000 people per year. Under the final rule and all alternatives, the EPA expects the largest benefit to accrue to the Hispanic race/ethnicity group and the lowest benefit to accrue to the non-Hispanic White race/ethnicity group. The EPA also expects slightly larger benefits to accrue to populations with income below twice the poverty level (100,943 grams of birth weight gain per 100,000 people per year under the final rule) compared to populations with income above twice the poverty level (93,366 grams of birth weight gain per 100,000 people per year under the final rule).

*Birth Weight-Related Deaths Avoided* – Under the final rule and all alternatives and across all race/ethnicity and income groups, values range from 0.19 to 1.00 birth weight-related deaths avoided per 100,000 people per year. Under the final rule and all alternatives, the EPA anticipates the greatest benefit to accrue to the non-Hispanic Black race/ethnicity group and the lowest benefit to accrue to the non-Hispanic White race/ethnicity group. The number of birth weight-related deaths avoided per 100,000 people per year is similar across income groups (e.g., for the final rule, 0.62 deaths avoided per 100,000 people for populations with income below twice the poverty level vs. 0.55 deaths avoided per 100,000 people for populations with income above twice the poverty level).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 8-22: Annualized Cases Avoided per 100,000 People by Race/Ethnicity and Income Group, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1)**

| Health Endpoint | Race and Ethnicity | | | | Income | |
|---|---|---|---|---|---|---|
| | Non-Hispanic Black | Hispanic | Other | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level |
| Non-Fatal MI Cases Avoided | 2.34 | 3.78 | 3.52 | 2.91 | 3.09 | 2.99 |
| Non-Fatal IS Cases Avoided | 7.48 | 5.33 | 3.87 | 3.78 | 4.68 | 4.45 |
| CVD Deaths Avoided | 3.90 | 1.57 | 1.29 | 1.26 | 1.72 | 1.62 |
| Non-Fatal RCC Cases Avoided | 3.31 | 4.04 | 3.04 | 2.73 | 3.09 | 3.02 |
| Fatal RCC Cases Avoided | 0.96 | 1.44 | 0.86 | 0.74 | 0.91 | 0.88 |
| Birth Weight Gain (total grams) | 122,024 | 167,846 | 102,190 | 71,201 | 100,943 | 93,366 |
| Birth Weight-Related Deaths Avoided | 1.00 | 0.93 | 0.47 | 0.41 | 0.62 | 0.55 |

Abbreviations: CVD – cardiovascular disease; MI – myocardial infarction; IS – ischemic stroke; RCC – renal cell carcinoma.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                            APRIL 2024

**Table 8-23: Annualized Cases Avoided per 100,000 People by Race/Ethnicity and Income Group, Option 1a (PFOA and PFOS MCLs of 4.0 ppt)**

| Health Endpoint | Race and Ethnicity | | | | Income | |
| --- | --- | --- | --- | --- | --- | --- |
| | Non-Hispanic Black | Hispanic | Other | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level |
| Non-Fatal MI Cases Avoided | 2.32 | 3.76 | 3.50 | 2.90 | 3.07 | 2.97 |
| Non-Fatal IS Cases Avoided | 7.44 | 5.30 | 3.85 | 3.76 | 4.65 | 4.42 |
| CVD Deaths Avoided | 3.88 | 1.56 | 1.28 | 1.26 | 1.71 | 1.62 |
| Non-Fatal RCC Cases Avoided | 3.29 | 4.02 | 3.02 | 2.72 | 3.07 | 3.00 |
| Fatal RCC Cases Avoided | 0.96 | 1.43 | 0.85 | 0.73 | 0.90 | 0.87 |
| Birth Weight Gain (total grams) | 121,470 | 166,945 | 101,591 | 70,745 | 100,345 | 92,829 |
| Birth Weight-Related Deaths Avoided | 0.99 | 0.92 | 0.47 | 0.41 | 0.62 | 0.55 |

Abbreviations: CVD – cardiovascular disease; MI – myocardial infarction; IS – ischemic stroke; RCC – renal cell carcinoma.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                            APRIL 2024

**Table 8-24: Annualized Cases Avoided per 100,000 People by Race/Ethnicity and Income Group, Option 1b (PFOA and PFOS MCLs of 5.0 ppt)**

| Health Endpoint | Race and Ethnicity | | | | Income | |
|---|---|---|---|---|---|---|
| | Non- Hispanic Black | Hispanic | Other | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level |
| Non-Fatal MI Cases Avoided | 2.00 | 3.30 | 2.96 | 2.46 | 2.64 | 2.54 |
| Non-Fatal IS Cases Avoided | 6.40 | 4.66 | 3.26 | 3.19 | 4.01 | 3.78 |
| CVD Deaths Avoided | 3.34 | 1.37 | 1.09 | 1.07 | 1.47 | 1.38 |
| Non-Fatal RCC Cases Avoided | 2.75 | 3.48 | 2.50 | 2.22 | 2.57 | 2.49 |
| Fatal RCC Cases Avoided | 0.80 | 1.23 | 0.70 | 0.60 | 0.76 | 0.73 |
| Birth Weight Gain (total grams) | 105,756 | 147,990 | 86,953 | 60,483 | 87,588 | 80,186 |
| Birth Weight-Related Deaths Avoided | 0.86 | 0.82 | 0.40 | 0.35 | 0.54 | 0.48 |

Abbreviations: CVD – cardiovascular disease; MI – myocardial infarction; IS – ischemic stroke; RCC – renal cell carcinoma.

**Table 8-25: Annualized Cases Avoided per 100,000 People by Race/Ethnicity and Income Group, Option 1c (PFOA and PFOS MCLs of 10.0 ppt)**

| Health Endpoint | Race and Ethnicity | | | | Income | |
|---|---|---|---|---|---|---|
| | Non- Hispanic Black | Hispanic | Other | Non-Hispanic White | Below Twice the Poverty Level | Above Twice the Poverty Level |
| Non-Fatal MI Cases Avoided | 1.07 | 1.93 | 1.43 | 1.26 | 1.45 | 1.32 |
| Non-Fatal IS Cases Avoided | 3.41 | 2.73 | 1.58 | 1.64 | 2.21 | 1.97 |
| CVD Deaths Avoided | 1.78 | 0.81 | 0.53 | 0.55 | 0.81 | 0.72 |
| Non-Fatal RCC Cases Avoided | 1.35 | 1.99 | 1.13 | 0.98 | 1.28 | 1.17 |
| Fatal RCC Cases Avoided | 0.39 | 0.71 | 0.32 | 0.26 | 0.38 | 0.35 |
| Birth Weight Gain (total grams) | 59,981 | 89,583 | 44,661 | 32,431 | 50,809 | 44,150 |
| Birth Weight-Related Deaths Avoided | 0.49 | 0.49 | 0.21 | 0.19 | 0.32 | 0.26 |

Abbreviations: CVD – cardiovascular disease; MI – myocardial infarction; IS – ischemic stroke; RCC – renal cell carcinoma.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 8.4.2.2 Household Costs

For category 1 and 2 PWS service areas, the EPA used SafeWater MCBC to estimate the distribution of annualized incremental household costs across race/ethnicity and income groups. The results are provided by system size category in Table 8-26 through Table 8-29. In addition to presenting annualized incremental household costs for each race/ethnicity group in Table 8-26 and Table 8-28, the EPA also presents household costs across "All" race/ethnicity groups to provide a basis for comparison. Table 8-28 and Table 8-29 present annualized incremental household costs by income group.

In estimating annualized incremental household costs of the final PFAS NPDWR, SafeWater MCBC first divided each PWS's total compliance costs by the PWS's average daily flow to determine the cost of compliance per 1,000 gallons of daily flow. Next, this cost was multiplied by the average household consumption from the Community Water System Survey (CWSS) to calculate the average household cost of compliance for the PWS. To calculate the average household cost for each race/ethnicity group by PWS system size strata, for each PWS included in the subset of systems in the EPA's EJ analysis, the EPA calculated a weighted average household cost by using the number of people in each race/ethnicity or income group served by each PWS as the weight. In addition to estimating the demographic breakdown of annualized incremental household costs of the final PFAS NPDWR for all systems included in the EPA's EJ analysis, the EPA also estimated the demographic breakdown of annualized incremental household costs for just the subset of PWSs that are anticipated to install treatment to comply with the rule.[104]

Below is a summary of the demographic distribution of incremental household costs, categorized by system size, for the final rule and regulatory alternatives. Results are presented both for the entire subset of PWSs included in the EPA's EJ analysis and just those anticipated to install treatment under the rule. Note that an analysis of household costs served by systems serving fewer than 3,300 people could not be completed due to limited sample size. In general, across all demographic groups and system size categories, the final rule is anticipated to have the highest associated costs and Option 1c is anticipated to have the lowest associated costs.

### 8.4.2.2.1 Incremental Household Costs for All PWSs

System size 3,300 to 10,000 – Annualized incremental household costs range from $5.88 to $29.26 per year across the final rule and regulatory alternatives and across race/ethnicity groups. When comparing household costs borne by particular race/ethnicity groups to those borne by the overall population served by systems in this size category, the non-Hispanic Black and Other race/ethnicity groups bear minimally elevated household costs under the final rule and all regulatory alternatives. Additionally, the Hispanic race/ethnicity group bears minimally elevated household costs under the final rule and Options 1a and 1b. The magnitude of household cost differences between each of these race/ethnicity groups and the overall population is small,

---

[104] For additional detail on treatment technology selection among systems anticipated to install treatment under the proposed rule, see Section 5.3.1.1.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ranging from $0.03 to $4.04 per year across race/ethnicity groups and across the final rule and regulatory alternatives. The Other race/ethnicity group bears the highest household costs under the final rule and Options 1a and 1b, whereas the non-Hispanic Black race/ethnicity group bears the highest household costs under Option 1c. The non-Hispanic White race/ethnicity group bears the lowest household costs under the final rule and Options 1a and 1b, whereas the Hispanic race/ethnicity groups bears the lowest household costs under Option 1c. When comparing incremental household costs across income groups, costs range from $4.99 to $26.93 per year across the final rule and regulatory alternatives. Populations with income above twice the poverty level bear higher incremental household costs compared to populations with income below twice the poverty level, with the cost difference ranging from $1.76 to $5.00.

System size 10,000 to 50,000 – Annualized incremental household costs range from $4.34 to $16.41 per year across the final rule and regulatory alternatives and across race/ethnicity groups. When comparing household costs borne by particular race/ethnicity groups to those borne by the overall population served by systems in this size category, the Other race/ethnicity group bears minimally elevated household costs under the final rule and all regulatory alternatives. The Hispanic race/ethnicity group also bears minimally elevated household costs under Option 1c. The magnitude of household cost differences between each of these race/ethnicity groups and the overall population is very small, ranging from $0.02 to $1.74 per year across race/ethnicity groups and across the final rule and regulatory alternatives. Under the final rule and all regulatory alternatives, the Other race/ethnicity group bears the highest household costs, whereas the non-Hispanic Black race/ethnicity group bears the lowest household costs. Under Option 1b, both the non-Hispanic Black and non-Hispanic White race/ethnicity groups bear the lowest household costs. When comparing incremental household costs across income groups, costs range from $4.13 to $15.07 per year across the final rule and regulatory alternatives. Populations with income above twice the poverty level bear slightly higher incremental household costs compared to populations with income below twice the poverty level, with the cost difference ranging from $0.45 to $1.32.

System size 50,000 to 100,000 – Annualized incremental household costs range from $3.29 to $13.67 per year across the final rule and regulatory alternatives and across race/ethnicity groups. When comparing household costs borne by particular race/ethnicity groups to those borne by the overall population served by systems in this size category, the Hispanic and Other race/ethnicity groups bear minimally elevated household costs under the final rule and all regulatory alternatives. Additionally, the non-Hispanic Black race/ethnicity group bears minimally elevated household costs under Option 1c. The magnitude of household cost differences between each of these race/ethnicity groups and the overall population is very small, ranging from $0.10 to $1.00 per year across race/ethnicity groups and across the final rule and regulatory alternatives. The Other race/ethnicity group bears the highest household costs under the final rule and Options 1a and 1b, whereas the Hispanic race/ethnicity group bears the highest household cost under Option 1c. The non-Hispanic Black race/ethnicity group bears the lowest household costs under the final rule and Option 1a, whereas the non-Hispanic White race/ethnicity group bears the lowest household costs under Options 1b and 1c. When comparing incremental household costs across income groups, costs range from $3.42 to $12.87 per year across the final rule and regulatory alternatives. Populations with income below twice the poverty level bear slightly higher incremental household costs compared to populations with income above twice the poverty level. However, the magnitude of these cost differences is small, ranging from $0.14 to $0.31.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

System size 100,000 to 1,000,000 – Annualized incremental household costs range from $3.59 to $13.46 per year across the final rule and regulatory alternatives and across race/ethnicity groups. When comparing household costs borne by particular race/ethnicity groups to those borne by the overall population served by systems in this size category, the non-Hispanic Black, Hispanic, and Other race/ethnicity groups bear minimally elevated household costs under the final rule and all regulatory alternatives. As in other system size categories, the magnitude of household cost differences between each of these race/ethnicity groups and the overall population is small, ranging from $0.11 to $1.18 per year across race/ethnicity groups and across the final rule and regulatory alternatives. The Hispanic race/ethnicity group bears the highest household costs under the final rule and Options 1a and 1b, whereas the Other race/ethnicity group bears the highest household costs under Option 1c. The non-Hispanic White race/ethnicity group bears the lowest household costs. When comparing incremental household costs across income groups, costs range from $3.73 to $12.44 per year across the final rule and regulatory alternatives. Populations with income below twice the poverty level bear slightly higher incremental household costs compared to populations with income above twice the poverty level. However, the magnitude of these cost differences is very small, ranging from $0.22 to $0.31.

The EPA's comparison of annualized incremental household costs across system size categories reveals that, in general, as system size increases, incremental household costs decrease under the final rule and all regulatory alternatives and across all demographic groups. One exception to this trend is Option 1c among systems serving 100,000 to 1,000,000 people, where costs are marginally higher than costs for systems serving 50,000 to 100,000 people.

The highest incremental household costs under the final rule and all regulatory alternatives are realized for the smallest systems (i.e., systems serving 3,300 to 10,000 people). Across race/ethnicity groups examined, the range of household costs within this system size category is $5.88 to $29.26 per year, and the EPA anticipates the highest cost ($29.26 per year) under the final rule for the Other race/ethnicity group. When comparing costs across income groups, populations with income above twice the poverty level bear the highest costs ($26.93) within this system size category under the final rule. The lowest incremental household costs under the final rule and all regulatory alternatives are realized for systems serving 50,000 to 100,000 people. Across race/ethnicity groups examined, the range of household costs within this system size category is $3.29 to $13.67, with the non-Hispanic White race/ethnicity group having the lowest cost of $3.29 under Option 1c. When comparing costs across income groups within this system size category, populations with income above twice the poverty level bear the lowest costs ($3.42) within this system size category under Option 1c.

Comparing the magnitude of household costs anticipated across system size categories illustrates the role that system size plays in household costs anticipated under the final PFAS rule. This is an expected result due to economies of scale and the impact that a smaller customer and tax base has on costs per household for funding and financing capital and operational infrastructure investments. Further, this analysis includes the estimated household costs for all systems impacted by the rule, not just the systems expected to install and operate treatment after exceeding the final MCLs. Households served by water systems triggered into treatment are expected to face greater cost increases than those presented here. The EPA presents the demographic breakdown of estimated household costs for those systems anticipated to install treatment under the final rule below in Section 8.4.2.2.2. Additionally, the EPA assesses the

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

impact of treatment technology costs specifically on small system households in the small system affordability analysis. For more information, see the EPA's assessment of small system affordability in Section 9.13.

**Table 8-26: Annualized Population Weighted Household Cost by PWS Size Category and Race/Ethnicity Group ($2022)**

| System Size[a] | Race/Ethnicity Group | Final Rule[b] | Option 1a[c] | Option 1b[d] | Option 1c[e] |
|---|---|---|---|---|---|
| 3,300 to 10,000 | All | $25.22 | $25.15 | $18.78 | $6.15 |
| 3,300 to 10,000 | Non-Hispanic Black | $28.24 | $28.17 | $21.49 | $7.89 |
| 3,300 to 10,000 | Hispanic | $27.20 | $27.15 | $20.38 | $5.88 |
| 3,300 to 10,000 | Other | $29.26 | $29.17 | $21.69 | $6.18 |
| 3,300 to 10,000 | Non-Hispanic White | $24.30 | $24.23 | $18.01 | $5.94 |
| 10,000 to 50,000 | All | $14.67 | $14.59 | $11.32 | $4.44 |
| 10,000 to 50,000 | Non-Hispanic Black | $14.55 | $14.48 | $11.23 | $4.34 |
| 10,000 to 50,000 | Hispanic | $14.64 | $14.57 | $11.29 | $4.46 |
| 10,000 to 50,000 | Other | $16.41 | $16.33 | $12.90 | $5.28 |
| 10,000 to 50,000 | Non-Hispanic White | $14.57 | $14.49 | $11.23 | $4.40 |
| 50,000 to 100,000 | All | $12.67 | $12.56 | $9.51 | $3.46 |
| 50,000 to 100,000 | Non-Hispanic Black | $12.30 | $12.22 | $9.41 | $3.66 |
| 50,000 to 100,000 | Hispanic | $12.93 | $12.80 | $9.78 | $3.84 |
| 50,000 to 100,000 | Other | $13.67 | $13.51 | $10.27 | $3.81 |
| 50,000 to 100,000 | Non-Hispanic White | $12.55 | $12.46 | $9.38 | $3.29 |
| 100,000 to 1,000,000 | All | $12.28 | $12.13 | $9.41 | $3.83 |
| 100,000 to 1,000,000 | Non-Hispanic Black | $12.39 | $12.24 | $9.63 | $4.01 |
| 100,000 to 1,000,000 | Hispanic | $13.46 | $13.27 | $10.26 | $4.27 |
| 100,000 to 1,000,000 | Other | $13.25 | $13.11 | $10.24 | $4.28 |
| 100,000 to 1,000,000 | Non-Hispanic White | $11.77 | $11.63 | $8.98 | $3.59 |

Notes:

[a]The number of systems serving fewer than 3,300 people represented in the UMCR 3 occurrence data is too limited to accurately estimate average population-weighted household costs by subpopulation. Therefore, results for these small systems are omitted. Also, household costs in this exhibit are population-weighted and will not match average household costs by size category shown in other exhibits in the economic analysis document that are not population-weighted.

[b]The final rule sets PFOA and PFOS MCLs of 4.0 ppt each, MCLs of 10 ppt for HFPO-DA, PFHxS, and PFNA each, and an HI of 1.

[c]Option 1a sets PFOA and PFOS MCLs of 4.0 ppt.

[d]Option 1b sets PFOA and PFOS MCLs of 5.0 ppt.

[e]Option 1c sets PFOA and PFOS MCLs of 10.0 ppt.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 8-27: Annualized Population Weighted Household Cost by PWS Size Category and Income Level ($2022)**

| System Size[a] | Income | Final Rule[b] | Option 1a[c] | Option 1b[d] | Option 1c[e] |
|---|---|---|---|---|---|
| 3,300 to 10,000 | Below twice the poverty level | $21.93 | $21.87 | $15.95 | $4.99 |
| 3,300 to 10,000 | Above twice the poverty level | $26.93 | $26.87 | $20.25 | $6.75 |
| 10,000 to 50,000 | Below twice the poverty level | $13.75 | $13.68 | $10.55 | $4.13 |
| 10,000 to 50,000 | Above twice the poverty level | $15.07 | $15.00 | $11.66 | $4.58 |
| 50,000 to 100,000 | Below twice the poverty level | $12.87 | $12.78 | $9.73 | $3.56 |
| 50,000 to 100,000 | Above twice the poverty level | $12.58 | $12.47 | $9.42 | $3.42 |
| 100,000 to 1,000,000 | Below twice the poverty level | $12.44 | $12.28 | $9.56 | $4.04 |
| 100,000 to 1,000,000 | Above twice the poverty level | $12.21 | $12.06 | $9.33 | $3.73 |

Notes:

[a]The number of systems serving fewer than 3,300 people represented in the UMCR 3 occurrence data is too limited to accurately estimate average population-weighted household costs by subpopulation. Therefore, results for these small systems are omitted. Also, household costs in this exhibit are population-weighted and will not match average household costs by size category shown in other exhibits in the economic analysis document that are not population-weighted.

[b]The final rule sets PFOA and PFOS MCLs of 4.0 ppt each, MCLs of 10 ppt for HFPO-DA, PFHxS, and PFNA each, and an HI of 1.

[c]Option 1a sets PFOA and PFOS MCLs of 4.0 ppt.

[d]Option 1b sets PFOA and PFOS MCLs of 5.0 ppt.

[e]Option 1c sets PFOA and PFOS MCLs of 10.0 ppt.

### 8.4.2.2.2 Incremental Household Costs for Treating PWSs

System size 3,300 to 10,000 – Annualized incremental household costs for systems anticipated to install treatment range from $120.94 to $181.78 per year across the final rule and regulatory alternatives and across race/ethnicity and income groups. When comparing household costs borne by particular race/ethnicity groups to those borne by the overall population served by systems in this system size category, the Hispanic and Other race/ethnicity group bears minimally elevated household costs under the final rule and Option 1a. Additionally, the non-Hispanic Black race/ethnicity group bears minimally elevated household costs under Options 1b and 1c and the non-Hispanic White race/ethnicity group bears minimally elevated household costs under Option 1c. The magnitude of household cost differences between each of these race/ethnicity groups and the overall population ranges from $0.21 to $30.12 per year across race/ethnicity groups and across the final rule and regulatory alternatives. The Other race/ethnicity group bears the highest household costs under the final rule and Option 1a, whereas the non-Hispanic Black race/ethnicity group bears the highest household costs under Options 1b and 1c. The non-Hispanic Black race/ethnicity group bears the lowest household costs under the final rule and Option 1a, whereas the Hispanic race/ethnicity group bears the lowest household costs under Options 1b and 1c. Populations with income below twice the

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

poverty level bear lower incremental household costs compared to populations with income above twice the poverty level under the final rule and all regulatory alternatives. The magnitude of household cost differences between the two income groups ranges from $0.65 to $15.96 per year across the final rule and regulatory alternatives.

System size 10,000 to 50,000 – Annualized incremental household costs for systems anticipated to install treatment range from $39.05 to $51.82 per year across the final rule and regulatory alternatives and across race/ethnicity and income groups. When comparing household costs borne by particular race/ethnicity groups to those borne by the overall population served by systems in this system size category, the Other and non-Hispanic White race/ethnicity groups bear minimally elevated household costs under the final rule and all regulatory alternatives. Additionally, the non-Hispanic Black race/ethnicity group bears minimally elevated household costs under Option 1c. The magnitude of household cost differences between each race/ethnicity group and the overall population is small, ranging from $0.05 to $2.55 per year across race/ethnicity groups and across the final rule and regulatory alternatives. The Other race/ethnicity group bears the highest household costs under the final rule and Options 1a and 1b, whereas the non-Hispanic Black race/ethnicity group bears the highest household costs under Option 1c. The Hispanic race/ethnicity group bears the lowest household costs under the final rule and all regulatory alternatives. Populations with income below twice the poverty level bear slightly lower incremental household costs compared to populations with income above twice the poverty level under the final rule and Options 1a and 1b; populations with income above twice the poverty level bear slightly lower incremental household costs compared to populations with income below twice the poverty level under Option 1c. The magnitude of household cost differences between the two income groups is very small, ranging from $0.22 to $1.31 per year across the final rule and regulatory alternatives.

System size 50,000 to 100,000 – Annualized incremental household costs for systems anticipated to install treatment range from $31.53 to $43.84 per year across the final rule and regulatory alternatives and across race/ethnicity and income groups. When comparing household costs borne by particular race/ethnicity groups to those borne by the overall population served by systems in this system size category, the non-Hispanic Black and non-Hispanic White race/ethnicity group bears minimally elevated costs under the final rule and all regulatory alternatives. Additionally, the Other race/ethnicity group bears minimally elevated household costs under the final rule and Options 1a and 1b. The magnitude of household cost differences between each of these race/ethnicity groups and the overall population is very small, ranging from $0.10 to $2.04 per year across race/ethnicity groups and across the final rule and regulatory alternatives. The non-Hispanic Black race/ethnicity group bears the highest household costs under the final rule and all regulatory alternatives. The Hispanic race/ethnicity group bears the lowest household costs under the final rule and all regulatory alternatives. Populations with income below twice the poverty level bear slightly lower incremental household costs compared to populations with income above twice the poverty level under the final rule and all regulatory alternatives. The magnitude of household cost differences between the two income groups is very small, ranging from $0.24 to $0.98 per year across the final rule and all regulatory alternatives.

System 100,000 to 1,000,000 – Annualized incremental household costs for systems anticipated to install treatment range from $21.63 to $32.92 per year across the final rule and regulatory

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

alternatives and across race/ethnicity and income groups. When comparing household costs borne by particular race/ethnicity groups to those borne by the overall population served by systems in this size category, the non-Hispanic Black race/ethnicity group bears minimally elevated costs under the final rule and all regulatory alternatives. Additionally, the Hispanic race/ethnicity group bears minimally elevated costs under the final rule and Option 1a, whereas the non-Hispanic White race/ethnicity group bears minimally elevated costs under Options 1b and 1c. The magnitude of household cost differences between each of these race/ethnicity groups and the overall population is small, ranging from $0.02 to $1.73 per year across race/ethnicity groups and across the final rule and regulatory alternatives. The non-Hispanic Black race/ethnicity group bears the highest household costs under the final rule and all regulatory alternatives. The Other race/ethnicity group bears the lowest household costs under the final rule, Option 1a, and Option 1b, whereas the Hispanic race/ethnicity group bears the lowest household costs under Option 1c. Populations with income below twice the poverty level bear slightly higher incremental household costs compared to populations with income above twice the poverty level under the final rule and all regulatory alternatives. The magnitude of household cost differences between the two income groups is very small, ranging from $1.01 to $1.74 per year across the final rule and all regulatory alternatives.

Consistent with the EPA's findings for incremental household costs across all systems, the EPA's comparison of incremental household costs across system size categories for just treating systems reveals that, in general, as system size increases, annualized incremental household costs decrease under the final rule and all regulatory alternatives and across all race/ethnicity and income groups.

The highest annualized incremental household costs for treating systems under the final rule and all regulatory alternatives are realized for the smallest systems, with the range of incremental household costs for systems serving 3,300 to 10,000 people ranging from $120.94 to $181.78 per year across race/ethnicity groups examined. The EPA anticipates the highest cost ($181.78 per year) under Option 1a for the Other race/ethnicity group. Among the two income groups, the EPA anticipates the highest cost ($180.70) under the final rule for populations with income above twice the poverty level. Systems serving 100,000 to 1,000,000 people bear the lowest annualized incremental household costs for treating systems under the final rule and all options.

This analysis provides an opportunity to understand the demographic breakdown of incremental household costs anticipated to be incurred due to treatment installation needed to comply with the final PFAS NPDWR. Annualized incremental household costs for systems required to install treatment are higher for all size categories and across all demographic groups compared to incremental household costs across all systems. These differences are expected, as treatment installation costs are higher than other compliance costs (i.e., monitoring and reporting). In some cases, such as for communities served by the smallest systems (i.e., systems serving 3,300 to 10,000 people), the annual incremental household costs isolated among only systems anticipated to install treatment are over $100 higher than annual incremental household costs averaged across all systems.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 8-28: Annualized Population-Weighted Household Cost for Treating PWSs by Size Category and Race/Ethnicity Group**

| System Size[a] | Race/Ethnicity Group | Final Rule[b] | Option 1a[c] | Option 1b[d] | Option 1c[e] |
|---|---|---|---|---|---|
| 3,300 to 10,000 | All | $175.66 | $175.56 | $167.04 | $151.06 |
| 3,300 to 10,000 | Non-Hispanic Black | $174.17 | $173.99 | $169.33 | $163.10 |
| 3,300 to 10,000 | Hispanic | $177.67 | $177.49 | $166.11 | $120.94 |
| 3,300 to 10,000 | Other | $181.64 | $181.78 | $166.46 | $123.78 |
| 3,300 to 10,000 | Non-Hispanic White | $175.25 | $175.17 | $166.83 | $156.09 |
| 10,000 to 50,000 | All | $50.92 | $50.69 | $48.07 | $41.03 |
| 10,000 to 50,000 | Non-Hispanic Black | $50.78 | $50.56 | $48.02 | $41.42 |
| 10,000 to 50,000 | Hispanic | $48.37 | $48.16 | $45.57 | $39.05 |
| 10,000 to 50,000 | Other | $51.82 | $51.60 | $48.92 | $41.38 |
| 10,000 to 50,000 | Non-Hispanic White | $51.39 | $51.16 | $48.53 | $41.36 |
| 50,000 to 100,000 | All | $43.08 | $42.74 | $40.51 | $32.81 |
| 50,000 to 100,000 | Non-Hispanic Black | $43.84 | $43.58 | $41.86 | $34.85 |
| 50,000 to 100,000 | Hispanic | $41.34 | $40.96 | $38.71 | $31.53 |
| 50,000 to 100,000 | Other | $43.50 | $43.04 | $40.61 | $31.72 |
| 50,000 to 100,000 | Non-Hispanic White | $43.43 | $43.11 | $40.82 | $33.01 |
| 100,000 to 1,000,000 | All | $32.62 | $32.24 | $29.63 | $23.34 |
| 100,000 to 1,000,000 | Non-Hispanic Black | $32.92 | $32.54 | $30.34 | $25.07 |
| 100,000 to 1,000,000 | Hispanic | $32.77 | $32.31 | $29.29 | $21.63 |
| 100,000 to 1,000,000 | Other | $32.07 | $31.76 | $28.95 | $22.48 |
| 100,000 to 1,000,000 | Non-Hispanic White | $32.56 | $32.20 | $29.65 | $23.69 |

Notes:

[a]The number of systems serving fewer than 3,300 people represented in the UMCR 3 occurrence data is too limited to accurately estimate average population-weighted household costs by subpopulation. Therefore, results for these small systems are omitted. Also, household costs in this exhibit are population-weighted and will not match average household costs by size category shown in other exhibits in the economic analysis document that are not population-weighted.

[b]The final rule sets PFOA and PFOS MCLs of 4.0 ppt each, MCLs of 10 ppt for HFPO-DA, PFHxS, and PFNA each, and an HI of 1.

[c]Option 1a sets PFOA and PFOS MCLs of 4.0 ppt.

[d]Option 1b sets PFOA and PFOS MCLs of 5.0 ppt.

[e]Option 1c sets PFOA and PFOS MCLs of 10.0 ppt.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 8-29: Annualized Population Weighted Household Cost for Treating PWSs by PWS Size Category and Income Level ($2022)**

| System Size[a] | Income | Final Rule[b] | Option 1a[c] | Option 1b[d] | Option 1c[e] |
|---|---|---|---|---|---|
| 3,300 to 10,000 | Below twice the poverty level | $164.78 | $164.65 | $158.28 | $150.58 |
| 3,300 to 10,000 | Above twice the poverty level | $180.70 | $180.61 | $170.88 | $151.23 |
| 10,000 to 50,000 | Below twice the poverty level | $49.99 | $49.77 | $47.38 | $41.19 |
| 10,000 to 50,000 | Above twice the poverty level | $51.30 | $51.07 | $48.35 | $40.97 |
| 50,000 to 100,000 | Below twice the poverty level | $42.86 | $42.58 | $40.23 | $32.15 |
| 50,000 to 100,000 | Above twice the poverty level | $43.18 | $42.82 | $40.64 | $33.13 |
| 100,000 to 1,000,000 | Below twice the poverty level | $33.33 | $32.92 | $30.45 | $24.51 |
| 100,000 to 1,000,000 | Above twice the poverty level | $32.28 | $31.91 | $29.24 | $22.77 |

Notes:

[a]The number of systems serving fewer than 3,300 people represented in the UMCR 3 occurrence data is too limited to accurately estimate average population-weighted household costs by subpopulation. Therefore, results for these small systems are omitted. Also, household costs in this exhibit are population-weighted and will not match average household costs by size category shown in other exhibits in the economic analysis document that are not population-weighted.

[b]The final rule sets PFOA and PFOS MCLs of 4.0 ppt each, MCLs of 10 ppt for HFPO-DA, PFHxS, and PFNA each, and an HI of 1.

[c]Option 1a sets PFOA and PFOS MCLs of 4.0 ppt.

[d]Option 1b sets PFOA and PFOS MCLs of 5.0 ppt.

[e]Option 1c sets PFOA and PFOS MCLs of 10.0 ppt.

## 8.5 Conclusions

This section provides a summary of the EJ analyses for estimating the demographic distribution of baseline PFAS exposure and exposure over several thresholds as well as the cost and benefits of the final PFAS NPDWR.

### 8.5.1  EJ PFAS Exposure Analysis

The EPA's analysis of demographic groups with PFAS exposure over baseline thresholds based on trigger levels of 2 ppt demonstrates that certain communities of color experience elevated baseline PFAS drinking water exposures compared to the entire sample population. For example, the percentage of non-Hispanic Black and Hispanic populations with PFAS drinking water exposure above baseline thresholds is greater than the percentage of the total populations served across all PFAS analytes considered in this analysis. Similarly, when these results are further filtered by system size, for large systems, non-Hispanic Black and Hispanic populations have higher baseline PFAS drinking water exposure compared to the percentage of the total population served across all demographic groups. For small systems, non-Hispanic Asian and non-Hispanic Black populations served have higher baseline PFAS drinking water exposure

FINAL RULE                                                                                                                APRIL 2024

compared to the percentage of the total population served across all demographic groups for particular PFAS analytes.

Across all hypothetical regulatory thresholds, elevated exposure—and thus expected reductions in exposure under the hypothetical regulatory scenarios—is anticipated to occur in communities of color and/or low-income populations. The EPA estimates the most notable differences in anticipated reductions in exposure are for Hispanic populations, specifically when using UCMR 5 MRL values as hypothetical regulatory thresholds in the analysis. The results from the EPA's analysis indicate that Hispanic populations are estimated to experience at least two percentage points higher rates of exposure to all PFAS analytes examined in this analysis. Hispanic populations are therefore also anticipated to experience greater reductions in exposure compared to the entire sample population. In addition, under hypothetical regulatory thresholds set at the UCMR 5 MRL values, the EPA anticipates some of the largest reductions in exposure to PFOA and PFHxS to occur for non-Hispanic Native American or Alaska Native and non-Hispanic Pacific Islander populations due to relatively high concentration levels when these PFAS are detected at PWSs serving these groups.

These findings are supported by literature that indicates that communities of lower socioeconomic status are more likely to live near environmentally hazardous facilities and face disproportionate impacts of exposure to toxic chemicals than communities of relatively higher socioeconomic status (Brown, 1995; Brulle & Pellow, 2006; Banzhaf et al., 2019; U.S. EPA, 1994). The literature also indicates that people of color and low-income populations are more likely to be served by water systems with higher PFAS occurrence or reside in proximity to a PFAS contamination site, thereby increasing baseline exposure (Black et al., 2021; Lee, Kang, et al., 2021; Desikan et al., 2019).

## 8.5.2 SafeWater EJ Analysis of Regulatory Options

The EPA's analysis of the demographic distribution of health benefits and household costs anticipated to result from the final PFAS NPDWR and regulatory alternatives evaluated demonstrates that, in general, across demographic groups, the EPA's final rule offers the greatest quantified benefits when compared to benefits anticipated to result under the regulatory alternatives. Additionally, in general, when compared to regulatory alternatives evaluated, the EPA's final rule will result in the highest household costs.

Under the final rule, across all health endpoints evaluated, communities of color (i.e., Hispanic, non-Hispanic Black, and/or Other race/ethnicity groups) are anticipated to experience the greatest reductions in adverse health effects associated with PFAS exposure, resulting in the greatest quantified benefits associated with the final rule. For instance, non-Hispanic Black populations are expected to experience 7.48 avoided non-fatal IS cases and 3.90 avoided CVD deaths per 100,000 people per year, as compared to 3.78 avoided non-fatal IS cases and 1.26 avoided CVD deaths per 100,000 people per year for non-Hispanic White populations. Additionally, under the final rule, while in most cases the difference in cases of illnesses and deaths avoided across income groups is small, quantified health benefits are higher for low-income communities (i.e., populations with income below twice the poverty level) across all health endpoints evaluated, compared to populations with income above twice the poverty level.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The EPA's findings could be driven by disparities in baseline exposure to PFAS and underlying disparities in death and/or disease incidence by race/ethnicity. This potential explanation is supported by literature demonstrating that overburdened communities continue to experience elevated rates of morbidity and mortality (Uche et al., 2021; Driscoll & Gregory, 2021; Fryar et al., 2017). Additionally, evidence in the literature indicates that people of color and low-income populations are more likely to be served by water systems with higher PFAS occurrence or reside in close proximity to a PFAS contamination site, which also supports this finding (Black et al., 2021; Lee, Kang, et al., 2021; Desikan et al., 2019).

When examining costs anticipated to result from the final rule, the EPA found that cost differences across demographic groups are typically small, with no clear unidirectional trend in cost differences based on demographic group. In some cases, the EPA found that communities of color and low-income communities are anticipated to bear minimally increased costs but in other cases, costs to communities of color and low-income communities are anticipated to be lower than those across all race/ethnicity groups or populations with income above twice the poverty level, respectively.

Additionally, incremental household costs to all race/ethnicity and income groups generally decrease as system size increases, which is expected due to economies of scale. This is especially true if systems serving these communities are required to install treatment to comply with the PFAS NPDWR. For example, systems serving 3,300 to 10,000 people that will be required to install treatment to comply with the final rule have substantially higher costs than systems in all larger size categories, irrespective of demographic group.

## 8.5.3 Overall Environmental Justice Conclusion

The EPA conducted the EJ analyses presented in this chapter on populations served by a subset of PWSs to assess the demographic distribution of exposure to PFAS and the EJ impacts that are anticipated to result from the final PFAS NPDWR. The EPA conducted two separate analyses to address the following questions:

1. Are population groups of concern (i.e., people of color and low-income populations) disproportionately exposed to PFAS compounds in drinking water delivered by PWSs?
2. Are population groups of concern disproportionately affected by the final rule?
3. If any disproportionate impacts are identified, do they create or mitigate baseline EJ concerns?

When examined collectively, results from these analyses identify communities of color and low-income communities as being disproportionately exposed to PFAS in drinking water under baseline conditions. In one hypothetical regulatory scenario, non-Hispanic American Indian or Alaska Native, non-Hispanic Black, and Hispanic populations face elevated exposure across nearly all PFAS analytes examined when compared to the total population served. In some cases, these communities experience twice the rate of PFAS exposure in drinking water in comparison to non-Hispanic White populations. When quantifying the race/ethnicity distribution of quantified health benefits anticipated to result from the final PFAS NPDWR, the EPA found that of the race/ethnicity groups evaluated, communities of color are anticipated to experience the greatest health benefits under the final rule and all regulatory alternatives.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                      APRIL 2024

When comparing benefits across the final rule and regulatory alternatives, quantified health benefits were generally the highest for communities of color under the final rule. This finding could be influenced by the fact that elevated baseline exposure rates for these populations translate to higher benefits associated with the final rule, as greater reductions in exposure are anticipated to occur as a result of implementing the final PFAS NPDWR.

To alleviate potential cost disparities identified by the EPA's analysis, there may be an opportunity for many communities to utilize BIL (P.L. 117-58) funding to provide financial assistance for addressing emerging contaminants. BIL funding has specific allocations for both disadvantaged and/or small communities and emerging contaminants, including PFAS.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# 9 Statutory and Administrative Requirements

As part of the rulemaking process, the EPA is required to address the burden that the final rule may place on certain types of governments, businesses, and populations. This chapter presents analyses performed by the EPA in accordance with the following federal mandates and statutory requirements:

1. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563 (2011): Modernizing Regulatory Review.
2. Paperwork Reduction Act (PRA) (U.S. EPA, 2010b).
3. The Regulatory Flexibility Act (RFA) of 1980, as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996.
4. Unfunded Mandates Reform Act (UMRA) of 1995.
5. Executive Order 13132: Federalism.
6. Executive Order 13175: Consultation and Coordination with Indian Tribal Governments.
7. Executive Order 13045: Protection of Children from Environmental Health and Safety Risks.
8. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use.
9. National Technology Transfer and Advancement Act of 1995 (NTTAA).
10. Executive Order 12898: Federal Action to Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing our Nation's Commitment to Environmental Justice for All.
11. Consultations with the Science Advisory Board (SAB), National Drinking Water Advisory Council (NDWAC), and the Department of Health and Human Services.
12. SDWA Section 1412(b)(4)(E) National Small System Affordability Determination.

Many of the statutory requirements and executive orders listed above call for an explanation of why the final requirements are necessary, the statutory authority for the final requirements, and the primary objectives that the final requirements are intended to achieve (see Chapter 3 for additional information regarding the need for the final rule). Others are designed to assess the financial and health effects of the final regulatory requirements on sensitive, low-income, and tribal populations as well as on small systems and governments.

## 9.1 Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review

Executive Order 12866, 1993 (58 FR 51735, October 4, 1993), as amended by Executive Order 14094 (88 FR 21879, April 6, 2023) gives OMB the authority to review regulatory actions that are categorized as "significant" under section 3(f) of Executive Order 12866. The Order defines "significant regulatory action" as one that is likely to result in a rule that may:

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

1. Have an annual effect on the economy of $200 million or more (adjusted every 3 years by the Administrator of OIRA for changes in gross domestic product); or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities;

2. Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

3. Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

4. Raise legal or policy issues for which centralized review would meaningfully further the President's priorities or the principles set forth in this Executive order, as specifically authorized in a timely manner by the Administrator of OIRA in each case.

This action is an economically significant regulatory action that was submitted to the OMB for review. Any changes made in response to OMB recommendations have been documented in the docket. The analysis in Chapter 7 compares the annual estimated incremental costs and the annual incremental benefits of the final rule. In addition to the monetized costs and benefits of the final regulation, a number of non-monetized impacts exist. See Sections 5.7, 6.2.2, and 6.2.3 of this EA for greater detail on the non-monetized impacts of the final regulation.

## 9.2 Additional Analysis Pursuant to EO 12866

The EPA is committed to understanding and addressing climate change impacts in carrying out the agency's mission of protecting human health and the environment. Pursuant to EO 12866, the EPA has estimated the carbon dioxide ($CO_2$) emissions associated with the operation of the best available treatment technologies the EPA expects will be used to comply with the PFAS NPDWR.

The EPA estimated the climate disbenefits of changes in $CO_2$ emissions expected from the final PFAS rule using estimates of the social cost of carbon (SC-$CO_2$) that reflect recent advances in the scientific literature on climate change and its economic impacts and incorporate recommendations made by the National Academies of Science, Engineering, and Medicine (National Academies, 2017). The EPA presented these estimates in the regulatory impact analysis (RIA) of the EPA's December 2023 Final Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review". The EPA solicited public comment on the methodology and use of these estimates in the RIA for the agency's December 2022 supplemental proposed Oil and Gas rulemaking, and has conducted an external peer review of these estimates, as described further below.

The SC-$CO_2$ is the monetary value of the net harm to society from emitting a metric ton of $CO_2$ into the atmosphere in a given year, or the benefit of avoiding that increase. In principle, SC-$CO_2$ is a comprehensive metric that includes the value of all future climate change impacts (both negative and positive), including changes in net agricultural productivity, human health effects, property damage from increased flood risk, changes in the frequency and severity of natural disasters, disruption of energy systems, risk of conflict, environmental migration, and the value

of ecosystem services. The SC-$CO_2$, therefore, reflects the societal value of reducing $CO_2$ emissions by one metric ton and is the theoretically appropriate value to use in conducting benefit-cost analyses of policies that affect $CO_2$ emissions. In practice, data and modeling limitations restrain the ability of SC-$CO_2$ estimates to include all physical, ecological, and economic impacts of climate change, implicitly assigning a value of zero to the omitted climate damages. The estimates are, therefore, a partial accounting of climate change impacts and likely underestimate the marginal benefits of abatement (and marginal damages from emissions).

Since 2008, the EPA has used estimates of the social cost of various greenhouse gases (i.e., social cost of carbon (SC-$CO_2$), social cost of methane (SC-$CH_4$), and social cost of nitrous oxide (SC-$N_2O$)), collectively referred to as the "social cost of greenhouse gases" (SC-GHG), in analyses of actions that affect GHG emissions. The values used by the EPA from 2009 to 2016, and since 2021 have been consistent with those developed and recommended by the Interagency Working Group (IWG) on the SC-GHG; and the values used from 2017 to 2020 were consistent with those required by E.O. 13783, which disbanded the IWG. During 2015–2017, the National Academies conducted a comprehensive review of the SC-$CO_2$ and issued a final report in 2017 recommending specific criteria for future updates to the SC-$CO_2$ estimates, a modeling framework to satisfy the specified criteria, and both near-term updates and longer-term research needs pertaining to various components of the estimation process (National Academies, 2017). The IWG was reconstituted in 2021 and E.O. 13990 directed it to develop a comprehensive update of its SC-GHG estimates, recommendations regarding areas of decision-making to which SC-GHG should be applied, and a standardized review and updating process to ensure that the recommended estimates continue to be based on the best available economics and science going forward.

The EPA is a member of the IWG and is participating in the IWG's work under E.O. 13990. While that process continues, as noted in previous EPA RIAs, the EPA is continuously reviewing developments in the scientific literature on the SC-GHG, including more robust methodologies for estimating damages from emissions, and looking for opportunities to further improve SC-GHG estimation going forward.[105]  In the December 2022 RIA for the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, the agency included a sensitivity analysis of the climate benefits of the Supplemental Proposal using a new set of SC-GHG estimates that incorporates recent research addressing recommendations of the National Academies (2017) in addition to using the interim SC-GHG estimates presented in the Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (IWG, 2021) that the IWG recommended for use until updated estimates that address the National Academies' recommendations are available.

The EPA solicited public comment on the sensitivity analysis and the accompanying draft technical report, *EPA Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances*, which explains the methodology underlying the new set of estimates, in the December 2022 Supplemental Proposal.[106]  Please see the response to comments document

---

[105] EPA strives to base its analyses on the best available science and economics, consistent with its responsibilities, for example, under the Information Quality Act.

[106] See https://www.epa.gov/environmental-economics/scghg for a copy of the final report and other related materials.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

for that rulemaking for summaries and responses to public comments. The response to comments document can be found in the docket for the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review.

To ensure that the methodological updates adopted in the technical report are consistent with economic theory and reflect the latest science, the EPA also initiated an external peer review panel to conduct a high-quality review of the technical report, completed in May 2023. The peer reviewers commended the agency on its development of the draft update, calling it a much-needed improvement in estimating the SC-GHG and a significant step towards addressing the National Academies' recommendations with defensible modeling choices based on current science. The peer reviewers provided numerous recommendations for refining the presentation and for future modeling improvements, especially with respect to climate change impacts and associated damages that are not currently included in the analysis. Additional discussion of omitted impacts and other updates have been incorporated in the technical report to address peer reviewer recommendations. Complete information about the external peer review, including the peer reviewer selection process, the final report with individual recommendations from peer reviewers, and the EPA's response to each recommendation is available on the EPA's website.[107]

For an overview of the methodological updates incorporated into the SC-GHG estimates applied in the EA for the final PFAS NPDWR, see Section 3.2 of the RIA for the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review (U.S. EPA, 2023g). A more detailed explanation of each input and the modeling process is provided in the technical report, Supplementary Material for the RIA: EPA Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances (U.S. EPA, 2023h), included in the docket for the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, and included in the docket for this action.

Table 9-1 summarizes the resulting averaged certainty-equivalent SC-CO$_2$ estimates under each near-term discount rate that are used to estimate the climate disbenefits of the changes in CO$_2$ emissions expected to result from the final PFAS rule. These estimates are reported in 2020 dollars and are identical to those presented in U.S. EPA (2023h). The SC-CO$_2$ increases over time within the models — i.e., the societal harm from one metric ton emitted in 2030 is higher than the harm caused by one metric ton emitted in 2025 — because future emissions produce larger incremental damages as physical and economic systems become more stressed in response to greater climatic change, and because GDP is growing over time and many damage categories are modeled as proportional to GDP. The full results generated from the updated methodology for carbon dioxide and other greenhouse gases (SC-CO2, SC-CH4, and SC-N2O) for emissions years 2020 through 2080 are provided in U.S. EPA (2023h).

---

[107] https://www.epa.gov/environmental-economics/scghg-tsd-peer-review

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 9-1: Estimates of the Social Cost of $CO_2$, 2020-2080 (2020\$ per metric ton $CO_2$)**

| Year | Near-Term Ramsey Discount Rate | | |
|---|---|---|---|
| | 2.50% | 2.00% | 1.50% |
| 2020 | 120 | 190 | 340 |
| 2021 | 120 | 200 | 340 |
| 2022 | 120 | 200 | 350 |
| 2023 | 130 | 200 | 350 |
| 2024 | 130 | 210 | 360 |
| 2025 | 130 | 210 | 370 |
| 2026 | 130 | 220 | 370 |
| 2027 | 140 | 220 | 370 |
| 2028 | 140 | 220 | 380 |
| 2029 | 140 | 230 | 380 |
| 2030 | 140 | 230 | 380 |
| 2031 | 150 | 230 | 390 |
| 2032 | 150 | 240 | 390 |
| 2033 | 150 | 240 | 400 |
| 2034 | 160 | 250 | 400 |
| 2035 | 160 | 250 | 410 |
| 2036 | 160 | 250 | 410 |
| 2037 | 160 | 260 | 420 |
| 2038 | 170 | 260 | 420 |
| 2039 | 170 | 260 | 430 |
| 2040 | 170 | 270 | 430 |
| 2041 | 180 | 270 | 440 |
| 2042 | 180 | 280 | 440 |
| 2043 | 180 | 280 | 450 |
| 2044 | 190 | 280 | 450 |
| 2045 | 190 | 290 | 460 |
| 2046 | 190 | 290 | 460 |
| 2047 | 200 | 300 | 470 |
| 2048 | 200 | 300 | 470 |
| 2049 | 200 | 300 | 480 |
| 2050 | 210 | 310 | 480 |
| 2051 | 210 | 310 | 490 |
| 2052 | 210 | 320 | 490 |
| 2053 | 210 | 320 | 500 |
| 2054 | 220 | 320 | 500 |
| 2055 | 220 | 330 | 510 |
| 2056 | 220 | 330 | 510 |
| 2057 | 230 | 330 | 510 |
| 2058 | 230 | 340 | 520 |
| 2059 | 230 | 340 | 520 |

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 9-1: Estimates of the Social Cost of CO$_2$, 2020-2080 (2020$ per metric ton CO$_2$)**

| Year | Near-Term Ramsey Discount Rate | | |
|---|---|---|---|
| | 2.50% | 2.00% | 1.50% |
| 2060 | 230 | 350 | 530 |
| 2061 | 240 | 350 | 530 |
| 2062 | 240 | 350 | 540 |
| 2063 | 240 | 350 | 540 |
| 2064 | 240 | 360 | 540 |
| 2065 | 250 | 360 | 550 |
| 2066 | 250 | 360 | 550 |
| 2067 | 250 | 370 | 550 |
| 2068 | 250 | 370 | 560 |
| 2069 | 260 | 370 | 560 |
| 2070 | 260 | 380 | 570 |
| 2071 | 260 | 380 | 570 |
| 2072 | 260 | 380 | 570 |
| 2073 | 270 | 390 | 580 |
| 2074 | 270 | 390 | 580 |
| 2075 | 270 | 390 | 580 |
| 2076 | 270 | 390 | 590 |
| 2077 | 280 | 400 | 590 |
| 2078 | 280 | 400 | 590 |
| 2079 | 280 | 400 | 600 |
| 2080 | 280 | 410 | 600 |

Note: This table displays the values rounded to two significant figures. The annual unrounded values used in the calculations in this EA are available in Appendix A.5 of U.S. EPA (2023g) and at: www.epa.gov/environmental-economics/scghg

The methodological updates described in U.S. EPA (2023h) represent a major step forward in bringing SC-GHG estimation closer to the frontier of climate science and economics and address many of the National Academies' (2017) near-term recommendations. Nevertheless, the resulting SC-GHG estimates, including the SC-CO$_2$ estimates presented in Table 9-1, still have several limitations, as would be expected for any modeling exercise that covers such a broad scope of scientific and economic issues across a complex global landscape. There are still many categories of climate impacts and associated damages that are only partially or not reflected yet in these estimates and sources of uncertainty that have not been fully characterized due to data and modeling limitations. Please see Section 3.2 of U.S. EPA (2023h) for further discussion.

All of the EPA's peer reviewed WBS models include the consumption of purchased electricity. The EPA has used the WBS models to estimate the electricity consumed annually by operating each technology at the entry-point level. For more information on WBS estimation of energy usage, see the EPA's Work Breakdown Structure-Based Cost Models documents for GAC, IX, and RO, specifically Appendix E General Assumptions for Operating and Maintenance Costs.

Table 9-2 below provides a summary of the electricity consumption at the entry-point level by system size and treatment technology.

**Table 9-2: Entry Point Level Electricity Consumption Range by System Size and Technology (MWh/year)**

| Treatment Technology | Minimum Electricity Use (MWh/year) | Maximum Electricity Use (MWh/year) |
|---|---|---|
| **GAC** | | |
| <100 to 3,300 | 0 | 1 |
| 3,301 to 10,000 | 6 | 7 |
| 10,000 to 100,000 | 8 | 233 |
| 100,000 and above | 33 | 653 |
| **IX** | | |
| <100 to 3,300 | 0 | 0 |
| 3,301 to 10,000 | 2 | 2 |
| 10,000 to 100,000 | 2 | 4 |
| 100,000 and above | 7 | 14 |

The EPA uses the WBS estimates of MWh by system size and source and the estimates of the number of water systems anticipated to select each technology based on the decision tree (presented in Chapter 5 of this document) to estimate the total electricity used nationally to operate treatment technologies to comply with the rule. Table 9-3 below shows the annual national electricity use anticipated by system size and technology used. The EPA estimates the total national annual electricity use to be 229,179 MWh per year.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 9-3: National Electricity Use (MWh/year) by Technology and System Size.**

| Treatment Technology | Total Electricity Use (MWh/year) |
|---|---:|
| **GAC** | |
| <100 to 3,300 | 839 |
| 3,301 to 10,000 | 3,216 |
| 10,000 to 100,000 | 55,341 |
| 100,000 and above | 163,214 |
| **IX** | |
| <100 to 3,300 | 38 |
| 3,301 to 10,000 | 398 |
| 10,000 to 100,000 | 2,806 |
| 100,000 and above | 3,326 |
| Total | 229,179 |

To convert this estimated increase in electricity use nationally into national $CO_2$ emissions through 2080, the EPA used the latest reference case from the EPA's peer-reviewed Integrated Planning Model (IPM). The IPM is a multi-regional, dynamic, deterministic linear programming model of the U.S. electric power sector. It provides projections of least-cost capacity expansion, electricity dispatch, and emission control strategies for meeting energy demand and environmental, transmission, dispatch, and reliability constraints (U.S. EPA, 2023e). The EPA uses the IPM to analyze the projected impact of environmental policies on the electric power sector, and it also provides projections of $CO_2$ emissions from the power sector through 2055. The latest reference case, "Post-IRA 2022 reference case" was published in April of 2023 and reflects the impacts of the Inflation Reduction Act (IRA).

Although the U.S. electricity grid continues to decrease its reliance on coal combustion in favor of natural gas and renewable alternatives, electricity consumption continues to be associated with GHG emissions across the entire system of production and delivery. Combustion of fossil fuels releases $CO_2$, $CH_4$, and $N_2O$; sulfur hexafluoride ($SF_6$) and perfluorocarbons (PFCs) are used in electricity transmission and distribution equipment; and additional GHG emissions are associated with the manufacture and installation of equipment as well the extraction and delivery of fossil fuels (U.S. EPA, 2023c). An exact accounting of all these emissions categories would yield the most precise estimate of electricity sector climate-related impacts. However, $CO_2$ emissions from fossil fuel combustion comprise the vast majority of the electricity sector GHG emissions. Therefore, accounting for combustion emissions of $CO_2$ is sufficient for the purposes of estimating the approximate magnitude of the climate-related disbenefits of increased electricity consumption. For example, in 2021, the EPA estimates total electricity sector emissions of 1,584 million metric ton (MMT) of $CO_2$-equivalent GHGs from fossil fuel combustion, waste

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

incineration, process emissions, and electricity transmission and distribution. Over 97 percent of this total consists of $CO_2$ emissions from fossil fuel combustion.[108] Even accounting for upstream coal mining and natural gas systems, the share of electricity sector GHG emissions that are from fossil fuel combustion release of $CO_2$ is still at least 90 percent.[109,110] Note that the non-GHG emissions impacts associated with changes in electricity consumption are not accounted for in this analysis. For a more complete description of non-GHG impacts from the electricity sector, including ozone- and PM2.5-attributable premature mortality and illness as well as discussion of various unquantified health and welfare impacts, see recent the EPA regulatory impact analyses for air pollution regulations and the utilities sector in particular (U.S. EPA, 2023f).

From IPM reference case summary outputs, the EPA calculated projections of annual national-average $CO_2$ emissions per MWh of electricity generation over the model time horizon. The EPA mapped non-model years to calendar years following the IPM documentation guidance (U.S. EPA, 2023a).[111] After calendar year 2059, through the end of the period of analysis (2080), the EPA assumes that national-average electricity emission factors remain constant, which may lead to overstating the disbenefits of this rule. Table 9-4 below shows the IPM summary outputs and implied national-average $CO_2$ emissions factors for each IPM model year.

---

[108] Ibid. See Table 2-11. (1,540.9 MMT $CO_2$ from fossil fuel combustion)/(1,584.1 MMT $CO_2$ eq. total) = 97.3 percent in 2021.

[109] 92 percent = share of coal consumed by electricity sector in 2022. See U.S. Energy Information Administration, Monthly Energy Review, Table 6.2.

38 percent = share of natural gas consumed by electricity sector in 2022. See U.S. Energy Information Administration, Monthly Energy Review, Table 4.3.

90.1 percent = (1,540.9 MMT $CO_2$ from fossil fuel combustion in EPA GHGI Table 2-11)/[(1,584.1 MMT $CO_2$ eq. total in EPA GHGI Table 2-11) + (217.5 MMT $CO_2$ eq. from natural gas systems in EPA GHGI Table 3-65)*(38 percent) + (44.7 MMT $CH_4$ in $CO_2$ eq. from coal mining in EPA GHGI Table 3-34)*(92 percent) + (2.5 MMT $CO_2$ in $CO_2$ eq. from coal mining in EPA GHGI Table 3-36)*(92 percent)].

[110] Coal and especially gas are inputs to other sectors of the economy, so decreasing electricity sector demand for these fuels does not necessarily preclude their extraction and use elsewhere.

[111] The EPA mapped the calendar year 2028 to model run year 2028, calendar years 2029-31 to run year 2030, calendar years 2032-37 to run year 2035, calendar years 2038-42 to run year 2040, calendar years 2043-47 to run year 2045, calendar years 2048-52 to run year 2050, and calendar years 2053-80 to run year 2055.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                                    APRIL 2024

**Table 9-4: $CO_2$ Emissions per MWh Calculated from Post-IRA 2022 IPM Reference Case**

| IPM Model Year | $CO_2$ Emissions (Million Metric Tons/year)[a] | Grand Total Electricity Generated (Billions MWh/year)[a] | $CO_2$ Emissions (mt/MWh/year) |
|---|---|---|---|
| 2028 | 1,222 | 4.409 | 0.28 |
| 2030 | 972 | 4.545 | 0.21 |
| 2035 | 608 | 4.891 | 0.12 |
| 2040 | 481 | 5.265 | 0.09 |
| 2045 | 406 | 5.628 | 0.07 |
| 2050 | 357 | 6.071 | 0.06 |
| 2055 | 391 | 6.454 | 0.06 |

[a]Source: Post IRA Reference Case SSR.xlsx available at: https://www.epa.gov/power-sector-modeling/post-ira-2022-reference-case.

The EPA estimates the $CO_2$ emissions per model year associated with PFAS compliance emissions by multiplying the total annual electricity use associated with the rule per year by the annual national-average $CO_2$ emissions per MWh from Table 9-4 above. This methodology using national-average emission factors assumes that the geographic locations of these technologies and timing of their operations is similar to average U.S. electricity demand. The EPA believes that these assumptions are a reasonable approximation in this analysis where the treatment technologies are geographically widespread with fairly continuous operations. At this time, the EPA does not have sufficient information about the exact locations of units and timing of operations for a more refined methodology but expects this would have a minimal impact on the quantified results.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                    APRIL 2024

**Table 9-5: CO₂ emissions per Year from Operating Treatment Technologies to Comply with the PFAS NPDWR**

| IPM Model Year | Period of Analysis Year[a] | CO₂ Emission (mt/year) |
|---|---|---|
| 2028 | 2028 | 0 |
| 2030 | 2029-2031 | 49,004 |
| 2035 | 2032-2037 | 28,505 |
| 2040 | 2038-2042 | 20,954 |
| 2045 | 2043-2047 | 16,520 |
| 2050 | 2048-2052 | 13,466 |
| 2055 | 2053-2080 | 13,897 |

Note:

[a]The EPA's analysis assumes the rule is promulgated in 2024 and per the final rule requirements, systems must be in compliance with the final NPDWR by 2029. Therefore, the EPA models emissions associated with electricity use to operate treatment technologies beginning in 2029. Please see Chapter 1 for additional discussion on compliance timelines.

Table 9-6 presents the monetized climate disbenefits associated with operation of PFAS removal treatment technologies under the final PFAS NPDWR. The EPA multiplied the projected $CO_2$ emissions each year (shown in Table 9-5) by the SC-CO₂ estimate for that year (from Table 9-1) and annualized these results over the 2024-2080 analysis period. Monetized climate effects are presented under a 1.5 percent, 2 percent, and 2.5 percent near-term Ramsey discount rate, consistent with the EPA's updated estimates of the SC-CO₂. As described in U.S. EPA (2023h), the SC-CO₂ estimates rely on a dynamic discounting approach that provides over the constant discount rate framework used for SC-GHG estimation in EPA RIAs to date. Specifically, it provides internal consistency within the modeling and a more complete accounting of uncertainty consistent with economic theory and the National Academies' (2017) recommendation to employ a more structural, Ramsey-like approach to discounting that explicitly recognizes the relationship between economic growth and discounting uncertainty. This approach is also consistent with the National Academies' (2017) recommendation to use three sets of Ramsey parameters that reflect a range of near-term certainty-equivalent discount rates and are consistent with theory and empirical evidence on consumption rate uncertainty. See U.S. EPA (2023h) for a more detailed discussion of the entire discounting module and methodology used to value risk aversion in the SC-GHG estimates. The results presented in Table 9-6 are not directly comparable to the economic analyses prepared in the HRRCA analysis presented in Chapters 1-7 of this EA because climate disbenefits were assessed over a shorter period of analysis[112] and at different discount rates[113]. The EPA estimates a range of climate disbenefits associated with this rule from $8.8 million dollars per year (at a 1.5 percent discount

---

[112] The final rule analysis evaluates costs and benefits under the final rule for the period of analysis from 2024 through 2105. For more information see Chapter 2.2.1.

[113] The final rule analysis estimates the annualized value of future benefits and costs using a 2 percent discount. For more information see Chapter 2.2.2.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

rate) to $3.6 million dollars per year (at a 2.5 percent discount rate), which constitute less than 0.6% of the quantified benefits at a 2 percent discount rate.

**Table 9-6: Annualized Monetized Climate Disbenefits Associated with Operating Treatment Technologies to Comply with the Final PFAS NPDWR ($2022)**

| Ramsey Near Term Discount Rate | Annualized Value ($2022)[a] |
|---|---|
| 2.5 percent | $3,600,000 |
| 2 percent | $5,516,000 |
| 1.5 percent | $8,771,000 |

Note:
[a]Results were annualized over the 2024-2080 period of analysis.

## 9.3 Paperwork Reduction Act

The information collection requirements for the final rule will be submitted for approval to OMB under the Paperwork Reduction Act (PRA), 44 U.S.C. 3501 et seq. The ICR supporting statement prepared by the EPA has been assigned the EPA ICR number 2732.01 and is available in the docket at https://www.regulations.gov/docket/EPA-HQ-OW-2022-0114.

The PRA requires the EPA to estimate the burden, as defined in 5 CFR 1320.3(b), on PWSs and primacy agencies of complying with the rule. The information collected as a result of the final rule should allow primacy agencies and the EPA to determine appropriate requirements for specific systems and evaluate compliance with the final rule. Burden is defined at 5 CFR 1320.3(b) and means the total time, effort, and financial resources required to generate, maintain, retain, disclose, or provide information to or for a federal agency. The burden includes the time needed to conduct primacy agency and system activities during the first three years after promulgation, as described below.

### 9.3.1 Primacy Agency Activities

The EPA anticipates primacy agencies will be involved in the following activities for the first three years after publication of the final rule:

- Startup activities – read and understand the rule, adopt regulatory change, and provide internal and system staff with training and technical assistance;

- Review the initial monitoring event results, including confirmation sample results for MCL exceedances; and

- Review the results of standard monitoring from systems.

## 9.3.2 Public Water System Activities

The EPA anticipates systems will be involved in the following activities for the first three years after publication of the final rule:

- Startup activities – read and understand the rule and attend initial training from the primacy agency;

- Conduct initial monitoring including confirmation sampling for MCL exceedances; and

- Conduct standard monitoring, as needed; the EPA assumed that sampling for annual and triennial monitoring would not occur until after the three-year ICR period.

For the first three years after publication of the rule in the Federal Register, information requirements apply to an average of 33,594 respondents annually, including 33,538 PWSs and 56 primacy agencies. The burden associated with the final rule over the three years covered by the ICR is 2.1 million hours, for an average of 684,119 hours per year. The total cost over the three-year period is $176.8 million, for an average of $58.9 million per year (simple average over three years). The average burden per response (i.e., the amount of time needed for each activity that requires a collection of information) is 2.6 hours for PWSs and 2.6 hours for primacy agencies; the average cost per response is $247 for PWSs and $154 for primacy agencies. The collection requirements are mandatory under SDWA (42 U.S.C. 300g-7). Details on the calculation of the final rule information collection burden and costs can be found in the ICR for the final rule and Chapter 5 of this EA. A summary of the average annual burden and costs of the collection is presented in Table 9-7. The burdens and costs reflect labor and laboratory analysis costs.

**Table 9-7: Average Annual Burden, Costs, and Responses for the Final Rule Information Collection Request**

| Item | Burden (Hours in Thousands)[a] | Costs (Million $2022)[a] | Responses |
|---|---|---|---|
| Systems | 506 | $48.3 | 195,739 |
| Primacy agencies | 178 | $10.6 | 69,056 |
| Total[b] | 684 | $59.0 | 264,795 |
| Average per response – systems (hours or dollars) | 2.6 | $247.0 | Not applicable |
| Average per response – primacy agencies (hours or dollars) | 2.6 | $154.0 | Not applicable |

Notes:
[a]Different units indicated for the estimates of burden and cost average per response.
[b]Detail may not add to totals because of independent rounding.
Source: ICR Supporting Statement, available in the docket at https://www.regulations.gov/docket/EPA-HQ-OW-2022-0114.

The estimates of total responses, burden, and cost for system and primacy agency startup activities are provided in Table 9-8.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 9-8: Total Burden, Costs, and Responses for Each Required Activity**

| Item | Burden (Thousand Hours) | Costs (Million $2022) | Responses |
|---|---|---|---|
| System startup activities | 1,312 | $48.5 | 133,060 |
| Systems collect initial samples | 207 | $96.5 | 454,158 |
| **System subtotal** | **1,519** | **$145.0** | **587,218** |
| Primacy agency startup activities | 326 | $19.5 | 112 |
| Primacy agency review initial monitoring data | 207 | $12.4 | 207,056 |
| **Primacy agency subtotal[a]** | **533** | **$31.8** | **207,168** |
| **Combined systems and primacy agency[a]** | **2,052** | **$176.8** | **794,386** |

Note:
[a]Detail may not add to totals because of independent rounding.
Source: ICR Supporting Statement, available in the docket at https://www.regulations.gov/docket/EPA-HQ-OW-2022-0114.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9. The control number for this action is ICR OMB Control No. 2040-0307.

The information collection activities in this final rule have been submitted for approval to the OMB under the PRA. The ICR document that the EPA prepared has been assigned the EPA ICR number 2732.01. You can find a copy of the ICR in the docket for this rule at https://www.regulations.gov/docket/EPA-HQ-OW-2022-0114. When OMB approves this ICR, the agency will announce that approval in the Federal Register and publish a technical amendment to 40 CFR part 9 to display the OMB control number for the approved information collection activities contained in this final rule.

## 9.4 The Final Regulatory Flexibility Analysis

The RFA of 1980, amended by the SBREFA of 1996, requires regulators to assess the effects of regulations on small entities including businesses, nonprofit organizations, and governments. RFA/SBREFA generally requires an agency to prepare an initial regulatory flexibility analysis (IRFA) of any rule subject to notice and comment rulemaking requirements under the Administrative Procedure Act or any other statute unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities (SISNOSE). Small entities include small businesses, small organizations, and small governmental jurisdictions. Under the RFA, the Final Regulatory Flexibility Analysis (FRFA) must include:

1. A statement of the need for, and objectives of, the rule;
2. A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;
3. The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

statement of any change made to the proposed rule in the final rule as a result of the comments;

4.  A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

5.  A description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

6.  A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

The RFA provides default definitions for each type of small entity. Small entities are defined as: (1) a small business as defined by the Small Business Administration's (SBA) regulations at 13 CFR 121.201; (2) a small governmental jurisdiction that is a government of a city, county, town, school district, or special district with a population of less than 50,000; and (3) a small organization that is any "not-for-profit enterprise which is independently owned and operated and is not dominant in its field." The RFA also authorizes an agency to use alternative definitions for each category of small entity, "which are appropriate to the activities of the agency" after proposing the alternative definition(s) in the Federal Register and taking comment (5 USC 601(3)-(5)). In addition, to establish an alternative small business definition, agencies must consult with SBA's Chief Counsel for Advocacy.

For purposes of assessing the impacts of the final rule on small entities, the EPA considered small entities to be systems serving 10,000 people or fewer. This is the threshold specified by Congress in the SDWA 1996 Amendments for small system flexibility provisions. As required by the RFA, the EPA proposed using this alternative definition in the Federal Register (FR) (63 FR 7620, February 13, 1998), requested public comment, consulted with the SBA, and finalized the alternative definition in the agency's Consumer Confidence Reports regulation (U.S. EPA, 1998c, 63 FR 44524, August 19, 1998). As stated in that final rule, the alternative definition would be applied to all future drinking water regulations.

The EPA notes that the Infrastructure Investment and Jobs Act (also known as the BIL, P.L. 117-58) invests over $11.7 billion in the DWSRF General Supplemental fund; $4 billion in the DWSRF Emerging Contaminants fund; and $5 billion in the EC-SDC grants program. Together, these funds will reduce people's exposure to PFAS and other emerging contaminants through their drinking water. The BIL funding will prioritize investment in local communities that are on the frontlines of PFAS contamination and that have few options to finance solutions through traditional programs and help them meet their obligations under this regulation.

## 9.4.1 Need for, Objectives, and Legal Basis of the Rule

The need for the rule, the objectives of the rulemaking, the stakeholder outreach conducted, and the statutory authority the EPA is utilizing to finalize the rule are described in detail in Chapter 3.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

See Section 3.1 for detailed information on the need for the rule, Chapter 9 for information on stakeholder outreach during the rulemaking process, and Section 3.2 for additional detail on the statutory authority for the promulgation of the PFAS regulation. In summary, SDWA authorizes the EPA to establish NPDWRs for contaminants that may have an adverse public health effect, that are known to occur or that present a substantial likelihood of occurring in PWSs at a frequency and level of public health concern, and that present a meaningful opportunity for health risk reduction for persons served by PWSs. As a result, the EPA is finalizing an NPDWR for six PFAS including PFOA, PFOS, PFNA, PFHxS, HFPO-DA, and PFBS. Additionally, under the SDWA, the EPA Administrator is authorized to establish monitoring, recordkeeping, and reporting regulations that the Administrator can use to establish regulations under the SDWA, determine compliance with SDWA, and advise the public of the risks of unregulated contaminants.

The EPA is also addressing PFAS through several of its statutory authorities other than SDWA, including the CERCLA, RCRA, Toxic Substances Control Act (TSCA), Clean Water Act, Clean Air Act, and Emergency Planning and Community Right-to-Know Act. For example, as part of the EPA PFAS Strategic Roadmap, in 2022, the EPA has proposed to designate PFOA and PFOS as CERCLA hazardous substances to require reporting of PFOA and PFOS releases, enhance the availability of data, and ensure agencies can recover cleanup costs. The EPA recognizes that future actions under some of these statutes may have direct or indirect impacts for drinking water treatment facilities and could impact the compliance requirements related to disposal of PFAS treatment residuals that are generated by water systems. The EPA has also committed to restrict PFAS discharges from industrial sources through a multi-faceted Effluent Limitations Guidelines program to proactively establish national technology-based regulatory limits. Additionally, the EPA is seeking to proactively use National Pollutant Discharge Elimination System (NPDES) authorities to reduce discharges of PFAS at the source and obtain more comprehensive information through monitoring on the sources of PFAS discharges and quantity of PFAS discharged by these sources. The EPA notes that these actions may prevent or reduce PFAS entering into sources of drinking water in the future. More information on these statutory authorities and PFAS-related EPA activities can be found in the PFAS Strategic Roadmap.

## 9.4.2 Summary of the SBAR Comments and Recommendations

A Small Business Advocacy Review Panel (SBAR Panel or Panel) was convened to review the planned proposed rulemaking on the Proposed PFAS NPDWR. In addition to the EPA's Small Business Advocacy Chairperson, the Panel consists of the Director of the Standards and Risk Management Division of the EPA OGWDW, the Administrator of the Office of Information and Regulatory Affairs within the OMB, and the Chief Counsel for Advocacy of the Small Business Administration. The panel consulted with and reported on the comments of small entity representatives (SERs) and made findings on issues related to elements of an IRFA under Section 603 of the RFA. The SERs were presented with information related to PFAS background (such as health and occurrence, the SDWA regulatory development process and the EPA's actions to address PFAS in drinking water potential monitoring and reporting rule compliance considerations, treatment and feasibility considerations, potential public notification and education rule compliance considerations, and preliminary economic impacts to small systems. The EPA also provided to SERs that the agency's final regulatory determination for PFOA and PFOS outlined avenues that the agency considered to further evaluate additional PFAS

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

chemicals, other than PFOA and PFOS, and consider groups of PFAS as supported by use of the best available science. Additionally, as part of the EPA's PFAS Strategic Roadmap, the EPA reaffirmed its commitment to evaluate additional PFAS and consider regulatory actions to address additional PFAS or groups of PFAS as it develops the NDPWR. Further, the EPA provided to SERs that as the EPA considers whether to include additional PFAS as part of this regulation, the agency would consider several factors, including whether the same treatment approaches co-remove certain PFAS contaminants and how different PFAS are anticipated to be removed as part of the treatment process, the likelihood that the PFAS co-occur, the similarity of health effects and chemical structures, the environmental persistence characteristics, and the availability of accepted and approved analytical methods or indicators with comparable costs to those currently identified by the EPA to evaluate PFAS removal from drinking water, among other considerations.

In light of the SERs' comments, the Panel considered the regulatory flexibility issues and elements of the IRFA specified by RFA/SBREFA and developed the findings and discussion summarized in the SBAR report. For example, the SBAR Panel recommended several flexibilities in monitoring requirements for small systems, including the use of existing monitoring data (such as the UCMR 5) for initial monitoring purposes, as well as reduced initial monitoring requirements specifically for small ground water systems. Regarding public comment requests, the Panel recommended that the EPA request this for a few areas, such as laboratory capacity for monitoring, additional treatment technologies other than those identified in the proposed rule that have been shown to reduce levels of PFAS to the proposed regulatory standards, additional monitoring flexibilities, and PFAS disposal considerations. Moreover, specific to PFAS disposal, the Panel recommended that the EPA continue to evaluate the potential impacts related to the disposal of PFAS treatment residuals and potential implications from other EPA statutory authorities. This recommendation included presenting the costs of both non-hazardous and hazardous waste disposal of treatment residuals as a part of the proposed rule. To address stakeholder concerns, including those raised during the SBREFA process, the EPA conducted a sensitivity analysis with an assumption of hazardous waste disposal for illustrative purposes only. As part of this analysis, the EPA generated a second full set of unit cost curves that are identical to the curves used for the national cost analysis with the exception that spent GAC and spent IX resin are considered hazardous. The EPA acknowledges that if federal authorities later determine that PFAS-contaminated wastes require handling as hazardous wastes, the residuals management costs are expected to be higher. The EPA incorporated all Panel recommendations, as well as others, in the proposed and final rule.

The Panel also recommended the EPA to consider rule implementation delays for potential laboratory capacity-related challenges if those challenges potentially impact the ability of water systems to monitor for PFAS and reasonably comply with the NPDWR. As described in the proposed rule preamble (Section XII.D.), in accordance with SDWA 1412(b)(10), a state or the EPA may grant an extension of up to two additional years to comply with an NPDWR's MCL if the state or the EPA determines a system needs additional time for capital improvements. In the rule proposal, the EPA indicated that the agency did not intend to provide a two-year extension nationwide. However, the EPA noted in the proposal that under SDWA 1412(b)(10) or 1416 States may provide such extension on an individual system basis which may address compliance issues associated with treatment, laboratory, and disposal capacity. Additionally, the EPA notes that in the proposed rule preamble (Section IX.F) the agency sought public comment on the

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

proposed initial monitoring timeframe, particularly for NTNCWS or all systems serving 3,300 or fewer.

The report includes a number of other observations and recommendations to meet the statutory obligations for achieving small-system compliance through flexible regulatory compliance options. The report was finalized on August 1, 2022 and transmitted to the EPA Administrator for consideration. Detailed information on the overall panel process, including the comprehensive comments of the SERs and full description of Panel recommendations, can be found in the panel report titled, Final Report of the Small Business Advocacy Review Panel on the EPA's Planned Proposed Rule Per- and Polyfluoroalkyl Substances National Primary Drinking Water Regulation and can be found in the rulemaking docket at: https://www.regulations.gov/document/EPA-HQ-OW-2022-0114-0048.

## 9.4.3 Summary of the Final Rule and Public Comments on the Impacts to Small Entities

The EPA is regulating six PFAS in finished drinking water: (1) PFOS, (2) PFOA, (3) PFNA, (4) HFPO-DA and its ammonium salt (also known as GenX chemicals)), (5) PFHxS, and (6) PFBS. The final regulation utilizes compound-specific MCLs for PFOA, PFOS, PFNA, HFPO-DA and PFHxS and an MCL based on a HI for combinations of PFNA, HFPO-DA, PFHxS, and PFBS in mixtures. With this action, the EPA finalizes monitoring, reporting, public notification, and Consumer Confidence Report requirements for PWSs and primacy agencies to comply with the NPDWR.

In the proposal, the EPA evaluated three significant alternatives to minimize significant economic impacts on small PWSs that serve 10,000 or fewer people. The proposed and final rule would also allow water systems to select the most financially and technologically viable strategy that is effective in reducing PFAS in drinking water. The EPA evaluated the following significant alternatives for the proposed rule: 1) use of previously collected monitoring data, 2) a provision for small ground water systems to collect two, rather than four, quarterly samples over a one-year period for initial monitoring, or 3) installation and maintenance of POU treatment devices.

In response to the IRFA included as part of the proposal, the EPA received one comment specifically on the analytical approach used in the IRFA. The commenter states that "[d]etailed analysis on the impacts to NTNCWSs should be conducted to inform the cost/benefit analysis. For example, treating PFAS with GAC at the low levels proposed is much more costly than current treatment for currently regulated contaminants, and a 2008 study is not a reliable indicator of future costs. Lack of both actual data on occurrence in these systems and reliable information on cost of compliance makes finalizing the MCL as to NTNCWSs too uncertain." The EPA disagrees that the agency has not analyzed the impacts of the PFAS NPDWR on NTNCWS. The EPA has used both actual data on occurrence at NTNCWSs from UCMR3 and state data, as well as reliable information on costs to NTNCWSs using the WBS treatment cost models to assess the impact of the rule on NTNCWSs. As the EPA stated in the proposal, the EPA lacks information on the revenues of NTNCWS, therefore the agency does not take the same approach used for CWSs in the SISNOSE screening analysis where costs are compared to 1 and 3% of revenues. Instead, the EPA used the best available data, the EPA's Assessment of

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the Vulnerability of Noncommunity Water Systems to SDWA Cost Increases (SAIC, 1998) to find that NTNCWSs are less vulnerable to SDWA related increases than a typical CWS. The EPA proceeded with the SBAR Panel process, as detailed in this chapter.

Additionally, the EPA received many comments, including from the SBA Office of Advocacy, specific to various small system and IRFA-related topics including lack of funding availability for small water systems, the EPA's estimation of the impacts of the rule on small systems, the EPA's estimation and characterization on federal funding to defray compliance costs for small water systems, and "other factors that will further deter timely compliance" such as personnel shortages, supply chain disruptions, limited lab and disposal capacity, and availability of treatment technologies. For the EPA's response to SBA and other comments on funding availability, please see Section I of the preamble. For the EPA's response to SBA and other comments on the estimated costs to small water systems, please see Section XII of the preamble. For the EPA's response to SBA and other comments on lab capacity, see Section V and VIII of the preamble. For the EPA's response to SBA and other comments on technology and disposal capacity, see Section X of the preamble. For responses to SBA's and other commenters' recommendations to the EPA to provide burden-reducing flexibilities for small water systems, including finalizing one of the regulatory alternatives and phasing in the MCL, as well as providing additional time for compliance see Section V of the preamble. For response to SBA and other commenters concerned about the EPA's concurrent preliminary determination and proposed regulation for four PFAS, see Section III of the preamble.

## 9.4.4 Number and Description of Small Entities Affected

The EPA used SDWIS/Fed data from the fourth quarter of 2021 to identify 62,048 small PWSs, which represent 93% of all systems that may be impacted by the final PFAS regulation. A small PWS serves between 25 and 10,000 people. These water systems include 44,753 CWSs that serve year-round residents and 17,295 NTNCWSs that serve the same persons over six months per year (e.g., a PWS that is an office park or church). The final NPDWR will not affect TNCWSs as those systems will not be subject to the rule requirements. Additional information on the characteristics of these small drinking water systems along with a discussion of uncertainty in the dataset used to derive the estimated number of small systems impacted by the final PFAS regulation can be found in Section 4.3.1.

Table 9-9 and Table 9-10 show the number of affected small CWSS and NTNCWs respectively.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                              APRIL 2024

**Table 9-9: Inventory of Small CWSs**

| System Size (Population Served) | CWSs[a] | | |
| --- | --- | --- | --- |
| | Ground Water | Surface Water | Total |
| | A | B | C = A + B |
| ≤ 100 | 10,654 | 739 | 11,393 |
| 101–500 | 13,037 | 2,042 | 15,079 |
| 501–1,000 | 4,132 | 1,179 | 5,311 |
| 1,001–3,300 | 5,503 | 2,460 | 7,963 |
| 3,301–10,000 | 2,784 | 2,223 | 5,007 |
| TOTAL | 36,110 | 6,601 | 44,753 |

Abbreviations:  CWS – community water systems.
Note:
[a]Includes 23 CWSs serving 10,000 or fewer people for which no primary source water type was reported to SDWIS/Fed. The EPA assigned these systems to the source type of Ground Water.
Source: SDWIS/Fed fourth quarter 2021 "frozen" dataset that contains information reported through January 14, 2022. Includes all active CWSs.

**Table 9-10: Inventory of Small NTNCWSs**

| System Size (Population Served) | NTNCWSs[a] | | |
| --- | --- | --- | --- |
| | Ground Water | SW | Total |
| | A | B | C = A+B |
| ≤ 100 | 8,084 | 252 | 8,336 |
| 101–500 | 6,111 | 257 | 6,368 |
| 501–1,000 | 1,476 | 91 | 1,567 |
| 1,001–3,300 | 743 | 121 | 864 |
| 3,301–10,000 | 97 | 63 | 160 |
| TOTAL | 16,551 | 784 | 17,295 |

Abbreviations:  NTNCWS – non-transient non-community water systems.
Note:
[a]Includes 11 NTNCWSs serving 3,300 or fewer people for which no primary source type was reported to SDWIS/Fed. The EPA assigned these systems to the source water type of Ground Water.
Sources: SDWIS/Fed fourth quarter 2021 "frozen" dataset that contains information reported through January 14, 2022. Includes all active NTNCWSs.

## 9.4.5 Description of Compliance Requirements of the Final Rule

For a detailed description of the regulatory requirements under the final PFAS regulation see Section 2.1. The final rule requires PWSs subject to the rule to conduct initial monitoring. Related to this initial monitoring requirement, the final NPDWR includes a provision, made available to PWSs of all sizes, including CWSs and NTNCWs serving 10,000 or fewer people, to use qualified previously collected monitoring data to demonstrate levels of regulated PFAS in their water system to satisfy the initial monitoring requirement. The EPA assessed the extent to which this significant alternative minimizes the economic impact on small PWSs specifically in Section 9.4.7.1 below. Additionally, the EPA has included a provision in the final NPDWR where ground water systems serving a population of 10,000 or fewer may collect two quarterly

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

samples over a one-year period for the purpose of initial monitoring, rather than collecting four quarterly samples. The EPA assessed the extent to which this regulatory flexibility minimizes the economic impact on small PWSs in Section 9.4.7.2 below.

Based on initial monitoring results, systems will be required to conduct ongoing monitoring at least every three years or as often as four times per year. Details on the monitoring frequency requirements of the final NPDWR can be found in Section VIII of the Federal Register Notice for the final rule.

PWSs that exceed the drinking water standard are required to choose between treatment and nontreatment compliance options. The EPA identified the following Small System Compliance Technologies (SSCTs) GAC, Anion Exchange (AIX), and High-pressure Membranes (RO and NF). POU RO is not currently listed as a compliance option because the final rule requires treatment to concentrations below the current National Sanitation Foundation (NSF) International/American National Standards Institute (NSF/ANSI) certification standard for POU device removal of PFAS. However, POU treatment is reasonably anticipated to become a compliance option for small systems in the future if NSF/ANSI or other independent third-party certification organizations develop a new certification standard that mirrors the EPA's proposed regulatory standard. Details on SSCTs and costs can be found in Section 5.3.1 and *Best Available Technologies and Small System Compliance Technologies for Per- and Polyfluoroalkyl Substances (PFAS) in Drinking Water* (U.S. EPA, 2024c).

## 9.4.6 Analysis of Impact of Regulatory Options on Small System Costs

The EPA limited the quantitative cost impact analysis to small CWSs because small NTNCWSs operate in numerous industries and the EPA does not have information on NTNCWSs' revenues. The EPA's decision to limit its cost impact analysis to CWSs is supported by the EPA's Assessment of the Vulnerability of Noncommunity Water Systems to SDWA Cost Increases (1998). In this study, the EPA examined the burden of SDWA rule costs in comparison to the average revenues of various categories of NTNCWSs. All the NTNCWS categories reviewed were less vulnerable to SDWA-related increases than a typical CWS. The report notes that in some categories of businesses, costs are more easily passed on to the customer base than in others. In each NTNCWS category, however, total expenditures on water were found to be a relatively small percentage of total revenues. Water expenditures (including expenditures for sewer service and miscellaneous other utilities) totaled less than one percent of total revenues in nearly all cases and were not more than 1.3 percent of total revenues for any category. The implication is that an increase in water costs would similarly be less than one percent of revenue. This report included several caveats such as one that considered the potential for underestimating the impact to golf courses, which were grouped in with other recreational entities whose use of water was less significant to the core business than the golf courses. The EPA notes, however, that irrigation water for golf courses would not need to meet the final rule; only water used for human consumption would need to be treated. Despite the significant caveats listed, the report strongly suggested that NTNCWSs should not be considered particularly vulnerable to operating cost increases resulting from SDWA rulemakings.

FINAL RULE                                                                        APRIL 2024

To indicate the potential economic impact on small CWSs, the EPA divided annual costs by annual revenues and converted the decimal values to percentages and identified the number and percent of CWSs for which the impact percentages exceeded thresholds of one percent and three percent. For each system, the EPA estimated annual revenue using each system's average daily flow and the average revenue per thousand gallons delivered from the CWSS (U.S. EPA, 2009). For annual costs, the EPA estimated annual average monitoring costs based on system size and baseline PFAS occurrence. Annual costs also included annual treatment costs when baseline PFAS concentrations exceeded the PFAS limits of the final rule or options. Annual treatment costs are the sum of annual operating and maintenance costs and annualized capital costs.

Table 9-11 shows the number and proportion of CWSs incurring annual costs that exceed 1 percent and 3 percent of annual revenue at the commercial rate of capital for the final rule. Under the final rule, 16,542 small CWSs (37 percent of small CWSs) could incur annual costs greater than 1 percent of annual revenue and 8,199 small CWSs (18 percent of small CWSs) could incur annual costs greater than 3 percent of annual revenue. These potential impacts are high enough to preclude a finding of no SISNOSE. Details on treatment costs curves can be found in Section 5.3.1 and *Best Available Technologies and Small System Compliance Technologies for Per- and Polyfluoroalkyl Substances (PFAS) in Drinking Water* (U.S. EPA, 2024c). For the EPA's estimates of treatment costs by system size, see Appendix C.1. For information on federal financial assistance available to small systems for the installation of PFAS treatment technology, see Section 9.13.2.2.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                      APRIL 2024

**Table 9-11: Cost-Revenue Ratio for Small CWSs, Final Rule (PFOA and PFOS MCLs of 4.0 ppt each, PFHxS, PFNA, HFPO-DA MCLs of 10 ppt each and HI of 1) (Commercial Cost of Capital)**

| Ownership | Source Water | Population Served Size Category | Number of CWSs | Number of CWSs with Cost Revenue Ratio > 1% | Number of CWSs with Cost Revenue Ratio > 3% | Percent of CWS with Cost Revenue Ratio > 1% | Percent of CWS with Cost Revenue Ratio > 3% |
|---|---|---|---|---|---|---|---|
| Private | Ground | Less than 100 | 9,260 | 9,260 | 4,967 | 100% | 54% |
| Private | Ground | 100 to 500 | 8,225 | 2,892 | 890 | 35% | 11% |
| Private | Ground | 500 to 1,000 | 1,313 | 110 | 88 | 8% | 7% |
| Private | Ground | 1,000 to 3,300 | 1,048 | 80 | 77 | 8% | 7% |
| Private | Ground | 3,300 to 10,000 | 347 | 29 | 29 | 8% | 8% |
| Private | Surface | Less than 100 | 399 | 398 | 196 | 100% | 49% |
| Private | Surface | 100 to 500 | 770 | 206 | 67 | 27% | 9% |
| Private | Surface | 500 to 1,000 | 244 | 19 | 15 | 8% | 6% |
| Private | Surface | 1,000 to 3,300 | 278 | 18 | 18 | 6% | 6% |
| Private | Surface | 3,300 to 10,000 | 184 | 15 | 14 | 8% | 8% |
| Public | Ground | Less than 100 | 1,394 | 745 | 213 | 53% | 15% |
| Public | Ground | 100 to 500 | 4,812 | 1,153 | 395 | 24% | 8% |
| Public | Ground | 500 to 1,000 | 2,819 | 245 | 186 | 9% | 7% |
| Public | Ground | 1,000 to 3,300 | 4,455 | 341 | 326 | 8% | 7% |
| Public | Ground | 3,300 to 10,000 | 2,437 | 222 | 221 | 9% | 9% |
| Public | Surface | Less than 100 | 340 | 184 | 51 | 54% | 15% |
| Public | Surface | 100 to 500 | 1,272 | 255 | 93 | 20% | 7% |
| Public | Surface | 500 to 1,000 | 935 | 72 | 58 | 8% | 6% |
| Public | Surface | 1,000 to 3,300 | 2,182 | 143 | 140 | 7% | 6% |
| Public | Surface | 3,300 to 10,000 | 2,039 | 155 | 155 | 8% | 8% |
| **Total** | | | **44,753** | **16,542** | **8,199** | **37%** | **18%** |

Abbreviations: CWS – community water system
Note:
The commercial cost of capital is the weighted average cost for PWSs to raise capital or borrow to pay for compliance activities. Please see Section 4.3.5 for additional details on how the cost of capital for different CWSs was calculated. The CWS compliance costs were annualized using the cost of capital and then compared to the average revenue of the CWS size and ownership category.

## 9.4.7 The EPA's Steps to Minimize the Significant Economic Impact of the Final Rule on Small Systems

Significant alternatives are described below. The EPA evaluated the minimized economic impact for small systems for each of these alternatives. In the final rule, the EPA elected to allow use of previously collected PFAS monitoring data to satisfy initial monitoring requirements and retain the provision to allow for reduced initial monitoring for small ground water systems serving a population of 10,000 or fewer. After considering public comments on the proposal, the EPA has included a provision in the final rule to allow for an annual compliance monitoring frequency, raised the trigger level which determine when more frequency monitoring is required, and is also

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

exercising its authority under SDWA Section 1412(b)(10) to implement a nationwide two-year capital improvement extension to comply with MCL. Finally, the EPA notes that should POU devices become certified to meet the final NPDWR standard, this could minimize the economic impact of the final regulation on small PWSs, particularly on water systems in the smallest size category (e.g., those serving between 25 and 500 people).

### 9.4.7.1 Use of Previously Collected PFAS Monitoring Data

The EPA has included a provision in the final NPDWR where PWSs of all sizes may use previously collected monitoring data if it meets stated criteria to satisfy the initial monitoring requirement. This significant alternative is expected to offer substantial cost savings to small PWSs, particularly those serving a population between 3,301 and 10,000 that participate in UCMR 5. For the national cost analysis, the EPA assumes that systems with either UCMR 5 data or monitoring data in the State PFAS Database (U.S. EPA, 2024g) will not need to conduct the initial year of monitoring. As a simplifying assumption for the cost analysis, the EPA assumes all systems serving a population of greater than 3,300 have UCMR 5 data and those serving 3,300 or less do not. The EPA notes that this assumption is conservative and will likely overestimate costs for systems serving a population less than 3,300 as many state monitoring programs and other efforts will have collected monitoring data that can be used as initial monitoring data for these systems, thus offsetting those costs. Under these assumptions, the EPA estimates that this provision will reduce the economic burden on small systems nationally by $7 million dollars per year for three years.

### 9.4.7.2 Reduced Monitoring for Small Ground Water Systems

The EPA has included a provision in the final NPDWR where ground water systems serving a population of 10,000 or fewer may collect two quarterly samples over a one-year period for the purpose of initial monitoring, rather than collecting four quarterly samples. The EPA estimates that this provision will reduce the economic burden on small systems nationally by $21 million per year for three years.

### 9.4.7.3 Annual Monitoring for Systems "Reliably and Consistently" below the MCLs

Upon consideration of information submitted by commenters, the EPA has included a provision in the final rule to allow for annual compliance monitoring for all sized systems that are deemed to be "reliably and consistently"[114] below the MCLs, but still above the trigger levels. These systems would not be required to remain on quarterly monitoring, as proposed, and would instead be allowed to monitor annually once meeting the requirements of being deemed "reliably and consistently" below the MCLs. The introduction of annual monitoring has the potential to significantly reduce monitoring burden for water systems, including small systems, from taking 4 samples per year to taking 1 sample per year per EP. As most small systems have one EP, this

---

[114] The definition of reliably and consistently below the MCL means that each of the quarterly samples contains regulated PFAS concentrations below the applicable MCLs. For the PFAS NPDWR, this demonstration of reliably and consistently below the MCL would include consideration of at least four quarterly samples at an EP below the MCL, but states will make their own determination as to whether the detected concentrations are reliably and consistently below the MCL.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

requirement would save small water systems that are deemed "reliably and consistently" below the MCL a minimum approximately $930 per year.[115]

The EPA estimates that approximately 4,300 to 7,000 small PWSs may have regulated PFAS occurrence between the trigger levels and the MCLs, and therefore may be eligible for annual monitoring following four consecutive quarterly samples demonstrating they are "reliably and consistently" below the MCLs. Further, the EPA believes that most systems treating their water for regulated PFAS would likely be eligible for this compliance monitoring tier. Therefore, the EPA estimates that 2,900 to 5,400 small water systems in addition to the 4,300 to 7,000 small water systems above, may be eligible for annual monitoring, instead of quarterly monitoring, after taking action to comply with the rule.

### 9.4.7.4 Increased Trigger Levels

Upon consideration of information submitted by commenters, the EPA is finalizing higher trigger levels for the rule. In the proposal the EPA included trigger levels at 1/3 the MCLs: 1.3 ppt for PFOA and PFOS, 0.5 for the HI. For the final rule, the EPA has set trigger levels at 1/2 of the MCLs: 2.0 ppt for PFOA and PFOS, 5 ppt for PFHxS, GenX and PFNA, and 0.5 for the HI. As the trigger levels determine when more frequent monitoring is required, an increase in these levels will result in a burden reduction compared to the proposed rule for all water systems, including small water systems with compliance monitoring results between 1/2 and 1/3 of the MCLs.

### 9.4.7.5 MCL Compliance Period Extension

Upon consideration of information submitted by commenters, the EPA is exercising its authority under SDWA § 1412(b)(10) to implement a nationwide capital improvement extension to comply with MCL. All systems have 5 years to achieve compliance with the MCLs under the final rule. However, all systems must comply with the initial monitoring requirements by three years following rule promulgation, and all other requirements of the NPDWR, other than the MCL, starting three years following rule promulgation (e.g., compliance monitoring, reporting, and recordkeeping).

The agency notes that SDWA § 1416(a) and (b)(2)(C) describe how primacy agencies may also grant an exemption for systems meeting specified criteria that provides an additional period for compliance. PWSs that meet the minimum criteria outlined in the SDWA§ 1416 may be eligible for an exemption of up to three years. Exemptions for smaller water systems (≤3,300 population), meeting certain specified criteria may be renewed for one or more 2-year periods, but not to exceed six years. States exercising primacy enforcement responsibility must have adopted the 1998 Variance and Exemption Regulation for a water system to be eligible for an exemption in that State.

The EPA anticipates this will significantly reduce the burden of the final rule on all water systems, including small water systems. For more information see Section XI of the FRN.

---

[115] The laboratory analysis cost per sample for EPA Method 537.1 is $309 ($2022). The cost of three avoided samples equals $927.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### 9.4.7.6 Point-of-Use (POU) Technologies as Small System Compliance Technologies (SSCTs)

In the *Best Available Technologies and Small System Compliance Technologies for Per- and Polyfluoroalkyl Substances (PFAS) in Drinking Water* (U.S. EPA, 2024c), the EPA discusses POUs technologies and notes that the current certification standard is 70 ppt, which would not ensure these devices are able to meet the MCLs of the final rule. The EPA notes that based on the technologies used in many POU devices (e.g., RO), the agency anticipates devices are or will be capable of meeting the MCLs in this final rulemaking. If POU certifications are updated and do meet the SSCT criteria in the final NPDWR, this could minimize the economic impact of the final regulation on small PWSs, particularly on water systems in the smallest size category (e.g., those serving between 25 and 500 people). In particular, NTNCWS that control all of their potable taps (e.g., schools, gas stations, churches) may find the use of POU devices to be a particularly attractive option. The EPA has not estimated the potential national economic burden reduction because the current certification prevents POU devices from meeting the SSCT criteria for the final NPDWR. However, the EPA notes there is a potential for significant burden reduction particularly for very small water systems if POU certifications are updated and POU devices meet the SSCT criteria for the final NPDWR in the future.

## 9.5 Unfunded Mandates Reform Act

The UMRA (1995) seeks to protect state, local, and tribal governments from the imposition of unfunded federal mandates. In addition, the Act seeks to strengthen the partnership among the federal government and state, local, and tribal governments.

Title II of UMRA establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and the private sector. Under Section 202 of UMRA, the EPA generally must prepare a written statement, including a cost-benefit analysis, for proposed and final rules with "federal mandates" that may result in expenditures by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, adjusted for inflation. The EPA has calculated the cost of the rule in 2022 dollars, therefore, the UMRA requirements are triggered if expenditures exceed $168 million in one year (escalation based on GDP deflator).

Section 205 of UMRA generally requires the EPA to identify and consider a reasonable number of regulatory alternatives and adopt the least costly, most cost-effective, or least burdensome option that achieves the objectives of the rule. The provisions of Section 205 do not apply when they are inconsistent with applicable law. Note that in the case of NPDWRs, the UMRA Section 205 requirement to adopt the least costly, most cost-effective or least burdensome option is inconsistent with SDWA regulatory development requirements. SDWA section 1412(b)(4)(B) states that each national primary drinking water regulation for a contaminant for which a maximum contaminant level goal is established under this subsection shall specify a maximum contaminant level for such contaminant which is as close to the maximum contaminant level goal as is feasible, with feasible defined in section 1412(b)(4)(B)(5) as "feasible with the use of the best technology, treatment techniques and other means which the Administrator finds, after

examination for efficacy under field conditions and not solely under laboratory conditions, are available (taking cost into consideration)." Moreover, Section 205 allows the EPA to adopt an alternative other than the least costly, most cost-effective, or least burdensome alternative if the Administrator publishes with the rule an explanation of why that alternative was not adopted. The EPA's analysis of regulatory alternatives (Options 1a through 1c) found that they are less costly and lower burden options compared to the final rule. However, these options do not meet EPA's statutory requirement to, as stated above, set the MCL for a contaminant(s) as close to the MCLG as is feasible, taking costs into consideration. EPA has determined that the final rule is feasible, taking costs into consideration; see discussion in Section V of the preamble. Finally, as detailed in Chapter 7, the Administrator has reaffirmed the SDWA required (Section 1412(b)(4)(C)) determination made at proposal that the quantifiable and nonquantifiable benefits of the rule justify the quantifiable and nonquantifiable costs, which provides further justification for why EPA did not select the least burdensome option.

Before the EPA establishes any regulatory requirements that may significantly or uniquely affect small governments, including tribal governments, it must have developed under Section 203 of UMRA a small government agency plan. The plan must provide for notifying potentially affected small governments, enabling officials of affected small governments to have meaningful and timely input in the development of the EPA regulatory proposals with significant federal intergovernmental mandates, and informing, educating, and advising small governments on compliance with the regulatory requirements. Section 204 of UMRA requires EPA, to the extent permitted by law, develop an effective process to permit elected officials of state, local, and tribal governments to provide meaningful and timely input in the development of regulatory proposals containing significant Federal intergovernmental mandates. Options being considered for the proposed rule also met the consultation requirements of Federalism, therefore the EPA elected to engage the UMRA (Sections 203 and 204) and Federalism stakeholders in the same consultation as there are overlapping interests, and a discussion of potential options for the development of the proposed rule was more effectively communicated simultaneously. For more information on the consultation, refer to the Summary Report on Federalism and Unfunded Mandates Reform Act Consultation for the Development of the Proposed PFAS NPDWR in the public docket at https://www.regulations.gov/document/EPA-HQ-OW-2022-0114-0706.

The final rule contains a federal mandate that may result in expenditures to state, local, and tribal governments, in the aggregate, or to the private sector, of $168 million or more in any one year. For the final rule, the highest annual incremental cost over the analysis period occurs in the 6th year after rule promulgation. In this year PWSs are expected to have undiscounted incremental costs of $15.5 billion and Primacy Agencies will have undiscounted incremental costs of $5 million. Therefore, the final rule has costs in a single year of $15.5 billion and, therefore, is subject to the requirements of Sections 202 and 205 of UMRA. As discussed in Section II.E of the preamble for the final rule, the EPA anticipates that significant federal funding available through BIL and other sources will assist many disadvantaged communities, small systems, and others with the costs of addressing emerging contaminants, like PFAS.

The annualized costs of the final rule, that are borne by public, private, and tribal PWSs are provided in Table 9-12. As the exhibit shows, public entities bear most of the costs (but may pass them on to consumers). As discussed in Chapter 2, in addition to these PWS costs, primacy

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

agencies will incur annualized incremental administrative costs of $4.7 million under the final rule.

**Table 9-12: Annual Costs by PWS Size and Ownership, Final Rule (Million $2022) (Commercial Cost of Capital)**

|  | Public Water Systems Serving < 10,000 People | All Public Water Systems |
|---|---|---|
| Publicly-Owned Public Water Systems | $189.6 | $1,284.6 |
| Privately-Owned Public Water Systems | $161.3 | $247.0 |
| Tribal-Owned Public Water Systems | $4.4 | $9.0 |

Abbreviations: PWS – public water system; PFAS – per- and polyfluoroalkyl substances; PFOS – perfluorooctanesulfonic acid; MCL – maximum contaminant level; HI – hazard index.

## 9.6 Executive Order 13132: Federalism

Executive Order 13132 (1999), entitled "Federalism" (64 FR 43255, August 10, 1999), requires the EPA to develop an accountable process to ensure "meaningful and timely input by state and local officials in the development of regulatory policies that have federalism implications." "Policies that have federalism implications" are defined in the Executive Order to include regulations that have "substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government."

To fulfill requirements of Executive Order 13132 Section 6, the EPA held a Federalism consultation with state and local government officials as well as their representative associations to solicit input on key areas to inform the development of the proposed rule. Options considered for the proposed rule also met the consultation requirements of UMRA, therefore the EPA elected to engage the UMRA stakeholders in the same consultation because there are overlapping interests, and a discussion of potential options for the development of the proposed rule was more effectively communicated simultaneously. For more information on the consultation, refer to the Summary Report on Federalism and Unfunded Mandates Reform Act Consultation for the Development of the Proposed PFAS NPDWR in the public docket at https://www.regulations.gov/document/EPA-HQ-OW-2022-0114-0706. The EPA also received public comments from some of these organizations during the public comment period following the rule proposal. These individual organization comments are available in the Docket. The EPA considered all comments provided by individual states and state organizations provided during the public comment period and used these comments to inform the final rule.

This action has federalism implications due to the substantial direct compliance costs on state or local governments. The net change in annualized primacy agency related cost for state, local, and tribal governments in the aggregate is estimated to be $4.7 million. Also see Table 9-12 for annual costs to publicly-owned water systems, which are estimated to be $1,284.6 million. Please see Section XIII.E of the preamble for the final rule for the EPA's federalism summary impact statement.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 9.7 Executive Order 13175: Consultation and Coordination with Indian Tribal Governments

Executive Order 13175 (2000), entitled "Consultation and Coordination with Indian Tribal Governments" (65 FR 67249, November 9, 2000), requires the EPA to develop an accountable process to ensure "meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications." The Executive Order defines "policies that have tribal implications to include regulations that have "substantial direct effects on one or more Indian tribes, on the relationship between the federal government and the Indian tribes, or on the distribution of power and responsibilities between the federal government and Indian tribes."

Under Executive Order 13175, the EPA may not issue a regulation that has tribal implications, that imposes substantial direct compliance costs, and that is not required by statute, unless the federal government provides the funds necessary to pay the direct compliance costs incurred by tribal governments, or the EPA consults with tribal officials early in the process of developing the proposed regulation and develops a tribal summary impact statement.

The EPA has identified 998 public water systems serving tribal communities, 84 of which are federally owned. The EPA estimates that tribal governments will incur public water system compliance costs of $9.0 million per year attributable to monitoring, treatment or nontreatment actions to reduce PFAS in drinking water, and administrative costs, and that these estimated impacts will not fall evenly across all tribal systems. The final PFAS NPDWR does offer regulatory relief by providing flexibilities for all water systems to potentially utilize pre-existing monitoring data in lieu of initial monitoring requirements and for ground water CWSs and NTNCWSs serving 10,000 or fewer people to reduce initial monitoring from quarterly monitoring during a consecutive 12-month period to only monitoring twice during a consecutive 12-month period. These flexibilities may result in implementation cost savings for many tribal systems since 98 percent of tribal CWSs and 94 percent of NTNCWs serve 10,000 or fewer people.

The EPA has concluded that the final rule has Tribal implications, because it will impose direct compliance costs on Tribal governments, and the federal government will not provide funds necessary to pay those direct compliance costs. However, the EPA notes that the federal government will provide a potential source of funds necessary to offset some of those direct compliance costs. The Infrastructure Investment and Jobs Act (also known as the BIL, P.L. 117-58) invests over $11.7 billion in the DWSRF General Supplemental fund; $4 billion in the DWSRF Emerging Contaminants fund; and $5 billion in the EC-SDC grants program. The EPA has reserved a portion of the EC-SDC program for EPA Regions to provide direct support to Tribes, similar to support under the Small, Underserved, and Disadvantaged Communities Tribal program that was enacted under the WIIN Act. Together, these funds will reduce people's exposure to PFAS and other emerging contaminants through their drinking water. Additionally, the EPA partners closely with the Indian Health Service (IHS) Areas to identify infrastructure needs and to implement drinking water infrastructure projects. Additionally, the EPA partners with IHS to provide technical assistance to support compliance with regulatory requirements.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Consistent with the EPA's Policy on Consultation and Coordination with Indian Tribes (May 4, 2011), the EPA consulted with tribal officials early in the process of developing the proposed regulation to gain an understanding of tribal views on key areas of the proposed PFAS NPDWR and provide tribal officials an opportunity to have meaningful and timely input on its development. For more information on the consultation with tribes, refer to the Summary Report on Tribal Consultation: Development of the Proposed PFAS NPDWR in the public docket at https://www.regulations.gov/document/EPA-HQ-OW-2022-0114-0704.

## 9.8 Executive Order 13045: Protection of Children from Environmental Health and Safety Risks

Executive Order 13045 (1997), entitled "Protection of Children from Environmental Health and Safety Risks" (62 FR 19885; April 23, 1997) applies to any rule initiated after April 21, 1998, that (1) is determined to be "economically significant" as defined under Executive Order 12866; and (2) concerns an environmental, health, or safety risk that the EPA has reason to believe may have a disproportionate effect on children. If the regulatory action meets both criteria, the EPA must evaluate the environmental, health, or safety effects of the planned rule on children, and explain why the planned regulation is preferable to other potentially effective and reasonably feasible options considered by the EPA.

The final rule is subject to Executive Order 13045 because it is economically significant as defined in Executive Order 12866. This action's health and risk assessments are contained in Section 6.2.2, and the associated appendices. The EPA expects that the final rule would provide additional protection to both children and adults who consume drinking water supplied by the affected systems. The EPA also expects that the benefits of the final rule, including reduced health risk, will provide significant benefits to infants and children. As detailed in the Final Human Health Toxicity Assessments for PFOA and PFOS (U.S. EPA, 2024e; U.S. EPA, 2024f), the ATSDR *Toxicological Profile for Perfluoroalkyls* (ATSDR, 2021), and the toxicity assessments for HFPO-DA and PFBS (U.S. EPA, 2021c; U.S. EPA, 2021d), there is evidence for adverse effects of PFAS for several developmental and reproductive endpoints, as well as evidence for adverse endocrine, and immune effects in infants or children. The EPA discusses the qualitative benefits from avoided adverse health effects of PFOA, PFOS, and other PFAS, including effects on infants and children in Section 6.2.2.2. In Section 6.2.2.2.1, the EPA quantifies the avoided morbidity and mortality associated with reductions in infant birth weight from reduced maternal PFOA and PFOS exposure in drinking water. The EPA also assesses the potential benefits of reduced PFNA on infant birth weight in a sensitivity analysis found in Appendix K.

This rulemaking finalizes the MCLGs for PFOA and PFOS as zero based on cancer effects. This MCLG is protective of the adverse effects observed in infants and children (e.g., decreased birth weight). This rulemaking also finalizes individual MCLGs for HFPO-DA, PFNA, and PFHxS, as well as the HI MCLG for mixtures of PFBS, HFPO-DA, PFNA, and PFHxS. The chronic toxicity values (i.e., chronic oral reference dose and equivalents) used to develop these MCLGs U.S. EPA, 2024e; U.S. EPA, 2024fprovide an estimate of a daily oral exposure to the human population (including sensitive subpopulations) that is likely to be without an appreciable risk of deleterious non-cancer effects during a lifetime.

# 9.9 Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use

Executive Order 13211 (2001), "Actions Concerning Regulations That Significantly Affect Energy Supply Distribution, or Use," provides that agencies shall prepare and submit to the Administrator of the Office of Information and Regulatory Affairs, OMB, a Statement of Energy Effects for certain actions identified as "significant energy actions." Section 4(b) of Executive Order 13211 defines "significant energy actions" as "any action by an agency (normally published in the Federal Register) that promulgates or is expected to lead to the promulgation of a final rule or regulation, including notices of inquiry, advance notices of proposed rulemaking, and notices of proposed rulemaking: (1)(i) that is a significant regulatory action under Executive Order 12866 or any successor order, and (ii) is likely to have a significant adverse effect on the supply, distribution, or use of energy; or (2) that is designated by the Administrator of the Office of Information and Regulatory Affairs as a significant energy action."

The final rule is not a "significant energy action" as defined in Executive Order 13211. The EPA estimates that the PFAS NPDWR will result in an increased electricity use of approximately 229 GWh per year, for more information see Section 9.2. Total U.S. electricity consumption in 2022 was about 4.05 million GWh (U.S. EIA, 2023). The electricity consumed as a result of the PFAS NPDWR represents approximately 0.005% of total U.S. electricity consumption. This rule is a significant regulatory action under Executive Order 12866; however, it is not likely to have a significant adverse effect on the supply, distribution, or use of energy, for the reasons described as follows.

## 9.9.1 Energy Supply

The final rule does not regulate power generation, either directly or indirectly, and public and private systems subject to the proposed rule do not, as a general rule, generate power. Further, the energy cost increases borne by customers of systems as a result of the final rule is a low percentage of the total cost of water. Therefore, power generation utilities that purchase water as part of their operations are unlikely to face any significant effects as a result of the final rule.

## 9.9.2 Energy Distribution

The final rule does not regulate any aspect of energy distribution and systems that are regulated by the proposed rule already have electrical service. The rule is not expected to increase peak electricity demand for systems because of the small amount of electricity used (see above). Therefore, the EPA assumes that the existing connections are adequate and that the final rule has no discernible adverse effect on energy distribution.

## 9.9.3 Energy Use

The EPA has determined that the incremental energy used to implement water treatment at drinking water systems in response to the final regulatory requirements is minimal. Therefore, the EPA does not expect any noticeable effect on the national levels of power generation in terms of average and peak loads.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 9.10 National Technology Transfer and Advancement Act

Section 12(d) of the NTTAA of 1995 directs the EPA to use voluntary consensus standards in its regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., materials specifications, test methods, sampling procedures, and business practices) that are developed or adopted by voluntary consensus standards bodies. NTTAA directs the EPA to provide Congress, through OMB, explanations when the EPA decides not to use available and applicable voluntary consensus standards.

The EPA's approved monitoring and sampling protocols generally include voluntary consensus standards developed by agencies such as the American National Standards Institute (ANSI) and other such bodies wherever the EPA deems these methodologies appropriate for compliance monitoring.

## 9.11 Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, Executive Order 14096: Revitalizing our Nation's Commitment to Environmental Justice for All

Executive Order 12898 (1994), "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations" (59 FR 7629, February 16, 1994) established federal executive policy on environmental justice. Its main provision directs federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission. Agencies must do this by identifying and addressing as appropriate any disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations and low-income populations in the U.S. Executive Order 14096 (2023), "Revitalizing our Nation's Commitment to Environmental Justice for All" (88 FR 25251, April 21, 2023) builds upon and strengthens its commitment to environmental justice outlined in Executive Order 12898, directing the federal government to identify, analyze, and address disproportionate and adverse human health or environmental effects of agency actions on communities with environmental justice concerns. For information on the EPA's Environmental Justice Analysis, see Chapter 8.

On March 2, 2022 and April 5, 2022, the EPA held public stakeholder meetings related to EJ and the development of the proposed NPDWR. The meetings provided an opportunity for the EPA to share information and for communities to offer input on EJ considerations related to the development of the proposed rule. The EPA received public comment on topics including establishing an MCL for PFAS and regulating PFAS as a class, affordability of PFAS abatement options and responsibility for remediation, limiting industrial discharge of PFAS, and the EPA's relationship with community groups. For more information on the EJ stakeholder meetings, refer to the EJ Considerations for the Development of the Proposed PFAS Drinking Water Regulation Public Meeting Summaries in the public docket at https://www.regulations.gov/document/EPA-HQ-OW-2022-0114-0009 and https://www.regulations.gov/document/EPA-HQ-OW-2022-0114-0026. Additionally, the written public comments from this pre-rule proposal engagement are included within the public docket.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 9.12 Consultations with the Science Advisory Board, National Drinking Water Council, and the Secretary of Health and Human Services

### 9.12.1 Science Advisory Board

As required by Section 1412(e) of the SDWA, in 2021-2022, the EPA asked SAB to evaluate the current scientific data on the following: The EPA's Proposed Approaches to the Derivation of a Draft Maximum Contaminant Level Goal for PFOA and PFOS in Drinking Water (U.S. EPA, 2021f; U.S. EPA, 2021g); a draft framework for estimated noncancer health risks associated with mixtures of PFAS; and the EPA's methodology for evaluating reduced cardiovascular disease risks. The EPA sought SAB comment on whether the analyses provided in these documents are scientifically supported, clearly described, and informative toward supporting the EPA's proposed National Primary Drinking Water Rulemaking effort (U.S. EPA, 2022j). The SAB PFAS Review Panel deliberated and sought input from public meetings held in December 2021, January 2022, and May 2022. The SAB Chartered Body conducted a quality review of the draft panel report July 2022. The SAB's final report, titled "EPA's Analyses to Support EPA's National Primary Drinking Water Rulemaking for PFAS" was transmitted to the EPA Administrator on August 22, 2022. See SAB website at for more information on the SAB review.[116] For information on the EPA responses to SAB's review, see U.S. EPA (2022i).

### 9.12.2 National Drinking Water Advisory Council

In accordance with Section 1412 (d) of the SDWA, the EPA consulted with NDWAC, on the proposed rule. The EPA consulted with NDWAC in a public meeting on April 19, 2022, on key areas of the proposed rule including monitoring, treatment, public notification, and PFAS mixtures. For more information on the consultation with the NDWAC, refer to the NDWAC Virtual Public Meeting Summary in the public docket at https://www.regulations.gov/document/EPA-HQ-OW-2022-0114-0705.

On August 8, 2023, the EPA consulted with the NDWAC prior to the final rule during a virtual meeting where the EPA presented the proposed PFAS NPDWR, including the proposed MCLs, monitoring and public notification requirements, and treatment and economic considerations. The EPA reiterated that the PFAS NPDWR was developed with extensive consultation from state, local and tribal partners to identify avenues that would reduce PFAS in drinking water and reaffirmed its commitment to working with these partners on rule implementation. The EPA carefully considered the information provided by the NDWAC during the development of a final PFAS NPDWR. A summary of the NDWAC input from that meeting is available in the National Drinking Water Advisory Council Meeting Summary Report (NDWAC, 2023).

---

[116] https://sab.epa.gov/ords/sab/f?p=100:18:10311539418988:::18:P18_ID:2601#charge

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 9.12.3 Secretary of Health and Human Services

In accordance with Section 1412 (d) of the SDWA, on September 28, 2022, the EPA consulted with the Department of Health and Human Services (HHS). The EPA provided information to HHS officials on the draft proposed NPDWR and considered HHS input as part of the interagency review. A summary of this meeting is available in the docket at EPA-HQ-OW-2022-0114 at www.regulations.gov.

On November 2nd, 2022, the EPA consulted with HHS on the final rule. Like with the proposed rule, the EPA provided information to HHS officials on the final NPDWR and considered HHS input as part of the interagency review. A summary of this meeting is available in the docket at EPA-HQ-OW-2022-0114 at www.regulations.gov.

## 9.13 Affordability Analyses

The SDWA, as amended in 1996, requires that the EPA list technologies for small systems [Section 1412(b)(4)(E)(ii)]:

> The Administrator shall include in the list any technology, treatment technique, or other means that is affordable, as determined by the Administrator in consultation with the States, for small public water systems serving -
>     (I) a population of 10,000 or fewer but more than 3,300;
>     (II) a population of 3,300 or fewer but more than 500; and
>     (III) a population of 500 or fewer but more than 25;
> and that achieves compliance with the MCL or treatment technique, including packaged or modular systems and point-of-entry or POU treatment units.

The EPA's long-standing methodology for determining whether there are affordable compliance technologies for a new drinking water standard for small systems compares the cumulative cost of providing drinking water that complies with the new standard to an affordability threshold equal to 2.5 percent of median household income (63 FR 42032). Should the EPA determine there are no affordable SSCTs, the SDWA Section 1412(b)(15)(B) requires the EPA to identify variance technologies that may not achieve compliance with the drinking water standard but achieve the maximum reduction or inactivation efficiency that is affordable considering the size of the system and the quality of the source water.

In addition to the required analysis for small system affordability, the EPA is using alternative expenditure margins and other changes to the national level affordability methodology to better understand the cost impacts of new standards on low income and disadvantaged households served by small drinking water systems. As part of this analysis, the EPA is utilizing a number of recommendations from the SAB, NDWAC, and other stakeholders such as the AWWA. The agency conducted supplemental affordability analyses using alternative metrics suggested to the EPA by these advisory bodies and stakeholders to demonstrate the potential affordability implications of the proposed NPDWR on the determination of affordable technologies for small systems at the national level of analysis.

The EPA's national small system affordability determination can be found in Section 9.13.1. The EPA's supplementary affordability analyses can be found in Section 9.13.2.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## 9.13.1 National Small System Affordability Determination

The EPA determined that there are several affordable treatment technologies for small systems. The determination, documented in *Best Available Technologies and Small System Compliance Technologies for Per- and Polyfluoroalkyl Substances (PFAS) in Drinking Water* (U.S. EPA, 2024c), compared the estimated incremental treatment costs per household with a baseline expenditure margin that equals 2.5 percent of median household income minus baseline drinking water utility cost per household. Table 9-13 shows which technologies satisfy the affordability criterion for three small system size categories. Where the EPA does not consider the substantial financial assistance for capital costs available as part of the Bipartisan Infrastructure Law and other mechanisms, for systems serving between 25-500 people IX and POU devices are affordable technologies, GAC is affordable in some cases, and centralized RO is not. In this scenario, for the smallest system size category, upper bound estimated annual household treatment costs for GAC exceed the expenditure margin. This exceedance is primarily driven by capital costs and attributable to the use of high-cost materials (e.g., stainless steel) in the upper bound estimates. Systems using low-cost materials, but with source water characteristics otherwise set to the upper bound (e.g., influent PFAS at approximately 7,000 ppt, influent TOC at 2 mg/L), would fall below the expenditure margin. As discussed in Section 9.13.2.2 below, where available financial assistance for capital costs is considered, GAC, IX, and POU devices are affordable technologies (see Section 9.13.2.2 below). For systems serving 501-3,300 people, where The EPA does not consider financial assistance, GAC, IX, and POU devices are affordable technologies, and RO is affordable in some cases. For systems serving 3,301-10,000 people GAC, IX and centralized RO are affordable technologies, and POU treatment is not applicable to systems of that size category.[117]

---

[117] Note, the results shown in Table 9-13 and discussed in this section are dependent on the estimated annual household technology costs reported in Table 9-15 which assumes costs associated with standard waste management of spent GAC and spent IX resin using current typical management practices (reactivation for GAC and incineration for resin). Future changes to regulations might result in classification of spent GAC or spent IX resin as hazardous waste. The EPA estimated annual cost per household if systems are required to dispose of these residuals as hazardous waste and conducted the same national level affordability analysis using the higher hazardous waste handling treatment costs. The agency found the increased treatment costs for both GAC and IX did not change the affordability conclusions. See Table 9-16 for annualized cost per household assuming hazardous waste disposal and U.S. EPA (2024c) for the complete analysis.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

A technology must be both effective and affordable to be designated as an SSCT. Technologies that meet the effectiveness criterion include those designated as BATs for the final rule are: GAC, IX, and RO. This section also presents preliminary affordability results for POU devices. POU devices are not currently evaluated as a compliance option because the regulatory options under consideration require treatment to concentrations below the current certification standard for POU devices. However, POU treatment is anticipated to become a compliance option for small systems in the future should NSF/ANSI or another accredited third-party certification entity develop a new certification standard that mirrors the EPA's regulatory standard. More information is available in Section XI of the preamble the EPA does not anticipate additional costs for water systems associated with the certification updating process. To evaluate affordability, the EPA compared incremental costs per household for each technology against an expenditure margin. Table 9-14 shows the expenditure margins for each system size category. It also shows how the EPA derived the expenditure margins, beginning with estimates of median household income (MHI), which vary by system size category. The annual affordability threshold for household expenditures on drinking water is 2.5 percent of MHI. The EPA deducted estimates of baseline or current water bills from the affordability threshold to obtain the expenditure margin estimates.

**Table 9-13: SSCT Affordability Analysis Results – Technologies that Meet Effectiveness Criterion**

| System Size (Population Served) | GAC | IX | RO | POU[a] |
|---|---|---|---|---|
| 25 to 500 | In some cases[b] | Yes | No | Yes |
| 501 to 3,300 | Yes | Yes | No[b] | Yes |
| 3,301 to 10,000 | Yes | Yes | Yes | Data Unavailable[c] |

Abbreviations: GAC – granular activated carbon; IX – ion exchange; POU – point-of-use treatment; RO – reverse osmosis; SSCT – small system compliance technology.

Notes:

[a]POU devices are not currently a compliance option because the final rule requires treatment to concentrations below the current certification standard for POU devices. However, POU treatment is anticipated to become a compliance option for small systems in the future should NSF/ANSI or another accredited third-party certification entity develop a new certification standard that mirrors (or is demonstrated to treat to concentrations lower than) the EPA's proposed regulatory standard. The affordability conclusions presented here should be considered preliminary because they reflect the costs of devices certified under the current standard, not a future standard. More information is in Section XI of the preamble for the final rule.

[b]Upper bound estimates of annual household treatment costs exceed expenditure margin. Lower bound estimates of annual household treatment costs do not exceed the expenditure margin. This exceedance is primarily driven by capital costs and attributable to the use of high-cost materials (e.g., stainless steel) in the upper bound estimates. Systems using low-cost materials, but with source water characteristics otherwise set to the upper bound (e.g., influent PFAS at approximately 7,000 ppt, influent TOC at 2 mg/L), would fall below the expenditure margin.

[c]For evaluating costs for this PFAS rulemaking, the EPA's WBS model for POU treatment does not cover systems serving more than 3,300 people (greater than 1 MGD design flow).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 9-14: Expenditure Margins for SSCT Affordability Analysis**

| System Size (Population Served) | Median Household Income[a] | Affordability Threshold[b] | Baseline Water Cost[c] | Expenditure Margin |
|---|---|---|---|---|
| | A | B = 2.5% x A | C | D = B - C |
| 25 to 500 | $62,950 | $1,574 | $551 | $1,022 |
| 501 to 3,300 | $60,926 | $1,523 | $638 | $885 |
| 3,301 to 10,000 | $66,746 | $1,669 | $666 | $1,002 |

Abbreviations: SSCT – small system compliance technology.
Notes:
[a]MHI based on U.S. Census Bureau's American Community Survey five-year estimates (U.S. Census Bureau, 2010) stated in 2010 dollars, adjusted to 2022 dollars using the CPI (for all items) for areas under 2.5 million persons.
[b]Affordability threshold equals 2.5 percent of MHI.
[c]Household water costs derived from 2006 Community Water System Survey (U.S. EPA, 2009), based on residential revenue per connection within each size category, adjusted to 2022 dollars based on the CPI for All Urban Consumers: Water and Sewer and Trash Collection Services in U.S. City Average.

Table 9-15 provides ranges of per-household costs for each technology and system size category. The ranges indicate minimum and maximum costs, for further information on SSCT costs, see U.S. EPA (2024c).

**Table 9-15: Total Annual Cost per Household for Candidate Technologies**

| System Size (Population Served) | GAC | IX | RO | POU[a] |
|---|---|---|---|---|
| 25 to 500 | $607 to $1,241 | $563 to $990 | $4,332 to $5,224 | $345 to $357 |
| 501 to 3,300 | $203 to $484 | $171 to $351 | $721 to $1,324 | $327 to $327 |
| 3,301 to 10,000 | $178 to $417 | $145 to $284 | $388 to $544 | Data unavailable[b] |

Abbreviations: GAC – granular activated carbon; IX – ion exchange; POU – point-of-use treatment; RO – reverse osmosis; SSCT – small system compliance technology.
Notes:
[a]POU devices are not currently a compliance option because the final rule requires treatment to concentrations below the current certification standard for POU devices. However, POU treatment is anticipated to become a compliance option for small systems in the future should NSF/ANSI or another accredited third-party certification entity develop a new certification standard that mirrors (or is demonstrated to treat to concentrations lower than) the EPA's proposed regulatory standard. Costs presented here should be considered preliminary estimates because they reflect the costs of devices certified under the current testing standard, not a future standard. More information is in Section XI of the preamble for the final rule.
[b]For evaluating costs for this PFAS rulemaking, the EPA's WBS model for POU treatment does not cover systems serving more than 3,300 people (greater than 1 MGD design flow).

The results discussed above assume management of spent GAC and spent IX resin using current typical management practices (reactivation for GAC and incineration for resin). The EPA has proposed some PFAS be designated as hazardous substances under CERCLA and is in the process of proposing some PFAS be listed as hazardous constituents under the RCRA. If finalized, neither of these actions would result in new requirements as to how PFAS containing waste, including spent GAC or resin, is required to be managed. However, waste management facilities may, at their own discretion, refuse to accept PFAS-containing materials or drinking water treatment operations may choose to send spent GAC and resin containing PFAS to facilities permitted to treat and/or dispose of hazardous wastes. To consider the implications of this possibility, the EPA has developed an assessment of the current unit costs for disposing spent treatment materials and the costs associated with their disposal as hazardous waste. Table 9-16 shows the resulting cost per household if systems dispose of these residuals as hazardous

FINAL RULE                                                                                          APRIL 2024

waste. For the smallest system size category not considering available financial assistance, upper bound estimated annual household treatment costs for GAC and IX exceed the expenditure margin in Table 9-8. This exceedance is primarily driven by capital costs and attributable to the use of high-cost materials (e.g., stainless steel) in the upper bound estimates. Systems using low-cost materials, but with source water characteristics otherwise set to the upper bound (e.g., influent PFAS at approximately 7,000 ppt, influent TOC at 2 mg/L), would fall below the expenditure margin, even under a hazardous waste scenario. Technologies are affordable for all small systems when the technologies do not use high-cost materials. Technologies that do not use high-cost materials are available for small systems. Although costs increase in this scenario, the increases are not significant enough to change the conclusions about affordability.

**Table 9-16: Total Annual Cost per Household Assuming Hazardous Waste Disposal**

| System Size (Population Served) | GAC | IX |
|---|---|---|
| 25 to 500 | $630 to $1,369 | $586 to $1,027 |
| 501 to 3,300 | $211 to $520 | $176 to $360 |
| 3,301 to 10,000 | $185 to $438 | $148 to $289 |

Abbreviations: GAC – granular activated carbon; IX – ion exchange.

## 9.13.2 Supplemental Affordability Analyses

In 2002, Congress required the EPA to re-evaluate small system variance policy because of the concern with the high cost of arsenic treatment in small communities. In response, in 2003, the EPA consulted with NDWAC and SAB. The SAB and NDWAC made a number of recommendations regarding the method by which the EPA evaluates the affordability of compliance with drinking water standards.

Some key recommendations made by both the SAB and the NDWAC include:

- The EPA should consider the household cost of each new regulation on an incremental basis rather than a total cost of all water treatment regulations, and

- The EPA should consider reducing the current affordability threshold, and

- Financial assistance should be incorporated in the affordability calculations if the financial support is generally available to all systems (nationwide).

In addition to the SAB and NDWAC recommendations, several additional reports by stakeholders have offered recommendations on the improvement of the EPA's affordability methodology, including:

- The National Academy of Public Administration (NAPA) report, Developing a New Framework for Community Affordability of Clean Water Services (NAPA, 2017),

- The National Association of Clean Water Agencies, American Water Works Association, and Water Environment Federation report, Developing a New Framework for Household Affordability and Financial Capability Assessment in the Water Sector (Raucher et al., 2019), and

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- The American Water Works Association expert panel report, *Improving the Evaluation of Household-Level Affordability in SDWA Rulemaking: New Approaches* (AWWA, 2021).

The recommendations in these reports point to the need to further assess the impacts of new regulatory costs across income groups with a particular focus on low income and disadvantaged communities and individuals within water systems. In particular, the American Water Works Association (2021) expert panel report stressed that the agency also assess the affordability impacts to low-income households by setting the per household expenditure margin based on the lowest quintile (20th percentile) of the income distribution.

The EPA has estimated the impact of some potential changes to National Level Affordability Criteria and analysis based on suggested changed from the SAB, NDWAC, and AWWA's expert panel. In the following subsections, the EPA estimated small system affordability based on; (1) an incremental approach with expenditure margins of 1.0 percent of annual MHI and 2.5 percent of the lowest quintile of annual household income, and no additional adjustment for total current annual water expenditures, and (2) taking into account nationally available financial assistance when assessing affordability.

## 9.13.2.1    Small System Affordability Analysis with Potential Additional Expenditure Margins

As part of the EPA's consideration of additional annual expenditure margins to improve the assessment of affordability impacts to low income and disadvantaged communities, two incremental cost analyses are conducted utilizing alternative potential expenditure margins. Given the recommendations from the NDWAC, the first expenditure margin threshold is based on 1.0 percent of annual MHI. The second expenditure margin threshold is set equal to 2.5 percent of the lowest quintile of annual household income and is based on the American Water Works Association (2021) expert panel report. These expenditure margins are estimated for each of the small system size categories: 25 to 500, 501 to 3,300, and 3,301 to 10,000 people served. As this is an incremental analysis no additional adjustments are made to the values to account for current annual drinking water cost. Table 9-17 shows the calculated annual expenditure margins by system size.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Table 9-17: Potential Annual Expenditure Margins for SSCT Affordability Analysis**

| System Size (Population Served) | 1.0% of Median Household Income[a] | 2.5% of Lowest Quintile Income[b] |
|---|---|---|
| | A | B |
| 25 to 500 | $629 | $731 |
| 501 to 3,300 | $609 | $714 |
| 3,301 to 10,000 | $667 | $774 |

Abbreviations: SSCT – small system compliance technology.
Notes:
[a]MHI is based on U.S. Census Bureau's American Community Survey five-year estimates (U.S. Census Bureau, 2010) stated in 2010 dollars, adjusted to 2022 dollars using the CPI (for all items) for areas under 2.5 million persons.
[b]Lowest quintile (20th percentile) household income is based on U.S. Census 2010 American Community Survey 5-year estimates (U.S. Census Bureau, 2010) stated in 2010 dollars, adjusted to 2022 dollars using the CPI (for all items) for areas under 2.5 million persons.

Given these alternative annual expenditure margins the remainder of the assessment process is the same as the EPA's current small system affordability methodology. The estimated total annual household costs for each of the deemed efficient treatment technologies presented in Table 9-15 are compared against the estimated annual expenditure margin thresholds from Table 9-17 for each system size category. Table 9-18 presents the affordability results using the 1.0 percent of annual MHI expenditure margin and Table 9-19 provides the information when the 2.5 percent of the lowest quintile of annual household income is used as the threshold.

**Table 9-18: Affordability Analysis Results Using a 1.0% of Annual Median Household Income Expenditure Margin**

| System Size (Population Served) | GAC | IX | RO | POU[a] |
|---|---|---|---|---|
| 25 to 500 | In some cases[b] | In some cases[b] | No | Yes |
| 501 to 3,300 | Yes | Yes | No | Yes |
| 3,301 to 10,000 | Yes | Yes | Yes | Data unavailable[c] |

Abbreviations: GAC – granular activated carbon; IX – ion exchange; POU– point-of-use treatment; and RO – reverse osmosis.
Notes:
[a]POU devices are not currently a compliance option because the final rule requires treatment to concentrations below the current certification standard for POU devices. However, POU treatment is anticipated to become a compliance option for small systems in the future should NSF/ANSI or another accredited third-party certification entity develop a new certification standard that mirrors (or is demonstrated to treat to concentrations lower than) the EPA's final regulatory standard. The affordability conclusions presented here should be considered preliminary because they reflect the costs of devices certified under the current standard, not a future standard. More information is in Section XI of the preamble for the final rule.
[b]Upper bound estimates of annual household treatment costs exceed expenditure margin. Lower bound estimates of annual household treatment costs do not exceed the expenditure margin. This exceedance is primarily driven by capital costs and attributable to the use of high-cost materials (e.g., stainless steel) in the upper bound estimates. Systems using low-cost materials, but with source water characteristics otherwise set to the upper bound (e.g., influent PFAS at approximately 7,000 ppt, influent TOC at 2 mg/L), would fall below the expenditure margin.
[c]For evaluating costs for this PFAS rulemaking, the EPA's WBS model for POU treatment does not cover systems serving more than 3,300 people (greater than 1 MGD design flow).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                     APRIL 2024

**Table 9-19: Affordability Analysis Results Using a 2.5% of Lowest Quintile of Annual Household Income Expenditure Margin**

| System Size (Population Served) | GAC | IX | RO | POU[a] |
|---|---|---|---|---|
| 25 to 500 | In some cases[b] | In some cases[b] | No | Yes |
| 501 to 3,300 | Yes | Yes | No | Yes |
| 3,301 to 10,000 | Yes | Yes | Yes | Data unavailable[c] |

Abbreviations: GAC – granular activated carbon; IX – ion exchange; POU – point-of-use treatment; and RO – reverse osmosis.

Notes:

[a]POU devices are not currently a compliance option because the final rule requires treatment to concentrations below the current certification standard for POU devices. However, POU treatment is anticipated to become a compliance option for small systems in the future should NSF/ANSI or another accredited third-party certification entity develop a new certification standard that mirrors (or is demonstrated to treat to concentrations lower than) the EPA's proposed regulatory standard. The affordability conclusions presented here should be considered preliminary because they reflect the costs of devices certified under the current standard, not a future standard. More information is in Section XI of the preamble for the final rule.

[b]Upper bound estimated annual household treatment costs exceed expenditure margin. Lower bound estimated annual household treatment costs do not exceed the expenditure margin. This exceedance is primarily driven by capital costs and attributable to the use of high-cost materials (e.g., stainless steel) in the upper bound estimates. Systems using low-cost materials, but with source water characteristics otherwise set to the upper bound (e.g., influent PFAS at approximately 7,000 ppt, influent TOC at 2 mg/L), would fall below the expenditure margin.

[c]For evaluating costs for this PFAS rulemaking, the EPA's WBS model for POU treatment does not cover systems serving more than 3,300 people (greater than 1 MGD design flow).

The results in both Table 9-18 and Table 9-19, which utilize the supplemental expenditure margins, of 1.0 percent of annual MHI and 2.5 percent of the lowest quintile of annual household income, and the results of the EPA's national level affordability analysis in Table 9-9, which utilizes a household expenditure margin estimated by adjusting 2.5 percent of median household income minus baseline median annual drinking water costs, differ in the case of IX for systems serving 25 to 500 people. As indicated by the "In some cases" reported in Table 9-18 and Table 9-19 for GAC and IX the upper bound annual household treatment cost for both these technologies exceed both the 1.0 percent of annual MHI and 2.5 percent of the lowest quintile of annual household income expenditure margins, however, the estimated lower bound annual household treatment costs do not exceed the expenditure margins. The alternative expenditure margins also changed the affordability results for RO in the 501–3,300 system size category. In the national affordability analysis using the 2.5 percent of MHI with baseline adjustment upper bound RO annual household cost estimates exceed the expenditure margin but the lower bound costs do not. When using both the 1.0 percent of annual MHI and 2.5 percent of the lowest quintile of annual household income potential criteria both the high and low bound estimated annual household treatment costs exceed the expenditure margins.[118]

---

[118] Note, the results shown in Table 9-18 and Table 9-19 and discussed in this section are dependent on the estimated annual household technology costs reported in Table 9-15 which assumes costs associated with standard waste management of spent GAC and spent IX resin using current typical management practices (reactivation for GAC and incineration for resin). Future changes to regulations might result in classification of spent GAC or spent IX resin as hazardous waste. The EPA estimated annual cost per household if systems are required to dispose of these residuals as hazardous waste and conducted the same national level affordability analyses with the 1.0 percent of MHI and 2.5 percent of the lowest quintile of annual household income expenditure margins and using the higher hazardous waste handling treatment costs. The agency found the increased treatment costs for both GAC and IX did not change the affordability conclusions.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### 9.13.2.2    Small System Affordability Analysis When Accounting for Financial Assistance

The SAB and NDWAC recommended to the EPA that the national level affordability analysis should include the impact of financial assistance if the financial support is generally available to all systems (nationwide). The recommendations themselves indicate a two-step process; (1) determine if and how much financial assistance is available to small systems on a national level for compliance with a specific rule, in this case the PFAS drinking water rule, and (2) calculate the potential impact of the financial assistance on the estimated per household treatment costs for each of the small system size categories.

On the national level, significant financial assistance is available to small systems for the installation of PFAS treatment technology. One critical and long-established source of this assistance is available through the EPA's DWSRF Program that was authorized by Congress as part of the 1996 Amendments to the SDWA. The DWSRF's purpose is to provide a source of financial assistance to water systems and states to help them achieve the public health protection objectives of SDWA. A unique feature of the DWSRF Program is that it is state based. The EPA awards capitalization grants to states who provide a 20 percent match, creating a dedicated fund from which loans are made to water systems and into which the loan repayments (and interest) are deposited so they can be loaned out again. Within some broad statutory constraints contained in SDWA, the states have considerable flexibility to tailor the DWSRF Program to their own unique needs and circumstances.

The SDWA established three criteria at the core of the process used by states in ranking projects in priority order to receive funding. States are required, to the maximum extent practicable, to give priority for the use of DWSRF funds to projects that:

1.  Address the most serious risk to human health;
2.  Are necessary to ensure compliance with SDWA requirements; and
3.  Assist systems most in need on a per household basis according to state affordability criteria.

Thus, system level affordability, according to state affordability criteria, is a central consideration in ranking projects eligible to receive DWSRF assistance. Each state has developed, and the EPA has approved, a project priority ranking procedure. The specific weight given to affordability considerations vis-à-vis public health and SDWA compliance considerations varies from state to state. States are required to include their project priority ranking system as part of the Intended Use Plan they are required to develop in support of their application for each capitalization grant. The Intended Use Plan must contain both the project priority ranking system and the priority list of projects eligible for DWSRF assistance. The state must provide notice and opportunity for public comment on the priority list of projects.

Under the core DWSRF Program, the state may establish an interest rate between zero percent and the market rate. The lower the interest rate, the greater the subsidy provided to the borrower. SDWA requires states to establish a Disadvantaged Communities Program within their DWSRF under which communities considered disadvantaged according to state developed affordability criteria could receive additional subsidies beyond a zero percent loan. These additional subsidies

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

often take the form of principal forgiveness (i.e., loan forgiveness) or grants. There is no limit to the amount of additional subsidy that can be provided to a particular project except for an overall limit on the total amount of additional subsidy of 35 percent of the state's annual capitalization grant.

This additional subsidization could be directed entirely to a few projects, essentially making the assistance those projects receive equivalent to a 100 percent grant; or the additional subsidization could be distributed among a larger number of projects and combined with zero or low-interest loans. States may also offer communities they consider disadvantaged[119] a loan term of 40 years rather than the base period of 20 to 30 years. Notably, the loan term cannot extend beyond the design life of the capital improvement constructed via the DWSRF loan.

The SDWA provided the EPA with the authority to publish information to assist states in establishing affordability criteria for purposes of a disadvantaged community program. The agency worked with a group of expert stakeholders and published "Information for States on Developing Affordability Criteria for Drinking Water" (document number 816-R-98-002) in February 1998 (U.S. EPA, 1998b). The agency provided additional information to assist states' affordability criteria development in the "Implementation of the Clean Water and Drinking Water State Revolving Fund Provisions of the Bipartisan Infrastructure Law" memorandum in March 2022 (U.S. EPA, 2022d).

PFAS drinking water treatment loans and grants have been and will continue to be available to systems of all sizes under the traditional DWSRF program funding and allocation structure. In addition to these funding sources, on November 15, 2021, the Infrastructure Investment and Jobs Act (IIJA), often referred to as the Bipartisan Infrastructure Law or BIL (P.L. 117-58), appropriated $4 billion over 5 years ($800,000,000 per year) for projects that are DWSRF eligible whose primary purpose must be to address emerging contaminants, with a focus on PFAS. The EPA expects to establish a NPDWR for PFOA and PFOS. The agency is also evaluating additional PFAS and groups of PFAS. Given stated Congressional intent of this appropriation, PFAS-focused projects will be eligible for funding under this appropriation regardless of whether the EPA has established a NPDWR for that particular PFAS or group of PFAS. These BIL funds must be distributed to communities entirely as forgivable loans or grants, and states are not required to provide matching funds as with most DWSRF projects. 25 percent of this BIL funding is targeted toward disadvantaged communities and/or communities fewer than or equal to 25,000 people.

In addition to the DWSRF BIL funds, as part of a government-wide effort to confront PFAS pollution, the BIL authorizes $5 billion as part of the EC-SDC grants program that can be used to reduce PFAS in drinking water in communities facing disproportionate impacts. The goal of the EC-SDC grants program is for states to provide grants to public water systems in small or disadvantaged communities to address emerging contaminants, including PFAS. Funding will be provided to participating states and territories to benefit small or disadvantaged communities in scoping, planning, testing, and remediating emerging contaminants in drinking and source water.

---

[119] Disadvantaged community is defined as the service area of a public water system that meets affordability criteria established after public review and comment by the State in which the public water system is located.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

These funds can be used in small or disadvantaged communities to address emerging contaminants like PFAS in drinking water through actions such as technical assistance, water quality testing, contractor training, and installation of centralized treatment technologies and systems. On June 15, 2022, the EPA announced that it is making $1 billion available in FY2022 of a total of $5 billion for fiscal years 2022–2026.

Given the BIL emerging contaminant funding being made available through the DWSRF and the EC-SDC grants program, the EPA expects that most small systems will have access to financial assistance for PFAS related capital expenditures. The EPA estimates that the total amount of initial capital treatment technology expenditures for small systems nationally ranges between approximately $1.8 and $3.5 billion. The EPA expects funding from BIL to be more than sufficient to cover the capital costs for small systems. Hence, it seems reasonable to consider these funds for the purposes of illustrating the potential impact of including financial assistance in the calculation of the national level affordability assessment for small system compliance technologies. Because BIL funds are limited to providing grants and loan forgiveness associated with PFAS drinking water treatment capital expenditures, the EPA in this example zeroed out only the capital cost of the candidate effective technologies. The annual per household treatment cost ranges presented in Table 9-15 represent operations and maintenance costs for the technologies by small system size category. Comparing the cost ranges in Table 9-20 with unadjusted cost ranges in Table 9-15 demonstrates the potential large decrease in technology cost when financial assistance is considered. The decreases across technologies and system size categories range from 52 percent to 84 percent for the centralized technologies, and approximately 30 percent for POU technologies.

**Table 9-20: Annual Cost per Household for Candidate Technologies Assuming 100% Financial Assistance for Technology Capital Costs**

| System Size (Population Served) | GAC | IX | RO | POU[a] |
|---|---|---|---|---|
| 25 to 500 | $134 to $230 | $140 to $161 | $1,160 to $1,242 | $244 to $256 |
| 501 to 3,300 | $57 to $141 | $58 to $78 | $281 to $338 | $228 to $228 |
| 3,301 to 10,000 | $66 to $147 | $60 to $86 | $186 to $219 | Data unavailable[b] |

Abbreviations: GAC – granular activated carbon; IX – ion exchange; POU – point-of-use treatment; and RO – reverse osmosis.
Notes:
[a]POU devices are not currently a compliance option because the final rule requires treatment to concentrations below the current certification standard for POU devices. However, POU treatment is anticipated to become a compliance option for small systems in the future should NSF/ANSI or another accredited third-party certification entity develop a new certification standard that mirrors (or is demonstrated to treat to concentrations lower than) the EPA's proposed regulatory standard. The affordability conclusions presented here should be considered preliminary because they reflect the costs of devices certified under the current standard, not a future standard. More information is in Section XI of the preamble for the final rule.
[b]For evaluating costs for this PFAS rulemaking, the EPA's WBS model for POU treatment does not cover systems serving more than 3,300 people (greater than 1 MGD design flow).

Table 9-21, Table 9-22, and Table 9-23 below show the affordability results utilizing the 2.5 percent of annual MHI minus the baseline median annual drinking water cost, the incremental 1.0 percent of annual MHI, and using the 2.5 percent of the lowest quintile of annual household income expenditure margins, respectively. Given the significant reduction in estimated per household annual treatment costs for GAC and IX, the technologies were found to satisfy the

national level affordability criterion for the three statutorily mandated small system size categories.[120] Centralized RO with high per household operations and maintenance costs, of $1,081 to $1,153, in the system size category of 25–500 people served was found to be unaffordable in that system size category across all alternative expenditure margins, but economies of scale reduce per household costs in systems serving between 501 and 10,000 people sufficiently to approve the technology as affordable under the three alternative expenditure margins. POU treatment was also found to be affordable at the national level of analysis for systems serving 25 to 500 and 501 to 3,300 people across the three presented expenditure margins. POU treatment is not applicable to systems serving more than 3,300 people given the increasing complexity of managing POU programs at such large scales.

**Table 9-21: Affordability Analysis Results Using a 2.5% of Annual Median Household Income Minus the Baseline Median Annual Drinking Water Cost Expenditure Margin and Assuming 100% Financial Assistance for Technology Capital Costs**

| System Size (Population Served) | GAC | IX | RO | POU[a] |
|---|---|---|---|---|
| 25 to 500 | Yes | Yes | No | Yes |
| 501 to 3,300 | Yes | Yes | Yes | Yes |
| 3,301 to 10,000 | Yes | Yes | Yes | Data unavailable[b] |

Abbreviations: GAC – granular activated carbon; IX – ion exchange; POU – point-of-use treatment; and RO – reverse osmosis.
Notes:
[a]POU devices are not currently a compliance option because the final rule requires treatment to concentrations below the current certification standard for POU devices. However, POU treatment is anticipated to become a compliance option for small systems in the future should NSF/ANSI or another accredited third-party certification entity develop a new certification standard that mirrors (or is demonstrated to treat to concentrations lower than) the EPA's proposed regulatory standard. The affordability conclusions presented here should be considered preliminary because they reflect the costs of devices certified under the current standard, not a future standard. More information is available in Section XI of the preamble for the final rule.
[b]For evaluating costs for this PFAS rulemaking, the EPA's WBS model for POU treatment does not cover systems serving more than 3,300 people (greater than 1 MGD design flow).

---

[120] Note, the results shown in Table 9-21, Table 9-22, and Table 9-23 and discussed in this section are dependent on the estimated annual household technology costs reported in Table 9-20 which assumes operations and maintenance costs associated with standard waste management of spent GAC and spent IX resin using current typical management practices (reactivation for GAC and incineration for resin). Future changes to regulations might result in classification of spent GAC or spent IX resin as hazardous waste. The EPA estimated annual operations and maintenance cost per household if systems are required to dispose of these residuals as hazardous waste and conducted the same national level affordability analyses using the three alternative expenditure margins using the higher hazardous waste handling treatment costs. The agency found the increased treatment costs for both GAC and IX did not change the affordability conclusions.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                 APRIL 2024

**Table 9-22: Affordability Analysis Results Using a 1.0% of Annual Median Household Income Expenditure Margin and Assuming 100% Financial Assistance for Technology Capital Costs**

| System Size (Population Served) | GAC | IX | RO | POU[a] |
|---|---|---|---|---|
| 25 to 500 | Yes | Yes | No | Yes |
| 501 to 3,300 | Yes | Yes | Yes | Yes |
| 3,301 to 10,000 | Yes | Yes | Yes | Data unavailable[b] |

Abbreviations: GAC – granular activated carbon; IX – ion exchange; POU– point-of-use treatment; and RO – reverse osmosis.
Notes:
[a]POU devices are not currently a compliance option because the final rule requires treatment to concentrations below the current certification standard for POU devices. However, POU treatment is anticipated to become a compliance option for small systems in the future should NSF/ANSI or another accredited third-party certification entity develop a new certification standard that mirrors (or is demonstrated to treat to concentrations lower than) the EPA's proposed regulatory standard. The affordability conclusions presented here should be considered preliminary because they reflect the costs of devices certified under the current standard, not a future standard. More information is available in Section XI of the preamble for the final rule.
[b]For evaluating costs for this PFAS rulemaking, the EPA's WBS model for POU treatment does not cover systems serving more than 3,300 people (greater than 1 MGD design flow).

**Table 9-23: Affordability Analysis Results Using a 2.5% of Lowest Quintile of Annual Household Income Expenditure Margin and Assuming 100% Financial Assistance for Technology Capital Costs**

| System Size (Population Served) | GAC | IX | RO | POU[a] |
|---|---|---|---|---|
| 25 to 500 | Yes | Yes | No | Yes |
| 501 to 3,300 | Yes | Yes | Yes | Yes |
| 3,301 to 10,000 | Yes | Yes | Yes | Data unavailable[b] |

Abbreviations: GAC – granular activated carbon; IX – ion exchange; POU – point-of-use treatment; and RO – reverse osmosis.

Notes:

[a]POU devices are not currently a compliance option because the final rule requires treatment to concentrations below the current certification standard for POU devices. However, POU treatment is anticipated to become a compliance option for small systems in the future should NSF/ANSI or another accredited third-party certification entity develop a new certification standard that mirrors (or is demonstrated to treat to concentrations lower than) the EPA's proposed regulatory standard. The affordability conclusions presented here should be considered preliminary because they reflect the costs of devices certified under the current standard, not a future standard. More information is available in Section XI of the final rule.
[b]For evaluating costs for this PFAS rulemaking, the EPA's WBS model for POU treatment does not cover systems serving more than 3,300 people (greater than 1 MGD design flow).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# 10  References

3M Company. (2000). *Sanitized report: Exploratory 28-day oral toxicity study with telomer alcohol, telomer acrylate, PFHS and PFOS (positive control) by daily gavage in the rat followed by a 14/28-day recovery period [TSCA Submission]. (FYI-0500-01378 B; DCN 84000000018). St. Paul, MN.* Retrieved from https://yosemite.epa.gov/oppts/epatscat8.nsf/ReportSearchView/05ADDF3067814C978525703B004B4119

Aassve, A., Cavalli, N., Mencarini, L., Plach, S., & Sanders, S. (2021). Early assessment of the relationship between the COVID-19 pandemic and births in high-income countries. *Proceedings of the National Academy of Sciences, 118*(36).

Abt Associates. (2020). *Labor Costs for National Drinking Water Rules. Submitted to Rajiv Khera, U.S. Environmental Protection Agency, Office of Ground Water and Drinking Water. EPA Contract No. EP-B16C-0001.*

Adamson, D. T., Piña, E. A., Cartwright, A. E., Rauch, S. R., Anderson, R. H., Mohr, T., & Connor, J. A. (2017). 1, 4-Dioxane drinking water occurrence data from the third unregulated contaminant monitoring rule. *Science of the total environment, 596*, 236-245.

Agency for Toxic Substances and Disease Registry. (2018). *Toxicological Profile for Perfluoroalkyls*.

Agency for Toxic Substances and Disease Registry. (2021). *Toxicological Profile for Perfluoroalkyls*.

Almond, D., Chay, K. Y., & Lee, D. S. (2005). The costs of low birth weight. *The Quarterly journal of economics, 120*(3), 1031-1083. doi:10.1093/qje/120.3.1031

Almond, D., Doyle Jr, J. J., Kowalski, A. E., & Williams, H. (2010). Estimating marginal returns to medical care: Evidence from at-risk newborns. *The Quarterly journal of economics, 125*(2), 591-634.

Ambavane, A., Yang, S., Atkins, M. B., Rao, S., Shah, A., Regan, M. M., . . . Michaelson, M. D. (2020). Clinical and economic outcomes of treatment sequences for intermediate- to poor-risk advanced renal cell carcinoma. *Immunotherapy, 12*(1), 37-51. doi:10.2217/imt-2019-0199

American Association for the Advancement of Science. (2020). Per- and Polyfluoroalkyl Substances (PFAS) in Drinking Water. Retrieved from https://www.aaas.org/epi-center/pfas

American Cancer Society. (2020). *Cancer facts and figures - 2019 key statistics about kidney cancer*. Retrieved from https://www.cancer.org/cancer/types/kidney-cancer/about/key-statistics.html

American Water Works Association. (2021). Improving the Evaluation of Household-Level Affordability in SDWA Rulemaking: New Approaches.

Anderson, R. N. (1999). *Method for constructing complete annual US life tables* (Vol. 129): National Ctr for Health Statistics.

Appleman, T. D., Higgins, C. P., Quiñones, O., Vanderford, B. J., Kolstad, C., Zeigler-Holady, J. C., & Dickenson, E. R. (2014). Treatment of poly-and perfluoroalkyl substances in US full-scale water treatment systems. *Water research, 51*, 246-255.

Aquafina. (2022). Aquafina FAQ. Retrieved from https://www.aquafina.com/en-US/faq.html#:~:text=Aquafina%20originates%20from%20public%20water,can%20affect%20a%20water's%20taste

Arias, E., Heron, M., & Tejada-Vera, B. (2013). United States life tables eliminating certain causes of death, 1999-2001.

Arias, E., & Xu, J. (2019). *United States Life Tables, 2017.*

Association of State Drinking Water Administrators. (2023). *PFAS Cost of State Transactions (PCoSTS) Study*. Retrieved from https://www.asdwa.org/wp-content/uploads/2023/05/PCoSTS-Final.pdf

Averina, M., Brox, J., Huber, S., & Furberg, A.-S. (2021). Exposure to perfluoroalkyl substances (PFAS) and dyslipidemia, hypertension and obesity in adolescents. The Fit Futures study. *Environmental research, 195*, 110740.

Bach, C. C., Bech, B. H., Nohr, E. A., Olsen, J., Matthiesen, N. B., Bonefeld-Jorgensen E.C., . . . Henriksen, T. B. (2016). Perfluoroalkyl acids in maternal serum and indices of fetal growth: the Aarhus Birth Cohort. *Environmental health perspectives, 124*(6), 848-854. doi:10.1289/ehp.1510046.

Bach, C. C., Vested, A., Jørgensen, K. T., Bonde, J. P. E., Henriksen, T. B., & Toft, G. (2016). Perfluoroalkyl and polyfluoroalkyl substances and measures of human fertility: a systematic review. *Critical reviews in toxicology, 46*(9), 735-755.

Bach, J. P., Riedel, O., Pieper, L., Klotsche, J., Dodel, R., & Wittchen, H. U. (2011). Health-related quality of life in patients with a history of myocardial infarction and stroke. Cerebrovascular Diseases. *31(1)*, 68-76.

Banzhaf, S., Ma, L., & Timmins, C. (2019). Environmental Justice: The Economics of Race, Place, and Pollution. *The Journal of Economic Perspectives: A Journal of the American Economic Association, 33(1), 185–208.*

Bao, W. W., Qian, Z. M., Geiger, S. D., Liu, E., Wang, S. Q., Lawrence, W. R., . . . Dong, G. H. (2017). Gender-specific associations between serum isomers of perfluoroalkyl substances and blood pressure among Chinese: isomers of C8 health project in China. *Science of the total environment, 607-608*, 1304-1312. doi:10.1016/j.scitotenv.2017.07.124

Barry, V., Winquist, A., & Steenland, K. (2013). Perfluorooctanoic Acid (PFOA) Exposures and Incident Cancers Among Adults Living Near A Chemical Plant. *Environmental health perspectives, 121*(11-12), 1313–1318. doi:https://doi.org/10.1289/ehp.1306615

Bartell, S. M., Calafat, A. M., Lyu, C., Kato, K., Ryan, P. B., & Steenland, K. (2010). Rate of decline in serum PFOA concentrations after granular activated carbon filtration at two public water systems in Ohio and West Virginia. *Environmental health perspectives, 118*(2), 222-228.

Bartell, S. M., & Vieira, V. M. (2021). Critical review on PFOA, kidney cancer, and testicular cancer. *J Air Waste Manag Assoc, 71*(6), 663-679. doi:10.1080/10962247.2021.1909668

Barton, K. E., Starling, A. P., Higgins, C. P., McDonough, C. A., Calafat, A. M., & Adgate, J. L. (2020). Sociodemographic and Behavioral Determinants of Serum Concentrations of Per- and Polyfluoroalkyl Substances in A Community Highly Exposed to Aqueous Film-Forming Foam Contaminants in Drinking Water. *Int J Hyg Environ Health, 223*(1), 256-266. doi:10.1016/j.ijheh.2019.07.012

Beatty, A. L., Ku, I. A., Bibbins-Domingo, K., Christenson, R. H., DeFillippi, C. R., Ganz, P., . . . Whooley, M. A. (2015). Traditional risk factors versus biomarkers for prediction of secondary events in patients with stable Coronary Heart Disease: from the Heart and Soul Study. *Journal of the American Heart Association, 4*. doi:10.1161/JAHA.114.001646

Behrman, J. R., & Rosenzweig, M. R. (2004). Returns to birthweight. *Review of Economics and Statistics, 86*(2), 586-601.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Behrman, R. E., & Butler, A. S. (2007). Preterm birth: causes, consequences, and prevention. *Institute of Medicine of the National Academies*.

Black, J., Moreland, A., McNeill Ransom, M., & Sanchez, E. (2021). Perfluoroalkyl and Polyfluoroalkyl Substances: Using Law and Policy to Address These Environmental Health Hazards in the United States. *Health Matrix, 31*, 340.

Blake, B. E., Pinney, S. M., Hines, E. P., Fenton, S. E., & Ferguson, K. K. (2018). Associations between longitudinal serum perfluoroalkyl substance (PFAS) levels and measures of thyroid hormone, kidney function, and body mass index in the Fernald Community Cohort. *Environmental pollution, 242*, 894-904.

Bonefeld-Jorgensen, E. C., Long, M., Fredslund, S. O., Bossi, R., & Olsen, J. (2014). Breast cancer risk after exposure to perfluorinated compounds in Danish women: A case-control study nested in the Danish National Birth Cohort. *Cancer Causes Control, 25*(11), 1439-1448.

Boone, L., Meyer, D., Cusick, P., Ennulat, D., Bolliger, A. P., Everds, N., . . . Bounous, D. (2005). Selection and interpretation of clinical pathology indicators of hepatic injury in preclinical studies. *Veterinary clinical pathology, 34*(3), 182-188.

Boronow, K. E., Brody, J. G., Schaider, L. A., Peaslee, G. F., Havas, L., & Cohn, B. A. (2019). Serum concentrations of PFASs and exposure-related behaviors in African American and non-Hispanic white women. *Journal of exposure science & environmental epidemiology, 29*(2), 206-217.

Brown, P. (1995). Race, class, and environmental health: A review and systematization of the literature. *Environmental research, 69(1), 15–30.* doi:https://doi.org/10.1006/enrs.1995.1021

Brulle, R. J., & Pellow, D. N. (2006). Environmental justice: Human health and environmental inequalities. *Annual Review of Public Health, 27, 103–124.* doi:https://doi.org/10.1146/annurev.publhealth.27.021405.102124

Brunke, M., & Gonser, T. (1997). The ecological significance of exchange processes between rivers and groundwater. *Freshwater biology, 37*(1), 1-33.

Budtz-Jørgensen, E., & Grandjean, P. (2018). Application of benchmark analysis for mixed contaminant exposures: Mutual adjustment of perfluoroalkylate substances associated with immunotoxicity. *PLoS One, 13*(10), e0205388.

Buekers, J., Colles, A., Cornelis, C., Morrens, B., Govarts, E., & Schoeters, G. (2018). Socio-Economic Status and Health: Evaluation of Human Biomonitored Chemical Exposure to Per- and Polyfluorinated Substances across Status. *International journal of environmental research and public health, 15*(12). doi:10.3390/ijerph15122818

Butenhoff, J. L., Chang, S.-C., Ehresman, D. J., & York, R. G. (2009). Evaluation of potential reproductive and developmental toxicity of potassium perfluorohexanesulfonate in Sprague Dawley rats. *Reproductive Toxicology, 27*(3-4), 331-341.

Butenhoff, J. L., Chang, S. C., Olsen, G. W., & Thomford, P. J. (2012). Chronic dietary toxicity and carcinogenicity study with potassium perfluorooctanesulfonate in Sprague Dawley rats. *Toxicology, 293*, 1-15. doi:10.1016/j.tox.2012.01.003

Cadwallader, A., A. Greene, H. Holsinger, A. Lan, M. Messner, M. Simic, & Albert, R. (2022). A Bayesian hierarchical model for estimating national PFAS drinking water occurrence. *AWWA Water Science, e1284*.

Cakmak, S., Lukina, A., Karthikeyan, S., Atlas, E., & Dales, R. (2022). The association between blood PFAS concentrations and clinical biochemical measures of organ function and

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                      APRIL 2024

metabolism in participants of the Canadian Health Measures Survey (CHMS). *Science of the total environment, 827*, 153900.

Calafat, A. M., Kato, K., Hubbard, K., Jia, T., Botelho, J. C., & Wong, L.-Y. (2019). Legacy and alternative per- and polyfluoroalkyl substances in the U.S. general population: Paired serum-urine data from the 2013–2014 National Health and Nutrition Examination Survey. *Environment international, 131*, 105048.

Calafat, A. M., Wong, L.-Y., Kuklenyik, Z., Reidy, J. A., & Needham, L. L. (2007). Polyfluoroalkyl Chemicals in the U.S. population: Data from the National Health and Nutrition Examination Survey (NHANES) 2003–2004 and Comparisons with NHANES 1999–2000. *Environmental health perspectives, 115*(11), 1596–1602.

California Environmental Protection Agency. (2021). *Proposed Public Health Goals for Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid in Drinking Water*.

Canova, C., Barbieri, G., Jeddi, M. Z., Gion, M., Fabricio, A., Dapra, F., . . . Pitter, G. (2020). Associations between perfluoroalkyl substances and lipid profile in a highly exposed young adult population in the Veneto Region. *Environment international, 145*, 106117.

Cantor, K. P., Lynch, C. F., Hildesheim, M. E., Dosemeci, M., Lubin, J., Alavanja, M., & Craun, G. (1998). Drinking water source and chlorination byproducts. I. Risk of bladder cancer. *Epidemiology (Cambridge, Mass.), 9*(1), 21-28. doi:http://dx.doi.org/10.1097/00001648-199801000-00007

Cantor, K. P., Villanueva, C. M., Silverman, D. T., Figueroa, J. D., Real, F. X., Garcia-Closas, M., . . . Tardon, A. (2010). Polymorphisms in GSTT1, GSTZ1, and CYP2E1, disinfection by-products, and risk of bladder cancer in Spain. *Environmental health perspectives, 118*(11), 1545-1550.

Carlsen Bach, C., Bjerregård Matthiesen, N., Olsen, J., & Brink Henriksen, T. (2018). Conditioning on parity in studies of perfluoroalkyl acids and time to pregnancy: an example from the Danish National Birth Cohort. *Environmental health perspectives, 126*(11), 117003.

Catelan, D., Biggeri, A., Russo, F., Gregori, D., Pitter, G., Da Re, F., . . . Canova, C. (2021). Exposure to perfluoroalkyl substances and mortality for COVID-19: A spatial ecological analysis in the Veneto region (Italy). *International journal of environmental research and public health, 18*(5), 2734.

Centers for Disease Control and Prevention. (2017). *User Guide to the 2017 Period/2016 Cohort Linked Birth/Infant Death Public Use File*.

Centers for Disease Control and Prevention. (2018). *User Guide to the 2018 Period/2017 Cohort Linked Birth/Infant Death Public Use File*.

Centers for Disease Control and Prevention. (2019). *Fourth National Report on Human Exposure to Environmental Chemicals: Updated Tables, January 2019, Volume One*. Retrieved from https://stacks.cdc.gov/view/cdc/75822

Centers for Disease Control and Prevention. (2020a). *National Vital Statistics System, Linked Birth / Infant Death Records 1995-2019 on CDC WONDER Online Database. Data are from the Linked Birth / Infant Deaths Records 1995-2019, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program.* Retrieved from: https://wonder.cdc.gov/lbd-current.html

Centers for Disease Control and Prevention. (2020b). *Underlying Cause of Death, 1999-2020 on CDC WONDER Online Database, released in 2020. Data are from the Multiple Cause of Death Files, 1999-2019, as compiled from data provided by the 57 vital statistics*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*jurisdictions through the Vital Statistics Cooperative Program.* Retrieved from: http://wonder.cdc.gov/ucd-icd10.html

Chaikind, S., & Corman, H. (1991). The impact of low birthweight on special education costs. *Journal of Health Economics, 10*(3), 291-311.

Chang, C.-J., Barr, D. B., Ryan, P. B., Panuwet, P., Smarr, M. M., Liu, K., . . . Ly, V. (2022). Per-and polyfluoroalkyl substance (PFAS) exposure, maternal metabolomic perturbation, and fetal growth in African American women: a meet-in-the-middle approach. *Environment international, 158*, 106964.

Château-Degat, M.-L., Pereg, D., Dallaire, R., Ayotte, P., Dery, S., & Dewailly, É. (2010). Effects of perfluorooctanesulfonate exposure on plasma lipid levels in the Inuit population of Nunavik (Northern Quebec). *Environmental research, 110*(7), 710-717.

Chatterji, P., Kim, D., & Lahiri, K. (2014). Birth weight and academic achievement in childhood. *Health Economics, 23*(9), 1013-1035.

Chen, A., Jandarov, R., Zhou, L., Calafat, A. M., Zhang, G., Urbina, E. M., . . . Bockor, L. (2019). Association of perfluoroalkyl substances exposure with cardiometabolic traits in an island population of the eastern Adriatic coast of Croatia. *Science of the total environment, 683*, 29-36.

Chen, C. W., & Gibb, H. (2003). Procedures for calculating cessation lag. *Regulatory Toxicology and Pharmacology, 38*(2), 157-165.

Chen, M. H., Ng, S., Hsieh, C. J., Lin, C. C., Hsieh, W. S., & Chen, P. C. (2017). The impact of prenatal perfluoroalkyl substances exposure on neonatal and child growth. *Science of the total environment, 607-608*, 669-675. doi:10.1016/j.scitotenv.2017.06.273

Cheng, W., Dastgheib, S. A., & Karanfil, T. (2005). Adsorption of dissolved natural organic matter by modified activated carbons. *Water research, 39*(11), 2281-2290.

Chili, C. A., Westerhoff, P., & Ghosh, A. (2012). GAC removal of organic nitrogen and other DBP precursors. *Journal-American Water Works Association, 104*(7), E406-E415.

Chin, D. A., & Qi, X. (2000). Ground water under direct influence of surface water. *Journal of Environmental Engineering, 126*(6), 501-508.

Chowdhury, Z. Z., Zain, S. M., Rashid, A. K., Rafique, R. F., & Khalid, K. (2013). Breakthrough Curve Analysis for Column Dynamics Sorption of Mn(II) Ions from Wastewater by Using <i>Mangostana garcinia</i> Peel-Based Granular-Activated Carbon. *Journal of Chemistry, 2013*, 959761. doi:10.1155/2013/959761

Christensen, K. Y., Raymond, M., & Meiman, J. (2018). Perfluoralkyl substances and metabolic syndrome. *International journal of hygiene and environmental health, 222*(1), 147-153. doi:10.1016/j.ijheh.2018.08.014

Christensen, K. Y., Raymond, M., Thompson, B., & Anderson, H. (2016). Perfluoroalkyl substances in older male anglers in Wisconsin. *Environment international, 91*, 312-318.

Chu, C., Zhou, Y., Li, Q.-Q., Bloom, M. S., Lin, S., Yu, Y.-J., . . . Yang, B.-Y. (2020). Are perfluorooctane sulfonate alternatives safer? New insights from a birth cohort study. *Environment international, 135*, 105365.

Colaizy, T. T., Bartick, M. C., Jegier, B. J., Green, B. D., Reinhold, A. G., Schaefer, A. J., . . . Jobe, A. H. (2016). Impact of optimized breastfeeding on the costs of necrotizing enterocolitis in extremely low birthweight infants. *The Journal of Pediatrics, 175*, 100-105. e102.

Colantonio, L. D. M., PhD; Rosenson, Robert S. MD; Deng, Luqin PhD; Monda, Keri L. PhD; Dai, Yuling MS, MSPH; Farkouh, Michael E. MD, MSc; Safford, Monika M. MD;

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Philip, Kiran MD, MBA; Mues, Katherine E. PhD, MPH; Muntner, Paul PhD. (2019). Adherence to Statin Therapy Among US Adults Between 2007 and 2014. *Journal of the American Heart Association, 8*(1). doi:https://doi.org/10.1161/JAHA.118.010376

Collier, S. A., Deng, L., Adam, E. A., Benedict, K. M., Beshearse, E. M., Blackstock, A. J., . . . Fullerton, K. E. (2021). Estimate of burden and direct healthcare cost of infectious waterborne disease in the United States. *Emerging infectious diseases, 27*(1), 140.

Costello, E., Rock, S., Stratakis, N., Eckel, S. P., Walker, D. I., Valvi, D., . . . Kohli, R. (2022). Exposure to per-and polyfluoroalkyl substances and markers of liver injury: a systematic review and meta-analysis. *Environmental health perspectives, 130*(4), 046001.

Costet, N., Villanueva, C. M., Jaakkola, J. J. K., Kogevinas, M., Cantor, K. P., King, W. D., . . . Cordier, S. (2011). Water disinfection by-products and bladder cancer: is there a European specificity? A pooled and meta-analysis of European case–control studies. *Occupational and environmental medicine, 68*(5), 379-385.

Crittenden, J. C., Vaitheeswaran, K., Hand, D. W., Howe, E. W., Aieta, E. M., Tate, C. H., . . . Davis, M. K. (1993). Removal of dissolved organic carbon using granular activated carbon. *Water research, 27*(4), 715-721. doi:https://doi.org/10.1016/0043-1354(93)90181-G

Cropper, M. L., & Krupnick, A. J. (2000). *Social costs of chronic heart and lung disease*.

Cuthbertson, A. A., Kimura, S. Y., Liberatore, H. K., Summers, R. S., Knappe, D. R., Stanford, B. D., . . . Richardson, S. D. (2019). Does granular activated carbon with chlorination produce safer drinking water? From disinfection byproducts and total organic halogen to calculated toxicity. *Environmental Science & Technology, 53*(10), 5987-5999.

D'Agostino, R. B., Vasan, R. S., Pencina, M. J., Wolf, P. A., Cobain, M., Massaro, J. M., & Kannel, W. B. (2008). General cardiovascular risk profile for use in primary care. *Circulation, 117*(6), 743-753.

Dalla Zuanna, T., Savitz, D. A., Barbieri, G., Pitter, G., Jeddi, M. Z., Daprà, F., . . . Canova, C. (2021). The association between perfluoroalkyl substances and lipid profile in exposed pregnant women in the Veneto region, Italy. *Ecotoxicology and environmental safety, 209*, 111805.

Darrow, L. A., Stein, C. R., & Steenland, K. (2013). Serum Perfluorooctanoic Acid and Perfluorooctane Sulfonate Concentrations in Relation to Birth Outcomes in the Mid-Ohio Valley, 2005–2010. *Environ. Health Perspect., 121*(10), 1207-1213. doi:10.1289/ehp.1206372

Dastgheib, S. A., Karanfil, T., & Cheng, W. (2004). Tailoring activated carbons for enhanced removal of natural organic matter from natural waters. *Carbon, 42*(3), 547-557.

de Abreu Domingos, R., & da Fonseca, F. V. (2018). Evaluation of adsorbent and ion exchange resins for removal of organic matter from petroleum refinery wastewaters aiming to increase water reuse. *Journal of environmental management, 214*, 362-369.

Deeks, J. J. (2002). Issues in the selection of a summary statistic for meta-analysis of clinical trials with binary outcomes. *Statistics in medicine, 21*(11), 1575-1600.

Desikan, A., Carter, J., Kinser, S., & Goldman, G. (2019). Abandoned Science, Broken Promises: How the Trump Administration's Neglect of Science Is Leaving Marginalized Communities Further Behind.

Dickenson, E., & Higgins, C. (2016). Treatment Mitigation Strategies for Poly- and Perfluorinated Chemicals. *Water Research Foundation*.

Dobson, K. G., Ferro, M. A., Boyle, M. H., Schmidt, L. A., Saigal, S., & Van Lieshout, R. J. (2018). How do childhood intelligence and early psychosocial adversity influence income attainment among adult extremely low birth weight survivors? A test of the cognitive reserve hypothesis. *Development and psychopathology, 30*(4), 1421-1434.

Domingo, J. L., & Nadal, M. (2019). Human exposure to per-and polyfluoroalkyl substances (PFAS) through drinking water: A review of the recent scientific literature. *Environmental research, 177*, 108648.

Dong, Z., Wang, H., Yu, Y. Y., Li, Y. B., Naidu, R., & Liu, Y. (2019). Using 2003–2014 US NHANES data to determine the associations between per-and polyfluoroalkyl substances and cholesterol: Trend and implications. *Ecotoxicology and environmental safety, 173*, 461-468.

Driscoll, A. K., & Gregory, E. C. W. (2021). Prepregnancy Body Mass Index and Infant Outcomes by Race and Hispanic Origin: United States, 2020. *Natl Vital Stat Rep, 70*(16), 1-8.

Du, Z., Deng, S., Bei, Y., Huang, Q., Wang, B., Huang, J., & Yu, G. 2014. . (2014). Adsorption behavior and mechanism of perfluorinated compounds on various adsorbents—A review. *Journal of hazardous materials, 274*, 443-454.

Dunder, L., Lind, P. M., Salihovic, S., Stubleski, J., Kärrman, A., & Lind, L. (2022). Changes in plasma levels of per-and polyfluoroalkyl substances (PFAS) are associated with changes in plasma lipids-A longitudinal study over 10 years. *Environmental research, 211*, 112903.

Dzierlenga, M., Crawford, L., & Longnecker, M. (2020). Birth weight and perfluorooctane sulfonic acid: a random-effects meta-regression analysis. *Environmental Epidemiology, 4*(3).

Eick, S. M., Enright, E. A., Geiger, S. D., Dzwilewski, K. L., DeMicco, E., Smith, S., . . . Morello-Frosch, R. (2021). Associations of maternal stress, prenatal exposure to per-and polyfluoroalkyl substances (PFAS), and demographic risk factors with birth outcomes and offspring neurodevelopment: an overview of the ECHO. CA. IL prospective birth cohorts. *International journal of environmental research and public health, 18*(2), 742.

Elder, T., Figlio, D., Imberman, S., & Persico, C. (2020). The role of neonatal health in the incidence of childhood disability. *American Journal of Health Economics, 6*(2), 216-250.

Electricwala, B., Wassel, C. L., Amari, D. T., & Cristino, J. (2020). PCV73 Risk Factors Associated with Statin Use Among Adult Nhanes Participants with Ascvd. *Value in Health, 23*, S499. doi:10.1016/j.jval.2020.08.564

Ellington, S., Strid, P., Tong, V. T., Woodworth, K., Galang, R. R., Zambrano, L. D., . . . Gilboa, S. M. (2020). Characteristics of women of reproductive age with laboratory-confirmed SARS-CoV-2 infection by pregnancy status—United States, January 22–June 7, 2020. *Morbidity and Mortality Weekly Report, 69*(25), 769.

Ellis, J. J., Erickson, S. R., Stevenson, J. G., Bernstein, S. J., Stiles, R. A., & Fendrick, A. M. (2004). Suboptimal statin adherence and discontinuation in primary and secondary prevention populations. *Journal of General Internal Medicine, 19*(6), 638-645. doi:10.1111/j.1525-1497.2004.30516.x

Engels, E. A., Schmid, C. H., Terrin, N., Olkin, I., & Lau, J. (2000). Heterogeneity and statistical significance in meta-analysis: an empirical study of 125 meta-analyses. *Statistics in medicine, 19*(13), 1707-1728.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Environmental Council of the States. (2022). Processes and Considerations for Setting State PFAS Standards.

Eschauzier, C., Beerendonk, E., Scholte-Veenendaal, P., & De Voogt, P. (2012). Impact of treatment processes on the removal of perfluoroalkyl acids from the drinking water production chain. *Environmental Science & Technology, 46*(3), 1708-1715.

Executive Order 12866. 1993. Regulatory Planning and Review. 58 FR 51735, October 4, 1993. Available at https://www.reginfo.gov/public/jsp/Utilities/EO_12866.pdf, (1993).

Executive Order 12898. 1994. Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations. 59 FR 7629; February 16, 1994. Available at https://www.archives.gov/files/federal-register/executive-orders/pdf/12898.pdf, (1994).

Executive Order 13045. 1997. Protection of Children from Environmental Health Risks and Safety Risks. 62 FR 19885, April 23, 1997. Available at https://www.gpo.gov/fdsys/pkg/FR-1997-04-23/pdf/97-10695.pdf, (1997).

Executive Order 13132. 1999. Federalism. 64 FR 43255, August 10, 1999. Available at https://www.gpo.gov/fdsys/pkg/FR-1999-08-10/pdf/99-20729.pdf, (1999).

Executive Order 13175. 2000. Consultation and Coordination with Indian Tribal Governments. 65 FR 67249, November 9, 2000. Available at https://www.gpo.gov/fdsys/pkg/FR-2000-11-09/pdf/00-29003.pdf, (2000).

Executive Order 13211. 2001. Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use. 66 FR 28355, May 22, 2001. Available at https://www.gpo.gov/fdsys/pkg/FR-2001-05-22/pdf/01-13116.pdf, (2001).

Executive Order 13563. 2011. Improving Regulation and Regulatory Review. 76 FR 3821, January 21, 2011. Available at https://www.gpo.gov/fdsys/pkg/FR-2011-01-21/pdf/2011-1385.pdf, (2011).

Executive Order 14096. 2023. Revitalizing Our Nation's Commitment to Environmental Justice for All. Federal Register. 88 FR 25251. Available at https://www.whitehouse.gov/briefing-room/presidential-actions/2023/04/21/executive-order-on-revitalizing-our-nations-commitment-to-environmental-justice-for-all/, (2023).

Fan, Y., Li, X., Xu, Q., Zhang, Y., Yang, X., Han, X., . . . Lu, C. (2020). Serum albumin mediates the effect of multiple per-and polyfluoroalkyl substances on serum lipid levels. *Environmental pollution, 266*, 115138.

Fei, C., McLaughlin, J. K., Lipworth, L., & Olsen, J. (2009). Maternal levels of perfluorinated chemicals and subfecundity. *Human reproduction, 24*(5), 1200-1205. doi:10.1093/humrep/den490

Fisher, M., Arbuckle, T. E., Wade, M., & Haines, D. A. (2013). Do perfluoroalkyl substances affect metabolic function and plasma lipids?—Analysis of the 2007–2009, Canadian Health Measures Survey (CHMS) Cycle 1. *Environmental research, 121*, 95-103.

Foreman, K., Vacs Renwick, D., McCabe, M., Cadwallader, A., Holsinger, H., Kormondy, C., & Albert, R. (2021). Effects of harmful algal blooms on regulated disinfection byproducts: Findings from five utility case studies. *AWWA Water Science, 3*(3), e1223.

Frawley, R. P., Smith, M., Cesta, M. F., Hayes-Bouknight, S., Blystone, C., Kissling, G. E., . . . Germolec, D. (2018). Immunotoxic and hepatotoxic effects of perfluoro-n-decanoic acid (PFDA) on female Harlan Sprague–Dawley rats and B6C3F1/N mice when administered by oral gavage for 28 days. *Journal of Immunotoxicology, 15*(1), 41-52.

Freeman, L. E., Cantor, K. P., Baris, D., Nuckols, J. R., Johnson, A., Colt, J. S., . . . Silverman, D. T. (2017). Bladder Cancer and Water Disinfection By-product Exposures through

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Multiple Routes: A Population-Based Case-Control Study (New England, USA). *Environmental health perspectives, 125*(6).

Fried, L. P., Borhani, N. O., Enright, P., Furberg, C. D., Gardin, J. M., Kronmal, R. A., . . . Newman, A. (1991). The cardiovascular health study: design and rationale. *Annals of epidemiology, 1*(3), 263-276.

Friedman, G. D., Cutter, G. R., Donahue, R. P., Hughes, G. H., Hulley, S. B., Jacobs Jr, D. R., . . . Savage, P. J. (1988). CARDIA: study design, recruitment, and some characteristics of the examined subjects. *Journal of clinical epidemiology, 41*(11), 1105-1116.

Frisbee, S. J., Shankar, A., Knox, S. S., Steenland, K., Savitz, D. A., Fletcher, T., & Ducatman, A. M. (2010). Perfluorooctanoic acid, perfluorooctanesulfonate, and serum lipids in children and adolescents: results from the C8 Health Project. *Archives of pediatrics & adolescent medicine, 164*(9), 860-869.

Fromme, H., Tittlemier, S. A., Völkel, W., Wilhelm, M., & Twardella, D. (2009). Perfluorinated compounds–exposure assessment for the general population in Western countries. *International journal of hygiene and environmental health, 212*(3), 239–270.

Fry, K., & Power, M. C. (2017). Persistent organic pollutants and mortalityin the United States, NHANES 1999–2011. *Environmental Health, 16*(105), 1-12. doi:10.1186/s12940-017-0313-6

Fryar, C. D., Ostchega, Y., Hales, C. M., Zhang, G., & Kruszon-Moran, D. (2017). Hypertension Prevalence and Control Among Adults: United States, 2015-2016. *NCHS Data Brief*(289), 1-8.

Fu, Y., Wang, T., Fu, Q., Wang, P., & Lu, Y. (2014). Associations between serum concentrations of perfluoroalkyl acids and serum lipid levels in a Chinese population. *Ecotoxicology and environmental safety, 106*, 246-252.

Ghisari, M., Long, M., Røge, D. M., Olsen, J., & Bonefeld-Jørgensen, E. C. (2017). Polymorphism in xenobiotic and estrogen metabolizing genes, exposure to perfluorinated compounds and subsequent breast cancer risk: A nested case-control study in the Danish National Birth Cohort. *Environmental research, 154*, 325–333. doi:10.1016/j.envres.2017.01.020

Gleason, J. A., Post, G. B., & Fagliano, J. A. (2015). Associations of perfluorinated chemical serum concentrations and biomarkers of liver function and uric acid in the US population (NHANES), 2007–2010. *Environmental research, 136*, 8-14.

Glynn, A., Berger, U., Bignert, A., Ullah, S., Aune, M., Lignell, S., & Darnerud, P. O. (2012). Perfluorinated Alkyl Acids in Blood Serum from Primiparous Women in Sweden: Serial Sampling during Pregnancy and Nursing, And Temporal Trends 1996–2010. *Environmental Science & Technology, 46*(16), 9071-9079. doi:10.1021/es301168c

Goff, D. C., Lloyd-Jones, D. M., Bennett, G., Coady, S., D'Agostino, R. B., Gibbons, R., . . . Wilson, P. W. F. (2014). 2013 ACC/AHA guideline on the assessment of cardiovascular risk: A report of the American College of Cardiology/American Heart Association task force on practice guidelines. *Circulation, 129*(25 suppl 2), 49-73.

Goldstein, K. M., Zullig, L. L., Bastian, L. A., & Bosworth, H. B. (2016). Statin Adherence: Does Gender Matter? *Current Atherosclerosis Reports, 18*(11), 63. doi:10.1007/s11883-016-0619-9

Govarts, E., Iszatt, N., Trnovec, T., De Cock, M., Eggesbø, M., Murinova, L. P., . . . Koppen, G. (2018). Prenatal exposure to endocrine disrupting chemicals and risk of being born small

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

for gestational age: Pooled analysisof seven European birth cohorts. *Environment International, 115*, 267-278. doi:10.1016/j.envint.2018.03.01

Govarts, E., Remy, S., Bruckners, L., Hond, E. D., Sioen, I., Nelen, V., . . . Schoeters, G. (2016). Combined Effects of Prenatal Exposures to Environmental Chemicals on Birth Weight. *International journal of environmental research and public health, 13*(495), 1-19. doi:10.3390/ijerph13050495

Graham, G. (2015). Disparities in cardiovascular disease risk in the United States. *Current cardiology reviews, 11*(3), 238-245.

Grandjean, P., Andersen, E. W., Budtz-Jørgensen, E., Nielsen, F., Molbank, K., Weihe, P., & Heilmann, C. (2012). Serum Vaccine Antibody Concentrationsin Children Exposed to Perfluorinated Compounds. *Jama, 307*(4), 391-397.

Grandjean, P., Heilmann, C., Nielsen, F., Mogensen, U. B., Timmermann, A. G., & Budtz-Jørgensen, E. (2017). Estimated exposures to perfluorinated compounds in infancy predict attenuated vaccine antibody concentrations at age 5-years. *Journal of Immunotoxicolgy, 14*(1), 188-195. doi:10.1080/1547691X.2017.1360968

Grandjean, P., Heilmann, C., Weihe, P., Nielsen, F., Mogensen, U. B., & Budtz-Jørgensen, E. (2017). Serum Vaccine Antibody Concentrations in Adolescents Exposed to PerfluorinatedCompounds. *Environmental health perspectives*. doi:10.1289/EHP275

Grandjean, P., Timmermann, C. A. G., Kruse, M., Nielsen, F., Vinholt, P., Boding, L., . . . Mølbak, K. (2020). Severity of COVID-19 at elevated exposure to perfluorinated alkylates. *PLoS One, 15*(12), e0244815.

Greco, S. L., Belova, A., Haskell, J., & Backer, L. (2019). Estimated burden of disease from arsenic in drinking water supplied by domestic wells in the United States. *Journal of water and health, 17*(5), 801-812.

Guelfo, J. L., & Adamson, D. T. (2018). Evaluation of a National Data set for Insights into Sources, Composition, and Concentrations of Per- and Polyfluoroalkyl Substances (PFASs) in U.S. Drinking Water. *Environmental pollution, 236*, 505-513. doi:https://doi.org/10.1016/j.envpol.2018.01.066

Hardell, E., Karrman, A., van Bavel, B., Bao, J., Carlberg, M., & Hardell, L. (2014). Case–control study on perfluorinated alkyl acids (PFAAs) and the risk of prostate cancer. *Environment international, 63*, 35-39. doi:10.1016/j.envint.2013.10.005

Hartge, P., Silverman, D., Hoover, R., Schairer, C., Altman, R., Austin, D., . . . Marrett, L. D. (1987). Changing cigarette habits and bladder cancer risk: a case-control study. *Journal of the National Cancer Institute, 78*(6), 1119-1125.

Hashempour, Y., Nasseri, M., Mohseni-Bandpei, A., Motesaddi, S., & Eslamizadeh, M. (2020). Assessing vulnerability to climate change for total organic carbon in a system of drinking water supply. *Sustainable Cities and Society, 53*, 101904. doi:https://doi.org/10.1016/j.scs.2019.101904

He, X., Liu, Y., Xu, B., Gu, L., & Tang, W. (2018). PFOA is associated with diabetes and metabolic alteration in US men: National Health and Nutrition Examination Survey 2003–2012. *Science of the total environment, 625*, 566-574.

Hines, C. T., Padilla, C. M., & Ryan, R. M. (2020). The effect of birth weight on child development prior to school entry. *Child development, 91*(3), 724-732.

Hooper, S. M., & Allgeier, S. C. (2002). GAC and membrane treatment studies Chapter 21 in Information Collection Rule Data Analysis. *Water Research Foundation and AWWA*.

Hrubec, Z., & McLaughlin, J. K. (1997). Former cigarette smoking and mortality among US veterans: a 26-year follow-up, 1954-1980. *Changes in cigarette-related disease risks and their implication for prevention and control. Bethesda, MD: US Government Printing Office*, 501-530.

Hrudey, S. E., Backer, L. C., Humpage, A. R., Krasner, S. W., Michaud, D. S., Moore, L. E., . . . Stanford, B. D. (2015). Evaluating evidence for association of human bladder cancer with drinking-water chlorination disinfection by-products. *Journal of Toxicology and Environmental Health, Part B, 18*(5), 213-241.

Hu, X. C., Andrews, D. Q., Lindstrom, A. B., Bruton, T. A., Schaider, L. A., Grandjean, P., . . . Sunderland, E. M. (2016). Detection of Poly- and Perfluoroalkyl Substances (PFASs) in U.S. Drinking Water Linked to Industrial Sites, Military Fire Training Areas, and Wastewater Treatment Plants. *Environmental Science & Technology Letters, 3*(10), 344-350. doi:10.1021/acs.estlett.6b00260

Hu, Z., Morton, L. W., & Mahler, R. L. (2011). Bottled water: United States consumers and their perceptions of water quality. *International journal of environmental research and public health, 8*(2), 565-578. doi:10.3390/ijerph8020565

Hua, G., & Reckhow, D. A. (2008). DBP formation during chlorination and chloramination: effect of reaction time, pH, dosage, and temperature. *Journal-American Water Works Association, 100*(8), 82-95.

Huang, M., Jiao, J., Zhuang, P., Chen, X., Wang, J., & Zhang, Y. (2018). Serum polyfluoroalkyl chemicals are associated with risk of cardiovascular diseases in national US population. *Environment international, 119*, 37-46.

Hutcheson, R., Innes, K., & Conway, B. (2019). Perfluoroalkyl substances and likelihood of stroke in persons with and without diabetes. *Diabetes and Vascular Disease Research, 17*(1), 1479164119892223. doi:10.1177/1479164119892223

ICF. (2020). *Memorandum re: Trends in Infant Mortality by Birth Weight Categories, EPA Contract No. 68HE0C18D0001, TO 68HERC20F0107. Submitted to U.S. Environmental Protection Agency Office of Groundwater and Drinking Water July 30, 2020.* Retrieved from https://www.regulations.gov/docket/EPA-HQ-OW-2022-0114

ICF. (2021). *Memorandum re: Summary of Literature Review of Non-Medical Effects and Economic Burden Related to Low Birth Weight Infants. Submitted to U.S. Environmental Protection Agency Office of Groundwater and Drinking Water October 5, 2021.* Retrieved from https://www.regulations.gov/docket/EPA-HQ-OW-2022-0114

ICF. (2022a). *Memorandum re: Literature Review of ASCVD Risk Models and Limitations. Submitted to U.S. Environmental Protection Agency Office of Groundwater and Drinking Water April 4, 2022.* Retrieved from https://www.regulations.gov/docket/EPA-HQ-OW-2022-0114

ICF. (2022b). *Memorandum re: Literature Review of Population Attributable Fraction Estimates and Next Steps for Renal Cell Carcinoma PFAS Benefits Modeling, EPA Contract No. 68HE0C18D0001, TO 68HERC22F0262. Submitted to U.S. Environmental Protection Agency Office of Groundwater and Drinking Water July 28, 2022.* Retrieved from https://www.regulations.gov/docket/EPA-HQ-OW-2022-0114

Ioannou, G. N., Boyko, E. J., & Lee, S. P. (2006). The prevalence and predictors of elevated serum aminotransferase activity in the United States in 1999–2002. *Official journal of the American College of Gastroenterology| ACG, 101*(1), 76-82.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Ioannou, G. N., Weiss, N. S., Boyko, E. J., Mozaffarian, D., & Lee, S. P. (2006). Elevated serum alanine aminotransferase activity and calculated risk of coronary heart disease in the United States. *Hepatology, 43*(5), 1145-1151.

Iriarte-Velasco, U., I. Álvarez-Uriarte, J., Chimeno-Alanis, N., & R. González-Velasco, J. (2008). Natural organic matter adsorption onto granular activated carbons: implications in the molecular weight and disinfection byproducts formation. *Industrial & engineering chemistry research, 47*(20), 7868-7876.

Jacob, J. A. (2016). U.S. infant mortality rate declines but still exceeds other developed countries. *Journal of the American Medical Association, 315*(5), 451-452.

Jain, R. B. (2018). Time trends over 2003–2014 in the concentrations of selected perfluoroalkyl substances among U.S. adults aged >20 years: Interpretational issues. *Science of the total environment, 645*, 946–957. doi:10.1016/j.scitotenv.2018.07.198

Jain, R. B., & Ducatman, A. (2019a). Roles of gender and obesity in defining correlations between perfluoroalkyl substances and lipid/lipoproteins. *Science of the total environment, 653*, 74-81.

Jain, R. B., & Ducatman, A. (2019b). Selective associations of recent low concentrations of perfluoroalkyl substances with liver function biomarkers: NHANES 2011 to 2014 data on US adults aged≥ 20 years. *Journal of occupational and environmental medicine, 61*(4), 293-302.

Jelenkovic, A., Mikkonen, J., Martikainen, P., Latvala, A., Yokoyama, Y., Sund, R., . . . Kim, J. (2018). Association between birth weight and educational attainment: an individual-based pooled analysis of nine twin cohorts. *J Epidemiol Community Health, 72*(9), 832-837.

Ji, J., Song, L., Wang, J., Yang, Z., Yan, H., Li, T., . . . Li, J. (2021). Association between urinary per-and poly-fluoroalkyl substances and COVID-19 susceptibility. *Environment international, 153*, 106524.

Jiang, J., Zhang, X., Zhu, X., & Li, Y. (2017). Removal of intermediate aromatic halogenated DBPs by activated carbon adsorption: a new approach to controlling halogenated DBPs in chlorinated drinking water. *Environmental Science & Technology, 51*(6), 3435-3444.

Johnson, P. I., Sutton, P., Atchley, D. S., Koustas, E., Lam, J., Sen, S., . . . Woodruff, T. J. (2014). The Navigation Guide—Evidence-Based Medicine Meets Environmental Health: Systematic Review of Human Evidence for PFOA Effects on Fetal Growth. *Environmental health perspectives, 122*(10), 1028-1039. doi:10.1289/ehp.1307893

Johnston, J., & Cushing, L. (2020). Chemical Exposures, Health, and Environmental Justice in Communities Living on the Fenceline of Industry. *Current Environmental Health Reports, 7*(1), 48-57. doi:10.1007/s40572-020-00263-8

Joyce, C., Goodman-Bryan, M., & Hardin, A. (2012). *Preterm Birth and Low Birth Weight*. Retrieved from The Urban Child Institute: http://www.urbanchildinstitute.org/sites/all/files/2010-10-01-PTB-and-LBW.pdf

Kamai, E. M., McElrath, T. F., & Ferguson, K. K. (2019). Fetal growth in environmental epidemiology: mechanisms, limitations, and a review of associations with biomarkers of non-persistent chemical exposures during pregnancy. *Environmental Health, 18*(1), 43.

Kato, K., Wong, L.-Y., Chen, A., Dunbar, C., Webster, G. M., Lanphear, B. P., & Calafat, A. M. (2014). Changes in serum concentrations of maternal poly-and perfluoroalkyl substances over the course of pregnancy and predictors of exposure in a multiethnic cohort of Cincinnati, Ohio pregnant women during 2003–2006. *Environmental Science & Technology, 48*(16), 9600-9608.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Kempisty, D., Arevalo, E., Spinelli, A., Edeback, V., Dickenson, E., Husted, C., . . . Knappe, D. (2022). Granular activated carbon adsorption of perfluoroalkyl acids from ground and surface water. *AWWA Water Science, 4(1)e1269*. doi:https://doi.org/10.1002/aws2.1269

Khalil, N., Chen, A., Lee, M., Czerwinski, S., Ebert, J. R., DeWitt, J., & Kannan, K. (2016). Association of perfluoroalkyl substances, bone mineral density, and osteoporosis in the US population in NHANES 2009–2010. *Environmental health perspectives, 124*(1), 81-87.

Khalil, N., Ebert, J. R., Honda, M., Lee, M., Nahhas, R. W., Koskela, A., . . . Kannan, K. (2018). Perfluoroalkyl substances, bone density, and cardio-metabolic risk factors in obese 8–12 year old children: A pilot study. *Environmental research, 160*, 314-321. doi:10.1016/j.envres.2017.10.014

Khera, R., Ransom, P., & Speth, T. F. (2013). Using work breakdown structure models to develop unit treatment costs. *Journal-American Water Works Association, 105*(11), E628-E641.

Kim, W. H., Nishijima, W., Shoto, E., & Okada, M. (1997). Competitive removal of dissolved organic carbon by adsorption and biodegradation on biological activated carbon. *Water Science and Technology, 35*(7), 147-153. doi:https://doi.org/10.1016/S0273-1223(97)00125-X

Kim, W. R., Flamm, S. L., Di Bisceglie, A. M., & Bodenheimer, H. C. (2008). Serum activity of alanine aminotransferase (ALT) as an indicator of health and disease. *Hepatology, 47*(4), 1363-1370.

King, W. D., & Marrett, L. D. (1996). Case-control study of bladder cancer and chlorination by-products in treated water (Ontario, Canada). *Cancer causes & control: CCC, 7*(6), 596–604. doi:https://doi.org/10.1007/BF00051702

Kingsley, S. L., Eliot, M. N., Kelsey, K. T., Calafat, A. M., Ehrlich, S., Lanphear, B. P., . . . Braun, J. M. (2018). Variability and predictors of serum perfluoroalkyl substance concentrations during pregnancy and early childhood. *Environmental research, 165*, 247-257. doi:10.1016/j.envres.2018.04.033

Kirchberger, I., Burkhardt, K., Heier, M., Thilo, C., & Meisinger, C. (2020). Resilience is strongly associated with health-related quality of life but does not buffer work-related stress in employed persons 1 year after acute myocardial infarction. *Quality of Life Research, 29*(2), 391-401. doi:10.1007/s11136-019-02306-6

Kirisits, M. J., Snoeyink, V. L., & Kruithof, J. C. (2000). The reduction of bromate by granular activated carbon. *Water research, 34*(17), 4250-4260.

Klein, R., & Lynch, M. (2018). *Development of Medical Cost Estimates for Adverse Birth Outcomes*. Prepared for U.S. EPA National Center for Environmental Economics

Kotlarz, N., McCord, J., Collier, D., Lea, C. S., Strynar, M., Lindstrom, A. B., . . . Hoppin, J. A. (2020). Measurement of Novel, Drinking Water-Associated PFAS in Blood from Adults and Children in Wilmington, North Carolina. *Environ Health Perspect, 128*(7), 77005. doi:10.1289/ehp6837

Kowlessar, N. M., Jiang, H. J., & Steiner, C. (2013). Hospital stays for newborns, 2011: statistical brief# 163.

Kwo, P. Y., Cohen, S. M., & Lim, J. K. (2017). ACG clinical guideline: evaluation of abnormal liver chemistries. *Official journal of the American College of Gastroenterology| ACG, 112*(1), 18-35.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Lau, C., Ambalavanan, N., Chakraborty, H., Wingate, M. S., & Carlo, W. A. (2013). Extremely low birth weight and infant mortality rates in the United States. *Pediatrics, 131*(5), 855-860.

Lauritzen, H. B., Larose, T. L., Øien, T., Sandanger, T. M., Odland, J. O., van der Bor, M., & Jacobsen, G. W. (2017). Maternal serum levels of perfluoroalkyl substances and organochlorines and indices of fetal growth: a scandinavian case–cohort study. *Pediatric research, 81*(1), 33-42. doi:10.1038/pr.2016.187

LeChevallier, M. W. (2020). Managing Legionella pneumophila in Water Systems. *Journal: American Water Works Association, 112*(2).

Lee, S., Kang, D., Kim, Y., Kim, Y. J., & Kim, S. Y. (2021). Activity-Based Exposure Levels and Cancer Risk Assessment Due to Naturally Occurring Asbestos for the Residents Near Abandoned Asbestos Mines in South Korea. *Int J Environ Res Public Health, 18*(10). doi:10.3390/ijerph18105225

Lee, S., Kar, A., & Reade, A. (2021). *Dirty Water: Toxic "Forever" PFAS Chemicals Are Prevalent in the Drinking Water of Environmental Justice Communities*. Retrieved from https://www.nrdc.org/sites/default/files/dirty-water-pfas-ej-communities-report.pdf.

Leigh, A., McEvoy, J. W., Garg, P., Carr, J. J., Sandfort, V., Oelsner, E. C., . . . Yeboah, J. (2019). Coronary artery calcium scores and atherosclerotic cardiovascular disease risk stratification in smokers. *JACC: Cardiovascular Imaging, 12*(5), 852-861.

Leino, A. D., Dorsch, M. P., & Lester, C. A. (2020). Changes in Statin Use Among U.S. Adults With Diabetes: A Population-Based Analysis of NHANES 2011-2018. *Diabetes Care, 43*(12), 3110-3112. doi:10.2337/dc20-1481

Lenters, V., Portengen, L., Rignell-Hydbom, A., Jonsson, B. A. G., Lindh, C. H., Piersma, A. H., . . . Vermeulen, R. (2016). Prenatal Phthalate, Perfluoroalkyl Acid, and Organochlorine Exposures and Term Birth Weight in Three Birth Cohorts: Multi-Pollutant Models Based on Elastic Net Regression. *Environmental health perspectives, 124*, 365-372. doi:10.1289/ehp.1408933

Lewey, J., Shrank, W. H., Bowry, A. D. K., Kilabuk, E., Brennan, T. A., & Choudhry, N. K. (2013). Gender and racial disparities in adherence to statin therapy: A meta-analysis. *American Heart Journal, 165*(5), 665-678. doi:https://doi.org/10.1016/j.ahj.2013.02.011

Li, N., Liu, Y., Papandonatos, G. D., Calafat, A. M., Eaton, C. B., Kelsey, K. T., . . . Lanphear, B. P. (2021). Gestational and childhood exposure to per-and polyfluoroalkyl substances and cardiometabolic risk at age 12 years. *Environment international, 147*, 106344.

Li, S., Peng, Y., Wang, X., Qian, Y., Xiang, P., Wade, S. W., . . . Handelsman, Y. (2019). Cardiovascular events and death after myocardial infarction or ischemic stroke in an older Medicare population. *Clinical cardiology, 42*(3), 391-399.

Li, Y., Barregard, L., Xu, Y., Scott, K., Pineda, D., Lindh, C. H., . . . Fletcher, T. (2020). Associations between perfluoroalkyl substances and serum lipids in a Swedish adult population with contaminated drinking water. *Environmental Health, 19*(1), 1-11.

Li, Y., Fletcher, T., Mucs, D., Scott, K., Lindh, C. H., Tallving, P., & Jakobsson, K. (2018). Half-lives of PFOS, PFHxS and PFOA after end of exposure to contaminated drinking water. *Occupational and environmental medicine, 75*(1), 46-51.

Liao, S., Yao, W., Cheang, I., Tang, X., Yin, T., Lu, X., . . . Li, X. (2020). Association between perfluoroalkyl acids and the prevalence of hypertension among US adults. *Ecotoxicology and environmental safety, 196*, 110589.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Liddie, J. M., Schaider, L. A., & Sunderland, E. M. (2023). Sociodemographic Factors Are Associated with the Abundance of PFAS Sources and Detection in U.S. Community Water Systems. *Environmental Science & Technology, 57(21)*, 7902–7912.

Liew, Z., Olsen, J., Cui, X., Ritz, B., & Arah, O. A. (2015). Bias from conditioning on live birth in pregnancy cohorts: an illustration based on neurodevelopment in children after prenatal exposure to organic pollutants. *International Journal of Epidemiology, 44*(1), 345-354.

Lin, C. Y., Lee, H. L., Hwang, Y. T., & Su, T. C. (2020). The association between total serum isomers of per-and polyfluoroalkyl substances, lipid profiles, and the DNA oxidative/nitrative stress biomarkers in middle-aged Taiwanese adults. *Environmental research, 182*, 109064.

Lin, P.-I. D., Cardenas, A., Hauser, R., Gold, D. R., Kleinman, K. P., Hivert, M.-F., . . . Oken, E. (2020). Per-and polyfluoroalkyl substances and blood pressure in pre-diabetic adults—cross-sectional and longitudinal analyses of the diabetes prevention program outcomes study. *Environment international, 137*, 105573.

Lin, P.-I. D., Cardenas, A., Hauser, R., Gold, D. R., Kleinman, K. P., Hivert, M.-F., . . . Horton, E. S. (2019). Per-and polyfluoroalkyl substances and blood lipid levels in pre-diabetic adults—longitudinal analysis of the diabetes prevention program outcomes study. *Environment international, 129*, 343-353.

Liu, G., Dhana, K., Furtado, J. D., Rood, J., Zong, G., Liang, L., . . . Coull, B. (2018). Perfluoroalkyl substances and changes in body weight and resting metabolic rate in response to weight-loss diets: a prospective study. *PLoS medicine, 15*(2), e1002502.

Liu, G., Zhang, B., Hu, Y., Rood, J., Liang, L., Qi, L., . . . Grandjean, P. (2020). Associations of perfluoroalkyl substances with blood lipids and apolipoproteins in lipoprotein subspecies: the POUNDS-lost study. *Environmental Health, 19*(1), 1-10.

Liu, H.-S., Wen, L.-L., Chu, P.-L., & Lin, C.-Y. (2018). Association among total serum isomers of perfluorinated chemicals, glucose homeostasis, lipid profiles, serum protein and metabolic syndrome in adults: NHANES, 2013–2014. *Environmental pollution, 232*, 73-79.

Liu, J.-J., Cui, X.-X., Tan, Y.-W., Dong, P.-X., Ou, Y.-Q., Li, Q.-Q., . . . Qin, S.-J. (2022). Per- and perfluoroalkyl substances alternatives, mixtures and liver function in adults: A community-based population study in China. *Environment international, 163*, 107179.

Liu, M., Zhang, G., Meng, L., Han, X., Li, Y., Shi, Y., . . . Jiang, G. (2021). Associations between novel and legacy per-and polyfluoroalkyl substances in human serum and thyroid cancer: a case and healthy population in Shandong Province, East China. *Environmental Science & Technology, 56*(10), 6144-6151.

Liu, Z., Que, S., Xu, J., & Peng, T. (2014). Alanine aminotransferase-old biomarker and new concept: a review. *International journal of medical sciences, 11*(9), 925.

Lloyd-Jones, D. M., Huffman, M. D., Karmali, K. N., Sanghavi, D. M., Wright, J. S., Pelser, C., . . . Goff Jr, D. C. (2017). Estimating longitudinal risks and benefits from cardiovascular preventive therapies among Medicare patients: the million hearts longitudinal ASCVD risk assessment tool: a special report from the American heart association and American College of cardiology. *Circulation, 135*(13), e793-e813.

Louis, G. M. B., Zhai, S., Smarr, M. M., Grewal, J., Zhang, C., Grantz, K. L., . . . Honda, M. (2018). Endocrine disruptors and neonatal anthropometry, NICHD fetal growth studies-singletons. *Environment international, 119*, 515-526.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Lu, S., & Bartell, S. M. (2020). *Serum PFAS Calculator for Adults*. Retrieved from
www.ics.uci.edu/~sbartell/pfascalc.html

Luo, D., Wu, W., Pan, Y., Du, B., Shen, M., & Zeng, L. (2021). Associations of prenatal
exposure to per-and polyfluoroalkyl substances with the neonatal birth size and hormones
in the growth hormone/insulin-like growth factor axis. *Environmental Science &
Technology, 55*(17), 11859-11873.

Ma, S., & Finch, B. K. (2010). Birth outcome measures and infant mortality. *Population
research and policy review, 29*(6), 865-891.

Malits, J., Blustein, J., Trasande, L., & Attina, T. M. (2018). Perfluorooctanoic acid and low
birth weight: Estimates of US attributable burden and economic costs from 2003 through
2014. *International journal of hygiene and environmental health, 221*(2), 269-275.
doi:10.1016/j.ijheh.2017.11.004

Manzano-Salgado, C. B., Casas, M., Lopez-Espinosa, M.-J., Ballester, F., Iñiguez, C., Martinez,
D., . . . Basterretxea, M. (2017). Prenatal exposure to perfluoroalkyl substances and
cardiometabolic risk in children from the Spanish INMA Birth Cohort Study.
*Environmental health perspectives, 125*(9), 097018.

Martin, K. V., Hilbert, T. J., Reilly, M., Christian, W. J., Hoover, A., Pennell, K. G., . . . Haynes,
E. N. (2023). PFAS soil concentrations surrounding a hazardous waste incinerator in East
Liverpool, Ohio, an environmental justice community. *Environmental science and
pollution research international, 30(33)*, 80643–80654.

Martino Cinnera, A., Bonnì, S., Pellicciari, M. C., Giorgi, F., Caltagirone, C., & Koch, G.
(2020). Health-related quality of life (HRQoL) after stroke: Positive relationship between
lower extremity and balance recovery. *Topics in Stroke Rehabilitation, 27*(7), 534-540.
doi:10.1080/10749357.2020.1726070

Martuzzi, M., Mitis, F., & Forastiere, F. (2010). Inequalities, inequities, environmental justice in
waste management and health. *European Journal of Public Health, 20*(1), 21-26.
doi:https://doi.org/10.1093/eurpub/ckp216

Mathiesen, U., Franzen, L., Frydén, A., Foberg, U., & Bodemar, G. (1999). The clinical
significance of slightly to moderately increased liver transaminase values in
asymptomatic patients. *Scandinavian journal of gastroenterology, 34*(1), 85-91.

Mattsson, K., Rignell-Hydbom, A., Holmberg, S., Thelin, A., Jönsson, B. A., Lindh, C. H., . . .
Rylander, L. (2015). Levels of perfluoroalkyl substances and risk of coronary heart
disease: Findings from a population-based longitudinal study. *Environmental research,
142*, 148-154.

McCleaf, P., Englund, S., Östlund, A., Lindegren, K., Wiberg, K., & Ahrens, L. (2017). Removal
efficiency of multiple poly-and perfluoroalkyl substances (PFASs) in drinking water
using granular activated carbon (GAC) and anion exchange (AE) column tests. *Water
research*(120), 77-87.

McCord, J., & Strynar, M. (2019). Identification of per-and polyfluoroalkyl substances in the
Cape Fear River by high resolution mass spectrometry and nontargeted screening.
*Environmental Science & Technology, 53*(9), 4717-4727.

McCord, J., Strynar, M., Washington, J., Bergman, E., & Goodrow, S. (2020). Emerging
chlorinated polyfluorinated polyether compounds impacting the waters of southwestern
New Jersey identified by use of nontargeted analysis. *Environmental Science &
Technology Letters, 7*(12), 903-908.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

McDonough, L. K., Santos, I. R., Andersen, M. S., O'Carroll, D. M., Rutlidge, H., Meredith, K., . . . Lapworth, D. J. (2020). Changes in global groundwater organic carbon driven by climate change and urbanization. Nature communications. *11(1)*, 1-10.

McIntire, D. D., Bloom, S. L., Casey, B. M., & Leveno, K. J. (1999). Birth weight in relation to morbidity and mortality among newborn infants. *New England Journal of Medicine, 340*(16), 1234-1238.

McLaren Jr, R. A., Trejo, F. E., Blitz, M. J., Bianco, A., Limaye, M., Brustman, L., . . . Minkoff, H. (2021). COVID-related "lockdowns" and birth rates in New York. *American journal of obstetrics & gynecology MFM, 3*(6), 100476.

McNamara, J. D., Franco, R., Mimna, R., & Zappa, L. (2018). Comparison of activated carbons for removal of perfluorinated compounds from drinking water. *Journal-American Water Works Association, 110*(1), E2-E14.

Minnesota Pollution Control Agency. (2021). *Minnesota's PFAS Blueprint*. (p-gen1-22). Retrieved from https://www.pca.state.mn.us/sites/default/files/p-gen1-22.pdf

Mohai, P., & Saha, R. (2015). Which came first, people or pollution? A review of theory and evidence from longitudinal environmental justice studies. *Environmental research letters, 10(12)*, 125011.

Mollon, L., & Bhattacharjee, S. (2017). Health related quality of life among myocardial infarction survivors in the United States: a propensity score matched analysis. *Health and Quality of Life Outcomes, 15*(1), 235. doi:10.1186/s12955-017-0809-3

Mongraw-Chaffin, M., Gujral, U. P., Kanaya, A. M., Kandula, N. R., Carr, J. J., & Anderson, C. A. (2018). Relation of ectopic fat with atherosclerotic cardiovascular disease risk score in South Asians living in the United States (from the Mediators of Atherosclerosis in South Asians Living in America [MASALA] Study). *The American journal of cardiology, 121*(3), 315-321.

Mora, S., Wenger, N. K., Cook, N. R., Liu, J., Howard, B. V., Limacher, M. C., . . . Paynter, N. P. (2018). Evaluation of the pooled cohort risk equations for cardiovascular risk prediction in a multiethnic cohort from the Women's Health Initiative. *JAMA Internal Medicine, 178*(9), 1231-1240.

Muntner, P., Colantonio, L. D., Cushman, M., Goff, D. C., Jr., Howard, G., Howard, V. J., . . . Safford, M. M. (2014). Validation of the atherosclerotic cardiovascular disease Pooled Cohort risk equations. *Jama, 311*(14), 1406-1415. doi:10.1001/jama.2014.2630

National Academies of Sciences, E., and Medicine,. (2020). *Management of Legionella in Water Systems*. Washington, DC.: The National Academies Press

National Academies of Sciences, E., and Medicine,. (2022). *Guidance on PFAS Exposure, Testing, and Clinical Follow-Up (2022)*. Washington, DC: The National Academies Press.

National Academies of Sciences, E., and Medicine,. (2023). *Low Birth Weight Babies and Disability*. Retrieved from Washington, DC: https://nap.nationalacademies.org/catalog/27375/low-birth-weight-babies-and-disability

National Academy of Public Administration. (2017). Developing a New Framework for Community Affordability of Clean Water Services.

National Cancer Institute. (2020). *Persistent Poverty Linked to Increased Risk of Dying from Cancer*. Retrieved from https://www.cancer.gov/news-events/cancer-currents-blog/2020/persistent-poverty-increased-cancer-death-risk

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

National Drinking Water Advisory Council. (2023). *National Drinking Water Advisory Council Meeting Summary Report*.

National Institutes of Health. (2017). What are the risks of preeclampsia & eclampsia to the fetus? Retrieved from https://www.nichd.nih.gov/health/topics/preeclampsia/conditioninfo/risk-fetus

National Institutes of Health. (2018). What are the risks of preeclampsia & eclampsia to the mother? Retrieved from https://www.nichd.nih.gov/health/topics/preeclampsia/conditioninfo/risk-mother

National Technology Transfer and Advancement Act. 1995. Public Law No. 104-113, 110 Stat. 783. 104th Congress. Available at https://www.gpo.gov/fdsys/pkg/PLAW-104publ113/pdf/PLAW-104publ113.pdf.,  (1995).

National Toxicology Program. (2018a). 28-day evaluation of the toxicity (C06100) of perfluorohexane sulfonate potassium salt (PFHSKslt) (3871-99-6) on Harlan Sprague-Dawley rats exposed via gavage.

National Toxicology Program. (2018b). *28-day evaluation of the toxicity (C20615) of perfluorodecanoic acid (PFDA) (335-76-2) on Harlan Sprague-Dawley rats exposed via gavage [NTP]. U.S. Department of Health and Human Services.*  Retrieved from http://dx.doi.org/10.22427/NTP-DATA-002-02652-0004-0000-1

National Toxicology Program. (2018c). *Report on Carcinogens: Monograph on Haloacetic Acids Found as Water Disinfection By-Products*. Research Triangle Park, NC.

National Toxicology Program. (2021). Report on Carcinogens, Fifteenth Edition.; Research Triangle Park, NC: U.S. Department of Health and Human Services, Public Health Service.

Negri, E., Metruccio, F., Guercio, V., Tosti, L., Benfenati, E., Bonzi, R., . . . Moretto, A. (2017). Exposure to PFOA and PFOS and fetal growth: a critical merging of toxicological and epidemiological data. *Critical reviews in toxicology, 10.1080/10408444.2016.1271972*, 489-515. doi:10.1080/10408444.2016.1271972

Nelson, J. W., Hatch, E. E., & Webster, T. F. (2010). Exposure to polyfluoroalkyl chemicals and cholesterol, body weight, and insulin resistance in the general US population. *Environmental health perspectives, 118*(2), 197-202.

Nelson, J. W., Scammell, M. K., Hatch, E. E., & Webster, T. F. (2012). Social disparities in exposures to bisphenol A and polyfluoroalkyl chemicals: a cross-sectional study within NHANES 2003-2006. *Environmental Health, 11*(1), 1-15.

Nguyen, Q. D., Odden, M. C., Peralta, C. A., & Kim, D. H. (2020). Predicting risk of atherosclerotic cardiovascular disease using pooled cohort equations in older adults with frailty, multimorbidity, and competing risks. *Journal of the American Heart Association, 9*(18), e016003.

Nguyen, V. K., Kahana, A., Heidt, J., Polemi, K., Kvasnicka, J., Jolliet, O., & Colacino, J. A. (2020). A comprehensive analysis of racial disparities in chemical biomarker concentrations in United States women, 1999–2014. *Environment international, 137*, 105496.

Nian, M., Li, Q.-Q., Bloom, M., Qian, Z. M., Syberg, K. M., Vaughn, M. G., . . . Gurram, N. (2019). Liver function biomarkers disorder is associated with exposure to perfluoroalkyl acids in adults: Isomers of C8 Health Project in China. *Environmental research, 172*, 81-88.

Nicoletti, C., Salvanes, K. G., & Tominey, E. (2018). Response of parental investments to child's health endowment at birth. In *Health Econometrics*: Emerald Publishing Limited.

O'Sullivan, A. K., Rubin, J., Nyambose, J., Kuznik, A., Cohen, D. J., & Thompson, D. (2011). Cost estimation of cardiovascular disease events in the US. *Pharmacoeconomics, 29*(8), 693-704.

Obsekov, V., Kahn, L. G., & Trasande, L. (2023). Leveraging systematic Reviews to Explore disease burden and costs of per-and polyfluoroalkyl substance exposures in the United States. *Exposure and Health, 15*(2), 373-394.

Occupational Safety and Health Administration. (2010). *Occupational Exposure to Respirable Crystalline Silica -- Review of Health Effects Literature and Preliminary Quantitative Risk Assessment*.

Occupational Safety and Health Administration. (2016). *Occupational Exposure to Respirable Crystalline Silica*. (81 FR 16285 2016-04800). Federal Register Retrieved from https://www.federalregister.gov/documents/2016/03/25/2016-04800/occupational-exposure-to-respirable-crystalline-silica

Ochoa-Herrera, V., & Sierra-Alvarez, R. (2008). Removal of perfluorinated surfactants by sorption onto granular activated carbon, zeolite and sludge. *Chemosphere, 72*(10), 1588-1593.

Office of Environmental Health Hazard Assessment. (2016). CalEnviroScreen 3.0.

Osuchukwu, O., & Reed, D. (2022). Small for Gestational Age. *StatPearls [Internet]*.

Papadopoulou, E., Stratakis, N., Basagana, X., Brantsæter, A. L., Casas, M., Fossati, S., . . . Maitre, L. (2021). Prenatal and postnatal exposure to PFAS and cardiometabolic factors and inflammation status in children from six European cohorts. *Environment international, 157*, 106853.

Park, J. H., Choi, J., Jun, D. W., Han, S. W., Yeo, Y. H., & Nguyen, M. H. (2019). Low alanine aminotransferase cut-off for predicting liver outcomes; a nationwide population-based longitudinal cohort study. *Journal of clinical medicine, 8*(9), 1445.

Park, S. K., Peng, Q., Ding, N., Mukherjee, B., & Harlow, S. D. (2019). Determinants of per-and polyfluoroalkyl substances (PFAS) in midlife women: evidence of racial/ethnic and geographic differences in PFAS exposure. *Environmental research, 175*, 186-199.

Pinheiro, P. S., Medina, H. N., Callahan, K. E., Koru-Sengul, T., Sharma, J., Kobetz, E. N., & Penedo, F. J. (2021). Kidney cancer mortality disparities among Hispanics in the US. *Cancer Epidemiology, 72*, 101938. doi:https://doi.org/10.1016/j.canep.2021.101938

Pitter, G., Zare Jeddi, M., Barbieri, G., Gion, M., Fabricio, A. S., Daprà, F., . . . Canova, C. (2020). Perfluoroalkyl substances are associated with elevated blood pressure and hypertension in highly exposed young adults. *Environmental Health, 19*(1), 1-11.

Pletcher, M. J., Vittinghoff, E., Thanataveerat, A., Bibbins-Domingo, K., & Moran, A. E. (2016). Young adult exposure to cardiovascular risk factors and risk of events later in life: The Framingham Offspring Study. *PLoS One, 11*(5), e0154288.

Pramanik, B. K., Pramanik, S. K., & Suja, F. (2015). A comparative study of coagulation, granular-and powdered-activated carbon for the removal of perfluorooctane sulfonate and perfluorooctanoate in drinking water treatment. *Environmental technology, 36*(20), 2610-2617.

R Core Team. (2021). R: A language and environment for statistical computing. Vienna, Austria: R Foundation for Statistical Computing.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                                                      APRIL 2024

Raghavan, S., Ho, Y.-L., Vassy, J. L., Posner, D., Honerlaw, J., Costa, L., . . . Cho, K. (2020). Optimizing Atherosclerotic Cardiovascular Disease Risk Estimation for Veterans With Diabetes Mellitus. *Circulation. Cardiovascular quality and outcomes, 13*(9), 120006528. doi:10.1161/circoutcomes.120.006528

Raleigh, K. K., Alexander, B. H., Olsen, G. W., Ramachandran, G., Morey, S. Z., Church, T. R., . . . Allen, E. M. (2014). Mortality and cancer incidence in ammonium perfluorooctanoate production workers. *Occupational Environmental Medicine, 71*, 500-506.

Ramhøj, L., Hass, U., Boberg, J., Scholze, M., Christiansen, S., Nielsen, F., & Axelstad, M. (2018). Perfluorohexane sulfonate (PFHxS) and a mixture of endocrine disrupters reduce thyroxine levels and cause antiandrogenic effects in rats. *Toxicological Sciences, 163*(2), 579-591.

Ramhøj, L., Hass, U., Gilbert, M. E., Wood, C., Svingen, T., Usai, D., . . . Axelstad, M. (2020). Evaluating thyroid hormone disruption: investigations of long-term neurodevelopmental effects in rats after perinatal exposure to perfluorohexane sulfonate (PFHxS). *Scientific reports, 10*(1), 2672.

Raucher, R., Clements, J., Rothstein, E., Mastracchio, J., & Green, Z. (2019). Developing a New Framework for Household Affordability and Financial Capability Assessment in the Water Sector.

Regli, S., Chen, J., Messner, M., Elovitz, M. S., Letkiewicz, F. J., Pegram, R. A., . . . Wright, J. M. (2015). Estimating potential increased bladder cancer risk due to increased bromide concentrations in sources of disinfected drinking waters. *Environmental Science & Technology, 49*(22), 13094-13102.

Richardson, S. D. (2022). Invited Perspective: Existing Rules for Disinfection By-Products Are Good, but They Are Not Enough. *Environmental health perspectives, 130*(8), 081302.

Robinson, J. G., & Booth, B. (2010). Statin use and lipid levels in older adults: National Health and Nutrition Examination Survey, 2001–2006. *Journal of Clinical Lipidology, 4*(6), 483–490. doi:10.1016/j.jacl.2010.10.002

Rockaway, T. D., Coomes, P. A., Rivard, J., & Kornstein, B. (2011). Residential water use trends in North America. *Journal-American Water Works Association, 103*(2), 76-89.

Rodríguez-Barranco, M., Tobías, A., Redondo, D., Molina-Portillo, E., & Sánchez, M. J. (2017). Standardizing effect size from linear regression models with log-transformed variables for meta-analysis. *BMC medical research methodology, 17*(1), 1-9.

Rodriguez, F., Chung, S., Blum, M. R., Coulet, A., Basu, S., & Palaniappan, L. P. (2019). Atherosclerotic cardiovascular disease risk prediction in disaggregated Asian and Hispanic subgroups using electronic health records. *Journal of the American Heart Association, 8*(14), e011874.

Roger, V. L., Go, A. S., Lloyd-Jones, D. M., Benjamin, E. J., Berry, J. D., Borden, W. B., . . . Ford, E. S. (2012). Heart disease and stroke statistics—2012 update: a report from the American Heart Association. *Circulation, 125*(1), e2.

Rosinger, A. Y., Herrick, K. A., Wutich, A. Y., Yoder, J. S., & Ogden, C. L. (2018). Disparities in plain, tap and bottled water consumption among US adults: National Health and Nutrition Examination Survey (NHANES) 2007-2014. *Public health nutrition, 21*(8), 1455-1464. doi:10.1017/S1368980017004050

Roth, K., Yang, Z., Agarwal, M., Liu, W., Peng, Z., Long, Z., . . . Petriello, M. C. (2021). Exposure to a mixture of legacy, alternative, and replacement per-and polyfluoroalkyl

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

substances (PFAS) results in sex-dependent modulation of cholesterol metabolism and liver injury. *Environment international, 157*, 106843.

Rücker, G., Schwarzer, G., Carpenter, J., & Olkin, I. (2009). Why add anything to nothing? The arcsine difference as a measure of treatment effect in meta-analysis with zero cells. *Statistics in medicine, 28*(5), 721-738.

Sagiv, S. K., Rifas-Shiman, S. L., Fleisch, A. F., Webster, T. F., Calafat, A. M., Ye, X., . . . Oken, E. (2018). Early-pregnancy plasma concentrations of perfluoroalkyl substances and birth outcomes in Project Viva: confounded by pregnancy hemodynamics? *American journal of epidemiology, 187*(4), 793-802.

Salihovic, S., Stubleski, J., Kärrman, A., Larsson, A., Fall, T., Lind, L., & Lind, P. M. (2018). Changes in markers of liver function in relation to changes in perfluoroalkyl substances-a longitudinal study. *Environment international, 117*, 196-203.

Science Applications International Corporation. (1998). *An Assessment of the Vulnerability of Non-Community Water Systems to SDWA Cost Increases. Submitted to U.S. Environmental Protection Agency September 29, 1998. EPA Contract No. 68-C.-0059, WA No. I-26.*

Shankar, A., Xiao, J., & Ducatman, A. (2012). Perfluorooctanoic acid and cardiovascular disease in US adults. *Archives of Internal Medicine, 172*(18), 1397-1403.

Shearer, J. J., Callahan, C. L., Calafat, A. M., Huang, W. Y., Jones, R. R., Sabbisetti, V. S., . . . Hofmann, J. N. (2021). Serum concentrations of per- and polyfluoroalkyl substances and risk of renal cell carcinoma. *Journal of the National Cancer Institute, 113*(5), 580-587. doi:10.1093/jnci/djaa143

Skolarus, L. E., Burke, J. F., Brown, D. L., & Freedman, V. A. (2014). Understanding stroke survivorship: expanding the concept of poststroke disability. *Stroke, 45*(1), 224-230.

Smalling, K. L., Romanok, K. M., Bradley, P. M., Morriss, M. C., Gray, J. L., Kanagy, L. K., . . . Jones, D. K. (2023). Per-and polyfluoroalkyl substances (PFAS) in United States tapwater: Comparison of underserved private-well and public-supply exposures and associated health implications. *Environment international*, 108033.

Sörengård, M., Östblom, E., Köhler, S., & Ahrens, L. (2020). Adsorption behavior of per-and polyfluoralkyl substances (PFASs) to 44 inorganic and organic sorbents and use of dyes as proxies for PFAS sorption. *Journal of Environmental Chemical Engineering, 8*(3), 103744.

Sorlini, S., & Collivignarelli, C. (2005). Chlorite removal with granular activated carbon. *Desalination, 176*(1-3), 255-265.

Souza, M. C. O., Saraiva, M. C. P., Honda, M., Barbieri, M. A., Bettiol, H., Barbosa, F., & Kannan, K. (2020). Exposure to per-and polyfluorinated alkyl substances in pregnant Brazilian women and its association with fetal growth. *Environmental research, 187*, 109585.

Speitel Jr, G. E., Turakhia, M. H., & Lu, C.-J. (1989). Initiation of micropollutant biodegradation in virgin GAC columns. *Journal (American Water Works Association)*, 168-176.

Starling, A. P., Adgate, J. L., Hamman, R. F., Kechris, K., Calafat, A. M., Ye, X., & Dabelea, D. (2017). Perfluoroalkyl substances during pregnancy and offspring weight and adiposity at birth: examining mediation by maternal fasting glucose in the Healthy Start Study. *Environ Health Perspect, 125*, 067016-067011. doi:10.1289/EHP641

FINAL RULE                                                                                              APRIL 2024

Steenland, K., Barry, V., & Savitz, D. (2018). Serum Perfluorooctanoic Acid and Birthweight: An Updated Meta-analysis With Bias Analysis. *Epidemiology, 29*(6), 765-776. doi:10.1097/EDE.0000000000000903

Steenland, K., Tinker, S., Frisbee, S., Ducatman, A., & Vaccarino, V. (2009). Association of perfluorooctanoic acid and perfluorooctane sulfonate with serum lipids among adults living near a chemical plant. *American journal of epidemiology, 170*(10), 1268-1278.

Steenland, K., & Woskie, S. (2012). Cohort mortality study of workers exposed to perfluorooctanoic acid. *American journal of epidemiology, 176*, 909–917.

Stoiber, T., Evans, S., & Naidenko, O. V. (2020). Disposal of products and materials containing per- and polyfluoroalkyl substances (PFAS): A cyclical problem. *Chemosphere, 260*, 127659. doi:https://doi.org/10.1016/j.chemosphere.2020.127659

Summers, R. S., Hooper, S., Shukairy, H., Solarik, G., & Owen, D. M. (1996). Assessing DBP Yield: Uniform Formation Conditions. *J. Amer. Water Works Assoc., 88(6)*, 80-93.

Summers, R. S., Kim, S. M., Shimabuku, K., Chae, S. H., & Corwin, C. J. (2013). Granular activated carbon adsorption of MIB in the presence of dissolved organic matter. *Water research, 47(10)*, 3507-3513.

Sunderland, E. M., Hu, X. C., Dassuncao, C., Tokranov, A. K., Wagner, C. C., & Allen, J. G. (2019). A review of the pathways of human exposure to poly- and perfluoroalkyl substances (PFASs) and present understanding of health effects. *J Expo Sci Environ Epidemiol, 29*(2), 131-147. doi:10.1038/s41370-018-0094-1

Temple, J. A., Reynolds, A. J., & Arteaga, I. (2010). Low birth weight, preschool education, and school remediation. *Education and urban society, 42*(6), 705-729.

Terry, L. G., & R.S., S. (2018). Biodegradable organic matter and rapid-rate biofilter performance: A review. *Water research, 128*, 234-245.

Thom, T., Kannel, W., Silbershatz, H., & D'Agostino, R. (2001). Cardiovascular diseases in the United States and prevention approaches. *Hurst's the heart, 1*, 3-17.

Thomford, P. (2002). 104-week dietary chronic toxicity and carcinogenicity study with perfluorooctane sulfonic acid potassium salt (PFOS; T-6295) in rats.

Toth, P. P., Granowitz, C., Hull, M., Anderson, A., & Philip, S. (2019). Long-term statin persistence is poor among high-risk patients with dyslipidemia: a real-world administrative claims analysis. *Lipids in Health and Disease, 18*(1). doi:10.1186/s12944-019-1099-z

Tsai, M., Chang, S., Kuo, W., Kuo, C., Li, S., Wang, M., . . . Chen, P. (2020). A case-control study of perfluoroalkyl substances and the risk of breast cancer in Taiwanese women. *Environment international*. doi:10.1016/j.envint.2020.105850

U.S Environmental Protection Agency. (2011). *PWSS Program ICR*.

U.S Environmental Protection Agency. (2022). *Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances*.

U.S. Bureau of Labor Statistics. (2021). Medical care in U.S. city average, all urban consumers, not seasonally adjusted, 1980-2021 CUUR0000SAM.

U.S. Bureau of Labor Statistics. (2022a). Medical care in U.S. city average, all urban consumers, not seasonally adjusted, 1980-2022 CUUR0000SAM.

U.S. Bureau of Labor Statistics. (2022b). Table 1. Employment Cost Index for total compensation, by occupational group and industry. Employment Cost Index Historical Listing – Volume III. Retrieved from https://www.bls.gov/web/eci/eci-current-nominal-.dollar.pdf

FINAL RULE                                                                    APRIL 2024

U.S. Census Bureau. (2010). *American Community Survey Five-Year Estimates. American Community Survey Demographic and Housing Estimates*. Retrieved from https://www.census.gov/programs-surveys/acs/technical-documentation/table-and-geography-changes.2010.html

U.S. Census Bureau. (2020a). *2019 Population Estimates by Age, Sex, Race and Hispanic Origin*. Retrieved from https://www.census.gov/newsroom/press-kits/2020/population-estimates-detailed.html

U.S. Census Bureau. (2020b). *Average Number of People per Household, by Race and Hispanic Origin, Marital Status, Age, and Education of Householder*. Retrieved from https://www2.census.gov/programs-surveys/demo/tables/families/2020/cps-2020/tabavg1.xls

U.S. Energy Information Administration. (2021). Annual Energy Outlook 2021. Retrieved August 10, 2021 https://www.eia.gov/outlooks/aeo/

U.S. Environmental Protection Agency. (1989). *Surface Water Treatment Rule*.

U.S. Environmental Protection Agency. (1994). *EPA09: Establish a Blueprint for Environmental Justice Throughout EPA's Operations*. Retrieved from https://govinfo.library.unt.edu/npr/library/reports/EPA9.html

U.S. Environmental Protection Agency. (1996). *DBP/ICR Analytical Methods Manual*. Cincinnati, Ohio

U.S. Environmental Protection Agency. (1997). *Discussion Summary: EPA Technology Design Workshop*. Retrieved from https://downloads.regulations.gov/EPA-HQ-OW-2018-0780-0197/content.pdf

U.S. Environmental Protection Agency. (1998a). *Alachlor Technical Fact Sheet. https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/fs_PC-090501_1-Dec-98.pdf*.

U.S. Environmental Protection Agency. (1998b). Information for States on Developing Affordability Criteria for Drinking Water. EPA 816-R-98-002.

U.S. Environmental Protection Agency. (1998c). *National Primary Drinking Water Regulations: Regulatory Flexibility Act. Federal Register 63(30):7620. February 13, 2008*.

U.S. Environmental Protection Agency. (1998d). *Primary Drinking Water Regulations, Code of Federal Regulations Title 40 Chapter I Subchapter D Part 141 https://www.ecfr.gov/current/title-40/chapter-I/subchapter-D/part-141*.

U.S. Environmental Protection Agency. (1998e). *Stage 1 Disinfectants and Disinfection Byproducts Rule*. Retrieved from https://www.govinfo.gov/content/pkg/FR-1998-12-16/pdf/98-32887.pdf

U.S. Environmental Protection Agency. (2000). *Geometries and Characteristics of Public Water Systems*. (EPA-815-R-00-24).

U.S. Environmental Protection Agency. (2002). *Hepatocellular hypertrophy. HED guidance document #G2002.01*.

U.S. Environmental Protection Agency. (2004). *The Standardized Monitoring Framework: A Quick Reference Guide*. (EPA-816-F-04-010). Retrieved from https://www.epa.gov/sites/default/files/2020-05/documents/smf_2020_final_508.pdf

U.S. Environmental Protection Agency. (2005a). *Drinking Water Criteria Document for Brominated Trihalomethanes*. (EPA-822-R-05-011).

U.S. Environmental Protection Agency. (2005b). *Economic Analysis for the Final Stage 2 Disinfectants and Disinfection Byproducts Rule*. (EPA 815-R-05-010).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

U.S. Environmental Protection Agency. (2005c). *Guidelines for Carcinogen Risk Assessment.* Washington, D.C. Retrieved from https://www3.epa.gov/airtoxics/cancer_guidelines_final_3-25-05.pdf

U.S. Environmental Protection Agency. (2006a). *National Primary Drinking Water Regulations: Long Term 2 Enhanced Surface Water Treatment Rule; Final Rule, EPA 815-Z-06-001.* (EPA 815-Z-06-001).

U.S. Environmental Protection Agency. (2006b). *National Primary Drinking Water Regulations: Stage 2 Disinfectants and Disinfection Byproducts Rule; Final Rule. 71 FR 388.* Retrieved from https://www.federalregister.gov/documents/2006/01/04/06-3/national-primary-drinking-water-regulations-stage-2-disinfectants-and-disinfection-byproducts-rule

U.S. Environmental Protection Agency. (2007a). *Atrazine Chemical Summary.* *https://archive.epa.gov/region5/teach/web/pdf/atrazine_summary.pdf*.

U.S. Environmental Protection Agency. (2007b). Office Ground Water and Drinking Water's Error Code Tracking Tool [for SDWIS/Fed]. *Developed 2007.*

U.S. Environmental Protection Agency. (2008). *Final Ozone NAAQS Regulatory Impact Analysis*. (EPA-452/R-08-003). Research Triangle Park, North Carolina Retrieved from https://www3.epa.gov/ttn/ecas/docs/ria/naaqs-o3_ria_final_2008-03.pdf

U.S. Environmental Protection Agency. (2009). *Community Water System Survey, Volume II: Detailed Tables and Survey Methodology. EPA 815-R-09-002.* Retrieved from http://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1009USA.txt

U.S. Environmental Protection Agency. (2010a). *Guidelines for Preparing Economic Analyses*.

Paperwork Reduction Act, as amended. 44 USC 3501–44 USC 3521. Available at https://www.gpo.gov/fdsys/pkg/USCODE-2015-title44/pdf/USCODE-2015-title44-chap35-subchapI-sec3501.pdf,  (2010b).

U.S. Environmental Protection Agency. (2011a). *The Benefits and Costs of the Clean Air Act from 1990 to 2020. Final Report - Rev. A.* Retrieved from https://www.epa.gov/sites/default/files/2015-07/documents/fullreport_rev_a.pdf

U.S. Environmental Protection Agency. (2011b). *Exposure Factors Handbook, 2011 Edition (Final).* (EPA-600-R-09-025F). U.S. Environmental Protection Agency, Washington, DC

U.S. Environmental Protection Agency. (2012). *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems; Final Rule*. Federal Register Retrieved from https://www.federalregister.gov/documents/2012/05/02/2012-9978/revisions-to-the-unregulated-contaminant-monitoring-regulation-ucmr-3-for-public-water-systems

U.S. Environmental Protection Agency. (2014). *Dichloromethane Technical Fact Sheet.* *https://archive.epa.gov/water/archive/web/pdf/archived-technical-fact-sheet-on-dichloromethane.pdf*.

U.S. Environmental Protection Agency. (2015). *Benefit and Cost Analysis for the Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category*. (EPA-821-R-15-005). US EPA, Office of Water, Washington DC 20460

U.S. Environmental Protection Agency. (2016a). *The Data Management and Quality Assurance/Quality Control Process for the Third Six-Year Review Information Collection Rule Dataset*. (EPA 810-R-16-015).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

U.S. Environmental Protection Agency. (2016b). *Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)*. (EPA822-R-16-004).

U.S. Environmental Protection Agency. (2016c). *Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)*. (EPA 822-R-16-005).

U.S. Environmental Protection Agency. (2016d). *Fact Sheet: PFOA& PFOS Drinking Water Health Advisories*. (EPA 800-F-16-003). Retrieved from https://www.epa.gov/sites/default/files/2016-06/documents/drinkingwaterhealthadvisories_pfoa_pfos_updated_5.31.16.pdf

U.S. Environmental Protection Agency. (2016e). *Health effects support document for Perfluorooctane Sulfonate (PFOS)*. (EPA 822-R-16-002). Retrieved from https://www.epa.gov/sites/production/files/2016-05/documents/pfos_hesd_final_508.pdf

U.S. Environmental Protection Agency. (2016f). *Health effects support document for Perfluorooctanoic Acid (PFOA)*. (EPA 822-R-16-003). Retrieved from https://www.epa.gov/sites/production/files/2016-05/documents/pfoa_hesd_final-plain.pdf

U.S. Environmental Protection Agency. (2016g). *Six-Year Review 3 Technical Support Document for Disinfectants/Disinfection Byproducts Rules*. (EPA-810-R-16-012). Retrieved from https://www.epa.gov/sites/production/files/2016-12/documents/810r16012.pdf

U.S. Environmental Protection Agency. (2016h). *Technical Guidance for Assessing Environmental Justice in Regulatory Analysis*. Retrieved from https://www.epa.gov/sites/default/files/2016-06/documents/ejtg_5_6_16_v5.1.pdf

U.S. Environmental Protection Agency. (2016i). *Technologies for Legionella Control in Premise Plumbing Systems: Scientific Literature Review. EPA 810-R-16-001*.

U.S. Environmental Protection Agency. (2016j). *Third Six-Year Review of National Primary Drinking Water Standards*. Retrieved from https://www.epa.gov/sites/default/files/2016-12/documents/six_year_3_review_frn_12-21-16.pdf

U.S. Environmental Protection Agency. (2017). *Third Unregulated Contaminant Monitoring Rule: Occurrence Data*. Retrieved from https://www.epa.gov/dwucmr/occurrence-data-unregulated-contaminant-monitoring-rule#3

U.S. Environmental Protection Agency. (2018). *Method 537.1: Determination of Selected Per- and Polyfluorinated Alkyl Substances in Drinking Water by Solid Phase Extraction and Liquid Chromatography/Tandem Mass Spectrometry (LC/MS/MS), Version 1.0*. (EPA/600/R-18/352). Retrieved from https://cfpub.epa.gov/si/si_public_record_Report.cfm?dirEntryId=343042&Lab=NERL

U.S. Environmental Protection Agency. (2019a). EJSCREEN Technical Documentation.

U.S. Environmental Protection Agency. (2019b). *Method 533: Determination of Per- and Polyfluoroalkyl Substances in Drinking Water by Isotope Dilution Anion Exchange Solid Phase Extraction and Liquid Chromatography/Tandem Mass Spectrometry*. (EPA 815-B-19-020). Retrieved from https://www.epa.gov/sites/default/files/2019-12/documents/method-533-815b19020.pdf

U.S. Environmental Protection Agency. (2019c). *Occurrence Data from the Third Unregulated Contaminant Monitoring Rule (UCMR 3)*. Retrieved from https://www.epa.gov/dwucmr/occurrence-data-unregulated-contaminant-monitoring-rule#3

U.S. Environmental Protection Agency. (2019d). Supplemental Environmental Assessment for Proposed Revisions to Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category (EA). EPA-821-R-19-010.

U.S. Environmental Protection Agency. (2020a). *Announcement of Preliminary Regulatory Determinations for Contaminants on the Fourth Drinking Water Contaminant Candidate List. EPA-HQ-OW-2019-0583 FRL-10005-88-OW. 85 FR 14098.* Retrieved from https://www.federalregister.gov/documents/2020/03/10/2020-04145/announcement-of-preliminary-regulatory-determinations-for-contaminants-on-the-fourth-drinking-water

U.S. Environmental Protection Agency. (2020b). *Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances.* Washington, D.C. Retrieved from https://www.epa.gov/system/files/documents/2021-11/epa-hq-olem-2020-0527-0002_content.pdf

U.S. Environmental Protection Agency. (2020c). *Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances. EPA-HQ-OLEM-2020-0527-0002.* Retrieved from https://www.epa.gov/system/files/documents/2021-11/epa-hq-olem-2020-0527-0002_content.pdf

U.S. Environmental Protection Agency. (2021a). *Analysis of Cardiovascular Disease Risk Reduction as a Result of Reduced PFOA and PFOS Exposure in Drinking Water*. (EPA 815-D-21-001). Retrieved from https://sab.epa.gov/ords/sab/f?p=100:19:9687145615924:::RP,19:P19_ID:963

U.S. Environmental Protection Agency. (2021b). *Announcement of Final Regulatory Determinations for Contaminants on the Fourth Drinking Water Contaminant Candidate List*. (86 FR 12272). Retrieved from https://www.federalregister.gov/documents/2021/03/03/2021-04184/announcement-of-final-regulatory-determinations-for-contaminants-on-the-fourth-drinking-water

U.S. Environmental Protection Agency. (2021c). *Human Health Toxicity Values for Hexafluoropropylene Oxide (HFPO) Dimer Acid and Its Ammonium Salt (CASRN 13252-13-6 and CASRN 62037-80-3) Also Known as "GenX Chemicals". EPA-8232-PR-1821-001010.* Retrieved from https://www.epa.gov/system/files/documents/2021-10/genx-chemicals-toxicity-assessment_tech-edited_oct-21-508.pdf

U.S. Environmental Protection Agency. (2021d). *Human Health Toxicity Values for Perfluorobutane Sulfonic Acid (CASRN 375-73-5) and Related Compound Potassium Perfluorobutane Sulfonate (CASRN 29420-49-3). EPA/600/R-20/345F.* Washington, DC

U.S. Environmental Protection Agency. (2021e). *PFAS Strategic Roadmap: EPA's Commitments to Action 2021–2024*. (EPA-100-K-21-002).

U.S. Environmental Protection Agency. (2021f). *Proposed Approaches to the Derivation of a Draft Maximum Contaminant Level Goal for Perfluorooctane Sulfonic Acid (PFOS) (CASRN 1763-23-1) in Drinking Water*. (EPA 822D21002).

U.S. Environmental Protection Agency. (2021g). *Proposed Approaches to the Derivation of a Draft Maximum Contaminant Level Goal for Perfluorooctanoic Acid (PFOA) (CASRN 335-67-1) in Drinking Water*. (EPA 822D21001). Washington, DC

U.S. Environmental Protection Agency. (2021h). *Safe Drinking Water Information System 2021 Quarter 4 Database*. Retrieved from https://www.epa.gov/ground-water-and-drinking-water/safe-drinking-water-information-system-sdwis-federal-reporting

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FINAL RULE                                                                APRIL 2024

U.S. Environmental Protection Agency. (2022a). *2022 EJSCREENBatch R package*. Retrieved from: https://github.com/USEPA/EJSCREENBatch.

U.S. Environmental Protection Agency. (2022b). *Comprehensive Environmental Response, Compensation, and Liability Act Hazardous Substances: Designation of Perfluorooctanoic Acid and Perfluorooctanesulfonic Acid. EPA-HQ-OLEM-2019-0341-0001.* Washington, D.C. Retrieved from https://www.regulations.gov/document/EPA-HQ-OLEM-2019-0341-0001

U.S. Environmental Protection Agency. (2022c). *The Fourth Unregulated Contaminant Monitoring Rule Occurrence Data. Office of Ground Water and Drinking Water. January 2022.* Retrieved from https://www.epa.gov/dwucmr/occurrence-data-unregulated-contaminant-monitoring-rule#4

U.S. Environmental Protection Agency. (2022d). *Implementation of the Clean Water and Drinking Water State Revolving Fund Provisions of the Bipartisan Infrastructure Law.* Retrieved from https://www.epa.gov/dwsrf/bipartisan-infrastructure-law-srf-memorandum

U.S. Environmental Protection Agency. (2022e). *IRIS Toxicological Review of Perfluorobutanoic Acid (PFBA) and Related Salts (Final Report, 2022). EPA/635/R-22/277F.* Retrieved from https://www.epa.gov/chemical-research/iris-toxicological-review-perfluorobutanoic-acid-pfba-and-related-salts-final

U.S. Environmental Protection Agency. (2022f). *Microbial and Disinfection Byproduct Data Files (2012-2019) from EPA's Fourth Six-Year Review Information Collection Request.* Retrieved from https://www.epa.gov/dwsixyearreview/microbial-and-disinfection-byproduct-data-files-2012-2019-epas-fourth-six-year

U.S. Environmental Protection Agency. (2022g). *ORD staff handbook for developing IRIS assessments [EPA Report]. (EPA 600/R-22/268). Washington, DC: U.S. Environmental Protection Agency, Office of Research and Development, Center for Public Health and Environmental Assessment.*

U.S. Environmental Protection Agency. (2022h). *PFAS Explained.* Retrieved from https://www.epa.gov/pfas/pfas-explained

U.S. Environmental Protection Agency. (2022i). *Review of EPA's Analyses to Support EPA's National Primary Drinking Water Rulemaking for PFAS. EPA-SAB-22-008.* Washington, D.C. Retrieved from https://sab.epa.gov/ords/sab/f?p=100:18:16490947993:::RP,18:P18_ID:2601#report

U.S. Environmental Protection Agency. (2022j). SAB PFAS Review Panel meeting. Retrieved from https://sab.epa.gov/ords/sab/f?p=100:19:7661444876021:::19:P19_ID:963#charge

U.S. Environmental Protection Agency. (2023a). Documentation for Post-IRA 2022 Reference Case.

U.S. Environmental Protection Agency. (2023b). *EPA Response to Letter of Peer Review for Disinfectant Byproduct Reduction as a Result of Granular Activated Carbon Treatment for PFOA and PFOS in Drinking Water: Benefits Analysis Related to Bladder Cancer.* Retrieved from EPA-815-B23-001

U.S. Environmental Protection Agency. (2023c). *Inventory of U.S. Greenhouse Gas Emissions and Sinks 1990-2021.* Retrieved from https://www.epa.gov/system/files/documents/2023-04/US-GHG-Inventory-2023-Main-Text.pdf

U.S. Environmental Protection Agency. (2023d). *IRIS Toxicological Review of Perfluorohexanoic Acid [PFHxA, CASRN 307-24-4] and Related Salts.* (EPA/635/R-

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

23/027Fa).  Retrieved from
https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0704tr.pdf

U.S. Environmental Protection Agency. (2023e). Power Sector Modeling.

U.S. Environmental Protection Agency. (2023f). Regulatory Impact Analyses for Air Pollution Regulations.

U.S. Environmental Protection Agency. (2023g). *Regulatory Impact Analysis for Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*. Washington, D.C. Retrieved from https://www.epa.gov/system/files/documents/2023-12/eo12866_oil-and-gas-nsps-eg-climate-review-2060-av16-ria-20231130.pdf

U.S. Environmental Protection Agency. (2023h). *Supplementary Material for the Regulatory Impact Analysis for the Final Rulemaking, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review": EPA Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances*. Washington, D.C. Retrieved from https://www.epa.gov/system/files/documents/2023-12/epa_scghg_2023_report_final.pdf

U.S. Environmental Protection Agency. (2023i). *Work Breakdown Structure-Based Cost Model for Granular Activated Carbon Drinking Water Treatment. EPA-822-P-23-012.* Retrieved from https://www.epa.gov/system/files/documents/2022-03/gac-documentation-.pdf_0.pdf

U.S. Environmental Protection Agency. (2023j). *Work Breakdown Structure-Based Cost Model for Ion Exchange Treatment of Per- and Polyfluoroalkyl Substances (PFAS) in Drinking Water. EPA-822-P-23-013.*

U.S. Environmental Protection Agency. (2023k). *Work Breakdown Structure-Based Cost Model for Nontreatment Options for Drinking Water Compliance. EPA-822-P-23-014.* Retrieved from https://www.epa.gov/sites/default/files/2019-07/documents/wbs-nontreatment-documentation-june-2019.pdf

U.S. Environmental Protection Agency. (2023l). *Work Breakdown Structure-Based Cost Model for Reverse Osmosis/Nanofiltration Drinking Water Treatment. EPA-822-P-23-015.*

U.S. Environmental Protection Agency. (2024a). *Appendix - Office of Water Final Human Health Toxicity Assessment for Perfluorooctane Sulfonic Acid (PFOS). EPA-815-R-24-007.* Washington, D.C.

U.S. Environmental Protection Agency. (2024b). *Appendix - Office of Water Final Human Health Toxicity Assessment for Perfluorooctanoic Acid (PFOA). EPA-815-R-24-006.* Washington, D.C.

U.S. Environmental Protection Agency. (2024c). *Best Available Technologies and Small System Compliance Technologies for Per- and Polyfluoroalkyl Substances (PFAS) in Drinking Water. EPA-815-R-24-011.*

U.S. Environmental Protection Agency. (2024d). *Framework for Estimating Noncancer Health Risks Associated with Mixtures of Per- and Polyfluoroalkyl Substances (PFAS). EPA-815-R-24-003.* Washington, D.C.

U.S. Environmental Protection Agency. (2024e). *Office of Water Final Human Health Toxicity Assessment for Perfluorooctane Sulfonic Acid (PFOS). EPA-815-R-24-009.* Washington, D.C.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

U.S. Environmental Protection Agency. (2024f). *Office of Water Final Human Health Toxicity Assessment for Perfluorooctanoic Acid (PFOA). EPA-815-R-24-008.* Washington, D.C.

U.S. Environmental Protection Agency. (2024g). Per- and Polyfluoroalkyl Substances (PFAS) Occurrence & Contaminant Background Support Document for the Final PFAS National Primary Drinking Water Regulation. EPA-815-R-24-013.

U.S. Environmental Protection Agency. (2024h). *PFAS National Primary Drinking Water Regulation Rulemaking Federal Register Notice*.  Retrieved from https://www.govinfo.gov/content/pkg/FR-2023-03-29/pdf/2023-05471.pdf

U.S. Environmental Protection Agency. (2024i). *Technical Support Document - Technologies and Cost for Removing Per- and Polyfluoroalkyl Substances (PFAS) from Drinking Water. EPA-815-R-24-012.*

U.S. Food and Drug Administration. (2022). *Bottled Water Everywhere: Keeping it Safe*. Retrieved from https://www.fda.gov/consumers/consumer-updates/bottled-water-everywhere-keeping-it-safe

U.S. Office of Management and Budget. (2003). *Circular A-4: Regulatory Analysis*. Washington, DC: OMB

U.S. Office of Management and Budget. (2023). *Circular A-4: Regulatory Analysis*. Washington, DC: OMB Retrieved from https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf

Uche, U. I., Evans, S., Rundquist, S., Campbell, C., & Naidenko, O. V. (2021). Community-Level Analysis of Drinking Water Data Highlights the Importance of Drinking Water Metrics for the State, Federal Environmental Health Justice Priorities in the United States. *International journal of environmental research and public health, 18*(19), 10401.

Ullah, M., Moin, A. T., Araf, Y., Bhuiyan, A. R., Griffiths, M. D., & Gozal, D. (2020). Potential effects of the COVID-19 pandemic on future birth rate. *Frontiers in public health, 8*, 893.

Unfunded Mandates Reform Act of 1995. Public Law 104-4. 110 Stat. 48. 104th Congress. Available at https://www.gpo.gov/fdsys/pkg/PLAW-104publ4/pdf/PLAW-104publ4.pdf., (1995).

United States Energy Information Administration. (2023). *Electricity Explained: Use of Electricity*. Retrieved from https://www.eia.gov/energyexplained/electricity/use-of-electricity.php

Valvi, D., Oulhote, Y., Weihe, P., Dalgård, C., Bjerve, K. S., Steuerwald, U., & Grandjean, P. (2017). Gestational diabetes and offspring birth size at elevated environmental pollutant exposures. *Environment international, 107*, 205-215.

Vélez, M., Arbuckle, T., & Fraser, W. (2015). Maternal exposure to perfluorinated chemicals and reduced fecundity: the MIREC study. *Human reproduction, 30*(3), 701-709.

Velten, S., Hammes, F., Boller, M., & Egli, T. (2007). Rapid and direct estimation of active biomass on granular activated carbon through adenosine tri-phosphate (ATP) determination. *Water research, 41*(9), 1973-1983.

Verner, M. A., Loccisano, A. E., Morken, N. H., Yoon, M., Wu, H., McDougall, R., . . . Longnecker, M. P. (2015). Associations of Perfluoroalkyl Substances (PFAS) with Lower Birth Weight: An Evaluation of Potential Confounding by Glomerular Filtration Rate Using a Physiologically Based Pharmacokinetic Model (PBPK). *Environmental health perspectives, 123*(12), 1317-1324. doi:10.1289/ehp.1408837

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Vieira, V. M., Hoffman, K., Shin, H., Weinberg, J. M., Webster, T. F., & Fletcher, T. (2013). Perfluorooctanoic acid exposure and cancer outcomes in a contaminated community: A geographic analysis. *Environmental health perspectives, 121*(3), 318-323.

Vieux, F., Maillot, M., Rehm, C. D., Barrios, P., & Drewnowski, A. (2020). Trends in tap and bottled water consumption among children and adults in the United States: analyses of NHANES 2011–16 data. *Nutrition Journal, 19*(1), 10. doi:10.1186/s12937-020-0523-6

Villanueva, C. M., Cantor, K. P., Cordier, S., Jaakkola, J. J. K., King, W. D., Lynch, C. F., . . . Kogevinas, M. (2004). Disinfection byproducts and bladder cancer: a pooled analysis. *Epidemiology, 15*(3), 357-367.

Villanueva, C. M., Cantor, K. P., King, W. D., Jaakkola, J. J., Cordier, S., Lynch, C. F., . . . Kogevinas, M. (2006). Total and specific fluid consumption as determinants of bladder cancer risk. *International Journal of Cancer, 118*(8), 2040–2047. doi:https://doi.org/10.1002/ijc.21587

Villanueva, C. M., Fernández, F., Malats, N., Grimalt, J. O., & Kogevinas, M. (2003). Meta-analysis of studies on individual consumption of chlorinated drinking water and bladder cancer. *J Epidemiol Community Health, 57*(3), 166-173. doi:10.1136/jech.57.3.166

Wang, L., Vacs Renwick, D., & Regli, S. (2019). Re-assessing effects of bromide and granular activated carbon on disinfection byproduct formation. *AWWA Water Science, 1*(4), e1147. doi:https://doi.org/10.1002/aws2.1147

Wang, Y., Adgent, M., Su, P.-H., Chen, H.-Y., Chen, P.-C., Hsiung, C. A., & Wang, S.-L. (2016). Prenatal exposure to perfluorocarboxylic acids (PFCAs) and fetal and postnatal growth in the Taiwan Maternal and Infant Cohort Study. *Environmental Health Perspectives, 124*(11), 1794-1800.

Water Research Foundation. (2016). *Residential End Uses of Water, Version 2: Executive Report*. Retrieved from https://www.circleofblue.org/wp-content/uploads/2016/04/WRF_REU2016.pdf

Waterfield, G., Rogers, M., Grandjean, P., Auffhammer, M., & Sunding, D. (2020). Reducing exposure to high levels of perfluorinated compounds in drinking water improves reproductive outcomes: evidence from an intervention in Minnesota. *Environmental Health, 19*, 1-11.

Weisman, R. J., Heinrich, A., Letkiewicz, F., Messner, M., Studer, K., Wang, L., & Regli, S. (2022). Estimating national exposures and potential bladder cancer cases associated with chlorination DBPs in US drinking water. *Environmental Health Perspectives, 130*(8), 087002. doi:https://doi.org/10.1289/EHP9985

Whelton, P. K., Carey, R. M., Aronow, W. S., Casey, D. E., Collins, K. J., Dennison Himmelfarb, C., . . . Jones, D. W. (2018). 2017 ACC/AHA/AAPA/ABC/ACPM/AGS/APhA/ASH/ASPC/NMA/PCNA guideline for the prevention, detection, evaluation, and management of high blood pressure in adults: a report of the American College of Cardiology/American Heart Association Task Force on Clinical Practice Guidelines. *Journal of the American College of Cardiology, 71*(19), e127-e248.

Widefield Water and Sanitation District. (2018). *From Pilot to Full-Scale: A Case Study for the Treatment of Perfluorinated Compounds (PFCs) with Ion Exchange*. Paper presented at the AWWA Water Quality Technology Conference, Toronto, Ontario, Canada.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Wikström, S., Lin, P.-I., Lindh, C. H., Shu, H., & Bornehag, C.-G. (2020). Maternal serum levels of perfluoroalkyl substances in early pregnancy and offspring birth weight. *Pediatric research, 87*(6), 1093-1099. doi:10.1038/s41390-019-0720-1

Wikström, S., Lindh, C. H., Shu, H., & Bornehag, C.-G. (2019). Early pregnancy serum levels of perfluoroalkyl substances and risk of preeclampsia in Swedish women. *Scientific reports, 9*(1), 1-7.

Wilder, L., Worley, R., & Breysse, P. (2017). DIRECT FROM ATSDR: Community Exposures to Per-and Polyfluoroalkyl Substances in Drinking Water: A National Issue. *Journal of Environmental Health, 80*(2), 38-41.

Williams, O. (1989). The Atherosclerosis Risk in Communities (ARIC) study-design and objectives. *American journal of epidemiology, 129*(4), 687-702.

Windham, G., & Fenster, L. (2008). Environmental contaminants and pregnancy outcomes. *Fertility and sterility, 89*(2), e111-e116.

Wright, J., Larsen, A., Rappazzo, K., Ru, H., Radke, E., & Bateson, T. (2023). Systematic review and meta-analysis of birthweight and PFNA exposures. *Environmental research*, 115357.

Yang, Q., Guo, X., Sun, P., Chen, Y., Zhang, W., & Gao, A. (2018). Association of serum levels of perfluoroalkyl substances (PFASs) with the metabolic syndrome (MetS) in Chinese male adults: A cross–sectional study. *Science of the total environment, 621*, 1542-1549. doi:10.1016/j.scitotenv.2017.10.074

Yao, Q., Gao, Y., Zhang, Y., Qin, K., Liew, Z., & Tian, Y. (2021). Associations of paternal and maternal per-and polyfluoroalkyl substances exposure with cord serum reproductive hormones, placental steroidogenic enzyme and birth weight. *Chemosphere, 285*, 131521.

Yapsakli, K., & Çeçen, F. (2010). Effect of type of granular activated carbon on DOC biodegradation in biological activated carbon filters. *Process Biochemistry, 45*(3), 355-362. doi:https://doi.org/10.1016/j.procbio.2009.10.005

Yin, X., Di, T., Cao, X., Liu, Z., Xie, J., & Zhang, S. (2021). Chronic exposure to perfluorohexane sulfonate leads to a reproduction deficit by suppressing hypothalamic kisspeptin expression in mice. *Journal of Ovarian Research, 14*, 1-13.

Yu, J., Lv, L., Lan, P., Zhang, S., Pan, B., & Zhang, W. (2012). Effect of effluent organic matter on the adsorption of perfluorinated compounds onto activated carbon. *Journal of hazardous materials, 225*, 99-106.

Yuan, J., Passeport, E., & Hofmann, R. (2022). Understanding adsorption and biodegradation in granular activated carbon for drinking water treatment: A critical review. *Water research, 210*, 118026. doi:https://doi.org/10.1016/j.watres.2021.118026

Zachman, B. A., & Summers, R. S. (2010). Modeling TOC breakthrough in granular activated carbon adsorbers. *Journal of Environmental Engineering, 136*(2), 204-210.

Zaggia, A., Conte, L., Falletti, L., Fant, M., & Chiorboli, A. (2016). Use of strong anion exchange resins for the removal of perfluoroalkylated substances from contaminated drinking water in batch and continuous pilot plants. *Water research, 91*, 137-146.

Zahm, S., Bonde, J. P., Chiu, W. A., Hoppin, J., Kanno, J., Abdallah, M., . . . Dorman, D. C. (2024). Carcinogenicity of perfluorooctanoic acid and perfluorooctanesulfonic acid. *The Lancet Oncology, 25*(1), 16-17.

Zhang, Y., Vittinghoff, E., Pletcher, M. J., Allen, N. B., Zeki Al Hazzouri, A., Yaffe, K., . . . Ives, D. G. (2019). Associations of Blood Pressure and Cholesterol Levels During Young

Adulthood with Later Cardiovascular Events. *Journal of the American College of Cardiology, 74*(3), 330-341.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# Exhibit 5

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF RICHLAND

THE STATE OF SOUTH CAROLINA, *ex. rel.* Alan M. Wilson, in his official capacity as Attorney General of the State of South Carolina,

        Plaintiff,

        vs.

3M COMPANY; EIDP, INC., *f/k/a* E.I. DUPONT DE NEMOURS AND COMPANY ("Old DuPont"); THE CHEMOURS COMPANY ("Chemours"); THE CHEMOURS COMPANY FC, LLC ("Chemours FC"); CORTEVA, INC. ("Corteva"); and DUPONT DE NEMOURS, INC. ("New DuPont"),

        Defendants.

IN THE COURT OF COMMON PLEAS

FIFTH JUDICIAL CIRCUIT

Civil Action No.: 2023-CP-40-04111

**ORDER**

The matters before the Court are Defendants' Motions to Dismiss the Complaint filed by the State of South Carolina, by and through its Attorney General Alan M. Wilson ("Plaintiff" or the "State"). Defendant 3M Company ("3M") filed its Motion to Dismiss on May 1, 2024, and Defendants EIDP, Inc., The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours Inc. (collectively, "DuPont") joined in a separate Motion to Dismiss, which was also filed May 1, 2024. The parties fully briefed the Defendants' Motions, and the Court held a hearing on July 2, 2024. The Court has carefully considered the Motions to Dismiss and the related briefing, the arguments of the parties offered during the hearing, and the relevant law. For the reasons set forth below, the Court **DENIES** Defendants' Motions to Dismiss.

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**BACKGROUND**

In this action, the State seeks to recover for contamination to South Carolina's natural resources and property caused by per- and polyfluoroalkyl substances ("PFAS"). Comp. ¶ 1. The State alleges Defendants are manufacturers, marketers, distributors, sellers, and/or promoters of PFAS and PFAS-containing products. *Id.* ¶ 27. The State asserts that Defendants proximately caused the contamination at issue by, *inter alia*, purposely sending PFAS chemical products into South Carolina while misleading the public about the toxic and dangerous properties of these chemicals. *See, e.g.*, *id.* ¶ 8.

Importantly, Plaintiff's instant lawsuit addresses contamination caused by PFAS products separate and apart from aqueous film-forming foam ("AFFF"), a firefighting material that contains PFAS. *Id.* ¶¶ 20-21. The State has specifically disclaimed any relief for AFFF-related contamination in this action: "PFAS as defined in this Complaint expressly excludes [AFFF] . . . . The State is not seeking to recover through this Complaint any relief for contamination or injury related to AFFF or AFFF products used at airports, military bases, or certain industrial locations." *Id.* ¶ 20. After filing this case, the State filed a separate action expressly seeking recovery for PFAS contamination caused by AFFF products ("AFFF Litigation").

In this case, therefore, Plaintiff seeks damages for PFAS contamination caused by an array of chemical products used in consumer goods sold and consumed in the State of South Carolina, including food packaging, non-stick cookware, and stain resistant upholstery. *Id.* ¶ 4. The State asserts causes of action against Defendants for public nuisance, private nuisance, trespass, and violation of the South Carolina Unfair Trade Practices Act. *Id.* at pp. 35-42.

2

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## ANALYSIS

In their Motions to Dismiss, both 3M and DuPont raise arguments under Rules 12(b)(6) and 12(b)(8) of the South Carolina Rules of Civil Procedure. Defendants contend the State fails to allege facts sufficient to support any of its causes of action. Defendants further argue this action must be dismissed because there is another action pending between the same parties for the same claim. 3M also seeks dismissal under Rule 12(b)(1), SCRCP, claiming Plaintiff lacks standing to maintain this action. Finally, DuPont argues the Complaint should be dismissed pursuant to Rule 12(b)(7), SCRCP, because Plaintiff has failed to join necessary parties. The Court will address each argument in turn.

### I. Rule 12(b)(6)

#### A. Legal Standard

Under Rule 12(b)(6), SCRCP, a defendant may move to dismiss based on a failure to state facts sufficient to constitute a cause of action. However, "[a] motion to dismiss under Rule 12(b)(6) should not be granted if facts alleged and inferences reasonably deducible therefrom would entitle the plaintiff to relief on any theory of the case." *Flateau v. Harrelson*, 355 S.C. 197, 202, 584 S.E.2d 413, 416 (Ct. App. 2003). In deciding whether to grant a motion to dismiss, the court should view the complaint "in the light most favorable to the plaintiff," *id.*, and the court "must presume all well-pled facts to be true." *Gressette v. S.C. Elec. and Gas Co.*, 370 S.C. 377, 378-79, 635 S.E.2d 538, 538 (2006).

#### B. Plaintiff has Sufficiently Supported Each of its Causes of Action.

##### 1. Nuisance and Trespass

Defendants raise several arguments in support of their position that Plaintiff's Complaint fails to state proper claims for nuisance and trespass. Defendants contend (i) Plaintiff's nuisance

3

and trespass claims fail because the State has not adequately pled causation; (ii) Plaintiff's nuisance and trespass claims fail because the State has not demonstrated that it holds exclusive possession of the property at issue; (iii) Plaintiff's nuisance claim fails because Plaintiff has not adequately alleged that Defendants controlled the property that created the nuisance; and (iv) Plaintiff's trespass claim fails because the State has not alleged a "tangible" invasion upon its property.

The Court finds the Complaint states facts sufficient to support the nuisance and trespass causes of action. First, Plaintiff has sufficiently pled causation to overcome dismissal at this stage. The State alleges that 3M and DuPont produced both PFAS compounds and consumer products containing PFAS. Comp. ¶¶ 46-49, 53-55, 79-85. The State further alleges throughout the Complaint that Defendants' products caused widespread contamination of the State's natural resources and property. *See, e.g., id.* ¶¶ 8, 27, 78, 105, 114, 142, 174, 184, 191. Although Defendants claim these allegations are "conclusory" and insufficient, the State has supported them with particularized allegations of fact. *See Skywaves I Corp. v. Branch Banking & Tr. Co.*, 423 S.C. 432, 455 n.9, 814 S.E.2d 643, 656 n.9 (Ct. App. 2018). For example, the Complaint identifies areas in the State that have been contaminated by the PFAS compounds PFOS and PFHxs, which only 3M manufactured, and PFOA, which only 3M and DuPont manufactured. Comp. ¶¶ 47, 55, 84, 136-37. Viewing the Complaint as a whole and in the light most favorable to Plaintiff, the State has adequately pled causation.

Next, the Court finds Plaintiff has alleged an adequate possessory interest in the natural resources and property at issue to support its nuisance and trespass claims. Defendants attach great significance to Plaintiff's status as "trustee" of State natural resources, claiming Plaintiff's lack of exclusive possession over these resources is fatal to its claims. The Court disagrees. "The public trust doctrine provides that lands below the high water mark are presumptively owned by the State

4

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and held in trust for the benefit of the public." *Hoyler v. State*, 428 S.C. 279, 291, 833 S.E.2d 845, 851 (Ct. App. 2019). "The doctrine rightfully forbids the State from permitting activity substantially impairing the public interest in marine life, water quality, or public access." *Id.* at 291, 833 S.E.2d at 851-52. Allowing Plaintiff to maintain nuisance and trespass claims in response to contamination of State natural resources serves the purposes of the public trust doctrine. Moreover, Plaintiff's status as trustee does not render it incapable of asserting these claims. *See* Restatement (Second) of Trusts § 280 ("The trustee can maintain such actions at law or suits in equity or other proceedings against a third person as he could maintain if he held the trust property free of trust."). Accordingly, Plaintiff's status as trustee over a portion of the natural resources and property at issue in this case does not bar Plaintiff's nuisance and trespass claims at this stage of the litigation.

The Court also rejects Defendants' argument that they lacked the requisite level of "control" over the contaminants to be held liable for nuisance. At this stage, the allegations supporting the nuisance claim are sufficient to withstand dismissal. Although Defendants contend the Complaint fails to establish that Defendants had control over the property at the time of the alleged nuisance and reference *Clark v. Greenville Cnty.*, 313 S.C. 205, 210, 437 S.E.2d 117, 119 (1993), when the facts are viewed in the light most favorable to the State, Plaintiff has sufficiently alleged control. Specifically, Plaintiff has alleged that Defendants had prior experience with other PFAS releases and knew or should have known that their PFAS products would enter the environment through their intended and foreseeable uses. Comp. ¶ 174 (alleging that Defendants knew PFAS "would escape from industrial processes and household, consumer, and commercial products and contaminate State natural resources and property"); Comp. ¶ 175 (alleging that Defendants had "first-hand knowledge and experience regarding releases of PFAS to the

5

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

environment, including groundwater and other natural resources"). The Complaint's allegations and the inferences which can be drawn therefrom include a knowledge of not only foreseeability but an inevitability of the release of the chemical products into the environment and the contamination of the State's natural resources and property, as such, the State's nuisance claim is plausible.

Finally, the Court finds Plaintiff's trespass claim is sufficiently pled to survive dismissal. The Court finds that state has the requisite possessory interest to maintain an action for trespass, not only for the lands it exclusively owns, which does not seem contested, but also for the natural resources of the state. See *Georgia v. Tenn. Copper Co.,* 206 U.S. 230, 237, 27 S.Ct. 618, 51 L.Ed. 1038 1907, ("the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain."). See Also *Rhode Island v. Atl. Richfield Co.*, 357 F. Supp. 3d 129, 143-44 (D.R.I. 2018) citing inter alia *New Hampshire v. City of Dover,* 153 N.H. 181, 891 A.2d 524, 527, 530 (2006). Defendants contend PFAS contamination cannot give rise to a trespass action under the South Carolina Supreme Court's decision in *Babb v. Lee Cnty. Landfill*, 405 S.C. 129, 747 S.E.2d 468 (2013). With respect to trespass, the *Babb* Court held that South Carolina does not recognize a cause of action arising from "invisible odors," as South Carolina only recognizes "intrusions by physical, tangible things[.]" *Id.* at 152, 747 S.E.2d at 480. Here, Plaintiff's trespass claim does not stem from an invisible odor, but rather from identifiable and measurable amounts of a PFAS product resulting in contamination that the state alleges, unlike a temporal disturbance of odor or quickly dissipating particulate, persists in the environment and contaminates State natural resources and property "indefinitely." Comp. ¶¶ 63, 168. Viewing these allegations in the light most favorable to Plaintiff, the State has sufficiently supported its trespass claim by alleging a "tangible" invasion.

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### 2.  Unfair Trade Practices Act

Defendants also contend Plaintiff's Complaint fails to state a claim for violation of the South Carolina Unfair Trade Practices Act ("UTPA").  With respect to this cause of action, Defendants argue (i) Plaintiff fails to establish the requisite "potential for repetition"; (ii) Plaintiff's allegations do not relate to "business or consumer transactions"; and (iii) the UTPA claim is barred by the applicable statute of limitations.

Plaintiff's Complaint states a valid claim for violation of the UTPA.  "To be actionable under the UTPA, the unfair or deceptive act or practice must have an impact upon the public interest." *York v. Conway Ford, Inc.*, 325 S.C. 170, 173, 480 S.E.2d 726, 728 (1997).  Although a plaintiff may demonstrate an impact on the public interest by showing the deceptive acts occurred in the past or are capable of repetition, "[t]hese two ways are not the only means for showing the potential for repetition or public impact, and each case must be evaluated on its own merits to determine what plaintiff must show to satisfy the . . . public impact prong of the UTPA." *Wright v. Craft*, 372 S.C. 1, 30, 640 S.E.2d 486, 502 (Ct. App. 2006).  In this case, the State alleges widespread contamination to the State's natural resources and property caused by Defendants who knew of, and concealed, the dangers of PFAS.  Comp. ¶¶ 46-78, 105.  These allegations are sufficient to establish the impact on the public interest, particularly in light of the South Carolina Constitution's recognition that "the conservation of [the State's] natural resources are matters of public concern." S.C. Const. art. XII section 1.

Furthermore, Plaintiff has sufficiently alleged Defendants' unfair and deceptive acts took place in the course of "business or consumer transactions" to the extent required by the UTPA. The State has alleged that Defendants promoted consumer products containing PFAS while concealing the dangers those products presented to human health and the environment, thereby

7

leading to the contamination at issue.  Comp. ¶¶ 58, 86, 104.  Accordingly, the UTPA claim does not lack a connection to business or consumer activity.

Finally, the Court refuses to find Plaintiff's UTPA claim is time-barred at this stage. DuPont contends the State's claim is barred by the applicable three-year statute of limitations because it was filed in August 2023, over three years after the South Carolina Department of Health and Environmental Control began its investigation into PFAS contamination in drinking water in January 2020.  Here, however, the State has alleged Defendants' conduct "[has] contaminated and injured, ***and continue[s] to contaminate and injure***, the environment and natural resources of South Carolina, harmed South Carolina property, and placed South Carolina at risk."  Comp. ¶ 114 (emphasis supplied).  Plaintiff further alleged that Defendants "continue to cause PFAS to intrude into and contaminate and injure these natural resources and property."  Comp. ¶ 164.  The South Carolina Supreme Court has held that "the language of UTPA itself contemplates that an unlawful method, act, or practice may result in multiple statutory violations, and it is the violations themselves that cause the statute of limitations to begin to run."  *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms.*, 414 S.C. 33, 78-79, 777 S.E.2d 176, 200 (2015).  Because the State alleges continuing violations and harm, the Court rejects Defendants' statute of limitations argument.

## II.  Rule 12(b)(8)

### A.  Legal Standard

Under Rule 12(b)(8), SCRCP, dismissal is only proper where there is "(1) another action pending, (2) between the same parties, (3) for the same claim." *Capital City Ins. Co. v. BP Staff, Inc.*, 382 S.C. 92, 105, 674 S.E.2d 524, 531 (Ct. App. 2009). To obtain dismissal on such a motion, "identity of parties, causes of action and relief must be shown." Id. at 106, 674 S.E.2d at 531; *see*

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*also Poston v. Homes Ins. Co. of N.Y.*, 191 S.C. 314, 317-18, 4 S.E.2d 261, 262 (1939) ("[A]n action may be pleaded in abatement of a second suit only when between the same parties and in the same jurisdiction and with the same object.").

### B. Dismissal under Rule 12(b)(8) is Inappropriate.

Defendants argue Plaintiff's Complaint should be dismissed because the claims in this action are "substantially similar" to those raised by the State in the AFFF litigation. Defendants contend the two actions involve the same contamination, causes of action, and similar defendants. The Court disagrees, as this case does not raise the same claim as the AFFF Litigation for several reasons.

The State is pursuing different damages flowing from different uses of different products in the two separate actions. In this case, the State seeks to recover for damages caused by non-AFFF sources, e.g., products like food packaging, non-stick cookware, and stain repellant upholstery and carpeting. In the AFFF Litigation, the State expressly seeks damages for contamination caused only by firefighting foam products used to extinguish liquid fuel fires. Accordingly, because the AFFF Litigation relates to an entirely distinct set of contaminants, the defendants in the two cases are being sued in different capacities for different alleged wrongdoing. *See Cricket Cove Ventures, LLC v. Gilland*, 390 S.C. 312, 322, 701 S.E.2d 39, 44 (Ct. App. 2010). Of course, the Court also notes the AFFF Litigation also involves several defendants who are not parties to this action: Buckeye Fire Equipment Company, National Foam, Inc., and Tyco Fire Products LP.

Defendants previously removed this case, contending it related to Defendants' production of AFFF products for the United States military, thereby giving rise to federal officer jurisdiction. However, the United States District Court for the District of South Carolina rejected Defendants'

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

jurisdictional argument and remanded the case, determining this case lacks any nexus to Defendants' AFFF-related conduct because the State has disclaimed any relief for AFFF contamination. *In re Aqueous Film-Forming Foams Prod. Liab. Litig.*, No. 2:18-MN-2873-RMG, 2024 WL 1470056, at *3 (D.S.C. Feb. 29, 2024). The Court agrees with the District Court's sound reasoning, concludes the two actions are sufficiently distinct, and rejects Defendants' Rule 12(b)(8) arguments.

### III.  Rule 12(b)(1)

3M also moves for dismissal under Rule 12(b)(1), SCRCP, contending the State lacks standing to pursue its claims. 3M contends the Complaint fails to demonstrate that the State suffered a legally cognizable "injury-in-fact." *Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*, 407 S.C. 67, 75, 753 S.E.2d 846, 850 (2014).[1] The Court disagrees. Plaintiff has adequately alleged injury-in-fact, as evidenced by the section of the Complaint devoted to describing the "natural resources and property injuries" caused by PFAS contamination. Comp. ¶¶ 133-161. The Court rejects 3M's argument that the State's allegations as to injury are impermissibly "vague." The Complaint identifies specific sites where PFAS contamination is alleged, along with the results of testing for specific PFAS compounds. Comp. ¶¶ 136-37. Taken as a whole, the Complaint clearly satisfies the injury-in-fact requirement, and the State has standing to pursue this action.

### IV.  Rule 12(b)(7)

Finally, DuPont seeks dismissal under Rule 12(b)(7), SCRCP, claiming the State has failed to join parties as required by Rule 19, SCRCP. DuPont argues other PFAS manufacturers are

---

[1] 3M also contends the State lacks standing because the Complaint fails to sufficiently plead causation. The Court has concluded above the Complaint's allegations as to causation are adequate.

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

"necessary" parties in this action, and the Court should not proceed in their absence. However, DuPont, who carries the burden of showing the need of joining necessary parties, has not identified any particular company that it contends is a necessary party in this case. Regardless, even in the absence of other potentially responsible companies, the Court declines to dismiss the case under Rule 12(b)(7) as it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit. *See Temple v. Syntheses Corp.*, 498 U.S. 5, 7, 112 L. Ed. 2d 263, 111 S. Ct. 315 (1990). Other PFAS manufacturers' absence from the instant action will not impair Defendants' ability to protect their interests, as Defendants remain free to contend the State's injuries were caused by other entities. Allowing this case to proceed against the Defendants the State has chosen to sue is proper because of South Carolina's longstanding recognition of the "right of the plaintiff to choose her defendant." *See Smith v. Tiffany*, 419 S.C. 548, 563, 799 S.E.2d 479, 487 (2017).

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Motions to Dismiss are **DENIED**.

_____
The Honorable Daniel M. Coble

(*judicial e-signature page to follow*)

11

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2024 Jul 23 10:50 AM - RICHLAND - COMMON PLEAS - CASE#2023CP4004111
ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



Richland Common Pleas

**Case Caption:**     South Carolina Attorney General Alan M Wilson vs   3M Company ,
                      defendant, et al

**Case Number:**      2023CP4004111

**Type:**             Master/Order/Other


So Ordered

s/ Daniel Coble, 2774


Electronically signed on 2024-07-23 08:56:12     page 12 of 12

# Exhibit 6

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN RE:
PFAS LITIGATION COORDINATED
DOCKET

Grand Strand Water and Sewer Authority

*Plaintiff*,

v.

Aladdin Manufacturing Corporation;
Burlington Industries, Inc.; Delta Mills, Inc., its
predecessors, successors, assigns, and/or
responsible parties; Domtar Paper Company,
LLC, Elevate Textiles, Inc.; Fiber Industries,
LLC; GFL Environmental USA, Inc.; J.P.
Stevens & Company, Inc., its predecessors,
successors, assigns, and/or responsible parties;
Mohawk Industries, Inc.; Nan Ya Plastics
Corporation, America; PRET Advanced
Materials, LLC; Red Rock Disposal, LLC;
Sampson County Disposal, LLC; and Waste
Industries, LLC,

*Defendants*.

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

C.A. No.: 2024-CP-26-05523

**NOTICE OF DISMISSAL OF
DEFENDANTS GFL ENVIRONMENTAL
USA, INC. AND WASTE INDUSTRIES,
LLC WITHOUT PREJUDICE**

Pursuant to Rule 41(a)(1)(A) of the South Carolina Rules of Civil Procedure, Plaintiff,

Grand Strand Water and Sewer Authority ("GSWSA"), by and through undersigned counsel,

hereby gives notice that it is dismissing Defendants GFL Environmental USA, Inc. and Waste

Industries, LLC from this action without prejudice. Each party will bear its own fees and costs.

Respectfully submitted,

 */s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)

Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

Jerome Tapley (*Pro Hac Vice)*
Hirlye R. "Ryan" Lutz, III (*Pro Hac Vice)*
Brett Thompson (*Pro Hac Vice)*
Akira Watson (*Pro Hac Vice)*
Hunter Phares (S.C. Bar No. 107158)
Hamilton Jordan (*Pro Hac Vice)*
Hannah C. Caldwell (*Pro Hac Vice)*
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, AL 35205
(205) 328-2200
jtapley@corywatson.com
rlutz@corywatson.com
bthompson@corywatson.com
awatson@corywatson.com
hphares@corywatson.com
hjordan@corywatson.com
hcaldwell@corywatson.com

*Attorneys for Plaintiffs*

February 28, 2025

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# Exhibit 7

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# EXHIBIT 2

## Notice of Intent to Sue Under the Clean Water Act and Receipt of Notice

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SOUTHERN
ENVIRONMENTAL
LAW
CENTER**

601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516

Telephone 919-967-1450
Facsimile 919-929-9421

May 7, 2024

*Via-Certified Mail – Return Receipt Requested*

**Joseph Smith**
Sampson County Landfill General Manager
GFL Environmental, Inc.
7434 Roseboro Hwy.
Roseboro, NC 28382

**CT Corporation System**
Registered Agent
Sampson County Disposal, LLC
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

**Bryan Wuester**
Regional Landfill Manager
GFL Environmental, Inc.
7434 Roseboro Hwy.
Roseboro, NC 28382

**CT Corporation System**
Registered Agent
Waste Industries USA, LLC
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

**John Pfleger**
Regional Environmental Compliance Manager
GFL Environmental, Inc.
3301 Benson Dr., Ste. 601
Raleigh, NC 27609

**CT Corporation System**
Registered Agent
Waste Industries, LLC
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

**Corporations Creations Network, Inc.**
Registered Agent
GFL Environmental, Inc.
3411 Silverside Rd
Tatnall Building, Ste. 104
Wilmington, DE 19810

**RE:**    **60-Day Notice of Intent to Sue Sampson County Disposal, LLC; Waste Industries, USA, LLC; Waste Industries, LLC; and GFL Environmental, Inc. for Violations of the Clean Water Act**

Mr. Smith, Mr. Wuester, and Mr. Pfleger:

This letter is to notify Sampson County Disposal, LLC and its parent companies Waste Industries, USA, LLC; Waste Industries, LLC; and GFL Environmental, Inc. (collectively, "GFL"), as well as the Environmental Protection Agency Administrator and Region IV Administrator, the North Carolina Department of Environmental Quality Secretary and Division of Water Resources Director, and the Attorney General of the United States of America, that Environmental Justice Community Action Network ("EJCAN") intends to file suit against GFL for serious and ongoing violations of the Clean Water Act.

Notice of Intent to Sue
May 7, 2024
Page 2 of 28

The Clean Water Act violations set out herein are in addition to GFL's violations of the Resource Conservation and Recovery Act ("RCRA") identified in EJCAN's February 13, 2024, Notice of Intent to Sue ("RCRA notice"). This letter incorporates the RCRA notice in its entirety and does not change or restrict any potential remedies that EJCAN may seek under RCRA. EJCAN reserves the right to add additional claims based on the same or a similar pattern of actions. EJCAN also reserves the right to seek additional remedies under state and federal law and does not intend, by giving this notice, to waive any other rights or remedies.

Unless the violations described in the RCRA notice and in this letter are fully redressed, EJCAN will file a lawsuit against GFL under Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), and Section 505(a)(1) the Clean Water Act, 33 U.S.C. § 1365(a)(1), after the respective notice periods have expired. EJCAN will seek redress for the violations described in this letter, including injunctive relief and attorneys' fees and expenses under 33 U.S.C. §§ 1365(a) and (d). EJCAN will also seek civil penalties for GFL's violations of the Clean Water Act of up to $66,712 per day for each violation pursuant to 33 U.S.C. § 1319(d) and 40 C.F.R. § 122.

## I.    Summary of Violations & Civil Enforcement Demand

GFL is violating 33 U.S.C. § 1311(a) of the Clean Water Act because it is discharging per- and polyfluoroalkyl substances ("PFAS") from multiple point sources at the Sampson County Landfill ("Landfill") into Bearskin Swamp—a riverine system which includes a navigable stream and adjacent wetlands (together, "Bearskin Swamp")—without authorization from a National Pollutant Discharge Elimination System ("NPDES") permit. These unpermitted and unlawful discharges originate from various point sources, including:

- A drainage channel identified as "SW-5," which discharges PFAS into Bearskin Swamp;
- Outfalls 1 & 2 of the Landfill's Gravity Groundwater Intercept ("GGI") system, which discharge PFAS into Bearskin Swamp;
- The Landfill and its leachate collection system, which discharge PFAS into groundwater that flows into Bearskin Swamp; and
- The Landfill and its leachate collection system, including toe drains, as well as several additional ditches, channels, and other conveyances, which discharge PFAS into Bearskin Swamp.

GFL is also violating its certificate of coverage under North Carolina's NPDES general stormwater permit for landfills, NCG120054, by discharging PFAS-contaminated stormwater from stormwater outfalls into Bearskin Swamp.

GFL's violations of the Clean Water Act have occurred every day for at least the past five years and continue to occur each and every day that GFL discharges PFAS into Bearskin Swamp—including on, but not limited to: October 12, 2019; November 10, 2019; December 20, 2019; January 25, 2020; September 11, 2023; September 13, 2023; September 14, 2023, and November 14, 2023.  These violations continue to this day.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 3 of 28

GFL must take immediate steps to cease these longstanding and ongoing violations of the Clean Water Act, including, but not limited to:

- Cease and abate the discharge of PFAS into Bearskin Swamp by:
  - Preventing discharge of PFAS from the Landfill, the Landfill's leachate collection system, the GGI outfalls, and through ditches, channels, and any other conveyances that discharge into Bearskin Swamp;
  - Installing leachate treatment technology that prevents PFAS from entering Bearskin Swamp;
  - Installing groundwater treatment technology that prevents PFAS from entering Bearskin Swamp through the GGI system;
  - Reconfiguring the stormwater runoff system to prevent stormwater from becoming contaminated and prevent any stormwater that is contaminated through contact with solid waste from entering Bearskin Swamp;
  - Monitoring stormwater runoff to ensure that no PFAS are present prior to discharge; and
- Remediate PFAS-contaminated soil, sediment, and water in Bearskin Swamp.

## II.     Persons Responsible for Violations

The Landfill is owned and operated by GFL Environmental, Inc. ("GFL Environmental"), which wholly owns Sampson County Disposal, LLC ("Sampson County Disposal").[1] GFL Environmental acquired Sampson County Disposal's parent company, Waste Industries (including Waste Industries, USA, LLC, and Waste Industries, LLC), thereby gaining ownership of the Landfill, in 2018.[2] Because GFL Environmental is the parent company for Sampson County Disposal and Waste Industries, this notice letter collectively refers to these entities as "GFL." Under the Clean Water Act, GFL Environmental and its subsidiaries are the "person(s)" responsible for the violations described in this letter.

The Registered Agent on file for Sampson County Disposal and Waste Industries with the North Carolina Secretary of State is CT Corporation System. The Registered Agent on file for GFL Environmental with the Securities and Exchange Commission is Corporations Creations Network, Inc.

## III.     Persons Giving Notice

Pursuant to 40 C.F.R. part 135, the person giving notice of intent to sue is:

Environmental Justice Community Action Network
P.O. Box 616
Clinton, NC 28329
(910) 299-9118

---

[1] GFL Env't, Inc., *Sampson County Community Info*, https://perma.cc/8BQP-N6U7.
[2] *Id.*

Notice of Intent to Sue
May 7, 2024
Page 4 of 28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EJCAN is a North Carolina nonprofit organization working to ensure that Sampson County communities have clean and safe air, water, and soil. EJCAN has approximately 200 members, many of whom live, work, or recreate in Roseboro and the Snow Hill community in Sampson County. EJCAN members also fish, kayak, and otherwise recreate in the Cape Fear Basin, including Bearskin Swamp. These members' health, recreational, aesthetic, and other interests are harmed by GFL's longstanding, ongoing, and illegal discharge of PFAS into Bearskin Swamp.

## IV.     Identification of Legal Counsel

Pursuant to 40 C.F.R. § 135.3(c), the following legal counsel, who will be representing EJCAN, are identified:

Maia Hutt
Irena Como
Zoe Gabrielson

Southern Environmental Law Center
601 W. Rosemary Street, Suite 220
Chapel Hill, NC 27516
(919) 967-1450

mhutt@selcnc.org
icomo@selcnc.org
zgabrielson@selcnc.org

## V.     Background

### A. The Sampson County Landfill

GFL is unlawfully discharging PFAS into Bearskin Swamp in violation of the Clean Water Act. These violations take place at the Sampson County Landfill, located at 7437 Roseboro Highway in Roseboro, North Carolina. The Landfill is composed of an active municipal solid waste ("MSW") and construction and demolition ("C&D") landfill, permitted under solid waste permit 82-02, and a closed MSW and C&D landfill permitted under solid waste permit 82-01.[3] In addition to the management of active and closed cells for placement of solid waste, GFL also operates a leachate collection system, landfill gas management system, and groundwater gravity intercept system.

---

[3] *See generally* N.C. Dep't of Env't Quality, Facility Permit Nos. 8202-MSWLF-2000 (Nov. 15, 2022), https://edocs.deq nc.gov/WasteManagement/DocView.aspx?id=1741437&dbid=0&repo=WasteManagement, https://perma.cc/8SNT-MZBA (permit for active MSW landfill), 8202-CDLF-1996 (Sept. 9, 2022), https://edocs.deq nc.gov/WasteManagement/DocView.aspx?id=1704987&dbid=0&repo=WasteManagement, https://perma.cc/8QVB-Q3ZE (permit for active C&D landfill); 8201-MSWLF- (Aug. 2000), https://edocs.deq nc.gov/WasteManagement/DocView.aspx?id=1469161&dbid=0&repo=WasteManagement, https://perma.cc/44MS-ZUKW (closure and post-closure plan for closed landfill).

Notice of Intent to Sue
May 7, 2024
Page 5 of 28

For decades, the owners and operators of the Landfill, including GFL, have generated revenue by accepting a variety of solid wastes, including commercial and municipal refuse, ashes, sludges, animal manure, residue from incineration, food processing wastes, dredging wastes, tires, asbestos,[4] and creosote/treated timbers.[5] This includes highly contaminated industrial waste from known PFAS producers and users, such as the Chemours Company's chemical manufacturing facility in Fayetteville[6] and the Marine Corps Base Camp Lejeune.[7] According to public records, Chemours' parent company and predecessor, E. I. DuPont de Nemours & Co. ("DuPont"), began sending sludge left over from the PFAS-production process to the Landfill at least as early as 1995, and continued until 2018.[8]

### B. Bearskin Swamp

Bearskin Swamp, also known as Turlington Millpond, is a riverine system that includes a popular fishing stream and wetlands that run through the Snow Hill community in Sampson County, North Carolina. Bearskin Swamp flows through the Eastern side of the Landfill and drains to the Southwest into the Little Coharie Creek, which flows into the Great Coharie Creek. The Great Coharie Creek flows into the Cape Fear River Basin, North Carolina's largest river basin.

The state of North Carolina has designated the stream at the center of Bearskin Swamp as a Class C stream.[9] This classification indicates that the stream must be kept safe for fishing, boating, swimming, and "protected for secondary recreation, fishing, wildlife, fish consumption, aquatic life … agriculture, and other uses."[10] Bearskin Swamp has also been designated as a Swamp water.[11] Swamp waters are "topographically located so as to generally have low velocities and other natural characteristics which are different from adjacent streams draining land with steeper topography."[12]

The United States Fish and Wildlife Service's National Wetlands Inventory identifies Bearskin Swamp as a permanently flooded Riverine System that includes wetlands and

---

[4] Sampson Cnty., *Solid Waste & Recycling,* https://perma.cc/W7SU-ZVMW.

[5] Sampson Cnty. Disposal, *Disposal Gate Rate (Per Ton)* (2023), https://perma.cc/4GZZ-BWHH.

[6] *See* Steve DeVane, *Sludge from Chemours Plant Dumped in Sampson County Landfill*, The Fayetteville Observer (Oct. 20, 2018), https://perma.cc/225N-MFXV.

[7] URS Grp., Inc., *Solid Waste Management Plan Update* 5-20, U.S. Marine Corps. (July 2012), https://perma.cc/6T2F-3LX9.

[8] *See, e.g.*, *Compliance Evaluation Inspection E.I. Dupont de Nemours WWTP* 3, Dep't of Env't, Health & Nat. Res. (Apr. 19, 1995), https://perma.cc/BCT3-3S5U; *see also* Steve DeVane, *Sludge from Chemours Plant Dumped in Sampson County Landfill*, The Fayetteville Observer (Oct. 20, 2018), https://perma.cc/225N-MFXV.

[9] Div. of Water Res., *Alphabetic List of NC Waterbodies: Cape Fear River Basin*, N.C. Dep't of Env't Quality (Mar. 3, 2016), https://perma.cc/97A9-5GLD.

[10] Div. of Water Quality, *A Guide to Surface Freshwater Classifications in North Carolina*, N.C. Dep't of Env't & Nat. Res. (2009), https://perma.cc/ZVE9-S975.

[11] *See NC Surface Water Classifications*, N.C. Dep't of Env't Quality, https://perma.cc/FEV8-WTGM.

[12] Div. of Water Quality, *A Guide to Surface Freshwater Classifications in North Carolina*, N.C. Dep't of Env't & Nat. Res. (2009), https://perma.cc/2ZZM-DEAJ.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 6 of 28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

deepwater habitat.[13] The Wetlands Inventory identifies the wetlands that are part of Bearskin Swamp as Palustrine nontidal wetlands.[14] Bearskin Swamp provides important habitat for various species, including mussels, darters, and shiners, and aquatic species popular with recreational and subsistence fishers, such as sunfish, bluegill, perch, crappie, croakers, and eels.[15] Members of the Snow Hill community and other local residents enjoy fishing along Bearskin Swamp. People who grew up in the area fondly remember playing in and around the stream as children.

Bearskin Swamp, despite this ecological and social importance, bears a heavy pollution burden from the Landfill. The eastern edge of the Landfill is located only a few hundred feet away from Bearskin Swamp, and groundwater and surface water on the site "generally flow to the northeast and east towards Bearskin Swamp."[16] The Landfill, its leachate collection system, the outfalls for the GGI system, and numerous drainage channels, ditches, conveyances, and stormwater outfalls discharge PFAS from the Landfill into Bearskin Swamp. As a result, PFAS concentrations in parts of Bearskin Swamp adjacent to and downstream of the Landfill are dangerously high, and community members worry that it is no longer safe to consume fish caught in the stream or let their children play in the water.

### C. PFAS Are Mobile, Persistent, and Harmful to Human Health and the Environment

As outlined in the RCRA notice, PFAS, often referred to as "forever chemicals," encompass a group of thousands of synthetic chemicals manufactured and used broadly by industry since the 1940s[17] due to their ability to repel water and other substances, stabilize heat and chemicals, and reduce friction.[18] But these chemicals are toxic and highly persistent, and although they may transform into other PFAS, they do not break down into benign substances once released into the environment, or upon entering our bodies.[19] The toxic and persistent nature of PFAS poses a significant threat to human health and the environment, even at extremely low concentrations.

Given the magnitude of the threat posed by PFAS pollution, EPA recently finalized drinking water standards for six PFAS compounds under the Safe Drinking Water Act:

---

[13] *National Wetlands Inventory*, U.S. Fish & Wildlife Serv. (last accessed May 3, 2024), https://fwsprimary.wim.usgs.gov/wetlands/apps/wetlands-mapper/ (Latitude 34.963, longitude -78.474; check boxes labeled "Wetlands" and "Riparian" in top left corner).

[14] *Id.*

[15] *See, e.g.*, Harry LeGrand et al., *Freshwater Fishes of North Carolina*, N.C. Biodiversity Proj. & N.C. State Parks (2024), https://perma.cc/SRS3-V3W9.

[16] *Water Quality Monitoring Report, First Semi-Annual 2023 Sampling Event* 8, GFL Env't Inc. (Sept. 15, 2023), https://edocs.deq nc.gov/WasteManagement/DocView.aspx?id=1818780&dbid=0&repo=WasteManagement, https://perma.cc/6JKB-NE6D (hereinafter "First Semi-Annual 2023 Sampling Event, Permit No. 82-02").

[17] EPA, *Our Current Understanding of the Human Health and Environmental Risks of PFAS* (June 7, 2023), https://perma.cc/9ZXJ-Z5JC.

[18] Interstate Tech. Reg. Council, *History and Use of Per- and Polyfluoroalkyl Substances (PFAS) Found in the Environment* (Aug. 2020), https://perma.cc/94SL-55LD.

[19] Ian T. Cousins et al., *The High Persistence of PFAS is Sufficient for Their Management as a Chemical Class*, 12 Env't Sci. Process Impacts 2307 (2020), https://perma.cc/HGH3-STFG; Carol F. Kwiatkowski et al., *Scientific Basis for Managing PFAS as a Chemical Class*, 7 Env't Sci. Process Impacts 534 (2020), https://perma.cc/WQ4L-YC9X.

Notice of Intent to Sue
May 7, 2024
Page 7 of 28

perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorononanoic acid ("PFNA"), perfluorohexane sulfonate ("PFHxS"), hexafluoropropylene oxide ("HFPO-DA," also known as Chemours' proprietary "GenX chemicals"), and mixtures containing two or more of PFHxS, PFNA, GenX chemicals, or perfluorobutanesulfonic acid ("PFBS").[20] Each of these PFAS compounds have been found at the Landfill and in Bearskin Swamp at concentrations that substantially exceed EPA's new drinking water standards. Additionally, just last month, EPA designated PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act that "may present substantial danger to public health or welfare or the environment when released into the environment."[21]

Decades of scientific research underscore these risks. PFOA and PFOS, both present in high concentrations at the Landfill and in Bearskin Swamp, cause developmental effects in fetuses and infants, kidney and testicular cancer, liver malfunction, hypothyroidism, high cholesterol, ulcerative colitis, lower birth weight and size in infants, obesity, decreased immune response to vaccines, reduced hormone levels, and delayed puberty.[22] International scientists and experts classify PFOA as carcinogenic and PFOS as possibly carcinogenic to humans.[23] Epidemiological studies show that other PFAS—including PFHxS,[24] PFBS,[25] perfluorobutanoic

---

[20] *See* PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532 (Apr. 26, 2024) (to be codified at 40 C.F.R. pts. 141, 142).

[21] *See Pre-Publication Notice: Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances* 11, EPA (Apr. 17, 2024), https://perma.cc/9C4T-B5TE.

[22] *See generally id.*; *see also* Arlene Blum et al., *The Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)*, 123 Env't. Health Persps. A107-111 (May 1, 2015), https://perma.cc/PP72-HZZW; PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532 (Apr. 26, 2024) (to be codified at 40 C.F.R. pts. 141, 142).

[23] Int'l Agency for Rsch. on Cancer, IARC Monographs *Evaluate the Carcinogenicity of Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic Acid (PFOS)* (Dec. 1, 2023), https://perma.cc/4QAU-J6HJ.

[24] EPA, *IRIS Toxicological Review of Perfluorohexanesulfonic Acid (PFHxS, CASRN 335-46-4) and Related Salts* xiv (July 2023), https://perma.cc/JLR8-4MMM (explaining that exposure to PFHxS "is likely to cause thyroid and developmental immune effects in humans"); Min Joo Kim et al., *Association Between Perfluoroalkyl Substances Exposure and Thyroid Function in Adults: A Meta-Analysis*, 13 PLOS One (May 10, 2018), https://perma.cc/F8FY-WG2V (meta-analysis of human data concluding that exposure to PFHxS was associated with decreased levels of total thyroxine (T4), a thyroid hormone); Jessica Trowbridge et al., *Extending Nontargeted Discovery of Environmental Chemical Exposures During Pregnancy and Their Association With Pregnancy Complications-A Cross-Sectional Study*, 131 Env't Health Persps. 077003-1 (Jul. 2023), https://perma.cc/8LYF-HVZJ (explaining that PFHxS can travel through the umbilical cord during pregnancy); Mengment Xu et al., *Using Comprehensive Lipid Profiling to Study Effects of PFHxS During Different Stages of Early Zebrafish Development*, 808 Sci. of Total Env't 151739 (2022), https://perma.cc/2K8P-3B9R (concluding that PFHxS can disrupt the ability to break down lipids and can cause oxidative stress in fetal development).

[25] *See* EPA, *Drinking Water Health Advisory: Perfluorobutane Sulfonic Acid (CASRN 375-73-5) and Related Compound Potassium Perfluorobutane Sulfonate (CASRN 29420-49-3)* 14 (June 2022), https://perma.cc/6J9Q-M2QU (explaining that exposure to PFBS can lead to degraded liver and kidney functions, compromised immune systems, and fetal development issues); EPA, *Human Health Toxicity Values for Perfluorobutane Sulfonic Acid (CASRN 375-73-5) and Related Compound Potassium Perfluorobutane Sulfonate (CASRN 29420-49-3)* 35 (Apr. 2021), https://perma.cc/L68Z-Q39Y (explaining that literature confirms exposure to PFBS impacts to thyroid, reproductive systems, development, kidneys, liver, and lipid and lipoprotein homeostasis); Veronika Ehrlich et al., *Consideration of Pathways for Immunotoxicity of Per- and Polyfluoroalkyl Substances (PFAS)*, Env't Health 22:19, 5 (2023), https://perma.cc/QC27-CR8V (finding that PFBS is associated with decreased bone marrow cells, as well as decreased spleen and thymus function).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 8 of 28

acid ("PFBA"),[26] perfluorohexanoic acid ("PFHxA"),[27] PFNA,[28] perfluorodecanoic acid ("PFDA"),[29] GenX chemicals,[30] perfluoroundecanoic acid ("PFUnA"),[31] perfluorododecanoic acid ("PFDoDA"),[32] perfluoropropanoic acid ("PFPrA")[33] and perfluoropentanoic acid ("PFPeA")—also endanger human health even at extremely low concentrations.[34]

---

[26] EPA, *IRIS Toxicological Review of Perfluorobutanoic Acid (PFBA, CASRN 375-22-4) and Related Salts* xii, (Dec. 2022), https://perma.cc/UP5H-7VQJ (explaining "available evidence indicates that developmental, thyroid, and liver effects in humans are likely caused by PFBA exposure in utero or during adulthood").

[27] *See* EPA, *IRIS Toxicological Review of Perfluorohexanoic Acid [PFHxA, CASRN 307-24-4] and Related Salts* xiv (Apr. 2023), https://perma.cc/W33E-WUZL (concluding exposure to PFHxA "likely causes" liver, fetal development, and immune system complications, as well as decreased red blood cell counts).

[28] Cheryl E. Rockwell et al., *Acute Immunotoxic Effects of Perfluorononanoic Acid (PFNA) in C57BL/6 Mice*, J. of Clinical & Experimental Pharmacology S4-002 7 (2013), https://perma.cc/48DX-X3HC (concluding that PFNA can disrupt blood cell functions and alter immune system responses); Agency for Toxic Substances & Disease Registry, *Toxicological Profile for Perfluoroalkyls* 7-21 (May 2021), https://perma.cc/7MCX-HDMV (noting decreased pup survival in rodents as well as developmental delays, decreases in birth weight, decreased sperm motility, and altered immune responses); Francesca Coperchini et al., *Thyroid Disrupting Effects of Old and New Generation PFAS*, 11 Frontiers in Endocrinology 612320 (Jan. 2021), https://perma.cc/VSK9-KBHR; Ryan C. Lewis et al., *Serum Biomarkers of Exposure to Perfluoroalkyl Substance in Relation to Serum Testosterone and Measures of Thyroid Function Among Adults and Adolescents from NHANES 2011-2012*, 12 Int'l J. Env't Rsch. Pub. Health 6098–6114 (2015), https://perma.cc/U8MQ-LG4P (finding exposure to PFAS may disrupt thyroid hormones).

[29] EPA, *IRIS Toxicological Review of Perfluorodecanoic Acid (PFDA) and Related Salts (Public Comment and External Review Draft)* (Apr. 2023), https://perma.cc/2LPK-LLHH.

[30] *See* EPA, *Drinking Water Health Advisory: Hexafluoropropylene Oxide (HFPO) Dimer Acid (CASRN 13252-13-6) and HFPO Dimer Acid Ammonium Salt (CASRN 62037-80-3), Also Known as "GenX Chemicals"* 20 (June 2022), https://perma.cc/P3ZF-G23R (explaining that exposure to GenX increases harms to liver, reproductive, and developmental functions); *see also* Sylvia Gong et al., *Toxicity Assessment of Hexafluoropropylene Oxide-Dimer Acid on Morphology, Heart Physiology, and Gene Expression During Zebrafish (*Danio rerio*) Development*, 30 Env't Sci. & Pollution Rsch. 32,320, 32,327–31 (Dec. 3, 2022), https://perma.cc/58YX-9YCV (concluding that exposure to GenX led to spinal deformations, increased heart rate, and changes in gene expression); Zuying Feng et al., *Physiological and Transcriptomic Effects of Hexafluoropropylene Oxide Dimer Acid in* Caenorhabditis elegans *During Development*, 244 Ecotoxicology and Env't Safety 114,047 (Oct. 2022), https://perma.cc/9B79-DETV (GenX exposure can lead to altered gene expression during fetal development).

[31] *See* Agency for Toxic Substances & Disease Registry, *Toxicological Profile for Perfluoroalkyls* 139, 164, 172 (May 2021), https://perma.cc/7MCX-HDMV; Mika Takahashi et al., *Repeated Dose and Reproductive/Developmental Toxicity of Perfluoroundecanoic Acid in Rats*, 39 J. Toxicological Scis. 97–108 (2014), https://perma.cc/45AA-G8JV.

[32] Agency for Toxic Substances & Disease Registry, *Toxicological Profile for Perfluoroalkyls* 27, 118, 140, 166 (May 2021), https://perma.cc/7MCX-HDMV (PFDoDA is associated with harm to the liver, increased mortality of pregnant females).

[33] EPA, *ORD Human Health Toxicity Value for Perfluoropropanoic Acid (CASRN 422-64-0 | DTXSID8059970)* 16-18 (July 2023), https://perma.cc/AK64-BHYK (PFPrA is associated with liver toxicity).

[34] Ke Gao et al., *Prenatal Exposure to Per- and Polyfluoroalkyl Substances (PFASs) and Association Between the Placental Transfer Efficiencies and Dissociation Constant of Serum Proteins – PFAS Complexes*, 52 Env't Sci & Tech. 6529–38 (2019), https://perma.cc/FN8N-MJTJ; Xin Liu et al., *Structure-Based Investigation on the Association Between Perfluoroalkyl Acids Exposure and Both Gestational Diabetes Mellitus and Glucose Homeostasis in Pregnant Women*, 127 Env't Int'l 85–93 (2019), https://perma.cc/AM4Y-DW2P; Surabhi Shah-Kulkarni et al., *Prenatal Exposure to Perfluorinated Compounds Affects Thyroid Hormone Levels in Newborn Girls*, 94 Env't Int'l 607–613 (2016), https://perma.cc/C4YL-SQW7; Xiaofei Song et al., *Biomonitoring PFAAs in Blood and Semen Samples: Investigation of a Potential Link Between PFAAs Exposure and Semen Mobility in China*, 113 Env't Int'l 50–54 (2018), https://perma.cc/7HUF-5G3C.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 9 of 28

Short-chain PFAS found at the Landfill, like GenX chemicals and PFPrA, are "associated with similar adverse toxicological effects" as their longer-chain predecessors, "can be equally environmentally persistent and are even more mobile in the environment and more difficult to remove from drinking water."[35] These short-chain PFAS also bioaccumulate in the living tissues of humans and animals over time.[36] For instance, exposure to GenX chemicals can lead to cardiovascular toxicity,[37] maternal and fetal liver toxicity,[38] and other fetal gene expression changes that can result in increased heart rate and spinal deformities.[39] Exposure to PFHxA "likely causes" liver, developmental, and immune system complications and decreased red blood cell counts in humans.[40] Similarly, exposure to PFPrA, an ultra-short-chain PFAS which has been documented in particularly high concentrations at the Landfill and in Bearskin Swamp, has been linked to liver injury.[41] PFPeA, also found at high concentrations at the Landfill and in Bearskin Swamp, readily crosses the placenta[42] and has been found at higher levels in pregnant women with gestational diabetes mellitus.[43] And like other PFAS, PFPeA is associated with altered thyroid hormone levels[44] and has been linked to decreased sperm mobility.[45] Nafion Byproduct 2, another PFAS chemical produced by Chemours that is pervasive at the Landfill and in Bearskin

[35] Carol F. Kwiatkowski et al., *Scientific Basis for Managing PFAS as a Chemical Class*, 7 Env't Sci. Process Impacts 534 (2020), https://perma.cc/WQ4L-YC9X; Fan Li et al., *Short-chain Per- and Polyfluoroalkyl Substances in Aquatic Systems: Occurrence, Impacts, and Treatment*, 380 Chem. Eng'g J. 122506 (2020), https://perma.cc/9JWF-G2H5.

[36] Fan Li et al., *Short-chain Per- and Polyfluoroalkyl Substances in Aquatic Systems: Occurrence, Impacts, and Treatment*, 380 Chem. Eng'g J. 122506 (2020), https://perma.cc/9JWF-G2H5.

[37] Sylvia Gong et al., *Toxicity Assessment of Hexafluoropropylene Oxide-Dimer Acid on Morphology, Heart Physiology, and Gene Expression During Zebrafish (*Danio rerio*) Development*, 30 Env't Sci. & Pollution Rsch. 32,320, 32,328 (Dec. 3, 2022), https://perma.cc/58YX-9YCV.

[38] Bevin E. Blake et al., *Transcriptional Pathways Linked to Fetal and Maternal Hepatic Dysfunction Caused by Gestational Exposure to Perfluorooctanoic Acid (PFOA) or Hexafluoropropylene Oxide-Dimer Acid (HFPO-DA or GenX) in CD-1 Mice*, 248 Ecotoxicology & Env't Safety 114,314 (Nov. 24, 2022), https://perma.cc/7LG9-4DMK.

[39] Sylvia Gong et al., *Toxicity Assessment of Hexafluoropropylene Oxide-Dimer Acid on Morphology, Heart Physiology, and Gene Expression During Zebrafish (*Danio rerio*) Development*, 30 Env't Sci. & Pollution Rsch. 32,320, 32,327-31 (Dec. 3, 2022), https://perma.cc/58YX-9YCV.

[40] EPA, *IRIS Toxicological Review of Perfluorohexanoic Acid [PFHxA, CASRN 307-24-4] and Related Salts* xiv (Apr. 2023), https://perma.cc/W33E-WUZL (concluding exposure to PFHxA "likely causes" liver, fetal development, and immune system complications, as well as decreased red blood cell counts).

[41] EPA, *ORD Human Health Toxicity Value for Perfluoropropanoic Acid (CASRN 422-64-0 | DTXSID8059970)* 16-17 (July 2023), https://perma.cc/AK64-BHYK.

[42] Ke Gao et al., *Prenatal Exposure to Per- and Polyfluoroalkyl Substances (PFASs) and Association Between the Placental Transfer Efficiencies and Dissociation Constant of Serum Proteins – PFAS Complexes*, 52 Env't Sci & Tech. 6529–38 (2019), https://perma.cc/FN8N-MJTJ.

[43] Xin Liu et al., *Structure-Based Investigation on the Association Between Perfluoroalkyl Acids Exposure and Both Gestational Diabetes Mellitus and Glucose Homeostasis in Pregnant Women*, 127 Env't Int'l 85–93 (2019), https://perma.cc/AM4Y-DW2P.

[44] Surabhi Shah-Kulkarni et al., *Prenatal Exposure to Perfluorinated Compounds Affects Thyroid Hormone Levels in Newborn Girls*, 94 Env't Int'l 607–613 (2016), https://perma.cc/C4YL-SQW7.

[45] Xiaofei Song et al., *Biomonitoring PFAAs in Blood and Semen Samples: Investigation of a Potential Link Between PFAAs Exposure and Semen Mobility in China*, 113 Env't Int'l 50–54 (2018), https://perma.cc/7HUF-5G3C.

Notice of Intent to Sue
May 7, 2024
Page 10 of 28

Swamp, has been linked to toxic intestinal and liver effects, as well as developmental impacts and reduced birth weight.[46]

Finally, PFAS harm the environment. PFAS have been shown to cause harm to species like fish,[47] reptiles,[48] amphibians,[49] mollusks,[50] and other aquatic invertebrates,[51] all of which are

[46] *See, e.g.*, Wanying Gui et al., *Emerging Polyfluorinated Compound Nafion By-Product 2 Disturbs Intestinal Homeostasis in Zebrafish (*Danio Rerio*)*, 249 Ecotoxicology & Env't Safety 114368 (2023), https://perma.cc/UY98-D4MT (showing toxic liver effects in zebrafish, organisms that are commonly used to develop human toxicity research); Justin M. Conley et al., *Developmental Toxicity on Nafion Byproduct 2 (NBP2) in the Sprague-Dawley Rat With Comparisons to Hexafluoropropylene Oxide-Dimer Acid (HFPO-DA or GenX) and Perfluorooctane Sulfonate (PFOS)*, 160 Env't Int'l 107056 (2022), https://perma.cc/Y537-MUZZ (showing liver and fetal development impacts, as well as increased neonatal mortality, in rats).

[47] *See, e.g.*, Haihua Huang et al., *Toxicity, Uptake Kinetics and Behavior Assessment in Zebrafish Embryos Following Exposure to Perfluorooctanesulphonicacid (PFOS)*, 98 Aquatic Toxicology 139–47 (2010), https://perma.cc/2FVN-GA3B (fish embryos exposed to PFOS developed spinal, brain, eye, and tail problems, malformations, and slower swimming); *see also* Carrie E. Jantzen et al., *PFOS, PFNA, and PFOA Sub-Lethal Exposure to Embryonic Zebrafish Have Different Toxicity Profiles in Terms of Morphometrics, Behavior and Gene Expression*, 175 Aquatic Toxicology 160–70 (2016), https://perma.cc/J6Q9-SFDA; An Hagenaars et al., *Structure–Activity Relationship Assessment of Four Perfluorinated Chemicals Using a Prolonged Zebrafish Early Life Stage Test*, 82 Chemosphere 764, 771 (2011), https://perma.cc/Y63D-YMH7; Yongbing Du et al., *Chronic Effects of Water-Borne PFOS Exposure on Growth, Survival and Hepatotoxicity in Zebrafish: A Partial Life-Cycle Test*, 74 Chemosphere 723, 726–29 (2009), https://perma.cc/AJ9J-T7R6; John Charles Rotondo et al., *Environmental Doses of Perfluorooctanoic Acid Change the Expression of Genes in Target Tissues of Common Carp*, 37 Env't Toxicology & Chem. 942, 947 (2018), https://perma.cc/9V8B-NQPY; Yang Liu et al., *The Thyroid-Disrupting Effects of Long-Term Perfluorononanoate Exposure on Zebrafish (*Danio rerio*)*, 20 Ecotoxicology 47, 47 (2011), https://perma.cc/BXL2-RGJ2; Lianguo Chen et al., *Multigenerational Disruption of the Thyroid Endocrine System in Marine Medaka after a Life-Cycle Exposure to Perfluorobutanesulfonate*, 52 Env't Sci. & Tech. 4432, 4432–39 (2018), https://perma.cc/7M8J-XJES; Lianguo Chen et al., *Perfluorobutanesulfonate Exposure Causes Durable and Transgenerational Dysbiosis of Gut Microbiota in Marine Medaka*, 5 Env't Sci. & Tech. Letters 731, 731–38 (2018), https://perma.cc/AN42-S3W5; Lianguo Chen et al., *Accumulation of Perfluorobutane Sulfonate (PFBS) and Impairment of Visual Function in the Eyes of Marine Medaka after a Life-Cycle Exposure*, 201 Aquatic Toxicology 1, 1–10 (2018), https://perma.cc/YT6Y-XBD2.

[48] *See, e.g.*, Theresa Guillette et al., *Blood Concentrations of Per- and Polyfluoroalkyl Substances are Associated with Autoimmune-like Effects in American Alligators from Wilmington, North Carolina*, 4 Frontier Toxicology 1010185 (Oct. 20, 2022), https://perma.cc/UM3G-9RVB.

[49] *See, e.g.*, Gerald T. Ankley et al., *Partial Life-Cycle Toxicity and Bioconcentration Modeling of Perfluorooctanesulfonate in the Northern Leopard Frog (*Rana pipiens*)*, 23 Env't Toxicology & Chem. 2745, 2745 (2004), https://perma.cc/94BH-29CH; Yan Cheng et al., *Thyroid Disruption Effects of Environmental Level Perfluorooctane Sulfonates (PFOS) in* Xenopus laevis, 20 Ecotoxicology 2069, 2069–78 (2011), https://perma.cc/2MK3-8AWZ; Qin-Qin Lou et al., *Effects of Perfluorooctanesulfonate and Perfluorobutanesulfonate on the Growth and Sexual Development of* Xenopus laevis, 22 Ecotoxicology 1133, 1133–44 (2013), https://perma.cc/G5CN-Z42L.

[50] *See, e.g.*, Changhui Liu et al., *Oxidative Toxicity of Perfluorinated Chemicals in Green Mussel and Bioaccumulation Factor Dependent Quantitative Structure-Activity Relationship*, 33 Env't Toxicology & Chem. 2323, 2323–32 (2014), https://perma.cc/5CHC-84RJ; Changhui Liu et al., *Immunotoxicity in Green Mussels Under Perfluoroalkyl Substance (PFAS) Exposure: Reversible Response and Response Model Development*, 37 Env't Toxicology & Chem. 1138, 1138–45 (2018), https://perma.cc/HL9K-FLZY.

[51] *See, e.g.*, Kyunghee Ji et al., *Toxicity of Perfluorooctane Sulfonic Acid and Perfluorooctanoic Acid on Freshwater Macroinvertebrates (*Daphnia magna *and* Moina macrocopa*) and Fish (*Oryzias latipes*)*, 27 Env't Toxicology & Chem. 2159, 2159 (2008), https://perma.cc/96YJ-JBBA; Magali Houde et al, *Endocrine-Disruption Potential of Perfluoroethylcyclohexane Sulfonate (PFECHS) in Chronically Exposed* Daphnia magna, 218 Env't Pollution 950,

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 11 of 28

present in Bearskin Swamp. PFAS also endanger people who eat fish from PFAS-polluted waterways because PFAS tend to accumulate in fish tissue once they are present in the water.[52] Studies have shown those who eat PFAS-contaminated fish have higher PFAS concentrations in their blood,[53] and "even low levels of seafood [consumption] have been associated with elevated PFAS levels."[54] Indeed, "[w]idespread PFAS contamination of freshwater fish in surface waters in the U.S. is likely a significant source of exposure to PFOS and potentially other [PFAS] for all persons who consume freshwater fish, but especially for high frequency freshwater fish consumers."[55] This route of exposure is particularly concerning here due to the prevalence of subsistence and recreational fishing in Bearskin Swamp by members of the Snow Hill community.

### D.  GFL Is Polluting Bearskin Swamp with PFAS

PFAS-laden solid waste has been and continues to be disposed at the Landfill, only a few hundred feet away from Bearskin Swamp. GFL's mismanagement of this waste has caused widespread PFAS pollution in Bearskin Swamp, as evidenced by water quality sampling conducted by the State of North Carolina and independent researchers. This sampling, along with monitoring data submitted to the state by GFL, reveals that nearly every PFAS compound present in elevated concentrations downstream of the Landfill is also present at high levels in the Landfill's leachate.

The following PFAS compounds have been documented in the Landfill's leachate, the

---

[52] 950–56 (2016), https://perma.cc/XM6R-K5ZQ; Ruoyu Liang et al., *Effects of Perfluorooctane Sulfonate on Immobilization, Heartbeat, Reproductive and Biochemical Performance of* Daphnia magna, 168 Chemosphere 1613, 1613–18 (2017), https://perma.cc/NF8R-U3BC; Michelle MacDonald et al., *Toxicity of Perfluorooctane Sulfonic Acid and Perfluorooctanoic Acid to* Chironomus tentans, 23 Env't Toxicology & Chem. 2116, 2116 (2004), https://perma.cc/HM58-6M2U.

[52] *See, e.g.*, Line S. Haug et al., *Diet and Particularly Seafood are Major Sources of Perfluorinated Compounds in Humans*, 36 Env't Int'l 772, 776 (2010), https://perma.cc/4844-ZJ9E; *see also* EPA, *Framework For Estimating Noncancer Health Risks Associated With Mixtures Of Per- and Polyfluoroalkyl Substances (PFAS)* 12 (Mar. 2023), https://perma.cc/Z8R2-2ZW3; Patricia A. Fair et al., *Perfluoroalkyl Substances (PFASs) in Edible Fish Species from Charleston Harbor and Tributaries, South Carolina, United States: Exposure and Risk Assessment*, 171 Env't Rsch. 266 (Apr. 2019), https://perma.cc/TR4K-8D8M; Patricia A. Fair et al., *Associations Between Perfluoroalkyl Compounds and Immune and Clinical Chemistry Parameters in Highly Exposed Bottlenose Dolphins (*Tursiops Truncatus*)*, 32 Env't Toxicology & Chem. 736 (2013), https://perma.cc/958P-C6VZ; Charlotta Rylander et al., *Dietary Predictors and Plasma Concentrations of Perfluorinated Compounds in a Coastal Population from Northern Norway*, J. Env't & Pub. Health (2009), https://perma.cc/4SLW-KTNQ (demonstrating "that PFOS and PFHpS concentrations . . . increased with intake of fatty fish"); Jerzy Falandysz et al., *Is Fish a Major Source of Fluorinated Surfactants and Repellents in Humans Living on the Baltic Coast?*, 40 Env't Sci. Tech. 748, 750–51 (2006), https://perma.cc/L53B-FVTR.

[53] Nadia Barbo et al., *Locally Caught Freshwater Fish Across the United States Are Likely a Significant Source of Exposure to PFOS and Other Perfluorinated Compounds*, 220 Env't Rsch. 115165, 3 (2023), https://perma.cc/MP9E-MW82; Falandysz et al., *supra* note 52, at 748.

[54] Patricia A. Fair et al., *Perfluoroalkyl Substances (PFASs) in Edible Fish Species from Charleston Harbor and Tributaries, South Carolina, United States: Exposure and Risk Assessment*, 171 Env't Rsch. 266, 271 (Apr. 2019), https://perma.cc/TR4K-8D8M.

[55] Nadia Barbo et al., *Locally Caught Freshwater Fish Across the United States Are Likely A Significant Source of Exposure to PFOS and Other Perfluorinated Compounds*, 220 Env't Rsch. 115165, 9 (2023), https://perma.cc/MP9E-MW82.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 12 of 28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

groundwater beneath the Landfill, GFL's gravity groundwater intercept system outfalls, ditches, channels, and other conveyances discharging into Bearskin Swamp:

PFOA

PFOS

GenX chemicals

Nafion Byproduct 1

Nafion Byproduct 2

Nafion Byproduct 4

Nafion Byproduct 5

Nafion Byproduct 6

HydroEVE

PFBA

PFBS

Perfluoroheptanoic acid ("PFHpA")

PFHxS

PFNA

PFPeA

Perfluoropentane sulfonic acid ("PFPeS")

Perfluoroethoxysulfonic acid ("NVHOS")

Perfluoro-4-isopropoxybutanoic acid ("PFECA-G")

Perfluoro(3,5,7,9-tetraoxadecanoic) acid ("PFO4DA")

Perfluoro(3,5,7-trioxaoctanoic) acid ("PFO3OA")

Perfluoro(3,5-dioxahexanoic) acid ("PFO2HxA")

Perfluoro-2-methoxyaceticacid ("PFMOAA")

Perfluoro-3-methoxypropanoic acid ("PFMOPrA")

Perfluoro-4-methoxybutanoic acid ("PFMOBA")

PFPrA

R-EVE

Perfluoro-3,5,7,9,11-pentaoxadodecanoic acid ("PFO5DA")

Perfluoroethoxypropyl carboxylic acid ("PEPA")

Perfluoromethoxypropyl carboxylic acid ("PMPA")

6:2 fluorotelomersulfonic acid ("6:2 FTS")

8:2 fluorotelomersulfonic acid ("8:2 FTS")

The discharge of any PFAS compound into Bearskin Swamp constitutes a Clean Water Act violation.[56]

　　　　1.  *GFL Has Been Discharging PFAS to Bearskin Swamp Since at Least 2019*

　　　　GFL's persistent PFAS pollution of Bearskin Swamp was first documented nearly five years ago, when researchers at the University of North Carolina Chapel Hill ("UNC

---

[56] There are over 15,000 known PFAS compounds. It is highly likely additional PFAS are present at the Landfill and in GFL's discharges to Bearskin Swamp. *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, Nat'l Inst. of Env't Health Scis. (last updated Apr. 2, 2024), https://perma.cc/C8LF-RAEQ (citing *CompTox Chemicals Dashboard*, EPA, https://comptox.epa.gov/dashboard/chemical-lists/PFASSTRUCT)).

Notice of Intent to Sue
May 7, 2024
Page 13 of 28

Researchers") found significantly higher concentrations of PFAS adjacent to and downstream of the Landfill relative to upstream.[57] Their findings were peer-reviewed and published in 2023. As illustrated in the figures below, the UNC Researchers sampled surface waters upstream of, adjacent to, and downstream of the Landfill and found extremely high PFAS concentrations at three sampling locations adjacent to the Landfill and elevated PFAS concentrations downstream of the Landfill.[58]

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

---

[57] Aleah Walsh & Courtney G. Woods, *Presence of Perfluoroalkyl Substances in Landfill Adjacent Surface Waters in North Carolina*, 20 Int'l J. Env't Rsch. & Pub. Health 6524 at 4 (Aug. 4, 2023), https://perma.cc/D7RW-A64U (hereinafter "Walsh & Woods 2023 UNC Study").
[58] *Id.*

Notice of Intent to Sue
May 7, 2024
Page 14 of 28

**Figure 1: Surface Water Sampling, UNC Researchers[59]**



---

[59] *Id.*

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 15 of 28

The UNC Researchers identified twelve PFAS compounds at their sampling locations along Bearskin Swamp: PFBA, PFPeA, PFBS, PFHxA, PFHpA, PFOA, GenX chemicals, PMPA, PEPA, NVHOS, Nafion Byproduct 2, and Nafion Byproduct 4.[60] They found that "PFAS concentrations were lowest at the upstream site [marked on the above map as HP] and [upstream] tributary sites (MKt, KRt) and highest at the sites proximal to the landfill (ML, RB, and MK)."[61] PFAS levels were significantly higher near the Landfill, ranging from 0.85 to 26.2 times higher compared to upstream sites.[62] The UNC Researchers concluded that there is likely migration of the Landfill's leachate off-site,[63] and "contamination . . . is entering the surrounding environment."[64] This data demonstrates that GFL's PFAS pollution of Bearskin Swamp dates back to at least October 2019, with clear evidence of PFAS at elevated levels downstream of the Landfill on sampling dates October 12, 2019; November 10, 2019; December 20, 2019; and January 25, 2020.

### 2. GFL's Pollution of Bearskin Swamp Is Ongoing

Last year, the North Carolina Department of Environmental Quality ("DEQ") began sampling the stream in Bearskin Swamp for PFAS. Like the UNC Researchers, DEQ found relatively low levels of PFAS upstream, extremely high levels of PFAS adjacent to, and persistently elevated levels of PFAS downstream of the Landfill.

DEQ used the following sampling locations for PFAS testing:

- SW-1: "Surface water point SW-1 is the facility's upstream sampling point located along Bearskin Swamp to the north of the active facility."[65] (34.980126, -78.448936).[66]
- SW-4: "Surface water point SW-4 is located downstream and north of the active MSW landfill along an unnamed tributary to Bearskin Swamp."[67] (34.98779, -78.457848).[68]
- SW-5: "Surface water point SW-5 is a second downstream sampling location located east of the active facility in a drainage channel that discharges into a wetland area."[69] (34.989879, -78.454919).[70]

---

[60] *See id*. at 6.
[61] *Id*. at 7.
[62] *Id*. at 11.
[63] *See id*. at 12.
[64] *Id*. at 11.
[65] First Semi-Annual 2023 Sampling Event, Permit No. 82-02, *supra* note 16, at 7.
[66] *Revised Work Plan for PFAS Sampling and Analysis – Permit No. 82-02*, GFL Env't Inc., tbl.3 (June 29, 2023), https://edocs.deq nc.gov/WasteManagement/DocView.aspx?id=1809883&dbid=0&repo=WasteManagement, https://perma.cc/8DZN-BAJ7 (hereinafter "2023 PFAS Work Plan for 82-02").
[67] First Semi-Annual 2023 Sampling Event, Permit No. 82-02, *supra* note 16, at 7.
[68] 2023 PFAS Work Plan for 82-02, *supra* note 66, at tbl.3.
[69] First Semi-Annual 2023 Sampling Event, Permit No. 82-02, *supra* note 16, at 7.
[70] 2023 PFAS Work Plan for 82-02, *supra* note 66, at tbl.3.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 16 of 28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

- SW-1S: "upstream" of closed MSW/C&D landfills "toward the northern end of the property"[71] (34.970538 -78.445721).[72]
- SW-2S: "Downstream" of closed MSW/C&D landfills "toward the southern end of the property where Highway 24 passes over Bearskin Swamp."[73] (34.964388 - 78.444143).[74] Both SW-1S and SW-2S "are located along Bearskin Swamp on the eastern property boundary, which drains into Little Coharie Creek."[75]

These are the same sampling locations used by GFL in their semi-annual monitoring plans and PFAS Monitoring Plans.[76]

---

[71] *Water Quality Monitoring Report, Second Semi-Annual 2022 Sampling Event* 6, GFL Env't Inc. (Mar. 8, 2023), https://edocs.deq nc.gov/WasteManagement/DocView.aspx?id=1792514&dbid=0&repo=WasteManagement, https://perma.cc/UA22-5ZVE (hereinafter "Second Semi-Annual 2022 Sampling Event, Permit No. 82-01").

[72] *Revised Work Plan for PFAS Sampling and Analysis – Permit No. 82-01*, GFL Env't Inc., tbl.4 (June 29, 2023), https://edocs.deq nc.gov/WasteManagement/DocView.aspx?id=1809881&dbid=0&repo=WasteManagement, https://perma.cc/6XLX-FCWB (hereinafter "2023 PFAS Work Plan for 82-01").

[73] Second Semi-Annual 2022 Sampling Event, Permit No. 82-01, *supra* note 71, at 6-7.

[74] 2023 PFAS Work Plan for 82-01, *supra* note 72, at tbl.4.

[75] Second Semi-Annual 2022 Sampling Event, Permit No. 82-01, *supra* note 71, at 6.

[76] *See* First Semi-Annual 2023 Sampling Event, Permit No. 82-02*, supra* note 16 (most recent publicly available semi-annual water quality monitoring plan for active landfill); Second Semi-Annual 2022 Sampling Event, Permit No. 82-01, *supra* note 71 (most recent publicly available water quality monitoring plan for closed landfill); *see also* 2023 PFAS Work Plan for 82-02*, supra* note 66 (PFAS monitoring plan for active landfill); 2023 PFAS Work Plan for 82-01, *supra* note 72 (PFAS monitoring plan for closed landfill).

Notice of Intent to Sue
May 7, 2024
Page 17 of 28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Figure 2: Surface Water Sampling DEQ (see Attachments 1 and 2)**



Notice of Intent to Sue
May 7, 2024
Page 18 of 28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

In September of 2023, DEQ sampled Bearskin Swamp over a two-day period. The results, at Attachment 1, speak for themselves: upstream, PFAS levels are relatively low or non-detectable, but adjacent to and downstream of the active MSW and C&D units, PFAS concentrations exceed health-based standards by several orders of magnitude. This trend is pronounced for PFAS compounds that are proprietary to or associated with the Chemours Fayetteville Works site. This pattern is unsurprising, since GFL contracted with Chemours to accept millions of pounds of PFAS-contaminated sludge from Chemours for decades.

**Figure 3: Total PFAS at Sampling Locations Near Landfill (see Attachment 1)[77]**



DEQ most recently sampled Bearskin Swamp in November 2023, again finding significantly higher PFAS concentrations downstream of the Landfill than upstream. DEQ's upstream sampling location was located where Bearskin Swamp flows past Bonnetsville Road, (35.01352, -78.44878). DEQ's downstream sampling location was located just south of the Landfill, where Bearskin Swamp flows under Roseboro Highway (34.96392, -78.44384). Results from this sampling event are recorded in Attachment 2.

---

[77] Here, "total PFAS" reflects the sum of all PFAS collected by DEQ. This only represents a small fraction of the thousands of PFAS compounds which are potentially present.

Notice of Intent to Sue
May 7, 2024
Page 19 of 28

**Figure 4: Upstream and Downstream Sampling Results, Nov. 14, 2023 (see Attachment 2)**



### VI.    GFL is violating the Clean Water Act

#### A. GFL Is Unlawfully Discharging PFAS into Bearskin Swamp in Violation of Clean Water Act Section 301

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[78] To that end, section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source to waters of the United States except in compliance with, among other conditions, a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342.

Under the Clean Water Act, "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source."[79] The term "pollutant" includes "solid waste, . . . sewage, garbage . . . chemical wastes, biological materials . . . and industrial, municipal, and agricultural waste."[80] The term "point source" includes any "discernible, confined and discrete conveyance" from which pollutants may be discharged, including pipes, ditches, channels, tunnels, conduits, wells, discrete fissures, and containers.[81] Congress has also made it clear that a landfill leachate collection system is a point source under the Clean Water Act.[82] The

---

[78] Clean Water Act, 33 U.S.C. § 1251(a).

[79] 33 U.S.C. § 1362(12)(A).

[80] *Id.* § 1362(6).

[81] *Id.* § 1362(14).

[82] *Hudson River Fishermen's Ass'n. v. Westchester Cnty.*, 686 F. Supp. 1044, 1048 (S.D.N.Y. 1988) ("In 1987, Congress made clear that the term point source includes a landfill leachate collection system . . . For that matter, leaks from a leachate collection system have been held to constitute a possible point source.") (citing Water Quality Act of 1987, Pub. L. No. 100-4, § 507, 101 Stat. 7, 78 (1987) and *O'Leary v. Moyer's Landfill, Inc.*, 523 F. Supp. 642, 647 (E.D. Pa. 1981)).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 20 of 28

point source need not be the original source of the pollution however; all that is required is that it conveys the pollution to a water of the United States.[83]

Surface waters are "waters of the United States" if they are, among other things, "currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce" or are "relatively permanent, standing or continuously flowing" tributaries of such waters.[84] Wetlands adjacent to navigable waters or tributaries of navigable waters are waters of the United States if they have a "continuous surface connection to those waters."[85]

GFL's Clean Water Act violations are longstanding and ongoing. GFL has violated and continues to violate the Act by discharging PFAS into the stream and wetlands that comprise Bearskin Swamp—both waters of the United States—from multiple point sources, including but not limited to:

- A drainage channel identified as "SW-5" that discharges PFAS into Bearskin Swamp;
- Outfalls 1 & 2 of the Landfill's GGI system, which discharge PFAS into Bearskin Swamp;
- The Landfill and its leachate collection system, which discharge PFAS into groundwater that flows into Bearskin Swamp; and
- The Landfill and its leachate collection system, including toe drains, as well as several additional ditches, channels, and other conveyances that discharge PFAS into Bearskin Swamp.

These discharges are not authorized by GFL's existing certificate of coverage under North Carolina's General Stormwater Permit, NCG120054, and GFL's discharges of PFAS from stormwater outfalls into Bearskin Swamp violate that permit.

### 1. The Navigable Stream and Adjacent Wetlands that Comprise Bearskin Swamp Are Waters of the United States

Bearskin Swamp is a permanently flooded riverine system that includes wetlands and a stream.[86] The stream is a permanent, continuously flowing tributary of the Little Coharie Creek and part of the Cape Fear River Basin.[87] The wetlands have a continuous surface connection to

---

[83] *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004) ("[A] point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.'"); 33 U.S.C. § 1362(7) (defining "navigable waters" as "waters of the United States, including the territorial seas").

[84] Revised Definition of 'Waters of the United States', 88 Fed. Reg. 3004, 3070, 3098 (Jan. 18, 2023); 40 C.F.R. § 120.2(a) (2023); *see also* Revised Definition of 'Waters of the United States'; Conforming, 88 Fed. Reg. 61,964 (Sept. 8, 2023). For violations occurring prior to March 20, 2023, see Consolidation of Corps Permit Regulations, 51 Fed. Reg. 41216-17 (Nov. 13, 1986); 33 C.F.R § 328.3 (March 19, 2023).

[85] 40 C.F.R. § 120.2(a).

[86] *National Wetlands Inventory*, U.S. Fish & Wildlife Serv. (last accessed May 3, 2024), https://fwsprimary.wim.usgs.gov/wetlands/apps/wetlands-mapper/ (coordinates 34.983, -78.438; check boxes labeled "Wetlands" and "Riparian" in top left corner).

[87] *See* 40 C.F.R. § 120.2(a).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 21 of 28

the stream.[88] Therefore, both the stream and wetlands that make up Bearskin Swamp are waters of the United States.

### 2.  PFAS Are Pollutants Under the Clean Water Act

As noted above, the Clean Water Act defines the term "pollutant" broadly to include "solid waste, . . . sewage, garbage . . . chemical wastes, biological materials . . . and industrial, municipal, and agricultural waste."[89] PFAS fall within this broad category.[90]

#### a)  Discharge through Drainage Channel at SW-5

GFL discharges PFAS into Bearskin Swamp through a drainage channel labelled SW-5. GFL's semi-annual monitoring reports openly acknowledge that SW-5 is a point source that discharges into wetlands, stating: "Surface water point SW-5 is a second downstream sampling location located east of the active facility *in a drainage channel that discharges into a wetland area*."[91] GFL and its subsidiaries have described SW-5 as a drainage channel that discharges into a wetland since at least 2008.[92]

Sampling conducted by DEQ on September 13, 2023, revealed extremely high PFAS concentrations in the SW-5 drainage channel. These results, described in Section V.D. 2. in Figures 2 and 3 and set forth in Attachment 1, demonstrate GFL is unlawfully discharging PFAS through this drainage channel into Bearskin Swamp.

#### b)  Discharge through GGI Outfall 1 and GGI Outfall 2

Outfall 1 and Outfall 2 of the Gravity Groundwater Intercept ("GGI") system are point sources discharging PFAS into Bearskin Swamp through two outlets. GGI Outfall 1 is located "east of the [active] MSW landfill" and GGI Outfall 2 is located "north of the [active] MSW."[93] According to GFL's own reports,"[b]oth GGI outfalls discharge into wetland areas on the property."[94] The engineering firm hired by GFL to design the GGI system confirms that the system includes a "discharge line which gravity drains to Bearskin Swamp."[95] Hand-drawn illustrations from GFL's 2023 Semi-Annual Monitoring Report also clearly show drainage pipe outfalls discharging into areas labelled as "swamp."

---

[88] *See id.*; *see also Sackett v. EPA*, 598 U.S. 651, 678-79 (2023).

[89] 33 U.S.C. § 1362(6).

[90] *See generally, e.g.*, *Parris v. 3M Co.*, 595 F. Supp. 3d 1288 (N.D. Ga. 2022) (treating PFAS as a pollutant under the Clean Water Act).

[91] First Semi-Annual 2023 Sampling Event, Permit No. 82-02, *supra* note 16, at 7 (emphasis added).

[92] *Water Quality Monitoring Report, Second Semi-Annual 2007 Sampling Event* 3, GFL Env't Inc. (Feb. 13, 2008), https://edocs.deq nc.gov/WasteManagement/DocView.aspx?id=73188&dbid=0&repo=WasteManagement, https://perma.cc/HCZ6-KHWV.

[93] First Semi-Annual 2023 Sampling Event, Permit No. 82-02, *supra* note 16, at 7.

[94] *Id.*

[95] *Id.*; *see also* Stacey A. Smith & Joan A. Smyth, *Gravity Driven Dewatering Systems for Landfill Expansion*, 109 Waste Mgmt. & Env't IV 183, 190 (2008), https://perma.cc/378U-4P98 ("[T]he site received approval to complete the dewatering system with the discharge pipe to Bearskin Swamp[.]") (hereinafter "Smith & Smyth").

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 22 of 28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Figures 5 and 6: GGI Outfall Diagrams**[96]

 

The low-lying, Eastern counties of North Carolina—including Sampson County—are characterized by high groundwater tables.[97] Landfills in North Carolina are required to keep a four-foot separation between the uppermost aquifer and the landfill liner to prevent groundwater contamination.[98] But this requirement reduces the available airspace—the volume of space on a landfill site permitted for disposal of solid waste—and required GFL to import extra soil from offsite, cutting into the company's bottom line. GFL and its predecessors thus installed a GGI system, which artificially lowered the aquifer by 10-15 feet and increased the amount of landfill airspace by 2.5 million cubic yards, thereby maximizing the Landfill's profitability.[99]

The GGI system, in operation at the Landfill since 2005, consists of "a series of trenches that intercept and gravity drain groundwater underneath the cells[.]"[100] According to GFL, the system "drains to a sump underneath each cell. Each sump is connected to a discharge line which gravity drains to Bearskin Swamp."[101] The designers of the GGI system noted that the site's "steep topography leading to [Bearskin Swamp] was a key element to the dewatering system being driven by gravity in perpetuity."[102] In other words, the GGI system captures groundwater

---

[96] First Semi-Annual 2023 Sampling Event, Permit No. 82-02, *supra* note 16, at 128-29.
[97] *See, e.g.*, Corey Davis, *Our Curious Coast: Rivers and Wetlands*, N.C. State Univ. (July 20, 2022), https://perma.cc/3KRR-YVJV.
[98] Smith & Smyth, *supra* note 95, at 183-184; *see also* N.C.G.S. § 130A-295.6(f); 15A N.C. Admin. Code 13B 0.1624(b)(4).
[99] Smith & Smyth, *supra* note 95, at 190.
[100] Letter from John R. Fearrington, Project Eng'r, Smith & Gardner, to Elizabeth Werner, Hydrogeologist, Dep't of Env't Quality (May 5, 2017), https://edocs.deq nc.gov/WasteManagement/DocView.aspx?id=685843&dbid=0&repo=WasteManagement, https://perma.cc/2FVU-AXDP.
[101] *Id.*
[102] Smith & Smyth, *supra* note 95, at 184.

Notice of Intent to Sue
May 7, 2024
Page 23 of 28

under the Landfill's cells and discharges it to Bearskin Swamp.

The shallow groundwater under both the open and closed cells of the Landfill is highly contaminated by PFAS present in the Landfill's leachate. MW-107A, a groundwater monitoring well located to the East (downgradient) of the active MSW landfill, near Bearskin Swamp, measured a total PFAS concentration of 63,437.33 ppt. MW-15, located on the Southeast side of the closed MSW landfill, has a total PFAS concentration of 29,771.03 ppt. MW-2N, located South and East of the active MSW landfill, has a total PFAS concentration of 18,354.42 ppt. And MW-108, located between the active MSW landfill and GGI Outfall 1, measured 5,852.075 ppt (with a field duplicate of 6,308.387 ppt). A spreadsheet documenting the groundwater monitoring results from sampling conducted by DEQ at these monitoring wells is attached as Attachment 3.

The water captured by the GGI system and discharged into Bearskin Swamp is also highly contaminated by PFAS compounds present in landfill leachate. DEQ sampling conducted on September 14, 2023 revealed extremely high PFAS concentrations at both outfalls: GGI Outfall 1 had 9,590.99 ppt total PFAS (with a field duplicate of 9,504.31 ppt), and GGI Outfall 2 had 3,884.822 ppt total PFAS.[103] A spreadsheet documenting PFAS concentrations at GGI Outfall 1 and GGI Outfall 2 is attached as Attachment 4.

GFL's discharge of PFAS from the GGI system into Bearskin Swamp violates the Clean Water Act's prohibition on unpermitted discharges.

c)  <u>Other Discharges from the Landfill into Bearskin Swamp</u>

GFL is also discharging PFAS into Bearskin Swamp from the Landfill and the leachate collection system, and through various other conveyances and mismanaged sediment and erosion control measures, including toe drains, ditches, channels, and retention ponds along the Eastern side of the active MSW and C&D and closed MSW units. PFAS-contaminated water is being conveyed overland from the base of these units into Bearskin Swamp through these conveyances and sediment and erosion control measures, which are particularly active following rain events.

GFL is also discharging PFAS from the Landfill and its leachate collection system to groundwater, through which PFAS then travels to the hydrologically connected Bearskin Swamp. As discussed above, groundwater beneath the Landfill is highly contaminated by PFAS compounds present in the leachate.[104] Groundwater at the site flows downhill from west to east, directly into Bearskin Swamp.[105] As the United States Supreme Court explained in 2020, a discharge of pollutants from a point source into navigable waters after traveling through groundwater is subject to the Clean Water Act's permitting requirements if that discharge is the "functional equivalent of a direct discharge from the point source into navigable waters."[106] Here, GFL's discharge of PFAS into groundwater, which travels only a few hundred feet downgradient before entering Bearskin Swamp is the functional equivalent of a direct discharge, as, among

---

[103] Here, "total PFAS" reflects the sum of all PFAS collected by DEQ. This only represents a small fraction of the thousands of PFAS compounds which are potentially present.
[104] *See* Attachment 3.
[105] *See* First Semi-Annual 2023 Sampling Event, Permit No. 82-02, *supra* note 16, at 111 fig.1.
[106] *Cnty. of Maui, Haw. v. Haw. Wildlife Fund*, 590 U.S. 165, 183-84 (2020).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 24 of 28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

other factors, the transit time and distance traveled are short, and minimal chemical alteration occurs. GFL's discharge of PFAS through groundwater into waters of the United States thus violates the Clean Water Act's prohibition on unpermitted discharges.

### B. GFL's Discharges of PFAS-Contaminated Stormwater Are Unpermitted and Violate the Stormwater General Permit

As noted above, no NPDES permit authorizes GFL to discharge PFAS into Bearskin Swamp. GFL's only active NPDES permit is a certificate of coverage under the State Stormwater General Permit for Landfills, NCG120054 ("Stormwater General Permit"). This permit authorizes the Landfill to "discharge stormwater," but specifically omits from its coverage discharges of *contaminated* stormwater—that is, any stormwater that has come into "direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater."[107] Moreover, the notice of intent to receive coverage under the Stormwater General Permit instructs applicants that "discharge of waste (including leachate) to the waters of the state *are specifically excluded from coverage under this General Permit*."[108] The permit also provides that discharges besides those authorized by the permit— i.e., everything other than non-contaminated stormwater[109]—are "prohibited."[110]

The Landfill's stormwater runoff system includes several stormwater outfalls that discharge directly into Bearskin Swamp. Outfalls 3, 4, 5, and 6 discharge to the east of the Landfill into Bearskin Swamp.[111] GFL has also identified "Bearskin Creek" as the receiving waters for Outfalls 1, 2, and 10.[112] The Stormwater General Permit requires representative outfalls to be monitored for chemical oxygen demand, total suspended solids, and fecal coliform.[113] Sampling conducted by GFL and submitted to DEQ reveals consistently high fecal

---

[107] Contaminated stormwater is defined in the permit as "[s]tormwater that comes into direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater as defined in this section. Some specific areas of a landfill that may produce contaminated stormwater include (but are not limited to): the open face of an active landfill with exposed waste (no cover added); the areas around wastewater treatment operations; trucks, equipment, or machinery that have been in direct contact with the waste; and waste dumping areas." *General Permit No. NCG120000* 27, N.C. Dep't of Env't Quality (July 1, 2021), https://perma.cc/XRB5-PGBC (hereinafter "Permit No. NCG120000").

[108] Div. of Energy, Min., & Land Res. Land Quality Section, *National Pollutant Discharge Elimination System NCG120000 Notice of Intent* 1, N.C. Dep't of Env't Quality, https://perma.cc/62TR-B2QM (emphasis in original).

[109] Non-contaminated stormwater is defined in the permit as "[s]tormwater that does not come into direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater as defined in this section. Non-contaminated stormwater includes stormwater that flows off the cap, cover, intermediate cover, daily cover, and/or final cover of the landfill." NCG120000, *supra* note 107, at 28.

[110] *See id.* at 2.

[111] *See, e.g.*, *Representative Outfall Plan*, GFL Env't Inc. (June 2010), https://edocs.deq nc.gov/Stormwater/DocView.aspx?id=982969&dbid=0&repo=WaterResources, https://perma.cc/EVC8-W4F4.

[112] *See, e.g.*, John R. Fearrington, *2019 Second Semi-Annual Discharge Monitoring Report* 2, Smith & Gardner Eng'rs (Dec. 30, 2019), https://edocs.deq nc.gov/WaterResources/DocView.aspx?id=1144121&dbid=0&repo=WaterResources, https://perma.cc/QWK6-SAGB.

[113] *Id.*; *see also* Permit No. NCG120000, *supra* note 107, at 10.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Notice of Intent to Sue
May 7, 2024
Page 25 of 28

coliform levels at these stormwater outfalls.[114] This data suggests that GFL is discharging contaminated stormwater—i.e. stormwater that has come into direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater—in violation of the Stormwater General Permit. Moreover, surface water sampling locations in Bearskin Swamp near and downstream of the stormwater outfalls show elevated PFAS concentrations, making each of these stormwater outfalls—Outfalls 1, 2, 3, 4, 5, 6, and 10—likely sources of unlawful PFAS discharges.

Discharges of contaminated stormwater are prohibited by the Stormwater General Permit. GFL's discharge of PFAS-contaminated stormwater through Outfalls 1, 2, 3, 4, 5, 6, and 10 therefore constitutes noncompliance with the Stormwater General Permit and the Clean Water Act, because, as the Permit explains, "any [Stormwater General] permit noncompliance constitutes a violation of the Clean Water Act[.]"[115]

In sum, the Stormwater General Permit does not authorize GFL to discharge PFAS into Bearskin Swamp—in fact, the Permit prohibits such discharges. Therefore, GFL's discharges of PFAS into Bearskin Swamp through stormwater outfalls are both unpermitted discharges prohibited by the Clean Water Act and violations of the Stormwater General Permit.

### C.  GFL's Discharges Are Unlawful and Ongoing

GFL's unlawful and unpermitted discharges continue and are ongoing. GFL has violated, and will continue to violate, the Clean Water Act's prohibition on unpermitted discharges each and every day it discharges PFAS into Bearskin Swamp without a permit authorizing these discharges.

GFL has, every day for the past five years, violated and continues to violate the Clean Water Act each time it discharged PFAS into Bearskin Swamp from the drainage channel at SW-5; the GGI system at outfalls GGI-1 and GGI-2; the stormwater outfalls; from the Landfill and its leachate collection system through toe drains and other overland conveyances on the eastern side of the Landfill; and from the Landfill and its leachate collection system through groundwater. These violations have been ongoing since at least 2019, including, but not limited to, the following dates when sampling events conducted by DEQ, GFL, and/or UNC Researchers, confirmed GFL's unlawful PFAS discharges into Bearskin Swamp:

- October 12, 2019
- November 10, 2019
- December 20, 2019
- January 25, 2020

---

[114] *See, e.g.*, Matthew M. Jones, *November 2022 Exceedence Reporting and Tier Notification Sampson County Disposal, LLC Landfill Certificate of Coverage #NCG120054 General Permit #NCG120000*, Smith & Gardner Eng'rs (Dec. 21, 2022), https://edocs.deq nc.gov/WaterResources/DocView.aspx?id=2624462&dbid=0&repo=WaterResources, https://perma.cc/8M5X-KNQF.
[115] Permit No. NCG120000, *supra* note 107, at 22.

Notice of Intent to Sue
May 7, 2024
Page 26 of 28

- September 11, 2023
- September 13, 2023
- September 14, 2023
- November 14, 2023

These violations continue to this day.

**VII.    Conclusion**

As described above, GFL's discharges of PFAS to waters of the United States constitute ongoing and recurrent violations of the Clean Water Act. EJCAN is prepared to file suit under 33 U.S.C. § 1365 against GFL (with Sampson County Disposal, LLC; Waste Industries USA, LLC; Waste Industries LLC; and GFL Environmental, Inc. joined as defendants) once the notice period has expired, unless GFL takes immediate steps to redress this harm.

During the relevant notice period, EJCAN is willing to discuss the factual assertions set forth in this letter as well as effective remedies for the violations noted above. EJCAN also remains willing to discuss the subject matter of its RCRA notice. EJCAN has retained the assistance of the counsel listed below, and all responses to this letter should be directed to the undersigned counsel.

Thank you for your prompt attention to this matter.

Sincerely,

Maia Hutt
Staff Attorney
Southern Environmental Law Center
(919) 391-7537
mhutt@selcnc.org

Irena Como
Senior Attorney
Southern Environmental Law Center
(919) 867- 4404
icomo@selcnc.org

Notice of Intent to Sue
May 7, 2024
Page 27 of 28

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

_Zoe Gabrielson_

Zoe Gabrielson
Associate Attorney
Southern Environmental Law Center
(919) 867-1817
zgabrielson@selcnc.org

Southern Environmental Law Center
601 W. Rosemary Street, Suite 220
Chapel Hill, NC 27516
919-967-1450

*Counsel for Environmental Justice
Community Action Network*

CC:

***Via electronic mail and certified mail – return receipt requested*:**

**Grady L. Shields**
Wyrick Robbins Yates & Ponton LLP
4101 Lake Boone Trail, Suite 300
Raleigh, NC 27615
gshields@wyrick.com

***Via certified mail – return receipt requested*:**

**Environmental Protection Agency Administrator and Region IV Administrator**

| | |
|---|---|
| **Michael S. Regan** | **Jeaneanne Gettle** |
| Administrator | Acting Regional Administrator |
| U.S. Environmental Protection Agency | U.S. EPA, Region 4 |
| Office of the Administrator | Sam Nunn Atlanta Federal Center |
| Mail Code 1101A | Mail Code 9T25 |
| 1200 Pennsylvania Avenue, NW | 61 Forsyth Street, SW |
| Washington, DC 20460 | Atlanta, GA 30303 |

Notice of Intent to Sue
May 7, 2024
Page 28 of 28

## Chief Administrative Officers of North Carolina's Solid Waste Management Agency

**Richard Rogers**
Division of Water Resources, Division
Director
N.C. Department of Environmental Quality
1611 Mail Service Center
Raleigh, NC 27699-1611

**Elizabeth S. Biser**
Secretary
N.C. Department of Environmental Quality
1601 Mail Service Center
Raleigh, NC 27699-1601

## United States Attorney General

**Hon. Merrick Garland**
Attorney General of the United States of
America
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530-0001

**Jolene Ann Lauria**
Acting Assistant Attorney General for
Administration
U.S. Department of Justice
Justice Management Division
950 Pennsylvania Avenue, NW
Room 1111
Washington, DC 20530

**Citizen Suit Coordinator**
U.S. Department of Justice
Environment and Natural Resources Div.
Law and Policy Section
P.O. Box 7415
Ben Franklin Station
Washington, DC 20044-7415

**Michael F. Easley, Jr.**
U.S. Attorney for the Eastern District of
North Carolina
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Attachment 1: Total PFAS at Sampling Locations Near Landfill, Sept. 2023 (in parts per trillion)**

| Pollutant | Upstream of Landfill | Adjacent to Active Landfill | | | Adjacent to Closed Landfill | | |
|---|---|---|---|---|---|---|---|
| | SW-1 | SW-4 | SW-5 | SW-5 (field duplicate) | SW-1S | SW-1S (field duplicate) | SW-2S |
| Nafion Byproduct 4 | 1.54 | 525 | 1440 | 1530 | 40.9 | 35.1 | 36.8 |
| GenX | 0.782 | 105 | 328 | 332 | 4.8 | 5.27 | 5.15 |
| PMPA | 4.7 | 47.3 | 153 | 157 | 6.31 | 6.51 | 6.27 |
| PFMOAA | 1.29 | 87 | 143 | 153 | 5.8 | 5.94 | 5.54 |
| Nafion Byproduct 5 | ND | 70.3 | 192 | 197 | 1.76 | 1.9 | 1.78 |
| Nafion Byproduct 2 | 0.664 | 31 | 50.2 | 49.8 | 2.08 | 2.18 | 2.19 |
| Nafion Byproduct 6 | ND | 6.87 | 8.63 | 10.2 | ND | ND | ND |
| Nafion Byproduct 1 | ND | ND | 5.05 | 6.87 | ND | ND | ND |
| PFO2HxA | 3.64 | 22.7 | 31.8 | 31.2 | 4.36 | 4.86 | 4.07 |
| PEPA | 0.399 | 12.6 | 15 | 13.7 | 0.872 | 0.872 | 2.01 |
| HydroEVE | ND | 16.4 | 24.6 | 25.1 | 1.11 | 1.22 | 1.26 |
| PFO3OA | 0.894 | 5.79 | 9.65 | 10.9 | 0.842 | 0.894 | 0.918 |
| PFECA-G | ND | 0.227 | ND | ND | ND | ND | ND |
| R-EVE | ND | 144 | 233 | 270 | 11.5 | 10.3 | 11.4 |
| PFO4DA | 0.384 | 2.05 | ND | 6.31 | ND | ND | ND |
| PFO5DA | 0.273 | 0.787 | ND | ND | ND | ND | ND |
| NVHOS | 1.26 | 401 | 820 | 947 | 46.9 | 48.8 | 49.9 |

Chemours-Associated PFAS[1]

Case 7:24-cv-00831-BO-RN    Document 1-9    Filed 08/30/24    Page 31 of 49

| Additional PFAS Compounds | | | | | | | |
|---|---|---|---|---|---|---|---|
| FPePA | ND | 9.37 | 79.3 | 85.1 | ND | ND | ND |
| PFBS | 1.32 | 101 | 138 | 142 | 6.5 | 5.69 | 6.35 |
| PFBA | ND | 138 | 227 | 223 | 15.2 | 14.5 | 14.9 |
| PFHpA | 1.07 | 33.4 | 111 | 96.7 | 4.11 | 3.83 | 4.7 |
| PFHxS | ND | 3.82 | 60.9 | 64.2 | ND | ND | ND |
| PFHxA | 0.948 | 128 | 389 | 388 | 12.9 | 12 | 13 |
| PFOA | 1.18 | 44 | 214 | 192 | 7.85 | 7.67 | 8.48 |
| PFOS | 3.55 | 4.3 | 104 | 110 | 2.45 | 2.98 | 2.86 |
| PFPeA | 3.29 | 455 | 984 | 878 | 32.7 | 32.7 | 34 |
| PFPrA | ND | 1350 | 2110 | 2280 | 30.5 | 31.3 | 30.1 |
| PFNA | ND | 1.52 | 16.6 | ND | ND | ND | ND |
| PFDA | ND | ND | 34.1 | 28.3 | ND | ND | ND |
| PFPeS | ND | 0.859 | ND | ND | ND | ND | ND |
| DONA, ADONA | ND | ND | ND | ND | ND | 15.8 | ND |
| PFMOPrA | 0.163 | 1.65 | ND | ND | ND | ND | ND |
| PFMOBA | ND | 5.25 | 6.03 | 5.57 | ND | ND | ND |
| **TOTAL PFAS[2]** | **27.347** | **3,754.193** | **7,927.86** | **8,232.95** | **239.444** | **250.316** | **241.678** |

[1] *Site Associated PFAS Fate and Transport Study Chemours Fayetteville Works*, Geosyntec Consultants (June 2019), https://www.chemours.com/en/-/media/files/corporate/p27-pfas-fate-transport-study-2019-06-24.pdf?rev=6a198d6bfae4429db853b01a52506e05&hash=1D1790D3BACD09B7AE21D46F4514EECD, https://perma.cc/77ZH-8WQD.

[2] Here, "total PFAS" reflects the sum of all PFAS collected by DEQ. This only represents a small fraction of the thousands of PFAS compounds which are potentially present.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Attachment 2: Upstream and Downstream Sampling Results, Nov. 2023**

**(in parts per trillion)**

| Pollutant | Upstream | Downstream | Downstream (field duplicate) |
|---|---|---|---|
| PFBS | 1.05 | 11.7 | 11.6 |
| PFBA | 4.67 | 29.7 | 30.7 |
| PFOS | 1.28 | 2.54 | 2.11 |
| PFOA | 0.76 | 10.9 | 11.4 |
| PFHpA | ND | 6.90 | 6.23 |
| PFHxS | ND | 1.79 | 1.95 |
| PFHxA | ND | 19.6 | 19.2 |
| PFPeS | ND | 0.667 | 0.708 |
| PFPeA | ND | 66.4 | 66.6 |
| NVHOS | ND | 62.8 | 62.5 |
| GenX | 0.575 | 13.8 | 13.4 |
| Nafion Byproduct 4 | 0.473 | 102 | 117 |
| Nafion Byproduct 5 | ND | 4.28 | 4.13 |
| Nafion Byproduct 6 | ND | 0.676 | 0.758 |
| HydroEVE | ND | 1.32 | 1.51 |
| Nafion Byproduct 2 | 0.295 | 3.94 | 4.24 |
| PFO4DA | 0.255 | 0.644 | 0.702 |
| PFO3OA | 0.506 | 1.16 | 1.27 |
| PFO2HxA | 1.62 | 3.65 | 3.54 |
| PFMOAA | 1.11 | 7.63 | 7.58 |
| PFMOBA | ND | 0.47 | 0.509 |
| PFPrA | 4.99 | 27.6 | 27.2 |
| R-EVE | ND | 20.5 | 23.2 |
| PFO5DA | ND | 0.227 | 0.187 |
| PEPA | 0.283 | 1.72 | 1.73 |
| PMPA | 3.72 | 8.75 | 8.55 |
| **TOTAL PFAS**[1] | **21.587** | **411.364** | **428.504** |

---

[1] Here, "total PFAS" reflects the sum of all PFAS collected by DEQ. This only represents a small fraction of the thousands of PFAS compounds which are potentially present.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Attachment 3: Onsite Groundwater Monitoring Wells, Sept. 2023 (in parts per trillion)**

| Pollutant | MW-107A | MW-15 | MW-2N | MW-108 | MW-108 (field duplicate) |
|---|---|---|---|---|---|
| FHpPA | ND | ND | 4.68 | ND | ND |
| FPePA | ND | ND | 212 | 8.26 | 8.43 |
| FPrPA | ND | ND | 16.6 | ND | ND |
| N-MeFOSAA | ND | ND | 23.9 | ND | ND |
| PFBS | 288 | 47.6 | 27.9 | 98.2 | 106 |
| PFBA | 1270 | 910 | 223 | 276 | 293 |
| PFDA | 18.3 | ND | 2.67 | 3.89 | 4.19 |
| PFHpS | ND | ND | 5.4 | ND | ND |
| PFHpA | 544 | 413 | 80.1 | 328 | 349 |
| PFHxS | 30.6 | ND | 188 | 11.1 | 11.1 |
| PFHxA | 439 | 171 | 141 | 406 | 379 |
| PFNA | 20 | ND | 8.57 | 12.8 | 14.9 |
| PFOS | 28.1 | ND | 103 | 4.1 | 3.94 |
| PFOA | 503 | 83.8 | 186 | 818 | 869 |
| PFPeS | ND | ND | 15.7 | 1.54 | 1.46 |
| PFPeA | 8850 | 11400 | 340 | 803 | 976 |
| NVHOS | 5260 | 462 | 128 | 650 | 720 |
| GenX | 70.8 | 2400 | 2060 | 464 | 486 |
| PFECA-G | ND | ND | ND | 0.328 | 0.336 |
| Nafion Byproduct 4 | 26900 | 672 | 4430 | 974 | 1100 |
| Nafion Byproduct 5 | 1770 | 84.7 | 590 | 29.8 | 26.2 |
| Nafion Byproduct 6 | 29.7 | 8.8 | ND | 6.72 | 6.1 |
| HydroEVE | 4.52 | 22.8 | 56.1 | 7.2 | 7.15 |
| Nafion Byproduct 2 | 60.4 | 26.3 | 25 | 34.9 | 33.4 |
| PFO4DA | ND | ND | ND | 1.34 | 1.27 |
| PFO3OA | 3.66 | 20.5 | 10.8 | 2.91 | 2.77 |
| PFO2HxA | 19.1 | 103 | 22.2 | 10.3 | 10.7 |
| PFMOAA | 114 | 313 | 123 | 24.4 | 25.4 |
| PFMOPrA | ND | 10.4 | ND | 0.651 | 0.708 |
| PFMOBA | 12.8 | 9.03 | ND | 3.22 | 3.29 |
| PFPrA | 16900 | 12000 | 8750 | 754 | 745 |
| R-EVE | 263 | 216 | 229 | 94 | 102 |
| PFO5DA | 3.05 | ND | 6.8 | 0.576 | 0.593 |
| PEPA | 10.2 | 66.1 | 11 | 5.44 | 5.15 |
| PMPA | 25.1 | 331 | 334 | 17.4 | 16.3 |
| **Total PFAS**[1] | **63,437.33** | **29,771.03** | **18,354.42** | **5,852.075** | **6,308.387** |

[1] Here, "total PFAS" reflects the sum of all PFAS collected by DEQ. This only represents a small fraction of the thousands of PFAS compounds which are potentially present.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Attachment 4: PFAS Concentrations at Groundwater Gravity Intercept Outfalls, Sept. 2023 (in parts per trillion)**

| Pollutant | GGI Outfall 1 | GGI Outfall 1 (field duplicate) | GGI Outfall 2 |
|---|---|---|---|
| FPePA | 3.13 | ND | 9.46 |
| 6:2 FTS | 26.1 | 26.2 | ND |
| 8:2 FTS | ND | 2.97 | ND |
| PFBS | 83.2 | 87.5 | 95.8 |
| PFBA | 202 | 213 | 117 |
| PFDA | 65.6 | 55.3 | ND |
| PFHpA | 273 | 284 | 29.5 |
| PFHxS | 11.6 | 11.9 | 3.3 |
| PFHxA | 304 | 351 | 120 |
| PFNA | 48.8 | 46.3 | 1.56 |
| PFOS | 19.5 | 17.8 | 1.32 |
| PFOA | 971 | 877 | 40.9 |
| PFPeA | 1050 | 1020 | 600 |
| NVHOS | 2080 | 2260 | 512 |
| GenX | 22.1 | 19.5 | 92.5 |
| Nafion Byproduct 4 | 2730 | 2540 | 510 |
| Nafion Byproduct 5 | 111 | 108 | 193 |
| Nafion Byproduct 6 | 24.6 | 22.6 | 6.71 |
| HydroEVE | 13.4 | 12.2 | 17.2 |
| PFO4DA | 7.78 | 7.26 | ND |
| PFO3OA | 11.3 | 11.2 | 2.91 |
| PFO2HxA | 20.5 | 20.6 | 14.9 |
| PFMOAA | 56.3 | 53.8 | 37.2 |
| PFMOBA | 3.7 | 3.98 | 1.95 |
| PFPrA | 1060 | 1090 | 1000 |
| R-EVE | 231 | 219 | 397 |
| PFO5DA | 33.29 | 2.86 | 0.685 |
| PEPA | 5.18 | 4.74 | 11.9 |
| PMPA | 18.6 | 18.1 | 30.1 |
| **Total PFAS[1]** | **9,590.99** | **9,504.31** | **3,884.822** |

---

[1] Here, "total PFAS" reflects the sum of all PFAS collected by DEQ. This only represents a small fraction of the thousands of PFAS compounds which are potentially present.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)     $
☐ Return Receipt (electronic)   $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required      $
☐ Adult Signature Restricted Delivery  $

Postmark
Here

MAY 07 2024
CHAPEL HILL NC 27514

Postage
$

Joseph Smith
Sampson County Landfill, Gen. Mgr.
GFL Environmental, Inc.
7434 Roseboro Hwy.
Roseboro, NC 28382

9589 9410 5270 1135 0671 94

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Joseph Smith
Sampson County Landfill, Gen. Mgr.
GFL Environmental, Inc.
7434 Roseboro Hwy.
Roseboro, NC 28382

9590 9402 8528 3186 5210 81

2. Article Number (Transfer from service label)

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Teresa Kongey     ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
Teresa Kongey                     5-14-24

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

ROSEBORO 28382
MAY 14 2024

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)          $
☐ Certified Mail Restricted Delivery     $
☐ Adult Signature Required          $
☐ Adult Signature Restricted Delivery $

Postage
$

Total Pos
$

Sent To    Bryan Wuester
Regional Landfill Manager
Street an  GFL Environmental, Inc.
City, Stat  7434 Roseboro Hwy.
Roseboro, NC 28382

Postmark
Here

MAY 7 2024

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Bryan Wuester
Regional Landfill Manager
GFL Environmental, Inc.
7434 Roseboro Hwy.
Roseboro, NC 28382

9590 9402 8849 4005 0192 46

2. Article Number (Transfer from service label)

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____          ☐ Agent
                                  ☐ Addre

B. Received by (Printed Name)     C. Date of Deliv
                                  5-14-24

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below?        ☐ No

MAY 14 2024

3. Service Type
☐ Adult Signature                 ☐ Priority Mail Express®
☐ Adult Signature Restricted Delivery  ☐ Registered Mail™
☐ Certified Mail®                 ☐ Registered Mail Restricted Delivery
☐ Certified Mail Restricted Delivery  ☐ Signature Confirmation™
☐ Collect on Delivery             ☐ Signature Confirmation
☐ Collect on Delivery Restricted Delivery  Restricted
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Receipt

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*

Raleigh, NC 27609

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)       $
☐ Return Receipt (electronic)     $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required        $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage
$

Total Postage and Fees
$

Sent To    **John Pfleger**
           Regional Env'tl Compliance Manager
Street a    GFL Environmental, Inc.
City, Sta   3301 Benson Dr., Suite 601
           Raleigh, NC 27609-7331
PS Form

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**John Pfleger**
Regional Env'tl Compliance Manager
GFL Environmental, Inc.
3301 Benson Dr., Suite 601
Raleigh, NC 27609-7331

9590 9402 8849 4005 0192 39

2. Article Number *(Transfer from service label)*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee
B. Received by *(Printed Name)*    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053                    Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)          $ _____
☐ Return Receipt (electronic)        $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage

$

Total Post*

$

Sent To    **CT Corporation System**
Street and **Registered Agent**
City, State **Sampson County Disposal, LLC**
           **160 Mine Lake Ct. Ste. 200**
           **Raleigh, NC 27615**

---

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**CT Corporation System**
Registered Agent
Sampson County Disposal, LLC
160 Mine Lake Ct. Ste. 200
Raleigh, NC 27615

9590 9402 8849 4005 0192 15

2. Article Number (Transfer from service label)

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Angel_____    ☐ Agent
                 ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
A. Jovel                        5/17

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523





ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523





ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523





ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $

Postage
$

Total Postage
$

Sent To    Michael S. Regan, Administrator, EPA
           Office of the Administrator
Street and Mail Code 1101A
City, State 1200 Pennsylvania Avenue, NW
           Washington, DC 20460

---

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. | A. Signature |
| ■ Print your name and address on the reverse so that we can return the card to you. | X ☐ Agent ☐ Addressee |
| ■ Attach this card to the back of the mailpiece, or on the front if space permits. | B. Received by *(Printed Name)*   C. Date of Delivery |
| 1. Article Addressed to: | D. Is delivery address different from item 1? ☐ Yes   If YES, enter delivery address below: ☐ No |

1. Article Addressed to:

**Michael S. Regan, Administrator, EPA**
Office of the Administrator
Mail Code 1101A
1200 Pennsylvania Avenue, NW
Washington, DC 20460

MAY 13 2024

9590 9402 8849 4005 0191 23

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

2. Article Number *(Transfer from service label)*

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

Atlanta, GA 30303

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage

$

Total P

$

Sent T    Jeaneanne Gettle
          Sam Nunn Atlanta Federal Center
Street    Mail Code 9T25
City, S   61 Forsyth Street, SW
          Atlanta, GA 30303

PS Form 3811

---

| **SENDER:** *COMPLETE THIS SECTION* | **COMPLETE THIS SECTION ON DELIVERY** |
|---|---|
| ■ Complete items 1, 2, and 3.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X    ☑ Agent   ☐ Addressee<br>B. Received by *(Printed Name)*   C. Date of Delivery |
| 1. Article Addressed to:<br><br>Jeaneanne Gettle<br>Sam Nunn Atlanta Federal Center<br>Mail Code 9T25<br>61 Forsyth Street, SW<br>Atlanta, GA 30303 | D. Is delivery address different from item 1? ☐ Yes<br>    If YES, enter delivery address below:  ☐ No |
| ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖<br>9590 9402 8849 4005 0191 16 | 3. Service Type<br>☐ Adult Signature<br>☐ Adult Signature Restricted Delivery<br>☐ Certified Mail®<br>☐ Certified Mail Restricted Delivery<br>☐ Collect on Delivery<br>☐ Collect on Delivery Restricted Delivery<br>☐ Insured Mail<br>☐ Insured Mail Restricted Delivery (over $500) | ☐ Priority Mail Express®<br>☐ Registered Mail™<br>☐ Registered Mail Restricted Delivery<br>☐ Signature Confirmation™<br>☐ Signature Confirmation Restricted Delivery |
| 2. Article Number *(Transfer from service label)* | |

PS Form **3811**, July 2020 PSN 7530-02-000-9053              Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com*.

Raleigh NC 27699

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)   $
☐ Return Receipt (electronic)   $
☐ Certified Mail Restricted Delivery   $
☐ Adult Signature Required   $
☐ Adult Signature Restricted Delivery   $

Postmark
Here

Postage
$

Total
$

Sent

Street

City

**Elizabeth S. Biser**
Secretary
N.C. Department of Environmental Quality
1601 Mail Service Center
Raleigh, NC 27699-1601

PS Form 3811   See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Elizabeth S. Biser**
Secretary
N.C. Department of Environmental Quality
1601 Mail Service Center
Raleigh, NC 27699-1601

9590 9402 8849 4005 0192 08

2. Article Number *(Transfer from service label)*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *Walter F. Lane*   ☐ Agent   ☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery
*William F. Lane*   *May 13, 2024*

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☑ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



U.S. Postal Service™
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage

$

Total P

$

Sent T    **Richard Rogers**
Street     Division of Water Resources
           N.C. Department of Environmental Quality
City, S    1611 Mail Service Center
           Raleigh, NC 27699-1611

ALERT: FLOODING AND SEVERE WEATHER IN THE SOUTH, SOUTHEAST, AND CENTRAL U.S. ...

# USPS Tracking®

FAQs ›

Remove ✕

**Tracking Number:**

## 9589071052701135067286

Copy          Add to Informed Delivery (https://informeddelivery.usps.com/)

### Latest Update

Your item was picked up at a postal facility at 10:09 am on May 9, 2024 in RALEIGH, NC 27699.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

● **Delivered**
**Delivered, Individual Picked Up at Postal Facility**
RALEIGH, NC 27699
May 9, 2024, 10:09 am

● **Arrived at Post Office**
RALEIGH, NC 27611
May 9, 2024, 9:40 am

● **In Transit to Next Facility**
May 8, 2024

● **Departed Post Office**
CHAPEL HILL, NC 27514
May 7, 2024, 5:00 pm

● **USPS in possession of item**
CHAPEL HILL, NC 27514
May 7, 2024, 12:45 pm

Feedback

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

● **Hide Tracking History**

**What Do USPS Tracking Statuses Mean?** (https://faq.usps.com/s/article/Where-is-my-package)

| Text & Email Updates | ⌄ |
|---|---|

| USPS Tracking Plus® | ⌄ |
|---|---|

| Product Information | ⌃ |
|---|---|

**Postal Product:**
First-Class Mail®

**Features:**
Certified Mail™

**See tracking for related item: 9590940288494005019109** (/go/TrackConfirmAction?tLabels=9590940288494005019109)

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

# Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ALERT: FLOODING AND SEVERE WEATHER IN THE SOUTH, SOUTHEAST, AND CENTRAL U.S. …

# USPS Tracking®

FAQs >

**Tracking Number:**

## 9590940288494005019109

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

### Latest Update

The U.S. Postal Service has received electronic notification on May 7, 2024 at 12:45 pm that you have associated a return receipt to your item.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

**Pre-Shipment**
**Return Receipt Associated**
May 7, 2024, 12:45 pm

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

Text & Email Updates                                    ⌄

USPS Tracking Plus®                                      ⌄

Product Information                                      ⌃

Remove ✕

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Feedback

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Postal Product:**
USPS Ground Advantage™

**Features:**
Return Receipt
USPS Tracking®

**See tracking for related item: 9589071052701135067286 (/go/TrackConfirmAction?tLabels=9589071052701135067286)**

## See Less ∧

Track Another Package

Enter tracking or barcode numbers

# Need More Help?

Contact USPS Tracking support for further assistance.

**FAQs**

# Exhibit 8

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF NORTH CAROLINA

## SOUTHERN DIVISION

ENVIRONMENTAL JUSTICE COMMUNITY ACTION NETWORK,

Plaintiff,

v.

GFL ENVIRONMENTAL, INC.; SAMPSON COUNTY DISPOSAL, LLC; WASTE INDUSTRIES, USA, LLC; WASTE INDUSTRIES, LLC; BLACK CREEK RENEWABLE ENERGY, LLC,

Defendants.

Civil Action No. 7:24-CV-831

## CONSENT DECREE

This Consent Decree is entered by and between Environmental Justice Community Action Network ("EJCAN", or "Plaintiff") and Sampson County Disposal, LLC and its parent and affiliated companies, Waste Industries, USA, LLC; Waste Industries, LLC; Black Creek Renewable Energy, LLC, and GFL Environmental, Inc. (together "GFL", or "Defendants"). Plaintiff and Defendants, as parties to this Consent Decree, are collectively referred to herein as the "Parties" or individually as a "Party." Capitalized terms used and not otherwise defined in the body of this Consent Decree shall have the meaning set forth in Article III.

1

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## I.    RECITALS

WHEREAS, Plaintiff EJCAN is a North Carolina non-profit member organization based in Sampson County, North Carolina, dedicated to achieving environmental justice and providing technical, legal, educational, and funding resources to Sampson County communities facing environmental problems; and EJCAN has members who live, work, or regularly visit family and friends in the unincorporated community of Snow Hill, located in Roseboro, North Carolina;

WHEREAS, Defendant GFL owns and operates the Landfill, which includes municipal solid waste and construction and demolition waste units, and is sited in the Snow Hill Community;

WHEREAS, PFAS chemicals are used in a large number of consumer products and industrial applications, including cookware, food packaging, stain repellant fabrics and carpeting, and fire-fighting foam, among others, which materials are typically disposed of in permitted solid waste landfills;

WHEREAS, GFL contends that the Chemours Company's Fayetteville facility was a customer of the Landfill that did not disclose that its waste contained significant amounts of PFAS, specifically Gen-X chemicals, until such information became public in 2018, at which point the Landfill voluntarily ceased accepting such waste;

2

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

WHEREAS, GFL contends that beginning in 2019 and continuing to the present, GFL has worked with DEQ to address potential environmental impacts associated with the Landfill's receipt of the PFAS-containing waste, including the Chemours waste, and has also undertaken additional measures to address those potential impacts;

WHEREAS, on April 10, 2024, the EPA, based on its review of the best available health effects data and its determination that PFAS exposure may result in adverse health effects and illness, issued a final rule establishing maximum contaminant levels, or MCLs, for certain PFAS compounds in public drinking water systems, including individual numeric MCLs for five PFAS: PFOA, PFOS, PFHxS, PFNA, and HFPO-DA (GenX);

WHEREAS, on February 13, 2024, EJCAN sent GFL and other requisite persons and entities a Notice of Intent to Sue for Violations of the Resource Conservation and Recovery Act ("RCRA NOI"). EJCAN alleged that GFL's past and present handling, storage, treatment, or disposal of PFAS-laden solid waste—including operation of landfill flares that combust PFAS-laden landfill gas; a leachate evaporator that superheated PFAS-laden landfill leachate and released its constituents into the air; and various surface water and groundwater discharges—had contaminated the air and water, including Bearskin Swamp—a popular recreation and fishing area—and several private drinking water wells in the Snow

3

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Hill community, with PFAS, and thus poses an imminent and substantial endangerment to the health of people living in and around the Snow Hill community and the environment in violation of RCRA;

WHEREAS, on May 7, 2024, EJCAN sent GFL and other requisite persons and entities a Notice of Intent to Sue for Violations of the Clean Water Act ("CWA NOI"). EJCAN alleged that GFL had and continued to discharge PFAS through the Sampson County Landfill's Groundwater Gravity Intercept system, leachate collection system, drainage channels, and other conveyances, into Bearskin Swamp, a water of the United States, without a National Pollutant Discharge Elimination System Permit in violation of the CWA; and that GFL's past and ongoing discharge of PFAS through its stormwater outfalls into Bearskin Swamp violated its Certificate of Coverage under North Carolina NPDES General Stormwater Permit for Landfills, NCG120054, and the CWA;

WHEREAS, on August 30, 2024, EJCAN filed a Complaint against GFL in the United States District Court for the Eastern District of North Carolina, alleging, *inter alia*, that GFL's treatment, storage, and disposal of PFAS-laden solid waste contaminated surface water, groundwater, and residential drinking water wells in the Snow Hill community and that these waste management practices may present an imminent and substantial endangerment to human health and the environment in violation of Section 7002 of RCRA, 42 U.S.C. § 6972(a)(1)(B); that GFL's discharge

4

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

of PFAS from GGI Outfall 1, GGI Outfall 2, SW-4, SW-5, and through other conveyances and groundwater transport into Bearskin Swamp violated Section 301 of the CWA, 33 U.S.C. § 1311(a), which prohibits discharges of pollutants to waters of the United States without a NPDES permit; and that GFL's discharge of PFAS into Bearskin Swamp through Stormwater Outfalls 1, 2, 3, 4, 5, 6, and 10 violated GFL's Certificate of Coverage under North Carolina's stormwater general permit for landfills, and therefore violated the Clean Water Act, 33 U.S.C. § 1311(a);

WHEREAS, GFL (a) denies all allegations and alleged violations made in both the RCRA NOI and CWA NOI, and the Complaint, and admits no liability, fault, or wrongdoing of any kind arising out of Plaintiff's allegations herein or in the Litigation, and (b) believes that the alleged environmental matters at issue should be addressed in a cooperative manner with the NC DEQ and other stakeholders rather than through the litigation process;

WHEREAS, the United States "encourages citizen suit parties, in reaching proposed consent judgments, to consider environmental justice considerations and any disproportionate impacts on communities that may be involved in the alleged violations."[1];

---

[1] U.S. Dep't of Justice, *Notification on Receipt of a Clean Air Act or Clean Water Act Citizen Suit Complaint* 4 (last updated Jan. 2022), https://perma.cc/C6L2-FST6.

5

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

WHEREAS, a copy of this proposed Consent Decree was received by the Attorney General of the United States and the EPA Administrator more than forty-five (45) days before entry of the proposed Consent Decree by the Court as required by 33 U.S.C. § 1365(c)(3); and

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid prolonged litigation between the Parties; this Consent Decree is fair, reasonable, and in the public interest; and the relief proposed is within the scope of the Litigation, furthers the objectives of the CWA and RCRA, and does not violate either statute.

**NOW THEREFORE, WITHOUT THE TRIAL OR ADJUDICATION OF ANY ISSUE OF FACT OR LAW AND WITHOUT ADMISSION BY DEFENDANTS OF ANY VIOLATIONS OR WRONGDOING, AND UPON CONSENT AND AGREEMENT OF THE PARTIES, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

## II.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over the Litigation pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), and 28 U.S.C. § 1331.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

2.    For purposes of entry of this Consent Decree and any action to enforce this Consent Decree, GFL consents to this Court's jurisdiction.

3.    Venue is proper in the United States District Court for the Eastern District of North Carolina pursuant to 33 U.S.C. § 1365(c)(1), 42 U.S.C. § 6972(a)(2), and 28 U.S.C. § 1391(b).

## III.    DEFINITIONS

Whenever the terms listed below are used in this Consent Decree or in any attached Appendix, the following definitions will apply:

4.    "Bearskin Swamp" means the tributary of the Little Coharie Creek (also known as the "Little Coharie River") and part of the Cape Fear River Basin that flows along the Eastern border of the Landfill and through portions of the Snow Hill Community.

5.    "Clean Water Act" or "CWA" means the federal law governing pollution control and water quality, codified at 33 U.S.C. § 1251 *et seq.*

6.    "Community Landfill Website" means the public-facing website maintained and updated by GFL containing information regarding emissions data, emergency alerts, and community complaints and GFL's responses to those concerns as set forth herein.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

7.    "DEQ" means the North Carolina Department of Environmental Quality.

8.    "Effective Date" means the date upon which the approval of this Consent Decree is recorded on the Court's docket.

9.    "EPA" means the United States Environmental Protection Agency.

10.    "EPA limit of quantitation" has the same meaning as "reporting limit" and "minimum level," and means the lowest detectable level at which the concentration of a pollutant in a medium can be quantified using EPA Method 537.1.

11.    "GenX chemicals" means hexafluoropropylene oxide dimer acid ("HFPO-DA") and its ammonium salt. In the context of MCLs, "GenX" refers specifically to the concentration of HFPO-DA.

12.    "GFL" means GFL Environmental Inc. and its indirect wholly-owned subsidiaries, Sampson County Disposal, LLC, Waste Industries USA, LLC, Black Creek Renewable Energy, LLC, and Waste Industries, LLC; provided, however, that the sole permit holder of the Landfill is Sampson County Disposal, LLC, and inclusion of additional GFL entities is not intended to be a statement on the appropriateness or lack

8

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

of appropriateness of their inclusion in the matters set forth herein or in the Litigation.

13.  "Gravity Groundwater Intercept" or "GGI" system means the series of trenches that intercept and gravity drain groundwater underneath the liner system of the Landfill to sumps, which connect via a discharge line to outfalls that discharge into Bearskin Swamp.[2]

14.  "GGI Outfall 1" is the southernmost outfall of the GGI system, located at approximately 34.981522, -78.450461.

15.  "GGI Outfall 2" is the northernmost outfall of the GGI system, located at approximately 34.986443, -78.458161. Together, GGI Outfall 1 and GGI Outfall 2 are "the GGI Outfalls."

16.  "Leachate" means a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste. *See* 40 CFR 258.2.

17.  "Litigation" means the Complaint filed by Plaintiff on August 30, 2024.

18.  "Maximum Contaminant Level" or "MCL" means the legal threshold limit of the concentration of a substance that is allowed in public

---

[2] *See, e.g.*, Letter from John R. Fearrington & Joan A. Smyth, Smith Gardner Inc., to Elizabeth Werner, Hydrogeologist, N.C. Dep't of Env't Quality (May 5, 2017), https://perma.cc/C4BD-D8MN.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

drinking water systems under the Safe Drinking Water Act and the National Primary Drinking Water Regulations, as set by EPA. The current MCLs are 4.0 nanograms per liter or parts per trillion (ppt) for PFOA, 4.0 ppt for PFOS, 10 ppt for PFHxS, 10 ppt for PFNA, and 10 ppt for HPFO-DA ("GenX chemicals"). As used in this document, "MCLs" refers to the concentrations in this paragraph, and the levels shall remain applicable even if the underlying EPA action upon which they are based is rescinded, set aside, vacated, or otherwise becomes ineffective.

19. "National Pollutant Discharge Elimination System Permit" or "NPDES Permit" means a permit issued pursuant to the Clean Water Act authorizing discharges into waters of the United States.

20. "Operational Life" means the time period during which the Landfill is actively accepting solid waste for disposal at the Landfill. The Landfill's operational life will be over when it permanently ceases to accept all solid waste for disposal at the Landfill.

21. "PFAS" means per- and polyfluoroalkyl substances.

22. "PFAS Work Plan" means the documents, approved by DEQ, that outline GFL's procedures and plans to analyze soil, groundwater, GGI discharges, surface water, and leachate for PFAS.[3]

23. "PFOA" means Perfluorooctanoic acid or such other chemical definition recognized by EPA.

24. "PFOS" means Perfluorooctane sulfonic acid or such other chemical definition recognized by EPA.

25. "PFNA" means Perfluorononanoic acid or such other chemical definition recognized by EPA.

26. "PFHxS" means Perfluorohexanesulfonic acid or such other chemical definition recognized by EPA.

27. "Resource Conservation and Recovery Act" or "RCRA" means the federal law governing the management of solid and hazardous waste, codified at 42 U.S.C. § 6901 *et seq.*

28. "Sampson County Landfill" or "the Landfill" refers to all closed and active waste cells maintained by GFL under NC Solid Waste Permit

---

[3] See (1) GFL's June 28, 2023 *Response to Comments and Revised PFAS Work Plan for PFAS Sampling and Analysis – Permit No. 82-02* (approved by DEQ July 7, 2023), https://perma.cc/R78V-5XTX; (2) GFL's June 28, 2023 *Response to Comments and Revised PFAS Work Plan for PFAS Sampling and Analysis – Permit No. 82-01* (Approved by DEQ July 7, 2023) https://perma.cc/T7JL-QJ8D; (3) GFL's February 15, 2024 *Initial Site Assessment Work Plan* (approved by DEQ February 21, 2024), and (4) GFL's July 29, 2024 *Secondary Site Assessment Work Plan* (pending DEQ approval).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Numbers 82-01 and 82-02, and any new waste cells opened by GFL under NC Solid Waste Permit Number 82-02, or new permits, which are located at 7434 Roseboro Highway in Roseboro, North Carolina, and excludes the landfill cells maintained by Sampson County under Permit 82-01.

29. "Snow Hill Community" is a neighborhood located in rural Roseboro, North Carolina. For the purpose of this Consent Decree, the geographic boundaries of the Snow Hill Community are set forth in Exhibit 1.

30. "Special Order by Consent" or "SOC" means an order issued by DEQ to an entity that has accepted responsibility for causing or contributing to pollution of waters of the State which temporarily authorizes interim corrective measures aimed at achieving compliance with environmental laws. *See* N.C. Gen. Stat. § 143-215.2; N.C. Admin. Code 02H .1200 *et seq.*

31. "Special Waste" means solid wastes that can require special handling and management, including white goods, whole tires, used oil, lead-acid batteries, and medical wastes. *See* N.C. Gen. Stat. § 130A-290(a)(40).

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## IV.    INJUNCTIVE RELIEF

### A.    Remedial Investigation & Pollution Prevention

32.    **Emissions Monitoring System and Odor Mitigation.** Within ninety (90) days of the Effective Date, the Parties shall jointly select, and GFL will, at its sole expense, retain an independent, third-party consultant ("Consultant") to design and implement a continuous emissions monitoring system around the perimeter of the Landfill. The development, implementation, and other costs related to the system shall be financed by GFL. Taking into account the recommendations of the Consultant, the placement of the system's monitoring stations shall be mutually agreed to by the Parties. Monitoring stations shall be located to isolate emissions originating primarily from the Landfill (as opposed to from nearby industrial hog operations). Taking into account the recommendations of the Consultant, the Parties shall determine reasonable emissions standards. All data collected from the continuous emissions monitoring system will be contemporaneously made public on the Community Landfill Website maintained by GFL.

33.    The initial monitoring period for the continuous emissions monitoring system shall last three-hundred-and-sixty-five (365) days.

34. Within sixty (60) days of the conclusion of the initial monitoring period, the Consultant shall issue a report identifying the sources of any actionable fugitive emissions and recommending emission and odor reduction measures.

35. Within ninety (90) days of the Consultant delivering this report to the Parties, GFL shall, to the maximum extent practicable, implement the recommended emission and odor reduction measures.

36. During the initial monitoring period, GFL shall respond to and meaningfully address odor complaints raised by community members and/or by EJCAN. GFL shall use one or more of the following odor reduction strategies to address these complaints: enhanced management of odorous waste streams (e.g. dead animals, food waste), odor management in construction areas, and enhanced daily and interim cover practices.

37. **Drone Surface Emissions Monitoring.** Within ninety (90) days of the Effective Date, GFL shall have submitted a request to EPA to change its required methane emissions monitoring technique from on-foot monitoring to EPA-approved drone surface emissions monitoring to identify fugitive methane emissions at the Landfill. Once approved, and subject to the EPA-approved vendor's availability, GFL shall

14

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

implement and continue this monitoring for the Operational Life of the Landfill. GFL shall share the results of this monitoring with EJCAN on a semi-annual basis and shall stop methane leaks or other sources of fugitive emissions identified through this monitoring in a timely manner.

**B.    Treatment of PFAS Discharges & Treatment Standards**

38.    **Interim GGI Treatment Standards and Permitting.** GFL shall continue to diligently pursue and make all best efforts to obtain a Special Order by Consent ("SOC") from DEQ permitting the temporary treatment of discharge from GGI Outfalls 1 and 2.

39.    As part of this process, GFL shall request that DEQ impose enforceable removal standards and/or effluent limitations in the SOC that meet or exceed the following:

a. Start-up through two (2) months: 50% removal standard for PFOA, PFOS, Gen-X, PFHxS, and PFNA (subject to EPA limits of quantitation for EPA Method 537.1 Modified).

b. Three (3) months to one (1) year: 80% removal standard for PFOA, PFOS, Gen-X, PFHxS, and PFNA (subject to EPA limits of quantitation for EPA Method 537.1 Modified).

15

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

c. Greater than one (1) year: achieve EPA MCLs for PFOA, PFOS, HFPO-DA (Gen-X), PFHxS, and PFNA (subject to EPA limits of quantitation for EPA Method 537.1 Modified).

40. In the event that DEQ issues an SOC or otherwise permits an interim treatment system for discharges from the GGI Outfalls without these minimum removal standards or effluent limits, as applicable, GFL shall ensure that discharges from the GGI Outfalls meet the standards set forth herein.

41. In the event that DEQ refuses to issue an SOC or otherwise permit the interim GGI Outfall treatment system, GFL shall, within 90 days after any such refusal, apply for a NPDES permit for the GGI Outfalls. In any application, GFL shall request that DEQ include, at a minimum, enforceable effluent limits in the NPDES permit for PFOA, PFOS, HFPO-DA (Gen-X), PFHxS, and PFNA equal to EPA's MCLs for these compounds.

42. **Permanent GGI Treatment Standards and Permitting.** Unless GFL has moved forward under the conditions in paragraph 41, once GFL's discharges from the GGI Outfalls consistently satisfy the standards set forth in Paragraph 39(c), GFL shall apply for a NPDES permit applicable to the discharges at GGI Outfall 1 and Outfall 2. GFL shall

16

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

request that DEQ include, at a minimum, enforceable effluent limits in the NPDES permit for PFOA, PFOS, Gen-X, PFHxS, and PFNA equal to EPA's MCLs for these compounds.

43. **Leachate Treatment System Permitting.** GFL shall continue to diligently pursue and make its best efforts to obtain a NPDES permit from DEQ for the proposed discharge from its leachate treatment reverse osmosis system. Within sixty (60) days of the Effective Date, GFL shall request in writing that DEQ include enforceable effluent limitations in any NPDES permit issued for the leachate treatment reverse osmosis system equal to EPA's MCLs for the following constituents: PFOA, PFOS, HFPO-DA (Gen-X), PFHxS, and PFNA. GFL shall also include this request for enforceable effluent limitations equal to EPA's MCLs for PFOA, PFOS, HFPO-DA (Gen-X), PFHxS, and PFNA in any subsequent permit application (including amendments or renewals) for the leachate treatment reverse osmosis system. During this permitting process, GFL shall keep EJCAN apprised of communications with DEQ and agrees to take any input from EJCAN into consideration.

44. **Restriction on New Special Waste Contracts.** As of the Effective Date, GFL shall decline any and all new contracts for the acceptance at

17

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the Landfill of the following: (1) soils and other materials associated with PFAS remediation projects generated from military bases, and (2) PFAS-containing fire-fighting foams or residue, until such a time that the permanent treatment system for the GGI Outfalls and leachate reverse osmosis treatment system are operational and in compliance with the standards set forth in Paragraphs 42 and 43.

## C.  Community Engagement & Accountability

45.  **Information Sharing.** As of the Effective Date, GFL shall take the following measures to increase transparency, engagement, and accountability regarding matters at the Landfill that impact the Snow Hill Community and EJCAN members:

46.  Until such time as the reverse osmosis leachate treatment system and the permanent GGI treatment system are consistently meeting the discharge standards set forth in Paragraphs 42 and 43 for a period of four (4) years, GFL shall share with EJCAN, through counsel and concurrently with transmission, all materials and communications related to PFAS at the Landfill that GFL transmits to DEQ and/or that DEQ transmits to GFL. This includes but is not limited to documents related to the PFAS Work Plan, sampling results, and GGI and leachate treatment system permitting documents. GFL shall make reasonable

18

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

efforts to deliver these materials to EJCAN prior to submission to DEQ and shall, in good faith, take EJCAN and/or EJCAN's consultants' input into consideration prior to submitting documents to DEQ.

47.   GFL shall make its Special Waste Consultant, who reviews sampling data from special waste streams and confirms the material meets the permit requirements for disposal at the Landfill along with any special handling required, available for discussion with EJCAN and/or its consultants upon request. GFL shall also share information regarding the review and approval process for special waste on the Community Landfill Website. Upon request of EJCAN, the Special Waste Consultant shall attend one community meeting in Snow Hill (described in Paragraph 52) and shall be available to answer questions from the community.

48.   **Semi-Annual Compliance Report.** Semi-annually, and beginning one-hundred-and-eighty (180) days after the Effective Date, until such time as the reverse osmosis leachate treatment system and the permanent GGI treatment system are consistently meeting the discharge standards set forth in Paragraphs 42 and 43 for a period of four (4) years, GFL shall share with EJCAN, through counsel, a report detailing GFL's compliance with this Consent Decree, the actions GFL

19

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

has taken to carry out its obligations detailed herein, and any deficiencies or failures to comply. In the event of any deficiencies or failures to comply, the report will include an explanation and proposed plan to come into compliance with this Consent Decree.

49. **Truck Policy.** GFL shall, within thirty (30) days of the Effective Date, post its truck access policy in public view at the Landfill's scalehouse. The policy shall state that customer access to the Landfill is limited solely to the gate on Highway 24. GFL shall also request truck traffic (1) not to access the gate on Highway 24 through the Snow Hill Community, and (2) not to line up outside of the gate outside of the Landfill's operating hours.

50. **Emergency Management Plan and Emergency Alert System.** GFL shall use its best efforts to urge local emergency management personnel to develop a community evacuation plan in the event of an emergency at the Landfill. Subject to obtaining access to phone numbers, GFL shall institute a "robocall" system (calls and texts) for people who live within two (2) miles of the Landfill. This system will be used solely to alert community members in the event of an emergency at the Landfill that may impact public safety or prompt the need for evacuation.

20

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

51.  **Community Engagement and Complaint Process.** GFL shall use its best efforts to provide meaningful engagement opportunities with residents of the Snow Hill Community and keep the community informed of activities at the Landfill, including but not limited to progress on the PFAS Work Plan, results of the emissions monitoring system (Paragraph 32), and odor management efforts. This commitment shall include, but is not limited to the following actions:

52.  GFL shall attend quarterly, in-person community meetings in the Snow Hill Community coordinated with Snow Hill residents and/or EJCAN. The initial such meeting shall be held within sixty (60) days of the Effective Date and the first two such meetings will be treated as confidential and will only be open to the Parties and their counsel, Snow Hill Community residents, and EJCAN members.

53.  Within ninety (90) days of the Effective Date, GFL shall establish and fund an unmanned hotline to receive complaints or concerns related to the Landfill.

54.  Within one hundred twenty (120) days of the Effective Date, GFL shall establish and maintain a public website, the Community Landfill Website, that community members can access for the latest information on Landfill matters that impact the community; provided however, that

21

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

GFL may request an extension as long as it is working diligently and in good faith towards meeting the deadline and can demonstrate that the delay is outside of GFL's reasonable control, such as due to its third-party vendor's or consultant's availability. The Community Landfill Website shall include a tab or window for community members to submit complaints related to the Landfill.

55. GFL shall respond to Landfill-related complaints submitted through the hotline or the Community Landfill Website within seven (7) business days indicating, to the best of its ability, the source of the issue and steps GFL will take to address the complaint. GFL's responses to complaints and description of steps being taken to address each complaint shall be regularly posted on the Community Landfill Website.

56. No later than the date upon which the Community Landfill Website is active, GFL shall establish an internal complaint response and escalation process to ensure that community complaints are meaningfully addressed within seven (7) business days. This process will be shared with EJCAN and posted on the Community Landfill Website on the same tab or window used to submit complaints related to the Landfill.

22

## D.     Diversion of Waste

57.     **School Recycling and Composting Program.** Within one hundred and twenty (120) days of the Effective Date, GFL shall establish a school recycling and composting program in at least ten (10) public schools in Sampson County and fund a recycling and composting-related curriculum in these schools through the end of the 2027-2028 school year. Thereafter, GFL will offer to continue the recycling program at a rate to be negotiated with the school system.

58.     **Recycling Campaign.** Within one hundred and twenty (120) days of the Effective Date, GFL shall fund and initiate a public campaign in Sampson County to encourage recycling.

## E.     Conservation

59.     **Wetland Conservation.** Within one hundred and eighty (180) days of the Effective Date, GFL shall place the thirty (30) acres of wetlands currently owned by GFL at the Roseboro Mine site (Attached as Exhibit 2) into trust through a conservation easement.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

23

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**F.    Community Benefits**

60.    GFL shall provide benefits to the Snow Hill Community consistent with the terms of the confidential Community Benefit Settlement Agreement.

## V.    RELEASE

61.    For the consideration herein and other good and valuable consideration, EJCAN hereby waives, releases, discharges, and covenants not to sue GFL for any and all claims which were alleged or could have been alleged in the Litigation.

## VI.    OTHER TERMS

62.    **Effect of Consent Decree.** This Consent Decree resolves all claims which were alleged or could have been alleged against GFL by EJCAN in the Litigation, and all such claims shall be deemed to be dismissed with prejudice. This Consent Decree in no way affects or relieves GFL from its responsibility and obligation to comply with Federal, State and local laws or regulations and applicable permits.

63.    **Administrative Review.** The Parties acknowledge, agree, and notify the Court that, pursuant to 33 U.S.C. § 1365(c)(3), this Consent Decree cannot be entered or effective prior to forty-five (45) days following the

24

receipt of this Consent Decree by the Attorney General and the EPA Administrator. Therefore, upon execution of this Consent Decree by the Parties, Plaintiff shall serve copies of the Consent Decree upon the U.S. Attorney General, EPA Administrator, and EPA Regional Administrator in accordance with 40 C.F.R. § 135.5. The Parties shall also jointly lodge the Consent Decree with the Court upon execution. Upon expiration of the 45-day review period, so long as the reviewing authorities do not object to the entry of this Consent Decree, the Parties shall jointly move the Court for entry of the Consent Decree and notify the Court regarding dates upon which the EPA Administrator and Attorney General received copies pursuant to 40 C.F.R. § 135.5(b).

64. **No Admission of Liability or Fault**. By entering into this Consent Decree, GFL denies and does not admit to liability, fault or wrongdoing.

65. **Continuing Jurisdiction.** The United States District Court for the Eastern District of North Carolina shall have continuing jurisdiction to interpret and enforce the terms and conditions of this Consent Decree and to resolve disputes arising hereunder, and for such other and further actions as may be necessary or appropriate in the construction or execution of the Consent Decree.

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

66. **Effect of Entry or Lack of Entry.** Upon entry by the Court, this Consent Decree resolves all claims which were alleged against GFL by EJCAN in the Litigation and the Litigation shall be dismissed with prejudice. If for any reason the reviewing authorities object to this Consent Decree and/or the Court refuses to approve and/or enter this Consent Decree in the form presented, the Parties shall retain all rights they had in this litigation before lodging of this Consent Decree. In the event that the Court refuses to approve and/or enter this Consent Decree in the form presented, or in the event the United States proposes modifications to this Decree, the Parties shall negotiate in good faith in an attempt to resolve such objection and/or refusal by the Court; however, the Parties reserve and shall retain all rights to object to any modification proposed by the United States, or any other person or entity.

67. **Entire Agreement.** The Parties have reached an independent confidential Community Benefit Agreement related to these matters. This Consent Decree, along with the independent Community Benefit Settlement Agreement, constitutes the entire agreement among the Parties concerning the subject matter hereof and supersedes all previous

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

correspondence, communications, agreements and understandings, whether oral or written, among the Parties or their representatives.

68. **Modification.** This Consent Decree may be modified or amended only by an Order of Court, made upon a written joint request of the Parties.

69. **Authorization.** Each Party represents and warrants that the person signing this Consent Decree on behalf of such Party is duly authorized to enter into this Consent Decree on the Party's behalf.

70. **Successors and Assigns.** This Consent Decree shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

71. **Notices/Dispute Resolution.** The Parties shall provide one another with thirty (30) days written notice and opportunity to cure any alleged breach of this Consent Decree before commencing an action to enforce this Consent Decree. Such notice shall be given to all counsel of record, as reflected on the Court's docket report, and may be given via email. If the Parties cannot reach an agreed resolution within thirty (30) days after the receipt of notice by the other Party, then the Parties agree to commence mediation of the dispute in good faith no later than seventy-five (75) days after the receipt of the notice. A Party may petition the

27

District Court to (a) resolve the dispute; (b) designate a mediator for good cause shown if the Parties cannot agree on a mediator mutually agreeable to the Parties; or (c) seek to enforce the Consent Decree only where a mediation was conducted in good faith and is unsuccessful.

72.　**Counterparts.** This Consent Decree may be signed in counterparts. Facsimile, electronic and scanned signatures or copies of this Consent Decree shall be effective as originals for all purposes.

ENTERED this ___5___ day of December, 2024.

The Honorable Terrence W. Boyle
Judge, United States District Court
Eastern District of North Carolina

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# Exhibit 1

## Snow Hill Community Map

# Snow Hill Community Boundary



ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Last Updated: 8/23/2024
Author: Libbie Weimer
(lweimer@selcnc.org)
Sources: USGS, NCDOT, NCDEQ

SOUTHERN
ENVIRONMENTAL
LAW
CENTER

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# Exhibit 2

## Wetland Conservation Map

ELECTRONICALLY FILED - 2025 Feb 28 4:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Exhibit 2

## Wetland Conservation Map

Full parcel:



Approx 30 acre portion to be put into conservation in purple below:



ELECTRONICALLY FILED - 2025 Feb 28 1:44 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN RE:
PFAS LITIGATION COORDINATED
DOCKET

Grand Strand Water and Sewer Authority

*Plaintiff*,

v.

Aladdin Manufacturing Corporation;
Burlington Industries, Inc.; Delta Mills, Inc., its
predecessors, successors, assigns, and/or
responsible parties; Domtar Paper Company,
LLC, Elevate Textiles, Inc.; Fiber Industries,
LLC; GFL Environmental USA, Inc.; J.P.
Stevens & Company, Inc., its predecessors,
successors, assigns, and/or responsible parties;
Mohawk Industries, Inc.; Nan Ya Plastics
Corporation, America; PRET Advanced
Materials, LLC; Red Rock Disposal, LLC;
Sampson County Disposal, LLC; and Waste
Industries, LLC,

*Defendants*.

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

C.A. No.: 2024-CP-26-05523

**NOTICE OF DISMISSAL OF
DEFENDANTS GFL ENVIRONMENTAL
USA, INC. AND WASTE INDUSTRIES,
LLC WITHOUT PREJUDICE**

Pursuant to Rule 41(a)(1)(A) of the South Carolina Rules of Civil Procedure, Plaintiff,

Grand Strand Water and Sewer Authority ("GSWSA"), by and through undersigned counsel,

hereby gives notice that it is dismissing Defendants GFL Environmental USA, Inc. and Waste

Industries, LLC from this action without prejudice. Each party will bear its own fees and costs.

Respectfully submitted,

 */s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)

Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

Jerome Tapley (*Pro Hac Vice*)
Hirlye R. "Ryan" Lutz, III (*Pro Hac Vice*)
Brett Thompson (*Pro Hac Vice*)
Akira Watson (*Pro Hac Vice*)
Hunter Phares (S.C. Bar No. 107158)
Hamilton Jordan (*Pro Hac Vice*)
Hannah C. Caldwell (*Pro Hac Vice*)
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, AL 35205
(205) 328-2200
jtapley@corywatson.com
rlutz@corywatson.com
bthompson@corywatson.com
awatson@corywatson.com
hphares@corywatson.com
hjordan@corywatson.com
hcaldwell@corywatson.com

*Attorneys for Plaintiffs*

February 28, 2025

ELECTRONICALLY FILED - 2025 Feb 28 1:44 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br>COUNTY OF HORRY | IN THE COURT OF COMMON PLEAS<br>FOR THE FIFTEENTH JUDICIAL CIRCUIT |
| IN RE: PFAS LITIGATION COORDINATED DOCKET | C.A. No. 2024-CP-26-05523 |
| GRAND STRAND WATER AND SEWER AUTHORITY,<br><br>*Plaintiff*,<br><br>v.<br><br>ALADDIN MANUFACTURING CORPORATION; BURLINGTON INDUSTRIES, INC.; DELTA MILLS, INC., its predecessors, successors, assigns, and/or responsible parties; DOMTAR PAPER COMPANY, LLC; ELEVATE TEXTILES, INC., FIBER INDUSTRIES, LLC; GFL ENVIRONMENTAL USA, INC.; J.P. STEVENS & COMPANY, INC., its predecessors, successors, assigns, and/or responsible parties; MOHAWK INDUSTRIES, INC.; NAN YA PLASTICS CORPORATION, AMERICA; NAN YA ADVANCED MATERIALS, LLC; RED ROCK DISPOSAL, LLC; SAMPSON COUNTY DISPOSAL, LLC; and WASTE INDUSTRIES, LLC,<br><br>*Defendants*. | **MEMORANDUM BY NAN YA PLASTICS CORPORATION, AMERICA IN REPLY TO THE MEMORANDUM BY PLAINTIFF IN RESPONSE TO THE MOTIONS TO DISMISS** |

## INTRODUCTION

Defendant Nan Ya Plastics Corporation America ("Nan Ya") has moved the Court to dismiss Plaintiff's Second Amended Complaint as to NAN YA pursuant to South Carolina Rules of Civil Procedure 8, 12(b)(1), and 12(b)(6). Plaintiff Grand Strand Water & Sewer Authority ("Plaintiff") is a public entity that operates the Bull Creek Surface Water Treatment Plant ("SWTP") and the Myrtle Beach SWTP and owns certain land on Bull Creek in Bucksport, South Carolina and on the Intracoastal Waterway in Myrtle Beach. (Plaintiff's Second Amended

1

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Complaint ("SAC"). Plaintiff's SWTPs withdraw water from Bull Creek and the Intracoastal Waterway for treatment before distributing it to customers. Plaintiff's claims involve per- and polyfluoroalkyl and related substances ("PFAS"). There are multiple types of PFAS.

Nan Ya learned that the former U.S. Air Force Base site in Myrtle Beach, now the location of the Myrtle Beach International Airport, is discharging very high concentrations of several of the PFAS chemicals which Plaintiff complains of into the Atlantic Intracoastal Waterway (AIWW) only 2.5 miles from one of Plaintiff's water intakes on the Waterway and some 10 miles from its Bull Creek intake. In response to that information, Nan Ya added as a basis for dismissal of this action SCRCP 12(b)(7) and 19(b) for failure to join the United States as an indispensable party. In its Memorandum in Response, Plaintiff argues that the United States is not only not a necessary and indispensable party, but that it is not a relevant party. The reasoning of Plaintiff is that because in its Second Amended Complaint it disavows any claims based on contamination by PFAS chemicals from Aqueous Film-Forming Foam products ("AFFF"). Plaintiff says it has chosen to sue only defendants it claims are discharging PFAS chemicals that were not contained in AFFF products and that this renders irrelevant whether the former Air Force Base site is discharging PFAS chemicals into waters close to its two intake points. As explained below, this reasoning is fundamentally flawed.

**I.**

**THE FORMER AIR BASE PFAS CHEMICALS ARE NO DIFFERENT THAN OTHERS**

As explained in Nan Ya's Amended Memorandum in support of its motion, the concentrations of four PFAS chemicals being discharged into the AIWW are huge, ranging from 249,000,000 ppt to 150,000 ppt. The PFAS molecules that Plaintiff claims are in the water where it withdraws drinking water are not chemically stamped indicating their origin. A PFOS molecule

2

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

for instance has no marker tying it to release from the Lake City POTW as opposed to the Air Base site. The harm is the same to Plaintiff regardless of origin. It is the amount of the chemicals that drives the degree of harm, not their origin. There is little doubt based on the Department of Defense reports filed with Nan Ya's motion that the Air Base site is by far the largest contributor of PFAS contamination to the waters from which Plaintiff withdraws drinking water. In fact, South Carolina's Department of Environmental Services ("DES" and formerly DHEC) has published its conclusion that current and former military bases such as the former Myrtle Beach Air Base are the single greatest source of PFAS contamination of drinking water supplies in South Carolina. Exhibit A.

In short, in terms of what is the cause of the harm Plaintiff complains of, it does not matter whether Plaintiff is seeking to recover any damages from the United States by reason of its contribution of PFAS chemicals to the waters from which it draws drinking water. The actions of the United States in causing PFAS contamination and its continued inaction in failing to clean it up are not just *A* cause of Plaintiff's harm; it is clearly the ***primary cause*** of that harm. Few areas of fact in this case could be more relevant than that.

The DOD reports confirm that there is currently nothing being done at the former Air Base site to clean up the ground and surface water contamination or to prevent those highly contaminated waters from flowing into the AIWW and ultimately to Plaintiff's two intake points, only a few miles away. Therefore, the Air Base site continues to add PFAS contamination to those waters and will until a clean-up is undertaken.

**II.**

**PLAINTIFF IS SEEKING INJUNCTIVE RELIEF AS WELL AS DAMAGES**

3

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The second amended complaint seeks injunctive relief against all defendants.  Plaintiff is seeking an injunction ordering all defendants to abate what they say is both a nuisance and a trespass, presumably by ceasing the alleged discharges of PFAS chemicals into waters that flow to and mix with the waters where it has intake facilities.  More significantly, Plaintiff asks the Court to order all defendants to, "remove *their* PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX chemicals from Plaintiff's water systems by funding the acquisition, installation, and operation of treatment technology capable of removing them."  (Emphasis supplied).  It is stating the obvious to point out that it is not possible for any defendant to identify *their* PFAS molecules as distinct from molecules of chemicals discharged by others.  What Plaintiff is asking is for the defendants it has chosen to sue to pay for the clean up of *all* PFAS chemicals, including those discharged into the subject waters by the United States.

Such a demand is not only outrageously inequitable, it also seeks to bypass a fundamental element of Plaintiff's causes of action – causation.  It is black letter law that, "a person who breaches a duty to a plaintiff is not liable for injuries unless the injuries were proximately caused by the breach….the wrongful act must have been the cause-in-fact of the injury."  Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence and if the injury would have occurred anyway, then the defendant's breach did not cause it and defendant is not liable.  Hubbard and Felix, South Carolina Law of Torts, 1997, p. 128-129.  Nothing could be more relevant in this case than who caused the waters at issue to be contaminated with PFAS.  If Plaintiff would have suffered the injury regardless of any discharge by Nan Ya or any other defendant named in this suit because of contamination from the old Air Base site, those defendants are not liable.  That fact must be determined in order for there to be an equitable resolution of Plaintiff's demands for relief.

4

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff cannot magically make the contribution of the United States to its problem with PFAS chemicals disappear.  Defendants must be allowed to explore completely these facts.

### III.

### THE UNITED STATES IS AN INDISPENDABLE PARTY

Exploring the degree and means of contribution of PFAS chemicals to the AIWW can only be done with the United States as a party.  Plaintiff argues that defendants can fully explore the degree of federal contribution of PFAS chemicals to the affected waters without the United States being a party and that the United States would face no risk of prejudice from being left out this case.  To take the most mundane of the issues first, Plaintiff asserts that the Freedom of Information Act is sufficient as a means to investigate these facts.  It is not.  No depositions can be taken under FOIA.  Federal employees may only be deposed and called as witnesses it the US is a party and those are vital to exploring these facts.

Plaintiff's argument that there is no possibility the United States would be adversely affected by this case going forward without its participation as a party is simply is manifestly untrue.  In EEE Minerals, LLC v. North Dakota, 318 F.R.D 118 (D.N.D. 2016), the court explained the importance the US Supreme Court attaches to the avoidance of prejudice to the United States by proceeding with litigation that could prejudice the United States without its participation, citing Republic of the Philippines v. Pimentel, 553 U.S. 851, 867, 128 S.Ct. 2180, 171 L.Ed.2d 131 (2008).  As the apparent greatest contributor of PFAS chemicals to the waters from which Plaintiff draws water, it has a vital interest in any judgment reflecting on its culpability.  Several statutes waive the sovereign immunity of the United States for discharging pollutants dangerous to drinking water safety.  If this case goes forward without the participation of the United States, that will not prevent a finding by a jury that the United States is responsible for the majority of the

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PFAS chemicals in the AIWW.  That is inherently prejudicial to the United States even if it is not bound by the finding.  Plaintiff's decision not to pursue its claims against the greatest culprit in the problem it complains of does not change that reality.

There is no way this case can be tried equitably or completely without the participation of the United States as a defendant, whether Plaintiff wishes to sue it or not.  Plaintiff can, if this case is dismissed pursue its existing claims as well as claims against the United States.  There is specific waiver of sovereign immunity allowing claims to be filed through citizens suits under the Safe Drinking Water Act, 42 U.S.C. § 300j-8(e), the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B), and the Comprehensive Environmental Recovery and Compensation Act, 42 U.S.C. Sec. 9613.   There is also a remedy under the Federal Tort Claims Act, 28 U.S.C. Sec. 2871, et seq.  Therefore, the case must be dismissed and Plaintiff allowed to bring its claims against the United States in the ways, or perhaps in others, detailed in the Nan Ya's Amended Memorandum in Support of the Motion to Dismiss.

### III. CONCLUSION

For all of the foregoing reasons, Nan Ya Plastics Corporation, America's Motion to Dismiss should be granted, and all of the claims that Plaintiff has asserted against Nan Ya should be dismissed.

Respectfully submitted,


s/ Stan Barnett

_____

Stan Barnett (SC 000533)
Stan Barnett, Attorney at Law
305 North Civitas Street
Mt. Pleasant, SC 29464
843-708-4887
Stan.barnett@yahoo.com
*Counsel for Nan Ya Plastics Corporation, America*

6

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

March 5, 2025
Mount Pleasant, SC

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# EXHIBIT A

Journal of South Carolina Water Resources, Volume 8, Issue 1, Pages 48–53, 2021

# South Carolina Sampling, Analysis, and Governance of Per- and Polyfluoroalkyl Substances

Justin Kidd[1], Emily Fabricatore[1], and Dennis Jackson[1]

AUTHORS: [1]Savannah River National Laboratory (SRNL), Aiken, South Carolina, 29808, USA.

**Abstract.** The extent of sampling, analytical, and governance guidelines for per- and polyfluoroalkyl substances (PFAS) in individual states is currently inconsistent. There are no federally mandated regulations on PFAS, and the geochemical variations within different states can lead to regionally specific PFAS contamination, resulting in state-specific guidelines for PFAS contamination in different environmental matrices. There are no facilities in South Carolina known to currently or previously produce PFAS; however, they may be used in the production of other goods at industries throughout South Carolina, including Class B firefighting foams, consumer items, packaging, and stain- and weather-resistant fabrics. We assessed the sampling, analytical, and governance strategies of the South Carolina Department of Health and Environmental Control (SCDHEC) to understand current state-specific guidelines for PFAS contamination in South Carolina. This assessment indicates that SCDHEC has conducted sampling and analysis of community drinking water systems supplied by surface water for PFAS contamination. Additionally, risk indicators have been made for highly susceptible areas for likely PFAS contamination, including Department of Defense (DOD) and Department of Energy (DOE) sites, airports, and landfills in South Carolina. Recently, bills have been introduced into the South Carolina legislature to address PFAS. These proactive approaches in South Carolina aid in the assessment of the risks of PFAS contamination and are important steps for SCDHEC and South Carolina legislative stakeholders as they continue to develop and enforce state-specific standards for PFAS chemicals and await more information and official regulatory drivers from the US Environmental Protection Agency (US EPA).

## INTRODUCTION

Per- and polyfluoroalkyl substances (PFAS) are a group of between 5,000 and 10,000 humanmade, fluorinated, organic chemicals that have been manufactured and used in various industries around the world (ITRC 2020; 3M 2020; Dorrance et al. 2017). PFAS have a unique combination of chemical properties, which result in benefits such as low surface tension, oil-repellent ability, and water solubility. These properties enable their use in applications including biocides, hydraulic fluids, firefighting foam, and household products (Rayne and Forest 2009; Kim et al. 2015; Ahrens et al. 2009) Their widespread use has led to their detection in food, commercial household products, workplaces, drinking water, and living organisms (Domingo and Nadal 2017; Kucharzyk et al. 2017; Rahman et al. 2014; Valsecchi et al. 2013). PFAS have been coined as "forever chemicals" due to the extremely strong carbon-fluorine bond. Because of their persistence in the environment and human body, as well as a lack of understanding the full health risks associated with exposure, PFAS are emerging contaminants of concern.

When assessing the hazards of chemicals, many states rely on guidance from federal agencies to sample, analyze, and regulate these chemicals. For PFAS, the US Environmental Protection Agency (US EPA) has developed sampling and analytical methods for 29 PFAS analytes in drinking water (US EPA 2020a). Aside from this, only nonenforced federal guidelines currently exist for PFAS, like the EPA PFAS Action Plan, which recommends the lifetime health advisory of 70 ppt for perfluorooctanoic acid (PFOA) and perfluorooctane-sulfonic acid (PFOS) combined. As a result, states like South Carolina (SC) have begun testing for PFAS (SCDHEC, 2020).

Due to the growing body of science and literature around PFAS, combined with public pressure on legislative bodies to regulate PFAS, it is important to understand what South Carolina is doing to ensure that its residents are safe from PFAS contamination as well as how the Department of Energy (DOE) and Department of Defense (DOD) are

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

South Carolina Sampling, Analysis, and Governance of Per- and Polyfluoroalkyl Substances

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

involved. The goals of this paper are to analyze SCDHEC data and reports on PFAS chemicals and (1) identify major locations of PFAS contamination and highly susceptible locations for PFAS contamination in South Carolina, (2) identify the PFAS sampling and guidance procedures used by South Carolina, and (3) be aware and knowledgeable of current and impending PFAS regulations in South Carolina.

## MATERIALS AND METHODS

PFAS information for South Carolina was collected by searching through the South Carolina Department of Health and Environmental Control (SCDHEC) website. The information found through the SCDHEC website was stored on a secure database. For information or data on PFAS sampling, analyses, or regulations that were missing or unavailable online, an email was sent to a point-of-contact within the SCDHEC, and the information was retrieved via email or telephone.

## RESULTS AND DISCUSSION

### VULNERABLE SITES FOR PFAS CONTAMINATION IN SOUTH CAROLINA

The SCDHEC Bureau of Water (BOW) released a report detailing the internal strategy to assess PFAS in drinking water (SCDHEC 2020). This report identified sites throughout the state where PFAS contamination was plausible and the existence of an associated risk based on the three most significant vulnerability factors: (1) PFAS source type, (2) drinking water source, and (3) groundwater aquifer system type based on peer-reviewed literature (Table 1).

### Department of Defense and Department of Energy Sites

The most concerning sites for PFAS contamination in South Carolina are DOD facilities due to the potential usage of aqueous film forming foam (AFFF), the PFAS-containing military grade fire retardants, since 2014 (DOD 2018). The DOD and DOE are investigating PFAS as an emerging contaminant under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) as it may endanger public health and the environment. The DOD is actively investigating its military installations in South Carolina through their PFAS Task Force (DOD, 2020), and the DOE is investigating its Savannah River Site (SRS) for potential PFAS contamination at the request of the SCDHEC (2020). The SCDHEC's Bureau of Land and Waste Management (BLWM) is actively working with the DOD on their investigation of the eleven South Carolina military installations (Figure 1), including the stakeholder review process.

**Table 1.** Number of Sites in South Carolina Identified as Plausible PFAS Locations with Associated Risk

| Risk Ranking | Source Types | Number of Sites in South Carolina |
|---|---|---|
| 1 | DOD/DOE | 11 DOD/1 DOE |
| 2 | PFAS or FP Manufacturing | 0 |
| 3 | Landfills | 677 |
| 4 | Part 139 Airports | 8 |
| 5 | Fire Training Areas | 2+ |
| 6 | Petroleum Refineries | 0 |
| 7 | Industrial | 384 |
| 8 | Wastewater Treatment Plants | 746 |

### South Carolina Regional and International Airports

Regional and international airports that serve scheduled and unscheduled flights with more than 30 passenger seats, serve scheduled air carrier operations in aircraft between 9 and 31 seats, and the Federal Aviation Administration (FAA) Administrator requires to have a certificate must be certified as a Part 139 airport. This certification requires the airport to have aircraft rescue and firefighting (ARFF) capabilities, which includes proper equipment (e.g., AFFF), personnel, and training. Under the FAA, Part 139 airports are required to conduct an annual timed drill for firefighting response using AFFF (FAA 2020). South Carolina houses 8 Part 139 airports (Figure 1) that have potentially performed annual fire drills with AFFF discharges (SCDHEC 2020).

### South Carolina Fire Training Areas

In addition to DOD installations and Part 139 airports, fire training areas are those where the discharge of AFFF could have occurred. The BOW lists at least 500 fire stations in South Carolina with unknown usage of AFFF (SCDHEC 2020), but two areas are of high concern. Columbia, South Carolina, is home to a very large and extensive fire training facility in the US. The South Carolina Fire Academy Facility encompasses 208 acres north of Columbia and is known to have trained with AFFF. The Fire Academy was previously located at the Columbia Metropolitan Airport, and both locations are likely to have legacy PFAS concentrations from AFFF usage (SCDHEC 2020).

### South Carolina Landfills

Landfills and their associated leachates are areas of potential PFAS contamination concern because historically PFAS were used in nonstick and weatherproofing applications, as well

Kidd, Fabricatore, Jackson



**Figure 1.** Vulnerable locations for PFAS contamination in South Carolina. The 500+ fire stations in South Carolina with unknown AFFF usage are not included in the map.

as food packaging, that have been discarded. South Carolina has 677 total landfills comprised of Class 2 (construction and demolition debris), Class 3 (municipal solid waste, construction, demolition, and industrial solid waste), and industrial-only landfills. Active landfills (N=107) can accept municipal solid waste, debris, and industrial solid waste, while inactive (N=570) landfills either are not operational or are operational but have not accepted waste since 1940. Active landfills are of most concern for PFAS because these chemicals do not degrade over time and may leach out of the landfills (i.e., landfill leachate). Figure 2 highlights the locations of current active Class 2 and Class 3 landfills in South Carolina that are susceptible to PFAS contamination (SCDHEC 2020).

### Other Vulnerable Sites in South Carolina

The SCDHEC BOW has identified high-risk industrial facilities and has grouped them into the following: (1) organic chemicals, plastics, and synthetic fibers; (2) pulp and paper; (3) textiles; and (4) airports/other. South Carolina is home to 65 organic chemicals, plastics, and synthetic fiber facilities; 11 pulp and paper facilities; 68 textile facilities; and 240 airports or other potential locations (SCDHEC, 2020). Wastewater

treatment plants are locations ideal to be investigated due to the acceptance of industrial waste. There are 746 wastewater treatment plants in South Carolina: 146 domestic facilities, 90 municipal facilities (with pretreatment), 126 municipal facilities (without pretreatment), and 362 individually permitted facilities (SCDHEC 2020).

### SOUTH CAROLINA PFAS SAMPLING AND ANALYSIS

There has been a varied response by states with respect to PFAS sampling requirements. Of the 50 US states, 22 are not actively sampling, and the remaining 38 are sampling in one type of environmental matrix as of July 2021 (ITRC 2021). All states that have reported sampling efforts monitor drinking water using standards recommended by either the US EPA or the Interstate Technology and Regulatory Council (ITRC 2020). Out of the 38 states, 12 report sampling groundwater, while only 9 are sampling surface water.

South Carolina has sampled and analyzed for PFAS in community drinking water systems where raw water is supplied by surface waters using US EPA methods 533 and 537.1 [US EPA 2020a]. These standard US EPA methods provide information on sampling methods, including the correct equipment to use when sampling, the method for

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## South Carolina Sampling, Analysis, and Governance of Per- and Polyfluoroalkyl Substances

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

sampling, information on decontaminating equipment after sampling, information on collecting and handling samples, and shipping samples for PFAS drinking water samples. The SCDHEC has sampled for PFAS in 44 community drinking water systems, while 10 other community drinking water systems have provided data to the SCDHEC on sampling and analysis results. Trends and observations of compliance sampling performed by the SCDHEC are shown in Table 2 (SCDHEC 2020). However, it is important to note that the US EPA method 537.1 has method detection limits for individual compounds between 10 and 90 parts per trillion (ppt), and more sensitive methods are now available. The method detection limits from this method can be presumed insufficient to meet reporting guidelines for health advisory levels established by PFAS guidance documents in states that have developed their own PFAS sampling and analytical guidelines.

This sampling effort has accounted for approximately 3.3 million of the approximate 4 million users (82%) of community water systems in South Carolina (see Table 2). Current efforts include the SCDHEC sampling of community drinking water systems supplied by groundwater, and the SCDHEC BOW workgroup is developing strategies to assess PFAS contamination in ambient surface waters and groundwater, including fish tissue (SCDEC 2020). Peer-reviewed literature has found PFAS in sediments and wildlife tissues previously (Fair et al. 2019; Tipton et al 2019; White et al. 2015). In addition to PFAS testing by the SCDHEC, the company Corix Utilities, which is a parent company of Blue Granite Water Company of South Carolina, is planning regular testing for PFAS at 365 of its water systems across the country, even though the US federal government doesn't require routine testing (Fretwell 2020).

### SOUTH CAROLINA CURRENT AND IMPENDING PFAS REGULATIONS

The US EPA has set a lifetime health advisory for PFOA and PFOS in the amount of 70 parts per trillion (ppt) combined. A health advisory provides information on contaminants that are known or suspected to have adverse health effects on people. These are nonenforceable and nonregulatory but provide information to states agencies and public health officials on information spanning from health effects, analytical methods, treatment options, and so forth associated with drinking water contamination. This is used to be a buffer or offer a margin of protection to protect all



**Figure 2.** Active Class 2 and Class 3 landfills in South Carolina that are vulnerable to PFAS contamination.

Kidd, Fabricatore, Jackson

**Table 2.** Summary of Findings from SCDHEC Sampling of Public Water Systems (SCDHEC, 2020)

| Observation | Result |
|---|---|
| Community Drinking Water Systems Sampled by SCDHEC | 44 |
| Community Drinking Water Systems that Provided Data to SCDHEC | 10 |
| Population Served of Sampled Water Systems | 82% |
| Number of Exceedances of EPA's LHA of 70 ppt | 0 |
| Maximum PFOA Concentration Measured | 18 ppt |
| Maximum PFOS Concentration Measured | 16 ppt |
| Maximum Combined PFOA and PFOS Measured | 32 ppt |

Americans from adverse health effects from unregulated contaminant exposure. In the US EPA's 2020 PFAS Action Plan, the main focus of their PFAS drinking water goals are to move forward with the establishment of a maximum contaminant level for PFOA and PFOS under the Safe Drinking Water Act (SDWA) (US EPA 2020b). A part of the SDWA established in 1974 is the Unregulated Contaminant Monitoring Rule (UCMR), which began in 1999 and which cycles through a maximum of 30 unregulated contaminants. Every 5 years, the list of contaminants is updated, and they are monitored throughout the country in public water systems serving more than 10,000 people (US EPA 2020b). Under UCMR 3, the SCDHEC tested for applicable PFAS at all public water systems fitting the monitoring criteria. Additionally, small sites serving under 10,000 people were randomly tested (SCDHEC 2020).

As noted earlier, there is a mixed response by states in monitoring requirements for PFAS. The US EPA (2020b) put out an action plan addressing strategies and potential regulatory decisions. The SCDHEC has complied with federal requirements, such as sampling public water systems, but has decided that more scientific information is required before recommending regulations to be passed on a state level. South Carolina is following the US EPA's Health Advisory Bulletin until such time as either state or federal regulations are enacted (SCDHEC 2020). The SCDHEC will remain involved and up to date regarding national regulatory progress (SCDHEC 2020).

The regulation of PFAS chemicals at both the state and federal levels is ever changing. As new information surrounding PFAS emerges, guidance documents and legislation become outdated quickly. This is evident in South Carolina, where new and amended bills continue to be introduced into the South Carolina legislature. Bill 4718 was introduced in January 2020. This bill was added to amend pending Bill 5339 (Cancer Prevention Act) by adding a section to require the SCDHEC to promulgate regulations to establish MCLs for certain pollutants, specifically PFOA, PFOS, other PFAS, hexavalent chromium, 1,4 dioxane, and other contaminants where regulations have been established in 2 or more states. It

is required that decisions be made based on studies, peer-reviewed science, information from the Agency for Toxic Substances and Disease Registry (ATSDR), and evidence from other states. Additionally, new House Bill H.3515 was introduced in the current session and is in committee following a joint resolution in both the State House and Senate. Bills 5339 and 4718 have been introduced to the SC House and are in committee. To be passed, the bills are required to be passed by both the SC House and the SC Senate, ratified, and approved or vetoed by the governor (SC State Government 2020).

## CONCLUSIONS

Currently, the assessments made by the SCDHEC are most concerned with protecting the public from exposure to PFAS contamination. The focus of sampling has been on drinking waters provided to South Carolina residents, with less focus on the assessment of PFAS-contaminated sources. Due to the lack of case-specific information about PFAS use or disposal at given sites within South Carolina, the necessity for a standard method that can be used for vulnerable sites within the state becomes apparent. Other states, like Michigan, California, and New York, have developed and made public state-specific sampling and testing guidelines for PFAS chemicals in a multitude of environmental matrices (Michigan 2021; California 2021; New York 2021). It is imperative that the SCDHEC (a) remains vigilant in gathering new data of PFAS contamination as new or updated information is presented; (b) communicates information with stakeholders and the public in a timely, consistent, and transparent fashion; and (c) extends sampling and analytical efforts to other environmental matrices for a variety of PFAS analytes once methods and specific guidelines are available.

## REFERENCES

3M. 2020. 3M's Commitment to PFAS stewardship: PFAS history. https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/.

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

South Carolina Sampling, Analysis, and Governance of Per- and Polyfluoroalkyl Substances

Ahrens L, Felizeter S, Sturm R, Xie Z, Ebinghaus R. 2009. Polyfluorinated compounds in wastewater treatment plant effluents and surface waters along the River Elbe, Germany. Marine Pollution Bulletin. 58(9):1326–1333.

California State Water Quality Control Board. 2020. Per- and Polyfluoroalkyl Substances (PFAS) Sampling Guidelines for Non-Drinking Water.

Department of Defense (DOD). 2018. Alternatives to aqueous film forming foam report to Congress: June 2018. https://www.denix.osd.mil/derp/home/documents/alternatives-to-aqueous-film-forming-foam-report-to-congress/AFFF%20Alt%20Report%20to%20Congress_July2018%20(1).pdf.

Department of Defense (DOD). 2020. Per- and polyfluoroalkyl substances (PFAS) task force progress report: March 2020. https://media.defense.gov/2020/Mar/13/2002264440/-1/-1/1/PFAS_Task_Force_Progress_Report_March_2020.pdf.

Domingo JL, Nadal M. 2017. Per-and polyfluoroalkyl substances (PFASs) in food and human dietary intake: a review of the recent scientific literature. Journal of Agricultural and Food Chemistry. 65(3):533–543.

Dorrance LR, Kellogg S, Love AH. 2017. What you should know about per-and polyfluoroalkyl substances (PFAS) for environmental claims. Environmental Claims Journal. 29(4):290–304.

Fair PA, Wolf B, White ND, Arnott SA, Kannan K, Karthikraj R, Vena JE. 2019. Perfluoroalkyl substances (PFASs) in edible fish species from Charleston Harbor and tributaries, South Carolina, United States: Exposure and risk assessment. Environmental Research. 171:266–277.

Federal Aviation Administration (FAA). 2020. Part 139 Airport Certification. https://www.faa.gov/airports/airport_safety/part139_cert/.

Fretwell S. 2020. Water utility checking for potentially dangerous chemical in Carolinas, other states. The State. https://www.thestate.com/news/local/environment/article239259053.html.

Interstate Technology and Regulatory Council. 2020. History and use of per- and polyfluoroalkyl substances (PFAS). https://pfas-1.itrcweb.org/fact_sheets_page/PFAS_Fact_Sheet_History_and_Use_April2020.pdf.

Interstate Technology and Regulatory Council (ITRC). 2020. Per- and polyfluoroalkyl substances (PFAS) guidance document. https://pfas-1.itrcweb.org/wp-content/uploads/2020/04/ITRC_PFAS_TechReg_April2020.pdf.

Interstate Technology and Regulatory Council. 2021. Per- and polyfluoroalkyl substances. https://pfas-1.itrcweb.org/.

Kim M, Li LY, Grace JR, Yue C. (2015). Selecting reliable physicochemical properties of perfluoroalkyl and polyfluoroalkyl substances (PFASs) based on molecular descriptors. Environmental Pollution. 196:462–472.

Kucharzyk KH, Darlington R, Benotti M, Deeb R, Hawley E. 2017. Novel treatment technologies for PFAS compounds: A critical review. Journal of Environmental Management. 204:757–764.

Michigan. 2021. PFAS Sampling Guidance. https://www.michigan.gov/pfasresponse/0,9038,7-365-88059_91297---,00.html.

New York Department of Environmental Conservation. 2020. Guidelines for Sampling and Analysis of PFAS. https://nyscpg.wildapricot.org/resources/Documents/Website/Regulatory%20Updates/2020-01-23%20-%20NYSDEC_PFAS%20Sampling%20and%20Analysis.2020-01.pdf.

Rahman MF, Peldszus S, Anderson WB. 2014. Behaviour and fate of perfluoroalkyl and polyfluoroalkyl substances (PFASs) in drinking water treatment: a review. Water Research. 50:318–340.

Rayne S, Forest K. 2009. Perfluoroalkyl sulfonic and carboxylic acids: a critical review of physicochemical properties, levels and patterns in waters and wastewaters, and treatment methods. Journal of Environmental Science and Health Part A. 44(12):1145–1199.

South Carolina Department of Health and Environmental Control (SCDHEC). 2020. Per- and polyfluoroalkyl substances (PFAS). https://scdhec.gov/BOW/perfluoroalkyl-substances-pfas.

South Carolina Department of Health and Environmental Control (SCDHEC). 2020. Strategy to assess the impact of per- and polyfluoroalkyl substances on drinking water in South Carolina: Bureau of Water. https://scdhec.gov/sites/default/files/media/document/BOW%20PFAS%20Water%20Strategy.pdf.

South Carolina General Assembly. 2020. 123rd Session. Bill 4718 amendment to Bill 5339. https://www.scstatehouse.gov/sess123_2019-2020/bills/4718.html.

Tipton J, Guillette L, Lovelace S, Parrott B, Rainwater T, Reiner J. 2019. Analysis of PFAAs in American alligators' part 1: concentrations in alligators harvested for consumption during South Carolina public hunts. Journal of Environmental Science. 61:24–30.

US Environmental Protection Agency (EPA). 2020a. EPA PFAS drinking water laboratory methods. https://www.epa.gov/pfas/epa-pfas-drinking-water-laboratory-methods.

US Environmental Protection Agency (EPA). 2020b. EPA PFAS action plan: program update. https://www.epa.gov/sites/production/files/2020-01/documents/pfas_action_plan_feb2020.pdf.

Valsecchi S, Rusconi M, Polesello S. 2013. Determination of perfluorinated compounds in aquatic organisms: a review. Analytical and Bioanalytical Chemistry. 405(1):143–157.

White N, Balthis L, Kannan K, De Silva A, Wu Q, French K, Daugomah J, Spencer C, Fair P. 2015. Elevated levels of perfluoroalkyl substances in estuarine sediments of Charleston, SC. Science of the Total Environment. 521–522:79–89.

ELECTRONICALLY FILED - 2025 Mar 06 2:32 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Mar 11 9:12 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF HORRY** | ) | **FIFTEENTH JUDICIAL CIRCUIT** |
| | ) | |
| | ) | |
| GRAND STRAND WATER AND SEWER | ) | C.A. No.: 2024-CP-26-05523 |
| AUTHORITY, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| ALADDIN MANUFACTURING | ) | |
| CORPORATION; BURLINGTON | ) | |
| INDUSTRIES, INC.; DELTA MILLS, | ) | |
| INC., its predecessors, successors, assigns, | ) | |
| and/or responsible parties; DOMTAR | ) | |
| PAPER COMPANY, LLC; ELEVATE | ) | |
| TEXTILES, INC.; FIBER INDUSTRIES, | ) | |
| LLC; GFL ENVIRONMENTAL USA, | ) | |
| INC.; J.P. STEVENS & COMPANY, INC., | ) | |
| its predecessors, successors, assigns, and/or | ) | |
| responsible parties; MOHAWK | ) | |
| INDUSTRIES, INC.; NAN YA PLASTICS | ) | |
| CORPORATION, AMERICA; PRET | ) | |
| ADVANCED MATERIALS, LLC; RED | ) | |
| ROCK DISPOSAL, LLC; SAMPSON | ) | |
| COUNTY DISPOSAL, LLC; and WASTE | ) | |
| INDUSTRIES, LLC, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

### DEFENDANTS RED ROCK DISPOSAL, LLC AND SAMPSON COUNTY DISPOSAL, LLC'S REPLY IN SUPPORT OF MOTION TO DISMISS

Defendants Red Rock Disposal, LLC and Sampson County Disposal LLC respectfully submit the following reply in support of their motion to dismiss Grand Strand Water and Sewer Authority's Complaint.

1

ELECTRONICALLY FILED - 2025 Mar 11 9:12 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**A.      The Court Does Not Have Personal Jurisdiction Over Defendants.**

This Court's jurisdiction over nonresident companies is limited by constitutional due process. *Aviation Assocs. & Consultants, Inc. v. Jet Time, Inc.,* 303 S.C. 502, 507, 402 S.E.2d 177, 180 (1991). Grand Strand does not dispute that this Court can exercise jurisdiction over Defendants only if it determines that they have "purposefully availed" themselves of some privileges of conducting business in South Carolina. *Coggeshall v. Reprod. Endocrine Assocs. of Charlotte,* 376 S.C. 12, 16, 655 S.E.2d 476, 478 (2007). Grand Strand also does not dispute that in making that determination, controlling U.S. Supreme Court precedent instructs that "unilateral activity of another party or a third party is not an appropriate consideration," *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417 (1984), and "foreseeability of causing injury in [South Carolina]…" is not sufficient. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985).

The Constitution does not permit Grand Strand to require North Carolina companies that use a North Carolina wastewater treatment facility to dispose of North Carolina-generated waste to defend themselves in a South Carolina court.  Defendants alleged conduct is plainly not "directed at" South Carolina. *See S. Plastics Co. v. S. Com. Bank,* 310 S.C. 256, 260, 423 S.E.2d 128, 131 (1992). According to Grand Strand's allegations, Defendants actions would have no impacts at all in South Carolina but for Lumberton's acceptance and (allegedly) inadequate treatment of Defendants' wastewater, and discharges of its effluent upriver of South Carolina. Even if Defendants knew Lumberton would allow some PFAS to wind up 60 miles away in South Carolina (Grand Strand alleges only that Defendants "knew and/or reasonably should have known" this), Defendants' conduct was nevertheless aimed solely within North Carolina.

Nearly every supposedly analogous case cited by Grand Strand is inapposite because those defendants' actions lead directly and inevitably to impacts a short distance away in the forum state.

2

ELECTRONICALLY FILED - 2025 Mar 11 9:12 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

None of the cases support Grand Strand's jurisdictional argument. To the contrary, they demonstrate that the facts here are well outside the limits of when a court may exercise jurisdiction over non-resident parties for conduct entirely outside of the forum state's borders. No case cited by Grand Strand, save one, involved circumstances where the out-of-state actions were connected to the forum state only by the intervening conduct of a third-party.

In *Horne v. Mobile Area Water & Sewer Sys.*, 897 So. 2d 972 (Miss. 2004), the defendant opened the gates of its reservoir to release excess water directly into a river flowing across the border from Alabama to Mississippi 12 miles away. In *Triad Hunter, LLC v. Eagle Natrium, LLC*, not only did a mining company inject an allegedly harmful solution into the ground along the West Virginia-Ohio border, personal jurisdiction was based in part on the defendant's physical entry into Ohio to retrieve minerals. 132 N.E.3d 1272, 1285 (7th Dist. 2019)

The sole federal case Grand Strand relies on, *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565 (9th Cir. 2018), offers a stark factual contrast with the allegations in this case. *Pakootas* came to the court after a trial on the merits. By that time, the plaintiffs had established that the defendant had, for nearly a century, operated the world's largest lead and zinc smelter along the Columbia River, 10 miles from the Washington border. *Id*. at 572. During that time, the defendant had discharged some 10 million tons of toxic slag directly into the river, most of which had been carried downstream in Washington. The *Pakootas* court reached the conclusion that the defendant's actions were "expressly aimed" at the State of Washington on a record that included admissions from the defendant that it "was 'in effect dumping waste into another country,' using the Upper Columbia River as a 'free' and 'convenient disposal facility.'" *Id*. at 578. In contrast,

3

the Defendants—like almost every other waste generator in North Carolina—are directing their waste only to a lawful, permitted[1] wastewater treatment facility in their home state.

Grand Strand identifies only a single case, *Ex parte Aladdin Mfg. Corp.*, 305 So. 3d 214 (Ala. 2019), in which a court exercised personal jurisdiction over a party for alleged injuries that were caried into the forum state by the actions of a third party. *Aladdin*—decided by a closely divided Alabama court—is of no precedential value and cannot be relied on to ignore or alter the constitution limits on personal jurisdiction. The *Aladdin* majority relied on the Alabama law standards for intervening causation, brushing aside the constitutional requirement that personal jurisdiction be based solely on the actions and intentions of the defendant, not third parties. *Id*. at 232. As the *Aladdin* dissenters recognized, the majority's reasoning cannot be reconciled with U.S. Supreme Court precedent. *Id*. at 241. The alleged fact that releases from a third-party wastewater treatment plant end up in a river and, eventually, across states line, "does not establish that the defendants' actions were intentionally and directly aimed [at the foreign jurisdiction]." *Id*. Accordingly, this Court should disregard the *Aladdin* decision and find that only North Carolina courts have jurisdiction over the Defendants.

**B.    South Carolina Law Applies to Grand Strand's Claims Against the Defendants.**

Although Grand Strand argues that North Carolina law applies to its substantive claims against Defendants, it appears to concede that, regardless, South Carolina law applies to determine personal jurisdiction. Furthermore, personal jurisdiction, as explained above, turns on the federal

---

[1] Although the Complaint does not specifically allege that Lumberton is a lawfully permitted facility, Grand Strand argues in its response that under *Int'l Paper Co. v. Ouellette,* 479 U.S. 481 (1987), the Clean Water Act preempts substantive South Carolina tort law for its claims against Defendants. As explained in Section B below, Grand Strand's legal conclusions are incorrect, but the argument constitutes an admission that Lumberton and its discharges are lawfully permitted.

4

ELECTRONICALLY FILED - 2025 Mar 11 9:12 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

due process clause.  In any event, *Int'l Paper Co. v. Ouellette,* 479 U.S. 481 (1987), does not apply to preempt South Carolina law here.  *Ouellette* found only that "[t]he Act pre-empts state law to the extent that the state law is applied to an out-of-state ***point source***." *Id*. at 500 (emphasis added). Point sources are "defined and discrete conveyances" such as pipes, ditches etc., that discharge directly into waters of the United States. *Id*., n 4.  Under the Clean Water Act, point sources are regulated and must have a state-issued National Pollutant Discharge Elimination System (NPDES) permit.  *Id*. at 489. In contrast, all other potential sources of water pollution—"Non-point sources"— are generally outside the scope of the statute. *See Cnty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 590 U.S. 165, 175, 140 S. Ct. 1462, 1471, 206 L. Ed. 2d 640 (2020) ("The [Clean Water] Act envisions EPA's role in managing nonpoint source pollution and groundwater pollution as limited to studying the issue, sharing information with and collecting information from the States, and issuing monetary grants."). The alleged actions on which Grand Strand's claims against Defendants are not point source discharges, are not subject to an NDPES permit, and are not alleged to be regulated by the Clean Water Act.  *Ouellette* is inapplicable.

  **C. Grand Strand's Claims Are Not Ripe.**

  There is no inconsistency between water providers like Grand Strand having standing to challenge the rule establishing the MCLs and this lawsuit nevertheless being premature.  Grand Strand's claims here are not ripe in part because the MCLs on which they are based are being challenged.  The reverse is not true.  These and similar claims will have no effect on the validity of the MCLs. Further, the standards for ripeness in the two cases differ. As parties that will, *if the EPA rule is allowed to stand*, be impacted by it, water providers have standing to challenge it for the intuitive reason that it is directly aimed at them. *See* Exhibit 1 to Grand Strand's Response at p. 15 ("Water Associations' standing is self-evident because their public water system members

5

ELECTRONICALLY FILED - 2025 Mar 11 9:12 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are directly regulated by the rule and ha[ve]been injured by it.") (quotation omitted)); *see also Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592 (D.C. Cir. 2023) ("The lobstermen's standing to challenge the phase one rule is self-evident, as they are the 'object of the action.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992))). Furthermore, the EPA rule includes requirements that apply before 2029, such as water testing obligations, that are irrelevant to Grand Strand's claims here. *See* 89 Fed. Reg. 32,532, 32,633 (April 26, 2024).

The only contradiction is in Grand Stand's position. Grand Strand concedes that similarly situated water authorities are disputing the legality of the MCLs in a different court and seeking to have the rule nullified. At the same time, Grand Strand is asking for a judgment in this case requiring Defendants and others to fund its future compliance with that rule. No more evidence is needed to demonstrate why this case is premature than recognition of the undue windfall that would result if Grand Strand were to be awarded judgment in this case only to the have the challenges to the MCLs resolved in its favor, allowing the status quo to continue. In other words, Grand Strands' claims depend on the truth of three facts that are, for now, unknowable: (a) the MCLs will be in force and require compliance in 2029; (2) Grand Strand's source water will be contaminated with PFAS above the MCLs at that time; and (3) Grand Strand's current treatment equipment will not be able to meet the MCLs at that time.

Furthermore, the Complaint contradicts Grand Strand's characterization of this case as involving "straightforward state-law claims arising from past, present, and future property injuries." Response at pp. 5-6. Grand Strand's claims are all based, and depend on, its potential need to comply with the MCLs. Grand Strand alleges that its source water has been contaminated with PFAS "for decades." (Compl. ¶ 63). The event which allegedly gives rise to its claim is, explicitly, not the alleged longstanding contamination, but the promulgation of the PFAS MCLs.

ELECTRONICALLY FILED - 2025 Mar 11 9:12 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Although Grand Strand speculates in its brief about potential expenses, such as water treatment pilot programs, that *could* be incurred before the regulations go into effect, (Response at p. 9), the Complaint does not allege that Grand Strand has in fact incurred any costs whatsoever due to PFAS in its source water. Grand Strand's claims should be treated as what they are: a prophylactic measure to protect itself in the future if and when the (i) MCLs take effect; and (ii) future PFAS concentrations in its source water exceed the MCLs; and (iii) it must install additional water treatment equipment. Such claims are not ripe before any injury has occurred.

**D.    *Clark v. Greenville County* is Indistinguishable and Bars Grand Strand's Nuisance Claim.**

The South Carolina Supreme Court held in *Clark v. Greenville County* that only a party which controls a waste facility is liable in nuisance for releases from that facility. 313 S.C. 205, 210, 437 S.E.2d 117, 119 (1993). There is no dispute that Defendants do not control the Lumberton wastewater treatment plant. Grand Strand argues that Defendants may nevertheless be liable because they control their leachate ***before*** it is delivered to Lumberton. But the leachate is, of course, not causing or impacting Grand Strand in any way while it is under Defendants' control in North Carolina. If Lumberton's treatment were adequate, Grand Strand would have no basis to complain. The purported nuisance is the alleged contamination of the river system following Lumberton's discharges. Put another way, the plaintiffs in *Greenville County* could also have characterized their nuisance claims as being directed at the hazardous waste deposited in the landfill by the corporate defendants. But the South Carolina Supreme Court rejected the argument that such parties may be liable for nuisance. *Greenville County* thus compels dismissal of Grand Strand's nuisance claims.

ELECTRONICALLY FILED - 2025 Mar 11 9:12 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**E.     Conclusion**

For the foregoing reasons and the reasons stated in Defendants' initial memorandum of law, Red Rock Disposal, LLC and Sampson County Disposal, LLC's Motion to Dismiss should be granted, and all of the claims that Grand Strand has asserted against them should be dismissed.

**WILLIAMS MULLEN**

By: s/ John G. Tamasitis
Richard H. Willis (SC Bar No.: 6159)
John G. Tamasitis (SC Bar No.: 101875)
1230 Main Street, Suite 330
Columbia, SC 29201
Tel:   803.567.4615
Fax:  803.567.4601
rwillis@williamsmullen.com
jtamasitis@williamsmullen.com

*And*

**TAFT STETTINIUS & HOLLISTER**

Philip L. Comella (*PHV Admission to be filed*)
Ryan G. Rudich (*PHV Admission to be filed*)
111 E. Wacker Drive, Suite 2600
Chicago, IL 60601
Tel. 312.527.4000
Fax: 312.527.4011
pcomella@taftlaw.com
rrudich@taftlaw.com

*Counsel for Defendants Red Rock Disposal, LLC and Sampson County Disposal, LLC*

March 11, 2025

Columbia, South Carolina

8

ELECTRONICALLY FILED - 2025 Mar 17 1:41 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF HORRY** | ) | **FIFTEENTH JUDICIAL CIRCUIT** |
| | ) | |
| | ) | |
| GRAND STRAND WATER AND SEWER AUTHORITY, | ) | C.A. No.: 2024-CP-26-05523 |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| ALADDIN MANUFACTURING CORPORATION; BURLINGTON INDUSTRIES, INC.; DELTA MILLS, INC., its predecessors, successors, assigns, and/or responsible parties; DOMTAR PAPER COMPANY, LLC; ELEVATE TEXTILES, INC.; FIBER INDUSTRIES, LLC; GFL ENVIRONMENTAL USA, INC.; J.P. STEVENS & COMPANY, INC., its predecessors, successors, assigns, and/or responsible parties; MOHAWK INDUSTRIES, INC.; NAN YA PLASTICS CORPORATION, AMERICA; PRET ADVANCED MATERIALS, LLC; RED ROCK DISPOSAL, LLC; SAMPSON COUNTY DISPOSAL, LLC; and WASTE INDUSTRIES, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**DEFENDANTS RED ROCK DISPOSAL, LLC AND SAMPSON COUNTY DISPOSAL, LLC'S SUPPLEMENTAL BRIEFING ON PERSONAL JURISDICTION**

Defendants Red Rock Disposal, LLC ("RRD") and Sampson County Disposal LLC ("SCD") (together "Landfill Defendants") submit the following supplemental brief on personal jurisdiction, as requested by the Court at the hearing on March 12, 2025. For the reasons stated below, exercising personal jurisdiction over the Landfill Defendants would violate the South

ELECTRONICALLY FILED - 2025 Mar 17 1:41 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Carolina Long-Arm Statute, S.C. Code Ann. § 36-2-803, in addition to due process, and for both reasons the Landfill Defendants' Motion to Dismiss should be granted.

South Carolina courts have found that "[t]he determination of whether a court may exercise personal jurisdiction over a nonresident involves a two-step analysis." *Aviation Assocs. & Consultants, Inc. v. Jet Time, Inc.*, 303 S.C. 502, 505, 402 S.E.2d 177, 179 (1991). "First, the trial judge must determine that the South Carolina long-arm statute applies. Second, the trial judge must determine that the nonresident's contacts in South Carolina are sufficient to satisfy due process requirements." *Id*. (citation omitted).

The Long-Arm Statute states, in relevant part, as follows:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's:
    (1) transacting any business in this State;
    (2) contracting to supply services or things in the State;
    (3) commission of a tortious act in whole or in part in this State;
    (4) causing tortious injury or death in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State;
    . . .
(B) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

S.C. Code Ann. § 36-2-803.

Here, the Landfill Defendants' alleged conduct falls outside the scope of the Long-Arm Statute, and therefore, the Court lacks personal jurisdiction, even without addressing due process considerations. (As noted throughout the Landfill Defendants' briefing on this issue, jurisdiction would not be consistent with due process either).

Grand Strand's allegations against the Landfill Defendants are basely solely upon conduct in North Carolina. Grand Strand contends that the Landfill Defendants "collect[ed] the PFAS-contaminated leachate generated by their respective landfills and transport[ed] it to Lumberton,

ELECTRONICALLY FILED - 2025 Mar 17 1:41 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**North Carolina**[.]"  Pl. Memo in Opp. at 50 (emphasis added); *see also* Compl.,[1] ¶¶ 2, 22, 54,  94.  Grand Strand alleges that the Landfill Defendants' conduct results in alleged impacts to its facilities in South Carolina but only after being treated by the Lumberton wastewater treatment plant ("WWTP") in Lumberton, North Carolina.  Compl. ¶ 22.  The Landfill Defendants' act of sending leachate to a WWTP in North Carolina does not constitute transacting business in South Carolina, contracting to supply services or things in South Carolina, or committing any tortious act in whole or in part in South Carolina.  Accordingly, jurisdiction cannot rest on S.C. Code Ann. § 36-2-803(1)-(3).

Although the Complaint does not identify the section of the Long-Arm Statute that allegedly confers personal jurisdiction over the Landfill Defendants, at the March 12 hearing, Grand Strand suggested that § 36-2-803(A)(4) applies.  But this subsection has no application here.  To satisfy that subsection, it is not enough for a defendant's out-of-state conduct to result in alleged injury in South Carolina.  A plaintiff must *also* establish that the defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in [South Carolina]." *Id*.  Grand Strand does not allege that the Landfill Defendants do any business, have any presence, or derive any revenue from South Carolina.

In support of their motion to dismiss, the Landfill Defendants submitted an affidavit from Anthony Pelletier establishing that they have no South Carolina operations and that their landfills do not accept waste from South Carolina.  Grand Strand has not disputed these facts and at the March 12 hearing stated that it has no intention of engaging in jurisdictional discovery.  Thus, if

---

[1] Any reference to the "Complaint" refers to Plaintiff's Second Amended Complaint.

3

ELECTRONICALLY FILED - 2025 Mar 17 1:41 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

this Court were to apply a two-step analysis in determining personal jurisdiction, Grand Strand's claims against the Landfill Defendants fail under the first step.[2]

As argued in the Landfill Defendants' *Memorandum in Support of Their Motion to Dismiss*, Grand Strand's attempt to exercise personal jurisdiction also fails if South Carolina's Long-Arm Statute is "construed to extend to the outer limits of the due process clause." *Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491, 611 S.E.2d 505, 508 (2005).

In the due process analysis, jurisdiction can only attach if the plaintiff identifies "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state." *Coggeshall v. Reprod. Endocrine Assocs. of Charlotte*, 376 S.C. 12, 16, 655 S.E.2d 476, 478 (2007). The court's "principal inquiry" in this type of jurisdictional assessment "is whether the defendant's activities manifest an intention to submit to the power of a sovereign." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011).

As set out in the Landfill Defendant's *Memorandum*, Grand Strand's Complaint fails to meet this standard. Anthony Pelletier's affidavit shows that the Landfill Defendants have no contacts with South Carolina. Moreover, as alleged in the Complaint, the Landfill Defendants *purposely availed themselves of the Lumberton WWTP in North Carolina, not of any facility or business in South Carolina.*

---

[2] In South Carolina "[t]he question of personal jurisdiction over a nonresident defendant is one which must be resolved upon the facts of each particular case." *Moosally v. W.W. Norton & Co.*, 358 S.C. 320, 327, 594 S.E.2d 878, 882 (Ct. App. 2004). In appropriate cases, courts continue to apply both steps of the analysis and reject personal jurisdiction where the language of the long-arm statute unambiguously excludes the facts before the court. *See, e.g. Sullivan v. Hawker Beechcraft Corp.*, 397 S.C. 143, 723 S.E.2d 835 (Ct. App. 2012) (rejecting personal jurisdiction over nonresident owner of a plane that crashed in South Carolina because plaintiff did not allege facts showing conditions of § 36-2-803(A)(4) were satisfied); *see also Aviation Assocs.,* 303 S.C. at 506, 402 S.E.2d at 179 (finding that the long-arm statute was not satisfied because plaintiff could not establish that defendant conducted business in South Carolina).

ELECTRONICALLY FILED - 2025 Mar 17 1:41 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

As pointed out in the Landfill Defendants' Reply Brief, Grand Strand rests its due process argument upon an out-of-state decision, *Ex parte Aladdin Mfg. Corp.,* 305 So.3d 214 (Ala. 2019), that has no precedential value in South Carolina. *Aladdin* was decided under Alabama law and under a different procedural standard concerning writs of mandamus in that state.

Furthermore, as pointed out by the dissent in *Ex parte Aladdin,* the majority opinion inappropriately relied upon foreseeability in finding that the defendants allegedly knew the ineffectively treated wastewater would wind up in Alabama. 305 So.3d at 238, (majority); 305 So.3d at 241 (dissent). But as the U.S. Supreme Court has consistently stated, "foreseeability of causing injury in another state…is not a sufficient benchmark for exercising personal jurisdiction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quotations omitted). Ironically, Grand Strand, in referencing the *Aladdin* opinion in its *Consolidated Response in Opposition to Defendants' Motions to Dismiss,* quotes from a portion of the opinion dealing with foreseeability in the context of intervening causes, not personal jurisdiction. Consolidated Resp. at 51; *see Aladdin*, 305 So.2d at 232-33. Thus, *Ex parte Aladdin* is not only of no precedential value, but it is also wrongly decided because it relies upon foreseeability to base personal jurisdiction. The other cases Grand Strand cites were all taken from the *Aladdin* decision and concerned instances where the defendants directly discharged pollutants into waterways crossing state borders, thus purposely aiming their activities toward out-of-state resources. *See Defendants Red Rock Disposal, LLC and Sampson County Disposal, LLC's Amended Reply in Support of Motion to Dismiss,* pp. 3-4.

Disregarding the limits on personal jurisdiction in § 36-2-803(A)(4), as Grand Strand urges the Court to do, would be violative of the "plain meaning rule" and established precedent on statutory interpretation. *See Creswick v. Univ. of S.C.*, 434 S.C. 77, 81-82, 862 S.E.2d 706, 708

5

ELECTRONICALLY FILED - 2025 Mar 17 1:41 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(2021) ("Under the plain meaning rule, this Court has no right to search for or impose another meaning or resort to subtle or forced construction to change the scope of a clear and unambiguous statute."). Where, as here, the language of the statute being applied "is plain, unambiguous, and conveys a clear and definite meaning, there is no need to employ the rules of statutory interpretation, and this Court must apply the statute according to its literal meaning." *Id.* (citing *Miller v. Aiken*, 364 S.C. 303, 307, 613 S.E.2d 364, 366 (2005)). "Only where the language of an act gives rise to doubt or uncertainty as to legislative intent may this Court search for that intent beyond the borders of the act itself." *Id.* (citing *Smith v. Tiffany*, 419 S.C. 548, 556, 799 S.E.2d 479, 483 (2017)); *see also Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Under the plain meaning rule, it is not the court's place to change the meaning of a clear and unambiguous statute.").

The legislature's grant of jurisdiction to South Carolina courts over nonresident parties is clear and limited. A party alleged to have caused injury in South Carolina as a result of out-of-state conduct may be sued in South Carolina only if it "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State." S.C. Code Ann. § 36-2-803(4). Landfill Defendants do not meet this standard and, therefore, no jurisdiction exists under either step of the personal jurisdiction analysis.

For the foregoing reasons and the reasons stated in Landfill Defendants' initial memorandum of law and reply, Red Rock Disposal, LLC and Sampson County Disposal, LLC's Motion to Dismiss should be granted, and all of the claims that Grand Strand has asserted against them should be dismissed for lack of personal jurisdiction.

6

ELECTRONICALLY FILED - 2025 Mar 17 1:41 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**WILLIAMS MULLEN**

By: s/ John G. Tamasitis
Richard H. Willis (SC Bar No.: 6159)
John G. Tamasitis (SC Bar No.: 101875)
1230 Main Street, Suite 330
Columbia, SC 29201
Tel:   803.567.4615
Fax:  803.567.4601
rwillis@williamsmullen.com
jtamasitis@williamsmullen.com

*And*

**TAFT STETTINIUS & HOLLISTER**

Philip L. Comella (*PHV Admission to be filed*)
Ryan G. Rudich (*PHV Admission to be filed*)
111 E. Wacker Drive, Suite 2600
Chicago, IL 60601
Tel. 312.527.4000
Fax: 312.527.4011
pcomella@taftlaw.com
rrudich@taftlaw.com

*Counsel for Defendants Red Rock Disposal, LLC and
Sampson County Disposal, LLC*

March 17, 2025
Columbia, South Carolina

7

ELECTRONICALLY FILED - 2025 Mar 21 10:11 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| STATE OF SOUTH CAROLINA | ) IN THE COURT OF COMMON PLEAS |
| | ) |
| IN RE: | ) |
| PFAS LITIGATION COORDINATED DOCKET | ) |
| | ) C.A. No.: 2024-CP-26-05523 |
| _____ | ) |
| | ) |
| COUNTY OF HORRY | ) |
| | ) |
| GRAND STRAND WATER AND SEWER AUTHORITY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ALADDIN MANUFACTURING CORPORATION; BURLINGTON INDUSTRIES, INC.; DELTA MILLS, INC., its predecessors, successors, assigns, and/or responsible parties; DOMTAR PAPER COMPANY, LLC; ELEVATE TEXTILES, INC.; FIBER INDUSTRIES, LLC; GFL ENVIRONMENTAL USA, INC.; J.P. STEVENS & COMPANY, INC., its predecessors, successors, assigns, and/or responsible parties; MOHAWK INDUSTRIES, INC.; NAN YA PLASTICS CORPORATION, AMERICA; PRET ADVANCED MATERIALS, LLC; RED ROCK DISPOSAL, LLC; SAMPSON COUNTY DISPOSAL, LLC; and WASTE INDUSTRIES, LLC, | ) **Defendants Red Rock Disposal, LLC and Sampson County Disposal, LLC's Motion for Admission *Pro Hac Vice* for Philip L. Comella** |
| | ) |
| Defendants. | ) |
| | ) |

Pursuant to South Carolina Appellate Court Rule 404, I, Richard H. Willis, of Williams Mullen, member of the South Carolina Bar, hereby request the Court issue an Order permitting Philip L. Comella of the law firm of Taft Stettinius & Hollister LLP, 111 East Wacker Drive, Suite 2600, Chicago, Illinois 60601, to appear *pro hac vice* in this litigation as counsel for the Defendants Red Rock Disposal, LLC and Sampson County Disposal, LLC, and would show the Court as follows:

1.      Philip L. Comella is a member in good standing of the bar of Illinois, is of good moral

ELECTRONICALLY FILED - 2025 Mar 21 10:11 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

character, and is otherwise qualified for admission *pro hac vice* under the requirements of South Carolina Appellate Court Rule 404.

2.      Philip L. Comella is handling this matter in association with Richard H. Willis, who is a member of the law firm of Williams Mullen, 1230 Main Street, Suite 330, Columbia, South Carolina 29201, a member in good standing with the South Carolina Bar (S.C. Bar No.: 6159), and a resident of Columbia, South Carolina.

3.      This motion is supported by the attached Verified Application for Admission *Pro Hac Vice* of Philip L. Comella and Certificate of Good Standing, copies of which have been served by mail on the South Carolina Supreme Court of Bar Admission, along with a $250.00 check made payable to the South Carolina Supreme Court Office of Bar Admissions, pursuant to Rule 404 of the South Carolina Appellate Court Rules.

<u>**CERTIFICATION**</u>

The undersigned certifies that, pursuant to Rule 11 of the South Carolina Rules of Civil Procedure, his office has conferred with counsel for Plaintiff, and counsel for Plaintiff has not objected to this Motion.

**WILLIAMS MULLEN**

By: *s/ Richard H. Willis*
Richard H. Willis (S.C. Bar No.: 6159)
John G. Tamasitis (S.C. Bar No.: 101875)
1230 Main Street, Suite 330
Columbia, SC 29201
Tel:   803.567.4615
Fax:  803.567.4601
rwillis@williamsmullen.com
jtamasitis@williamsmullen.com

*Counsel for Defendants Red Rock Disposal, LLC and Sampson County Disposal, LLC*

ELECTRONICALLY FILED - 2025 Mar 21 10:11 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## VERIFIED APPLICATION FOR ADMISSION *PRO HAC VICE* IN THE STATE OF SOUTH CAROLINA

**Please type your answers in the space provided. Provide an answer for every question asked. In your own handwriting, sign in all spaces where a signature is required (no e-signatures). The accompanying certificate of good standing should not be older than 90 days at the time of the filing of this application.**

| | | |
|---|---|---|
| Grand Strand Water and Sewer Authority | C.A. No. 2024-CP-26-05523 | State of South Carolina County of Horry in The Court of Common Pleas Fifteenth Judicial Court |
| **Plaintiff** | Case No. | Tribunal |
| vs. | | |
| Aladdin Manufacturing Corporation, et al., | Mailing Address of Tribunal: | 1301 Second Avenue |
| **Defendant** | | Conway, SC 29526 |

Comes now ___Philip L. Comella___ , applicant herein, and respectfully represents the following:

1. Applicant resides at:

169 Sea Island Drive
_____
**Street Address**

| | | | |
|---|---|---|---|
| Ponte Vedra Beach | St. Johns | Florida | 32082 |
| **City** | **County** | **State** | **Zip Code** |
| (630) 853-5346 | | | |
| **Telephone** | | | |

2. Applicant is an attorney and a member of the law firm of (or practices law under the name of)

Taft Stettinius & Hollister LLP _____ , with offices at

111 East Wacker Drive, Suite 2600
_____
**Street Address**

| | | | |
|---|---|---|---|
| Chicago | Cook | Illinois | 60601 |
| **City** | **County** | **State** | **Zip Code** |
| (312) 527-4000 | (630) 853-5346 | (312) 527-4100 | pcomella@taftlaw.com |
| **Primary Telephone** | **Cell Phone** | **Fax Number** | **Email Address** |

3. Applicant has been retained personally or as a member of the above-named law firm by

GFL Environmental USA, Inc.; Red Rock Disposal, LLC; Sampson County Disposal, ___ to provide legal representation in connection with the above case now pending before the above-named tribunal of the State of South Carolina.

4. Since ___November___ of ___1983___ , Applicant has been, and presently is, a member in good standing of the bar of the highest court of the District of Columbia or the State of ___Illinois___ where Applicant regularly practices law. Attached is a certificate of good standing dated within the last 90 days from the bar of the highest court of the District of Columbia or the State where applicant regularly practices law. It is not necessary to provide a certificate of good standing from all courts before which you are admitted.

*Page 1 of 4*

ELECTRONICALLY FILED - 2025 Mar 21 10:11 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

5. List all courts before which Applicant has been admitted to practice law, including United States District Courts; United States Circuit Courts of Appeals; the Supreme Court of the United States; and state courts or the District of Columbia.

| Court: | Date Admitted: |
|---|---|
| U.S. Supreme Court | 2006 |
| U.S. Court of Appeals for 7th Cir. | 2005 |
| U.S. District Court for the Northern District of Illinois | 1983 |
| U.S. District Court for the Eastern District of Michigan | 2012 |
| Illinois State Bar | 1983 |
| U.S. District Court for the Southern District of Illinois | 2023 |
| | |

Is Applicant presently a member in good standing of the bars of those courts listed above? List any court named in the preceding paragraph that applicant is no longer admitted to practice before.

Yes

6. Is Applicant presently subject to any suspension or disbarment proceedings, or has Applicant been formally notified of any complaints pending before a disciplinary agency? If yes, give particulars, e.g., jurisdiction, court date.

No

7. Has Applicant had any application for admission *pro hac vice* in this or any other jurisdiction denied or any *pro hac vice* admission revoked? If yes give particulars, e.g., date, court, docket number, judge, circumstances; attach a copy of any order of denial or revocation.

No

8. Has Applicant had any certificate or privilege to appear and practice before any court or administrative body suspended or revoked? If yes, give particulars, e.g., date, court, administrative body, date of suspension and reinstatement.

No

9. Please be aware that local counsel must be Rule 403 certified. Local counsel of record associated

with Applicant in this case is <u>Richard Willis</u> of the <u>Williams Mullen</u>

law firm, which has offices at:

1230 Main Street
---
Street Address

| Columbia | Lexington | South Carolina | 29201 |
|---|---|---|---|
| City | County | State | Zip Code |
| (803) 567-4600 | | | rwillis@williamsmullen.com |
| Primary Telephone | Cell Phone | Fax Number | Email Address |

*Page 2 of 4*

ELECTRONICALLY FILED - 2025 Mar 21 10:11 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

_____6159_____
South Carolina Bar Number
(You must provide Bar Number)

10.     Has Applicant previously filed an application to appear pro hac vice in South Carolina cases?  If yes, give case name and status of litigation, date of application, local counsel of record in each case, and state whether application is pending or was granted.

Yes.  Simultaneous with the filing of this pro hac vice application, I am also submitting pro hac vice applications in the following cases:

Berkeley, South Carolina v. 3M Company, Inc., et al. (C.A. No. 2025-08-00117 (9th Judicial Circuit) *(Local counsel in this case is G. Wade Leach of Burr & Forman)*
South Carolina Public Service Authority a/k/a Santee Cooper v. China Jushi USA Corp., et al. (C.A. 2024-CP-08-03336) (The Court of Common Pleas Ninth Judicial Court) *(Local Counsel of record in this case is G. Wade Leach of Burr & Forman)*
Georgetown County Water and Sewer District v. 3M Company, Inc., et al. (C.A. No. 2025-CP-22-00015)(15th Judicial Circuit) *(Local counsel of record in this case is Richard Willis of Williams Mullen)*.

These cases are newly filed  and have been assigned to Judge Knie in Spartanburg, SC.

11.     Does Applicant agree to comply with the applicable statutes, laws and rules of the State of South Carolina and familiarize him/herself with and comply with the South Carolina Rules of Professional Conduct? Does Applicant consent to the jurisdiction of the South Carolina courts and Commission on Lawyer Conduct.

Yes

12.     Applicant respectfully requests to be submitted to practice in the above-named tribunal for this case only.

DATED this _____12th_____ day of _____March_____, 20__25__.

_____
APPLICANT

*Page 3 of 4*

## VERIFICATION

STATE OF  ILLINOIS                    )

COUNTY OF  COOK                    )

I,        Philip L. Comella                                        , do hereby swear or affirm under penalty of perjury that I am the applicant in the above-styled matter; that I have read the foregoing application and know the contents thereof; and that the contents are true of my own knowledge, except as to those matters stated on information and belief, and that as to those matters I believe them to be true.  I understand that I am under a continuing duty to promptly update the information provided in the application until the tribunal has ruled on the motion for admission pro hac vice.  Further, if the motion is granted, I understand that I am under a continuing duty to promptly update the information provided in the application as long as I continue to appear pro hac vice in the action or proceeding.  Any updated information shall be provided to both the tribunal that granted the motion and to the tribunal in which the action or proceeding may then be pending.

_____
APPLICANT/AFFIANT

Subscribed and sworn to before me this ___12th___ day of ____March____, 20 _25_

_____
(Notary Signature)

Notary Public for the State of _ILLINOIS_

My Commission Expires: _4/24/2025_

"OFFICIAL SEAL"
LORRAINE A M MAPLES
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/24/2025

## LOCAL COUNSEL CONSENT

I hereby consent, as local counsel of record, to the association of applicant in this cause pursuant to Rules Governing Admission *Pro Hac Vice* to the South Carolina Bar.

DATED this __20th__, __ day of __march__, 20_25_

_____
LOCAL COUNSEL OF RECORD

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this application upon the South Carolina Supreme Court by mail addressed to: South Carolina Supreme Court Office of Bar Admissions, PO Box 11330, Columbia, SC 29211, accompanied by payment of the $250 filing fee payable to the South Carolina Supreme Court on this ___20th___ day of __march__, 20_25_

_____

ELECTRONICALLY FILED - 2025 Mar 21 10:11 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Page 4 of 4*

STATE OF SOUTH CAROLINA                                   IN THE COURT OF COMMON PLEAS
COUNTY OF HORRY

## NOTICE OF ADR

Grand Strand Water And Sewer Authority                    2024CP2605523

### PLAINTIFF(S)                                          Filing Date: August 9, 2024

**Vs**

Burlington Industries Inc
Aladdin Manufacturing Corporation
Delta Mills Inc

### DEFENDANT(S)

Pursuant to the South Carolina Alternative Dispute Resolution Rules (SCADR), you are required to participate in the following methods of Alternative Dispute Resolution (ADR): mediation or arbitration (binding or non-binding); on or before 300 days from the date of filing of this action. The parties have a right to mutually agree upon the form of ADR and a neutral person(s) to conduct that ADR process. In the event the parties are unable to agree upon the form of ADR, the court hereby designates mediation as the default process of ADR. In the event the parties are unable to agree upon a mediator, the court hereby appoints

Margaret L. Evans, 4610 Oleander Drive, Suite 203, Myrtle Beach, SC 29577, Phone (843) 449-3411

to serve as mediator. In the event the aforementioned mediator has a conflict of interest or is unable to serve, the alternate mediator is

Christopher H. Pearce, 1314 Professional Drive, , Myrtle Beach, SC 29577, Phone (843) 839-3210 x101

The parties and/or their lawyers shall contact the court-appointed mediator directly regarding scheduling and payment of the court-mandated fee.

A Rule to Show Cause why sanctions should not be imposed may be issued in all cases that fail to file a Proof of ADR or Exemption form indicating evidence of participation in or exemption from an ADR process within 300 days from the date of filing of the action or 90 days from the date of this notice 06/23/2025.

Date: March 24, 2025

Notice of this Order was given by First Class Mail, E-mail, Fax or by the E-Filing Notice of Electronic Filing (NEF). Pro-Se parties were notified by first class mail on 03/24/2025

**Plaintiff Attorney:**

| | | |
|---|---|---|
| John Belton White Jr. | Griffin Littlejohn Lynch | Christopher Rutledge Jones |
| PO Box 2465 | PO Box 2465 | 19 Junction Way |
| Spartanburg, SC 29304 | Spartanburg, SC 29304 | Bluffton, SC 29910 |
| | | |
| Marghretta Hagood Shisko | Jerome Tapley | Robert Akira Watson |
| PO Box 2465 | 2131 Magnolia Ave South | 2131 Magnolia Ave South |
| Spartanburg, SC 29304 | Birmingham, AL 35205 | Birmingham, AL 35205 |
| | | |
| Hamilton Jordan | Brett Cooper Thompson | Hirlye Ray Lutz III |
| 2131 Magnolia Ave South | 2131 Magnolia Ave South | 2131 Magnolia Ave South |
| Birmingham, AL 35205 | Birmingham, AL 35205 | Birmingham, AL 35205 |

**Defendant Attorney:**

| | | |
|---|---|---|
| Konstantine Peter Diamaduros | Connor Bentley Bauknight | Andrew A. Mathias |
| 104 South Main Street | 1230 Main Street | 104 South Main Street |
| Ste. 900 | Suite 700 | Suite 900 |
| Greenville, SC 29601 | Columbia, SC 29201 | Greenville, SC 29601 |
| | | |
| Robert Yates Knowlton Sr. | John Gwilym Tamasitis | Richard Hood Willis |
| PO Box 11889 | 1230 Main Street | 1230 Main Street, Suite 330 |
| Columbia, SC 29211-1889 | Suite 330 | Columbia, SC 29201 |
| | Columbia, SC 29201 | |
| | | |
| Jonathan David Klett | Wesley Tyler Moran | Merritt Gordon Abney |
| PO Box 2048 | PO Box 3939 | 151 Meeting St., Ste. 600 |
| Greenville, SC 29602 | Myrtle Beach, SC 29578 | Charleston, SC 29401 |

ADR Coordinator

CP18
SCADR 102 (11/2012)

ELECTRONICALLY FILED - 2025 Mar 24 2:13 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Jennifer  Anderson
(843) 915-6803
Anderson.jennifer@horrycountysc.gov

ELECTRONICALLY FILED - 2025 Mar 24 2:13 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

CP18
SCADR 102 (11/2012)

ELECTRONICALLY FILED - 2025 Mar 24 4:00 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

Aladdin Manufacturing Corp. *et al.*,

*Defendants*.

C.A. No. 2024-CP-26-05523

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' SUPPLEMENTAL
<u>BRIEF ON PERSONAL JURISDICTION</u>**

Plaintiff Grand Strand Water and Sewer Authority submits this Response in Opposition to

Defendants Red Rock Disposal, LLC ("RRD") and Sampson County Disposal, LLC's ("SCD")

supplemental briefing on personal jurisdiction. For the reasons explained below, the determination

of personal jurisdiction pursuant to South Carolina's long-arm statute, S.C. Code Ann. § 36-2-803,

is folded into the Constitutional analysis of whether an out-of-state defendant possesses sufficient

minimum contacts with the forum state such that requiring the defendant to face suit in the forum

would comport with due process. Moreover, even if a separate analysis under the statute were

required, the jurisdictional conduct of RRD and SCD satisfies section 36-2-803(3).

1.      **The long-arm statute's construction is settled: the Legislature intended that it extend
        to the outer limits of constitutional due process.**

For over seventy-five years, South Carolina courts have construed the long-arm statute to

encompass due process limits. Despite this, Defendants now argue for a narrower interpretation

1

based on the statute's "plain meaning." Supp. Br., at 1–3, 5–6. But this is no gray area. Defendants do not merely relitigate an answered question—they ask this Court to contradict settled law.

The "cardinal rule" of statutory interpretation is "to ascertain and effectuate the legislature's intent." *Original Blue Ribbon Taxi Corp. v. S.C. Dept. of Motor Vehicles*, 380 S.C. 600, 607, 670 S.E.2d 674, 677 (Ct. App. 2008). While plain language is the "principal guidepost" in statutory construction, courts do not wield it to undermine legislative intent as established by context, statutory design, or—most importantly here—precedent. *See id*. at 607–611, 670 S.E.2d at 677–79 (rejecting plain meaning of self-insurance statute where it diverged from legislative purpose, as interpreted in caselaw).

As for the long-arm statute, the South Carolina Supreme Court has already done the work of ascertaining legislative intent: "We have repeatedly held that ***the drafters of our 'long arm statute' intended it to reach as far as due process allows***." *Jenkinson v. Murrow Bros. Seed Co.*, 272 S.C. 148, 151, 249 S.E.2d 780, 782 (1978) (emphasis added).

South Carolina's embrace of constitutional due process began mere months after a decision burned into every law student's brain: *International Shoe v. Washington*, 326 U.S. 310 (1945). In *State v. Ford Motor Co.*, the South Carolina Supreme Court adopted *International Shoe*'s due process guide, interpreting "doing business" under the long arm statute (then, section 10-424) as reaching constitutional limits—not the narrower scope of the same phrase in domestication statutes. 208 S.C. 379, 394, 398–99, 38 S.E.2d 242, 249 (1946). The Fourth Circuit later took note, observing that South Carolina "march[ed] along with the evolving constitutional doctrine" rather than clinging to restrictive readings. *Shealy v. Challenger Mfg. Co.*, 304 F.2d 102, 105–06 (4th Cir. 1962) (noting that *Ford* "approvingly endorsed the new vista" opened by International Shoe). The South Carolina Supreme Court reaffirmed this a decade later, endorsing *Shealy*'s "accurate

ELECTRONICALLY FILED - 2025 Mar 24 4:00 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

discussion" of its rulings extending jurisdiction "to the outer limits allowable . . . under *International Shoe.*" *Triplett v. R.M. Wade & Co.*, 261 S.C. 419, 426–28, 200 S.E.2d 375, 378–79 (1973).

The rest is history. South Carolina courts consistently reaffirmed this trajectory, and the "march along with the evolving constitutional doctrine" has never slowed. *Shealy*, 304 F.2d at 105. Decades later, South Carolina courts still treat the long-arm statute as coextensive with due process—so much so that, today, "the ***sole question*** becomes whether the exercise of personal jurisdiction would violate due process." *See, e.g., State v. NV Sumara Tobacco Trading Co.*, 379 S.C. 81, 88–89, 666 S.E.2d 218, 222 (2008) (emphasis added); *accord Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491, 611 S.E.2d 505, 508 (2005); *Kelsey v. House of Blues Myrtle Beach Rest. Corp.*, No. 2020-000407, 2024 WL 714748, at *5 (S.C. Ct. App. Feb. 21, 2024).

Defendants argue that reading the statute as coextensive with due process would violate "established precedent on statutory interpretation." Supp. Br., at 5. It is the exact opposite. Established precedent—construing this very long-arm statute—is that the legislature "intended it to reach as far as due process allows." *Jenkinson*, 272 S.C. at 151, 249 S.E.2d at 782. It is, and has long been, "***clearly the law*** in South Carolina that the long arm statute must be viewed as extending long arm jurisdiction to the limits imposed by the due process clause." *Atl. Soft Drink Co. of Columbia, Inc. v. S.C. Nat'l Bank*, 287 S.C. 228, 231, 336 S.E.2d 876, 878 (1985) (cleaned up).

The South Carolina Supreme Court's deference to its own body decisions is "at its zenith" where—as now—those decisions concern statutory construction. *Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 478, 892 S.E.2d 121, 129 (2023). Here, this is not a matter of mere horizontal stare decisis, but of binding precedent. While Defendants may preserve their "plain meaning"

3

ELECTRONICALLY FILED - 2025 Mar 24 4:00 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

argument for appeal, any departure from settled law is a question for the South Carolina Supreme Court. *See Walker v. State*, 12 S.C. 200, 281–82 (1879).

**2.      The statute's text nonetheless applies.**

Settled construction of the long-arm statute is decisive, but its text still applies. In South Carolina, the place of the wrong is generally considered to be where the final act occurs that is necessary to establish tort liability. *Parker v. Williams & Madjanik, Inc.*, 270 S.C. 570, 574, 243 S.E.2d 451, 454 (1978). And the South Carolina Supreme Court has squarely held that section 36-2-803(A)(3)—concerning the "commission of a tortious act in whole or in part in this State"—"applies to in-state injuries resulting from out-of-state wrongful acts or omissions." *Parker*, 270 S.C. at 574, 243 S.E.2d at 454.

Just as an architect who negligently designs a building in North Carolina, knowing it will be constructed in South Carolina, can be sued here when that building collapses, *see id.*, so too can Defendants, who negligently disposed of PFAS-contaminated waste—knowing that it continually pollutes South Carolina waters—be sued here when that PFAS causes harm. *See id.* In fact, this is the same provision the Mississippi Supreme Court utilized in *Horne v. Mobile Area Water & Sewer System*, on the same basis that applies here: "a tort is committed in Mississippi when the injury results in this State." 897 So. 2d 972, 977 (2004). *Compare id.* ("This is true because an injury is necessary to complete a tort."), *with Parker*, 270 S.C. at 574, 243 S.E.2d at 454 ("Generally, the place of the wrong is determined where the last event necessary to make an actor liable for an alleged tort takes place, or, as otherwise stated, the place where the injury is suffered rather than the place where the act which caused the injury was committed." (quoting 86 C.J.S. Torts, § 25)).

ELECTRONICALLY FILED - 2025 Mar 24 4:00 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Accordingly, even under RRD & SCD's incorrect premise that a personal jurisdiction inquiry requires an analysis of the long-arm statute's language, the statute is satisfied and this Court may exercise personal jurisdiction over these defendants.

**3.    Defendants have requisite minimum contacts with South Carolina.**

Defendants sow confusion with their discussion of *Ex parte Aladdin*. *See* Supp. Br., at 5. The Alabama Supreme Court did not "rel[y] upon foreseeability" alone, *id.*—it explicitly, and repeatedly, stated that foreseeability, by itself, was insufficient. *Ex parte Aladdin Mfg. Co.*, 305 So. 3d 214, 233 (Ala. 2019) (rejecting plaintiffs' argument "that foreseeability alone is enough under this particular water-pollution scenario"). Nor was it "decided under Alabama law." Supp. Br., at 5. The court applied federal due process principles interpreting Alabama's long-arm statute to extend to the constitutional limits—just as South Carolina does. *Ex parte Aladdin*, 305 So. 2d at 238–39.

South Carolina courts echo the U.S. Supreme Court on foreseeability's proper role in assessing jurisdiction. It is not enough that a particular harm is foreseeable in the tort sense. "Rather, it is that the defendant's conduct and connection ***with the forum state*** are such that he should ***reasonably anticipate being haled into court there***." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (emphases added). This is what *Ex parte Aladdin* comes down to. The court accepted as true the allegations that defendants disposed of their PFAS-contaminated wastewater into the river system, via a Georgia wastewater treatment plant, while ***knowing*** this wastewater was reaching Alabama, and the court found that this constituted purposeful, ***forum-directed conduct***—not merely foreseeable harm to the plaintiffs. *Ex parte Aladdin*, 305 So. 2d at 238–39. The defendants' contacts were ***with Alabama itself***, such that they could reasonably expect to face litigation there if those same contacts caused a tort. *Id.*

5

ELECTRONICALLY FILED - 2025 Mar 24 4:00 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

In sum, *Ex parte Aladdin* simply applied the same standard articulated in *Burger King Corp. v. Rudzewicz*: foreseeable harm resulting from purposeful conduct aimed at the forum supports specific personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985) ("The foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."). That is textbook purposeful availment—not overreliance on foreseeability.

This case is no outlier; it is the norm. Courts across the country have found personal jurisdiction in materially identical extraterritorial pollution cases—finding minimum contacts where the defendants knew their pollutants crossed state lines. Plaintiff cites many such cases. *See* Consol. Opp., at 50–51 (citing *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 577–78 (9th Cir. 2018); *Horne v. Mobile Area Water & Sewer Sys.*, 897 So. 2d 972 (Miss. 2004); *Triad Hunter, LLC v. Eagle Natrium, LLC*, 132 N.E.3d 1272, 1284–86 (Ohio Ct. App. 2019)). Furthermore, where there were appeals, including in *Ex parte Aladdin*, the Supreme Court denied certiorari in every instance. *See Aladdin Mfg. Corp. v. Water Works and Sewer Bd. of the Town of Centre*, 141 S. Ct. 1258 (2021) (denying certiorari); *Teck Metals Ltd. v. Confederated Tribes of the Colville Rsrv.*, 139 S. Ct. 2693 (2019) (same); *City of Mobile v. Horne*, 544 U.S. 922 (2005) (same). Here, as in *Ex parte Aladdin*, Plaintiff alleges that Defendants knowingly and repeatedly polluted South Carolina waters with PFAS for years. That allegation is unrebutted. Defendants' affidavits deny commercial activity—not the applicable jurisdictional facts. The conduct alleged is not accidental, attenuated, or random—it is continuous, deliberate, and directed at this forum. That is more than enough to establish personal jurisdiction under long-settled constitutional standards.

6

ELECTRONICALLY FILED - 2025 Mar 24 4:00 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**CONCLUSION**

For the reasons provided above and in Plaintiff's main opposition briefing, *see* Consol. Opp., at 48–52, Defendants' motion to dismiss on the basis of personal jurisdiction should be denied.

Respectfully submitted,

 /s/ John B. White. Jr.
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiffs*

March 24, 2025



# The Supreme Court of South Carolina

## Office of Bar Admissions

PATRICIA A. HOWARD
CLERK OF COURT

KATHLEEN "TINA" BRYANT
MANAGER, OFFICE OF BAR
ADMISSIONS

POST OFFICE BOX 11330
COLUMBIA, SOUTH CAROLINA 29211
TELEPHONE: (803) 734-1317
FAX: (803) 734-0394



March 24, 2025

The Honorable Renee Elvis
Clerk of Court
P.O. Box 677
Conway, SC 29528-0677

RE:    Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation, et al.

Case No: 2024-CP-26-05523

Dear Ms. Elvis:

I certify that the Office of Bar Admissions has received the verified application requesting Philip L. Comella be admitted *pro hac vice* in the above action. The $250 filing fee for the applicant has been paid.

Sincerely,

M.J. Thames
Bar Admissions Coordinator

cc:    Philip L. Comella
Richard Willis

ELECTRONICALLY FILED - 2025 Apr 03 4:00 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| IN RE: | ) | |
| PFAS LITIGATION COORDINATED DOCKET | ) | |
| | ) | C.A. No.: 2024-CP-26-05523 |
| _____ | ) | |
| | ) | |
| COUNTY OF HORRY | ) | |
| | ) | |
| GRAND STRAND WATER AND SEWER | ) | |
| AUTHORITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALADDIN MANUFACTURING | ) | **Order Granting *Pro Hac Vice*** |
| CORPORATION; BURLINGTON INDUSTRIES, | ) | **Admission for Philip L. Comella** |
| INC.; DELTA MILLS, INC., its predecessors, | ) | |
| successors, assigns, and/or responsible parties; | ) | |
| DOMTAR PAPER COMPANY, LLC; ELEVATE | ) | |
| TEXTILES, INC.; FIBER INDUSTRIES, LLC; | ) | |
| GFL ENVIRONMENTAL USA, INC.; J.P. | ) | |
| STEVENS & COMPANY, INC., its predecessors, | ) | |
| successors, assigns, and/or responsible parties; | ) | |
| MOHAWK INDUSTRIES, INC.; NAN YA | ) | |
| PLASTICS CORPORATION, AMERICA; PRET | ) | |
| ADVANCED MATERIALS, LLC; RED ROCK | ) | |
| DISPOSAL, LLC; SAMPSON COUNTY | ) | |
| DISPOSAL, LLC; and WASTE INDUSTRIES, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Before this Court is Defendants Red Rock Disposal, LLC and Sampson County Disposal, LLC's Motion for *Pro Hac Vice* Admission of Philip L. Comella, pursuant to Rule 404 of the South Carolina Appellate Court Rules. Upon consideration of said Motion, it is hereby ORDERED that the Motion is GRANTED, and Philip L. Comella is admitted to the practice of law in this Court *pro hac vice* as counsel for Defendants Red Rock Disposal, LLC and Sampson County Disposal, LLC in this matter pursuant to Rule 404 of the South Carolina Appellate Court Rules.

*[Signature block on the following page.]*

Page **1** of **2**

IT IS SO ORDERED, this _____ day of March 2025

_____
The Honorable Grace G. Knie

ELECTRONICALLY FILED - 2025 Apr 03 4:00 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



Horry Common Pleas

**Case Caption:**    Grand Strand Water And Sewer Authority VS   Burlington Industries
Inc , defendant, et al
**Case Number:**    2024CP2605523

**Type:**    Order/Pro Hac Vice

IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760

Electronically signed on 2025-04-02 17:33:36    page 3 of 3

ELECTRONICALLY FILED - 2025 Apr 03 4:00 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

_____

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

Aladdin Manufacturing Corporation; Burlington
Industries, Inc.; Delta Mills, Inc., its predecessors,
successors, assigns, and/or responsible parties;
Domtar Paper Company, LLC; Elevate Textiles,
Inc.; Fiber Industries, LLC; J.P. Stevens &
Company, Inc., its predecessors, successors, assigns,
and/or responsible parties; Mohawk Industries, Inc.;
Nan Ya Plastics Corporation, America; PRET
Advanced Materials, LLC; Red Rock Disposal,
LLC; and Sampson County Disposal, LLC,

*Defendants*.

C.A. No. 2024-CP-26-05523

**[PROPOSED] ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS,
MOTION FOR PROTECTIVE ORDER AND STAY OF DISCOVERY,
AND MOTION REGARDING FAILURE TO JOIN**

This matter came before the Court on motions to dismiss, a motion for protective order and

stay of discovery, and a motion regarding failure to join that were filed by various Defendants in

the above-captioned case. The following defendants filed motions to dismiss the Second Amended

Complaint pursuant to Rules 8(a), 12(b)(1), and 12(b)(6), SCRCP: (1) Domtar Paper Company,

LLC ("Domtar"); (2) Elevate Textiles, Inc. ("Elevate"); (3) Fiber Industries, LLC ("Darling

Fibers"); (4) GFL Environmental USA, Inc. ("GFL") and Waste Industries, LLC ("Waste

Industries"); (5) Mohawk Industries, Inc. and Aladdin Manufacturing Corporation (collectively,

"Mohawk"); (6) Nan Ya Plastics Corporation America ("Nan Ya"); (7) PRET Advanced Materials,

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

LLC ("PRET"); and (8) Red Rock Disposal, LLC ("RRD") and Sampson County Disposal, LLC ("SCD") (collectively, the "Landfill Defendants"). The Landfill Defendants also filed a Rule 12(b)(2), SCRCP, motion to dismiss for lack of jurisdiction, and Defendant Nan Ya filed a motion to dismiss for failure to name a necessary party pursuant to Rules 12(b)(7) and 19(b), SCRCP. Additionally, Defendant Elevate filed a motion for a protective order and to stay discovery in this case. Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff") filed a notice of dismissal without prejudice of GFL and Waste Industries on February 28, 2025.[1]

This Court held a hearing on March 12, 2025, during which the Court heard argument on the pending motions in this case. The parties filed briefs in support of their positions before the hearing, and the Court permitted the filing of supplemental briefing and caselaw on the issue of personal jurisdiction thereafter.

Having carefully considered the arguments, submissions, and the record in this case, as well as the applicable law, the Court finds and concludes that Defendants' motions are respectfully **DENIED**.

**BACKGROUND**[2]

Plaintiff alleges that, for decades, Defendants have knowingly and recklessly discharged toxic per- and polyfluoroalkyl substances ("PFAS") to the Pee Dee River Watershed,[3] Waccamaw River, and Intracoastal Waterway, contaminating Plaintiff's properties and the drinking water supplied to its customers with the chemicals. Plaintiff relies on and uses Bull Creek, located on the

---

[1] Because Plaintiff has voluntarily dismissed its claims against GFL and Waste Industries, their motion to dismiss is moot.

[2] The following background is based on the allegations in Plaintiff's Second Amended Complaint, filed October 7, 2024 (the "Complaint"), and does not constitute findings of fact by the Court.

[3] As set forth in the Complaint, the Pee Dee River Watershed includes the Great Pee Dee River, Little Pee Dee River, Lynches River, Lumber River, Lynches Lake Swamp, Black Creek, Bull Creek, and their respective tributaries.

2

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

downstream end of the Pee Dee River Watershed, and the Intracoastal Waterway ("ICW"), as vital sources to draw and supply drinking water to thousands of water customers. But Plaintiff alleges that Defendants' PFAS contamination threatens the health of Plaintiff's customers and harms Plaintiff's properties, including, for example, its water treatment and distribution infrastructure. These man-made "forever chemicals" do not break down naturally in the environment, and they cannot be removed with conventional water treatment processes. As a result of Defendants' alleged PFAS pollution, Plaintiff's water treatment system cannot provide water that is not contaminated with these dangerous chemicals to over 115,000 customers that rely on Plaintiff for their drinking water.

Plaintiff is a special purpose district responsible for supplying safe drinking water to customers in and around Horry County. Plaintiff owns and operates two surface water treatment plants ("SWTPs") that are part of its water treatment and distribution system. The Bull Creek SWTP provides potable water to approximately 115,000 customers, and it is riparian to and draws water from Bull Creek. The Myrtle Beach SWTP services the Cities of Myrtle Beach and North Myrtle Beach, and it is riparian to and draws water from the ICW.

Plaintiff alleges that Defendants Domtar, Elevate, Darling Fibers, Nan Ya, and PRET own and operate industrial facilities upstream of Plaintiff's drinking water intakes, and that these Defendants have used and continue to use PFAS chemicals in their manufacturing operations. Defendants' operations generated and/or continue to generate PFAS-laden wastewater, which they discharge to the Pee Dee River Watershed. Some of these Defendants discharge PFAS-contaminated wastewater directly to surface waters upstream of Plaintiff's water intakes, while others discharge PFAS-contaminated wastewater to upstream public wastewater treatment plants ("WWTPs"). Plaintiff alleges that Defendants Mohawk and others similarly owned and operated

3

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

upstream industrial facilities until they closed, used PFAS chemicals in their manufacturing operations, generated PFAS-laden wastewater, and continue to release contaminated wastewater to Pee Dee River Watershed via contaminated wastewater lagoons. Additionally, Plaintiff alleges that the Landfill Defendants own and operate landfills that engage in waste management operations, and they transport PFAS-contaminated leachate to an upstream WWTP for disposal.

According to Plaintiff, the treatment processes used by the directly discharging Defendants and by the municipal WWTPs that receive wastewater from the indirectly discharging Defendants cannot remove PFAS from Defendants' wastewater, and the polluted effluent passes through the treatment processes and into surface waters. Plaintiff alleges that Defendants' PFAS-contaminated water migrates downstream to Plaintiff's intakes on Bull Creek, causing injury to Plaintiff and its properties, which include Plaintiff's Bull Creek SWTP, related buildings, improvements, infrastructure, and equipment that comprise Plaintiff's water treatment and distribution system. Plaintiff further alleges that, because water supplied by the Bull Creek SWTP is contaminated with Defendants' PFAS, water supplied by the Bull Creek SWTP is also sent via Plaintiff's sewer system to its own WWTPs, which are located on, and discharge treated water to, the Waccamaw River. Because Plaintiff's WWTPs cannot remove PFAS, Plaintiff alleges that Defendants' PFAS also contaminates the Waccamaw River upstream of Plaintiff's Myrtle Beach SWTP on the ICW, also causing injury to Plaintiff's Myrtle Beach SWTP and related buildings, improvements, infrastructure, and equipment that also comprise Plaintiff's water treatment and distribution system.

Plaintiff further alleges that Defendants all knew or should have known that their chosen methods for disposing of their PFAS-contaminated wastewater would cause harm downstream. By their very nature, PFAS are persistent in the environment and resist natural breakdown methods

and water treatment methods. PFAS chemicals' stability, resistance to breakdown, and ability to repel oil and water make them desirable in Defendants' manufacturing and industrial applications but also render them an environmental menace and a hazard to human health.

The Environmental Protection Agency ("EPA") and numerous scientific studies have linked PFAS exposure to serious human health effects, including immune system suppression, thyroid disorders, liver damages, reproductive and developmental harms (particularly in infants and pregnant women), and kidney, testicular, and liver cancers. While PFAS are used in a variety of products, a major source of human PFAS exposure is through consuming PFAS-contaminated drinking water.

In March 2023, EPA issued proposed maximum contaminant levels ("MCLs")—the enforceable maximum amount of a contaminant that may be delivered to any public water system user (based on existing detection technology)—and maximum contaminant level goals ("MCLGs")—a purely safety-based standard for the maximum amount of a contaminant in drinking water at which adverse human health effects are not known or anticipated to occur—for certain PFAS compounds. Then, in April 2024, EPA issued the final MCLs—the agency's first ever binding regulatory limits for PFAS in drinking water. EPA set MCLs at 4 parts per trillion ("ppt") for PFOA and PFOS, 10 ppt for certain other PFAS compounds, and issued a "hazard index" approach to control mixtures of those other PFAS compounds. At that time, EPA also set MCLGs for PFOA and PFOS at zero ppt based on the agency's determination that there is no safe level of exposure to these two compounds.

Public drinking water systems such as Plaintiff's must comply with the enforceable MCLs by April 2029, but the MCLGs mean that any level of PFOA and PFOS in drinking water presents a risk of adverse health impacts. PFAS levels at Plaintiff's drinking water sources currently exceed

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

both the MCLs and MCLGs, and Plaintiff's water treatment system was never designed to, and cannot, remove Defendants' PFAS from the water. Plaintiff alleges that, as a result of Defendants' PFAS contamination, Plaintiff cannot supply drinking water to its customers that is free of PFAS contamination, and Plaintiff's property rights and properties—e.g., its land, SWTPs, distribution lines, and other infrastructure—have been harmed. Plaintiff claims that it has suffered, currently suffers, and will continue to suffer significant harm and property injuries because of the contamination, and Plaintiff seeks both monetary and equitable relief to remedy that harm and protect the communities it serves from the consumption of Defendants' PFAS.

Defendants deny Plaintiff's allegations and argue that the common law claims Plaintiff asserts are not appropriate avenues by which Plaintiff can seek relief.

## STANDARD OF REVIEW

South Carolina's pleading rules state that "[e]ach averment of a pleading shall be simple concise, and direct," and they do not require any "technical forms of pleading." Rule 8(e)(1), SCRCP. Courts must liberally construe pleadings "to do substantial justice to all parties." Rule 8(f), SCRCP; *Quality Towing, Inc. v. City of Myrtle Beach*, 340 S.C. 29, 33, 530 S.E.2d 369, 371 (2000). Pleadings provide notice to litigants of the issues in the case—"It is elementary that the principal purpose of pleadings is to inform the pleader's adversary of legal and factual positions which he will be required to meet on trial." *Shirley's Iron Works, Inc. v. City of Union*, 403 S.C. 560, 574, 743 S.E.2d 778, 785 (2013) (quoting *S.C. Nat'l Bank v. Joyner*, 289 S.C. 382, 387, 346 S.E.2d 329, 332 (Ct. App. 1986)). While a complaint must plead facts showing that the plaintiff is entitled to relief, the complaint need not allege "the evidence which will be used to prove those facts." *Clark v. Clark*, 293 S.C. 415, 416, 361 S.E.2d 328, 328 (1987); Rule 8(a), SCRCP.

A motion under Rule 12(b)(6), SCRCP, tests the legal sufficiency of a plaintiff's complaint, but "it is not a vehicle for addressing the underlying merits" of the claims asserted. *Doe v. Oconee Mem. Hosp.*, 437 S.C. 574, 581, 878 S.E.2d 920, 925 (Ct. App. 2022). A court should only dismiss a claim under this rule if it fails "to state facts sufficient to constitute a cause of action." Rule 12(b)(6), SCRCP. "A ruling on a 12(b)(6) motion to dismiss must be based solely upon the allegations set forth on the face of the complaint and the motion cannot be sustained if facts alleged and inferences reasonably deducible therefrom would entitle the plaintiff to any relief on any theory of the case." *Toussaint v. Ham*, 292 S.C. 415, 416, 357 S.E.2d 8, 9 (1987); *accord Stiles v. Onorato*, 318 S.C. 297, 300, 457 S.E.2d 601, 602–03 (1995). Additionally, the court "must presume all well pled facts to be true" and "every doubt" should be resolved in the plaintiff's favor. *Morrow Crane Co. v. T.R. Tucker Constr. Co.*, 296 SC. 427, 429, 373 S.E.2d 701, 702 (Ct. App. 1988); *Cole Vision Corp. v. Hobbs*, 394 S.C. 144, 149, 714 S.E.2d 537, 539 (2011). "Further, the complaint should not be dismissed merely because the court doubts the plaintiff will prevail in the action," *Plyler v. Burns*, 373 S.C. 637, 645, 647 S.E.2d 188, 192 (2007), and "novel questions of law should not ordinarily be resolved on a Rule 12(b)(6) motion," *Chestnut v. AVX Corp.*, 413 S.C. 224, 227, 776 S.E.2d 82, 84 (2015).

## CONCLUSIONS

In their motions, Defendants make the following arguments: (1) Plaintiff's claims are non-justiciable because they are not ripe and Plaintiff lacks standing to bring them; (2) Plaintiff failed to join the United States as a necessary and indispensable party under Rule 19, SCRCP; (3) Plaintiff's claim for trespass fails because it did not adequately allege that Defendants committed any intentional, unauthorized entry resulting in a tangible intrusion onto its properties; (4) Plaintiff's nuisance claims fail because the alleged contamination of a public water body cannot

7

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

form the basis for a private nuisance, and Plaintiff is a private entity that cannot sue for public nuisance because it does not allege a special injury; (5) Plaintiff's negligence claim fails because Defendants owed it no duty and Plaintiff failed to allege facts to show a breach by Defendants of any duty or to establish it has suffered a cognizable injury; (6) the Court should strike Plaintiff's requests for attorney's fees and prejudgment interest; (7) the "municipal cost recovery rule" precludes Plaintiff's recoveries; (8) these cases should be stayed and referred to the South Carolina Department of Environmental Services ("DES") based on the "primary jurisdiction" doctrine; (9) there is no personal jurisdiction over the Landfill Defendants; and (10) the Court should enter an order staying discovery until after it decides the issues raised in their motions to dismiss.

Having carefully and fully considered the allegations in Plaintiff's Complaint, the parties' submissions, the arguments presented, and the applicable law, the Court makes the following conclusions:

**1.      Plaintiff's claims are justiciable.**

"Our courts will not address the merits of any case unless it presents a justiciable controversy." *Jowers v. S.C. Dep't of Health and Env't Control*, 423 S.C. 343, 353, 815 S.E.2d 446, 451 (2018) (quoting *Byrd v. Irmo High Sch.*, 321 S.C. 426, 430–31, 468 S.E.2d 861, 864 (1996)). "Justiciability encompasses several doctrines, including ripeness, mootness, and standing." *James v. Anne's Inc.*, 390 S.C. 188, 193, 701 S.E.2d 730, 732 (2010) (citing *Jackson v. State*, 331 S.C. 486, 490 n.4, 489 S.E.2d 915, 917 n.4 (1997)). "A plaintiff has standing to challenge legislation when he sustained, or is in immediate danger of sustaining, actual prejudice or injury from the legislative action." *Jowers*, 423 S.C. at 353, 815 S.E.2d at 451 (citing *Sea Pines Ass'n for Prot. of Wildlife, Inc. v. S.C. Dep't of Nat. Res.*, 345 S.C. 594, 600, 550 S.E.2d 287, 291 (2001)). South Carolina courts "have explained ripeness by defining what is not ripe, stating 'an issue that is contingent, hypothetical, or abstract is not ripe for judicial review.'" *Id.* (quoting

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Colleton Cnty. Taxpayers Ass'n v. Sch. Dist. of Colleton Cnty.*, 371 S.C. 224, 242, 638 S.E.2d 685, 694 (2006)). "The principles of justiciability developed by South Carolina appellate courts have grown out of the federal court's interpretation of 'the case or controversy' requirement contained in Article III of the United States Constitution." *Crescent Homes SC, LLC v. CJN, LLC*, 445 S.C. 164, 184, 912 S.E.2d 389, 399 (Ct. App. 2024) (quoting Jean Hoefer Toal et al., *Appellate Practice in South Carolina*, at 125 (3d ed. 2016)).

Defendants contend that these actions are premature because enforcement of the MCLs for PFAS will not begin until April 2029, and that Plaintiff's obligations to comply with those regulations remain speculative and dependent on future developments. Defendants further cite pending litigation in the D.C. Circuit that may affect the final form of those regulations. As to standing, Defendants argue that Plaintiff does not own the waters at issue, which are instead owned by the State of South Carolina, and therefore Plaintiff lacks a concrete injury.

Plaintiff's Complaint pleads state common law causes of action, alleging that Defendants have maintained an ongoing PFAS contamination of its properties, including its land, SWTPs, water distribution infrastructure, and water sources. Plaintiff therefore alleges that it has suffered direct property injuries and interference with the use and enjoyment of its properties, including the inability to supply water free from unsafe concentrations of PFAS; incurring significant costs in investigating and identifying the sources of PFAS contamination; and property devaluation.

The Court finds that the issues of ripeness and standing boil down to the same question here: Whether Plaintiff alleges that it currently suffers concrete injury. Plaintiff's claims are not based on speculative future regulatory burdens but rather on existing and ongoing contamination of its land, infrastructure, and water sources with PFAS. Plaintiff does not assert claims premised solely on compliance with future regulations. Instead, it seeks relief for actual and continuing

9

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

property injuries allegedly caused by Defendants' discharges of PFAS-containing wastewater into rivers upstream of Plaintiff's water intakes. The Complaint describes specific harms to Plaintiff's properties and water treatment and distribution system that have already occurred and continue to occur. Accordingly, the claims are ripe for judicial review.

The Court also finds that standing requirements are satisfied because Plaintiff has sufficiently alleged a personal stake in the outcome of the controversy and that Plaintiff's injuries are fairly traceable to Defendants' conduct. The Complaint alleges that Defendants' conduct has directly resulted in the contamination of Plaintiff's SWTPs, water distribution infrastructure, and underlying property. Plaintiff further alleges it has suffered and will continue to suffer concrete injuries, including contamination of its system, interference with its properties and operations, and the imposition of significant investigative and remedial costs. That Plaintiff does not own the waters of the state does not bar its ability to seek relief for injuries to its legally protected interests in its land and infrastructure.

Accordingly, Defendants' motions to dismiss on the grounds of justiciability are hereby **DENIED**.

**2.      Plaintiff has not failed to join a person needed for just adjudication.**

Rule 19, SCRCP, controls the joinder of indispensable parties and states, in relevant part:

> **(a) Persons to Be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff.

**(b) Determination by Court Whenever Joinder Not Feasible.** If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

The South Carolina Supreme Court "has interpreted Rule 19 . . . to require that a party be a 'necessary party' to be joined in an action pursuant to the rule." *Ex parte Gov't Emp.'s Ins. Co.*, 373 S.C. 132, 137, 644 S.E.2d 699, 701 (2007) (quoting *Slatton v. Slatton*, 289 S.C. 128, 130, 345 S.E.2d 248, 249 (1986)). "A necessary party is one whose rights must be ascertained and settled before the rights of the parties to the action can be determined." *Slatton*, 289 S.C. at 130, 345 S.E.2d at 249.

Nonetheless, where multiple tortfeasors may exist, South Carolina adheres to the "plaintiff chooses" rule. *Smith v. Tiffany*, 419 S.C. 548, 562, 799 S.E.2d 479, 487 (2017). Thus, "[i]t is well-settled that a plaintiff has the sole right to determine which co-tortfeasors she will sue." *Chester v. S.C. Dep't of Pub. Safety*, 388 S.C. 343, 345, 698 S.E.2d 559, 560 (2010); *see also id.* ("A ruling that a . . . defendant can compel a plaintiff to join other alleged tortfeasors as defendants in that suit would overturn this firmly entrenched common law principle."). Courts have identified many important rationales for this rule. *See Tiffany*, 419 S.C. at 563, 799 S.E.2d at 487.

Defendant Nan Ya argues that the United States is an indispensable party under Rule 19(a) due to the potential discharge of aqueous film-forming foam ("AFFF") from a former United States

11

Air Force base located upstream of Plaintiff's Myrtle Beach SWTP. According to Nan Ya, there is "no doubt" that the United States has contributed to the PFAS pollution in the ICW, and it further contends that the United States is the most significant contributor, if not the only contributor. Nan Ya further argues that, unless the United States is a party, it cannot be forced to provide documents other than through Freedom of Information Act requests.

Plaintiff responds that the United States is neither a necessary nor relevant party. First, Plaintiff points to its own disclaimer of any injuries incurred as a result of AFFF contamination. Second, it argues that Rule 19 does not require the joinder of any third parties that Defendants contend are co-tortfeasors. Citing well-established South Carolina law, Plaintiff highlights that it has the legal right to choose which tortfeasors to sue, and it is not required to join every actor who might have contributed to the alleged harm (even assuming that the United States has contributed to the PFAS contamination in the ICW). Plaintiff further asserts that the rights of the United States need not be adjudicated to determine Defendants' liability and complete relief can be afforded among the parties presently before the Court.

Having considered the arguments of counsel and applicable South Carolina law, the Court finds that the United States is not necessary or indispensable under Rule 19(a), SCRCP. South Carolina courts have long recognized that a plaintiff may choose among tortfeasors in deciding whom to sue and is not required to join all potential wrongdoers. Nothing in the pleadings indicates that complete relief among the existing parties cannot be accorded in the absence of the United States, nor is there any indication that the United States claims an interest that would be impaired or leave Defendants at risk of multiple or inconsistent obligations if this action is adjudicated without its joinder.

12

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Accordingly, Defendant's motion to dismiss for failure to join an indispensable party under Rule 19, SCRCP, is hereby **DENIED**.

**3.     Plaintiff has alleged an actionable claim for trespass.**

Under South Carolina law, "a trespass is any interference with one's right to the exclusive, peaceable possession of his property." *Ravan v. Greenville Cnty.*, 315 S.C. 447, 463, 434 S.E.2d 296, 306 (Ct. App. 1993); *see also Hedgepath v. Am. Tel. & Tel. Co.*, 348 S.C. 340, 357, 559 S.E.2d 327, 337 (Ct. App. 2001) ("[T]respass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property . . . ." (quoting *Silvester v. Spring Valley Country Club*, 344 S.C. 280, 286, 543 S.E.2d 563, 566 (Ct. App. 2001))). To state a claim for actionable trespass, a plaintiff must allege that the defendant invaded his property without permission through an affirmative, intentional act. *Snow v. City of Columbia*, 305 S.C. 544, 552–53, 409 S.E.2d 797, 802 (Ct. App. 1991). "The gist of trespass is the injury to possession, and generally either actual or constructive possession is sufficient to maintain an action for trespass." *Hawkins v. City of Greenville*, 358 S.C. 280, 296, 594 S.E.2d 557, 566 (Ct. App. 2004).

Plaintiff alleges that Defendants are liable for trespass because Defendants have intentionally discharged wastewater containing PFAS products, and Defendants knew or should have known their PFAS-contaminated wastewater would enter and invade Plaintiff's properties, which include Plaintiff's SWTPs, related buildings, improvements, and infrastructure and equipment that comprise Plaintiff's water treatment and distribution system. Further, it alleges Defendants' products and wastewater have physically invaded and altered Plaintiff's properties, and they continue to do so.

Defendants contend that Plaintiff has not sufficiently alleged two necessary elements in support of its trespass claim—a tangible, physical intrusion by Defendants and that their conduct was intentional. Defendants argue that PFAS cannot support an actionable invasion or interference,

13

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

relying on *Babb v. Lee County Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013). They also argue that any alleged trespass was neither intentional nor unauthorized because, before reaching Plaintiff's water sources, some Defendants' PFAS-contaminated wastewater passes through WWTPs, while other Defendants discharge their PFAS-contaminated wastewater many miles upstream, and Plaintiff affirmatively withdraws water from Bull Creek and the ICW.

In *Babb*, the South Carolina Supreme Court answered certified questions from the federal district court, one of which asked if "South Carolina law recognizes a cause of action for trespass solely from invisible odors, rather than from a physical invasion such as dust or water." 405 S.C. at 144, 747 S.E.2d at 476. The Supreme Court answered that South Carolina law requires "an invasion by a physical, tangible thing for a trespass to exist, and accordingly, [it held] that odors cannot give rise to a trespass claim." *Id.* at 145, 747 S.E.2d at 476. While Defendants maintain that "PFAS molecules" are intangible, "microscopic" particles that cannot constitute a trespass under *Babb*, Plaintiff alleges that its properties were physically invaded with Defendants' PFAS-contaminated wastewater—indisputably tangible substances—causing past and continuing harm. Wastewater contaminated with PFAS, which persist indefinitely in the environment, is distinguishable from ephemeral, dissipating odors, and the *Babb* court even recognized that water constitutes a physical invasion. *See id.* at 144, 747 S.E.2d at 476. Plaintiff's allegations are therefore sufficient under *Babb* and decades of South Carolina precedent recognizing that chemical contamination via water is a physical invasion and actionable trespass, even if the individual contaminants are microscopic.[4]

---

[4] *See, e.g.*, *Kelly v. Para-Chem. S., Inc.*, 311 S.C. 223, 224, 428 S.E.2d 703, 703 (1993) (affirming a jury verdict for plaintiff in an "action for trespass through groundwater contamination"); *Johnson v. Hoechst Celanese Corp.*, 317 S.C. 415, 418–19, 453 S.E.2d 908, 910–11 (Ct. App. 1995) (noting that the jury returned a trespass verdict in favor of Plaintiff whose properties were either within a plume of chemically-contaminated groundwater or near a contaminated creek); *In re Wildewood Litig.*, 52 F.3d 499, 501–02 (4th

14

Plaintiff also sufficiently alleges that Defendants' invasion via PFAS-contaminated wastewater was intentional. A defendant's trespass was intentional if "the defendant acted voluntarily and [either] he knew or should have known the result would follow from his act." *Snow*, 305 S.C. at 553, 409 S.E.2d at 802. "[W]hile the trespasser, to be liable, need not intend or expect the damaging consequence of his entry, he must intend the act which constitutes the unwarranted entry on another's land." *Id.* That Defendants' PFAS-contaminated wastewater passes through WWTPs and/or travels miles downstream before reaching Plaintiff's intakes does not negate their intent; constructive knowledge that an unwarranted entry will occur is sufficient. *See id.*; *Comm'rs of Pub. Works v. Costco Wholesale Corp.*, C.A. No. 2:21-cv-42-RMG, 2021 WL 5908758, at *8 (D.S.C. Dec. 13, 2021) (finding allegations "that Defendants knew or should have known that their flushable wipes are misleadingly labeled, do not disperse as advertised, and enter directly into Plaintiff sewer system" are "affirmative or willful acts, even if the actual flushing of the wipes into Plaintiff's sewer system is done by third parties"). If proven, Plaintiff's allegations that Defendants voluntarily discharged and disposed of their industrial wastewater containing PFAS when they knew or should have known their contaminated wastewater would enter and pollute Plaintiff's properties would establish the intent requirement of Plaintiff's trespass claim.

---

Cir. 1995) (noting that trespass claim was submitted to the jury in a case alleging "the release by [Defendant]'s plant of trichloroethane (TCE) into the groundwater in and surrounding the owners' properties"); *Tillman v. Highland Indus., Inc.*, 486 F. Supp. 3d 1026, 1040–41 (D.S.C. 2020) (finding Plaintiff stated a trespass claim under South Carolina law where the complaint alleged chemical contamination of Plaintiff's property via Defendant's storm water discharge pipe); *Shockley v. Hoechst Celanese Corp.*, 793 F. Supp. 670, 672–74 (D.S.C. 1992) (upholding jury's determination that Defendant was liable for trespass in a case where Defendant's spilled chemicals contaminated groundwater and the contamination migrated to Plaintiff's property), *aff'd in part*, 996 F.2d 1212 (4th Cir. 1993) (affirming the jury's verdict for Plaintiff on trespass); *Weatherford v. E.I. Dupont de Nemours & Co.*, C.A. No. 4:22-cv-01427-RBH, 2023 WL 11015357, at *5 (D.S.C. Sept. 27, 2023) (concluding Plaintiff "plausibly alleged a trespass claim" under South Carolina law based on PFAS-contaminated wastewater entering the environment via river discharges and agricultural sludge and contaminating Plaintiff's wells).

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Accordingly, Defendants' motions to dismiss Plaintiff's trespass claim are hereby **DENIED**.

**4.      Plaintiff's allegations state claims for both private and public nuisance.**

"A nuisance is anything which works hurt, inconvenience, or damage; anything which essentially interferes with the enjoyment of life or property." *Neal v. Darby*, 282 S.C. 277, 285, 318 S.E.2d 18, 23 (Ct. App. 1984). A claim for private nuisance generally protects against unreasonable interference with the use and enjoyment of property, while public nuisance generally protects public rights—such as public order, health, and morals. *O'Cain v. O'Cain*, 322 S.C. 551, 560–62, 473 S.E.2d 460, 466 (Ct. App. 1996); *Overcash v. S.C. Elec. & Gas Co.*, 364 S.C. 569, 573–74, 614 S.E.2d 691, 621–22 (2005). Whether an interference constitutes a nuisance, however, depends on the facts. *Lefurgy v. Long Cove Club Owners Ass'n*, 313 S.C. 555, 558–59, 443 S.E.2d 577, 579 (Ct. App. 1994). Even lawful conduct "may become a nuisance by reason of circumstances, location, or surroundings." *Neal*, 282 S.C. at 286, 318 S.E.2d at 23.

Defendants argue they cannot be liable for creating a private or public nuisance, notwithstanding the allegations in the Complaint. Defendants contend that the contamination of public bodies of waters—such as the Pee Dee River Watershed, Waccamaw River, and ICW— cannot give rise to private or public nuisance because Plaintiff has not suffered any private property injuries. Several Defendants also argue that Plaintiff has not sufficiently alleged control. The Landfill Defendants claim they lacked the requisite "control" over their respective contributions to the nuisance, disclaiming control over their PFAS-contaminated leachate that they continually dispose of because they send their leachate to a WWTP. Defendant PRET makes a similar argument because it discharges its PFAS-contaminated wastewater to a WWTP. Relying principally on *Clark v. Greenville County*, 313 S.C. 205, 437 S.E.2d 117 (1993), Defendants

16

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

contend that the WWTPs' properties are the source of the PFAS contamination rather than their own.

The Court finds that Plaintiff has stated claims for actionable nuisance—both private and public. While Defendants argue that contamination of public waters cannot support a nuisance claim, Plaintiff alleges that Defendants' PFAS contamination of surface waters has interfered with Plaintiff's private property, resulting in private injury. Further, in addition to causing substantial and unreasonable interference with Plaintiff's use of its properties, Plaintiff alleges that Defendants' PFAS-contaminated wastewater has and continues to endanger the public health of the communities that Plaintiff supplies with drinking water. Plaintiff's allegations of discreet injuries to its properties constitute a substantial and unreasonable interference with Plaintiff's property rights for purposes of stating a private nuisance claim, as well as special injuries to allow Plaintiff to sue for public nuisance. *See Home Sales, Inc. v. City of N. Myrtle Beach*, 299 S.C. 70, 82, 382 S.E.2d 463, 469 (1989); *Overcash*, 364 S.C. at 573–75, 614 S.E.2d at 621–22.

Additionally, the Court disagrees with the argument that Plaintiff's nuisance claim should be dismissed because the defendants that discharge wastewater or dispose of leachate to WWTPs lack "control." Plaintiff alleges that Defendants, not the WWTPs, are the source of the nuisance. The Landfill Defendants own and control their landfills, where they generate PFAS-contaminated leachate, which they control, and they dispose of the leachate knowing it will interfere with Plaintiff's property rights. Similarly, the other defendants own and control their industrial facilities and the PFAS products they use, and they dispose of their PFAS-contaminated wastewater at those facilities in a way that prevents Plaintiff from enjoying the use of its own properties. *See Clark*, 313 S.C. at 209, 437 S.E.2d at 119. Plaintiff alleges that Defendants continually discharge their PFAS-contaminated wastewater from their facilities to WWTPs or dispose of their PFAS-laden

17

leachate to WWTPs with knowledge that the contamination passes through the WWTPs unchanged and flows directly into surface waters and onto Plaintiff's properties. Plaintiff has sufficiently alleged that Defendants controlled the nuisance.

Accordingly, Defendants' motions to dismiss Plaintiff's claims for private nuisance and public nuisance are hereby **DENIED**.

### 5.    Plaintiff's allegations state a claim for negligence.

"An essential element in a cause of action for negligence is the existence of a legal duty of care owed by the defendant to the plaintiff." *Bishop v. S.C. Dep't of Mental Health*, 331 S.C. 79, 85, 502 S.E.2d 78, 81 (1998). The existence of a legal duty is a question of law. *McCord v. Laurens Cnty. Health Care Sys.*, 429 S.C. 286, 296, 838 S.E.2d 220, 225 (Ct. App. 2020). Plaintiff alleges that "Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others." (Compl. ¶ 103.)

In opposing Plaintiff's negligence claim, Defendants cite case law providing that "there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656–57 (2006). Because they deliver their industrial wastewater to various WWTPs and owe no duty to ensure that the WWTPs treat their wastewater in a way that does not risk harm to third parties, the indirect-discharger Defendants argue that they owe no duty of care to Plaintiff. Defendants further argue that a duty to Plaintiff may only be created "by statute, a contractual relationship, status, property interest, or some other special circumstance," none of which are applicable here. *Id.*

Plaintiff responds that it does not allege Defendants have a duty to protect it from third parties, and that Defendants conflate different tenets of South Carolina law. It explains that while an affirmative duty to act may only be created in certain circumstances, once a party voluntarily

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

undertakes an act, it must exercise due care in doing so. Plaintiff contends that, by voluntarily engaging in their industrial activities, Defendants were required to do so with due care. Additionally, Plaintiff highlights that Defendants owed Plaintiff a duty because they "created a situation that they knew or should have known posed a substantial risk of injury" to Plaintiff. *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 294, 688 S.E.2d 125, 130 (2010); *see also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, § 7 ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.").

The Court agrees with Plaintiff and concludes that the Complaint sufficiently alleges a legal duty of care under the circumstances. Plaintiff does not allege that Defendants owed a duty to protect Plaintiff from the independent actions of a third party, but instead that Defendants owed a duty of care arising from their own conduct, which created a risk of harm. Moreover, South Carolina courts have consistently recognized a duty of care in environmental pollution contexts, where parties who released pollution into the environment owed a duty to those exposed to the pollutants. *See, e.g.*, *Chestnut v. AVX Corp.*, 413 S.C. 224, 226, 776 S.E.2d 82, 83 (2015) (finding that a manufacturer who released hazardous chemicals beyond its plant's boundaries, contaminating surrounding properties, owed a duty of care to the affected property owners); *Ravan v. Greenville Cnty.*, 315 S.C. 447, 452, 434 S.E.2d 296, 299 (Ct. App. 1993) (holding that the defendant transporter of toxic chemicals owed a duty of care not only during the transport but also in selecting a landfill location, thus extending its duty to mitigate risks associated with industrial waste disposal).

19

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The Court concludes that the allegations in the Complaint, taken as true, sufficiently establish that Defendants owed a duty of care to Plaintiff because of Defendants' undertaking of industrial operations that posed a substantial risk of harm to Plaintiff's water system.

The Court furthermore finds that the Complaint adequately pleads that Defendants breached their duties of due care in the use and disposal of PFAS by discharging the chemicals directly to surface waters or to on-site treatment works or municipal WWTPs with knowledge that PFAS are hazardous to human health, resistant to the treatment methods used by the treatment works or receiving WWTPs, and environmentally persistent, and further, that the on-site treatment works and receiving WWTPs discharge Defendants' PFAS to rivers upstream from Plaintiff's water intakes.

As for causation, "[p]roximate cause requires proof of both causation in fact and legal cause." *Bishop v. Dep't of Mental Health*, 331 S.C. 79, 88, 502 S.E.2d 78, 83 (1998). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence. Legal cause is proved by establishing foreseeability." *Id.* at 88–89, 502 S.E.2d at 83 (citation omitted). "Foreseeability is determined by looking to the natural and probable consequences of the complained of act." *Id.* at 89, 502 S.E.2d at 83. "The defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury." *Id.* "Ordinarily, the question of proximate cause is one of fact for the jury . . . ." *Hurd v. Williamsburg Cnty.*, 353 S.C. 596, 613, 579 S.E.2d 136, 145 (Ct. App. 2003) (quoting *McNair v. Rainsford*, 330 S.C. 332, 349, 499 S.E.2d 488, 497 (Ct. App. 1998)).

Plaintiff alleges that PFAS are man-made chemicals that do not occur naturally in the environment, Defendants discharge PFAS-contaminated wastewater into bodies of water upstream

20

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

of Plaintiff's properties, PFAS do not naturally degrade in the environment, and the PFAS that Defendants discharged flow downstream onto Plaintiff's properties. Plaintiff moreover alleges that Defendants knew that PFAS were in their waste streams and that PFAS are persistent and resistant to conventional wastewater treatment methods like those used by their on-site treatment works or receiving WWTPs. The Court finds that Plaintiff has sufficiently alleged causation-in-fact and proximate cause. Plaintiff's allegations, taken as true, are sufficient to allege that Defendants are "but-for" causes of Plaintiff's injuries, and that its injuries were the "natural and probable consequences" of Defendants' alleged conduct. *Bishop*, 331 S.C. at 89, 502 S.E.2d at 83.

As for Defendants' argument that Plaintiff fails to allege actionable physical injury or property damage to support its negligence claim, the Court rejects this argument for the same reasons stated in Section 1 pertaining to justiciability. The Court finds that the Complaint plainly alleges direct injuries to Plaintiff's properties caused by Defendants' PFAS, including the contamination of its land and treatment system and the inability to use its facilities to treat and supply drinking water without hazardous levels of PFAS.

Accordingly, Defendants' motions to dismiss Plaintiff's claim for negligence are hereby **DENIED**.

## 6.     The Court will not strike Plaintiff's request for attorney's fees or prejudgment interest at this time.

Defendant PRET argues that the Court should strike Plaintiff's request for attorney's fees and prejudgment interest because Plaintiff has not identified any applicable statute or contract providing for an award of attorney's fees, and Plaintiff's claims are not for a sum certain or capable of being reduced to any certainty.

Plaintiff responds that PRET's motion is procedurally improper because Rule 12(b)(6), SCRCP, applies to claims and not remedies, and it tests the legal sufficiency of a complaint to state

21

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

a cause of action. As for attorney's fees, Plaintiff further adds that it does seek a declaratory judgment, alleging that Defendants' PFAS contamination constitutes an irreparable injury for which there is no adequate remedy at law. Should Plaintiff prevail, it points out that attorney's fees are available under the Uniform Declaratory Judgments Act. *See* S.C. Code Ann. § 15-53-100.

The Court concludes that Defendant's motion is premature and not well-taken at this stage of the proceedings. Rule 12(b)(6) is directed to the sufficiency of claims, not specific forms of relief, and striking requests for remedies—such as attorney's fees or prejudgment interest—is not appropriate absent a clear legal bar. Moreover, Plaintiff has alleged a basis for declaratory relief, and the Uniform Declaratory Judgments Act permits the Court, in its discretion, to award attorney's fees in such actions. Likewise, Plaintiff's request for prejudgment interest cannot be evaluated until the nature and scope of damages, if any, have been established.

Accordingly, the Court declines to strike Plaintiff's requests for attorney's fees and prejudgment interest at this early stage of the litigation, and PRET's motion to strike is hereby **DENIED**.

**7.    The "municipal cost recovery rule" does not apply.**

Defendants seek dismissal of Plaintiff's claims based on the municipal cost recovery rule (also known as the "free public services doctrine"), which they contend precludes the tort recovery Plaintiff seeks. The basis for the argument is that Plaintiff is a government entity pursuing tort claims in order to upgrade its SWTPs, and that, under the municipal cost recovery rule, public expenditures made in the performance of governmental functions, like the costs of upgrading the SWTPs, are not recoverable in tort.

Neither Defendants nor Plaintiff cite any South Carolina decisions applying the municipal cost recovery rule, and it is unclear whether the rule has been previously recognized in our jurisprudence. Nevertheless, in jurisdictions that have recognized it, the rule generally "provides

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

that absent specific statutory authorization or damage to government-owned property, a county [or other government entity] cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." *Walker Cnty. v. Tri-State Crematory*, 284 Ga. App. 34, 37, 643 S.E.2d 324, 327 (2007). The municipal cost recovery rule rests on the premise that when legislative authorities have allocated the costs of public services across the public as whole, such as through taxes, courts should not intrude upon this legislative determination by authorizing tort recovery. *City of Flagstaff v. Atchison, Topeka and Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir. 1983). In the *Flagstaff* decision, the Ninth Circuit explained that application of the doctrine turns on "the identity of the claimant and the nature of the cost," which "combine to deny recovery." *Id.* at 324.

According to Plaintiff, Defendants' only real basis for invoking the municipal cost recovery rule is the fact that Plaintiff is a government entity. Plaintiff argues that the rule does not apply here because Plaintiff's provision of drinking water to paying customers is neither free nor public as contemplated by the doctrine. Rather, Plaintiff only provides drinking water to those customers who pay for the service.

The Court concludes that Plaintiff's claims should not be dismissed at this stage based on the municipal cost recovery rule. Plaintiff is a special purpose water district. Its water services are not funded by taxes paid by the general public, but instead through rates and fees collected from Plaintiff's customers, as the Legislature has expressly authorized Plaintiff to do. *See* S.C. Code Ann. § 5-31-670. Therefore, while Plaintiff is a government entity, its water services are not "free" or "public" for the purposes of applying the doctrine. *See Johnson v. 3M*, 563 F. Supp. 3d 1253, 1311 (N.D. Ga. 2021) ("Unlike services such as police or fire protection, water service to paying customers is not free for all the public[.]"). In addition, the Court concludes that Plaintiff's claims

23

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

should not be dismissed based on the municipal cost recovery rule at this stage because the claims at issue involve "damage to government-owned property." *Walker Cnty.*, 284 Ga. App. at 37, 643 S.E.2d at 327.

Accordingly, Defendants' motions to dismiss Plaintiff's claims on the basis of the municipal cost recovery rule are hereby **DENIED**.

**8.    There is no reason to stay these cases based on "primary jurisdiction."**

Defendants have requested that the Court dismiss or stay this case so it can be referred to DES on the grounds of primary jurisdiction, contending that the Legislature has entrusted DES with addressing the exact harm alleged here via the South Carolina State Safe Drinking Water Act ("SCSDWA"), S.C. Code Ann. §§ 44-55-10 to -120 (2018). According to Defendants, the SCSDWA vests DES with exclusive enforcement authority with respect to issues in this case relating to the contamination of public water systems.

The primary jurisdiction doctrine does not involve subject matter jurisdiction; it is a discretionary doctrine that "applies where a claim is originally cognizable in the courts, and it comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 64 (1956). In determining whether to apply the doctrine to stay a case, the court considers whether the case "rais[es] issues of fact not within the conventional experience of judges" or which "requir[e] the exercise of administrative discretion," further taking into account "the expert and specialized knowledge of the agencies" and "desirable uniformity" in regulation. *Id.*

Plaintiff responds that this is an unjustified delay tactic that falls well outside the scope of the primary jurisdiction doctrine. Plaintiff emphasizes that it asserts only common law claims and

24

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

does not seek relief under the SCSDWA or any other state or federal statute. Plaintiff furthermore points out that DES has not taken any action to control Defendants' PFAS discharges, and that it was EPA, not DES, that issued the MCLs for PFAS.

The Court declines to stay or dismiss this case based on the primary jurisdiction doctrine. The Court finds that while the case involves regulatory standards and factual matters that intersect with the purview of DES, the case is ultimately based on common law tort theories of negligence, nuisance, and trespass that are well within the Court's competence and experience. While the SCSDWA vests DES with authority to enforce the Act and lacks a citizen-suit enforcement provision, its text does not demonstrate a legislative intent for the SCSDWA to preempt or otherwise supersede common law claims relating to the contamination of public water systems.

Accordingly, Defendants' requests to dismiss or stay this case on the basis of primary jurisdiction are hereby **DENIED**.

**9.      This Court has personal jurisdiction over the Landfill Defendants.**

The Landfill Defendants also moved to dismiss Plaintiff's complaint against them for lack of personal jurisdiction pursuant to Rule 12(b)(2), SCRCP, arguing that personal jurisdiction is absent under both South Carolina's long-arm statute, S.C. Code Ann. § 36-2-803, and due process. The Complaint alleges that the Landfill Defendants "intentionally delivered PFAS-contaminated leachate to the Lumberton WWTP [in North Carolina], notwithstanding that these Defendants knew and/or reasonably should have known that "the treatment plant could not remove the PFAS and would discharge PFAS containing wastewater into waters upstream of Plaintiff's properties. The Landfill Defendant assert that all of Plaintiff's allegations against them are based solely upon their conduct in North Carolina, where they are organized and operate, including the alleged management or disposal of leachate within that state, and that they have not directed any conduct toward South Carolina. The Landfill Defendants submitted an affidavit stating that they have no

25

physical presence, operations, property, or employees in South Carolina. Accordingly, they argue that exercising personal jurisdiction over them would violate South Carolina's long-arm statute and offend traditional notions of fair play and substantial justice under the Due Process Clause.

A court's exercise of personal jurisdiction over an out-of-state defendant must conform with South Carolina's long-arm statute and the United States Constitution's Due Process Clause. *S. Plastics Co. v. S. Com. Bank*, 310 S.C. 256, 259, 423 S.E. 128, 130 (1992). The long-arm statute provides:

> (A) A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's:
>
> > (1) transacting any business in this State;
> >
> > (2) contracting to supply services or things in the State;
> >
> > (3) commission of a tortious act in whole or in part in this State;
> >
> > (4) causing tortious injury or death in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State;
> >
> > (5) having an interest in, using, or possessing real property in this State;
> >
> > (6) contracting to insure any person, property, or risk located within this State at the time of contracting;
> >
> > (7) entry into a contract to be performed in whole or in part by either party in this State; or
> >
> > (8) production, manufacture, or distribution of goods with the reasonable expectation that those goods are to be used or consumed in this State and are so used or consumed.
>
> (B) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

S.C. Code Ann. § 36-2-803.

Constitutional due process requires "that the defendant possess sufficient minimum contacts with the forum state, so that he could reasonably anticipate being haled into court there."

26

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491, 611 S.E.2d 505, 508 (2005). This is a "two-prong analysis," *Moosally v. WW. Norton Co., Inc.*, 358 S.C. 320, 331, 594 S.E.2d 878, 884 (Ct. App. 2004), where a court must first "find that the defendant directed its activities to residents of South Carolina and that the cause of action arises out of or relates to those activities." *Id.* at 331–32, 594 S.E. at 884. Second, the court weighs fairness factors, including "the burden on the defendant, the extent of the plaintiff's interest, South Carolina's interest, efficiency of adjudication, and the several states' interest in substantive social policies." *Id.* at 332, 594 S.E. at 884.

While the Parties dispute whether the long-arm statute applies more narrowly than the limits of due process, under the facts of this case, the Court agrees with Plaintiff that the statute extends to the outer limits of the due process clause. *See, e.g.*, *Jenkinson v. Murrow Bros. Seed Co.*, 272 S.C. 148, 151, 249 S.E.2d 780, 782 (1978) ("We have repeatedly held that the drafters of our 'long arm statute' intended it to reach as far as due process allows."). In any event, the South Carolina Supreme Court has held that subsection (A)(3) of the long-arm statute—"commission of a tortious act in whole or in part in this State"—"applies to in-state injuries from out-of-state wrongful acts or omissions." *Parker v. Williams & Madjanik, Inc.*, 270 S.C. 570, 574, 243 S.E.2d 451, 454 (1978). Under section 36-2-803(A)(3), personal jurisdiction exists where a defendant commits a tortious act in whole or in part in South Carolina. The statute also allows jurisdiction over conduct outside the state causing tortious injury within South Carolina if the defendant "regularly does or solicits business, or engages in any other persistent course of conduct," or "derives substantial revenue from goods used or consumed or services rendered" in the state. § 36-2-803(A)(4).

27

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff alleges that RRD and SCD each continued to send PFAS-contaminated leachate to a North Carolina WWTP for disposal while knowing their PFAS-contaminated leachate would pass through the WWTP and be discharged into surface waters flowing downstream into South Carolina, where it would cause the complained of harm to Plaintiff. The Court finds these allegations sufficient to satisfy both South Carolina's long-arm statute and due process.

Here, Plaintiff plausibly alleges that the Landfill Defendants' actions constitute tortious acts "in whole or part" in South Carolina. According to the Complaint, RRD and SCD transport PFAS-contaminated leachate from their North Carolina landfills to the Lumberton WWTP, which uses treatment methods that do not filter PFAS. Plaintiff alleges that the Landfill Defendants knew and/or reasonably should have known that PFAS from their leachate ultimately discharges into the Lumber River, a tributary of the Pee Dee River Watershed, which flows into South Carolina and contaminates Plaintiff's water sources. Because the Complaint alleges that these ongoing discharges, predictably, and repeatedly result in PFAS entering and injuring property within South Carolina, the Court concludes that the requirements of section 36-2-803(A)(3) are satisfied.

The Court also concludes that the exercise of personal jurisdiction over the Landfill Defendants comports with due process. The "minimum contacts" test is met where a defendant "directed its activities to residents of South Carolina and the cause of action arises out of or relates to those activities." *Moosally*, 358 S.C. at 331, 594 S.E.2d at 884. Plaintiff's Complaint adequately alleges that RRD and SCD engaged in conduct outside South Carolina—namely, disposing of their PFAS-laden leachate into a treatment system with no capacity to remove PFAS— that they knew or reasonably should have known would contaminate South Carolina waters downstream. This is sufficient to establish requisite minimum contact with South Carolina.

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Accordingly, the Landfill Defendants' motion to dismiss for lack of personal jurisdiction is hereby **DENIED.**

**10.    The motion for a protective order to stay discovery is denied.**

Defendant Elevate also moved for a protective order and to stay discovery pursuant to Rule 26(c), SCRCP, pending resolution of its motions to dismiss. The Court finds that this Order denying Defendants' motions to dismiss, as a practical matter, resolves Elevate's request.

Accordingly, Defendant's motion for a protective order and to stay discovery is hereby **DENIED**, except to the extent that the parties have already informally agreed to defer discovery pending the resolution of the motions to dismiss. Where in place, such agreements shall govern as to deadlines for discovery already served, unless otherwise ordered by the Court.

CONCLUSION

In summation and based on the foregoing, the Court:

- **DENIES** all motions to dismiss the Second Amended Complaint in *Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation et al.*, C.A. No. 2024-CP-26-05523 (15th Jud. Cir.), filed by Defendants Aladdin Manufacturing Corporation; Domtar Paper Company, LLC; Elevate Textiles, Inc.; Fiber Industries, LLC; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; and Sampson County Disposal, LLC;

- **DENIES** as **moot** the motion to dismiss the Second Amended Complaint in *Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation et al.*, C.A. No. 2024-CP-26-05523 (15th Jud. Cir.), filed by Defendants GFL Environmental USA, Inc. and Waste Industries, LLC; and

29

- **DENIES** the motion for protective order and to stay discovery in *Grand Strand Water and Sewer Authority v. Aladdin Manufacturing Corporation et al.*, C.A. No. 2024-CP-26-05523 (15th Jud. Cir.), filed by Defendant Elevate Textiles, Inc.

**SO ORDERED.**

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 09 10:02 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523



Horry Common Pleas

**Case Caption:**    Grand Strand Water And Sewer Authority VS   Burlington Industries
                     Inc , defendant, et al
**Case Number:**     2024CP2605523

**Type:**            Order/Other

IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760

Electronically signed on 2025-05-08 17:03:48    page 31 of 31

ELECTRONICALLY FILED - 2025 May 20 3:51 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br>COUNTY OF HORRY<br><br>IN RE:<br>PFAS LITIGATION COORDINATED<br>DOCKET<br><br>Grand Strand Water and Sewer Authority<br><br>*Plaintiff*,<br><br>v.<br><br>Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC, Elevate Textiles, Inc.; Fiber Industries, LLC; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; and Red Rock Disposal, LLC,<br><br>*Defendants*. | IN THE COURT OF COMMON PLEAS<br>FIFTEENTH JUDICIAL CIRCUIT<br><br><br>C.A. No.: 2024-CP-26-05523<br><br><br><br>**NOTICE OF DISMISSAL OF<br>DEFENDANT DOMTAR PAPER<br>COMPANY, LLC** |

Pursuant to Rule 41(a)(1)(A) of the South Carolina Rules of Civil Procedure, Plaintiff, Grand Strand Water and Sewer Authority, by and through undersigned counsel, hereby gives notice that it is dismissing Defendant Domtar Paper Company, LLC from this action without prejudice. In support of dismissal, Plaintiff offers the Affidavit of Brian Kozlowski, attached hereto as Exhibit A. Each party will bear its own fees and costs.

Respectfully submitted,

 */s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)

Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

Jerome Tapley (*Pro Hac Vice)*
Hirlye R. "Ryan" Lutz, III (*Pro Hac Vice)*
Brett Thompson (*Pro Hac Vice)*
Akira Watson (*Pro Hac Vice)*
Hunter Phares (S.C. Bar No. 107158)
Hamilton Jordan (*Pro Hac Vice)*
Hannah C. Caldwell (*Pro Hac Vice)*
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, AL 35205
(205) 328-2200
jtapley@corywatson.com
rlutz@corywatson.com
bthompson@corywatson.com
awatson@corywatson.com
hphares@corywatson.com
hjordan@corywatson.com
hcaldwell@corywatson.com

*Attorneys for Plaintiffs*

May 20, 2025

ELECTRONICALLY FILED - 2025 May 20 3:51 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

EXHIBIT A

ELECTRONICALLY FILED - 2025 May 20 3:51 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 20 3:51 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | | IN THE COURT OF COMMON PLEAS<br>FIFTEENTH JUDICIAL CIRCUIT |
| COUNTY OF HORRY | | C/A No. 2024-CP-26-05523 |
| GRAND STRAND WATER AND<br>SEWER AUTHORITY, | ) | [PFAS Litigation Coordinated Docket] |
| Plaintiff, | ) | |
| v. | ) | **AFFIDAVIT OF BRIAN KOZLOWSKI** |
| ALADDIN MANUFACTURING<br>CORPORATION; BURLINGTON<br>INDUSTRIES, INC.; DELTA MILLS,<br>INC., its predecessors, successors, assigns,<br>and/or responsible parties; DOMTAR<br>PAPER COMPANY, LLC; ELEVATE<br>TEXTILES, INC.; FIBER INDUSTRIES,<br>LLC; GFL ENVIRONMENTAL USA,<br>INC.; J.P. STEVENS & COMPANY, INC.,<br>its predecessors, successors, assigns,<br>and/or responsible parties; MOHAWK<br>INDUSTRIES, INC.; NAN YA PLASTICS<br>CORPORATION, AMERICA; PRET<br>ADVANCED MATERIALS, LLC; RED<br>ROCK DISPOSAL, LLC; SAMPSON<br>COUNTY DISPOSAL, LLC; and WASTE<br>INDUSTRIES, LLC, | ) | |
| Defendants. | ) | |

BRIAN KOZLOWSKI being duly sworn, deposes and states as follows:

1.　　I am over eighteen (18) years of age and competent to provide this affidavit.

2.　　I am currently employed at Domtar Paper Company, LLC ("Domtar"). I hold the title of Senior Director, Environment & Sustainability in Domtar's Paper and Packaging Business Unit. I have held various corporate environmental and sustainability roles since I began employment with Domtar in August 2013.

3.    I make this affidavit based upon my personal knowledge and interviews with current Domtar employees.

4.    Domtar operates a paper mill located at 585 Willamette Rd., Bennettsville, South Carolina 29512 (the "Marlboro Mill"). Domtar produces copy paper, tablet paper, base stock for thermal paper production, and market pulp at the Marlboro Mill. The manufacture of these products does not involve the use of PFAS[1]-containing chemicals.

5.    Domtar has never used PFAS-containing chemicals in its manufacturing processes at the Marlboro Mill, and its wastewater discharges to the Great Pee Dee River has not included PFAS that originated from any use of PFAS-containing chemicals in its manufacturing processes at the Marlboro Mill.

6.    Based on samples collected in March 2025 from the Marlboro Mill, PFAS constituents are already present in the intake water the Domtar Marlboro Mill withdraws from the Great Pee Dee River for use in its manufacturing processes, and this intake water (influent) has a higher PFAS concentration than water discharged (effluent) to the Great Pee Dee River via treated wastewater from Domtar's Marlboro Mill facility.

7.    Domtar operates a converting center at 300 North Park Dr, Rock Hill, South Carolina 29730. Domtar also operates a converting center at 191 W. Main St, Tatum, South Carolina 29594. At both locations, Domtar converts rolls of paper to sheets of paper. Domtar does not use water or discharge wastewater as part of the processes conducted at either of these converting centers.

---

[1] As defined in Plaintiff's Complaint and used herein, "PFAS" means per- and polyfluoroalkyl substances that include one or more of the following: perfluorooctanoic acid ("PFOA"), perfluorooctanesulfonic acid ("PFOS"), perflourononanoic acid ("PFNA"), perfluorobutane sulfonate ("PFBS"); perfluorohexane sulfonate (PFHxS"), and hexafluoropropyulene oxide dimer acid ("HFPO-DA" of "GenX Chemicals").

ELECTRONICALLY FILED - 2025 May 20 3:51 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

8.    Domtar operates a fluff pulp production facility at 1375 NC Highway 149 North, Plymouth, North Carolina 27962 (the "Plymouth Manufacturing Facility"). Domtar does not presently use, and has not historically used, PFAS-containing chemicals in its manufacturing processes at the Plymouth Manufacturing Facility.

9.    The Plymouth Manufacturing Facility does not discharge wastewater into any body of water in the Pee Dee River Watershed.[2]

10.    Domtar's headquarters are located at 234 Kingsley Park Dr, Fort Mill, South Carolina 29715. Domtar does not conduct manufacturing operations at that location.

11.    Except as identified above, Domtar does not conduct operations at any locations in North Carolina or South Carolina.

12.    If called as a witness, I am competent to testify to the facts set forth in this Affidavit.

_____
BRIAN KOZLOWSKI

Subscribed and sworn to before me
this 1st day of May, 2025

_____
Notary Public

---

[2] As defined in Plaintiff's Complaint and used herein, the "Pee Dee River Watershed" means the Great Pee Dee River, Lynches River, Lumber River, Little Pee Dee River, Lynches Lake Swamp, Black Creek and Blue Creek.

ELECTRONICALLY FILED - 2025 May 20 3:51 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF HORRY** | ) | **FIFTEENTH JUDICIAL CIRCUIT** |
| | ) | |
| | ) | |
| GRAND STRAND WATER AND SEWER AUTHORITY, | ) | C.A. No.: 2024-CP-26-05523 |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALADDIN MANUFACTURING CORPORATION; BURLINGTON INDUSTRIES, INC.; DELTA MILLS, INC., its predecessors, successors, assigns, and/or responsible parties; DOMTAR PAPER COMPANY, LLC; ELEVATE TEXTILES, INC.; FIBER INDUSTRIES, LLC; GFL ENVIRONMENTAL USA, INC.; J.P. STEVENS & COMPANY, INC., its predecessors, successors, assigns, and/or responsible parties; MOHAWK INDUSTRIES, INC.; NAN YA PLASTICS CORPORATION, AMERICA; PRET ADVANCED MATERIALS, LLC; RED ROCK DISPOSAL, LLC; SAMPSON COUNTY DISPOSAL, LLC; and WASTE INDUSTRIES, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **ANSWER TO FIRST AMENDED COMPLAINT** (JURY TRIAL DEMANDED) |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

Defendant Elevate Textiles, Inc. ("Elevate"), denying each and every allegation not specifically admitted herein, hereby submits its Answer to Plaintiffs' First Amended Complaint ("Complaint").

## STATEMENT OF THE CASE

1. Elevate denies all allegations contained in Paragraph 1 of the Complaint to the extent they relate to Elevate, and further denies any and all liability to Plaintiff and denies that

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff is entitled to damages or any other relief. The allegations contained in Paragraph 1 also contain legal conclusions to which no response is required and, to the extent a response is deemed to be required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 1.

2. Elevate denies all allegations contained in Paragraph 2 of the Complaint to the extent they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The allegations contained in Paragraph 2 also contain legal conclusions to which no response is required and, to the extent a response is deemed to be required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 2.

3. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 of the Complaint, and therefore the allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Elevate lacks sufficient knowledge to respond to the allegations concerning the other Defendants and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

4. Elevate does not own or operate an industrial facility upstream of Plaintiff's water intakes and does not discharge wastewater upstream of Plaintiff's water intakes and therefore denies all allegations contained in Paragraph 4 of the Complaint to the extent they relate to Elevate.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 4 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 4.

5.     Elevate does not own or operate an industrial facility upstream of Plaintiff's water intakes and does not discharge wastewater upstream of Plaintiff's water intakes and therefore denies all allegations contained in Paragraph 5 of the Complaint to the extent they relate to Elevate. Elevate further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The remaining allegations contained in Paragraph 5 are legal conclusions to which no response is required and, to the extent a response is deemed to be required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 5.

6.     Elevate denies the allegations in Paragraph 6 as they relate to PFAS. Elevate does not own or operate an industrial facility upstream of Plaintiff's water intakes and does not discharge wastewater upstream of Plaintiff's water intakes and therefore denies all allegations contained in Paragraph 6 of the Complaint to the extent they relate to Elevate. The remaining allegations contained in Paragraph 6 are legal conclusions to which no response is required and, to the extent a response is deemed to be required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 6.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

7.      The allegations contained in Paragraph 7 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 7 of the Complaint to the extent they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.  To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 7 of the Complaint.

## DISCLAIMER

8.      The allegations contained in Paragraph 8 of the Complaint do not pertain to Elevate and therefore no response is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8, and therefore the allegations are denied. The remaining allegations of Paragraph 8 of the Complaint are conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 8 of the Complaint.

9.      The allegations contained in Paragraph 9 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 9 of the Complaint to the extent they relate to Elevate. To the extent a further response is deemed to be required, Elevate lacks knowledge or

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 9 of the Complaint.

## JURISDICTION AND VENUE

10. The allegations contained in Paragraph 10 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 10 of the Complaint. Except as expressly admitted, the allegations set forth in Paragraph 10 are denied.

11. The allegations contained in Paragraph 11 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 11 of the Complaint. Except as expressly admitted, the allegations set forth in Paragraph 11 are denied.

12. The allegations contained in Paragraph 12 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 12 of the Complaint. Except as expressly admitted, the allegations set forth in Paragraph 12 are denied.

## PARTIES

**I.     Plaintiff**

13. Elevate lacks sufficient knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 13 of the Complaint, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied.

14. Elevate lacks sufficient knowledge or information sufficient to form a belief about

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the truth of the allegations set forth in Paragraph 14 of the Complaint, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied.

15.     Elevate lacks sufficient knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 15 of the Complaint, and therefore such allegations are denied.

## II.     Defendants

16.     Paragraph 16 pertains only to Defendant Burlington Industries, Inc. ("Burlington") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of the Complaint.

17.     Paragraph 17 pertains only to Defendant Domtar Paper Company, LLC ("Domtar") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 of the Complaint.

18.     Responding to the allegations contained in Paragraph 18 of the Complaint, Elevate admits only that it is a Delaware corporation authorized to do business in South Carolina. Elevate denies that it owns and operates the Richmond Plant and denies that it used and/or continues to use products that contain or degrade to PFIA, PFOS, PFHxs, PFNA, PFBS, and/or GenX Chemicals. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the Complaint to the extent they relate to Defendant Burlington, and therefore denies any and all remaining allegations contained in Paragraph 18 of the Complaint.

19.     Paragraph 19 pertains only to Defendant Fiber Industries, LLC ("Darling Fibers") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of the Complaint.

20.     Paragraph 20 pertains only to Defendant GFL Environmental USA, Inc., Defendant Waste Industries, LLC, Defendant Sampson County Disposal, LLC ("SCD"), and Defendant Red Rock Disposal, LLC ("RRD") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of the Complaint.

21.     Paragraph 21 pertains only to Defendant J.P. Stevens & Company, Inc. ("JPS"), Defendant Delta Mills, Inc. ("Delta Mills") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 of the Complaint.

22.     Paragraph 22 pertains only to Defendant Mohawk Industries, Inc. and Defendant Aladdin Manufacturing Corporation (collectively, "Mohawk") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of the Complaint.

23.     Paragraph 23 pertains only to Defendant Nan Ya Plastics Corporation, America ("Nan Ya") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the truth of the allegations contained in Paragraph 23 of the Complaint.

24.    Paragraph 24 pertains only to Defendant PRET Advanced Materials, LLC ("PRET") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24 of the Complaint.

## FACTUAL ALLEGATIONS

### I.    Background and Hazards of PFAS

25.    Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 25, and therefore such allegations are denied.

26.    Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 26, and therefore such allegations are denied.

27.    Elevate denies all allegations contained in Paragraph 27 of the Complaint to the extent they relate to Elevate. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 27 of the Complaint.

28.    Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 28, and therefore such allegations are denied.

29.    Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 29, and therefore such allegations are denied.

30.    Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 30, and therefore such allegations are denied.

31.    Elevate does not know what "current scientific evidence" to which the allegations

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

of Paragraph 31 refer and therefore cannot form a belief as to the truth of those allegations and therefore denies all allegations contained in Paragraph 31 of the Complaint.

32.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 32, and therefore such allegations are denied.

33.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 33, and therefore such allegations are denied.

34.     Elevate admits that the allegations contained in Paragraph 34 reference an EPA advisory. Elevate refers Plaintiff to the EPA advisory Plaintiff references for the contents of the advisory. Elevate lacks knowledge or information sufficient to form a belief about the basis for the referenced advisory, and therefore such allegations are denied.  Except as expressly admitted, all remaining allegations are denied.

35.     Elevate admits that the allegations contained in Paragraph 35 reference an EPA advisory. Elevate refers Plaintiff to the EPA advisory Plaintiff references for the contents of the advisory. Elevate lacks knowledge or information sufficient to form a belief about the basis for the referenced advisory, and therefore such allegations are denied.  Except as expressly admitted, all remaining allegations are denied.

36.     Elevate refers Plaintiff to the EPA advisory Plaintiff references in Paragraph 36 for the contents of the advisory. Elevate lacks knowledge or information sufficient to form a belief about the basis for the referenced advisory, and therefore such allegations are denied.  Except as expressly admitted, all remaining allegations are denied.

37.     Elevate admits that the allegations contained in Paragraph 37 reference an EPA advisory. Elevate refers Plaintiff to the EPA advisory Plaintiff references for the contents of the advisory. Elevate lacks knowledge or information sufficient to form a belief about the basis for the

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

referenced advisory, and therefore such allegations are denied.  Except as expressly admitted, all remaining allegations are denied.

38.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 38, and therefore such allegations are denied.

39.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 39, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

40.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 40, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

41.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 41, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

42.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 42, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

43.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 43, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

response is required, those allegations are denied. Any remaining allegations are denied.

44.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 44, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

45.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 45, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied. Elevate denies all allegations contained in Paragraph 45 of the Complaint to the extent they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief from the Court.

## II.     Contamination of Bull Creek and the Intracoastal Waterway with PFAS

46.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 46, and therefore such allegations are denied.

47.     Elevate denies the allegations contained in Paragraph 47 of the Complaint to the extent they relate to Elevate. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 47 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 47.

48.     Elevate denies that it is a source of PFOA or PFOS in the water at Plaintiff's water intake on Bull Creek and therefore denies all allegations in Paragraph 48 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

or any other relief.  Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 48.

49.     Elevate denies that it is, or was, an owner and operator of any manufacturing plant or related industrial facility throughout the Pee Dee River Watershed and therefore denies all allegations in Paragraph 49 as they relate to Elevate.  Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 49.

50.     Elevate denies the allegations in Paragraph 50 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.  Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 50.

51.     The allegations in Paragraph 51 pertain only to Defendants Nan Ya and PRET and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 51 and therefore denies the same.

52.     The allegations in Paragraph 52 pertain only to Defendants GFL, SCD, and RRD and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 52 and therefore denies the same.

53.     Elevate denies the allegations in Paragraph 53 as they relate to Elevate, and further

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.  Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 53.

54.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 54, and therefore such allegations are denied.

55.      Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 55, and therefore such allegations are denied.

56.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 56, and therefore such allegations are denied.

57.     Elevate denies the allegations in Paragraph 57 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.  Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 57 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 57.

58.     Elevate denies the allegations in Paragraph 58 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.  Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 58 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 58.

59.     Elevate denies the allegations in Paragraph 59 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.  Elevate lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 59 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 59.

60.    The allegations in Paragraph 60 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies the allegations in Paragraph 60 to the extent they relate to Elevate. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 60 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

### III.    Defendants have harmed Plaintiff and Plaintiff's community.

61.    Elevate denies the allegations in Paragraph 61 of the Complaint as they relate to Elevate. The allegations in Paragraph 61 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 61 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

62.    Elevate denies the allegations in Paragraph 62 of the Complaint as they relate to Elevate. The allegations in Paragraph 62 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 62 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

63.    Elevate denies the allegations in Paragraph 63 of the Complaint as they relate to Elevate. The allegations in Paragraph 63 also contain legal conclusions to which no response is

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 63 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

64.    Elevate denies the allegations in Paragraph 64 of the Complaint as they relate to Elevate. The allegations in Paragraph 64 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 64 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

## FIRST CAUSE OF ACTION

### Private Nuisance

65.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

66.    Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 66, and therefore such allegations are denied.

67.    The allegations in Paragraph 67 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 67, and therefore such allegations are denied.

68.    The allegations in Paragraph 68 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 68 as they relate to Elevate, and further denies any and all

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 68 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 68 of the Complaint.

69.     Elevate denies the allegations in Paragraph 69 of the Complaint as they relate to Elevate. The allegations in Paragraph 69 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 69 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

70.     The allegations in Paragraph 70 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 70 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 70 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 70 of the Complaint.

71.     The allegations in Paragraph 71 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 71 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 71 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 71 of the Complaint.

72.     The allegations in Paragraph 72 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 72 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 72 of the Complaint.

73.     The allegations in Paragraph 73 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 73 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 73 of the Complaint.

74.     The allegations in Paragraph 74 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 74 as they relate to Elevate, and further denies any and all

liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 74 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 74 of the Complaint.

75.     Elevate denies the allegations in Paragraph 75 of the Complaint, including subparagraphs 75(a) and (b), as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The allegations in Paragraph 75 also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 75 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 75 of the Complaint.

76.     The allegations in Paragraph 76 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 76 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 76 of the Complaint.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## SECOND CAUSE OF ACTION

### Public Nuisance

77.     Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

78.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 78, and therefore such allegations are denied. The allegations set forth in Paragraph 78 also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied.

79.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 79, and therefore such allegations are denied.

80.     Elevate denies all allegations contained in Paragraph 80 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The allegations in Paragraph 80 of the Complaint also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 80 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 80 of the Complaint.

81.     Elevate denies all allegations contained in Paragraph 81 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The allegations in Paragraph 81 of the Complaint also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 81 of the Complaint.

82. The allegations in Paragraph 82 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 82 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 82 of the Complaint.

83. The allegations in Paragraph 83 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 83 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 83 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 83 of the Complaint.

84. The allegations in Paragraph 84 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 84 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 84 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 84 of the Complaint.

85.     The allegations in Paragraph 85 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 85 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 85 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 85 of the Complaint.

86.     The allegations in Paragraph 86 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 86 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 86 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 86 of the Complaint.

87.     Elevate denies the allegations in Paragraph 87 of the Complaint, including subparagraphs 87(a) and (b), as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The allegations in

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Paragraph 87 also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 87 of the Complaint.

88.    The allegations in Paragraph 88 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 88 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 88 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 88 of the Complaint.

### THIRD CAUSE OF ACTION

**Trespass**

89.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

90.    The allegations in Paragraph 90 of the Complaint constitute legal conclusions to which no response is required. To the extend a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 90, and therefore such allegations are denied.

91.    The allegations in Paragraph 91 of the Complaint, including subparagraphs (a)-(d) pertain only to Defendants Nan Ya and PRET, and therefore no response from Elevate is required.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 91, and therefore such allegations are denied.

92. The allegations in Paragraph 92 of the Complaint, including subparagraphs (a), (b), (e), and (c), pertain only to Defendants GFL, SCD, and RRD, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 92, and therefore such allegations are denied.

93. The allegations in Paragraph 93 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 93, including subparagraphs (a)-(c), as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 93 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 93 of the Complaint.

94. The allegations in Paragraph 94 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 94, and therefore such allegations are denied.

95. The allegations in Paragraph 95 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 95 as they relate to Elevate, and further denies any and all

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 95 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 95 of the Complaint.

96.     The allegations in Paragraph 96 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 96 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 96 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 96 of the Complaint.

97.     The allegations in Paragraph 97 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 97 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 97 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 97 of the Complaint.

98.     The allegations in Paragraph 98 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

all allegations contained in Paragraph 98 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 98 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 98 of the Complaint.

99.     The allegations in Paragraph 99 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 99 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 99 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 99 of the Complaint.

**FOURTH CAUSE OF ACTION**

**Negligence, Gross Negligence, and/or Recklessness**

100.     Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

101.     The allegations in Paragraph 101 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 101 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

form a belief as to the truth of the allegations contained in Paragraph 101 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 101 of the Complaint.

102.    The allegations in Paragraph 102 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 102 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 102 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 102 of the Complaint.

103.    The allegations in Paragraph 103 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 103 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 103 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 103 of the Complaint.

104.    The allegations in Paragraph 104 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 104, and therefore such allegations are denied.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

105.    The allegations in Paragraph 105 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 105, and therefore such allegations are denied.

106.    The allegations in Paragraph 106 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 106, and therefore such allegations are denied.

107.    The allegations in Paragraph 107 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 107, and therefore such allegations are denied.

108.    The allegations in Paragraph 108 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 108 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 108 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 108 of the Complaint.

109.    The allegations in Paragraph 109 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 109 as they relate to Elevate, and further denies any and all

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 109 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 109 of the Complaint.

## FIFTH CAUSE OF ACTION

### Strict Products Liability – Ultrahazardous Activity
### (Burlington)

110.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

111.    The allegations in Paragraph 111 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 111 and therefore such allegations are denied.

112.    The allegations in Paragraph 112 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 112, and therefore such allegations are denied.

113.    The allegations in Paragraph 113 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 113, and therefore such allegations are denied.

114.    The allegations in Paragraph 114 of the Complaint pertain only to Defendant

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 114, and therefore such allegations are denied.

115.    The allegations in Paragraph 115 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 115, and therefore such allegations are denied.

116.    The allegations in Paragraph 116 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 116, and therefore such allegations are denied.

117.    The allegations in Paragraph 117 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 117, and therefore such allegations are denied.

118.    The allegations in Paragraph 118 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 118, and therefore such allegations are denied.

<u>**SIXTH CAUSE OF ACTION**</u>

**Strict Products Liability – Design Defect**
**(Burlington)**

119.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

120. The allegations in Paragraph 120 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 120 and therefore such allegations are denied.

121. The allegations in Paragraph 121 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 121, and therefore such allegations are denied.

122. The allegations in Paragraph 122 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 122, and therefore such allegations are denied.

123. The allegations in Paragraph 123 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 123, and therefore such allegations are denied.

124. The allegations in Paragraph 124 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 124, and therefore such allegations are denied.

125. The allegations in Paragraph 125 of the Complaint, including subparagraphs (a)-(f), pertain only to Defendant Burlington, and therefore no response from Elevate is required. To

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 125, and therefore such allegations are denied.

126.     The allegations in Paragraph 126 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 126, and therefore such allegations are denied.

127.     The allegations in Paragraph 127 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 127, and therefore such allegations are denied.

128.     The allegations in Paragraph 128 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 128, and therefore such allegations are denied.

129.     The allegations in Paragraph 129 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 129, and therefore such allegations are denied.

130.     The allegations in Paragraph 130 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 130, and therefore such allegations are denied.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## SEVENTH CAUSE OF ACTION

### Strict Products Liability – Failure to Warn
### (Burlington)

131.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

132.    The allegations in Paragraph 132 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 132, and therefore such allegations are denied.

133.    The allegations in Paragraph 133 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 133, and therefore such allegations are denied.

134.    The allegations in Paragraph 134 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 134, and therefore such allegations are denied.

135.    The allegations in Paragraph 135 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 135, and therefore such allegations are denied.

136.    The allegations in Paragraph 136 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

of the allegations set forth in Paragraph 136, and therefore such allegations are denied.

137.    The allegations in Paragraph 137 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 137, and therefore such allegations are denied.

138.    The allegations in Paragraph 138 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 138, and therefore such allegations are denied.

139.    The allegations in Paragraph 139 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 139, and therefore such allegations are denied.

### EIGHTH CAUSE OF ACTION

**Breach of Implied Warranties**
**(Burlington)**

140.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

141.    The allegations in Paragraph 141 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 141, and therefore such allegations are denied.

142.    The allegations in Paragraph 142 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 142, and therefore such allegations are denied.

143.    The allegations in Paragraph 143 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 143, and therefore such allegations are denied.

144.    The allegations in Paragraph 144 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 144, and therefore such allegations are denied.

145.    The allegations in Paragraph 145 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 145, and therefore such allegations are denied.

146.    The allegations in Paragraph 146 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 146, and therefore such allegations are denied. Elevate denies all allegations contained in Paragraph 146 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.

## PRAYER FOR RELIEF

Elevate denies any liability for any injury alleged in the Complaint and denies that Plaintiff is entitled to the relief or judgment requested in the Prayer for Relief. To the extent any

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

allegation of the Complaint is not addressed directly herein, such allegation is denied.

## ADDITIONAL DEFENSES

Without assuming the burden of proof where it otherwise rests with Plaintiff or another third party, Elevate further pleads the following additional defenses to all the individual claims alleged in the Complaint. All of the following defenses are pled in the alternative and none of them constitutes an admission that Elevate is liable to Plaintiff or any third party, that Plaintiff or any third party has been or will be injured or damaged in any way, or that Plaintiff or any third party is entitled to any relief whatsoever.

## FIRST DEFENSE

The Complaint, and each cause of action or count alleged therein, fails to state facts sufficient to constitute a claim upon which relief may be granted against Elevate.

## SECOND DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the applicable statutes of limitations.

## THIRD DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the applicable statutes of repose.

## FOURTH DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the doctrine of laches, waiver, res judicata, estoppel, collateral, estoppel, ratification, and unclean hands.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FIFTH DEFENSE**

Any injuries and/or damages alleged by Plaintiff were caused or contributed to by the negligence or actual conduct of other persons, firms, corporations, or entities over whom Elevate had no control or right of control and for whom Elevate is not responsible.

**SIXTH DEFENSE**

Any injuries and/or damages alleged by Plaintiff are barred by the doctrines of intervening cause and/or superseding cause.

**SEVENTH DEFENSE**

Plaintiff's claims are not ripe for adjudication and should be dismissed for presenting a contingent, hypothetical, or abstract dispute. Plaintiff alleges that it will be required to incur costs at some future date if the United States Environmental Protection Agency requires plaintiff to upgrade its systems to treat PFAS. Until these costs are incurred, Plaintiff cannot recover.

Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency has set final water quality standards, maximum contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether natural resources have been injured.

**EIGHTH DEFENSE**

Plaintiff also lacks standing to assert, in whole or in part, under the United States Constitution, the Constitution of South Carolina, state and federal statutes, and common law to bring the claims set forth in the Complaint.

Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and parens patriae doctrine because: (1) the property claimed to be affected is not held in the public trust and/or is not subject to the parens patriae doctrine; and (2) does not have

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

exclusive jurisdiction over the resources at issue, or only has partial jurisdiction over such resources and has failed to join other necessary trustees in this action.

Plaintiff lacks standing to bring an action for trespass because Plaintiff has no ownership over and is not entitled to exclusive possession of various property and water bodies referenced in the Complaint, and because Plaintiff cannot establish unreasonable or substantial damage to the resource.

### NINTH DEFENSE

Plaintiff has not demonstrated or pled a legally cognizable injury in the Complaint that is capable of redress.

### TENTH DEFENSE

Plaintiff's claims for alleged injuries and damages are barred, in whole or in part, because the claims for damages are speculative and conjectural.

### ELEVENTH DEFENSE

Plaintiff has failed to name all necessary and indispensable parties in its action.

### TWELFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Elevate does not owe a legal duty to Plaintiff or, if it owed such a duty, did not breach and/or fully discharged that duty.

### THIRTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because, at all relevant times, Elevate exercised due care with respect to activities and took reasonable precautions against foreseeable acts or omissions of others.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FOURTEENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Elevate proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

**FIFTEENTH DEFENSE**

Upon information and belief, Plaintiff's injuries, damages, or losses, if any, were directly and proximately caused by the intervening acts, superseding acts, and conduct of others, including Plaintiff, over which Elevate had no control, thereby precluding any recovery against Elevate.

**SIXTEENTH DEFENSE**

Even assuming Elevate was negligent, careless, or reckless in any respect, and that any such conduct on its part operated as a proximate cause of Plaintiff's injuries or damages, all of which are expressly denied, Plaintiff's comparative negligence, carelessness, or recklessness contributed to the cause of Plaintiff's alleged damages. For that reason, Elevate is not liable to Plaintiff in any sum whatsoever, and/or to the extent that a jury finds Plaintiff at fault for less than fifty percent (50%), Plaintiff's recovery should be reduced by that percentage amount.

**SEVENTEENTH DEFENSE**

Plaintiff's claims for punitive damages are violative of both the United States Constitution and the South Carolina Constitution, and Defendants plead that sections 15-32-530 et seq., of the South Carolina Code provide a cap to punitive damages potentially available in this matter.

Plaintiff also fails to state any basis upon which punitive damages are recoverable against Defendants and, accordingly, Plaintiff's prayer for such damages should be dismissed and/or stricken from the claims pursuant to Rule 12(b)(6) and/or Rule 12(f) of the South Carolina Rules of Civil Procedure.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Pursuant to S.C. Code Ann. §15-32-520, any proceeding to determine punitive damages should be bifurcated from any trial to determine liability and compensatory damages.

### EIGHTEENTH DEFENSE

Any damages suffered by Plaintiff, which such damages are expressly denied, are the direct and proximate result of Plaintiff's own conduct, and recovery should be barred or, alternatively, reduced in proportion to the same degree as to Plaintiff's comparative fault.

### NINETEENTH DEFENSE

Plaintiff has failed to mitigate its damages as required by law and such failure bars Plaintiff's recovery, in whole or in part, against Elevate.

### TWENTIETH DEFENSE

Elevate is entitled to a set-off and/or credit of any monies or proceeds received by or on behalf of Plaintiff as a result of the claims alleged in the Complaint, regardless of the source of such monies, prior to any dismissal of or judgment in this matter.

### TWENTY-FIRST DEFENSE

Plaintiff's claims are barred, in whole or in part, because Elevate did not own, operate, or otherwise control the facilities or activities described in the Complaint at the time that PFAS is alleged to have migrated out of those facilities.

### TWENTY-SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish its alleged injuries were caused by exposure to PFAS from any conduct attributable to Elevate.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**TWENTY-THIRD DEFENSE**

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that PFAS has been reliably established through scientific means, to be capable of causing Plaintiff's alleged injuries.

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish exposure to sufficient concentrations or amount of PFAS, and/or for sufficient duration, which has been reliably established, through scientific means, to be capable of causing alleged injuries.

**TWENTY-FOURTH DEFENSE**

Any damages Plaintiff may have suffered (which are expressly denied) were not reasonably foreseeable by Elevate at the time of the conduct alleged.

**TWENTY-FIFTH DEFENSE**

Plaintiff's claims against Elevate are barred by the doctrines of unjust enrichment in that Plaintiff seeks to recover costs or damages for construction, operation, and maintenance of public water supply systems after Plaintiff sought and obtained a permit to secure, treat, and distribute public water supplies and for which it received funding from its customers, state, local, and federal sources, including, but not limited to, funding to specifically address unexpected contamination in water supplies under the Emergency Response Plans of the Safe Drinking Water Act, 42 U.S.C. 300f to 300j.

**TWENTY-SIXTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, because Elevate neither knew, nor should have known, that any of the substances to which Plaintiff or Plaintiff's property was allegedly exposed were hazardous or constituted a reasonably foreseeable risk of physical harm by virtue of

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the prevailing state of the medical, scientific, technical, and/or industrial knowledge available to Elevate at all times relevant to the claims or causes of action asserted by Plaintiff.

Plaintiff's claims are barred, in whole or in part, because the alleged acts or omissions by Elevate, throughout the relevant and material time period, conformed to the then-existing custom and practice, and Elevate exercised due care and acted in accordance with and/or complied with available technological, medical, scientific, and industrial "state-of-the-art" practice, and/or applicable laws, regulations, standards, and orders.

### TWENTY-SEVENTH DEFENSE

Some or all of Plaintiff's claims are not amenable to judicial resolution because of the primary jurisdiction doctrine. *Texas v. Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907).

The relief sought is, in whole or in part, within the particular expertise of and is being addressed by federal and state governments, and their relevant agencies, and thus the Court should decline to exercise jurisdiction over these matters pursuant to the doctrine of primary jurisdiction, abstention, and or the doctrine of separation of powers.

### TWENTY-EIGHTH DEFENSE

The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of open and obvious conditions.

### TWENTY-NINTH DEFENSE

The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of voluntary exposure.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### THIRTIETH DEFENSE

The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of coming to the alleged nuisance.

### THIRTY-FIRST DEFENSE

The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of assumption of risk.

### THIRTY-SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of election of remedies.

### THIRTY-THIRD DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, because of consent, public necessity, private necessity and/or privilege.

### THIRTY-FOURTH DEFENSE

Elevate is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency, including, without limitation, acts or omissions made in accordance with applicable statutes, regulations, permits, and industry standards.

### THIRTY-FIFTH DEFENSE

Plaintiff's Complaint is barred, in whole or in part, by the doctrines of acquiescence, consent, justification, accord and satisfaction, ratification, settlement, or release.

### THIRTY-SIXTH DEFENSE

Plaintiff's alleged claims are preempted or barred by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq. and the South Carolina Hazardous Waste Management Action, S.C. Code Ann. § 44-56-10 et seq. to the extent such claims include, encompass or relate to environmental conditions or natural resource damages

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

or losses at any past, present or future facilities, sites, properties, locations or other areas listed on the United States Environmental Protection Agency's National Priority List (Superfund sites), or from which discharges or releases of materials have otherwise come to be located emanating from such facilities, sites, properties, locations or areas.

## THIRTY-SEVENTH DEFENSE

Plaintiff's claims are barred because it failed to exhaust administrative remedies.

## THIRTY-EIGHTH DEFENSE

Plaintiff is not entitled to recover from Elevate more than Elevate's fair, equitable, and proportionate share, if any, of the costs and damages sought by Plaintiff or to otherwise recover from Elevate more than the amount of such relief, if any, for which Elevate is liable.

## THIRTY-NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent they seek to impose retroactive liability.

Elevate may not be held liable under retroactive theories not requiring proof of fault or causation.

## FORTIETH DEFENSE

All claims for injunctive relief in Plaintiff's Complaint are barred because Plaintiff has adequate remedies at law, to the extent its claims are provable.

## FORTY-FIRST DEFENSE

Plaintiff's claims are barred to the extent that they seek to recover costs, damages, and expenses including, but not limited to, response, assessment, remediation cleanup and/or removal costs that Plaintiff incurred improperly, or that are not related to natural resource restoration or replacement damages.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FORTY-SECOND DEFENSE**

The damages sought by Plaintiff, if awarded, should be reduced by any amounts it recovers from any other sources and Plaintiff is barred from any form of double recovery regardless of the nature or source of such recovery.

**FORTY-THIRD DEFENSE**

Plaintiff's claims are barred, in whole or in part, because, to the extent Elevate discharged wastewater, which is denied, Elevate did not know or have reason to know that its wastewater discharge, alone or in conjunction with a discharge or discharges from other sources, would cause pass through or interference, as contemplated by 40 C.F.R. § 403.5(a)(2).

**FORTY-FOURTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the municipal cost recovery rule or the free public services doctrine. *See United States v. Standard Oil of California*, 332 U.S. 301 (1947).

**FORTY-FIFTH DEFENSE**

Plaintiff's claims are barred in whole or in part under the bulk supplier, component part supplier, sophisticated-purchaser, sophisticated-user, sophisticated intermediary, and/or knowledgeable-user doctrines or other similar or related doctrines available under applicable law.

**FORTY-SIXTH DEFENSE**

Although Elevate denies any liability, should Elevate, or any other party, be found liable for the damages alleged in the Amended Complaint, then the liability and damage should be apportioned among all responsible parties and non-parties pursuant to S.C. Code Ann. § 15-38-10 et seq.

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### FORTY-SEVENTH DEFENSE

Plaintiff's claims against Elevate are barred, in whole or in part, because Plaintiff failed to exercise reasonable diligence in mitigating and/or avoiding any alleged damages.

### FORTY-EIGHTH DEFENSE

Plaintiff's nuisance claims are barred, in whole or in part, because Elevate did not cause an unreasonable and substantial interference with Plaintiff's enjoyment of its property or with a right common to the general public.

### FORTY-NINTH DEFENSE

Elevate asserts and incorporates herein any affirmative defenses asserted or otherwise raised by other Defendants in this action to Plaintiff's Complaint.

### FIFTIETH DEFENSE

Elevate has not completed its investigation of Plaintiff's allegations. Elevate intends to act as best it can to inform itself of the pertinent facts and circumstances surrounding the allegations contained in Plaintiff's Complaint. Thus, Elevate hereby gives notice of its intent to assert any further affirmative defenses that Elevate may learn to be supported by facts and law, including, but not limited to, that this action is barred in whole or in any part by any applicable statute, contract, release, covenant, or by the doctrine of laches. Elevate reserves the right to amend this Answer to assert any such defenses.

**WHEREFORE**, having fully answered the Amended Complaint, Elevate respectfully requests that the Court:

1.  Dismiss with prejudice all claims asserted against Elevate;

2.  Grant judgment in favor of Elevate and against Plaintiff, declaring that Plaintiff is entitled to no damages, recovery and/or any other relief as to Elevate;

3.    Grant Elevate's costs and attorney's fees to the extent such costs and fees may be awarded in favor of Elevate consistent with applicable law; and

4.    Grant such other relief in favor of Elevate as the Court may deem just and proper.


This the 23rd day of May, 2025.


/s/Robert C. Osborne, III
Robert C. Osborne, III (SC Bar No. 101827)
Caroline McCracken (SC Bar No. 106971)
PARKER POE ADAMS BERNSTEIN LLP
850 Morrison Drive, Suite 400
Charleston, South Carolina 29403
Phone: 843-727-2650
robertosborne@parkerpoe.com
carolinemccracken@parkerpoe.com

*Attorneys for Elevate Textiles, Inc.*

ELECTRONICALLY FILED - 2025 May 23 3:22 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF HORRY** | ) | **FIFTEENTH JUDICIAL CIRCUIT** |
| | ) | |
| | ) | |
| GRAND STRAND WATER AND SEWER AUTHORITY, | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No: 2024CP2605523 |
| | ) | |
| *v.* | ) | |
| | ) | **DEFENDANT FIBER INDUSTRIES** |
| ALADDIN MANUFACTURING | ) | **LLC'S ANSWER TO PLAINTIFF'S** |
| CORPORATION; BURLINGTON | ) | **SECOND AMENDED COMPLAINT** |
| INDUSTRIES, INC.; DELTA MILLS, | ) | |
| INC., its predecessors, successors, assigns, | ) | |
| and/or responsible parties; DOMTAR | ) | |
| PAPER COMPANY, LLC; ELEVATE | ) | |
| TEXTILES, INC.; FIBER INDUSTRIES, | ) | |
| LLC; GFL ENVIRONMENTAL USA, | ) | |
| INC.; J.P. STEVENS & COMPANY, INC., | ) | |
| its predecessors, successors, assigns, and/or | ) | |
| responsible parties, MOHAWK | ) | |
| INDUSTRIES, INC.; NAN YA PLASTICS | ) | |
| CORPORATION, AMERICA; PRET | ) | |
| ADVANCED MATERIALS, LLC; RED | ) | |
| ROCK DISPOSAL, LLC; SAMPSON | ) | |
| COUNTY DISPOSAL, LLC; and WASTE | ) | |
| INDUSTRIES, LLC, | ) | |
| | ) | |
| *Defendants.* | ) | |

Defendant, Fiber Industries LLC d/b/a Darling Fibers (hereinafter "Defendant" or "Fiber"), by and through its undersigned counsel, hereby answers the Second Amended Complaint ("SAC") and respectfully asserts the following:

**FOR A FIRST DEFENSE**

1.     Each and every allegation of Plaintiff's SAC not specifically admitted is denied.

2.     Defendant denies the allegations contained in Paragraph 1 of the SAC and admits only that Plaintiff purports to bring this action against the named Defendants for alleged

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

"ongoing contamination of the Great Pee Dee River, Lynches River, Lumber River, Little Pee Dee River, Lynches Lake Swamp, Black Creek, and Bull Creek, . . . the Waccamaw River and Intracoastal Waterway; and Plaintiff's properties with certain" polyfluoroalkyl substances (hereinafter "PFAS"), but denies that Plaintiff is entitled to any relief.

3.     Defendant denies the allegations contained in Paragraph 2 of the SAC and admits only that as part of this lawsuit, Plaintiff "seeks a declaratory judgment, injunctive relief, abatement, damages, and an award of costs, including attorneys' fees," but denies that Plaintiff is entitled to any relief from Defendant and demands strict proof thereof. Further, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 2 of the SAC as they relate to other unspecified Defendants and therefore denies the same.

4.     With regard to Paragraph 3 of the SAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in said Paragraph and therefore denies the same and demands strict proof thereof.

5.     Defendant denies the allegations against Defendant contained in Paragraph 4 of the SAC as worded. Further, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 4 of the SAC as they relate to other unspecified Defendants and therefore denies the same.

6.     Defendant denies the allegations contained in Paragraph 5 of the SAC and admits only that Plaintiff claims it "has suffered losses to the use and enjoyment of its property rights" and alleges trespass and damage to its properties, but denies Plaintiff is entitled to relief from Defendant and demands strict proof thereof. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 5 of

2

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the SAC as they relate to other unspecified Defendants and therefore denies the same. Defendant further lacks knowledge or information sufficient to form a belief regarding any alleged levels of PFAS concentrations in Plaintiff's water sources, and whether they "cannot be adequately removed by conventional wastewater treatment processes," and therefore denies the same and demands strict proof thereof.

7.     With regard to Paragraph 6 of the SAC, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained therein as they relate to other unspecified Defendants and therefore denies the same. Defendant further lacks knowledge or information sufficient to form a belief regarding the alleged levels of PFAS concentrations in Plaintiff's water sources, and whether "Plaintiff's existing water treatment processes cannot remove them" and whether the alleged PFAS concentrations "exceed[] what the U.S. Environmental Protection Agency ("EPA") deems unsafe for consumption," and therefore denies the same and demands strict proof thereof. Defendant denies any and all remaining allegations contained in Paragraph 6 of the SAC as they relate to Defendant and demands strict proof thereof.

8.     Defendant denies the allegations contained in Paragraph 7 of the SAC and admits only that as part of this lawsuit, "[p]laintiff is also seeking equitable and injunctive relief requiring Defendants to fund the acquisition, installation, and operation of water treatment technologies at Plaintiff's SWTPs" and "recovery of punitive damages," but denies Plaintiff is entitled to any relief from Defendant and demands strict proof thereof.

9.     With regard to Paragraph 8, 9, 10, 11 of the SAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same and demands strict proof thereof.

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

10.     Paragraph 12 constitutes a legal conclusion requiring no response from Defendant. To the extent a response is required, Defendant reserves its right to contest subject matter jurisdiction.

11.     Paragraph 13 constitutes a legal conclusion requiring no response from Defendant. To the extent a response is required, Defendant reserves its right to contest personal jurisdiction.

12.     Paragraph 14 constitutes a legal conclusion requiring no response from Defendant. To the extent a response is required, Defendant reserves its right to contest venue.

13.     With regard to Paragraphs 15, 16, 17, 18, 19, and 20 of the SAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same and demands strict proof thereof.

14.     Defendant denies the allegations contained in Paragraph 21 of the SAC as worded and admits only that Defendant is a South Carolina Limited Liability Company that is located at 1000 E. McIver Road, Darlington, South Carolina 29532.

15.     With regard to Paragraphs 22, 23, 24, 25, and 26 of the SAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same and demands strict proof thereof.

16.     Defendant denies the allegations contained in Paragraph 27 of the SAC and admits only that PFAS contain carbon-fluorine bonds. Defendant lacks knowledge or information sufficient to form a belief as to the subjective, undefined, and ambiguous terms/phrases "extremely stable" and "wide variety of industrial, commercial, and consumer applications" as used in this Paragraph, and therefore denies all allegations of Paragraph 27 of the SAC and demands strict proof thereof.

4

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

17.     Defendant denies the allegations contained in Paragraph 28 of the SAC and admits only that PFAS contain carbon-fluorine bonds. Defendant lacks knowledge or information sufficient to form a belief as to what is meant by "pervasive in industrial, commercial, and consumer products" and "no known environmental breakdown mechanism" as used in this Paragraph, and therefore denies all allegations regarding the same.

18.     Defendant denies the allegations contained in Paragraph 29 of the SAC and admits only that Plaintiff purports to use the terms "PFOA, PFOS, PFHxS, PFNA, PFBS, and HFPO-DA (a/k/a GenX Chemicals) and fluoropolymers and side-chain fluorinated polymers" to refer to types of PFAS.

19.     With regard to Paragraphs 30, 31, 32, 33, 34, and 35, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs, and therefore denies the same and demands strict proof thereof.

20.     Defendant objects to Paragraph 36 of the SAC as it mischaracterizes a Provisional EPA Health Advisory article from 16 years ago and attempts to draw legal conclusions from this document. Subject to this objection, Defendant refers to the EPA's referenced provisional health advisories, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's provisional health advisories contained in this Paragraph.

21.     Defendant denies the allegations in Paragraph 37 of the SAC as alleged, which attempt to quote and characterize the EPA's published lifetime health advisory levels for PFOA and PFOS. Defendant refers to the EPA's referenced lifetime health advisories, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's lifetime health advisories contained in this Paragraph.

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

22.     Defendant denies the allegations in Paragraph 38 of the SAC as alleged, which attempt to quote and characterize the EPA's lifetime health advisory levels for PFOA and PFOS. Defendant refers to the EPA's referenced health advisories, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's health advisories contained in this Paragraph.

23.     Defendant denies the allegations in Paragraph 39 of the SAC as alleged, which attempt to quote and characterize the EPA's published lifetime drinking water health advisories for PFOA and PFOS. Defendant refers to EPA's referenced lifetime drinking water health advisories, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of EPA's lifetime drinking water health advisories contained in this Paragraph.

24.     Defendant denies the allegations in Paragraph 40 of the SAC as alleged, which attempt to quote and characterize the EPA's published lifetime drinking water health advisories for hexafluoropropylene oxide (HFPO) dimer acid and its ammonium salt (together referred to as "GenX chemicals") and perfluorobutane sulfonic acid and potassium perfluorobutane sulfonate (together referred to as "PFBS"). Defendant refers to the EPA's referenced lifetime drinking water health advisories, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's lifetime drinking water health advisories contained in this Paragraph.

25.     Defendant denies the allegations in Paragraph 41 of the SAC as alleged, which attempt to characterize the EPA's proposed maximum contaminant level ("MCL") and maximum contaminant level goals ("MCLG") for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals. Defendant refers to the EPA's referenced proposed MCLs and MCLGs, which

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

speak for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's proposed MCLs and MCLGs contained in this Paragraph.

26.     Defendant denies the allegations in Paragraph 42 of the SAC as alleged, which attempt to quote the EPA's PFAS National Primary Drinking Water Regulation Rulemaking. Defendant refers to the EPA's PFAS National Primary Drinking Water Regulation Rulemaking, which speaks for itself, for its true and complete contents, and Defendant denies any further characterization of the EPA's PFAS National Primary Drinking Water Regulation Rulemaking contained in this Paragraph.

27.     Defendant denies the allegations in Paragraph 43 of the SAC as alleged, which attempt to quote and characterize the EPA's PFAS National Primary Drinking Water Regulation Rulemaking. Defendant refers to the EPA's PFAS National Primary Drinking Water Regulation Rulemaking, which speaks for itself, for its true and complete contents, and Defendant denies any further characterization of the EPA's PFAS National Primary Drinking Water Regulation Rulemaking contained in this Paragraph.

28.     Defendant denies the allegations in Paragraph 44 of the SAC as alleged, which attempt to quote and characterize the EPA's press release regarding proposed MCLs. Defendant refers to the EPA's referenced proposed MCLs and press release, which speaks for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's proposed MCLs and press release contained in this Paragraph.

29.     Defendant denies the allegations in Paragraph 45 of the SAC as alleged, which attempt to quote and characterize the EPA's final National Primary Drinking Water Regulation, which established individual MCLs and MCLGs for six PFAS in drinking water (PFOA, PFOS, PFHxS, PFNA, and HFPO-DA), and related publications regarding the same. Defendant refers to

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the EPA's referenced final National Primary Drinking Water Regulation and accompanying publications, which speaks for themselves, for their true and complete contents, and Defendant denies any further characterization of the final National Primary Drinking Water Regulation and accompanying publications contained in this Paragraph.

30.     Defendant denies the allegations in Paragraph 46 of the SAC as alleged, which attempt to quote and characterize the EPA's final National Primary Drinking Water Regulation regarding individual MCLs and MCLGs for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals and PFAS mixtures containing at least two or more of PFHxS, PFNA, HFPO-DA, and PFBS using a Hazard Index MCL. Defendant refers to the EPA's final National Primary Drinking Water Regulation and referenced materials, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's National Primary Drinking Water Regulation and referenced materials contained in this Paragraph.

31.     Defendant denies the allegations in Paragraph 47 of the SAC as alleged, which attempt to characterize Plaintiff's obligations under the EPA's final National Primary Drinking Water Regulation. Defendant refers to the EPA's final National Primary Drinking Water Regulation, which speaks for itself, for its true and complete contents, and Defendant denies any further characterization of the EPA's National Primary Drinking Water Regulation contained in this Paragraph. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the remaining allegations in this Paragraph and therefore denies the same and demands strict proof thereof.

32.     With regard to Paragraph 48, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in this Paragraph and therefore denies the same and demands strict proof thereof.

8

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

33.    Defendant denies the allegations against Defendant contained in Paragraph 49 of the SAC as worded. Further, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 49 of the SAC as they relate to other unspecified Defendants and therefore denies the same.

34.    With regard to Paragraph 50, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in this Paragraph, and therefore denies the same and demands strict proof thereof.

35.    Defendant denies the allegations against Defendant contained in Paragraph 51 of the SAC as worded. Further, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 51 of the SAC as they relate to other unspecified Defendants and therefore denies the same.

36.    Defendant denies the allegations against Defendant contained in Paragraph 52 of the SAC as worded. Further, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 52 as they relate to Defendants Burlington, Domtar, Delta Mills & JP Stevens, Elevate, and Mohawk and therefore denies the same.

37.    With regard to Paragraphs 53 and 54 of the SAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs, and therefore denies the same and demands strict proof thereof.

38.    With regard to Paragraph 55, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph as they relate to unspecified Defendants and therefore denies the same. Defendant denies any and

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

all remaining allegations in Paragraph 55 as they relate to Defendant and demands strict proof thereof.

39.     With regard to Paragraphs 56, 57, and 58, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs, and therefore denies the same and demands strict proof thereof.

40.     With regard to Paragraphs 59, 60, and 61, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in these Paragraphs as they relate to Plaintiff's wastewater treatment technology or its ability to remove PFAS "from the water Plaintiff draws" and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 59, 60, and 61 as they relate to Defendant and demands strict proof thereof.

41.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 62 as they relate to unspecified Defendants' actual or constructive knowledge and therefore denies the same. Defendant denies any and all remaining allegations in this Paragraph as they relate to Defendant and demands strict proof thereof.

42.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 63 as they relate to Plaintiff's treatment technologies and unspecific Defendants' wastewater discharges and therefore denies the same. Defendant denies any and all remaining allegations in this Paragraph as they relate to Defendant and demands strict proof thereof.

43.     Defendant denies the allegations contained in Paragraphs 64 and 65 of the SAC.

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

44.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 66 as they relate to unspecified Defendants' actual or constructive knowledge and wastewater discharge and therefore denies the same. Defendant denies any and all remaining allegations in this Paragraph as they relate to Defendant and demands strict proof thereof.

45.     With regard to Paragraph 67, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

46.     With regard to Paragraphs 68 and 69 of the SAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in said paragraph and therefore denies the same and demands strict proof thereof.

47.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraphs 70, 71, 72, 73, and 74 as they relate to unspecified Defendants and/or Plaintiff's provision of water and therefore denies the same. Defendant denies any and all remaining allegations in these Paragraphs as they relate to Defendant and demands strict proof thereof.

48.     Defendant denies Paragraph 75 and demands strict proof thereof.

49.     Defendant denies the allegations contained in Paragraph 76 of the SAC and admits only that in Paragraph 76 Plaintiff "requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its riparian use of Bull Creek and the Intracoastal Waterway to supply potable water to its customers," but denies that Plaintiff is entitled to relief from Defendant and demands strict proof thereof.

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

50.     Defendant denies the allegations contained in Paragraph 77 of the SAC and admits only that in Paragraph 77 Plaintiff asks the Court for relief related to "funding the acquisition, installation, acquisition, installation, and operation of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination," but denies that Plaintiff is entitled to such relief from Defendant and demands strict proof thereof.

51.     Defendant denies Paragraph 78 and demands strict proof thereof.

52.     With regard to Paragraph 79, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

53.     With regard to Paragraphs 80, and 81 of the SAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs, and therefore denies the same and demands strict proof thereof.

54.     Defendant denies Paragraph 82 of the SAC and demands strict proof thereof.

55.     Defendant denies Paragraphs 83, 84, 85, 86, and 87 and demands strict proof thereof.

56.     Defendant denies the allegations contained in Paragraph 88 of the SAC and admits only that in Paragraph 88 Plaintiff "requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety and ensure that Plaintiff's customers and residents of Plaintiff's community receive water free from PFAS," but denies that Plaintiff is entitled to relief from Defendant and demands strict proof thereof.

57.     Defendant denies Paragraphs 89 and 90 and demands strict proof thereof.

12

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

58.     With regard to Paragraph 91, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

59.     With regard to Paragraphs 92, 93, and 94 of the SAC (including all subparts), Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same and demands strict proof thereof.

60.     With regard to Paragraph 95, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations regarding Burlington, Domtar, Delta Mills, Elevate, JPS, and Mohawk and therefore denies the same and demands strict proof thereof. Defendant denies any and all remaining allegations in this Paragraph 95 (including all subparts) and demands strict proof thereof.

61.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 96 of the SAC and therefore denies the same and demands strict proof thereof.

62.     Defendant denies Paragraph 97 and demands strict proof thereof.

63.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 98 as to Defendants Nan Ya, PRET, GFL, SCD, RRD, Burlington, Domtar, Delta Mills, Elevate, JPS, and Mohawk and therefore denies the same and demands strict proof thereof. Defendant denies any and all remaining allegations in Paragraph 98 as they relate to Defendant and demands strict proof thereof.

64.     Defendant denies Paragraphs 99, 100, and 101 and demands strict proof thereof.

65.     With regard to Paragraph 102, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

13

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

66.    Defendant denies the allegations contained in Paragraph 103 of the SAC and admits only that Plaintiff purports to describe a legal duty supposedly owed by Defendants but denies that Plaintiff's description and characterization of such duty is complete or accurate. Further, Defendant denies a legal duty was breached and demands strict proof thereof.

67.    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 104 as they relate to unspecified Defendants' actual or constructive knowledge and therefore denies the same. Defendant denies any and all remaining allegations in this Paragraph as they relate to Defendant and demands strict proof thereof.

68.    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 105 as they relate to unspecified Defendants' breach of a supposed duty and therefore denies the same and demands strict proof thereof. Defendant denies any and all remaining allegations in Paragraph 105 as they relate to Defendant and demands strict proof thereof.

69.    With regard to Paragraphs 106, 107, 108, and 109, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs, and therefore denies the same and demands strict proof thereof.

70.    Defendant denies Paragraphs 110 and 111 and demands strict proof thereof.

71.    With regard to Paragraph 112, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

72.    With regard to Paragraphs 113, 114, 115, 116, 117, 118, 119, and 120, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same and demands strict proof thereof.

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

73.     With regard to Paragraph 121, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein and demands strict proof thereof.

74.     With regard to Paragraphs 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, and 132, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same and demands strict proof thereof.

75.     With regard to Paragraph 133, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

76.     With regard to Paragraphs 134, 135, 136, 137, 138, 139, 140, and 141, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same and demands strict proof thereof.

77.     With regard to Paragraph 142, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

78.      With regard to Paragraphs 143, 144, 145, 146, 147, and 148, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in said paragraphs and therefore denies the same and demands strict proof thereof. To the extent Paragraph 148 is directed at Defendant in referencing "Defendants' [alleged] ultrahazardous activities," Defendant denies this allegation in Paragraph 148 and demands strict proof thereof. Defendant further denies Paragraph 148 as it pertains to Defendant and demands strict proof thereof.

79.     Plaintiff's Prayer for Relief beginning "WHEREFORE" is denied.

80.     Defendant demands a trial by jury.

15

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A SECOND DEFENSE

81.     The SAC, and each cause of action or count alleged therein, fails to state facts sufficient to constitute a claim upon which relief may be granted against Defendant.

## FOR A THIRD DEFENSE

82.     The Court in which the actions were filed lacks personal jurisdiction over Defendant, and the SAC should therefore be dismissed under Rule 12(b)(2) of the Federal Rules of Civil Procedure.

## FOR A FOURTH DEFENSE

83.     Plaintiff's claims are barred or limited for lack of standing.

## FOR A FIFTH DEFENSE

84.     Plaintiff's SAC, and each alleged claim contained therein, are barred, in whole or in part, by the applicable statutes of limitations.

## FOR A SIXTH DEFENSE

85.     Plaintiff's SAC, and each alleged claim contained therein, are barred, in whole or in part, by the applicable statute of repose.

## FOR A SEVENTH DEFENSE

86.     Plaintiff's SAC, and each cause of action or count alleged therein, fail to join all necessary and indispensable parties.

## FOR AN EIGHTH DEFENSE

87.     Plaintiff's SAC, and each alleged claim contained therein, are barred, in whole or in part, by the doctrine of laches.

## FOR A NINTH DEFENSE

88.     Plaintiff's SAC, and each alleged claim contained therein, are barred, in whole or

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

in part, because Plaintiff is not the real party in interest or lacks capacity to bring its claims.

### FOR A TENTH DEFENSE

89.    Plaintiff's claims are not ripe and/or have been mooted.

### FOR AN ELEVENTH DEFENSE

90.    Plaintiff's claims are or may be barred, in whole or in part, to the extent they have failed to exhaust administrative remedies.

### FOR A TWELFTH DEFENSE

91.    Plaintiff may be barred by the doctrine of unclean hands from all forms of relief sought in the SAC.

### FOR A THIRTEENTH DEFENSE

92.    Plaintiff may be barred by the doctrines of estoppel and/or waiver from all forms of relief sought in the SAC.

### FOR A FOURTEENTH DEFENSE

93.    Plaintiff may be barred by the doctrines of res judicata and collateral estoppel from all forms of relief sought in the SAC.

### FOR A FIFTEENTH DEFENSE

94.    Any injuries and/or damages sustained by Plaintiff may have been caused or contributed to by the negligence or actual conduct of Plaintiff and/or other persons, firms, corporations, or entities over whom Defendant had no control or right of control and for whom Defendant is not responsible.

### FOR A SIXTEENTH DEFENSE

95.    Any injuries and/or damages sustained by Plaintiff are barred by the doctrines of intervening cause and/or superseding cause.

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A SEVENTEENTH DEFENSE

96.     Plaintiff's claims are or may be barred, in whole or in part, by the doctrine of election of remedies.

## FOR AN EIGHTEENTH DEFENSE

97.     Plaintiff's claims are subject to all defenses that could be asserted if Plaintiff's claims were properly made by individuals on whose behalf or for whose alleged damages Plaintiff seeks to recover.

## FOR A NINETEENTH DEFENSE

98.     Plaintiff's claims are or may be barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of risk, and open and obvious risk.

## FOR A TWENTIETH DEFENSE

99.     Plaintiff's claims are or may be barred, in whole or in part, because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times.

## FOR A TWENTY-FIRST DEFENSE

100.     Plaintiff's claims are or may be barred, in whole or in part, because federal, state, and/or local authorities authorized, ratified, or were aware of and acquiesced in actions by Defendant that are the subject of Plaintiff's claims. Defendant is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency.

## FOR A TWENTY-SECOND DEFENSE

101.     Plaintiff's claims are or may be barred, in whole or in part, by the doctrine of primary jurisdiction.

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A TWENTY-THIRD DEFENSE

102.    Plaintiff's claims are or may be barred, in whole or in part, under the doctrine of federal preemption, including, without limitation, express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices, and policy statements, enacted and/or promulgated and/or issued by Congress, federal agencies, or the executive branch, including, without limitation, to the extent Plaintiff's claims constitute an impermissible challenge to a response or remediation action under CERCLA, 42 U.S.C. § 9613(h).

## FOR A TWENTY-FOURTH DEFENSE

103.    Plaintiff's damages, if any, were caused by the active, direct, and proximate negligence or actual conduct of entities or persons other than Defendant, and in the event that Defendant is found to be liable to Plaintiff, Defendant will be entitled to indemnification, contribution, and/or apportionment.

## FOR A TWENTY-FIFTH DEFENSE

104.    Defendant asserts its rights to allocation or apportionment of fault pursuant to applicable state law, as well as its right to a proportionate reduction of any damages found against Defendant based on the negligence or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiff.

## FOR A TWENTY-SIXTH DEFENSE

105.    Pursuant to the South Carolina Contribution Among Tortfeasors Act, S.C. Code Ann. § 15-38-10, et seq., any damages recoverable from Defendant should be limited to the percentage of the relative degree of fault of Defendant as compared with other parties to this action, if any, as well as other persons or entities not presently before this Court.

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A TWENTY-SEVENTH DEFENSE

106.    Plaintiff's claims against Defendant are barred or limited by the economic loss rule.

## FOR A TWENTY-EIGHTH DEFENSE

107.    Plaintiff may have failed or refused to exercise reasonable care and diligence to avoid loss and minimize damages and, therefore, may not recover for losses that could have been prevented by reasonable efforts on their part, or by expenditures which might reasonably have been made. Recovery, if any, should therefore be reduced by Plaintiff's failure to mitigate damages, if any.

## FOR A TWENTY-NINTH DEFENSE

108.    Plaintiff's claims are barred, in whole or in part, by the doctrines of acquiescence, accord and satisfaction, ratification, settlement, and/or release.

## FOR A THIRTIETH DEFENSE

109.    Plaintiff has not alleged an injury that, as a matter of law, supports a recovery in tort.

## FOR A THIRTY-FIRST DEFENSE

110.    To the extent that Plaintiff has split its claims, Plaintiff's claims are barred, in whole or in part, by the doctrine prohibiting claim splitting.

## FOR A THIRTY-SECOND DEFENSE

111.    Plaintiff's claims are barred, in whole or in part, because Defendant did not owe a legal duty to Plaintiff or, if it owed such a duty, did not breach and/or fully discharged that duty.

## FOR A THIRTY-THIRD DEFENSE

112.    Plaintiff's claims are barred, in whole or in part, because, at all relevant times,

20

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Defendant exercised due care with regard to its activities and took reasonable precautions against foreseeable acts or omissions of others.

## FOR A THIRTY-FOURTH DEFENSE

113.    Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendant proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

## FOR A THIRTY-FIFTH DEFENSE

114.    Plaintiff's claims are barred, in whole or in part, because to the extent Defendant owed any cognizable duty to warn, Defendant adequately discharged any such duty.

## FOR A THIRTY-SIXTH DEFENSE

115.    Plaintiff's claims are barred, in whole or in part, by the municipal cost recovery rule (also known as the "free public services doctrine").

## FOR A THIRTY-SEVENTH DEFENSE

116.    Plaintiff's claim for alleged injuries and damages are barred, in whole or in part, because the claims are speculative and conjectural.

## FOR A THIRTY-EIGHTH DEFENSE

117.    The relief that Plaintiff seeks, in whole or in part, violates Defendant's due process rights.

## FOR A THIRTY-NINTH DEFENSE

118.    Defendant denies any negligence, culpable conduct, or liability on its part but, if Defendant ultimately is found liable for any portion of Plaintiff's alleged damages, Defendant shall only be liable for its equitable share of Plaintiff's alleged damages.

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A FORTIETH DEFENSE

119.     Defendant denies any liability, but in the event Defendant is found to have any liability to Plaintiff, Defendant is entitled to an offset against any such liability on its part for the greatest of: (1) any amounts actually paid by any person or entity heretofore or hereafter for any of the injuries, costs, damages and expenses alleged in the SAC; (2) any amounts stipulated or otherwise agreed to in any release or covenant not to sue any person or entity heretofore or hereafter for any of the injuries, costs, damages and expenses alleged in the SAC; or (3) the equitable share of the liability of any person or entity that heretofore has received, or hereafter receives, any release from liability or covenant not to sue with regard to any of the injuries, costs, damages and expenses alleged in the SAC.

## FOR A FORTY-FIRST DEFENSE

120.     Defendant cannot be held jointly and severally liable for the acts or omissions of third parties because their acts or omissions were separate and distinct and the alleged harm is divisible from and greater than any harm allegedly caused by the acts or omissions of Defendant.

## FOR A FORTY-SECOND DEFENSE

121.     Plaintiff's claims are barred, in whole or in part, because Plaintiff fails to identify any specific product of Defendant which was allegedly manufactured, handled, sold, distributed, or used and caused the alleged injury.

## FOR A FORTY-THIRD DEFENSE

122.     Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish that their alleged injuries were caused by exposure to PFAS from any product(s) manufactured, handled, distributed, used or sold by Defendant or wastewater attributable to Defendant.

22

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A FORTY-FOURTH DEFENSE

123.    Plaintiff's purported exposure to products manufactured, handled, distributed, used or sold by Defendant or wastewater attributable to Defendant, if any, was too removed, indefinite, de minimis and insufficient to establish a reasonable degree of probability that any such product caused any alleged injury, damage or loss to Plaintiff.

## FOR A FORTY-FIFTH DEFENSE

124.    Plaintiff's claims are barred, in whole or in part, because Defendant acted reasonably and in good faith.

## FOR A FORTY-SIXTH DEFENSE

125.    Defendant has satisfied, fulfilled, and performed each and every obligation and duty imposed by law, if any, to the full extent of its responsibility.

## FOR A FORTY-SEVENTH DEFENSE

126.    Plaintiff's claims fail as a matter of substantive law and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the South Carolina Constitution to the extent that by relying on market share or other aggregate proof of causation or liability, Plaintiff seeks to deprive Defendant of procedural and substantive safeguards including, but not limited to, statutory and common law defenses to liability and causation generally.

## FOR A FORTY-EIGHTH DEFENSE

127.    Plaintiff's damages, if any, were caused or contributed to by third parties over whom Defendant has no control and no legal duty to control.

## FOR A FORTY-NINTH DEFENSE

128.    Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff seeks

23

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

to retroactively impose liability for conduct that was not actionable at the time it occurred, and Defendant may not be held liable under retroactive theories not requiring proof of fault or causation.

## FOR A FIFTIETH DEFENSE

129.    Any damages Plaintiff may have suffered were not reasonably foreseeable by Defendant at the time of the conduct alleged.

## FOR A FIFTY-FIRST DEFENSE

130.    To the extent any of the substances to which Plaintiff and/or Plaintiff's properties were allegedly exposed are purportedly hazardous or harmful, Plaintiff's claims are barred, in whole or in part, because Defendant neither knew, nor should have known, that any of the substances to which Plaintiff and/or Plaintiff's properties were allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of the medical, scientific, technical, and/or industrial knowledge available to Defendant at all times relevant to the claims or causes of action asserted by Plaintiff.

## FOR A FIFTY-SECOND DEFENSE

131.    Any product manufactured, handled, designed, sold, distributed, or used by Defendant and alleged to have caused harm to Plaintiff was, at the time, safer than any reasonable or feasible alternative designs, and any alternative designs would have been less safe, more likely to have caused injury or otherwise not feasible for their intended use.

## FOR A FIFTY-THIRD DEFENSE

132.    An award of judgment rendered in favor of Plaintiff must be reduced by the amount of compensation Plaintiff received, or are entitled to receive, from any source as a result of Plaintiff's alleged injuries.

24

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FOR A FIFTY-FOURTH DEFENSE**

133.    Defendant is entitled to all the procedural, substantive, and other protections, caps, and limitations provided by the state statutes and other state and federal law regarding Plaintiff's claims for compensatory and punitive damages.

**FOR A FIFTY-FIFTH DEFENSE**

134.    The SAC fails to state a claim upon which punitive or exemplary damages may be awarded.

**FOR A FIFTY-SIXTH DEFENSE**

135.    Defendant did not engage in any conduct which would warrant or form a valid basis for an award of punitive damages.

**FOR A FIFTY-SEVENTH DEFENSE**

136.    Plaintiff has failed to adequately plead and/or allege that Defendant acted with the requisite state of mind to warrant an award of punitive damages.

**FOR A FIFTY-EIGHTH DEFENSE**

137.    Defendant has complied with all applicable statutes and regulations set forth by local, state, and/or federal government(s) with regard to the conduct alleged in the SAC, and, therefore, to the extent that consideration is given to Plaintiff's claims, punitive damages are unwarranted in law and fact.

**FOR A FIFTY-NINTH DEFENSE**

138.    Punitive damages are not available because all conduct and activities of Defendant related to the matters alleged in the SAC conformed to industry standards based upon the state of medical, scientific, and/or industrial knowledge which existed during the relevant and material time period.

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FOR A SIXTIETH DEFENSE**

139.     To the extent any of the substances to which Plaintiff and/or Plaintiff's properties were allegedly exposed are purportedly hazardous or harmful, punitive damages are not available because Defendant neither knew nor should have known that the substances to which Plaintiff and/or Plaintiff's properties were allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm, and Defendant therefore lacked notice that its conduct was unlawful or subject to punishment and an award of punitive damages would violate Defendant's constitutional right to due process.

**FOR A SIXTY-FIRST DEFENSE**

140.     Plaintiff's claims for punitive or exemplary damages are barred or reduced by applicable law or statute, or are unconstitutional insofar as they violate the due process protections afforded by the Unites States Constitution, including, without limitation, the Fifth, Eighth, and Fourteenth Amendments to and the Excessive Fines Clause and Full Faith and Credit Clause of the United States Constitution, and other applicable provisions of the Constitution of any other state whose laws may apply.

**FOR A SIXTY-SECOND DEFENSE**

141.     To the extent Plaintiff seeks recovery of attorneys' fees and costs, Plaintiff is not entitled to any attorneys' fees or costs associated with this action because no statute or contract exists that would give Plaintiff the right to recover such fees or costs.

**FOR A SIXTY-THIRD DEFENSE**

142.     Plaintiff's claims are barred, in whole or in part, to the extent that the alleged injuries and damages, if any, were due to preexisting conditions, for which Defendant cannot be held responsible.

ELECTRONICALLY FILED - 2025 May 27 3:34 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A SIXTY-FOURTH DEFENSE

143.    Defendant reserves the right to assert all applicable defenses under the applicable rules of procedures, including, but not limited to, Federal Rules of Civil Procedure 8(c) and 12(b), as investigation and discovery proceeds.

## FOR A SIXTY-FIFTH DEFENSE

144.    Defendant adopts by reference any additional applicable defense pleaded by any other Defendant not otherwise pleaded herein.

## RESERVATION AND NON-WAIVER

145.    At this early stage of litigation there has been no discovery and Defendant has not had the opportunity to fully investigate Plaintiff's claim and, accordingly, reserves the right to amend this Answer to include any additional defenses which may be revealed through discovery, investigation, or otherwise.

WHEREFORE, having fully answered, Defendant prays that the SAC be dismissed, for the costs of defending this action, and for such other relief as the Court and jury deem just and proper.

MCANGUS GOUDELOCK & COURIE, LLC


s/ *Zachary S. Brown*
DOMINIC A. STARR (S.C. Bar No. 66231)
Email: dominic.starr@mgclaw.com
ZACHARY S. BROWN (S.C. Bar No. 103144)
Email: Zachary.Brown@mgclaw.com
2411 North Oak Street, Suite 401
Myrtle Beach, South Carolina 29577
Telephone: (843) 848-6000
Facsimile: (843) 449-2306
ATTORNEYS FOR FIBER INDUSTRIES LLC

Dated: May 27, 2025

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| IN RE: PFAS LITIGATION | ) | |
| COORDINATED DOCKET | ) | |
| | ) | |
| COUNTY OF HORRY | ) | FIFTEENTH JUDICIAL CIRCUIT |
| | ) | |
| Grand Strand Water and Sewer Authority, | ) | C.A. NO.: 2024-CP-26-05523 |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Aladdin Manufacturing Corporation; | ) | |
| Burlington Industries, Inc.; Delta Mills, | ) | |
| Inc., its predecessors, successors, assigns, | ) | |
| and/or responsible parties; Domtar Paper | ) | |
| Company, LLC; Elevate Textiles, Inc.; | ) | |
| Fiber Industries, LLC; J.P. Stevens & | ) | |
| Company, Inc., its predecessors, | ) | |
| successors, assigns, and/or responsible | ) | |
| parties; Mohawk Industries, Inc.; Nan Ya | ) | |
| Plastics Corporation, America; PRET | ) | |
| Advanced Materials, LLC; Red Rock | ) | |
| Disposal, LLC; and Sampson County | ) | |
| Disposal, LLC, | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANT RED ROCK DISPOSAL, LLC'S ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant Red Rock Disposal, LLC ("Red Rock" or "Defendant"), by its attorneys,
Williams Mullen and Taft, Stettinius & Hollister LLP, and for its Answer and Affirmative Defenses
to Plaintiff Grand Strand Water and Sewer Authority's ("Plaintiff") Second Amended Complaint
(the "Complaint"), hereby states as follows:

1

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## GENERAL DENIAL

Red Rock expressly denies each and every allegation in the Complaint, except those specifically admitted herein.

## FOR A FIRST DEFENSE

### Statement of the Case[1]

1.      Red Rock denies each and every allegation in paragraph 1.

2.      Red Rock denies each and every allegation in paragraph 2.

3.      Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 3 and therefore denies them.

4.      The allegations in paragraph 4 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock denies each and every allegation in paragraph 4.

5.      Red Rock denies each and every allegation in paragraph 5.

6.      Red Rock denies each and every allegation in paragraph 6.

7.      Red Rock denies each and every allegation in paragraph 7.

### Disclaimer

8.      Paragraph 8 sets forth legal conclusions to which no response is required or made.

9.      Paragraph 9 sets forth legal conclusions to which no response is required or made.

10.      Paragraph 10 sets forth legal conclusions to which no response is required or made.

11.      Paragraph 11 sets forth legal conclusions to which no response is required or made.

---

[1] The headers used in this Answer are for ease of reference and correspond to the headers set forth in Plaintiff's Second Amended Complaint.  They do not constitute an admission by Red Rock as to the validity of Plaintiff's causes of action.

2

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Jurisdiction and Venue**

12.     Paragraph 12 sets forth legal conclusions to which no response is required. Answering further, Red Rock states that it does not contest the Court's subject matter jurisdiction.

13.     Red Rock denies each and every allegation in paragraph 13 and denies that the Court has personal jurisdiction over Red Rock.  Red Rock filed a motion to dismiss the Complaint because the Court lacks personal jurisdiction over Red Rock, among other reasons.  The motion was denied by order entered on May 9, 2025.  Red Rock does not waive and expressly reserves the right to contest the Court's personal jurisdiction over Red Rock in this action.

14.     Paragraph 14 sets forth legal conclusions to which no response is required or made.

**Parties**

**I.     Plaintiff**

15.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 15 and therefore denies them.

16.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 16 and therefore denies them.

17.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 17 and therefore denies them.

**II.     Defendants**

18.     The allegations in paragraph 18 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 18 and therefore denies them.

19.     The allegations in paragraph 19 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it

3

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 19 and therefore denies them.

20.     The allegations in paragraph 20 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 20 and therefore denies them.

21.     The allegations in paragraph 21 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 21 and therefore denies them.

22.     Red Rock admits that it is a North Carolina limited liability company, that it operates the Red Rock Landfill, and that it has, at times in the past, transported leachate from the landfill to the Lumberton Wastewater Treatment Plant.  Red Rock denies each and every remaining allegation in paragraph 22 that is directed at Red Rock.  Red Rock states that the remaining allegations in paragraph 22 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 22 and therefore denies them.

23.     The allegations in paragraph 23 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 23 and therefore denies them.

24.     The allegations in paragraph 24 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 24 and therefore denies them.

25.     The allegations in paragraph 25 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 25 and therefore denies them.

26.     The allegations in paragraph 26 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 26 and therefore denies them.

## Factual Allegations

### I.     Background and Hazards of PFAS

27.     Red Rock admits that PFAS are a group of man-made chemicals that do not occur naturally in the environment. Red Rock lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 27 and therefore denies them.

28.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 28 and therefore denies them.

29.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 29 and therefore denies them.

30.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 30 and therefore denies them.

31.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 31 and therefore denies them.

5

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

32.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 32 and therefore denies them.

33.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 33 and therefore denies them.

34.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 34 and therefore denies them.

35.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 35 and therefore denies them.

36.     Red Rock states that the publication referred to in paragraph 36 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 36.

37.     Red Rock states that the publication referred to in paragraph 37 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 37.

38.     Red Rock states that the publication referred to in paragraph 38 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 38.

39.     Red Rock states that the publication referred to in paragraph 39 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 39.

40.     Red Rock states that the publication referred to in paragraph 40 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 40.

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

41.     Red Rock states that the publication referred to in paragraph 41 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 41.

42.     Red Rock states that the publication referred to in paragraph 42 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 42.

43.     Red Rock states that the publication referred to in paragraph 43 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 43.

44.     Red Rock states that the publication referred to in paragraph 44 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 44.

45.     Red Rock states that the publications referred to in paragraph 45 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 45.

46.     Paragraph 46 sets forth legal conclusions to which no response is required or made. Red Rock also states that the publications referred to in paragraph 46 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 46.

47.     Paragraph 47 sets forth legal conclusions to which no response is required or made. Red Rock lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 47 and therefore denies them.

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## II.    Contamination of Bull Creek and the Intracoastal Waterway with PFAS

48.    Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 48 and therefore denies them.

49.    Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 49 and therefore denies them.

50.    Red Rock denies that it is the source of any PFAS at Plaintiff's water intakes.  Red Rock lacks knowledge or information sufficient to form a belief with respect to the other allegations in paragraph 50 and therefore denies them.

51.    The allegations in paragraph 51 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 50 and therefore denies them.

52.    The allegations in paragraph 52 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 52 and therefore denies them.

53.    The allegations in paragraph 53 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 53 and therefore denies them.

54.    Red Rock admits that it operates a landfill in North Carolina and leachate from the landfill has been delivered to the Lumberton WWTP for treatment.  Red Rock denies each and every remaining allegation in paragraph 54.

55.    Red Rock denies each and every allegation in paragraph 55.

8

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

56.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 56 and therefore denies them.

57.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 57 and therefore denies them.

58.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 58 and therefore denies them.

59.     Red Rock denies each and every allegation in paragraph 59.

60.     Red Rock denies each and every allegation in paragraph 60.

61.     Red Rock denies that it is responsible for contaminating Plaintiff's water intakes on the Intercoastal Waterway or damaging Plaintiff's property at the Myrtle Beach SWTP.  Red Rock lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 61 and therefore denies them.

62.     Red Rock denies each and every allegation in paragraph 62.

**III.     Defendants have harmed Plaintiff and Plaintiff's community.**

63.     Red Rock denies each and every allegation in paragraph 63.

64.     Red Rock denies each and every allegation in paragraph 64.

65.     Red Rock denies each and every allegation in paragraph 65.

66.     Red Rock denies each and every allegation in paragraph 66.

**FIRST CAUSE OF ACTION**
**Private Nuisance**

67.     Red Rock incorporates its responses to all prior allegations by reference as if fully set forth herein.

68.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 68 and therefore denies them.

9

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

69.    Paragraph 69 sets forth legal conclusions to which no response is required or made. Red Rock lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 69 and therefore denies them.

70.    Red Rock denies each and every allegation in paragraph 70.

71.    Red Rock denies each and every allegation in paragraph 71.

72.    Red Rock denies each and every allegation in paragraph 72.

73.    Red Rock denies each and every allegation in paragraph 73.

74.    Red Rock denies each and every allegation in paragraph 74.

75.    Red Rock denies each and every allegation in paragraph 75.

76.    Red Rock denies each and every allegation in paragraph 76.

77.    Red Rock denies each and every allegation in paragraph 77.

78.    Red Rock denies each and every allegation in paragraph 78.

## SECOND CAUSE OF ACTION
### Public Nuisance

79.    Red Rock incorporates its responses to all prior allegations by reference as if fully set forth herein.

80.    Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 80 and therefore denies them.

81.    Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 81 and therefore denies them.

82.    Red Rock states that paragraph 82 sets forth legal conclusions to which no response is required or made.  Red Rock denies each and every remaining allegation in paragraph 82.

83.    Red Rock denies each and every allegation in paragraph 83.

84.    Red Rock denies each and every allegation in paragraph 84.

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

85.	Red Rock denies each and every allegation in paragraph 85.

86.	Red Rock denies each and every allegation in paragraph 86.

87.	Red Rock denies each and every allegation in paragraph 87.

88.	Red Rock denies each and every allegation in paragraph 88.

89.	Red Rock denies each and every allegation in paragraph 89.

90.	Red Rock denies each and every allegation in paragraph 90.

### THIRD CAUSE OF ACTION
### Trespass

91.	Red Rock incorporates its responses to all prior allegations by reference as if fully set forth herein.

92.	Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 92 and therefore denies them.

93.	The allegations in paragraph 93 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 93, including subparts (a)-(d), and therefore denies them.

94.	Red Rock denies each and every allegation in paragraph 94, including each and every allegation in subparts (a)-(d).

95.	Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 95, including subparts (a)-(c), and therefore denies them.

96.	Red Rock denies each and every allegation in paragraph 96.

97.	Red Rock denies each and every allegation in paragraph 97.

98.	Red Rock denies each and every allegation in paragraph 98.

99.	Red Rock denies each and every allegation in paragraph 99.

11

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

100.     Red Rock denies each and every allegation in paragraph 100.

101.     Red Rock denies each and every allegation in paragraph 101.

## FOURTH CAUSE OF ACTION
### Negligence, Gross Negligence, and/or Recklessness

102.     Red Rock incorporates its responses to all prior allegations by reference as if fully set forth herein.

103.     Paragraph 103 sets forth legal conclusions to which no response is required or made. Red Rock denies each and every remaining allegation in paragraph 103.

104.     Red Rock denies each and every allegation in paragraph 104.

105.     Red Rock denies each and every allegation in paragraph 105.

106.     The allegations in paragraph 106 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 106 and therefore denies them.

107.     The allegations in paragraph 107 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 107 and therefore denies them.

108.     The allegations in paragraph 108 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 108 and therefore denies them.

109.     The allegations in paragraph 109 are not directed at Red Rock and therefore do not require a response from Red Rock.  To the extent a response is required, Red Rock states that it

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 109 and therefore denies them.

110.    Red Rock denies each and every allegation in paragraph 110.

111.    Red Rock denies each and every allegation in paragraph 111.

## FIFTH CAUSE OF ACTION
### Strict Products Liability – Ultrahazardous Activity
### (Burlington)

The Fifth Cause of Action (paragraphs 112-120) is not directed at Red Rock and therefore no response is required from Red Rock.  To the extent a response is required, Red Rock denies each and every allegation in the Fifth Cause of Action.

## SIXTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Burlington)

The Sixth Cause of Action (paragraphs 121-132) is not directed at Red Rock and therefore no response is required from Red Rock.  To the extent a response is required, Red Rock denies each and every allegation in the Fifth Cause of Action.

## SEVENTH CAUSE OF ACTION
### Strict Products Liability – Failure to Warn
### (Burlington)

The Seventh Cause of Action (paragraphs 133-141) is not directed at Red Rock and therefore no response is required from Red Rock.  To the extent a response is required, Red Rock denies each and every allegation in the Fifth Cause of Action.

## EIGHTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Burlington)

The Eighth Cause of Action (paragraphs 142-148) is not directed at Red Rock and therefore no response is required from Red Rock.  To the extent a response is required, Red Rock denies each and every allegation in the Fifth Cause of Action.

13

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## PRAYER FOR RELIEF

In response to the paragraph beginning with "WHEREFORE" and appearing under the heading "RELIEF DEMANDED" below paragraph 148 of the Complaint, Red Rock denies that Plaintiff is entitled to any judgment or decree in its favor, injunctive relief of any kind, compensatory or punitive damages, or costs, and asks that the Court dismiss the Complaint in its entirety.

## AFFIRMATIVE DEFENSES

Red Rock asserts the following affirmative defenses in response to the allegations in Plaintiff's Complaint filed or consolidated in the above-captioned action as follows:

1.     Defendant's actions have at all times been pursuant to express permits and directives of various state and federal regulatory agencies with which Defendant has at all relevant times and parameters been fully compliant.  Accordingly, Defendant pleads license as an affirmative defense to Plaintiff's claims.

2.     Plaintiff has failed to state facts sufficient to constitute a cause of action and the Complaint should be dismissed pursuant to Rule 12(b)(6) of the South Carolina Rules of Civil Procedure.

3.     Plaintiff's claims should be dismissed, pursuant to Rule 12(b)(2) of the South Carolina Rules of Civil Procedure, because the Court lacks personal jurisdiction over the Defendant.

4.     Plaintiff's claims are not ripe for adjudication and should be dismissed for presenting a contingent, hypothetical, or abstract dispute.  Plaintiff alleges that it will be required to incur costs at some future date when the State or United States Environmental Protection Agency

14

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

will require it to upgrade their systems to treat PFAS. Until these costs are incurred, Plaintiff cannot recover.

5. Further, Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency have set final water quality standards, maximum contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether Plaintiff has suffered any injury.

6. Plaintiff lacks standing to assert, in whole or in part, under the United States Constitution, the Constitution of South Carolina, state and federal statutes, and common law, the claims set forth in the Complaint.

7. Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and *parens patriae* doctrine, because the property claimed to be affected is not held in the public trust and/or is not subject to the *parens patriae* doctrine.

8. Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and *parens patriae* doctrine, because it does not have exclusive jurisdiction over the resources at issue, or only has partial jurisdiction over such resources and has failed to join other necessary trustees in this action.

9. Plaintiff lacks standing to bring an action for trespass because Plaintiff has no ownership over and is not entitled to exclusive possession of various property and water bodies referenced in the Complaint, and because Plaintiff cannot establish unreasonable or substantial damage to the property.

10. Plaintiff has not demonstrated or pled a legally cognizable injury in the Complaint that is capable of redress.

11. Plaintiff's claims for alleged injuries and damages are barred, in whole or in part, because the claims for damages are speculative and conjectural.

15

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

12.     Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations or repose.

13.     Plaintiff has failed to name all necessary and indispensable parties in its action.

14.     Plaintiff's claims are barred, in whole or in part, because Defendant does not owe a legal duty to Plaintiff or, if it owed such a duty, did not breach and/or fully discharged that duty.

15.     Plaintiff's claims are barred, in whole or in part, because, at all relevant times, Defendant exercised due care with respect to its activities and took reasonable precautions against foreseeable acts or omissions of others.

16.     Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendant proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

17.     Upon information and belief, Plaintiff's injuries, damages, or losses, if any, were directly and proximately caused by the intervening acts, superseding acts, and conduct of others, including Plaintiff, over which Defendant had no control, thereby precluding any recovery against Defendant.

18.     Even assuming Defendant was negligent, careless, or reckless in any respect, and that any such conduct on its part operated as a proximate cause of Plaintiff's injuries or damages, all of which are expressly denied, Plaintiff's comparative negligence, carelessness, or recklessness contributed to the cause of Plaintiff's alleged damages.  For that reason, Defendant is not liable to Plaintiff in any sum whatsoever, and/or to the extent that a jury finds Plaintiff at fault for less than fifty percent (50%), Plaintiff's recovery should be reduced by that percentage amount.

19.     Plaintiff's claim for punitive damages is violative of both the United States Constitution and the South Carolina Constitution, and Defendant pleads that sections 15-32-530 *et*

16

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*seq.*, of the South Carolina Code provide a cap to punitive damages potentially available in this matter.

20.    Plaintiff fails to state any basis upon which punitive damages are recoverable against Defendant and, accordingly, Plaintiff's prayer for such damages should be dismissed and/or stricken from the claims pursuant to Rule 12(b)(6) and/or 12(f) of the South Carolina Rules of Civil Procedure.

21.    Pursuant to S.C. Code Ann. § 15-32-520, any proceeding to determine punitive damages should be bifurcated from any trial to determine liability and compensatory damages.

22.    Any damages suffered by Plaintiff, which such damages are expressly denied, are the direct and proximate result of Plaintiff's conduct, and its recovery should be barred or, alternatively, reduced in proportion to the same degree as to Plaintiff's comparative fault.

23.    Plaintiff has failed to mitigate its damages as required by law and such failure bars Plaintiff's recovery, in whole or in part, against Defendant.

24.    Defendant is entitled to a set-off and/or credit of any monies or proceeds received by or on behalf of Plaintiff as a result of the claims alleged in the Complaint, regardless of the source of such monies, prior to any dismissal of or judgment in this matter.

25.    Plaintiff's claims are barred, in whole or in part, because Defendant did not own, operate, or otherwise control the facilities described in the Complaint at the time that PFAS is alleged to have migrated out of those facilities.

26.    Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish its alleged injuries were caused by exposure to PFAS from any conduct attributable to Defendant.

27.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that PFAS has been reliably established through scientific means, to be capable of causing Plaintiff's alleged injuries.

28.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that its residents and/or customers were exposed to sufficient concentrations or amount of PFAS, and/or for sufficient duration, which has been reliably established, through scientific means, to be capable of causing alleged injuries.

29.     Any damages Plaintiff may have suffered (which are expressly denied) were not reasonably foreseeable by Defendant at the time of the conduct alleged.

30.     Plaintiff's claims against Defendant are barred by the doctrines of unjust enrichment in that Plaintiff seeks to recover costs or damages for construction, operation, and maintenance of public water supply systems after Plaintiff sought and obtained a permit to secure, treat, and distribute public water supplies and for which it received funding from its residents and/or customers, State, Local, and Federal sources, including but not limited to funding to specifically address unexpected contamination in water supplies under the Emergency Response Plans of the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j.

31.     Plaintiff's claims are preempted or otherwise precluded by State and Federal law to the extent Plaintiff seeks recovery of costs or damages for contamination of water supplies, the enforcement of which is vested exclusively in State and Federal agencies pursuant to State and Federal statutes, including but not limited to the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the South Carolina Hazardous Waste Management Act, S.C. Code Ann. § 44-56-10 *et seq*.

32.     Plaintiff's claims are barred, in whole or in part, because Defendant neither knew, nor should have known, that any of the substances to which Plaintiff or Plaintiff's property was

18

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

allegedly exposed were hazardous or constituted a reasonably foreseeable risk of physical harm by virtue of the prevailing state of the medical, scientific, technical, and/or industrial knowledge available to Defendant at all times relevant to the claims or causes of action asserted by Plaintiff.

33.    Further, Plaintiff's claims are barred, in whole or in part, because the alleged acts or omissions by Defendant, throughout the relevant and material time period, conformed to the then-existing custom and practice, and Defendant exercised due care and acted in accordance with and/or complied with available technological, medical, scientific, and industrial "state-of-the-art" practice, and/or applicable laws, regulations, standards, and orders.

34.    Plaintiff's claims are barred in whole or in part under the bulk supplier, component part supplier, sophisticated-purchaser, sophisticated-user, sophisticated intermediary, and/or knowledgeable-user doctrines or other similar or related doctrines available under applicable law.

35.    Some or all of Plaintiff's claims are not amenable to judicial resolution because of the primary jurisdiction doctrine. *Texas v. Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907).

36.    The relief sought is, in whole or in part, within the particular expertise of and is being addressed by federal and state governments, and their relevant agencies, and thus the Court should decline to exercise jurisdiction over these matters pursuant to the doctrine of primary jurisdiction, abstention, and or the doctrine of separation of powers.

37.    The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of open and obvious conditions.

38.    The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of voluntary exposure.

39.    The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of coming to the nuisance.

19

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

40.    The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of primary implied assumption of risk.

41.    Plaintiff's claims are barred, in whole or in part, by the doctrine of election of remedies.

42.    Plaintiff's claims are or may be barred, in whole or in part, because of consent, public necessity, private necessity and/or privilege.

43.    Defendant is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency, including without limitation, acts or omissions made in accordance with applicable statutes, regulations, permits, and industry standards.

44.    Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, waiver, res judicata, estoppel, ratification, and unclean hands.

45.    Plaintiff's Complaint is barred, in whole or in part, by the doctrines of acquiescence, consent, justification, accord and satisfaction, ratification, settlement, or release.

46.    Plaintiff's claims are preempted or barred by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq*. and the South Carolina Hazardous Waste Management Action, S.C. Code Ann. §§ 44-56-10 *et seq.* to the extent such claims include, encompass or relate to environmental conditions or natural resource damages or losses at any past, present or future facilities, sites, properties, locations or other areas listed on the United States Environmental Protection Agency's National Priority List (Superfund sites), or from which discharges or releases of materials have otherwise come to be located emanating from such facilities, sites, properties, locations or areas.

47.    Plaintiff's claims are barred because they failed to exhaust administrative remedies.

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

48.    Plaintiff is not entitled to recover from Defendant more than Defendant's fair, equitable, and proportionate share, if any, of the costs and damages sought by Plaintiff or to otherwise recover from Defendant more than the amount of such relief, if any, for which Defendant is liable.

49.    Plaintiff's claims are barred, in whole or in part, to the extent they seek to impose retroactive liability.  Defendant may not be held liable under retroactive theories not requiring proof of fault or causation.

50.    All claims for injunctive relief in Plaintiff's Complaint are barred because Plaintiff has adequate remedies at law, to the extent its claims are provable.

51.    Plaintiff's claims are barred to the extent that Plaintiff seeks to recover costs, damages, and expenses including, but not limited to, response, assessment, remediation cleanup and/or removal costs that Plaintiff incurred improperly, or that are not related to natural resource restoration or replacement damages.

52.    The damages sought by Plaintiff, if awarded, should be reduced by any amounts they recover from any other sources and Plaintiff is barred from any form of double recovery regardless of the nature or source of such recovery.

53.    Plaintiff's claims are barred, in whole or in part, because Defendant did not know or have reason to know that its wastewater discharge, alone or in conjunction with a discharge or discharges from other sources, would cause pass through or interference, as contemplated by 40 C.F.R. § 403.5(a)(2).

54.    Plaintiff's claims are barred, in whole or in part, by the municipal cost recovery rule. *See United States v. Standard Oil of California*, 332 U.S. 301 (1947).

55.    Plaintiff's claims are barred because Defendant's conduct was not a substantial factor in causing the injures alleged.

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

56.     Plaintiff's claims are barred by the economic loss rule.  *Sapp v. Ford Motor Company*, 386 S.C. 143, 687 S.E.2d 47 (2009).

57.     Plaintiff's recovery for any alleged trespass or nuisance, which is expressly denied, is limited to the lost rental value of Plaintiff's real property interest.

58.     Without admitting liability, Defendant alleges that if it is found to have been engaged in any of the activities alleged in the Complaint, such activities were too removed, indefinite, *de minimus* and insufficient to establish a reasonable degree of probability that any such activity caused any alleged injury, damage or loss to Plaintiff.

59.     Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish that its alleged injuries were caused by exposure to PFAS from any product(s) attributable to Defendant.

60.     Plaintiff's claims are barred by the doctrine of contributory negligence.

61.     Defendant asserts and incorporates herein any affirmative defenses asserted or otherwise raised by other defendants in this action to Plaintiff's Complaint.

62.     Defendant has not completed its investigation of Plaintiff's allegations.  Defendant intends to act as best it can to inform itself of the pertinent facts and circumstances surrounding the allegations contained in Plaintiff's Complaint.  Thus, Defendant hereby gives notice of its intent to assert any further affirmative defenses that it may learn to be supported by facts and law, including but not limited to, that this action is barred in whole or in any part by any applicable statute, contract, release, covenant, or by the doctrine of laches.  Defendant reserves the right to amend this Answer to assert any such additional defenses.

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**WHEREFORE**, having fully answered the Second Amended Complaint, Red Rock Disposal, LLC prays that the Complaint be dismissed with prejudice, that Red Rock Disposal, LLC be awarded its attorneys' fees and costs associated with defending this action, and for such other and further relief as the Court may deem just and proper.

**WILLIAMS MULLEN**

By: s/John G. Tamasitis
Richard H. Willis (SC Bar No. 6159)
John G. Tamasitis (SC Bar No. 101875)
1230 Main Street, Suite 330
Columbia, SC 29201
Tel. 803.567.4615
Fax: 803.567.4601
rwillis@williamsmullen.com
jtamasitis@williamsmullen.com

and

**TAFT STETTINIUS & HOLLISTER**

Philip L. Comella (*admitted Pro Hac Vice*)
Ryan G. Rudich (*admitted Pro Hac Vice*)
111 E. Wacker Drive, Suite 2600
Chicago, IL 60601
Tel. 312.527.4000
Fax: 312.527.4011
pcomella@taftlaw.com
rrudich@taftlaw.com

*Counsel for Defendant Red Rock Disposal, LLC*

May 27, 2025

Columbia, South Carolina

23

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| IN RE: PFAS LITIGATION | ) | |
| COORDINATED DOCKET | ) | |
| | ) | |
| COUNTY OF HORRY | ) | FIFTEENTH JUDICIAL CIRCUIT |
| | ) | |
| Grand Strand Water and Sewer Authority, | ) | C.A. NO.: 2024-CP-26-05523 |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC; Elevate Textiles, Inc.; Fiber Industries, LLC; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; and Sampson County Disposal, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANT SAMPSON COUNTY DISPOSAL, LLC'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant Sampson County Disposal, LLC ("Sampson" or "Defendant"), by its attorneys, Williams Mullen and Taft, Stettinius & Hollister LLP, and for its Answer and Affirmative Defenses to Plaintiff Grand Strand Water and Sewer Authority's ("Plaintiff") Second Amended Complaint (the "Complaint"), hereby states as follows:

1

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## GENERAL DENIAL

Sampson expressly denies each and every allegation in the Complaint, except those specifically admitted herein.

## FOR A FIRST DEFENSE

### Statement of the Case[1]

1.      Sampson denies each and every allegation in paragraph 1.

2.      Sampson denies each and every allegation in paragraph 2.

3.      Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 3 and therefore denies them.

4.      The allegations in paragraph 4 are not directed at Sampson and therefore do not require a response from Sampson.  To the extent a response is required, Sampson denies each and every allegation in paragraph 4.

5.      Sampson denies each and every allegation in paragraph 5.

6.      Sampson denies each and every allegation in paragraph 6.

7.      Sampson denies each and every allegation in paragraph 7.

### Disclaimer

8.      Paragraph 8 sets forth legal conclusions to which no response is required or made.

9.      Paragraph 9 sets forth legal conclusions to which no response is required or made.

10.     Paragraph 10 sets forth legal conclusions to which no response is required or made.

11.     Paragraph 11 sets forth legal conclusions to which no response is required or made.

---

[1] The headers used in this Answer are for ease of reference and correspond to the headers set forth in Plaintiff's Second Amended Complaint.  They do not constitute an admission by Sampson as to the validity of Plaintiff's causes of action.

2

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**Jurisdiction and Venue**

12.     Paragraph 12 sets forth legal conclusions to which no response is required. Answering further, Sampson states that it does not contest the Court's subject matter jurisdiction.

13.     Sampson denies each and every allegation in paragraph 13 and denies that the Court has personal jurisdiction over Sampson.  Sampson filed a motion to dismiss the Complaint because the Court lacks personal jurisdiction over Sampson, among other reasons.  The motion was denied by order entered on May 9, 2025.  Sampson does not waive and expressly reserves the right to contest the Court's personal jurisdiction over Sampson in this action.

14.     Paragraph 14 sets forth legal conclusions to which no response is required or made.

**Parties**

**I.     Plaintiff**

15.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 15 and therefore denies them.

16.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 16 and therefore denies them.

17.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 17 and therefore denies them.

**II.     Defendants**

18.     The allegations in paragraph 18 are not directed at Sampson and therefore do not require a response from Sampson.  To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 18 and therefore denies them.

19.     The allegations in paragraph 19 are not directed at Sampson and therefore do not require a response from Sampson.  To the extent a response is required, Sampson states that it lacks

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief with respect to the allegations in paragraph 19 and therefore denies them.

20.     The allegations in paragraph 20 are not directed at Sampson and therefore do not require a response from Sampson.  To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 20 and therefore denies them.

21.     The allegations in paragraph 21 are not directed at Sampson and therefore do not require a response from Sampson.  To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 21 and therefore denies them.

22.     Sampson admits that it is a North Carolina limited liability company, that it operates the Sampson Landfill, and that it has, at times in the past, transported leachate from the landfill to the Lumberton Wastewater Treatment Plant.  Sampson denies each and every remaining allegation in paragraph 22 that is directed at Sampson.  Sampson states that the remaining allegations in paragraph 22 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 22 and therefore denies them.

23.     The allegations in paragraph 23 are not directed at Sampson and therefore do not require a response from Sampson.  To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 23 and therefore denies them.

24.     The allegations in paragraph 24 are not directed at Sampson and therefore do not require a response from Sampson.  To the extent a response is required, Sampson states that it lacks

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief with respect to the allegations in paragraph 24 and therefore denies them.

25.     The allegations in paragraph 25 are not directed at Sampson and therefore do not require a response from Sampson.  To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 25 and therefore denies them.

26.     The allegations in paragraph 26 are not directed at Sampson and therefore do not require a response from Sampson.  To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 26 and therefore denies them.

<b><u>Factual Allegations</u></b>

**I.     Background and Hazards of PFAS**

27.     Sampson admits that PFAS are a group of man-made chemicals that do not occur naturally in the environment.  Sampson lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 27 and therefore denies them.

28.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 28 and therefore denies them.

29.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 29 and therefore denies them.

30.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 30 and therefore denies them.

31.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 31 and therefore denies them.

5

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

32.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 32 and therefore denies them.

33.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 33 and therefore denies them.

34.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 34 and therefore denies them.

35.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 35 and therefore denies them.

36.     Sampson states that the publication referred to in paragraph 36 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 36.

37.     Sampson states that the publication referred to in paragraph 37 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 37.

38.     Sampson states that the publication referred to in paragraph 38 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 38.

39.     Sampson states that the publication referred to in paragraph 39 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 39.

40.     Sampson states that the publication referred to in paragraph 40 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 40.

6

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

41.     Sampson states that the publication referred to in paragraph 41 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 41.

42.     Sampson states that the publication referred to in paragraph 42 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 42.

43.     Sampson states that the publication referred to in paragraph 43 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 43.

44.     Sampson states that the publication referred to in paragraph 44 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 44.

45.     Sampson states that the publications referred to in paragraph 45 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 45.

46.     Paragraph 46 sets forth legal conclusions to which no response is required or made. Sampson also states that the publications referred to in paragraph 46 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 46.

47.     Paragraph 47 sets forth legal conclusions to which no response is required or made. Sampson lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 47 and therefore denies them.

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

II.     **Contamination of Bull Creek and the Intracoastal Waterway with PFAS**

48.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 48 and therefore denies them.

49.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 49 and therefore denies them.

50.     Sampson denies that it is the source of any PFAS at Plaintiff's water intakes. Sampson lacks knowledge or information sufficient to form a belief with respect to the other allegations in paragraph 50 and therefore denies them.

51.     The allegations in paragraph 51 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 50 and therefore denies them.

52.     The allegations in paragraph 52 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 52 and therefore denies them.

53.     The allegations in paragraph 53 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 53 and therefore denies them.

54.     Sampson admits that it operates a landfill in North Carolina and leachate from the landfill has been delivered to the Lumberton WWTP for treatment. Sampson denies each and every remaining allegation in paragraph 54.

55.     Sampson denies each and every allegation in paragraph 55.

8

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

56.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 56 and therefore denies them.

57.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 57 and therefore denies them.

58.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 58 and therefore denies them.

59.     Sampson denies each and every allegation in paragraph 59.

60.     Sampson denies each and every allegation in paragraph 60.

61.     Sampson denies that it is responsible for contaminating Plaintiff's water intakes on the Intercoastal Waterway or damaging Plaintiff's property at the Myrtle Beach SWTP.  Sampson lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 61 and therefore denies them.

62.     Sampson denies each and every allegation in paragraph 62.

**III.     Defendants have harmed Plaintiff and Plaintiff's community.**

63.     Sampson denies each and every allegation in paragraph 63.

64.     Sampson denies each and every allegation in paragraph 64.

65.     Sampson denies each and every allegation in paragraph 65.

66.     Sampson denies each and every allegation in paragraph 66.

**FIRST CAUSE OF ACTION**
**Private Nuisance**

67.     Sampson incorporates its responses to all prior allegations by reference as if fully set forth herein.

68.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 68 and therefore denies them.

9

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

69. Paragraph 69 sets forth legal conclusions to which no response is required or made. Sampson lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 69 and therefore denies them.

70. Sampson denies each and every allegation in paragraph 70.

71. Sampson denies each and every allegation in paragraph 71.

72. Sampson denies each and every allegation in paragraph 72.

73. Sampson denies each and every allegation in paragraph 73.

74. Sampson denies each and every allegation in paragraph 74.

75. Sampson denies each and every allegation in paragraph 75.

76. Sampson denies each and every allegation in paragraph 76.

77. Sampson denies each and every allegation in paragraph 77.

78. Sampson denies each and every allegation in paragraph 78.

## SECOND CAUSE OF ACTION
### Public Nuisance

79. Sampson incorporates its responses to all prior allegations by reference as if fully set forth herein.

80. Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 80 and therefore denies them.

81. Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 81 and therefore denies them.

82. Sampson states that paragraph 82 sets forth legal conclusions to which no response is required or made. Sampson denies each and every remaining allegation in paragraph 82.

83. Sampson denies each and every allegation in paragraph 83.

84. Sampson denies each and every allegation in paragraph 84.

10

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

85.     Sampson denies each and every allegation in paragraph 85.

86.     Sampson denies each and every allegation in paragraph 86.

87.     Sampson denies each and every allegation in paragraph 87.

88.     Sampson denies each and every allegation in paragraph 88.

89.     Sampson denies each and every allegation in paragraph 89.

90.     Sampson denies each and every allegation in paragraph 90.

## THIRD CAUSE OF ACTION
### Trespass

91.     Sampson incorporates its responses to all prior allegations by reference as if fully set forth herein.

92.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 92 and therefore denies them.

93.     The allegations in Paragraph 93 are not directed as Sampson and therefore do not require a response from Sampson.  To the extent a response is required, Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 93, including subparts (a)-(d), and therefore denies them.

94.     Sampson denies each and every allegation in paragraph 94, including each and every allegation in subparts (a)-(d).

95.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 95, including subparts (a)-(c), and therefore denies them.

96.     Sampson denies each and every allegation in paragraph 96.

97.     Sampson denies each and every allegation in paragraph 97.

98.     Sampson denies each and every allegation in paragraph 98.

99.     Sampson denies each and every allegation in paragraph 99.

11

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

100.    Sampson denies each and every allegation in paragraph 100.

101.    Sampson denies each and every allegation in paragraph 101.

**FOURTH CAUSE OF ACTION**
**Negligence, Gross Negligence, and/or Recklessness**

102.    Sampson incorporates its responses to all prior allegations by reference as if fully set forth herein.

103.    Paragraph 103 sets forth legal conclusions to which no response is required or made. Sampson denies each and every remaining allegation in paragraph 103.

104.    Sampson denies each and every allegation in paragraph 104.

105.    Sampson denies each and every allegation in paragraph 105.

106.    The allegations in paragraph 106 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 106 and therefore denies them.

107.    The allegations in paragraph 107 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 107 and therefore denies them.

108.    The allegations in paragraph 108 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 108 and therefore denies them.

109.    The allegations in paragraph 109 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks

12

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief with respect to the allegations in paragraph 109 and therefore denies them.

110.    Sampson denies each and every allegation in paragraph 110.

111.    Sampson denies each and every allegation in paragraph 111.

## FIFTH CAUSE OF ACTION
### Strict Products Liability – Ultrahazardous Activity
### (Burlington)

The Fifth Cause of Action (paragraphs 112-120) is not directed at Sampson and therefore no response is required from Sampson.  To the extent a response is required, Sampson denies each and every allegation in the Fifth Cause of Action.

## SIXTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Burlington)

The Sixth Cause of Action (paragraphs 121-132) is not directed at Sampson and therefore no response is required from Sampson.  To the extent a response is required, Sampson denies each and every allegation in the Fifth Cause of Action.

## SEVENTH CAUSE OF ACTION
### Strict Products Liability – Failure to Warn
### (Burlington)

The Seventh Cause of Action (paragraphs 133-141) is not directed at Sampson and therefore no response is required from Sampson.  To the extent a response is required, Sampson denies each and every allegation in the Fifth Cause of Action.

## EIGHTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Burlington)

The Eighth Cause of Action (paragraphs 142-148) is not directed at Sampson and therefore no response is required from Sampson.  To the extent a response is required, Sampson denies each and every allegation in the Fifth Cause of Action.

13

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**PRAYER FOR RELIEF**

In response to the paragraph beginning with "WHEREFORE" and appearing under the heading "RELIEF DEMANDED" below paragraph 148 of the Complaint, Sampson denies that Plaintiff is entitled to any judgment or decree in its favor, injunctive relief of any kind, compensatory or punitive damages, or costs, and asks that the Court dismiss the Complaint in its entirety.

**AFFIRMATIVE DEFENSES**

Sampson asserts the following affirmative defenses in response to the allegations in Plaintiff's Complaint filed or consolidated in the above-captioned action as follows:

1.      Defendant's actions have at all times been pursuant to express permits and directives of various state and federal regulatory agencies with which Defendant has at all relevant times and parameters been fully compliant.  Accordingly, Defendant pleads license as an affirmative defense to Plaintiff's claims.

2.      Plaintiff has failed to state facts sufficient to constitute a cause of action and the Complaint should be dismissed pursuant to Rule 12(b)(6) of the South Carolina Rules of Civil Procedure.

3.      Plaintiff's claims should be dismissed, pursuant to Rule 12(b)(2) of the South Carolina Rules of Civil Procedure, because the Court lacks personal jurisdiction over the Defendant.

4.      Plaintiff's claims are not ripe for adjudication and should be dismissed for presenting a contingent, hypothetical, or abstract dispute.  Plaintiff alleges that it will be required to incur costs at some future date when the State or United States Environmental Protection Agency

14

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

will require it to upgrade their systems to treat PFAS.  Until these costs are incurred, Plaintiff cannot recover.

5.     Further, Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency have set final water quality standards, maximum contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether Plaintiff has suffered any injury.

6.     Plaintiff lacks standing to assert, in whole or in part, under the United States Constitution, the Constitution of South Carolina, state and federal statutes, and common law, the claims set forth in the Complaint.

7.     Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and *parens patriae* doctrine, because the property claimed to be affected is not held in the public trust and/or is not subject to the *parens patriae* doctrine.

8.     Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and *parens patriae* doctrine, because it does not have exclusive jurisdiction over the resources at issue, or only has partial jurisdiction over such resources and has failed to join other necessary trustees in this action.

9.     Plaintiff lacks standing to bring an action for trespass because Plaintiff has no ownership over and is not entitled to exclusive possession of various property and water bodies referenced in the Complaint, and because Plaintiff cannot establish unreasonable or substantial damage to the property.

10.    Plaintiff has not demonstrated or pled a legally cognizable injury in the Complaint that is capable of redress.

11.    Plaintiff's claims for alleged injuries and damages are barred, in whole or in part, because the claims for damages are speculative and conjectural.

15

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

12.     Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations or repose.

13.     Plaintiff has failed to name all necessary and indispensable parties in its action.

14.     Plaintiff's claims are barred, in whole or in part, because Defendant does not owe a legal duty to Plaintiff or, if it owed such a duty, did not breach and/or fully discharged that duty.

15.     Plaintiff's claims are barred, in whole or in part, because, at all relevant times, Defendant exercised due care with respect to its activities and took reasonable precautions against foreseeable acts or omissions of others.

16.     Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendant proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

17.     Upon information and belief, Plaintiff's injuries, damages, or losses, if any, were directly and proximately caused by the intervening acts, superseding acts, and conduct of others, including Plaintiff, over which Defendant had no control, thereby precluding any recovery against Defendant.

18.     Even assuming Defendant was negligent, careless, or reckless in any respect, and that any such conduct on its part operated as a proximate cause of Plaintiff's injuries or damages, all of which are expressly denied, Plaintiff's comparative negligence, carelessness, or recklessness contributed to the cause of Plaintiff's alleged damages.  For that reason, Defendant is not liable to Plaintiff in any sum whatsoever, and/or to the extent that a jury finds Plaintiff at fault for less than fifty percent (50%), Plaintiff's recovery should be reduced by that percentage amount.

19.     Plaintiff's claim for punitive damages is violative of both the United States Constitution and the South Carolina Constitution, and Defendant pleads that sections 15-32-530 *et*

16

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*seq.*, of the South Carolina Code provide a cap to punitive damages potentially available in this matter.

20.     Plaintiff fails to state any basis upon which punitive damages are recoverable against Defendant and, accordingly, Plaintiff's prayer for such damages should be dismissed and/or stricken from the claims pursuant to Rule 12(b)(6) and/or 12(f) of the South Carolina Rules of Civil Procedure.

21.     Pursuant to S.C. Code Ann. § 15-32-520, any proceeding to determine punitive damages should be bifurcated from any trial to determine liability and compensatory damages.

22.     Any damages suffered by Plaintiff, which such damages are expressly denied, are the direct and proximate result of Plaintiff's conduct, and its recovery should be barred or, alternatively, reduced in proportion to the same degree as to Plaintiff's comparative fault.

23.     Plaintiff has failed to mitigate its damages as required by law and such failure bars Plaintiff's recovery, in whole or in part, against Defendant.

24.     Defendant is entitled to a set-off and/or credit of any monies or proceeds received by or on behalf of Plaintiff as a result of the claims alleged in the Complaint, regardless of the source of such monies, prior to any dismissal of or judgment in this matter.

25.     Plaintiff's claims are barred, in whole or in part, because Defendant did not own, operate, or otherwise control the facilities described in the Complaint at the time that PFAS is alleged to have migrated out of those facilities.

26.     Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish its alleged injuries were caused by exposure to PFAS from any conduct attributable to Defendant.

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

27.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that PFAS has been reliably established through scientific means, to be capable of causing Plaintiff's alleged injuries.

28.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that its residents and/or customers were exposed to sufficient concentrations or amount of PFAS, and/or for sufficient duration, which has been reliably established, through scientific means, to be capable of causing alleged injuries.

29.     Any damages Plaintiff may have suffered (which are expressly denied) were not reasonably foreseeable by Defendant at the time of the conduct alleged.

30.     Plaintiff's claims against Defendant are barred by the doctrines of unjust enrichment in that Plaintiff seeks to recover costs or damages for construction, operation, and maintenance of public water supply systems after Plaintiff sought and obtained a permit to secure, treat, and distribute public water supplies and for which it received funding from its residents and/or customers, State, Local, and Federal sources, including but not limited to funding to specifically address unexpected contamination in water supplies under the Emergency Response Plans of the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j.

31.     Plaintiff's claims are preempted or otherwise precluded by State and Federal law to the extent Plaintiff seeks recovery of costs or damages for contamination of water supplies, the enforcement of which is vested exclusively in State and Federal agencies pursuant to State and Federal statutes, including but not limited to the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the South Carolina Hazardous Waste Management Act, S.C. Code Ann. § 44-56-10 *et seq.*

32.     Plaintiff's claims are barred, in whole or in part, because Defendant neither knew, nor should have known, that any of the substances to which Plaintiff or Plaintiff's property was

18

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

allegedly exposed were hazardous or constituted a reasonably foreseeable risk of physical harm by virtue of the prevailing state of the medical, scientific, technical, and/or industrial knowledge available to Defendant at all times relevant to the claims or causes of action asserted by Plaintiff.

33.     Further, Plaintiff's claims are barred, in whole or in part, because the alleged acts or omissions by Defendant, throughout the relevant and material time period, conformed to the then-existing custom and practice, and Defendant exercised due care and acted in accordance with and/or complied with available technological, medical, scientific, and industrial "state-of-the-art" practice, and/or applicable laws, regulations, standards, and orders.

34.     Plaintiff's claims are barred in whole or in part under the bulk supplier, component part supplier, sophisticated-purchaser, sophisticated-user, sophisticated intermediary, and/or knowledgeable-user doctrines or other similar or related doctrines available under applicable law.

35.     Some or all of Plaintiff's claims are not amenable to judicial resolution because of the primary jurisdiction doctrine. *Texas v. Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907).

36.     The relief sought is, in whole or in part, within the particular expertise of and is being addressed by federal and state governments, and their relevant agencies, and thus the Court should decline to exercise jurisdiction over these matters pursuant to the doctrine of primary jurisdiction, abstention, and or the doctrine of separation of powers.

37.     The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of open and obvious conditions.

38.     The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of voluntary exposure.

39.     The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of coming to the nuisance.

19

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

40.     The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of primary implied assumption of risk.

41.     Plaintiff's claims are barred, in whole or in part, by the doctrine of election of remedies.

42.     Plaintiff's claims are or may be barred, in whole or in part, because of consent, public necessity, private necessity and/or privilege.

43.     Defendant is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency, including without limitation, acts or omissions made in accordance with applicable statutes, regulations, permits, and industry standards.

44.     Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, waiver, res judicata, estoppel, ratification, and unclean hands.

45.     Plaintiff's Complaint is barred, in whole or in part, by the doctrines of acquiescence, consent, justification, accord and satisfaction, ratification, settlement, or release.

46.     Plaintiff's claims are preempted or barred by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq*. and the South Carolina Hazardous Waste Management Action, S.C. Code Ann. §§ 44-56-10 *et seq.* to the extent such claims include, encompass or relate to environmental conditions or natural resource damages or losses at any past, present or future facilities, sites, properties, locations or other areas listed on the United States Environmental Protection Agency's National Priority List (Superfund sites), or from which discharges or releases of materials have otherwise come to be located emanating from such facilities, sites, properties, locations or areas.

47.     Plaintiff's claims are barred because they failed to exhaust administrative remedies.

20

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

48.    Plaintiff is not entitled to recover from Defendant more than Defendant's fair, equitable, and proportionate share, if any, of the costs and damages sought by Plaintiff or to otherwise recover from Defendant more than the amount of such relief, if any, for which Defendant is liable.

49.    Plaintiff's claims are barred, in whole or in part, to the extent they seek to impose retroactive liability.  Defendant may not be held liable under retroactive theories not requiring proof of fault or causation.

50.    All claims for injunctive relief in Plaintiff's Complaint are barred because Plaintiff has adequate remedies at law, to the extent its claims are provable.

51.    Plaintiff's claims are barred to the extent that Plaintiff seeks to recover costs, damages, and expenses including, but not limited to, response, assessment, remediation cleanup and/or removal costs that Plaintiff incurred improperly, or that are not related to natural resource restoration or replacement damages.

52.    The damages sought by Plaintiff, if awarded, should be reduced by any amounts they recover from any other sources and Plaintiff is barred from any form of double recovery regardless of the nature or source of such recovery.

53.    Plaintiff's claims are barred, in whole or in part, because Defendant did not know or have reason to know that its wastewater discharge, alone or in conjunction with a discharge or discharges from other sources, would cause pass through or interference, as contemplated by 40 C.F.R. § 403.5(a)(2).

54.    Plaintiff's claims are barred, in whole or in part, by the municipal cost recovery rule. *See United States v. Standard Oil of California*, 332 U.S. 301 (1947).

55.    Plaintiff's claims are barred because Defendant's conduct was not a substantial factor in causing the injures alleged.

21

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

56.     Plaintiff's claims are barred by the economic loss rule. *Sapp v. Ford Motor Company*, 386 S.C. 143, 687 S.E.2d 47 (2009).

57.     Plaintiff's recovery for any alleged trespass or nuisance, which is expressly denied, is limited to the lost rental value of Plaintiff's real property interest.

58.     Without admitting liability, Defendant alleges that if it is found to have been engaged in any of the activities alleged in the Complaint, such activities were too removed, indefinite, *de minimus* and insufficient to establish a reasonable degree of probability that any such activity caused any alleged injury, damage or loss to Plaintiff.

59.     Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish that its alleged injuries were caused by exposure to PFAS from any product(s) attributable to Defendant.

60.     Plaintiff's claims are barred by the doctrine of contributory negligence.

61.     Defendant asserts and incorporates herein any affirmative defenses asserted or otherwise raised by other defendants in this action to Plaintiff's Complaint.

62.     Defendant has not completed its investigation of Plaintiff's allegations. Defendant intends to act as best it can to inform itself of the pertinent facts and circumstances surrounding the allegations contained in Plaintiff's Complaint. Thus, Defendant hereby gives notice of its intent to assert any further affirmative defenses that it may learn to be supported by facts and law, including but not limited to, that this action is barred in whole or in any part by any applicable statute, contract, release, covenant, or by the doctrine of laches. Defendant reserves the right to amend this Answer to assert any such additional defenses.

ELECTRONICALLY FILED - 2025 May 27 4:55 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**WHEREFORE**, having fully answered the Second Amended Complaint, Sampson County Disposal, LLC prays that the Complaint be dismissed with prejudice, that Sampson County Disposal, LLC be awarded its attorneys' fees and costs associated with defending this action, and for such other and further relief as the Court may deem just and proper.

**WILLIAMS MULLEN**

By: s/John G. Tamasitis
Richard H. Willis (SC Bar No. 6159)
John G. Tamasitis (SC Bar No. 101875)
1230 Main Street, Suite 330
Columbia, SC 29201
Tel. 803.567.4615
Fax: 803.567.4601
rwillis@williamsmullen.com
jtamasitis@williamsmullen.com

and

**TAFT STETTINIUS & HOLLISTER**

Philip L. Comella (*admitted Pro Hac Vice*)
Ryan G. Rudich (*admitted Pro Hac Vice*)
111 E. Wacker Drive, Suite 2600
Chicago, IL 60601
Tel. 312.527.4000
Fax: 312.527.4011
pcomella@taftlaw.com
rrudich@taftlaw.com

*Counsel for Defendant Sampson County Disposal, LLC*

May 27, 2025

Columbia, South Carolina

23

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br>COUNTY OF HORRY | IN THE COURT OF COMMON PLEAS<br>FOR THE FIFTEENTH JUDICIAL CIRCUIT |

| | |
|---|---|
| IN RE: PFAS LITIGATION COORDINATED DOCKET | C.A. No. 2024-CP-26-05523 |

| | |
|---|---|
| GRAND STRAND WATER AND SEWER AUTHORITY,<br><br>*Plaintiff*,<br><br>v.<br><br>ALADDIN MANUFACTURING CORPORATION; BURLINGTON INDUSTRIES, INC.; DELTA MILLS, INC., its predecessors, successors, assigns, and/or responsible parties; DOMTAR PAPER COMPANY, LLC; ELEVATE TEXTILES, INC.; FIBER INDUSTRIES, LLC; GFL ENVIRONMENTAL USA, INC.; J.P. STEVENS & COMPANY, INC., its predecessors, successors, assigns, and/or responsible parties; MOHAWK INDUSTRIES, INC.; NAN YA PLASTICS CORPORATION, AMERICA; PRET ADVANCED MATERIALS, LLC; RED ROCK DISPOSAL, LLC; SAMPSON COUNTY DISPOSAL, LLC; and WASTE INDUSTRIES, LLC,<br><br>*Defendants*. | **ANSWER OF DEFENDANT, NAN YA PLASTICS CORPORATION, AMERICA** |

COMES NOW, the Defendant, Nan Ya Plastics Corporation, America, by and through their counsel signing below, answering the Second Amended Complaint ("the Complaint") of the Plaintiff, alleging as follows;

1. All allegations of the Complaint not specifically admitted or denied herein are hereby denied.

2. Paragraphs 1 and 2 are denied.

3. Paragraph 3 is admitted.

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

4. Paragraphs 4-7 are denied as to this Defendant and otherwise, this Defendant does not possess information sufficient to form a belief.

5. Paragraphs 8-11 do not require an answer from this Defendant.

6. Paragraphs 12-15 are admitted.

7. This Defendant is without information sufficient to form a belief as to paragraphs 16-24 and 26.

8. Paragraph 25 is denied except as to its corporate existence and ownership of property near Lake City, South Carolina.

9. As to paragraphs 27-35, this Defendant does not have sufficient knowledge to form a belief.

10. As to paragraphs 36-47, this Defendant craves reference to the text of the various publications cited in these paragraphs.

11. Paragraph 48-49 are admitted.

12. As to paragraph 50 this Defendant lacks sufficient information to form a belief.

13. Paragraph 51 is denied as to this Defendant.

14. As to paragraphs 52 and 54, this Defendant is without sufficient information to form a belief.

15. Paragraph 53 is denied as to this Defendant.

16. Paragraph 55 is denied as to this Defendant.

17. As to paragraphs 56-58 this Defendant lacks sufficient information to form a belief.

18. Paragraphs 59-67 are denied as to this Defendant.

19. As to paragraphs 68-69 this Defendant is without sufficient information to form a belief.

20. Paragraphs 70-79 are denied as to this Defendant.

21. As to paragraphs 80-81 this Defendant is without information sufficient to form a belief.

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

22. Paragraphs 82-91 are denied as to this Defendant.

23. As to paragraph 92 this Defendant lacks information sufficient to form a belief.

24. Paragraphs 93-112 are denied as to this Defendant.

25. As to paragraphs 113-148 this Defendant lacks information sufficient to form a belief.

**FURTHER RESPONDING AND BY WAY OF SEPARATE AND AFFIRMATIVE DEFENSES:**

Without assuming any burden of proof it would not otherwise bear, NAN YA hereby asserts the following affirmative defenses to the Complaint:

### FIRST SEPARATE AND AFFIRMATIVE DEFENSE

The claims asserted in the Complaint fail, in whole or in part, to state a claim upon which relief may be granted.

### SECOND SEPARATE AND AFFIRMATIVE DEFENSE

The claims asserted in the Complaint are barred, in whole or in part, by the applicable statute(s) of limitations or other rule, regulation or doctrine requiring the institution of an action within a certain prescribed period of time or by a certain date.

### THIRD SEPARATE AND AFFIRMATIVE DEFENSE

The claims asserted in the Complaint are barred, in whole or in part, by equitable doctrines, including but not limited to laches, waiver, estoppel and unclean hands.

### FOURTH SEPARATE AND AFFIRMATIVE DEFENSE

The claims asserted in the Complaint contravene fundamental notions of public policy.

### FIFTH SEPARATE AND AFFIRMATIVE

Plaintiff is not entitled to recover from NAN YA more than NAN YA's fair, equitable, and proportionate share, if any, of the costs and damages sought by Plaintiff or to otherwise recover from NAN YA more than the amount of such relief, if any, for which NAN YA is liable.

3

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## SIXTH SEPARATE AND AFFIRMATIVE DEFENSE

If Plaintiff sustains any damages, these damages were caused by acts or omissions by it or of one or more persons or entities for whose conduct NAN YA is not responsible and with whom NAN YA has no legal connection, including, but not limited to: 1) Horry County by reason of its ownership of the site of the former Myrtle Beach Air Force Base which is draining both surface water and ground water into the Atlantic Intracoastal Waterway containing extremely high concentrations of several PFAS chemicals, approximately 2.5 million parts per trillion; 2) the fire departments of the county and municipalities in Horry County and counties upstream of Horry County which, upon information and belief, for decades discharged PFAS chemicals into the ground as part of firefighting and training exercises; 3) landfills both inside Horry County and nearby counties which, upon information and belief, contain waste that contains PFAS chemicals which are leaking from the landfills into surface waters which flow to Plaintiff's water intake points; and 4) mines and quarries both inside Horry County and in nearby counties which, upon information and belief, collect ground and surface water contaminated with PFAS chemicals which then is released into surface waters which flow to the water intake points of Plaintiff.

## SEVENTH SEPARATE AND AFFIRMATIVE DEFENSE

If Plaintiff sustained or sustains any damages, the acts and omissions of persons or entities other than NAN YA, over whom NAN YA had no control, were intervening or supervening causes of the injuries, costs and damages alleged by Plaintiff.

## EIGHTH SEPARATE AND AFFIRMATIVE DEFENSE

NAN YA may not be held liable under retroactive theories not requiring proof of fault or causation.

4

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## NINTH SEPARATE AND AFFIRMATIVE DEFENSE

Any legally cognizable injury or damage that Plaintiff has suffered, to the extent any was suffered, was caused either in whole or in part by the acts or omissions of Plaintiff or its agents and not as a result of any conduct by NAN YA.

## TENTH SEPARATE AND AFFIRMATIVE DEFENSE

To the extent other parties not named in the case are responsible for any alleged claims or damages by Plaintiff, such claims against NAN YA are barred by Plaintiff's failure to join such parties.

## ELEVENTH SEPARATE AND AFFIRMATIVE

At all times and places mentioned in the Complaint, NAN YA complied with all then applicable laws, regulations and standards.

## TWELFTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims and damages, if any, against NAN YA are subject to setoff and recoupment and therefore must be reduced accordingly.

## THIRTEENTH SEPARATE AND AFFIRMATIVE DEFENSE

At all times and places mentioned in the Complaint, NAN YA was not negligent, whether by act of commission or omission, which act was the proximate cause of any alleged liability, injuries or damages sustained by Plaintiff of which it complains.

## FOURTEENTH SEPARATE AND AFFIRMATIVE DEFENSE

The claims asserted in the Complaint fail and/or are barred, in whole or in part, by Plaintiff's failure to mitigate damages.

## FIFTEENTH SEPARATE AND AFFIRMATIVE DEFENSE

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Without admitting liability, NAN YA alleges that if it is found to have been engaged in any of the activities alleged in the Complaint, such activities were de minimis and not the cause of any damage alleged by Plaintiff, such damages being caused principally by releases of PFAS chemicals from locations including the site of the former Myrtle Beach Air Force Base, now owned by Horry County.

### SIXTEENTH SEPARATE AND AFFIRMATIVE DEFENSE

Sources and conditions other than NAN YA were the cause of Plaintiff's alleged damages, if any such damages being caused principally by releases of PFAS chemicals from locations including the site of the former Myrtle Beach Air Force Base, now owned by Horry County.

### SEVENTEENTH SEPARATE AND AFFIRMATIVE DEFENSE

As to each and every cause of action asserted against NAN YA in Plaintiff's Complaint, NAN YA alleges that Plaintiff is guilty of comparative fault, including assumption of the risk, to such a degree as to bar or reduce any recovery to which he might otherwise be entitled.

### EIGHTEENTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff is barred from recovering, in whole or in part, the relief requested from NAN YA by virtue to the doctrine of avoidable consequences.

### NINETEENTH SEPARATE AND AFFIRMATIVE DEFENSE

NAN YA owes and owed no duty or obligation to Plaintiff.

### TWENTIETH SEPARATE AND AFFIRMATIVE DEFENSE

To the extent NAN YA owed any duty or obligation to Plaintiff, NAN YA did not breach a duty or obligation allegedly owed to Plaintiff.

### TWENTY-FIRST SEPARATE AND AFFIRMATIVE DEFENSE

6

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's claims are barred to the extent that they seek to recover costs, damages, and expenses including, but not limited to, response, assessment, remediation cleanup and/or removal costs that Plaintiff incurred improperly, or that are not related to natural resource restoration or replacement damages.

### TWENTY-SECOND SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff has not suffered a legally cognizable injury in fact.

### TWENTY-THIRD SEPARATE AND AFFIRMATIVE DEFENSE

The damages sought by Plaintiff, if awarded, should be reduced by any amounts it recovers from any other sources and plaintiff is barred from any form of double recovery regardless of the nature or source of such recovery.

### TWENTY-FOURTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred because no actions or inactions by NAN YA have resulted in any interim, temporary, or permanent impairment or damage to a natural resource.

### TWENTY-FIFTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent they seek to impose retroactive liability.

### TWENTY-SIXTH SEPARATE AND AFFIRMATIVE DEFENSE

At all relevant times, NAN YA exercised due care with respect to its activities and took precautions against foreseeable acts or omissions of others and consequences that could reasonably result from such acts or omissions.

### TWENTY-SEVENTH SEPARATE AND AFFIRMATIVE DEFENSE

To the extent Plaintiff seeks equitable relief, those claims are barred by equitable and legal doctrines of accord and satisfaction.

7

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### TWENTY-EIGHTH SEPARATE AND AFFIRMATIVE DEFENSE

All claims for equitable relief in Plaintiff's Complaint are barred because Plaintiff has adequate remedies at law, to the extent its claims are provable.

### TWENTY-NINTH SEPARATE AND AFFIRMATIVE DEFENSE

All claims for equitable relief in Plaintiff's Complaint are barred because equity will not exceed the rights of parties existing at law.

### THIRTIETH SEPARATE AND AFFIRMATIVE DEFENSE

NAN YA did not proximately cause any of the acts, omissions, hazards or damages alleged in any claims asserted in the Complaint, such damages, if any, having been caused as alleged above by others, including by the United States government's discharge of PFAS chemicals at the Myrtle Beach Air Force Base and by the continued release of these chemicals from the site of that Base, now owned and controlled by Horry County.

### THIRTY-FIRST SEPARATE AND AFFIRMATIVE DEFENSE

Without admitting liability, if NAN YA is found to be responsible for any of the damages complained of, it is absolved from a judgment of liability by virtue of the superseding or intervening actions of others, including by the United States government's discharge of PFAS chemicals at the Myrtle Beach Air Force Base and by the continued release of these chemicals from the site of that Base, now owned and controlled by Horry County.

### THIRTY-SECOND SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff has failed to join all necessary and indispensable parties to this action, including, but not limited to the United States, Horry County, all municipal and county governments which operated fire departments and discharged PFAS chemicals that have or are leaching into surface waters which flow to Plaintiff's water intake points, all landfills which contain waste

8

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

contaminated with PFAS chemicals and all mines and quarries which contain water contaminated with PFAS chemicals which drain into surface waters which flow to Plaintiff's water intake points.

### THIRTY-THIRD SEPARATE AND AFFIRMATIVE DEFENSE

The damages Plaintiff seeks, if awarded, would result in unjust enrichment to Plaintiff.

### THIRTY-FOURTH SEPARATE AND AFFIRMATIVE DEFENSE

No action or inaction by NAN YA has resulted in any nuisance.

### THIRTY-FIFTH SEPARATE AND AFFIRMATIVE DEFENSE

NAN YA is entitled to offset against any liability on its part, if any, for the greatest of (1) any amounts actually paid by any person or entity for any of the injuries, costs, damages, and expenses alleged in the Complaint; or (2) any amounts stipulated or otherwise agreed to in any release of or covenant not to sue any person or entity for any of the injuries, costs, damages, and expenses alleged in the Complaint; or (3) the equitable share of liability of any person or entity that received, or receives, any release from liability or covenant not to sue with respect to any of the injuries, costs, damages, and expenses alleged in the Complaint.

### THIRTY-SIXTH SEPARATE AND AFFIRMATIVE DEFENSE

All claims for equitable relief in Plaintiff's Complaint are barred because equity will not compel action that is already being undertaken and/or is unnecessary.

### THIRTY-SEVENTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's Complaint violates NAN YA's right to procedural due process under the Fourteenth Amendment of the United States Constitution and the Constitution of the State of South Carolina to the extent it seeks punitive or exemplary damages, and therefore fails to state a cause of action upon which punitive damages can be awarded.

9

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**THIRTY-EIGHTH SEPARATE AND AFFIRMATIVE DEFENSE**

Plaintiff's Complaint violates NAN YA's right to protection from excessive fines as provided in the Eighth Amendment of the United States Constitution and in the Constitution of the State of South Carolina to the extent it seeks punitive or exemplary damages, and violates NAN YA's rights to substantive due process as provided in the Fifth and Fourteenth Amendment to the United States Constitution and the Constitution of the State of South 58 Carolina, and therefore fails to state a cause of action supporting the punitive damages claimed.

**THIRTY-NINTH SEPARATE AND AFFIRMATIVE DEFENSE**

During all relevant times, NAN YA utilized state of the art in the design and manufacture of all its products, if any, related to this action.

**FORTIETH SEPARATE AND AFFIRMATIVE DEFENSE**

If NAN YA is held liable, which liability is strictly denied, then the liability of NAN YA would be passive, imputed or secondary, while persons other than NAN YA, whether individual, corporate or otherwise and whether named or unnamed in the Complaint, would be actively and primarily liable for the alleged damages under breach of contract, negligence, strict liability, implied and express warranty theories, or otherwise, including as alleged above, the United States government, Horry County, all counties and municipalities which operate fire departments that have discharged PFAS chemicals into sites which drain into waters which flow to the Plaintiff's water intake points, and all landfills and mines and quarries which contain PFAS chemicals which drain into such surface waters.

**FORTY-FIRST SEPARATE AND AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred in whole or in part by the informed intermediary or sophisticated user doctrine and/or the bulk supplier doctrine.

10

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FORTY-SECOND SEPARATE AND AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred to the extent plaintiffs seek recovery on the "market share" theory.

**FORTY-THIRD SEPARATE AND AFFIRMATIVE DEFENSE**

Plaintiff's alleged claims are barred, in whole or in part, by the applicable repose period, including, but not limited to, those set forth in South Carolina Statutes.

**FORTY-FOURTH SEPARATE AND AFFIRMATIVE DEFENSE**

Plaintiff's claims for alleged injuries and damages are barred, in whole or in part, because the claims are speculative and conjectural.

**FORTY-FIFTH SEPARATE AND AFFIRMATIVE DEFENSE**

The use of South Carolina's natural resources is not being limited because of the presence of any compounds the Complaint alleges Nan Ya discharged, which discharge is denied.

**FORTY-SIXTH SEPARATE AND AFFIRMATIVE DEFENSE**

Plaintiff's alleged claims are barred to the extent Plaintiff's response actions will be, are or have been excessive, unnecessary, unreasonable, and/or inconsistent with statutory requirements.

**FORTY-SEVENTH SEPARATE AND AFFIRMATIVE DEFENSE**

Plaintiff lacks standing under the United States Constitution, the South Carolina Constitution, and state and federal statutes and common law to bring the claims set forth in the Complaint.

**FORTY-EIGHTH SEPARATE AND AFFIRMATIVE DEFENSE**

11

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and parens patriae doctrine, because the property claimed to be affected is not held in the public trust and/or is not subject to the parens patriae doctrine.

## FORTY-NINTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and parens patriae doctrine, because it does not have exclusive jurisdiction over the resources at issue, or only has partial jurisdiction over such resources and has failed to join other necessary trustees in this action.

## FIFTIETH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff lacks standing to bring an action for nuisance damages.

## FIFTY-FIRST SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's alleged nuisance claim is barred, in whole or in part, because the alleged nuisance cannot be remedied at a reasonable cost by reasonable means.

## FIFTY-SECOND SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff lacks standing to bring an action for trespass because Plaintiff has no ownership over and is not entitled to exclusive possession of various property and water bodies referenced in the Complaint, and because Plaintiff cannot establish unreasonable or substantial damage to the res.

## FIFTY-THIRD SEPARATE AND AFFIRMATIVE DEFENSE

NAN YA is not liable to Plaintiff for the manufacturing activities of other manufacturers or for any costs incurred by Plaintiff related to products and chemicals not produced by NAN YA.

## FIFTY-FOURTH SEPARATE AND AFFIRMATIVE DEFENSE

12

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's alleged claims are preempted by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq., to the extent such claims include, encompass or relate to environmental conditions or natural resource damages or losses at any past, present or future facilities, sites, properties, locations or other areas listed on the United States Environmental Protection Agency's National Priority List (Superfund sites), or from which discharges or releases of materials have otherwise come to be located emanating from such facilities, sites, properties, locations or areas.

## FIFTY-FIFTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims are preempted or barred by CERCLA §§ 113 (b), 113(h) and 122(e), 42 U.S.C. §§ 9613(b), 9613(h) and 9622(e)(6), to the extent they are challenges to the United States Environmental Protection Agency's removal or remedial decisions with respect to sites or locations listed on the National Priorities List (Superfund sites), or that encompass or relate to environmental conditions or natural resource damages or losses at any past, present or future facilities, sites, properties, locations, or other areas or from which discharges or releases of materials from such sites have otherwise come to be located.

## FIFTY- SIXTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims are premature or barred to the extent they are disguised claims for investigation and cleanup costs, or challenges to the EPA's remedial decisions, as CERCLA § 113(g)(1), 42 U.S.C. § 9613(g)(1) bars initiation of an action for such damages without prior notice to the United States and NAN YA prior to selection of the remedial action for the facility.

## FIFTY- SEVENTH SEPARATE AND AFFIRMATIVE DEFENSE

13

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's alleged claims are barred against NAN YA because NAN YA is not a liable party under CERCLA § 107(a), 42 U.S.C. § 9607(a), or a responsible party or liable person under CERCLA or South Carolina Statutes.

## FIFTY-EIGHTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff is barred from recovering costs that are not response costs that are necessary or consistent with the National Contingency Plan.

## FIFTY-NINTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's alleged claims are barred to the extent they seek compensation for costs that are not response costs as defined by CERCLA § 101(25), 42 U.S.C. § 9601(25).

## SIXTIETH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent they are based on contamination resulting from the alleged release of substances occurring before CERCLA was enacted on December 11, 1980. 42 U.S.C. § 9607(f)(1).

## SIXTY-FIRST SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by CERCLA § 107(a)(4)(C), 42 U.S.C. § 9607(a)(4)(C), and/or applicable South Carolina statutes because there is no injury to natural resources "resulting from" or "caused by" a release by NAN YA.

## SIXTY-SECOND SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's alleged claims are barred, in whole or in part, to the extent Plaintiff seeks any relief inconsistent with the applicable federal or state regulatory schemes for addressing alleged releases of contaminants.

## SIXTY-THIRD SEPARATE AND AFFIRMATIVE DEFENSE

14

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's claims are preempted or barred by the Federal Water Pollution Control Act Amendments of 1972 (FWPCA), § 101, et seq., the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251, et seq., including, FWPCA § 301, 33 U.S.C. § 1311, FWPCA §502, § 1362(7), and 63 FWPCA § 502, §1362(12), including but not limited to and the "Waters of the United States" rule.

### SIXTY-FOURTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims, in whole or in part, are subject to either the exclusive jurisdiction or the primary jurisdiction of the EPA or South Carolina Department of Environmental Services ("DES").

### SIXTY-FIFTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not investigated the cause of harm, presence of harm, or extent of harm alleged in its Complaint, and specifically has not completed a natural resource damages assessment.

### SIXTY-SIXTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims are premature to the extent that neither the State nor EPA have set final water quality standards, maximum contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether natural resources have been injured.

### SIXTY-SEVENTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because NAN YA's conduct was sanctioned by law at the relevant times that PFAS compounds were allegedly released.

### SIXTY-EIGHTH SEPARATE AND AFFIRMATIVE DEFENSE

NAN YA's conduct was lawful in all respects when taken under the federal and state laws then applicable.

15

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### SIXTY-NINTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff seeks to retroactively impose liability for conduct that was not actionable at the time it occurred.

### SEVENTIETH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's alleged claims are barred, in whole or in part, by the economic loss doctrine.

### SEVENTY-FIRST SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff is not entitled to injunctive relief because it has failed to state facts sufficient to show continuing acts, the threat of irreparable harm, or a reasonable likelihood of repetition of the alleged conduct if it were, in fact, established to be wrongful.

### SEVENTY-SECOND SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff is not entitled to injunctive or declaratory relief because it has a plain, common, adequate at remedy at law.

### SEVENTY-THIRD SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's alleged claims are barred, in whole or in part, to the extent Plaintiff already released, settled, entered into an accord and satisfaction with respect to, or otherwise compromised their claims relating to any of the alleged damages.

### SEVENTY-FOURTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because they are not yet ripe.

### SEVENTY-FIFTH SEPARATE AND AFFIRMATIVE DEFENSE

The Complaint does not describe its claims or events with sufficient particularity to permit NAN YA to fully ascertain what other defenses may exist, and NAN YA presently has insufficient knowledge or information to form a belief as to whether it has additional defenses available to it. NAN YA therefore reserves the right to assert all defenses which may pertain

16

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

to the Complaint once the precise nature of the claims is ascertained, and in the event discovery indicates that additional defenses would be appropriate.

### SEVENTY-SIXTH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because NAN YA acted reasonably and in good faith.

### SEVENTY-SEVENTH SEPARATE AND AFFIRMATIVE DEFENSE

NAN YA hereby incorporates by reference to the fullest extent possible all affirmative defenses of other defendants in this action to the extent such defenses would apply to claims asserted against NAN YA.

### SEVENTY-EIGHTH SEPARATE AND AFFIRMATIVE DEFENSE

The pleading of the defenses described above shall not be construed as an undertaking by NAN YA of any burden which would otherwise be the responsibility of Plaintiff.

### SEVENTY-NINTH SEPARATE AND AFFIRMATIVE DEFENSE

NAN YA cannot be held jointly and severally liable for the acts or omissions of third parties because their acts or omissions were separate and distinct and the alleged harm is divisible from and greater than any harm allegedly caused by acts or omissions of NAN YA.

### EIGHTIETH SEPARATE AND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, for failing to link any of their alleged exposure to any product(s) manufactured by NAN YA.

### EIGHTY-FIRST SEPARATE AND AFFIRMATIVE DEFENSE

NAN YA pleads all applicable statutory caps on punitive damages, including but not limited to, the caps described in S.C. Code § 15-32-520 et seq., as amended.

### EIGHTY-SECOND SEPARATE AND AFFIRMATIVE DEFENSE

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's claims for punitive or exemplary damages are subject to the limitations of S.C. Code § 15-33-135 in that the Plaintiff cannot demonstrate that NAN YA showed willful misconduct, malice, or reckless disregard for their rights by clear and convincing evidence.

## EIGHTY-THIRD SEPARATE AND AFFIRMATIVE DEFENSE

With respect to Plaintiff's demand for punitive damages, NAN YA specifically raises and incorporates by reference any and all standards or limitations regarding the enforceability of such damage awards as held in BMW v. Gore, 116 S. Ct. 1589 (1996), State Farm Mut. Auto Ins. Co. v. Campbell, 123 S. Ct. 1513 (2003), Phillip Morris USA v. Williams, 127 S. Ct. 1057 (2007), and Exxon Shipping Co. v. Baker, 128 S. Ct. 2605 (2008).

## EIGHTY-FOURTH SEPARATE AND AFFIRMATIVE DEFENSE

NAN YA has not acted or failed to act in such a way as to give rise to any claim for attorney's fees or expenses of litigation

## ADDITIONAL SEPARATE AND AFFIRMATIVE DEFENSE

NAN YA reserves the right to assert any additional separate and affirmative defenses that may became available or revealed to it during the course of their investigation and between now and the time that judgment, if any, is rendered in this action, based upon facts obtained during discovery and investigation and is consistent with the South Carolina Rules of Civil Procedure.

WHEREFORE, having fully answered the Plaintiff's Complaint, and having asserted these affirmative defenses, NAN YA prays that Plaintiff's Complaint be dismissed with prejudice and that they be awarded the costs and reasonable fees associated with this matter, and such other relief as the Court may deem just and proper.

Respectfully submitted,

18

s/ Stan Barnett

 

Stan Barnett  SC Bar No. 533
Stan Barnett, Attorney at Law
305 North Civitas Street
Mt. Pleasant, SC 29464
843-708-4887
Stan.barnett@yahoo.com
*Counsel for Nan Ya Plastics Corporation, America*

May 28, 2025
Mount Pleasant, South Carolina

19

ELECTRONICALLY FILED - 2025 May 28 9:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 02 1:11 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF HORRY | FOR THE FIFTEENTH JUDICIAL CIRCUIT |

<table>
<tr><td>

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

Aladdin Manufacturing Corporation, et al.,

*Defendants*.

</td><td>

In Re: PFAS Litigation Coordinated Docket

C.A. No. 2024-CP-26-05523

**REPORT ON RECEIVERSHIPS FOR J.P. STEVENS & COMPANY, INC. AND DELTA MILLS, INC.**

</td></tr>
</table>

Peter D. Protopapas (the "Receiver") hereby submits this report on the status of the Receiverships for J.P. Stevens & Company, Inc. ("J.P. Stevens") and Delta Mills, Inc. ("Delta Mills").

## I.     INTRODUCTION

J.P. Stevens and Delta Mills were named as defendants in a 2024 lawsuit captioned *Grand Strand Water and Sewer Authority vs. Aladdin, et al.* pending as Case Number 2024-CP-26-05523 in Horry County, South Carolina (the "Grand Strand Lawsuit").[1]   Plaintiffs allege that, before its dissolution, J.P. Stevens operated a number of textile mills and/or plants in South Carolina, including a facility in Wallace, South Carolina that Plaintiffs contend J.P. Stevens "transferred" to Delta Mills in 1987.  Plaintiffs further allege that these mills discharged certain toxic per- and polyfluoroalkyl substances ("PFAS") into the Pee Dee Watershed, thus allegedly "contaminating

---

[1] J.P. Stevens and Delta Mills also have been named as Defendants in a second 2024 lawsuit, captioned as *City of Florence v. Aladdin Manufacturing Corporation et al.*, pending as Case Number 2024-CP-21-02844 in Florence County, South Carolina (the "City of Florence Lawsuit"). On February 3, 2025, this Court also appointed Peter D. Protopapas as Receiver for J.P. Stevens and Delta Mills in connection with the City of Florence Lawsuit. The Receiver's work described herein applies to the Receiverships in both lawsuits.

ELECTRONICALLY FILED - 2025 Jun 02 1:11 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's properties and the domestic water supply for over 115,000 water customers in Horry County."

On February 3, 2025, this Court appointed Peter D. Protopapas as the Receiver for both J.P. Stevens and Delta Mills. In its Orders appointing the Receiver, this Court gave the Receiver the "power and authority [to] fully administer all assets of" J.P. Stevens and Delta Mills and to "take any and all steps necessary to protect the interests of" J.P. Stevens and Delta Mills pursuant to S.C. Code § 15-65-10. The Orders are "inclusive of, but not limited to, the right and obligation to administer any insurance assets of J.P. Stevens [and Delta Mills] as well as any claims related to the actions or failure to act of J.P. Stevens' [and Delta Mills'] insurance carriers."

The purpose of this filing is to provide the Court with an update on the Receiver's activities to date in discharging these duties, summarized in three general categories: (i) investigating corporate history to assist in the defense of the underlying claims and to identify historical insurance coverage information; (ii) engaging the identified insurers with regard to the defense and indemnity of the underlying claims, including working through disputes with regard to the insurers' obligations and filing coverage litigation as necessary; and (iii) defending the underlying litigation. By making this filing, the Receiver does not waive any attorney-client or work-product privileges, but instead discloses the information contained herein in order to advise this Court of his activities.

## II.     RECEIVERSHIP ACTIVITIES

### A.     Investigation of Corporate History, Identification of Historical Insurance Coverage Information

#### 1.     Overview of work undertaken and near-term next steps

One of the first steps in a receivership is to research corporate history, both to assist in understanding and defending the underlying claims and to identify historical insurance programs

ELECTRONICALLY FILED - 2025 Jun 02 1:11 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and potential coverage. To do this, the Receiver has undertaken to investigate all available public resources, including historical corporate records, court records, newspapers, and libraries, among others, to piece together the historic operations of the company. The Receiver's work has included (i) sending a team of attorneys for nearly a week to review the J.P. Stevens corporate records housed at the Clemson University Archives; (ii) researching all available public resources for corporate history information; and (iii) doing a deep review of the Delta Mills bankruptcy filings and associated documents.

To date, the Receiver has reviewed tens of thousands of pages of documents and collected relevant documents for additional review. As a result of this work, the Receiver has identified numerous insurance companies that the Receiver believes likely issued insurance coverage to J.P. Stevens and/or Delta Mills that may provide coverage for the Grand Strand Lawsuit and the City of Florence Lawsuit. To ensure that a full investigation is undertaken, the Receiver has issued 21 subpoenas to known and suspected insurers and insurance brokers. Some subpoena recipients have responded; others have not responded or have not provided fulsome responses. The Receiver continues to engage with the subpoena recipients and may need to file motions to compel with this Court to enforce compliance.

The Receiver also is in the process of issuing subpoenas to certain professionals (including lawyers and consultants) involved in the Delta Mills bankruptcy to determine if they have additional information about Delta Mills' historical insurance coverage.

Lastly, based on a review of public court filings, the Receiver also has reached out to more than a dozen attorneys who previously represented J.P. Stevens and Delta Mills to determine what helpful information they might have. That work has resulted in the identification of more than 50 boxes of historical information that the Receiver will review in the coming weeks.

ELECTRONICALLY FILED - 2025 Jun 02 1:11 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**2.      Overview of information uncovered to date**

*a.      Corporate history*

Although the Receiver is still reviewing collected materials, based on the materials reviewed the Receiver has been able to piece together the following corporate history of J.P. Stevens and Delta Mills operations in South Carolina.

J.P. Stevens was originally founded in 1813 and began operating mills throughout New England.  In the 1900s, the Company expanded exponentially to become one of the largest textile manufacturers in the United States and the world, associated with popular brand names such as Utica, Laura Ashley, and Ralph Lauren.

J.P. Steven's rapid expansion kick-started in 1946 when it merged with nine other (mostly southern) textile companies with operational mills to expand its total number of mills to 29. By the late 1970s, J.P. Stevens employed over 44,000 people and operated over 80 plants, ***including several mills in South Carolina***.  J.P. Stevens' operations in South Carolina included fabrication of cotton and synthetic clothing, dyeing, printing, aviation production and sales, research and development, and chemical production. It is primarily these operations – and alleged discharge of PFAS associated with them – that are at issue in the Grand Strand Lawsuit and the City of Florence Lawsuit.

We have also determined that J.P. Stevens produced chemicals for its own use as well as for sale to other companies, including sales in South Carolina.  As shown in the illustration below taken from a sales brochure, the J.P. Stevens products offered for sale included greige mill processing aids, finishing chemicals, and dyeing chemicals.

4

ELECTRONICALLY FILED - 2025 Jun 02 1:11 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## Chemicals Available

The Chemical Division of J. P. Stevens & Co., Inc. produces and sells textile chemicals for greige goods processing, finishing and dyeing in the general categories outlined on this page.

The list of specific chemicals offered by the Division changes frequently and, therefore, is not reproduced here. It presently comprises more than one hundred different products. Copies of the current list are available from J. P. Stevens & Co., Inc., Chemical Division, P.O. Box 21247, Greensboro, N. C. 27420.



**Greige Mill Processing Aids**
Antifoams
Antistats
Carpet Yarn Lubricants
Coning Lubricants
Detergents
Fugitints
Penetrants
Size Adjuncts
Sizes
Wool Oils

**Finishing Chemicals**
Antifoams
Builders
Catalysts
Flame Retardants
Fulling Compounds
Laminating Adhesives
Napping Lubricants
Permanent Press Resins
Scouring Agents
Sequestering & Chelating Agents
Sewing Lubricants
Softeners
Soil Release Finishes
Solvent Cleaners
Solvent Scours
Spotting Agents
Stabilizers
Surfactants
Wash-Wear Resins
Water-repellants
Wetting Agents

**Dyeing Chemicals**
Antifoams
Dispersants
Dye Assistants
Dye Carriers
Dye Levelers
Dye Resists
Penetrants
Sequestering and Chelating Agents
Softeners
Surfactants
Wetting Agents

In public relations materials released in 1972, J.P. Stevens noted that "the Chemical Division's sales yielded a 40-45 percent return on investment annually from the sale of commercial chemicals."

In the 1980s, Delta Mills acquired (among other assets) a J.P. Stevens plant located in Wallace, South Carolina. Operations at the Wallace, South Carolina plant are the focus of the Grand Strand Action and the City of Florence Action. The Receiver is still investigating the other South Carolina assets that were acquired by Delta Mills from J.P. Stevens.

Delta Mills filed for bankruptcy in 2006. At the time of its bankruptcy, Delta Mills' headquarters was listed as being located at a plant located at 700 North Woods Drive, Fountain

5

ELECTRONICALLY FILED - 2025 Jun 02 1:11 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Inn, South Carolina.  According to the bankruptcy filings Delta Mills was in 2006 "conduct[ing] its business" from the Fountain Inn, South Carolina and Wallace, South Carolina plants.

b.    *Historical insurance programs*

Based on the investigation to date, the Receiver has collected evidence that the following insurance companies issued potentially responsive insurance policies to J.P. Stevens:

- Northbrook Insurance Company n/k/a Allstate Insurance Company;

- Buffalo Insurance Company n/k/a Underwriters Reinsurance Company;

- Liberty Mutual Insurance Company;

- Prudential Reinsurance Company n/k/a Everest Reinsurance Company;

- General Reinsurance Corporation;

- First State Insurance Company;

- National Union Fire Insurance Company of Pittsburgh, PA;

- Hartford Accident & Indemnity Company; and

- New England Insurance Company.

The Receiver has also collected evidence that the following insurance companies issued potentially responsive insurance policies to Delta Mills:

- Liberty Mutual Insurance Company;

- United States Fire Insurance Company;

- Twin City Fire Insurance Company;

- Fireman's Fund Insurance Company; and

- 21st Century Pacific Insurance Company.

B.      **Efforts to Obtain Insurance Coverage**

Once responsive historical insurance is identified, the Receiver engages the carriers in an attempt to obtain insurance coverage.  This begins with tendering the lawsuits to the carriers and requesting the insurers fulfill their defense and indemnity obligations under their insurance contracts.  Here, the Receiver has tendered the Grand Strand Lawsuit and the City of Florence Lawsuit to each the insurance companies listed in Section II.A.2.b and is monitoring responses and following up as necessary.  If the insurers refuse to fulfill their contractual obligations then coverage litigation may ensue.

C.      **Defense of the Underlying Cases**

Finally, the Receiver is in the process of identifying defense counsel to defend the allegations against JPS and Delta Mills.

***

The Receiver is available at the convenience of this Court to provide additional written information or to appear at a status to provide more detail.

Respectfully submitted,

s/ Peter D. Protopapas
Peter D. Protopapas, Receiver
SC BAR 68304
2110 N. Beltline Blvd.
Columbia, SC 29204
803.978.6111
pdp@rplegalgroup.com

June 2, 2025

ELECTRONICALLY FILED - 2025 Jun 02 1:11 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET
_____

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC; Elevate Textiles, Inc.; Fiber Industries, LLC; GFL Environmental USA, Inc.; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; Sampson County Disposal, LLC; and Waste Industries, LLC,

*Defendants*.

C.A. No. 2024-CP-26-05523

**PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR LEAVE TO AMEND**

Please take notice that Plaintiff, Grand Strand Water and Sewer Authority ("Plaintiff"), moves for leave of Court, pursuant to Rule 15(a) of the South Carolina Rules of Civil Procedure, to amend Plaintiff's pleading in the above-captioned action. Simultaneously with the filing of this Motion, Plaintiff is filing Plaintiff's proposed Third Amended Summons and Complaint. Plaintiff seeks leave of Court to amend the summons and complaint in this matter to:

1. Remove Defendants Domtar Paper Company, LLC; GFL Environmental USA, Inc.; and Waste Industries, LLC (and the allegations against them) from the summons and complaint

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

because Plaintiff has voluntarily dismissed those defendants from the lawsuit without prejudice[1];

2. Add certain PFAS manufacturers/suppliers and dischargers as defendants in this action; and

3. Make minor edits to the factual allegations asserted in the second amended complaint, filed October 7, 2024.

Before filing this motion, Plaintiff sought the currently named defendants' written consent to amend pursuant to Rule 15(a), SCRCP, and provided them with a copy of Plaintiff's proposed Third Amended Complaint. As of the date of this motion, Defendants Burlington Industries, Inc. and PRET Advanced Materials, LLC responded that they do not object. The remaining defendants—Aladdin Manufacturing Corporation; Delta Mills, Inc.; Elevate Textiles, Inc.; Fiber Industries, LLC; J.P. Stevens & Company, Inc.; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; Red Rock Disposal, LLC; and Sampson County Disposal, LLC—have neither consented nor expressed any objection.

Where, as here, a party seeks leave of court to amend a pleading, the South Carolina Rules of Civil Procedure state that "leave shall be freely given when justice so requires and does not prejudice any other party." Rule 15(a), SCRCP. "This rule strongly favors amendments and the court is encouraged to freely grant leave to amend." *Parker v. Spartanburg Sanitary Sewer Dist.*, 362 S.C. 276, 286, 607 S.E.2d 711, 717 (Ct. App. 2005). South Carolina's Rule 15(a) "is substantially the same as the Federal Rule, . . . and the Supreme Court of the United States has referred to the Rule's 'freely given' provision as a 'mandate' that 'is to be heeded.'" *Patton v.*

---

[1] Plaintiff dismissed Defendant Domtar Paper Company, LLC from this action without prejudice on May 20, 2025, and Plaintiff dismissed Defendants GFL Environmental USA, Inc. and Waste Industries, LLC from this action without prejudice on February 28, 2025.

2

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

*Miller*, 420 S.C. 471, 490, 804 S.E.2d 252, 262 (2017) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The party opposing a motion for leave to amend has the burden to establish prejudice—i.e., "a lack of notice that the new issue is to be tried and a lack of opportunity to refute it." *Stanley v. Kirkpatrick*, 357 S.C. 169, 175, 592 S.E.2d 296, 2986 (2004); *see also Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*, 403 S.C. 623, 632, 743 S.E.2d 808, 812 (2013) ("A motion to amend is within the sound discretion of the trial judge and the opposing party has the burden of establishing prejudice.").

Granting Plaintiff leave to amend to remove the dismissed defendants, add claims against new parties, and update the complaint's factual allegations is consistent with the goal of having cases be decided on their merits. *See Patton*, 420 S.C. at 492–93, 804 S.E.2d at 263; *cf. Yelsen Land Co. v. State*, 397 S.C. 15, 20, 723 S.E.2d 592, 595 (2012) (noting that the plaintiff was allowed to amend the complaint to add a defendant). Additionally, no party has articulated any objection to Plaintiff's proposed amendment or any reason for denying Plaintiff's proposed amendment (much less established prejudice), and there is no "bad faith, undue delay, or prejudice" that would warrant denying Plaintiff leave to amend. *Doe v. Oconee Mem. Hosp.*, 437 S.C. 574, 583, 878 S.E.2d 920, 925 (Ct. App. 2022) (noting the denial of leave to amend is an abuse of discretion in "the absence of a proper reason" (quoting *Forrester v. Smith & Steele Builders, Inc.*, 295 S.C. 504, 507, 369 S.E.2d 156, 158 (Ct. App. 1988))). Plaintiff, therefore, respectfully submits that the Court should grant leave to amend pursuant to Rule 15(a), SCRCP, and consistent with South Carolina law. *See, e.g.*, *Maybank 2754, LLC v. Zurlo*, 444 S.C. 47, 83, 906 S.E.2d 94, 114 (Ct. App. 2024) ("In the absence of any apparent or declared reason . . . the leave sought should, as the rules require, be 'freely given.'" (quoting *Patton*, 420 S.C. at 490, 804 S.E.2d at 262)).

Further, Plaintiff respectfully submits that the Court should exercise its discretion to expedite a decision on Plaintiff's Motion to Amend and enter an order granting Plaintiff leave to amend as soon as possible because none of the defendants have expressed any opposition to amendment. *See generally Skydive Myrtle Beach, Inc. v. Horry Cnty.*, 426 S.C. 175, 182, 826 S.E.2d 585, 588 (2019) ("A trial court has discretion to deny a motion to amend if the party opposing the amendment can show a valid reason for denying the motion."); Rule 1, SCRCP ("These rules . . . shall be construed to secure the just, speedy, and inexpensive determination of every action."); *RE: Local PFAS Litig.*, Order (S.C. Sup. Ct. filed Oct. 7, 2024) (encouraging "the effective and expeditious disposition of this litigation"). An expedited order granting leave to amend will ensure that the new defendants are served, receive notice of the claims against them, and have the opportunity to participate in the litigation and defend the merits without delay. *See Doe*, 437 S.C. at 583, 878 S.E.2d at 925.

Respectfully moved,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

June 5, 2025

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

_____

Grand Strand Water and Sewer Authority,

                           *Plaintiff*,

       v.

AGC Chemicals Americas, Inc.; Aladdin
Manufacturing Corporation; Archroma U.S., Inc;
Arkema, Inc.; Burlington Industries, Inc.; Clariant
Corporation; Corteva, Inc.; Daikin America, Inc.;
Delta Mills, Inc., its predecessors, successors,
assigns, and/or responsible parties; DuPont de
Nemours, Inc.; EIDP, Inc.; Elevate Textiles, Inc.;
Fiber Industries, LLC; Huntsman International,
LLC; International Paper Company; INV
Performance Surfaces, LLC; J.P. Stevens &
Company, Inc., its predecessors, successors, assigns,
and/or responsible parties; Mohawk Industries, Inc.;
Nan Ya Plastics Corporation, America; PRET
Advanced Materials, LLC; Red Rock Disposal,
LLC; Sampson County Disposal, LLC; Solvay
Specialty Polymers USA, LLC; Sonoco Products
Company; The Chemours Company; and Westrock
CP, LLC,

                           *Defendants*.

C.A. No. 2024-CP-26-05523

**THIRD AMENDED SUMMONS**
(JURY TRIAL DEMANDED)

**TO THE ABOVE-NAMED DEFENDANTS:**

YOU ARE HEREBY SUMMONED and required to answer the Third Amended

Complaint in this action, a copy of which is hereby served on you, and to serve a copy of your

Answer to the Third Amended Complaint on the subscriber at 291 S. Pine Street, Spartanburg, SC

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

29302, within 30 days after service hereof, exclusive of the day of such service, and if you fail to

answer the Third Amended Complaint, judgment by default will be rendered against you for the

relief demanded in the Third Amended Complaint.

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

June 5, 2025

2

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

_____

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc.; Aladdin Manufacturing Corporation; Archroma U.S., Inc; Arkema, Inc.; Burlington Industries, Inc.; Clariant Corporation; Corteva, Inc.; Daikin America, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; DuPont de Nemours, Inc.; EIDP, Inc.; Elevate Textiles, Inc.; Fiber Industries, LLC; Huntsman International, LLC; International Paper Company; INV Performance Surfaces, LLC; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; Sampson County Disposal, LLC; Solvay Specialty Polymers USA, LLC; Sonoco Products Company; The Chemours Company; and Westrock CP, LLC,

*Defendants*.

C.A. No. 2024-CP-26-05523

**THIRD AMENDED COMPLAINT**
(JURY TRIAL DEMANDED)

Plaintiff, GRAND STRAND WATER AND SEWER AUTHORITY, by and through the undersigned counsel, brings this action against the above-named Defendants for compensatory and punitive damages, injunctive relief, and abatement of a nuisance, and alleges as follows:

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## STATEMENT OF THE CASE

1.     Plaintiff, Grand Strand Water and Sewer Authority, brings this action to address Defendants' ongoing contamination of the Great Pee Dee River, Lynches River, Lumber River, Little Pee Dee River, Lynches Lake Swamp, Black Creek, and Bull Creek (collectively the "Pee Dee River Watershed"); the Waccamaw River; the Intracoastal Waterway; and Plaintiff's properties with certain toxic per- and polyfluoroalkyl substances ("PFAS"): perfluorooctanoic acid ("PFOA"); perfluorooctanesulfonic acid ("PFOS"); perfluorononanoic acid ("PFNA"); perfluorobutane sulfonate ("PFBS"); perfluorohexane sulfonate ("PFHxS"); and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals").

2.     As Plaintiff has recently discovered, Defendants have discharged and continue to discharge products that contain or degrade to these PFAS to the Pee Dee River Watershed, which travel downstream to Plaintiff's water intakes on Bull Creek and the Intracoastal Waterway, thereby contaminating Plaintiff's properties and the domestic water supply for over 115,000 water customers in Horry County. Plaintiff seeks a declaratory judgment, injunctive relief, abatement, damages, and an award of costs, including attorneys' fees, for Defendants' repeated and ongoing PFAS contamination.

3.     Plaintiff is a special purpose district that provides potable water to residents of various counties in South Carolina, including Horry County. It owns and occupies riparian properties in Horry County, on Bull Creek in Bucksport, South Carolina; and on the Intracoastal Waterway in Myrtle Beach, South Carolina. On these respective properties, Plaintiff operates the Bull Creek Surface Water Treatment Plant ("SWTP"); Myrtle Beach SWTP; and related buildings, improvements, property, and equipment that make up these water treatment and distribution

2

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

systems. Plaintiff's SWTPs draw raw water from Bull Creek and the Intracoastal Waterway for treatment before distributing treated water to customers.

4.      Defendants own and/or operate industrial facilities upstream of Plaintiff's water intakes and have in the past and/or currently use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in their industrial processes ("Discharger Defendants") or otherwise supply these products to Discharger Defendants' manufacturing facilities ("Supplier Defendants"). Discharger Defendants then discharge wastewater contaminated with these products to surface waters in the Pee Dee River Watershed upstream of Plaintiff's water intakes. Some Defendants directly discharge PFAS-contaminated wastewater, while others do so indirectly via certain wastewater treatment plants ("WWTPs"). These WWTPs include the Johnsonville WWTP, the Lake City WWTP, and the Lumberton WWTP.

5.      Industrial wastewater from Discharger Defendants' facilities contains high levels of PFAS, which cannot be adequately removed by conventional wastewater treatment processes, are discharged to the Pee Dee River Watershed, and flow downstream to Plaintiff's water intakes. As a direct and proximate result of Defendants' actions, Plaintiff has suffered losses to the use and enjoyment of its property rights, and Plaintiff's properties have been, and will continuously be, trespassed and damaged by water contaminated with dangerous concentrations of PFAS.

6.      Defendants' PFAS contaminate Plaintiff's water sources at concentrations exceeding what the U.S. Environmental Protection Agency ("EPA") deems unsafe for consumption, and Plaintiff's existing water treatment processes cannot remove them. Instead, Plaintiff requires new water treatment technologies to remove, and provide water free from, Defendants' PFAS.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

7.    As a result of Defendants' intentional, willful, wanton, reckless, and/or negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff has suffered injury to its property rights and resulting damages, including compensatory and consequential damages. Plaintiff is also seeking equitable and injunctive relief requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of water treatment technologies at Plaintiff's SWTPs that will remove Defendants' PFAS from drinking water. In addition, based on the Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiff is seeking the recovery of punitive damages.

## DISCLAIMER

8.    Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, Mil-Spec, or other variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

9.    Plaintiff's causes of action against Sampson County Disposal, LLC; Red Rock Disposal, LLC; Elevate Textiles, Inc.; and International Paper Company arise under North Carolina Law. Plaintiff brings no cause of action against these Defendants under South Carolina law.

10.    Plaintiff's causes of action against the remaining Defendants arise under South Carolina law.

11.    Plaintiff brings no cause of action against, and seeks no relief from, any Defendant under federal law or statute.

## JURISDICTION AND VENUE

4

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

12.     This Court has subject matter jurisdiction over this action pursuant to Article V of the Constitution of the State of South Carolina; sections 6-11-1610 and 14-1-80 of the South Carolina Code; and Act No. 337, 1971 S.C. Acts 444.

13.     This Court has personal jurisdiction over all Defendants, consistent with due process and South Carolina's long-arm statute, section 36-2-803 of the South Carolina Code.

14.     Venue is also properly in this Court pursuant to sections 15-7-10 and -30 of the South Carolina Code because the subject of the action is for injuries sustained to Plaintiff's property located in Horry County, and the most substantial part of Defendants' alleged acts or omissions giving rise to Plaintiff's claims occurred in Horry County. *See id.* at § 15-7-30(B) ("If there is more than one defendant, the action may be tried in any county where the action properly may be maintained against one of the defendants pursuant to this section.").

## PARTIES

### I.     Plaintiff

15.     Plaintiff Grand Strand Water and Sewer Authority is a special purpose district created for the distribution of potable water and provision of sewer services. Act No. 337, 1971 S.C. Acts 444.

16.     Plaintiff owns two properties at issue. The first is located at 8052 Treatment Plant Road, Bucksport, South Carolina 29527, where Plaintiff operates the Bull Creek SWTP. The Bull Creek SWTP is riparian to, and draws raw water from, Bull Creek. Plaintiff's second property is located at 3020 Mr. Joe White Avenue, Myrtle Beach, South Carolina 29577, where it operates the Myrtle Beach SWTP for the Myrtle Beach service area. The Myrtle Beach SWTP is riparian to, and draws raw water from, the Intracoastal Waterway.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

17.    The Bull Creek SWTP provides potable water to approximately 115,000 customers. The Myrtle Beach SWTP services the Cities of Myrtle Beach and North Myrtle Beach, which distribute the water to their residents.

## II.    Discharger Defendants

18.    Defendant **Burlington Industries, Inc.** ("Burlington") was a Delaware corporation authorized to do business in South Carolina until its dissolution in 2004. On May 13, 2022, the South Carolina Circuit Court appointed Peter McCoy, Jr., a resident of Charleston County, South Carolina, as the receiver for Burlington. *See Mimms v. Burlington Indus., Inc. et al.*, C.A. No. 2021-CP-40-05873, Order Appointing Receiver Over Defendant Burlington Industries, Inc. (Richland Cnty. Ct. of Common Pleas May 13, 2022). Burlington was the owner and operator of an industrial facility located at 670 N. Main Street, Society Hill, South Carolina 29593. The facility is a former textile mill and finishing facility bordering Cedar Creek and the Great Pee Dee River, and it encompasses roughly 234 acres. Over the course of the facility's operations, Defendant used products that contain or degrade to PFOA, PFOS, PFNA, PFHxS, PFBS, and/or GenX Chemicals in the manufacture of textile products. As part of its processes, Defendant discharged industrial wastewater contaminated with these PFAS from its own wastewater treatment plant to Cedar Creek and the Great Pee Dee River upstream of Bull Creek. Wastewater lagoons and other storage basins at the facility have accumulated PFOA, PFOS, PFNA, PFHxS, PFBS, GenX Chemicals, and/or their precursors for decades. These PFAS overflow to the Great Pee Dee River upstream of Bull Creek. Defendant's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River to Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs. Burlington also manufactured and distributed agricultural biosolid products contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, GenX

6

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Chemicals, and/or their precursors to farms and other users throughout the Pee Dee River Watershed upstream of Plaintiff's water intake on Bull Creek. PFAS from Burlington's biosolids have accumulated in the Pee Dee River Watershed, continually flow downstream to Plaintiff's water intakes, and contaminate Plaintiff's properties and its water sources.

19.     Defendant **Elevate Textiles, Inc. ("Elevate")** is a Delaware corporation authorized to do business in South Carolina. Elevate owns and operates an industrial facility located at 740 Old Cheraw Highway, Rockingham, NC 28379 ("Richmond Plant"), which was previously owned and operated by Defendant Burlington. Throughout the facility's operation, both Burlington and Elevate used, and Elevate continues to use, products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals. As part of their processes, Burlington and Elevate discharged, and Elevate continues to discharge, industrial wastewater contaminated with products that contain or degrade to these PFAS from the Richmond Plant to Hitchcock Creek upstream of Great Pee Dee River and Bull Creek. The Richmond Plant does not remove Defendants' PFAS, and it discharged and continues to discharge their PFAS into the Great Pee Dee River upstream of Plaintiff's Bull Creek intake. Defendants' PFAS resist environmental degradation, flow downstream from the Great Pee Dee River and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

20.     Defendant **Fiber Industries, LLC ("Darling Fibers")** is a South Carolina limited liability company, and it owns and operates a textile manufacturing facility located at 1000 E. McIver Road, Darlington, South Carolina 29532. There, Darling Fibers uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile fibers and fabrics. As part of its processes, the Darlington facility directly discharges industrial wastewater contaminated with products that contain or degrade to these PFAS into Black

7

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Creek upstream of the Great Pee Dee River and Bull Creek. Darling Fibers' PFAS resist environmental degradation, flow downstream from Black Creek, the Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

21.     Defendant **International Paper Company ("IP")** is a New York corporation authorized to do business in South Carolina. IP owns and operates an industrial facility located at 820 Canton Road, Lumberton, North Carolina 28358. There, it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of paper-based packaging products. As part of its processes, IP's facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Lumberton WWTP. The Lumberton WWTP cannot remove IP's PFAS, which it discharges to the Lumber River upstream of Bull Creek. IP's PFAS resist environmental degradation, flow downstream from the Lumber River, Little Pee Dee River, Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

22.     Defendant **J.P. Stevens & Company, Inc.** was a Delaware corporation authorized to do business in the State of South Carolina until 1999. J.P. Stevens & Company, Inc. and its predecessors, successors, assigns, and/or responsible parties are collectively referenced as **"JPS."** From 1946 to 1987, JPS operated the Delta Mills industrial facility located at 4351 Brickyard Road, Wallace, South Carolina 29596. JPS transferred the Delta Mills facility to Defendant **Delta Mills, Inc.,** who owned and operated the facility from 1987 to 2006. Delta Mills, Inc. was a Delaware corporation with its principal place of business located at 700 North Woods Drive, Fountain Inn, South Carolina 29644. Delta Mills, Inc. and its predecessors, successors, assigns,

8

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and/or responsible parties are collectively referenced as **"Delta Mills."** Over the course of the Delta Mills facility operations, Defendants JPS and Delta Mills used products that contain or degrade to PFOA, PFOS, PFNA, PFHxS, PFBS, and/or GenX Chemicals in the finishing of textile products. As part of their processes, JPS and Delta Mills discharged industrial wastewater contaminated with these PFAS from the facility's own WWTP to the Great Pee Dee River upstream of Bull Creek. JPS and Delta Mills also created wastewater lagoons on the facility property, which were contaminated with high levels of these PFAS that accumulated over decades. Delta Mills did not remediate this contamination when it ceased operations in 2006, and the PFAS continually overflow and/or migrate to the Great Pee Dee River upstream of Bull Creek. JPS's and Delta Mills' PFAS resist environmental degradation, flow downstream from the Great Pee Dee River and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

23.     Defendants **Mohawk Industries, Inc.** and **Aladdin Manufacturing Corporation** are Delaware corporations authorized to do business in the State of South Carolina (collectively **"Mohawk"**). Mohawk owns Oak River Mill located at 2118 Marlboro Road, Blenheim, South Carolina 29516, which Mohawk operated until its closing in October 2022. For nearly 60 years, Mohawk used products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of carpet products at Oak River Mill. As part of its processes, Oak River Mill discharged industrial wastewater contaminated with products that contain or degrade to these PFAS directly into the Great Pee Dee River upstream of Bull Creek. Oak River Mill also utilized wastewater lagoons contaminated with high levels of these PFAS and/or their precursors on the border of the Great Pee Dee River. These lagoons currently and continually overflow and/or release contaminated wastewater into the Great Pee Dee River upstream of Bull

9

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Creek. PFAS and/or their precursors from both Mohawk's legacy discharges and continuing lagoon discharges resist environmental degradation, flow downstream from the Great Pee Dee River and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

24.     Defendant **Nan Ya Plastics Corporation, America ("Nan Ya")** is a Delaware corporation authorized to do business in the State of South Carolina. Nan Ya owns and operates an industrial facility located at 140 E. Beulah Road, Lake City, South Carolina 29560, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of plastics, polyester chips, resin, fibers, and yarns. As part of its processes, the Nan Ya facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Lake City WWTP. The Lake City WWTP cannot remove Nan Ya's PFAS, and the WWTP discharges water contaminated with Nan Ya's PFAS into Lake Swamp upstream of Bull Creek. Nan Ya's PFAS resist environmental degradation, flow downstream from Lake Swamp, Lynches River, the Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

25.     Defendant **PRET Advanced Materials, LLC ("PRET")** is a Delaware limited liability company that does business in South Carolina. PRET owns and operates an industrial facility located at 520 Kingsburg Highway, Johnsonville, South Carolina 29555, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of plastics and resins. As part of its processes, the PRET facility discharges industrial wastewater with products that contain or degrade to these PFAS to the Johnsonville WWTP. The Johnsonville WWTP cannot remove PRET's PFAS, and the WWTP discharges water

10

contaminated with PRET's PFAS into Lynches River upstream of Bull Creek. PRET's PFAS resist environmental degradation, flow downstream from Lynches River, the Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

26.     Defendants **Red Rock Disposal, LLC ("RRD")** and **Sampson County Disposal, LLC ("SCD") (together, "GFL Landfills")** operate landfills in North Carolina that have transported and/or continue to transport leachate to the Lumberton WWTP in Lumberton, NC for disposal. Defendant RRD is a North Carolina limited liability company and operates the Red Rock Disposal Landfill located at 7130 New Landfill Drive, Holly Springs, North Carolina 27540. Defendant SCD is a North Carolina limited liability company and operates the Sampson County Landfill located at 7434 Roseboro, North Carolina 28382. Leachate generated by the two landfills operated by the respective GFL Landfills contains significant amounts of PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors, and has been transported to Lumberton WWTP for disposal. As of in or around December 2024, RRD ceased transporting leachate from the Red Rock Disposal Landfill to the Lumberton WWTP for disposal; however, its legacy discharges of leachate containing high levels of PFAS continue to contaminate Plaintiff's water sources and properties. The Lumberton WWTP could not and cannot remove the GFL Landfills' PFAS from the leachate they generate before the WWTP discharged and/or discharges their PFAS into the Lumber River upstream of Bull Creek. GFL Landfills' PFAS resist environmental degradation, flow downstream from the Lumber River, Little Pee Dee River, Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

11

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

27.     Defendant **Sonoco Products Company ("Sonoco")** is a South Carolina corporation, and it owns and operates an industrial complex at and around 1 N 2nd Street, Hartsville, South Carolina 29550. There, it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of packaging products. As part of its processes, the Sonoco facility directly discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to Black Creek upstream of Bull Creek. The treatment processes employed by Sonoco do not remove PFAS prior to their discharge to Black Creek. Sonoco's PFAS resist environmental degradation, flow downstream from Black Creek, the Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

28.     Defendant **WestRock CP, LLC ("WestRock")** is a Delaware limited liability company authorized to do business in South Carolina. WestRock owns and operates a paper mill at 7320 Paper Mill Road, Florence, South Carolina 29506. There, it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of containerboard, kraft linerboard, and/or related paper-based packaging products. As part of its processes, the WestRock facility directly discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Great Pee Dee River upstream of Bull Creek. The treatment processes employed by WestRock do not remove PFAS prior to their discharge to the Great Pee Dee River. WestRock's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

## III.    Supplier Defendants

12

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

29.     Defendant **AGC Chemicals Americas, Inc. ("Asahi")** is a foreign Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Asahi has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

30.     Defendant **Archroma U.S., Inc. ("Archroma")** is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Archroma has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

31.     Defendant **Arkema, Inc. ("Arkema")** is a Pennsylvania corporation authorized to do business in South Carolina. Among other acts and omissions, Arkema has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

32.     Defendant **Clariant Corporation ("Clariant")** is a New York corporation authorized to do business in South Carolina. Among other acts and omissions, Clariant has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

33.     Defendant **Daikin America, Inc. ("Daikin")** is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Daikin has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

34.     Defendant **EIDP, Inc. ("Old DuPont")**, f/k/a E.I. du Pont de Nemours and Company, is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Old DuPont has manufactured and supplied products containing or degrading

13

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

35. Defendant **The Chemours Company ("Chemours")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Chemours has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

36. Defendant **Corteva, Inc. ("Corteva")** is a Delaware corporation that conducts business in South Carolina. Among other acts and omissions, Corteva has assumed PFAS-related liabilities from Old DuPont.

37. Defendant **DuPont de Nemours, Inc. ("New DuPont")**, f/k/a DowDuPont, Inc., is a Delaware corporation that conducts business in South Carolina. Among other acts and omissions, New DuPont has assumed PFAS-related liabilities from Old DuPont.

38. Defendant **INV Performance Surfaces, LLC ("Invista")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Invista has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

39. Defendant **Huntsman International, LLC ("Huntsman")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Huntsman has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

14

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

40.     Defendant **Solvay Specialty Polymers USA, LLC ("Solvay")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Solvay has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

**FACTUAL ALLEGATIONS**

**I.     Background and Hazards of PFAS**

41.      PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable, repel both oil and water, and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial, commercial, and consumer applications.

42.     The stable carbon-fluorine bonds that make PFAS pervasive in industrial, commercial, and consumer products also result in their persistence in the environment. They are colloquially termed "forever chemicals," as terminal PFAS have no known environmental breakdown mechanism, are readily absorbed into biota, and tend to bioaccumulate with repeated exposure.

43.     There are both polymer and non-polymer PFAS. Non-polymer PFAS include substances like PFOA, PFOS, PFHxS, PFNA, PFBS, and HFPO-DA (a/k/a GenX Chemicals). Polymer PFAS include fluoropolymers and side-chain fluorinated polymers that are often the active chemistry in the PFAS-containing products sold and utilized by Defendants.

44.     There are also both terminal PFAS and their precursors. Precursors may undergo environmental degradation that ultimately results in the formation of terminal PFAS—meaning no further degradation occurs under normal environmental conditions. PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are all terminal PFAS.

15

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

45.     Both polymer and non-polymer PFAS can degrade to terminal PFAS. Generally, terminal PFAS are present in or otherwise form from PFAS products via three primary routes: (1) as a direct byproduct of the manufacturing process; (2) the degradation of precursor PFAS that are byproducts of the manufacturing process; and/or (3) the degradation of polymer PFAS into terminal PFAS and precursor PFAS.

46.     Further, PFAS are manufactured by either electrochemical fluorination ("ECF") or telomerization.

47.     PFAS leach from soil to groundwater and are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to contamination. Therefore, a major source of human exposure to PFAS is through ingestion of contaminated drinking water. Exposure is dose-additive, meaning that exposure to low levels of multiple PFAS, which individually would pose little or no risk, can result in a combined dose capable of causing adverse health effects.

48.     While there are thousands of different PFAS chemicals, current scientific evidence shows that harmful health effects can result from consuming drinking water with any level of PFOA or PFOS, and at certain aggregate levels of PFHxS, PFNA, PFBS, and GenX Chemicals. Depending on the type of PFAS, negative health effects include increased risk of certain types of cancer and adverse impacts on fetal growth and development; reproduction; and on liver, thyroid, immune, cardiovascular, and/or nervous system function.

49.     PFOA and PFOS have been the most widely used PFAS, and they are the most studied by regulators and the scientific community. While some industries voluntarily phased out products containing PFOA and PFOS by 2015, their limited use continues even in the United

16

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

States. Due to their persistent nature, PFOA and PFOS remain in the environment from decades of legacy industrial use.

50.     Products based on PFAS consisting of shorter fluorinated carbon chains were developed to replace "long-chain" PFAS like PFOA and PFOS, and they are now used in industrial applications to confer similar properties and characteristics. These "short-chain" PFAS are still bioaccumulative and environmentally persistent, and some short-chain PFAS products nevertheless still contain PFOA and PFOS and their precursors. Terminal short-chain PFAS include PFBS and GenX Chemicals.

51.     Based on the science available in 2009, EPA published provisional drinking water health advisories for short-term exposure to PFOA and PFOS.[1] The advisory levels at that time were 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. In the same publication, EPA reported that it conducted sampling of public drinking water in Alabama communities, finding PFOA and PFOS levels lower than 40 ppt. It explained, "Based on its current understanding, EPA believes these levels are not of concern and residents may rely upon public water systems."[2]

52.     On May 16, 2016, due to the evolution of science on the health effects of PFOA and PFOS, EPA published lifetime health advisory levels for each chemical in drinking water.[3] Superseding the 2009 provisional levels, the 2016 levels for PFOA and PFOS were 70 ppt, independently or in the aggregate. EPA explained that its new health advisories "identify the

---

[1] U.S.E.P.A., Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS) (Jan. 8, 2009), *available at* https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf.

[2] *Id.*

[3] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 33250 (May 25, 2016).

17

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure."[4]

53.    EPA's 2016 Health Advisories were based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicated that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects. But based on its review of the science, EPA stated that its analysis indicated exposure to PFOA and PFOS at or below health advisory levels "will not result in adverse health effects (including cancer and non-cancer) to the general population over a lifetime (or any shorter period) of exposure to these chemicals."[5]

54.    On June 15, 2022, EPA again updated health advisory levels for PFOA and PFOS on an interim basis, which replaced the 2016 advisory levels.[6] EPA explained that updated human epidemiological data indicated "that the level at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS"—finding "associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, development (e.g., decreased birth weight), and cancer."[7] Concerned with the public health implications of its data, EPA issued interim levels

---

[4] *Id.*

[5] *Id.*

[6] Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022).

[7] *Id.*

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

pending determination of maximum contaminant levels and maximum contaminant level goals. The interim levels were 0.004 ppt for PFOA and 0.02 ppt for PFOS.

55.     Simultaneously, EPA also issued health advisories for the first time covering PFBS and GenX Chemicals. EPA reported that "GenX Chemicals have been linked to health effects on the liver, the kidney, the immune system, and developmental effects, as well as cancer."[8] For PFBS, it noted studies indicating health effects on the thyroid, reproductive system, development, and kidney. Based on its 2021 toxicity studies for these chemicals, EPA released final health advisories for each: GenX Chemicals at 10 ppt and PFBS at 2,000 ppt.

56.     In March of 2023, EPA issued proposed maximum contaminant levels ("MCLs") and maximum contaminant level goals ("MCLGs") for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals.[9] An MCLG is the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, allowing an adequate margin of safety. An MCL is the maximum allowable level of a contaminant that may be delivered to any user of a public water system and is based on the feasibility of existing technology to detect PFAS at a threshold level.

57.     At that time, EPA announced that, "[f]ollowing a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."[10] Therefore, it proposed MCLG levels for both chemicals at zero

---

[8] *Id.*

[9] PFAS Nat'l Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (Mar. 29, 2023) (to be codified at 40 C.F.R. pt. 141, 142).

[10] *Id.*

19

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ppt. Enforceable MCL levels for each chemical were proposed at 4 ppt. According to EPA, "[a]ny exceedance of this limit requires action to protect public health, regardless of any mixture in which they are found."[11]

58.     Due to their toxic effects, dose additivity, and presence in drinking water, EPA proposed a hazard index approach covering mixtures of PFHxS, PFNA, PFBS, and GenX Chemicals. The hazard index is the sum of each PFAS's "hazard quotient." Hazard quotients are first calculated by dividing the applicable PFAS's "exposure metric" (i.e., concentration in drinking water) by its "health reference value" (PFHxS: 9 ppt; GenX Chemicals: 10 ppt; PFNA: 10 ppt; PFBS: 2,000 ppt). If the sum of each's hazard quotient is below 1.0, then it "represents a level at which no known or anticipated adverse effects on the health of persons is expected to occur and which allows for an adequate margin of safety."[12] If greater than 1.0, then "potential risk is indicated."[13]

59.     EPA stated that, once its proposed MCLs became final, it would "save thousands of lives and prevent tens of thousands of avoidable illnesses."[14]

60.     EPA finalized its proposed MCLs and MCLGs on April 10, 2024.[15] In accompanying publications, EPA declared, "The science is clear: exposure to these six PFAS is

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] U.S.E.P.A., *EPA Releases Annual Report Showing Steady Progress to Protect Communities from PFAS Pollution* (Dec. 14, 2023), *available at* https://www.epa.gov/newsreleases/epa-releases-annual-report-showing-steady-progress-protect-communities-pfas-pollution.

[15] U.S.E.P.A., PFAS Nat'l Primary Drinking Water Regulation Rulemaking (Apr. 10, 2024), *available at* https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf (pre-publication version).

20

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

linked to significant health risks" that include "certain cancers and heart impacts in adults, and immune and developmental impacts in infants and children."[16]

61.    The final regulation solidifies MCLs of 4.0 ppt for PFOA and PFOS and 10.0 ppt for PFNA, PFHxS, and GenX Chemicals, including a Hazard Index that covers mixtures of PFBS with PFNA, PFHxS, and GenX Chemicals. It also enshrines MCLGs of zero ppt for PFOA and PFOS, which EPA states "reflects the latest science showing that there is no level of exposure to these two PFAS without risk of health impacts."[17] According to EPA, "[t]he more you reduce your exposure to PFAS, the more you reduce your risk."[18]

62.    EPA's final regulations mandate several new obligations regarding PFAS, including the implementation of solutions to reduce regulated PFAS concentrations in the drinking water that Plaintiff distributes, maintenance of ongoing compliance monitoring, and informing the public of PFAS levels in the water and of any violations.

63.    EPA's April 10, 2024 regulation imposed a deadline of 2027 for Plaintiff to begin conducting and reporting regular PFAS monitoring and a deadline of 2029 for Plaintiff to comply with all MCLs.

64.    On May 14, 2025, EPA affirmed its intention to maintain the April 10, 2024 regulation MCLs and MCLGs for PFOA and PFOS, but it announced plans to propose extending the MCL compliance deadline by two years, to 2031, "[t]o allow drinking water systems more

---

[16] U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024); *see also* U.S.E.P.A., Final PFAS Nat'l Drinking Water Regulation Landing Page, http://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (providing links to EPA PFAS regulation publications).

[17] U.S.E.P.A., *Presentation: Overview EPA PFAS NPDWR* (Apr. 10, 2024).

[18] U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024).

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

time to develop plans for addressing PFOA and PFOS where they are found and implement solutions."[19] Although EPA announced its intention to rescind the MCLs concerning PFNA, PFHxS, and GenX Chemicals, as well as the Hazard Index covering mixtures of PFBS, PFNA, PFHxS, and GenX Chemicals, it did so "to ensure that the determinations and any resulting drinking water regulation follow the legal process laid out in the Safe Drinking Water Act," and EPA did not retract its prior statement that the science shows that exposure to these types of PFAS is linked to significant health risks.[20] At the same time, EPA expressed the importance of protecting public health and "ensur[ing] that polluters are held responsible."[21]

65.     EPA's recent announcement stated that "EPA plans to issue a proposed rule this fall and finalize this rule in the Spring of 2026."[22] Under the April 10, 2024 final National Primary Drinking Water Regulation, Plaintiff must begin conducting and reporting regular PFAS monitoring by 2027, and Plaintiff must comply with all MCLs by 2029. EPA's planned rule would extend Plaintiff's MCL compliance deadline for PFOA and PFOS from 2029 to 2031.

## II.     Contamination of Bull Creek and the Intracoastal Waterway with PFAS

66.     Bull Creek is a tributary of the Great Pee Dee River, branching off the river near Bucksport, South Carolina. By way of the Great Pee Dee River, Bull Creek is also hydrologically connected to the Little Pee Dee and Lumber Rivers to the northeast, and to the Lynches River, Lake Swamp, and Black Creek to the northwest.

---

[19] U.S.E.P.A., *EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS* (May 14, 2025), *available at* https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos [hereinafter *EPA 2025 MCL Announcement*].

[20] *Id.*

[21] *Id.*

[22] *Id.*

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

67. Defendants' industrial facilities, and/or their applicable WWTPs, operate upstream of Bull Creek.

68. PFAS sampling of Bull Creek, the Great Pee Dee River, Little Pee Dee River, Lumber River, Lynches River, and Black Creek confirms the presence of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals throughout these bodies of water. These PFAS flow downstream and contaminate the water at Plaintiff's water intake on Bull Creek at concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intakes confirm the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source.

69. Discharger Defendants are, or were, owners and operators of manufacturing plants and related industrial facilities throughout the Pee Dee River Watershed. In their industrial processes, Discharger Defendants utilize, or utilized, products that contain or degrade to PFOS, PFOA, PFHxS, PFNA, PFBS, and/or GenX Chemicals. Discharger Defendants' industrial processes generate industrial wastewater containing these PFAS, which Discharger Defendants ultimately discharge to surface waters upstream of Bull Creek.

70. As part of their industrial processes, Defendants Burlington, Darling Fibers, Delta Mills, Elevate, JP Stevens, Mohawk, Sonoco, and WestRock in the past discharged and/or currently discharge PFAS-contaminated wastewater directly to surface waters upstream of Bull Creek, as follows:

| Defendant(s) | Surface Waters |
|---|---|
| Burlington | Great Pee Dee River; Hitchcock Creek |
| Darling Fibers | Black Creek |
| Delta Mills & JP Stevens | Great Pee Dee River |

23

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| Elevate | Hitchcock Creek |
| Mohawk | Great Pee Dee River |
| Sonoco | Black Creek |
| WestRock | Great Pee Dee River |

71.     As part of their industrial processes, Defendants Nan Ya, PRET, and IP indirectly discharge PFAS-contaminated wastewater to WWTPs that lack filtration technologies to remove their PFAS. The WWTPs then discharge water contaminated with these Defendants' PFAS to surface waters upstream of Bull Creek as follows:

| Defendant | WWTP | Surface Waters |
|---|---|---|
| Nan Ya | Lake City WWTP | Lynches Lake Swamp |
| PRET | Johnsonville WWTP | Lynches River |
| IP | Lumberton WWTP | Lumber River |

72.     Defendants GFL Landfills operate landfills in North Carolina, and they transported and/or continue to transport PFAS-contaminated leachate to the Lumberton WWTP, which lacks filtration technologies to remove their PFAS. The Lumberton WWTP then discharged and/or discharges water contaminated with the GFL Landfills' PFAS to the Lumber River upstream of the Little Pee Dee River and Bull Creek.

73.     Defendants' PFAS and their precursors flow downstream from the facilities where the chemicals are directly or indirectly discharged to surface waters to Plaintiff's water intake on Bull Creek, damaging Plaintiff's property and contaminating its water sources.

74.     The Bull Creek SWTP utilizes conventional water treatment technologies to treat raw water, including coagulation, flocculation, sedimentation, filtration, and chlorination. None of

24

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

these methods remove PFAS from water, and the Bull Creek SWTP requires new water treatment technologies to do so.

75.     Plaintiff also owns and operates the Bucksport Regional and Conway WWTPs, which operate along the Waccamaw River upstream of the Intracoastal Waterway.

76.     Neither the Bucksport Regional nor the Conway WWTPs have industrial users. Instead, both provide sewer services primarily to residential and commercial customers that use potable water distributed from the Bull Creek SWTP.

77.      Because the Bull Creek SWTP cannot remove Defendants' PFAS from the water Plaintiff draws from Bull Creek, the water that sewer customers send to the Bucksport and Conway WWTPs remains contaminated with Defendants' PFAS.

78.     Like the Bull Creek SWTP, the Bucksport and Conway WWTPs are not equipped to address Defendants' PFAS. Both utilize conventional wastewater treatment methods, including screening and grit removal, aeration, clarification, chlorination, and UV disinfection—none of which remove Defendants' PFAS. Once the Bucksport and Conway WWTPs treat sewer water, both discharge treated effluent that consequently remains contaminated with Defendants' PFAS to the Waccamaw River upstream of the Intracoastal Waterway.

79.     Plaintiff's Myrtle Beach SWTP draws raw water from the Intracoastal Waterway for treatment and distribution to the Cities of Myrtle Beach and North Myrtle Beach, which in turn provide the water to tens of thousands of people. But because Defendants' PFAS resist environmental degradation and conventional treatment methods, they contaminate the waters of the Intracoastal Waterway at Plaintiff's water intake and damage Plaintiff's property at the Myrtle Beach SWTP. As with the Bull Creek SWTP, the Myrtle Beach SWTP utilizes conventional water

25

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

treatment methods that do not remove Defendants' PFAS, and the Myrtle Beach SWTP requires new treatment technologies to do so.

80.     All Defendants knew or should have known that conventional wastewater treatment technologies used by direct discharger Defendants and WWTPs cannot remove PFAS from wastewater. All Defendants also knew or should have known that their treated wastewater contaminates surface waters and the water Plaintiff draws for its customers.

81.     Despite knowing of the adverse health and environmental effects of PFAS, particularly the chemicals' capacity to endanger drinking water supplies when released to surface waters, Supplier Defendants did not require, instruct, advise, or otherwise direct the Discharger Defendants to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's properties.

82.     All Defendants knew or should have known that conventional treatment technologies used by public water systems like Plaintiff's cannot remove Defendants' PFAS from water that is treated and distributed as potable drinking water.

**III.     Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.**

83.     All Defendants have long known that PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are environmentally persistent, bioaccumulative, dose-additive, and toxic; that they cannot be removed by conventional water and wastewater treatment methods; and that there is no safe dose for PFOA and PFOS.

84.     Old DuPont pioneered the field of PFAS chemistry in the middle of the twentieth century, and it was long a leader in the industry. Old DuPont's knowledge of the properties of PFAS, including knowledge of the compounds' chemistry, toxicology, environmental fate, and

26

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

effects on human health has been virtually unmatched, typically exceeding that of government regulators, the scientific community, and the public.

85.    Old DuPont has maintained an in-house staff of doctors, environmental engineers, industrial hygienists, and scientists in health-related fields, as well as a corporate industrial medicine program. Old DuPont was thus well equipped to understand the potential dangers of exposing people to PFAS via drinking water.

86.    By the early 1960s, Old DuPont understood PFOA and PFNA to be toxic based on studies that found exposure to the chemicals to increase liver size in rats, and by the mid-1960s, if not earlier, Old DuPont knew that PFOA could leach from waste into water and groundwater.

87.    In 1978, Old DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. Old DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but it did not disclose this to the public or to EPA. Three years later, Old DuPont again failed to disclose data demonstrating the transplacental movement of PFOA to fetuses. It also failed to disclose widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works facility near Parkersburg, West Virginia, where PFOA concentrations exceeded Old DuPont's own Community Exposure Guideline.

88.    In 1991, Old DuPont researchers recommended following up a study from ten years earlier of employees who might have been exposed to PFOA. The prior study showed elevated liver enzymes in the blood of Old DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, Old DuPont chose not to conduct the follow-up study, instead postponing it until after it was sued.

27

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

89.     By 1999, at the latest, Old DuPont knew that PFOA was present in its products based on telomer PFAS chemistry.

90.     In or around December 2005, Old DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. Upon information and belief, in statements to the public and government regulators, Old DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, Old DuPont stated that "the weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues." Old DuPont made those statements against the advice of its own Epidemiology Review Board, which urged it not to make public statements asserting that PFOA does not pose any health risks. In 2005, EPA levied a record-setting $16.5 million civil penalty against Old DuPont for failing to disclose to EPA information about the health risks of PFOA and about the company's environmental releases of PFOA in West Virginia and Ohio.

91.     For decades, Old DuPont purchased the PFOA it used in the manufacture of Teflon and other products from 3M Company ("3M").

92.     In May 2000, 3M announced it would phase out its manufacture and sale of products based on long-chain PFAS, including PFOA and PFOS, by 2002. In its public announcement of the phaseout, 3M cited the chemicals' environmental persistence and its finding that PFOS was present in the blood of the general public.

93.     In response to 3M's phaseout announcement, and despite the public concerns 3M cited for its phaseout decision and Old DuPont's own internal knowledge of the risks to human health and the environment posed by PFOA, Old DuPont did not cease using PFOA or eliminate

28

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PFOA from its products. Instead, Old DuPont opened its own plant to manufacture PFOA to use in the manufacture of Old DuPont's products.

94.     As demonstrated by its material safety data sheet for PFOA, Old DuPont knew PFOA required disposal by incineration by at least 1991.

95.     Old DuPont participated in the Telomer Research Program ("TRP") that was convened by EPA in the early 2000s to coordinate research and data on PFOA and PFAS manufactured by the telomerization process. The TRP consisted of the leading telomer-based PFAS manufacturers. Through its participation in the TRP, Old DuPont obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

96.     In 2015, Old DuPont spun off its Performance Chemicals business (which included the design, manufacture, marketing, and sale of PFAS, as well as the environmental liabilities) to Chemours. Chemours inherited Old DuPont's expertise, resources, and knowledge of PFAS, and PFOA in particular.

97.     Invista was formed in 2004 through the sale of Old DuPont's Textiles & Interiors division to Koch Industries and conducted bundled sales of textile products with Old DuPont PFAS products that it knew could degrade to PFOA. Invista inherited Old DuPont's expertise, resources, and knowledge of PFAS, and PFOA in particular.

98.     Huntsman uses PFAS manufactured by other Supplier Defendants, including Old DuPont and Chemours, to blend with other non-PFAS components in the manufacture of the PFAS products it sells. Upon information and belief, Huntsman has long known that PFAS are persistent,

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

99.     Daikin is a subsidiary of Daikin Industries, Ltd., which has been in the PFAS business in Japan since the 1940s. It entered the U.S. market in the early 1990s, establishing manufacturing operations in Decatur, Alabama, adjacent to 3M's plant there.

100.     Daikin purchased PFOA from 3M for use as a processing chemical in its manufacture of fluoropolymers. Daikin knew from the early 1990s that PFOA was carcinogenic, bioaccumulative, environmentally persistent, and soluble in water.

101.     Though fully aware of the reasons that 3M decided to withdraw its products based on long-chain PFAS in 2000, Daikin rushed to fill as much of the PFAS market left by 3M as possible, with the specific intent to prevent customers from shifting to non-PFAS products.

102.     Underscoring its position as one of the world's leading PFAS manufacturers, Daikin participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

103.     Daikin was well aware of the need to incinerate or otherwise treat wastewater to remove PFAS; indeed, Daikin practiced incineration for the PFAS-containing wastewater generated at its Decatur, Alabama facility by or around the mid-2000s.

104.     Asahi is a subsidiary of AGC, Inc., f/k/a Asahi Glass Co., Ltd., a Japanese company that has manufactured and sold PFAS products since at least the 1970s. Upon information and belief, Asahi has long known that PFAS are persistent, bioaccumulative, and toxic, and that

30

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

105.    Underscoring its position as one of the world's leading PFAS manufacturers, Asahi participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

106.    Arkema is a subsidiary of Arkema S.A., a French company formed in 2004 from a reorganization of Total S.A.'s chemicals business. Arkema S.A. and its predecessors have been manufacturing PFAS since at least the 1950s. Upon information and belief, Arkema has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

107.    Clariant was formed in 1995 and was previously known as Sandoz Chemical Corporation and as Sodeyco, Inc. Upon information and belief, Clariant has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

108.    Underscoring its position as one of the world's leading PFAS manufacturers, Clariant participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

31

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

109.    Archroma was formed in 2013 through the sale of Clariant's textile, paper, and emulsions business to SK Capital Partners. Archroma inherited Clariant's expertise, resources, and knowledge of PFAS.

110.    Solvay is the successor of Solvay Solexis, Inc. and Ausimont USA, Inc. Upon information and belief, Solvay has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells. At its Gloucester County, New Jersey facility, Solvay's use of PFOA and PFNA in the manufacture of fluoropolymer products has caused severe contamination of drinking water, surface waters, groundwater, and soils in the surrounding vicinity. In 2023, Solvay settled a lawsuit brought by the State of New Jersey arising from this contamination for $393 million.

111.    Safe or safer nonfluorinated alternatives to PFAS-based products exist, as demonstrated by some of Supplier Defendants' own current product offerings. Such nonfluorinated alternatives could have been commercially viable much earlier (and the harm to Plaintiff mitigated) if Supplier Defendants had not chosen to ignore the clear evidence of health and environmental dangers they possessed many years ago.

112.    Despite Supplier Defendants' knowledge that their products contained or degraded to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals; that these PFAS were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove their PFAS from wastewater; and that Discharger Defendants discharged these PFAS to the Pee Dee River Watershed, damaging and interfering with Plaintiff's property rights and public health,

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Supplier Defendants continued to sell products containing or degrading to these PFAS to Discharger Defendants. Specifically:

(a)     Asahi continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Asahiguard and Surflon;

(b)     Arkema continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Kynar;

(c)     Clariant continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Nuva;

(d)     Archroma continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Nuva and Fluowet;

(e)     Daikin continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Unidyne;

(f)     Old DuPont continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Teflon, Zonyl, and Capstone;

(g)     Chemours continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Capstone;

(h)     Invista continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Stainmaster and Antron;

(i)     Huntsman continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Phobol and Oleophobol; and

(j)     Solvay continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Algoflon and Halar.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**IV.     Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal.**

113.    At all times relevant hereto, Supplier Defendants were directly involved in, and exercised control over, Discharger Defendants' use, handling, application, and disposal of Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

114.    Supplier Defendants specified the type and amount of PFAS-containing products to be used or applied, and the manner in which PFAS-containing products were to be used or applied, at Discharger Defendants' facilities upstream from Plaintiff's intake on the Bull Creek.

115.    Supplier Defendants designed and provided equipment for the use of their PFAS-containing products at Discharger Defendants' facilities upstream from Plaintiff's intake on Bull Creek.

116.    Supplier Defendants jointly conducted research with Discharger Defendants for new PFAS-containing products as well as methods of using or applying these products.

117.    Supplier Defendants monitored the products manufactured by Discharger Defendants for the amount of PFAS-containing products used in the manufacture of Discharger Defendants' products in order to ensure those products met Supplier Defendants' specifications on the amount of PFAS-containing products to be used or applied.

118.    Some Supplier Defendants, including Archroma, Arkema, Invista, and Huntsman, maintained offices and/or laboratories near Discharger Defendants' facilities upstream from Plaintiff's intake on Bull Creek, and all Supplier Defendants were in constant contact with the Discharger Defendants concerning the use, handling, application, and disposal of their PFAS-containing products.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

119.     Employees of the Supplier Defendants were routinely present in Discharger Defendants' facilities to provide direction, support, and technical assistance concerning the use, handling, application, and disposal of Supplier Defendants' PFAS-containing products.

120.     Supplier Defendants provided information to the Discharger Defendants concerning the health and environmental impacts of Supplier Defendants' PFAS-containing products, and the Discharger Defendants, at least in part, relied on this information.

121.     Supplier Defendants were familiar with the wastewater disposal practices of the Discharger Defendants' facilities, including that a portion of the Supplier Defendants' PFAS-containing products went into the Discharger Defendants' wastewater streams and that the treatment methods used by the Discharger Defendants' on-site treatment works and/or receiving WWTPs could not remove Defendants' PFAS from the effluent. Supplier Defendants nevertheless failed to require, instruct, advise, or otherwise direct the Discharger Defendants to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's property. Supplier Defendants continued to sell their PFAS-containing products to Discharger Defendants they knew or should have known were disposing of the products in an environmentally irresponsible manner.

122.     Supplier Defendants have been aware for many years of the presence of their PFAS chemicals in the Pee Dee River Watershed upstream of Plaintiff's intakes.

## V.     Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.

123.     Supplier Defendants actively worked to suppress and delay scientific understanding and government regulation of PFAS by, among other things, suppressing and altering critical internal studies documenting the harms of their PFAS-containing products, distorting public discourse on and downplaying the harmful effects of PFAS, misleading EPA on the safety of their

35

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PFAS-containing products and PFAS more generally, and hiring leaders in the scientific community to exert influence and suppress unwanted information contrary to their position.

124.    Supplier Defendants, by agreement and/or tacit understanding between them, each knowingly pursued a common plan and design and/or acted in concert to market and promote products they knew to be dangerous to the environment and human health. Supplier Defendants engaged in concerted conduct for the purpose of suppressing, concealing, and minimizing information on the risks to human health and the environment posed by PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and for the purpose of delaying, obstructing, and interfering with regulators' investigation and regulation of these chemicals.

125.    The delay in PFAS regulation resulted directly from Supplier Defendants' concerted efforts, over decades, to conceal critical studies from the scientific community and simultaneously introduce studies and media downplaying the adverse effects of PFAS.

## VI.    Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities.

126.    By 2013, Old DuPont understood that it faced massive, mounting environmental liabilities arising from its decades-long manufacture, use, marketing, sale, and distribution of PFAS, likely totaling in the billions of dollars.

127.    Beginning in or around 2013, Old DuPont sought to isolate these PFAS-related liabilities from its billions of dollars in valuable assets and to evade responsibility for the environmental harms it caused. This scheme unfolded over several years and involved the creation of multiple new corporate entities.

128.    The first major step in this scheme was the 2015 spinoff of Chemours, a newly formed entity that received Old DuPont's Performance Chemicals business. Along with this

36

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

transfer, Old DuPont saddled Chemours with a significant portion of Old DuPont's environmental liabilities.

129.    Per the separation agreement between Old DuPont and Chemours, Chemours assumed liabilities related to Old DuPont's manufacture, use, and sale of PFAS and agreed to indemnify Old DuPont against all liabilities associated with the Performance Chemicals business—regardless of when those liabilities arose and against whom those liabilities are asserted or determined.

130.    Internally, Old DuPont knew that Chemours lacked the financial resources to adequately cover the PFAS-related liabilities Old DuPont had transferred to Chemours.

131.    In 2017, Old DuPont completed a merger with The Dow Chemical Company ("Old Dow") to create DowDuPont, Inc. This so-called "merger of equals" was carefully structured to avoid exposing Old Dow's assets to Old DuPont's PFAS liabilities. Rather than a true integration, this transaction served as a temporary restructuring vehicle by which Old DuPont sought to further separate the company's valuable assets from its PFAS liabilities and other environmental obligations.

132.    Following the merger, assets were stripped out of Old DuPont and transferred to DowDuPont, which then mixed and combined the assets of Old DuPont with the assets of Old Dow. DowDuPont then recognized its business into three distinct business segments: Agriculture, Materials Science, and Specialty Products.

133.    This restructuring paved the way for the creation of three independent companies by 2019: (1) Corteva, which holds the Agriculture business and became the parent holding company of Old DuPont; (2) Dow, Inc. ("New Dow"), which holds the Materials Science business and became the parent company of Old Dow; and (3) DuPont de Nemours, Inc. (i.e., New DuPont),

37

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

which was formerly known as DowDuPont and retained the Specialty Products business as well as some non-core business segments and product lines once belonging to Old DuPont.

134.    Pursuant to the separation agreement between Corteva, New Dow, and DowDuPont/New DuPont, Corteva and New DuPont have each assumed responsibility for certain Old DuPont liabilities, including Old DuPont liabilities related to PFAS.

## VII.    Defendants Have Harmed Plaintiff and Plaintiff's Community.

135.    Discharger Defendants have, for decades, discharged PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors into the Pee Dee River Watershed, which has caused, and continues to cause, contamination of these waters with PFAS chemicals exceeding EPA's current health advisories, MCLGs, and MCLs. Indeed, absent new treatment technologies, Plaintiff cannot use its properties and exercise its property rights to provide water that is either free of all PFOA and PFOS, or compliant with EPA's MCLs.

136.    Supplier Defendants have supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to Discharger Defendants, while knowing that Discharger Defendants discharge wastewater laden with these PFAS to wastewater treatment facilities that cannot remove them from the wastewater before it is discharged to the Pee Dee River Watershed upstream of Plaintiff's water intakes.

137.    Defendants' conduct has proximately caused the contamination of the Pee Dee River Watershed; the Waccamaw River; the Intracoastal Waterway; and of Plaintiff's land, its Bull Creek and Myrtle Beach SWTPs, its Bucksport and Conway WWTPs, and its water treatment and distribution systems with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals—including PFOA and PFOS at concentrations above EPA's MCLGs and MCLs.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

138.    Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in acts and omissions that have proximately caused unreasonable interference with Plaintiff's right to use and enjoy its properties and its right to use the waters of Bull Creek and the Intracoastal Waterway, and have caused Plaintiff additional past, present, and future injury to property.

139.    Despite knowing that there is no safe dose for PFOA or PFOS, and that PFHxS, PFNA, PFBS, and GenX Chemicals are hazardous to human health,

(a)    Discharger Defendants, directly or indirectly, discharged industrial wastewater contaminated with these chemicals into the Pee Dee River Watershed or tributaries thereof, which they knew or should have known contaminated Plaintiff's property; and

(b)    Supplier Defendants continued to supply these chemicals to Discharger Defendants, knowing that they discharged these chemicals into the Pee Dee River Watershed or tributaries thereof, which Supplier Defendants knew or should have known contaminated Plaintiff's property.

## FIRST CAUSE OF ACTION

### Private Nuisance

140.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

141.    Plaintiff is a special purpose district created for the purpose of constructing, operating, maintaining, improving, and extending a water treatment and distribution system for residents of Horry County and other counties. It uses its properties for those purposes, including the withdrawal of raw water from Bull Creek and the Intracoastal Waterway, the treatment of raw water into potable drinking water, and the distribution of treated potable drinking water to customers in Horry County and other counties.

39

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

142.    Plaintiff owns riparian land abutting Bull Creek and the Intracoastal Waterway, and Plaintiff has a riparian property right in the reasonable use of these waters, including for the provision of water to its customers.

143.    Through the conduct described herein, Defendants created, contributed to, and/or maintained a nuisance; that is, the contamination of the Pee Dee River Watershed, the Waccamaw River, and the Intracoastal Waterway with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals at concentrations exceeding those EPA deems unsafe for consumption.

144.    Due to Defendants' contamination, Plaintiff cannot provide water to its customers without PFAS, or even at PFAS concentrations that comply with EPA's MCLs, absent new water treatment technology.

145.    Defendants' contamination caused, contributed to, and/or maintains a nuisance that substantially and unreasonably interferes with Plaintiff's use and enjoyment of its properties, interferes with Plaintiff's properties and its property rights and riparian rights, damages Plaintiff's properties, and causes Plaintiff additional inconvenience, annoyance, and harm.

146.    Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights.

147.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer damages related to Defendants' contamination of the Pee Dee River Watershed, the Waccamaw River, the Intracoastal Waterway, and Plaintiff's property, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

148.     In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

149.     The ongoing contamination of Bull Creek, the Intracoastal Waterway, and Plaintiff's properties constitutes a continuing irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its use of Bull Creek and the Intracoastal Waterway to supply potable water to its customers.

150.     Defendants' interference with Plaintiff's use of its properties can be abated by funding the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

151.     Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, and the costs of its abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## SECOND CAUSE OF ACTION

### Public Nuisance

152.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

153.     Plaintiff is a special purpose district created for the purpose of constructing, operating, maintaining, improving, and extending a water treatment and distribution system for residents of Horry County and other counties. It uses its properties for those purposes, including the withdrawal of raw water from Bull Creek and the Intracoastal Waterway, the treatment of raw

41

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

water into potable drinking water, and the distribution of treated potable drinking water to customers in Horry County and other counties.

154.    Plaintiff's customers use the water Plaintiff provides for many purposes, including drinking, cooking, bathing, cleaning, washing, and watering plants and gardens.

155.    Plaintiff's customers, and indeed all residents in Plaintiff's community, have a right to potable water that is reasonably pure and safe for their use—and thus free from contamination by Defendants' PFOA, PFOS, PFNA, PFHxS, PFBS, and GenX Chemicals. Defendants' contamination unreasonably interferes with, disrupts, and threatens public health, safety, and order. Indeed, EPA makes clear that there is no safe dose for consuming PFOA and PFOS.

156.    Plaintiff has sustained special injuries as a result of Defendants' public nuisance, including but not limited to, the lost use of its properties; the inability to provide potable water to customers without concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals deemed unsafe by EPA; expenses associated with the evaluation, testing, acquisition, installation, operation, and maintenance of required treatment technologies to remove unsafe concentrations of these PFAS from water; expenses incurred in discovering and identifying sources of Defendants' contamination; interference with Plaintiff's right to use Bull Creek and the Intracoastal Waterway; interference with the use of Plaintiff's SWTPs and water treatment and distribution systems; and lost revenue.

157.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer special injury and damages related to Defendants' contamination of the Pee Dee River Watershed, the Waccamaw River, the Intracoastal Waterway, and Plaintiff's properties.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

158.     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights and endangers the health of Plaintiff's customers, consumers of Plaintiff's drinking water, and Plaintiff's community.

159.     As a result of the nuisance caused by Defendants, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

160.     In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

161.     Defendants' ongoing contamination constitutes a continuing threat to public health, safety, and order, and it constitutes irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety and ensure that Plaintiff's customers and residents of Plaintiff's community receive water free from PFAS.

162.     Defendants' contamination of potable water with unsafe concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals can be abated by requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

163.     Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, the costs of abatement in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## THIRD CAUSE OF ACTION

### Trespass

164.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

165.     Plaintiff owns, possesses, and actively exercises its right to use its land, SWTPs, and related buildings, improvements, property, and equipment that make up its water treatment and distribution systems.

166.     Discharger Defendants Nan Ya, PRET, and IP intentionally discharged and continue to discharge PFAS and/or PFAS-containing products to the Lake City, Johnsonville, and Lumberton WWTPs, respectively, notwithstanding that they knew and/or reasonably should have known that:

(a)     these WWTPs cannot remove their PFAS and/or PFAS-containing products from wastewater before discharging to surface waters upstream of Plaintiff's water intake on Bull Creek;

(b)     Plaintiff draws water from Bull Creek for the provision of safe potable water to its customers;

(c)     water Plaintiff draws from Bull Creek is contaminated with the PFAS and/or PFAS-containing products these Defendants discharge to these WWTPs;

(d)     these Defendants' PFAS and/or PFAS-containing products that contaminate the water distributed from Plaintiff's Bull Creek SWTP pass through Plaintiff's Bucksport Regional and Conway WWTPs to enter the Waccamaw River and Intracoastal Waterway;

(e)     Plaintiff draws water from the Intracoastal Waterway for the provision of drinking water to the cities of Myrtle Beach and North Myrtle Beach;

(f)     water Plaintiff draws from the Intracoastal Waterway is contaminated with these Defendants' PFAS and/or PFAS-containing products; and, thereby,

44

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(g)     water contaminated with high concentrations of these Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

167.     Discharger Defendants RRD and SCD intentionally delivered and/or continue to deliver leachate contaminated with PFAS and/or PFAS-containing products to the Lumberton WWTP, notwithstanding that these Defendants knew and/or reasonably should have known that:

(a)     the Lumberton WWTP cannot remove their PFAS and/or PFAS-containing products from the leachate before discharging to surface waters upstream of Plaintiff's water intake on Bull Creek;

(b)     Plaintiff draws water from Bull Creek for the provision of safe potable water to its customers;

(c)     that water Plaintiff draws from Bull Creek is contaminated with the PFAS and/or PFAS-containing products these Defendants send to the Lumberton WWTP;

(d)     these Defendants' PFAS and/or PFAS-containing products that contaminate the water distributed from Plaintiff's Bull Creek SWTP pass through Plaintiff's Bucksport Regional and Conway WWTPs to enter the Waccamaw River and Intracoastal Waterway;

(e)     Plaintiff draws water from the Intracoastal Waterway for the provision of drinking water to the cities of Myrtle Beach and North Myrtle Beach;

(f)     water Plaintiff draws from the Intracoastal Waterway is contaminated with these Defendants' PFAS and/or PFAS-containing products; and, thereby,

(g)     water contaminated with high concentrations of these Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

168.     Discharger Defendants Burlington, Darling Fibers, Delta Mills, Elevate, JPS, Mohawk, Sonoco, and WestRock intentionally discharged and continue to discharge PFAS and/or

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PFAS-containing products to the Pee Dee River Watershed, notwithstanding that these Defendants knew and/or reasonably should have known that:

(a)     the wastewater treatment methods used by these Defendants cannot remove their PFAS and/or PFAS-containing products from wastewater before discharging to surface waters upstream of Plaintiff's water intake on Bull Creek;

(b)     Plaintiff draws water from Bull Creek for the provision of safe potable water to its customers;

(c)     water Plaintiff draws from Bull Creek is contaminated with the PFAS and/or PFAS-containing products they discharge to the Pee Dee River Watershed; and, thereby,

(d)     these Defendants' PFAS and/or PFAS-containing products that contaminate the water distributed from Plaintiff's Bull Creek SWTP pass through Plaintiff's Bucksport Regional and Conway WWTPs to enter the Waccamaw River and Intracoastal Waterway;

(e)     Plaintiff draws water from the Intracoastal Waterway for the provision of drinking water to the cities of Myrtle Beach and North Myrtle Beach;

(f)     water Plaintiff draws from the Intracoastal Waterway is contaminated with these Defendants' PFAS and/or PFAS-containing products; and, thereby,

(g)     water contaminated with high concentrations of Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

169.    Supplier Defendants intentionally supplied and continued to supply PFAS-containing products to Discharger Defendants notwithstanding that Supplier Defendants knew and/or reasonably should have known that:

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(a)    Discharger Defendants discharged and continue to discharge, directly or indirectly, Supplier Defendants' PFAS-containing products and/or PFAS to on-site wastewater treatment facilities or publicly owned WWTPs that cannot remove Supplier Defendants' PFAS-containing products and/or PFAS from wastewater before discharge to surface waters upstream of Plaintiff's water intake on Bull Creek;

(b)    Plaintiff draws water from the Bull Creek for the provision of safe potable water to its customers;

(c)    water Plaintiff draws from the Bull Creek is contaminated with Supplier Defendants' PFAS-containing products and/or PFAS that Discharger Defendants directly or indirectly discharged to the Pee Dee River Watershed;

(d)    Supplier Defendants' PFAS-containing products and/or PFAS that contaminate the water distributed from Plaintiff's Bull Creek SWTP pass through Plaintiff's Bucksport Regional and Conway WWTPs to enter the Waccamaw River and Intracoastal Waterway;

(e)    Plaintiff draws water from the Intracoastal Waterway for the provision of drinking water to the cities of Myrtle Beach and North Myrtle Beach;

(f)    water Plaintiff draws from the Intracoastal Waterway is contaminated with Supplier Defendants' PFAS-containing products and/or PFAS; and, thereby,

(g)    water contaminated with high concentrations of Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

170.    Plaintiff has not consented to, and does not consent to, the invasion of its properties by water contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals at

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

concentrations exceeding EPA's MCLs and MCLGs and beyond what EPA deems unsafe for consumption.

171.     Defendants' invasions of Plaintiff's properties are continuing and ongoing, and each separate invasion of PFAS-contaminated water constitutes a new trespass each time Plaintiff's water pumps are active.

172.     Discharger Defendants Nan Ya, PRET, and IP intend that, while using PFAS in their industrial processes, PFAS-containing wastewater generated by those processes be discharged to the Lake City, Johnsonville, and Lumberton WWTPs, respectively. Discharger Defendants RRD and SCD intend and/or intended that their PFAS-contaminated leachate be disposed of by the Lumberton WWTP. Defendants Burlington, Darling Fibers, Delta Mills, Elevate, JPS, Mohawk, Sonoco, and WestRock intend and/or intended that, while using PFAS in their industrial processes, PFAS-containing wastewater be discharged to the Pee Dee River Basin. Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and its property rights and riparian rights.

173.     Supplier Defendants intend that Discharger Defendants, while using Supplier Defendants' PFAS-containing products in their industrial processes, dispose of the resulting wastewater contaminated with Supplier Defendants' PFAS-containing products by discharging it, directly or indirectly, to surface waters. Supplier Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and its property rights and riparian rights.

174.     Defendants' conduct is the actual and proximate cause of the invasion of PFAS-contaminated water into Plaintiff's properties, including its land, SWTPs, and related buildings, improvements, property, and equipment that make up its water treatment and distribution systems.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The damage to Plaintiff's properties is the direct and proximate result of Defendants' intentional conduct.

175.    As a direct, proximate, and foreseeable result of Defendants' trespasses, Plaintiff has suffered, now suffers, and will continue to suffer invasion of its property rights and damages, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

176.    Defendants' ongoing trespasses can be abated by requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

## FOURTH CAUSE OF ACTION

### Negligence, Gross Negligence, and/or Recklessness

177.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

178.    Discharger Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others, which includes preventing the direct and/or indirect discharge of these PFAS into surface waters upstream of Plaintiff's SWTPs, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

179.    Discharger Defendants knew or should have known that the PFAS they discharged were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by themselves or their WWTPs could not remove their PFAS; and that surface waters—including the Pee Dee River Watershed—were vulnerable to the contamination that has taken and now takes place.

49

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

180.    Discharger Defendants nonetheless negligently, recklessly, wantonly, and/or willfully breached their duty in causing products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to escape their premises and contaminate the Pee Dee River Watershed, thereby interfering with Plaintiff's property rights and injuring Plaintiff's properties.

181.    Supplier Defendants have a duty to use due care in the manufacturing, formulation, handling, control, disposal, labeling, and creation and dissemination of requirements and instructions for the use and disposal of products containing or that degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to ensure the proper use and disposal of these products and prevent their improper use and disposal.

182.    Supplier Defendants had superior knowledge that their PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals contained in or degrading from their products were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove these PFAS; that conventional water treatment technologies utilized by water systems like Plaintiff's could not remove these PFAS; and that surface waters, including the Pee Dee River Watershed, were vulnerable to the contamination that now takes place.

183.    By continually supplying their PFAS-containing products without providing their customers with proper instruction and/or direction on appropriate PFAS disposal measures, or otherwise preventing the discharge of their PFAS to surface waters, Supplier Defendants breached their duty of care and negligently, recklessly, wantonly, and willfully created the risk that their PFAS would contaminate the Pee Dee River Watershed, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

184.    Additionally, Defendant Burlington had a duty to use due care in the manufacturing, handling, control, disposal, labeling, and instructing for the use and disposal of biosolid products that contain PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors to ensure the proper use of these products and prevent contamination of surface waters.

185.    By continually suppyling biosolid products without providing warnings, proper instructions, or direction on the dangers of these PFAS and their properties, or otherwise preventing their contamination of surface waters, Burlington negligently, recklessly, wantonly, and/or willfully created the risk that its PFAS would contaminate the Pee Dee River Watershed, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

186.    Because Burlington created the risk of harm from PFAS-contaminated water, it had a duty to ensure that users of its biosolid products did not allow PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors to escape its users' premises and contaminate the Pee Dee River Watershed. Burlington also had a duty to warn others, including Plaintiff, of the danger presented by water contaminated with its PFAS.

187.    Burlington negligently, recklessly, wantonly, and willfully breached its duty by failing to prevent the discharge of these PFAS from its biosolid products into the Pee Dee River Watershed, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property, and by failing to warn Plaintiff of the danger presented by water contaminated by its PFAS.

188.    As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including but not limited to loss in value; the cost of removing Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals; the costs of evaluating,

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Defendants' PFAS; and other damages to be proved at trial.

189.    Defendants are jointly and severally liable to Plaintiff for all damages resulting from their conduct, practices, actions, omissions, and inactions, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## FIFTH CAUSE OF ACTION

### Strict Products Liability – Ultrahazardous Activity
### (Supplier Defendants)

190.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

191.    PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

192.    Supplier Defendants manufactured, formulated, handled, sold, and/or distributed products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to Discharger Defendants, knowing that these PFAS have been, and are presently, discharged to surface waters, and thereby enter and contaminate Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

193.    Rather than require the proper disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, Supplier Defendants required or permitted Discharger Defendants to discharge these products, which they knew to be hazardous, to surface waters upstream from Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

194.     Supplier Defendants knew that PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were environmentally persistent, bioaccumulative, dose-additive, and toxic; and Supplier Defendants knew there was no safe dose of PFOA or PFOS.

195.     Supplier Defendants knew or expected that these hazardous PFAS that they were manufacturing, formulating, handling, selling, and/or distributing would reach Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system while in essentially the same condition as when they left the hands of Supplier Defendants.

196.     Supplier Defendants manufactured, formulated, handled, sold, and/or distributed their products that were dangerous and unsafe for the uses and purposes for which they were intended despite knowing the consequences of their use and of exposure to their products.

197.     Supplier Defendants or their agents were responsible for the unreasonably dangerous products sold and distributed to Discharger Defendants and received financial benefits from their sale and distribution.

198.     As a direct, proximate, and foreseeable result of Supplier Defendants' ultrahazardous activities, their PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals have damaged Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

199.     As a direct, proximate, and foreseeable result of Supplier Defendants' ultrahazardous activities, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS;

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

200.   Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## SIXTH CAUSE OF ACTION
### Strict Products Liability – Ultrahazardous Activity
### (Burlington)

201.   Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

202.   PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

203.   Burlington manufactured, handled, sold, and distributed biosolid products containing or degrading to these PFAS chemicals to agricultural and/or other users, knowing that these PFAS chemicals have been, and are presently, discharged to surface waters, and thereby enter and contaminate Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

204.   Burlington knew that these PFAS chemicals were environmentally persistent, bioaccumulative, toxic, and dose-additive; and Burlington knew that there was no safe dose of PFOA or PFOS.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

205.     Burlington knew or expected that these hazardous PFAS chemicals that it was manufacturing, handling, selling, and distributing would reach Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system while in essentially the same condition as when they left Burlington's hands.

206.     Burlington manufactured, handled, sold, and distributed its biosolid products that were dangerous and unsafe for the uses and purposes for which they were intended, despite knowing the consequences of the use and of, and exposure to, its products.

207.     Burlington and/or its agents were responsible for the unreasonably dangerous products that it sold and distributed, and Burlington and received financial benefits from their sales and distribution.

208.     As a direct and proximate result of Burlington's ultrahazardous activities, its PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors have damaged Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals.

209.     As a direct, proximate, and foreseeable result of Burlington's ultrahazardous activities, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Burlington's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Burlington's PFAS; and other damages to be proved at trial.

210.     Burlington committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Burlington's conduct was performed to

55

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## SEVENTH CAUSE OF ACTION

### Strict Products Liability – Design Defect
### (Supplier Defendants)

211.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

212.    PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

213.    Supplier Defendants knew that Discharger Defendants would purchase and use their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals without inspection for defects.

214.    Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals have been, and are presently, discharged to surface waters, and thereby enter and contaminate Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

215.    Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were used in a reasonably foreseeable manner and without substantial change in their condition.

216.    Supplier Defendants knew that the use of their products containing or degrading to these PFAS in their intended manner would result in PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals contaminating Plaintiff's water sources and Plaintiff's SWTPs and related

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

buildings, improvements, property, and equipment that make up its water treatment and distribution system.

217.     Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals sold and/or distributed to Discharger Defendants were and are defective in design and unreasonably dangerous for their intended use because:

(a)     PFAS resist environmental degradation;

(b)     PFAS cause extensive and persistent surface water contamination when used and discharged to surface waters in their foreseeable and intended manner;

(c)     PFAS contamination in drinking water poses significant threats to public health and property; indeed, there is no safe dose of PFOA or PFOS in drinking water;

(d)     Supplier Defendants failed to conduct and/or failed to disclose reasonable, appropriate, and/or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS; and

(e)     There are and were safe or safer alternatives to PFAS that Supplier Defendants could have employed in their products.

218.     Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were and are dangerous to a degree beyond that which was and is contemplated by the ordinary consumer.

219.     The foreseeable risk of harm to public health and property posed by Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals outweighed and outweigh the utility of such products and the cost to Supplier Defendants of reducing or eliminating those risks.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

220. A reasonable product manufacturer would have known of the significant dangers posed by Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

221. As a direct, proximate, and foreseeable result of the use of Supplier Defendants' defective and unsafe products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, these PFAS have damaged Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

222. As a direct, proximate, and foreseeable result of the use of Supplier Defendants' defective and unsafe products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

223. Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

**EIGHTH CAUSE OF ACTION**
**Strict Products Liability – Design Defect**
**(Burlington)**

58

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

224.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

225.    PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

226.    Burlington knew that agricultural users would purchase and use its biosolid products containing these PFAS and their precursors without inspection for defects.

227.    Burlington's biosolid products containing or degrading to these PFAS chemicals have been, and are presently, discharged to surface waters, and thereby enter and contaminate Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

228.    Burlington's biosolid products containing these PFAS and their precursors were used in a reasonably foreseeable manner and without substantial change in their condition.

229.    Burlington knew that the use of its biosolid products in their intended manner would result in PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals damaging Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

230.    Burlington's biosolid products were and are defective in design and unreasonably dangerous for their intended use because:

(a)     PFAS resist environmental degradation;

(b)     PFAS leach from soil to groundwater, are highly mobile and water soluble, making groundwater and surface water vulnerable to contamination;

(c)     Applying PFAS-contaminated biosolids to soil near surface waters exposes surface waters to PFAS contamination via overland and groundwater flow;

59

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(d)     PFAS contamination in drinking water poses significant threats to public health and property; indeed, there is no safe dose of PFOA or PFOS in drinking water;

(e)     Burlington failed to conduct and/or failed to disclose reasonable, appropriate, and/or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS; and

(f)     There are and were safe or safer feasible alternatives to PFAS-contaminated biosolids that Burlington could have employed in its products.

231.     Burlington's products containing or degrading to these PFAS chemicals were and are dangerous beyond that which was and is contemplated by the ordinary consumer.

232.     The foreseeable risk of harm to public health and property posed by Burlington's products containing these PFAS outweighed and outweigh the utility of such products and the cost to Burlington of reducing or eliminating those risks.

233.     A reasonable product manufacturer knew or should have known of the significant dangers posed by Burlington's products containing PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors.

234.     As a direct and proximate result of the sale and application of Burlington's defective and unsafe biosolid products, these PFAS have contaminated Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from Burlington's PFAS.

235.     As a direct, proximate, and foreseeable result of the sale and application of Burlington's defective and unsafe biosolid products, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Burlington's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Burlington's PFAS; and other damages to be proved at trial.

236.     Burlington committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Burlington's conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## NINTH CAUSE OF ACTION

### Strict Products Liability – Failure to Warn
### (Supplier Defendants)

237.     Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

238.     Supplier Defendants design, manufacture, formulate, promote, market, and/or distribute products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

239.     Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals are used by Discharger Defendants in a reasonably foreseeable manner and without substantial change in the condition of such products, and Supplier Defendants knew that Discharger Defendants purchase and use their products without inspection for defects.

240.     Supplier Defendants knew that the use of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals purchased or otherwise acquired from them would result in their products being discharged to surface waters, and thereby enter and

61

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

contaminate Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

241.    Supplier Defendants knew that their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were environmentally persistent and bioaccumulative, that not all of their products are exhausted or adhere in Discharger Defendants' applications, that a portion of their products enter wastewater and are thus discharged via Discharger Defendants' sewer pipes, and that wastewater treatment facilities utilize conventional wastewater treatment methods that cannot remove their products from wastewater before it is discharged to surface waters that Plaintiff relies on to supply potable water to the public, making Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals unreasonably dangerous.

242.    Despite the known and/or foreseeable risk of contaminating potable water sources and Plaintiff's properties, Supplier Defendants fail to provide adequate warnings to Discharger Defendants and other users or to take any other precautionary measure to mitigate these hazards.

243.    Supplier Defendants fail to adequately describe such dangers or provide precautionary statements regarding such hazards, and they fail to provide instruction or direction on the proper disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the labeling of their products.

244.    As a direct and proximate result of Supplier Defendants' failure to warn of the dangers and hazards posed by discharging their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, such PFAS have damaged Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals.

245.     As a direct, proximate, and foreseeable result of Supplier Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

246.     Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## TENTH CAUSE OF ACTION
### Strict Products Liability – Failure to Warn
### (Burlington)

247.     Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

248.     Burlington manufactured, formulated, promoted, marketed, and/or distributed biosolid products containing PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors.

249.     Burlington's biosolid products were used by agricultural users in a reasonably foreseeable manner and without substantial change in the condition of such products, and Burlington knew that agricultural users purchased and used its products without inspection for defects.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

250.    Burlington knew or should have known that the use of its biosolid products would result in these PFAS being discharged to surface waters, and thereby entering and contaminating Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

251.    Burlington knew that these PFAS in its biosolid products were environmentally persistent and bioaccumulative, that use of its biosolids would cause PFAS to accumulate in soil and groundwater, and that its PFAS would infiltrate surface waters that Plaintiff relies on to supply potable water to the public—making Burlington's biosolid products unreasonably dangerous.

252.    Despite the known and/or foreseeable risk of contaminating potable water sources and Plaintiff's properties, Burlington failed to provide adequate warnings to its customers and other users or to take any other precautionary measures to mitigate those hazards.

253.    Burlington failed to adequately describe such dangers or provide precautionary statements regarding such hazards, and it failed to provide instruction or direction on the proper use and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the labeling of such products. As a result of these failures, Burlington's biosolid products were sold and distributed in an unreasonably dangerous and defective condition.

254.    As a direct and proximate result of Burlington's failure to warn of the dangers and hazards posed by its biosolid products, PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors have damaged Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

255.    As a direct, proximate, and foreseeable result of Burlington's conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties; including loss in value; the cost of removing Burlington's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Burlington's PFAS; and other damages to be proved at trial.

256.    Burlington committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Burlington's conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## ELEVENTH CAUSE OF ACTION

### Breach of Implied Warranties
### (Supplier Defendants)

257.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

258.    Supplier Defendants manufacture, sell, and distribute products to be used in Discharger Defendants' ordinary industrial applications with knowledge of the purposes for which Discharger Defendants use their products.

259.    Supplier Defendants' products include those that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and Supplier Defendants know or have reason to know that such products are not fit for the known and ordinary uses at Discharger Defendants' facilities.

260.    Supplier Defendants know that Discharger Defendants indirectly discharge Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to surface waters, including the Pee Dee River Watershed.

65

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

261.    Supplier Defendants know that PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals are environmentally persistent, bioaccumulative, dose-additive, and toxic, and Supplier Defendants know there is no safe dose of PFOA or PFOS.

262.    Supplier Defendants have breached applicable implied warranties, and as a result, Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system are contaminated with Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

263.    As a direct, proximate, and foreseeable result of Supplier Defendants' breaches of implied warranties, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial. Plaintiff is entitled to damages in an amount that will address its damages caused by Supplier Defendants' breaches of implied warranties.

## TWELFTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Burlington)

264.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

265.    Burlington manufactured, sold, and distributed its biosolid products to be used in ordinary agricultural applications with knowledge of those applications.

66

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

266.    Burlington's biosolid products include PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors, and Burlington knew or had reason to know that such biosolids were not fit for the known and ordinary uses on agricultural lands.

267.    Burlington knew that agricultural users of its biosolid products would apply its biosolids to lands nearby or abutting surface waters in the Pee Dee River Watershed, causing Burlington's PFAS to infiltrate these surface waters.

268.    Burlington knew that these PFAS chemicals are environmentally persistent, bioaccumulative, toxic, and dose-additive, and Burlington knew that there is no safe dose of PFOA or PFOS.

269.    Burlington breached applicable implied warranties, and as a result, caused the contamination of Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from Burlington's PFAS.

270.    As a direct, proximate, and foreseeable result of Burlington's breach of implied warranties, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Burlington's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Burlington's PFAS; and other damages to be proved at trial. Plaintiff is entitled to damages in an amount that will address its damages caused by Burlington's breaches of implied warranties

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiff demands trial by jury, and respectfully requests that the Court grant the following relief where available:

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(a)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate the nuisance they have caused, created, and maintained;

(b)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate their trespasses onto Plaintiff's properties;

(c)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to remove their PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX chemicals from Plaintiff's water systems by funding the evaluation, testing, acquisition, installation, operation, and maintenance of treatment technology capable of removing them;

(d)     Enter a judgment against all Defendants, jointly and severally, for past, present, and future compensatory damages in such amounts as the evidence shows Plaintiff to be justly entitled to recover, including interest and reasonable attorneys' fees and litigation expenses, and punitive damages, as applicable, in an amount sufficient to punish and penalize Defendants, and to deter them from repeating their wrongful conduct, and all costs; and

(e)     Award such other relief and further relief as this Court deems just, proper, and equitable.

*Signature Page Follows*

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

June 5, 2025

69

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| **STATE OF SOUTH CAROLINA**<br>**COUNTY OF HORRY** | **IN THE COURT OF COMMON PLEAS**<br>**FIFTEENTH JUDICIAL CIRCUIT** |

GRAND STRAND WATER AND            )
SEWER AUTHORITY                          )
                                   )     C.A. No.: 2024-CP-26-05523
       Plaintiff,                            )
                                   )
v.                                                 )
                                   )
ALADDIN MANUFACTURING           )
CORPORATION, ET AL.                     )
                                   )
       Defendants.                         )

## DEFENDANTS MOHAWK INDUSTRIES, INC. AND ALADDIN MANUFACTURING CORPORATION'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

Defendants Aladdin Manufacturing Corporation ("Aladdin") and Mohawk Industries, Inc. ("Mohawk," and collectively the "Mohawk Defendants"), by and through its undersigned counsel, hereby file this Answer in response to Plaintiff Grand Strand Water and Sewer Authority's ("Plaintiff") Second Amended Complaint ("Complaint").

Subject to and without waiving the defenses raised in the Mohawk Defendants' Motion to Dismiss and the below Affirmative and Other Defenses, the Mohawk Defendants respond to the Complaint as follows.

The Complaint contains purported references to several documents, third-party publications, and statements that have often been excerpted, paraphrased, characterized, and otherwise taken out of context. These documents, third-party publications, and statements should be considered, if at all, in context and in unmodified form, and the Mohawk Defendants hereby respectfully refer the Court to the respective documents, third-party publications, and statements for their complete contents.

1

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Except as is expressly admitted, qualified, or explained herein, Mohawk Defendants specifically deny each and every allegation contained in the Complaint, including without limitation any allegations contained in titles, headings, and subparagraphs of the Complaint, and specifically denies any liability to Plaintiff. To the extent that the titles, headings, and subparagraphs of the Complaint are intended to be allegations directed at Mohawk Defendants, they are denied.

Mohawk Defendants specifically deny that it contaminated South Carolina waterways with excessive concentrations of PFAS. Furthermore, Mohawk Defendants do not concede that PFAS was present at facilities owned or operated by Mohawk Defendants, nor do Mohawk Defendants concede that it discharged PFAS into any bodies of water.

Mohawk Defendants do not concede or adopt any suggestion, implication, or assertion concerning any alleged connection, association, or causal relationship between PFAS and purported harm to humans.

Plaintiff's use of the term "Defendants" is problematic. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to allegations that pertain to other defendants and, therefore, such allegations are denied. The Mohawk Defendants respond to the allegations contained in the individually numbered paragraphs of the Complaint only on behalf of the Mohawk Defendants themselves.

## STATEMENT OF THE CASE

1.      The allegations in Paragraph 1 contain introductory statements to which no response is required. To the extent a response is required, and to the extent the allegations in Paragraph 1 are directed at Mohawk Defendants, Mohawk Defendants deny the allegations.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

2.     To the extent the allegations in Paragraph 2 are directed at Mohawk Defendants, Mohawk Defendants deny the allegations.

3.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3, and therefore deny them.

4.     Upon information and belief, the Mohawk Defendants admit only that Aladdin owned and/or operated industrial manufacturing facilities upstream of Plaintiff's water intakes. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 4, and, therefore, such allegations are denied.

5.     The Mohawk Defendants deny any allegation that the Mohawk Defendants have contaminated surface waters in the Pee Dee River Watershed. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 5, and, therefore, such allegations are denied.

6.     To the extent the allegations in Paragraph 6 are directed at Mohawk Defendants, the Mohawk Defendants deny the allegations. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 6 and, therefore, such allegations are denied.

7.     The Mohawk Defendants admit that the Complaint purports to seek compensatory, consequential, and punitive damages and equitable and injunctive relief but deny that Plaintiff is entitled to any such relief. The Mohawk Defendants deny the allegations in Paragraph 7 as they relate to Mohawk Defendants.  The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 7, and, therefore, such allegations are denied.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## RESPONSE TO DISCLAIMER

8.     The allegations in Paragraph 8 contain a disclaimer to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8, and therefore deny them.

9.     The allegations in Paragraph 9 contain a legal conclusion and disclaimer to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9, and therefore deny them.

10.     The allegations in Paragraph 10 contain a legal conclusion to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and therefore deny them.

11.     The allegations in Paragraph 11 contain a disclaimer to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11, and therefore deny them.

## RESPONSE TO JURISDICTION AND VENUE

12.     The allegations in Paragraph 12 contain conclusions of law to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

13. The allegations in Paragraph 13 contain conclusions of law to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13, and therefore deny them.

14. The allegations in Paragraph 14 contain conclusions of law to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14, and therefore deny them.

**RESPONSE TO PARTIES**

15. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15, and therefore deny them.

16. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16, and therefore deny them.

17. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17, and therefore deny them.

18. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and therefore denies them.

19. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, and therefore denies them.

20. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20, and therefore denies them.

21. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

22.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22, and therefore denies them.

23.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23, and therefore denies them.

24.     The Mohawk Defendants admit that they are Delaware corporations authorized to do business in South Carolina and that the Oak River Mill plant, located at 2118 Marlboro Road, Blenheim, South Carolina 29516, operated as a yarn conversion and extrusion facility located on the Great Pee Dee River until its closure in October 2022. The Mohawk Defendants further admit that the Oak River Mill plant is approximately 80 miles upstream from the Bull Creek Surface Water Treatment Plant. The Mohawk Defendants deny the remaining allegations in Paragraph 24.

25.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and therefore denies them.

26.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and therefore denies them.

## RESPONSE TO FACTUAL ALLEGATIONS

**"Background and Hazard of PFAS"**

27.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27, and therefore deny them.

28.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28, and therefore deny them.

29.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29, and therefore deny them.

6

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

30.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30, and therefore deny them.

31.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and therefore deny them.

32.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32, and therefore deny them.

33.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33, and therefore deny them.

34.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34, and therefore deny them.

35.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35, and therefore deny them.

36.     The allegations in Paragraph 36 refer to specific publications from the United States Environmental Protection Agency ("EPA"), which speak for themselves. The Mohawk Defendants deny any allegations in Paragraph 36 that are in addition to or inconsistent with the terms of those publications.

37.     The Mohawk Defendants admit that, in 2016, the EPA published a "Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate," which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the health advisories' terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 37.

38.     The Mohawk Defendants admit that, in 2016, the EPA published a "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)" and a "Drinking Water Health Advisory for

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Perfluorooctane Sulfonate (PFOS)," which speak for themselves. The Mohawk Defendants deny any allegation inconsistent with the health advisories' terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 38.

39.     The Mohawk Defendants admit that, in 2022, the EPA published an interim "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)" and an interim "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)," which speak for themselves. The Mohawk Defendants deny any allegation inconsistent with the health advisories' terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 39.

40.     The Mohawk Defendants admit that, in 2022, the EPA published a "Drinking Water Health Advisories for GenX Chemicals and PFBS" which speak for themselves. The Mohawk Defendants deny any allegation inconsistent with the health advisories' terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 40.

41.     The Mohawk Defendants admit that, in 2023, the EPA proposed a National Primary Drinking Water Regulation for six PFAS, including perfluorooctanoic acid (PFOA), perfluorooctane sulfonic acid (PFOS), perfluorononanoic acid (PFNA), hexafluoropropylene oxide dimer acid (HFPO-DA, commonly known as GenX Chemicals), perfluorohexane sulfonic acid (PFHxS), and perfluorobutane sulfonic acid (PFBS), which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 41.

42.     The Mohawk Defendants admit that, in 2023, the EPA proposed a National Primary Drinking Water Regulation for six PFAS, including PFOA, PFOS, PFNA, GenX Chemicals, PFHxS, and PFBS, which speaks for itself. The Mohawk Defendants deny any allegation

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 42.

43.     The Mohawk Defendants admit that, in 2023, the EPA proposed a National Primary Drinking Water Regulation for six PFAS, including PFOA, PFOS, PFNA, GenX Chemicals, PFHxS, and PFBS, which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 43.

44.     The Mohawk Defendants admit that, in 2023, the EPA published a news release titled *EPA Releases Annual Report Showing Steady Progress to Protect Communities from PFAS Pollution*, which speaks for itself. The Mohawk Defendants deny any allegations inconsistent with the news release's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 44.

45.     The Mohawk Defendants admit that, in 2024, the EPA finalized a National Primary Drinking Water Regulation for six PFAS, including perfluorooctanoic acid (PFOA), perfluorooctane sulfonic acid (PFOS), perfluorononanoic acid (PFNA), hexafluoropropylene oxide dimer acid (HFPO-DA, commonly known as GenX Chemicals), perfluorohexane sulfonic acid (PFHxS), and perfluorobutane sulfonic acid (PFBS), which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 45.

46.     The Mohawk Defendants admit that, in 2024, the EPA finalized a National Primary Drinking Water Regulation for six PFAS, including PFOA, PFOS, PFNA, GenX Chemicals, PFHxS, and PFBS, which speaks for itself. The Mohawk Defendants deny any allegation

9

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 46.

47.     The Mohawk Defendants admit that, in 2024, the EPA finalized a National Primary Drinking Water Regulation for six PFAS, including PFOA, PFOS, PFNA, GenX Chemicals, PFHxS, and PFBS, which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 47.

**"Contamination of Bull Creek and Intracoastal Waterway with PFAS"**

48.     Upon information and belief, The Mohawk Defendants admit the allegations in Paragraph 48.

49.     Upon information and belief, Mohawk Defendants admit only that Aladdin Manufacturing Corporation operated the Oak River Mill plant 80 miles upstream of Bull Creek and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 49, and therefore deny them.

50.     The Mohawk Defendants deny the allegations in Paragraph 50 as they relate to the Mohawk Defendants. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 50, and therefore deny them.

51.     The Mohawk Defendants admit that Aladdin operated the Oak River Mill plant 80 miles upstream of Bull Creek. The Mohawk Defendants further admit that the mill's industrial wastewater complied with permits issued by the South Carolina Department of Health. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 51, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

52.    To the extent the allegations in Paragraph 52 are directed at the Mohawk Defendants, upon information and belief, the Mohawk Defendants admit that Aladdin operated the Oak River Mill plant 80 miles upstream of Bull Creek. The Mohawk Defendants further admit that the mill's industrial wastewater complied with permits issued by the South Carolina Department of Health.  The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 52, and therefore deny them.

53.    The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the allegations in Paragraph 53, and therefore deny them.

54.    The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54, and therefore deny them.

55.    The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55, and therefore deny them.

56.    The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the allegations in Paragraph 56, and therefore deny them.

57.    The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57, and therefore deny them.

58.    The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58, and therefore deny them.

59.    The Mohawk Defendants deny the allegations in Paragraph 59 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 59, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

60.     The Mohawk Defendants deny the allegations in Paragraph 60 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 60, and therefore deny them.

61.     The Mohawk Defendants deny the allegations in Paragraph 61 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 61, and therefore deny them.

62.     Paragraph 62 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 62 as they relate to the Mohawk Defendants.

**"Defendants have harmed Plaintiff and Plaintiff's Community"**

63.     The Mohawk Defendants deny the allegations in Paragraph 63 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 63, and therefore deny them.

64.     Paragraph 64 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 64 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 64, and therefore deny them.

65.     Paragraph 65 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 65 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information

12

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 65, and therefore deny them.

66.     Paragraph 66 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 66 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 66, and therefore deny them.

## FIRST CAUSE OF ACTION

### Private Nuisance

67.     The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 66 as if set forth fully herein.

68.     The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68, and therefore deny them.

69.     The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69, and therefore deny them.

70.     Paragraph 70 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 70 as they relate to the Mohawk Defendants.  The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 70, and therefore deny them.

71.     To the extent the allegations in Paragraph 71 are directed at Mohawk Defendants, Mohawk Defendants deny the allegations. The Mohawk Defendants are without knowledge or

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 71, and therefore deny them.

72. Paragraph 72 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 72 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 72, and therefore deny them.

73. Paragraph 73 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 73 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 73, and therefore deny them.

74. Paragraph 74 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 74 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 74, and therefore deny them.

75. Paragraph 75 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 75 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 75, and therefore deny them.

14

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

76.    Paragraph 76 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 76 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 76, and therefore deny them.

77.    Paragraph 77 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 77 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 77, and therefore deny them.

78.    Paragraph 78 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 78 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 78, and therefore deny them.

## SECOND CAUSE OF ACTION

### Public Nuisance

79.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 78 as if set forth fully herein.

80.    The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80, and therefore deny them.

81.    The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

82.     Paragraph 82 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 82 as they relate to the Mohawk Defendants. The remaining allegation in Paragraph 82 refer to specific publications from EPA, which speak for themselves. The Mohawk Defendants deny any allegations in Paragraph 82 that are in addition to or inconsistent with the terms of those publications.

83.     Paragraph 83 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 83 as they relate to the Mohawk Defendants. The allegation in Paragraph 88 refer to specific publications from EPA, which speak for themselves. The Mohawk Defendants deny any allegations in Paragraph 83 that are in addition to or inconsistent with the terms of those publications.  The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 83, and therefore deny them.

84.     Paragraph 84 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 84 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84, and therefore deny them.

85.     Paragraph 85 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 85 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 85, and therefore deny them.

16

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

86.     Paragraph 86 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 86 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 86, and therefore deny them.

87.     Paragraph 87 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 87 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 87, and therefore deny them.

88.     Paragraph 88 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 88 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 88, and therefore deny them.

89.     To the extent the allegations in Paragraph 89 are directed at Mohawk Defendants, Mohawk Defendants deny the allegations. The Mohawk Defendants further deny that they were the source of any alleged contamination referenced in Paragraph 89. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 89, and therefore deny them.

90.     Paragraph 90 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 90 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information

17

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 90, and therefore deny them.

## THIRD CAUSE OF ACTION

### Trespass

91.  The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 90 as if set forth fully herein.

92.  The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92, and therefore deny them.

93.  The allegations in Paragraph 93, including all subparagraphs, are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93, including all subparagraphs, and therefore deny them.

94.  The allegations in Paragraph 94, including all subparagraphs, are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94, including all subparagraphs, and therefore deny them.

95.  Paragraph 95, including its subparagraphs, states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 95 as they relate to the Mohawk Defendants. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 95, and therefore deny them.

96.    The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96, including all subparagraphs, and therefore deny them.

97.    Paragraph 97 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 97 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 97, and therefore deny them.

98.    Paragraph 98 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 98 as they relate to the Mohawk Defendants. To the extent the allegations in Paragraph 98 are directed at other defendants, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98, and therefore deny them.

99.    Paragraph 99 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 99 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 99, and therefore deny them.

100.    Paragraph 100 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 100 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 100, and therefore deny them.

19

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

101.     Paragraph 101 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 101 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 101, and therefore deny them.

## FOURTH CAUSE OF ACTION

### Negligence, Gross Negligence, and/or Recklessness

102.     The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 101 as if set forth fully herein.

103.     Paragraph 103 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 103 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 103, and therefore deny them.

104.     Paragraph 104 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 104 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 104, and therefore deny them.

105.     Paragraph 105 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 105 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 105, and therefore deny them.

106.    The allegations in Paragraph 106 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106, and therefore deny them.

107.    The allegations in Paragraph 107 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107, and therefore deny them.

108.    The allegations in Paragraph 108 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108, and therefore deny them.

109.    The allegations in Paragraph 109 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109, and therefore deny them.

110.    Paragraph 110 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 110 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 110, and therefore deny them.

21

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

111.    Paragraph 111 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 111 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 111, and therefore deny them.

## FIFTH CAUSE OF ACTION

### Strict Products Liability – Ultrahazardous Activity (Burlington)

112.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 111 as if set forth fully herein.

113.    The allegations in Paragraph 113 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113, and therefore deny them.

114.    The allegations in Paragraph 114 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114, and therefore deny them.

115.    The allegations in Paragraph 115 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 115, and therefore deny them.

116.    The allegations in Paragraph 116 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116, and therefore deny them.

117.     The allegations in Paragraph 117 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117, and therefore deny them.

118.     The allegations in Paragraph 118 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118, and therefore deny them.

119.     The allegations in Paragraph 119 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119, and therefore deny them.

120.     The allegations in Paragraph 120 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120, and therefore deny them.

<u>**SIXTH CAUSE OF ACTION**</u>

**Strict Products Liability – Design Defect (Burlington)**

121.     The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 120 as if set forth fully herein.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

122. The allegations in Paragraph 122 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122, and therefore deny them.

123. The allegations in Paragraph 123 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123, and therefore deny them.

124. The allegations in Paragraph 124 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124, and therefore deny them.

125. The allegations in Paragraph 125 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125, and therefore deny them.

126. The allegations in Paragraph 126 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126, and therefore deny them.

127. The allegations in Paragraph 127, including all subparagraphs, are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required,

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127, including all subparagraphs, and therefore deny them.

128.   The allegations in Paragraph 128 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128, and therefore deny them.

129.   The allegations in Paragraph 129 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129, and therefore deny them.

130.   The allegations in Paragraph 130 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130, and therefore deny them.

131.   The allegations in Paragraph 131 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131, and therefore deny them.

132.   The allegations in Paragraph 132 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## SEVENTH CAUSE OF ACTION

### Strict Products Liability – Failure to Warn (Burlington)

133.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 132 as if set forth fully herein.

134.    The allegations in Paragraph 134 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134, and therefore deny them.

135.    The allegations in Paragraph 135 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 135, and therefore deny them.

136.    The allegations in Paragraph 136 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 136, and therefore deny them.

137.    The allegations in Paragraph 137 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 137, and therefore deny them.

138.    The allegations in Paragraph 138 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants

26

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 138, and therefore deny them.

139.    The allegations in Paragraph 139 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139, and therefore deny them.

140.    The allegations in Paragraph 140 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 140, and therefore deny them.

141.    The allegations in Paragraph 141 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141, and therefore deny them.

## EIGHTH CAUSE OF ACTION

### Breach of Implied Warranties (Burlington)

142.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 141 as if set forth fully herein.

143.    The allegations in Paragraph 143 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 143, and therefore deny them.

27

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

144.    The allegations in Paragraph 144 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 144, and therefore deny them.

145.    The allegations in Paragraph 145 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 145, and therefore deny them.

146.    The allegations in Paragraph 146 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146, and therefore deny them.

147.     The allegations in Paragraph 147 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 147, and therefore deny them.

148.    The allegations in Paragraph 148 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 148, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## RESPONSE TO PRAYER FOR RELIEF

Responding to the WHEREFORE Paragraph that follows Paragraph 148 of Plaintiff's Complaint, the Mohawk Defendants deny any and all liability and further denies that Plaintiff is entitled to any of the relief sought in this Paragraph, including subparagraphs (a) through (e).

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming the burden of proof where it otherwise rests with Plaintiff, the Mohawk Defendants assert the following defenses.

### FIRST DEFENSE

Plaintiff's Complaint fails, in whole or in part, to state a claim for relief and should be dismissed in its entirety pursuant to SCRCP 12(b)(6) and 12(c).

### SECOND DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the applicable statutes of limitations and/or repose.

### THIRD DEFENSE

Plaintiff's Complaint, and each cause of action or count alleged therein, fails to join necessary parties.

### FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

### FIFTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because Plaintiff is not the real party in interest.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SIXTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, to the extent Plaintiff has failed to exhaust administrative remedies.

**SEVENTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, by the doctrine of estoppel and/or waiver.

**EIGHTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, by the doctrines of res judicata and/or collateral estoppel.

**NINTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, by the doctrine of election of remedies.

**TENTH DEFENSE**

Pursuant to the South Carolina Contribution Among Tortfeasors Act, S.C. Code Ann. § 15-38-10, *et seq.*, any damages recoverable from the Mohawk Defendants should be limited to the percentage of the relative degree of fault of the Mohawk Defendants as compared with other parties to this action, if any, as well as other persons or entities not presently before this Court.

**ELEVENTH DEFENSE**

Any alleged injuries and/or damages sustained by Plaintiff may have been caused or contributed to by the negligence, omissions or actual conduct of Plaintiff and/or other persons, firms, corporations, or entities over whom the Mohawk Defendants had no control or right of control and for whom the Mohawk Defendants are not responsible.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## TWELFTH DEFENSE

Any alleged injuries and/or damages sustained by Plaintiff may be barred, in whole or in part, by the doctrines of intervening cause and/or superseding cause.

## THIRTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendants proximately caused the purported injuries and damages allegedly sustained by Plaintiffs.

## FOURTEENTH DEFENSE

Plaintiffs' claim for alleged injuries and damages are barred, in whole or in part, because the claims are speculative and conjectural.

## FIFTEENTH DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times.

## SIXTEENTH DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, because federal, state, and/or local authorities authorized, ratified, or were aware of and acquiesced in actions by Defendants that are the subject of Plaintiffs' claims. Defendants are not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency.

## SEVENTEENTH DEFENSE

Plaintiffs' claims are barred to the extent the "permit shield" doctrine and "federally permitted release" defense applies because any leachate was discharged pursuant to lawful permits.

31

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**EIGHTEENTH DEFENSE**

Plaintiffs' claims are or may be barred, in whole or in part, by the doctrine of primary jurisdiction.

**NINETEENTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, under the doctrines of contributory negligence and/or comparative fault, and/or other applicable common law or statutory doctrines.

**TWENTIETH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, because the Mohawk Defendants' actions were in conformity with (i) any federal, state or other regulations, standards, guidelines, specifications, and laws in effect; (ii) available knowledge and research of the scientific and industrial communities; and (iii) generally recognized and prevailing industry standards; and (iv) state of the art in existence at the time the design was prepared and the products were manufactured, handled, sold, distributed, and/or used.

**TWENTY-FIRST DEFENSE**

Any product manufactured, handled, designed, sold, distributed, or used by the Mohawk Defendants and alleged to have caused harm to Plaintiff was, at the time, safer than any reasonable or feasible alternative designs, and any alternative designs would have been less safe, more likely to have caused injury or otherwise not feasible for their intended use.

**TWENTY-SECOND DEFENSE**

Plaintiff's claims may be barred, in whole or in part, because federal, state, and/or local authorities, departments and/or agencies authorized, ratified, or were aware of and acquiesced to actions taken by the Mohawk Defendants that are the subject of Plaintiff's claims. The Mohawk

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Defendants are not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority, department or agency.

## TWENTY-THIRD DEFENSE

Plaintiff's claims may be barred, in whole or in part, under the doctrine of Federal Preemption, including, without limitation, express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices, military specification, and policy statements, enacted and/or promulgated and/or issues by Congress, federal agencies, or the executive branch.

## TWENTY-FOURTH DEFENSE

The Mohawk Defendants assert its rights to allocation, setoff or apportionment of fault pursuant to applicable law, as well as its rights to a proportionate reduction of any damages found against the Mohawk Defendants based on the negligence, omissions or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiff.

## TWENTY-FIFTH DEFENSE

An award of judgment rendered in favor of Plaintiff must be reduced by the amount of compensation Plaintiff received, or is entitled to receive, from any source as a result of Plaintiff's alleged injuries.

## TWENTY-SIXTH DEFENSE

Plaintiff may have failed or refused to exercise reasonable care and diligence to avoid loss and minimize damages and, therefore, may not recover for losses that could have been prevented by reasonable efforts on Plaintiff's part, or by expenditures which might reasonably have been made. Recovery, if any, should therefore be reduced by Plaintiff's failure to mitigate damages, if any.

33

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**TWENTY-SEVENTH DEFENSE**

The Mohawk Defendants and its agents and/or employees acted with due care and otherwise conducted themselves at all relevant times as reasonable people and/or entities under the circumstances.

**TWENTY-EIGHTH DEFENSE**

The Mohawk Defendants have satisfied, fulfilled and performed each and every obligation and duty imposed by law, if any, to the full extent of its responsibility.

**TWENTY-NINTH DEFENSE**

Any alleged injury, damage or loss sustained by Plaintiff in connection with the subject matter of this action was not reasonably foreseeable to the Mohawk Defendants.

**THIRTIETH DEFENSE**

Plaintiff's claims fail as a matter of substantive law and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the South Carolina Constitution to the extent that by relying on market share or other aggregate proof of causation or liability, Plaintiff seeks to deprive the Mohawk Defendants of procedural and substantive safeguards including, but not limited to, statutory and common law defenses to liability and causation generally.

**THIRTY-FIRST DEFENSE**

Plaintiff's claims may be barred for lack of proximate causation between any alleged act, omission, or product of the Mohawk Defendants and the claims, damages, and harm alleged in Plaintiff's Complaint.

**THIRTY-SECOND DEFENSE**

Plaintiff's claims against the Mohawk Defendants are barred by the economic loss rule.

34

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## THIRTY-THIRD DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot prove that its alleged injuries were caused by exposure to PFAS allegedly contained in any product(s) manufactured, handled, distributed, used, or sold by the Mohawk Defendants.

## THIRTY-FOURTH DEFENSE

The Mohawk Defendants affirmatively assert as a defense, credit, or set-off against the damages claimed by Plaintiff, any payment, voluntary payment, or settlement (and any monies paid pursuant thereto) between Plaintiff and any other person or entity. The Mohawk Defendants also assert the affirmative defenses of satisfaction, payment, and release.

## THIRTY-FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that Plaintiff was exposed to a sufficient concentration or amount of PFAS, and/or for a sufficient duration, that has been reliably established, through scientific means, to be capable of causing Plaintiff's alleged injuries.

## THIRTY-SIXTH DEFENSE

To the extent that Plaintiffs have split their claims, Plaintiffs' claims are barred in whole, or in part, by the doctrine prohibiting claim splitting.

## THIRTY-SEVENTH DEFENSE

Plaintiff's purported exposure to products manufactured, handled, distributed, used or sold by the Mohawk Defendants, if any, was too removed, indefinite, de minimis and insufficient to establish a reasonable degree of probability that any such product caused any alleged injury, damage or loss to Plaintiff.

35

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## THIRTY-EIGHTH DEFENSE

The Mohawk Defendants cannot be held jointly and severally liable for the acts or omissions of third parties or other parties because their acts or omissions were separate and distinct and the alleged harm is divisible from and greater than any harm allegedly caused by acts, omissions, or products of the Mohawk Defendants.

## THIRTY-NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff seeks to retroactively impose liability for conduct that was not actionable at the time it occurred, and the Mohawk Defendants may not be held liable under retroactive theories not requiring proof or fault or causation.

## FORTIETH DEFENSE

Plaintiff's claims are barred, in whole or in part, because The Mohawk Defendants neither knew, nor should have known, that any of the chemicals or substances to which Plaintiff was allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of medical, scientific, technical, and/or industrial knowledge available to the Mohawk Defendants at all times relevant to the claims or causes of action asserted by Plaintiff.

## FORTY-FIRST DEFENSE

Plaintiffs' trespass claims are barred because PFAS molecules constitute "tangible" matter that will not support a trespass claim. *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 480 (2013).

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FORTY-SECOND DEFENSE**

The Mohawk Defendants is entitled to all procedural, substantive, and other protections, caps, and limitations provided by applicable state statutes and other state laws regarding Plaintiff's claims for compensatory and punitive damages. The Mohawk Defendants specifically pleads the application of S.C. Code Ann. § 15-32-530 to this action.

**FORTY-THIRD DEFENSE**

The Complaint fails to state a claim upon which punitive damages may be awarded. Nor did the Mohawk Defendants engage in any conduct that would permit an award of punitive damages. And, any award of punitive damages would violate the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, the excessive fines clause of the Eighth Amendment to the United States Constitution, and various articles and sections of the South Carolina Constitution.

**FORTY-FOURTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, by the political question and separation of powers doctrines because their claims implicate issues of statewide importance that are reserved for state regulation.

**FORTY-FIFTH DEFENSE**

Plaintiff's claims against the Mohawk Defendants may not arise out of the same transactions or occurrences as their claims against other defendants, as required for proper joinder of parties.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FORTY-SIXTH DEFENSE

To the extent Plaintiff seeks equitable relief, Plaintiff is not entitled to equitable relief because Plaintiff has an adequate remedy at law, if Plaintiff is entitled to any remedy, and the alleged harm is not irreparable.

## FORTY-SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the free public services doctrine and by the municipal cost recovery doctrine.

## FORTY-EIGHTH DEFENSE

Plaintiff's claims are barred to the extent that Plaintiff's alleged damages are speculative, uncertain, and hypothetical.

## FORTY-NINTH DEFENSE

Plaintiff's damages, if any, may have been the direct and proximate result of facts and circumstances over which the Mohawk Defendants exercises no control.

## FIFTIETH DEFENSE

Plaintiff's nuisance claims are barred, in whole or in part, because they lack the legal authority or standing to bring a nuisance claim under South Carolina law.

## FIFTY-FIRST DEFENSE

Plaintiff's private nuisance claim is barred, in whole or in part, because the Mohawk Defendants did not unreasonably interfere with Plaintiff's ownership or possession of land.

## FIFTY-SECOND DEFENSE

Plaintiff's nuisance claims against the Mohawk Defendants are barred by the doctrine of "coming to the nuisance," the prior nuisance doctrine, and/or the doctrine of consent.

38

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FIFTY-THIRD DEFENSE

Plaintiff's public nuisance claim fails because Plaintiff is not a private person bringing an action for damages to real or personal property.

## FIFTY-FOURTH DEFENSE

Plaintiff's public nuisance claim fails because Plaintiff fails to allege facts showing that the Mohawk Defendants controlled the instrumentality of the alleged nuisance.

## FIFTY-FIFTH DEFENSE

Plaintiff's public nuisance claim fails because Plaintiff failed to plead that it suffered a particular damage beyond that which the public has experienced.

## FIFTY-SIXTH DEFENSE

Plaintiff's trespass claim fails because the Mohawk Defendants did not interfere with Plaintiff's right to the exclusive, peaceable possession of its property.

## FIFTY-SEVENTH DEFENSE

Plaintiff's tort-based claims fail because the Mohawk Defendants do not owe Plaintiff a duty under governing law.

## FIFTY-EIGHTH DEFENSE

Plaintiff's tort-based claims fail because The Mohawk Defendants did not breach any duty allegedly owed to Plaintiff.

## FIFTY-NINTH DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of risk, and open and obvious risk.

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SIXTIETH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, because the Mohawk Defendants complied at all relevant times with all applicable laws, including all legal and regulatory duties.

**SIXTY-FIRST DEFENSE**

Plaintiff's claims may be barred, reduced, or limited pursuant to the applicable South Carolina statutory and common law regarding limitations of awards, caps on recovery, and setoffs.

**SIXTY-SECOND DEFENSE**

Plaintiffs' claims against Defendants under the South Carolina Unfair Trade Practices Act are barred in whole or in part to the extent that the Act: (i) does not allow for recovery by any party who is not considered a "person" under S.C. Code Ann § 39-5-10(a) and (ii) does not govern conduct that did not occur in "trade and commerce." S.C. Code Ann. § 39-5-20(a).

**SIXTY-THIRD DEFENSE**

To the extent Plaintiff seeks recovery of attorneys' fees and costs, Plaintiff is not entitled to any attorneys' fees or costs associated with this action because no statute or contract exists that would give Plaintiff the right to recover such fees or costs.

**SIXTY-FOURTH DEFENSE**

The Mohawk Defendants adopts by reference any additional applicable defense pled by any other defendant not otherwise pled herein.

**RESERVATION OF RIGHTS**

The Mohawk Defendants hereby reserve the right to amend this Answer, raise additional defenses as may be discovered during the course of this litigation and its continuing factual investigations, add cross-claims, or assert third-party claims pursuant to the provisions of the South Carolina Rules of Civil Procedure, the substantive law of South Carolina, and the inherent

ELECTRONICALLY FILED - 2025 Jun 06 2:04 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

authority of this Court to manage the procedural aspects of this litigation. Any allegation not expressly admitted in this Answer is denied.

WHEREFORE, having fully answered Plaintiff's Complaint, The Mohawk Defendants deny that Plaintiff is entitled to any of the relief requested in the Complaint, and respectfully prays for the dismissal of Plaintiff's Complaint with prejudice and for such other and further relief as this Court may deem just and proper.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: s/ MERRITT G. ABNEY
    Merritt G. Abney
    SC Bar No. 71893
    E-Mail: merritt.abney@nelsonmullins.com
    Sarah Specter Powell
    SC Bar No. 104261
    E-Mail: sarah.powell@nelsonmullins.com
    151 Meeting Street / Sixth Floor
    Post Office Box 1806 (29402-1806)
    Charleston, SC  29401-2239
    (843) 853-5200

    Wesley T. Moran
    South Carolina Bar No. 102787
    E-Mail: wes.moran@nelsonmullins.com
    3751 Robert M. Grissom Parkway / Suite 300
    Post Office Box 3939 (29578-3939)
    Myrtle Beach, SC 29577-6412
    (843) 448-3500

    *Attorneys for Defendants Aladdin Manufacturing Corporation and Mohawk Industries, Inc.*

Charleston, South Carolina

June 6, 2025

41

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

Grand Strand Water and Sewer Authority,

Plaintiff,

v.

Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC, PRET Textiles, Inc.; Fiber Industries, LLC; GFL Environmental USA, Inc.; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; and Waste Industries, LLC,

Defendants.

IN THE COURT OF COMMON PLEAS

FIFTEENTH JUDICIAL CIRCUIT

C.A. No.: 2024-CP-26-05523

**DEFENDANT PRET ADVANCED MATERIALS, INC.'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant PRET Advanced Materials, LLC ("PRET"), denying each and every allegation not specifically admitted herein, hereby submits its Answer to Plaintiff Grand Strand Water and Sewer Authority's ("Plaintiff" or "GSWSA") Second Amended Complaint (the "Complaint").

**STATEMENT OF THE CASE[1]**

1.    PRET denies each and every allegation in Paragraph 1.

2.    PRET denies each and every allegation in Paragraph 2.

3.    PRET lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 of the Complaint, and therefore denies them.

---

[1] The headers used in this Answer are for ease of reference and correspond to the headers set forth in Plaintiff's Second Amended Complaint.  They do not constitute an admission by PRET as to any allegation in the Second Amended Complaint.

1

4.     PRET denies each and every allegation in Paragraph 4.

5.     PRET denies each and every allegation in Paragraph 5.

6.     PRET denies each and every allegation in Paragraph 6.

7.     PRET denies each and every allegation in Paragraph 7.

## DISCLAIMER

8.     Paragraph 8 sets forth legal conclusions to which no response is required.  To the extent a response is required, PRET denies each and every allegation in Paragraph 8.

9.     The allegations in Paragraph 9 sets forth legal conclusions to which no response is required.  The allegations in Paragraph 9 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET denies each and every allegation in Paragraph 9.

10.     Paragraph 10 sets forth legal conclusions to which no response is required.  To the extent a response is required, PRET denies each and every allegation in Paragraph 10.

11.     Paragraph 11 sets forth legal conclusions to which no response is required.  To the extent a response is required, PRET denies each and every allegation in Paragraph 11.

## JURISDICTION AND VENUE

12.     Paragraph 12 sets forth legal conclusions to which no response is required.  To the extent a response is required, PRET denies each and every allegation in Paragraph 12.

13.     Paragraph 13 sets forth legal conclusions to which no response is required.  To the extent a response is required, PRET denies each and every allegation in Paragraph 13.

14.     Paragraph 14 sets forth legal conclusions to which no response is required.  To the extent a response is required, PRET denies each and every allegation in Paragraph 14.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

2

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## PARTIES

### I.     Plaintiff

15.     PRET lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Complaint, and therefore denies them.

16.     PRET lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 of the Complaint, and therefore denies them.

17.     PRET lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 of the Complaint, and therefore denies them.

### II.     Defendants

18.     The allegations in Paragraph 18 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the Complaint, and therefore denies them.

19.     The allegations in Paragraph 19 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint, and therefore denies them.

20.     The allegations in Paragraph 20 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint, and therefore denies them.

21.     The allegations in Paragraph 21 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks

3

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the Complaint, and therefore denies them.

22. The allegations in Paragraph 22 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 of the Complaint, and therefore denies them.

23. The allegations in Paragraph 23 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 of the Complaint, and therefore denies them.

24. The allegations in Paragraph 24 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Complaint, and therefore denies them.

25. The allegations in Paragraph 25 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 of the Complaint, and therefore denies them.

26. In response to Paragraph 26 of the Complaint, PRET admits that it is a Delaware limited liability company that owns and operates a facility located at 520 Kingsburg Highway, Johnsonville, South Carolina 29555. PRET denies the each and every remaining allegation in Paragraph 26 that is directed at PRET. PRET states that the remaining allegations in Paragraph 26 are not directed at PRET and therefore do not require a response from PRET. To the extent a

4

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 of the Complaint, and therefore denies them.

## FACTUAL ALLEGATIONS

### I.     Background and Hazards of PFAS

27.     PRET lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 27 of the Complaint, and therefore denies them.

28.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 28 of the Complaint, and therefore denies them.

29.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 29 of the Complaint, and therefore denies them.

30.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 30 of the Complaint, and therefore denies them.

31.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 31 of the Complaint, and therefore denies them.

32.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 32 of the Complaint, and therefore denies them.

33.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 33 of the Complaint, and therefore denies them.

34.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 34 of the Complaint, and therefore denies them.

35.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 35 of the Complaint, and therefore denies them.

5

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

36.     In response to Paragraph 36 of the Complaint, PRET states that the publication referred to in Paragraph 36 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, PRET denies the allegations in Paragraph 36.

37.     In response to Paragraph 37 of the Complaint, PRET states that the publication referred to in Paragraph 37 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, PRET denies the allegations in Paragraph 37.

38.     In response to Paragraph 38 of the Complaint, PRET states that the publication referred to in Paragraph 38 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, PRET denies the allegations in Paragraph 38.

39.     In response to Paragraph 39 of the Complaint, PRET states that the publication referred to in Paragraph 39 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, PRET denies the allegations in Paragraph 39.

40.     In response to Paragraph 40 of the Complaint, PRET states that the publication referred to in Paragraph 40 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, PRET denies the allegations in Paragraph 40.

41.     In response to Paragraph 41 of the Complaint, PRET states that the publication referred to in Paragraph 41 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, PRET denies the allegations in Paragraph 41.

42.     In response to Paragraph 42 of the Complaint, PRET states that the publication referred to in Paragraph 42 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, PRET denies the allegations in Paragraph 42.

43.     In response to Paragraph 43 of the Complaint, PRET states that the publication referred to in Paragraph 43 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 43.

44.     In response to Paragraph 44 of the Complaint, PRET states that the publication referred to in Paragraph 44 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 44.

45.     In response to Paragraph 45 of the Complaint, PRET states that the publication referred to in Paragraph 45 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 45.

46.     Paragraph 46 sets forth legal conclusions to which no response is required. PRET also states that the publication referred to in Paragraph 46 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 46.

47.     Paragraph 47 sets forth legal conclusions to which no response is required. PRET lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 47, and therefore denies them.

II.     **Contamination of Bull Creek and the Intracoastal Waterway with PFAS**

48.     Upon information and belief, Paragraph 48 of the Complaint is admitted.

49.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 49 of the Complaint, and therefore denies them.

50.     PRET denies the allegations in Paragraph 50 of the Complaint as they relate to PRET. PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 50, and therefore denies them.

7

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

51.     In response to Paragraph 51 of the Complaint, PRET admits only that it owns and operates a facility in Johnsonville, South Carolina.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 51, and therefore denies them.  Further answering the allegations of Paragraph 51, PRET asserts that, at all times, it complied with government permits issued to it relating to wastewater.

52.     The allegations in Paragraph 52 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 52, and therefore denies them.

53.     In response to Paragraph 53 of the Complaint, PRET admits only that it owns and operates a facility in Johnsonville, South Carolina.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 53, and therefore denies them.  Further answering the allegations of Paragraph 53, PRET asserts that, at all times, it complied with government permits issued to it relating to wastewater.

54.     The allegations in Paragraph 54 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 54, and therefore denies them.

55.     PRET denies each and every allegation in Paragraph 55 of the Complaint.

56.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 56 of the Complaint, and therefore denies them.

57.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 57 of the Complaint, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

58.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 58 of the Complaint, and therefore denies them.

59.     PRET denies each and every allegation in Paragraph 59 of the Complaint.

60.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 60 of the Complaint, and therefore denies them.

61.     PRET denies the allegations in Paragraph 61 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 61, and therefore denies them.

62.     PRET denies each and every allegation in Paragraph 62 of the Complaint.

**III.     Defendants have harmed Plaintiff and Plaintiff's community.**

63.     PRET denies each and every allegation in Paragraph 63 of the Complaint.

64.     PRET denies each and every allegation in Paragraph 64 of the Complaint.

65.     PRET denies each and every allegation in Paragraph 65 of the Complaint.

66.     PRET denies each and every allegation in Paragraph 66 of the Complaint.

**FIRST CAUSE OF ACTION**
**Private Nuisance**

67.     PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

68.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 68 of the Complaint, and therefore denies them.

69.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 69 of the Complaint, and therefore denies them.

70.     PRET denies each and every allegation in Paragraph 70 of the Complaint.

71.     PRET denies each and every allegation in Paragraph 71 of the Complaint.

9

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

72. PRET denies each and every allegation in Paragraph 72 of the Complaint.

73. PRET denies each and every allegation in Paragraph 73 of the Complaint.

74. PRET denies each and every allegation in Paragraph 74 of the Complaint.

75. PRET denies each and every allegation in Paragraph 75 of the Complaint.

76. PRET denies each and every allegation in Paragraph 76 of the Complaint.

77. PRET denies each and every allegation in Paragraph 77 of the Complaint.

78. PRET denies each and every allegation in Paragraph 78 of the Complaint.

## SECOND CAUSE OF ACTION
### Public Nuisance

79. PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

80. PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 80 of the Complaint, and therefore denies them.

81. PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 81 of the Complaint, and therefore denies them.

82. Paragraph 82 sets forth legal conclusions to which no response is required. To the extent a response is required, PRET denies each and every allegation in Paragraph 82.

83. PRET denies each and every allegation in Paragraph 83 of the Complaint.

84. PRET denies each and every allegation in Paragraph 84 of the Complaint.

85. PRET denies each and every allegation in Paragraph 85 of the Complaint.

86. PRET denies each and every allegation in Paragraph 86 of the Complaint.

87. PRET denies each and every allegation in Paragraph 87 of the Complaint.

88. PRET denies each and every allegation in Paragraph 88 of the Complaint.

89. PRET denies each and every allegation in Paragraph 89 of the Complaint.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

90.     PRET denies each and every allegation in Paragraph 90 of the Complaint.

## THIRD CAUSE OF ACTION
### Trespass

91.     PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

92.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 92 of the Complaint, and therefore denies them.

93.     PRET denies each and every allegation in Paragraph 93 of the Complaint, including all subparts (a)-(d).

94.     The allegations in Paragraph 94 of the Complaint are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 94 of the Complaint, including subparts (a), (b), (e), and (c), and therefore denies them.

95.     The allegations in Paragraph 95 of the Complaint are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 95 of the Complaint, including subparts (a)-(c), and therefore denies them.

96.     PRET denies each and every allegation in Paragraph 96 of the Complaint.

97.     PRET denies each and every allegation in Paragraph 97 of the Complaint.

98.     PRET denies each and every allegation in Paragraph 98 of the Complaint.

99.     PRET denies each and every allegation in Paragraph 99 of the Complaint.

100.     PRET denies each and every allegation in Paragraph 100 of the Complaint.

101.     PRET denies each and every allegation in Paragraph 101 of the Complaint.

11

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FOURTH CAUSE OF ACTION**
**Negligence, Gross Negligence, and/or Recklessness**

102.    PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

103.    Paragraph 103 of the Complaint sets forth legal conclusions to which no response is required.  PRET denies each and every allegation in Paragraph 103 of the Complaint.

104.    PRET denies each and every allegation in Paragraph 104 of the Complaint.

105.    PRET denies each and every allegation in Paragraph 105 of the Complaint.

106.    The allegations in Paragraph 106 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 106, and therefore denies them.

107.    The allegations in Paragraph 107 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 107, and therefore denies them.

108.    The allegations in Paragraph 108 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 108, and therefore denies them.

109.    The allegations in Paragraph 109 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 109, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

110.    PRET denies each and every allegation in Paragraph 110 of the Complaint

111.    PRET denies each and every allegation in Paragraph 111 of the Complaint

**FIFTH CAUSE OF ACTION**
**Strict Products Liability – Ultrahazardous Activity**
**(Burlington)**

112.    PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

113.    The allegations in Paragraph 113 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 113, and therefore denies them.

114.    The allegations in Paragraph 114 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 114, and therefore denies them.

115.    The allegations in Paragraph 115 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 115, and therefore denies them.

116.    The allegations in Paragraph 116 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 116, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

117. The allegations in Paragraph 117 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 117, and therefore denies them.

118. The allegations in Paragraph 118 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 118, and therefore denies them.

119. The allegations in Paragraph 119 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 119, and therefore denies them.

120. The allegations in Paragraph 120 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 120, and therefore denies them.

<u>**SIXTH CAUSE OF ACTION**</u>
**Strict Products Liability – Design Defect**
**(Burlington)**

121. PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

122. The allegations in Paragraph 122 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks

14

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 122, and therefore denies them.

123.   The allegations in Paragraph 123 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 123, and therefore denies them.

124.   The allegations in Paragraph 124 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 124, and therefore denies them.

125.   The allegations in Paragraph 125 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 125, and therefore denies them.

126.   The allegations in Paragraph 126 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 126, and therefore denies them.

127.   The allegations in Paragraph 127, including all subparts, are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 127, including all subparts (a)-(f), and therefore denies them.

15

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

128. The allegations in Paragraph 128 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 128, and therefore denies them.

129. The allegations in Paragraph 129 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 129, and therefore denies them.

130. The allegations in Paragraph 130 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 130, and therefore denies them.

131. The allegations in Paragraph 131 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 131, and therefore denies them.

132. The allegations in Paragraph 132 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 132, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SEVENTH CAUSE OF ACTION**

**Strict Products Liability – Failure to Warn**
**(Burlington)**

133.    PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

134.    The allegations in Paragraph 134 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 134, and therefore denies them.

135.    The allegations in Paragraph 135 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 135, and therefore denies them.

136.    The allegations in Paragraph 136 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 136, and therefore denies them.

137.    The allegations in Paragraph 137 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 137, and therefore denies them.

138.    The allegations in Paragraph 138 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 138, and therefore denies them.

139.   The allegations in Paragraph 139 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 139, and therefore denies them.

140.   The allegations in Paragraph 140 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 140, and therefore denies them.

141.   The allegations in Paragraph 141 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 141, and therefore denies them.

<u>**EIGHTH CAUSE OF ACTION**</u>
**Breach of Implied Warranties**
**(Burlington)**

142.   PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

143.   The allegations in Paragraph 143 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 143, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

144.    The allegations in Paragraph 144 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 144, and therefore denies them.

145.    The allegations in Paragraph 145 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 145, and therefore denies them.

146.    The allegations in Paragraph 146 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 146, and therefore denies them.

147.    The allegations in Paragraph 147 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 147, and therefore denies them.

148.    The allegations in Paragraph 148 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 148, and therefore denies them.

<u>**PRAYER FOR RELIEF**</u>

In response to the WHEREFORE Paragraph that follows Paragraph 148 of the Complaint, PRET denies any liability and further denies that Plaintiff is entitled to any of the relief sought in

19

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

this Paragraph, including subparts (a) through (e).

## ADDITIONAL DEFENSES

Without assuming the burden of proof where it otherwise rests with Plaintiff or another third party, PRET further pleads the following additional defenses to all the individual claims alleged in the Complaint. All of the following defenses are pled in the alternative and none of them constitute an admission that PRET is liable to Plaintiff or any third party, that Plaintiff or any third party has been or will be injured or damaged in any way, or that Plaintiff or any third party is entitled to any relief whatsoever.

## FIRST DEFENSE

The Complaint, and each cause of action or count alleged therein, fails to state facts sufficient to constitute a claim upon which relief may be granted against PRET.

## SECOND DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the applicable statutes of limitations and/or repose.

## THIRD DEFENSE

The Complaint, and each alleged claim contained therein, fails to join necessary and indispensable parties.

## FOURTH DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the doctrine of laches, waiver, res judicata, estoppel collateral, estoppel, ratification, and unclean hands.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FIFTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, because Plaintiff is not the real party in interest.

**SIXTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, to the extent Plaintiff has failed to exhaust administrative remedies.

**SEVENTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, by the doctrine of election of remedies.

**EIGHTH DEFENSE**

Pursuant to the South Carolina Contribution Among Tortfeasors Act, S.C. Code Ann. § 15-38-10, et seq., any damages recoverable from PRET should be limited to the percentage of the relative degree of fault of PRET as compared with other parties to this action, if any, as well as other persons or entities not presently before this Court.

**NINTH DEFENSE**

Any injuries and/or damages alleged by Plaintiff were caused or contributed to by the negligence or actual conduct of other persons, firms, corporations, or entities over whom PRET had no control or right of control and for whom PRET is not responsible.

**TENTH DEFENSE**

Any injuries and/or damages alleged by Plaintiff are barred by the doctrines of intervening cause and/or superseding cause.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ELEVENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendants proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

**TWELFTH DEFENSE**

Plaintiff's claims are not ripe for adjudication and should be dismissed for presenting a contingent, hypothetical, or abstract dispute. Plaintiff alleges that it will be required to incur costs at some future date if the United States Environmental Protection Agency requires plaintiff to upgrade its systems to treat PFAS. Until these costs are incurred, Plaintiff cannot recover.

Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency has set final water quality standards, maximum contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether natural resources have been injured.

**THIRTEENTH DEFENSE**

Plaintiff's claims are or may be barred, in whole or in part, because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times.

**FOURTEENTH DEFENSE**

Plaintiff's claims are or may be barred, in whole or in part, because federal, state, and/or local authorities authorized, ratified, or were aware of and acquiesced in actions by Defendants that are the subject of Plaintiff's claims. Defendants are not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency.

22

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FIFTEENTH DEFENSE**

Plaintiff's claims are barred to the extent the "permit shield" doctrine and "federally permitted release" defense applies because any leachate was discharged pursuant to lawful permits.

**SIXTEENTH DEFENSE**

Plaintiff's claims are or may be barred, in whole or in part, by the doctrine of primary jurisdiction.

**SEVENTEENTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, under the doctrines of contributory negligence and/or comparative fault, and/or other applicable common law or statutory doctrines.

**EIGHTEENTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, because PRET's actions were in conformity with (i) any federal, state or other regulations, standards, guidelines, specifications, and laws in effect; (ii) available knowledge and research of the scientific and industrial communities; (iii) generally recognized and prevailing industry standards; and (iv) state of the art in existence at the time the design was prepared and the products were manufactured, handled, sold, distributed, and/or used.

**NINETEENTH DEFENSE**

Any product manufactured, handled, designed, sold, distributed, or used by PRET and alleged to have caused harm to Plaintiff was, at the time, safer than any reasonable or feasible alternative designs, and any alternative designs would have been less safe, more likely to have caused injury or otherwise not feasible for their intended use.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**TWENTIETH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, because federal, state, and/or local authorities, departments and/or agencies authorized, ratified, or were aware of and acquiesced to actions taken by PRET that are the subject of Plaintiff's claims. PRET is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority, department or agency.

**TWENTY-FIRST DEFENSE**

Plaintiff's claims may be barred, in whole or in part, under the doctrine of Federal Preemption, including, without limitation, express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices, military specification, and policy statements, enacted and/or promulgated and/or issues by Congress, federal agencies, or the executive branch.

**TWENTY-SECOND DEFENSE**

PRET asserts its rights to allocation, setoff or apportionment of fault pursuant to applicable law, as well as its rights to a proportionate reduction of any damages found against PRET based on the negligence, omissions or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiff.

**TWENTY-THIRD DEFENSE**

An award of judgment rendered in favor of Plaintiff must be reduced by the amount of compensation Plaintiff received, or is entitled to receive, from any source as a result of Plaintiff's alleged injuries.

**TWENTY-FOURTH DEFENSE**

Plaintiff may have failed or refused to exercise reasonable care and diligence to avoid loss

24

and minimize damages and, therefore, may not recover for losses that could have been prevented by reasonable efforts on Plaintiff's part, or by expenditures which might reasonably have been made. Recovery, if any, should therefore be reduced by Plaintiff's failure to mitigate damages, if any

## TWENTY-FIFTH DEFENSE

PRET and its agents and/or employees acted with due care and otherwise conducted themselves at all relevant times as reasonable people and/or entities under the circumstances.

## TWENTY-SIXTH DEFENSE

PRET has satisfied, fulfilled and performed each and every obligation and duty imposed by law, if any, to the full extent of its responsibility.

## TWENTY-SEVENTH DEFENSE

Any alleged injury, damage or loss sustained by Plaintiff in connection with the subject matter of this action was not reasonably foreseeable to PRET

## TWENTY-EIGHTH DEFENSE

Plaintiff's claims fail as a matter of substantive law and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the South Carolina Constitution to the extent that by relying on market share or other aggregate proof of causation or liability, Plaintiff seeks to deprive PRET of procedural and substantive safeguards including, but not limited to, statutory and common law defenses to liability and causation generally.

## TWENTY-NINTH DEFENSE

Plaintiff's claims may be barred for lack of proximate causation between any alleged act, omission, or product of PRET and the claims, damages, and harm alleged in Plaintiff's Complaint.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## THIRTIETH DEFENSE

Plaintiff's claims against PRET are barred by the economic loss rule.

## THIRTY-FIRST DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot prove that its alleged injuries were caused by exposure to PFAS allegedly contained in any product(s) manufactured, handled, distributed, used, or sold by PRET.

## THIRTY-SECOND DEFENSE

PRET affirmatively asserts as a defense, credit, or set-off against the damages claimed by Plaintiff, any payment, voluntary payment, or settlement (and any monies paid pursuant thereto) between Plaintiff and any other person or entity. PRET also asserts the affirmative defenses of satisfaction, payment, and release.

## THIRTY-THIRD DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that Plaintiff was exposed to a sufficient concentration or amount of PFAS, and/or for a sufficient duration, that has been reliably established, through scientific means, to be capable of causing Plaintiff's alleged injuries.

## THIRTY-FOURTH DEFENSE

To the extent that Plaintiff has split its claims, Plaintiff's claims are barred in whole, or in part, by the doctrine prohibiting claim splitting.

## THIRTY-FIFTH DEFENSE

Plaintiff's purported exposure to products manufactured, handled, distributed, used or sold by PRET, if any, was too removed, indefinite, de minimis and insufficient to establish a reasonable degree of probability that any such product caused any alleged injury, damage or loss to Plaintiff.

26

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**THIRTY-SIXTH DEFENSE**

PRET cannot be held jointly and severally liable for the acts or omissions of third parties or other parties because their acts or omissions were separate and distinct and the alleged harm is divisible from and greater than any harm allegedly caused by acts, omissions, or products of PRET.

**THIRTY-SEVENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff seeks to retroactively impose liability for conduct that was not actionable at the time it occurred, and PRET may not be held liable under retroactive theories not requiring proof or fault or causation.

**THIRTY-EIGHTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, because PRET neither knew, nor should have known, that any of the chemicals or substances to which Plaintiff was allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of medical, scientific, technical, and/or industrial knowledge available to PRET at all times relevant to the claims or causes of action asserted by Plaintiff.

**THIRTY-NINTH DEFENSE**

Plaintiff's trespass claims are barred because PFAS molecules constitute "tangible" matter that will not support a trespass claim. *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 480 (2013).

**FOURTIETH DEFENSE**

PRET is entitled to all procedural, substantive, and other protections, caps, and limitations provided by applicable state statutes and other state laws regarding Plaintiff's claims for compensatory and punitive damages. PRET specifically pleads the application of S.C. Code Ann. § 15-32-530 to this action.

27

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FORTY-FIRST DEFENSE**

The Complaint fails to state a claim upon which punitive damages may be awarded.  Nor did PRET engage in any conduct that would permit an award of punitive damages. And, any award of punitive damages would violate the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, the excessive fines clause of the Eighth Amendment to the United States Constitution, and various articles and sections of the South Carolina Constitution.

**FORTY-SECOND DEFENSE**

Plaintiff's claims may be barred, in whole or in part, by the political question and separation of powers doctrines because their claims implicate issues of statewide importance that are reserved for state regulation.

**FORTY-THIRD DEFENSE**

Plaintiff's claims against PRET may not arise out of the same transactions or occurrences as their claims against other defendants, as required for proper joinder of parties.

**FORTY-FOURTH DEFENSE**

To the extent Plaintiff seeks equitable relief, Plaintiff is not entitled to equitable relief because Plaintiff has an adequate remedy at law, if Plaintiff is entitled to any remedy, and the alleged harm is not irreparable.

**FORTY-FIFTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the free public services doctrine and by the municipal cost recovery doctrine.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FORTY-SIXTH DEFENSE**

Plaintiff's claims are barred to the extent that Plaintiff's alleged damages are speculative, uncertain, and hypothetical.

**FORTY-SEVENTH DEFENSE**

Plaintiff's damages, if any, may have been the direct and proximate result of facts and circumstances over which PRET exercises no control.

**FORTY-EIGHTH DEFENSE**

Plaintiff's nuisance claims are barred, in whole or in part, because they lack the legal authority or standing to bring a nuisance claim under South Carolina law.

**FORTY-NINTH DEFENSE**

Plaintiff's private nuisance claim is barred, in whole or in part, because PRET did not unreasonably interfere with Plaintiff's ownership or possession of land.

**FIFTIETH DEFENSE**

Plaintiff's nuisance claims against PRET are barred by the doctrine of "coming to the nuisance," the prior nuisance doctrine, and/or the doctrine of consent.

**FIFTY-FIRST DEFENSE**

Plaintiff's public nuisance claim fails because Plaintiff is not a private person bringing an action for damages to real or personal property.

**FIFTY-SECOND DEFENSE**

Plaintiff's public nuisance claim fails because Plaintiff failed to plead that it suffered a particular damage beyond that which the public has experienced.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FIFTY-THIRD DEFENSE**

Plaintiff's trespass claim fails because PRET did not interfere with Plaintiff's right to the exclusive, peaceable possession of its property.

**FIFTY-FOURTH DEFENSE**

Plaintiff's tort-based claims fail because PRET does not owe Plaintiff a duty under governing law.

**FIFTY-FIFTH DEFENSE**

Plaintiff's tort-based claims fail because PRET did not breach any duty allegedly owed to Plaintiff.

**FIFTY-SIXTH DEFENSE**

Plaintiff's claims are or may be barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of risk, and open and obvious risk.

**FIFTY-SIXTH DEFENSE**

Plaintiff's claims may be barred, in whole or in part, because PRET complied at all relevant times with all applicable laws, including all legal and regulatory duties.

**FIFTY-SEVENTH DEFENSE**

Plaintiff's claims may be barred, reduced, or limited pursuant to the applicable South Carolina statutory and common law regarding limitations of awards, caps on recovery, and setoffs.

**FIFTY-EIGHTH DEFENSE**

To the extent Plaintiff seeks recovery of attorneys' fees and costs, Plaintiff is not entitled to any attorneys' fees or costs associated with this action because no statute or contract exists that would give Plaintiff the right to recover such fees or costs.

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FIFTY-NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because PRET did not own, operate, or otherwise control the facilities or activities described in the Complaint at the time that PFAS is alleged to have migrated out of those facilities.

## SIXTIETH DEFENSE

PRET adopts by reference any additional applicable defense pled by any other defendant not otherwise pled herein.

## RESERVATION OF RIGHTS

PRET hereby reserves the right to amend this Answer, raise additional defenses as may be discovered during the course of this litigation and its continuing factual investigations, add cross-claims, or assert third-party claims pursuant to the provisions of the South Carolina Rules of Civil Procedure, the substantive law of South Carolina, and the inherent authority of this Court to manage the procedural aspects of this litigation.  Any allegation not expressly admitted in this Answer is denied.

WHEREFORE, having fully answered Plaintiff's Complaint, PRET Advanced Materials, LLC denies that Plaintiff is entitled to any of the relief requested in the Second Amended Complaint, and respectfully prays for the dismissal of Plaintiff's Second Amended Complaint with prejudice and for such other and further relief as this Court may deem just and proper.

[*Signature Block on Following Page*]

31

ELECTRONICALLY FILED - 2025 Jun 09 2:25 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

By: s/ Robert Y. Knowlton
Robert Y. Knowlton, S.C. Bar No. 3589
John P. Boyd, S.C. Bar No. 72412
1201 Main Street, 22nd Floor (29201)
Post Office Box 11889
Columbia, SC 29211-1889
(803) 779-3080
bknowlton@hsblawfirm.com
jboyd@hsblawfirm.com

Frank T. Davis, S.C. Bar No. 66291
Jonathan D. Klett, S.C. Bar. 103208
One North Main, 2nd Floor
(864)240-3211
fdavis@hsblawfirm.com
jklett@hsblawfirm.com

*Attorneys for Defendant PRET Advanced
Materials, LLC*

June 9, 2025

32

ELECTRONICALLY FILED - 2025 Jun 13 12:35 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

_____

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc.; Aladdin Manufacturing Corporation; Archroma U.S., Inc; Arkema, Inc.; Burlington Industries, Inc.; Clariant Corporation; Corteva, Inc.; Daikin America, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; DuPont de Nemours, Inc.; EIDP, Inc.; Elevate Textiles, Inc.; Fiber Industries, LLC; Huntsman International, LLC; International Paper Company; INV Performance Surfaces, LLC; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; Sampson County Disposal, LLC; Solvay Specialty Polymers USA, LLC; Sonoco Products Company; The Chemours Company; and Westrock CP, LLC,

*Defendants*.

C.A. No. 2024-CP-26-05523

**[PROPOSED] ORDER GRANTING PLAINTIFF'S
MOTION FOR LEAVE TO AMEND**

This matter came before the Court on Plaintiff's Motion for Leave to Amend pursuant to

Rule 15(a), SCRCP, which Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff") filed

in this matter on June 5, 2025. Along with filing the Motion for Leave to Amend, Plaintiff filed

ELECTRONICALLY FILED - 2025 Jun 13 12:35 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the proposed Third Amended Summons and Complaint. Having reviewed and considered Plaintiff's Motion and the proposed Third Amended Summons and Complaint, the Court finds that Plaintiff should be granted leave to amend the summons and complaint in this matter and GRANTS Plaintiff's Motion for Leave to Amend for the following reasons:

Rule 15(a) of the South Carolina Rules of Civil Procedure governs the amendment of pleadings. The Rule permits a party to amend its pleadings more than "30 days after a responsive pleading is served" if the party obtains either written consent from the adverse parties or leave of court, "and leave shall be freely given when justice so requires and does not prejudice any other party." Rule 15(a), SCRCP. "This rule strongly favors amendments and the court is encouraged to freely grant leave to amend." *Parker v. Spartanburg Sanitary Sewer Dist.*, 362 S.C. 276, 286, 607 S.E.2d 711, 717 (Ct. App. 2005). South Carolina's Rule 15(a) "is substantially the same as the Federal Rule, . . . and the Supreme Court of the United States has referred to the Rule's 'freely given' provision as a 'mandate' that 'is to be heeded.'" *Patton v. Miller*, 420 S.C. 471, 490, 804 S.E.2d 252, 262 (2017) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The party opposing a motion for leave to amend has the burden to establish prejudice—i.e., "a lack of notice that the new issue is to be tried and a lack of opportunity to refute it." *Stanley v. Kirkpatrick*, 357 S.C. 169, 175, 592 S.E.2d 296, 2986 (2004); *see also Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*, 403 S.C. 623, 632, 743 S.E.2d 808, 812 (2013) ("A motion to amend is within the sound discretion of the trial judge and the opposing party has the burden of establishing prejudice.").

Here, Plaintiff filed the summons and complaint on August 9, 2024, and Plaintiff filed a second amended summons and complaint on October 7, 2024, before any defendant served a responsive pleading. The Court recently entered its Order Denying Defendants' Motions to Dismiss, Motion for Protective Order and Stay of Discovery, and Motion Regarding Failure to

ELECTRONICALLY FILED - 2025 Jun 13 12:35 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Join on May 9, 2025. Plaintiff now seeks leave of this Court to amend the summons and complaint in this action to remove three defendants that Plaintiff has voluntarily dismissed, add several PFAS manufacturers/suppliers and dischargers as defendants, and update certain factual allegations. Before seeking leave of Court, Plaintiff sought the written consent of the previously named defendants to amend, and none of the defendants expressed any objection or opposition to Plaintiff's proposed Third Amended Summons and Complaint.

Under the circumstances, the Court finds that Plaintiff should be granted leave to amend pursuant to Rule 15(a), SCRCP, and consistent with South Carolina law. The Third Amended Summons and Complaint will not prejudice any party, and no party has expressed opposition to the amendment or demonstrated a valid reason for denying Plaintiff's Motion for Leave to Amend. Therefore, the Court exercises its discretion to expedite its decision on the Motion and decide this matter without a hearing so that Plaintiff may proceed with service of the Third Amended Summons and Complaint without delay. *See* Rule 1, SCRCP.

THEREFORE, IT IS ORDERED that Plaintiff's Motion for Leave to Amend is GRANTED. The Court further ORDERS that: Plaintiff's Third Amended Summons and Complaint, filed June 5, 2025, are the operative pleadings in this matter; Defendants Domtar Paper Company, LLC, GFL Environmental USA, Inc., and Waste Industries, LLC shall be removed from the case caption as named defendants; the new defendants named in the Third Amended Summons and Complaint are added as parties to this action and shall be listed as named defendants in the case caption; and Plaintiff may serve the Third Amended Summons and Complaint on the defendants named therein in accordance with the South Carolina Rules of Civil Procedure.

*Judge's Signature Page Follows*

3





Horry Common Pleas

**Case Caption:**     Grand Strand Water And Sewer Authority VS   Burlington Industries
                     Inc , defendant, et al

**Case Number:**     2024CP2605523

**Type:**            Order/Leave to Amend


IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760


Electronically signed on 2025-06-13 10:54:32     page 4 of 4

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

IN RE:
PFAS LITIGATION COORDINATED
DOCKET

———————————————————

Grand Strand Water and Sewer Authority,

     Plaintiff,

v.

AGC Chemicals Americas, Inc.; Aladdin
Manufacturing Corporation; Archroma U.S.,
Inc; Arkema, Inc.; Burlington Industries, Inc.;
Clariant Corporation; Corteva, Inc.; Daikin
America, Inc.; Delta Mills, Inc., its
predecessors, successors, assigns, and/or
responsible parties; DuPont de Nemours, Inc.;
EIDP, Inc.; Elevate Textiles, Inc.; Fiber
Industries, LLC; Huntsman International, LLC;
International Paper Company; INV
Performance Surfaces, LLC; J.P. Stevens &
Company, Inc., its predecessors, successors,
assigns, and/or responsible parties; Mohawk
Industries, Inc.; Nan Ya Plastics Corporation,
America; PRET Advanced Materials, LLC;
Red Rock Disposal, LLC; Sampson County
Disposal, LLC; Solvay Specialty Polymers
USA, LLC; Sonoco Products Company; The
Chemours Company; and Westrock CP, LLC,

     Defendants.

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

Case No. 2024-CP-26-05523

**DEFENDANT BURLINGTON
INDUSTRIES, INC.'S ANSWER TO
THIRD AMENDED COMPLAINT**

Defendant Burlington Industries, Inc. ("Burlington"), by and through its undersigned

counsel, hereby files this Answer in response to Plaintiff Grand Strand Water and Sewer

Authority's ("Plaintiff") Third Amended Complaint ("Complaint").

1

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## PRELIMINARY STATEMENT

Burlington incorporates the following matters into the responses to each paragraph of the Complaint.

A.      Burlington was a Delaware corporation authorized to do business in South Carolina until its dissolution in 2004.  Burlington has been in receivership since May 13, 2022, which is when the South Carolina Circuit Court appointed Peter McCoy, Jr. as the receiver for Burlington ("Receiver").  All responses and defenses contained in this Answer are made on behalf of Burlington's Receiver and should not be construed as a response on behalf of any other Burlington or Burlington-related entity.

B.      An investigation on behalf of the Receiver into the facts and circumstances related to this matter is ongoing.  This investigation is not complete, and, therefore, the following responses and defenses should not be construed as factual representations of the Receiver.  Rather, they are based upon, and therefore necessarily limited by, the facts and information presently available to the Receiver.  Burlington reserves the right to seek to amend and/or supplement its Answer as may be appropriate or necessary in accordance with the South Carolina Rules of Civil Procedure.

C.      Burlington submits this Answer only on behalf of itself in receivership.  Where allegations are made against "Defendants" as a group, however described, Burlington's responses only apply to itself in receivership.

D.      The Complaint contains purported references to several documents, third-party publications, and statements that have often been excerpted, paraphrased, characterized, and otherwise taken out of context.  These documents, third-party publications, and statements should be considered, if at all, in context and in unmodified form, and Burlington hereby respectfully

2

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

refers the Court to the respective documents, third-party publications, and statements for their complete contents.

E.      Except as is expressly admitted, qualified, or explained herein, Burlington specifically denies each and every allegation contained in the Complaint, including without limitation any allegations contained in titles, headings, and subparagraphs of the Complaint, and specifically denies any liability to Plaintiff.  To the extent that the titles, headings, and subparagraphs of the Complaint are intended to be allegations directed at Burlington, they are denied.

F.      Burlington specifically denies that it contaminated South Carolina waterways with excessive concentrations of PFAS.[1]  Furthermore, Burlington does not concede that PFAS was present at facilities owned or operated by Burlington, nor does Burlington concede that it discharged PFAS into any bodies of water.

G.      Burlington does not concede or adopt any suggestion, implication, or assertion concerning any alleged connection, association, or causal relationship between PFAS and purported harm to humans.

### RESPONSE TO STATEMENT OF THE CASE

1.      The allegations in Paragraph 1 contain introductory statements to which no response is required.  To the extent a response is required, and to the extent the allegations in Paragraph 1 are directed at Burlington, Burlington denies the allegations.  To the extent the

---

[1] "PFAS" as used herein is a collective reference to the substances at issue in Plaintiff's Complaint: per- and polyfluoroalkyl substances (PFAS); perfluorooctanoic acid (PFOA); perfluorooctanesulfonic acid (PFOS); perfluorononanoic acid (PFNA); perfluorobutane sulfonate (PFBS); perfluorohexane sulfonate (PFHxS); and hexafluoropropylene oxide dimer acid (HFPO-DA or GenX Chemicals).

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

2.      To the extent the allegations in Paragraph 2 are directed at Burlington, Burlington denies the allegations.  To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

3.      Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3, and therefore denies them.

4.      Upon information and belief, Burlington admits only that it owned and/or operated industrial manufacturing facilities upstream of Plaintiff's water intakes.  To the extent the remaining allegations in Paragraph 4 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

5.      To the extent the allegations in Paragraph 5 are directed at Burlington, Burlington denies the allegations.  To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

6.      To the extent the allegations in Paragraph 6 are directed at Burlington, Burlington denies the allegations.  To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

7.     To the extent the allegations in Paragraph 7 are directed at Burlington, Burlington denies the allegations.  To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

## RESPONSE TO DISCLAIMER

8.     The allegations in Paragraph 8 contain a disclaimer to which no response is required.  To the extent a response is required, Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8, and therefore denies them.

9.     The allegations in Paragraph 9 contain a disclaimer to which no response is required.  To the extent a response is required, Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9, and therefore denies them.

10.     The allegations in Paragraph 10 contain a disclaimer to which no response is required.  To the extent a response is required, Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and therefore denies them.

11.     The allegations in Paragraph 11 contain a disclaimer to which no response is required.  To the extent a response is required, Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## RESPONSE TO JURISDICTION AND VENUE

12.     The allegations in Paragraph 12 contain conclusions of law to which no response is required.  To the extent a response is required, Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12, and therefore denies them.

13.     The allegations in Paragraph 13 contain conclusions of law to which no response is required.  To the extent a response is required, Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13, and therefore denies them.

14.     The allegations in Paragraph 14 contain conclusions of law to which no response is required.  To the extent a response is required, Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14, and therefore denies them.

## RESPONSE TO PARTIES

15.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15, and therefore denies them.

16.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16, and therefore denies them.

17.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17, and therefore denies them.

18.     Burlington admits that it was a Delaware corporation authorized to do business in South Carolina until its dissolution in 2004, and that on May 13, 2022, the South Carolina Circuit Court appointed Peter McCoy, Jr., as the receiver for Burlington.  Upon information and belief,

6

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Burlington further admits that it was the owner and operator of a roughly 234-acre industrial facility located in Society Hill, South Carolina, which is a former textile mill and finishing facility bordering Cedar Creek and the Great Pee Dee River. Burlington denies the remaining allegations in Paragraph 18.

19. Upon information and belief, Burlington admits only that it previously owned and operated an industrial facility located in Rockingham, NC. To the extent the remaining allegations in Paragraph 19 are directed at Burlington, Burlington denies them. To the extent the remaining allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge or information sufficient to form a belief as to the truth of such allegations and therefore denies them.

20. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20, and therefore denies them.

21. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21, and therefore denies them.

22. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22, and therefore denies them.

23. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23, and therefore denies them.

24. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24, and therefore denies them.

25. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

26.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and therefore denies them.

27.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27, and therefore denies them.

28.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28, and therefore denies them.

29.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29, and therefore denies them.

30.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30, and therefore denies them.

31.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and therefore denies them.

32.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32, and therefore denies them.

33.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33, and therefore denies them.

34.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34, and therefore denies them.

35.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35, and therefore denies them.

36.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

37.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37, and therefore denies them.

38.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38, and therefore denies them.

39.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39, and therefore denies them.

40.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, and therefore denies them.

## RESPONSE TO FACTUAL ALLEGATIONS

41.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41, and therefore denies them.

42.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42, and therefore denies them.

43.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43, and therefore denies them.

44.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44, and therefore denies them.

45.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45, and therefore denies them.

46.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46, and therefore denies them.

47.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47, and therefore denies them.

48.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48, and therefore denies them.

49.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49, and therefore denies them.

50.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50, and therefore denies them.

51.     The allegations in Paragraph 51 refer to specific publications from the United States Environmental Protection Agency ("EPA"), to which Burlington specifically craves reference and denies any allegations in Paragraph 51 that are in addition to or inconsistent with the terms of those publications.

52.     The allegations in Paragraph 52 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 52 that are in addition to or inconsistent with the terms of those publications.

53.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53, and therefore denies them.

54.     The allegations in Paragraph 54 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 54 that are in addition to or inconsistent with the terms of those publications.

55.     The allegations in Paragraph 55 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 55 that are in addition to or inconsistent with the terms of those publications.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

56.	The allegations in Paragraph 56 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 56 that are in addition to or inconsistent with the terms of those publications.

57.	The allegations in Paragraph 57 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 57 that are in addition to or inconsistent with the terms of those publications.

58.	The allegations in Paragraph 58 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 58 that are in addition to or inconsistent with the terms of those publications.

59.	The allegations in Paragraph 59 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 59 that are in addition to or inconsistent with the terms of those publications.

60.	The allegations in Paragraph 60 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 60 that are in addition to or inconsistent with the terms of those publications.

61.	The allegations in Paragraph 61 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 61 that are in addition to or inconsistent with the terms of those publications.

62.	The allegations in Paragraph 62 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 62 that are in addition to or inconsistent with the terms of those publications.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

63. The allegations in Paragraph 63 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 63 that are in addition to or inconsistent with the terms of those publications.

64. The allegations in Paragraph 64 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 64 that are in addition to or inconsistent with the terms of those publications.

65. The allegations in Paragraph 65 refer to specific publications from the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 65 that are in addition to or inconsistent with the terms of those publications.

66. Upon information and belief, Burlington admits the allegations in Paragraph 66.

67. To the extent the allegations in Paragraph 67 are directed at Burlington, upon information and belief, Burlington admits only that it owned and/or operated industrial facilities upstream of Bull Creek and denies any remaining allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

68. Burlington denies that it was the source of any alleged contamination referenced in Paragraph 68. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 68, and therefore denies them.

69. To the extent the allegations in Paragraph 69 are directed at Burlington, upon information and belief, Burlington admits only that it owned and/or operated certain manufacturing plants and industrial facilities upstream of Bull Creek and denies any remaining allegations. To the extent the allegations in this Paragraph are directed at other defendants,

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

70.     To the extent the allegations in Paragraph 70 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

71.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71, and therefore denies them.

72.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72, and therefore denies them.

73.     To the extent the allegations in Paragraph 73 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

74.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74, and therefore denies them.

75.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75, and therefore denies them.

76.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76, and therefore denies them.

77.     To the extent the allegations in Paragraph 77 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other

13

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

78.     To the extent the allegations in Paragraph 78 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

79.     To the extent the allegations in Paragraph 79 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

80.     To the extent the allegations in Paragraph 80 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

81.     To the extent the allegations in Paragraph 81 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

82.     To the extent the allegations in Paragraph 82 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

83.     To the extent the allegations in Paragraph 83 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

84.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84, and therefore denies them.

85.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85, and therefore denies them.

86.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86, and therefore denies them.

87.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87, and therefore denies them.

88.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88, and therefore denies them.

89.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89, and therefore denies them.

90.     The allegations in Paragraph 90 refer to specific publications from Old DuPont and the EPA, to which Burlington specifically craves reference and denies any allegations in Paragraph 90 that are in addition to or inconsistent with the terms of those publications. Burlington lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 90, and therefore denies them.

91.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

92.     The allegations in Paragraph 92 refer to specific publications from 3M, to which Burlington specifically craves reference and denies any allegations in Paragraph 92 that are in addition to or inconsistent with the terms of those publications.  Burlington lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 92, and therefore denies them.

93.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93, and therefore denies them.

94.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94, and therefore denies them.

95.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95, and therefore denies them.

96.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96, and therefore denies them.

97.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97, and therefore denies them.

98.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98, and therefore denies them.

99.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99, and therefore denies them.

100.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100, and therefore denies them.

101.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

102. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102, and therefore denies them.

103. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103, and therefore denies them.

104. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104, and therefore denies them.

105. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105, and therefore denies them.

106. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106, and therefore denies them.

107. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107, and therefore denies them.

108. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108, and therefore denies them.

109. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109, and therefore denies them.

110. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 110, and therefore denies them.

111. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111, and therefore denies them.

112. To the extent the allegations in Paragraph 112, including all subparagraphs, are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph, including all subparagraphs, are directed at other defendants, Burlington lacks

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

113.     To the extent the allegations in Paragraph 113 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

114.     To the extent the allegations in Paragraph 114 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

115.     To the extent the allegations in Paragraph 115 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

116.     To the extent the allegations in Paragraph 116 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

117.     To the extent the allegations in Paragraph 117 directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

118.     To the extent the allegations in Paragraph 118 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

119.     To the extent the allegations in Paragraph 119 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

120.     To the extent the allegations in Paragraph 120 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

121.     To the extent the allegations in Paragraph 121 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

122.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122, and therefore denies them.

123.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123, and therefore denies them.

124.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124, and therefore denies them.

19

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

125.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125, and therefore denies them.

126.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126, and therefore denies them.

127.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127, and therefore denies them.

128.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128, and therefore denies them.

129.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129, and therefore denies them.

130.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130, and therefore denies them.

131.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131, and therefore denies them.

132.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132, and therefore denies them.

133.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 133, and therefore denies them.

134.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134, and therefore denies them.

135.    To the extent the allegations in Paragraph 135 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

136.    To the extent the allegations in Paragraph 136 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

137.    To the extent the allegations in Paragraph 137 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

138.    To the extent the allegations in Paragraph 138 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

139.    To the extent the allegations in Paragraph 139, including all subparagraphs, are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph, including all subparagraphs, are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

**RESPONSE TO FIRST CAUSE OF ACTION**
**Private Nuisance**

140.    Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 139 as if fully set forth herein.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

141. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141, and therefore denies them.

142. Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142, and therefore denies them.

143. To the extent the allegations in Paragraph 143 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

144. To the extent the allegations in Paragraph 144 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

145. To the extent the allegations in Paragraph 145 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

146. To the extent the allegations in Paragraph 146 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

147. To the extent the allegations in Paragraph 147 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

148.    To the extent the allegations in Paragraph 148 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

149.    To the extent the allegations in Paragraph 149 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

150.    To the extent the allegations in Paragraph 150 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

151.    To the extent the allegations in Paragraph 151 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

<u>**RESPONSE TO SECOND CAUSE OF ACTION**</u>
**Public Nuisance**

152.    Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 151 as if fully set forth herein.

153.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 153, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

154.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 154, and therefore denies them.

155.    To the extent the allegations in Paragraph 155 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

156.    To the extent the allegations in Paragraph 156 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

157.    To the extent the allegations in Paragraph 157 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

158.    To the extent the allegations in Paragraph 158 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

159.    To the extent the allegations in Paragraph 159 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

160.    To the extent the allegations in Paragraph 160 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

161.    To the extent the allegations in Paragraph 161 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

162.    To the extent the allegations in Paragraph 162 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

163.    To the extent the allegations in Paragraph 163 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

## RESPONSE TO THIRD CAUSE OF ACTION
### Trespass

164.    Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 163 as if fully set forth herein.

165.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 165, and therefore denies them.

166.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 166, including all subparagraphs, and therefore denies them.

25

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

167.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 167, including all subparagraphs, and therefore denies them.

168.     To the extent the allegations in Paragraph 168, including all subparagraphs, are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph, including all subparagraphs, are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

169.     To the extent the allegations in Paragraph 169, including all subparagraphs, are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph, including all subparagraphs, are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

170.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 170, including all subparagraphs, and therefore denies them.

171.     To the extent the allegations in Paragraph 171 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

172.     To the extent the allegations in Paragraph 172 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

173.    To the extent the allegations in Paragraph 173, including all subparagraphs, are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph, including all subparagraphs, are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

174.    To the extent the allegations in Paragraph 174 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

175.    To the extent the allegations in Paragraph 175 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

176.    To the extent the allegations in Paragraph 176 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

### RESPONSE TO FOURTH CAUSE OF ACTION
### Negligence, Gross Negligence, and/or Recklessness

177.    Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 176 as if fully set forth herein.

178.    The allegations in Paragraph 178 contain conclusions of law to which no response is required.  To the extent a response is required, and to the extent the allegations in Paragraph 178 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in

27

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

179.    To the extent the allegations in Paragraph 179 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

180.    To the extent the allegations in Paragraph 180 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

181.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 181, including all subparagraphs, and therefore denies them.

182.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 182, including all subparagraphs, and therefore denies them.

183.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 183, including all subparagraphs, and therefore denies them.

184.    The allegations in Paragraph 184 contain conclusions of law to which no response is required.  To the extent a response is required, Burlington denies the allegations in Paragraph 184.

185.    Burlington denies the allegations in Paragraph 185.

186.    Burlington denies the allegations in Paragraph 186.

187.    Burlington denies the allegations in Paragraph 187.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

188.    To the extent the allegations in Paragraph 188 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

189.    To the extent the allegations in Paragraph 189 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

## RESPONSE TO FIFTH CAUSE OF ACTION
### Strict Products Liability – Ultrahazardous Activity
### (Supplier Defendants)

190.    Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 189 as if fully set forth herein.

191.    Burlington denies the allegations in Paragraph 191.

192.    To the extent the allegations in Paragraph 192 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

193.    To the extent the allegations in Paragraph 193 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

194.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 194, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

195.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 195, and therefore denies them.

196.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 196, and therefore denies them.

197.     To the extent the allegations in Paragraph 197 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

198.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 198, and therefore denies them.

199.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 199, and therefore denies them.

200.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 200, and therefore denies them.

## RESPONSE TO SIXTH CAUSE OF ACTION
### Strict Products Liability – Ultrahazardous Activity
### (Burlington)

201.     Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 200 as if fully set forth herein.

202.     Burlington denies the allegations in Paragraph 202.

203.     Burlington denies the allegations in Paragraph 203.

204.     Burlington denies the allegations in Paragraph 204.

205.     Burlington denies the allegations in Paragraph 205.

206.     Burlington denies the allegations in Paragraph 206.

30

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

207.   Burlington denies the allegations in Paragraph 207.

208.   Burlington denies the allegations in Paragraph 208.

209.   Burlington denies the allegations in Paragraph 209.

210.   Burlington denies the allegations in Paragraph 210.

**RESPONSE TO SEVENTH CAUSE OF ACTION**
**Strict Products Liability – Design Defect**
**(Supplier Defendants)**

211.   Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 210 as if fully set forth herein.

212.   Burlington denies the allegations in Paragraph 212.

213.   To the extent the allegations in Paragraph 213 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

214.   Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 214, and therefore denies them.

215.   Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 215, and therefore denies them.

216.   Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 216, and therefore denies them.

217.    To the extent the allegations in Paragraph 217, including all subparagraphs, are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph, including all subparagraphs, are directed at other defendants, Burlington lacks

31

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

218.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 218, and therefore denies them.

219.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 219, and therefore denies them.

220.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 220, and therefore denies them.

221.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 221, and therefore denies them.

222.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 222, and therefore denies them.

223.    Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 223, and therefore denies them.

**RESPONSE TO EIGHTH CAUSE OF ACTION**
**Strict Products Liability – Design Defect**
**(Burlington)**

224.    Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 223 as if fully set forth herein.

225.    Burlington denies the allegations in Paragraph 225.

226.    Burlington denies the allegations in Paragraph 226.

227.    Burlington denies the allegations in Paragraph 227.

228.    Burlington denies the allegations in Paragraph 228.

229.    Burlington denies the allegations in Paragraph 229.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

230.   Burlington denies the allegations in Paragraph 230, including all subparagraphs.

231.   Burlington denies the allegations in Paragraph 231.

232.   Burlington denies the allegations in Paragraph 232.

233.   Burlington denies the allegations in Paragraph 233.

234.   Burlington denies the allegations in Paragraph 234.

235.   Burlington denies the allegations in Paragraph 235.

236.   Burlington denies the allegations in Paragraph 236.

**RESPONSE TO NINTH CAUSE OF ACTION**
**Strict Products Liability – Failure to Warn**
**(Supplier Defendants)**

237.   Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 236 as if fully set forth herein.

238.   Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 238, and therefore denies them.

239.   To the extent the allegations in Paragraph 239 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

240.   Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 240, and therefore denies them.

241.   Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 241, and therefore denies them.

242.   To the extent the allegations in Paragraph 242 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

243.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 243, and therefore denies them.

244.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 244, and therefore denies them.

245.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 245, and therefore denies them.

246.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 246, and therefore denies them.

### RESPONSE TO TENTH CAUSE OF ACTION
**Strict Products Liability – Failure to Warn**
**(Burlington)**

247.     Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 246 as if fully set forth herein.

248.     Burlington denies the allegations in Paragraph 248.

249.     Burlington denies the allegations in Paragraph 249.

250.     Burlington denies the allegations in Paragraph 250.

251.     Burlington denies the allegations in Paragraph 251.

252.     Burlington denies the allegations in Paragraph 252.

253.     Burlington denies the allegations in Paragraph 253.

254.     Burlington denies the allegations in Paragraph 254.

255.     Burlington denies the allegations in Paragraph 255.

256.     Burlington denies the allegations in Paragraph 256.

34

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## RESPONSE TO ELEVENTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Supplier Defendants)

257.     Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 256 as if fully set forth herein.

258.     To the extent the allegations in Paragraph 258 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

259.     To the extent the allegations in Paragraph 259 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

260.     To the extent the allegations in Paragraph 260 are directed at Burlington, Burlington denies the allegations. To the extent the allegations in this Paragraph are directed at other defendants, Burlington lacks knowledge and information sufficient to form a belief as to the truth of the allegations and therefore denies them.

261.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 261, and therefore denies them.

262.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 262, and therefore denies them.

263.     Burlington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 263, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**RESPONSE TO TWELFTH CAUSE OF ACTION**
**Breach of Implied Warranties**
**(Burlington)**

264.    Burlington repeats and reasserts its answers and denials to Paragraphs 1 through 263 as if fully set forth herein.

265.    The allegations in Paragraph 265 are denied as stated.

266.    Burlington denies the allegations in Paragraph 266.

267.    Burlington denies the allegations in Paragraph 267.

268.    Burlington denies the allegations in Paragraph 268.

269.    Burlington denies the allegations in Paragraph 269.

270.    Burlington denies the allegations in Paragraph 270.

**RESPONSE TO PRAYER FOR RELIEF**

Responding to the WHEREFORE Paragraph that follows Paragraph 270 of Plaintiff's Complaint, Burlington denies any and all liability and further denies that Plaintiff is entitled to any of the relief sought in this Paragraph, including subparagraphs (a) through (e).

**AFFIRMATIVE AND OTHER DEFENSES**

Burlington asserts the following defenses to the Complaint.  By providing notice of these defenses, Burlington does not admit or acknowledge that it bears the burden of proof or burden of persuasion with respect to any such defense.  Burlington reserves its rights to: (1) alter or amend this list; (2) assert additional defenses or withdraw any of these defenses as may be appropriate following fact or expert discovery; and (3) rely on any other applicable defenses set forth in any Answer or notices of defenses provided by any other defendant in this action. Independent of these defenses, Burlington further demands that Plaintiff satisfy its burden to

36

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

provide sufficient evidence under the applicable burden of proof for each and every element of each of its claims for which it seeks relief.

### FIRST DEFENSE

1.    The Complaint, and each cause of action or count alleged therein, fails to state a claim, in whole or in part, upon which relief may be granted under the governing substantive and procedural law.

### SECOND DEFENSE

2.    Plaintiff's Complaint fails, in whole or in part, to state a claim for relief and should be dismissed in its entirety pursuant to Rules 12(b)(6) and 12(c) of the South Carolina Rules of Civil Procedure ("SCRCP").

### THIRD DEFENSE

3.    Plaintiff's Complaint fails, in whole or in part, to join indispensable parties and should be dismissed pursuant to Rules 12(b)(7) and 19(a), SCRCP.

### FOURTH DEFENSE

4.    Plaintiff's claims may be barred, in whole or in part, by the applicable statutes of limitations and/or repose.

### FIFTH DEFENSE

5.    Plaintiff's claims are barred, in whole or in part, because they are not ripe for adjudication.

### SIXTH DEFENSE

6.    Plaintiff's claims are barred, in whole or in part, because Plaintiff lacks standing to assert them.

37

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### SEVENTH DEFENSE

7.      Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

### EIGHTH DEFENSE

8.      Plaintiff's claims are barred, in whole or in part, because Plaintiff is not the real party in interest or lacks capacity to bring its claims, including claims indirectly maintained on behalf of its' citizens and/or customers and claims brought as *parens patriae*.

### NINTH DEFENSE

9.      Plaintiff's claims may be barred, in whole or in part, to the extent Plaintiff has failed to exhaust administrative remedies.

### TENTH DEFENSE

10.     Plaintiff's claims may be barred, in whole or in part, by the doctrine of estoppel and/or waiver.

### ELEVENTH DEFENSE

11.     Plaintiff's claims may be barred, in whole or in part, by the doctrines of res judicata and/or collateral estoppel.

### TWELFTH DEFENSE

12.     Plaintiff's claims may be barred, in whole or in part, by the doctrine of election of remedies.

### THIRTEENTH DEFENSE

13.     Pursuant to the South Carolina Contribution Among Tortfeasors Act, S.C. Code Ann. § 15-38-10, *et seq.*, any damages recoverable from Burlington should be limited to the percentage of the relative degree of fault of Burlington as compared with other parties to this action, if any, as well as other persons or entities not presently before this Court.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOURTEENTH DEFENSE

14.     Any alleged injuries and/or damages sustained by Plaintiff may have been caused or contributed to by the negligence, omissions or actual conduct of Plaintiff and/or other persons, firms, corporations, or entities over whom Burlington had no control or right of control and for whom Burlington is not responsible.

## FIFTEENTH DEFENSE

15.     Any alleged injuries and/or damages sustained by Plaintiff may be barred, in whole or in part, by the doctrines of intervening cause and/or superseding cause.

## SIXTEENTH DEFENSE

16.     Plaintiff's claims may be barred, in whole or in part, under the doctrines of contributory negligence and/or comparative fault, and/or other applicable common law or statutory doctrines.

## SEVENTEENTH DEFENSE

17.     Plaintiff's claims may be barred, in whole or in part, because Burlington's products were in conformity with (i) any federal, state or other regulations, standards, guidelines, specifications, and laws in effect; (ii) available knowledge and research of the scientific and industrial communities; and (iii) generally recognized and prevailing industry standards; and (iv) state of the art in existence at the time the design was prepared and the products were manufactured, handled, sold, distributed, and/or used.

## EIGHTEENTH DEFENSE

18.     Any product manufactured, handled, designed, sold, distributed, or used by Burlington and alleged to have caused harm to Plaintiff was, at the time, safer than any reasonable

39

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

or feasible alternative designs, and any alternative designs would have been less safe, more likely to have caused injury or otherwise not feasible for their intended use.

## NINETEENTH DEFENSE

19.    Plaintiff's claims may be barred, in whole or in part, because federal, state, and/or local authorities, departments and/or agencies authorized, ratified, or were aware of and acquiesced to actions taken by Burlington that are the subject of Plaintiff's claims. Burlington is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority, department or agency.

## TWENTIETH DEFENSE

20.    Plaintiff's claims may be barred, in whole or in part, under the doctrine of Federal Preemption, including, without limitation, express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices, military specification, and policy statements, enacted and/or promulgated and/or issues by Congress, federal agencies, or the executive branch.

## TWENTY-FIRST DEFENSE

21.    Burlington asserts its rights to allocation, setoff or apportionment of fault pursuant to applicable law, as well as its rights to a proportionate reduction of any damages found against Burlington based on the negligence, omissions or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiff.

## TWENTY-SECOND DEFENSE

22.    An award of judgment rendered in favor of Plaintiff must be reduced by the amount of compensation Plaintiff received, or is entitled to receive, from any source as a result of Plaintiff's alleged injuries.

40

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**TWENTY-THIRD DEFENSE**

23.     Plaintiff may have failed or refused to exercise reasonable care and diligence to avoid loss and minimize damages and, therefore, may not recover for losses that could have been prevented by reasonable efforts on Plaintiff's part, or by expenditures which might reasonably have been made. Recovery, if any, should therefore be reduced by Plaintiff's failure to mitigate damages, if any.

**TWENTY-FOURTH DEFENSE**

24.     Burlington and its agents and/or employees acted with due care and otherwise conducted themselves at all relevant times as reasonable people and/or entities under the circumstances.

**TWENTY-FIFTH DEFENSE**

25.     Burlington has satisfied, fulfilled and performed each and every obligation and duty imposed by law, if any, to the full extent of its responsibility.

**TWENTY-SIXTH DEFENSE**

26.     Any alleged injury, damage or loss sustained by Plaintiff in connection with the subject matter of this action was not reasonably foreseeable to Burlington.

**TWENTY-SEVENTH DEFENSE**

27.     Plaintiff's claims fail as a matter of substantive law and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the South Carolina Constitution to the extent that by relying on market share or other aggregate proof of causation or liability, Plaintiff seeks to deprive Burlington of procedural and substantive safeguards including, but not limited to, statutory and common law defenses to liability and causation generally.

41

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**TWENTY-EIGHTH DEFENSE**

28.     Plaintiff's claims may be barred for lack of proximate causation between any alleged act, omission, or product of Burlington and the claims, damages, and harm alleged in Plaintiff's Complaint.

**TWENTY-NINTH DEFENSE**

29.     Plaintiff's claims are barred, in whole or in part, because Plaintiff fails to identify any specific product of Burlington which was allegedly manufactured, handled, sold, distributed, or used and caused the alleged injury.

**THIRTIETH DEFENSE**

30.     Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot prove that its alleged injuries were caused by exposure to PFAS allegedly contained in any product(s) manufactured, handled, distributed, used, or sold by Burlington.

**THIRTY-FIRST DEFENSE**

31.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot prove that PFAS has been reliably established, through scientific means, to be capable of causing Plaintiff's alleged injuries.

**THIRTY-SECOND DEFENSE**

32.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that Plaintiff was exposed to a sufficient concentration or amount of PFAS, and/or for a sufficient duration, that has been reliably established, through scientific means, to be capable of causing Plaintiff's alleged injuries.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## THIRTY-THIRD DEFENSE

33.     Plaintiff's purported exposure to products manufactured, handled, distributed, used or sold by Burlington, if any, was too removed, indefinite, de minimis and insufficient to establish a reasonable degree of probability that any such product caused any alleged injury, damage or loss to Plaintiff.

## THIRTY-FOURTH DEFENSE

34.     Burlington cannot be held jointly and severally liable for the acts or omissions of third parties or other parties because their acts or omissions were separate and distinct and the alleged harm is divisible from and greater than any harm allegedly caused by acts, omissions, or products of Burlington.

## THIRTY-FIFTH DEFENSE

35.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff seeks to retroactively impose liability for conduct that was not actionable at the time it occurred, and Burlington may not be held liable under retroactive theories not requiring proof or fault or causation.

## THIRTY-SIXTH DEFENSE

36.     Plaintiff's claims are barred, in whole or in part, because Burlington neither knew, nor should have known, that any of the chemicals or substances to which Plaintiff was allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of medical, scientific, technical, and/or industrial knowledge available to Burlington at all times relevant to the claims or causes of action asserted by Plaintiff.

43

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## THIRTY-SEVENTH DEFENSE

37.    Burlington is entitled to all procedural, substantive, and other protections, caps, and limitations provided by applicable state statutes and other state laws regarding Plaintiff's claims for compensatory and punitive damages. Burlington specifically pleads the application of S.C. Code Ann. § 15-32-530 to this action.

## THIRTY-EIGHTH DEFENSE

38.    The Complaint fails to state a claim upon which punitive damages may be awarded. Nor did Burlington engage in any conduct that would permit an award of punitive damages. And, any award of punitive damages would violate the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, the excessive fines clause of the Eighth Amendment to the United States Constitution, and various articles and sections of the South Carolina Constitution.

## THIRTY-NINTH DEFENSE

39.    To the extent Plaintiff seeks punitive damages against Burlington under a strict liability or warranty cause of action, those claims may be barred, in whole or in part, if punitive damages are not recoverable under those claims pursuant to applicable law.

## FORTIETH DEFENSE

40.    Plaintiff's claims may be barred, in whole or in part, by the political question and separation of powers doctrines because their claims implicate issues of statewide importance that are reserved for state regulation.

## FORTY-FIRST DEFENSE

41.    Plaintiff's claims against Burlington may not arise out of the same transactions or occurrences as their claims against other defendants, as required for proper joinder of parties.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FORTY-SECOND DEFENSE

42.     Plaintiff's claims may be barred, in whole or in part, by the Due Process or Ex Post Facto clauses of the Constitution of the United States or the Constitution of the State of South Carolina.

## FORTY-THIRD DEFENSE

43.     To the extent Plaintiff seeks equitable relief, Plaintiff is not entitled to equitable relief because Plaintiff has an adequate remedy at law and the alleged harm is not irreparable.

## FORTY-FOURTH DEFENSE

44.     Plaintiff's claims are barred, in whole or in part, by the free public services doctrine and by the municipal cost recovery doctrine.

## FORTY-FIFTH DEFENSE

45.     Plaintiff's claims are barred to the extent that Plaintiff's alleged damages are speculative, uncertain, and hypothetical.

## FORTY-SIXTH DEFENSE

46.     Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any damages.

## FORTY-SEVENTH DEFENSE

47.     Plaintiff's damages, if any, may have been the direct and proximate result of facts and circumstances over which Burlington exercises no control.

## FORTY-EIGHTH DEFENSE

48.     Plaintiff's nuisance claims are barred, in whole or in part, because they lack the legal authority or standing to bring a nuisance claim under South Carolina law.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FORTY-NINTH DEFENSE**

49. Plaintiff's nuisance claims are barred, in whole or in part, because Burlington did not create, cause, continue, or maintain the alleged nuisance or otherwise have control over the cause of the alleged harm.

**FIFTIETH DEFENSE**

50. Plaintiff's private nuisance claim is barred, in whole or in part, because Burlington did not unreasonably interfere with Plaintiff's ownership or possession of land.

**FIFTY-FIRST DEFENSE**

51. Plaintiff's nuisance claim is barred, in whole or in part, because the alleged contamination of a public body of water was not so intermittent or periodical as described to be considered continuing.

**FIFTY-SECOND DEFENSE**

52. Plaintiff's nuisance claim is barred, in whole or in part, under the doctrine of coming to the nuisance.

**FIFTY-THIRD DEFENSE**

53. Plaintiff's public nuisance claim is barred, in whole or in part, because no action of Burlington involved the interference with real or personal property, the alleged public nuisance would have impermissible extraterritorial reach, and the alleged conduct of Burlington is too remote from the alleged injury as a matter of law and due process.

**FIFTY-FOURTH DEFENSE**

54. Plaintiff's public nuisance claim fails because Plaintiff is not a private person bringing an action for damages to real or personal property.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### FIFTY-FIFTH DEFENSE

55.     Plaintiff's public nuisance claim fails because Plaintiff fails to allege facts showing that Burlington controlled the instrumentality of the alleged nuisance.

### FIFTY-SIXTH DEFENSE

56.     Plaintiff's public nuisance claim fails because Plaintiff failed to plead that it suffered a particular damage beyond that which the public has experienced.

### FIFTY-SEVENTH DEFENSE

57.     Plaintiff's trespass claim fails because Burlington did not interfere with Plaintiff's right to the exclusive, peaceable possession of its property.

### FIFTY-EIGHTH DEFENSE

58.     Plaintiff's trespass claim fails because Plaintiff does not have an exclusive right to the water at issue.

### FIFTY-NINTH DEFENSE

59.     Plaintiff's trespass claim fails because there was no intentional, unauthorized entry onto Plaintiff's property.

### SIXTIETH

60.     Plaintiff's trespass claim fails because PFAS are not tangible substances.

### SIXTY-FIRST DEFENSE

61.     Plaintiff's tort-based claims fail because Burlington does not owe Plaintiff a duty under governing law.

### SIXTY-SECOND DEFENSE

62.     Plaintiff's tort-based claims fail because Burlington did not breach any duty allegedly owed to Plaintiff.

47

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## SIXTY-THIRD DEFENSE

63.     Plaintiff's claims for strict liability may be barred because of the principles embodied in Section 402A of the Restatement (Second) of Torts and its comments, to the extent adopted by applicable law.

## SIXTY-FOURTH DEFENSE

64.     Plaintiff's products liability claims may be barred, in whole or in part, by the Restatement (Third) of Torts: Products Liability, to the extent adopted by applicable law.

## SIXTY-FIFTH DEFENSE

65.     Plaintiff has alleged an injury that, as a matter of law, does not support a recovery in tort.

## SIXTY-SIXTH DEFENSE

66.     Plaintiff's claims may be barred, in whole or in part, to the extent Plaintiff's alleged injuries and damages were caused by the disregard of, or failure to follow and heed, warnings, recommendations, specifications, uses, standards, or instructions provided by Burlington.

## SIXTY-SEVENTH DEFENSE

67.     Plaintiff cannot obtain relief on its claims based on actions undertaken by Burlington of which Burlington provided adequate notice or warnings.

## SIXTY-EIGHTH DEFENSE

68.     Plaintiff's warranty claim may be barred, in whole or in part, to the extent that any warranties were disclaimed and/or are limited by applicable provisions of the UCC.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## SIXTY-NINTH DEFENSE

69.     Plaintiff's warranty claim may be barred, in whole or in part, because there was no warranty.

## SEVENTIETH DEFENSE

70.     Plaintiff's warranty claim may be barred, in whole or in part, because Plaintiff did not provide Burlington with reasonable notice of any alleged breach and otherwise failed to satisfy all conditions precedent or subsequent to the enforcement of any such warranty.

## SEVENTY-FIRST DEFENSE

71.     Plaintiff's warranty claim may be barred, in whole or in part, because Plaintiff was not in privity of contract with Burlington and did not rely on any warranty allegedly provided.

## SEVENTY-SECOND DEFENSE

72.     Plaintiff's warranty claim may be barred, in whole or in part, to the extent any implied warranty was disclaimed.

## SEVENTY-THIRD DEFENSE

73.     Plaintiff's claims may be barred, in whole or in part, because Burlington complied at all relevant times with all applicable laws, including all legal and regulatory duties.

## SEVENTY-FOURTH DEFENSE

74.     To the extent Plaintiff seeks recovery of attorneys' fees and costs, Plaintiff is not entitled to any attorneys' fees or costs associated with this action because no statute or contract exists that would give Plaintiff the right to recover such fees or costs, and because Burlington did not act in a manner that gives rise to such a claim in this lawsuit.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## SEVENTY-FIFTH DEFENSE

75.     Plaintiff's strict liability claims are barred to the extent strict liability is not (or was not during the applicable time period) recognized as a cause of action under applicable law.

## SEVENTY-SIXTH DEFENSE

76.     Plaintiff's claims may be barred, in whole or in part, by the doctrine of spoliation of evidence and Burlington reserves the right to raise the spoliation doctrine as a defense to Plaintiff's claims if some or all of the evidence has not been properly preserved.

## SEVENTY-SEVENTH DEFENSE

77.     Plaintiff's claims may be barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of the risk, open and obvious conditions, and/or failure to heed any applicable warnings.

## SEVENTY-EIGHTH DEFENSE

78.     Plaintiff's claims should be dismissed or stayed, in whole or in part, based on the primary jurisdiction doctrine.  The relief sought is, in whole or in part, within the particular expertise of and is being addressed by federal and state governments and their relevant agencies, and thus, the Court should decline to exercise jurisdiction over these matters.

## SEVENTY-NINTH DEFENSE

79.     Plaintiff's alleged claims are preempted or barred by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq*. and the South Carolina Hazardous Waste Management Action, S.C. Code Ann. 44-56-10 *et seq*. to the extent such claims include, encompass or relate to environmental conditions or natural resource damages or losses at any past, present or future facilities, sites, properties, locations or

50

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

other areas listed on EPA's National Priority List (Superfund sites), or from which discharges or releases of materials have otherwise come to be located emanating from such facilities, sites, properties, locations or areas.

## EIGHTIETH DEFENSE

80.     Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency have set final water quality standards, minimum contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether Plaintiff has suffered an injury.

## EIGHTY-FIRST DEFENSE

81.     Plaintiff's claims are barred, in whole or in part, under the bulk suppliers, component part supplier, sophisticated-purchasers, sophisticated-user, sophisticated intermediary, and/or knowledgeable-user doctrines or other similar or related doctrines available under applicable law.

## EIGHTY-SECOND DEFENSE

82.     Plaintiff's Complaint should be dismissed because Burlington did not design, market, sell, advertise, or distribute PFAS, and is not the successor to any corporation that may have designed, marketed, sold, advertised or distributed any PFAS.

## EIGHTY-THIRD DEFENSE

83.     Plaintiff's claims are barred, in whole or in part, because Burlington did not contribute any PFAS to any alleged discharge from its facility.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## EIGHTY-FOURTH DEFENSE

84.    Plaintiff's claims are or may be barred, in whole or in part, because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times.

## EIGHTY-FIFTH DEFENSE

85.    Plaintiff's claims are barred to the extent the "permit shield" doctrine and "federally permitted release" defense applies because any leachate was discharged pursuant to lawful permits.

## EIGHTY-SIXTH DEFENSE

86.    Plaintiff's damages, if any, were caused by the active, direct, and proximate negligence or actual conduct of entities or persons other than Burlington, and in the event that Burlington is found to be liable to Plaintiff, Burlington will be entitled to indemnification, contribution, and/or apportionment.

## EIGHTY-SEVENTH DEFENSE

87.    Plaintiff's claims against Burlington are barred or limited by the economic loss rule.

## EIGHTY-EIGHTH DEFENSE

88.    To the extent Plaintiff has split their claims, Plaintiff's claims are barred in whole, or in part, by the doctrine prohibiting claim splitting.

## EIGHTY-NINTH DEFENSE

89.    Plaintiff's claims are barred, in whole or in part, for failing to link any of their alleged exposure or alleged injuries to any of Burlington's alleged discharges.

52

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## NINETIETH DEFENSE

90.     Plaintiff's claims are barred by the doctrine of unjust enrichment in that Plaintiff seeks to recover costs or damages for construction, operation, and maintenance of public water supply systems after Plaintiff sought and obtained a permit to secure, treat, and distribute public water supplies and for which it received funding from its residents and/or customers, State, Local, and Federal sources, including but not limited to funding to specifically address unexpected contamination in water supplies under the Emergency Response Plans of the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j.

## NINETY-FIRST DEFENSE

91.     Plaintiff's claims are barred, in whole or in part, because Burlington did not know or have reason to know that its alleged wastewater discharge, alone or in conjunction with a discharge or discharges from other sources, would cause pass through or interference, as contemplated by 40 C.F.R. § 403.5(a)(2).

## NINETY-SECOND DEFENSE

92.     Burlington adopts by reference any additional applicable defense pled by any other defendant not otherwise pled herein.

## RESERVATION OF RIGHTS

Burlington hereby reserves the right to amend this Answer, raise additional defenses as may be discovered during the course of this litigation and its continuing factual investigations, add cross-claims, or assert third-party claims pursuant to the provisions of the South Carolina Rules of Civil Procedure, the substantive law of South Carolina, and the inherent authority of this Court to manage the procedural aspects of this litigation.

ELECTRONICALLY FILED - 2025 Jun 30 4:49 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

WHEREFORE, having fully answered Plaintiff's Complaint, Burlington denies that Plaintiff is entitled to any of the relief requested in the Complaint, and respectfully prays for the dismissal of Plaintiff's Complaint with prejudice and for such other and further relief as this Court may deem just and proper.

Respectfully submitted,

s/ Konstantine P. Diamaduros
Andrew A. Mathias (SC Bar No. 76220)
Konstantine P. Diamaduros (SC Bar No. 102231)
Connor B. Bauknight (SC Bar No. 105019)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
Telephone: 864.370.2211
Facsimile: 864.282.1177
AMathias@maynardnexsen.com
KDiamaduros@maynardnexsen.com
CBauknight@maynardnexsen.com

*Attorneys for Defendant Burlington Industries, Inc.*

June 30, 2025
Greenville, South Carolina

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF HORRY** | ) | **FIFTEENTH JUDICIAL CIRCUIT** |
| | ) | |
| | ) | |
| GRAND STRAND WATER AND SEWER AUTHORITY, | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No: 2024CP2605523 |
| | ) | |
| *v.* | ) | |
| | ) | **DEFENDANT FIBER INDUSTRIES** |
| AGC CHEMICALS AMERICAS INC.; | ) | **LLC'S ANSWER TO PLAINTIFF'S** |
| ALADDIN MANUFACTURING | ) | **THIRD AMENDED COMPLAINT** |
| CORPORATION; ARCHROMA U.S. INC.; | ) | |
| ARKEMA, INC.; BURLINGTON | ) | |
| INDUSTRIES, INC.; CLARIANT | ) | |
| CORPORATION; CORTEVA, INC.; | ) | |
| DAIKIN AMERICA INC.; DELTA MILLS, | ) | |
| INC., its predecessors, successors, assigns, | ) | |
| and/or responsible parties; DUPONT DE | ) | |
| NEMOURS, INC.; EIDP, INC.; ELEVATE | ) | |
| TEXTILES, INC.; FIBER INDUSTRIES, | ) | |
| LLC; HUNTSMAN INTERNATIONAL, | ) | |
| LLC; INTERNATIONAL PAPER | ) | |
| COMPANY; INC PERFORMANCE | ) | |
| SURFACES, LLC; J.P. STEVENS & | ) | |
| COMPANY, INC., its predecessors, | ) | |
| successors, assigns, and/or responsible parties, | ) | |
| MOHAWK INDUSTRIES, INC.; NAN YA | ) | |
| PLASTICS CORPORATION, AMERICA; | ) | |
| PRET ADVANCED MATERIALS, LLC; | ) | |
| RED ROCK DISPOSAL, LLC; SAMPSON | ) | |
| COUNTY DISPOSAL, LLC; SOLVAY | ) | |
| SPECIALTY POLYMERS USA, LLC; | ) | |
| SONOCO PRODUCTS COMPANY; THE | ) | |
| CHEMOURS COMPANY; and WESTROCK | ) | |
| CP, LLC, | ) | |
| | ) | |
| *Defendants.* | | |

4905-9507-6688v.2

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Defendant, Fiber Industries LLC d/b/a Darling Fibers (hereinafter "Defendant" or "Fiber"), by and through its undersigned counsel, hereby answers the Third Amended Complaint ("TAC") and respectfully asserts the following:

### FOR A FIRST DEFENSE

1.     Each and every allegation of Plaintiff's TAC not specifically admitted is denied.

2.     Defendant denies the allegations contained in Paragraph 1 of the TAC and admits only that Plaintiff purports to bring this action against the named Defendants for alleged "ongoing contamination of the Great Pee Dee River, Lynches River, Lumber River, Little Pee Dee River, Lynches Lake Swamp, Black Creek, and Bull Creek, . . . the Waccamaw River and Intracoastal Waterway; and Plaintiff's properties with certain" polyfluoroalkyl substances (hereinafter "PFAS"), but denies that Plaintiff is entitled to any relief.

3.     Defendant denies the allegations contained in Paragraph 2 of the TAC and admits only that as part of this lawsuit, Plaintiff "seeks a declaratory judgment, injunctive relief, abatement, damages, and an award of costs, including attorneys' fees," but denies that Plaintiff is entitled to any relief from Defendant and demands strict proof thereof. Further, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 2 of the TAC as they relate to other unspecified Defendants and therefore denies the same.

4.     With regard to Paragraph 3 of the TAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in said Paragraph and therefore denies the same and demands strict proof thereof.

5.     Defendant denies the allegations against Defendant contained in Paragraph 4 of the TAC as worded. Further, Defendant lacks knowledge or information sufficient to form a

2

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

belief as to the truth or falsity of the allegations contained in Paragraph 4 of the TAC as they relate to other unspecified Defendants and therefore denies the same.

6.     Defendant denies the allegations contained in Paragraph 5 of the TAC and admits only that Plaintiff claims it "has suffered losses to the use and enjoyment of its property rights" and alleges trespass and damage to its properties, but denies Plaintiff is entitled to relief from Defendant and demands strict proof thereof. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 5 of the TAC as they relate to other unspecified Defendants and therefore denies the same. Defendant further lacks knowledge or information sufficient to form a belief regarding any alleged levels of PFAS concentrations in Plaintiff's water sources, and whether they "cannot be adequately removed by conventional wastewater treatment processes," and therefore denies the same and demands strict proof thereof.

7.     With regard to Paragraph 6 of the TAC, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained therein as they relate to other unspecified Defendants and therefore denies the same. Defendant further lacks knowledge or information sufficient to form a belief regarding the alleged levels of PFAS concentrations in Plaintiff's water sources, and whether "Plaintiff's existing water treatment processes cannot remove them" and whether the alleged PFAS concentrations "exceed[] what the U.S. Environmental Protection Agency ("EPA") deems unsafe for consumption," and therefore denies the same and demands strict proof thereof. Defendant denies any and all remaining allegations contained in Paragraph 6 of the TAC as they relate to Defendant and demands strict proof thereof.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

8.     Defendant denies the allegations contained in Paragraph 7 of the TAC and admits only that as part of this lawsuit, "[p]laintiff is also seeking equitable and injunctive relief requiring Defendants to fund the evaluation, testing, acquisition, installation, operation and maintenance of water treatment technologies at Plaintiff's SWTPs" and "recovery of punitive damages," but denies Plaintiff is entitled to any relief from Defendant and demands strict proof thereof.

9.     With regard to Paragraphs 8, 9, 10, and 11 of the TAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same and demands strict proof thereof.

10.     Paragraph 12 constitutes a legal conclusion requiring no response from Defendant. To the extent a response is required, Defendant reserves its right to contest subject matter jurisdiction.

11.     Paragraph 13 constitutes a legal conclusion requiring no response from Defendant. To the extent a response is required, Defendant reserves its right to contest personal jurisdiction.

12.     Paragraph 14 constitutes a legal conclusion requiring no response from Defendant. To the extent a response is required, Defendant reserves its right to contest venue.

13.     With regard to Paragraphs 15, 16, 17, 18, and 19 of the TAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same and demands strict proof thereof.

14.     Defendant denies the allegations contained in Paragraph 20 of the TAC as worded and admits only that Defendant is a South Carolina Limited Liability Company that is located at 1000 E. McIver Road, Darlington, South Carolina 29532.

4

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

15.    With regard to Paragraphs 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, and 40 of the TAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same and demands strict proof thereof.

16.    Defendant denies the allegations contained in Paragraph 41 of the TAC and admits only that PFAS contain carbon-fluorine bonds. Defendant lacks knowledge or information sufficient to form a belief as to the subjective, undefined, and ambiguous terms/phrases "extremely stable" and "wide variety of industrial, commercial, and consumer applications" as used in this Paragraph, and therefore denies all allegations of Paragraph 41 of the TAC and demands strict proof thereof.

17.    Defendant denies the allegations contained in Paragraph 42 of the TAC and admits only that PFAS contain carbon-fluorine bonds. Defendant lacks knowledge or information sufficient to form a belief as to what is meant by "pervasive in industrial, commercial, and consumer products" and "no known environmental breakdown mechanism" as used in this Paragraph, and therefore denies all allegations regarding the same.

18.    Defendant denies the allegations contained in Paragraph 43 of the TAC and admits only that Plaintiff purports to use the terms "PFOA, PFOS, PFHxS, PFNA, PFBS, and HFPO-DA (a/k/a GenX Chemicals) and fluoropolymers and side-chain fluorinated polymers" to refer to types of PFAS.

19.    With regard to Paragraphs 44, 45, 46, 47, 48, 49, and 50, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs, and therefore denies the same and demands strict proof thereof.

5

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

20.     Defendant objects to Paragraph 51 of the TAC as it mischaracterizes a Provisional EPA Health Advisory article from 16 years ago and attempts to draw legal conclusions from this document. Subject to this objection, Defendant refers to the EPA's referenced provisional health advisories, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's provisional health advisories contained in this Paragraph.

21.     Defendant denies the allegations in Paragraph 52 of the TAC as worded, which attempt to quote and characterize the EPA's published lifetime health advisory levels for PFOA and PFOS. Defendant refers to the EPA's referenced lifetime health advisories, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's lifetime health advisories contained in this Paragraph.

22.     Defendant denies the allegations in Paragraph 53 of the TAC as worded, which attempt to quote and characterize the EPA's lifetime health advisory levels for PFOA and PFOS. Defendant refers to the EPA's referenced health advisories, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's health advisories contained in this Paragraph.

23.     Defendant denies the allegations in Paragraph 54 of the TAC as worded, which attempt to quote and characterize the EPA's published lifetime drinking water health advisories for PFOA and PFOS. Defendant refers to EPA's referenced lifetime drinking water health advisories, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of EPA's lifetime drinking water health advisories contained in this Paragraph.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

24.     Defendant denies the allegations in Paragraph 55 of the TAC as worded, which attempt to quote and characterize the EPA's published lifetime drinking water health advisories for hexafluoropropylene oxide (HFPO) dimer acid and its ammonium salt (together referred to as "GenX chemicals") and perfluorobutane sulfonic acid and potassium perfluorobutane sulfonate (together referred to as "PFBS"). Defendant refers to the EPA's referenced lifetime drinking water health advisories, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's lifetime drinking water health advisories contained in this Paragraph.

25.     Defendant denies the allegations in Paragraph 56 of the TAC as worded, which attempt to characterize the EPA's proposed maximum contaminant levels ("MCLs") and maximum contaminant level goals ("MCLGs") for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals. Defendant refers to the EPA's referenced proposed MCLs and MCLGs, which speak for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's proposed MCLs and MCLGs contained in this Paragraph.

26.     Defendant denies the allegations in Paragraph 57 of the TAC as worded, which attempt to quote the EPA's PFAS National Primary Drinking Water Regulation Rulemaking. Defendant refers to the EPA's PFAS National Primary Drinking Water Regulation Rulemaking, which speaks for itself, for its true and complete contents, and Defendant denies any further characterization of the EPA's PFAS National Primary Drinking Water Regulation Rulemaking contained in this Paragraph.

27.     Defendant denies the allegations in Paragraph 58 of the TAC as worded, which attempt to quote and characterize the EPA's PFAS National Primary Drinking Water Regulation Rulemaking. Defendant refers to the EPA's PFAS National Primary Drinking Water Regulation

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Rulemaking, which speaks for itself, for its true and complete contents, and Defendant denies any further characterization of the EPA's PFAS National Primary Drinking Water Regulation Rulemaking contained in this Paragraph.

28.     Defendant denies the allegations in Paragraph 59 of the TAC as worded, which attempt to quote and characterize the EPA's press release regarding proposed MCLs. Defendant refers to the EPA's referenced proposed MCLs and press release, which speaks for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's proposed MCLs and press release contained in this Paragraph.

29.     Defendant denies the allegations in Paragraph 60 of the TAC as worded, which attempt to quote and characterize the EPA's final National Primary Drinking Water Regulation, which established individual MCLs and MCLGs for six PFAS in drinking water (PFOA, PFOS, PFHxS, PFNA, and HFPO-DA), and related publications regarding the same. Defendant refers to the EPA's referenced final National Primary Drinking Water Regulation and accompanying publications, which speaks for themselves, for their true and complete contents, and Defendant denies any further characterization of the final National Primary Drinking Water Regulation and accompanying publications contained in this Paragraph.

30.     Defendant denies the allegations in Paragraph 61 of the TAC as worded, which attempt to quote and characterize the EPA's final National Primary Drinking Water Regulation regarding individual MCLs and MCLGs for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals and PFAS mixtures containing at least two or more of PFHxS, PFNA, HFPO-DA, and PFBS using a Hazard Index MCL. Defendant refers to the EPA's final National Primary Drinking Water Regulation and referenced materials, which speak for themselves, for their true

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and complete contents, and Defendant denies any further characterization of the EPA's National Primary Drinking Water Regulation and referenced materials contained in this Paragraph.

31.     Defendant denies the allegations in Paragraph 62 of the TAC as worded, which attempt to characterize Plaintiff's obligations under the EPA's final National Primary Drinking Water Regulation. Defendant refers to the EPA's final National Primary Drinking Water Regulation, which speaks for itself, for its true and complete contents, and Defendant denies any further characterization of the EPA's National Primary Drinking Water Regulation contained in this Paragraph. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the remaining allegations in this Paragraph and therefore denies the same and demands strict proof thereof.

32.     Defendant denies the allegations in Paragraph 63 of the TAC as worded, which attempt to characterize Plaintiff's obligations under the EPA's final National Primary Drinking Water Regulation. Defendant refers to the EPA's final National Primary Drinking Water Regulation referenced, which speaks for itself, for its true and complete contents, and Defendant denies any further characterization of the EPA's final National Primary Drinking Water Regulation contained in this Paragraph. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the remaining allegations in this Paragraph and therefore denies the same and demands strict proof thereof.

33.     Defendant denies the allegations in Paragraph 64 of the TAC as worded, which attempt to quote and characterize the EPA's referenced May 14, 2025 news release. Defendant refers to the EPA's May 14, 2024 news release, which speaks for itself, for its true and complete contents, and Defendant denies any further characterization of the EPA's May 14, 2025 news release contained in this Paragraph.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

34.     Defendant denies the allegations in Paragraph 65 of the TAC as worded, which attempt to characterize the EPA's referenced May 14, 2025 news release and Plaintiff's obligations under the EPA's final National Primary Drinking Water Regulation. Defendant refers to the EPA's final National Primary Drinking Water Regulation and the EPA's May 14, 2025 news release, which speaks for themselves, for their true and complete contents, and Defendant denies any further characterization of the EPA's final National Primary Drinking Water Regulation and the EPA's May 14, 2025 news release contained in this Paragraph. Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the remaining allegations in this Paragraph and therefore denies the same and demands strict proof thereof.

35.     With regard to Paragraph 66, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in this Paragraph and therefore denies the same and demands strict proof thereof.

36.     Defendant denies the allegations against Defendant contained in Paragraph 67 of the TAC as worded. Further, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 67 of the TAC as they relate to other unspecified Defendants and therefore denies the same.

37.     With regard to Paragraph 68, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in this Paragraph, and therefore denies the same and demands strict proof thereof.

38.     Defendant denies the allegations against Defendant contained in Paragraph 69 of the TAC as worded. Further, Defendant lacks knowledge or information sufficient to form a

10

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

belief as to the truth or falsity of the allegations contained in Paragraph 69 of the TAC as they relate to other unspecified Defendants and therefore denies the same.

39.    Defendant denies the allegations against Defendant contained in Paragraph 70 of the TAC as worded. Further, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 70 as they relate to Defendants Burlington,  Delta Mills & JP Stevens, Elevate, Mohawk, Sonoco, and WestRock and therefore denies the same.

40.    With regard to Paragraphs 71 and 72 of the TAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs, and therefore denies the same and demands strict proof thereof.

41.     With regard to Paragraph 73, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph as they relate to unspecified Defendants and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 73 as they relate to Defendant and demands strict proof thereof.

42.    With regard to Paragraphs 74, 75 and 76,  Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs, and therefore denies the same and demands strict proof thereof.

43.    With regard to Paragraphs 77, 78, and 79, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in these Paragraphs as they relate to Plaintiff's wastewater treatment technology or its ability to remove PFAS "from the water Plaintiff draws" and therefore denies the same. Defendant denies

11

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

any and all remaining allegations in Paragraphs 77, 78, and 79 as they relate to Defendant and demands strict proof thereof.

44.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraphs 80, 81, 82, and 83 including as they relate to unspecified Defendants and therefore denies the same. Defendant denies any and all remaining allegations in these Paragraphs as they relate to Defendant and demands strict proof thereof.

45.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraphs 84, 85, 86, 87, 88, 89, and 90 as to "Old DuPont" and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 84, 85, 86, 87, 88, 89, and 90 as they relate to Defendant, if at all, and demands strict proof thereof.

46.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 91 as to "Old DuPont" and Defendant 3M and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 91 as they relate to Defendant, if at all, and demands strict proof thereof.

47.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 92 as to Defendant 3M and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 92 as they relate to Defendant, if at all, and demands strict proof thereof.

48.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 93 as to "Old DuPont" and Defendant 3M and

12

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 93 as they relate to Defendant, if at all, and demands strict proof thereof.

49.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraphs 94 and 95 as to "Old DuPont" and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 94 and 95 as they relate to Defendant, if at all, and demands strict proof thereof.

50.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 96 as to "Old DuPont" and Defendant Chemours and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 96 as they relate to Defendant, if at all, and demands strict proof thereof.

51.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 97 as to Defendant Invista and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 97 as they relate to Defendant, if at all, and demands strict proof thereof.

52.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 98 as to "Old DuPont" and Defendants Huntsman and Chemours and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 98 as they relate to Defendant, if at all, and demands strict proof thereof.

53.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 99 as to Defendant Daikin and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 99 as they relate to Defendant, if at all, and demands strict proof thereof.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

54.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraphs 100 and 101 as to Defendants Daikin and 3M and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 100 and 101 as they relate to Defendant, if at all, and demands strict proof thereof.

55.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraphs 102 and 103 as to Defendant Daikin and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 102 and 103 as they relate to Defendant, if at all, and demands strict proof thereof.

56.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraphs 104 and 105 as to Defendant Asahi and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 104 and 105 as they relate to Defendant, if at all, and demands strict proof thereof.

57.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 106 as to Defendant Arkema and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 106 as they relate to Defendant, if at all, and demands strict proof thereof.

58.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraphs 107 and 108 as to Defendant Clariant and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 107 and 108 as they relate to Defendant, if at all, and demands strict proof thereof.

59.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 109 as to Defendant Archroma and therefore

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

denies the same. Defendant denies any and all remaining allegations in Paragraph 109 as they relate to Defendant, if at all, and demands strict proof thereof.

60.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 110 as to Defendant Solvay and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 110 as they relate to Defendant, if at all, and demands strict proof thereof.

61.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 111 as they relate to unspecified Defendants and therefore denies the same. Defendant denies any and all remaining allegations in this Paragraph as they relate to Defendant, if at all, and demands strict proof thereof.

62.     With regard to Paragraph 112, including all subparts, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations regarding Defendants Asahi, Arkema, Clariant, Archroma, Daikin, Old DuPont, Chemours, Invista, Huntsman, and Solvay and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 112, including all subparts, as they relate to Defendant and demands strict proof thereof.

63.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations contained in Paragraphs 113, 114, 115, 116, 117, 118, 119, 120, and 121 of the TAC as they relate to unspecified Defendants and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 113, 114, 115, 116, 117, 118, 119, 120, and 121 as they relate to Defendant and demands strict proof thereof.

64.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 122 as they relate to unspecified

15

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Defendants' knowledge and therefore denies the same. Defendant denies any and all remaining allegations in this Paragraph as they relate to Defendant, if at all, and demands strict proof thereof.

65.     With regard to Paragraphs 123, 124, and 125, Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in these Paragraphs as they relate to unspecified Defendants and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 123, 124, and 125 as they relate to Defendant, if at all, and demands strict proof thereof.

66.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraphs 126 and 127 as to "Old DuPont" and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 126 and 127 as they relate to Defendant, if at all, and demands strict proof thereof.

67.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraphs 128, 129, and 130 as to "Old DuPont" and Defendant Chemours and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 128, 129, and 130 as they relate to Defendant, if at all, and demands strict proof thereof.

68.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraphs 131 and 132 as to "Old DuPont" and "Old Dow" and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 131 and 132 as they relate to Defendant, if at all, and demands strict proof thereof.

69.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraphs 133 and 134 as to "Old DuPont," "New Dow,"

16

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and Defendants Corteva and DuPont de Nemours, Inc. and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 133 and 134 as they relate to Defendant, if at all, and demands strict proof thereof.

70.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 135 as they relate to Plaintiff's treatment technologies and unspecified Defendants' wastewater discharges and therefore denies the same and demands strict proof thereof. Defendant denies any and all remaining allegations in this Paragraph as they relate to Defendant and demands strict proof thereof.

71.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 136 as they relate to Plaintiff's treatment technologies and unspecified Defendants and therefore denies the same and demands strict proof thereof. Defendant denies any and all remaining allegations in this Paragraph as they relate to Defendant and demands strict proof thereof.

72.     Defendant denies the allegations contained in Paragraphs 137 and 138 of the TAC.

73.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 139 as they relate to unspecified Defendants' actual or constructive knowledge and wastewater discharges and therefore denies the same. Defendant denies any and all remaining allegations in this Paragraph as they relate to Defendant and demands strict proof thereof.

74.     With regard to Paragraph 140, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

75. With regard to Paragraphs 141 and 142 of the TAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in said paragraph and therefore denies the same and demands strict proof thereof.

76. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraphs 143, 144, 145, 146, and 147 as they relate to unspecified Defendants and/or Plaintiff's provision of water and therefore denies the same and demands strict proof thereof. Defendant denies any and all remaining allegations in these Paragraphs as they relate to Defendant and demands strict proof thereof.

77. Defendant denies Paragraph 148 and demands strict proof thereof.

78. Defendant denies the allegations contained in Paragraph 149 of the TAC and admits only that in Paragraph 149 Plaintiff "requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its  use of Bull Creek and the Intracoastal Waterway to supply potable water to its customers," but denies that Plaintiff is entitled to relief from Defendant and demands strict proof thereof.

79. Defendant denies the allegations contained in Paragraph 150 of the TAC and admits only that in Paragraph 150 Plaintiff asks the Court for relief related to "funding the evaluation, testing, acquisition, installation, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination," but denies that Plaintiff is entitled to such relief from Defendant and demands strict proof thereof.

80. Defendant denies Paragraph 151 and demands strict proof thereof.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

81.     With regard to Paragraph 152, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

82.     With regard to Paragraphs 153 and 154 of the TAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs, and therefore denies the same and demands strict proof thereof.

83.     Defendant denies Paragraph 155 of the TAC as worded and demands strict proof thereof.

84.     Defendant denies Paragraphs 156, 157, 158, 159, and 160 and demands strict proof thereof.

85.     Defendant denies the allegations contained in Paragraph 161 of the TAC and admits only that in Paragraph 161 Plaintiff "requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety and ensure that Plaintiff's customers and residents of Plaintiff's community receive water free from PFAS," but denies that Plaintiff is entitled to relief from Defendant and demands strict proof thereof.

86.     Defendant denies Paragraphs 162 and 163 and demands strict proof thereof.

87.     With regard to Paragraph 164, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

88.     With regard to Paragraphs 165, 166, and 167 of the TAC (including all subparts), Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same and demands strict proof thereof.

19

89.     With regard to Paragraph 168, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations regarding Burlington, Delta Mills, Elevate, JPS, Mohawk, Sonoco, and WestRock and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 168 (including all subparts) as they relate to Defendant and demands strict proof thereof.

90.     With regard to Paragraph 169 of the TAC (including all subparts), Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations regarding unspecified Defendants and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 169 (including all subparts) as they relate to Defendant and demands strict proof thereof.

91.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 170 of the TAC and therefore denies the same and demands strict proof thereof.

92.     Defendant denies Paragraph 171 and demands strict proof thereof.

93.     Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 172 as to Defendants Nan Ya, PRET, IP, RRD, SCD, Burlington, Delta Mills, Elevate, JPS, Mohawk, Sonoco, and WestRock and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 172 as they relate to Defendant and demands strict proof thereof.

94.     With regard to Paragraph 173 of the TAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in this Paragraph and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 173 as they relate to Defendant and demands strict proof thereof.

20

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

95.     Defendant denies Paragraphs 174, 175, and 176 and demands strict proof thereof.

96.     With regard to Paragraph 177, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

97.     Defendant denies the allegations contained in Paragraph 178 of the TAC and admits only that Plaintiff purports to describe a legal duty supposedly owed by Defendants but denies that Plaintiff's description and characterization of such duty is complete or accurate. Further, Defendant denies a legal duty was breached and demands strict proof thereof.

98.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 179 as they relate to unspecified Defendants' actual or constructive knowledge and therefore denies the same. Defendant denies any and all remaining allegations in this Paragraph as they relate to Defendant and demands strict proof thereof.

99.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 180 as they relate to unspecified Defendants' breach of a supposed duty and therefore denies the same and demands strict proof thereof. Defendant denies any and all remaining allegations in Paragraph 180 as they relate to Defendant and demands strict proof thereof.

100.    Defendant denies the allegations contained in Paragraph 181 of the TAC and admits only that Plaintiff purports to describe a legal duty supposedly owed by Defendants but denies that Plaintiff's description and characterization of such duty is complete or accurate. Further, Defendant denies a legal duty was breached and demands strict proof thereof.

101.    Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 182 as they relate to unspecified

21

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Defendants' actual or constructive knowledge and therefore denies the same. Defendant denies any and all remaining allegations in this Paragraph as they relate to Defendant, if at all, and demands strict proof thereof.

102.     Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 183 as they relate to unspecified Defendants' breach of a supposed duty and therefore denies the same. Defendant denies any and all remaining allegations in Paragraph 183 as they relate to Defendant, if at all, and demands strict proof thereof.

103.     With regard to Paragraphs 184, 185, 186, and 187, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs as to Defendant Burlington and therefore denies the same.

104.     Defendant denies Paragraphs 188 and 189 and demands strict proof thereof.

105.     With regard to Paragraph 190, Defendant incorporates its answer to Plaintiff's corresponding prior allegations by reference as if fully set forth therein.

106.     With regard to Paragraph 191, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in this Paragraph, and therefore denies the same and demands strict proof thereof.

107.     With regard to Paragraphs 192, 193, 194, 195, 196, 197, 198, 199, and 200 of the TAC, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in said paragraphs as they relate to unspecified Defendants and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 192, 193, 194, 195, 196, 197, 198, 199, and 200 as they relate to Defendant, if at all, and demands strict proof thereof.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

108.    With regard to Paragraph 201, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

109.    With regard to Paragraphs 202, 203, 204, 205, 206, 207, 208, 209, and 210, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs as to Defendant Burlington and therefore denies the same.

110.    With regard to Paragraph 211, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

111.    With regard to Paragraph 212, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in this Paragraph, and therefore denies the same and demands strict proof thereof.

112.    With regard to Paragraphs 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, and 223, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs as they relate to unspecified Defendants and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, and 223 as they relate to Defendant, if at all, and demands strict proof thereof.

113.    With regard to Paragraph 224, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein and demands strict proof thereof.

114.    With regard to Paragraphs 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, and 236, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs as to Defendant Burlington and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

115. With regard to Paragraph 237, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

116. With regard to Paragraphs 238, 239, 240, 241, 242, 243, 244, 245, and 246 Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 238, 239, 240, 241, 242, 243, 244, 245, and 246 as they relate to Defendant, if at all, and demands strict proof thereof.

117. With regard to Paragraph 247, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

118. With regard to Paragraphs 248, 249 250, 251, 252, 253, 254, 255, and 256, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs as to Defendant Burlington and therefore denies the same.

119. With regard to Paragraph 257, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

120. With regard to Paragraphs 258, 259, 260, 261, 262, and 263, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs and therefore denies the same. Defendant denies any and all remaining allegations in Paragraphs 258, 259, 260, 261, 262, and 263 as they relate to Defendant, if at all, and demands strict proof thereof.

121. With regard to Paragraph 264, Defendant incorporates its answers to Plaintiff's corresponding prior allegations by reference as if fully set forth herein.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

122.     With regard to Paragraphs 265, 266, 267, 268, 269, and 270, Defendant lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in these Paragraphs as to Defendant Burlington and therefore denies the same.

123.     Plaintiff's Prayer for Relief beginning "WHEREFORE" is denied.

124.     Defendant demands a trial by jury.

## FOR A SECOND DEFENSE

125.     The TAC, and each cause of action or count alleged therein, fails to state facts sufficient to constitute a claim upon which relief may be granted against Defendant.

## FOR A THIRD DEFENSE

126.     The Court in which the actions were filed lacks personal jurisdiction over Defendant, and the TAC should therefore be dismissed under Rule 12(b)(2) of the Federal Rules of Civil Procedure.

## FOR A FOURTH DEFENSE

127.     Plaintiff's claims are barred or limited for lack of standing.

## FOR A FIFTH DEFENSE

128.     Plaintiff's TAC, and each alleged claim contained therein, are barred, in whole or in part, by the applicable statutes of limitations.

## FOR A SIXTH DEFENSE

129.     Plaintiff's TAC, and each alleged claim contained therein, are barred, in whole or in part, by the applicable statute of repose.

## FOR A SEVENTH DEFENSE

130.     Plaintiff's TAC, and each cause of action or count alleged therein, fail to join all necessary and indispensable parties.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR AN EIGHTH DEFENSE

131.    Plaintiff's TAC, and each alleged claim contained therein, are barred, in whole or in part, by the doctrine of laches.

## FOR A NINTH DEFENSE

132.    Plaintiff's TAC, and each alleged claim contained therein, are barred, in whole or in part, because Plaintiff is not the real party in interest or lacks capacity to bring its claims.

## FOR A TENTH DEFENSE

133.    Plaintiff's claims are not ripe and/or have been mooted.

## FOR AN ELEVENTH DEFENSE

134.    Plaintiff's claims are or may be barred, in whole or in part, to the extent they have failed to exhaust administrative remedies.

## FOR A TWELFTH DEFENSE

135.    Plaintiff may be barred by the doctrine of unclean hands from all forms of relief sought in the TAC.

## FOR A THIRTEENTH DEFENSE

136.    Plaintiff may be barred by the doctrines of estoppel and/or waiver from all forms of relief sought in the TAC.

## FOR A FOURTEENTH DEFENSE

137.    Plaintiff may be barred by the doctrines of res judicata and collateral estoppel from all forms of relief sought in the TAC.

## FOR A FIFTEENTH DEFENSE

138.    Any injuries and/or damages sustained by Plaintiff may have been caused or contributed to by the negligence or actual conduct of Plaintiff and/or other persons, firms,

26

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

corporations, or entities over whom Defendant had no control or right of control and for whom Defendant is not responsible.

## FOR A SIXTEENTH DEFENSE

139.    Any injuries and/or damages sustained by Plaintiff are barred by the doctrines of intervening cause and/or superseding cause.

## FOR A SEVENTEENTH DEFENSE

140.    Plaintiff's claims are or may be barred, in whole or in part, by the doctrine of election of remedies.

## FOR AN EIGHTEENTH DEFENSE

141.    Plaintiff's claims are subject to all defenses that could be asserted if Plaintiff's claims were properly made by individuals on whose behalf or for whose alleged damages Plaintiff seeks to recover.

## FOR A NINETEENTH DEFENSE

142.    Plaintiff's claims are or may be barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of risk, and open and obvious risk.

## FOR A TWENTIETH DEFENSE

143.    Plaintiff's claims are or may be barred, in whole or in part, because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A TWENTY-FIRST DEFENSE

144.    Plaintiff's claims are or may be barred, in whole or in part, because federal, state, and/or local authorities authorized, ratified, or were aware of and acquiesced in actions by Defendant that are the subject of Plaintiff's claims. Defendant is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency.

## FOR A TWENTY-SECOND DEFENSE

145.    Plaintiff's claims are or may be barred, in whole or in part, by the doctrine of primary jurisdiction.

## FOR A TWENTY-THIRD DEFENSE

146.    Plaintiff's claims are or may be barred, in whole or in part, under the doctrine of federal preemption, including, without limitation, express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices, and policy statements, enacted and/or promulgated and/or issued by Congress, federal agencies, or the executive branch, including, without limitation, to the extent Plaintiff's claims constitute an impermissible challenge to a response or remediation action under CERCLA, 42 U.S.C. § 9613(h).

## FOR A TWENTY-FOURTH DEFENSE

147.    Plaintiff's damages, if any, were caused by the active, direct, and proximate negligence or actual conduct of entities or persons other than Defendant, and in the event that Defendant is found to be liable to Plaintiff, Defendant will be entitled to indemnification, contribution, and/or apportionment.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A TWENTY-FIFTH DEFENSE

148.　Defendant asserts its rights to allocation or apportionment of fault pursuant to applicable state law, as well as its right to a proportionate reduction of any damages found against Defendant based on the negligence or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiff.

## FOR A TWENTY-SIXTH DEFENSE

149.　Pursuant to the South Carolina Contribution Among Tortfeasors Act, S.C. Code Ann. § 15-38-10, et seq., any damages recoverable from Defendant should be limited to the percentage of the relative degree of fault of Defendant as compared with other parties to this action, if any, as well as other persons or entities not presently before this Court.

## FOR A TWENTY-SEVENTH DEFENSE

150.　Plaintiff's claims against Defendant are barred or limited by the economic loss rule.

## FOR A TWENTY-EIGHTH DEFENSE

151.　Plaintiff may have failed or refused to exercise reasonable care and diligence to avoid loss and minimize damages and, therefore, may not recover for losses that could have been prevented by reasonable efforts on their part, or by expenditures which might reasonably have been made. Recovery, if any, should therefore be reduced by Plaintiff's failure to mitigate damages, if any.

## FOR A TWENTY-NINTH DEFENSE

152.　Plaintiff's claims are barred, in whole or in part, by the doctrines of acquiescence, accord and satisfaction, ratification, settlement, and/or release.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A THIRTIETH DEFENSE

153.    Plaintiff has not alleged an injury that, as a matter of law, supports a recovery in tort.

## FOR A THIRTY-FIRST DEFENSE

154.    To the extent that Plaintiff has split its claims, Plaintiff's claims are barred, in whole or in part, by the doctrine prohibiting claim splitting.

## FOR A THIRTY-SECOND DEFENSE

155.    Plaintiff's claims are barred, in whole or in part, because Defendant did not owe a legal duty to Plaintiff or, if it owed such a duty, did not breach and/or fully discharged that duty.

## FOR A THIRTY-THIRD DEFENSE

156.    Plaintiff's claims are barred, in whole or in part, because, at all relevant times, Defendant exercised due care with regard to its activities and took reasonable precautions against foreseeable acts or omissions of others.

## FOR A THIRTY-FOURTH DEFENSE

157.    Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendant proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

## FOR A THIRTY-FIFTH DEFENSE

158.    Plaintiff's claims are barred, in whole or in part, because to the extent Defendant owed any cognizable duty to warn, Defendant adequately discharged any such duty.

## FOR A THIRTY-SIXTH DEFENSE

159.    Plaintiff's claims are barred, in whole or in part, by the municipal cost recovery rule (also known as the "free public services doctrine").

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A THIRTY-SEVENTH DEFENSE

160.    Plaintiff's claim for alleged injuries and damages are barred, in whole or in part, because the claims are speculative and conjectural.

## FOR A THIRTY-EIGHTH DEFENSE

161.    The relief that Plaintiff seeks, in whole or in part, violates Defendant's due process rights.

## FOR A THIRTY-NINTH DEFENSE

162.    Defendant denies any negligence, culpable conduct, or liability on its part but, if Defendant ultimately is found liable for any portion of Plaintiff's alleged damages, Defendant shall only be liable for its equitable share of Plaintiff's alleged damages.

## FOR A FORTIETH DEFENSE

163.    Defendant denies any liability, but in the event Defendant is found to have any liability to Plaintiff, Defendant is entitled to an offset against any such liability on its part for the greatest of: (1) any amounts actually paid by any person or entity heretofore or hereafter for any of the injuries, costs, damages and expenses alleged in the TAC; (2) any amounts stipulated or otherwise agreed to in any release or covenant not to sue any person or entity heretofore or hereafter for any of the injuries, costs, damages and expenses alleged in the TAC; or (3) the equitable share of the liability of any person or entity that heretofore has received, or hereafter receives, any release from liability or covenant not to sue with regard to any of the injuries, costs, damages and expenses alleged in the TAC.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### FOR A FORTY-FIRST DEFENSE

164.     Defendant cannot be held jointly and severally liable for the acts or omissions of third parties because their acts or omissions were separate and distinct and the alleged harm is divisible from and greater than any harm allegedly caused by the acts or omissions of Defendant.

### FOR A FORTY-SECOND DEFENSE

165.     Plaintiff's claims are barred, in whole or in part, because Plaintiff fails to identify any specific product of Defendant which was allegedly manufactured, handled, sold, distributed, or used and caused the alleged injury.

### FOR A FORTY-THIRD DEFENSE

166.     Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish that their alleged injuries were caused by exposure to PFAS from any product(s) manufactured, handled, distributed, used or sold by Defendant or wastewater attributable to Defendant.

### FOR A FORTY-FOURTH DEFENSE

167.     Plaintiff's purported exposure to products manufactured, handled, distributed, used or sold by Defendant or wastewater attributable to Defendant, if any, was too removed, indefinite, de minimis and insufficient to establish a reasonable degree of probability that any such product caused any alleged injury, damage or loss to Plaintiff.

### FOR A FORTY-FIFTH DEFENSE

168.     Plaintiff's claims are barred, in whole or in part, because Defendant acted reasonably and in good faith.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### FOR A FORTY-SIXTH DEFENSE

169.    Defendant has satisfied, fulfilled, and performed each and every obligation and duty imposed by law, if any, to the full extent of its responsibility.

### FOR A FORTY-SEVENTH DEFENSE

170.    Plaintiff's claims fail as a matter of substantive law and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the South Carolina Constitution to the extent that by relying on market share or other aggregate proof of causation or liability, Plaintiff seeks to deprive Defendant of procedural and substantive safeguards including, but not limited to, statutory and common law defenses to liability and causation generally.

### FOR A FORTY-EIGHTH DEFENSE

171.    Plaintiff's damages, if any, were caused or contributed to by third parties over whom Defendant has no control and no legal duty to control.

### FOR A FORTY-NINTH DEFENSE

172.    Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff seeks to retroactively impose liability for conduct that was not actionable at the time it occurred, and Defendant may not be held liable under retroactive theories not requiring proof of fault or causation.

### FOR A FIFTIETH DEFENSE

173.    Any damages Plaintiff may have suffered were not reasonably foreseeable by Defendant at the time of the conduct alleged.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A FIFTY-FIRST DEFENSE

174.    To the extent any of the substances to which Plaintiff and/or Plaintiff's properties were allegedly exposed are purportedly hazardous or harmful, Plaintiff's claims are barred, in whole or in part, because Defendant neither knew, nor should have known, that any of the substances to which Plaintiff and/or Plaintiff's properties were allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of the medical, scientific, technical, and/or industrial knowledge available to Defendant at all times relevant to the claims or causes of action asserted by Plaintiff.

## FOR A FIFTY-SECOND DEFENSE

175.    Any product manufactured, handled, designed, sold, distributed, or used by Defendant and alleged to have caused harm to Plaintiff was, at the time, safer than any reasonable or feasible alternative designs, and any alternative designs would have been less safe, more likely to have caused injury or otherwise not feasible for their intended use.

## FOR A FIFTY-THIRD DEFENSE

176.    An award of judgment rendered in favor of Plaintiff must be reduced by the amount of compensation Plaintiff received, or are entitled to receive, from any source as a result of Plaintiff's alleged injuries.

## FOR A FIFTY-FOURTH DEFENSE

177.    Defendant is entitled to all the procedural, substantive, and other protections, caps, and limitations provided by the state statutes and other state and federal law regarding Plaintiff's claims for compensatory and punitive damages.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FOR A FIFTY-FIFTH DEFENSE**

178.    The TAC fails to state a claim upon which punitive or exemplary damages may be awarded.

**FOR A FIFTY-SIXTH DEFENSE**

179.    Defendant did not engage in any conduct which would warrant or form a valid basis for an award of punitive damages.

**FOR A FIFTY-SEVENTH DEFENSE**

180.    Plaintiff has failed to adequately plead and/or allege that Defendant acted with the requisite state of mind to warrant an award of punitive damages.

**FOR A FIFTY-EIGHTH DEFENSE**

181.    Defendant has complied with all applicable statutes and regulations set forth by local, state, and/or federal government(s) with regard to the conduct alleged in the TAC, and, therefore, to the extent that consideration is given to Plaintiff's claims, punitive damages are unwarranted in law and fact.

**FOR A FIFTY-NINTH DEFENSE**

182.    Punitive damages are not available because all conduct and activities of Defendant related to the matters alleged in the TAC conformed to industry standards based upon the state of medical, scientific, and/or industrial knowledge which existed during the relevant and material time period.

**FOR A SIXTIETH DEFENSE**

183.    To the extent any of the substances to which Plaintiff and/or Plaintiff's properties were allegedly exposed are purportedly hazardous or harmful, punitive damages are not available because Defendant neither knew nor should have known that the substances to which Plaintiff

35

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and/or Plaintiff's properties were allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm, and Defendant therefore lacked notice that its conduct was unlawful or subject to punishment and an award of punitive damages would violate Defendant's constitutional right to due process.

## FOR A SIXTY-FIRST DEFENSE

184.    Plaintiff's claims for punitive or exemplary damages are barred or reduced by applicable law or statute, or are unconstitutional insofar as they violate the due process protections afforded by the Unites States Constitution, including, without limitation, the Fifth, Eighth, and Fourteenth Amendments to and the Excessive Fines Clause and Full Faith and Credit Clause of the United States Constitution, and other applicable provisions of the Constitution of any other state whose laws may apply.

## FOR A SIXTY-SECOND DEFENSE

185.    To the extent Plaintiff seeks recovery of attorneys' fees and costs, Plaintiff is not entitled to any attorneys' fees or costs associated with this action because no statute or contract exists that would give Plaintiff the right to recover such fees or costs.

## FOR A SIXTY-THIRD DEFENSE

186.    Plaintiff's claims are barred, in whole or in part, to the extent that the alleged injuries and damages, if any, were due to preexisting conditions, for which Defendant cannot be held responsible.

## FOR A SIXTY-FOURTH DEFENSE

187.    Defendant reserves the right to assert all applicable defenses under the applicable rules of procedures, including, but not limited to, Federal Rules of Civil Procedure 8(c) and 12(b), as investigation and discovery proceeds.

ELECTRONICALLY FILED - 2025 Jun 30 9:58 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOR A SIXTY-FIFTH DEFENSE

188.    Defendant adopts by reference any additional applicable defense pleaded by any other Defendant not otherwise pleaded herein.

## RESERVATION AND NON-WAIVER

189.    At this early stage of litigation there has been no discovery and Defendant has not had the opportunity to fully investigate Plaintiff's claim and, accordingly, reserves the right to amend this Answer to include any additional defenses which may be revealed through discovery, investigation, or otherwise.

WHEREFORE, having fully answered, Defendant prays that the TAC be dismissed, for the costs of defending this action, and for such other relief as the Court and jury deem just and proper.

MCANGUS GOUDELOCK & COURIE, LLC


*s/ Dominic A. Starr*
DOMINIC A. STARR (S.C. Bar No. 66231)
Email: dominic.starr@mgclaw.com
ZACHARY S. BROWN (S.C. Bar No. 103144)
Email: Zachary.Brown@mgclaw.com
2411 North Oak Street, Suite 401
Myrtle Beach, South Carolina 29577
Telephone: (843) 848-6000
Facsimile: (843) 449-2306

ATTORNEYS FOR FIBER INDUSTRIES LLC


Dated: June 30, 2025

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA**<br>**COUNTY OF HORRY** | | **IN THE COURT OF COMMON PLEAS**<br>**FIFTEENTH JUDICIAL CIRCUIT** |

Grand Strand Water and Sewer Authority, )    Civil Action No.  2024-CP-26-05523

                     Plaintiff, )

      vs. )

AGG Chemicals Americas, Inc.; Aladdin )
Manufacturing Corporation; )
Archroma U.S., Inc.; Arkema, Inc.; )
Burlington Industries, Inc.; Clariant )
Corporation; Corteva, Inc.; Daikin America, )
Inc.; Delta Mills, Inc., its predecessors, )
successors, assigns, and/or responsible )
parties; DuPont de Nemours, Inc.; EIDP, )
Inc.; Elevate Textiles, Inc.; Fiber Industries, )
LLC; Huntsman International, LLC; )
International Paper Company; INV )
Performance Surfaces, LLC: J.P. Stevens & )
Company, Inc., its predecessors, successors, )
assigns, and/or responsible parties; Mohawk )
Industries, Inc.; Nan Ya Plastics )
Corporation, America; PRET Advanced )
Materials, LLC; Red Rock Disposal, LLC; )
Sampson County Disposal, LLC; Solvay )
Specialty Polymers USA, LLC; Sonoco )
Products Company; The Chemours )
Company; and Westrock CP, LLC, )
                        )
              Defendants. )
                        )

### DEFENDANTS MOHAWK INDUSTRIES, INC. AND ALADDIN MANUFACTURING CORPORATION'S ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT

Defendants Aladdin Manufacturing Corporation ("Aladdin") and Mohawk Industries, Inc.

("Mohawk," and collectively the "Mohawk Defendants"), by and through its undersigned counsel,

hereby file this Answer in response to Plaintiff Grand Strand Water and Sewer Authority's

("Plaintiff") Third Amended Complaint ("Complaint").

1

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Subject to and without waiving the defenses raised in the Mohawk Defendants' Motion to Dismiss and the below Affirmative and Other Defenses, the Mohawk Defendants respond to the Complaint as follows.

The Complaint contains purported references to several documents, third-party publications, and statements that have often been excerpted, paraphrased, characterized, and otherwise taken out of context. These documents, third-party publications, and statements should be considered, if at all, in context and in unmodified form, and the Mohawk Defendants hereby respectfully refer the Court to the respective documents, third-party publications, and statements for their complete contents.

Except as is expressly admitted, qualified, or explained herein, Mohawk Defendants specifically deny each and every allegation contained in the Complaint, including without limitation any allegations contained in titles, headings, and subparagraphs of the Complaint, and specifically denies any liability to Plaintiff. To the extent that the titles, headings, and subparagraphs of the Complaint are intended to be allegations directed at Mohawk Defendants, they are denied.

Mohawk Defendants specifically deny that it contaminated South Carolina waterways with excessive concentrations of PFAS. Furthermore, Mohawk Defendants do not concede that PFAS was present at facilities owned or operated by Mohawk Defendants, nor do Mohawk Defendants concede that it discharged PFAS into any bodies of water.

Mohawk Defendants do not concede or adopt any suggestion, implication, or assertion concerning any alleged connection, association, or causal relationship between PFAS and purported harm to humans.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's use of the term "Defendants" is problematic. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to allegations that pertain to other defendants and, therefore, such allegations are denied. The Mohawk Defendants respond to the allegations contained in the individually numbered paragraphs of the Complaint only on behalf of the Mohawk Defendants themselves.

**STATEMENT OF THE CASE**

1.      The allegations in Paragraph 1 contain introductory statements to which no response is required. To the extent a response is required, and to the extent the allegations in Paragraph 1 are directed at Mohawk Defendants, Mohawk Defendants deny the allegations.

2.      To the extent the allegations in Paragraph 2 are directed at Mohawk Defendants, Mohawk Defendants deny the allegations.

3.      The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3, and therefore deny them.

4.      Upon information and belief, the Mohawk Defendants admit only that Aladdin owned and/or operated industrial manufacturing facilities upstream of Plaintiff's water intakes. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 4, and, therefore, such allegations are denied.

5.      The Mohawk Defendants deny any allegation that the Mohawk Defendants have contaminated surface waters in the Pee Dee River Watershed. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 5, and, therefore, such allegations are denied.

6.      To the extent the allegations in Paragraph 6 are directed at Mohawk Defendants, the Mohawk Defendants deny the allegations. The Mohawk Defendants are without knowledge or

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

information sufficient to form a belief as to the remaining allegations in Paragraph 6 and, therefore, such allegations are denied.

7.     The Mohawk Defendants admit that the Complaint purports to seek compensatory, consequential, and punitive damages and equitable and injunctive relief but deny that Plaintiff is entitled to any such relief. The Mohawk Defendants deny the allegations in Paragraph 7 as they relate to Mohawk Defendants.  The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 7, and, therefore, such allegations are denied.

## RESPONSE TO DISCLAIMER

8.     The allegations in Paragraph 8 contain a disclaimer to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8, and therefore deny them.

9.     The allegations in Paragraph 9 contain a legal conclusion and disclaimer to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9, and therefore deny them.

10.     The allegations in Paragraph 10 contain a legal conclusion to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

11.     The allegations in Paragraph 11 contain a disclaimer to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11, and therefore deny them.

## RESPONSE TO JURISDICTION AND VENUE

12.     The allegations in Paragraph 12 contain conclusions of law to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12, and therefore deny them.

13.     The allegations in Paragraph 13 contain conclusions of law to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13, and therefore deny them.

14.     The allegations in Paragraph 14 contain conclusions of law to which no response is required. To the extent a response is required, the Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14, and therefore deny them.

## RESPONSE TO PARTIES

15.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15, and therefore deny them.

16.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16, and therefore deny them.

5

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

17.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17, and therefore deny them.

18.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and therefore denies them.

19.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, and therefore denies them.

20.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20, and therefore denies them.

21.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21, and therefore denies them.

22.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22, and therefore denies them.

23.     The Mohawk Defendants admit that they are Delaware corporations authorized to do business in South Carolina and that the Oak River Mill plant, located at 2118 Marlboro Road, Blenheim, South Carolina 29516, operated as a yarn conversion and extrusion facility located on the Great Pee Dee River until its closure in October 2022. The Mohawk Defendants further admit that the Oak River Mill plant is approximately 80 miles upstream from the Bull Creek Surface Water Treatment Plant. The Mohawk Defendants deny the remaining allegations in Paragraph 23.

24.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24, and therefore denies them.

25.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and therefore denies them.

6

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

26.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and therefore denies them.

27.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27, and therefore denies them.

28.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28, and therefore denies them.

29.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29, and therefore denies them.

30.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30, and therefore denies them.

31.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and therefore denies them.

32.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32, and therefore denies them.

33.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33, and therefore denies them.

34.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34, and therefore denies them.

35.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35, and therefore denies them.

36.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

37.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37, and therefore denies them.

38.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38, and therefore denies them.

39.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39, and therefore denies them.

40.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, and therefore denies them.

<u>RESPONSE TO FACTUAL ALLEGATIONS</u>

**"Background and Hazard of PFAS"**

41.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41, and therefore deny them.

42.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42, and therefore deny them.

43.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43, and therefore deny them.

44.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44, and therefore deny them.

45.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45, and therefore deny them.

46.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

47.      The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47, and therefore deny them.

48.      The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48, and therefore deny them.

49.      The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49, and therefore deny them.

50.      The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50, and therefore deny them.

51.      The allegations in Paragraph 51 refer to specific publications from the United States Environmental Protection Agency ("EPA"), which speak for themselves. The Mohawk Defendants deny any allegations in Paragraph 51 that are in addition to or inconsistent with the terms of those publications.

52.      The Mohawk Defendants admit that, in 2016, the EPA published a "Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate," which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the health advisories' terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 52.

53.      The Mohawk Defendants admit that, in 2016, the EPA published a "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)" and a "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)," which speak for themselves. The Mohawk Defendants deny any allegation inconsistent with the health advisories' terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 53.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

54. The Mohawk Defendants admit that, in 2022, the EPA published an interim "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)" and an interim "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)," which speak for themselves. The Mohawk Defendants deny any allegation inconsistent with the health advisories' terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 54.

55. The Mohawk Defendants admit that, in 2022, the EPA published a "Drinking Water Health Advisories for GenX Chemicals and PFBS" which speak for themselves. The Mohawk Defendants deny any allegation inconsistent with the health advisories' terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 55.

56. The Mohawk Defendants admit that, in 2023, the EPA proposed a National Primary Drinking Water Regulation for six PFAS, including perfluorooctanoic acid (PFOA), perfluorooctane sulfonic acid (PFOS), perfluorononanoic acid (PFNA), hexafluoropropylene oxide dimer acid (HFPO-DA, commonly known as GenX Chemicals), perfluorohexane sulfonic acid (PFHxS), and perfluorobutane sulfonic acid (PFBS), which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 56.

57. The Mohawk Defendants admit that, in 2023, the EPA proposed a National Primary Drinking Water Regulation for six PFAS, including PFOA, PFOS, PFNA, GenX Chemicals, PFHxS, and PFBS, which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 57.

58. The Mohawk Defendants admit that, in 2023, the EPA proposed a National Primary Drinking Water Regulation for six PFAS, including PFOA, PFOS, PFNA, GenX Chemicals,

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PFHxS, and PFBS, which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 58.

59.     The Mohawk Defendants admit that, in 2023, the EPA published a news release titled *EPA Releases Annual Report Showing Steady Progress to Protect Communities from PFAS Pollution*, which speaks for itself. The Mohawk Defendants deny any allegations inconsistent with the news release's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 59.

60.     The Mohawk Defendants admit that, in 2024, the EPA finalized a National Primary Drinking Water Regulation for six PFAS, including perfluorooctanoic acid (PFOA), perfluorooctane sulfonic acid (PFOS), perfluorononanoic acid (PFNA), hexafluoropropylene oxide dimer acid (HFPO-DA, commonly known as GenX Chemicals), perfluorohexane sulfonic acid (PFHxS), and perfluorobutane sulfonic acid (PFBS), which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 60.

61.     The Mohawk Defendants admit that, in 2024, the EPA finalized a National Primary Drinking Water Regulation for six PFAS, including PFOA, PFOS, PFNA, GenX Chemicals, PFHxS, and PFBS, which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 61.

62.     The Mohawk Defendants admit that, in 2024, the EPA finalized a National Primary Drinking Water Regulation for six PFAS, including PFOA, PFOS, PFNA, GenX Chemicals, PFHxS, and PFBS, which speaks for itself. The Mohawk Defendants deny any allegation

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 62.

63.     The Mohawk Defendants admit that, in 2024, the EPA finalized a National Primary Drinking Water Regulation for six PFAS, including PFOA, PFOS, PFNA, GenX Chemicals, PFHxS, and PFBS, which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 63.

64.     The Mohawk Defendants admit that, in 2025, the EPA published an article titled *EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS*, which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 64.

65.     The Mohawk Defendants admit that, in 2025, the EPA published an article titled *EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS*, which speaks for itself. The Mohawk Defendants deny any allegation inconsistent with the proposal's terms. The Mohawk Defendants also deny any remaining allegations in Paragraph 65.

**"Contamination of Bull Creek and Intracoastal Waterway with PFAS"**

66.     Upon information and belief, The Mohawk Defendants admit the allegations in Paragraph 66.

67.     Upon information and belief, Mohawk Defendants admit only that Aladdin Manufacturing Corporation operated the Oak River Mill plant 80 miles upstream of Bull Creek and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 67, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

68.     The Mohawk Defendants deny the allegations in Paragraph 68 as they relate to the Mohawk Defendants. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 68, and therefore deny them.

69.     The Mohawk Defendants admit that Aladdin operated the Oak River Mill plant 80 miles upstream of Bull Creek. The Mohawk Defendants further admit that the mill's industrial wastewater complied with permits issued by the South Carolina Department of Health. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 69, and therefore deny them.

70.     To the extent the allegations in Paragraph 70 are directed at the Mohawk Defendants, upon information and belief, the Mohawk Defendants admit that Aladdin operated the Oak River Mill plant 80 miles upstream of Bull Creek. The Mohawk Defendants further admit that the mill's industrial wastewater complied with permits issued by the South Carolina Department of Health.  The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 70, and therefore deny them.

71.     The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the allegations in Paragraph 71, and therefore deny them.

72.     The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72, and therefore deny them.

73.     The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73, and therefore deny them.

74.     The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the allegations in Paragraph 74, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

75.     The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75, and therefore deny them.

76.     The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76, and therefore deny them.

77.     The Mohawk Defendants deny the allegations in Paragraph 77 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 77, and therefore deny them.

78.     The Mohawk Defendants deny the allegations in Paragraph 78 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 78, and therefore deny them.

79.     The Mohawk Defendants deny the allegations in Paragraph 79 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 79, and therefore deny them.

80.     Paragraph 80 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 80 as they relate to the Mohawk Defendants.

81.     Paragraph 81 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 81 as they relate to the Mohawk Defendants.

82.     Paragraph 82 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 82 as they relate to the Mohawk Defendants.

**"Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties"**

14

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

83. The Mohawk Defendants deny the allegations in Paragraph 83 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 83, and therefore deny them.

84. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84, and therefore deny them.

85. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85, and therefore deny them.

86. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86, and therefore deny them.

87. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87, and therefore deny them.

88. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88, and therefore deny them.

89. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89, and therefore deny them.

90. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90, and therefore deny them.

91. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91, and therefore deny them.

92. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92, and therefore deny them.

93. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

94.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94, and therefore deny them.

95.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95, and therefore deny them.

96.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96, and therefore deny them.

97.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97, and therefore deny them.

98.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98, and therefore deny them.

99.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99, and therefore deny them.

100.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100, and therefore deny them.

101.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101, and therefore deny them.

102.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102, and therefore deny them.

103.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103, and therefore deny them.

104.     The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

105. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105, and therefore deny them.

106. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106, and therefore deny them.

107. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107, and therefore deny them.

108. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108, and therefore deny them.

109. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109, and therefore deny them.

110. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 110, and therefore deny them.

111. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111, and therefore deny them.

112. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112, and therefore deny them.

**"Supplier Defendants Were Directly Involved In Discharger Defendants' PFAS Use and Disposal"**

113. The Mohawk Defendants deny the allegations in Paragraph 113 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 113, and therefore deny them.

114. The Mohawk Defendants deny the allegations in Paragraph 114 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient

17

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

form a belief as to the truth of the remaining allegations in Paragraph 114, and therefore deny them.

115.    The Mohawk Defendants deny the allegations in Paragraph 115 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 115, and therefore deny them.

116.    The Mohawk Defendants deny the allegations in Paragraph 116 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 116, and therefore deny them.

117.    The Mohawk Defendants deny the allegations in Paragraph 117 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 117, and therefore deny them.

118.    The Mohawk Defendants deny the allegations in Paragraph 118 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 118, and therefore deny them.

119.    The Mohawk Defendants deny the allegations in Paragraph 119 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 119, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

120.    The Mohawk Defendants deny the allegations in Paragraph 120 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 120, and therefore deny them.

121.    The Mohawk Defendants deny the allegations in Paragraph 121 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 121, and therefore deny them.

122.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122, and therefore deny them.

**"Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products"**

123.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123, and therefore denies them.

124.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124, and therefore denies them.

125.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125, and therefore denies them.

**"Old Dupont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities"**

126.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126, and therefore deny them.

127.    The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

128. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128, and therefore deny them.

129. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129, and therefore denies them.

130. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130, and therefore denies them.

131. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131, and therefore denies them.

132. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132, and therefore denies them.

133. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 133, and therefore denies them.

134. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134, and therefore denies them.

**"Defendants have harmed Plaintiff and Plaintiff's Community"**

135. The Mohawk Defendants deny the allegations in Paragraph 135 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 135, and therefore deny them.

136. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 136, and therefore denies them.

137. Paragraph 137 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 137 as

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 137, and therefore deny them.

138.     Paragraph 138 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 138 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 65, and therefore deny them.

139.     Paragraph 139 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 139 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 139, and therefore deny them.

## FIRST CAUSE OF ACTION

### Private Nuisance

140.     The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 139 as if set forth fully herein.

141.     The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141, and therefore deny them.

142.     The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142, and therefore deny them.

143.     Paragraph 143 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 143 as

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 143, and therefore deny them.

144. To the extent the allegations in Paragraph 144 are directed at Mohawk Defendants, Mohawk Defendants deny the allegations. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 144, and therefore deny them.

145. Paragraph 145 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 145 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 145, and therefore deny them.

146. Paragraph 146 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 146 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 146, and therefore deny them.

147. Paragraph 147 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 147 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 147, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

148.    Paragraph 148 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 148 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 148, and therefore deny them.

149.    Paragraph 149 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 149 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 149, and therefore deny them.

150.    Paragraph 150 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 150 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 150, and therefore deny them.

151.    Paragraph 151 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 151 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 151 and therefore deny them.

## SECOND CAUSE OF ACTION

### Public Nuisance

23

152.     The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 151 as if set forth fully herein.

153.     The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 153, and therefore deny them.

154.     The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 154, and therefore deny them.

155.     Paragraph 155 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 155 as they relate to the Mohawk Defendants. The remaining allegation in Paragraph 155 refer to specific publications from EPA, which speak for themselves. The Mohawk Defendants deny any allegations in Paragraph 155 that are in addition to or inconsistent with the terms of those publications.

156.     Paragraph 156 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 156 as they relate to the Mohawk Defendants. The allegation in Paragraph 156 refer to specific publications from EPA, which speak for themselves. The Mohawk Defendants deny any allegations in Paragraph 156 that are in addition to or inconsistent with the terms of those publications. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 156, and therefore deny them.

157.     Paragraph 157 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 157 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84, and therefore deny them.

158.    Paragraph 158 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 158 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 158, and therefore deny them.

159.    Paragraph 159 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 159 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 159, and therefore deny them.

160.    Paragraph 160 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 160 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 160, and therefore deny them.

161.    Paragraph 161 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 161 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 161, and therefore deny them.

25

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

162. To the extent the allegations in Paragraph 162 are directed at Mohawk Defendants, Mohawk Defendants deny the allegations. The Mohawk Defendants further deny that they were the source of any alleged contamination referenced in Paragraph 162. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 162, and therefore deny them.

163. Paragraph 163 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 163 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 163, and therefore deny them.

## THIRD CAUSE OF ACTION

### Trespass

164. The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 163 as if set forth fully herein.

165. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 165, and therefore deny them.

166. The allegations in Paragraph 166, including all subparagraphs, are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 166, including all subparagraphs, and therefore deny them.

167. The allegations in Paragraph 167, including all subparagraphs, are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required,

26

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 167, including all subparagraphs, and therefore deny them.

168.     Paragraph 168, including its subparagraphs, states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 168 as they relate to the Mohawk Defendants. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 168, and therefore deny them.

169.     Paragraph 169, including its subparagraphs, states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 169 as they relate to the Mohawk Defendants. The Mohawk Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 169, and therefore deny them.

170.     The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 170, including all subparagraphs, and therefore deny them.

171.     Paragraph 171 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 171 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 171, and therefore deny them.

172.     Paragraph 172 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 172 as they relate to the Mohawk Defendants. To the extent the allegations in Paragraph 172 are directed

27

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

at other defendants, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 172, and therefore deny them.

173.     Paragraph 173 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 173 as they relate to the Mohawk Defendants. To the extent the allegations in Paragraph 173 are directed at other defendants, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 173, and therefore deny them.

174.     Paragraph 174 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 174 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 174, and therefore deny them.

175.     Paragraph 175 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 175 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 175, and therefore deny them.

176.     Paragraph 176 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 176 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 176, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FOURTH CAUSE OF ACTION**

**Negligence, Gross Negligence, and/or Recklessness**

177.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 176 as if set forth fully herein.

178.    Paragraph 178 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 178 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 178, and therefore deny them.

179.    Paragraph 179 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 179 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 179, and therefore deny them.

180.    Paragraph 180 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 180 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 180, and therefore deny them.

181.    The allegations in Paragraph 181 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 181, and therefore deny them.

29

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

182.	The allegations in Paragraph 182 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 182, and therefore deny them.

183.	The allegations in Paragraph 183 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 183, and therefore deny them.

184.	The allegations in Paragraph 184 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 184, and therefore deny them.

185.	The allegations in Paragraph 185 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 185, and therefore deny them.

186.	The allegations in Paragraph 186 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 186, and therefore deny them.

187.	The allegations in Paragraph 187 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 187, and therefore deny them.

188.     Paragraph 188 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 188 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 188, and therefore deny them.

189.     Paragraph 189 states legal conclusions to which no response is required. To the extent a response is required, the Mohawk Defendants deny the allegations in Paragraph 189 as they relate to the Mohawk Defendants. The Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 189, and therefore deny them.

## FIFTH CAUSE OF ACTION

### Strict Products Liability – Ultrahazardous Activity
### (Supplier Defendants)

190.     The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 189 as if set forth fully herein.

191.     The allegations in Paragraph 191 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 191, and therefore deny them.

192.     The allegations in Paragraph 192 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants

31

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 192, and therefore deny them.

193.    The allegations in Paragraph 193 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 193, and therefore deny them.

194.    The allegations in Paragraph 194 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 194, and therefore deny them.

195.    The allegations in Paragraph 195 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 195, and therefore deny them.

196.    The allegations in Paragraph 196 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 196, and therefore deny them.

197.    The allegations in Paragraph 197 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 197, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

198.    The allegations in Paragraph 198 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 198, and therefore deny them.

199.    The allegations in Paragraph 199 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 199, and therefore deny them.

200.    The allegations in Paragraph 200 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 200, and therefore deny them.

## SIXTH CAUSE OF ACTION

### Strict Products Liability – Ultrahazardous Activity
### (Burlington)

201.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 200 as if set forth fully herein.

202.    The allegations in Paragraph 202 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 202, and therefore deny them.

203.    The allegations in Paragraph 203 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants

33

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 203, and therefore deny them.

204.    The allegations in Paragraph 204 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 204, and therefore deny them.

205.    The allegations in Paragraph 205 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 205, and therefore deny them.

206.    The allegations in Paragraph 206 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 206, and therefore deny them.

207.    The allegations in Paragraph 207 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 207, and therefore deny them.

208.    The allegations in Paragraph 208 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 208, and therefore deny them.

34

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

209.    The allegations in Paragraph 209 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 209, and therefore deny them.

210.    The allegations in Paragraph 210 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 210, and therefore deny them.

### SEVENTH CAUSE OF ACTION

**Strict Products Liability – Design Defect**
**(Supplier Defendants)**

211.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 210 as if set forth fully herein.

212.    The allegations in Paragraph 212 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 212, and therefore deny them.

213.    The allegations in Paragraph 213 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 213, and therefore deny them.

214.    The allegations in Paragraph 214 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 214, and therefore deny them.

215.    The allegations in Paragraph 215 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 215, and therefore deny them.

216.    The allegations in Paragraph 216 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 216, and therefore deny them.

217.    The allegations in Paragraph 217, including all subparagraphs, are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 217, including all subparagraphs, and therefore deny them.

218.    The allegations in Paragraph 218 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 218, and therefore deny them.

219.    The allegations in Paragraph 219 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 219, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

220.    The allegations in Paragraph 220 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 220, and therefore deny them.

221.    The allegations in Paragraph 221 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 221, and therefore deny them.

222.    The allegations in Paragraph 222 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 222, and therefore deny them.

223.    The allegations in Paragraph 223 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 223, and therefore deny them.

<u>**EIGHTH CAUSE OF ACTION**</u>

**Strict Products Liability – Design Defect**
**(Burlington)**

224.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 223 as if set forth fully herein.

225.    The allegations in Paragraph 225 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 225, and therefore deny them.

226.    The allegations in Paragraph 226 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 226, and therefore deny them.

227.    The allegations in Paragraph 227 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 227, and therefore deny them.

228.    The allegations in Paragraph 228 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 228, and therefore deny them.

229.    The allegations in Paragraph 229 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 229, and therefore deny them.

230.    The allegations in Paragraph 230, including all subparagraphs, are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 230, including all subparagraphs, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

231.    The allegations in Paragraph 231 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 231, and therefore deny them.

232.    The allegations in Paragraph 232 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 232, and therefore deny them.

233.    The allegations in Paragraph 233 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 233, and therefore deny them.

234.    The allegations in Paragraph 234 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 234, and therefore deny them.

235.    The allegations in Paragraph 235 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 235, and therefore deny them.

236.    The allegations in Paragraph 236 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 236, and therefore deny them.

## NINTH CAUSE OF ACTION

### Strict Products Liability – Failure to Warn
### (Supplier Defendants)

237.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 236 as if set forth fully herein.

238.    The allegations in Paragraph 238 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 238, and therefore deny them.

239.    The allegations in Paragraph 239 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 239, and therefore deny them.

240.    The allegations in Paragraph 240 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 240, and therefore deny them.

241.    The allegations in Paragraph 241 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 241, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

242.     The allegations in Paragraph 242 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 242, and therefore deny them.

243.     The allegations in Paragraph 243 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 243, and therefore deny them.

244.     The allegations in Paragraph 244 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 244, and therefore deny them.

245.     The allegations in Paragraph 245 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 245, and therefore deny them.

246.     The allegations in Paragraph 246 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 246, and therefore deny them.

## TENTH CAUSE OF ACTION

### Strict Products Liability – Failure to Warn
### (Burlington)

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

247.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 246 as if set forth fully herein.

248.    The allegations in Paragraph 248 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 248, and therefore deny them.

249.    The allegations in Paragraph 249 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 249, and therefore deny them.

250.    The allegations in Paragraph 250 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 250, and therefore deny them.

251.    The allegations in Paragraph 251 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 251, and therefore deny them.

252.    The allegations in Paragraph 252 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 252, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

253.    The allegations in Paragraph 253 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 253, and therefore deny them.

254.    The allegations in Paragraph 254 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 254, and therefore deny them.

255.    The allegations in Paragraph 255 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 255, and therefore deny them.

256.    The allegations in Paragraph 256 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 256, and therefore deny them.

## ELEVENTH CAUSE OF ACTION

### Breach of Implied Warranties
### (Supplier Defendants)

257.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 256 as if set forth fully herein.

258.    The allegations in Paragraph 258 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants

43

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 258, and therefore deny them.

259.     The allegations in Paragraph 259 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 259, and therefore deny them.

260.     The allegations in Paragraph 260 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 260, and therefore deny them.

261.     The allegations in Paragraph 261 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 261, and therefore deny them.

262.      The allegations in Paragraph 262 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 262, and therefore deny them.

263.     The allegations in Paragraph 263 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 263, and therefore deny them.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## TWELFTH CAUSE OF ACTION

### Breach of Implied Warranties
### (Burlington)

264.    The Mohawk Defendants incorporate by reference their responses to Paragraphs 1 through 263 as if set forth fully herein.

265.    The allegations in Paragraph 265 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 265, and therefore deny them.

266.    The allegations in Paragraph 266 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 266, and therefore deny them.

267.    The allegations in Paragraph 267 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 267, and therefore deny them.

268.    The allegations in Paragraph 268 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 268, and therefore deny them.

269.    The allegations in Paragraph 269 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 269, and therefore deny them.

270. The allegations in Paragraph 270 are not directed at the Mohawk Defendants; therefore, no response is necessary. To the extent a response is required, the Mohawk Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 270, and therefore deny them.

## RESPONSE TO PRAYER FOR RELIEF

Responding to the WHEREFORE Paragraph that follows Paragraph 148 of Plaintiff's Complaint, the Mohawk Defendants deny any and all liability and further denies that Plaintiff is entitled to any of the relief sought in this Paragraph, including subparagraphs (a) through (e).

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming the burden of proof where it otherwise rests with Plaintiff, the Mohawk Defendants assert the following defenses.

## FIRST DEFENSE

Plaintiff's Complaint fails, in whole or in part, to state a claim for relief and should be dismissed in its entirety pursuant to SCRCP 12(b)(6) and 12(c).

## SECOND DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the applicable statutes of limitations and/or repose.

## THIRD DEFENSE

Plaintiff's Complaint, and each cause of action or count alleged therein, fails to join necessary parties.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

## FIFTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because Plaintiff is not the real party in interest.

## SIXTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, to the extent Plaintiff has failed to exhaust administrative remedies.

## SEVENTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrine of estoppel and/or waiver.

## EIGHTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrines of res judicata and/or collateral estoppel.

## NINTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrine of election of remedies.

## TENTH DEFENSE

Pursuant to the South Carolina Contribution Among Tortfeasors Act, S.C. Code Ann. § 15-38-10, *et seq.*, any damages recoverable from the Mohawk Defendants should be limited to the percentage of the relative degree of fault of the Mohawk Defendants as compared with other parties to this action, if any, as well as other persons or entities not presently before this Court.

## ELEVENTH DEFENSE

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Any alleged injuries and/or damages sustained by Plaintiff may have been caused or contributed to by the negligence, omissions or actual conduct of Plaintiff and/or other persons, firms, corporations, or entities over whom the Mohawk Defendants had no control or right of control and for whom the Mohawk Defendants are not responsible.

## TWELFTH DEFENSE

Any alleged injuries and/or damages sustained by Plaintiff may be barred, in whole or in part, by the doctrines of intervening cause and/or superseding cause.

## THIRTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendants proximately caused the purported injuries and damages allegedly sustained by Plaintiffs.

## FOURTEENTH DEFENSE

Plaintiffs' claim for alleged injuries and damages are barred, in whole or in part, because the claims are speculative and conjectural.

## FIFTEENTH DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times.

## SIXTEENTH DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, because federal, state, and/or local authorities authorized, ratified, or were aware of and acquiesced in actions by Defendants that are the subject of Plaintiffs' claims. Defendants are not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## SEVENTEENTH DEFENSE

Plaintiffs' claims are barred to the extent the "permit shield" doctrine and "federally permitted release" defense applies because any leachate was discharged pursuant to lawful permits.

## EIGHTEENTH DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, by the doctrine of primary jurisdiction.

## NINETEENTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, under the doctrines of contributory negligence and/or comparative fault, and/or other applicable common law or statutory doctrines.

## TWENTIETH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because the Mohawk Defendants' actions were in conformity with (i) any federal, state or other regulations, standards, guidelines, specifications, and laws in effect; (ii) available knowledge and research of the scientific and industrial communities; and (iii) generally recognized and prevailing industry standards; and (iv) state of the art in existence at the time the design was prepared and the products were manufactured, handled, sold, distributed, and/or used.

## TWENTY-FIRST DEFENSE

Any product manufactured, handled, designed, sold, distributed, or used by the Mohawk Defendants and alleged to have caused harm to Plaintiff was, at the time, safer than any reasonable or feasible alternative designs, and any alternative designs would have been less safe, more likely to have caused injury or otherwise not feasible for their intended use.

## TWENTY-SECOND DEFENSE

49

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's claims may be barred, in whole or in part, because federal, state, and/or local authorities, departments and/or agencies authorized, ratified, or were aware of and acquiesced to actions taken by the Mohawk Defendants that are the subject of Plaintiff's claims. The Mohawk Defendants are not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority, department or agency.

## TWENTY-THIRD DEFENSE

Plaintiff's claims may be barred, in whole or in part, under the doctrine of Federal Preemption, including, without limitation, express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices, military specification, and policy statements, enacted and/or promulgated and/or issues by Congress, federal agencies, or the executive branch.

## TWENTY-FOURTH DEFENSE

The Mohawk Defendants assert its rights to allocation, setoff or apportionment of fault pursuant to applicable law, as well as its rights to a proportionate reduction of any damages found against the Mohawk Defendants based on the negligence, omissions or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiff.

## TWENTY-FIFTH DEFENSE

An award of judgment rendered in favor of Plaintiff must be reduced by the amount of compensation Plaintiff received, or is entitled to receive, from any source as a result of Plaintiff's alleged injuries.

## TWENTY-SIXTH DEFENSE

Plaintiff may have failed or refused to exercise reasonable care and diligence to avoid loss and minimize damages and, therefore, may not recover for losses that could have been prevented

50

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

by reasonable efforts on Plaintiff's part, or by expenditures which might reasonably have been made. Recovery, if any, should therefore be reduced by Plaintiff's failure to mitigate damages, if any.

## TWENTY-SEVENTH DEFENSE

The Mohawk Defendants and its agents and/or employees acted with due care and otherwise conducted themselves at all relevant times as reasonable people and/or entities under the circumstances.

## TWENTY-EIGHTH DEFENSE

The Mohawk Defendants have satisfied, fulfilled and performed each and every obligation and duty imposed by law, if any, to the full extent of its responsibility.

## TWENTY-NINTH DEFENSE

Any alleged injury, damage or loss sustained by Plaintiff in connection with the subject matter of this action was not reasonably foreseeable to the Mohawk Defendants.

## THIRTIETH DEFENSE

Plaintiff's claims fail as a matter of substantive law and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the South Carolina Constitution to the extent that by relying on market share or other aggregate proof of causation or liability, Plaintiff seeks to deprive the Mohawk Defendants of procedural and substantive safeguards including, but not limited to, statutory and common law defenses to liability and causation generally.

## THIRTY-FIRST DEFENSE

51

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's claims may be barred for lack of proximate causation between any alleged act, omission, or product of the Mohawk Defendants and the claims, damages, and harm alleged in Plaintiff's Complaint.

## THIRTY-SECOND DEFENSE

Plaintiff's claims against the Mohawk Defendants are barred by the economic loss rule.

## THIRTY-THIRD DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot prove that its alleged injuries were caused by exposure to PFAS allegedly contained in any product(s) manufactured, handled, distributed, used, or sold by the Mohawk Defendants.

## THIRTY-FOURTH DEFENSE

The Mohawk Defendants affirmatively assert as a defense, credit, or set-off against the damages claimed by Plaintiff, any payment, voluntary payment, or settlement (and any monies paid pursuant thereto) between Plaintiff and any other person or entity. The Mohawk Defendants also assert the affirmative defenses of satisfaction, payment, and release.

## THIRTY-FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that Plaintiff was exposed to a sufficient concentration or amount of PFAS, and/or for a sufficient duration, that has been reliably established, through scientific means, to be capable of causing Plaintiff's alleged injuries.

## THIRTY-SIXTH DEFENSE

To the extent that Plaintiffs have split their claims, Plaintiffs' claims are barred in whole, or in part, by the doctrine prohibiting claim splitting.

## THIRTY-SEVENTH DEFENSE

52

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's purported exposure to products manufactured, handled, distributed, used or sold by the Mohawk Defendants, if any, was too removed, indefinite, de minimis and insufficient to establish a reasonable degree of probability that any such product caused any alleged injury, damage or loss to Plaintiff.

### THIRTY-EIGHTH DEFENSE

The Mohawk Defendants cannot be held jointly and severally liable for the acts or omissions of third parties or other parties because their acts or omissions were separate and distinct and the alleged harm is divisible from and greater than any harm allegedly caused by acts, omissions, or products of the Mohawk Defendants.

### THIRTY-NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff seeks to retroactively impose liability for conduct that was not actionable at the time it occurred, and the Mohawk Defendants may not be held liable under retroactive theories not requiring proof or fault or causation.

### FORTIETH DEFENSE

Plaintiff's claims are barred, in whole or in part, because The Mohawk Defendants neither knew, nor should have known, that any of the chemicals or substances to which Plaintiff was allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of medical, scientific, technical, and/or industrial knowledge available to the Mohawk Defendants at all times relevant to the claims or causes of action asserted by Plaintiff.

### FORTY-FIRST DEFENSE

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiffs' trespass claims are barred because PFAS molecules constitute "tangible" matter that will not support a trespass claim. *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 480 (2013).

## FORTY-SECOND DEFENSE

The Mohawk Defendants is entitled to all procedural, substantive, and other protections, caps, and limitations provided by applicable state statutes and other state laws regarding Plaintiff's claims for compensatory and punitive damages. The Mohawk Defendants specifically pleads the application of S.C. Code Ann. § 15-32-530 to this action.

## FORTY-THIRD DEFENSE

The Complaint fails to state a claim upon which punitive damages may be awarded. Nor did the Mohawk Defendants engage in any conduct that would permit an award of punitive damages. And, any award of punitive damages would violate the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, the excessive fines clause of the Eighth Amendment to the United States Constitution, and various articles and sections of the South Carolina Constitution.

## FORTY-FOURTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the political question and separation of powers doctrines because their claims implicate issues of statewide importance that are reserved for state regulation.

## FORTY-FIFTH DEFENSE

Plaintiff's claims against the Mohawk Defendants may not arise out of the same transactions or occurrences as their claims against other defendants, as required for proper joinder of parties.

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FORTY-SIXTH DEFENSE**

To the extent Plaintiff seeks equitable relief, Plaintiff is not entitled to equitable relief because Plaintiff has an adequate remedy at law, if Plaintiff is entitled to any remedy, and the alleged harm is not irreparable.

**FORTY-SEVENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the free public services doctrine and by the municipal cost recovery doctrine.

**FORTY-EIGHTH DEFENSE**

Plaintiff's claims are barred to the extent that Plaintiff's alleged damages are speculative, uncertain, and hypothetical.

**FORTY-NINTH DEFENSE**

Plaintiff's damages, if any, may have been the direct and proximate result of facts and circumstances over which the Mohawk Defendants exercises no control.

**FIFTIETH DEFENSE**

Plaintiff's nuisance claims are barred, in whole or in part, because they lack the legal authority or standing to bring a nuisance claim under South Carolina law.

**FIFTY-FIRST DEFENSE**

Plaintiff's private nuisance claim is barred, in whole or in part, because the Mohawk Defendants did not unreasonably interfere with Plaintiff's ownership or possession of land.

**FIFTY-SECOND DEFENSE**

Plaintiff's nuisance claims against the Mohawk Defendants are barred by the doctrine of "coming to the nuisance," the prior nuisance doctrine, and/or the doctrine of consent.

**FIFTY-THIRD DEFENSE**

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's public nuisance claim fails because Plaintiff is not a private person bringing an action for damages to real or personal property.

### FIFTY-FOURTH DEFENSE

Plaintiff's public nuisance claim fails because Plaintiff fails to allege facts showing that the Mohawk Defendants controlled the instrumentality of the alleged nuisance.

### FIFTY-FIFTH DEFENSE

Plaintiff's public nuisance claim fails because Plaintiff failed to plead that it suffered a particular damage beyond that which the public has experienced.

### FIFTY-SIXTH DEFENSE

Plaintiff's trespass claim fails because the Mohawk Defendants did not interfere with Plaintiff's right to the exclusive, peaceable possession of its property.

### FIFTY-SEVENTH DEFENSE

Plaintiff's tort-based claims fail because the Mohawk Defendants do not owe Plaintiff a duty under governing law.

### FIFTY-EIGHTH DEFENSE

Plaintiff's tort-based claims fail because The Mohawk Defendants did not breach any duty allegedly owed to Plaintiff.

### FIFTY-NINTH DEFENSE

Plaintiffs' claims are or may be barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of risk, and open and obvious risk.

### SIXTIETH DEFENSE

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff's claims may be barred, in whole or in part, because the Mohawk Defendants complied at all relevant times with all applicable laws, including all legal and regulatory duties.

### SIXTY-FIRST DEFENSE

Plaintiff's claims may be barred, reduced, or limited pursuant to the applicable South Carolina statutory and common law regarding limitations of awards, caps on recovery, and setoffs.

### SIXTY-SECOND DEFENSE

Plaintiffs' claims against Defendants under the South Carolina Unfair Trade Practices Act are barred in whole or in part to the extent that the Act: (i) does not allow for recovery by any party who is not considered a "person" under S.C. Code Ann § 39-5-10(a) and (ii) does not govern conduct that did not occur in "trade and commerce." S.C. Code Ann. § 39-5-20(a).

### SIXTY-THIRD DEFENSE

To the extent Plaintiff seeks recovery of attorneys' fees and costs, Plaintiff is not entitled to any attorneys' fees or costs associated with this action because no statute or contract exists that would give Plaintiff the right to recover such fees or costs.

### SIXTY-FOURTH DEFENSE

The Mohawk Defendants adopts by reference any additional applicable defense pled by any other defendant not otherwise pled herein.

### <u>RESERVATION OF RIGHTS</u>

The Mohawk Defendants hereby reserve the right to amend this Answer, raise additional defenses as may be discovered during the course of this litigation and its continuing factual investigations, add cross-claims, or assert third-party claims pursuant to the provisions of the South Carolina Rules of Civil Procedure, the substantive law of South Carolina, and the inherent

ELECTRONICALLY FILED - 2025 Jun 30 5:08 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

authority of this Court to manage the procedural aspects of this litigation. Any allegation not expressly admitted in this Answer is denied.

WHEREFORE, having fully answered Plaintiff's Complaint, The Mohawk Defendants deny that Plaintiff is entitled to any of the relief requested in the Complaint, and respectfully prays for the dismissal of Plaintiff's Complaint with prejudice and for such other and further relief as this Court may deem just and proper.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: s/ MERRITT G. ABNEY

Merritt G. Abney
SC Bar No. 71893
E-Mail: merritt.abney@nelsonmullins.com
Sarah Specter Powell
SC Bar No. 104261
E-Mail: sarah.powell@nelsonmullins.com
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC  29401-2239
(843) 853-5200

Wesley T. Moran
South Carolina Bar No. 102787
E-Mail: wes.moran@nelsonmullins.com
3751 Robert M. Grissom Parkway / Suite 300
Post Office Box 3939 (29578-3939)
Myrtle Beach, SC 29577-6412
(843) 448-3500

*Attorneys for Defendants Aladdin Manufacturing Corporation and Mohawk Industries, Inc.*

Charleston, South Carolina

June 30, 2025

58

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF HORRY | FIFTEENTH JUDICIAL CIRCUIT |

| | |
|---|---|
| Grand Strand Water and Sewer Authority, | C.A. No.: 2024-CP-26-05523 |
| Plaintiff, | |
| v. | |
| AGC Chemicals Americas, Inc.; Aladdin Manufacturing Corporation; Archroma U.S., Inc; Arkema, Inc.; Burlington Industries, Inc.; Clariant Corporation; Corteva, Inc.; Daikin America, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; DuPont de Nemours, Inc.; EIDP, Inc.; Elevate Textiles, Inc.; Fiber Industries, LLC; Huntsman International, LLC; International Paper Company; INV Performance Surfaces, LLC; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; Sampson County Disposal, LLC; Solvay Specialty Polymers USA, LLC; Sonoco Products Company; The Chemours Company; and Westrock CP, LLC, | **DEFENDANT PRET ADVANCED MATERIALS, INC.'S ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT** |
| Defendants. | |

Defendant PRET Advanced Materials, LLC ("PRET"), denying each and every allegation not specifically admitted herein, hereby submits its Answer to Plaintiff Grand Strand Water and Sewer Authority's ("Plaintiff" or "GSWSA") Third Amended Complaint (the "Complaint").

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## STATEMENT OF THE CASE[1]

1.　　PRET denies each and every allegation in Paragraph 1.

2.　　PRET denies each and every allegation in Paragraph 2.

3.　　PRET lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 of the Complaint, and therefore denies them.

4.　　PRET denies each and every allegation in Paragraph 4.

5.　　PRET denies each and every allegation in Paragraph 5.

6.　　PRET denies each and every allegation in Paragraph 6.

7.　　PRET denies each and every allegation in Paragraph 7.

## DISCLAIMER

8.　　Paragraph 8 sets forth legal conclusions to which no response is required. To the extent a response is required, PRET denies each and every allegation in Paragraph 8.

9.　　The allegations in Paragraph 9 sets forth legal conclusions to which no response is required. The allegations in Paragraph 9 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET denies each and every allegation in Paragraph 9.

10.　　Paragraph 10 sets forth legal conclusions to which no response is required. To the extent a response is required, PRET denies each and every allegation in Paragraph 10.

11.　　Paragraph 11 sets forth legal conclusions to which no response is required. To the extent a response is required, PRET denies each and every allegation in Paragraph 11.

---

[1] The headers used in this Answer are for ease of reference and correspond to the headers set forth in Plaintiff's Third Amended Complaint. They do not constitute an admission by PRET as to any allegation in the Third Amended Complaint.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## JURISDICTION AND VENUE

12.      Paragraph 12 sets forth legal conclusions to which no response is required.  To the extent a response is required, PRET denies each and every allegation in Paragraph 12.

13.      Paragraph 13 sets forth legal conclusions to which no response is required.  To the extent a response is required, PRET denies each and every allegation in Paragraph 13.

14.      Paragraph 14 sets forth legal conclusions to which no response is required.  To the extent a response is required, PRET denies each and every allegation in Paragraph 14.

## PARTIES

### I.      Plaintiff

15.      PRET lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Complaint, and therefore denies them.

16.      PRET lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 of the Complaint, and therefore denies them.

17.      PRET lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 of the Complaint, and therefore denies them.

### II.      Discharger Defendants.

18.      The allegations in Paragraph 18 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the Complaint, and therefore denies them.

19.      The allegations in Paragraph 19 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint, and therefore denies them.

20.     The allegations in Paragraph 20 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint, and therefore denies them.

21.     The allegations in Paragraph 21 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the Complaint, and therefore denies them.

22.     The allegations in Paragraph 22 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 of the Complaint, and therefore denies them.

23.     The allegations in Paragraph 23 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 of the Complaint, and therefore denies them.

24.     The allegations in Paragraph 24 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Complaint, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

25.    In response to Paragraph 25 of the Complaint, PRET admits that it is a Delaware limited liability company that owns and operates a facility located at 520 Kingsburg Highway, Johnsonville, South Carolina 29555.  PRET denies the each and every remaining allegation in Paragraph 25 that is directed at PRET.  PRET states that the remaining allegations in Paragraph 25 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 of the Complaint, and therefore denies them.

26.    The allegations in Paragraph 26 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 of the Complaint, and therefore denies them.

27.    The allegations in Paragraph 27 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 of the Complaint, and therefore denies them.

28.    The allegations in Paragraph 28 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 of the Complaint, and therefore denies them.

**III.    Supplier Defendants.**

29.    The allegations in Paragraph 29 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 of the Complaint, and therefore denies them.

30.     The allegations in Paragraph 30 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 of the Complaint, and therefore denies them.

31.     The allegations in Paragraph 31 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 of the Complaint, and therefore denies them.

32.     The allegations in Paragraph 32 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 of the Complaint, and therefore denies them.

33.     The allegations in Paragraph 33 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 of the Complaint, and therefore denies them.

34.     The allegations in Paragraph 34 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 of the Complaint, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

35.     The allegations in Paragraph 35 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35 of the Complaint, and therefore denies them.

36.     The allegations in Paragraph 36 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 of the Complaint, and therefore denies them.

37.     The allegations in Paragraph 37 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 of the Complaint, and therefore denies them.

38.     The allegations in Paragraph 38 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 of the Complaint, and therefore denies them.

39.     The allegations in Paragraph 39 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 of the Complaint, and therefore denies them.

40.     The allegations in Paragraph 40 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 of the Complaint, and therefore denies them.

## FACTUAL ALLEGATIONS

### I.     Background and Hazards of PFAS

41.     PRET lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 41 of the Complaint, and therefore denies them.

42.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 42 of the Complaint, and therefore denies them.

43.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 43 of the Complaint, and therefore denies them.

44.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 44 of the Complaint, and therefore denies them.

45.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 45 of the Complaint, and therefore denies them.

46.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 46 of the Complaint, and therefore denies them.

47.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 47 of the Complaint, and therefore denies them.

48.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 48 of the Complaint, and therefore denies them.

49.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 49 of the Complaint, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

50.    PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 50 of the Complaint, and therefore denies them.

51.    In response to Paragraph 51 of the Complaint, PRET states that the publication referred to in Paragraph 51 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 51.

52.    In response to Paragraph 52 of the Complaint, PRET states that the publication referred to in Paragraph 52 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 52.

53.    In response to Paragraph 53 of the Complaint, PRET states that the publication referred to in Paragraph 53 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 53.

54.    In response to Paragraph 54 of the Complaint, PRET states that the publication referred to in Paragraph 54 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 54.

55.    In response to Paragraph 55 of the Complaint, PRET states that the publication referred to in Paragraph 55 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 55.

56.    In response to Paragraph 56 of the Complaint, PRET states that the publication referred to in Paragraph 56 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 56.

57.    In response to Paragraph 57 of the Complaint, PRET states that the publication referred to in Paragraph 57 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 57.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

58.    In response to Paragraph 58 of the Complaint, PRET states that the publication referred to in Paragraph 58 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 58.

59.    In response to Paragraph 59 of the Complaint, PRET states that the publication referred to in Paragraph 59 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 59.

60.    In response to Paragraph 60 of the Complaint, PRET states that the publication referred to in Paragraph 60 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 60.

61.    Paragraph 61 sets forth legal conclusions to which no response is required. PRET also states that the publication referred to in Paragraph 61 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 61.

62.    In response to Paragraph 62 of the Complaint, PRET states that the publication referred to in Paragraph 62 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 62.

63.    In response to Paragraph 63 of the Complaint, PRET states that the publication referred to in Paragraph 63 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 63.

64.    In response to Paragraph 64 of the Complaint, PRET states that the publication referred to in Paragraph 64 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 64.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

65.    In response to Paragraph 65 of the Complaint, PRET states that the publication referred to in Paragraph 65 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, PRET denies the allegations in Paragraph 65.

## II.    Contamination of Bull Creek and the Intracoastal Waterway with PFAS

66.    Upon information and belief, Paragraph 66 of the Complaint is admitted.

67.    PRET denies the allegations in Paragraph 67 of the Complaint as they relate to PRET. PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 67, and therefore denies them.

68.    PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 68 of the Complaint, and therefore denies them.

69.    In response to Paragraph 69 of the Complaint, PRET admits only that it owns and operates a facility in Johnsonville, South Carolina and denies the remaining allegations as they relate to PRET. PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 69, and therefore denies them. Further answering the allegations of Paragraph 69, PRET asserts that, at all times, it complied with government permits issued to it relating to wastewater.

70.    The allegations in Paragraph 70 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 70, and therefore denies them.

71.    In response to Paragraph 71 of the Complaint, PRET admits only that it owns and operates a facility in Johnsonville, South Carolina and denies the remaining allegations as they relate to PRET. PRET lacks knowledge or information sufficient to form a belief about the truth

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

of the remaining allegations set forth in Paragraph 71, and therefore denies them. Further answering the allegations of Paragraph 71, PRET asserts that, at all times, it complied with government permits issued to it relating to wastewater.

72.     The allegations in Paragraph 72 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 72, and therefore denies them.

73.     PRET denies each and every allegation in Paragraph 73 of the Complaint.

74.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 74 of the Complaint, and therefore denies them.

75.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 75 of the Complaint, and therefore denies them.

76.     PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 76 of the Complaint, and therefore denies them.

77.     PRET denies each and every allegation in Paragraph 77 of the Complaint.

78.     PRET denies the allegations in Paragraph 78 of the Complaint as they relate to PRET. PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 78 of the Complaint, and therefore denies them.

79.     PRET denies the allegations in Paragraph 79 of the Complaint as they relate to PRET. PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 79, and therefore denies them.

80.     PRET denies each and every allegation in Paragraph 80 of the Complaint.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

81.     PRET denies the allegations in Paragraph 81 of the Complaint as they relate to PRET. PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 81, and therefore denies them.

82.     PRET denies each and every allegation in Paragraph 82 of the Complaint.

**III.     Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.**

83.     PRET denies each and very allegation in Paragraph 83 of the Complaint.

84.     The allegations in Paragraph 84 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 84, and therefore denies them.

85.     The allegations in Paragraph 85 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 85, and therefore denies them.

86.     The allegations in Paragraph 86 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 86, and therefore denies them.

87.     The allegations in Paragraph 87 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 87, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

88.     The allegations in Paragraph 88 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 88, and therefore denies them.

89.     The allegations in Paragraph 89 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 89, and therefore denies them.

90.     The allegations in Paragraph 90 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 90, and therefore denies them.

91.     The allegations in Paragraph 91 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 91, and therefore denies them.

92.     The allegations in Paragraph 92 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 92, and therefore denies them.

93.     The allegations in Paragraph 93 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 93, and therefore denies them.

94.     The allegations in Paragraph 94 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 94, and therefore denies them.

95.     The allegations in Paragraph 95 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 95, and therefore denies them.

96.     The allegations in Paragraph 96 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 96, and therefore denies them.

97.     The allegations in Paragraph 97 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 97, and therefore denies them.

98.     The allegations in Paragraph 98 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 98, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

99.     The allegations in Paragraph 99 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 99, and therefore denies them.

100.     The allegations in Paragraph 100 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 100, and therefore denies them.

101.     The allegations in Paragraph 101 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 101, and therefore denies them.

102.     The allegations in Paragraph 102 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 102, and therefore denies them.

103.     The allegations in Paragraph 103 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 103, and therefore denies them.

104.     The allegations in Paragraph 104 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 104, and therefore denies them.

105.    The allegations in Paragraph 105 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 105, and therefore denies them.

106.    The allegations in Paragraph 106 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 106, and therefore denies them.

107.    The allegations in Paragraph 107 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 107, and therefore denies them.

108.    The allegations in Paragraph 108 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 108, and therefore denies them.

109.    The allegations in Paragraph 109 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 109, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

110.    The allegations in Paragraph 110 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 110, and therefore denies them.

111.    The allegations in Paragraph 111 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 111, and therefore denies them.

112.    PRET denies the allegations in Paragraph 112 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 112, and therefore denies them, including subparts (a) – (j).

**IV.    Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal.**

113.    The allegations in Paragraph 113 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 113, and therefore denies them.

114.    The allegations in Paragraph 114 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 114, and therefore denies them.

115.    The allegations in Paragraph 115 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 115, and therefore denies them.

116.     PRET denies the allegations in Paragraph 116 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 116, and therefore denies them.

117.     PRET denies the allegations in Paragraph 117 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 117, and therefore denies them.

118.     PRET denies the allegations in Paragraph 118 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 118, and therefore denies them.

119.     PRET denies the allegations in Paragraph 119 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 119, and therefore denies them.

120.     PRET denies the allegations in Paragraph 120 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 120, and therefore denies them.

121.     PRET denies the allegations in Paragraph 121 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 121, and therefore denies them.

122.     The allegations in Paragraph 122 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 122, and therefore denies them.

## V. Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.

123. The allegations in Paragraph 123 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 123, and therefore denies them.

124. The allegations in Paragraph 124 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 124, and therefore denies them.

125. The allegations in Paragraph 125 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 125, and therefore denies them.

## VI. Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from its PFAS Liabilities.

126. The allegations in Paragraph 126 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 126, and therefore denies them.

127. The allegations in Paragraph 127 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 127, and therefore denies them.

128.    The allegations in Paragraph 128 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 128, and therefore denies them.

129.    The allegations in Paragraph 129 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 129, and therefore denies them.

130.    The allegations in Paragraph 130 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 130, and therefore denies them.

131.    The allegations in Paragraph 131 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 131, and therefore denies them.

132.    The allegations in Paragraph 132 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 132, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

133.    The allegations in Paragraph 133 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 133, and therefore denies them.

134.    The allegations in Paragraph 134 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 134, and therefore denies them.

**VII.    Defendants have harmed Plaintiff and Plaintiff's community.**

135.    PRET denies each and every allegation in Paragraph 135 of the Complaint.

136.    PRET denies each and every allegation in Paragraph 136 of the Complaint.

137.    PRET denies each and every allegation in Paragraph 137 of the Complaint.

138.    PRET denies each and every allegation in Paragraph 138 of the Complaint.

139.    PRET denies each and every allegation in Paragraph 139 of the Complaint including subparts (a) – (b).

<u>**FIRST CAUSE OF ACTION**</u>
**Private Nuisance**

140.    PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

141.    PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 141 of the Complaint, and therefore denies them.

142.    PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 142 of the Complaint, and therefore denies them.

143.    PRET denies each and every allegation in Paragraph 143 of the Complaint.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

144.    PRET denies each and every allegation in Paragraph 144 of the Complaint.

145.    PRET denies each and every allegation in Paragraph 145 of the Complaint.

146.    PRET denies each and every allegation in Paragraph 146 of the Complaint.

147.    PRET denies each and every allegation in Paragraph 147 of the Complaint.

148.    PRET denies each and every allegation in Paragraph 148 of the Complaint.

149.    PRET denies each and every allegation in Paragraph 149 of the Complaint.

150.    PRET denies each and every allegation in Paragraph 150 of the Complaint.

151.    PRET denies each and every allegation in Paragraph 151 of the Complaint.

## SECOND CAUSE OF ACTION
### Public Nuisance

152.    PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

153.    PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 153 of the Complaint, and therefore denies them.

154.    PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 154 of the Complaint, and therefore denies them.

155.    Paragraph 155 sets forth legal conclusions to which no response is required.  To the extent a response is required, PRET denies each and every allegation in Paragraph 155.

156.    PRET denies each and every allegation in Paragraph 156 of the Complaint.

157.    PRET denies each and every allegation in Paragraph 157 of the Complaint.

158.    PRET denies each and every allegation in Paragraph 158 of the Complaint.

159.    PRET denies each and every allegation in Paragraph 159 of the Complaint.

160.    PRET denies each and every allegation in Paragraph 160 of the Complaint.

161.    PRET denies each and every allegation in Paragraph 161 of the Complaint.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

162.    PRET denies each and every allegation in Paragraph 162 of the Complaint.

163.    PRET denies each and every allegation in Paragraph 163 of the Complaint.

### THIRD CAUSE OF ACTION
#### Trespass

164.    PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

165.    PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 165 of the Complaint, and therefore denies them.

166.    PRET denies each and every allegation in Paragraph 166 of the Complaint, including all subparts (a) - (g).

167.    The allegations in Paragraph 167 of the Complaint are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 167 of the Complaint, including subparts (a) - (g), and therefore denies them.

168.    The allegations in Paragraph 168 of the Complaint are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 168 of the Complaint, including subparts (a) - (g), and therefore denies them.

169.    PRET denies the allegations in Paragraph 169 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 169, and therefore denies them including subparts (a) – (g).

170.    PRET denies each and every allegation in Paragraph 170 of the Complaint.

171.    PRET denies each and every allegation in Paragraph 171 of the Complaint.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

172.    PRET denies each and every allegation in Paragraph 172 of the Complaint.

173.    PRET denies the allegations in Paragraph 173 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 173, and therefore denies them.

174.    PRET denies each and every allegation in Paragraph 174 of the Complaint.

175.    PRET denies each and every allegation in Paragraph 175 of the Complaint.

176.    PRET denies each and every allegation in Paragraph 176 of the Complaint

## FOURTH CAUSE OF ACTION
### Negligence, Gross Negligence, and/or Recklessness

177.    PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

178.    Paragraph 178 of the Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PRET denies each and every allegation in Paragraph 178 of the Complaint.

179.    PRET denies each and every allegation in Paragraph 179 of the Complaint.

180.    PRET denies each and every allegation in Paragraph 180 of the Complaint.

181.    The allegations in Paragraph 181 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 181, and therefore denies them.

182.    The allegations in Paragraph 182 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 182, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

183.    The allegations in Paragraph 183 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 183, and therefore denies them.

184.    The allegations in Paragraph 184 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 184, and therefore denies them.

185.    The allegations in Paragraph 185 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 185, and therefore denies them.

186.    The allegations in Paragraph 186 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 186, and therefore denies them.

187.    The allegations in Paragraph 187 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 187, and therefore denies them.

188.    PRET denies each and every allegation in Paragraph 188 of the Complaint.

189.    PRET denies each and every allegation in Paragraph 189 of the Complaint.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FIFTH CAUSE OF ACTION
### Strict Products Liability – Ultrahazardous Activity
### (Supplier Defendants)

190.   PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

191.   The allegations in Paragraph 191 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 191, and therefore denies them.

192.   The allegations in Paragraph 192 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 192, and therefore denies them.

193.   PRET denies the allegations in Paragraph 193 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 193.

194.   The allegations in Paragraph 194 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 194, and therefore denies them.

195.   The allegations in Paragraph 195 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 195, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

196.    The allegations in Paragraph 196 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 196, and therefore denies them.

197.    The allegations in Paragraph 197 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 197, and therefore denies them.

198.    The allegations in Paragraph 198 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 198, and therefore denies them.

199.    The allegations in Paragraph 199 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 199, and therefore denies them.

200.    The allegations in Paragraph 200 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 200, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SIXTH CAUSE OF ACTION**
**Strict Products Liability – Ultrahazardous Activity**
**(Burlington)**

201.     PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

202.     The allegations in Paragraph 202 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 202, and therefore denies them.

203.     The allegations in Paragraph 203 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 203, and therefore denies them.

204.     The allegations in Paragraph 204 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 204, and therefore denies them.

205.     The allegations in Paragraph 205 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 205, and therefore denies them.

206.     The allegations in Paragraph 206 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 206, and therefore denies them.

207.    The allegations in Paragraph 207 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 207.

208.    The allegations in Paragraph 208 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 208, and therefore denies them.

209.    The allegations in Paragraph 209 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 209, and therefore denies them.

210.    The allegations in Paragraph 210 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 210, and therefore denies them.

## SEVENTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Supplier Defendants)

211.    PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

212.    The allegations in Paragraph 212 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 212, and therefore denies them.

213.    The allegations in Paragraph 213 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 213, and therefore denies them.

214.    The allegations in Paragraph 214 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 214, and therefore denies them.

215.    The allegations in Paragraph 215 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 215, and therefore denies them.

216.    The allegations in Paragraph 216 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 216, and therefore denies them.

217.    The allegations in Paragraph 217 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 217, and therefore denies them including subparts (a) – (e).

218.    The allegations in Paragraph 218 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 218, and therefore denies them.

219.    The allegations in Paragraph 219 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 219, and therefore denies them.

220.    The allegations in Paragraph 220 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 220, and therefore denies them.

221.    The allegations in Paragraph 221 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 221, and therefore denies them.

222.    The allegations in Paragraph 222 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 222, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

223.   The allegations in Paragraph 223 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 223, and therefore denies them.

## EIGHTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Burlington)

224.   PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

225.   The allegations in Paragraph 225 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 225, and therefore denies them.

226.   The allegations in Paragraph 226 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 226, and therefore denies them.

227.   The allegations in Paragraph 227 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 227, and therefore denies them.

228.   The allegations in Paragraph 228 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 228, and therefore denies them.

229.   The allegations in Paragraph 229 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 229, and therefore denies them.

230.   The allegations in Paragraph 230 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 230, and therefore denies them including subparts (a) – (f).

231.   The allegations in Paragraph 231 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 231, and therefore denies them.

232.   The allegations in Paragraph 232 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 232, and therefore denies them.

233.   The allegations in Paragraph 233 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 233, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

234.    The allegations in Paragraph 234 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 234, and therefore denies them.

235.    The allegations in Paragraph 235 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 235, and therefore denies them.

236.    The allegations in Paragraph 236 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 236, and therefore denies them.

### NINTH CAUSE OF ACTION
### Strict Products Liability – Failure to Warn
### (Supplier Defendants)

237.    PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

238.    The allegations in Paragraph 238 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 238, and therefore denies them.

239.    The allegations in Paragraph 239 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 239, and therefore denies them.

240.    The allegations in Paragraph 240 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 240, and therefore denies them.

241.    PRET denies the allegations in Paragraph 241 of the Complaint as they relate to PRET.  PRET lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 241.

242.    The allegations in Paragraph 242 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 242, and therefore denies them.

243.    The allegations in Paragraph 243 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 243, and therefore denies them.

244.    The allegations in Paragraph 244 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 244, and therefore denies them.

245.    The allegations in Paragraph 245 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 245, and therefore denies them.

246.   The allegations in Paragraph 246 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 246, and therefore denies them.

### TENTH CAUSE OF ACTION
**Strict Products Liability – Failure to Warn**
**(Burlington)**

247.   PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

248.   The allegations in Paragraph 248 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 248, and therefore denies them.

249.   The allegations in Paragraph 249 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 249, and therefore denies them.

250.   The allegations in Paragraph 250 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 250, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

251. The allegations in Paragraph 251 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 251, and therefore denies them.

252. The allegations in Paragraph 252 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 252, and therefore denies them.

253. The allegations in Paragraph 253 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 253, and therefore denies them.

254. The allegations in Paragraph 254 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 254, and therefore denies them.

255. The allegations in Paragraph 255 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 255, and therefore denies them.

256. The allegations in Paragraph 256 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 256, and therefore denies them.

## ELEVENTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Burlington)

257. PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

258. The allegations in Paragraph 258 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 258, and therefore denies them.

259. The allegations in Paragraph 259 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 259, and therefore denies them.

260. The allegations in Paragraph 260 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 260, and therefore denies them.

261. The allegations in Paragraph 261 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 261, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

262. The allegations in Paragraph 262 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 262, and therefore denies them.

263. The allegations in Paragraph 263 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 263, and therefore denies them.

### TWELFTH CAUSE OF ACTION
#### Breach of Implied Warranties
#### (Burlington)

264. PRET incorporates its responses to all prior allegations by reference as if fully set forth herein.

265. The allegations in Paragraph 265 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 265, and therefore denies them.

266. The allegations in Paragraph 266 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 266, and therefore denies them.

267. The allegations in Paragraph 267 are not directed at PRET and therefore do not require a response from PRET. To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 267, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

268.   The allegations in Paragraph 268 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 268, and therefore denies them.

269.   The allegations in Paragraph 269 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 269, and therefore denies them.

270.   The allegations in Paragraph 270 are not directed at PRET and therefore do not require a response from PRET.  To the extent a response is required, PRET states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 270, and therefore denies them

## PRAYER FOR RELIEF

In response to the WHEREFORE Paragraph that follows Paragraph 270 of the Complaint, PRET denies any liability and further denies that Plaintiff is entitled to any of the relief sought in this Paragraph, including subparts (a) - (e).

## ADDITIONAL DEFENSES

Without assuming the burden of proof where it otherwise rests with Plaintiff or another third party, PRET further pleads the following additional defenses to all the individual claims alleged in the Complaint.  All of the following defenses are pled in the alternative and none of them constitute an admission that PRET is liable to Plaintiff or any third party, that Plaintiff or any third party has been or will be injured or damaged in any way, or that Plaintiff or any third party is entitled to any relief whatsoever.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FIRST DEFENSE

The Complaint, and each cause of action or count alleged therein, fails to state facts sufficient to constitute a claim upon which relief may be granted against PRET.

## SECOND DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the applicable statutes of limitations and/or repose.

## THIRD DEFENSE

The Complaint, and each alleged claim contained therein, fails to join necessary and indispensable parties.

## FOURTH DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the doctrine of laches, waiver, res judicata, estoppel collateral, estoppel, ratification, and unclean hands.

## FIFTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because Plaintiff is not the real party in interest.

## SIXTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, to the extent Plaintiff has failed to exhaust administrative remedies.

## SEVENTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrine of election of remedies.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**EIGHTH DEFENSE**

Pursuant to the South Carolina Contribution Among Tortfeasors Act, S.C. Code Ann. § 15-38-10, et seq., any damages recoverable from PRET should be limited to the percentage of the relative degree of fault of PRET as compared with other parties to this action, if any, as well as other persons or entities not presently before this Court.

**NINTH DEFENSE**

Any injuries and/or damages alleged by Plaintiff were caused or contributed to by the negligence or actual conduct of other persons, firms, corporations, or entities over whom PRET had no control or right of control and for whom PRET is not responsible.

**TENTH DEFENSE**

Any injuries and/or damages alleged by Plaintiff are barred by the doctrines of intervening cause and/or superseding cause.

**ELEVENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendants proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

**TWELFTH DEFENSE**

Plaintiff's claims are not ripe for adjudication and should be dismissed for presenting a contingent, hypothetical, or abstract dispute. Plaintiff alleges that it will be required to incur costs at some future date if the United States Environmental Protection Agency requires plaintiff to upgrade its systems to treat PFAS. Until these costs are incurred, Plaintiff cannot recover.

Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency has set final water quality standards, maximum contaminant

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether natural resources have been injured.

## THIRTEENTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times.

## FOURTEENTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, because federal, state, and/or local authorities authorized, ratified, or were aware of and acquiesced in actions by Defendants that are the subject of Plaintiff's claims.  Defendants are not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency.

## FIFTEENTH DEFENSE

Plaintiff's claims are barred to the extent the "permit shield" doctrine and "federally permitted release" defense applies because any leachate was discharged pursuant to lawful permits.

## SIXTEENTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, by the doctrine of primary jurisdiction.

## SEVENTEENTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, under the doctrines of contributory negligence and/or comparative fault, and/or other applicable common law or statutory doctrines.

## EIGHTEENTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because PRET's actions were in conformity with (i) any federal, state or other regulations, standards, guidelines, specifications,

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and laws in effect; (ii) available knowledge and research of the scientific and industrial communities; (iii) generally recognized and prevailing industry standards; and (iv) state of the art in existence at the time the design was prepared and the products were manufactured, handled, sold, distributed, and/or used.

## NINETEENTH DEFENSE

Any product manufactured, handled, designed, sold, distributed, or used by PRET and alleged to have caused harm to Plaintiff was, at the time, safer than any reasonable or feasible alternative designs, and any alternative designs would have been less safe, more likely to have caused injury or otherwise not feasible for their intended use.

## TWENTIETH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because federal, state, and/or local authorities, departments and/or agencies authorized, ratified, or were aware of and acquiesced to actions taken by PRET that are the subject of Plaintiff's claims. PRET is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority, department or agency.

## TWENTY-FIRST DEFENSE

Plaintiff's claims may be barred, in whole or in part, under the doctrine of Federal Preemption, including, without limitation, express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices, military specification, and policy statements, enacted and/or promulgated and/or issues by Congress, federal agencies, or the executive branch.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## TWENTY-SECOND DEFENSE

PRET asserts its rights to allocation, setoff or apportionment of fault pursuant to applicable law, as well as its rights to a proportionate reduction of any damages found against PRET based on the negligence, omissions or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiff.

## TWENTY-THIRD DEFENSE

An award of judgment rendered in favor of Plaintiff must be reduced by the amount of compensation Plaintiff received, or is entitled to receive, from any source as a result of Plaintiff's alleged injuries.

## TWENTY-FOURTH DEFENSE

Plaintiff may have failed or refused to exercise reasonable care and diligence to avoid loss and minimize damages and, therefore, may not recover for losses that could have been prevented by reasonable efforts on Plaintiff's part, or by expenditures which might reasonably have been made. Recovery, if any, should therefore be reduced by Plaintiff's failure to mitigate damages, if any

## TWENTY-FIFTH DEFENSE

PRET and its agents and/or employees acted with due care and otherwise conducted themselves at all relevant times as reasonable people and/or entities under the circumstances.

## TWENTY-SIXTH DEFENSE

PRET has satisfied, fulfilled and performed each and every obligation and duty imposed by law, if any, to the full extent of its responsibility.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**TWENTY-SEVENTH DEFENSE**

Any alleged injury, damage or loss sustained by Plaintiff in connection with the subject matter of this action was not reasonably foreseeable to PRET

**TWENTY-EIGHTH DEFENSE**

Plaintiff's claims fail as a matter of substantive law and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the South Carolina Constitution to the extent that by relying on market share or other aggregate proof of causation or liability, Plaintiff seeks to deprive PRET of procedural and substantive safeguards including, but not limited to, statutory and common law defenses to liability and causation generally.

**TWENTY-NINTH DEFENSE**

Plaintiff's claims may be barred for lack of proximate causation between any alleged act, omission, or product of PRET and the claims, damages, and harm alleged in Plaintiff's Complaint.

**THIRTIETH DEFENSE**

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot prove that its alleged injuries were caused by exposure to PFAS allegedly contained in any product(s) manufactured, handled, distributed, used, or sold by PRET.

**THIRTY-FIRST DEFENSE**

PRET affirmatively asserts as a defense, credit, or set-off against the damages claimed by Plaintiff, any payment, voluntary payment, or settlement (and any monies paid pursuant thereto) between Plaintiff and any other person or entity. PRET also asserts the affirmative defenses of satisfaction, payment, and release.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## THIRTY-SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that Plaintiff was exposed to a sufficient concentration or amount of PFAS, and/or for a sufficient duration, that has been reliably established, through scientific means, to be capable of causing Plaintiff's alleged injuries.

## THIRTY-THIRD DEFENSE

To the extent that Plaintiff has split its claims, Plaintiff's claims are barred in whole, or in part, by the doctrine prohibiting claim splitting.

## THIRTY-FOURTH DEFENSE

Plaintiff's purported exposure to products manufactured, handled, distributed, used or sold by PRET, if any, was too removed, indefinite, de minimis and insufficient to establish a reasonable degree of probability that any such product caused any alleged injury, damage or loss to Plaintiff.

## THIRTY-FIFTH DEFENSE

PRET cannot be held jointly and severally liable for the acts or omissions of third parties or other parties because their acts or omissions were separate and distinct and the alleged harm is divisible from and greater than any harm allegedly caused by acts, omissions, or products of PRET.

## THIRTY-SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff seeks to retroactively impose liability for conduct that was not actionable at the time it occurred, and PRET may not be held liable under retroactive theories not requiring proof or fault or causation.

## THIRTY-SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because PRET neither knew, nor should have known, that any of the chemicals or substances to which Plaintiff was allegedly exposed were

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of medical, scientific, technical, and/or industrial knowledge available to PRET at all times relevant to the claims or causes of action asserted by Plaintiff.

## THIRTY-EIGHTH DEFENSE

Plaintiff's trespass claims are barred because PFAS molecules constitute "tangible" matter that will not support a trespass claim. *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 480 (2013).

## THIRTY-NINTH DEFENSE

PRET is entitled to all procedural, substantive, and other protections, caps, and limitations provided by applicable state statutes and other state laws regarding Plaintiff's claims for compensatory and punitive damages. PRET specifically pleads the application of S.C. Code Ann. § 15-32-530 to this action.

## FOURTIETH DEFENSE

The Complaint fails to state a claim upon which punitive damages may be awarded. Nor did PRET engage in any conduct that would permit an award of punitive damages. And, any award of punitive damages would violate the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, the excessive fines clause of the Eighth Amendment to the United States Constitution, and various articles and sections of the South Carolina Constitution.

## FORTY-FIRST DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the political question and separation of powers doctrines because their claims implicate issues of statewide importance that are reserved for state regulation.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FORTY-SECOND DEFENSE**

Plaintiff's claims against PRET may not arise out of the same transactions or occurrences as their claims against other defendants, as required for proper joinder of parties.

**FORTY-THIRD DEFENSE**

To the extent Plaintiff seeks equitable relief, Plaintiff is not entitled to equitable relief because Plaintiff has an adequate remedy at law, if Plaintiff is entitled to any remedy, and the alleged harm is not irreparable.

**FORTY-FOURTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the free public services doctrine and by the municipal cost recovery doctrine.

**FORTY-FIFTH DEFENSE**

Plaintiff's claims are barred to the extent that Plaintiff's alleged damages are speculative, uncertain, and hypothetical.

**FORTY-SIXTH DEFENSE**

Plaintiff's damages, if any, may have been the direct and proximate result of facts and circumstances over which PRET exercises no control.

**FORTY-SEVENTH DEFENSE**

Plaintiff's nuisance claims are barred, in whole or in part, because they lack the legal authority or standing to bring a nuisance claim under South Carolina law.

**FORTY-EIGHTH DEFENSE**

Plaintiff's private nuisance claim is barred, in whole or in part, because PRET did not unreasonably interfere with Plaintiff's ownership or possession of land.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FORTY-NINTH DEFENSE**

Plaintiff's nuisance claims against PRET are barred by the doctrine of "coming to the nuisance," the prior nuisance doctrine, and/or the doctrine of consent.

**FIFTIETH DEFENSE**

Plaintiff's public nuisance claim fails because Plaintiff is not a private person bringing an action for damages to real or personal property.

**FIFTY-FIRST DEFENSE**

Plaintiff's public nuisance claim fails because Plaintiff failed to plead that it suffered a particular damage beyond that which the public has experienced.

**FIFTY-SECOND DEFENSE**

Plaintiff's trespass claim fails because PRET did not interfere with Plaintiff's right to the exclusive, peaceable possession of its property.

**FIFTY-THIRD DEFENSE**

Plaintiff's tort-based claims fail because PRET does not owe Plaintiff a duty under governing law.

**FIFTY-FOURTH DEFENSE**

Plaintiff's tort-based claims fail because PRET did not breach any duty allegedly owed to Plaintiff.

**FIFTY-FIFTH DEFENSE**

Plaintiff's claims are or may be barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of risk, and open and obvious risk.

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### FIFTY-SIXTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because PRET complied at all relevant times with all applicable laws, including all legal and regulatory duties.

### FIFTY-SEVENTH DEFENSE

Plaintiff's claims may be barred, reduced, or limited pursuant to the applicable South Carolina statutory and common law regarding limitations of awards, caps on recovery, and setoffs.

### FIFTY-EIGHTH DEFENSE

To the extent Plaintiff seeks recovery of attorneys' fees and costs, Plaintiff is not entitled to any attorneys' fees or costs associated with this action because no statute or contract exists that would give Plaintiff the right to recover such fees or costs.

### FIFTY-NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because PRET did not own, operate, or otherwise control the facilities or activities described in the Complaint at the time that PFAS is alleged to have migrated out of those facilities.

### SIXTIETH DEFENSE

The claimed injuries and/or damages of Plaintiff are so remote, speculative, or contingent that Plaintiff's claims must be barred on policy grounds.

### SIXTY-FIRST DEFENSE

PRET adopts by reference any additional applicable defense pled by any other defendant not otherwise pled herein.

### RESERVATION OF RIGHTS

PRET hereby reserves the right to amend this Answer, raise additional defenses as may be discovered during the course of this litigation and its continuing factual investigations, add cross-

ELECTRONICALLY FILED - 2025 Jun 30 12:12 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

claims, or assert third-party claims pursuant to the provisions of the South Carolina Rules of Civil Procedure, the substantive law of South Carolina, and the inherent authority of this Court to manage the procedural aspects of this litigation. Any allegation not expressly admitted in this Answer is denied.

**WHEREFORE**, having fully answered Plaintiff's Complaint, PRET Advanced Materials, LLC denies that Plaintiff is entitled to any of the relief requested in the Third Amended Complaint, and respectfully prays for the dismissal of Plaintiff's Third Amended Complaint with prejudice and for such other and further relief as this Court may deem just and proper.

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

By: s/ Robert Y. Knowlton
Robert Y. Knowlton, S.C. Bar No. 3589
John P. Boyd, S.C. Bar No. 72412
Sarah A. Hodges, S.C. Bar No. 106253
1201 Main Street, 22nd Floor (29201)
Post Office Box 11889
Columbia, SC 29211-1889
(803) 779-3080
bknowlton@hsblawfirm.com
jboyd@hsblawfirm.com
shodges@hsblawfirm.com

Frank T. Davis, S.C. Bar No. 66291
Jonathan D. Klett, S.C. Bar. 103208
One North Main, 2nd Floor
(864)240-3211
fdavis@hsblawfirm.com
jklett@hsblawfirm.com

*Attorneys for Defendant PRET Advanced Materials, LLC*

June 30, 2025

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| IN RE: PFAS LITIGATION COORDINATED DOCKET | ) | |
| | ) | |
| COUNTY OF HORRY | ) | FIFTEENTH JUDICIAL CIRCUIT |
| | ) | |
| Grand Strand Water and Sewer Authority, | ) | C.A. NO.: 2024-CP-26-05523 |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC; Elevate Textiles, Inc.; Fiber Industries, LLC; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; and Sampson County Disposal, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANT RED ROCK DISPOSAL, LLC'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S THIRD AMENDED COMPLAINT

Defendant Red Rock Disposal, LLC ("Red Rock" or "Defendant"), by its attorneys, Williams Mullen and Taft, Stettinius & Hollister LLP, and for its Answer and Affirmative Defenses to Plaintiff Grand Strand Water and Sewer Authority's ("Plaintiff") Third Amended Complaint (the "Complaint"), hereby states as follows:

1

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**GENERAL DENIAL**

Red Rock expressly denies each and every allegation in the Complaint, except those specifically admitted herein.

**STATEMENT OF THE CASE[1]**

1.  Red Rock denies each and every allegation in paragraph 1.

2.  Red Rock denies each and every allegation in paragraph 2.

3.  Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 3 and therefore denies them.

4.  The allegations in paragraph 4 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in paragraph 4.

5.  Red Rock denies each and every allegation in paragraph 5.

6.  Red Rock denies each and every allegation in paragraph 6.

7.  Red Rock denies each and every allegation in paragraph 7.

**DISCLAIMER**

8.  Paragraph 8 sets forth legal conclusions to which no response is required or made.

9.  Paragraph 9 sets forth legal conclusions to which no response is required or made.

10.  Paragraph 10 sets forth legal conclusions to which no response is required or made.

11.  Paragraph 11 sets forth legal conclusions to which no response is required or made.

---

[1] The headers used in this Answer are for ease of reference and correspond to the headers set forth in Plaintiff's Third Amended Complaint. They do not constitute an admission by Red Rock as to the validity of Plaintiff's causes of action.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**JURISDICTION AND VENUE**

12.     Paragraph 12 sets forth legal conclusions to which no response is required. Answering further, Red Rock states that it does not contest the Court's subject matter jurisdiction.

13.     Red Rock denies each and every allegation in paragraph 13 and denies that the Court has personal jurisdiction over Red Rock. Red Rock filed a motion to dismiss the Complaint because the Court lacks personal jurisdiction over Red Rock, among other reasons. The motion was denied by order entered on May 9, 2025. Red Rock does not waive and expressly reserves the right to contest the Court's personal jurisdiction over Red Rock in this action.

14.     Paragraph 14 sets forth legal conclusions to which no response is required or made.

**PARTIES**

**I.     Plaintiff**

15.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 15 and therefore denies them.

16.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 16 and therefore denies them.

17.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 17 and therefore denies them.

**ANSWER:**

**II.     Discharger Defendants**

18.     The allegations in paragraph 18 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 18 and therefore denies them.

3

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

19. The allegations in paragraph 19 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 19 and therefore denies them.

20. The allegations in paragraph 20 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 20 and therefore denies them.

21. The allegations in paragraph 21 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 21 and therefore denies them.

22. The allegations in paragraph 22 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 22 and therefore denies them.

23. The allegations in paragraph 23 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 23 and therefore denies them.

24. The allegations in paragraph 24 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it

4

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 24 and therefore denies them.

25.     The allegations in paragraph 25 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 25 and therefore denies them.

26.     Red Rock admits that it is a North Carolina limited liability company, that it operates the Red Rock Landfill, and that, at times in the past, it transported leachate from the landfill to the Lumberton Wastewater Treatment Plant. Red Rock denies each and every remaining allegation in paragraph 26 that is directed at Red Rock. Red Rock states that the remaining allegations in paragraph 26 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 26 and therefore denies them.

27.     The allegations in paragraph 27 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 27 and therefore denies them.

28.     The allegations in paragraph 28 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 28 and therefore denies them.

**III.     Supplier Defendants**

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

29.     The allegations in paragraph 29 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 29 and therefore denies them.

30.     The allegations in paragraph 30 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 30 and therefore denies them.

31.     The allegations in paragraph 31 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 31 and therefore denies them.

32.     The allegations in paragraph 32 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 32 and therefore denies them.

33.     The allegations in paragraph 33 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 33 and therefore denies them.

34.     The allegations in paragraph 34 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 34 and therefore denies them.

35.    The allegations in paragraph 35 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 35 and therefore denies them.

36.    The allegations in paragraph 36 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 36 and therefore denies them.

37.    The allegations in paragraph 37 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 37 and therefore denies them.

38.    The allegations in paragraph 38 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 38 and therefore denies them.

39.    The allegations in paragraph 39 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 39 and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

40.     The allegations in paragraph 40 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 40 and therefore denies them.

<b><u>FACTUAL ALLEGATIONS</u></b>

**I.     Background and Hazards of PFAS**

41.     Red Rock admits that PFAS are a group of man-made chemicals that do not occur naturally in the environment. Red Rock lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 41 and therefore denies them.

42.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 42 and therefore denies them.

43.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 43 and therefore denies them.

44.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 44 and therefore denies them.

45.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 45 and therefore denies them.

46.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 46 and therefore denies them.

47.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 47 and therefore denies them.

48.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 48 and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

49.    Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 49 and therefore denies them.

50.    Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 50 and therefore denies them.

51.    Red Rock states that the publication referred to in paragraph 51 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 51.

52.    Red Rock states that the publication referred to in paragraph 52 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 52.

53.    Red Rock states that the publication referred to in paragraph 53 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 53.

54.    Red Rock states that the publication referred to in paragraph 54 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 54.

55.    Red Rock states that the publication referred to in paragraph 55 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 55.

56.    Red Rock states that the publication referred to in paragraph 56 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 56.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

57.     Red Rock states that the publication referred to in paragraph 57 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 57.

58.     Red Rock states that the publication referred to in paragraph 58 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 58.

59.     Red Rock states that the publication referred to in paragraph 59 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 59.

60.     Red Rock states that the publications referred to in paragraph 60 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 60.

61.     Paragraph 61 sets forth legal conclusions to which no response is required or made. Red Rock also states that the publications referred to in paragraph 61 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 61.

62.     Paragraph 62 sets forth legal conclusions to which no response is required or made. Red Rock lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 62 and therefore denies them.

63.     Paragraph 63 sets forth legal conclusions to which no response is required or made. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 63.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

64.     Red Rock states that the publication referred to in paragraph 64 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 64.

65.     Paragraph 65 sets forth legal conclusions to which no response is required or made. Red Rock also states that the publications referred to in paragraph 65 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, Red Rock denies the allegations in Paragraph 65.

**11.     Contamination of Bull Creek and the Intracoastal Waterway with PFAS**

66.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 66 and therefore denies them.

67.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 67 and therefore denies them.

68.     Red Rock denies that it is the source of any PFAS at Plaintiff's water intakes. Red Rock lacks knowledge or information sufficient to form a belief with respect to the other allegations in paragraph 68 and therefore denies them.

69.     The allegations in paragraph 69 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 69 and therefore denies them.

70.     The allegations in paragraph 70 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 70 and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

71.     The allegations in paragraph 71 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 71 and therefore denies them.

72.     Red Rock admits that it operates a landfill in North Carolina and leachate from the landfill has been delivered to the Lumberton WWTP for treatment. Red Rock denies each and every remaining allegation in paragraph 72.

73.     Red Rock denies each and every allegation in paragraph 73.

74.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 74 and therefore denies them.

75.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 75 and therefore denies them.

76.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 76 and therefore denies them.

77.     Red Rock denies each and every allegation in paragraph 77.

78.     Red Rock denies each and every allegation in paragraph 78.

79.     Red Rock denies that it is responsible for contaminating Plaintiff's water intakes on the Intercoastal Waterway or damaging Plaintiff's property at the Myrtle Beach SWTP. Red Rock lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 79 and therefore denies them.

80.     Red Rock denies each and every allegation in paragraph 80.

81.     The allegations in paragraph 81 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it

12

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 81 and therefore denies them.

82.     Red Rock denies each and every allegation in paragraph 82.

**III.     Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.**

83.     Red Rock denies each and every allegation in paragraph 83.

84.     The allegations in paragraph 84 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 and therefore denies them.

85.     The allegations in paragraph 85 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85 and therefore denies them.

86.     The allegations in paragraph 86 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86 and therefore denies them.

87.     The allegations in paragraph 87 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 and therefore denies them.

88.     The allegations in paragraph 88 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88 and therefore denies them.

89.     The allegations in paragraph 89 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89 and therefore denies them.

90.     The allegations in paragraph 90 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90 and therefore denies them.

91.     The allegations in paragraph 91 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91 and therefore denies them.

92.     The allegations in paragraph 92 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92 and therefore denies them.

93.     The allegations in paragraph 93 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93 and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

94.     The allegations in paragraph 94 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 94 and therefore denies them.

95.     The allegations in paragraph 95 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 95 and therefore denies them.

96.     The allegations in paragraph 96 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 and therefore denies them.

97.     The allegations in paragraph 97 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97 and therefore denies them.

98.     The allegations in paragraph 98 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98 and therefore denies them.

99.     The allegations in paragraph 99 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99 and therefore denies them.

100.    The allegations in paragraph 100 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100 and therefore denies them.

101.    The allegations in paragraph 101 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 and therefore denies them.

102.    The allegations in paragraph 102 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102 and therefore denies them.

103.    The allegations in paragraph 103 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 and therefore denies them.

104.    The allegations in paragraph 104 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 104 and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

105. The allegations in paragraph 105 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105 and therefore denies them.

106. The allegations in paragraph 106 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106 and therefore denies them.

107. The allegations in paragraph 107 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107 and therefore denies them.

108. The allegations in paragraph 108 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108 and therefore denies them.

109. The allegations in paragraph 109 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109 and therefore denies them.

110. The allegations in paragraph 110 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it

17

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 and therefore denies them.

111.    The allegations in paragraph 111 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111 and therefore denies them.

112.    The allegations in paragraph 112 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112, including subparts (a)-(j), and therefore denies them.

## IV.    Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal.

113.    The allegations in paragraph 113 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in paragraph 113.

114.    The allegations in paragraph 114 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in paragraph 114.

115.    The allegations in paragraph 115 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in paragraph 115.

116.    The allegations in paragraph 116 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in paragraph 116.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

117.    The allegations in paragraph 117 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in paragraph 117.

118.    The allegations in paragraph 118 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in paragraph 118.

119.    The allegations in paragraph 119 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in paragraph 119.

120.    The allegations in paragraph 120 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in paragraph 120.

121.    The allegations in paragraph 121 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in paragraph 121.

122.    The allegations in paragraph 122 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 122 and therefore denies them.

## V.    Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.

123.    The allegations in paragraph 123 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 123 and therefore denies them.

124. The allegations in paragraph 124 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 124 and therefore denies them.

125. The allegations in paragraph 125 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125 and therefore denies them.

**VI.     Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities.**

126. The allegations in paragraph 126 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126 and therefore denies them.

127. The allegations in paragraph 127 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127 and therefore denies them.

128. The allegations in paragraph 128 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 128 and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

129.     The allegations in paragraph 129 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 129 and therefore denies them.

130.     The allegations in paragraph 130 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 130 and therefore denies them.

131.     The allegations in paragraph 131 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 131 and therefore denies them.

132.     The allegations in paragraph 132 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 132 and therefore denies them.

133.     The allegations in paragraph 133 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133 and therefore denies them.

134.     The allegations in paragraph 134 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134 and therefore denies them.

## VII. Defendants Have Harmed Plaintiff and Plaintiff's Community.

135.     Red Rock denies each and every allegation in paragraph 135.

136.     The allegations in paragraph 136 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 136 and therefore denies them.

137.     Red Rock denies each and every allegation in paragraph 137.

138.     Red Rock denies each and every allegation in paragraph 138.

139.     Red Rock denies each and every allegation in paragraph 139, including subparts (a)-(b), that is directed at Red Rock. Red Rock states that the allegations in paragraph 139 that are not directed at Red Rock do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 139 and therefore denies them.

### FIRST CAUSE OF ACTION
### Private Nuisance

140.     Red Rock incorporates its responses to all prior allegations by reference as if fully set forth herein.

141.     Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 141 and therefore denies them.

142.     Paragraph 142 sets forth legal conclusions to which no response is required or made. Red Rock lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 142 and therefore denies them.

22

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

143.    Red Rock denies each and every allegation in paragraph 143.

144.    Red Rock denies each and every allegation in paragraph 144.

145.    Red Rock denies each and every allegation in paragraph 145.

146.    Red Rock denies each and every allegation in paragraph 146.

147.    Red Rock denies each and every allegation in paragraph 147.

148.    Red Rock denies each and every allegation in paragraph 148.

149.    Red Rock denies each and every allegation in paragraph 149.

150.    Red Rock denies each and every allegation in paragraph 150.

151.    Red Rock denies each and every allegation in paragraph 151.

<u>**SECOND CAUSE OF ACTION**</u>
**Public Nuisance**

152.    Red Rock incorporates its responses to all prior allegations by reference as if fully set forth herein.

153.    Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 153 and therefore denies them.

154.    Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 154 and therefore denies them.

155.    Red Rock states that paragraph 155 sets forth legal conclusions to which no response is required or made. Red Rock denies each and every remaining allegation in paragraph 155.

156.    Red Rock denies each and every allegation in paragraph 156.

157.    Red Rock denies each and every allegation in paragraph 157.

158.    Red Rock denies each and every allegation in paragraph 158.

159.    Red Rock denies each and every allegation in paragraph 159.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

160.    Red Rock denies each and every allegation in paragraph 160.

161.    Red Rock denies each and every allegation in paragraph 161.

162.    Red Rock denies each and every allegation in paragraph 162.

163.    Red Rock denies each and every allegation in paragraph 163.

### THIRD CAUSE OF ACTION
**Trespass**

164.    Red Rock incorporates its responses to all prior allegations by reference as if fully set forth herein.

165.    Red Rock lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 165 and therefore denies them.

166.    The allegations in paragraph 166 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 166, including subparts (a)-(g), and therefore denies them.

167.    Red Rock denies each and every allegation in paragraph 167, including each and every allegation in subparts (a)-(g).

168.    The allegations in paragraph 168 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 168, including subparts (a)-(g), and therefore denies them.

169.    The allegations in paragraph 169 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 169, including subparts (a)-(g), and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

170. Red Rock denies each and every allegation in paragraph 170.

171. Red Rock denies each and every allegation in paragraph 171.

172. Red Rock denies each and every allegation in paragraph 172.

173. The allegations in paragraph 173 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 173 and therefore denies them.

174. Red Rock denies each and every allegation in paragraph 174.

175. Red Rock denies each and every allegation in paragraph 175.

176. Red Rock denies each and every allegation in paragraph 176.

**FOURTH CAUSE OF ACTION**
**Negligence, Gross Negligence, and/or Recklessness**

177. Red Rock incorporates its responses to all prior allegations by reference as if fully set forth herein.

178. Paragraph 178 sets forth legal conclusions to which no response is required or made. Red Rock denies each and every remaining allegation in paragraph 178.

179. Red Rock denies each and every allegation in paragraph 179.

180. Red Rock denies each and every allegation in paragraph 180.

181. The allegations in paragraph 181 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 181 and therefore denies them.

182. The allegations in paragraph 182 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it

25

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 182 and therefore denies them.

183.    The allegations in paragraph 183 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 183 and therefore denies them.

184.    The allegations in paragraph 184 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 184 and therefore denies them.

185.    The allegations in paragraph 185 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 185 and therefore denies them.

186.    The allegations in paragraph 186 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 186 and therefore denies them.

187.    The allegations in paragraph 187 are not directed at Red Rock and therefore do not require a response from Red Rock. To the extent a response is required, Red Rock states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 187 and therefore denies them.

188.    Red Rock denies each and every allegation in paragraph 188.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

189.    Red Rock denies each and every allegation in paragraph 189.

## FIFTH CAUSE OF ACTION
### Strict Products Liability – Ultrahazardous Activity
### (Supplier Defendants)

The Fifth Cause of Action (paragraphs 190-200) is not directed at Red Rock and therefore no response is required from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in the Fifth Cause of Action.

## SIXTH CAUSE OF ACTION
### Strict Products Liability – Ultrahazardous Activity
### (Burlington)

The Sixth Cause of Action (paragraphs 201-210) is not directed at Red Rock and therefore no response is required from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in the Sixth Cause of Action.

## SEVENTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Supplier Defendants)

The Seventh Cause of Action (paragraphs 211-223) is not directed at Red Rock and therefore no response is required from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in the Seventh Cause of Action.

## EIGHTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Burlington)

The Eighth Cause of Action (paragraphs 224-236) is not directed at Red Rock and therefore no response is required from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in the Eighth Cause of Action.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## NINTH CAUSE OF ACTION
### Strict Products Liability – Failure to Warn
### (Supplier Defendants)

The Ninth Cause of Action (paragraphs 237-246) is not directed at Red Rock and therefore no response is required from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in the Ninth Cause of Action.

## TENTH CAUSE OF ACTION
### Strict Products Liability – Failure to Warn
### (Burlington)

The Tenth Cause of Action (paragraphs 247-256) is not directed at Red Rock and therefore no response is required from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in the Tenth Cause of Action.

## ELEVENTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Supplier Defendants)

The Eleventh Cause of Action (paragraphs 257-263) is not directed at Red Rock and therefore no response is required from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in the Eleventh Cause of Action.

## TWELFTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Burlington)

The Twelfth Cause of Action (paragraphs 264-270) is not directed at Red Rock and therefore no response is required from Red Rock. To the extent a response is required, Red Rock denies each and every allegation in the Twelfth Cause of Action.

## PRAYER FOR RELIEF

In response to the paragraph beginning with "WHEREFORE" and appearing under the heading "PRAYER FOR RELIEF" below paragraph 270 of the Complaint, Red Rock denies that Plaintiff is entitled to any judgment or decree in its favor, injunctive relief of any kind,

28

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

compensatory or punitive damages, or costs, and asks that the Court dismiss the Complaint in its entirety.

## AFFIRMATIVE DEFENSES

Red Rock asserts the following affirmative defenses in response to the allegations in Plaintiff's Complaint filed or consolidated in the above-captioned action as follows:

1.      Defendant's actions have at all times been pursuant to express permits and directives of various state and federal regulatory agencies with which Defendant has at all relevant times and parameters been fully compliant. Accordingly, Defendant pleads license as an affirmative defense to Plaintiff's claims.

2.      Plaintiff has failed to state facts sufficient to constitute a cause of action and the Complaint should be dismissed pursuant to Rule 12(b)(6) of the South Carolina Rules of Civil Procedure.

3.      Plaintiff's claims should be dismissed, pursuant to Rule 12(b)(2) of the South Carolina Rules of Civil Procedure, because the Court lacks personal jurisdiction over the Defendant.

4.      Plaintiff's claims are not ripe for adjudication and should be dismissed for presenting a contingent, hypothetical, or abstract dispute. Plaintiff alleges that it will be required to incur costs at some future date when the State or United States Environmental Protection Agency will require it to upgrade their systems to treat PFAS. Until these costs are incurred, Plaintiff cannot recover.

5.      Further, Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency have set final water quality standards, maximum

29

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether Plaintiff has suffered any injury.

6.      Plaintiff lacks standing to assert, in whole or in part, under the United States Constitution, the Constitution of South Carolina, state and federal statutes, and common law, the claims set forth in the Complaint.

7.      Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and *parens patriae* doctrine, because the property claimed to be affected is not held in the public trust and/or is not subject to the *parens patriae* doctrine.

8.      Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and *parens patriae* doctrine, because it does not have exclusive jurisdiction over the resources at issue, or only has partial jurisdiction over such resources and has failed to join other necessary trustees in this action.

9.      Plaintiff lacks standing to bring an action for trespass because Plaintiff has no ownership over and is not entitled to exclusive possession of various property and water bodies referenced in the Complaint, and because Plaintiff cannot establish unreasonable or substantial damage to the property.

10.     Plaintiff has not demonstrated or pled a legally cognizable injury in the Complaint that is capable of redress.

11.     Plaintiff's claims for alleged injuries and damages are barred, in whole or in part, because the claims for damages are speculative and conjectural.

12.     Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations or repose.

13.     Plaintiff has failed to name all necessary and indispensable parties in its action.

30

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

14. Plaintiff's claims are barred, in whole or in part, because Defendant does not owe a legal duty to Plaintiff or, if it owed such a duty, did not breach and/or fully discharged that duty.

15. Plaintiff's claims are barred, in whole or in part, because, at all relevant times, Defendant exercised due care with respect to its activities and took reasonable precautions against foreseeable acts or omissions of others.

16. Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendant proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

17. Upon information and belief, Plaintiff's injuries, damages, or losses, if any, were directly and proximately caused by the intervening acts, superseding acts, and conduct of others, including Plaintiff, over which Defendant had no control, thereby precluding any recovery against Defendant.

18. Even assuming Defendant was negligent, careless, or reckless in any respect, and that any such conduct on its part operated as a proximate cause of Plaintiff's injuries or damages, all of which are expressly denied, Plaintiff's comparative negligence, carelessness, or recklessness contributed to the cause of Plaintiff's alleged damages. For that reason, Defendant is not liable to Plaintiff in any sum whatsoever, and/or to the extent that a jury finds Plaintiff at fault for less than fifty percent (50%), Plaintiff's recovery should be reduced by that percentage amount.

19. Plaintiff's claim for punitive damages is violative of both the United States Constitution and the South Carolina Constitution, and Defendant pleads that sections 15-32-530 *et seq.*, of the South Carolina Code provide a cap to punitive damages potentially available in this matter.

31

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

20.     Plaintiff fails to state any basis upon which punitive damages are recoverable against Defendant and, accordingly, Plaintiff's prayer for such damages should be dismissed and/or stricken from the claims pursuant to Rule 12(b)(6) and/or 12(f) of the South Carolina Rules of Civil Procedure.

21.     Pursuant to S.C. Code Ann. § 15-32-520, any proceeding to determine punitive damages should be bifurcated from any trial to determine liability and compensatory damages.

22.     Any damages suffered by Plaintiff, which such damages are expressly denied, are the direct and proximate result of Plaintiff's conduct, and its recovery should be barred or, alternatively, reduced in proportion to the same degree as to Plaintiff's comparative fault.

23.     Plaintiff has failed to mitigate its damages as required by law and such failure bars Plaintiff's recovery, in whole or in part, against Defendant.

24.     Defendant is entitled to a set-off and/or credit of any monies or proceeds received by or on behalf of Plaintiff as a result of the claims alleged in the Complaint, regardless of the source of such monies, prior to any dismissal of or judgment in this matter.

25.     Plaintiff's claims are barred, in whole or in part, because Defendant did not own, operate, or otherwise control the facilities described in the Complaint at the time that PFAS is alleged to have migrated out of those facilities.

26.     Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish its alleged injuries were caused by exposure to PFAS from any conduct attributable to Defendant.

27.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that PFAS has been reliably established through scientific means, to be capable of causing Plaintiff's alleged injuries.

32

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

28.    Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that its residents and/or customers were exposed to sufficient concentrations or amount of PFAS, and/or for sufficient duration, which has been reliably established, through scientific means, to be capable of causing alleged injuries.

29.    Any damages Plaintiff may have suffered (which are expressly denied) were not reasonably foreseeable by Defendant at the time of the conduct alleged.

30.    Plaintiff's claims against Defendant are barred by the doctrines of unjust enrichment in that Plaintiff seeks to recover costs or damages for construction, operation, and maintenance of public water supply systems after Plaintiff sought and obtained a permit to secure, treat, and distribute public water supplies and for which it received funding from its residents and/or customers, State, Local, and Federal sources, including but not limited to funding to specifically address unexpected contamination in water supplies under the Emergency Response Plans of the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j.

31.    Plaintiff's claims are preempted or otherwise precluded by State and Federal law to the extent Plaintiff seeks recovery of costs or damages for contamination of water supplies, the enforcement of which is vested exclusively in State and Federal agencies pursuant to State and Federal statutes, including but not limited to the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j, the Clean Water Act, 33 U.S.C. § 1251 et seq., and the South Carolina Hazardous Waste Management Act, S.C. Code Ann. § 44-56-10 et seq.

32.    Plaintiff's claims are barred, in whole or in part, because Defendant neither knew, nor should have known, that any of the substances to which Plaintiff or Plaintiff's property was allegedly exposed were hazardous or constituted a reasonably foreseeable risk of physical harm

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

by virtue of the prevailing state of the medical, scientific, technical, and/or industrial knowledge available to Defendant at all times relevant to the claims or causes of action asserted by Plaintiff.

33.     Further, Plaintiff's claims are barred, in whole or in part, because the alleged acts or omissions by Defendant, throughout the relevant and material time period, conformed to the then-existing custom and practice, and Defendant exercised due care and acted in accordance with and/or complied with available technological, medical, scientific, and industrial "state-of-the-art" practice, and/or applicable laws, regulations, standards, and orders.

34.     Plaintiff's claims are barred in whole or in part under the bulk supplier, component part supplier, sophisticated-purchaser, sophisticated-user, sophisticated intermediary, and/or knowledgeable-user doctrines or other similar or related doctrines available under applicable law.

35.     Some or all of Plaintiff's claims are not amenable to judicial resolution because of the primary jurisdiction doctrine. *Texas v. Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907).

36.     The relief sought is, in whole or in part, within the particular expertise of and is being addressed by federal and state governments, and their relevant agencies, and thus the Court should decline to exercise jurisdiction over these matters pursuant to the doctrine of primary jurisdiction, abstention, and or the doctrine of separation of powers.

37.     The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of open and obvious conditions.

38.     The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of voluntary exposure.

39.     The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of coming to the nuisance.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

40.   The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of primary implied assumption of risk.

41.   Plaintiff's claims are barred, in whole or in part, by the doctrine of election of remedies.

42.   Plaintiff's claims are or may be barred, in whole or in part, because of consent, public necessity, private necessity and/or privilege.

43.   Defendant is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency, including without limitation, acts or omissions made in accordance with applicable statutes, regulations, permits, and industry standards.

44.   Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, waiver, res judicata, estoppel, ratification, and unclean hands.

45.   Plaintiff's Complaint is barred, in whole or in part, by the doctrines of acquiescence, consent, justification, accord and satisfaction, ratification, settlement, or release.

46.   Plaintiff's claims are preempted or barred by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq. and the South Carolina Hazardous Waste Management Action, S.C. Code Ann. §§ 44-56-10 et seq. to the extent such claims include, encompass or relate to environmental conditions or natural resource damages or losses at any past, present or future facilities, sites, properties, locations or other areas listed on the United States Environmental Protection Agency's National Priority List (Superfund sites), or from which discharges or releases of materials have otherwise come to be located emanating from such facilities, sites, properties, locations or areas.

47.   Plaintiff's claims are barred because they failed to exhaust administrative remedies.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

48.     Plaintiff is not entitled to recover from Defendant more than Defendant's fair, equitable, and proportionate share, if any, of the costs and damages sought by Plaintiff or to otherwise recover from Defendant more than the amount of such relief, if any, for which Defendant is liable.

49.     Plaintiff's claims are barred, in whole or in part, to the extent they seek to impose retroactive liability. Defendant may not be held liable under retroactive theories not requiring proof of fault or causation.

50.     All claims for injunctive relief in Plaintiff's Complaint are barred because Plaintiff has adequate remedies at law, to the extent its claims are provable.

51.     Plaintiff's claims are barred to the extent that Plaintiff seeks to recover costs, damages, and expenses including, but not limited to, response, assessment, remediation cleanup and/or removal costs that Plaintiff incurred improperly, or that are not related to natural resource restoration or replacement damages.

52.     The damages sought by Plaintiff, if awarded, should be reduced by any amounts they recover from any other sources and Plaintiff is barred from any form of double recovery regardless of the nature or source of such recovery.

53.     Plaintiff's claims are barred, in whole or in part, because Defendant did not know or have reason to know that its wastewater discharge, alone or in conjunction with a discharge or discharges from other sources, would cause pass through or interference, as contemplated by 40 C.F.R. § 403.5(a)(2).

54.     Plaintiff's claims are barred, in whole or in part, by the municipal cost recovery rule. *See United States v. Standard Oil of California*, 332 U.S. 301 (1947).

55.     Plaintiff's claims are barred because Defendant's conduct was not a substantial factor in causing the injures alleged.

56.     Plaintiff's claims are barred by the economic loss rule. *Sapp v. Ford Motor Company*, 386 S.C. 143, 687 S.E.2d 47 (2009).

57.     Plaintiff's recovery for any alleged trespass or nuisance, which is expressly denied, is limited to the lost rental value of Plaintiff's real property interest.

58.     Without admitting liability, Defendant alleges that if it is found to have been engaged in any of the activities alleged in the Complaint, such activities were too removed, indefinite, *de minimus* and insufficient to establish a reasonable degree of probability that any such activity caused any alleged injury, damage or loss to Plaintiff.

59.     Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish that its alleged injuries were caused by exposure to PFAS from any product(s) attributable to Defendant.

60.     Plaintiff's claims are barred by the doctrine of contributory negligence.

61.     Defendant asserts and incorporates herein any affirmative defenses asserted or otherwise raised by other defendants in this action to Plaintiff's Complaint.

62.     Defendant has not completed its investigation of Plaintiff's allegations. Defendant intends to act as best it can to inform itself of the pertinent facts and circumstances surrounding the allegations contained in Plaintiff's Complaint. Thus, Defendant hereby gives notice of its intent to assert any further affirmative defenses that it may learn to be supported by facts and law, including but not limited to, that this action is barred in whole or in any part by any applicable statute, contract, release, covenant, or by the doctrine of laches. Defendant reserves the right to amend this Answer to assert any such additional defenses.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**WHEREFORE**, having fully answered the Third Amended Complaint, Red Rock Disposal, LLC prays that the Complaint be dismissed with prejudice, that Red Rock Disposal, LLC be awarded its attorneys' fees and costs associated with defending this action, and for such other and further relief as the Court may deem just and proper.

**WILLIAMS MULLEN**

By: s/John G. Tamasitis
Richard H. Willis (SC Bar No. 6159)
John G. Tamasitis (SC Bar No. 101875)
1230 Main Street, Suite 330
Columbia, SC 29201
Tel. 803.567.4615
Fax: 803.567.4601
rwillis@williamsmullen.com
jtamasitis@williamsmullen.com

and

**TAFT STETTINIUS & HOLLISTER**

Philip L. Comella (*admitted Pro Hac Vice*)
Ryan G. Rudich (*admitted Pro Hac Vice*)
111 E. Wacker Drive, Suite 2600
Chicago, IL 60601
Tel. 312.527.4000
Fax: 312.527.4011
pcomella@taftlaw.com
rrudich@taftlaw.com

*Counsel for Defendant Red Rock Disposal, LLC*

June 30, 2025
Columbia, South Carolina

38

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| --- | --- | --- |
| IN RE: PFAS LITIGATION COORDINATED DOCKET | ) ) ) | |
| COUNTY OF HORRY | ) ) | FIFTEENTH JUDICIAL CIRCUIT |
| Grand Strand Water and Sewer Authority, | ) ) | C.A. NO.: 2024-CP-26-05523 |
| *Plaintiff,* | ) ) ) | |
| vs. | ) ) | |
| Aladdin Manufacturing Corporation; Burlington Industries, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; Domtar Paper Company, LLC; Elevate Textiles, Inc.; Fiber Industries, LLC; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Sampson Disposal, LLC; and Sampson County Disposal, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) | |

## DEFENDANT SAMPSON COUNTY DISPOSAL, LLC'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S THIRD AMENDED COMPLAINT

Defendant Sampson County Disposal, LLC ("Sampson" or "Defendant"), by its attorneys, Williams Mullen and Taft, Stettinius & Hollister LLP, and for its Answer and Affirmative Defenses to Plaintiff Grand Strand Water and Sewer Authority's ("Plaintiff") Third Amended Complaint (the "Complaint"), hereby states as follows:

1

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## GENERAL DENIAL

Sampson expressly denies each and every allegation in the Complaint, except those specifically admitted herein.

## STATEMENT OF THE CASE[1]

1.      Sampson denies each and every allegation in paragraph 1.

2.      Sampson denies each and every allegation in paragraph 2.

3.      Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 3 and therefore denies them.

4.      The allegations in paragraph 4 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson denies each and every allegation in paragraph 4.

5.      Sampson denies each and every allegation in paragraph 5.

6.      Sampson denies each and every allegation in paragraph 6.

7.      Sampson denies each and every allegation in paragraph 7.

## DISCLAIMER

8.      Paragraph 8 sets forth legal conclusions to which no response is required or made.

9.      Paragraph 9 sets forth legal conclusions to which no response is required or made.

10.      Paragraph 10 sets forth legal conclusions to which no response is required or made.

11.      Paragraph 11 sets forth legal conclusions to which no response is required or made.

---

[1] The headers used in this Answer are for ease of reference and correspond to the headers set forth in Plaintiff's Third Amended Complaint. They do not constitute an admission by Sampson as to the validity of Plaintiff's causes of action.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## JURISDICTION AND VENUE

12.    Paragraph 12 sets forth legal conclusions to which no response is required. Answering further, Sampson states that it does not contest the Court's subject matter jurisdiction.

13.    Sampson denies each and every allegation in paragraph 13 and denies that the Court has personal jurisdiction over Sampson. Sampson filed a motion to dismiss the Complaint because the Court lacks personal jurisdiction over Sampson, among other reasons. The motion was denied by order entered on May 9, 2025. Sampson does not waive and expressly reserves the right to contest the Court's personal jurisdiction over Sampson in this action.

14.    Paragraph 14 sets forth legal conclusions to which no response is required or made.

## PARTIES

### I.    Plaintiff

15.    Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 15 and therefore denies them.

16.    Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 16 and therefore denies them.

17.    Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 17 and therefore denies them.

**ANSWER:**

### II.    Discharger Defendants

18.    The allegations in paragraph 18 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 18 and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

19.     The allegations in paragraph 19 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 19 and therefore denies them.

20.     The allegations in paragraph 20 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 20 and therefore denies them.

21.     The allegations in paragraph 21 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 21 and therefore denies them.

22.     The allegations in paragraph 22 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 22 and therefore denies them.

23.     The allegations in paragraph 23 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 23 and therefore denies them.

24.     The allegations in paragraph 24 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief with respect to the allegations in paragraph 24 and therefore denies them.

25.     The allegations in paragraph 25 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 25 and therefore denies them.

26.     Sampson admits that it is a North Carolina limited liability company, that it operates the Sampson County Landfill, and that it has, at times in the past, transported leachate from the landfill to the Lumberton Wastewater Treatment Plant. Sampson denies each and every remaining allegation in paragraph 26 that is directed at Sampson. Sampson states that the remaining allegations in paragraph 26 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 26 and therefore denies them.

27.     The allegations in paragraph 27 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 27 and therefore denies them.

28.     The allegations in paragraph 28 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 28 and therefore denies them.

**III.     Supplier Defendants**

5

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

29.     The allegations in paragraph 29 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 29 and therefore denies them.

30.     The allegations in paragraph 30 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 30 and therefore denies them.

31.     The allegations in paragraph 31 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 31 and therefore denies them.

32.     The allegations in paragraph 32 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 32 and therefore denies them.

33.     The allegations in paragraph 33 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 33 and therefore denies them.

34.     The allegations in paragraph 34 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief with respect to the allegations in paragraph 34 and therefore denies them.

35.     The allegations in paragraph 35 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 35 and therefore denies them.

36.     The allegations in paragraph 36 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 36 and therefore denies them.

37.     The allegations in paragraph 37 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 37 and therefore denies them.

38.     The allegations in paragraph 38 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 38 and therefore denies them.

39.     The allegations in paragraph 39 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 39 and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

40.     The allegations in paragraph 40 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 40 and therefore denies them.

## FACTUAL ALLEGATIONS

### I.     Background and Hazards of PFAS

41.     Sampson admits that PFAS are a group of man-made chemicals that do not occur naturally in the environment. Sampson lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 41 and therefore denies them.

42.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 42 and therefore denies them.

43.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 43 and therefore denies them.

44.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 44 and therefore denies them.

45.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 45 and therefore denies them.

46.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 46 and therefore denies them.

47.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 47 and therefore denies them.

48.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 48 and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

49.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 49 and therefore denies them.

50.     Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 50 and therefore denies them.

51.     Sampson states that the publication referred to in paragraph 51 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 51.

52.     Sampson states that the publication referred to in paragraph 52 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 52.

53.     Sampson states that the publication referred to in paragraph 53 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 53.

54.     Sampson states that the publication referred to in paragraph 54 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 54.

55.     Sampson states that the publication referred to in paragraph 55 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 55.

56.     Sampson states that the publication referred to in paragraph 56 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 56.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

57.     Sampson states that the publication referred to in paragraph 57 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 57.

58.     Sampson states that the publication referred to in paragraph 58 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 58.

59.     Sampson states that the publication referred to in paragraph 59 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 59.

60.     Sampson states that the publications referred to in paragraph 60 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 60.

61.     Paragraph 61 sets forth legal conclusions to which no response is required or made. Sampson also states that the publications referred to in paragraph 61 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 61.

62.     Paragraph 62 sets forth legal conclusions to which no response is required or made. Sampson lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 62 and therefore denies them.

63.     Paragraph 63 sets forth legal conclusions to which no response is required or made. To the extent any additional response is required, Sampson denies the allegations in Paragraph 63.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

64. Sampson states that the publication referred to in paragraph 64 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 64.

65. Paragraph 65 sets forth legal conclusions to which no response is required or made. Sampson also states that the publications referred to in paragraph 65 speak for themselves and denies any mischaracterization of the same. To the extent any additional response is required, Sampson denies the allegations in Paragraph 65.

**11. Contamination of Bull Creek and the Intracoastal Waterway with PFAS**

66. Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 66 and therefore denies them.

67. Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 67 and therefore denies them.

68. Sampson denies that it is the source of any PFAS at Plaintiff's water intakes. Sampson lacks knowledge or information sufficient to form a belief with respect to the other allegations in paragraph 68 and therefore denies them.

69. The allegations in paragraph 69 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 69 and therefore denies them.

70. The allegations in paragraph 70 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 70 and therefore denies them.

11

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

71.    The allegations in paragraph 71 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 71 and therefore denies them.

72.    Sampson admits that it operates a landfill in North Carolina and leachate from the landfill has been delivered to the Lumberton WWTP for treatment. Sampson denies each and every remaining allegation in paragraph 72.

73.    Sampson denies each and every allegation in paragraph 73.

74.    Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 74 and therefore denies them.

75.    Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 75 and therefore denies them.

76.    Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 76 and therefore denies them.

77.    Sampson denies each and every allegation in paragraph 77.

78.    Sampson denies each and every allegation in paragraph 78.

79.    Sampson denies that it is responsible for contaminating Plaintiff's water intakes on the Intercoastal Waterway or damaging Plaintiff's property at the Myrtle Beach SWTP. Sampson lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 79 and therefore denies them.

80.    Sampson denies each and every allegation in paragraph 80.

81.    The allegations in paragraph 81 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks

12

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief with respect to the allegations in paragraph 81 and therefore denies them.

82. Sampson denies each and every allegation in paragraph 82.

**III.    Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.**

83. Sampson denies each and every allegation in paragraph 83.

84. The allegations in paragraph 84 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 and therefore denies them.

85. The allegations in paragraph 85 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85 and therefore denies them.

86. The allegations in paragraph 86 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86 and therefore denies them.

87. The allegations in paragraph 87 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 and therefore denies them.

88. The allegations in paragraph 88 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88 and therefore denies them.

89.     The allegations in paragraph 89 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89 and therefore denies them.

90.     The allegations in paragraph 90 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90 and therefore denies them.

91.     The allegations in paragraph 91 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91 and therefore denies them.

92.     The allegations in paragraph 92 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92 and therefore denies them.

93.     The allegations in paragraph 93 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93 and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

94.     The allegations in paragraph 94 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 94 and therefore denies them.

95.     The allegations in paragraph 95 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 95 and therefore denies them.

96.     The allegations in paragraph 96 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 and therefore denies them.

97.     The allegations in paragraph 97 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97 and therefore denies them.

98.     The allegations in paragraph 98 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98 and therefore denies them.

99.     The allegations in paragraph 99 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99 and therefore denies them.

100.    The allegations in paragraph 100 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100 and therefore denies them.

101.    The allegations in paragraph 101 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 and therefore denies them.

102.    The allegations in paragraph 102 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102 and therefore denies them.

103.    The allegations in paragraph 103 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 and therefore denies them.

104.    The allegations in paragraph 104 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 104 and therefore denies them.

16

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

105.    The allegations in paragraph 105 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105 and therefore denies them.

106.    The allegations in paragraph 106 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106 and therefore denies them.

107.    The allegations in paragraph 107 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107 and therefore denies them.

108.    The allegations in paragraph 108 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108 and therefore denies them.

109.    The allegations in paragraph 109 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109 and therefore denies them.

110.    The allegations in paragraph 110 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks

17

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 and therefore denies them.

111. The allegations in paragraph 111 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111 and therefore denies them.

112. The allegations in paragraph 112 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112, including subparts (a)-(j), and therefore denies them.

## IV. Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal.

113. The allegations in paragraph 113 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson denies each and every allegation in paragraph 113.

114. The allegations in paragraph 114 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson denies each and every allegation in paragraph 114.

115. The allegations in paragraph 115 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson denies each and every allegation in paragraph 115.

116. The allegations in paragraph 116 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson denies each and every allegation in paragraph 116.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

117.    The allegations in paragraph 117 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson denies each and every allegation in paragraph 117.

118.    The allegations in paragraph 118 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson denies each and every allegation in paragraph 118.

119.    The allegations in paragraph 119 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson denies each and every allegation in paragraph 119.

120.    The allegations in paragraph 120 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson denies each and every allegation in paragraph 120.

121.    The allegations in paragraph 121 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson denies each and every allegation in paragraph 121.

122.    The allegations in paragraph 122 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 122 and therefore denies them.

## V.    Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.

123.    The allegations in paragraph 123 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks

19

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 123 and therefore denies them.

124. The allegations in paragraph 124 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 124 and therefore denies them.

125. The allegations in paragraph 125 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125 and therefore denies them.

**VI.    Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities.**

126. The allegations in paragraph 126 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126 and therefore denies them.

127. The allegations in paragraph 127 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127 and therefore denies them.

128. The allegations in paragraph 128 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 128 and therefore denies them.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

129.     The allegations in paragraph 129 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 129 and therefore denies them.

130.     The allegations in paragraph 130 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 130 and therefore denies them.

131.     The allegations in paragraph 131 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 131 and therefore denies them.

132.     The allegations in paragraph 132 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 132 and therefore denies them.

133.     The allegations in paragraph 133 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133 and therefore denies them.

134.     The allegations in paragraph 134 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134 and therefore denies them.

**VII. Defendants Have Harmed Plaintiff and Plaintiff's Community.**

135.    Sampson denies each and every allegation in paragraph 135.

136.    The allegations in paragraph 136 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 136 and therefore denies them.

137.    Sampson denies each and every allegation in paragraph 137.

138.    Sampson denies each and every allegation in paragraph 138.

139.    Sampson denies each and every allegation in paragraph 139, including subparts (a)-(b), that is directed at Sampson. Sampson states that the allegations in paragraph 139 that are not directed at Sampson do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 139 and therefore denies them.

**FIRST CAUSE OF ACTION**
**Private Nuisance**

140.    Sampson incorporates its responses to all prior allegations by reference as if fully set forth herein.

141.    Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 141 and therefore denies them.

142.    Paragraph 142 sets forth legal conclusions to which no response is required or made. Sampson lacks knowledge or information sufficient to form a belief with respect to the remaining allegations in paragraph 142 and therefore denies them.

22

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

143. Sampson denies each and every allegation in paragraph 143.

144. Sampson denies each and every allegation in paragraph 144.

145. Sampson denies each and every allegation in paragraph 145.

146. Sampson denies each and every allegation in paragraph 146.

147. Sampson denies each and every allegation in paragraph 147.

148. Sampson denies each and every allegation in paragraph 148.

149. Sampson denies each and every allegation in paragraph 149.

150. Sampson denies each and every allegation in paragraph 150.

151. Sampson denies each and every allegation in paragraph 151.

## SECOND CAUSE OF ACTION
### Public Nuisance

152. Sampson incorporates its responses to all prior allegations by reference as if fully set forth herein.

153. Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 153 and therefore denies them.

154. Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 154 and therefore denies them.

155. Sampson states that paragraph 155 sets forth legal conclusions to which no response is required or made. Sampson denies each and every remaining allegation in paragraph 155.

156. Sampson denies each and every allegation in paragraph 156.

157. Sampson denies each and every allegation in paragraph 157.

158. Sampson denies each and every allegation in paragraph 158.

159. Sampson denies each and every allegation in paragraph 159.

160. Sampson denies each and every allegation in paragraph 160.

23

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

161. Sampson denies each and every allegation in paragraph 161.

162. Sampson denies each and every allegation in paragraph 162.

163. Sampson denies each and every allegation in paragraph 163.

### THIRD CAUSE OF ACTION
**Trespass**

164. Sampson incorporates its responses to all prior allegations by reference as if fully set forth herein.

165. Sampson lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 165 and therefore denies them.

166. The allegations in paragraph 166 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 166, including subparts (a)-(g), and therefore denies them.

167. Sampson denies each and every allegation in paragraph 167, including each and every allegation in subparts (a)-(g).

168. The allegations in paragraph 168 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 168, including subparts (a)-(g), and therefore denies them.

169. The allegations in paragraph 169 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 169, including subparts (a)-(g), and therefore denies them.

170. Sampson denies each and every allegation in paragraph 170.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

171.    Sampson denies each and every allegation in paragraph 171.

172.    Sampson denies each and every allegation in paragraph 172.

173.    The allegations in paragraph 173 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 173 and therefore denies them.

174.    Sampson denies each and every allegation in paragraph 174.

175.    Sampson denies each and every allegation in paragraph 175.

176.    Sampson denies each and every allegation in paragraph 176.

<u>**FOURTH CAUSE OF ACTION**</u>
**Negligence, Gross Negligence, and/or Recklessness**

177.    Sampson incorporates its responses to all prior allegations by reference as if fully set forth herein.

178.    Paragraph 178 sets forth legal conclusions to which no response is required or made. Sampson denies each and every remaining allegation in paragraph 178.

179.    Sampson denies each and every allegation in paragraph 179.

180.    Sampson denies each and every allegation in paragraph 180.

181.    The allegations in paragraph 181 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 181 and therefore denies them.

182.    The allegations in paragraph 182 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief with respect to the allegations in paragraph 182 and therefore denies them.

183.    The allegations in paragraph 183 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 183 and therefore denies them.

184.    The allegations in paragraph 184 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 184 and therefore denies them.

185.    The allegations in paragraph 185 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 185 and therefore denies them.

186.    The allegations in paragraph 186 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 186 and therefore denies them.

187.    The allegations in paragraph 187 are not directed at Sampson and therefore do not require a response from Sampson. To the extent a response is required, Sampson states that it lacks knowledge or information sufficient to form a belief with respect to the allegations in paragraph 187 and therefore denies them.

188.    Sampson denies each and every allegation in paragraph 188.

26

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

189.     Sampson denies each and every allegation in paragraph 189.

## FIFTH CAUSE OF ACTION
### Strict Products Liability – Ultrahazardous Activity
### (Supplier Defendants)

The Fifth Cause of Action (paragraphs 190-200) is not directed at Sampson and therefore no response is required from Sampson. To the extent a response is required, Sampson denies each and every allegation in the Fifth Cause of Action.

## SIXTH CAUSE OF ACTION
### Strict Products Liability – Ultrahazardous Activity
### (Burlington)

The Sixth Cause of Action (paragraphs 201-210) is not directed at Sampson and therefore no response is required from Sampson. To the extent a response is required, Sampson denies each and every allegation in the Sixth Cause of Action.

## SEVENTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Supplier Defendants)

The Seventh Cause of Action (paragraphs 211-223) is not directed at Sampson and therefore no response is required from Sampson. To the extent a response is required, Sampson denies each and every allegation in the Seventh Cause of Action.

## EIGHTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Burlington)

The Eighth Cause of Action (paragraphs 224-236) is not directed at Sampson and therefore no response is required from Sampson. To the extent a response is required, Sampson denies each and every allegation in the Eighth Cause of Action.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### NINTH CAUSE OF ACTION
**Strict Products Liability – Failure to Warn**
**(Supplier Defendants)**

The Ninth Cause of Action (paragraphs 237-246) is not directed at Sampson and therefore no response is required from Sampson. To the extent a response is required, Sampson denies each and every allegation in the Ninth Cause of Action.

### TENTH CAUSE OF ACTION
**Strict Products Liability – Failure to Warn**
**(Burlington)**

The Tenth Cause of Action (paragraphs 247-256) is not directed at Sampson and therefore no response is required from Sampson. To the extent a response is required, Sampson denies each and every allegation in the Tenth Cause of Action.

### ELEVENTH CAUSE OF ACTION
**Breach of Implied Warranties**
**(Supplier Defendants)**

The Eleventh Cause of Action (paragraphs 257-263) is not directed at Sampson and therefore no response is required from Sampson. To the extent a response is required, Sampson denies each and every allegation in the Eleventh Cause of Action.

### TWELFTH CAUSE OF ACTION
**Breach of Implied Warranties**
**(Burlington)**

The Twelfth Cause of Action (paragraphs 264-270) is not directed at Sampson and therefore no response is required from Sampson. To the extent a response is required, Sampson denies each and every allegation in the Twelfth Cause of Action.

### PRAYER FOR RELIEF

In response to the paragraph beginning with "WHEREFORE" and appearing under the heading "PRAYER FOR RELIEF" below paragraph 270 of the Complaint, Sampson denies that Plaintiff is entitled to any judgment or decree in its favor, injunctive relief of any kind,

28

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

compensatory or punitive damages, or costs, and asks that the Court dismiss the Complaint in its entirety.

## AFFIRMATIVE DEFENSES

Sampson asserts the following affirmative defenses in response to the allegations in Plaintiff's Complaint filed or consolidated in the above-captioned action as follows:

1.      Defendant's actions have at all times been pursuant to express permits and directives of various state and federal regulatory agencies with which Defendant has at all relevant times and parameters been fully compliant. Accordingly, Defendant pleads license as an affirmative defense to Plaintiff's claims.

2.      Plaintiff has failed to state facts sufficient to constitute a cause of action and the Complaint should be dismissed pursuant to Rule 12(b)(6) of the South Carolina Rules of Civil Procedure.

3.      Plaintiff's claims should be dismissed, pursuant to Rule 12(b)(2) of the South Carolina Rules of Civil Procedure, because the Court lacks personal jurisdiction over the Defendant.

4.      Plaintiff's claims are not ripe for adjudication and should be dismissed for presenting a contingent, hypothetical, or abstract dispute. Plaintiff alleges that it will be required to incur costs at some future date when the State or United States Environmental Protection Agency will require it to upgrade their systems to treat PFAS. Until these costs are incurred, Plaintiff cannot recover.

5.      Further, Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency have set final water quality standards, maximum

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether Plaintiff has suffered any injury.

6.     Plaintiff lacks standing to assert, in whole or in part, under the United States Constitution, the Constitution of South Carolina, state and federal statutes, and common law, the claims set forth in the Complaint.

7.     Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and *parens patriae* doctrine, because the property claimed to be affected is not held in the public trust and/or is not subject to the *parens patriae* doctrine.

8.     Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and *parens patriae* doctrine, because it does not have exclusive jurisdiction over the resources at issue, or only has partial jurisdiction over such resources and has failed to join other necessary trustees in this action.

9.     Plaintiff lacks standing to bring an action for trespass because Plaintiff has no ownership over and is not entitled to exclusive possession of various property and water bodies referenced in the Complaint, and because Plaintiff cannot establish unreasonable or substantial damage to the property.

10.     Plaintiff has not demonstrated or pled a legally cognizable injury in the Complaint that is capable of redress.

11.     Plaintiff's claims for alleged injuries and damages are barred, in whole or in part, because the claims for damages are speculative and conjectural.

12.     Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations or repose.

13.     Plaintiff has failed to name all necessary and indispensable parties in its action.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

14.    Plaintiff's claims are barred, in whole or in part, because Defendant does not owe a legal duty to Plaintiff or, if it owed such a duty, did not breach and/or fully discharged that duty.

15.    Plaintiff's claims are barred, in whole or in part, because, at all relevant times, Defendant exercised due care with respect to its activities and took reasonable precautions against foreseeable acts or omissions of others.

16.    Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendant proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

17.    Upon information and belief, Plaintiff's injuries, damages, or losses, if any, were directly and proximately caused by the intervening acts, superseding acts, and conduct of others, including Plaintiff, over which Defendant had no control, thereby precluding any recovery against Defendant.

18.    Even assuming Defendant was negligent, careless, or reckless in any respect, and that any such conduct on its part operated as a proximate cause of Plaintiff's injuries or damages, all of which are expressly denied, Plaintiff's comparative negligence, carelessness, or recklessness contributed to the cause of Plaintiff's alleged damages. For that reason, Defendant is not liable to Plaintiff in any sum whatsoever, and/or to the extent that a jury finds Plaintiff at fault for less than fifty percent (50%), Plaintiff's recovery should be reduced by that percentage amount.

19.    Plaintiff's claim for punitive damages is violative of both the United States Constitution and the South Carolina Constitution, and Defendant pleads that sections 15-32-530 *et seq.*, of the South Carolina Code provide a cap to punitive damages potentially available in this matter.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

20.     Plaintiff fails to state any basis upon which punitive damages are recoverable against Defendant and, accordingly, Plaintiff's prayer for such damages should be dismissed and/or stricken from the claims pursuant to Rule 12(b)(6) and/or 12(f) of the South Carolina Rules of Civil Procedure.

21.     Pursuant to S.C. Code Ann. § 15-32-520, any proceeding to determine punitive damages should be bifurcated from any trial to determine liability and compensatory damages.

22.     Any damages suffered by Plaintiff, which such damages are expressly denied, are the direct and proximate result of Plaintiff's conduct, and its recovery should be barred or, alternatively, reduced in proportion to the same degree as to Plaintiff's comparative fault.

23.     Plaintiff has failed to mitigate its damages as required by law and such failure bars Plaintiff's recovery, in whole or in part, against Defendant.

24.     Defendant is entitled to a set-off and/or credit of any monies or proceeds received by or on behalf of Plaintiff as a result of the claims alleged in the Complaint, regardless of the source of such monies, prior to any dismissal of or judgment in this matter.

25.     Plaintiff's claims are barred, in whole or in part, because Defendant did not own, operate, or otherwise control the facilities described in the Complaint at the time that PFAS is alleged to have migrated out of those facilities.

26.     Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish its alleged injuries were caused by exposure to PFAS from any conduct attributable to Defendant.

27.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that PFAS has been reliably established through scientific means, to be capable of causing Plaintiff's alleged injuries.

32

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

28.     Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that its residents and/or customers were exposed to sufficient concentrations or amount of PFAS, and/or for sufficient duration, which has been reliably established, through scientific means, to be capable of causing alleged injuries.

29.     Any damages Plaintiff may have suffered (which are expressly denied) were not reasonably foreseeable by Defendant at the time of the conduct alleged.

30.     Plaintiff's claims against Defendant are barred by the doctrines of unjust enrichment in that Plaintiff seeks to recover costs or damages for construction, operation, and maintenance of public water supply systems after Plaintiff sought and obtained a permit to secure, treat, and distribute public water supplies and for which it received funding from its residents and/or customers, State, Local, and Federal sources, including but not limited to funding to specifically address unexpected contamination in water supplies under the Emergency Response Plans of the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j.

31.     Plaintiff's claims are preempted or otherwise precluded by State and Federal law to the extent Plaintiff seeks recovery of costs or damages for contamination of water supplies, the enforcement of which is vested exclusively in State and Federal agencies pursuant to State and Federal statutes, including but not limited to the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j, the Clean Water Act, 33 U.S.C. § 1251 et seq., and the South Carolina Hazardous Waste Management Act, S.C. Code Ann. § 44-56-10 et seq.

32.     Plaintiff's claims are barred, in whole or in part, because Defendant neither knew, nor should have known, that any of the substances to which Plaintiff or Plaintiff's property was allegedly exposed were hazardous or constituted a reasonably foreseeable risk of physical harm

33

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

by virtue of the prevailing state of the medical, scientific, technical, and/or industrial knowledge available to Defendant at all times relevant to the claims or causes of action asserted by Plaintiff.

33.     Further, Plaintiff's claims are barred, in whole or in part, because the alleged acts or omissions by Defendant, throughout the relevant and material time period, conformed to the then-existing custom and practice, and Defendant exercised due care and acted in accordance with and/or complied with available technological, medical, scientific, and industrial "state-of-the-art" practice, and/or applicable laws, regulations, standards, and orders.

34.     Plaintiff's claims are barred in whole or in part under the bulk supplier, component part supplier, sophisticated-purchaser, sophisticated-user, sophisticated intermediary, and/or knowledgeable-user doctrines or other similar or related doctrines available under applicable law.

35.     Some or all of Plaintiff's claims are not amenable to judicial resolution because of the primary jurisdiction doctrine. *Texas v. Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907).

36.     The relief sought is, in whole or in part, within the particular expertise of and is being addressed by federal and state governments, and their relevant agencies, and thus the Court should decline to exercise jurisdiction over these matters pursuant to the doctrine of primary jurisdiction, abstention, and or the doctrine of separation of powers.

37.     The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of open and obvious conditions.

38.     The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of voluntary exposure.

39.     The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of coming to the nuisance.

34

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

40.     The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of primary implied assumption of risk.

41.     Plaintiff's claims are barred, in whole or in part, by the doctrine of election of remedies.

42.     Plaintiff's claims are or may be barred, in whole or in part, because of consent, public necessity, private necessity and/or privilege.

43.     Defendant is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency, including without limitation, acts or omissions made in accordance with applicable statutes, regulations, permits, and industry standards.

44.     Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, waiver, res judicata, estoppel, ratification, and unclean hands.

45.     Plaintiff's Complaint is barred, in whole or in part, by the doctrines of acquiescence, consent, justification, accord and satisfaction, ratification, settlement, or release.

46.     Plaintiff's claims are preempted or barred by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq. and the South Carolina Hazardous Waste Management Action, S.C. Code Ann. §§ 44-56-10 et seq. to the extent such claims include, encompass or relate to environmental conditions or natural resource damages or losses at any past, present or future facilities, sites, properties, locations or other areas listed on the United States Environmental Protection Agency's National Priority List (Superfund sites), or from which discharges or releases of materials have otherwise come to be located emanating from such facilities, sites, properties, locations or areas.

47.     Plaintiff's claims are barred because they failed to exhaust administrative remedies.

35

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

48.     Plaintiff is not entitled to recover from Defendant more than Defendant's fair, equitable, and proportionate share, if any, of the costs and damages sought by Plaintiff or to otherwise recover from Defendant more than the amount of such relief, if any, for which Defendant is liable.

49.     Plaintiff's claims are barred, in whole or in part, to the extent they seek to impose retroactive liability. Defendant may not be held liable under retroactive theories not requiring proof of fault or causation.

50.     All claims for injunctive relief in Plaintiff's Complaint are barred because Plaintiff has adequate remedies at law, to the extent its claims are provable.

51.     Plaintiff's claims are barred to the extent that Plaintiff seeks to recover costs, damages, and expenses including, but not limited to, response, assessment, remediation cleanup and/or removal costs that Plaintiff incurred improperly, or that are not related to natural resource restoration or replacement damages.

52.     The damages sought by Plaintiff, if awarded, should be reduced by any amounts they recover from any other sources and Plaintiff is barred from any form of double recovery regardless of the nature or source of such recovery.

53.     Plaintiff's claims are barred, in whole or in part, because Defendant did not know or have reason to know that its wastewater discharge, alone or in conjunction with a discharge or discharges from other sources, would cause pass through or interference, as contemplated by 40 C.F.R. § 403.5(a)(2).

54.     Plaintiff's claims are barred, in whole or in part, by the municipal cost recovery rule. *See United States v. Standard Oil of California*, 332 U.S. 301 (1947).

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

55.    Plaintiff's claims are barred because Defendant's conduct was not a substantial factor in causing the injures alleged.

56.    Plaintiff's claims are barred by the economic loss rule. *Sapp v. Ford Motor Company*, 386 S.C. 143, 687 S.E.2d 47 (2009).

57.    Plaintiff's recovery for any alleged trespass or nuisance, which is expressly denied, is limited to the lost rental value of Plaintiff's real property interest.

58.    Without admitting liability, Defendant alleges that if it is found to have been engaged in any of the activities alleged in the Complaint, such activities were too removed, indefinite, *de minimus* and insufficient to establish a reasonable degree of probability that any such activity caused any alleged injury, damage or loss to Plaintiff.

59.    Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish that its alleged injuries were caused by exposure to PFAS from any product(s) attributable to Defendant.

60.    Plaintiff's claims are barred by the doctrine of contributory negligence.

61.    Defendant asserts and incorporates herein any affirmative defenses asserted or otherwise raised by other defendants in this action to Plaintiff's Complaint.

62.    Defendant has not completed its investigation of Plaintiff's allegations. Defendant intends to act as best it can to inform itself of the pertinent facts and circumstances surrounding the allegations contained in Plaintiff's Complaint. Thus, Defendant hereby gives notice of its intent to assert any further affirmative defenses that it may learn to be supported by facts and law, including but not limited to, that this action is barred in whole or in any part by any applicable statute, contract, release, covenant, or by the doctrine of laches. Defendant reserves the right to amend this Answer to assert any such additional defenses.

ELECTRONICALLY FILED - 2025 Jun 30 2:38 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**WHEREFORE**, having fully answered the Third Amended Complaint, Sampson County Disposal, LLC prays that the Complaint be dismissed with prejudice, that Sampson County Disposal, LLC be awarded its attorneys' fees and costs associated with defending this action, and for such other and further relief as the Court may deem just and proper.

**WILLIAMS MULLEN**

By: s/John G. Tamasitis
Richard H. Willis (SC Bar No. 6159)
John G. Tamasitis (SC Bar No. 101875)
1230 Main Street, Suite 330
Columbia, SC 29201
Tel. 803.567.4615
Fax: 803.567.4601
rwillis@williamsmullen.com
jtamasitis@williamsmullen.com

and

**TAFT STETTINIUS & HOLLISTER**

Philip L. Comella (*admitted Pro Hac Vice*)
Ryan G. Rudich (*admitted Pro Hac Vice*)
111 E. Wacker Drive, Suite 2600
Chicago, IL 60601
Tel. 312.527.4000
Fax: 312.527.4011
pcomella@taftlaw.com
rrudich@taftlaw.com

*Counsel for Defendant Sampson County Disposal, LLC*

June 30, 2025
Columbia, South Carolina

38

ELECTRONICALLY FILED - 2025 Jul 07 10:40 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

---

Grand Strand Water and Sewer Authority,

*Plaintiff,*

v.

AGC Chemicals Americas, Inc. *et al.,*

*Defendants.*

C.A. No. 2024-CP-26-05523

**ACCEPTANCE OF SERVICE
ON BEHALF OF SONOCO
PRODUCTS COMPANY**

Pursuant to Rule 4(j), SCRCP, I hereby accept and acknowledge service and my receipt via email of the Third Amended Summons and Third Amended Complaint in the above captioned matter on behalf of Defendant Sonoco Products Company ("Sonoco"), effective this 25th day of June, 2025, with no further service on Sonoco being necessary.

_____
Robert Y. Knowlton
HAYNSWORTH SINKLER BOYD, PA
PO Box 11889
Columbia, SC 29211
803-540-7843
bknowlton@hsblawfirm.com

*Counsel for Sonoco Products Company*

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | **IN THE COURT OF COMMON PLEAS** |
| | ) | |
| **COUNTY OF HORRY** | ) | **FIFTEENTH JUDICIAL CIRCUIT** |
| | ) | |
| | ) | |
| GRAND STRAND WATER AND SEWER AUTHORITY, | ) | C.A. No.: 2024-CP-26-05523 |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AGC CHEMICALS AMERICAS, INC.; ALADDIN MANUFACTURING CORPORATION; ARCHROMA U.S. INC.; ARKEMA, INC.; BURLINGTON INDUSTRIES, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA, INC.; DELTA MILLS, INC., its predecessors, successors, assigns, and/or responsible parties; DUPONT DE NEMOURS, INC.; EIDP, INC.; ELEVATE TEXTILES, INC.; FIBER INDUSTRIES, LLC; HUNTSMAN INTERNATIONAL, LLC; INTERNATIONAL PAPER COMPANY; INV PERFORMANCE SURFACES, LLC; J.P. STEVENS & COMPANY, INC., its predecessors, successors, assigns, and/or responsible parties; MOHAWK INDUSTRIES, INC.; NAN YA PLASTICS CORPORATION, AMERICA; PRET ADVANCED MATERIALS, LLC; RED ROCK DISPOSAL, LLC; SAMPSON COUNTY DISPOSAL, LLC; SOLVAY SPECIALTY POLYMERS USA, LLC; SONOCO PRODUCTS COMPANY; THE CHEMOURS COMPANY; and WESTROCK CP, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **ELEVATE TEXTILE INC.'S ANSWER TO THIRD AMENDED COMPLAINT** (JURY TRIAL DEMANDED) |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Defendant Elevate Textiles, Inc. ("Elevate"), denying each and every allegation not specifically admitted herein, hereby submits its Answer to Plaintiff's Third Amended Complaint ("Complaint").

<strong><u>STATEMENT OF THE CASE</u></strong>

1.     Elevate denies all allegations contained in Paragraph 1 of the Complaint to the extent they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The allegations contained in Paragraph 1 also contain legal conclusions to which no response is required and, to the extent a response is deemed to be required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 1.

2.     Elevate denies all allegations contained in Paragraph 2 of the Complaint to the extent they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The allegations contained in Paragraph 2 also contain legal conclusions to which no response is required and, to the extent a response is deemed to be required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 2.

3.     Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 of the Complaint, and therefore the allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a

PPAB 12568031v2

response is required, those allegations are denied. Elevate lacks sufficient knowledge to respond to the allegations concerning the other Defendants and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

4.      Elevate does not own or operate an industrial facility upstream of Plaintiff's water intakes and does not discharge wastewater upstream of Plaintiff's water intakes and therefore denies all allegations contained in Paragraph 4 of the Complaint to the extent they relate to Elevate. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 4 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 4.

5.      Elevate does not own or operate an industrial facility upstream of Plaintiff's water intakes and does not discharge wastewater upstream of Plaintiff's water intakes and therefore denies all allegations contained in Paragraph 5 of the Complaint to the extent they relate to Elevate. Elevate further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The remaining allegations contained in Paragraph 5 are legal conclusions to which no response is required and, to the extent a response is deemed to be required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 5.

6.      Elevate denies the allegations in Paragraph 6 as they relate to Elevate. Elevate does not own or operate an industrial facility upstream of Plaintiff's water intakes and does not discharge wastewater upstream of Plaintiff's water intakes and therefore denies all allegations contained in Paragraph 6 of the Complaint to the extent they relate to Elevate. The remaining

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

allegations contained in Paragraph 6 are legal conclusions to which no response is required and, to the extent a response is deemed to be required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 6.

7.      The allegations contained in Paragraph 7 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 7 of the Complaint to the extent they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.  To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 7 of the Complaint.

## DISCLAIMER

8.      The allegations contained in Paragraph 8 of the Complaint do not pertain to Elevate and therefore no response is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8, and therefore the allegations are denied. The remaining allegations of Paragraph 8 of the Complaint are conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8 of the Complaint to the extent they relate to other

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Defendants, and therefore denies any and all remaining allegations contained in Paragraph 8 of the Complaint.

9.     The allegations contained in Paragraph 9 of the Complaint constitute legal conclusions to which no response is required.

10.     The allegations contained in Paragraph 10 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 10 of the Complaint to the extent they relate to Elevate. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 10 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 10 of the Complaint.

11.     The allegations contained in Paragraph 11 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 11 of the Complaint to the extent they relate to Elevate. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 11 of the Complaint.

## JURISDICTION AND VENUE

12.     The allegations contained in Paragraph 12 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 12 of the Complaint. Except as expressly admitted, the allegations set forth in Paragraph 12 are denied.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

13.     The allegations contained in Paragraph 13 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 13 of the Complaint. Except as expressly admitted, the allegations set forth in Paragraph 13 are denied.

14.     The allegations contained in Paragraph 14 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 14 of the Complaint. Except as expressly admitted, the allegations set forth in Paragraph 14 are denied.

## PARTIES

### I.     Plaintiff

15.     Elevate lacks sufficient knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 15 of the Complaint, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied.

16.     Elevate lacks sufficient knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 16 of the Complaint, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied.

17.     Elevate lacks sufficient knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 17 of the Complaint, and therefore such allegations are denied.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## II.     Discharger Defendants

18.     Paragraph 18 pertains only to Defendant Burlington Industries, Inc. ("Burlington") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the Complaint.

19.     Responding to the allegations contained in Paragraph 19 of the Complaint, Elevate admits only that it is a Delaware corporation authorized to do business in South Carolina. Elevate denies that it owns and operates the Richmond Plant and denies that it used and/or continues to use products that contain or degrade to PFIA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of the Complaint to the extent they relate to Defendant Burlington, and therefore denies any and all remaining allegations contained in Paragraph 19 of the Complaint.

20.     Paragraph 20 pertains only to Defendant Fiber Industries, LLC ("Darling Fibers") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of the Complaint.

21.     Paragraph 21 pertains only to Defendant International Paper Company ("IP") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 of the Complaint.

22.     Paragraph 22 pertains only to Defendant J.P. Stevens & Company, Inc. ("JPS") and Defendant Delta Mills, Inc. ("Delta Mills") and therefore no response from Elevate is required. To

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of the Complaint.

23.    Paragraph 23 pertains only to Defendant Mohawk Industries, Inc. and Defendant Aladdin Manufacturing Corporation (collectively, "Mohawk") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23 of the Complaint.

24.    Paragraph 24 pertains only to Defendant Nan Ya Plastics Corporation, America ("Nan Ya") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24 of the Complaint.

25.    Paragraph 25 pertains only to Defendant PRET Advanced Materials, LLC ("PRET") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25 of the Complaint.

26.    Paragraph 26 pertains only to Defendants Red Rock Disposal, LLC ("RRD") and Sampson County Disposal, LLC ("SCD") (together, "GFL Landfills") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 of the Complaint.

27.    Paragraph 27 pertains only to Defendant Sonoco Products Company ("Sonoco") and therefore no response from Elevate is required. To the extent that a response is deemed to be

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 of the Complaint.

28.     Paragraph 28 pertains only to Defendant WestRock CP, LLC ("WestRock") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 of the Complaint.

## III.     Supplier Defendants

29.     Paragraph 29 pertains only to Defendant AGC Chemicals Americas, Inc. ("Asahi") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29 of the Complaint.

30.     Paragraph 30 pertains only to Defendant Archroma U.S., Inc. ("Archroma") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30 of the Complaint.

31.     Paragraph 31 pertains only to Defendant Arkema, Inc. ("Arkema") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31 of the Complaint.

32.     Paragraph 32 pertains only to Defendant Clariant Corporation ("Clariant") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 of the Complaint.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

33.     Paragraph 33 pertains only to Defendant Daikin America, Inc. ("Daikin") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33 of the Complaint.

34.     Paragraph 34 pertains only to Defendant EIDP, Inc. ("Old DuPont"), f/k/a E.I. du Pont de Nemours and Company, and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34 of the Complaint.

35.     Paragraph 35 pertains only to Defendant The Chemours Company ("Chemours") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35 of the Complaint.

36.     Paragraph 36 pertains only to Defendant Corteva, Inc. ("Corteva") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 of the Complaint.

37.     Paragraph 37 pertains only to Defendant DuPont de Nemours, Inc. ("New DuPont"), f/k/a DowDuPont, Inc., and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 of the Complaint.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

38.     Paragraph 38 pertains only to Defendant INV Performance Surfaces, LLC ("Invista") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38 of the Complaint.

39.     Paragraph 39 pertains only to Defendant Huntsman International, LLC ("Huntsman") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 39 of the Complaint.

40.     Paragraph 40 pertains only to Defendant Solvay Specialty Polymers USA, LLC ("Solvay") and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40 of the Complaint.

## FACTUAL ALLEGATIONS

### I.     Background and Hazards of PFAS

41.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 41, and therefore such allegations are denied.

42.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 42, and therefore such allegations are denied.

43.     Elevate denies all allegations contained in Paragraph 43 of the Complaint to the extent they relate to Elevate and specifically denies that it sold or used PFAS-containing products. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 43 of the Complaint.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

44.　　Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 44, and therefore such allegations are denied.

45.　　Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 45, and therefore such allegations are denied.

46.　　Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 46, and therefore such allegations are denied.

47.　　Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 47, and therefore such allegations are denied.

48.　　Elevate does not know what "current scientific evidence" to which the allegations of Paragraph 48 refer and therefore cannot form a belief as to the truth of those allegations and therefore denies all allegations contained in Paragraph 48 of the Complaint.

49.　　Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 49, and therefore such allegations are denied.

50.　　Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 50, and therefore such allegations are denied.

51.　　Elevate admits that the allegations contained in Paragraph 51 reference an EPA advisory. Elevate refers Plaintiff to the EPA advisory Plaintiff references for the contents of the advisory. Elevate lacks knowledge or information sufficient to form a belief about the basis for the referenced advisory, and therefore such allegations are denied.  Except as expressly admitted, all remaining allegations are denied.

52.　　Elevate admits that the allegations contained in Paragraph 52 reference an EPA advisory. Elevate refers Plaintiff to the EPA advisory Plaintiff references for the contents of the advisory. Elevate lacks knowledge or information sufficient to form a belief about the basis for the

referenced advisory, and therefore such allegations are denied.  Except as expressly admitted, all remaining allegations are denied.

53.     Elevate refers Plaintiff to the EPA advisory Plaintiff references in Paragraph 53 for the contents of the advisory. Elevate lacks knowledge or information sufficient to form a belief about the basis for the referenced advisory, and therefore such allegations are denied.  Except as expressly admitted, all remaining allegations are denied.

54.     Elevate admits that the allegations contained in Paragraph 54 reference an EPA advisory. Elevate refers Plaintiff to the EPA advisory Plaintiff references for the contents of the advisory. Elevate lacks knowledge or information sufficient to form a belief about the basis for the referenced advisory, and therefore such allegations are denied.  Except as expressly admitted, all remaining allegations are denied.

55.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 55, and therefore such allegations are denied.

56.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 56, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

57.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 57, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

58.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 58, and therefore such allegations are denied. The

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

59.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 59, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

60.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 60, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

61.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 61, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

62.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 62, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied. Elevate denies all allegations contained in Paragraph 62 of the Complaint to the extent they relate to Elevate, and further denies any and all liability to Plaintiff.

63.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 63, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

response is required, those allegations are denied. Any remaining allegations are denied. Elevate denies all allegations contained in Paragraph 63 of the Complaint to the extent they relate to Elevate, and further denies any and all liability to Plaintiff.

64.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 64, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied.

65.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 65, and therefore such allegations are denied. The allegations also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Any remaining allegations are denied. Elevate denies all allegations contained in Paragraph 65 of the Complaint to the extent they relate to Elevate, and further denies any and all liability to Plaintiff.

## II.     Contamination of Bull Creek and the Intracoastal Waterway with PFAS

66.     Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 66, and therefore such allegations are denied.

67.     Elevate denies the allegations contained in Paragraph 67 of the Complaint to the extent they relate to Elevate. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 67 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 67.

68.     Elevate denies that it is a source of PFOA or PFOS in the water at Plaintiff's water intake on Bull Creek and therefore denies all allegations in Paragraph 68 as they relate to Elevate,

and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 68 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 68.

69.     Elevate denies that it is, or was, an owner and operator of any manufacturing plant or related industrial facility throughout the Pee Dee River Watershed and therefore denies all allegations in Paragraph 69 as they relate to Elevate. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 69 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 69.

70.     Elevate denies the allegations in Paragraph 70 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 70 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 70.

71.     The allegations in Paragraph 71 pertain only to Defendants Nan Ya, PRET, and IP and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 71 and therefore denies the same.

72.     The allegations in Paragraph 72 pertain only to Defendants GFL Landfills and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72 and therefore denies the same.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

73.    Elevate denies the allegations in Paragraph 73 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.  Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 73.

74.    Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 74, and therefore such allegations are denied.

75.    Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 75, and therefore such allegations are denied.

76.    Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 76, and therefore such allegations are denied.

77.    Elevate denies the allegations in Paragraph 77 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.  Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 77 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 77.

78.    Elevate denies the allegations in Paragraph 78 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.  Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 78.

79.    Elevate denies the allegations in Paragraph 79 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

relief. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 79 of the Complaint to the extent they relate to other Defendants, and therefore denies any and all remaining allegations contained in Paragraph 79.

80.     The allegations in Paragraph 80 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies the allegations in Paragraph 80 to the extent they relate to Elevate. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 80 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

81.     The allegations in Paragraph 81 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies the allegations in Paragraph 81 to the extent they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 31 and throughout the Complaint. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 81 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

82.     The allegations in Paragraph 82 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies the allegations in Paragraph 82 to the extent they relate to Elevate. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 82 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

PPAB 12568031v2

**III.    Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.**

83.    The allegations in Paragraph 83 of the Complaint contain legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies the allegations in Paragraph 83 to the extent they relate to Elevate. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 83 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

84.    The allegations in Paragraph 84 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 84 and therefore denies the same.

85.    The allegations in Paragraph 85 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 85 and therefore denies the same.

86.    The allegations in Paragraph 86 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 86 and therefore denies the same.

87.    The allegations in Paragraph 87 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87 and therefore denies the same.

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

88.     The allegations in Paragraph 88 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 88 and therefore denies the same.

89.     The allegations in Paragraph 89 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 89 and therefore denies the same.

90.     The allegations in Paragraph 90 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 90 and therefore denies the same.

91.     The allegations in Paragraph 91 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 91 and therefore denies the same.

92.     The allegations in Paragraph 92 do not pertain to Elevate and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies all allegations in Paragraph 92 to the extent they relate to Elevate. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 92 and therefore denies the same.

93.     The allegations in Paragraph 93 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 93 and therefore denies the same.

94.     The allegations in Paragraph 94 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 94 and therefore denies the same.

95.     The allegations in Paragraph 95 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 95 and therefore denies the same.

96.     The allegations in Paragraph 96 pertain only to Defendants Old DuPont and Chemours and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 96 and therefore denies the same.

97.     The allegations in Paragraph 97 pertain only to Defendants Old DuPont and Invista and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 97 and therefore denies the same.

98.     The allegations in Paragraph 98 pertain only to Defendants Huntsman, Old DuPont, and Chemours and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 98 and therefore denies the same.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

99.     The allegations in Paragraph 99 pertain only to Defendant Daikin and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 99 and therefore denies the same.

100.     The allegations in Paragraph 100 pertain only to Defendant Daikin and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 100 and therefore denies the same.

101.     The allegations in Paragraph 101 pertain only to Defendant Daikin and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 101 and therefore denies the same.

102.     The allegations in Paragraph 102 pertain only to Defendant Daikin and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 102 and therefore denies the same.

103.     The allegations in Paragraph 103 pertain only to Defendant Daikin and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 103 and therefore denies the same.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

104. The allegations in Paragraph 104 pertain only to Defendant Asahi and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 104 and therefore denies the same.

105. The allegations in Paragraph 105 pertain only to Defendant Asahi and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 105 and therefore denies the same.

106. The allegations in Paragraph 106 pertain only to Defendant Arkema and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 106 and therefore denies the same.

107. The allegations in Paragraph 107 pertain only to Defendant Clariant and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 107 and therefore denies the same.

108. The allegations in Paragraph 108 pertain only to Defendant Clariant and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 108 and therefore denies the same.

109. The allegations in Paragraph 109 pertain only to Defendants Clariant and Archroma and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

allegations contained in Paragraph 109 and therefore denies the same.

110.    The allegations in Paragraph 110 pertain only to Defendant Solvay and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 110 and therefore denies the same.

111.    The allegations in Paragraph 111 pertain only to "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 111 and therefore denies the same. Any and all remaining allegations are denied as they relate to Elevate.

112.    The allegations in Paragraph 112 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 112 and therefore denies the same. Elevate denies the allegations in Paragraph 112 of the Complaint, including subparagraphs 112 (a) through (j), as they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 112 and throughout the Complaint.

IV.    **Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal.**

113.    The allegations in Paragraph 113 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 113 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 113 and throughout the Complaint. To the extent

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 113 and therefore denies the same.

114.    The allegations in Paragraph 114 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 114 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 114 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 114 and therefore denies the same.

115.    The allegations in Paragraph 115 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 115 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 115 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 115 and therefore denies the same.

116.    The allegations in Paragraph 116 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 116 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that

PPAB 12568031v2

term is defined or used by Plaintiff in Paragraph 116 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 116 and therefore denies the same.

117.    The allegations in Paragraph 117 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 117 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 117 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 117 and therefore denies the same.

118.    The allegations in Paragraph 118 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 118 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 118 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 118 and therefore denies the same.

119.    The allegations in Paragraph 119 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 119 of the Complaint to the

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 119 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 119 and therefore denies the same.

120.     The allegations in Paragraph 120 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 120 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 120 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 120 and therefore denies the same.

121.     The allegations in Paragraph 121 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 121 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 121 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 121 and therefore denies the same.

122.     The allegations in Paragraph 122 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 122 and therefore denies the same. Elevate denies any and all allegations in Paragraph 122 to the extent that they relate to Elevate.

**V.      Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.**

123.    The allegations in Paragraph 123 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 123 and therefore denies the same. Elevate denies any and all allegations in Paragraph 123 to the extent that they relate to Elevate.

124.    The allegations in Paragraph 124 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 124 and therefore denies the same. Elevate denies any and all allegations in Paragraph 124 to the extent that they relate to Elevate.

125.    The allegations in Paragraph 125 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 125 and therefore denies the same. Elevate denies any and all allegations in Paragraph 125 to the extent that they relate to Elevate.

**VI.     Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities.**

126.    The allegations in Paragraph 126 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

allegations contained in Paragraph 126 and therefore denies the same.

127.     The allegations in Paragraph 127 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 127 and therefore denies the same.

128.     The allegations in Paragraph 128 pertain only to Defendants Old DuPont and Chemours and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 128 and therefore denies the same.

129.     The allegations in Paragraph 129 pertain only to Defendants Old DuPont and Chemours and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 129 and therefore denies the same.

130.     The allegations in Paragraph 130 pertain only to Defendants Old DuPont and Chemours and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 130 and therefore denies the same.

131.     The allegations in Paragraph 131 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 131 and therefore denies the same.

132.     The allegations in Paragraph 132 pertain only to Defendant Old DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 132 and therefore denies the same.

133.     The allegations in Paragraph 133 pertain only to Defendants Old DuPont, Corteva, and New DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 133 and therefore denies the same.

134.     The allegations in Paragraph 134 pertain only to Defendants Old DuPont, Corteva, and New DuPont and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 134 and therefore denies the same.

## VII.     Defendants Have Harmed Plaintiff and Plaintiff's Community.

135.     The allegations in Paragraph 135 constitute legal conclusions and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 135 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 135 and throughout the Complaint. Elevate denies that it has discharged PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors into the Pee Dee River, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 135 as they relate to other Defendants and therefore denies the same.

136.     The allegations in Paragraph 136 pertain only to the alleged conduct of "Supplier Defendants" and therefore no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 136 of the Complaint to the

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 136 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 136 as they relate to other Defendants and therefore denies the same.

137.    Elevate denies the allegations in Paragraph 137 of the Complaint as they relate to Elevate. The allegations in Paragraph 137 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 137 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

138.    Elevate denies the allegations in Paragraph 138 of the Complaint as they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 139 (a) and (b) and throughout the Complaint. The allegations in Paragraph 138 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 138 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

139.    Elevate denies the allegations in Paragraph 139 of the Complaint as they relate to Elevate, including subparagraphs 139 (a) and (b). The allegations in Paragraph 139 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 139 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

## FIRST CAUSE OF ACTION

### Private Nuisance

140.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

141.    Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 141, and therefore such allegations are denied.

142.    The allegations in Paragraph 142 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 142, and therefore such allegations are denied.

143.    The allegations in Paragraph 143 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 143 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 143 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 143 of the Complaint.

144.    Elevate denies the allegations in Paragraph 144 of the Complaint as they relate to Elevate. The allegations in Paragraph 144 also contain legal conclusions to which no response is

PPAB 12568031v2

required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 144 of the Complaint to the extent the allegations relate to other Defendants, and therefore such allegations are denied.

145.    The allegations in Paragraph 145 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 145 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 145 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 145 of the Complaint.

146.    The allegations in Paragraph 146 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 146 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 146 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 146 of the Complaint.

147.    The allegations in Paragraph 147 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 147 as they relate to Elevate, and further denies any and all

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 147 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 147 of the Complaint.

148.     The allegations in Paragraph 148 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 148 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 148 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 148 of the Complaint.

149.     The allegations in Paragraph 149 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 149 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 149 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 149 of the Complaint.

150.     The allegations in Paragraph 150 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

all allegations contained in Paragraph 150 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 150 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 150 of the Complaint.

151. The allegations in Paragraph 151 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 151 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 151 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 151 of the Complaint.

<u>SECOND CAUSE OF ACTION</u>

**Public Nuisance**

152. Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

153. Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 153, and therefore such allegations are denied. The allegations set forth in Paragraph 153 also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied.

PPAB 12568031v2

154.    Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 154, and therefore such allegations are denied.

155.    Elevate denies all allegations contained in Paragraph 155 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The allegations in Paragraph 155 of the Complaint also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 155 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 155 of the Complaint.

156.    Elevate denies all allegations contained in Paragraph 156 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The allegations in Paragraph 156 of the Complaint also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 156 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 156 of the Complaint.

157.    The allegations in Paragraph 157 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 157 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

form a belief as to the truth of the allegations contained in Paragraph 157 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 157 of the Complaint.

158.    The allegations in Paragraph 158 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 158 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 158 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 158 of the Complaint.

159.    The allegations in Paragraph 159 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 159 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 159 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 159 of the Complaint.

160.    The allegations in Paragraph 160 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 160 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 160 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 160 of the Complaint.

161.    The allegations in Paragraph 161 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 161 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 161 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 161 of the Complaint.

162.    Elevate denies the allegations in Paragraph 162 of the Complaint to the extent that they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. The allegations in Paragraph 162 also contain conclusions of law to which no response is required and, to the extent a response is required, those allegations are denied. Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 162 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 162 of the Complaint.

163.    The allegations in Paragraph 163 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 163 as they relate to Elevate, and further denies any and all

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 163 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 163 of the Complaint.

<b><u>THIRD CAUSE OF ACTION</u></b>

<b>Trespass</b>

164.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

165.    The allegations in Paragraph 165 of the Complaint constitute legal conclusions to which no response is required. To the extend a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 165, and therefore such allegations are denied.

166.    The allegations in Paragraph 166 of the Complaint, including subparagraphs (a)-(g) pertain only to Defendants Nan Ya, PRET, and IP and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 166, and therefore such allegations are denied.

167.    The allegations in Paragraph 167 of the Complaint, including subparagraphs (a)-(g), pertain only to Defendants RRD and SCD, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 167, and therefore such allegations are denied.

168. The allegations in Paragraph 168 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 168, including subparagraphs (a)-(g), as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 168 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 168 of the Complaint.

169. The allegations in Paragraph 169 of the Complaint, including subparagraphs (a)-(g), pertain only to "Supplier Defendants," and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies the allegations in Paragraph 169 of the Complaint as they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 169 and throughout the Complaint. The allegations in Paragraph 169 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 169, and therefore such allegations are denied.

170. The allegations in Paragraph 170 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 170, and therefore such allegations are denied.

171. The allegations in Paragraph 171 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

all allegations contained in Paragraph 171 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 171 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 171 of the Complaint.

172. The allegations in Paragraph 172 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 172 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 172 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 172 of the Complaint.

173. The allegations in Paragraph 173 of the Complaint pertain only to "Supplier Defendants," and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies the allegations in Paragraph 173 of the Complaint as they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 173 and throughout the Complaint. The allegations in Paragraph 173 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 173, and therefore such allegations are denied.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

174. The allegations in Paragraph 174 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 174 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 174 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 174 of the Complaint.

175. The allegations in Paragraph 175 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 175 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 175 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 175 of the Complaint.

176. The allegations in Paragraph 176 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 176 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 176 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

contained in Paragraph 176 of the Complaint.

## FOURTH CAUSE OF ACTION

### Negligence, Gross Negligence, and/or Recklessness

177.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

178.    The allegations in Paragraph 178 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 178 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 178 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 178 of the Complaint.

179.    The allegations in Paragraph 179 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 179 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 179 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 179 of the Complaint.

180.    The allegations in Paragraph 180 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

all allegations contained in Paragraph 180 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 180 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 180 of the Complaint.

181.    The allegations in Paragraph 181 of the Complaint pertain only to "Supplier Defendants," and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies the allegations in Paragraph 181 of the Complaint as they relate to Elevate. The allegations in Paragraph 181 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 181, and therefore such allegations are denied.

182.    The allegations in Paragraph 182 of the Complaint pertain only to "Supplier Defendants," and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies the allegations in Paragraph 182 of the Complaint as they relate to Elevate. The allegations in Paragraph 182 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 182, and therefore such allegations are denied.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

183.    The allegations in Paragraph 183 of the Complaint pertain only to "Supplier Defendants," and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies the allegations in Paragraph 183 of the Complaint as they relate to Elevate. The allegations in Paragraph 183 also contain legal conclusions to which no response is required and, to the extent a response is required, those allegations are denied. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 183, and therefore such allegations are denied.

184.    The allegations in Paragraph 184 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 184, and therefore such allegations are denied.

185.    The allegations in Paragraph 185 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 185, and therefore such allegations are denied.

186.    The allegations in Paragraph 186 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 186, and therefore such allegations are denied.

PPAB 12568031v2

187.    The allegations in Paragraph 187 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 187, and therefore such allegations are denied.

188.    The allegations in Paragraph 188 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 188 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 188 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 188 of the Complaint.

189.    The allegations in Paragraph 189 of the Complaint constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 189 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 189 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 189 of the Complaint.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FIFTH CAUSE OF ACTION

### Strict Products Liability – Ultrahazardous Activity (Supplier Defendants)

190.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

191.    The allegations in Paragraph 191 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 191 and therefore such allegations are denied.

192.    The allegations in Paragraph 192 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 192 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 192 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 192 of the Complaint.

193.    The allegations in Paragraph 193 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 193 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 193 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 193 of the Complaint.

194.    The allegations in Paragraph 194 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 194 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 194 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 194 of the Complaint.

195.    The allegations in Paragraph 195 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 195 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 195 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 195 of the Complaint.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

196. The allegations in Paragraph 196 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 196 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 196 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 196 of the Complaint.

197. The allegations in Paragraph 197 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 197 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 197 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 197 of the Complaint.

198. The allegations in Paragraph 198 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 198 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is

deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 198 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 198 of the Complaint.

199.    The allegations in Paragraph 199 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 199 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 199 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 199 of the Complaint.

200.    The allegations in Paragraph 200 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate denies all allegations contained in Paragraph 200 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief. To the extent a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 200 of the Complaint to the extent they relate to other Defendants and therefore denies any and all remaining allegations contained in Paragraph 200 of the Complaint.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SIXTH CAUSE OF ACTION**

**Strict Products Liability – Ultrahazardous
Activity
(Burlington)**

201.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

202.    The allegations in Paragraph 202 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 202 and therefore such allegations are denied.

203.    The allegations in Paragraph 203 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 203 and therefore such allegations are denied.

204.    The allegations in Paragraph 204 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 204 and therefore such allegations are denied.

205.    The allegations in Paragraph 205 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 205 and therefore such allegations are denied.

206.     The allegations in Paragraph 206 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 206 and therefore such allegations are denied.

207.     The allegations in Paragraph 207 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 207 and therefore such allegations are denied.

208.     The allegations in Paragraph 208 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 208 and therefore such allegations are denied.

209.     The allegations in Paragraph 209 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 209 and therefore such allegations are denied.

PPAB 12568031v2

210. The allegations in Paragraph 210 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 210 and therefore such allegations are denied.

## SEVENTH CAUSE OF ACTION

### Strict Products Liability – Design Defect
### (Supplier Defendants)

211. Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

212. The allegations in Paragraph 212 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 212 and therefore such allegations are denied.

213. The allegations in Paragraph 213 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 213 and therefore such allegations are denied.

214. The allegations in Paragraph 214 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 214 and therefore such allegations are denied.

215.    The allegations in Paragraph 215 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 215 and therefore such allegations are denied.

216.    The allegations in Paragraph 216 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 216 and therefore such allegations are denied.

217.    The allegations in Paragraph 217 of the Complaint, including subparts (a)-(e), constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 217, including subparts (a)-(e), and therefore such allegations are denied.

218.    The allegations in Paragraph 218 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 218 and therefore such allegations are denied.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

219.    The allegations in Paragraph 219 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 219 and therefore such allegations are denied.

220.    The allegations in Paragraph 220 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 220 and therefore such allegations are denied.

221.    The allegations in Paragraph 221 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 221 and therefore such allegations are denied.

222.    The allegations in Paragraph 222 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 222 and therefore such allegations are denied.

223.    The allegations in Paragraph 223 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 223 and therefore such allegations are denied.

## EIGHTH CAUSE OF ACTION

### Strict Products Liability - Design
### Defect (Burlington)

224.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

225.    The allegations in Paragraph 225 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 225 and therefore such allegations are denied.

226.    The allegations in Paragraph 226 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 226 and therefore such allegations are denied.

227.    The allegations in Paragraph 227 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 227 and therefore such allegations are denied.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

228. The allegations in Paragraph 228 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 228 and therefore such allegations are denied.

229. The allegations in Paragraph 229 of the Complaint constitute legal conclusions and are directed only toward Defendant Burlington, and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 229 and therefore such allegations are denied.

230. The allegations in Paragraph 230 of the Complaint, including subparagraphs (a)-(f), pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 230, and therefore such allegations are denied.

231. The allegations in Paragraph 231 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 231, and therefore such allegations are denied.

232. The allegations in Paragraph 232 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 232, and therefore such allegations are denied.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

233.    The allegations in Paragraph 233 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 233, and therefore such allegations are denied.

234.    The allegations in Paragraph 234 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 234, and therefore such allegations are denied.

235.    The allegations in Paragraph 235 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 235, and therefore such allegations are denied.

236.    The allegations in Paragraph 236 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 236, and therefore such allegations are denied.

## NINTH CAUSE OF ACTION

### Strict Products Liability - Failure to Warn
### (Supplier Defendants)

237.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

238.    The allegations in Paragraph 238 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or

PPAB 12568031v2

information sufficient to form a belief as to the truth of the allegations contained in Paragraph 238, and therefore such allegations are denied.

239.     The allegations in Paragraph 239 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 239 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 239 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 239  as they relate to other Defendants and therefore denies the same.

240.     The allegations in Paragraph 240 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 240  as they relate to other Defendants and therefore denies the same.

241.     The allegations in Paragraph 241 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 241 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 241 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 241 as they relate to other Defendants and therefore denies the same.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

242.     The allegations in Paragraph 242 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 242 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 242 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 242 as they relate to other Defendants and therefore denies the same.

243.     The allegations in Paragraph 243 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 243 as they relate to other Defendants and therefore denies the same.

244.     The allegations in Paragraph 244 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 244 as they relate to other Defendants and therefore denies the same.

245.     The allegations in Paragraph 245 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 245 as they relate to other Defendants and therefore denies the same.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

246.     The allegations in Paragraph 246 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 246 as they relate to other Defendants and therefore denies the same.

### TENTH CAUSE OF ACTION

### Strict Products Liability - Failure to Warn
### (Burlington)

247.     Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

248.     The allegations in Paragraph 248 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 248, and therefore such allegations are denied.

249.     The allegations in Paragraph 249 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 249, and therefore such allegations are denied.

250.     The allegations in Paragraph 250 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 250, and therefore such allegations are denied.

251.     The allegations in Paragraph 251 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 251, and therefore such allegations are denied.

252.     The allegations in Paragraph 252 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 252, and therefore such allegations are denied.

253.     The allegations in Paragraph 253 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 253, and therefore such allegations are denied.

254.     The allegations in Paragraph 254 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 254, and therefore such allegations are denied.

255.     The allegations in Paragraph 255 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 255, and therefore such allegations are denied.

256.     The allegations in Paragraph 256 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 256, and therefore such allegations are denied.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**ELEVENTH CAUSE OF ACTION**

**Breach of Implied Warranties**
**(Supplier Defendants)**

257.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the Complaint as though fully set forth herein.

258.    The allegations in Paragraph 258 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 258 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 258 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 258 as they relate to other Defendants and therefore denies the same.

259.    The allegations in Paragraph 259 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in Paragraph 259 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 259 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 259 as they relate to other Defendants and therefore denies the same.

260.    The allegations in Paragraph 260 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent that a response is deemed to be required, Elevate denies the allegations in

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Paragraph 260 of the Complaint to the extent that they relate to Elevate, and specifically denies that it is a "Discharger Defendant" as that term is defined or used by Plaintiff in Paragraph 260 and throughout the Complaint. To the extent that a further response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 260 as they relate to other Defendants and therefore denies the same.

261.    The allegations in Paragraph 261 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 261 as they relate to other Defendants and therefore denies the same.

262.    The allegations in Paragraph 262 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 262 as they relate to other Defendants and therefore denies the same.

263.    The allegations in Paragraph 263 of the Complaint constitute legal conclusions and are directed only toward "Supplier Defendants," and therefore, no response from Elevate is required. To the extent a response is deemed to be required Elevate lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 263 as they relate to other Defendants and therefore denies the same.

## TWELFTH CAUSE OF ACTION

### Breach of Implied Warranties
### (Burlington)

264.    Elevate fully incorporates herein its responses to the foregoing paragraphs in the

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Complaint as though fully set forth herein.

265.    The allegations in Paragraph 265 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 265, and therefore such allegations are denied.

266.    The allegations in Paragraph 266 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 266, and therefore such allegations are denied.

267.    The allegations in Paragraph 267 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 267, and therefore such allegations are denied.

268.    The allegations in Paragraph 268 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 268, and therefore such allegations are denied.

269.    The allegations in Paragraph 269 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 269, and therefore such allegations are denied.

270.    The allegations in Paragraph 270 of the Complaint pertain only to Defendant Burlington, and therefore no response from Elevate is required. To the extent a response is deemed

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

to be required, Elevate lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 270, and therefore such allegations are denied. Elevate denies all allegations contained in Paragraph 270 as they relate to Elevate, and further denies any and all liability to Plaintiff and denies that Plaintiff is entitled to damages or any other relief.

### PRAYER FOR RELIEF

Elevate denies any liability for any injury alleged in the Complaint and denies that Plaintiff is entitled to the relief or judgment requested in the Prayer for Relief. To the extent any allegation of the Complaint is not addressed directly herein, such allegation is denied.

### ADDITIONAL DEFENSES

Without assuming the burden of proof where it otherwise rests with Plaintiff or another third party, Elevate further pleads the following additional defenses to all the individual claims alleged in the Complaint. All of the following defenses are pled in the alternative and none of them constitutes an admission that Elevate is liable to Plaintiff or any third party, that Plaintiff or any third party has been or will be injured or damaged in any way, or that Plaintiff or any third party is entitled to any relief whatsoever.

### FIRST DEFENSE

The Complaint, and each cause of action or count alleged therein, fails to state facts sufficient to constitute a claim upon which relief may be granted against Elevate.

### SECOND DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the applicable statutes of limitations.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**THIRD DEFENSE**

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the applicable statutes of repose.

**FOURTH DEFENSE**

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the doctrine of laches, waiver, res judicata, estoppel, collateral, estoppel, ratification, and unclean hands.

**FIFTH DEFENSE**

Any injuries and/or damages alleged by Plaintiff were caused or contributed to by the negligence or actual conduct of other persons, firms, corporations, or entities over whom Elevate had no control or right of control and for whom Elevate is not responsible.

**SIXTH DEFENSE**

Any injuries and/or damages alleged by Plaintiff are barred by the doctrines of intervening cause and/or superseding cause.

**SEVENTH DEFENSE**

Plaintiff's claims are not ripe for adjudication and should be dismissed for presenting a contingent, hypothetical, or abstract dispute. Plaintiff alleges that it will be required to incur costs at some future date if the United States Environmental Protection Agency requires plaintiff to upgrade its systems to treat PFAS. Until these costs are incurred, Plaintiff cannot recover.

Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency has set final water quality standards, maximum contaminant levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether natural resources have been injured.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**EIGHTH DEFENSE**

Plaintiff also lacks standing to assert, in whole or in part, under the United States Constitution, the Constitution of South Carolina, state and federal statutes, and common law to bring the claims set forth in the Complaint.

Plaintiff lacks standing to bring the claims set forth in the Complaint under both the public trust doctrine and parens patriae doctrine because: (1) the property claimed to be affected is not held in the public trust and/or is not subject to the parens patriae doctrine; and (2) does not have exclusive jurisdiction over the resources at issue, or only has partial jurisdiction over such resources and has failed to join other necessary trustees in this action.

Plaintiff lacks standing to bring an action for trespass because Plaintiff has no ownership over and is not entitled to exclusive possession of various property and water bodies referenced in the Complaint, and because Plaintiff cannot establish unreasonable or substantial damage to the resource.

**NINTH DEFENSE**

Plaintiff has not demonstrated or pled a legally cognizable injury in the Complaint that is capable of redress.

**TENTH DEFENSE**

Plaintiff's claims for alleged injuries and damages are barred, in whole or in part, because the claims for damages are speculative and conjectural.

**ELEVENTH DEFENSE**

Plaintiff has failed to name all necessary and indispensable parties in its action.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**TWELFTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, because Elevate does not owe a legal duty to Plaintiff or, if it owed such a duty, did not breach and/or fully discharged that duty.

**THIRTEENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, because, at all relevant times, Elevate exercised due care with respect to activities and took reasonable precautions against foreseeable acts or omissions of others.

**FOURTEENTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Elevate proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

**FIFTEENTH DEFENSE**

Upon information and belief, Plaintiff's injuries, damages, or losses, if any, were directly and proximately caused by the intervening acts, superseding acts, and conduct of others, including Plaintiff, over which Elevate had no control, thereby precluding any recovery against Elevate.

**SIXTEENTH DEFENSE**

Even assuming Elevate was negligent, careless, or reckless in any respect, and that any such conduct on its part operated as a proximate cause of Plaintiff's injuries or damages, all of which are expressly denied, Plaintiff's comparative negligence, carelessness, or recklessness contributed to the cause of Plaintiff's alleged damages. For that reason, Elevate is not liable to Plaintiff in any sum whatsoever, and/or to the extent that a jury finds Plaintiff at fault for less than fifty percent (50%), Plaintiff's recovery should be reduced by that percentage amount.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SEVENTEENTH DEFENSE**

Plaintiff's claims for punitive damages are violative of both the United States Constitution and the South Carolina Constitution, and Defendants plead that sections 15-32-530 et seq., of the South Carolina Code provide a cap to punitive damages potentially available in this matter.

Plaintiff also fails to state any basis upon which punitive damages are recoverable against Defendants and, accordingly, Plaintiff's prayer for such damages should be dismissed and/or stricken from the claims pursuant to Rule 12(b)(6) and/or Rule 12(f) of the South Carolina Rules of Civil Procedure.

Pursuant to S.C. Code Ann. §15-32-520, any proceeding to determine punitive damages should be bifurcated from any trial to determine liability and compensatory damages.

**EIGHTEENTH DEFENSE**

Any damages suffered by Plaintiff, which such damages are expressly denied, are the direct and proximate result of Plaintiff's own conduct, and recovery should be barred or, alternatively, reduced in proportion to the same degree as to Plaintiff's comparative fault.

**NINETEENTH DEFENSE**

Plaintiff has failed to mitigate its damages as required by law and such failure bars Plaintiff's recovery, in whole or in part, against Elevate.

**TWENTIETH DEFENSE**

Elevate is entitled to a set-off and/or credit of any monies or proceeds received by or on behalf of Plaintiff as a result of the claims alleged in the Complaint, regardless of the source of such monies, prior to any dismissal of or judgment in this matter.

PPAB 12568031v2

**TWENTY-FIRST DEFENSE**

Plaintiff's claims are barred, in whole or in part, because Elevate did not own, operate, or otherwise control the facilities or activities described in the Complaint at the time that PFAS is alleged to have migrated out of those facilities.

**TWENTY-SECOND DEFENSE**

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot establish its alleged injuries were caused by exposure to PFAS from any conduct attributable to Elevate.

**TWENTY-THIRD DEFENSE**

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that PFAS has been reliably established through scientific means, to be capable of causing Plaintiff's alleged injuries.

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish exposure to sufficient concentrations or amount of PFAS, and/or for sufficient duration, which has been reliably established, through scientific means, to be capable of causing alleged injuries.

**TWENTY-FOURTH DEFENSE**

Any damages Plaintiff may have suffered (which are expressly denied) were not reasonably foreseeable by Elevate at the time of the conduct alleged.

**TWENTY-FIFTH DEFENSE**

Plaintiff's claims against Elevate are barred by the doctrines of unjust enrichment in that Plaintiff seeks to recover costs or damages for construction, operation, and maintenance of public water supply systems after Plaintiff sought and obtained a permit to secure, treat, and distribute public water supplies and for which it received funding from its customers, state, local, and federal sources, including, but not limited to, funding to specifically address unexpected contamination in

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

water supplies under the Emergency Response Plans of the Safe Drinking Water Act, 42 U.S.C. 300f to 300j.

### TWENTY-SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Elevate neither knew, nor should have known, that any of the substances to which Plaintiff or Plaintiff's property was allegedly exposed were hazardous or constituted a reasonably foreseeable risk of physical harm by virtue of the prevailing state of the medical, scientific, technical, and/or industrial knowledge available to Elevate at all times relevant to the claims or causes of action asserted by Plaintiff.

Plaintiff's claims are barred, in whole or in part, because the alleged acts or omissions by Elevate, throughout the relevant and material time period, conformed to the then-existing custom and practice, and Elevate exercised due care and acted in accordance with and/or complied with available technological, medical, scientific, and industrial "state-of-the-art" practice, and/or applicable laws, regulations, standards, and orders.

### TWENTY-SEVENTH DEFENSE

Some or all of Plaintiff's claims are not amenable to judicial resolution because of the primary jurisdiction doctrine. *Texas v. Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907).

The relief sought is, in whole or in part, within the particular expertise of and is being addressed by federal and state governments, and their relevant agencies, and thus the Court should decline to exercise jurisdiction over these matters pursuant to the doctrine of primary jurisdiction, abstention, and or the doctrine of separation of powers.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## TWENTY-EIGHTH DEFENSE

The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of open and obvious conditions.

## TWENTY-NINTH DEFENSE

The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of voluntary exposure.

## THIRTIETH DEFENSE

The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of coming to the alleged nuisance.

## THIRTY-FIRST DEFENSE

The claims and/or damages alleged in the Complaint are barred, in whole or in part, under the doctrine of assumption of risk.

## THIRTY-SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of election of remedies.

## THIRTY-THIRD DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, because of consent, public necessity, private necessity and/or privilege.

## THIRTY-FOURTH DEFENSE

Elevate is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency, including, without limitation, acts or omissions made in accordance with applicable statutes, regulations, permits, and industry standards.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### THIRTY-FIFTH DEFENSE

Plaintiff's Complaint is barred, in whole or in part, by the doctrines of acquiescence, consent, justification, accord and satisfaction, ratification, settlement, or release.

### THIRTY-SIXTH DEFENSE

Plaintiff's alleged claims are preempted or barred by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq. and the South Carolina Hazardous Waste Management Action, S.C. Code Ann. § 44-56-10 et seq. to the extent such claims include, encompass or relate to environmental conditions or natural resource damages or losses at any past, present or future facilities, sites, properties, locations or other areas listed on the United States Environmental Protection Agency's National Priority List (Superfund sites), or from which discharges or releases of materials have otherwise come to be located emanating from such facilities, sites, properties, locations or areas.

### THIRTY-SEVENTH DEFENSE

Plaintiff's claims are barred because it failed to exhaust administrative remedies.

### THIRTY-EIGHTH DEFENSE

Plaintiff is not entitled to recover from Elevate more than Elevate's fair, equitable, and proportionate share, if any, of the costs and damages sought by Plaintiff or to otherwise recover from Elevate more than the amount of such relief, if any, for which Elevate is liable.

### THIRTY-NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent they seek to impose retroactive liability.

Elevate may not be held liable under retroactive theories not requiring proof of fault or causation.

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FORTIETH DEFENSE**

All claims for injunctive relief in Plaintiff's Complaint are barred because Plaintiff has adequate remedies at law, to the extent its claims are provable.

**FORTY-FIRST DEFENSE**

Plaintiff's claims are barred to the extent that they seek to recover costs, damages, and expenses including, but not limited to, response, assessment, remediation cleanup and/or removal costs that Plaintiff incurred improperly, or that are not related to natural resource restoration or replacement damages.

**FORTY-SECOND DEFENSE**

The damages sought by Plaintiff, if awarded, should be reduced by any amounts it recovers from any other sources and Plaintiff is barred from any form of double recovery regardless of the nature or source of such recovery.

**FORTY-THIRD DEFENSE**

Plaintiff's claims are barred, in whole or in part, because, to the extent Elevate discharged wastewater, which is denied, Elevate did not know or have reason to know that its wastewater discharge, alone or in conjunction with a discharge or discharges from other sources, would cause pass through or interference, as contemplated by 40 C.F.R. § 403.5(a)(2).

**FORTY-FOURTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the municipal cost recovery rule or the free public services doctrine. *See United States v. Standard Oil of California*, 332 U.S. 301 (1947).

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FORTY-FIFTH DEFENSE**

Plaintiff's claims are barred in whole or in part under the bulk supplier, component part supplier, sophisticated-purchaser, sophisticated-user, sophisticated intermediary, and/or knowledgeable-user doctrines or other similar or related doctrines available under applicable law.

**FORTY-SIXTH DEFENSE**

Although Elevate denies any liability, should Elevate, or any other party, be found liable for the damages alleged in the Amended Complaint, then the liability and damage should be apportioned among all responsible parties and non-parties pursuant to S.C. Code Ann. § 15-38-10 et seq.

**FORTY-SEVENTH DEFENSE**

Plaintiff's claims against Elevate are barred, in whole or in part, because Plaintiff failed to exercise reasonable diligence in mitigating and/or avoiding any alleged damages.

**FORTY-EIGHTH DEFENSE**

Plaintiff's nuisance claims are barred, in whole or in part, because Elevate did not cause an unreasonable and substantial interference with Plaintiff's enjoyment of its property or with a right common to the general public.

**FORTY-NINTH DEFENSE**

Elevate asserts and incorporates herein any affirmative defenses asserted or otherwise raised by other Defendants in this action to Plaintiff's Complaint.

**FIFTIETH DEFENSE**

Elevate has not completed its investigation of Plaintiff's allegations. Elevate intends to act as best it can to inform itself of the pertinent facts and circumstances surrounding the allegations contained in Plaintiff's Complaint. Thus, Elevate hereby gives notice of its intent to assert any

PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 24 2:48 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

further affirmative defenses that Elevate may learn to be supported by facts and law, including, but not limited to, that this action is barred in whole or in any part by any applicable statute, contract, release, covenant, or by the doctrine of laches. Elevate reserves the right to amend this Answer to assert any such defenses.

**WHEREFORE**, having fully answered the Amended Complaint, Elevate respectfully requests that the Court:

1.     Dismiss with prejudice all claims asserted against Elevate;

2.     Grant judgment in favor of Elevate and against Plaintiff, declaring that Plaintiff is entitled to no damages, recovery and/or any other relief as to Elevate;

3.     Grant Elevate's costs and attorney's fees to the extent such costs and fees may be awarded in favor of Elevate consistent with applicable law; and

4.     Grant such other relief in favor of Elevate as the Court may deem just and proper.


This the 24th day of July, 2025.


*/s/Robert C. Osborne, III*
Robert C. Osborne, III (SC Bar No. 101827)
Caroline McCracken (SC Bar No. 106971)
PARKER POE ADAMS BERNSTEIN LLP
850 Morrison Drive, Suite 400
Charleston, South Carolina 29403
Phone: 843-727-2650
robertosborne@parkerpoe.com
carolinemccracken@parkerpoe.com

*Attorneys for Elevate Textiles, Inc.*


PPAB 12568031v2

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF HORRY | FIFTEENTH JUDICIAL CIRCUIT |
| Grand Strand Water and Sewer Authority, | C.A. No.: 2024-CP-26-05523 |
| Plaintiff, | |
| v. | |
| AGC Chemicals Americas, Inc.; Aladdin Manufacturing Corporation; Archroma U.S., Inc; Arkema, Inc.; Burlington Industries, Inc.; Clariant Corporation; Corteva, Inc.; Daikin America, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; DuPont de Nemours, Inc.; EIDP, Inc.; Elevate Textiles, Inc.; Fiber Industries, LLC; Huntsman International, LLC; International Paper Company; INV Performance Surfaces, LLC; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; Sampson County Disposal, LLC; Solvay Specialty Polymers USA, LLC; Sonoco Products Company; The Chemours Company; and Westrock CP, LLC, | **DEFENDANT SONOCO PRODUCTS COMPANY'S ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT** |
| Defendants. | |

Defendant Sonoco Products Company ("Sonoco"), denying each and every allegation not specifically admitted herein, hereby submits its Answer to Plaintiff Grand Strand Water and Sewer Authority's ("Plaintiff" or "GSWSA") Third Amended Complaint (the "Complaint").

1

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## STATEMENT OF THE CASE[1]

1.      Sonoco denies each and every allegation in Paragraph 1.

2.      Sonoco denies each and every allegation in Paragraph 2.

3.      Sonoco lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 of the Complaint, and therefore denies them.

4.      Sonoco denies each and every allegation in Paragraph 4.

5.      Sonoco denies each and every allegation in Paragraph 5.

6.      Sonoco denies each and every allegation in Paragraph 6.

7.      Sonoco denies each and every allegation in Paragraph 7.

## DISCLAIMER

8.      Paragraph 8 sets forth legal conclusions to which no response is required.  To the extent a response is required, Sonoco denies each and every allegation in Paragraph 8.

9.      The allegations in Paragraph 9 sets forth legal conclusions to which no response is required.  The allegations in Paragraph 9 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco denies each and every allegation in Paragraph 9.

10.     Paragraph 10 sets forth legal conclusions to which no response is required.  To the extent a response is required, Sonoco denies each and every allegation in Paragraph 10.

11.     Paragraph 11 sets forth legal conclusions to which no response is required.  To the extent a response is required, Sonoco denies each and every allegation in Paragraph 11.

---

[1] The headers used in this Answer are for ease of reference and correspond to the headers set forth in Plaintiff's Third Amended Complaint.  They do not constitute an admission by Sonoco as to any allegation in the Third Amended Complaint.

2

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**JURISDICTION AND VENUE**

12.     Paragraph 12 sets forth legal conclusions to which no response is required.  To the extent a response is required, Sonoco denies each and every allegation in Paragraph 12.

13.     Paragraph 13 sets forth legal conclusions to which no response is required.  To the extent a response is required, Sonoco denies each and every allegation in Paragraph 13.

14.     Paragraph 14 sets forth legal conclusions to which no response is required.  To the extent a response is required, Sonoco denies each and every allegation in Paragraph 14.

**PARTIES**

**I.     Plaintiff**

15.     Sonoco lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Complaint, and therefore denies them.

16.     Sonoco lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 of the Complaint, and therefore denies them.

17.     Sonoco lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 of the Complaint, and therefore denies them.

**II.     Discharger Defendants.**

18.     The allegations in Paragraph 18 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the Complaint, and therefore denies them.

19.     The allegations in Paragraph 19 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks

3

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the Complaint, and therefore denies them.

20.     The allegations in Paragraph 20 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Complaint, and therefore denies them.

21.     The allegations in Paragraph 21 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the Complaint, and therefore denies them.

22.     The allegations in Paragraph 22 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 of the Complaint, and therefore denies them.

23.     The allegations in Paragraph 23 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 of the Complaint, and therefore denies them.

24.     The allegations in Paragraph 24 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Complaint, and therefore denies them.

4

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

25.     The allegations in Paragraph 25 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 of the Complaint, and therefore denies them.

26.     The allegations in Paragraph 26 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 of the Complaint, and therefore denies them.

27.     In response to Paragraph 27 of the Complaint, Sonoco admits that it is a South Carolina corporation that owns and operates a facility located at 1 N 2nd Street, Hartsville, South Carolina 29550.  Sonoco denies the each and every remaining allegation in Paragraph 27 that is directed at Sonoco.  Sonoco states that the remaining allegations in Paragraph 27 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 of the Complaint, and therefore denies them.

28.     The allegations in Paragraph 28 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 of the Complaint, and therefore denies them.

III.     Supplier Defendants.

29.     The allegations in Paragraph 29 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 of the Complaint, and therefore denies them.

30. The allegations in Paragraph 30 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 of the Complaint, and therefore denies them.

31. The allegations in Paragraph 31 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 of the Complaint, and therefore denies them.

32. The allegations in Paragraph 32 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 of the Complaint, and therefore denies them.

33. The allegations in Paragraph 33 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 of the Complaint, and therefore denies them.

34. The allegations in Paragraph 34 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 of the Complaint, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

35.     The allegations in Paragraph 35 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35 of the Complaint, and therefore denies them.

36.     The allegations in Paragraph 36 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 of the Complaint, and therefore denies them.

37.     The allegations in Paragraph 37 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 of the Complaint, and therefore denies them.

38.     The allegations in Paragraph 38 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 of the Complaint, and therefore denies them.

39.     The allegations in Paragraph 39 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 of the Complaint, and therefore denies them.

40.     The allegations in Paragraph 40 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states it lacks

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 of the Complaint, and therefore denies them.

## FACTUAL ALLEGATIONS

### I.     Background and Hazards of PFAS

41.     Sonoco lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 41 of the Complaint, and therefore denies them.

42.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 42 of the Complaint, and therefore denies them.

43.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 43 of the Complaint, and therefore denies them.

44.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 44 of the Complaint, and therefore denies them.

45.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 45 of the Complaint, and therefore denies them.

46.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 46 of the Complaint, and therefore denies them.

47.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 47 of the Complaint, and therefore denies them.

48.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 48 of the Complaint, and therefore denies them.

49.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 49 of the Complaint, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

50.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 50 of the Complaint, and therefore denies them.

51.     In response to Paragraph 51 of the Complaint, Sonoco states that the publication referred to in Paragraph 51 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 51.

52.     In response to Paragraph 52 of the Complaint, Sonoco states that the publication referred to in Paragraph 52 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 52.

53.     In response to Paragraph 53 of the Complaint, Sonoco states that the publication referred to in Paragraph 53 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 53.

54.     In response to Paragraph 54 of the Complaint, Sonoco states that the publication referred to in Paragraph 54 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 54.

55.     In response to Paragraph 55 of the Complaint, Sonoco states that the publication referred to in Paragraph 55 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 55.

56.     In response to Paragraph 56 of the Complaint, Sonoco states that the publication referred to in Paragraph 56 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 56.

57.     In response to Paragraph 57 of the Complaint, Sonoco states that the publication referred to in Paragraph 57 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 57.

9

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

58.     In response to Paragraph 58 of the Complaint, Sonoco states that the publication referred to in Paragraph 58 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 58.

59.     In response to Paragraph 59 of the Complaint, Sonoco states that the publication referred to in Paragraph 59 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 59.

60.     In response to Paragraph 60 of the Complaint, Sonoco states that the publication referred to in Paragraph 60 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 60.

61.     Paragraph 61 sets forth legal conclusions to which no response is required.  Sonoco also states that the publication referred to in Paragraph 61 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 61.

62.     In response to Paragraph 62 of the Complaint, Sonoco states that the publication referred to in Paragraph 62 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 62.

63.     In response to Paragraph 63 of the Complaint, Sonoco states that the publication referred to in Paragraph 63 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 63.

64.     In response to Paragraph 64 of the Complaint, Sonoco states that the publication referred to in Paragraph 64 speaks for itself and denies any mischaracterization of the same.  To the extent any additional response is required, Sonoco denies the allegations in Paragraph 64.

10

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

65.     In response to Paragraph 65 of the Complaint, Sonoco states that the publication referred to in Paragraph 65 speaks for itself and denies any mischaracterization of the same. To the extent any additional response is required, Sonoco denies the allegations in Paragraph 65.

## II.     Contamination of Bull Creek and the Intracoastal Waterway with PFAS

66.     Upon information and belief, Paragraph 66 of the Complaint is admitted.

67.     Sonoco denies the allegations in Paragraph 67 of the Complaint as they relate to Sonoco. Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 67, and therefore denies them.

68.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 68 of the Complaint, and therefore denies them.

69.     In response to Paragraph 69 of the Complaint, Sonoco admits only that it owns and operates a facility in Hartsville, South Carolina and denies the remaining allegations as they relate to Sonoco. Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 69, and therefore denies them. Further answering the allegations of Paragraph 69, Sonoco asserts that, with respect to PFAS, it complied with government permits issued to it relating to wastewater.

70.     In response to Paragraph 70 of the Complaint, Sonoco admits only that it owns and operates a facility in Hartsville, South Carolina and denies the remaining allegations as they relate to Sonoco. Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 70, and therefore denies them. Further answering the allegations of Paragraph 70, Sonoco asserts that, with respect to PFAS, it complied with government permits issued to it relating to wastewater.

11

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

71.     The allegations in Paragraph 71 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 71, and therefore denies them.

72.     The allegations in Paragraph 72 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 72, and therefore denies them.

73.     Sonoco denies each and every allegation in Paragraph 73 of the Complaint.

74.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 74 of the Complaint, and therefore denies them.

75.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 75 of the Complaint, and therefore denies them.

76.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 76 of the Complaint, and therefore denies them.

77.     Sonoco denies each and every allegation in Paragraph 77 of the Complaint.

78.     Sonoco denies the allegations in Paragraph 78 of the Complaint as they relate to Sonoco. Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 78 of the Complaint, and therefore denies them.

79.     Sonoco denies the allegations in Paragraph 79 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 79, and therefore denies them.

80.     Sonoco denies each and every allegation in Paragraph 80 of the Complaint.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

81.     Sonoco denies the allegations in Paragraph 81 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 81, and therefore denies them.

82.     Sonoco denies each and every allegation in Paragraph 82 of the Complaint.

**III.     Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.**

83.     Sonoco denies each and very allegation in Paragraph 83 of the Complaint.

84.     The allegations in Paragraph 84 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 84, and therefore denies them.

85.     The allegations in Paragraph 85 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 85, and therefore denies them.

86.     The allegations in Paragraph 86 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 86, and therefore denies them.

87.     The allegations in Paragraph 87 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 87, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

88. The allegations in Paragraph 88 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 88, and therefore denies them.

89. The allegations in Paragraph 89 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 89, and therefore denies them.

90. The allegations in Paragraph 90 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 90, and therefore denies them.

91. The allegations in Paragraph 91 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 91, and therefore denies them.

92. The allegations in Paragraph 92 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 92, and therefore denies them.

93. The allegations in Paragraph 93 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 93, and therefore denies them.

94.     The allegations in Paragraph 94 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 94, and therefore denies them.

95.     The allegations in Paragraph 95 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 95, and therefore denies them.

96.     The allegations in Paragraph 96 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 96, and therefore denies them.

97.     The allegations in Paragraph 97 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 97, and therefore denies them.

98.     The allegations in Paragraph 98 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 98, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

99.     The allegations in Paragraph 99 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 99, and therefore denies them.

100.     The allegations in Paragraph 100 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 100, and therefore denies them.

101.     The allegations in Paragraph 101 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 101, and therefore denies them.

102.     The allegations in Paragraph 102 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 102, and therefore denies them.

103.     The allegations in Paragraph 103 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 103, and therefore denies them.

104.     The allegations in Paragraph 104 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks

16

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 104, and therefore denies them.

105.    The allegations in Paragraph 105 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 105, and therefore denies them.

106.    The allegations in Paragraph 106 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 106, and therefore denies them.

107.    The allegations in Paragraph 107 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 107, and therefore denies them.

108.    The allegations in Paragraph 108 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 108, and therefore denies them.

109.    The allegations in Paragraph 109 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 109, and therefore denies them.

17

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

110.     The allegations in Paragraph 110 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 110, and therefore denies them.

111.     The allegations in Paragraph 111 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 111, and therefore denies them.

112.     Sonoco denies the allegations in Paragraph 112 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 112, and therefore denies them, including subparts (a) – (j).

**IV.     Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal.**

113.     The allegations in Paragraph 113 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 113, and therefore denies them.

114.     The allegations in Paragraph 114 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 114, and therefore denies them.

115.     The allegations in Paragraph 115 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks

18

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 115, and therefore denies them.

116.     Sonoco denies the allegations in Paragraph 116 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 116, and therefore denies them.

117.     Sonoco denies the allegations in Paragraph 117 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 117, and therefore denies them.

118.     Sonoco denies the allegations in Paragraph 118 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 118, and therefore denies them.

119.     Sonoco denies the allegations in Paragraph 119 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 119, and therefore denies them.

120.     Sonoco denies the allegations in Paragraph 120 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 120, and therefore denies them.

121.     Sonoco denies the allegations in Paragraph 121 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 121, and therefore denies them.

122.     The allegations in Paragraph 122 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 122, and therefore denies them.

## V.   Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.

123.   The allegations in Paragraph 123 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 123, and therefore denies them.

124.   The allegations in Paragraph 124 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 124, and therefore denies them.

125.   The allegations in Paragraph 125 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 125, and therefore denies them.

## VI.   Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from its PFAS Liabilities.

126.   The allegations in Paragraph 126 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 126, and therefore denies them.

127.   The allegations in Paragraph 127 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 127, and therefore denies them.

128.    The allegations in Paragraph 128 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 128, and therefore denies them.

129.    The allegations in Paragraph 129 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 129, and therefore denies them.

130.    The allegations in Paragraph 130 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 130, and therefore denies them.

131.    The allegations in Paragraph 131 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 131, and therefore denies them.

132.    The allegations in Paragraph 132 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 132, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

133.    The allegations in Paragraph 133 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 133, and therefore denies them.

134.    The allegations in Paragraph 134 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 134, and therefore denies them.

**VII.    Defendants have harmed Plaintiff and Plaintiff's community.**

135.    Sonoco denies each and every allegation in Paragraph 135 of the Complaint.

136.    Sonoco denies each and every allegation in Paragraph 136 of the Complaint.

137.    Sonoco denies each and every allegation in Paragraph 137 of the Complaint.

138.    Sonoco denies each and every allegation in Paragraph 138 of the Complaint.

139.    Sonoco denies each and every allegation in Paragraph 139 of the Complaint including subparts (a) – (b).

**FIRST CAUSE OF ACTION**
**Private Nuisance**

140.    Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

141.    Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 141 of the Complaint, and therefore denies them.

142.    Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 142 of the Complaint, and therefore denies them.

143.    Sonoco denies each and every allegation in Paragraph 143 of the Complaint.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

144.     Sonoco denies each and every allegation in Paragraph 144 of the Complaint.

145.     Sonoco denies each and every allegation in Paragraph 145 of the Complaint.

146.     Sonoco denies each and every allegation in Paragraph 146 of the Complaint.

147.     Sonoco denies each and every allegation in Paragraph 147 of the Complaint.

148.     Sonoco denies each and every allegation in Paragraph 148 of the Complaint.

149.     Sonoco denies each and every allegation in Paragraph 149 of the Complaint.

150.     Sonoco denies each and every allegation in Paragraph 150 of the Complaint.

151.     Sonoco denies each and every allegation in Paragraph 151 of the Complaint.

## SECOND CAUSE OF ACTION
### Public Nuisance

152.     Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

153.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 153 of the Complaint, and therefore denies them.

154.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 154 of the Complaint, and therefore denies them.

155.     Paragraph 155 sets forth legal conclusions to which no response is required.  To the extent a response is required, Sonoco denies each and every allegation in Paragraph 155.

156.     Sonoco denies each and every allegation in Paragraph 156 of the Complaint.

157.     Sonoco denies each and every allegation in Paragraph 157 of the Complaint.

158.     Sonoco denies each and every allegation in Paragraph 158 of the Complaint.

159.     Sonoco denies each and every allegation in Paragraph 159 of the Complaint.

160.     Sonoco denies each and every allegation in Paragraph 160 of the Complaint.

161.     Sonoco denies each and every allegation in Paragraph 161 of the Complaint.

23

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

162.     Sonoco denies each and every allegation in Paragraph 162 of the Complaint.

163.     Sonoco denies each and every allegation in Paragraph 163 of the Complaint.

### THIRD CAUSE OF ACTION
**Trespass**

164.     Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

165.     Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 165 of the Complaint, and therefore denies them.

166.     The allegations in Paragraph 166 of the Complaint are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 166 of the Complaint, including subparts (a) - (g), and therefore denies them.

167.     The allegations in Paragraph 167 of the Complaint are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 167 of the Complaint, including subparts (a) - (g), and therefore denies them.

168.     Sonoco denies each and every allegation in Paragraph 168, including subparts (a) - (g), and therefore denies them.

169.     Sonoco denies the allegations in Paragraph 169 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 169, and therefore denies them including subparts (a) – (g).

170.     Sonoco denies each and every allegation in Paragraph 170 of the Complaint.

171.     Sonoco denies each and every allegation in Paragraph 171 of the Complaint.

24

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

172.    Sonoco denies each and every allegation in Paragraph 172 of the Complaint.

173.    Sonoco denies the allegations in Paragraph 173 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 173, and therefore denies them.

174.    Sonoco denies each and every allegation in Paragraph 174 of the Complaint.

175.    Sonoco denies each and every allegation in Paragraph 175 of the Complaint.

176.    Sonoco denies each and every allegation in Paragraph 176 of the Complaint

## FOURTH CAUSE OF ACTION
### Negligence, Gross Negligence, and/or Recklessness

177.    Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

178.    Paragraph 178 of the Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, Sonoco denies each and every allegation in Paragraph 178 of the Complaint.

179.    Sonoco denies each and every allegation in Paragraph 179 of the Complaint.

180.    Sonoco denies each and every allegation in Paragraph 180 of the Complaint.

181.    The allegations in Paragraph 181 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 181, and therefore denies them.

182.    The allegations in Paragraph 182 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 182, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

183. The allegations in Paragraph 183 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 183, and therefore denies them.

184. The allegations in Paragraph 184 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 184, and therefore denies them.

185. The allegations in Paragraph 185 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 185, and therefore denies them.

186. The allegations in Paragraph 186 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 186, and therefore denies them.

187. The allegations in Paragraph 187 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 187, and therefore denies them.

188. Sonoco denies each and every allegation in Paragraph 188 of the Complaint.

189. Sonoco denies each and every allegation in Paragraph 189 of the Complaint.

26

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**FIFTH CAUSE OF ACTION**
**Strict Products Liability – Ultrahazardous Activity**
**(Supplier Defendants)**

190.    Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

191.    The allegations in Paragraph 191 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 191, and therefore denies them.

192.    The allegations in Paragraph 192 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 192, and therefore denies them.

193.    Sonoco denies the allegations in Paragraph 193 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 193.

194.    The allegations in Paragraph 194 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 194, and therefore denies them.

195.    The allegations in Paragraph 195 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 195, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

196.    The allegations in Paragraph 196 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 196, and therefore denies them.

197.    The allegations in Paragraph 197 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 197, and therefore denies them.

198.    The allegations in Paragraph 198 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 198, and therefore denies them.

199.    The allegations in Paragraph 199 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 199, and therefore denies them.

200.    The allegations in Paragraph 200 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 200, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SIXTH CAUSE OF ACTION**
**Strict Products Liability – Ultrahazardous Activity**
**(Burlington)**

201.    Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

202.    The allegations in Paragraph 202 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 202, and therefore denies them.

203.    The allegations in Paragraph 203 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 203, and therefore denies them.

204.    The allegations in Paragraph 204 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 204, and therefore denies them.

205.    The allegations in Paragraph 205 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 205, and therefore denies them.

206.    The allegations in Paragraph 206 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 206, and therefore denies them.

207.   The allegations in Paragraph 207 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 207.

208.   The allegations in Paragraph 208 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 208, and therefore denies them.

209.   The allegations in Paragraph 209 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 209, and therefore denies them.

210.   The allegations in Paragraph 210 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 210, and therefore denies them.

## SEVENTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Supplier Defendants)

211.   Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

30

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

212. The allegations in Paragraph 212 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 212, and therefore denies them.

213. The allegations in Paragraph 213 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 213, and therefore denies them.

214. The allegations in Paragraph 214 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 214, and therefore denies them.

215. The allegations in Paragraph 215 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 215, and therefore denies them.

216. The allegations in Paragraph 216 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 216, and therefore denies them.

217. The allegations in Paragraph 217 are not directed at Sonoco and therefore do not require a response from Sonoco. To the extent a response is required, Sonoco states that it lacks

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 217, and therefore denies them including subparts (a) – (e).

218.    The allegations in Paragraph 218 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 218, and therefore denies them.

219.    The allegations in Paragraph 219 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 219, and therefore denies them.

220.    The allegations in Paragraph 220 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 220, and therefore denies them.

221.    The allegations in Paragraph 221 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 221, and therefore denies them.

222.    The allegations in Paragraph 222 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 222, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

223.     The allegations in Paragraph 223 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 223, and therefore denies them.

## EIGHTH CAUSE OF ACTION
### Strict Products Liability – Design Defect
### (Burlington)

224.     Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

225.     The allegations in Paragraph 225 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 225, and therefore denies them.

226.     The allegations in Paragraph 226 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 226, and therefore denies them.

227.     The allegations in Paragraph 227 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 227, and therefore denies them.

228.     The allegations in Paragraph 228 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 228, and therefore denies them.

229.    The allegations in Paragraph 229 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 229, and therefore denies them.

230.    The allegations in Paragraph 230 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 230, and therefore denies them including subparts (a) – (f).

231.    The allegations in Paragraph 231 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 231, and therefore denies them.

232.    The allegations in Paragraph 232 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 232, and therefore denies them.

233.    The allegations in Paragraph 233 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 233, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

234.    The allegations in Paragraph 234 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 234, and therefore denies them.

235.    The allegations in Paragraph 235 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 235, and therefore denies them.

236.    The allegations in Paragraph 236 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 236, and therefore denies them.

**NINTH CAUSE OF ACTION**
**Strict Products Liability – Failure to Warn**
**(Supplier Defendants)**

237.    Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

238.    The allegations in Paragraph 238 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 238, and therefore denies them.

239.    The allegations in Paragraph 239 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks

35

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 239, and therefore denies them.

240.    The allegations in Paragraph 240 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 240, and therefore denies them.

241.    Sonoco denies the allegations in Paragraph 241 of the Complaint as they relate to Sonoco.  Sonoco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations set forth in Paragraph 241.

242.    The allegations in Paragraph 242 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 242, and therefore denies them.

243.    The allegations in Paragraph 243 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 243, and therefore denies them.

244.    The allegations in Paragraph 244 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 244, and therefore denies them.

245.    The allegations in Paragraph 245 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 245, and therefore denies them.

246.   The allegations in Paragraph 246 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 246, and therefore denies them.

**TENTH CAUSE OF ACTION**
**Strict Products Liability – Failure to Warn**
**(Burlington)**

247.   Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

248.   The allegations in Paragraph 248 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 248, and therefore denies them.

249.   The allegations in Paragraph 249 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 249, and therefore denies them.

250.   The allegations in Paragraph 250 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 250, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

251.   The allegations in Paragraph 251 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 251, and therefore denies them.

252.   The allegations in Paragraph 252 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 252, and therefore denies them.

253.   The allegations in Paragraph 253 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 253, and therefore denies them.

254.   The allegations in Paragraph 254 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 254, and therefore denies them.

255.   The allegations in Paragraph 255 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 255, and therefore denies them.

256.   The allegations in Paragraph 256 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 256, and therefore denies them.

## ELEVENTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Burlington)

257.    Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

258.    The allegations in Paragraph 258 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 258, and therefore denies them.

259.    The allegations in Paragraph 259 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 259, and therefore denies them.

260.    The allegations in Paragraph 260 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 260, and therefore denies them.

261.    The allegations in Paragraph 261 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 261, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

262.    The allegations in Paragraph 262 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 262, and therefore denies them.

263.    The allegations in Paragraph 263 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 263, and therefore denies them.

## TWELFTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Burlington)

264.    Sonoco incorporates its responses to all prior allegations by reference as if fully set forth herein.

265.    The allegations in Paragraph 265 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 265, and therefore denies them.

266.    The allegations in Paragraph 266 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 266, and therefore denies them.

267.    The allegations in Paragraph 267 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 267, and therefore denies them.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

268.    The allegations in Paragraph 268 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 268, and therefore denies them.

269.    The allegations in Paragraph 269 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 269, and therefore denies them.

270.    The allegations in Paragraph 270 are not directed at Sonoco and therefore do not require a response from Sonoco.  To the extent a response is required, Sonoco states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in Paragraph 270, and therefore denies them

## PRAYER FOR RELIEF

In response to the WHEREFORE Paragraph that follows Paragraph 270 of the Complaint, Sonoco denies any liability and further denies that Plaintiff is entitled to any of the relief sought in this Paragraph, including subparts (a) - (e).

## ADDITIONAL DEFENSES

Without assuming the burden of proof where it otherwise rests with Plaintiff or another third party, Sonoco further pleads the following additional defenses to all the individual claims alleged in the Complaint.  All of the following defenses are pled in the alternative and none of them constitute an admission that Sonoco is liable to Plaintiff or any third party, that Plaintiff or any third party has been or will be injured or damaged in any way, or that Plaintiff or any third party is entitled to any relief whatsoever.

41

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FIRST DEFENSE

The Complaint, and each cause of action or count alleged therein, fails to state facts sufficient to constitute a claim upon which relief may be granted against Sonoco.

## SECOND DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the applicable statutes of limitations and/or repose.

## THIRD DEFENSE

The Complaint, and each alleged claim contained therein, fails to join necessary and indispensable parties.

## FOURTH DEFENSE

The Complaint, and each alleged claim contained therein, is barred, in whole or in part, by the doctrine of laches, waiver, res judicata, estoppel collateral, estoppel, ratification, and unclean hands.

## FIFTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because Plaintiff is not the real party in interest.

## SIXTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, to the extent Plaintiff has failed to exhaust administrative remedies.

## SEVENTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrine of election of remedies.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### EIGHTH DEFENSE

Pursuant to the South Carolina Contribution Among Tortfeasors Act, S.C. Code Ann. § 15-38-10, et seq., any damages recoverable from Sonoco should be limited to the percentage of the relative degree of fault of Sonoco as compared with other parties to this action, if any, as well as other persons or entities not presently before this Court.

### NINTH DEFENSE

Any injuries and/or damages alleged by Plaintiff were caused or contributed to by the negligence or actual conduct of other persons, firms, corporations, or entities over whom Sonoco had no control or right of control and for whom Sonoco is not responsible.

### TENTH DEFENSE

Any injuries and/or damages alleged by Plaintiff are barred by the doctrines of intervening cause and/or superseding cause.

### ELEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because none of the alleged acts or omissions of Defendants proximately caused the purported injuries and damages allegedly sustained by Plaintiff.

### TWELFTH DEFENSE

Plaintiff's claims are not ripe for adjudication and should be dismissed for presenting a contingent, hypothetical, or abstract dispute.  Plaintiff alleges that it will be required to incur costs at some future date if the United States Environmental Protection Agency requires plaintiff to upgrade its systems to treat PFAS.  Until these costs are incurred, Plaintiff cannot recover.

Plaintiff's claims are premature to the extent that neither the State nor the United States Environmental Protection Agency has set final water quality standards, maximum contaminant

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

levels, acceptable soil cleanup levels, or other regulatory standards that are necessary to evaluate whether natural resources have been injured.

### THIRTEENTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, because any alleged levels of contamination did not exceed any applicable laws or binding regulatory standards at the relevant times.

### FOURTEENTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, because federal, state, and/or local authorities authorized, ratified, or were aware of and acquiesced in actions by Defendants that are the subject of Plaintiff's claims. Defendants are not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency.

### FIFTEENTH DEFENSE

Plaintiff's claims are barred to the extent the "permit shield" doctrine and "federally permitted release" defense applies because any PFAS leachate was discharged pursuant to lawful permits.

### SIXTEENTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, by the doctrine of primary jurisdiction.

### SEVENTEENTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, under the doctrines of contributory negligence and/or comparative fault, and/or other applicable common law or statutory doctrines.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### EIGHTEENTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because Sonoco's actions were in conformity with (i) any federal, state or other regulations, standards, guidelines, specifications, and laws in effect; (ii) available knowledge and research of the scientific and industrial communities; (iii) generally recognized and prevailing industry standards; and (iv) state of the art in existence at the time the design was prepared and the products were manufactured, handled, sold, distributed, and/or used.

### NINETEENTH DEFENSE

Any product manufactured, handled, designed, sold, distributed, or used by Sonoco and alleged to have caused harm to Plaintiff was, at the time, safer than any reasonable or feasible alternative designs, and any alternative designs would have been less safe, more likely to have caused injury or otherwise not feasible for their intended use.

### TWENTIETH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because federal, state, and/or local authorities, departments and/or agencies authorized, ratified, or were aware of and acquiesced to actions taken by Sonoco that are the subject of Plaintiff's claims. Sonoco is not responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority, department or agency.

### TWENTY-FIRST DEFENSE

Plaintiff's claims may be barred, in whole or in part, under the doctrine of Federal Preemption, including, without limitation, express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices,

45

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

military specification, and policy statements, enacted and/or promulgated and/or issues by Congress, federal agencies, or the executive branch.

### TWENTY-SECOND DEFENSE

Sonoco asserts its rights to allocation, setoff or apportionment of fault pursuant to applicable law, as well as its rights to a proportionate reduction of any damages found against Sonoco based on the negligence, omissions or other conduct of any settling tortfeasor and/or responsible third party and/or Plaintiff.

### TWENTY-THIRD DEFENSE

An award of judgment rendered in favor of Plaintiff must be reduced by the amount of compensation Plaintiff received, or is entitled to receive, from any source as a result of Plaintiff's alleged injuries.

### TWENTY-FOURTH DEFENSE

Plaintiff may have failed or refused to exercise reasonable care and diligence to avoid loss and minimize damages and, therefore, may not recover for losses that could have been prevented by reasonable efforts on Plaintiff's part, or by expenditures which might reasonably have been made. Recovery, if any, should therefore be reduced by Plaintiff's failure to mitigate damages, if any

### TWENTY-FIFTH DEFENSE

Sonoco and its agents and/or employees acted with due care and otherwise conducted themselves at all relevant times as reasonable people and/or entities under the circumstances.

### TWENTY-SIXTH DEFENSE

Sonoco has satisfied, fulfilled and performed each and every obligation and duty imposed by law, if any, to the full extent of its responsibility with respect to PFAS.

46

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## TWENTY-SEVENTH DEFENSE

Any alleged injury, damage or loss sustained by Plaintiff in connection with the subject matter of this action was not reasonably foreseeable to Sonoco

## TWENTY-EIGHTH DEFENSE

Plaintiff's claims fail as a matter of substantive law and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the South Carolina Constitution to the extent that by relying on market share or other aggregate proof of causation or liability, Plaintiff seeks to deprive Sonoco of procedural and substantive safeguards including, but not limited to, statutory and common law defenses to liability and causation generally.

## TWENTY-NINTH DEFENSE

Plaintiff's claims may be barred for lack of proximate causation between any alleged act, omission, or product of Sonoco and the claims, damages, and harm alleged in Plaintiff's Complaint.

## THIRTIETH DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff cannot prove that its alleged injuries were caused by exposure to PFAS allegedly contained in any product(s) manufactured, handled, distributed, used, or sold by Sonoco.

## THIRTY-FIRST DEFENSE

Sonoco affirmatively asserts as a defense, credit, or set-off against the damages claimed by Plaintiff, any payment, voluntary payment, or settlement (and any monies paid pursuant thereto) between Plaintiff and any other person or entity. Sonoco also asserts the affirmative defenses of satisfaction, payment, and release.

47

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### THIRTY-SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff cannot establish that Plaintiff was exposed to a sufficient concentration or amount of PFAS, and/or for a sufficient duration, that has been reliably established, through scientific means, to be capable of causing Plaintiff's alleged injuries.

### THIRTY-THIRD DEFENSE

To the extent that Plaintiff has split its claims, Plaintiff's claims are barred in whole, or in part, by the doctrine prohibiting claim splitting.

### THIRTY-FOURTH DEFENSE

Plaintiff's purported exposure to products manufactured, handled, distributed, used or sold by Sonoco, if any, was too removed, indefinite, de minimis and insufficient to establish a reasonable degree of probability that any such product caused any alleged injury, damage or loss to Plaintiff.

### THIRTY-FIFTH DEFENSE

Sonoco cannot be held jointly and severally liable for the acts or omissions of third parties or other parties because their acts or omissions were separate and distinct and the alleged harm is divisible from and greater than any harm allegedly caused by acts, omissions, or products of Sonoco.

### THIRTY-SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff seeks to retroactively impose liability for conduct that was not actionable at the time it occurred, and Sonoco may not be held liable under retroactive theories not requiring proof or fault or causation.

48

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### THIRTY-SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Sonoco neither knew, nor should have known, that any of the chemicals or substances to which Plaintiff was allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of medical, scientific, technical, and/or industrial knowledge available to Sonoco at all times relevant to the claims or causes of action asserted by Plaintiff.

### THIRTY-EIGHTH DEFENSE

Plaintiff's trespass claims are barred because PFAS molecules do not constitute "tangible" matter sufficient to support a trespass claim. *Babb v. Lee Cnty. Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 480 (2013).

### THIRTY-NINTH DEFENSE

Sonoco is entitled to all procedural, substantive, and other protections, caps, and limitations provided by applicable state statutes and other state laws regarding Plaintiff's claims for compensatory and punitive damages. Sonoco specifically pleads the application of S.C. Code Ann. § 15-32-530 to this action.

### FOURTIETH DEFENSE

The Complaint fails to state a claim upon which punitive damages may be awarded. Nor did Sonoco engage in any conduct that would permit an award of punitive damages. And, any award of punitive damages would violate the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, the excessive fines clause of the Eighth Amendment to the United States Constitution, and various articles and sections of the South Carolina Constitution.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### FORTY-FIRST DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the political question and separation of powers doctrines because their claims implicate issues of statewide importance that are reserved for state regulation.

### FORTY-SECOND DEFENSE

Plaintiff's claims against Sonoco may not arise out of the same transactions or occurrences as their claims against other defendants, as required for proper joinder of parties.

### FORTY-THIRD DEFENSE

To the extent Plaintiff seeks equitable relief, Plaintiff is not entitled to equitable relief because Plaintiff has an adequate remedy at law, if Plaintiff is entitled to any remedy, and the alleged harm is not irreparable.

### FORTY-FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the free public services doctrine and by the municipal cost recovery doctrine.

### FORTY-FIFTH DEFENSE

Plaintiff's claims are barred to the extent that Plaintiff's alleged damages are speculative, uncertain, and hypothetical.

### FORTY-SIXTH DEFENSE

Plaintiff's damages, if any, may have been the direct and proximate result of facts and circumstances over which Sonoco exercises no control.

### FORTY-SEVENTH DEFENSE

Plaintiff's nuisance claims are barred, in whole or in part, because they lack the legal authority or standing to bring a nuisance claim under South Carolina law.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## FORTY-EIGHTH DEFENSE

Plaintiff's private nuisance claim is barred, in whole or in part, because Sonoco did not unreasonably interfere with Plaintiff's ownership or possession of land.

## FORTY-NINTH DEFENSE

Plaintiff's nuisance claims against Sonoco are barred by the doctrine of "coming to the nuisance," the prior nuisance doctrine, and/or the doctrine of consent.

## FIFTIETH DEFENSE

Plaintiff's public nuisance claim fails because Plaintiff is not a private person bringing an action for damages to real or personal property.

## FIFTY-FIRST DEFENSE

Plaintiff's public nuisance claim fails because Plaintiff failed to plead that it suffered a particular damage beyond that which the public has experienced.

## FIFTY-SECOND DEFENSE

Plaintiff's trespass claim fails because Sonoco did not interfere with Plaintiff's right to the exclusive, peaceable possession of its property.

## FIFTY-THIRD DEFENSE

Plaintiff's tort-based claims fail because Sonoco does not owe Plaintiff a duty under governing law.

## FIFTY-FOURTH DEFENSE

Plaintiff's tort-based claims fail because Sonoco did not breach any duty allegedly owed to Plaintiff.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

### FIFTY-FIFTH DEFENSE

Plaintiff's claims are or may be barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of risk, and open and obvious risk.

### FIFTY-SIXTH DEFENSE

Plaintiff's claims may be barred, in whole or in part, because Sonoco complied at all relevant times with all applicable laws, including all legal and regulatory duties.

### FIFTY-SEVENTH DEFENSE

Plaintiff's claims may be barred, reduced, or limited pursuant to the applicable South Carolina statutory and common law regarding limitations of awards, caps on recovery, and setoffs.

### FIFTY-EIGHTH DEFENSE

To the extent Plaintiff seeks recovery of attorneys' fees and costs, Plaintiff is not entitled to any attorneys' fees or costs associated with this action because no statute or contract exists that would give Plaintiff the right to recover such fees or costs.

### FIFTY-NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Sonoco did not own, operate, or otherwise control the facilities or activities described in the Complaint at the time that PFAS is alleged to have migrated out of those facilities.

### SIXTIETH DEFENSE

The claimed injuries and/or damages of Plaintiff are so remote, speculative, or contingent that Plaintiff's claims must be barred on policy grounds.

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## SIXTY-FIRST DEFENSE

Sonoco adopts by reference any additional applicable defense pled by any other defendant not otherwise pled herein.

## RESERVATION OF RIGHTS

Sonoco hereby reserves the right to amend this Answer, raise additional defenses as may be discovered during the course of this litigation and its continuing factual investigations, add cross-claims, or assert third-party claims pursuant to the provisions of the South Carolina Rules of Civil Procedure, the substantive law of South Carolina, and the inherent authority of this Court to manage the procedural aspects of this litigation.  Any allegation not expressly admitted in this Answer is denied.

**WHEREFORE**, having fully answered Plaintiff's Third Amended Complaint, Sonoco Products Company denies that Plaintiff is entitled to any of the relief requested in the Third Amended Complaint, and respectfully prays for the dismissal of Plaintiff's Third Amended Complaint with prejudice and for such other and further relief as this Court may deem just and proper.

[*Signature Page to Follow*]

ELECTRONICALLY FILED - 2025 Jul 25 10:43 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

_s/ Robert Y. Knowlton_

Robert Y. Knowlton, S.C. Bar No. 3589
John P. Boyd, S.C. Bar No. 72412
Sarah A. Hodges, S.C. Bar No. 106253
1201 Main Street, 22nd Floor (29201)
Post Office Box 11889
Columbia, SC 29211-1889
(803) 779-3080
bknowlton@hsblawfirm.com
jboyd@hsblawfirm.com
shodges@hsblawfirm.com

Jonathan D. Klett, S.C. Bar No. 103208
One North Main, 2nd Floor
Greenville, SC  29601
P.O. Box 2048 29602
(864)240-3211
jklett@hsblawfirm.com

_Attorneys for Defendant Sonoco Products Company_

July 25, 2025

54

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF FLORENCE

IN THE COURT OF COMMON PLEAS
TWELVTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

City of Florence, South Carolina,

*Plaintiff,*

v.

AGC Chemicals Americas, Inc.et al.,

*Defendants.*

C.A. No. 2024-CP-21-02844

**DEFENDANT J.P. STEVENS & COMPANY, INC.'S ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant J.P. Stevens & Company, Inc., (hereinafter referred to as "JPS" or "Defendant"), by and through undersigned counsel, hereby files this Answer in response to Plaintiff City of Florence's ("Plaintiff") Second Amended Complaint ("Complaint") any and all Cross-Claims asserted previously or in the future by any Co-Defendants or Third-Party Defendants, whether having appeared in the case at this time or not, and denies all allegations not hereinafter specifically admitted and, as to the correspondingly numbered paragraphs of the Complaint, states as follows:

**STATEMENT OF THE CASE[1]**

1. Defendant denies the allegations contained in Paragraph 1.

2. Defendant denies the allegations contained in Paragraph 2.

---

[1] The headings and subheadings set forth in Plaintiff's Complaint are used herein for reference only, but such references do not constitute admissions by Defendant of any statements or assertions set forth therein. To the extent necessary, Defendant denies all allegations set forth in any heading or subheading in the Complaint.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

3.     Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraph 3. To the extent a response is required, these allegations are denied.

4.     Defendant denies the allegations contained in Paragraph 4.

5.     Defendant denies the allegations contained in Paragraph 5.

6.     Defendant denies the allegations contained in Paragraph 6.

7.     Defendant denies the allegations contained in Paragraph 7.

## DISCLAIMER

8.     The allegations contained in Paragraphs 8, 9, 10, and 11 state legal conclusions to which no response is required. To the extent a response is required, these allegations are denied.

## JURISDICTION AND VENUE

9.     The allegations contained in Paragraphs 12, 13, and 14 state legal conclusions to which no response is required. To the extent a response is required, these allegations are denied

## PARTIES

### I.     Plaintiff

10.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 15, 16, and 17. To the extent a response is required, these allegations are denied.

### II.     Defendants

11.     Paragraphs 18 through 22 do not appear to relate to Defendant and therefore no response is required. To the extent that the allegations in these paragraphs attempt to assert liability on Defendant, Defendant denies the allegations contained in these paragraphs.

12.     Defendant denies the allegations contained in Paragraph 23.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

13. Paragraphs 24 through 26 do not appear to relate to Defendant and therefore no response is required. To the extent that the allegations in these paragraphs attempt to assert liability on Defendant, Defendant denies the allegations contained in these paragraphs.

## FACTUAL ALLEGATIONS

### I. Background and Hazards of PFAS

14. Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 27. To the extent a response is required, these allegations are denied.

15. Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 28. To the extent a response is required, these allegations are denied.

16. Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 29. To the extent a response is required, these allegations are denied.

17. Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 30. To the extent a response is required, these allegations are denied.

18. Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 31. To the extent a response is required, these allegations are denied.

19. Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 32. To the extent a response is required, these allegations are denied.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

20.     Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 33. To the extent a response is required, these allegations are denied.

21.     Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 34. To the extent a response is required, these allegations are denied.

22.     Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 35. To the extent a response is required, these allegations are denied.

23.     Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 36. To the extent a response is required, these allegations are denied.

24.     Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 37. To the extent a response is required, these allegations are denied.

25.     Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 38. To the extent a response is required, these allegations are denied.

26.     Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 39. To the extent a response is required, these allegations are denied.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

27.     Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 40. To the extent a response is required, these allegations are denied.

28.     Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 41. To the extent a response is required, these allegations are denied.

29.     Defendant is without sufficient knowledge and information to form a belief as to the truth of the allegations contained in Paragraphs 42. To the extent a response is required, these allegations are denied.

30.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 43. To the extent a response is required, these allegations are denied.

31.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 44. To the extent a response is required, these allegations are denied.

32.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 45. To the extent a response is required, these allegations are denied.

33.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 46. To the extent a response is required, these allegations are denied.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

34.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 47. To the extent a response is required, these allegations are denied.

## II.     Contamination of Bull Creek and Intracoastal Waterway with PFAS

35.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 48. To the extent a response is required, these allegations are denied.

36.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 49. To the extent a response is required, these allegations are denied.

37.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 50. To the extent a response is required, these allegations are denied.

38.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 51. To the extent a response is required, these allegations are denied.

39.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 52. To the extent a response is required, these allegations are denied.

40.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 53. To the extent a response is required, these allegations are denied.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

41.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 54. To the extent a response is required, these allegations are denied.

42.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 55. To the extent a response is required, these allegations are denied.

43.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 56. To the extent a response is required, these allegations are denied.

44.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 57. To the extent a response is required, these allegations are denied.

45.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 58. To the extent a response is required, these allegations are denied.

46.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 59. To the extent a response is required, these allegations are denied.

47.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 60. To the extent a response is required, these allegations are denied.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

48.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 61. To the extent a response is required, these allegations are denied.

49.     Defendant denies allegations contained in Paragraphs 62.

**III.     Defendants Have Harmed Plaintiff and Plaintiff's Community.**

82.     Defendant denies the allegations contained in Paragraph 63 of the Complaint.

83.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraphs 64. To the extent that the allegations in these paragraphs attempt to assert liability on Defendant, Defendant denies the allegations contained in these paragraphs.

84.     Defendant denies the allegations contained in Paragraph 65 of the Complaint.

85.     Defendant denies the allegations contained in Paragraph 66 of the Complaint.

**FIRST CAUSE OF ACTION**
**Private Nuisance**

86.     Responding to Paragraph 67 of the Complaint, Defendant incorporates by reference all prior responses set forth in Paragraphs 1-66 above, as if they are fully set forth herein.

87.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraph 68 of the Complaint. To the extent a response is required, Defendant denies these allegations.

88.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraph 69 of the Complaint. To the extent a response is required, Defendant denies these allegations.

89.　　Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraph 70 of the Complaint. To the extent a response is required, Defendant denies these allegations.

90.　　Defendant denies the allegations contained in Paragraph 71.

91.　　Defendant denies the allegations contained in Paragraph 72.

92.　　Defendant denies the allegations contained in Paragraph 73.

93.　　Defendant denies the allegations contained in Paragraph 74.

94.　　Defendant denies the allegations contained in Paragraph 75.

95.　　Defendant denies the allegations contained in Paragraph 76.

96.　　Defendant denies the allegations contained in Paragraph 77.

97.　　Defendant denies the allegations contained in Paragraph 78.

## SECOND CAUSE OF ACTION
### Public Nuisance

98.　　Responding to Paragraph 79 of the Complaint, Defendant incorporates by reference all prior responses set forth in Paragraphs 1-78 above, as if they are fully set forth herein.

99.　　Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraph 80 of the Complaint. To the extent a response is required, Defendant denies these allegations.

100.　　Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraph 81 of the Complaint. To the extent a response is required, Defendant denies these allegations.

101.　　Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraph 82 of the Complaint. To the extent a response is required, Defendant denies these allegations.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

102.     Defendant denies the allegations contained in Paragraph 83.

103.     Defendant denies the allegations contained in Paragraph 84.

104.     Defendant denies the allegations contained in Paragraph 85.

105.     Defendant denies the allegations contained in Paragraph 86.

106.     Defendant denies the allegations contained in Paragraph 87.

107.     Defendant denies the allegations contained in Paragraph 88.

108.     Defendant denies the allegations contained in Paragraph 89.

109.     Defendant denies the allegations contained in Paragraph 90.

**THID CAUSE OF ACTION**
**Trespass**

110.     Responding to Paragraph 91 of the Complaint, Defendant incorporates by reference all prior responses set forth in Paragraphs 1-90 above, as if they are fully set forth herein.

111.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraph 92 of the Complaint. To the extent a response is required, Defendant denies these allegations.

112.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraph 93, including subparts (a) through (d) of the Complaint. To the extent a response is required, Defendant denies these allegations.

113.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraph 94, including subparts (a) through (d) of the Complaint. To the extent a response is required, Defendant denies these allegations.

114.     Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraph 95, including subparts (a) through (d) of the Complaint. To the extent a response is required, Defendant denies these allegations.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

115.    Defendant is without sufficient knowledge and/or information to form a belief as to the truth of the allegations contained in Paragraph 96 of the Complaint. To the extent a response is required, Defendant denies these allegations.

116.    Defendant denies the allegations contained in Paragraph 97.

117.    Defendant denies the allegations contained in Paragraph 98.

118.    Defendant denies the allegations contained in Paragraph 99.

119.    Defendant denies the allegations contained in Paragraph 100.

120.    Defendant denies the allegations contained in Paragraph 101.

## FOURTH CAUSE OF ACTION
### Negligence, Gross Negligence, and/or Recklessness

121.    Responding to Paragraph 102 of the Complaint, Defendant incorporates by reference all prior responses set forth in Paragraphs 1-101 above, as if they are fully set forth herein.

122.    Defendant denies the allegations contained in Paragraph 103.

123.    Defendant denies the allegations contained in Paragraph 104.

124.     Defendant denies the allegations contained in Paragraph 105.

125.    Paragraphs 106 through 109 do not appear to relate to Defendant and therefore no response is required. To the extent that the allegations in these paragraphs attempt to assert liability on Defendant, Defendant denies the allegations contained in these paragraphs.

126.    Defendant denies the allegations contained in Paragraph 110.

127.    Defendant denies the allegations contained in Paragraph 111.

## FIFTH CAUSE OF ACTION
### Strict Liability – Ultrahazardous Activity
### (Burlington)

128.    Responding to Paragraph 112 of the Complaint, Defendant incorporates by reference all prior responses set forth in Paragraphs 1-111 above, as if they are fully set forth herein.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

129.     Paragraphs 113 through 120 do not appear to relate to Defendant and therefore no response is required. To the extent that the allegations in these paragraphs attempt to assert liability on Defendant, Defendant lacks sufficient knowledge and/or information to form a belief as to the truth of these allegations and therefore denies the allegations contained in these paragraphs.

## SIXTH CAUSE OF ACTION
### Strict Product Liability – Design Defect
### (Burlington)

130.     Responding to Paragraph 121 of the Complaint, Defendant incorporates by reference all prior responses set forth in Paragraphs 1-120 above, as if they are fully set forth herein.

131.     Paragraphs 122 through 132 do not appear to relate to Defendant and therefore no response is required. To the extent that the allegations in these paragraphs attempt to assert liability on Defendant, Defendant denies the allegations contained in these paragraphs.

## SEVENTH CAUSE OF ACTION
### Strict Products Liability – Failure to Warn
### (Burlington)

132.     Responding to Paragraph 133 of the Complaint, Defendant incorporates by reference all prior responses set forth in Paragraphs 1-132 above, as if they are fully set forth herein.

133.     Paragraphs 134 through 141 do not appear to relate to Defendant and therefore no response is required. To the extent that the allegations in these paragraphs attempt to assert liability on Defendant, Defendant denies the allegations contained in these paragraphs.

## EIGTH CAUSE OF ACTION
### Breach of Implied Warranties
### (Burlington)

134.     Responding to Paragraph 142 of the Complaint, Defendant incorporates by reference all prior responses set forth in Paragraphs 1- 133 above, as if they are fully set forth herein.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

135. Paragraphs 135 through 148 do not appear to relate to Defendant and therefore no response is required. To the extent that the allegations in these paragraphs attempt to assert liability on Defendant, Defendant lacks sufficient knowledge and/or information to form a belief as to the truth of these allegations and therefore denies the allegations contained in these paragraphs.

## PRAYER FOR RELIEF

Defendant denies the allegations and requests for relief contained in the unnumbered paragraph beginning with WHEREFORE on page 36 of the Complaint, including all subparts (a through e), and demands strict proof thereof. Defendant denies any liability whatsoever to Plaintiffs in this matter.

## AFFIRMATIVE DEFENSES

1. By asserting the statements and defenses below, Defendant is not implying, alleging, contending, or admitting that it has the burden of proof with respect to any of those statements or defenses. Defendant asserts as follows:

2. **PERSONAL JURISDICTION** - Plaintiffs' claims against Defendant are barred because this Court lacks personal jurisdiction over Defendant.

3. **IMPROPER VENUE** - Venue may be improper in this action. Defendant reserves its rights to move for dismissal and/or transfer of the action based on improper and/or inconvenient venue and/or forum *non convenience* and further reserves its rights to seek application of the law of the appropriate venue on all issues, including but not limited to statute of limitations, statute of repose, and punitive damages.

4. **LACK OF STANDING** – Plaintiff's nuisance claims are barred, in whole or in part, because they lack the legal authority or standing to bring a nuisance claim under South Carolina law.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

5.    **SUBJECT MATTER JURISDICTION** - Plaintiffs' claims are barred to the extent this Court lacks subject matter jurisdiction over this action.

6.    **FAILURE TO STATE A CLAIM -** The Complaint fails to state fails to state facts sufficient to constitute a cause of action against this Defendant; therefore, Plaintiffs' action against this Defendant should be dismissed pursuant to Rule 12(b)(6).

7.    **RULE 9(b) -** Plaintiffs' claims based on fraud and misrepresentation, or any forms of same, fail to set forth allegations against Defendant with specific particularity as required and, therefore, are barred.

8.    **STATUTE OF LIMITATIONS -** The Complaint, in whole or in part, is barred by the applicable statute of limitations and/or repose.

9.    **UNCLEAN HANDS** - The Complaint is barred by laches, waiver, unclean hands, and/or ratification. Further, Plaintiffs have failed to provide Defendant with timely notice of their claims and alleged injuries and damages, resulting in Defendant being substantially prejudiced in it ability to defend itself in this action, for which Plaintiffs' claims are barred.

10.    **RETROACTIVE LIABILITY** - Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seek to impose liability retroactively for conduct that was not actionable at the time it occurred.

11.    **CONFLICTS OF LAW** - Defendant hereby notifies the Court and all parties that, upon discovery and investigation of Plaintiffs' claims, the law of another state may be applicable under the governing conflicts of law.

12.    **CONTRIBUTORY/COMPARATIVE NEGLIGENCE -** Plaintiffs' claims are barred, in whole or in part, by the contributory or comparative negligence of Plaintiff(s); in the alternative, any award to Plaintiffs should be reduced by the percentage of comparative negligence of

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Plaintiff(s).

13.     **DOCTRINE OF MISUSE** - Plaintiffs' claims are barred, in whole or in part, by the doctrines of misuse and/or assumption of the risk and/or misuse.

14.     **NO MANUFACURING** - Defendant specifically denies that it designed, manufactured, fabricated, or assembled any PFAS-containing material or product(s) alleged to be at issue in this case that caused or contributed to Plaintiff's alleged disease.

15.     **DE MINIMIS EXPOSURE** - To the extent Plaintiff was exposed to any PFAS through any act or omission of Defendant or from or by any product allegedly manufactured, distributed, supplied, or sold by Defendant, which is denied, it was de minimis or of such insufficient quantities, at such infrequent intervals, for such short periods of time, or under such conditions, as to amount to no proximate or contributing cause of Plaintiff's alleged injury.

16.     **ACTS OF ANOTHER** - If Plaintiffs suffered damages as alleged in the Complaint, which damages this Defendant specifically denies, such claimed damages did not result, directly or indirectly, from any act or omission of this Defendant, but such damages, if any, resulted from the acts or omissions of persons other than this Defendant, for which acts or omissions this Defendant is in no way liable, and Plaintiffs, therefore, are not entitled to recover from this Defendant.

17.     **SUPERSEDING/INTERVENING CAUSE -** Plaintiffs' claims are barred, in whole or in part, to the extent the alleged injuries and damages were caused by superseding or intervening causes or the conduct of third parties over whom or over which Defendant had no control or authority, or to the extent they were caused by Plaintiffs (or either of them) or any other party or parties in this action. Further, none of the alleged injuries or damages were the proximate result of any negligence/wantonness or other alleged wrongful conduct on the part of Defendant, which alleged negligence/wantonness or other alleged wrongful conduct is denied by Defendant.

18.     **MODIFICATION/ALTERATION** - To the extent that any of the products allegedly used by Plaintiff or to which Plaintiff was allegedly exposed are found to be attributable to Defendant, which Defendant denies, and such products were modified, altered, or in any way varied from when they are alleged to have left Defendant's hands, Plaintiffs' claims against Defendant are barred.

19.     **STATE OF THE ART -** To the extent it may be found that Defendant manufactured, supplied, distributed, or sold any products alleged to be at issue in this action, which is denied, those products, when manufactured and distributed, conformed to the state of the art and were in conformity with the prevailing industry standards at the time, and the then-current medical, scientific, and industrial knowledge, art, and practice was such that Defendant did not know and could not know that any of those products about which Plaintiffs complain presented a foreseeable risk of harm to Plaintiff in the normal and expected use of those products during the relevant time period.

20.     **BENEFICIAL PRODUCT** - If the trier of fact determines that a risk of damages or harm is inherent in any product for which Defendant is found to be liable, which is denied, any risks or danger created by the alleged risk (which is denied) is outweighed by the benefits of the product(s).

21.     **RES JUDICATA** - Plaintiffs' claims are barred, in whole or in part, by the doctrine(s) of collateral estoppel, *res judicata*, release, discharge, and/or accord and satisfaction.

22.     **IMPROPER PARTY** - Defendant is not the proper party and/or the real party in interest in connection with the claims asserted by Plaintiffs.

23.     **IMPROPER JOINDER -** There is a lack of joinder of one or more parties who should or must be joined and, without the joinder of these proper parties, complete relief cannot be accorded among those already attempted to be made parties to this civil action. Further, there is a misjoinder of parties. Therefore, Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' failure to join one or more necessary and indispensable parties.

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

24.     **REGULATORY COMPLIANCE -** If Plaintiff was exposed to any products found to be associated with this Defendant, which is denied, said products at the time they were manufactured were in conformity with all applicable federal and state regulations, standards, specifications, and laws; therefore, Plaintiffs' claims against this Defendant are barred.

25.     **KNOWLEDGE OF RISK** - This Defendant asserts that the state of medical and scientific knowledge and all materials relating thereto at all times material herein were such that this Defendant would not have known, nor could have reasonably known, that products of the type it is alleged to have manufactured, supplied, distributed, or sold—which is denied—presented any risk of harm, which risk of harm is denied, to the Plaintiff if properly used.

26.     **PRIOR NUISANCE DOCTRINE** - Plaintiff's nuisance claims against the Defendants are barred by the doctrine of "coming to the nuisance," the prior nuisance doctrine, and/or the doctrine of consent.

27.     **COMMON LAW** - Plaintiffs' claims are or may be barred, in whole or in part, under applicable common law or statutory doctrines, including but not limited to avoidable consequences, voluntary exposure, assumption of risk, and open and obvious risk.

28.     **LACK OF BREACH** - Plaintiffs' claims are barred, in whole or in part, because Defendant did not breach any duty owed to Plaintiffs or either of them.

29.     **INTERMITTENT/PERIODICAL** - Plaintiff's nuisance claim is barred, in whole or in part, because the alleged contamination of a public body of water was not so intermittent or periodical as described to be considered continuing.

30.     **UNIFORM COMMERCIAL CODE -** Defendant denies that there existed any warranties, express or implied, between it and Plaintiff. Even if such warranties existed, which is denied, Plaintiff's claims for breach of warranty are barred by Plaintiff's failure to comply with the

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

notice provisions required by South Carolina law and Article 2 of the Uniform Commercial Code, because there is no privity of contract between Plaintiff(s) and Defendant, and because Defendant effectively disclaimed any warranties.

31.     **STRICT LIABILITY -** Defendant cannot be liable to Plaintiff under the doctrine of strict liability to the extent Plaintiff was not exposed to or injured by a product sold as new property after the effective date of the statute.

32.     **PRE-EXISTING -** Plaintiffs' claims are barred, in whole or in part, to the extent the alleged injuries and damages are the sole, direct, and proximate result of pre-existing conditions or idiosyncratic reactions of Plaintiff, for which Defendant is not liable.

33.     **FEDERAL PREEMPTION -** Plaintiff's claims may be barred, in whole or in part, under the doctrine of Federal Preemption, including, without limitation, express preemption, implied conflict preemption, and field preemption, pursuant to any applicable statutes, regulations, guidance documents, notices, military specification, and policy statements, enacted and/or promulgated and/or issues by Congress, federal agencies, or the executive branch.

34.     **CONCERT OF ACTION -** There has been no concert of action between Defendant and any of the other named Defendants. The Defendants are not joint tortfeasors and, therefore, Defendant may not be held jointly and severally liable with the other named Defendants.

35.     **FAILURE TO MITIGATE -** Plaintiffs' alleged injuries and damages, if proven, are barred, in whole or in part, to the extent Plaintiff(s) failed to use reasonable diligence to mitigate them.

36.     **DEGREEES OF FAULT -** If the factfinder determines that Plaintiffs are entitled to recover damages, the amount of damages must be apportioned according to the respective degrees of fault and legal responsibility of all parties and non-parties in this action according to proof presented at trial. Further, Defendant requests a judgment and declaration of indemnification and contribution

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

against all other parties or persons in accordance with the apportionment of fault between the parties and non-parties.

37.     **JUDGEMENT REDUCTION -** In the event Plaintiffs recover a verdict or judgment against Defendant, said verdict or judgment must be reduced by those amounts that have been, or will, with reasonable certainty, replace or indemnify Plaintiffs, in whole or in part, for any past or future claimed economic source such as insurance, social security, workers' compensation, or employee benefits programs.

38.     **ATTORNEY'S FEES -** Any request by Plaintiffs for legal fees and/or expenses is barred, in whole or in part, to the extent not expressly authorized by the law of South Carolina or other applicable law.

39.     **SPECULATIVE DAMAGES -** Plaintiffs' claims are barred, in whole or in part, to the extent the damages sought have not accrued and are contingent or are merely speculative and/or uncertain.

40.     **INSUFFICIENT FACTS -** Plaintiffs' Complaint fails to state facts sufficient to warrant an award of punitive damages.

41.     **ACCORD & SATISFACTION -** To the extent that Plaintiffs have, or either of them has, has received payment from any alleged joint tortfeasor in full satisfaction of any of the alleged injuries and/or claims against this Defendant and/or other alleged joint tortfeasors, Plaintiffs' Complaint in each and every count and cause of action alleged therein is barred by the defenses of payment and accord and satisfaction.

42.     **SET-OFF -** If the Plaintiffs have, or either of them has, settled or should hereafter settle with any party or non-party with respect to any of the allegations in the Complaint or for any of the injuries or damages alleged in this action, Ascend is entitled to a credit, reduction, or set-off in the

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

amount of said settlement(s).

43.    **STANDARDS OF LIMITATIONS -** To the extent Plaintiffs' Complaint asserts a demand for punitive damages, this Defendant specifically incorporates by reference any and all standards of limitations regarding the determination and/or enforceability of punitive damage awards that arose in the decisions of *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424 (2001); and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003).

44.    **PUNITITVE DAMAGES -** To the extent Plaintiffs' Complaint seeks punitive damages, this Defendant affirmatively pleads the following in regard to punitive damages:

(a) An award of punitive damages in this civil action would amount to a deprivation of property without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the South Carolina Constitution;

(b) An award of punitive damages in this civil action would violate the due process provisions of the Fifth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the South Carolina Constitution;

(c) The criteria used for determining whether and in what amount punitive damages may be awarded are impermissible, vague, imprecise, and inconsistent and, therefore, violate the due process provisions of the Fifth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the South Carolina Constitution;

(d) An award of punitive damages in this civil action would amount to an excessive fine in violation of the Eighth Amendment to the United States Constitution and the corresponding provisions of the South Carolina Constitution; and

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(e) Plaintiffs' claim for punitive damages is barred by the "double jeopardy" clause of the Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment.

45.     **BIFURACATION** - Pursuant to S.C. Code Ann. § 15-32-520, Defendant hereby requests trial bifurcation on the issues of actual damages and punitive damages. To the extent the Court submits the question of punitive damages to the jury, the award of punitive damages, if any, is subject to the caps and limitations set forth in S.C. Code Ann. § 15-32-530, and Defendant pleads and incorporates all defenses, limitations on damages, and other privileges contained in S.C. Code Ann. §§ 15-32-520 and 15-32-530 as if fully stated herein verbatim.

46.     **BANKRUPT DEFENDANTS** - Some or all of Plaintiffs' claims or causes of action may not be maintained to the extent that discharge in bankruptcy requires Defendant to defend this action without joining indispensable parties who have declared bankruptcy as co-defendants and prevents the triers of fact from being able to hear and judge all relevant evidence. Defendant further reserves the right to seek contribution and/or indemnity from those parties not joined in this action as a result of bankruptcy.

47.     **POST SALE DUTY** - This Defendant denies that it has any post-sale duty to warn and asserts that South Carolina has affirmatively established that it does not recognize a post-sale duty to warn.

48.     **SECTION 15-73-10 et seq.** - The alleged injuries and damages to Plaintiffs are barred by Section 15-73-10 et seq. of the South Carolina Code of Laws; therefore, Plaintiffs are prohibited by law from asserting or recovering under a cause of action based on strict liability for actual or punitive damages.

49.     **FREE PUBLIC SERVICES DOCTRINE -** Plaintiff's claims are barred, in whole

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

or in part, by the free public services doctrine and by the municipal cost recovery doctrine.

50.     **EQUAL PROTECTION -** Plaintiff's claims fail as a matter of substantive law and violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the South Carolina Constitution to the extent that by relying on market share or other aggregate proof of causation or liability, Plaintiff seeks to deprive Burlington of procedural and substantive safeguards including, but not limited to, statutory and common law defenses to liability and causation generally.

51.     **OTHER AFFIRMATIVE DEFENSES** - This Defendant adopts and incorporates by reference herein, as if fully set forth, all defenses, both affirmative and otherwise, raised, pleaded, or asserted by other Defendants but only to the extent applicable to Defendant sued by Plaintiffs as a premises defendant and only to the extent not inconsistent with the other responses and affirmative defenses asserted herein by this Defendant.

52.     **RESERVATION OF RIGHTS** - Defendant's first notice of the claims set forth in Plaintiffs' Complaint against it was service of said Complaint upon it, and accordingly, Defendant reserves the right to amend its Answer, if same becomes appropriate, after full investigation and discovery. Defendant further gives notice herein that it will rely on all defenses lawfully available to it at the time of trial and intends to rely upon any other defenses that may become available to apparent during the discovery proceedings in this action, and hereby reserves its right to supplement or amend its standard set of affirmative defenses and to assert any such defenses, and/or supplement, alter, or change the affirmative defenses asserted herein upon ascertaining additional or different facts during and upon completion of discovery and investigation.

## RESERVATION OF CROSS-CLAIMS

All Cross-Claims for contribution and for indemnity by this Defendant against all Co-Defendants and Third-Party Defendants are hereby reserved and implied.

## JURY DEMAND

This Defendant requests trial by jury on all issues so triable.

**WHEREFORE**, this Defendant prays the Court for the following relief:

1.    That the Complaint be dismissed with prejudice as to this Defendant;

2.    That all Cross-Claims against this Defendant be dismissed with prejudice;

3.    That the Plaintiffs and other Defendants and/or Third-Party Defendants have and recover nothing from this Defendant;

4.    That the costs of this action be taxed against the Plaintiffs and/or other Defendants and/or Third-Party Defendants;

5.    That any judgment against this Defendant be reduced by any amount that any employer of Plaintiff, their successors or assigns, would be entitled to receive therefrom by way of subrogation;

6.    That there be a trial by jury on all issues of fact; and

7.    For such other and further relief as the Court deems just and proper.

Respectfully submitted,

 /s/ Yancey A. McLeod III
Yancey A. McLeod, III (S.C. Bar No. 80911)
Joshua M. W. Salley (S.C. Bar No. 104243)
Maron Marvel Bradley Anderson & Tardy LLC
259 Seven Farms Drive Suite 300

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Charleston, SC 29402
ymcleod@maronmarvel.com
Jsalley@maronmarvel.com

*Attorneys for J.P. Stevens & Company, Inc.*

July 24, 2025
Charleston, SC

ELECTRONICALLY FILED - 2025 Aug 01 3:05 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Aug 05 8:18 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS

FOR THE FIFTEENTH
JUDICIAL CIRCUIT

In Re:
PFAS Litigation Coordinated Docket

Grand Strand Water and Sewer Authority,

*Plaintiff,*

v.

ACG Chemicals Americas, Inc., et al.

*Defendants.*

C.A. No. 2024-CP-26-05523

**ACCEPTANCE OF SERVICE
ON BEHALF OF
DELTA MILLS, INC.**

Pursuant to Rule 4(j), SCRCP, I hereby accept and acknowledge service and my receipt via email of the Third Amended Summons and Third Amended Complaint in the above captioned matter on behalf of Defendant Delta Mills, Inc. ("Delta Mills"), effective this 3rd day of August, 2025, with no further service on Delta Mills being necessary.

s/ Peter D. Protopapas
Peter D. Protopapas

ELECTRONICALLY FILED - 2025 Aug 05 8:18 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

In Re:
PFAS Litigation Coordinated Docket

Grand Strand Water and Sewer Authority,

*Plaintiff,*

v.

ACG Chemicals Americas, Inc., et al.

*Defendants.*

IN THE COURT OF COMMON PLEAS

FOR THE FIFTEENTH
JUDICIAL CIRCUIT

C.A. No. 2024-CP-26-05523

**ACCEPTANCE OF SERVICE
ON BEHALF OF
J.P. STEVENS & COMPANY, INC.**

Pursuant to Rule 4(j), SCRCP, I hereby accept and acknowledge service and my receipt via email of the Third Amended Summons and Third Amended Complaint in the above captioned matter on behalf of Defendant J.P. Stevens & Company, Inc. ("J.P. Stevens"), effective this 3rd day of August, 2025, with no further service on J.P. Stevens being necessary.

s/ Peter D. Protopapas
Peter D. Protopapas, Receiver

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc., *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

FIFTEENTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-26-05523

**PROOF OF SERVICE**

Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff") served Plaintiff's Third Amended Summons and Third Amended Complaint on Defendant AGC Chemicals Americas, Inc. ("AGC Chemicals") via certified mail, restricted delivery, mailed on July 30, 2025, from Spartanburg, SC to AGC Chemicals' registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was August 4, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street

Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**DER: COMPLETE THIS SECTION**

Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

AGC Chemicals Americas, Inc.
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia. SC 29223

9590 9402 9285 4295 4908 74

9589 0710 5270 2830 3166 17

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature Pam Johnson

X    *Pam Johnson*
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
   Delivery
☐ Collect on Delivery
   Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF HORRY | FIFTEENTH JUDICIAL CIRCUIT |

IN RE:

PFAS LITIGATION COORDINATED DOCKET

---

Grand Strand Water and Sewer Authority,

C.A. No. 2024-CP-26-05523

*Plaintiff*,

**PROOF OF SERVICE**

v.

AGC Chemicals Americas, Inc., *et al.*,

*Defendants*.

Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff") served Plaintiff's Third Amended Summons and Third Amended Complaint on Defendant Archroma US, Inc. ("Archroma") via certified mail, restricted delivery, mailed on July 30, 2025, from Spartanburg, SC to Archroma's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was August 4, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street

Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Archroma US, Inc.
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9285 4295 4908 67

2. Article Number (Transfer from service label)

9589 0710 5270 2830 3166 24

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  *Pam Johnson*

☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053       Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

IN THE COURT OF COMMON PLEAS

FIFTEENTH JUDICIAL CIRCUIT

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc., *et al.*,

*Defendants*.

C.A. No. 2024-CP-26-05523

**PROOF OF SERVICE**

Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff") served Plaintiff's Third Amended Summons and Third Amended Complaint on Defendant The Chemours Company ("Chemours") via certified mail, restricted delivery, mailed on July 30, 2025, from Spartanburg, SC to Chemours' registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was August 4, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street

Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Chemours Company
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9285 4295 4902 87

2. Article Number *(Transfer from service label)*

9589 0710 5270 2830 3192 67

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

Pam Johnson

X

☐ Agent
☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery

8/4/25

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☒ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ___ ail
☐ ___ ail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☒ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF HORRY | FIFTEENTH JUDICIAL CIRCUIT |

IN RE:

PFAS LITIGATION COORDINATED DOCKET

---

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc., *et al.*,

*Defendants*.

C.A. No. 2024-CP-26-05523

**PROOF OF SERVICE**

Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff") served Plaintiff's Third Amended Summons and Third Amended Complaint on Defendant EIDP, Inc. ("EIDP") via certified mail, restricted delivery, mailed on July 30, 2025, from Spartanburg, SC to EIDP's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was August 4, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988

jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

EIDP, Inc.
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9285 4295 4908 05

2. Article Number (Transfer from service label)

9589 0710 5270 2830 3166 86

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X    Pam Johnson          ☐ Agent
                          ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery
   Pam Johnson                     8/4/25

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☑ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☑ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

IN THE COURT OF COMMON PLEAS

FIFTEENTH JUDICIAL CIRCUIT

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc., *et al.*,

*Defendants*.

C.A. No. 2024-CP-26-05523

**PROOF OF SERVICE**

Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff") served Plaintiff's Third Amended Summons and Third Amended Complaint on Defendant International Paper Company ("International Paper") via certified mail, restricted delivery, mailed on July 30, 2025, from Spartanburg, SC to International Paper's registered agent, CT Corporation System, 2 Office Park Court, Ste. 103, Columbia, SC 29223. The date of delivery was August 4, 2025, as shown on the attached signed USPS Return Receipt Card.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 11, 2025

ELECTRONICALLY FILED - 2025 Aug 11 11:00 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

International Paper Company
c/o Registered Agent,
CT Corporation System
2 Office Park Court, Ste. 103
Columbia, SC 29223

9590 9402 9285 4295 4903 24

2. Article Number (Transfer from service label)

9589 0710 5270 2830 3167 09

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature Johnson

X    _Pam Johnson_          □ Agent
                            □ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?   □ Yes
   If YES, enter delivery address below:        □ No

3. Service Type
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
☒ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
□ ___ il
□ ___ il Restricted Delivery
  (over $500)

□ Priority Mail Express®
□ Registered Mail™
□ Registered Mail Restricted Delivery
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery

Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc., *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

FIFTEENTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-26-05523

**PROOF OF SERVICE**

Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff") served Plaintiff's Third Amended Summons and Third Amended Complaint on Defendant Arkema, Inc. ("Arkema") via certified mail, restricted delivery, mailed on July 30, 2025, from Spartanburg, SC to Arkema's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was August 4, 2025, as shown on the attached signed USPS Return Receipt Card and USPS Tracking Results.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street

Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 12, 2025

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Arkema, Inc.
c/o/ Registered Agent,
Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 9285 4295 4908 50

2. Article Number (Transfer from service label)

9589 0710 5270 2830 3166 31

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  *Daniele Kriz*
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

Daniele Kriz

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ___ Mail
☐ ___ ail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

USPS Tracking®

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FAQs >

Remove ✕

Tracking Number:

9589071052702830316631

Copy    Add to Informed Delivery (https://informeddelivery.usps.com/)

Latest Update

Your item was delivered to an individual at the address at 3:27 pm on August 4, 2025 in WEST COLUMBIA, SC 29169.

Get More Out of USPS Tracking:

USPS Tracking Plus®

Delivered
Delivered, Left with Individual
WEST COLUMBIA, SC 29169
August 4, 2025, 3:27 pm

See All Tracking History

What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)

Text & Email Updates ⌄

USPS Tracking Plus® ⌄

Product Information ⌄

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

Feedback

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc., *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

FIFTEENTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-26-05523

**PROOF OF SERVICE**

Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff") served Plaintiff's Third Amended Summons and Third Amended Complaint on Defendant Clariant Corporation ("Clariant") via certified mail, restricted delivery, mailed on July 30, 2025, from Spartanburg, SC to Clariant's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was August 4, 2025, as shown on the attached signed USPS Return Receipt Card and USPS Tracking Results.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street

Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 12, 2025

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Clariant Corporation
c/o Registered Agent,
Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 9285 4295 4908 43

2. Article Number (Transfer from service label)

9589 0710 5270 2830 3166 48

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)   Daniele Kriz
C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

Daniele Kriz

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Mail Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt

# USPS Tracking®

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

FAQs ›

Remove ✕

Tracking Number:

## 9589071052702830316648

Copy     Add to Informed Delivery (https://informeddelivery.usps.com/)

Latest Update

Your item was delivered to an individual at the address at 3:27 pm on August 4, 2025 in WEST COLUMBIA, SC 29169.

**Get More Out of USPS Tracking:**

**USPS Tracking Plus®**

Delivered
Delivered, Left with Individual
WEST COLUMBIA, SC 29169
August 4, 2025, 3:27 pm

**See All Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

| | |
|---|---|
| **Text & Email Updates** | ⌄ |
| **USPS Tracking Plus®** | ⌄ |
| **Product Information** | ⌄ |

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

## Need More Help?

Contact USPS Tracking support for further assistance.

**FAQs**

Feedback

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc., *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

FIFTEENTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-26-05523

**PROOF OF SERVICE**

Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff") served Plaintiff's Third Amended Summons and Third Amended Complaint on Defendant Solvay Specialty Polymers USA, LLC ("Solvay Specialty") via certified mail, restricted delivery, mailed on July 30, 2025, from Spartanburg, SC to Solvay Specialty's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was August 4, 2025, as shown on the attached signed USPS Return Receipt Card and USPS Tracking Results.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street

Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 12, 2025

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE #2024CP2605523

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Solvay Specialty Polymers USA, LLC
c/o Registered Agent,
Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

|||||||||||||||||||||||||||||||||||
9590 9402 9285 4295 4902 94

2. Article Number *(Transfer from service label)*

9589 0710 5270 3193 6964 77

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X *Daniele Kriz*    ☐ Agent  ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

*Daniele Kriz*

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ...ail
☐ ...ail Restricted Delivery
(over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053       Domestic Return Receipt

# USPS Tracking®

Remove ✕

Tracking Number:

95890710527031 93696477

Copy          Add to Informed Delivery (https://informeddelivery.usps.com/)

Latest Update

Your item was delivered to an individual at the address at 3:27 pm on August 4, 2025 in WEST COLUMBIA, SC 29169.

**Get More Out of USPS Tracking:**

**USPS Tracking Plus®**

Delivered

Delivered, Left with Individual
WEST COLUMBIA, SC 29169
August 4, 2025, 3:27 pm

**See All Tracking History**

**What Do USPS Tracking Statuses Mean?** **(https://faq.usps.com/s/article/Where-is-my-package)**

**Text & Email Updates**                                                        ⌄

**USPS Tracking Plus®**                                                          ⌄

**Product Information**                                                          ⌄

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

## Need More Help?

Contact USPS Tracking support for further assistance.

**FAQs**

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Feedback

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA

COUNTY OF HORRY

IN RE:

PFAS LITIGATION COORDINATED DOCKET

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

AGC Chemicals Americas, Inc., *et al.*,

*Defendants*.

IN THE COURT OF COMMON PLEAS

FIFTEENTH JUDICIAL CIRCUIT

C.A. No. 2024-CP-26-05523

**PROOF OF SERVICE**

Plaintiff Grand Strand Water and Sewer Authority ("Plaintiff") served Plaintiff's Third Amended Summons and Third Amended Complaint on Defendant Westrock CP, LLC ("Westrock") via certified mail, restricted delivery, mailed on July 30, 2025, from Spartanburg, SC to Westrock's registered agent, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. The date of delivery was August 4, 2025, as shown on the attached signed USPS Return Receipt Card and USPS Tracking Results.

*/s/ John B. White, Jr.*
John B. White, Jr. (SC Bar No. 05996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
JOHN B. WHITE, JR., PA
PO Box 2465 (29304)
291 S. Pine Street

Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

Spartanburg, SC
August 12, 2025

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Westrock CP, LLC
c/o Registered Agent,
Corporation Service Company
508 Meeting Street
West Columbia, SC 29169

9590 9402 9285 4295 4902 70

2. Article Number *(Transfer from service label)*

9589 0710 5270 2830 3192 74

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*        C. Date of Delivery

Daniela Kriz
4 0 AUG 2025

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☒ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ... Mail
☐ ... il Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☒ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053        Domestic Return Receipt

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

# USPS Tracking®

Tracking Number:                                                                Remove ✕

9589071052702830319274

Copy          Add to Informed Delivery (https://informeddelivery.usps.com/)

Latest Update

Your item was delivered to an individual at the address at 3:27 pm on August 4, 2025 in WEST COLUMBIA, SC 29169.

**Get More Out of USPS Tracking:**

**USPS Tracking Plus®**

Delivered

Delivered, Left with Individual
WEST COLUMBIA, SC 29169
August 4, 2025, 3:27 pm

**See All Tracking History**

**What Do USPS Tracking Statuses Mean?** **(https://faq.usps.com/s/article/Where-is-my-package)**

**Text & Email Updates**                                                            ⌄

**USPS Tracking Plus®**                                                              ⌄

**Product Information**                                                              ⌄

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

# Need More Help?

Contact USPS Tracking support for further assistance.

**FAQs**

ELECTRONICALLY FILED - 2025 Aug 12 10:28 AM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Feedback

ELECTRONICALLY FILED - 2025 Feb 03 3:07 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FOR THE FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

Grand Strand Water and Sewer Authority,

*Plaintiff*,

v.

Aladdin Manufacturing Corporation, et al.,

*Defendants*.

C.A. No. 2024-CP-26-05523

**ORDER APPOINTING A RECEIVER OVER DEFENDANT DELTA MILLS, INC.**

This matter came before the Court on Plaintiff Grand Strand Water and Sewer Authority's ("Plaintiff" or "GSWSA") Motion for the Appointment of a Receiver over Defendant Delta Mills, Inc. pursuant to section 15-65-10(4) of the South Carolina Code. This Court—which has exclusive jurisdiction to hear and dispose of all Local PFAS Litigation cases and all pretrial matters arising therefrom[1]—finds that the application is meritorious under the applicable statute because Defendant Delta Mills, Inc. is a dissolved Delaware corporation that has forfeited its corporate rights. Further, Plaintiff has properly served Delta Mills, Inc. with the Second Amended Summons and Complaint, but Delta Mills, Inc. has failed to answer and is in default. Plaintiff likewise has provided sufficient notice to Defendant Delta Mills, Inc. by serving the Motion for the Appointment of a Receiver on the South Carolina Secretary of State. Therefore, the Court finds that Plaintiff's Motion is appropriate and will be GRANTED.

---

[1] *RE: Local PFAS Litigation*, S.C. Sup. Ct. Order dated Oct. 7, 2024.

ELECTRONICALLY FILED - 2025 Feb 03 3:07 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

This Court hereby appoints Peter D. Protopapas as Receiver over Defendant Delta Mills, Inc. pursuant to section 15-65-10(4) of the South Carolina Code. The Receiver's appointment, including all of his duties and protections, extends to Delta Mills, Inc., as well as its affiliated entities and all of their past, present, and future predecessors, successors, affiliates, parents, subsidiaries, and assigns that may be discovered in the future (collectively, "Delta Mills").

The Receiver has the power and authority to fully administer all assets of Delta Mills, accept service on behalf of Delta Mills, engage counsel on behalf of Delta Mills, and take any and all steps necessary to protect the interests of Delta Mills, whatever they may be. This Order is inclusive of, but is not limited to, the Receiver's right and obligation to administer any insurance assets of Delta Mills, as well as any claims related to the actions and/or omissions of Delta Mills' insurance carriers.

In addition to the powers of the Receiver set forth herein, the Receiver shall have the following rights, authority, and powers with respect to Delta Mills' property: (1) to collect all accounts receivable and all rents due from any tenant; (2) to change locks to all premises where any property is situated; (3) to open any mail addressed to Delta Mills or any business it owned and to redirect the delivery of any such mail to the Receiver; (4) to endorse and cash all checks and negotiable instruments payable to Delta Mills, except paychecks for current wages; (5) to hire a real estate broker to sell any real property and interest belonging to Delta Mills; (6) to hire any person or company to move and store any property of Delta Mills; (7) to insure any property belonging to Delta Mills (but not the obligation); (8) to obtain financial records of or pertaining to Delta Mills from any financial institution, bank, credit union, savings and loan or title company, credit bureau, or any other third party; (9) to obtain copies of any lease, lease application, credit application, payment history, or rent payments of or pertaining to Delta Mills from any landlord,

2

building owner, or building manager where Delta Mills or any business it owned was a tenant; (10) to hire any person or entity necessary to accomplish any right, authority, or power under this Order; (11) to take all action necessary to gain access to all storage facilities, safety deposit boxes, real property, and leased premises wherein any property of Delta Mills may be situated; and (12) to obtain and review copies of all documents related to Delta Mills or any business it owned.

Additionally, the Court expects the Receiver to investigate the existence of all insurance coverage potentially available to Delta Mills. This includes providing potential insurers with information to facilitate the insurers' search for coverage, including coverage provided to the receivership company and coverage provided to the receivership company as an additional insured under coverage written to another entity. The Court expects all insurers to cooperate with the Receiver's investigation, conduct thorough and diligent searches for potential insurance coverage, and deliver any and all policy documents or other evidence of coverage to the Receiver.

The Court further orders that, as the Court appointing the Receiver, neither the Receiver nor Delta Mills may be sued outside this Court without obtaining the Receiver's consent or an order of this Court prior to doing so.

ELECTRONICALLY FILED - 2025 Feb 03 3:07 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



Horry Common Pleas

**Case Caption:**     Grand Strand Water And Sewer Authority VS Aladdin Manufacturing
                     Corporation , defendant, et al
**Case Number:**     2024CP2605523

**Type:**            Order/Appointment of Receiver


IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760


Electronically signed on 2025-02-03 09:05:39     page 4 of 4

ELECTRONICALLY FILED - 2025 Feb 03 3:07 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Feb 03 3:11 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FOR THE FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

Grand Strand Water and Sewer Authority,

*Plaintiff,*

v.

Aladdin Manufacturing Corporation, et al.,

*Defendants.*

C.A. No. 2024-CP-26-05523

**ORDER APPOINTING A RECEIVER OVER DEFENDANT J.P. STEVENS & COMPANY, INC.**

This matter came before the Court on Plaintiff Grand Strand Water and Sewer Authority's ("Plaintiff" or "GSWSA") Motion for the Appointment of a Receiver over Defendant J.P. Stevens & Company, Inc. pursuant to section 15-65-10(4) of the South Carolina Code. This Court—which has exclusive jurisdiction to hear and dispose of all Local PFAS Litigation cases and all pretrial matters arising therefrom[1]—finds that the application is meritorious under the applicable statute because Defendant J.P. Stevens & Company, Inc. is a dissolved Delaware corporation that has forfeited its corporate rights. Further, Plaintiff has properly served J.P. Stevens & Company, Inc. with the Second Amended Summons and Complaint, but J.P. Stevens & Company, Inc. has failed to answer and is in default. Plaintiff likewise has provided sufficient notice to Defendant J.P. Stevens & Company, Inc. by serving the Motion for the Appointment of a Receiver on the South Carolina Secretary of State. Therefore, the Court finds that Plaintiff's Motion is appropriate and will be GRANTED.

---

[1] *RE: Local PFAS Litigation*, S.C. Sup. Ct. Order dated Oct. 7, 2024.

ELECTRONICALLY FILED - 2025 Feb 03 3:11 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

This Court hereby appoints Peter D. Protopapas as Receiver over Defendant J.P. Stevens & Company, Inc. pursuant to section 15-65-10(4) of the South Carolina Code. The Receiver's appointment, including all of his duties and protections, extends to J.P. Stevens & Company, Inc., as well as its affiliated entities and all of their past, present, and future predecessors, successors, affiliates, parents, subsidiaries, and assigns that may be discovered in the future (collectively, "JPS").

The Receiver has the power and authority to fully administer all assets of JPS, accept service on behalf of JPS, engage counsel on behalf of JPS, and take any and all steps necessary to protect the interests of JPS, whatever they may be. This Order is inclusive of, but is not limited to, the Receiver's right and obligation to administer any insurance assets of JPS, as well as any claims related to the actions and/or omissions of JPS' insurance carriers.

In addition to the powers of the Receiver set forth herein, the Receiver shall have the following rights, authority, and powers with respect to JPS' property: (1) to collect all accounts receivable and all rents due from any tenant; (2) to change locks to all premises where any property is situated; (3) to open any mail addressed to JPS or any business it owned and to redirect the delivery of any such mail to the Receiver; (4) to endorse and cash all checks and negotiable instruments payable to JPS, except paychecks for current wages; (5) to hire a real estate broker to sell any real property and interest belonging to JPS; (6) to hire any person or company to move and store any property of JPS; (7) to insure any property belonging to JPS (but not the obligation); (8) to obtain financial records of or pertaining to JPS from any financial institution, bank, credit union, savings and loan or title company, credit bureau, or any other third party; (9) to obtain copies of any lease, lease application, credit application, payment history, or rent payments of or pertaining to JPS from any landlord, building owner, or building manager where JPS or any

2

ELECTRONICALLY FILED - 2025 Feb 03 3:11 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

business it owned was a tenant; (10) to hire any person or entity necessary to accomplish any right, authority, or power under this Order; (11) to take all action necessary to gain access to all storage facilities, safety deposit boxes, real property, and leased premises wherein any property of JPS may be situated; and (12) to obtain and review copies of all documents related to JPS or any business it owned.

Additionally, the Court expects the Receiver to investigate the existence of all insurance coverage potentially available to JPS. This includes providing potential insurers with information to facilitate the insurers' search for coverage, including coverage provided to the receivership company and coverage provided to the receivership company as an additional insured under coverage written to another entity. The Court expects all insurers to cooperate with the Receiver's investigation, conduct thorough and diligent searches for potential insurance coverage, and deliver any and all policy documents or other evidence of coverage to the Receiver.

The Court further orders that, as the Court appointing the Receiver, neither the Receiver nor JPS may be sued outside this Court without obtaining the Receiver's consent or an order of this Court prior to doing so.

ELECTRONICALLY FILED - 2025 Feb 03 3:11 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523



Horry Common Pleas

**Case Caption:**     Grand Strand Water And Sewer Authority VS Aladdin Manufacturing
                      Corporation , defendant, et al
**Case Number:**      2024CP2605523

**Type:**             Order/Appointment of Receiver


IT IS SO ORDERED.

S/GRACE GILCHRIST KNIE - 2760


Electronically signed on 2025-02-03 14:20:57     page 4 of 4